IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| ORLY GENGER, | § | CASE NO. 19-10926-TMD |
| | § | |
| | § | |
| Debtor. | § | |

**JOINDER OF DALIA GENGER TO JUDGMENT CREDITOR SAGI GENGER'S MOTION TO DISMISS BANKRUPTCY CASE OR, ALTERNATIVELY, TO TRANSFER VENUE, AND MEMORANDUM OF LAW IN SUPPORT [Dkt. No. 32]**

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE

Dalia Genger, a creditor and party in interest of the Debtor ("Orly" or the "Debtor") in the above-captioned Chapter 7 case ("Bankruptcy Case"), and, pursuant to 11 U.S.C. §§ 305(a) and 707, and Rules 1014 and 1017 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), files this Joinder ("Joinder") to the *Motion to Dismiss this Chapter 7 Bankruptcy Case or, Alternatively, to Transfer Venue, and Memorandum of Law in Support* [Dkt. No. 32] (the "Motion to Dismiss") filed by Sagi Genger ("Sagi"), and in support would respectfully show the Court as follows:

I.
PRELIMINARY STATEMENT AND SUMMARY

A. **Dalia's and D&K Joinder in the Motion to Dismiss**

1. Dalia and D&K join in the Motion's request that this Court dismiss this Bankruptcy Case for cause, or alternatively, to transfer venue to the Southern District of New York. This joinder is for all purposes of standing, appearance and participation at all hearings or proceedings dealing with the Motion to Dismiss.

Page 1

**B.      Proceeding is Not a Waiver of Dalia's Rights to Obtain Needed Discovery but Expressly Subject Thereto**

2.      This Joinder is without waiver of, and subject to the express reservation of the right to amend and supplement this Joinder based upon the Trustee, the Debtor and her insiders joint objections to allowing Dalia or D&K have access to documents designed by one or more of them as "confidential" in the pending Turnover Motion and litigation pending in the District Court for the Southern District of New York ("SDNY"), that seeks the recovery of $32.3 million plus interest in fraudulently transferred assets against five non-debtor-insiders to this Debtor. [See, Response to Trustee's Motion to Quash Subpoena (Dkt No.123)].

**C.      Incorporation of Dalia's Omnibus Statement of Background Facts and Dalia's Objection to the Rule 9019 Motion to Approve Settlement and Objection to Discharge of the Debtor**

3.      Dalia and D&K incorporate herein by reference the Omnibus Statement of Background Facts filed by Dalia [Dkt. No. 112] as if fully set out herein *verbatim*. Additionally, Dalia incorporates herein the Objection to the Trustee's Rule 9019 Motion to Approve Settlement and Dalia's Objection to the Debtor's Discharge [Dkt. No. 99].

**D.      This Chapter 7 Bankruptcy Case Has Been Filed, and is Being Prosecuted in Bad Faith**

4.      The SDNY case has involved two years of work and supervision of factual and discovery disputes by the District Court, culminating in the District Court's order requiring the Debtor and these insiders to respond to Sagi's damming list of evidence and law establishing the fraudulent transfers. It was precisely to avoid this impending ruling by the District Court that the Debtor filed this Chapter 7 bankruptcy case. This Court is being asked to enter orders dealing with or Settling and resolving the pending Turnover Motion District Court case now pending in the SDNY before Hon. Judge Forrest, and to do so over the objections of Dalia and without Dalia's

access to documents these insiders unilaterally designated as "Confidential" and refused to allow Dalia access, even conditioned on Dalia's counsel's agreement to execute a copy of the Confidentiality Agreement and order and abide by its terms.

5. This case involves only Insiders – and only family members or their lawyers. There is but one undisputed unsecured creditor for $750.00. This case is forum shopping to get out of the Courts of New York, to hijack a Chapter 7 Trustee's jurisdiction with promises of a million dollars, in order to obtain the Trustee's approval of a settlement that favors only the four (4) insiders to this Debtor by giving these target defendant-Insiders 97% (or $31 million) of the assets fraudulently transferred, along with a release of each of them and their attorneys and depriving Dalia and Sagi Genger (the only other significant creditors) of access to the only known *"res"* (the fraudulent transfer cash and Promissory Notes) which was owned by Dalia and transferred to the Debtor only on a promise of support.

