

# EMMET, MARVIN & MARTIN, LLP
## COUNSELLORS AT LAW

120 Broadway
New York, New York 10271
212-238-3000

**www.emmetmarvin.com**

Thomas A. Pitta
*Partner*
Tel: 212-238-3148
Fax: 212-238-3100 •Fax (alt.) 212-608-0544
tpitta@emmetmarvin.com

April 17, 2020

**Via ECF and FedEx**
Honorable James J. Garrity, Jr.
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

    RE:   *In re Orly Genger*, Case No.: 19-13895-jlg

Dear Judge Garrity:

    This firm represents Sagi Genger ("**Sagi**"), a judgment creditor in the above-referenced chapter 7 case (the "**Case**"). As requested by Your Honor at the March 4, 2020 status conference, we provide this status report regarding the progress of the Case to date and how Sagi believes the Case should proceed going forward.

    On September 13, 2019, when the Case was still in the Western District of Texas, Sagi filed a Motion to Dismiss the Case (the "**Motion to Dismiss**"). The Motion to Dismiss also sought, as an alternative to dismissal, transfer of venue to this District. Judge Davis determined to hear the venue portion of the Motion in the first instance.

    Following a full-day evidentiary hearing on November 5, 2019, Judge Davis transferred venue of the Case to this District, finding that "this Debtor can and will claim residence in a location that suits her legally strategic interests" and that her newly claimed Texas residence "was at least, in part, prompted by a desire to file bankruptcy in Texas should it become necessary to get away from the New York Courts." At the conclusion of the venue transfer hearing, Judge Davis further stated that: "I leave the alternative relief of dismissal for a decision by the Southern District of New York."

    For the reasons below, Sagi believes dismissal is the right remedy and the Court should schedule a hearing on the Motion to Dismiss expeditiously.

    Notwithstanding Sagi's belief that this case should be dismissed, since the transfer to this District and the appointment of Ms. Piazza as the Chapter 7 Trustee, we have engaged in discussions with Trustee and her counsel, and several other parties, in the hope of achieving settlement in the Case. In the process, we provided the Trustee with extensive background information relevant to the Case and made various settlement proposals. Unfortunately, these efforts have not resulted in a settlement.

EMMET, MARVIN & MARTIN, LLP

Honorable James J. Garrity, Jr.
April 17, 2020
Page 2

With no settlement having been reached, despite more than five months of effort, we believe the Case has reached the point where the parties need the Court to hear and determine the threshold jurisdictional issue on its merits.

Accordingly, we respectfully request that the Court schedule a hearing on the Motion to Dismiss. In order to clarify the issues raised by the Motion, we intend to file a revised Motion within one week's time that: (a) eliminates the mooted portions of the original Motion relating to venue; (b) updates the Motion to include facts occurring subsequent to the September 13, 2019 filing date; and (c) provides precedents from this Circuit. We believe only limited discovery is necessary for the Motion to Dismiss,[1] and a hearing can be held about one month after the Motion is filed.

### **Procedural Status**

This is not an ordinary, run-of-the mill Chapter 7 bankruptcy case. The debtor, Orly Genger ("**Orly**" or the "**Debtor**"), and her husband enjoy a collection of multi-million dollar homes around the world. The Debtor's husband is a senior partner at a major New York law firm. At his prior corporate job, according to public filings, he received an executive severance package worth at least $50 million plus use of a corporate jet. His exotic car collection includes a Rolls Royce and a Lamborghini.

Other than Sagi, no other creditor has brought any collection suit against the Debtor; indeed, her other "creditors" are, mainly, her father, her husband, her husband's law firm (each of whose claims, as noted below, are contrived), and her prior law firm, which was discharged from service four years ago and has made no formal collection effort of which we are aware. Most of these parties are directly or indirectly tied to the (now stayed) litigation described below seeking to avoid the fraudulent conveyances and encumbrances the Debtor made to frustrate her true creditors.

