IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| | § | |
| ORLY GENGER, | § | CASE NO. 19-13895-jlg |
| | § | |
| | § | |
| Debtor. | § | |

**JUDGMENT CREDITOR SAGI GENGER'S AMENDED AND UPDATED
MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT**

Thomas A. Pitta, Esq.
John Dellaportas, Esq.
Emmet, Marvin & Martin, LLP
120 Broadway
New York, New York 10280
Telephone: (212) 238-3000
Facsimile: (212) 238-3100
*Counsel to Judgment Creditor
Sagi Genger*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 4

    A.    The Debtor and Sagi Agree to
          Financially Support Their Mother .............................................................. 4

    B.    The Debtor Goes on a Losing Litigation Spree
          Against Her Mother and Brother ............................................................... 6

    C.    The Debtor Liquidates the TRI Shares for $32.3 Million
          And Triggers the Obligation to Support Her Mother.................................... 8

    D.    The Debtor Group Schemes To Frustrate
          The Debtor's Financial Obligation to Her Mother .................................... 14

    E.    The Debtor Dissipates Her Remaining Assets
          In the Run Up to Her Filing this Bankruptcy Case .................................... 16

    F.    The Debtor Files False Bankruptcy Schedules
          Omitting Her Claim on the $15 Million Promissory Notes ........................ 16

ARGUMENT .......................................................................................................... 17

    A.    Governing Standards for Dismissal ........................................................ 17

    B.    This Case Was Filed In Bad Faith .......................................................... 18

    C.    This Debtor's Schedules Are Also In Bad Faith........................................ 21

    D.    The Two-Party Nature Of This Case
          Also Mandates Dismissal....................................................................... 23

CONCLUSION........................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Genger v. Genger*,
121 A.D.3d 270 (1st Dep't 2014) ........................................................................... 7

*Genger v. Genger*,
144 A.D.3d 581 (1st Dep't 2016) ........................................................................ 7, 8

*Genger v. Genger*,
2018 WL 3632521 (S.D.N.Y. July 27, 2018) ...................................... 1, 3, 5, 8, 17

*Genger v. Genger*,
76 F. Supp. 3d 488 (S.D.N.Y. 2015) .............................................................. 1, 6, 10

*Genger v. Pedowitz & Meister LLP*,
2015 WL 1688668 (N.Y. Sup. Ct. April 14, 2015) .................................................. 8

*Gilboy v. Reukema*,
610 F. App'x 17 (2d Cir. 2015) ............................................................................ 18

*Genger v. TR Investors, LLC*,
26 A.3d 180 (Del. 2011) ........................................................................................ 6

*In re 167 West 133rd Street Housing Development Fund Corp.*,
2018 WL 463746 (Bankr. S.D.N.Y. Sept. 25, 2018) ............................................. 18

*In re Ajunwa*,
2012 WL 3820638 (Bankr. S.D.N.Y. Sept. 4, 2012) ............................................. 19

*In re Genger*,
2008 WL 11188493 (Surr. Ct., N.Y. Cnty. Dec. 31, 2008) ..................................... 7

*In re Genger*,
2015 WL 1597526 (Surr. Ct., N.Y. Cnty. Apr. 9, 2015) ......................................... 7

*In re Green*,
934 F.2d 568 (4th Cir. 1991) ................................................................................ 17

*In re Griffieth*,
209 B.R. 823 (Bankr. N.D.N.Y. 1996) .................................................................. 18

*In re Klutchko*,
338 B.R. 554 (Bankr. S.D.N.Y. 2005) .................................................................. 21

*In re Krohn*,
886 F.2d 123 (6th Cir. 1989) ................................................................................ 17

*In re Krueger*,
    812 F.3d 365 (5th Cir. 2016) ........................................................................ 16, 20

*In re Loco Realty Corp.*,
    2009 WL 2883050 (Bankr. S.D.N.Y. June 25, 2009) .............................................. 21

*In re Lombardo*,
    370 B.R. 506 (Bankr. E.D.N.Y. 2007) ............................................................... 17, 18

*In re Murray*,
    900 F.3d 53 (2d Cir. 2018) .............................................................................. 16, 20

*In re O'Brien*,
    328 B.R. 669 (Bankr. W.D.N.Y. 2005) ................................................................... 17

*In re Papadopoulos*,
    2015 WL 1216541 (Bankr. S.D.N.Y. Mar. 13, 2015) ............................................... 21

*In re Selectron Management Corp.*,
    2010 WL 3811863 (Bankr. E.D.N.Y. Sept. 27, 2010) ............................................. 21

*In re Smith*,
    507 F.3d 64 (2d Cir. 2007) ................................................................................. 16

*In re Syndicom Corp.*,
    268 B.R. 26 (Bankr. S.D.N.Y. 2001) ..................................................................... 19

*In re Riccardo*,
    248 B.R. 717 (Bankr. S.D.N.Y. 2000) ................................................................... 23

*In re Uddin*,
    196 B.R. 19 (Bankr. S.D.N.Y. 1996) ................................................................. 17, 23

*Isnady v. Village of Walden*,
    2019 WL 3252753 (S.D.N.Y.), *aff'd*, 2020 WL 1608493 (2d Cir. Apr. 2, 2020) .................. 21

*Jensen v. Brooks (In re Brooks)*,
    278 B.R. 563 (Bankr. M.D. Fla. 2002) ................................................................... 23

*Local Loan Co. v. Hunt*,
    292 U.S. 234 (1934) ......................................................................................... 17

*Marrama v. Citizens Bank of Massachusetts*,
    49 U.S. 365 (2007) ........................................................................................... 18

*Precision Instrument Manufacturing Co. v. Auto. Maintenance Mach. Co.*,
    324 U.S. 806 (1945) .......................................................................................... 18

*TR Investors, LLC v. Genger*,
   2009 WL 4696062 (Del. Ch. Ct. Dec. 9, 2009) ........................................................... 6

*TR Investors, LLC v. Genger*,
   2010 WL 2901704 (Del. Ch. Ct. July 23, 2010) ..................................................... 5, 6

*TPR Inv. Associates, Inc. v. Pedowitz & Meister LLP*,
   2014 WL 1979932 (S.D.N.Y. May 15, 2014) ........................................................... 11


**Statutes and Other Authorities**

11 U.S.C. § 305(a) ............................................................................................... *passim*

11 U.S.C. § 707 .................................................................................................... *passim*

11 U.S.C. § 727(a) (4) ............................................................................................ 4, 21

*Am. Jur. 2d Bankruptcy* § 1143 ................................................................................ 19

6 *Collier on Bankruptcy*, § 707.03 [1] (16th ed. 2018) .............................................. 17

TO THE HON. JAMES L. GARRITY, U.S. BANKRUPTCY JUDGE:

COMES NOW, Sagi Genger ("**Sagi**"), a pre-petition judgment creditor of Orly Genger, the Debtor ("**Orly**" or the "**Debtor**") in the above-captioned Chapter 7 case ("**Bankruptcy Case**"), by and through his undersigned counsel and, pursuant to 11 U.S.C. §§ 305(a) and 707 and Rule 1017 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), files this Amended and Updated Motion to Dismiss and Memorandum of Law in Support (this "**Motion**"), and, in support would respectfully show the Court as follows:

## INTRODUCTION

1.      The purpose of this Bankruptcy Case is not to aid a good faith debtor to deal with her debts and obtain a fresh start.  Rather, it is to frustrate the efforts of one particular creditor, the Debtor's brother Sagi, to collect on a judgment representing Orly's half of a financial commitment they made to support their mother Dalia Genger ("**Dalia**").

