

# EMMET, MARVIN & MARTIN, LLP
## COUNSELLORS AT LAW

120 Broadway 32nd Floor
New York, New York 10271
212-238-3000

**www.emmetmarvin.com**

John Dellaportas
*Partner*
Tel: 212-238-3092
Fax: 212-238-3100  Fax (alt.) 212-406-6953
jdellaportas@emmetmarvin.com

May 29, 2020

**Via ECF**

Honorable James J. Garrity, Jr.
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

      **RE:** *In re Orly Genger*, **Case No.: 19-13895-jlg**

Dear Judge Garrity:

    We represent judgment creditor Sagi Genger ("Sagi"). At the Court's instruction, we respectfully submit this letter motion in support of our position that the September 12, 2019 investigative report prepared by Sason Matityahu, a private investigator retained by counsel to Sagi (the "Report"), should not be discoverable.

    The Report should be shielded from discovery on three grounds:

- First, the Report is protected by the attorney work product doctrine, in that it was prepared at the request of counsel, in anticipation of matters to be litigated as part of this bankruptcy case;

- Second, the Report cannot be the subject of a valid discovery request by Mr. Herschmann, as it contains no information that is likely to be relevant to his claim in this case, as would be required under Fed. R. Civ. P. 26(b)(1) and Bankruptcy Rule 7026; and

- Third, by demanding the Report in this forum, Mr. Herschmann is improperly seeking to usurp/circumvent the role of the Israeli Court, which has jurisdiction over the Debtor's suit against Mr. Matityahu, is best situated to determine any matters of Israeli law, and to date has not directed the turnover of the Report.

We examine each of these grounds below.

EMMET, MARVIN & MARTIN, LLP                                                                          2

## Background

This matter arises out of a series of false statements made during discovery by the Debtor and her husband, which a federal court later found to be "an attempt to frustrate the post-judgment discovery being attempted by Sagi Genger." Exh. A at 5.

To try to overcome these challenges, Sagi's longstanding Israeli counsel, the Tel Aviv firm of Parnes & Co., retained Mr. Matiyahu, an Israeli private investigator who is licensed under Israel's Private Investigators and Security Services Law, 5732-1972. Sagi has never met or even communicated with Mr. Matiyahu, who was retained solely by counsel to assist in counsel's efforts in Israel.

To properly understand the context, some background is required. In 2004, as part of Arie and Dalia Genger's divorce, trusts set up for the benefit of Sagi and Orly were given valuable shares in a Genger family business called Trans-Resources, Inc. ("TRI"), with the express written agreement that, should those shares ever be monetized, and should their mother Dalia thereafter need financial support, the two children would provide that support in equal amounts (up to a set amount based on a formula).

As the U.S. District Court later found, in 2013, "Orly monetized her beneficial interest in the Orly Trust [TRI] shares for $32.3 million, while Sagi [earlier] sold his interests in the TRI shares for $37.0 million." *Genger v. Genger*, 76 F. Supp. 3d 488, 501 (S.D.N.Y.), *aff'd,* 663 F. App'x 44 (2d Cir. 2016). Notwithstanding this windfall, Orly reneged on her financial commitment to her mother and repudiated the 2004 agreement. That led to a federal court suit in which the District Court upheld the agreement's validity, a decision the Second Circuit unanimously affirmed in 2016. *Id.*

Despite the Second Circuit's ruling, the Debtor continued to refuse to meet her financial obligations. Instead (we have since learned), she secretly made arrangements to dissipate the $32.3 million to her husband, father and business partners. When Dalia made a second financial request in 2017, Orly again reneged, requiring a second round of federal court litigation, with the same result. *Genger v. Genger*, 2018 WL 3632521 (S.D.N.Y. July 27, 2018), *aff'd*, 771 F. App'x 99 (2d Cir. 2019).

Because Orly had no meritorious substantive defense in the second federal action (the 2004 agreement having already been adjudicated valid), she instead tried to derail the suit by challenging service of process and, later, diversity jurisdiction.

