# KASOWITZ BENSON TORRES LLP

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
NEW YORK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

EHerschmann@kasowitz.com

June 5, 2020

**BY ECF**

Honorable James L. Garrity, Jr.
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

   Re: *Orly Genger*, Case No. 19-13895-jlg

Dear Judge Garrity:

  I write in opposition to Mr. Dellaportas' May 29, 2020 submission (the "May 29 Letter") on behalf of creditor Sagi Genger, and in further support of my May 4, 2020 application (attached hereto as Ex. 1) seeking an order directing that Sagi and his counsel: (i) produce to me (and only to me) any and all reports or other documents, including electronic and native format versions with metadata, that contain or refer to any of my personal information not obtained by subpoena or court order; (ii) identify all persons to whom such information has been communicated; (iii) produce the contents of those communications; and (iv) hold all such information, reports or other documents in strict confidence pending further order of this Court.

  Sagi's latest submission only confirms that he has no legitimate basis to oppose the requested relief. During the May 21, 2020 conference, the court asked Mr. Dellaportas to address two questions: (1) whether attorney work product protection applies to investigators' reports sent directly to Sagi with no involvement by or copy to an attorney; and (2) assuming the protection applies whether those reports, which the investigator produced in violation of applicable United States and Israeli law, lose that protection because of the crime fraud exception.

  In his nine page submission, with its 492 pages of attachments, Mr. Dellaportas mostly ignores the Court's questions and instead launches yet another *ad hominem* attack on me and my law firm, repeating arguments that he has made before other courts, in which he has never been successful.

Kasowitz Benson Torres llp

Honorable James L. Garrity, Jr.
June 5, 2020
Page 2 of 19

Mr. Dellaportas also ignores this Court's admonishment that he should tone down the rhetoric in his submissions. This is not the first time that he has been so admonished. Judge Davis, when the bankruptcy case was in Texas, likewise told Mr. Dellaportas that he knew that Mr. Dellaportas was ghost writing briefs for Texas counsel representing various parties including drafting the motion to dismiss and certain objections: "I think one person wrote all three [submissions]. And I don't think I need a linguistic algorithm to tell me that . . . There's more time spent calling Orly a liar than there is on the substance of the motion [to dismiss]. That kind of pleading I find disgusting and unhelpful." Ex. 2 (October 23, 2019 Hearing Tr. (the "Oct. 23 Tr.") at 8:3-15). Yet, that is the exact same tone that Mr. Dellaportas uses here - even after Your Honor told him to stop using that type of rhetoric.

The straightforward answer to the Court's questions are: Mr. Dellaportas does not and cannot come close to showing that the investigators' reports were work product of an Israeli lawyer, as he claims, done at the direction and request of the attorney or reflected any attorney's mental impressions -- and nowhere does he identify any individual lawyer, nor does he produce any correspondence, let alone an affidavit from the purported attorney evidencing that it was work product. The reason is plain. The reports were produced illegally, and either no attorney was in fact involved at all, or no attorney is willing to admit to participating in a crime. That is also plainly the reason Mr. Dellaportas is so strenuously resisting producing to me reports which contain only my personal information. The claim that I am not entitled to such reports is absurd on its face.

### RELEVANT BACKGROUND

As Sagi correctly informed this Court, I am a "party" (ECF No. 247) to this case based only on a UCC filed promissory note between the Debtor and me for a loan that occurred at the end of 2016, long before Sagi commenced any action against Orly that led to her filing for bankruptcy protection (Sagi had already been provided copies of the wire transfer confirmation). Ex. 3.

Sagi has also already received proof that my assets are totally separate and apart from the Debtor's and cannot be used to satisfy any of the Debtor's obligations.

During post-judgment discovery, Sagi argued that "Orly's pre-nuptial agreement (the "Prenuptial or Premarital Agreement") is a critical piece of evidence to determine which assets are the separate property of either Orly or her husband, versus which assets are their community property. Texas is a community property state." *See* Tex. Fam. Code § 3.102; S.D.N.Y. Dkt. 17-cv-8181 (the "Freeman Dkt.") at ECF No. 126, p. 2.), and "thus any assets in his name . . . are relevant to Orly's claimed inability to honor her indemnity to Sagi." Freeman Dkt, ECF No. 126 at p. 8.

Judge Freeman subsequently ruled that Sagi was entitled to broad post-judgment discovery, but Judge Freeman personally redacted all of my personal financial information from the Prenuptial Agreement before she authorized its production to Sagi pursuant to a Protective

KASOWITZ BENSON TORRES LLP

HONORABLE JAMES L. GARRITY, JR.
JUNE 5, 2020
PAGE 3 OF 19

Order. The Prenuptial Agreement unconditionally establishes that the Debtor's and my assets are separate, and that my assets are not available to satisfy any obligation or judgment against her. The Premarital Agreement was upheld by the District Court of Travis County, Texas on October 24, 2016 (No. D-I-GN-16-004247). Sagi does not deny, because he cannot, the validity of my Premarital Agreement. That should have been the end of any attempt by Sagi to gain access to my personal information. Instead, he has made multiple applications to have the redactions lifted -- which have failed -- based on the same frivolous arguments that he uses now to try to justify the illegal conduct of his investigators.

In what could only be an attempt to harass me, Dellaportas on September 16, 2019 -- after he received a copy of the premarital agreement -- sent a subpoena returnable on Rosh Hashanah, the Jewish New Year which he knew I observe, seeking among other things, all of my personal financial information. Judge Davis admonished him: "[h]ere [in Texas] we don't serve subpoenas without consulting the party from whom discovery is sought ever. We don't serve on holidays. We don't demand production in two days. And as I said before, after ten years of litigation, what else is out there that hasn't been discovered?" Ex. 2 (Oct. 23 Tr.) at 8:18-22. I filed a motion for a protective order on October 11, 2019 while the case was still in Texas related to Sagi's improper subpoena, which is pending before this Court.

On June 3, even though Mr. Dellaportas knew that this Court was addressing the issues of the investigators' reports and the dissemination of my Premarital Agreement as a "gating issue" to any further discovery, served me with a supplemental subpoena asking for even more personal financial documents -- including, among other things, an unredacted copy of my Premarital Agreement, which are wholly irrelevant to these bankruptcy proceedings. I plan to supplement my motion for protective order once this Court addresses the above-described issues.

Simply put, during post judgment discovery, Judge Freeman ordered Mr. Dellaportas and Sagi to not issue any subpoenas for any of my information without giving me advance notice (Ex. 4 (Jan. 8, 2019 Hearing Tr.) at 141:24 to 142:6) (I never received any notice from them), and after their multiple attempts to try to get a court order to require me to produce my personal information were not successful , Sagi decided to engage in criminal conduct by hiring an investigator in Israel to steal what he could not obtain legally. And, after Mr. Dellaportas denied to this Court that any reports existed concerning me (Mar. 4, 2020 Status Conference Transcript (the "Mar. 4 Tr.") at 72:22 to 73:4, available at ECF No. 224-1), Sagi came up with a new theory that it is somehow attorney work product for some foreign law firm and shielded from discovery. It is not.

