# EMMET, MARVIN & MARTIN, LLP
### COUNSELLORS AT LAW



120 Broadway 32nd Floor
New York, New York 10271
212-238-3000

**www.emmetmarvin.com**

John Dellaportas
*Partner*
Tel: 212-238-3092
Fax: 212-238-3100  Fax (alt.) 212-406-6953
jdellaportas@emmetmarvin.com

June 12, 2020

**Via ECF**

Honorable James J. Garrity, Jr.
U.S. Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

  **RE: *In re Orly Genger*, Case No.: 19-13895-jlg**

Dear Judge Garrity:

  Our firm represents judgment creditor Sagi Genger ("Sagi"). At the Court's instruction, we respectfully submit this reply letter in further support of our motion to shield from discovery the September 12, 2019 investigative report prepared by Sason Matityahu, a private investigator retained by counsel to Sagi (the "Report").

  In our opening letter motion, we set forth three reasons why the Report should not be produced: first, it is attorney work product; second, it contains no information likely to be relevant to any claim or defense in this case, as required by Fed. R. Civ. P. 26(b)(1); and third, that this very matter is currently before the Israeli court, which is uniquely qualified to address any supposed violations of Israeli law, and can also direct the Report to be turned over if that Court sees fit to do so.

  In response, Mr. Herschmann barely addresses the first ground, and completely ignores the second and third. Instead, he delivers a 19-page screed in which he seeks to smear Sagi, myself, and the attorney through whose law firm Mr. Matityahu was retained. Ordinarily, we would ignore the irrelevant parts of his rant, but his letter is so replete with misleading and false statements, that we feel compelled to reply below.

  In doing so, we want to make sure the forest is not lost in the trees. Mr. Herschmann filed multiple false affidavits, which a federal court found were designed to "frustrate" Sagi's post-judgment discovery. To overcome that barrier, Sagi retained a licensed private investigator, who uncovered information the Bankruptcy Court later used to transfer venue. Now the perpetrator of those false affidavits, Mr. Herschmann, demands this Court grant him equity over his victim. His demand is without merit.

EMMET, MARVIN & MARTIN, LLP                                                                    2

## **Mr. Herschmann Misstates This Court's Ruling**

Mr. Herschmann begins his letter by claiming that: "During the May 21, 2020 conference, the court asked Mr. Dellaportas to address two questions: (1) whether attorney work product protection applies to investigators' reports <u>sent directly to Sagi with no involvement by or copy to an attorney</u>; and (2) assuming the protection applies whether those reports, which the investigator <u>produced in violation of applicable United States and Israeli law</u>, lose that protection because of the crime fraud exception." (Emphases added.) He then accuses me of "ignor[ing] the Court's questions."

This did not happen. In the May 21, 2020 call, the Court simply set a briefing schedule on our objection to producing the Report. Your Honor never stated either (a) that the Report was "sent directly to Sagi with no involvement by or copy to an attorney" (it was not), nor (b) that the Report was "produced in violation of applicable United States and Israeli law" (we are not aware of any evidence that it was).

It is not hard to understand why Mr. Herschmann is putting his own words in the Court's mouth. As the attached declarations reflect (Exhs. O-P),[1] the Report was procured through the law firm of Parnes & Co., which until Mr. Herschmann's recent inquiry, had the only copy. (I obtained the document from Mr. Parnes, not from Sagi.) Sagi did not hire Mr. Matityahu, has never met him, and has never even communicated with him. In other words, the Report was procured <u>exclusively</u> through an attorney.

Second, Mr. Herschmann has never identified any evidence that any laws were broken. As previously noted, Mr. Matityahu is a duly licensed private investigator in Israel, and hiring him violated no laws. Mr. Herschmann admits he interviewed Mr. Matityahu, yet he does not specify any illegal investigative technique that Mr. Matityahu employed. We are unaware of any improper conduct by Mr. Matityahu.