6. This proposed "Settlement" agreed to by the Chapter 7 Trustee, the Debtor, and her various cohorts (all "Insiders") would purge the fraud by delivery of clean title *and a release* to these non-debtor fraud-actors to the $31 million of the fraudulently transferred cash[1] and promissory notes, yet not even end the family litigation that has plagued the family for over a decade. Rather, it would unfairly *continue* that litigation, only shift it to claims against Dalia and Sagi, the parties that are most injured by the Settlement. The proposed Settlement requires the Chapter 7 Trustee to "take all necessary steps to remove and transfer" multiple litigation cases pending in New York state courts, including the Chapter 7 Trustee's incredibly perplexing agreement to attempt to remove, sever and transfer a previously dismissed action against Dalia.

---

[1] The proposed settlement does not result in the $1 million being paid to the estate – but only $250,000.00 paid with the balance due some day in the future on conditions that the Trustee has no control.

In fact, the Trustee has already appeared for Orly in that New York state court case brought by Orly seeking to have Dalia's judgment of no-liability reconsidered. The Trustee is already implementing his agreements under the proposed Settlement although the New York State Court promptly denied the Chapter 7 Trustee's relief[2].

7. Prior to entering into this proposed Settlement, the Trustee never spoke to Dalia or her counsel. However, when the Trustee filed his Motion to have the Settlement Agreement he told this Court that he had consulted with all constituents before reaching the settlement. That is simply not true. And, when Dalia's counsel contacted the Trustee seeking disclosure of documents directly related to this settlement, the Trustee refused and filed a Motion to Quash the Dalia subpoena.

8. The Chapter 7 Trustee has gone even farther and obligated himself to attempt to stay additional litigation that runs entirely among non-debtor parties. Such an agreement is wholly improper and fundamentally flawed in the face of well-established law, including but not limited to broad and compelling doctrines of abstention, and proves that the Bankruptcy Case is intended for improper purposes.

9. Central to the proposed Settlement Agreement is the disposition of claims of the estate to the twin $7.5 million promissory under which about $12 million is expected to be paid.[3]

---

[2] Through the Debtors' insider law firm (and without a prior application disclosing the engagement or proposed settlement to this Court), the chapter 7 trustee intervened to argue that a claim asserted by the Debtor in her capacity as the beneficiary of the Trust, should be revived and severed under the chapter 7 trustee's authority, so that it could be transferred to this Bankruptcy Court. Judge Jaffee, on October 4, 2019 in the NY Supreme Court, 109749/2009, in response to the Trustee's Motion to Reconsider and Sever Dalia, Rule:
> Having read the papers in support of plaintiffs' order to show cause and defense counsel's email of October 4, 2019, **_I find that because the damages assertedly arising from Dalia's alleged fraud are those that have been adjudicated_** (NYSCEF 1594, 1630), the action was properly marked disposed, per order dated August 9, 2019. [Emphasis Added.]

This is but one example of how once Dalia made her daughter Orly a multi-millionaire on the written promise by Orly to contribute to Dalia's support, Orly has not only refused to pay her mother one penny of support but instead sued her mother for tortuously forcing Orly to accept the millions and her responsibility. Orly's argument - "no good deed should go unpunished."

[3] Dalia understands that the twin notes are subject to a $3 million set-off.

The Settlement Agreement seeks to assign rights to those notes to Debtor's father and husband with nothing to be retained by the estate.[4] Those terms are beyond the authority of the Trustee for three distinct reasons: (i) Dalia already enjoys a constructive trust over that consideration by operation of New York Law. Accordingly, her interest is superior to that of the Trustee under New York, Second and Fifth Circuit precedent; (ii) The Settlement Agreement improperly interferes with equitable distribution of marital property ordered by the New York Supreme Court contrary to federal bankruptcy law and (iii) Approval by this Court of the Settlement Agreement offends the principals of judicial comity between this Court and the courts of the Second Circuit and New York State and in tension with the Rooker-Feldman Doctrine. The proposed Settlement Agreement's recitations and arrangements implement remedies in favor of the Insiders, including Arie, specifically rejected by the courts in New York.