The most significant of these conveyances involves a missing $32.3 million. In 2018, the U.S. District Court for the Southern District of New York, in decision affirmed by the U.S. Court of Appeals, found that the Debtor in 2013 "**monetized her beneficial interest [in a family business] for $32.3 million**." *Genger v. Genger*, 2018 WL 3632521, *2 (S.D.N.Y. July 27, 2018), *aff'd*, 771 F. App'x 99 (2d Cir. 2019).

Post-bankruptcy discovery in that case has since revealed that the Debtor— knowing that $12 million of her $32.3 million was owed to her estranged mother, Dalia—

---

[1] Last Summer, Sagi served subpoenas in connection with his Motion to Dismiss, but no party produced any documents or provided any deposition dates in response. Sagi served the current, post-transfer subpoenas, in an abundance of caution, mainly to confirm that the requested materials do not exist.

EMMET, MARVIN & MARTIN, LLP

Honorable James J. Garrity, Jr.
April 17, 2020
Page 3

instead purported to convey and encumber that money to her husband (Eric Herschmann), her father (Arie), and two of his creditors (Arnold and David Broser)—for no consideration. On June 11, 2019, Sagi brought a CPLR 5225 turnover proceeding to set aside those conveyances and encumbrances. Orly responded with this bankruptcy filing. In her schedules, Orly claims "total property" of only $56,628 plus a 50% interest in a downtown Austin condo. She makes no mention of the $32.3 million.

In his November 7, 2019 Order granting the motion to transfer, the missing $32 million was central to Judge Davis' thinking:

> … **[T]he bankruptcy will create a new layer of litigation** that arises from the same transactions, facts and set of occurrences that are the subject of litigation that has been concluded and the litigation that remains pending in New York.
>
> **In particular I'm thinking of the Section 727 adversaries in which the Debtor will be required to explain what happened to 32 million dollars ….** The issues related to [Orly's Austin] condo, the gift and the pledge, will be only a fraction of the issues dealt with in the fraudulent conveyance and nondischarge cases. **The other issues all relate to the 32 million and where it went, all of which has been the subject of more than a decade of litigation pending in New York**. (11.7.19 Tr. at 4, 8, emphases added).

Recovery of this $32.3 million for the Chapter 7 estate should be sufficient to pay all the outstanding claims against the estate. Nor should such recovery be a lengthy or challenging process, as Sagi's turnover proceeding is based entirely on the previously adjudicated findings of the District Court, which in turn were unanimously affirmed by the Court of Appeals. Rather than address the merits, Orly's lawyers obtained a lengthy extension of their time to respond, supposedly to accommodate attorney schedules. A few days before her response date, Orly filed this case and invoked the stay. *See Genger v. Genger,* Case 1:17-cv-08181-VSB-DCF (SDNY), Docs. 212-214, 218, 221.

Basically all that is still needed to be done to recover the $32.3 million, and thereby pay every legitimate creditor in full, is to file a reply brief. Tellingly, the Debtor and her cohorts (who happen to be her other alleged creditors) are lined up in vehement opposition <u>against</u> the restoration of the Debtor's assets to the Debtor so she may honor her debts. Instead, they wish to use the bankruptcy law to sanctify her fraudulent conveyances at the expense of her legitimate creditors.

Needless to say, this is not a valid invocation of the bankruptcy laws. Those exist to help good faith debtors deal with their debts and obtain a fresh start. Moreover, as we detail in our Motion to Dismiss, the events described in this letter are just the tip of the

EMMET, MARVIN & MARTIN, LLP

Honorable James J. Garrity, Jr.
April 17, 2020
Page 4

iceberg. The Debtor and her cohorts have engaged in backdated and fabricated documents, false testimony under oath, willful concealment of assets, and other acts of wrongdoing that shock the conscience. Under the standards set forth in this Circuit and others, dismissal is the most appropriate, perhaps only appropriate, remedy.

## **Bases for Dismissal**

Under Section 707(a) of the Bankruptcy Code, a Court may dismiss a Chapter 7 case "for cause," including when the case is filed by the debtor in bad faith, *see In re Aiello*, 428 B.R. 296, 302 (Bankr. E.D.N.Y. 2010) (citing *In re Lombardo*, 370 B.R. 506, 511 (Bankr. E.D.N.Y. 2007), when the debtor's situation is, in essence, a two-party dispute. *See In re Loco Realty Corp.,* 2009 WL 2883050, *2 (Bankr. S.D.N.Y. June 25, 2009); *In re Selectron Mgmt. Corp.,* 2010 WL 3811863, *6 (Bankr. E.D.N.Y. Sept. 27, 2010) (citation omitted). Both of these standards are met here.