2.      According to her bankruptcy schedules, the Debtor has no meaningful assets beyond a 50% share in an Austin condo at the W Hotel.  Yet according to the U.S. District Court for the Southern District of New York, in summary judgments that were twice affirmed by the U.S. Court of Appeals for the Second Circuit, in 2013 **"Orly monetized her beneficial interest in the [TRI] shares for $32.3 million."** *Genger v. Genger*, 76 F. Supp. 3d 488, 501 (S.D.N.Y.), *aff'd,* 663 F. App'x 44 (2d Cir. 2016); *Genger v. Genger*, 2018 WL 3632521 (S.D.N.Y.), *aff'd,* 771 F. App'x 99 (2d. Cir. 2019).  Orly obtained that windfall from rights to shares distributed to her in a 2004 divorce settlement between her parents. In exchange, Orly agreed, in writing, to indemnify Sagi for half of certain domestic support obligations to their mother.  In the intervening years, however, Orly grew estranged from her mother, and thereafter, having extracted all of the gains from her support agreement, sought to renege on her concomitant duties. Twice, the U.S. District Court, affirmed by the Second Circuit, said she could not do that.

3.       Knowing this day would come, the Debtor has spent the last seven years trying to shield the $32.3 million from Sagi and, thus, Dalia, by transferring that money to, and encumbering it in favor of, her husband Eric Herschmann ("**Herschmann**"), her father Arie Genger ("**Arie**"), and her father's purported lenders Arie and David Broser (the "**Brosers**") and their various entities (together, the "**Debtor Group**").  Last week, the *entire* Debtor Group filed a *joint* status report in which they all proclaimed that not "one penny" of the $32.3 million belongs to the Debtor and called on this Court to reject the findings that the Second Circuit affirmed.

4.       Last Summer, the District Court was on the cusp of hearing a turnover motion to undo all of the Debtor's fraudulent conveyances when the Debtor filed her petition in the Western District of Texas in order to put a stop to that ruling.  Indeed, as Bankruptcy Judge Davis found, in transferring venue to this District, that the Debtor "suffered many adverse decisions from New York Courts" and was "at least, in part, prompted by a desire to file bankruptcy in Texas should it become necessary to get away from the New York Courts." Exh. A at 10. [1]

5.       Whatever her motivation, it does not justify bankruptcy fraud and concealment.  But that is exactly what happened here.  In their status report, the Debtor Group tells this Court that: "[t]he Remaining Trump Group Settlement Proceeds [*i.e.*, the $15 million left to be paid on the original $32.3 million] do not belong to Orly." Doc. 237 at 11. This parrots a filing the Debtor made to Judge Davis in the Western District of Texas, in which she claimed that: "Although the Sagi Parties make the false claim that Debtor's 'retain[ed] signing authority' over promissory notes that are in New York is significant, Debtor asserts no claims to the notes." Doc 153 p. 6; *see also* Exh. J at 21 (Debtor's Second Circuit Reply Brief dated March 11, 2019, claiming that the $32.3 million in 2013 settlement proceeds had "nothing to do with Orly").

---

[1]       References herein are to the exhibits annexed to the accompanying Declaration of John Dellaportas sworn to on April 24, 2020 and are cited herein as "Exh."

6.      In fact, the opposite is undeniably true.  Orly's signing authority is set forth in black and white in a March 31, 2007 Agreement signed by the very same parties who now constitute the Debtor Group.  In the recitals to the Agreement, the signatories "set forth their agreement with respect to payments to [Arie] and [Orly] pursuant to the [2013] Settlement Agreement." Exh. R at 1.  The Agreement provides that, after paying another $4.5 million to the Brosers, and $2 million to Orly's husband to pay off her supposed debts to him, the remaining $8.5 million will be paid "in accordance with joint written instructions of [Arie] and [Orly]." *Id.* at 2.  In other words, the Debtor has co-signing authority over *at least $8.5 million dollars*.  Yet the Debtor Group is *still* claiming that Orly is not entitled to even "one penny."

7.      With a multitude of debtors *in true crisis* soon to be filing bankruptcy petitions, this Court has better uses of its time than to adjudicate a longstanding two-party, intra-family dispute that the District Court was set to resolve on its own.  Other than Sagi (who previously restricted his recovery in the turnover motion to the $32.3 million in fraudulently transferred assets to which the Debtor claims no interest), no creditor has brought a collection suit against the Debtor; rather, Orly's only other alleged "creditors" are the co-signatories on her status report, her former law firm, and a surety listed as having a claim of $750.  Magistrate Judge Freeman, assigned to oversee this matter prior to the bankruptcy, has been handling these cases for over six years.  Upon dismissal, the matter will likely revert to her Court (reviewable by District Judge Broderick), where all sides can appear and get a fair hearing.

8.      The Debtor Group misleadingly quotes certain critical comments made by Judge Davis about Sagi's motion *before* the hearing.  But *after* the hearing, Judge Davis adopted, as his own findings, the key allegations made by Sagi in that motion.  As Judge Davis further observed, "the bankruptcy will create a new layer of litigation that arises from the same transactions, facts and set of occurrences that are the subject of litigation that has been concluded and the litigation

-3-

that remains pending in New York. In particular I'm thinking of the Section 727 adversaries in which the Debtor will be required to explain what happened to 32 million dollars …. Findings made by the New York courts previously may well have collateral estoppel effect in this latest layer of litigations spawned by the bankruptcy filing." Exh. A at 4-5.

9.      Sagi appreciates the efforts undertaken by the Chapter 7 trustee, and indeed has made several proposals to the trustee.  Still, it is unsurprising that the trustee's efforts have not met with success.  The Debtor's estate is populated by "creditors" whose professed desire is to prevent the return to the estate of property they hold.  Accordingly, what is needed now is an adjudication. By this motion, Sagi seeks either dismissal of the Bankruptcy Case, or alternatively an expedited adjudication of the fraudulent conveyances before this Court.

## BACKGROUND

10.      Orly is far from a typical Chapter 7 debtor.  Whatever happens in this bankruptcy, she has enjoyed, and will continue to enjoy, the life of the 1%.  She and her husband own a collection of multi-million-dollar homes around the world (Tel Aviv, Austin, Miami Beach, Englewood, and Woodstock).  Her husband is a senior equity partner at Kasowitz Benson, which averages profits per equity partner of over $2 million per year.  At his prior job, he received an executive severance package of $50 million and use of a corporate jet.  His exotic car collection includes a Rolls Royce, Bentley and Lamborghini.  The couple share an AmEx "Black Card" (reserved for those who charge over $250,000 per year) and use it liberally. Exh. DD.