First, when process was served on Orly at her homes in Austin and New Jersey, and at the Jerusalem address which she had registered with the Israeli government, Orly moved to dismiss on the ground that that she could only be lawfully served at an address in Tel Aviv she would not disclose. 1:17-cv-08181, Doc. 27, p. 14 of 18 (Orly: "For some reason known only to him (and his counsel), [Sagi] chose to ignore Orly's sworn declaration about living in Tel Aviv and tried to effect service at Texas and Jerusalem addresses that he had to know were wrong."). Sagi thus had to retain a licensed Israeli private investigator (not

EMMET, MARVIN & MARTIN, LLP                                                                                       3

Mr. Matityahu), who discovered that Orly was residing in a home listed in the name of a shell entity registered to Mr. Herschmann's sister-in-law.

Once service was effectuated, Orly kept insisting that the case should be dismissed because her alleged status as a permanent Israeli resident supposedly destroyed diversity jurisdiction.  In a May 16, 2018 declaration in support of her motion, for example, Orly stated under oath that: "Many months before this action was commenced by my mother and brother [in October 2017], I had moved from Austin, Texas to Tel Aviv, Israel. I intended at that time, and still intend, to live permanently in Israel, and have no intention to move from Israel. …All of Sagi's previous claims that my domicile is in … Texas … are inaccurate." Exh. B at 1, 3 (emphasis added).

In support of her dismissal motion, also Orly submitted a declaration from her husband dated January 25, 2018, in which he also swore under oath that: "Orly and I … were married [in Israel] in the fall of 2016.  Since that time, Orly has lived in Tel Aviv, Israel. She lives here with me …." Exh. C at 1 (emphasis added).

The District Court ultimately rejected Orly's jurisdictional defense and, on August 17, 2018, entered judgment in favor of Sagi (all of which remains unpaid).  Thereafter, Sagi served post-judgment discovery requests on the Debtor and her husband.  Of relevance here, the Debtor provided the following interrogatory answer:

> INTERROGATORY NO. 16:
>
> Identify all bank (checking or savings) accounts, brokerage accounts, credit card accounts, debit card accounts, or other financial accounts held by, in the name of, or for the benefit of, Defendant, either individually or jointly, or any account which Defendant has a direct or indirect interest in or control over, for any period during the last six years.
>
> RESPONSE:
>
> Orly objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. Subject to these objections and the foregoing general objections, Orly identifies the following accounts in her name: Vanguard brokerage account # [redacted]; Vanguard money market account # [redacted]; Morgan Stanley account # [redacted]; and Bank of America account # (unknown; attached by Sagi in 2017)

Exh. D at 15 (emphasis added).

In a subsequent deposition taken in March 2019, the Debtor again denied having any credit card other than a Bank of America Visa (presumably tied to the above-referenced account), either individually or jointly with her husband. Exh. E.

EMMET, MARVIN & MARTIN, LLP                                                                                          4

Meanwhile, Mr. Herschmann objected to providing *any* discovery. Instead, in 2019, he brought a motion to quash before the U.S. District Court for the Western District of Texas, claiming that he had no relevant information *at all*. To our surprise, he also stated, contrary to his 2018 declaration cited above, that he did not actually live in Tel Aviv, but rather had lived exclusively in Texas for the past nine years:

> **My Home in Austin**
>
> 3.   I am a resident of Texas and have been since 2010.
>
> 4.   I live at 210 Lavaca Street, Unit 1903 in Austin (the W Residences), my (only) homestead-protected property. Prior to living in Austin, I lived in Houston, Texas.

Exh. F at 1 (emphasis added). And, like Orly, he denied having any joint accounts:

> **My Separate Assets and Tax Returns**
>
> 44.  I have no joint bank or household accounts with my wife Orly Genger. We have not commingled any of our assets. Orly does not have access to my bank accounts. We do not share any credit cards. …
>
> 45.  … I have given my wife cash to buy food but no other funds and definitely nowhere near $10,000 total.

*Id.* at 7 (emphasis added).