Kasowitz Benson Torres LLP

Honorable James L. Garrity, Jr.
June 5, 2020
Page 4 of 19

**RELEVANT TIMELINE REGARDING
SAGI'S INVESTIGATOR'S SEPTEMBER 9, 2019 REPORT CONCERNING ME**

On May 4, 2020, Mr. Dellaportas represented to this Court that he was unaware of any investigator's report concerning me until after the March 4, 2020 court conference when he spoke with Sagi's Israeli counsel and learned, *for the very first time*, that the investigator had also prepared a similar report concerning me at "around the same time (i.e., September 12, 2019)" that he prepared a report concerning Orly - and that is why Mr. Dellaportas misspoke when he told the Court that none existed.[1]

Clearly, if Mr. Dellaportas was aware of the existence of the investigator's report prior to the March 4 court conference, it would put into question all of his representations to this Court. The timing of his September, 2019 subpoena to me, coupled with his specific demand regarding my "whereabouts since 2016," is hard to reconcile with his representations that he knew nothing about an investigator's report until seven months later. The below timeline is illustrative:

| Sept. 12, 2019 | Sagi's Israeli investigator prepares a report for Sagi regarding Orly's (16+ year old) bank account and her travel records to/from Israel. Ex. 5. |
|---|---|
| **Sept. 12, 2019 (Thursday)** | Sagi's Israeli investigator prepares report concerning my travel to/from Israel and my personal banking information for Sagi. ECF No. 241-1 (Dellaportas April 20, 2020 letter (the "Apr. 20 Letter") at p. 2. |
| **Sept. 16, 2019 (Monday)** | Dellaportas sends a subpoena to me with 44 document requests, including: <br> No. 39. Records of air travel by Orly Genger since January 2018. <br> No. 40 Any record kept Orly Genger and/or her spouse's **whereabouts** since 2016. (emphasis added)[2] [sic]. Ex. 6. <br> (Sagi's prior post-judgment subpoena from Dellaportas did not ask about my whereabouts. Ex. 7, (Sagi March 13, 2019 subpoena). |

---

[1] Mr. Dellaportas' statements include: "We have nothing further beyond [the investigator's report on Orly] we have provided." (Mar. 4 Tr. at 73:2-4); "When I was asked unexpectedly about it at the [March 4] conference, I was only aware of single report [concerning Orly] from the investigator. After the conference, however, I spoke with Israeli counsel, who informed me of a second report [concerning Mr. Herschmann]." (ECF No. 241 (Dellaportas May 4, 2020 letter) at p. 2); "[L]ast September [the investigator] prepared an investigative report concerning the Debtor . . . at around the same time, [the investigator] prepared a report . . . concerning you  . . . [that] lists your date of birth, Israeli ID number, Israeli entrances/exits, and bank names and addresses . . . you went to Israel [*i.e.*, September 23, 2019] and intimidated [the investigator]...." (May 29 Letter at pp. 1-2).

[2] In Sagi's prior subpoena to me dated March 13, 2019, he did not ask anything about my whereabouts even though Mr. Dellaportas' May 29 Letter reflects my whereabouts were always a concern to them.

KASOWITZ BENSON TORRES LLP

HONORABLE JAMES L. GARRITY, JR.
JUNE 5, 2020
PAGE 5 OF 19

| | |
|---|---|
| Sept. 17, 2019 | Sagi's [Texas] counsel sends a letter to Orly's counsel, with a copy to the Chapter 7 Trustee, alleging that Orly "presently has a bank account in Israel at [a specific branch]" that she failed to disclose on her Schedules. *See* the October 16, 2016 Declaration of Yovel Nachmani (the "Nachmani 2019 Decl.") at ECF No. 205-13, Ex. A. |
| Sept. 18, 2018 | Sagi's Texas counsel provides a copy of the investigator's report concerning Orly (in Hebrew). *Id*. |
| Sept. 23, 2019 | I meet with Sagi's investigator in Israel who admits that he prepared a report for concerning me as well. *See* Ex. 8 (the "Nachmani 2020 Decl.") at ¶ 2. |
| Sept. 25, 2019 | Dellaportas, on behalf of Sagi, wrongfully accuses me of bankruptcy fraud for hiding an Israeli bank account for Orly. ECF No. 42 (Sagi Expedited Motion to Show Cause). |
| Sept. 26, 2019 | Israeli bank confirms that no account exists for Orly. Nachmani 2019 Decl. at Ex. C. |
| March 4, 2020 | Dellaportas denies to this Court any knowledge concerning any investigator report concerning me. Mar. 4. Tr. at 72:22 to 73:4. |

Kasowitz Benson Torres llp

Honorable James L. Garrity, Jr.
June 5, 2020
Page 6 of 19

## ARGUMENT

### A. Sagi Cannot Establish that Work Product Protection Applies to My Personal Information

Work product is material prepared by or at the direction of an attorney that contains "mental impressions, conclusions, opinions, or legal theories of [an] attorney." *See* Fed. R. Civ. P. 26(b)(3). Work product includes, among other things, memoranda that contain analysis of law or fact, evaluations of trial strategy, perceived strengths and weaknesses in a case, intended lines of proof, cross-examination plans, and the inferences drawn by the lawyer. *See Upjohn Co. v. United States*, 449 U.S. 383, 339-402 (1981) ("Rule 26 accords special protection to work product revealing the attorney's mental processes.").

Mr. Dellaportas nowhere argues that the investigators' reports contain mental impressions or opinion or legal theories of an attorney. If he did make that claim, this Court could examine the report *in camera* to confirm the claim and order appropriate redactions if necessary. However, he makes no such claim. Rather, and therefore, the reports should be produced in their entirety.

Sagi, as the party asserting work product protection, has the burden to show that the application is consistent with the purposes underlying the protection (*See, e.g., In re Grand Jury Subpoenas Dated Mar. 19, 2002*, 318 F.3d 379, 384 (2d Cir. 2003). Sagi must also "describe the nature of the documents, communications, or tangible things not produced or disclosed -- and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A).