As we noted in our opening letter, about nine months ago, Mr. Herschmann both (a) filed a criminal complaint against Mr. Matityahu in Israel and (b) caused his wife, while in bankruptcy, to file a civil suit against Mr. Matityahu. Exh. N. (She is in fact represented by Mr. Herschmann's Israeli attorney.) If any laws were broken, the Israeli courts and authorities are well equipped to address that. (To date, they have taken no action of which we are aware.) By contrast, Mr. Herschmann does not articulate what jurisdiction *this* Court has to be involved in an Israeli matter. As the Second Circuit holds, the Bankruptcy Code does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d 86, 92 (2d Cir. 2003). The Court's jurisdiction does not exist to satisfy Mr. Herschmann's curiosity.

---

[1] For clarity, exhibits to this letter begin with the letter O, so as not to overlap with Exhibits A-N in our opening letter motion (which are also cited herein).

EMMET, MARVIN & MARTIN, LLP                                                                          3

## Mr. Herschmann's Request Is Barred By Unclean Hands

As we detailed in our opening letter, the retention of Mr. Matityahu did not emerge in a vacuum. Rather, it was a legitimate effort to obtain post-judgment information in the face of some highly *illegitimate* submissions by Mr. Herschmann and his wife (while she was represented by Mr. Herschmann and his law firm).

It is one thing for Mr. Herschmann to have made questionable submissions to other judges in other forums. Perhaps those matters are best left to those other Courts (although the automatic stay prevents them from being addressed therein). It is quite another thing, however, for him to *continue* making such submissions in *this* Court. Yet Mr. Herschmann does that very thing, in the face of uncontroverted evidence to the contrary.

*#1: The False Statements About The Joint Account*

First, there is Mr. Herschmann's and his wife's joint AmEx account, the existence of which both denied under oath. Exhs. D at 15, F at 7. On page 11 of his letter, Mr. Herschmann claims I "mistakenly assert" that Orly's AmEx account "was a joint account with me." Rather than debate the point, we refer the Court to the <u>original</u> Doc. 239-31.[2] As the Court can see, each month Mr. Herschmann and his wife would receive a single AmEx statement, with each of their charges listed on it. The first page of each bill lists a "New Balance" comprised of the total charges by Mr. Herschmann and his wife. The last page of each bill lists a "Total Points Balance" showing the AmEx Points that Mr. Herschmann earns from his and his wife's charges. In his letter, Mr. Herschmann does not explain how this can be considered anything other than a joint account.

In a footnote on page 11 of his letter, Mr. Herschmann further claims that the Debtor "did not have any American Express card jointly or otherwise when she responded to Mr. Dellaportas' questions." Our subpoena on AmEx did not seek bills through the date of the Debtor's deposition, so it is theoretically possible that she cancelled the account by that point in time, having learned of our subpoena. But Mr. Herschmann ignores that in October 2018, the Debtor served her sworn answers to Sagi's Interrogatories, No. 16 of which asked her to "Identify all … credit card accounts … or other financial accounts held by, in the name of, or for the benefit of, [Orly], either individually or jointly …." Exh. D at 15. In response, she did not identify the joint AmEx account or any other active credit card, *despite having using their joint account 23 times that same month*. Exh. Q. The Debtor's answers were also signed by Mr. Herschmann's law partner, Mr. Bowen, and it is difficult to imagine he did not review his wife's answers before they were served.

---

[2] Although the bills were produced by American Express without confidentiality restriction, at Mr. Herschmann's request, we have entered into a stipulation to remove his name and AmEx points from the exhibit available on the public docket. Doc. 253-3. As of this date, however, the original remains on the docket, and belies Mr. Herschmann's claims.

*#2:  The False Statement About Where He Lived*

On page 10, Mr. Herschmann next claims that: "Contrary to Sagi's claims, … I never said that I always lived in Texas."  In fact, he did so swear.  To be precise, Mr. Herschmann told a federal court under oath (in the course of trying to quash Sagi's subpoena) that: "I am a resident of Texas and have been since 2010.  I live at 210 Lavaca Street, Unit 1903 in Austin (the W Residences) ….  Prior to living in Austin, I lived in Houston, Texas."  Exh. F at 1.  Yet not long before that, he told a *different* federal court, again under oath, that: "Since [fall 2016], Orly has lived in Tel Aviv, Israel.  She lives here with me …."  Exh. C at 1.  No matter how many homes he may have, both these statements cannot be true (as Magistrate Judge Austin observed).