10.     This case is intended solely for the inappropriate purposes of providing the Debtors' insiders a "do-over" on claims that they have rightfully and consistently lost and shielding them from the avoidance and recovery of millions of dollars in fraudulent transfers for the benefit of the Debtor's true estate. Instead, this Court should decline the Debtor's and her conspirators' desperate invitations to tread upon the integrity of its sister State and Federal courts who have already taken custody of the parties' disputes and conducted abundant proceedings thereon.

11.     This case is a stark example of forum shopping to avoid not only a pending deadline to respond to the Turnover Motion and hearing before the District Court (SDNY) but also a particular court (District Judge Forrest), wholly against the Fifth Circuit's guidance of

---

[4] The $1 million contingent payment outlined in the agreement is meaningless as the payors security interest is being left undisturbed despite being created within the 1 year preference period.

"discouragement of forum-shopping and avoidance of inequitable administration of the laws."[5] Forum shopping is nothing new for this Debtor and her Insiders. The District Court for the Southern District of New York perceived obvious forum shopping efforts and ruled that the claims asserted in the 2010 Action were "nothing more than a collateral attack on the Delaware Supreme Court." *Glenclova Inv. Co.*, 874 F.Supp.2d. at 297. *See also Genger v. Genger*, 38 Misc.3d. 1213(A), 1213A, 966 N.Y.S.2d. 346, 346, 2013 N.Y. Misc. LEXIS 185, *24, 2013 NY Slip Op 50091(U), 9 (N.Y.Sup.Ct. N.Y.Cy. 2010). This did not, however, stop the forum shopping. Only recently Magistrate Judge Austin of the Western District of Texas (Austin Division) ordered that a motion to quash a subpoena brought by Orly's husband should be transferred to the Southern District of New York, finding that: "[Eric] Herschmann and [Orly] Genger, as owners of multiple residences, have used this fact to their legal advantage by claiming to reside in ***whichever location most suits their legal needs at the time***." *See Genger v. Genger*, Civil Action No.: 1:19-mc-00366-LY (W.D. Tex.), Docket No. 11 (p. 5 of 6) (Emphasis Added.). This Chapter 7 filing is simply a continuation of the Debtor's and her insiders' forum shopping for an improper purpose.

**E. The Best Evidence of Bad Faith – the Schedules and Statement and Orly's Evasive Post Filing Conduct**

12.    In order to avoid this response obligation, the Debtor filed this Chapter 7 case on the eve of the deadline to respond to the SDNY Turnover Motion, in a venue that Orly knew she could not support. For example, after multiple losses in Federal and State Court in New York, the Debtor now swears that she moved to Texas sometime in late 2018 or early 2019 (incredibly, she contends that she does not, in fact, remember when she moved to Texas. *See* Transcript of 341

---

[5]    Improper forum shopping may result in a dismissal. *All Plaintiffs v. All Defendants*, 645 F.3d 329, 336 (5th Cir. 2011) *citing Hanna v. Plumer*, 380 U.S. 460, 469-70, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965); *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 395 (5th Cir. 2003).

Creditors' Meeting, August 15, 2019, at p. 5).[6]  Yet the Debtor and her insiders have spent the last two years insisting—repeatedly and **under oath**—that, she permanently resided in Israel with no intention of ever moving back to the United States.  In a **May 16, 2018** declaration, Orly attested to the Court under oath that:

> "Many months before this action was commenced by my mother and brother [in October 2017], I had moved from Austin, Texas to Tel Aviv, Israel. I intended at that time, and still intend, to live permanently in Israel, and have no intention to move from Israel. …All of Sagi's previous claims that my domicile is in … Texas … are inaccurate."

[*See*, **Exhibit Y** at 2 (emphasis added) to pending Motion to Dismiss].

13.     Similarly, even the schedules filed literally disclaim the "penalty of perjury" mandates of the Debtor's furnishing and executing complete Schedules and Statements in a bankruptcy case.  The Schedules and Statements neither acknowledge that which the New York Courts have found as "law of the case" multiple times (that the Debtor "monetized" in 2013 her $32 million of TRI Stock) and that all of those funds found their way to her father, his creditors, or her husband.[7]  Not only do the bankruptcy disclosures not mention these transactions, the

---

[6]    The Debtor: ….the holidays I think, of, of 2018.
….
Question: So, in September or October of last year, you moved back to Texas?
The Debtor: Um, that's when I- I'd made the decision. I mean, I don't, I don't know ... It made my move- moving back. I mean, this stuff doesn't happen in one singular moment.
….
Question: And uh, when did you actually physically make that move um, back to Texas?
The Debtor: **_Uh, I don't remember_**.