While space considerations keep us from detailing the full scope of the Debtor's fraud warranting dismissal, we provide some context. As the District Court found, the Debtor's $32.3 million windfall derives from shares in a family business (TRI) that her mother assigned to her trust in a 2004 divorce. In exchange, the Debtor agreed to support her mother in her retirement, should she request it. Thus, from the moment the Debtor received the $32.3 million, she knew it was not "free money," rather, it came encumbered by a commitment to use a portion of those funds to support the debtor's mother, a retired 74-year old homemaker who is currently in poor health.[2]

As later calculated by the District Court, the Debtor is obligated to provide up to $12.35 million of the $32.3 million to support her mother (through an agreement whereby Sagi must provide his mother with twice that support). That still leaves the Debtor with $20 million, which would please most people. Not Orly.

First, the Debtor concealed the true terms of the 2013 settlement from the District Court, having her attorneys falsely represent to Judge Forrest that, in a "nightmare for Orly … Orly and the Orly Trust have none of the [TRI] shares, and none of the proceeds" therefrom. In actuality, as Judge Forrest found, and the documents reflect, the Debtor, upon signing the 2013 settlement agreement, received (though her counsel of record) a cash payment of $17.3 million, which she immediately had her attorney wire to a purported trust for the putative benefit of her longtime family friends and business partners, the Brosers, who had purportedly loaned money to the Debtor's father (albeit never to the Debtor herself) to fund his various unsuccessful litigations and his lifestyle in such things as the purchase of a luxury condominium in Miami.

---

[2] To avoid duplication, Sagi incorporates by reference the information contained in the "Introduction" section to Dalia Genger's status report.

EMMET, MARVIN & MARTIN, LLP

Honorable James J. Garrity, Jr.
April 17, 2020
Page 5

    The remaining $15 million of the $32.3 million was in the form of two $7.5 million promissory notes.[3] Because payment on those notes had not yet come due, and would not for many years, the conspirators had to get creative. Together, they hatched a scheme to encumber those two promissory notes with bogus, backdated "liabilities."

    The conspirators fought tooth-and-nail to keep the $32.2 million hidden as long as possible, going so far as to submit numerous false sworn statements:

- In a state court action, David Broser obtained an order quashing a trial subpoena on him by filing an affidavit falsely claiming he had no records of the disposition of the $32.3 million. In fact, the first $17.3 million thereof went into his corporate bank account.

- Later, the Debtor was asked in interrogatories to "[i]dentify the amount, date, and recipient of all payments made and/or to be made to any person or entity pursuant to Defendant's 2013 settlement." She falsely swore that she had "no knowledge" of the subject.

- Shortly thereafter, a Rule 30(b)(6) witness for Kasowitz falsely testified that: "We don't have any information about any agreements" about payments yet to come due under the 2013 Settlement Agreement.

    Eventually, post-judgment discovery revealed the truth. Contrary to the foregoing representations—each one made under penalty of perjury—the Debtor, her husband, her father, David Broser, and Kasowitz had all signed an agreement in 2017 expressly acknowledging Orly's rights to the $32.3 million, and vesting her and her father with co-signing authority over the final $8.5 million to be paid thereunder—*after* her husband gets paid $2 million and the Brosers another $4.5 million.

---

[3] In his letter to the Court, the Trustee asserts that Sagi and the "Sagi Group" (which includes various parties around the world with no stake in the bankruptcy) are somehow violating the automatic stay by failing to provide releases to the "Trump Group" (a group of people and businesses around the world that are not parties to the bankruptcy). The "Sagi Group" is under no obligation to waive its unasserted rights, but more importantly, the Debtor failed to list those promissory notes on her schedules and lied about them under oath just prior to filing for bankruptcy. That conduct, and the Trustee's apparent position that the notes belong to the estate, should be sufficient reason for the Trustee to support dismissal or oppose a discharge. Neither has occurred.