### A.      The Debtor And Sagi Agree To Financially Support Their Mother

11.      To understand why a person of this Debtor's means, with a recent $32.3 million windfall from her parents and only one real creditor, has filed for bankruptcy, unfortunately requires a brief diversion into the history of the Genger family dispute.  That history revolves

around ownership of a formerly Genger-controlled company called Trans-Resources, Inc.

("**TRI**"), which was and is the world's second largest producer of potassium nitrate.

12.    The story begins in 2004. As the District Court would later find:

As part of the [Arie-Dalia] divorce, Dalia agreed to convey her marital rights to 794.40 shares of TRI to trusts benefitting Sagi and Orly (the "Sagi Trust" and the "Orly Trust," respectively) in exchange for a commitment by Sagi and Orly to financially support her. This arrangement was effectuated via three documents.

First, Dalia and Arie signed a stipulation of settlement finalizing the terms of their divorce settlement …), which was fully executed on October 30, 2004. In the 2004 Divorce Stipulation, Dalia promised to convey equal interests in a total of 794.40 shares of TRI to the Orly Trust and the Sagi Trust. The 2004 Divorce Stipulation contains an "entire understanding" clause, which is subject to a carve-out for other agreements…"entered into concurrently herewith." …

The second was a letter signed by Sagi and Dalia dated October 30, 2004 (the "2004 Promise"). In the 2004 Promise, Sagi agreed to pay Dalia up to an amount equal to all dividends, distributions, proceeds or other payments attributable to the TRI shares, upon Dalia's demand. The 2004 Promise also states that the agreement is made "in consideration of" the following: "Orly and [Sagi] are benefitting by the receipt of a total of 794.40 shares of [TRI], or beneficial interests in those shares, by trusts for [their] benefit." …

At the time the 2004 Promise was signed, Orly was vacationing in Fiji, and thus could not contemporaneously sign the 2004 Promise. However, before Sagi signed the 2004 Promise, Orly verbally agreed to indemnify Sagi for 50% of the payments he would have to make under the 2004 Promise.

The third agreement was a letter signed by Sagi and Orly dated November 10, 2004 (the "2004 Indemnity"). In the 2004 Indemnity, Orly agreed to indemnify Sagi "for and against one-half (½) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations, including [Sagi's] reasonable counsel and other professional fees, expenses and costs, which arise from [Sagi's] undertakings in the [2004 Promise]."…

On June 16, 2013, Orly entered into a settlement agreement … with the Trump Group and others regarding her claims to ownership of the TRI shares. The agreement provides that Orly, Arie, and their litigation funders, will receive $32.3 million in exchange for a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and that Orly waives all of her claims to the TRI shares….

*Genger v. Genger*, 76 F. Supp. 3d 488, 492-494 (S.D.N.Y. 2015) (emphasis added).

**B.    The Debtor and Her Father Go On
       <u>A Losing Litigation Spree Against Her Mother and Brother</u>**

13.    In 2007, a post-divorce audit by FTI Consulting uncovered that Arie had misrepresented marital assets in listing a $30 million personal liability stemming from TRI share ownership.  Arie brought suit against Dalia seeking a declaration that the report was wrong.  The matter was then referred to arbitration before Justice Milonas (Ret.), who found in a 2008 award that Arie's listing of the liability to be "significantly misleading, and Arie's exposure, if at all, was minimal. … That listing was there for a reason and it was clearly wrong, and skewed the numbers significantly." Exh. K at 8.  By contrast, Justice Milonas found the "most credible, reliable and the fairest assessment [of TRI] was prepared by Sagi." *Id.* at 11.

14.    The following year, a legal battle broke out in Delaware between Arie and his former friends and business partners, the Trump Group, over control of TRI.  The Trump Group claimed that the 2004 conveyances of TRI stock violated TRI's stockholder agreement, giving the Trump Group the right to purchase the shares from its former parent company, TPR Investment Associates, Inc. ("**TPR**").  Arie testified that he had told the Trump Group about the transfers at the time, and his star witness on that issue was Orly.  Following a lengthy trial, then-Chancellor Strine ruled in favor of the Trump Group, essentially finding that Orly had lied on the stand to hurt Sagi: "[t]he lack of specific details in her testimony undermines her credibility because of her personal interest in the outcome of this case and **her obvious desire to protect her father in his feud with her brother** …." *TR Investors, LLC v. Genger*, 2010 WL 2901704, at *7 (Del. Ch. July 23, 2010), *aff'd in relevant part*, 26 A.3d 180 (Del. 2011) (emphasis added).  Chancellor Strine further held that to rule for Arie on the TRI dispute "would only reward him for his own perfidy" and sanctioned him a whopping $4 million for evidence spoliation. *Id.* at *18; *TR Investors, LLC v. Genger*, 2009 WL 4696062 (Del. Ch. Dec. 9, 2009), *aff'd*, 26 A.3d 180 (Del. 2011).  The

-6-

foregoing findings were all affirmed by the Delaware Supreme Court. *See Genger v. TR Investors, LLC*, 26 A.3d 180 (Del. 2011).

15.    Sagi and Dalia had stayed neutral in the Delaware litigation (Sagi only appeared as a witness called by Arie), but Arie and Orly nevertheless blamed them for this fiasco.  Starting in 2007 and continuing for years, the Debtor filed no less than eight lawsuits against her brother and mother, all of which, we now are told, were funded in some part by her father Arie for his own personal benefit.  In their joint status report, the Debtor Group falsely characterized these lawsuits as somehow successful.  In fact, Orly is 0 for 8.

16.    In 2007, Orly sued Sagi and the trustee of her trust in New York Surrogate's Court, but then withdrew that suit when the trustee resigned in favor of her mother.  Orly then sued her mother, the new trustee, three times.  In 2008, the Surrogate's Court threw out Orly's first suit against Dalia, finding that Orly's claims were based on a "material misstatement." *In re Genger*, 2008 WL 11188493, *3 (Surr. Ct., N.Y. Cnty. Dec. 31, 2008).  Orly then filed two more petitions against Dalia, one of which was also dismissed (*In re Genger,* 2015 WL 1597526, *1 (Surr. Ct., N.Y. Cnty. Apr. 9, 2015)), and the other of which Orly effectively abandoned, choosing instead to pursue parallel claims in the New York Supreme Court.

17.    Orly also filed four suits against her brother and mother in New York Supreme Court.  The first one, in which Orly (together with Arie) sought hundreds of millions of dollars in damages from Sagi and Dalia relating to TRI, was dismissed on the pleadings in an Appellate Division ruling penned by Justice Helen Freedman, partly on the ground of Arie's "unclean hands." *Genger v. Genger*, 121 A.D.3d 270, 278 (1st Dep't 2014).  Orly's second lawsuit, concerning TRI's former parent, TPR, went to trial in the Summer of 2016, after which J.H.O. Gammerman issued this bench ruling: "Orly seeks an award of approximately $85 million in damages …. I find … that no damages were … suffered." Exh. P at 3-4.