However, when Sagi served third-party subpoenas, the responses painted quite a different picture. For example, Sagi subpoenaed AmEx directly for "Copies of all credit card statements and records for Orly Genger, aka Orly Herschmann, SS#: [redacted] for the past six years." Exh. G. In response, again to our great surprise, AmEx produced statements showing that Orly actually had *three undisclosed AmEx cards*. Further, one of the AmEx cards was a joint "Black Card" with her husband, in which she charged about $185,000 (*i.e.,* far more than $10,000) in just two years. Exh. H.

Presented with this and other inconsistencies between Mr. Herschmann's sworn statements and the unrefuted evidence, the U.S. District Court for the Western District of Texas transferred the case back to this District. (More on that below.)

Meanwhile, Orly continued to claim, to the Southern District of New York and on appeal to the Second Circuit, that she was an Israeli resident, notwithstanding that her (non-estranged) husband was now claiming to have *always* lived in Texas. When counsel to Sagi raised this discrepancy with Debtor's counsel by letter dated April 30, 2019 (Exh. I), the Kasowitz firm replied two days later with a letter threatening to seek "sanctions and disciplinary measures" against Sagi's counsel, merely for suggesting that the Debtor and her counsel might actually be living in Texas as opposed to Israel:

> **Whatever your motivation, your statements are demonstrably false, your demands are completely misplaced, and your letter is contemptible. … Among other things, …. I, personally, have visited Mr. Herschmann and Ms. Genger at their Tel Aviv home on two occasions (in September 2017 and October 2018), as have Michael Bowen (in December 2018 and January 2019), Andrew Kurland (in March 2019), and numerous other people, including other lawyers from this firm. During this time, I also have received hundreds of calls with a *972 country code (Israel) from Mr. Herschmann.**
>
> **Please confirm to me immediately in writing that you withdraw your scurrilous April 30 letter and will cease and desist from further such conduct. If you do not do so and if you repeat any false and reckless accusations, we will take all necessary and appropriate steps to seek sanctions and disciplinary measures. Enough is enough**

Exh. J (emphasis added).

Yet a few months later, the Debtor filed for bankruptcy in Texas, *claiming Texas residency*. When asked at the 341 Creditors' Meeting held on August 15, 2019, the Debtor testified that she had actually moved to Texas in late 2018 or early 2019-*i.e.,* several months before the Kasowitz letter insisting she was still living in Israel, and threatening sanctions on Sagi's counsel merely for suggesting otherwise. Exh. K at 5-6.

The Debtor further testified that while in Austin, she had no access to resources, such that if she wanted to buy an ice cream cone for her daughter, her husband (whom, the dockets indicate, has an active law practice in New York) would have to pay:

> [Trustee]:   I only have two quick questions. One I already knew before this meeting, and one he kind of inspired me to ask, which is: So you walk out of your door on Lavaca and you've got a little girl, right? So y'all are walking along and your little girl wants ice cream; How do you get her the ice cream?
>
> [Debtor]:   … But Dad is known to be the ice cream guy. So I'm not really fond of the whole ice cream thing for her, but that's his...
>
> [Trustee]:   <u>So y'all are both here all day, every day? Aren't you like a New York lawyer?</u> [Turning to Herschmann]
>
> [Hersch.]:   If only people wished. <u>I ran Southern Union, which is a natural gas company down here for many years</u>.

Exh. K at 26 (emphasis added). In reality, according to published news reports, Mr. Herschmann left his executive position with Southern Union in 2011. Exh. L.