By Mr. Dellaportas' own admission, the investigator's report concerning me -- similar to the report concerning Orly and prepared by the same investigator -- contains no attorney work product whatsoever. The report is addressed to Sagi himself, not Mr. Dellaportas or any other attorney. Mr. Dellaportas admits that the report contains: my date of birth, my Israeli personal ID number, my Israeli travel records and my personal banking information. ECF No. 241 at p. 2. The work product doctrine does not protect this type of factual information, but instead would protect only the attorney's interpretation of those facts. *See* Jeff A. Anderson et al., *The Work Product Doctrine*, 68 Cornell L. Rev. 760, 842-43 (1983). Thus, while the work product doctrine will generally protect a document prepared by an attorney, it does not protect the underlying facts that are contained in that document. See *Hickman v. Taylor*, 329 U.S. 495 at 511-13; *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995); *Infosystems, Inc. v. Ceridian Corp.*, 197 F.R.D. 303, 306-07 (E.D. Mich. 2000); 8 Charles Alan Wright, et al., *Federal Practice & Procedure* § 2023 (3d ed. West 2019).

KASOWITZ BENSON TORRES LLP

HONORABLE JAMES L. GARRITY, JR.
JUNE 5, 2020
PAGE 7 OF 19

### B. Sagi Fails to Identify Any Attorney Who is Asserting Work Product Protection

Mr. Dellaportas has been unwilling for at least the last six months (since the issue of an investigative report about me was first raised) to identify the attorney who is supposedly now claiming work product immunity. Mr. Dellaportas is not asserting "attorney work product" for any of his own "work" or even for the work of any attorney in the United States or Israel. Rather, he is now claiming that it is attorney work product of an entire law firm -- "Sagi's long standing Israeli counsel, the Tel Aviv firm of Parnes & Co." May 29 Letter at p. 2. Notably, Sagi does not identify any specific attorney at Parnes & Co. If, however, Sagi is claiming that it is really his best friend and business partner David Parnes, who is the "attorney" claiming work product (even though he is not a litigator) for Parnes & Co., Parnes actually holds himself that as being the senior partner at a different law firm in Israel called Parnes Raanan & Co. (https://www.parnesraanan.com/).

Further, neither Mr. Parnes nor any other attorney has submitted an affidavit or any other substantiation asserting any basis for any work product claim related to the investigators' reports.[3] Sagi has not identified the date he supposedly retained anyone at Parnes & Co. related to any investigation, did not produce any retainer agreement with Parnes & Co. related to this matter, billing records or any proof of payments to Parnes & Co. for Sagi's investigators. And, if Parnes really was the attorney that Sagi had supposedly used to hire the investigator, why did not Mr. Dellaportas promptly identify him since they have known each other for years. Dellaportas April 20 Letter at p. 1: "Sagi had to retain Israeli counsel." (ECF No. 241-1 ); Dellaportas May 4 Letter at p. 2: "[a]fter the [March 4] conference, however, I spoke with Israeli counsel") (ECF No. 241). Ex. 9, May 5, 2020 transcript ("May 5 Tr.") at 72:9-12 (Sagi "retained an Israeli attorney") (). The reason is plain. The Parnes affidavit would be admitting to his own criminal conduct. *See* Section D below.

Moreover, as the Court may recall from my prior submissions, the investigator has already admitted to me and my counsel, Yovel Nachmani and Dror Arad Ayalon, that he prepared the reports for Sagi and dealt directly with him. *See* Nachmani 2019 Decl. at ECF No. 205-13, ¶ 12. As the attached affidavit from Yovel Nachmani, further demonstrates, when we met with the investigator in Israel on September 23, 2019, the investigator denied ever having heard of, or knowing, David Parnes. *See* Ex. 8 (Nachmani 2020 Decl.) at ¶ 2.

The reason Mr. Dellaportas has tried to imply, without directly saying so and without supplying any evidence, that David Parnes is the attorney who is supposedly behind the

---

[3] I am not and have not been a party to any litigation involving Sagi or any of his investigators here or in Israel. Sagi's obtaining another creditor's personal financial and travel information has nothing to do with the underlying bankruptcy. Moreover, since Sagi already had a redacted copy of my premarital agreement, he knew that the Debtor and I maintained no joint assets other than my gifting an undivided 50% interest in my homestead protected residence in Austin to her.

KASOWITZ BENSON TORRES LLP

HONORABLE JAMES L. GARRITY, JR.
JUNE 5, 2020
PAGE 8 OF 19

protected work product is clear. Parnes is a long standing business associate of Sagi[4] who has shown himself willing to lie on Sagi's behalf or assist Sagi in lying. As described below, both a Southern District of New York Judge and a New York Supreme Court Judge have found that Parnes gave completely false testimony at trial on behalf of Sagi and rejected his testimony *in toto*. Mr. Dellaportas was Sagi's counsel during both of these trials.

New York Supreme Court Judge Jaffe found that Parnes assisted Sagi in creating "false" and fictitious "legal" documents to defraud Orly out of her interests in a real estate business and other assets. *Orly Genger v. Sagi Genger*, No. 100697/08, 2016 WL 551444 (N.Y. Sup. Ct., N.Y. Cty. Feb. 10, 2016) at *5, 7, 8. ("Given the long and *close personal and business* relationship between defendant [Sagi] and Parnes, **[**Sagi**]**'s claim that he did not recognize Parnes's handwriting on the documents underlying the [fraudulent] transaction is incredible . . . [t]his prevarication, as well as defendant's evasiveness and equivocation about the transaction, warrant doubt as to defendant's general credibility." "[Parnes'] unquestioning participation in much of defendant [Sagi's] financial maneuvering reflects poorly on his credibility, thereby warranting the rejection of his testimony . . ." "[g]iven [Sagi and Parnes'] proclivity to execute undated and backdated documents," they cannot be believed).[5] (emphasis added). The court also expressly found that Sagi "had no trouble creating false documents" and that his testimony was so rife with "prevarication," "evasiveness," and "equivocation" as to "warrant doubt as to his general credibility." *Id*. at *7, 8. These findings were expressly upheld by the Appellate Division. *See Genger v. Genger*, 144 A.D.3d 581, (1st Dep't Nov. 29, 2016). Sagi, through an entity he and Orly owned, agreed to indemnify Parnes for his wrongful conduct in assisting Sagi to commit this fraud against Orly. *See* Ex. 11 [TPR Board Minutes]. Attached hereto as Exhibit 12 (S.D.N.Y Dkt. 14-cv-5683, ECF No. 119) is a court filing that addresses the many issues and inconsistencies in Parnes' prior testimony submitted on behalf of Sagi during Sagi's fraud trial.