*#3:  The False Statement About The Backdated Note*

Also on page 10, Mr. Herschmann claims that: "Sagi's self-serving characterization of the UCC filed note as being 'bogus' and 'backdated' is baseless and is contrary to the evidence."  Once again, the documents tell a different tale.  The "secured promissory note" upon which Mr. Kasowitz bases his $2 million bankruptcy claim purports, on its face, to have been executed on December 30, 2016, apparently to coincide with a payment that Mr. Herschmann made to his own firm at that time.  (We do not attach the document, because Mr. Herschmann speciously designated the entire note as "Confidential.")  The document's metadata from Kasowitz, however, shows that the document did not even exist on that date, and was only finalized some four months later in April 2017.  Exh. R.  (To this day, we do not know when the Debtor actually executed the note.)

In other words, after telling his wife and two courts of law that Kasowitz's legal services were "pro bono," he turned around and had his wife sign a document recharacterizing those legal fees as a "secured loan" he purportedly made just two months into their marriage.  As we will explain at the appropriate juncture, this was in response to negative develops in the underlying litigations, which made clear the scope of the Debtor's liabilities, and thus Mr. Herschmann's desire to put his wife into his debt.  For now, we simply note that Mr. Herschmann's denial of the backdating is untrue.

Moreover, Mr. Herschmann's backdating of documents to shield the Debtor's assets does not end with the promissory note to him.  The Debtor's father, Arie, also got a promissory note dated  December 2016.  The metadata shows, and Arie's attorney has admitted, that it was not drafted until mid-2018.  To govern the relationship between the two notes, Mr. Herschmann had his firm prepare a subordination agreement, which was also backdated to December 2016.  Arie's note includes pages of false recitations that it replaces ten earlier promissory notes which, in fact, never existed.  And, as more fully set forth in our motion to dismiss, these arrangements were then concealed through a series of false statements made by the participants, mostly under oath.

EMMET, MARVIN & MARTIN, LLP                                                                           5

*#4: The False Statement About The Transfer From His Wife*

Lastly, on page 10 of his letter, Mr. Herschmann claims that "Orly did not … transfer anything to me." As his own proof of claim reflects, one month after the Court entered a $3.2 million judgment in favor of Sagi, Mr. Herschmann had his wife execute a Deed of Trust providing that, to the extent the couple's Austin home lacked homestead protection under Texas law, Orly "conveys the Property to Trustee [Mr. Herschmann's sister-in-law] in trust" for Mr. Herschmann's benefit. Exh. S at 7.

Further, Mr. Herschmann has filed a UCC lien over his wife's assets, specifically covering the settlement proceeds at issue in this case. Exh. S ta 5. Conveyance of a lien is legally a transfer, although this one is undoubtedly void. *See, e.g., Priestley v. Panmedix Inc.,* 18 F.Supp.3d 486, 498-502 (S.D.N.Y. 2014) (setting aside security interest as fraudulent conveyance); *see also Matter of Holloway*, 955 F.2d 1008, 1015 (5th Cir. 1992) (setting aside debtor's transfer of security interest to former wife).

We could go on, but the Court gets the point. Mr. Herschmann's claim is premised on false statements. Thus, even were it otherwise meritorious, which it is not, his demand should be denied based on unclean hands. *See, e. g., Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.,* 792 F. Supp. 969, 969-70 (S.D.N.Y. 1992) (denying equity where party made sworn statements that directly contradict each other).

## Mr. Herschmann Mischaracterizes The Prior Proceedings

Rather than address the single discovery issue before the Court, Mr. Herschmann devotes most of his letter to grossly mischaracterizing various prior proceedings. While these mischaracterizations have nothing to do with whether the Report should be compelled to be produced, we feel the need to address them.