[7]    The following courts have specifically held and ruled that it was Orly that "monetized" her rights in the TRI Stock:  *Genger I,* 76 F. Supp.3d at 491, 501;  *Genger III*, 2018 U.S. Dist. Lexis 126958, *17 n.5;  *See, Genger v. Genger*, 663 Fed. Appx. 44 *; 2016 U.S. App. xLEXIS 17642 **; 2016 WL 5539979, *50 (2nd Cir. 2016); *Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 185 (Del. 2011).
> ***Orly benefitted from the shares regardless of whether the settlement money went to Orly, as a gift to Arie***, …. But surely any $32 million transaction for ***her*** shares would confer upon her more than a peppercorn, …

*Genger v. Genger*, 663 Fed. Appx. 44 *; 2016 U.S. App. LEXIS 17642 **; 2016 WL 5539979 *50 (2nd Cir. 2016).

Page 7

Chapter 7 Trustee has not announced the investigation or determination of these facts established by years of Federal, State and Arbitration judges' findings. Dalia believes these facts have been withheld from the Trustee.

**F. The Remarkable $75,000.00 Schedules and Statements Filed by the Debtor**

    1.    **The Non-Statutory, Non-Rules Disclaimers in the "Introduction" - the "Global Notes, Methodology and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs"**

14.    Only a cursory analysis of the Schedules and Statements show the extent of non-disclosure bad faith and outright evasion. Begin with the "Introduction" that is 3 page-single-spaced disclaimer of the accuracy of the disclosures and the purported lack of knowledge of the Debtor in completing and filing her Schedules and Statement of Affairs. This is a remarkable attempt to modify the "penalty of perjury" obligation upon execution by a Debtor of her schedules and statements.[8] As an example:

> Although the Debtor has made reasonable efforts to ensure the accuracy and completeness of such financial information, inadvertent errors or omissions, as well as the discovery of conflicting, revised or subsequent information, may cause a material change to the Schedules and Statement. Thus, the Debtor is unable to warrant or represent the Schedules and Statement are without inadvertent errors, omissions or inaccuracies. … ***Notwithstanding the foregoing, the Debtor shall not be required to update, amend or supplement the Schedules and Statement, but reserves the right to do so***.

---

[8]     The petition, schedules, and statement of financial affairs are executed under oath and penalty of perjury. Fed. R. Bankr.P. 1008; Official Form 1 (Voluntary Petition); Official Form 7 (Statement of Financial Affairs). *See Heil,* 289 B.R. at 907-08. *See also Hamo v. Wilson ( In re Hamo)*, 233 B.R. 718, 725 (6th Cir. BAP 1999); *Beaubouef v. Beaubouef ( In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992).

    The debtor must fully disclose all information relevant to the administration of the bankruptcy case. *Kentile Floors, Inc. v. Winham,* 440 F.2d 1128 (9th Cir.1971); *In the Matter of Garman,* 643 F.2d 1252 (7th Cir.1980). *See In re Robinson,* 292 B.R. 599 (Bankr.D.Ohio 2003); *Woolman v. Wallace ( In re Wallace)*, 289 B.R. 428 (Bankr.N.D.Okla.2003); *Fleet Securities, Inc. v. Vina ( In re Vina)*, 283 B.R. 803 (Bankr.M.D.Fla.2002); *In re Firrone,* 272 B.R. 213 (Bankr.N.D.Ill.2000); *In re Riccardo,* 248 B.R. 717 (Bankr.S.D.N.Y.2000).

    "***It is not for the debtor to decide what is and is not relevant***. *A debtor who omits important information and fail[s] to make full disclosure, place[s] the right to the discharge in serious jeopardy.*" *Jensen v. Brooks (In re Brooks)*, 278 B.R. 563 (Bankr. M.D. Fla. 2002) (Emphasis Added) In fact, "[c]reditors are entitled to judge for themselves what will benefit, and what will prejudice, them" and the estate. *Chalik,* 748 F.2d at 618.