EMMET, MARVIN & MARTIN, LLP

Honorable James J. Garrity, Jr.
April 17, 2020
Page 6

This concealment was deliberate. When, at her deposition, the Debtor was asked why her 2016 prenuptial agreement listed no assets, she admitted that: "It was a joint decision with my husband. …Well, it was really his. … My husband understood my legal situation. He understood my possible exposure and liabilities."

In furtherance of the scheme, the Debtor executed a series of fraudulent documents, including, most significantly: (a) a $5.4 million promissory note dated "December 31, 2016," in favor of her father; and (b) a $2 million promissory note dated "December 30, 2016" in favor of her husband. Metadata evidence has since revealed that these "2016" notes were significantly backdated by the Debtor to make them appear to match her subsequent narrative. Orly then gave UCC liens on all her assets to her husband and her father, to try to place them ahead of her true creditors.

These promissory notes do not reflect actual, bona fide debts. The Debtor has never directly received a single dollar under either note, nor has she ever made a single dollar of "repayment" to her husband or father under either one. These notes supposedly reflect advances that the Debtor's husband and father allegedly made to her lawyers for various losing cases which Arie admits were brought for his (not the Debtor's) benefit. In actuality, the whole story was invented after the fact and applied retroactively as a fraudulent asset protection scheme to frustrate the Debtor's creditors.

The Debtor claims that her $5.4 note to her father replaced ten previous notes, one for each of the years 2007 through 2016. Pre-bankruptcy discovery has revealed that these prior ten notes never existed. To the extent her father loaned her money to pursue a lawsuit, she fully repaid that loan when she settled that lawsuit in June 2013 and used the settlement proceeds to pay off his $17.3 million debt to the Brosers.

As for the $2 million note the Debtor gave to her husband, that money supposedly was for her payment of legal fees to Kasowitz, his own firm, to (unsuccessfully) sue the Debtor's brother and mother four times. However, most of that legal work was on a case where her husband told the Court: "all of the attorneys that are on the trial for Kasowitz are working pro bono," a claim repeated in the couple's 2016 prenuptial agreement. The Debtor's husband produced a wire-transfer receipt to his firm, but repeated demands for proof that the payment was used to satisfy bills to Orly have gone unmet.

The foregoing UCC liens, promissory notes, etc. basically "round trip" the $32.3 million out of the Debtor's bankruptcy estate and then back to her through her family and friends; in particular her husband, who (per the couple's AmEx Black Card) supports her lavish lifestyle. Meanwhile, the Debtor, through this bankruptcy, continues to prevent her mother from accessing the retirement fund her children promised her.

EMMET, MARVIN & MARTIN, LLP

Honorable James J. Garrity, Jr.
April 17, 2020
Page 7

At the last conference, it was suggested that the Debtor is an innocent victim. In reality, since 2007 Orly has brought at least six losing lawsuits against her mother and brother. While others may have influenced her, Orly is a 41-year old businessperson with an Ivy League education. She has agency in her decisions. She did not file this Case to deal honestly with her debts, but rather to frustrate her creditors.

## Conclusion

Sagi believes restoring the District Court proceeding remains the best vehicle to resolve this otherwise intractable dispute, and this Case serves no proper bankruptcy purpose. We therefore request that the Motion to Dismiss, which has been pending since last September, be afforded a prompt hearing, prior to the Court taking up any other aspects of this Case. We thank the Court for its consideration.

Respectfully submitted,

/s/ *Thomas A. Pitta*
Thomas A. Pitta
Emmet, Marvin & Martin, LLP
120 Broadway, 32nd Floor
New York, New York 10271
*Attorneys for Sagi Genger*

cc:  Elizabeth Aboulafia, Esq.
     Raymond W. Battaglia, Esq.
     Rocco A. Cavaliere, Esq.
     John Dellaportas, Esq.
     Yann Geron, Esq.
     Christopher Kiplok, Esq.
     Andrew Kurland, Esq.
     Paul J. Labov, Esq.
     Frank A. Oswald, Esq.