18.    In Orly's third lawsuit, she claimed to have been "defrauded" when she sold her interest in a Canadian real estate interest to her brother for $100,000, which she claimed was actually worth $12 million.  An initial liability ruling in her favor was vacated on appeal for lack of injury (*Genger v. Genger*, 144 A.D.3d 581, 582 (1ˢᵗ Dep't 2016)). The case was then referred to a CPA at the Mazars firm, who calculated that Orly's interest (purchased for $100,000) was theoretically worth between $99,551 and $132,374 at the time, translating to a pecuniary loss of $0 to $32,374 (a distant cry from the $12 million Orly claimed). Exh. S at 63.  At a mandatory conference last fall to set a trial date, no counsel appeared on behalf of either Orly or the Chapter 7 trustee attend, meaning this case, too, is effectively abandoned.

19.    A fourth lawsuit that Orly brought against Dalia and others in Supreme Court, seeking to litigate yet more TRI-related issues, was dismissed as precluded by the dismissal of the first Supreme Court suit listed above. *See Genger v. Pedowitz & Meister LLP*, 2015 WL 1688668 (N.Y. Sup. Ct. April 14, 2015).[2]

20.    While all these frivolous lawsuits accomplished nothing in terms of recovery, they did rack up significant legal fees.  How Orly paid those fees, and its implications for the current Bankruptcy Case, are discussed below.

### C.    The Debtor Liquidates the TRI Shares for $32.3 Million And Triggers the Obligation to Support Her Mother

21.    While Orly failed in all of her claims against Sagi and Dalia, she did have one tremendous success against the Trump Group.  On June 16, 2013, Orly entered into a settlement

---

[2]    In addition to unsuccessfully suing her mother and brother eight times, Orly also unsuccessfully sued Sagi's lawyer (David Parnes), Dalia's law firm (Pedowitz & Meister), Sagi's mother-in-law (Rochelle Fang), and Sagi's sister-in-law (Leah Fang). All of those claims were dismissed on the pleadings.  She also obtaining a wrongful *ex parte* TRO and attachment on the accounts of Sagi's wife and children. It was later vacated.  By contrast, Sagi only commenced two actions (both of which were successful) to enforce his indemnity.  His turnover proceeding was limited to seeking recovery of the $32.3 million that Orly says is not hers.

agreement (the "**2013 Settlement Agreement**") with the Trump Group, whom she had sued over, *inter alia*, claims to beneficial ownership of the TRI shares.  Exh. W.  By the Agreement, the Trump Group agreed to pay $32.3 million to Orly's attorney and to drop a suit against Arie for misappropriating $5 million from TRI. *Id.* at 2-3.  In exchange, Orly acknowledged that the Trump Group owned "all right, title and interest" to TRI shares previously purportedly held for Orly's benefit in trust. *Id.* at 5; *see also Genger,* 76 F. Supp. 3d at 494.  The $32.3 million settlement payment consisted of $17.3 million in cash up front, plus two additional $7.5 million promissory notes. *Id.* at 494 n.11.  Those two notes remain outstanding.

22.    In 2014, upon learning of the 2013 Settlement Agreement (and thus of the fact that both her children had financially gained from the TRI shares whose rights were assigned in her 2004 divorce), Dalia made her first support request under the aforementioned 2004 agreement, for $200,000.  Sagi promptly paid the request, but when he sought 50% indemnity from Orly, she refused, spuriously claiming the agreement was a forgery and otherwise unenforceable.  Litigation ensued, culminating in a grant of summary judgment in favor of Sagi by the U.S. District Court, which was unanimously affirmed by the U.S. Court of Appeals in 2016.  *See Genger v. Genger*, 76 F. Supp. 3d 488, 501 (S.D.N.Y. 2015), *aff'd*, 663 F. App'x 44 (2d Cir. 2016).  In doing so, the Court of Appeals rejected Orly's argument (identical to the one she makes now) that Orly did not benefit because she gave away the money to her father to pay his debts: "Orly benefitted from the shares regardless of whether the settlement money went to Orly, as a gift to Arie..." *Genger v. Genger,* 663 F. App'x 44, 49 (2d Cir. 2016).

23.    In the fall of 2017, with the validity of the 2004 agreements (collectively, the "**2004 Integrated Agreement**") now affirmed, Dalia invoked her clawback rights for a second time, requesting financial support from Sagi and Orly in the amount of $6 million.  Sagi conceded liability, but Orly did not.  Instead, she again refused to pay her one-half share, despite the parties'

agreement having been adjudicated to be valid and enforceable in the earlier federal court suit. *See Genger,* 76 F.Supp.3d at 499-501.  Accordingly, a second suit ensued.  On August 17, 2018, the District Court entered a first-party judgment against Sagi in favor of Dalia for $6 million, and a third-party judgment against the Debtor in favor of Sagi for half that amount, *i.e.,* $3 million plus interest and expenses (the "**Judgment**").  Exhs. H, I.  Orly did not pay the Judgment, but instead again appealed to the Second Circuit, where she was represented by both named partners of the Kasowitz Benson firm.  The Court of Appeals again unanimously affirmed in Sagi's favor. *Genger*, 771 F. App'x at 102.

24.    According to the District Court, Orly must support Dalia for up to $12.35 million of the $32.3 million. *See Genger, 2018 WL 3632521* at 6 n.5 ("Dalia's conveyed marital interest of 794.4 shares represents 36% of the total TRI shares that were monetized. Using that figure, the maximum amount payable to Dalia under the 2004 Integrated Agreement is approximately $24.7 million (or 36% of the total $69.3 million value) [to Sagi and Orly]).").  That still leaves Orly at least $20 million, which would please most people.  Not Orly.

**D.    The Debtor Group Schemes To Frustrate
The Debtor's Financial Obligation to Her Mother**

25.    In collaboration with her father Arie, and later her husband/Kasowitz partner, Orly set about to deny Sagi his lawful right to partial indemnification of his support obligation to Dalia. Thus, when the first $17.3 million payment was made in 2013, the Debtor's then-attorney, William Wachtel, immediately wired the entire sum to a purported trust established for the benefit of *Arie's* purported creditors, the Brosers.  Exhs. B, L.  (David Broser testified that Orly never borrowed money from him and owes him nothing. (Exh. HH at 36.))  Despite knowing that this money was not all hers to give, the Debtor gave it away anyway.

26.    Because, however, the remaining $15 million in promissory notes had not yet come

due, the Debtor Group had to be more creative as to how to place it beyond the reach of Dalia's clawback rights. They adopted a multi-pronged approach. First, for over a year, they concealed the terms of the Settlement Agreement from Dalia and Sagi, while misrepresenting to various Courts the contents thereof. For example, Orly's then-counsel at the Zeichner firm (who helped negotiate the deal) falsely told the District Court: "That equal receipt of TRI Shares benefiting both Sagi and Orly never happened. Rather, … only Sagi benefited. … "Sagi (via TPR) obtain[ed] all the value – and Orly none." Exh. N at 2. "As it turns out," Judge Forrest later observed, "Orly has effectively monetized an interest in the very shares *she claims not to have received* to the tune of $32.3 million." *Genger,* 76 F. Supp. 3d at 491 (emphasis added).[3]

27.     Even once the 2013 Settlement Agreement was finally produced, however, that document still did not reveal how the Debtor Group (defined as the "AG Group" therein) planned to distribute the $15 million in proceeds from the two promissory notes. Exh. W at 1. Rather, the document only states that the notes would be held by Orly's then-counsel of record, Mr. Wachtel. (In April 2007, the Debtor wrote to Mr. Wachtel, demanding that he step down in favor of Michael Bowen, her new husband's law partner, advising Mr. Wachtel that his refusal to do so "will delay payment by the Trump Group under the Settlement Agreement, and cause damage to me and other members of the AG Group." Exh. O (emphasis added). The Debtor's admission in the letter as to her stake in the proceeds further belies her current claims to this Court.