EMMET, MARVIN & MARTIN, LLP                                                                                              6

### Relevant Court Findings

Suffice it to say, the Debtor's and her husband's ever-shifting positions did not go over well with the courts in Texas. For instance, in transferring Mr. Herschmann's quash motion back to this District, Magistrate Judge Austin held that:

> From Mr. Herschmann's filings in this matter, it would appear that he would be dumbfounded that anyone would think he was anything other than an Austin resident. To put it mildly, however, the answer to the question of where Mr. Herschmann and Ms. Genger reside is a moving target. In a filing in the underlying lawsuit made less than a year ago, Orly Genger swore that she and her infant daughter (the child of Mr. Herschmann) are permanent, full-time residents of Tel Aviv, Israel. … Mr. Herschmann confirmed this in a declaration he submitted in the New York case—and executed in Tel Aviv in January 2018—where he swears that "Orly and I got engaged in Israel in 2016 and were married here in the fall of 2016. Since that time, Orly has lived in Tel Aviv, Israel. *She lives here with me and our infant daughter,* who was born in 2017." …
>
> Despite these sworn states of relatively recent vintage, Herschmann submitted a declaration just days ago in this proceeding that paints quite a different picture. … Conspicuously absent from that filing is any mention that he ever lived in Tel Aviv, much less as recently as May 2018. … Instead, the recent declaration strongly suggests that Herschmann is a full time resident of Austin, and that "[p]rior to living in Austin [he] lived in Houston." *Id.* … The most charitable interpretation of these very different sworn statements is that Herschmann moves between at least Austin and Tel Aviv—though nothing in any sworn document actually says this. The more likely actual state of affairs is that Herschmann and Genger, as owners of multiple residences, have used this fact to their legal advantage by claiming to reside in whichever location most suits their legal needs at the time. In this instance, <u>in an attempt to frustrate the post-judgment discovery being attempted by Sagi Genger</u>, Herschmann claims to have such a strong connection to Austin that it would be a burden for him to have to deal with his subpoena objections in Manhattan. The Court's not buying it.

Exh. A at 4-5 (italics in original, underlining added).

Then last fall, Bankruptcy Judge Davis held a full-day witness hearing on the venue question, following which he granted Sagi's motion to transfer. In doing so, Judge Davis adopted Judge Austin's earlier findings:

> As Judge Austin observed this Debtor can and will claim residence in a location that suits her legally strategic interests. The Debtor retained Texas

EMMET, MARVIN & MARTIN, LLP                                                                                    7

> bankruptcy counsel in August of 2018. Since she got married in 2016 in Israel she lived for a short time in Texas, and until February of 2019, when she moved to Texas, lived for a long periods of time in New York and Tel Aviv. This is based on her testimony and it's corroborated by the American Express statements.

Exh. M at 9.

These judicial findings are very much appreciated, but they did not come about on their own. Rather, the second of the two rulings, in particular, was a direct consequence of evidence uncovered by Mr. Matityahu, after such evidence was improperly suppressed during discovery and denied through false statements made under oath. For the reasons set forth below, there is no basis to reward the wrongdoers and reveal Mr. Matityahu's Report; rather, there would be significant prejudice to Sagi in doing so.

### #1: The Report Is Protected Attorney Work Product

The work-product doctrine, recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 510 (1947), reflects the strong "public policy underlying the orderly prosecution and defense of legal claims." As the Supreme Court in that case observed: "In performing his various duties, … it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. … This work is reflected … in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed … as the 'Work product of the lawyer.'" *Id.* at 510-511. The Court therefore recognized a qualified privilege for certain materials prepared by an attorney "acting for his client in anticipation of litigation." *Id.* at 508.

As the Supreme Court recognized in *United States v. Nobles*, 422 U.S. 225, 238-39 (1975), the doctrine extends to the work of investigators retained by attorneys: "**One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself**." (Emphasis added.)

Since *Nobles* was decided, the federal courts have routinely granted work product protection to the work of investigators retained by attorneys. *See, e.g., In re Hughes,* 633 F.2d 282, 291 (3d Cir. 1980) (inquiry into investigative techniques of private investigator retained by defense counsel was shielded by work-product protection); *Powell v. YRC Worldwide, Inc.,* 2016 WL 9943457, at *2 (S.D.W. Va. Apr. 18, 2016) ("The work product doctrine protects material prepared by adjusters and investigators hired by counsel."); *Smith v. Coulombe*, 2013 WL 428363, at *5 (D. Or. Feb. 4, 2013) ("because the Stoelk investigation would not have happened 'but for' the threat of litigation, … [the reports are] subject to the qualified immunity of the work product doctrine").