Parnes, along with Sagi, also drafted the divorce agreement between Dalia and Arie Genger which has led to so many years of litigation amongst the Genger family. Parnes testified that although he drafted the divorce agreement while he was actively practicing law, he did not do so as an attorney, but was simply "using [his] legal skills" to draft it.[6] In that agreement,

---

[4] Parnes formed the Manhattan Safety entity in St. Kitts for Sagi that is involved in the various Recovery Effort lawsuits that are related to this bankruptcy. Manhattan Safety, along with Dalia and Sagi, tried to put millions of dollars of debt on Orly's Trust related to supposed legal costs that the Trust had to incur to bring multiple lawsuits, including claims against Orly herself -- the only beneficiary of the Trust. These supposed multi-million dollar debts were voided by the New York Supreme Court as being bogus which findings were unanimously affirmed by the Appellate Division (*See* S.D.N.Y Dkts. 19-cv-5641; 19-cv-5642; *see also Orly Genger v. Dalia Genger*, 39 Misc. 3d 1235(A), (N.Y. Sup. Ct. May 29, 2013); *Orly Genger v. Dalia Genger*, 120 A.D.3d 1102 (App. Div. 1st Dep't 2014).
[5] Ex. 10 (Judge Jaffe finding of fraud Decision & Judgment).
[6] "**Q.** How about the drafting and the working of the drafting of that agreement; would you have called that legal work? The legal stipulation of settlement in the divorce? **A.** No, I do not think that was -- those were not legal services, no. That was a legal document, but...**Q.** You're saying you were working on that document not in your capacity as an attorney? **A.** I think I was using my -- yes, not in the capacity as an attorney. I was using my legal

Kasowitz Benson Torres llp

Honorable James L. Garrity, Jr.
June 5, 2020
Page 9 of 19

Parnes and Sagi made themselves attorneys-in-fact regarding any future disputes between Arie and Dalia. Further, at Sagi's request, Parnes also became the trustee for Orly's Trust. Ex. 13 (Apr. 16, 2015 Parnes Dep. Tr. at 186:14-20, 288:8 to 289:16; Ex. 14.

Parnes also testified on Sagi's behalf in another case in which Sagi wrongly accused the former Prime Minister of Israel's son as being involved in a massive international conspiracy to somehow defraud Sagi. U.S. District Court Judge Shira Scheindlin found Sagi's case to consist of "a maze of backdated, incomplete and contradictory documents [many of which were created by Parnes], and even more dubious testimony." *Sagi Genger v. Sharon*, 910 F. Supp. 2d 656, 657, 667 (S.D.N.Y. 2012) ("It is disheartening to hold a bench trial for the purpose of weighing credibility in a hotly contested factual dispute, only to be faced with layer upon layer of deceit and dysfunction necessarily leading to the conclusion that, at best, only one of five witnesses – the accountant [Bill Fischer] – could possibly be deemed credible.").[7]

Here, however, admitting to criminal conduct in connection with the investigators' report was apparently a bridge too far even for Mr. Parnes, and Mr. Dellaportas has utterly failed to provide any basis for his assertion that the report constitutes Mr. Parnes' or anyone else's work product.

### C. Sagi Cannot Justify His Investigators' Illegal Conduct

Mr. Dellaportas tries to justify Sagi's use of private investigators to illegally obtain my personal travel and banking information by claiming: (i) that Orly tried to "dissipate the $32.3 million [Trump Settlement] to her husband . . .;" (ii) that Orly falsely claimed when she lived in Israel and when she moved back to Texas, and therefore our "joint whereabouts" are relevant; (iii) that "Orly continued to claim, to the Southern District of New York and on appeal to the Second Circuit, that she was an Israeli resident, notwithstanding that her (non-estranged) husband was now claiming to have *always* lived in Texas," (emphasis in original) and that Daniel R. Benson of the Kasowitz Benson law firm threatened Mr. Dellaportas with sanctions "for suggesting that [Orly] and [I] might actually be living in Texas as opposed to Israel;" and

---

skills to form the first document but not as an attorney, no. The parties were represented by counsel. JUSTICE CRANE: Separate counsel? THE WITNESS: Separate counsel. **Q.** When you were working on the document, were you drafting provisions and language to go into the document? **A.** Yes, I was. **Q.** And you're telling us that you don't believe you were doing that as an attorney? **A.** Yes." Apr. 16, 2015 Parnes Dep. Tr. at 288:17 to 289:16.

[7] Sagi has a long history of improper conduct. This Court may consider this information in weighing the veracity of his work product protection claims here. In addition, immediately preceding the many Genger lawsuits, Sagi had been sued by the SEC for securities fraud committed while Sagi was an executive officer of a publicly traded company called Lumenis. A final judgment and consent decree was entered against him in that action related to a *"cooking the books"* type scheme, which included a lifetime bar, "permanently restrain[ing] and enjoin[ing]" him from violating multiple provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. *See SEC v. Lumenis Ltd., et al.*, C.A. No. 06-cv-03225 (LAK); ECF. No. 3, at 1-5.

KASOWITZ BENSON TORRES LLP

HONORABLE JAMES L. GARRITY, JR.
JUNE 5, 2020
PAGE 10 OF 19

(iv) that Sagi believes that Orly and I had a joint American Express account, and that she lied about it during her March 7, 2019 deposition testimony.

All of those allegations are false, and, under all circumstances, they could not justify Sagi's illegal conduct here. First, Orly did not try to "dissipate" anything to me nor did she transfer anything to me. To enable Orly to pay a portion of my firm's legal bills, I lent Orly (and her father Arie) $2 million dollars of my separate assets pursuant to a secured promissory note. The only person who questions the legitimacy of the note -- even though he has a copy of the wire transfer -- is Sagi (under the absurd theory that Kasowitz's legal bills are fictitious and all legal work was done "pro bono" on all matters for Orly regardless of the terms of the written retainer agreements, billing records, payments, time entries, etc.). Sagi's self-serving characterization of the UCC filed note as being "bogus" and "backdated" is baseless and is contrary to the evidence.

Second, Orly truthfully testified when she became a domiciliary of Israel, and when she moved back to Texas. Where I was living, and when I travelled to and from Israel, are irrelevant to this bankruptcy proceeding (just as they were irrelevant in the District Court proceeding). Contrary to Sagi's claims, I never said that I changed my permanent residence from Texas to Israel, because it never happened. Likewise, I never said that I *always* lived in Texas. My only homestead is in Texas where I am registered to vote, have my driver's license, etc. I, like Sagi, own more than one residence, but I am, and have been a domiciliary of Texas for more than a decade. Mr. Dellaportas has also claimed that I lied about my Texas residency, because he claims that I am a full-time practicing lawyer in Kasowitz's New York offices. However, as the attached Kasowitz records reflect, I was not in the Kasowitz's New York office at all in 2017. I was there for six days in 2018. I was not there at all in 2019 and 2020. *See* Ex. 15.