First, Mr. Herschmann falsely claims that Bankruptcy Judge Davis: "told Mr. Dellaportas that he knew that Mr. Dellaportas was ghost writing briefs for Texas counsel representing various parties including drafting the motion to dismiss and certain objections." Mr. Herschmann is simply making that up. The comment he refers to was directed to Texas counsel, not to me or anyone else. More fundamentally, Mr. Herschmann leaves out that Judge Davis made that comment at the *initial* conference in the case, before any evidence had been submitted. A month later, after a day of testimony from the Debtor and numerous documentary submissions, Judge Davis expressly *adopted* those formerly "unhelpful" allegations as his own findings. Exh. A.

Next, Mr. Herschmann complains that we served a discovery subpoena on him with an October 1, 2019 response date corresponding with a holiday. As Mr. Herschmann plainly knows, having practiced law for many years, the date on a subpoena is simply a control date. Indeed, we thereafter repeatedly offered to negotiate both response dates and subpoena scope, but he instead moved to quash contending that he is exempt from *all* discovery. Almost a year later, Mr. Herschmann has yet to produce a single document, nor

EMMET, MARVIN & MARTIN, LLP                                                                                   6

agree to sit for a deposition on any day, holiday or otherwise.

Given that Mr. Herschmann seeks to place himself in front of his wife's other, legitimate creditors, he do not agree that he should be exempt from discovery. Yet Mr. Herschmann now threatens to seek yet another "protective order," because we are requesting, *inter alia*, an unredacted copy of the Debtor's pre-nuptial agreement. What Mr. Herschmann neglects to tell this Court is that Magistrate Judge Freeman, in ordering the initial redactions, expressly ordered that: "**If Sagi is able to come forward with evidence to suggest that, prior to or during her marriage to Herschmann, Orly transferred any of her assets to him, then Sagi may seek further discovery regarding the portions of the Premarital Agreement that set out Herschmann's assets.**" Exh. T at 2-3. Sagi has now come forward with indisputable evidence of such transfers.

Further, the testimony of the Debtor cited in the motion to dismiss, admitting that the document was crafted with asset concealment in mind, makes it reasonable to believe that: (i) drafts contain relevant information and (ii) the estate may have an interest in community property, as the pre-nuptial agreement is rooted in fraud.

Next, Mr. Herschmann--after decrying "*ad hominem* attacks"--again falsely accuses me of having had the Report before I did, despite having no reason to believe it to be true. It is false. As I told the Court previously, once I learned of the Report, I notified Mr. Herschmann of its existence. Unlike in the above-discussed statements, I do not double-down on inaccurate statements, but rather correct them, which is what I did here. In furtherance of his false allegation, Mr. Herschmann offers a "Timeline" of entries that relate to the investigative report on Orly, <u>not</u> the one on him. As the report on Orly was given to Mr. Herschmann last fall, one can only suspect he is trying to confuse the Court. In any event, his chart is a *non sequitur*, and his letter should be struck.

### **Mr. Herschmann's Work Product Argument Ignores Binding Precedent**

In our opening letter, we cited to multiple cases from the Supreme Court and other federal courts holding that the work product doctrine extends to reports prepared by private investigators. *See United States v. Nobles*, 422 U.S. 225, 238-39 (1975); *accord, e.g., In re Grand Jury Proceeding*, 79 F. App'x 476, 477 (2d Cir. 2003) ("attorney-client privilege may extend to communications with a third party, such as an accountant or private investigator hired to assist in the rendition of legal services… A party asserting that a document is protected by the work-product doctrine must demonstrate that the document was prepared 'in anticipation of litigation'").

In his response, Mr. Herschmann simply ignores these cases, instead citing to a *Cornell Law Review* article from which he offers no quote. As the governing precedents make clear, the choice of information gathered by an investigator hired by counsel is protected by attorney work product and attorney-client privilege because, *inter alia*, it can give insight into the thought processes of the engaging attorney.

Next, Mr. Herschmann claims in a header that: "Sagi Fails to Identify Any Attorney Who is Asserting Work Product Protection." In reality, our opening letter identified the law firm that retained Mr. Matityahu--Parnes & Co. Mr. Herschmann offensively describes Mr. Parnes as an "attorney" in scare quotes, but in reality, Mr. Parnes has been a practicing attorney since 1997 when he graduated from Cambridge. Exh. O.