Page 8

After claiming "reasonable" effort to ensure accuracy, the Debtor disclaims her obligation to "update, amend or supplement the Schedules and Statement …" with accurate information even when it is discovered and known to exist. These disclaimers continue:

- To be certain that nothing in, or missing from, the Schedules and Statements can be used to establish intentional withholding of information, transactions, assets, and liabilities, the Debtor actually suggests that "[i]n the event that the Schedules and Statement differ from the foregoing Global Notes, the **_Global Notes shall control_**. [*See*, "Global Notes Control, pg. 3]. "Global Notes" are not signed under penalty of perjury – or under any penalty for that matter.

- Next, the Debtor claims to "admits" nothing in her "sworn" schedules or statements (*See*, Reservation of Rights, pg. 2);

- Although the debtor schedules less than $60,000.00 in assets, and a $75,000 retainer to her Chapter 7 lawyer, the Debtor claims that "… [i]t would be prohibitively expensive and unduly burdensome and to obtain current market valuations for all of the assets." (*See*, Net Book Value of Assets, pg. 2).

- Regarding her assets, the Debtor suggests that "… the Debtor may not have identified and/or set forth all of her (filed or potential) causes of action against third parties as assets in her Schedules and Statement" (who else would know what the Debtor's purported claims are, if not the Debtor?) then claims that "[t]he Debtor reserves all of her rights with respect to any causes of action against third parties" presumably even the undisclosed one, notwithstanding the fact that "the Debtor" no longer owns any of these causes of action, disclosed or not, all belong to the estate. [*See*, "Causes of Action" pg. 3].

- Remarkably, this same suggestion is also referenced by the Debtor as to the obligations to honestly complete Schedule A/B, first, when the debtor claims "Debtor has identified *claims that third parties, in various litigation, may have suggested that she owns* (and which Debtor does not agree exist)" which apparently the Debtor is not intending to disclose (at least voluntarily). Without the detailed history above, the Court would have no idea to what this disclaimer refers. However, with this Debtors history disclosed, this reference is to the $32 million in fraudulent transfer the Debtor made.

- Next the Debtor claims that (although she lives off the funds and cash of her multi-millionaire husband) and, according to the Debtor although "Schedules I and J request information on the Debtor's non-filing spouse's financial assets and income… [s]uch information is not available to the Debtor, and is, accordingly not listed." The Schedules do not "request" any information – they "require" full, honest, and truthful disclosures. These answers to the questions are not optional, or at the pleasure of a debtor. The Debtor simply refuses to disclose the information, all of which is "available" to the Debtor. [*See*, "Specific Disclosures" 1st ¶ pg. 4].

- Regarding the $3+ million condominium located in the "W Hotel" downtown Austin, the disclaimers state that "Debtor owns an undivided interest in a condominium property with her non-filing spouse which was granted by gift…." This intentionally vague reference is not only intended to confuse, but when followed by a reference that the ownership rights ("but has no parking rights or other contractual rights with respect to that property") makes clear that the Debtor does not want to talk about the actual purchase price. This intentionally vague statement suggesting that valuation of her asset is not possible defies logic and good faith [*See*, Specific Disclosures 2nd ¶ pg. 4].

The true need for these disclaimers becomes crystal clear when this Court reviews the Debtor's purported Schedules and Statements and compares same to the actual historical facts.

    **2.**    **The Phony Schedules of Assets**

15. It is literally a waste of time to review the purported "assets" of this Debtor. Between the disclaimers of all knowledge of the value of her assets and the twenty (20) categories of assets with "unknown" valued or the eight (8) times describing assets as $0.00, this Debtor whose assets she monetized in late 2013-early 2014 for $32,000,000.00 are nowhere to be found. This Debtor, who spent $75,000.00 on Chapter 7 bankruptcy advice, and even suggest that it would be just too expensive to have anyone appraise these values now claims to be literally broke, disclosing only $56,627.77 in asset value.