28.     The change in escrow agents was part and parcel of a scheme by the Debtor Group

---

[3]     The Debtor made similar misrepresentations to Chancellor Strine, leading him to remark, at a preliminary conference, that it would be unfair for Sagi to win the "Powerball." Having tricked that Court into believing something that was palpably false, on an incomplete record, the Debtor Group now quotes that remark in their joint status report, while ignoring the District Court's subsequent findings, made on a complete record. To be clear, District Judge Keenan reviewed the transcript of Chancellor Strine's remarks and discussed them with counsel at oral argument, before rejecting Chancellor Strine's preliminary finding in his final order. *See TPR Inv. Associates, Inc. v. Pedowitz & Meister LLP,* 2014 WL 1979932 (S.D.N.Y. May 15, 2014).

to encumber those two promissory notes by having the Debtor pledge them as "security" to her

husband and father for bogus, backdated "liabilities." Key to the Debtor's plan were the creation

of three documents in 2017-2018, each of which were backdated to "December 2016" to match

the Debtor's timeline: (a) $5.4 million promissory note dated December 31, 2016, in favor of her

father (the "**Arie Note**"); (b) $2 million promissory note dated December 30, 2016 in favor of her

husband made jointly by Arie and Orly (the "**Herschmann Note**"); and (c) an agreement dated

December 31, 2016 ███████████████████████████████ (the

"**Subordination Agreement**"). Exhs. T, U, V, Z, RR.

29.    Claiming the Arie Note and the Herschmann Note to be "secured" debts, the Debtor

next caused UCC financing statements to be filed in Texas, Florida and New Jersey, liening all of

her assets first in favor of her husband, and second in favor of her father, who then turned around

and filed UCC financing statements liening all of *his* assets in favor of the Debtor's husband. Exhs.

E, F, G. The effect – and plain intent – of the UCC liens, promissory notes and related agreements

is to "round trip" the money out of the Debtor's estate and then back to the Debtor through her

husband, who supports her lifestyle. According to her AmEx *Centurion Card* statements (Exh.

DD), the Debtor is lavishly supported by her husband, Mr. Herschmann, a fact that both the Debtor

and her husband falsely denied, under oath. Exh. II.

30.    In post-judgment discovery, the Debtor Group concealed these arrangements from

Sagi, going so far as to make many false statements under oath. First, when asked in interrogatories

to "[i]dentify the amount, date, and recipient of all payments made and/or to be made to any person

or entity pursuant to Defendant's 2013 settlement," Orly falsely swore on October 8, 2018 that she

had "no knowledge." Exh. OO at 17. Shortly thereafter, the Debtor's counsel and noteholder,

Michael Bowen (Exh. D), appearing as a Rule 30(b)(6) witness on behalf of the Kasowitz firm,

falsely testified that: "We don't have any information about any agreements between the AG

Group" concerning payments under the 2013 Settlement Agreement – even though the Kasowitz firm is a party and signatory to that very agreement that so provides, along with the Debtor and her husband. Exhs. M at 32; R at 5. David Broser also made multiple false statements, under oath, as to the supposed non-existence of such documents. Exh. HH at 40-41.

31.    All of these statements made were knowingly false. In truth, the Debtor Group had entered into an Agreement dated March 31, 2017, by which they purported to encumber the upcoming $15 million note payments from the Trump Group to pay her husband and the Brosers, but not the money she committed to pay her mother (the "**2017 Agreement**"). Exh. R. The existence of the 2017 Agreement was only accidentally revealed, when Sagi discovered a passing reference to it in another document produced in discovery.

32.    All this subterfuge was necessary because these documents do not reflect any actual, bona fide debts. It is undisputed that the Debtor has never directly received a single dollar in exchange for the promissory notes to her husband and father; nor has she ever made a single dollar of "repayment" under either one. Exh. Q at 113-117. Rather, as the story goes, these notes reflect advances that the Debtor's husband and father allegedly made to Orly's lawyers. *Id.* In fact, Arie may have paid Orly's lawyers directly for certain lawsuits brought in her name (though those suits were not for her benefit), using some of the funds he supposedly borrowed from the Brosers. Yet incredibly, when one of those suits led to Orly's $32.3 million settlement, and $17.3 million was used to fully repay Arie's alleged debt to the Brosers, Arie continued to treat Orly's alleged, corresponding debt to him as still *unpaid*. Exh. X.

33.    In reality, the whole story was fabricated after the fact and applied retroactively as a fraudulent asset protection scheme to frustrate Sagi's ability to obtain payment on his judgment. The UCC liens based on the 2016 Arie Note were not filed until August 2018, which was after Sagi had won summary judgment. While the Arie Note purports to replace ten earlier notes, no

-13-

one can produce copies of any of them, or even a contemporaneous document referencing any of

them, because they never existed. Exh. Y at 11-17. Rather, records from Arie's and Orly's shared

accountant reveal that the amounts supposedly stated on the face of each of the ten notes for 2007-

2016 were first calculated in July 2017. Exh SS.

34.      The Debtor's $2 million promissory note to her husband, Eric Herschmann, is also

bogus. She purportedly conveyed it to him three months after they were married, supposedly for

her husband's payment of legal fees to his own firm, Kasowitz, on her behalf. However, the lion's

share of Kasowitz's legal work on her behalf was for a state court action wherein Mr. Herschmann

told the court that: "I have a retainer letter that would reflect that all of the attorneys that are on

the trial for Kasowitz are working pro bono." Exh. BB at 957-58.  The couple's prenuptial

agreement ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ Exh. EE at 27 of 39.  Yet in her Schedules,

the Debtor now claims she owes Kasowitz $1.5 million, on top of the $2 million payment that was

supposedly made by her husband on account of "pro-bono services," having made no additional

payments since December 2016.[4]  Exh. PP at Schedule E/F, No. 4.3.

E.       **The Debtor Dissipates Her Remaining Assets
         In the Run Up to Her Filing this Bankruptcy Case**

35.      Apparently not wanting to leave any loose ends, with the $32.3 million in proceeds

from the 2013 Settlement Agreement dissipated by the foregoing scheme, the Debtor set about

---

[4] ████████████████████████████████████████████████████████
████████ (Mr. Herschmann moved to quash Sagi's subpoena which would have gotten to the bottom of the
matter, and then had his wife file for bankruptcy before the Magistrate could rule on the discovery motion).
Even if the payment were for Kasowitz's not-in-fact "pro bono" legal work on Orly's behalf, this would
simply have been an example of a wealthy spouse paying his less-wealthy spouse's bills. When Orly's legal
fortunes soured, however, the payment was retroactively recharacterized as a "secured loan," and a
promissory note was created and backdated to conform to that story.

transferring away her remaining assets as well.