EMMET, MARVIN & MARTIN, LLP                                                                              8

The critical issue in these cases is whether the report was prepared in anticipation of litigation, as opposed to in the regular course of business. A document is prepared "in anticipation of litigation" if "in light of the nature of the document and the factual situation in the particular case, [it] can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Adlman,* 134 F.3d 1194, 1202 (2d Cir. 1998) (citations omitted). "Conversely, protection will be withheld from 'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation.'" *Schaeffler v. United States*, 806 F.3d 34, 43 (2d Cir. 2015) (quoting *Adlman*, 134 F.3d at 1202).

Here, this bankruptcy litigation was the sole purpose of the Report. Mr. Matityahu was retained following the Debtor's bankruptcy filing, first in anticipation of a contested venue motion, in order to investigate the Debtor's residency. Because Mr. Herschmann has previously used his own residency to bolster his wife's claims as to her residency, his whereabouts, too, were relevant. Second, Mr. Matityahu was retained to investigate the Debtor's bank and credit card accounts. These were important for two reasons--because the charges reflect the Debtor's location, and because they might also indicate the location of assets. Here as well, Mr. Herschmann's information was also relevant, by virtue of the fact that the Debtor was making most of her charges on the couple's joint AmEx card, the existence of which both had both falsely denied under oath.

Such financial information was and is also highly relevant to the pending motion to dismiss. Where, as here, "there are factual circumstances that raise even a slight showing that there has been a transfer of property from the judgment debtor to the [spouse], inquiry into personal assets of a non-party is within a court's discretion." *Internet Direct Response, Inc. v. Buckley*, 2010 WL 1752181, at *3 (C.D. Cal. Apr. 29, 2010) (citing *United States v. Neumann*, 1999 WL 156151 (D. Mass. Mar. 5, 1999), *Parkhurst v. Tabor*, 2009 WL 1872793 (W.D. Ark. June 30, 2009)).

By contrast, there is no basis to pierce the work product protection. Accordingly, Mr. Herschmann's demand for the Report should be denied.

### #2: The Report Is Not Relevant To Mr. Herschmann's Claim

Even had it been properly subpoenaed, the Report would not be discoverable, as it contains no information likely to be relevant to Mr. Herschmann's claim in this case, as required under Fed. R. Civ. P. 26(b)(1). As we previously advised Mr. Herschmann, the Report lists his departure and arrival dates in and out of Israel, and the names of banks in which he has accounts (without account numbers or amounts). We have offered to produce the document *in camera* so the Court can confirm this. Such information has no bearing on Mr. Herschmann's bankruptcy claim, which rather is premised on a backdated promissory note he had his wife sign shortly after their marriage. As set forth below, Mr. Herschmann appears to be misusing this Court for other purposes.

EMMET, MARVIN & MARTIN, LLP                                                                                          9

### #3: The Matter Is Before the Israeli Courts

Lastly, there is a more appropriate forum for Mr. Herschmann to seek this relief: the Shalom Court of Tel-Aviv Jaffe. Mr. Herschmann has neglected to inform this Court that last summer, during the pendency of this bankruptcy case, the supposedly-broke Debtor filed a lawsuit in Israel against Mr. Matityahu *over these same facts*. (A translated copy of her Israeli Complaint is annexed hereto as Exhibit N.)

Whether an Israeli licensed private investigator violated Israeli law is a matter the Israeli Courts are uniquely qualified to address. Indeed, as noted above, Mr. Matityahu is licensed by the State of Israel. Further, all parties to the matter hold Israeli citizenship. If the Israeli Court believes the Report should be produced, it can direct that be done. That Mr. Herschmann is instead seeking relief from this Court suggests an effort to circumvent and undermine the Israeli Court's jurisdiction.

For all the foregoing reasons, the Report should not be ordered produced. We thank the Court for its consideration.

Sincerely,

John Dellaportas

Encls.

cc:    All Counsel of Record (via ECF)