Third, Sagi, continues to allege that Orly told the Second Circuit that she was a domiciliary of Israel when she filed a brief in Second Circuit in July, 2019. This is the same argument that Sagi made in his motion to dismiss before Judge Davis: "A little over an hour before filing for bankruptcy, Orly was still describing herself as a domiciliary of Israel." *See* September 12, 2019 Sagi Motion to Dismiss, ECF No. 32 at ¶ 8. Judge Davis addressed this allegation directly:

> [The Court referencing Mr. Dellaportas' Motion to Dismiss]: Only a few hours before the filing of this bankruptcy, [Orly] described her domicile [in] Israel . . . (Pause) How much of what you [Mr. Dellaportas] write can I believe? ***That's false***. Her statement spoke as of a point in time two years earlier.

Ex. 2 (Oct. 23 Tr.at 8:6-13), (emphasis added).

Mr. Dellaportas nonetheless repeats this same allegation, which Judge Davis had already ruled was "false," as a supposed basis to invade my privacy and to violate the law.

KASOWITZ BENSON TORRES LLP

HONORABLE JAMES L. GARRITY, JR.
JUNE 5, 2020
PAGE 11 OF 19

      Contrary to Mr. Dellaportas' claim, Daniel R. Benson, a named partner at the Kasowitz Benson law firm, never threatened "to seek 'sanctions and disciplinary measures" against Mr. Dellaportas merely for suggesting that the Debtor and [I] might actually be living in Texas as opposed to Israel." Mr. Benson was responding to yet another absurd and outrageous allegation from Mr. Dellaportas that the Kasowitz Benson firm filed a knowingly false declaration with the Court" and his demand that the firm "immediately withdraw [the] declaration from both the Second Circuit and District Court, notify both of those Courts of the specific false statement made therein, and explain to both Courts how this false statement came to be filed." The response from Mr. Benson was completely accurate and appropriate. Mr. Dellaportas, while putting part of Mr. Benson's responsive letter (in bold print) in his submission, leaves out this relevant part:

> Your charge that our firm filed a knowingly false declaration is baseless and irresponsible . . . I understand that your latest letter is part of a broader pattern of unprofessional and unethical conduct, including your leveling repeated false assertions about, among other things, this firm's billing records and practices and wild, irresponsible and baseless charges of criminal conduct (such as assault) against lawyers at this firm.
>
> Please confirm to me immediately in writing that you withdraw your scurrilous April 30 letter and will cease and desist from further such conduct. If you do not do so and if you repeat any false and reckless accusations, we will take all necessary and appropriate steps to seek sanctions and disciplinary measures. Enough is enough."

*See* Dellaportas May 29 Exh. J.

      Fourth, Sagi's theory, which defies logic, is that since Orly had an American Express card at some time before she filed for bankruptcy (which he mistakenly asserts was a joint account with me) which supposedly shows where she was located, he could hire a private investigator in Israel in September 2019 to illegally obtain my personal travel and banking information.[8]

      Mr. Dellaportas made the same American Express argument at least two times to Judge Freeman and Judge Broderick to try to gain access to my personal information. That argument was likewise never successful.

---

[8] On March 7, 2019, Orly provided truthful testimony to Mr. Dellaportas. See Mr. Dellaportas May 29 Exh. H. She did not have any American Express card jointly or otherwise when she responded to Mr. Dellaportas' questions.. *Compare* Ex. 16, p. 3 *with* Dellaportas May 29 Exh. H, p. 389.

## Kasowitz Benson Torres llp

Honorable James L. Garrity, Jr.
June 5, 2020
Page 12 of 19

In May and June, 2019, Mr. Dellaportas made all these same arguments multiple times (almost verbatim) to Judge Freeman and Judge Broderick, without success.  (*See* Ex. 16 for a comparison of Sagi's prior claims with the May 29 Letter).  *See* Freeman Dkt., ECF Nos. 195, 197, 201, 202, 206; S.D.N.Y Dkt. 19-mc-210, ECF Nos. 13, 15; Ex. 20.

Mr. Dellaportas' entire argument is a series of non sequiturs. Sagi decided to try an "*end run*" around the judicial system to illegally gain access to my confidential personal information, and when he got caught, asserted a meritless claim of attorney work product immunity for some foreign law firm.  As described below, Sagi's improper conduct would have remained hidden from this Court, but for his bankruptcy fraud and witness intimidation accusations against me -- which would be outrageous were they not so patently absurd and meritless.

### D. Sagi Has Conceded His Private Investigation Was Illegal

Mr. Dellaportas has abandoned any claim that the investigator could or did legally obtain my personal information, and instead -- after he assured this Court during the May 21 conference that he would not do so -- argues that these issues are not properly before Your Honor by claiming that I am "improperly seeking to usurp/circumvent the role of the Israeli Court."  He is wrong.

Initially, Sagi claimed that personal travel and banking financial information was "commonly available" in Israel and anyone could get it without a subpoena.  *See* Nachmani 2019 Decl. at ¶ 10.  He now abandons that argument since it contradicts the Israel Population Registry Law, 1965, that requires that the Israeli Government maintain a database listing a person's "date of entry into Israel,"  *See* Israel Population Registry Law at § 2 (a)(12).  That same law restricts access of this information to certain Government agencies including: the Minister of the Interior, the Minister of Defense or the Inspector-General of Police solely "for the purpose of the discharge of their duties."  *See Id*. at § 31. Further, the Israel Privacy Protection Regulations (Data Security), 2017, (*See* Israel Ministry of Justice website at https://www.gov.il/BlobFolder/ legalinfo/data_security_regulation/en/PROTECTION%20OF%20PRIVACY%20REGULATIONS.pdf) requires high-level security clearance to access the databases that contain, among other things, personal travel records, and it restricts access for high-level security personnel "only to the extent needed for the performance of their jobs." (*Id*. App. 2 and § 4(a)-(b)).  Not surprisingly, there is no special carve out for private investigators.  Sagi has not attempted to explain how he obtained my banking information or how he obtained Orly's banking records from 16+ years ago.  As discussed during the May 21 conference, someone, presumably Sagi's investigator, called my bank and pretended to be me to try to gain access to specific transactions from my bank.

And, before Mr. Dellaportas admitted to this Court that Sagi had an investigator's report related to me, he told the Texas Bankruptcy Court that "[a]n investigator hired by [Sagi] recently identified an Israeli bank account held by the Debtor that was not listed on her schedule" and claimed "[w]e have no idea if this bank account is significant . . ." ECF No. 42 at ¶ 9.  There was no bank account (Sagi never claimed that any attorney was involved in his hiring the

Kasowitz Benson Torres llp

Honorable James L. Garrity, Jr.
June 5, 2020
Page 13 of 19

investigators before the Texas Bankruptcy Court even though the issue had been raised for, as Sagi now admits, at least "six months."). ECF No. 241-1 (Apr. 20 Letter) at p. 1.