### **Mr. Herschmann's Smears Are Baseless And Inappropriate**

Mr. Herschmann also claims that Mr. Parnes "has shown himself willing to lie on Sagi's behalf or assist Sagi in lying." This allegation is outrageous and untrue, and no court has ever found otherwise. Mr. Herschmann then proceeds with a warped description of certain prior Genger family litigations, apparently in the hope of smearing Mr. Parnes and Sagi, and thereby distracting the Court from his direct role in the Debtor's dissipation of assets through the falsified business records outlined above (and others).

Before addressing the specifics of his allegations, however, we note the following. Over the course of the prior decade and a half of Genger family litigation, various Courts, at one point or another, have remarked both favorably and unfavorably about every member of the Genger family. Notwithstanding what Mr. Herschmann would have the Court believe, Sagi has fared best of all. As Judge Davis expressly held, Orly's "move to Texas … was at least, in part, prompted by a desire to file bankruptcy in Texas should it become necessary to get away from the New York Courts." Exh. M at 10. The Court was referring to all the litigations in which the Court sided with Sagi over Orly.

Indeed, the very reason we are here in Bankruptcy Court is because Judge Forrest adopted Sagi's recitation of the parties' 2004 agreement over Orly's feigned denial of it; indeed, she ruled for Sagi on summary judgment, as the uncontroverted evidence proved Sagi's version of events and thoroughly debunked Orly's. *See Genger v. Genger*, 76 F. Supp. 3d 488 (S.D.N.Y. 2015). Mr. Herschmann is well aware of this, as he represented Orly on her unsuccessful appeal to the Second Circuit (*Genger v. Genger*, 663 F. App'x 44 (2d Cir. 2016)). In fact, Mr. Herschmann has represented the Debtor on almost all of her losing cases, before several different judges in various forums.

For example, Mr. Herschmann includes in his letter a lengthy discussion about a state court case called *Orly Genger v. Sagi Genger*. There, Orly claimed that Sagi had underpaid her by $12 million for her interest in a family business venture. However, he neglects to inform this Court that the initial liability finding in Orly's favor was reversed by the Appellate Division, and on remand the Court-appointed CPA from the Mazars accounting firm found zero damages, because Sagi had actually *overpaid* Orly for her business interest. Orly, represented by Mr. Herschmann, rounded out her time in that Court by speciously accusing the presiding justice (the same one who had initially ruled in Orly's favor) of misconduct, and then abandoning the case altogether.

Next, Mr. Herschmann bizarrely describes *Genger v. Sharon* as a case in which

EMMET, MARVIN & MARTIN, LLP                                                                                              8

"Sagi wrongly accused the former Prime Minister of Israel's son as being involved in a massive international conspiracy to somehow defraud Sagi." The case was actually about the enforceability of a promissory note executed by the defendant's company.

In a footnote, Mr. Herschmann describes *Orly Genger v. Dalia Genger* as a case in which "Dalia and Sagi … tried to put millions of dollars of debt on Orly's Trust related to supposed legal costs that the Trust had to incur to bring multiple lawsuits…." In reality, Dalia Genger, as Trustee of the Orly Genger 1993 Trust, and Sagi Genger, as President of TPR Investment Associates, Inc., had reached an agreement to settle, for $10.4 million, two lawsuits the Debtor had brought (purportedly on behalf of the Trust) against TPR. Orly did "succeed" in voiding that settlement, after which she then lost both suits and collected $0 for the Trust. Instead, the Debtor now owes Sagi and other defendants a small fortune in legal fees for a wrongful attachment that was procured by Mr. Herschmann. That Mr. Herschmann would brag about this outcome speaks volumes.