16. Critically missing is any indication or even hint that there is $15 million in promissory notes from the Trump/Orly monetization of the TRI stock still being held, now by Mr. Bowen, a partner in Kasowitz and a partner of Herschmann.

    **3.**    **Schedule of Creditors – Nothing but Family or Insiders**

17. It is, however, the Schedule of Creditors that illustrates the depth of deception of this Debtor's purported need for Chapter 7 bankruptcy protection. After admittedly turning over almost $17 million to her father Arie in cash, she now schedules her father as a secured creditor for $5,451,389.27. What could this Debtor possibly have received in fair equivalent value for this payments or this indebtedness ***totaling $22,451,389.27***? The answer is, of course, nothing. She simply gave all of her monetized stock cash to her father as part of the fraudulent transfer scheme, planning all along to try and wait out the 6-year New York statute of limitations on fraudulent transfers, then file bankruptcy and walk away from her multi-million debts due her brother and

mother. But for the Southern District Federal Courts work and the Turnover Motion, the plan may have worked.

18. Next, the Debtor schedules her husband as a secured creditor with a claim of $2,301,399.48, apparently legal fees incurred in the multiple losses at the courthouse involving the Debtor's failed litigation against her brother and mother, and the Trumps. This Insider Claim deserves detailed scrutiny – that which the Chapter 7 Trustee seems to be disinterested.

19. Next, is Kasowitz, Benson, Torres LLP, Herschmann's law firm, and again an Insider,[9] claiming still more legal fees for more losing litigation representation efforts, totaling $1,457,751.00 [the most recent loss on October 4, 2019, when Judge Jaffee denied the Trustee's request to reconsider her prior rulings, and sever Dalia out of that pending suit]. Confirming these bills are a sham is the Trustee's proposal which includes Kasowitz working on a contingency fee basis to **defend** claims. Only one listed suit, is as a plaintiff for the estate. A court appointed

---

[9] Herschmann is clearly an "insider" to the Debtor Orly, as her non-filing spouse. Likewise, as a partners in the Kasowitch law firm, the law firm is an "insider" to Herschmann. An "insider to an insider to the Debtor" is under § 101 is deemed an insider to the Debtor. *In re Bos*, 561 B.R. 868, 885 n.69 (Bankr. N.D. Fla 2016) noted that "…an insider of an insider of the debtor is an insider of the debtor. *citing In re Parks*, 503 B.R. 820, 835 (Bankr. W.D. Wash. 2013) (holding that one-year preference period was applicable because individual was an insider of an insider as to the debtor). Horgan is an insider of Bos." 11 U.S.C.S. § 101(31)(E) also deems an "insider of an affiliate" to be an insider "as if such affiliate were the debtor*." See, Sherron Assocs. Loan Fund XXI (Lacey) L.L.C. v. Thomas (In re Parks)*, 503 B.R. 820, 822 (Bankr. W.D. Wash. 2013).[1]

As noted in *Glassman v. Heimbach, Spitko & Heckman (In re Spitko)*, Nos. 04-18836bif, 05-0258, 2007 Bankr. LEXIS 2050, at *27 (Bankr. E.D. Pa. June 11, 2007) "[a]ttorneys have not generally been considered insiders of their debtor-clients. *(citations omitted).* Whenever an attorney has been found to be an extra-statutory insider, that status has been imposed because of a relationship with the debtor that transcended the normal attorney-client boundaries. *Compare In re Broumas,* 135 F.3d 769 (Table), 1998 WL 77842 (4th Cir. 1998) [published in full-text format at 1998 U.S. App. LEXIS 3070], (attorney is an insider); *In re Lemanski,* 56 B.R. 981 (Bankr. W.D. Wisc. 1986) (same); *In re Durkay,* 9 B.R. 58 (Bankr. N.D. Ohio 1981).

Page 12

appraiser listed the potential damages as $0 - $30k against Sagi. In any case, such damages would be subject to Sagi's $3 million+ offset. In other words, Kasowitz will continue to work for free.

20. Next is the Orly Genger Trust listed an unsecured creditor with a claim "unknown".

21. The Debtor does schedule the final judgments obtained by her brother, Sagi, totaling $3,219,693.00, but again only an insider or an affiliate of this insider TPR Investments Associates, Inc. The Debtor does schedule with Dalia (her mother) and D&K GP, LLC an entity owned by her mother. All Insiders so far.