36.    In 2016 and 2017, the Debtor completely liquidated her sizable portfolio of investment assets, transferring much of it to a trust for her own benefit. Exh. AA at 35-39.[5]  Next, in August 2018, after summary judgment was rendered in Sagi's favor in the New York federal suit, the Debtor emptied out all of her U.S. investment and bank accounts and hurriedly wired all the money to IOLA account of her attorney, who could not account for it. Exh. FF.  Then, in September 2018 (three weeks after judgment was entered against her), the Debtor recorded a transfer of her controlling interest in her valuable investment portfolio and art holdings business, Everything Important LLC, to Arie for no cash, but instead only a nominal reduction on her supposed debt to him.  Exh. GG.  (The Bill of Sale is dated January 1, 2017—20 months before it was filed—and appears to be yet another backdated document.)  Lastly, on September 28, 2018 (one week after Sagi domesticated his judgment in Texas), Orly and her husband recorded a "Deed of Trust" purporting to conditionally transfer her residual rights to her fifty percent (50%) interest in the couple's property—a multi-million dollar apartment in the W Hotel in downtown Austin—to a trust for the benefit of Mr. Herschmann. Exh. QQ.

37.    None of this was mere coincidence – this was a preplanned and purposeful scheme. At her deposition, when the Debtor was asked why her 2016 premarital agreement had ███████ ████████████████████████████████████████ she responded: ██████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████ Exh. Q at 79-80 (emphasis added).  As the U.S. District Court for the Western District of Texas later found, the Debtor and

---

[5]    The Debtor reported six-digit income, independent of her husband, for each of the last four reported taxable years 2013 – 2016: ██████████████████████████. Exhs., JJ, KK, LL, MM. Movant does not yet have the Debtor's 2018 or 2019 tax returns.

her husband were perfectly willing to make dubious statements, even under oath, in "an attempt to frustrate the post-judgment discovery being attempted by Sagi Genger." Exh. NN at 5. This Bankruptcy Case is yet more of the same.

### F.    The Debtor Files False Bankruptcy Schedules Omitting Her Claim on the $15 Million Promissory Notes

38.    On June 11, 2019, Sagi filed before District Judge Broderick (who had succeeded to the case upon Judge Forrest's retirement) a post-judgment motion (the "**Turnover Motion**") to set aside the Debtor's fraudulent conveyances. Exh. CC. Rather than consent to this relief, which would have been sufficient to pay all of Orly's creditors, legitimate and otherwise, and obviate any valid purpose this Bankruptcy Case could otherwise serve, Orly first sought and obtained a lengthy extension of her time to reply and then, when that time finally came around, she instead filed this Bankruptcy Case.

39.    In her bankruptcy schedules ("**Schedules**"), the Debtor lists "total property," outside of her multi-million-dollar apartment at Austin's "W" Hotel, of only $56,627.77. Exh. PP at Schedule A/B, No. 63.

40.    In her Schedules, the Debtor acknowledges that: "Third parties have asserted, in various litigation, that Debtor may have claims that the Debtor does not believe exist. To the extent known, such alleged claims have been listed and have been designated in such a manner to disclose, for notice purposes, the alleged claims but do not constitute an admission that such claim(s) exist." Exh. PP at 3. Yet remarkably, the Debtor fails to list, even as a "disputed" claim, her interest in the $32.3 million. Given that the District Court found that it "has been conclusively established that … Sagi and Orly monetized their beneficial interests in the TRI shares for a total of $69.3 million," $32.3 million of which was monetized by Orly (*Genger,* 2018 WL 3632521, at *6), this claim should have been scheduled, and its omission is deliberate.

-16-

**ARGUMENT**

**A.      Governing Standards for Dismissal**

41.      The principal goal of bankruptcy law is to afford honest debtors a fresh start by relieving them from the weight of oppressive indebtedness.  *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).  Section 707 "limits a chapter 7 debtor's right to a 'fresh start' by permitting the 'bankruptcy court to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors.'" *In re Uddin*, 196 B.R. 19, 21-22 (Bankr. S.D.N.Y. 1996) (citing *In re Green*, 934 F.2d 568, 570 (4th Cir. 1991); *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989)).  Such is the case here.

42.      A Bankruptcy Court's decision to dismiss a case for cause under Section 707(a) is guided by equitable considerations and is committed to the sound discretion of the Court. *See In re Murray*, 900 F.3d 53, 58-59 (2d Cir. 2018) (*citing In re Smith*, 507 F.3d 64, 73 (2d Cir. 2007); *In re Krueger*, 812 F.3d 365, 369–75 (5th Cir. 2016); 6 *Collier on Bankruptcy* § 707.03 [1] (16th ed. 2018)).  The Court of Appeals will "disturb a dismissal for cause only if the bankruptcy court has abused its discretion." *In re Murray*, 900 F.3d at 59. (citation omitted).

43.      The Debtor's false statements and machinations are head-spinning.  The Debtor's demonstrated lack of candor and good faith in her sworn, voluntary petition is also an affront to the dignity of this Court and the Bankruptcy Code.  Her bankruptcy filing lacks good faith and has no proper purpose.  Its only goal is to keep her assets in the hands of her father (who, in turn, has pledged all his assets back to her husband) and her husband, who supports the Debtor in a lavish lifestyle, while leaving her one true creditor – Sagi (and by extension, her estranged mother, Dalia) – holding the bag.  This is a textbook bad-faith bankruptcy filing.  Accordingly, Sagi respectfully submits that the most – perhaps only – appropriate remedy for such misconduct is dismissal of the Debtor's bankruptcy case under 11 U.S.C. §§ 305(a) and/or 707.

-17-

**B.**    **This Case Was Filed In Bad Faith**

44.    According to the Second Circuit: "Cause for dismissal may be found in a variety of circumstances, and courts must engage in a case-by-case analysis to determine whether dismissal is appropriate...the analysis in a for-cause dismissal can consider whether the debtor is able to repay his debts as part of the larger 'required inquiry into whether dismissal would be in the best interest of all parties in interest.'" *Gilboy v. Reukema*, 610 F. App'x 17, 18 (2d Cir. 2015) (citation omitted). Courts in this Circuit have dismissed Chapter 7 cases pursuant to § 707(a) where there is an absence of good faith. *See, e.g., In re Lombardo*, 370 B.R. 506, 511 (Bankr. E.D.N.Y. 2007); *In re O'Brien*, 328 B.R. 669 (Bankr. W.D.N.Y. 2005); *In re Griffieth*, 209 B.R. 823, 827-828 (Bankr. N.D.N.Y. 1996); *see also, e.g., In re 167 West 133rd Street Housing Development Fund Corp.,* 2018 WL 4637460, at *8 (Bankr. S.D.N.Y. Sept. 25, 2018) (granting dismissal of Chapter 11 bankruptcy filing under comparable "bad faith" standard).As the Supreme Court has recognized, Bankruptcy Courts "routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words 'for cause'." *Marrama v. Citizens Bank of Massachusetts*, 49 U.S. 365, 373 (2007).