Now, Mr. Dellaportas argues that the investigators' reports – which directly contradict his allegations that Orly and I maintain joint bank accounts -- are not relevant pursuant to Fed. R. Civ. P. 26(b)(1) and Bankruptcy Rule 7026, while at the same time arguing that my "financial information was and is also highly relevant to the pending motion to dismiss," (May 29 Letter at p. 8) and my personal travel and financial information are "matters which are highly relevant to the present bankruptcy case." ECF No. 241-1 (Dellaportas Apr. 20 Letter) at p. 2. Sagi cannot have it both ways. Sagi affirmatively used the same investigator's report related to Orly in this bankruptcy proceeding and did not assert any work product immunity claim at that time.[9]

Sagi cannot now shield his investigators' reports behind a claim of work product while at the same time using the investigator's information to improperly and falsely accuse me of wrongdoing. Fed. R. Evid. 502(a) provides that a voluntary disclosure of privileged information will result in subject matter waiver if the protected document is voluntarily disclosed and "fairness" requires that the undisclosed and disclosed documents be considered together. *Id*. "Under both [Fed. R. Evid. 502(a) and 106], a party that makes a selective, misleading presentation that is unfair to the adversary opens itself to a more complete and accurate presentation." Fed. R. Evid. 502(a) advisory committee's note. *See Chick-Fil-A v. ExxonMobil Corp.*, No. 08-61422-CIV, 2009 WL 3763032, at *7 (S.D. Fla. Nov. 10, 2009) (applying Fed. R. Evid. 502(a) to find that defendant's voluntary disclosure of otherwise protected work product resulted in subject matter waiver with respect to ordinary work product). *See also In re Grand Jury Subpoena Duces Tecum Dated Mar. 24, 1983*, 566 F. Supp. 883, 885 (S.D.N.Y. 1983) (Partial disclosure constituted a full waiver of all materials on the same subject matter).

Mr. Dellaportas, after denying that any investigator's report existed related to me, has now admitted that this same investigator prepared a similar report at the same time containing my banking and travel records, but now claims that Sagi "[h]ad to retain [some previously unidentified] Israeli counsel, who in turn *had* to retain an Israeli private investigator" to illegally obtain my information even though "Sagi ordinarily would not care about [my] whereabouts or [my bank] accounts."[10] Dellaportas Apr. 20 Letter, at p. 1 (ECF No. 241-1) (emphasis added).

---

[9] The investigator's report relating to Orly was produced by Sagi's Texas counsel. It is not clear if Mr. Dellaportas knew that it was going to be produced since he was not copied on the emails and the Texas counsel produced it within an hour of it first being demanded. (*See* Nachmani 2019 Decl. at Ex A). Originally, Sagi's Texas counsel produced a supposed verbatim translation of the report to the Trustee, but the translation inexplicably deleted the identity of the investigator and his contact information that was contained in the original Hebrew version. Once Orly demanded the original Hebrew report, we were able to identify the investigator that Sagi tried to hide from the Court, the Trustee, Orly and me.

[10] Sagi has spent several years raising my business successes long before I met Orly in various court filings to improperly claim that Orly is wealthy For example, he attaches a 2011 Wall Street Journal article to his May 29 Letter (ECF 252-12) that has nothing to do with anything before this Court, to simply show that the headline dealt with large sums of money.

KASOWITZ BENSON TORRES LLP

HONORABLE JAMES L. GARRITY, JR.
JUNE 5, 2020
PAGE 14 OF 19

That convoluted argument is nonsensical on its face and whatever Sagi's supposed justification for illegally obtaining my personal information, it cannot and should not be protected by inappropriate and inapplicable assertions of attorney work product immunity. (Sagi already had, as Mr. Dellaportas has now admitted, (illegally) obtained Orly's travel records for multiple years). The argument that he needed to know my "whereabouts" and where I maintain my separate bank accounts to pursue his claims as a creditor in this bankruptcy is specious, and Sagi and Mr. Dellaportas must now twist themselves into the proverbial "pretzel" to concoct some legal or factual basis for their wrongful conduct. Sagi's investigator illegally accessed Orly's bank records and found no joint bank accounts. Clearly, he did not need to illegally access my personal bank records to show that no such joint bank accounts existed.

Sagi's supposed reason and timing for hiring the investigator is also impossible to determine based on his inconsistent statements to this Court. During the May 5 Court conference, Mr. Dellaportas told your Honor "[That] Mr. Genger, in pursuit of post-judgment discovery, retained an Israeli attorney, who retained a licensed private investigator, who conducted some research, produced a couple of reports." Ex. 9 (May 5 Tr.) at 72:9-12. Any post-judgment discovery by Sagi would have had to pre-date July 19, 2019 -- the date of Debtor's bankruptcy filing. Yet, in his May 29, 2020 Letter, Mr. Dellaportas, shifts gears and now claims this that "this bankruptcy litigation was the sole purpose for the [r]eport" [concerning Herschmann]. [The investigator] was retained following the Debtor's bankruptcy filing." May 29 Letter at p. 8. Whatever the truth is when and for what reason Sagi decided to hire investigators, it does not help him rebut the crime fraud exception.

We now know, because Mr. Dellaportas finally admitted it during the May 21, 2020 Court conference, that there are at least four investigator's reports concerning the Debtor and me that contain confidential travel records. There is the report about Orly's address in Israel (a property in which Orly never had any ownership interest (Freeman Dkt., ECF No. 79 [Sagi Decl.] (*Report 1*). Then there is the report about Orly's 16+ year old bank account which was the basis for Sagi to (inaccurately) accuse me and my law firm of bankruptcy fraud (*Report 2*). We also know that Mr. Dellaportas relied on a different investigator and yet another report to allege in court filings that Orly spent "27 days to be exact" in Israel during a certain six month period in 2017. (Freeman Dkt. ECF. No. 99 at p. 11 *citing* Sagi Supp. Decl., ECF No. 79) (*Report 3)*. And, then there is the investigator's report about me from September 2019 *(Report 4)*.

Mr. Dellaportas' claim that he mistakenly told the Court that he was "only aware of [a] single report" related to Orly because he was "unexpectedly asked about it" at the March 4 conference strains credulity. Indeed, it is directly belied by his own admission to this Court on May 21 that he knew of at least three investigator reports and that I had been raising the issue about a report concerning me for "six months." Moreover, Sagi -- who commissioned all four reports -- was in Court during the March 4 conference, and Mr. Dellaportas never corrected his inaccurate statement until May 4, 2020. N.Y. Rules of Prof'l Conduct, R.3.3(a)(1).