Mr. Herschmann's final mischaracterization is the most egregious. On page 12 of his letter, he writes that: "In May and June, 2019, Mr. Dellaportas made all these same arguments multiple times (almost verbatim) to Judge Freeman and Judge Broderick [concerning his false statements], without success." He leaves out the reason these motions were "without success"; namely, in July, while the motions were *sub judice*, the Debtor filed for bankruptcy, whereupon Mr. Herschmann's firm immediately invoked the automatic stay with the District Court. As we have noted in our motion to dismiss, such "success" is not a proper, good faith basis to file for bankruptcy.

### **Mr. Herschmann Has Put Forward No Evidence Of Any Illegality**

On page 12, Mr. Herschmann begins a section of his letter with the following title: "Sagi Has Conceded His Private Investigation Was Illegal." No, Sagi has not. Mr. Herschmann also tries to flip the burden for his ludicrous "crime/fraud" argument on its head, arguing that "Sagi has not attempted to explain how he obtained my banking information or how he obtained Orly's banking records from 16+ years ago." Since Sagi has never communicated with Mr. Matityahu, he would have no way of knowing that. It is Mr. Herschmann who is screeching about a "crime" being committed, one not charged by actual Israeli criminal authorities, so it is incumbent upon him to prove it.

Further, Mr. Matityahu did not obtain "banking records." He obtained bank names. As Israel has only three major banks, this information is far from revealing.

### **There Has Been No Waiver**

Mr. Herschmann next argues: "Sagi cannot have it both ways. Sagi affirmatively used the same investigator's report related to Orly in this bankruptcy proceeding and did not assert any work product immunity claim at that time." In reality, there were two separate reports--one on Orly, which was used in the bankruptcy case, and another on Mr.

EMMET, MARVIN & MARTIN, LLP                                                                  9

Herschmann, which has never been used for any purpose. Sagi has not waived any attorney work product protection as to anything dealing with Mr. Herschmann.

Mr. Herschmann also makes the convoluted claim that "Sagi's supposed reason and timing for hiring the investigator is also impossible to determine based on his inconsistent statements to this Court." According to him, the "inconsistency" consists of my having described Mr. Matityahu's retention as being "in pursuit of post-judgment discovery," which, according to Mr. Herschmann, "would have had to pre-date July 19, 2019 -- the date of Debtor's bankruptcy filing." As far as "gotcha's" go, this one misses the mark. Our post-judgment discovery efforts most definitely include the bankruptcy, wherein we have served numerous discovery requests. As I explained in the same hearing:

> The issue that we have is that through post-judgment discovery we've now been trying for a year-and-a-half to get discovery from Mr. Herschmann. He hasn't produced a single document. He's never agreed to a single day to sit for a deposition. (5/5/20 Hrg. at 72:20-24, emphasis added).

The "year and a half" I referenced was from fall 2018 to spring 2020. This passage appears a mere eight lines below the one that Mr. Herschmann quotes. Yet he deceptively argues that by post-judgment discovery, I only meant through July 19, 2019. This is yet another brazen example of him trying to mislead the Court.

Lastly, Mr. Herschmann again tries to confuse the Court by claiming that "We now know, because Mr. Dellaportas finally admitted it during the May 21, 2020 Court conference, that there are at least four investigator's reports concerning the Debtor and me that contain confidential travel records."

Mr. Herschmann is apparently hoping the Court will not realize that this is not something he "now knows" because I "finally admitted it." Rather, he has always known that in 2017-2018, Sagi (again through counsel) retained a different private investigator (not Mr. Matityahu) for a different purpose, because Sagi so stated in a declaration filed with the District Court. Indeed, when the investigator's invoice was submitted as part of our fee application, Mr. Herschmann's firm filed an objection thereto, arguing that the investigator's fee was not recoverable. *See* Case 1:17-cv-08181 Doc. 125 at ¶ 5 and Exhibit E thereto. Thus, for Mr. Herschmann to now claim that the existence of a prior investigator is some sort of revelation is flat-out ridiculous.[3]

---

[3]     On page 15, Mr. Herschmann strangely feels the need to tell the Court I went "to Kelley Drye & Warren LLP (for a year)." While I am flattered by the interest he has taken in my career, I was actually at Kelley Drye for three years (from July 1, 2016 to June 11, 2019), before accepting an offer to become Co-Chair of the Litigation Department at Emmet Marvin last summer. Mr. Herschmann could have easily refreshed his recollection as to these dates, simply by reviewing our shared litigation dockets across multiple lawsuits since 2015.