22. The Debtor next scheduled is Zeichner Ellman & Krause, LLP for $448,310.98, again the Debtor's former lawyers who she dismissed three years ago and who have apparently made no effort to collect, and who Orly has threatened to sue for malpractice.

23. The only non-insider creditor listed is Markel Surety for $750.00.

24. Bankruptcy cases involving only insiders are not only suspect, but most often swiftly dealt with by abstention and dismissal. Insiders cannot vote on most all of the issues that general unsecured creditors may vote – for a good reason. They are not reliable to exercise a vote that would be fair to the estate and unsecured class of creditors – but here there are none.

**G.    If Not Dismissed This Case Should Be Transferred to the Southern District of New York**

25. One of the factors considered under permissive transfers of venue is "the state's interest in having local controversies decided within its borders, by those familiar with its law." Here, those interests have already acutely arisen. Were the Chapter 7 Trustee possessed of greater familiarity with controlling New York law and had greater access to the parties, New York Courts and their records, he might not have made the egregious missteps that he committed attempting to revive the Dismissed Action (in which the estate can have no interest), at the invitation of the Debtor and her fraud conspirators. These same types of considerations underlie section 321 of the Bankruptcy Code, which requires that a chapter 7 trustee reside or have an office in the district in

which the chapter 7 case is pending, or an adjacent judicial district. 11 U.S.C. § 321. *See also In re Oklahoma City Associates*, 98 B.R. 194, 199 (Bankr. E.D. Pa. 1989) ("The administration of the estate is likely to be most economically conducted where it is in close proximity to the principal asset and witnesses (including creditors)"). Here, as confirmed by the Settlement Agreement, the primary asset to which this case is directed, is comprised of substantial litigation pending in New York.

26. In fact, all of the factors considered by the Courts weigh in favor of transferring this case to the Southern District of New York, due to the close nexus that this case bears to the Genger family's litigation disputes, of which this case comprises a mere part. All of that prior and pending litigation exists in New York (or Delaware). It is undisputed that the Genger family and their related entities are extremely familiar with New York and its courts, having long resided or been domiciled in New York, and litigated there for decades. The Debtor and her husband have interests in homes in New York and New Jersey. Therefore, the primary asserts, the parties and the witnesses, are all located in, or have a close nexus with and demonstrated ability to transact business and litigate in, New York. As to the enforceability of judgments and the possibility of liquidation, from the perspective of bankruptcy and nationwide jurisdiction, there is little difference between this Court and the Southern District of New York, but what difference there is, weighs in favor of New York, which has a much closer nexus to the parties, the witnesses, the primary litigation assets, and the historical transactions.

27. As to those litigation "assets", the final such listed matter under the Chapter 11 Trustee's proposed Settlement Agreement, *In the Matter of the Petition of Dalia Genger, as Trustee of the Orly Genger 1993 Trust, Created by Trust Agreement Dated December 13, 1993 between Arie Genger, as Grantor, and Lawrence M. Small and Sash A. Spencer, as Trustees, to*

*Turnover Property of the Orly Genger 1993 Trust*, New York County Surrogate's Court File No. 0017/2008 (Anderson, J.) is an entirely state law matter consolidated with the First Surrogate Court Case (the "Surrogate Court Turnover Claims"), and is asserted by the Trust against the Debtor and her fraudulent transferee insiders for the turnover of the 2013 Settlement proceeds which belong to the Trust. The Debtor is a nominal defendant therein, as she has already fraudulently transferred all of her rights to the 2013 Settlement and has no further interest to turnover, and for accounting purposes. Mandatory abstention plainly applies to this proceeding exactly the same as it applies in the First Surrogate Court Case. It is an entirely state law matter, not yet removed to this Court, in which diversity jurisdiction does not exist and as to which the Trust has filed no claim in this case. The Surrogate's Court, which has already resolved multiple Genger family disputes and has thereby also developed substantial familiarity with the parties and their disputes, can clearly adjudicate this matter within a reasonable time. Finally, this is a chapter 7 case in which timing of administration is a minor consideration. *IO at Tech Ridge LP v. Hartford Fire Ins. Co. (In re IO at Tech Ridge LP)*, 2018 Bankr. LEXIS 1323 (Bankr. W.D. Tex. 2018) (explaining that this element, "…is not difficult to meet. According to some courts, the issue is not which court can adjudicate the action faster; but whether the state court can dispose of the action timely.").