45.    This "good faith" requirement has strong historical roots in equity:

> The guiding doctrine…is the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim is…a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith…Thus while 'equity does not demand that its suitors shall have led blameless lives,'…it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814-15 (1945).

46.    In determining whether there is cause to dismiss a bankruptcy case, "the courts may consider the debtor's entire course of conduct, before, during, and after the filing of a chapter 7

petition, including acts or omissions arguably covered by more specific provisions of the Bankruptcy Code…" 9A *Am. Jur. 2d Bankruptcy* § 1143.

47.    "[T]he fifteen factor approach in *Lombardo* … is the most commonly and recently utilized § 707(a) test." *In re Ajunwa*, 2012 WL 3820638, at *6 (Bankr. S.D.N.Y. Sept. 4, 2012). "The factors are (1) the debtor's manipulations having the effect of frustrating one particular creditor, (2) the absence of an attempt to pay creditors, (3) the debtor's failure to make significant lifestyle changes, (4) the debtor has sufficient resources to pay substantial portion of debts, (5) the debtor inflates expenses to disguise financial well-being, (6) the debtor is overutilizing protections of the Bankruptcy Code to the unconscionable detriment of creditors; (7) the debtor reduced his creditors to a single creditor in the months prior to the filing of the petition; (8) the debtor filed in response to a judgment, pending litigation or collection action; (9) there is an intent to avoid a large single debt; (10) the debtor transferred assets; (11) the debtor is paying debts to insiders; (12) the debtor failed to make candid and full disclosure; (13) the debts are modest in relation to assets and income; (14) there are multiple bankruptcy filings or other procedural "gymnastics"; and (15) the unfairness of the use of Chapter 7." *Id.* at 6, n.10.

48.    It is hard to imagine which of these fifteen factors do *not* apply here.  To wit, Orly had admitted to filing this Bankruptcy Case in response to the judgment of a single creditor, Sagi (Exh. C at 67); she has made no attempt to pay any of her judgment to him; she continues to live the lifestyle of a very rich woman (per Judge Davis, after learning of her international travel schedule in the 2019 calendar year: "[t]his highly mobile individual can clearly be where she needs to be" (Exh. A at 7)); she transferred assets right before filing for bankruptcy (*e.g.,* emptying out her investment accounts and sending the money to her lawyer, who could not account for it); and she made special arrangements to protect insiders (*e.g.,* the Deed of Trust for her husband's benefit, and the UCC for her father's benefit, both less than a year before she filed for bankruptcy); she

-19-

failed to make candid and full disclosure of her assets, in particular her right to some or all of the $32.3 million; and she certainly put her true creditors through the "gymnastics" of a spurious Texas venue, not to mention her litany of other meritless lawsuits over the years.

49.     But of every one of these fifteen factors, #8 – the debtor filed in response to a judgment, pending litigation or collection action – is perhaps most spot on.  There can be no doubt that the Debtor's primary, if not sole, purpose, in filing this Bankruptcy Case was and is to protect the fraudulent transferees of the $32.3 million from the turnover motion brought in the District Court.  Any doubt on this point was resolved when, just last week the Debtor filed a joint status report with all those transferees beseeching the Court not to undo her transfers.

50.     In *In re Syndicom Corp.*, 268 B.R. 26, 51-52 (Bankr. S.D.N.Y. 2001), the Bankruptcy Court identified these additional factors as reflecting a debtor's bad faith:

[a]     the case was filed as a tactical step in connection with [litigation]…and with the purpose of securing a tactical advantage…[;]

[b]     [t]here has been no showing of any financial pressure on the Debtor [other than its adversary in a]…two-party dispute[;]

[c]     unsecured creditors would not benefit in any material way from the debtor's filing and would not be prejudiced in any material way as a result of relief from the stay[; and]

[d]     the case was filed with both the purpose and effect of securing benefits for non-debtor individuals…in contrast to securing benefits for the Debtor …

Each of the *Syndicom* factors is present here.  This Bankruptcy Case was filed as a tactic to stay the federal court suit wherein, after years of litigation, the U.S. District Court was situated to set aside the Debtor's fraudulent conveyances, and she and her cohorts faced impending motions for sanctions and contempt.  The tactical nature of this case is entirely consistent with her and her conspirators' pre-bankruptcy litigation strategy of false oaths.

51.     The Fifth Circuit's decision in *In re Krueger*, 812 F.3d 365 (5th Cir. 2016) – upon which the Second Circuit relied in *In re Murray, supra*, provides a case in point.  In *Krueger*, "the

record [was] replete with evidence that Krueger filed bankruptcy for illegitimate purposes, misled the court and other parties, and engaged in bare-knuckle litigation practices, including lying under oath …. As the bankruptcy court found: 'Krueger petitioned for bankruptcy not to seek a fresh start as an honest but unfortunate debtor, but to hamper the state court litigation ….'" 812 F.3d at 374. The Fifth Circuit thus held that: "His duplicitous behavior is exactly the sort of conduct contemplated by most courts as giving cause for dismissal under § 707(a)." *Id.* at 375.

52.    The Debtor's behavior here has been far more duplicitous than that in *Krueger*, and accordingly this case should be dismissed for all the same reasons.

### C.    This Debtor's Schedules Are Also In Bad Faith

53.    The Debtor has also been less than candid in her bankruptcy schedules, which provides *yet another ground* for bad faith dismissal. "[A] debtor's bankruptcy petition and the accompanying schedules and statement of financial affairs constitute statements under oath." *In re Papadopoulos*, 2015 WL 1216541, *8 (Bankr. S.D.N.Y. Mar. 13, 2015) (internal citation omitted). "[T]he integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets." *Isnady v. Vill. of Walden*, 2019 WL 3252753, at *6 (S.D.N.Y.), *aff'd*, 799 F. App'x 91 (2d Cir. 2020). As explained in *In re Klutchko*, 338 B.R. 554, 568 (Bankr. S.D.N.Y. 2005) (citations and internal quotation marks omitted):

> [A] debtor's obligation to provide accurate disclosure should not be minimized. The purpose behind 11 U.S.C. § 727(a) (4) is to enforce debtors' duty of disclosure and to ensure that the debtor provides reliable information to those who have an interest in the administration of the estate. Bankruptcy Trustees lack the time and resources to play detective and uncover all the assets and transactions of their debtors.

54.    Here, most egregiously, the Debtor makes no mention of the $32.3 million, not even as a "disputed" claim, notwithstanding the fact that there was an open turnover proceeding at the time Orly filed for bankruptcy. As Judge Davis found, issues relating to "the 32 million and where it went … has been the subject of more than a decade of litigation pending in New York, and will

be among the central issues in this Bankruptcy Case." Exh. A at 8.  What good faith basis could Orly possibly have had to omit that claim?  Surely, it was not inadvertent.

55.    Even beyond the missing $32.3 million, there is little, if any, meaningful financial information provided in the Schedules or the Statement of Financial Affairs. No information is provided as to the value of the various trusts, some of which the Debtor used to move assets from her own name.  Further, the Debtor lists only two secured creditors, her husband and her father. Both claims should have been listed as subject to avoidance claims, but were not. These Schedules, as well, reek of bad faith and support dismissal.