KASOWITZ BENSON TORRES LLP

HONORABLE JAMES L. GARRITY, JR.
JUNE 5, 2020
PAGE 15 OF 19

    While Mr. Dellaportas clearly did not hire the private investigator -- no lawyer did -- it is clear that he knew what the investigator was doing. As stated above, Mr. Dellaportas claims that he was unaware of any reports concerning me until sometime after the March 4 court conference. Mar. 4. Tr. at 72:22 to 73:4. It is hard to imagine that Sagi would keep this information from Mr. Dellaportas if the report, as they claim, was prepared for the "sole purpose" of the bankruptcy proceeding and "highly" relevant to the motion to dismiss." How was Mr. Dellaportas going to use this "work product" if he did not know that it existed? Also, why would Sagi withhold this information from his own counsel for more than six months. Mr. Dellaportas has been Sagi's lead attorney in multiple litigations in multiple jurisdictions and Sagi has remained a loyal client even when Mr. Dellaportas went -- in a mere six year period -- from Duane Morris LLP to Morgan Lewis & Bockius LLP, then to Kelley Drye & Warren LLP (for a year), and now to Emmet Marvin & Martin LLP. Finally, how could this report have been prepared in "anticipation of litigation" if the only attorney who could use it in these proceeding was never made aware of it?

    **E.    The Crime Fraud Exception Defeats Any Attorney Work Product Protection Claim**

    Even assuming *arguendo*, contrary to the law and the facts, that an attorney did commission the report and the report was attorney work product, the crime fraud exception would mandate disclosure. The information contained in the reports are clearly stolen and work product immunity does not apply when a client consults a lawyer for the purpose of furthering an illegal or fraudulent act. *See, e.g., United States v. Zolin*, 491 U.S. 554, 563 (1989); *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986); *In re Grand Jury Subpoenas Duces Tecum*, 773 F.2d 204, 206 (8th Cir. 1985); *Catton v. Def. Tech. Sys., Inc.*, No. 05 Civ. 6954(SAS), 2007 WL 3406928, at *2 (S.D.N.Y. Nov. 15, 2007).

    Sagi's defense is essentially, that the investigator is "licensed" in Israel, and my close friend and business partner hired him.[11] However, that is no defense at all. Being licensed does not mean one does not or cannot commit criminal conduct. If that were true, then the Chief of Staff to the Minister of Public Security statement that the Israel National Police's "investigation [of illegally obtaining my travel and banking records] is underway and being conducted by the Fraud Crimes Unit of the Central Unit in the Jerusalem District Police . . . senior officials in the

---

[11] It is not clear if Sagi is attempting to hide behind an advice of counsel defense to try to protect himself from the illegal conduct of his investigators. If so, he has put that advice and material *at issue* and that would also mandate disclosure (A client who claims to have acted pursuant to the advice of a lawyer cannot use the work product doctrine to immunize that advice from scrutiny. Such a defense places the advice "at issue" and removes the work product protection, even with respect to opinion work product. See Restatement (Third) of the Law Governing Lawyers § 92(1)(a) (2000)). *Matsushita Elecs. Corp. v. Loral Corp.*, No. 92 Civ. 5461 (SAS), 1995 U.S. Dist. LEXIS 12880, *3 (S.D.N.Y., September 7, 1995)(" It is conceded that reliance on an advice-of-counsel defense waives the defendants' attorney-client privilege and the attorney work-product rule.").

Kasowitz Benson Torres llp

Honorable James L. Garrity, Jr.
June 5, 2020
Page 16 of 19

Jerusalem District Attorney's Office and the Investigations Division are part of the investigation . . . and [it] is advancing at a satisfactory pace" (ECF No. 242-1 (Herschmann Letter, Ex A) at ¶ 2) would make no sense.

Further, as demonstrated in the attached declaration of Yovel Nachmani, attorneys, judges and licensed private investigators have been convicted in Israel for illegally accessing personal information of someone else.  *See* Ex. 8 (Nachmani 2020 Decl.) at ¶ 6.

The Ninth Circuit's holding in *United States v. Christensen,* 828 F.3d 763 (9th Cir. 2016), analyzing the application of the crime-fraud exception to the work product doctrine is instructive here.  In *Christensen*, defendants appealed their criminal convictions stemming from an enterprise offering illegal private investigation services in Southern California. The Court held that the recordings that defendant private investigator had secretly made of his phone calls with defendant Christensen, an attorney, discussing illegal wiretappings were not protected work product:

> Here, the recordings reflected [defendant's] illegal attempt to obtain intimate personal information about an opponent in litigation as part of his preparation for trial. The Supreme Court has recognized that the work product protection was necessary to avoid such 'unfairness and sharp practices . . . in the giving of legal advice and in the preparation of cases for trial.' It would indeed be perverse . . . to allow a lawyer to claim an evidentiary privilege to prevent disclosure of work product generated by those very activities the privilege was meant to prevent. The work product doctrine did not apply here.

*Christensen*, 828 F.3d at 805-806 (internal quotations and citations omitted).

Here, as in *Christensen,* the crime-fraud exception applies because the report concerning me was gathered and distributed in violation of Israeli law (Nachmani 2019 Decl. at ¶ 10; Ex. 8 (Nachmani 2020 Decl.) at ¶ 6) and in furtherance of illegal activity in the United States including, among other crimes, mail fraud, wire fraud and conspiracy.  The multiple times that Sagi used investigators to illegally obtain my and the Debtor's personal financial and travel records and the transmission of that information via electronic means and via the mail and their use of those materials in the court proceedings to obtain money, satisfies the elements of these criminal statutes.[12]

---

[12] 18 U.S.C. § 1341; 18 U.S.C. § 1343; 18 U.S.C. § 1349. "The essential elements of both [mail fraud and wire fraud] are: "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." *United States v. Carpenter*, 190 F. Supp. 3d 260, 265 (D. Conn. 2016), citing *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004).  The crime of conspiring to commit mail and wire fraud imposes liability on "[a]ny person who . . . conspires to commit" the substantive offense.  To prove conspiracy, it must be shown that "the defendant agreed with another to commit the offense [and] that he knowingly engaged in

KASOWITZ BENSON TORRES LLP

HONORABLE JAMES L. GARRITY, JR.
JUNE 5, 2020
PAGE 17 OF 19

The crime-fraud exception has also been applied to deny privilege protection to what would otherwise have been protected documents because of the misconduct of a party's private investigators. *See*, e.g., *Meyer v. Kalanick*, No. 15-Civ.-9796, 2016 WL 3189961, at *3-4 (S.D.N.Y. June 7, 2016) (crime-fraud exception applied and required defendant to produce materials from private investigator, who had lied to third parties during investigation to obtain information about plaintiff and plaintiff's counsel). *See, e.g.*, G. Michael Halfenger, Comment, *The Attorney Misconduct Exception to the Work Product Doctrine*, 58 U. Chi. L. Rev. 1079 (1991).

Finally, in addition to the crime fraud exception, the multiple ethical violations would also mandate production. *See* N.Y. Rules of Prof'l Conduct R.4.4(a); 5.3(a); 5.3(b)(1); and 8.4(a)-(d).