EMMET, MARVIN & MARTIN, LLP                                                                                                  10

## Mr. Herschmann's Arguments About The
## Pre-Nup Contravene Express Court Rulings

In the last section of his letter, Mr. Herschmann shamelessly seeks to rewrite the actual Protective Order, in contravention of Magistrate Judge Freeman's express rulings. He proceeds with this contrived argument even though the Court never granted him leave to brief this issue, and even though it has zero to do with the Report.

By way of background, it will not surprise the Court to learn that the parties to the District Court action could not agree on the wording of a Protective Order to be entered. One of the main points of contention was Kasowitz's insistence that confidential materials could only be used by counsel for judgment collection efforts *in that same District Court action*. We disagreed, arguing that such materials should be usable *in any action to enforce Sagi's judgment*. The issue came to a head at a January 29, 2019 hearing before Judge Freeman, at which both Mr. Herschmann and I appeared. Exh. U.

At the outset of the hearing, Judge Freeman made her position crystal clear: "Well, first of all, I read enforcement of the judgment to include <u>any action brought to enforce or collect the final judgment</u>. I read it to include locating and [levying] against any assets." Exh. U at 28: 21-24 (emphasis added). Despite further objections from Mr. Herschmann and his colleague, they were unable to shake the Court's position, which the Protective Order went on to reflect. Exh V. Specifically, Paragraph 5 provides in relevant part that "Confidential Discovery Material" can be used both in the District Court action "(including for discovery disputes and fee applications), <u>and/or in any other proceeding or action brought to enforce or collect the final judgment against Orly Genger</u>…." *Id.* (emphasis added). Paragraph 6, in turn, provided that such Material can be shared by "counsel retained by Sagi Genger specifically for this action <u>and who are representing him in connection with enforcement of the Judgment</u>, including any paralegal, clerical and other assistant employed by such counsel and assigned to this matter." *Id.*

Remarkably, Mr. Herschmann--who was at that hearing, unsuccessfully arguing this very point--now acts as if he actually won that point, claiming it is Sagi who now wishes "to rewrite the Court's Order to read: 'counsel retained by Sagi Genger specifically for this action or who are representing him in connection with enforcement of the Judgment." We have not "rewritten" anything. As the hearing transcript reflects, Judge Freeman ruled, and the Protective Order thereafter went on to reflect, that Confidential Discovery Material can be used in other actions "to enforce or collect the final judgment." Sagi's proof of claim in this bankruptcy is plainly such an action.

On May 21, 2020, the Court instructed me to provide Mr. Herschmann with a list of those persons who received the redacted pre-nuptial agreement, and the dates on which they received them. The Court did not set a deadline, but I indicated I would try to complete it by Friday, May 29. As that turned out to be a holiday, I needed one extra business day, until the following Monday morning, to provide Mr. Herschmann the list.

EMMET, MARVIN & MARTIN, LLP                                                                     11

The Court can review the list, which is annexed hereto as Exhibit W. As one can see, contrary to Mr. Hershmann's prior allegations, the pre-nuptial agreement has only been provided to parties entitled to see it under Court Order and/or U.S. Code. Still dissatisfied, Mr. Herschmann proceeded to send harassing letters to parties on the list, demanding, *inter alia*, details of the recipient's "security policy" and "computer systems," and falsely implying he was entitled to such information by virtue of Your Honor's ruling. *See, e.g.,* Exh. X. Each of those recipients affirmed the accuracy of my list.

Still, that was not enough. Now, Mr. Herschmann comes before this Court and seeks to relitigate the prior judicial rulings as to the discoverability of the Debtor's redacted pre-nuptial agreement. The ruling he apparently has the greatest issue with is Judge Davis's directive that counsel for any party who signed the Texas confidentiality agreement could have access to the hearing exhibits in advance of the October 31, 2020 venue hearing. Incredibly, Mr. Herschmann now argues that: "[t]here is no way that these third parties who represented the Orly Genger Trust, its Trustee, Dalia and TPR Associates, Inc. … could arguably fit within the requirements of the Protective Order."