28.   This Court would abstain from adjudicating any of these state law proceedings in this Chapter 7 case. The analysis of the specific, permissive abstention factors this Court stated in *IO at Tech Ridge*:

> In reading the statute, it is apparent that Congress believed that state court matters generally belong in state court unless a strong federal interest suggests otherwise….This suit is a state court matter as there is no independent basis for federal jurisdiction. So, what is the strong federal interest?....The right question is: Must the lawsuit be tried in bankruptcy court to resolve the bankruptcy case? The answer would be yes, if a plan could not be confirmed absent resolution of the lawsuit. But here the answer is no….that suit can be pursued in state court in the ordinary course of the litigation process…by a chapter 7 trustee.

Page 15

*Id.*, at *8-9, *16-17.

29. Here, given that this case was filed as a chapter 7 case, this consideration has little weight. Indeed, the District Court for the Southern District of New York has already opined that these disputes belong in New York state court. *Glenclova Inv. Co.*, 874 F.Supp.2d. at 314 ("The Court…strongly suggests that the parties agree to litigate their claims in the New York Supreme Court.").

WHEREFORE, PREMISES CONSIDERED, Dalia Genger and D&K GP, LLC respectfully joins for all purposes in the request by Sagi Genger for entry of an Order dismissing the Debtor's case with a two-year refiling bar or, in the alternative, transferring the case to the United States Bankruptcy Court for the Southern District of New York.

Dated: October 18, 2019.

Respectfully submitted,

  /s/ *Shelby A. Jordan*
Shelby A. Jordan
Texas Bar No. 11016700
**JORDAN HOLZER & ORTIZ, P.C.**
500 N. Shoreline Blvd., Suite 900
Corpus Christi, Texas 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
sjordan@jhwclaw.com
**ATTORNEYS FOR DALIA GENGER AND D&K GP LLC**

**CERTIFICATE OF SERVICE**

The undersigned hereby certified that a true and correct copy of the foregoing instrument has been served on this 18th day of October 2019 upon the parties listed in the attached service list and via ECF notification.

*/s/ Shelby A. Jordan*
Shelby A. Jordan

**Via ECF**
United States Trustee – AU12
United States Trustee
903 San Jacinto Blvd., Suite 230
Austin, Texas 78701

**Via ECF**
Arie Genger
c/o Deborah D. Williamson
Dykema Gossett PLLC
112 East Pecan St., Suite 1800
San Antonio, TX 78205

**Via ECF**
c/o Trustee Ron Satija
Brian Talbot Cumings
Graves, Dougherty, Hearon & Moody
401 Congress Avenue, Suite 2700
Austin, Texas 78701

**Via ECF**
Arie Genger
c/o Deborah N. Williamson
Dykema Gossett PLLC
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205

**Via ECF**
Eric Herschmann
c/o Raymond Battaglia
66 Granburg Circle
San Antonio, TX 78218-3010

**Via ECF**
Sagi Genger
c/o Sabrina Streusand & TPR Investment
Streusand, Landon, Ozburn & Lemmon, LLP
1801 S. MoPac Expressway, Suite 320
Austin, Texas 78746

**Via ECF**
Eric J. Taube
Waller Lansden Dortch & Davis, LLC
100 Congress Ave, Suite 1800
Austin, Texas 78701

**Via ECF**
Thomas A. Pitta
Emmet, Marvin & Martin, LLP
120 Broadway
New York, NY 10271

**Via ECF**
The Orly Genger 1993 Trust
c/o Jay Ong
Munsch Hardt Kopf & Harr PC
303 Colorado Street, #2600
Austin, Texas 78701

**Via ECF**
SureTec Insurance Co.
c/o Ryan Brent DeLaune
Clark Hill Strasburger
901 Main Street, Suite 6000
Dallas, Texas 75202

**Via ECF**
Ron Satija
P.O. Box 660208
Austin, TX 78766-7208