56.    The Debtor's nondisclosure and outright evasion starts with her "Introduction", wherein the Debtor makes a 3 page-single-spaced disclaimer of the accuracy of the disclosures and her purported lack of knowledge in completing and filing her Schedules and Statement of Affairs. This is a remarkable attempt to modify the "penalty of perjury" obligation upon execution by a Debtor of her  schedules. *See* Fed. R. Bankr. P. 1008; Official Form 1 (Voluntary Petition); Official Form 7 (Statement of Financial Affairs).  As an example:

> Although the Debtor has made reasonable efforts to ensure the accuracy and completeness of such financial information, inadvertent errors or omissions, as well as the discovery of conflicting, revised or subsequent information, may cause a material change to the Schedules and Statement. Thus, *the Debtor is unable to warrant or represent the Schedules and Statement are without inadvertent errors, omissions or inaccuracies*. … Notwithstanding the foregoing, the Debtor shall not be required to update, amend or supplement the Schedules and Statement but reserves the right to do so.

Exh. PP at 2 (emphasis added).

57.    Next, the Debtor states in her Global Notes that, "[i]n the event that the Schedules and Statement differ from the foregoing Global Notes, *the **Global Notes shall control***. Exh. PP at 3.  Those "Global Notes," however, are not signed under penalty of perjury – or any penalty, for that matter.

-22-

58.    Next, although she lives off her rich husband's cash, Orly claims that: Schedules I

and J request information on the Debtor's non-filing spouse's financial assets and income… [s]uch

information is not available to the Debtor, and is, accordingly not listed." The Schedules do not

"request" any information – they "require" full, honest, and truthful disclosures. These answers to

the questions are not optional, or at the pleasure of a debtor. The Debtor simply refuses to disclose

the information. Exh. PP at 4 ( "Specific Disclosures").

59.    The debtor must fully disclose all information relevant to the administration of the

bankruptcy case. *In re Riccardo,* 248 B.R. 717, 724 (Bankr. S.D.N.Y. 2000).  "*It is not for the*

*debtor to decide what is and is not relevant*." *Jensen v. Brooks (In re Brooks),* 278 B.R. 563, 566

(Bankr. M.D. Fla. 2002) (emphasis added).  Given the forgoing, and the purposeful omissions, it

is impossible to conclude that the Debtor's failure to disclose relevant information was anything

but purposeful.  This case should be dismissed for this reason as well.[6]

> **D.    The Two-Party Nature of This Case**
> **Also Mandates Dismissal**

60.    In addition, the Court may also dismiss Debtor's bankruptcy petition under 11

U.S.C. § 305(a) (1), which provides that a bankruptcy case may be dismissed at any time if "the

interests of creditors and the debtor would be better served by such dismissal or suspension."

Dismissal under Section 305(a) (1) may be appropriate in instances where "the debtor's financial

condition is, in essence, a two party dispute between the debtor and [a] secured creditor[]." *In re*

*Loco Realty Corp.*, 2009 WL 2883050, at \*2 (Bankr. S.D.N.Y. June 25, 2009) (citing *In re C-TC*

*9th Ave. Partnership*, 113 F.3d 1304, 1311 (2d Cir. 1997)).  "In cases where [a]…petition is really

---

[6]    To date, the Debtor and her husband have refused to provide any discovery in this Bankruptcy Case.  Accordingly, once such discovery is provided, Sagi reserves the right to also seek discovery under 11 USC § 707(b) (1) based on the ground that "the granting of relief would be an abuse of the provisions of this chapter." *See, e.g., In re Uddin*, *supra*.

-23-

a two-party dispute that can be addressed in state court…then the Court can and will abstain … if bankruptcy courts were to entertain two-party disputes, then it would 'transform' the bankruptcy courts into a collections device." *In re Selectron Mgmt. Corp.*, 2010 WL 3811863, at *6 (Bankr. E.D.N.Y. Sept. 27, 2010) (citation omitted).

61.    At its core, this is a two-party dispute between two family factions, over the Debtor's decade-long effort to frustrate her mother's right to financial support.  The involvement of every other party or alleged creditor is derivative of, and would be resolved as part of, the adjudication by the District Court of that two-party dispute.

62.    Here, there has been no showing of any financial pressure on the Debtor by any creditor other than Sagi, making this essentially a two-party dispute.  Moreover, Sagi's "pressure" was to attempt to *restore* assets to Orly.  As noted above, prior to filing for bankruptcy, the Debtor spent the better part of a year litigating to avoid having tens of millions of dollars in assets restored to her so she could pay these claims.  That is not the conduct of an honest debtor.  Additionally, Sagi has limited his turnover motion to seeking only the proceeds of the recovered fraudulent transfers, assets the Debtor has repeatedly stated she has no interest in.

63.    The bilateral nature of this dispute is exemplified by the fact that the Debtor, her father, her husband, his law firm, and the Broser entities – *i.e.,* nearly all the parties that have appeared in this case other than Sagi, Dalia (whose claims are intertwined with Sagi's), and the Orly Genger 1993 Trust – filed a joint letter with this Court in response to the Court's request for such position statements. Docket No. 237.   In their letter, these parties argue that none of the $32.3 million in proceeds of the TRI Shares ever belonged to the Debtor and, therefore, the Debtor's assets are limited to her 50% share of the apartment in Austin and the $56,627.77 in miscellaneous assets, nearly all of which the Debtor claims is exempt property.

64.    On the other side are Sagi, Dalia, and the Orly Genger 1993 Trust.  All these parties

-24-

wish to see the $32.3 million used to satisfy her obligations, and consequently support dismissal as the most efficient path to that result..

65.    As Judge Davis noted, "the bankruptcy will create a new layer of litigation that arises from the same transactions, facts and set of occurrences that are the subject of litigations that have concluded and the litigation that remains pending in New York." Exh. A at 4.  Dismissal of the Bankruptcy Case will allow the District Court to hear the turnover motion and bring this litigation saga to a conclusion.

## CONCLUSION

WHEREFORE, for the reasons stated above, judgment creditor Sagi Genger respectfully requests entry of an order (a) dismissing the Debtor's Bankruptcy Case pursuant to either or both of Sections 707(a) and/or 305(a) (1) of the Bankruptcy Code and (b) granting him such other and further relief to which he is justly entitled.

Dated: April 24, 2020                    Respectfully submitted,

                                        *s/Thomas A. Pitta*
                                        Thomas A. Pitta, Esq.
                                        John Dellaportas, Esq.
                                        Emmet, Marvin & Martin, LLP
                                        120 Broadway
                                        32nd Floor
                                        New York, New York 10271
                                        Telephone: (212) 238-3000
                                        Facsimile: (212) 238-3100
                                        *Counsel to Judgment Creditor*
                                        *Sagi Genger*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this motion has been served upon each

attorney of record by ECF and filed with the Court on this the 24th day of April, 2020.

*s/ Beth Khinchuk*

_____

BETH KHINCHUK

7867847v.7