### F. Sagi Cannot be Trusted to Accurately Report the Facts Concerning his Claim of Work Product Protection

In assessing whether Sagi's assertion of work product immunity for my confidential information has any credibility, I respectfully direct the Court to how Sagi treated the Court ordered confidentiality of my premarital agreement.

On May 21, 2020 Your Honor ordered that Mr. Dellaportas produce a list of everyone who received a copy of, or access to, my confidential premarital agreement that was produced pursuant to Judge Freeman's February 7, 2019 Protective Order. Mr. Dellaportas produced that list to me on June 1, 2020 -- twelve days after this Court issued its Order. As shown below, Sagi knowingly violated his obligations under Judge Freeman's Protective Order.

During the May 21 conference, Mr. Dellaportas told Your Honor that the premarital agreement had been given to "all types of people" who were allegedly assisting Sagi in his judgment enforcement, including Sagi's "attorney in Israel." We had extensive discussions about why an attorney in Israel would have a copy of my premarital agreement and whether such production could comply with Judge Freeman's Protective Order. Your Honor ordered Mr. Dellaportas to produce the list to me. When I received the list, I was surprised to see that it did not include any Israeli attorney. I immediately contacted Mr. Dellaportas and asked that he identify the attorney in Israel. Mr. Dellaportas engaged in revisionist history, telling me that he "speculated" that he gave it to an Israeli attorney. Mr. Dellaportas also told me that he checked with the above-mentioned David Parnes, who advised that he never received it. It is hard to imagine why Mr. Dellaportas thought he had shared it with an attorney in Israel if they had not discussed it.

---

the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy." *Id.* at 266 (internal quotations omitted).

## Kasowitz Benson Torres llp

Honorable James L. Garrity, Jr.
June 5, 2020
Page 18 of 19

      The Protective Order was very clear and limited disclosure of the confidential agreement to "counsel retained by Sagi Genger specifically for this action ***and*** who are representing him in connection with enforcement of the Judgment . . ." (emphasis added) *See* Freeman Dkt. ECF No. 181 at 6(b).

      Based on Sagi's list, it is clear that he decided to rewrite the Court's Order to read: "counsel retained by Sagi Genger specifically for this action ***or*** who are representing him in connection with enforcement of the Judgment (or that Sagi thinks may need to help him assemble certain motions). "

      As Your Honor will further recall, during the May 21 conference when I raised concerns about Sagi's disclosure of my confidential premarital agreement to third parties, Mr. Dellaportas literally responded by saying "*blah, blah, blah*" and later "*wah, wah, wah*." That cavalier attitude can be the only explanation for why certain third parties have been given copies of my confidential agreement in violation of the Protective Order. This Court appropriately recognized during the May 22, 2020 conference that it was "very sensitive to the concerns around the [confidentiality of the] prenuptial agreement." (May 22, 2020 Transcript at 5:4-5). As described herein, Sagi showed no such concerns.

      There is no way that these third parties who represented the Orly Genger Trust, its Trustee, Dalia and TPR Associates, Inc. (Sagi is still investigating if he gave it to another attorney) could arguably fit within the requirements of the Protective Order -- they are clearly not "retained by Sagi . . . and . . . representing him . . ." in the action before Judge Freeman. For example, the Orly Genger Trust argues that proceeds from the Trump Settlement Agreement all belong to Orly's Trust. That Trust is adverse since Sagi and Dalia argue that it all belongs to them. Clearly, Orly's Trust could never "represent[] Sagi in connection with enforcement of [his] Judgment . . ." as required by the Protective Order, since it would be a direct breach of the Trustee's duty of undivided loyalty to Orly -- the only beneficiary of the Trust -- to help Sagi get this money. And, Orly's Trust would be working for someone who is directly adverse to its only beneficiary. Yet, that is exactly what Sagi is arguing now to justify providing them with copies of my confidential Agreement.

      Sagi and Mr. Dellaportas then argue that they did not breach the Protective Order by providing the confidential premarital agreement to counsel for the Orly Genger Trust and its Trustee, because those attorneys "were assisting (Sagi) in assembling the exhibits to be filed with Sagi's motion to dismiss [in Texas]." And Sagi says that almost two months later they signed a draft confidentiality agreement related to Arie Genger's potential production that was never agreed to by me, Orly or any of the other Parties, never so-ordered by any Court and does not address the restrictions contained in Judge Freeman's Protective Order. Arie never had a copy of the premarital agreement and thus could never agree to its release it to anyone *See* Ex. 18 (June 1, 2020 Mr. Dellaportas letter) at p. 2 and Exh. D).

KASOWITZ BENSON TORRES LLP

HONORABLE JAMES L. GARRITY, JR.
JUNE 5, 2020
PAGE 19 OF 19

      Sagi's explanation as to why he shared the premarital agreement with counsel for his mother, Dalia, is also nonsensical.  Of course, counsel for Dalia does not represent Sagi.  Sagi also provided the premarital agreement to other attorneys who are not admitted in New York and who were never "retained by Sagi Genger specifically for [the action before Judge Freeman]."

      If that were not enough, Sagi orchestrated with Mr. Dellaportas a plan to evade the Protective Order on September 11, 2019.  On that date, Sagi directed Adam Pollock, who has appeared before Your Honor purportedly on behalf of the Orly Genger Trust and Recovery Effort, Inc., to issue a subpoena to Sagi via email to Mr. Dellaportas -- returnable 5 days later -- for all the confidential materials which had been produced pursuant to the Protective Order, including my premarital agreement.  Mr. Dellaportas -- without even requiring formal service of the subpoena -- promptly said to everyone who produced information pursuant to the Protective Order "[i]n the absence of being presented with a motion to quash filed with the Court from which the subpoena was issued, by the close of business (9 days later), we will be making a responsive production."  Mr. Dellaportas demanded that the motion to quash not be directed to Judge Freeman even though she had issued the Protective Order regarding the subpoenaed documents. (*See* Freeman Dkt. ECF No. 224-1 to 3, attached hereto as Exhibit 18).  Instead, Mr. Dellaportas tried to direct the motion to the new Judge assigned to the Manhattan Safety/Recovery Effort cases who had no familiarity with the prior Protective Order.  Judge Freeman quashed the bogus subpoena. See *Id*. at ECF No. 233.

      In short, Mr. Dellaportas has offered no basis for the asserted work product protection.  He has not offered and cannot offer any reason I should not receive a copy of reports containing my own personal and confidential information, and he cannot rebut that the crime fraud exception would apply under all circumstances.

      For the foregoing reasons and those in my May 4, 2020 application (Ex. 1), I ask that the Court grant the relief requested herein.

      I thank the Court for its consideration in this matter.

      Respectfully submitted,

      */s/ Eric Herschmann*

cc:  All Counsel of Record (by ECF)

Enclosures