There actually is a way--Judge Davis expressly so ruled, on the record. Exh. Y. Once again, Mr. Herschmann actually appeared at that hearing, so it is remarkable that he is now acting like it never happened. Regardless, here is the ruling:

> THE COURT: What about [Dalia Genger's counsel Shelby] Jordan?
> …
> MR. JORDAN: I've always offered to sign the confidentiality agreement that's been signed and live by it. That's in writing, delivered several times. That if I can just see the documents that everybody else has, not these new documents that are requested, I don't, I have not ever requested new documents or other documents. But, the one's that --
>
> THE COURT: We have a limited number of parties to the litigation. That's the whole point of the bad faith business. … If the parties that are involved in this all sign the confidentiality agreement, then they should have access … to the documents, and whatever terms the confidentiality agreement are.….

Exh. Y at 20-21. Mr. Shelby signed the confidentiality agreement, and was thus provided the hearing exhibits by Ms. Streusand (Sagi's Texas counsel).

Despite this clear ruling, Mr. Herschmann now argues that: "Sagi's explanation as to why he shared the premarital agreement with counsel for his mother, Dalia [*i.e.,* the same Mr. Jordan in the transcript above], is also nonsensical." We submit that Mr. Herschmann's arguments are what are nonsensical, as they ignore the Court's rulings. Such arguments are not being made in good faith. They should be rejected.

EMMET, MARVIN & MARTIN, LLP                                                                    12

      Next, Mr. Herschmann complains because I initially indicated that the pre-nuptial agreement was shared with Mr. Parnes. As it turns out, it was not, so I did not put his name on the list. It is difficult to understand why this matters. As a counsel assisting Sagi in judgment collection, Mr. Parnes is fully authorized under the Protective Order to receive all Confidential Discovery Material with the exception of Attorneys' Eyes Only (AEO) material, which the pre-nuptial agreement is not. Exh. V. (Under Section 4, we agreed to exclude Mr. Parnes from AEO material at the insistence of Mr. Herschmann, in order to avoid litigating yet another of his never-ending strange demands.)

      Again not satisfied, Mr. Herschmann wrote to Kelley Drye (where I worked when the pre-nuptial agreement was produced) and demanded they run an email search. They did so, and confirmed it was never sent to Mr. Parnes. Exh. Z. As Mr. Parnes was permitted to receive the document in any event, this appears to be simply another, failed attempt at creating a discovery dispute, to distract the Court from the real matters at hand.

      Mr. Herschmann concludes his letter by spinning a fanciful tale of Sagi "directing" counsel for the Orly Trust to serve a subpoena. The story goes on and on, with one fib after another, concluding with Mr. Herschmann claiming that "Judge Freeman quashed the bogus subpoena. *See Id.* at ECF No. 233." No part of this story is true. Most significantly, Judge Freeman did not "quash" a "bogus subpoena." Rather, as the docket entry reflects, she held that the underlying confidentiality dispute could not then be resolved because "all proceedings in this action are currently stayed pending the resolution of the bankruptcy proceedings commenced by Orly Genger …. Accordingly, until the stay is lifted, this Court will not entertain, within the construct of this action, either an application to de-designate documents or an application of any proposed intervenors."

      No doubt, Mr. Herschmann views this as another "success." But a real resolution will only be had once this bad faith bankruptcy is dismissed.

      Accordingly, for all the foregoing reasons, and those in our opening submission, production of the Report should not be compelled because: (a) its protected by the attorney work product doctrine; (b) it is not relevant to any claim or defense still pending in the bankruptcy; and (c) the matter is already before an Israeli court, a court better situated and already addressing Mr. Herschmann's allegations of wrongdoing.

      We thank the Court for its consideration.

                                                Sincerely,

                                                John Dellaportas

Encls.
cc:     All Counsel of Record (via ECF)