**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>ORLY GENGER,<br><br>                      Debtor. | Chapter 7<br><br>Case No. 19-13895 (JLG) |

**OBJECTION OF ARIE GENGER, ARNOLD BROSER, DAVID BROSER, ADBG LLC AND TEDCO, INC. TO MOTION OF THE ORLY GENGER TRUST, BY ITS TRUSTEE MICHAEL OLDNER, RECOVERY EFFORT, INC., AND MANHATTAN SAFETY MAINE, INC. FOR THE ENTRY OF AN ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY TO CERTAIN NON-BANKRUPTCY LITIGATIONS**

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................1

I.     RELEVANT BACKGROUND ......................................................................................6

   A.   **The Genger Family Litigations** .........................................................................6

   B.   **The Inter-Creditor Agreement** ........................................................................17

   C.   **The Inter-Related Actions** ..............................................................................19

       1.   **The Turnover Motion** ..........................................................................19

       2.   **The Surrogate's Court Action** ............................................................19

       3.   **Sagi v. Broser** ......................................................................................20

       4.   **Bankruptcy Claims** .............................................................................20

       5.   **The MSM and Lawyers Actions** .........................................................22

   D.   **Both Chapter 7 Trustees Have Informally but Actively Pursued Claims Relating to the Disputed Settlement Proceeds** ........................................................................23

ARGUMENT ........................................................................................................................24

II.     THE AUTOMATIC STAY APPLIES TO THE MSM ACTIONS ...............................24

   A.   **The MSM Action Seeks to Exert Control Over a Potential Estate Claim** ...............24

   B.   **The MSM Action is Equivalent to Action against the Debtor** ................................30

   C.   **The MSM Action is a Dispute over Potential Estate Property** ...............................33

III.    MOVANTS HAVE CONSENTED TO THIS COURTS' JURISDICTION ...........................34

   A.   **The Orly Trust Has Filed a Claim for the Disputed Settlement Proceeds** ................34

   B.   **The Sagi Parties Have Objected to Dischargeability** ...........................................35

IV.    MOVANTS' REQUEST TO PROCEED WITH DISCOVERY IS BASELESS ...................36

V.    THE COURT SHOULD ENJOIN THE MSM ACTION .............................................38

VI.    CONCLUSION ........................................................................................................40

## Table of Authorities

Page(s)

**Cases**

*Adelphia Communications Corp. v. Bank of America, N.A.*, 365 B.R. 24
(Bankr. S.D.N.Y. 2007) ................................................................................6

*In re Affirmative Ins. Holdings, Inc.*, 565 B.R. 566 (Bankr. D. Del. 2017) .....................33

*In re Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 345 (S.D.N.Y. 2015) ..........................27

*CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31 (S.D.N.Y. 1990) ....................37

*Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116 (2d Cir. 2008) ..........................24

*In re CIL Ltd.*, 2018 WL 1989436 (Bankr. S.D.N.Y. Apr. 25, 2018) .........................39

*In re CIL Ltd.*, 2018 WL 878888 (Bankr. S.D.N.Y. Feb. 9, 2018) ..........................25, 26

*In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir. 1992) ....................................................31

*In re Cruisephone, Inc.*, 278 B.R. 325 (Bankr. E.D.N.Y. 2002) ......................................34

*D'Angelo-Fenton v. Town of Carmel Police Dep't,* 470 F. Supp. 2d 387 (S.D.N.Y.
2007) ..............................................................................................................6

*In re Deflora Lake*, 571 B.R. 587 (Bankr. S.D.N.Y. 2017) ..............................................33

*In re Dreier LLP,* 2010 WL 3835179 (S.D.N.Y. Sept. 10, 2010) ....................................27

*In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010) .................................................34

*Fidelity Mortg. Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir.1976),
*cert. denied*, 429 U.S. 1093 ........................................................................39

*In re Gen. Growth Properties, Inc.*, 426 B.R. 71 (Bankr. S.D.N.Y. 2010) .....................32

*Genger v. Genger*, 41 N.Y.S.3d 414 (N.Y. App. Div. 2016) ...........................................17

*Genger v. Genger*, 966 N.Y.S.2d 346, 2013 WL 221485 (Sup. Ct. NY County, Jan. 3,
2013) ..............................................................................................................11

*Genger v. Genger*, 147 A.D.3d 443, 46 N.Y.S.3d 413 (1st Dept 2017) .........................23

*Genger v. TR Inv'rs, LLC*, 26 A.3d 180 (Del. 2011) ..............................................9, 10, 22

*Glenclova Inv. Co. v. Trans-Resources, Inc.*, 874 F. Supp. 2d 292 (S.D.N.Y. 2012) *passim*

*Glenclova Inv. Co. v. Trans-Resources, Inc.*, 2013 WL 6003512 (S.D.N.Y. Nov. 12,
2013). ...................................................................................................... *passim*

*In re Granite Partners*, 194 B.R. 318 (Bankr. S.D.N.Y. 1996) ........................................25

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ................................26, 39

*Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 325 N.E.2d 137 (1975) ..35

*In re Johns-Manville Corp.*, 40 B.R. 219 (S.D.N.Y. 1984) ..............................................38

*Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, 2014 WL 4783008
(S.D.N.Y. Sept. 25, 2014) ............................................................................36

*Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC) ("Madoff/Marshall")*, 740 F.3d 81 (2d Cir. 2014) ...................................................................................25, 28, 29

*In re Neuman*, 71 B.R. 567 (S.D.N.Y. 1987) .................................................................33

*In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012) ......................................................38

*Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 121 F. Supp. 3d 321 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016) ...........................................29, 30

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000).............................................................6

*In re Salander- O'Reilly Galleries, LLC*, 475 B.R. 9 (S.D.N.Y. 2012)............................33

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016) *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 565 B.R. 510 (S.D.N.Y. 2017) ........................................................................................................26

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 203 (Bankr. S.D.N.Y. 2017)...................................................................................................25

*Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 429 B.R. 423 (Bankr.S.D.N.Y.2010), *aff'd sub nom. In re Madoff*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81 (2d Cir. 2014)..............................................................................................................28, 33

*Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr. S.D.N.Y. 1999)...................................................................................................6

*In re Soundview Elite Ltd.*, 565 B.R. 534 (Bankr. S.D.N.Y. 2017) ...........................25, 26

*In re The 1031 Tax. Grp. LLC*, 397 B.R. 670 (Bankr. S.D.N.Y. 2008)...........................25

*TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*, No. 13-8243, 2014 WL 1979932 (S.D.N.Y. May 15, 2014) ...............................................................................8, 12

*TR Investors, LLC v. Genger*, C.A. No. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23, 2010)............................................................................................................9

*TR Investors, LLC v. Genger*, C.A. No. 3994-VCS, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010), *aff'd in part, rev'd in part, Genger v. TR Investors, LLC*, 26 A.3d 180 (Del. 2011)......................................................................................7, 9

*Trans-Res., Inc. v. Nausch Hogan & Murray*, 298 A.D.2d 27, 746 N.Y.S.2d 701 (2002)35

*In re Tronox*, 855 F.3d 84 (2d Cir. 2017) ...............................................................38, 39

*Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).............................................34

**Statutes and Rules**

11 U.S.C. § 105 ...............................................................................................................38

11 U.S.C. § 105(a) .....................................................................................................28, 39

11 U.S.C. § 225 ...............................................................................................................22

11 U.S.C. § 362(a) ...............................................................................................20, 22, 37

11 U.S.C. § 362(a)(1).....................................................................................30, 31, 38

11 U.S.C. §  362(a)(3).....................................................................................................24, 38

11 U.S.C. § 541 ........................................................................................................25, 33

11 U.S.C. § 541(a)(1)........................................................................................................24

28 U.S.C. § 157(I)............................................................................................................35

28 U.S.C. § 157(J) ...........................................................................................................35

FRCP 19............................................................................................................................31

FRCP 19(a)(1)(A) .............................................................................................................31

FRE 201(b)(2)......................................................................................................................6

By their motion (the "Motion"), Movants, the Orly Genger 1993 Trust (the "Orly Trust"),

Manhattan Safety Maine, Inc. ("MSM"), and Recovery Effort Inc. ("RE"), seek an order

declaring that the automatic stay does not apply to the MSM Action and the Lawyers Action.[1]

The undersigned defendants to the MSM Action, Arie Genger ("Arie"), and Arnold Broser,

David Broser, ADBG LLC ("ADBG"), and Tedco, Inc. (collectively, the "Broser Parties"),

hereby oppose the Motion and request that the Court deny the Motion and enter an order

enjoining Movants from prosecuting the MSM Action.

## PRELIMINARY STATEMENT

Despite Movant the Orly Trust having filed a proof of claim in this case for **$41,622,588**

(the largest amount asserted in a claim thus far) (*see* Claim No. 12) based on an attached stayed

state court action by the Orly Trust to which Orly is a party, the Movants now seek a "comfort

order" that the automatic stay does not apply to the entirely duplicative MSM Action brought by

the Orly Trust's sham assignee, RE.  They are wrong.

The MSM Action is an avoidance action seeking to avoid and recover $17.3 million paid

under a $50 million June 2013 settlement agreement with the "Trump Group", as well as two

$7.5 million notes issued in connection with that same settlement that have not yet been paid

(such amounts, the "Disputed Settlement Proceeds").  While Debtor Orly Genger is a party to

that settlement agreement, Movant the Orly Trust is not, nor are MSM or RE, which as discussed

below are shell entities created on the eve of bankruptcy by Orly's estranged mother and brother,

Dalia and Sagi Genger.

As the Court is now aware, there is a dispute as to whether the Disputed Settlement

Proceeds are property of Orly's bankruptcy estate, and that dispute is at the very heart of these

---

[1] Undefined terms are used as defined in the Motion. Citations to "Ex." are to the exhibits attached to the declaration of Jared C. Borriello. Internal citations are omitted throughout.

1

bankruptcy proceedings.  Sagi has identified the MSM Action as one of eight pending actions

"all of which center on the same issue that is central to this bankruptcy—the fate of the $32.3

million in Orly's settlement proceeds."[2]  These various actions seek to recover the very same

property and transfers under alternative arguments, but all based on the very same fact – that

Orly was a signatory to the June 2013 settlement agreement (the "2013 Settlement").  Movants

contend that the Disputed Settlement Proceeds belong to the Orly Trust; Sagi contends that the

Disputed Settlement Proceeds belong to Orly individually; and Dalia claims that over $12

million of the Disputed Settlement Proceeds belong to Dalia.  While Arie and the Broser Parties

dispute that the Disputed Settlement Proceeds belong to Orly, the Orly Trust or Dalia, it is black

letter law that a dispute as to whether property belongs to a debtor's estate is a "core"

Bankruptcy Court proceeding, as is the determination of a party's proof of claim.  Here, Sagi, the

Orly Trust and Dalia have all filed proofs of claim in this case relating to the Disputed

Settlement Proceeds, as have other creditors.

 Movants' pursuit of the MSM Action also violates the automatic stay imposed by Orly's

bankruptcy filing to the extent that the claims relating to the Disputed Settlement Proceeds are

determined to be property of her bankruptcy estate and because Orly is an indispensable party.

First, the potential avoidance claims are actively being pursued in this chapter 7 case.  As

the Court is aware, the successor chapter 7 trustee is presently informally pursuing those

potential claims in this case, and those potential claims were the subject of a pending settlement

motion with the Texas trustee prior to the transfer of this case to New York.  And as stated

above, Sagi, Dalia and the Orly Trust have filed proofs of claim and in Dalia's case, also an

---

[2] *See In re Orly Genger*, No. 19-13895 (Bankr. S.D.N.Y. Sept. 13, 2019), ECF No. 32, at ¶¶ 53, 54.

adversary proceeding (Adv. Pro. No. 20-01010), before this Court asserting that all or some

portion of the Disputed Settlement Proceeds belong to them.

Second, Orly is an indispensable party to the MSM Action.  A brief history is necessary

and is discussed further below.  The MSM Action is the end result of a June 2019 shell game

hatched by the Debtor Orly Genger's estranged mother and brother, Dalia and Sagi Genger, to

litigate around the automatic stay.  While most of these actions occurred a few weeks before this

bankruptcy case was commenced, Dalia and Sagi knew that the bankruptcy was coming because

Orly had made clear that she would file for bankruptcy relief if, as occurred that same month,

Sagi's judgment against her was upheld on appeal.

Several years earlier, Dalia, in her then capacity as trustee of the Orly Trust, filed a New

York state court action seeking to recover the Disputed Settlement Proceeds.  The amended

petition in that action is attached to the Orly Trust's proof of claim (*see* Claim No. 12).  Motions

to dismiss that amended petition were filed but had not yet been decided as of the petition date.

That action has since been removed and is now pending before this Court (Adv. Pro. No. 20-

01188).[3]  The Orly Trust has not disputed that its action is subject to the automatic stay.

Then in June 2019, within a span of days, as described further below, Dalia and Sagi

created the new shell companies, RE (in Arkansas) and MSM (in Maine) to manufacture

diversity jurisdiction.  They then assigned the Orly Trust's claims to RE (which is wholly-owned

by the Orly Trust and whose president is the present trustee of the Orly Trust), commenced the

MSM Action before the U.S. District Court for the Southern District of New York against certain

but not all of the defendants to Dalia's prior state court action, and dismissed without prejudice

that state court action against those new MSM Action defendants but not against the other

---

[3] The Orly Trust has moved to remand the action to state court.

3

defendants to that state court action, including Orly and the Trump Group.  Sagi and all of these various entities also entered into an "intercreditor agreement" under which they agreed to share any proceeds of their various pursuit of claims to recover the Disputed Settlement Proceeds. Thus, as a result of this improper claims splitting, the prior Dalia/Orly Trust action remains pending against Orly and the Trump Group, while the duplicative MSM Action intentionally removed Orly from the action, yet the parties all agreed to divide up any proceeds among themselves.

Accordingly, despite the case caption, Sagi and Dalia are the real plaintiffs in the MSM Action.  Using the Movant entities as a front, Sagi and Dalia seek to obtain the Disputed Settlement Proceeds on the pretense that the proceeds belong to the Orly Trust.  Courts rejected that claim years ago and Dalia, as the then trustee of the Orly Trust, separately dismissed with prejudice the Orly Trust's claims.  In fact, Sagi and his company TPR sold the Orly Trust's TRI shares in 2008 for $10.3 million.  Sagi/TPR has received all of that money but has failed to share even one penny of it with Orly.  There is thus no basis to suggest that the Orly Trust has an interest in the 2013 Settlement, and, more importantly here, no basis to suggest that the MSM Action is not subject to the automatic stay.

Here is what really happened: an outside investor in the Genger family business, the Trump Group,[4] settled years of drawn-out, expensive litigation so that it could determine ownership rights that had been held in limbo between the Delaware and New York courts for almost a decade. The proceeds of that settlement that have been distributed—by the Trump Group, as transferor—were required to be repaid to litigation funder ADBG both pursuant to ADBG's loan agreements and an unavoidable 2012 assignment by Arie and Orly of any proceeds

---

[4] The "Trump Group" refers to non-parties TR Investors, LLC, Glencova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC, Trans-Resources, LLC, Jules Trump, Eddie Trump and Mark Hirsch.

of the ADBG-funded litigations to the Genger Litigation Trust, which was then obligated to pay ADBG for the outstanding obligations owed to it.  ADBG is still owed millions of dollars in unpaid loan obligations that are being held up by Sagi and Dalia (and their entities).  The Genger Litigation Trust has filed a proof of claim in this action for the amounts still owed to it in connection with the settlement, as has ADBG.

Indeed, despite all of their efforts to mislead this and other Courts, the very simple fact is that Dalia and Sagi's actions have resulted in them receiving over $44 million relating to the family's TRI shares – the full benefit of Sagi's 2008 bargain with the Trump Group that Dalia supported – while Orly has not received one penny.  These and other improper conduct by Dalia are the subject of extremely valuable claims of the bankruptcy estate that will be pursued for the benefit of this chapter 7 estate and its stakeholders (these claims are part of the subject matter of the Trustee's pending 9019 settlement motion).  Arie and the Broser Parties are confident that after being presented with the evidence throughout this chapter 7 case, it will become clear to the Court very quickly who the bad actors are here – Dalia and Sagi.

Because the Movants' claims are entirely derivative or duplicative of the very same claims that Sagi contends belong to Orly's estate, and which the successor chapter 7 trustee is presently informally pursuing, the Court should also enjoin any further pursuit of the MSM Action.  Such a result is supported by binding Second Circuit precedent and is necessary here to prevent the Movants' abuse of the judicial process.

## I.      RELEVANT BACKGROUND

### A.      The Genger Family Litigations

1.      The following is a recitation of the pertinent facts as alleged in the Complaint, as well as a description of the relevant events that have occurred in Orly's bankruptcy case and other Genger family legal proceedings that are relevant to this action.[5]

2.      The Genger family litigation saga has been ongoing for over a decade, spawning over a dozen proceedings across the federal and state courts of New York and Delaware.  It all began in 2004, when Dalia and Arie Genger divorced.  Before then, Arie had indirectly held majority ownership of Trans Resources, Inc. ("TRI") through his majority ownership of an entity known as TPR Investors, Inc. ("TPR").[6]  In connection with their divorce settlement, Arie caused TPR to transfer its 52.85% stake in TRI as follows: Arie received approximately 14% of TRI's outstanding shares, and the Orly Trust and the Sagi Trust each received about 19.5% ("Orly Trust Shares" and "Sagi Shares," respectively).[7]  Pursuant to the divorce settlement, Arie's interest in TPR was transferred to Dalia, who ceded control to Sagi and named him as CEO.  Despite the assignments of the TRI shares, Arie maintained voting rights in TRI.

3.      In 2008, Sagi caused Dalia to become the trustee of the Orly Trust, against the wishes of its then sole beneficiary, Orly (Orly's three-year-old daughter became a secondary beneficiary when she was born).  Orly has been challenging Dalia's appointment and service as

---

[5] Matters as to which judicial notice may be taken include documents "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" pursuant to Rule 201(b)(2) of the Federal Rules of Evidence.  *See D'Angelo-Fenton v. Town of Carmel Police Dep't,* 470 F. Supp. 2d 387, 393 n.5 (S.D.N.Y. 2007) *see also Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir. 2000); *Adelphia Communications Corp. v. Bank of America, N.A.,* 365 B.R. 24, 34 (Bankr. S.D.N.Y. 2007) (taking judicial notice of documents incorporated in the complaint by reference); *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 309 (Bankr. S.D.N.Y. 1999).  Judicial notice can be taken by this Court of documents filed on the public docket, including those cited in this Opposition or attached to the Borriello Declaration, as applicable.
[6] *See Glenclova Inv. Co. v. Trans-Resources, Inc.*, 874 F. Supp. 2d 292, 295-96 (S.D.N.Y. 2012) ("*Glenclova*").
[7] *See* Ex. 1, *Genger v. Genger*, Index No. 651089/2010 (Sup. Ct. NY County) ("2010 Action") (Jan. 3, 2013) at 2.

trustee of the Orly Trust since that time.[8]  While the original action was dismissed on the grounds that Dalia had not yet taken any improper action in the short time she had been trustee, in 2009, Orly commenced an amended proceeding to remove Dalia as trustee.[9]  The New York State Surrogate's Court never decided that action but, shortly before this bankruptcy was commenced, determined that the case could proceed against Dalia.[10]  Between 2008 and 2019, Dalia refused to resign as trustee, and instead took and failed to take numerous acts that breached her fiduciary duties to Orly.  Those claims are valuable assets of the bankruptcy estate.  It was not until June 12, 2019 that Dalia finally purportedly resigned as trustee, and claims to have appointed Michael Oldner as her successor.[11]  Despite her duty of undivided loyalty to Orly as the Orly Trust's beneficiary, Dalia admits that she has never even met or spoken with Michael Oldner.[12]

4.    Also in 2008, TRI needed money. Arie offered his then-minority investors, the Trump Group, additional shares in TRI in exchange for a capital infusion. In the course of finalizing the deal, the Trump Group learned about Arie's 2004 transfer of TRI shares to himself and his children's trusts.[13]  The financing deal collapsed.  The Trump Group then contended that the 2004 transfers contravened a 2001 shareholders agreement,[14] rendering the 2004 transfers void and activating certain option rights for the Trump Group to acquire the improperly transferred shares.[15]  Arie disagreed.  When negotiations failed, litigation ensued.[16]

---

[8] Ex. 33, *Matter of Genger*, Index No. 2008-0017/E (Sur. Ct. NY County Feb. 14, 2008).

[9] Ex. 34, *Matter of Genger*, Index No. 2008-0017/E (Sur. Ct. NY County Dec. 31, 2008); *see* Ex. 51, *Matter of Genger*, Index No. 2008-0017/E (Sur. Ct. NY County July 1, 2009) (detailing Orly's verified petition).

[10] Ex. 35, *Matter of Genger*, Index No. 2008-0017/E (Sur. Ct. NY County June, 21, 2017) at 12-13.

[11] Ex. 52, Orly Genger 1993 Trust Instrument of Resignation of Trustee and Appointment of Successor Trustee.

[12] Ex. 39, Dalia Genger's Responses to Chapter 7 Trustee's Requests for Admission, at 3.

[13] *Glenclova,* 874 F. Supp. 2d at 296.

[14] *Id.*; *see also TR Investors, LLC v. Genger*, C.A. No. 3994-VCS, 2010 WL 3279385, (Del. Ch. Aug. 9, 2010), *aff'd in part, rev'd in part, Genger v. TR Investors, LLC*, 26 A.3d 180 (Del. 2011).

[15] *Glenclova*, 874 F. Supp. 2d. at 296.

[16] *Id.*

5.    In August 2008, Sagi, in his alleged capacity as President of TPR, entered into two or more agreements with the Trump Group.  In the first agreement, he sold the Sagi Shares to the Trump Group for approximately $26.7 million.[17]  The theory being that Sagi had the ability to transfer title to those shares to the Trump Group, regardless of whether he was acting in his capacity as the Sagi Trust or in his capacity as president of TPR.  Separately, pursuant to an August 22, 2008 side letter agreement (the "2008 Side Letter Agreement"), Sagi, in his capacity as president of TPR, purported to sell to the Trump Group both the Orly Trust's TRI shares (for $10.3 million) and Arie's TRI shares (for $7.4 million) without the consent of or prior consultation with Orly or Arie.[18]  With this arrangement, the Trump Group immediately obtained control of TRI.[19]

6.    Thereafter, in separate litigation, Sagi, without opposition from Dalia,[20] eventually successfully captured for himself the $10.3 million in funds that had been attributable to the Orly Trust and the $7.4 million attributable to Arie's TRI shares, by arguing that these TRI shares did not belong to Orly or the Orly Trust, but rather to TPR (controlled by Sagi).[21]  Thus, Sagi/TPR have now received all of the over $44 million in sale proceeds that Sagi/TPR had bargained for as the full and final consideration from the Trump Group for the sale of the TRI shares.

---

[17] *See* Ex. 50, Sagi Trust Stock Purchase Agreement.

[18] *See* Ex. 49, 2008 Side Letter Agreement.

[19] *Glenclova*, 874 F. Supp. 2d at 296.

[20] *See* Ex. 36, June 30, 2013 Email ("Sagi should also be reminded that both he and Dalia (on behalf of the Orly Trust, through its counsel Bob Meister) strongly urged my clients to consummate the purchase of the Orly Trust Shares in February 2011); *see also* Ex. 37, *TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP, et al.*, No. 13-08243-JF (S.D.N.Y. April 29, 2014), ECF No. 45, Hearing Tr. 26:7-9 (counsel for Dalia, as trustee for the Orly Trust, stating, "we don't object if this Court would direct that the escrow [*i.e.*, the escrowed $10.3 million] be given to TPR.").

[21] *See TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*, No. 13-8243, 2014 WL 1979932, at *8 (S.D.N.Y. May 15, 2014).

7.    Sagi caused the over $44 million that he/TPR received in connection with his two agreements to offshore accounts in Lichtenstein and the Cook Islands for his and/or Dalia's benefit.[22]  Sagi has not transferred any of that money to Arie or to the Orly Trust (or Orly as its beneficiary) despite the express distribution of property provided for by the 2004 divorce agreement.

8.    The Trump Group next started a separate proceeding in Delaware Chancery Court to void the 2004 TRI Transfers, among other things.[23]

9.    In 2009, Orly learned that Sagi and Dalia were wrongfully attempting to terminate Orly's indirect interest in TPR through a collusive, self-dealing transaction. If this happened, the 2008 Side Letter Agreement may have reverted the Orly and Arie Shares to TPR.  If that occurred, TPR stood to receive the significant proceeds from those shares' onward sale to the Trump Group.  Orly thus initiated *Genger v. Genger,* Index No. 109749/09 (the "2009 Action") against Dalia and Sagi, among others, to preserve her interest in TPR.[24] Dalia, in her role as trustee of the Orly Trust, appeared and contested.[25]

10.    In July 2010, the Delaware Chancery Court found that the Trump Group controlled TRI, but initially declined to determine the beneficial ownership of the Arie and Orly Trust Shares.[26] Arie and Orly then initiated *Genger v. Genger*, Index No. 651089/2010 (the

---

[22] Ex. 48, *Genger v. Genger,* Index No. 109749/09 ("2009 Action") (Aug. 9, 2016) Hearing Tr. at 862:2-12.
[23] *TR Investors*, C.A. No. 3994-VCS, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010), *aff'd in part, rev'd in part, Genger v. TR Investors, LLC*, 26 A.3d 180 (Del. 2011). *Glenclova* was later stayed in favor of the Chancery court and New York Supreme court proceedings, discussed below. *See Glenclova*, 874 F. Supp. 2d at 314.
[24] *See* Ex. 3, 2009 Action (July 9, 2009).
[25] *See* Ex. 4, 2009 Action (Sept. 16, 2009), NYSECF No. 13.
[26] *TR Investors, LLC v. Genger*, C.A. No. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23, 2010). In August 2010, the Delaware Chancery Court expanded its earlier ruling to hold that the Trump Group was entitled to exercise its rights under the "side letter" and purchase the Orly (and Arie) Shares. *See TR Investors*, C.A. No. 3994-VCS, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010). The Delaware Supreme court later reversed, finding that the Chancery court did not have the jurisdiction to determine the beneficial ownership of the shares. *See Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 201, 203 (Del. 2011)*; see also* Sec. I.C.5 *infra.*

9

"2010 Action") seeking, among other things, an injunction preventing Sagi or TPR from transferring the Orly or Arie Shares.[27]  The Trump Group, Dalia, ***as trustee of the Orly Trust***, and others then became parties to the 2010 Action.[28]

11.    In an agreement dated as of September 1, 2010, the interested parties, including the Orly Trust, with Dalia as trustee, and Orly "as beneficiary of" the Orly Trust and TPR, agreed to escrow the earlier agreed purchase price for the Orly Trust Shares, $10,314,005, pending determination of ownership.  In February 2011, the Trump Group exercised its option to buy the Arie Shares, with the funds remaining in escrow pending resolution of the ownership challenge.[29]  In July 2011, Delaware's Supreme Court reversed a Chancery Court decision that authorized the Trump Group to buy the Orly and Arie Shares, leaving their beneficial ownership unresolved.[30]  The shares' beneficial ownership remained at issue in the 2010 Action.

12.    In October 2011, despite the pendency of the 2010 Action, Dalia, as trustee of the Orly Trust, initiated yet another Delaware court proceeding against the Trump Group in which she claimed ownership of the Orly Trust Shares.[31] Convinced that Dalia was attempting to circumvent the 2010 Action and obfuscate her effort to sell the Orly Trust Shares to Orly's detriment, on October 26, 2011 Orly obtained a temporary restraining order in the 2010 Action against Dalia's Delaware Action and any new actions concerning the subject matter of the 2010 Action complaint.[32]  The 2010 Action Court entered a similar TRO against TPR and the Trump

---

[27] *See* Ex. 5, *Genger v. Genger*, Index No. 651089/2010 (Sup. Ct. NY County) ("2010 Action") (July 20, 2010) at ¶¶ 75-76.
[28] Ex. 6, 2010 Action (Sept. 20, 2011), NYSCEF No. 112.
[29] *See Glenclova*, 874 F. Supp. 2d. at 297.
[30] *Genger v. TR Investors, LLC,* 26 A.3d 180, 203 (Del. 2011).
[31] Ex. 7, *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors, LLC.*, C.A. No. 6906 (Del. Ch. Oct. 10, 2011).
[32] Ex. 8, 2010 Action (Oct. 10, 2011), NYSCEF No. 149; Ex. 9, 2010 Action (Oct. 26 2010), NYSCEF No. 150; Ex. 10, 2010 Action (Nov. 8 2011), NYSCEF No. 161.

Group on November 9, 2011.[33]  In early April, the 2010 Action Court continued those TROs

pending a decision in the New York District Court, which had been anticipated to determine the

proper forum and jurisdiction to determine the beneficial interest in the disputed shares.[34] On

June 14, 2012, that New York District Court stayed its own proceedings in favor of the 2010

Action.[35]

13.    On January 3, 2013, the 2010 Action Court granted in part and denied in part the

Trump Group's motion to dismiss Arie and Orly's complaint.[36] Arie then appealed this decision.

14.    Following Arie's appeal, in June of 2013, Orly (in her individual capacity and in

her capacity as beneficiary of the Orly Trust), Arie, and the Brosers, on the one hand, and the

Trump Group, on the other hand, (the "Settling Parties") entered into a settlement agreement to

settle claims relating to the TRI shares (the "2013 Settlement Agreement") that were being

litigated against the Trump Group. The 2013 Settlement Agreement expressly provided that Orly

was executing only "individually and as beneficiary of" the Orly Trust, rather than on behalf of

the Orly Trust.[37]

15.    ADBG LLC, an entity owned by the Brosers, provided litigation funding to Arie

that funded the various litigations that were settled by the 2013 Settlement Agreement.  The 2013

Settlement Agreement documented a settlement, which in total encompasses approximately $50

million in value related to TRI shares.[38]  A breakdown of the settlement follows:

---

[33] Ex. 11, 2010 Action (Nov. 9 2011), NYSCEF No. 165.
[34] Ex. 12, 2010 Action (Apr. 9 2012), NYSCEF No. 231.
[35] Ex. 13 *Glencova* (June 14, 2012), ECF. No 164.
[36] *Genger v. Genger*, 966 N.Y.S.2d 346, 2013 WL 221485 (Sup. Ct. NY County, Jan. 3, 2013).
[37] Ex. 14, 2013 Settlement Agreement.
[38] *See id.*, at ¶ 2.

| Total 2013 Settlement Agreement Consideration | $50 Million |
|---|---|
| Orly Trust TRI shares | Release claims to $10.3 Million held in escrow |
| Arie TRI shares | Release claims to $7.4 Million held in escrow |
| Additional consideration | $32.3 Million |

16.    A total of $17.3 million of the additional consideration in the settlement was paid

to Arie in early July 2013 by the Trump Group, as transferor, not the Orly Trust or Orly.  That

amount was required to be repaid to ADBG both pursuant to the ADBG litigation funding

agreement and an unavoidable 2012 assignment by Arie and Orly of any proceeds of the ADBG-

funded litigations to the Genger Litigation Trust, which is then obligated to pay ADBG for the

outstanding obligations owed to it.[39]    ADBG is still owed millions of dollars in unpaid loan

obligations that are improperly being held up by Sagi and Dalia's frivolous claims.

17.    The Trump Group also released claims to funds attributable to the Arie Shares

and the Orly Trust Shares held in two escrow accounts, for $7.4 million and $10.3 million,

respectively.  At the time, there was a pending dispute between Orly and TPR (controlled by

Sagi) regarding this $10.3 million based on Sagi/TPR's August 2008 sale of those shares

discussed above and those funds had been placed in escrow in a litigation between Orly and

TPR.[40]    TPR prevailed in that lawsuit.[41]    Sagi/TPR have since received that money but failed to

distribute it to Arie or the Orly Trust (or Orly as its beneficiary).  In May 2017, a New York

State Court determined that Sagi had committed tortious acts against Orly but declined to award

---

[39] Ex. 38, Genger Litigation Trust Agreement.
[40] Ex. 14, 2013 Settlement Agreement at 2.
[41] *See TPR Investment Associates, Inc*, 2014 WL 1979932, at *23.

monetary damages.[42]  Orly has appealed the damages findings and that action is presently

pending.[43]

18.     The remaining $15 million due under the 2013 Settlement Agreement has not

been paid to anyone yet.  These funds are in the form of two $7.5 million notes, which are not

yet due to be paid as a result of Sagi and Dalia's malicious litigation efforts against the Trump

Group (in addition to Orly, Arie, the Broser Parties and others). Additionally, these notes are

subject to ongoing depletion based on indemnity claims by the Trump Group.

19.     Members of the AG Group (the term used to refer to the non-Trump Group parties

to the 2013 Settlement Agreement), including Orly have consistently testified that Orly was not

entitled to any portion of either the $17.3 million payment or the remaining $15 million under

the 2013 settlement.  Moreover, even if she ever did somehow receive any proceeds, she already

assigned any such proceeds to the Genger Litigation Trust in 2012.

20.     Along with the June 2013 settlement, Orly also executed a corresponding

stipulation of discontinuance ("Stipulation of Discontinuance") "individually and as a

beneficiary," not on behalf of the Orly Trust.[44] The 2013 Settlement Agreement and the resulting

court order expressly strike out and initial references to the settlement being "on behalf of" the

Orly Trust.[45]

21.     The Settling Parties, on notice to Dalia and others, submitted the Stipulation of

Discontinuance. Sagi and Dalia objected.

---

[42] Ex. 46, 2009 Action (Mar. 25, 2019), NYSECF No. 1594.
[43] Ex. 47, 2009 Action (April 26, 2019), NYSECF No. 1596.
[44] Ex. 15, 2010 Action (July 1, 2013), NYSCEF No. 487.
[45] Ex. 14, 2013 Settlement Agreement ¶ 4; Ex. 15, 2010 Action (July 1, 2013), NYSCEF No. 487, at 1.

22.    Shortly after Sagi and Dalia began interfering with the 2013 Settlement

Agreement, on June 30, 2013, the Trump Group's counsel wrote an e-mail to Sagi's counsel that

strongly objected to that interference.[46]    The e-mail provides, among other things, as follows:

- "During the course of both our conference call with Justice Jaffe on Thursday
afternoon and my call with you on Friday, you left me with the impression that
Sagi and the Sagi Trust intend to seek some sort of a judicial review of the
Trumps' settlement with Orly, and that you may well question the fairness of that
settlement as it affects claims that the Orly Trust purportedly has relating to the
so-called 'Orly Trust Shares.'  Similarly, in papers you filed with Justice Jaffe on
Wednesday, you object to our settlement because, as stated in paragraph 4 of
Nicholas Schretzman's affidavit, it 'purports to dismiss claims brought on behalf
of the [Orly] Trust, and give away its claim to title to the Trust's central asset – its
claim to 1,102.80 shares of Trans-Resources, Inc. (the "TRI Shares") – without
any consideration to the Orly Trust.'  Mr. Schretzman goes on to make clear in
paragraph 5 that his objection is being registered on behalf of the Sagi Trust, as
the Orly Trust's remainderman beneficiary . . . ."

- "[Y]ou and Sagi cannot expect us to sit by while you interfere with and attempt
to disrupt the Settlement Agreement we reached with Arie and Orly on grounds
that are diametrically opposed to positions that Sagi has taken in court and the
contractual obligations of TPR, Sagi and the Sagi Trust."

- "Sagi, as President of TPR, negotiated the terms of the sale of the so called
'Orly Trust Shares' and then signed the agreement and later the stock powers
transferring those shares to our clients.  He repeatedly acknowledged on the
record that the consideration received for those shares was fair and reasonable."

- "Sagi should also be reminded that both he ***and Dalia (on behalf of the Orly
Trust, through its counsel Bob Meister) strongly urged my clients to
consummate the purchase of the Orly Trust Shares in February 2011***.  My
clients had little reason to do so as they were content to wait out judicial
determinations rather than commit to the purchase at a time when questions
concerning the future of the business remained unanswered and they had an open
date option to complete the purchase."  (Emphasis added.)

- "Your arguments before Justice Jaffe in opposition to our settlement with Arie
and Orly are in direct violation of contractual commitments of TPR, the Sagi
Trust and Sagi, and are contrary to Sagi's repeated representations to our client
and the courts regarding the effective and appropriate disposition of the Orly
Trust Shares on fair, reasonable and acceptable terms."

---

[46] Ex. 36, June 30, 2013 Email.

- "*I urge you to advise Sagi immediately to stop suggesting, in any forum and in any manner whatsoever, that the Orly Trust has any rights whatsoever to TRI shares*, and to withdraw his objections and those of his Trust to our settlement of claims brought against the Trump Group by Arie and Orly in Justice Jaffe's court."[47]

23.     The Movants fail to disclose this e-mail to the Court, instead relying on a prior June 28, 2013 letter[48] that was superseded by the June 30, 2013 e-mail above, as well as by a clarifying statement made to the court in that action.  In fact, the 2010 Action Court expressly rejected that June 28, 2013 letter as supporting the notion that the 2013 Settlement released derivative claims of the Orly Trust.[49]

24.     Despite receiving this strong admonishment, Dalia, as trustee, and Sagi continued to assert the same claims that Movants seeks to advance now—that somehow, someway, the Settlement Agreement compromised claims that properly belong to the Orly Trust to which Dalia, as trustee, was entitled.

25.     Confirming her true understanding that the 2013 Settlement did not settle any claims of the Orly Trust against the Trump Group pertaining to the TRI shares, Dalia, as trustee of the Orly Trust, promptly resumed the Delaware Chancery Court case against the Trump Group following the parties' execution of the June 2013 settlement agreement.  After Delaware Chancery Court Judge Strine blasted Sagi and Dalia's attorneys at an August 1, 2013 hearing, characterizing Sagi's[50] efforts as attempts to collect on a "Powerball ticket,"[51] and following the

---

[47] *Id.* (Emphasis added).

[48] S*ee* Motion, Exhibit 2 (ECF No. 258-2).

[49] Ex 16 ("They rely in large part on a letter to me dated June 28 . . . At oral argument counsel for the Trump Group explained that the stipulation submitted to me indicated that 'Orly was signing in whatever capacities she has,' and that the so-ordered stipulation 'supersedes' the arguments advanced in the June 28 letter.").

[50] Sagi controls the Sagi Parties' legal strategy.  Indeed, Dalia has testified that Sagi controls all of her financial affairs. *See* Ex. 41, 2009 Action (Aug. 30, 2016) Hearing Tr. at 880:3-7. Judge Strine's commentary in the transcript discussed in the footnote below suggests he was well aware of Sagi's control.

[51] *See* Ex. 40, *Genger v. TR Investors, LLC*, No. 6906-CS (Del. Ch. Aug. 1, 2013) Hearing Tr. at 36:21-37:6 ("To the extent that your client happened to end up in control of TPR and then turns it into a Powerball award for himself, leaving his sister -- apparently you believe -- in a cold, ruthless way, out of the family settlement. Orly would be entitled to bupkis. That's your client's ruthless belief; and that he, by virtue of the father having not given the prior

15

Trump Group's admonishment of Sagi and Dalia's efforts in their letter cited above, Dalia

stipulated to the dismissal with prejudice of the Orly Trust's claims against the Trump Group

pertaining to the Orly Trust Shares.  The stipulated order was entered on August 30, 2013.[52]

Still, the saga continued.

26.    Dalia, as trustee, Dalia, individually, Sagi, Sagi though TPR, and now MSM and

RE (the "Sagi Parties"), then began pursuing a course of conduct that continues to this day and to

this very action: dressing up the same facts in the coat of every conceivable cause of action in a

never-ending attempt to re-litigate the 2013 Settlement and Stipulation of Discontinuance to

which they were not parties.  For example, on September 27, 2013, Sagi and TPR moved to lift

the stay that the New York District Court had imposed in favor of the 2010 Action. In roundly

denying their motion, Judge Keenan wrote appropriately, "everyone acknowledges, the issues

raised in these claims were litigated, or are presently being litigated, in [another] court."[53]

27.    Dalia, for her part, proceeded to re-litigate the 2013 Settlement in the 2010

Action.  Throughout the ensuing years, Dalia sought to substitute herself for Orly, compel

payment of any settlement proceeds into the court to abide the resolution of her claims against

those proceeds, and challenge the dismissal of claims that Orly and Arie had pled. She was

---

notices of the transfers, that -- you know, "Heck, life's tough, Sis. Hope your art sells well."; *id.* at 38:21-39:5 ("But
that, from a fundamental equitable basis, the idea that -- again, that the world -- that this was just a Powerball ticket
handed to Sagi Genger; that this lack of notice gave him all the family wealth -- it's not, certainly, something that
strikes a Delaware judge, and it's not going to be my ultimate opinion, it doesn't strike me as why courts of equity
were ever founded. It seems capricious."; *id.* at 40:23-41:5 ("This family was already so torn apart that your client
[Sagi] cut a deal, and cut a deal in which he didn't give ratable treatment on behalf of the other family members.
And now, in your view, what you're saying is, as a cold, ruthless legal matter he claims to have won some sort of
life's Powerball because he ended up with control of TPR."); *id.* at 69:22-24 ("And, look. I do, frankly, put a low
probability on the notion that a judge in New York is going to conclude that Sagi won the Powerball.")
[52] Ex. 17, *Genger v. TR Investors, LLC*, No. 6906-CS (Del. Ch. Aug. 30, 2013).

[53] *Glenclova Inv. Co. v. Trans-Resources, Inc.*, 2013 WL 6003512, at *4 (S.D.N.Y. Nov. 12, 2013).

unsuccessful every time. *See also Genger v. Genger*, 41 N.Y.S.3d 414 (N.Y. App. Div. 2016).[54]

For example, the 2010 Action Court disagreed with Dalia's positions, finding:

> Movants allege that, although the stipulation specifies that Orly
> settled claims against the Trump Group in her individual capacity
> and as beneficiary of the Orly Trust, she actually settled derivative
> claims belonging to the Orly Trust. Thus, they argue that the
> settlement proceeds belong to the Orly Trust. . . . Dalia's assertion
> is not supported or accompanied by any analysis of the subject
> claims, and is fatally conclusory . . . In the settlement agreement,
> Orly stops short of releasing derivative claims.[55]

## B.    The Inter-Creditor Agreement

28.    By January of 2019, Sagi had become aware that Orly planned to file for

bankruptcy.[56] With Orly's bankruptcy looming, the Sagi Parties hatched a new plan to assert

claims in Orly's bankruptcy, while continuing to make the same challenges to the 2013

Settlement that they have been making outside of bankruptcy court, unsuccessfully, for years.

They would create entities to be controlled by their inner circle, purport to assign claims to those

entities, and enter into an inter-creditor agreement, providing for the sharing of any proceeds

from such claims among the Sagi Parties, all calculated to permit the Sagi Parties to litigate

around the automatic stay.

29.    On June 4, 2019, Sagi and Dalia, through TPR, and the Orly Trust, which Dalia

continued to control as trustee, incorporated RE in Arkansas.[57] On June 12, Manhattan Safety

was incorporated in Maine.[58] Also on June 12, Dalia purported to resign as trustee of the Orly

Trust and appoint Michael Oldner as her successor despite never having met or spoken with

---

[54] Ex. 18, 2010 Action, 2019 WL 856565, at *1 (Feb. 20, 2019) ("the motion of defendant Dalia Genger to substitute herself as plaintiff and to direct that the Trump Group settlement fund be paid into court is denied in its entirety")
[55] Ex. 16, 2010 Action (March 20, 2014), NYSCEF No. 925, at 2-3.
[56] Ex. 19, *Sagi v. Orly*, Case No. 17-CV-8181 (VSB) (S.D.N.Y. Jan. 8, 2019), Hearing Tr. at 67:9-14.
[57] Ex. 20, Recovery Effort Articles of Incorporation (June 4, 2019).
[58] Ex. 21, Manhattan Safety Maine Articles of Incorporation (June 12, 2019).

him.[59]  On June 13, Dalia, as trustee (despite purportedly resigning the day before), purported to

assign the Orly Trust claims to Dalia, as sole director of the Movant RE, for no stated

consideration.[60]  Presumably at some point thereafter, Mr. Oldner, also became President of RE.

RE is wholly-owned by the Orly Trust.[61]  Around the same time, TPR purported to assign a

bogus alleged debt it claims to be owed by the Orly Trust to MSM.  Robin Rodriguez, who

invests with Sagi and who pays Sagi $600,000 per year, is MSM's President.[62]

30.    On June 16, 2019, Movants, Sagi, and TPR, along with Sagi's longstanding

counsel as "escrow agent", entered into a sham "Inter-Creditor Agreement".  The Inter-Creditor

agreement provides that the Orly Trust's "principal asset is its claim to the $32.3 million in

litigation proceeds . . . accruing under a Settlement and Release Agreement, dated as of June 16,

2013."  The Inter-Creditor Agreement further provides for the sharing of such proceeds among

Sagi and the Movants.[63]

31.    Pursuant to the Inter-Creditor Agreement, in the event of any recovery by Sagi or

any of the Movants, Sagi and the Movants will share in the recoveries pursuant to a defined

waterfall.[64]  In effect, all the proceeds (of which there will be none) would go to Sagi and his

cohorts.

32.    On June 17, 2019, five days after Dalia purportedly resigned as trustee or the Orly

Trust and four days after Dalia purportedly assigned the Orly Trust's claims to RE, Dalia's

counsel, as "counsel to Dalia Genger, Trustee of the Orly Genger 1993 Trust," stating that Dalia

---

[59] Ex. 52, Orly Genger 1993 Trust Instrument of Resignation of Trustee and Appointment of Successor Trustee.; Ex.
39, Dalia Genger's Responses to Chapter 7 Trustee's Requests for Admission, at 3.

[60] Ex. 22, Dalia Assignment to Recovery Effort (June 13, 2019).

[61] Ex. 23, the Intercreditor Agreement (June 16, 2019).

[62] Ex. 40, *Genger v. TR Investors, LLC*, No. 6906-CS (Del. Ch. Aug. 1, 2013), Hearing Tr 40:23-41:5; Ex. 31, 2009
Action (Aug 24. 2016), Hearing Tr. at 496:11-14, 497:2-19; Ex. 21, Manhattan Safety Maine Articles of
Incorporation (June 12, 2019) at 2.

[63] Ex. 23, the Intercreditor Agreement (June 16, 2019).

[64] *Id.* at 2.

would take certain acts if all of the Disputed Settlement Proceeds were delivered to the Orly Trust.[65]  Later that day, the MSM Action was filed.

### C.    The Inter-Related Actions

33.    Around the same time, the Sagi Parties began moving pieces around the litigation game board.

#### 1.    The Turnover Motion

34.    On June 11, days before Movants' complaint was filed and while the inter-creditor arrangement was in the process of being consummated, Sagi filed a turnover motion in Southern District of New York, claiming that the 2013 Settlement proceeds belong to Orly individually.[66] Despite the fact that the Movants, Dalia and Sagi have repeatedly misrepresented to this Court and the Texas Bankruptcy Court that this chapter 7 case was filed on the verge of Sagi obtaining a judgment against Arie, the Broser Parties and others to turnover the Disputed Settlement Proceeds, nothing could be farther from the truth.  Rather, the defendants' time to respond to Sagi's action and to the MSM Action had not even elapsed before this chapter 7 case was filed.  On October 24, 2019, the District Court, obviously understanding the pendency of the automatic stay, dismissed the claims "without prejudice to renewal following the resolution of Ms. Genger's bankruptcy proceedings."[67]

#### 2.    The Surrogate's Court Action

35.    In 2016, Dalia filed the turnover application in the New York Surrogate's Court action seeking the same $32.3 million that the Sagi Parties seek to recover through Movants here.  It named Orly, individually, as a defendant, as well as many defendants to the MSM

---

[65] Ex. 53, Letter from Judith Bachman dated June 17, 2019.
[66] Ex. 24, *Sagi Genger v. Orly Genger*, No. 17-cv-8181 (VSB) (S.D.N.Y. June 11, 2019), ECF Nos. 212-214.
[67] Ex. 32, *Sagi Genger v. Orly Genger*, No. 17-cv-8181 (VSB) (S.D.N.Y. Oct. 28, 2019), ECF No. 230.

Action.[68] Dalia amended her application in 2018. Various motions to dismiss were filed but have not yet been decided. On June 20, 2019, as stated above, this action was referred to this Court following its removal.[69] The Orly Trust has moved to remand.

36.    On June 20, 2019, several days after the duplicative MSM Action had been commenced, the Orly Trust voluntarily discontinued without prejudice its claims in the Surrogate's Court action against the defendants in the MSM Action who had been parties to the Surrogate's Court action, allowing the same claims to be re-filed in the MSM Action, while leaving the claims pending against the other defendants, including Orly and the Trump Group.[70] As stated above, the Orly Trust does not contend that its action is not stayed by Orly's bankruptcy case.

### 3.    Sagi v. Broser

37.    On June 28, Sagi filed another complaint in the Southern District of New York seeking to recover the 2013 Settlement proceeds from the non-paying settling parties, which has not been served. Like the MSM Action, it declined to name Orly as a party.[71] On August 21, 2019, Judge Broderick, who by now had become acquainted with the Sagi Parties' litigations, *see* Sec.I.C.1, ordered that: "Pursuant to 11 U.S.C. § 362(a), this action is hereby stayed pending the outcome of the [Orly]'s bankruptcy proceedings".[72]

### 4.    Bankruptcy Claims

38.    On October 15, 2019, Sagi, TPR, and Dalia,[73] objected to Orly's discharge, claiming that Orly fraudulently transferred the 2013 Settlement proceeds. On October 25, 2019,

---

[68] Ex. 25, *Matter of Genger*, Index No. 2008-0017/E (Sur. Ct. NY County Mar. 28, 2018).
[69] *See In re Orly Genger*, No. 19-13895 (Bankr. S.D.N.Y. June 20, 2020) ECF No. 267 (Adv. Pro. No. 20-01188).
[70] Ex. 26, *Matter of Genger*, Index No. 2008-0017/E (Sur. Ct. NY County June 20, 2019).
[71] Ex. 27, *Sagi v. Broser et. al.*, No. 19-06100-VSB (S.D.N.Y. June 28, 2019), ECF No. 1.
[72] Ex. 28, *Sagi v. Broser et. al.*, No. 19-06100-VSB (S.D.N.Y. June 28, 2019), ECF No. 11.
[73] *See In re Orly Genger*, No. 19-13895 (Bankr. S.D.N.Y. Oct. 15, 2019), ECF Nos. 98-99.

the Orly Trust did the same.[74]  Sagi has also moved to dismiss Orly's bankruptcy case.[75]  The

Orly Trust and Dalia joined in Sagi's original motion to dismiss filed in Texas.[76]  Sagi recently

amended his motion to dismiss.[77]  That motion is scheduled to be heard on July 21, 2020.

### a)    The Orly Trust's Proof of Claim

39.    On December 9, 2019, the Orly Trust, through Michael Oldner as successor

Trustee to Dalia Genger, filed a proof of claim in the Texas Bankruptcy Court seeking

$41,622,588, the entirety of the Disputed Settlement Proceeds plus interest.  The same counsel

who brought this motion filed the claim.[78]

### b)    Dalia's Constructive Trust Claim

40.    In January 2020, Dalia, in her individual capacity, filed a claim in this Court

seeking declaratory judgment and the imposition of a constructive trust for her benefit on all

funds that the debtor has monetized from the Orly Trust's claim to beneficial ownership in TRI.[79]

Arie and the Broser Parties will be filing a motion to dismiss Dalia's bogus, long time-barred

claims.

41.    Tellingly, despite Dalia's long litigation history, she failed to pursue the

constructive trust claim until sixteen years after her divorce and almost seven years after the

2013 Settlement.  This is no accident.  In fact, Dalia did not concoct her frivolous constructive

trust claim until October 2019, when she asserted it for the very first time in an objection to the

Texas trustee's motion to approve a settlement with the MSM Action defendants that would have

---

[74] *See In re Orly Genger*, No. 19-13895 (Bankr. S.D.N.Y. Oct. 25, 2019), ECF No. 148.

[75] *See In re Orly Genger*, No. 19-13895 (Bankr. S.D.N.Y. Sept. 13, 2019), ECF No. 32.

[76] *In re Orly Genger*, No. 19-13895 (Bankr. S.D.N.Y. Sept. 13, 2019), ECF No. 108 (the Orly Trust's joinder); *In re Orly Genger*, No. 19-13895 (Bankr. S.D.N.Y. Sept. 13, 2019), ECF No. 112 (Dalia's).

[77] *In re Orly Genger*, No. 19-13895 (Bankr. S.D.N.Y. April 24, 2020), ECF No. 239.

[78] Ex. 29, Orly Trust Proof of Claim, at 3.

[79] *See In re Orly Genger*, No. 19-13895 (Bankr. S.D.N.Y. Jan. 22, 2020), ECF No. 218.

resolved any and all potential claims regarding the 2013 Settlement and that would have resulted

in the pursuit of the estate's valuable claims against Dalia.  *See* Sec.II.D *infra*.

### 5.    The MSM and Lawyers Actions

42.    The MSM Action seeks to recover the same Disputed Settlement Proceeds.[80]  Its

core allegations are that the 2010 Action was brought, in significant part, "on behalf of" the Orly

Trust, and that the 2013 Settlement wrongfully resolved various disputes concerning the Orly

Trust's beneficial ownership of certain shares in TRI.[81]  The MSM Complaint acknowledges that

the 2013 Settlement expressly provides for consideration other than the release of derivative

claims on behalf of the Orly Trust, but—counterfactually—repeatedly asserts otherwise, relying

only on *dicta* from a case between Sagi and Orly where the issue was not actually addressed and

which is not binding on Arie and the Broser Parties, who were not parties to that action.[82]

43.    Notably, in a footnote, Movants concede in the Motion what they would not in the

Complaint – "some of the settlement value is conceivably attributable to Arie's purported TRI

shares".[83]  However, they go on to make false statements about a Delaware Supreme Court

decision in support of their contention that his interest is "de Minimis".[84]  That case did ***not*** find

that Arie "had no ownership interest in the TRI shares[.]"  *Id.*  To the contrary, the Delaware

Supreme Court affirmed that TPR had voting rights in the TRI shares, but reversed on beneficial

ownership, finding that the Chancery Court did not have jurisdiction to determine that issue. *TR

Inv'rs, LLC*, 26 A.3d at 201, 203 ("the trial court went further . . . and adjudicated questions of

ultimate beneficial ownership as well. In doing that, however, the Court of Chancery crossed a

---

[80] Ex. 30, the MSM Complaint ¶ 1.
[81] *Id.* ¶¶ 2-10.
[82] *Id.* ¶¶ 32-33.
[83] S*ee* Motion at 10 n.5.
[84] *Id.* (citing *Genger v. TR Inv'rs, LLC*, 26 A.3d 180 (Del. 2011)).

jurisdictional line and exceeded its powers under Section 225."); *see also* Sec. I *supra*. In other

words, it held the opposite. But in any event, if the Movants contend that Arie's interest is de

minimis because of the invalidated transfer of TRI shares, then the same logic would apply to the

Orly Trust and therefore render Movants' claims essentially worthless even before considering

the host of dispositive defenses that bar those claims.

44.      Finally, the MSM Complaint alleges that MSM was harmed because at the time of

2013 Settlement the Orly Trust was indebted to TPR, MSM's assignor. The Orly Trust's debt

supposedly arises out of an unqualified guarantee on a note made by D & K Limited Partnership,

in favor of TPR.[85] For years, Sagi and his cohorts have stated on numerous occasions that the

D&K note was worthless and was never intended to be enforced.[86] As mentioned above, in 2009

Orly brought a claim against Sagi and Dalia alleging, among other things, breach of fiduciary

duty to the Orly Trust.[87] That claim alleged that Sagi, with assistance from Dalia, used his

control over TPR and another entity to engage in self-dealing and cause TPR to foreclose upon

the D&K note and injure the Orly Trust.[88] On April 8, 2016, the court in the 2009 Action found

that Orly had a right to summary judgment on the claim.[89] That decision was affirmed.[90]

## D.      Both Chapter 7 Trustees Have Informally but Actively Pursued Claims Relating to the Disputed Settlement Proceeds

45.      The Disputed Settlement Proceeds have also been pursued on an informal basis by

each of Orly's chapter 7 trustees. Before this case was transferred from the Western District of

---

[85] Ex. 30, the MSM Complaint ¶ 8.

[86] Ex. 42, *Dalia Genger v Arie Genger*, No. 13 170 Y 00996 07, American Arbitration Association, Commercial Arbitration Tribunal (Sept. 6, 2007) Hearing Tr. at 53:5-9; Ex. 43, *Dalia Genger v Arie Genger*, No. 13 170 Y 00996 07, American Arbitration Association, Commercial Arbitration Tribunal (Sept. 7, 2007) Hearing Tr. at 453:19-454:6.

[87] Ex. 3, 2009 Action (July 9, 2009) ¶¶ 82-115.

[88] Ex. 2, 2009 Action (April 8, 2016), NYSECF No. 1050, at 6-9.

[89] *Id.* at 1.

[90] *Genger v. Genger*, 147 A.D.3d 443, 443–44, 46 N.Y.S.3d 413 (1st Dept 2017).

Texas, Orly's Texas trustee reached a settlement with Arie and the Broser Parties (and others)

relating to the Disputed Settlement Proceeds, for which court approval was sought prior to the

transfer.[91]  Similarly, here in New York, the trustee's pending 9019 settlement motion makes

clear that she is investigating and discussing potential resolution of potential estate claims

relating to the Disputed Settlement Proceeds.  *See In re Orly Genger*, No. 19-13895 (Bankr.

S.D.N.Y. May, 21, 2020), ECF No. 248, ¶ 3 ("the Trustee has investigated . . . the possible

pursuit by the Trustee of a potential avoidance of transfers and liens aggregating $32.3 million

against certain third parties . . . relating to a portion of the settlement amount in a June 16, 2013

settlement agreement (the "Trump Group Settlement").").

## ARGUMENT

## II.    THE AUTOMATIC STAY APPLIES TO THE MSM ACTIONS

### A.    The MSM Action Seeks to Exert Control Over a Potential Estate Claim

45.    Arie and the Broser Parties dispute that the Disputed Settlement Proceeds belong

to Orly, the Orly Trust or Dalia.  Accordingly, they dispute that any claims exist, including that

any potential claims relating to the Disputed Settlement Proceeds belong to Orly's estate.

However, what matters for purposes of this Motion is that both trustees in this case have

informally pursued claims to avoid and recover the Disputed Settlement Proceeds on behalf of

Orly's estate.  While the ownership of the Disputed Settlement Proceeds is perhaps the most

heavily disputed issue in this case, there is no doubt that the MSM Action is derivative or

duplicative of the trustee's potential claim and is therefore also subject to the automatic stay.

46.    Section 362(a)(3) of the Bankruptcy Code stays "any act to obtain possession of

property of the estate or of property from the estate or to exercise control over property of the

---

[91] *See In re Orly Genger*, No. 19-13895 (Bankr. S.D.N.Y. May, 21, 2020), ECF No. 52 ¶¶ 6-7, 26-27.

estate." 11 U.S.C. § 362(a)(3). Section 541(a)(1) of the Bankruptcy Code broadly defines

"property of the estate" for the purposes of the automatic stay, to include "all legal or equitable

interests of the debtor in property" wherever located and by whomever held. 11 U.S.C. §

541(a)(1); s*ee also Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008)

("[E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and

derivative, is within the reach of § 541."). That includes causes of action that belong to the

estate. *In re Soundview Elite Ltd.*, 565 B.R. 534, 543 (Bankr. S.D.N.Y. 2017).

47.    The trustee has the exclusive standing to prosecute estate causes of action; the

automatic stay bars all other parties in interest from doing so. *See In re The 1031 Tax. Grp. LLC*,

397 B.R. 670, 679 (Bankr. S.D.N.Y. 2008) ("When the trustee has standing to sue, the automatic

stay prevents creditors or shareholders for asserting the claim notwithstanding that outside of

bankruptcy, they have a right to do so.") (internal citations and quotations omitted). Estate

causes of action include claims against third parties that the debtor would have had standing to

pursue. *See In re CIL Ltd.*, 2018 WL 878888, at *4 (Bankr. S.D.N.Y. Feb. 9, 2018) (citing *Sec.

Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 203, 209 (Bankr. S.D.N.Y. 2017)

("The principal question is whether the PTAC asserts claims that are derivative or duplicative of

the claims that the Trustee asserted or could have asserted against the Picower Parties, or instead,

asserts direct claims that belong to the Fox Parties."))

48.    In determining if a claim is an estate claim, subject to the automatic stay, courts

"look to the nature of the wrongs alleged in the [MSM Action's Complaint] without regard to

[Movants'] designation." *In re Granite Partners*, 194 B.R. 318, 325 (Bankr. S.D.N.Y. 1996). A

cause of action "belongs to a specific creditor ... if the alleged injury is 'primary,'

'particularized,' 'special,' 'direct,' 'personal,' 'distinct,' or 'individualized' to [that] creditor [ ]."

*See In re CIL Ltd.*, 2018 WL 878888, at \*4 (alterations in original).  Thus, the Court must

"inquire into the factual origins" and the nature of the legal claims asserted.  *Marshall v. Picard*

*(In re Bernard L. Madoff Inv. Sec. LLC) ("Madoff/Marshall")*, 740 F.3d 81, 89 (2d Cir. 2014).

49.    To do so, the Court must consider whether the particularized factual allegations in

the MSM Action's Complaint assert individualized claims against the Defendants, or merely

claims that are derivative or duplicative of claims that belong to the estate. *In re CIL Ltd.*, 2018

WL 878888, at \*7 (citing *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R.

284, 299 (Bankr. S.D.N.Y. 2016) *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 565 B.R.

510 (S.D.N.Y. 2017).

50.    To state a direct, independent claim, the injury cannot be a secondary effect from

the harm done to the estate, but must allege a specific injury that can be traced to a third party's

conduct.  *See, e.g., In re Soundview Elite Ltd.*, 565 B.R. at 544.  In *Soundview*, the plaintiff

challenged an investor's independent misconduct as a personal investment advisor that caused a

direct harm to plaintiff.  *Id.* at 549.

51.    *Hirsch v. Arthur Andersen & Co.*, provides another clear example of a direct,

independent claim.  In *Hirsch*, an investor's claim against a third party was independent where

the plaintiff alleged it had been defrauded by the defendant's specific acts—distributing

misleading memoranda to plaintiff/other investors.  72 F.3d 1085, 1089 (2d Cir. 1995).  Because

the defendant was alleged to have caused a particularized injury to the plaintiff through

defendant's alleged bad acts directed at the plaintiff, the claim belonged to the investor, not the

trustee. *Id.* at 1094.

52.    Unlike in *Soundview* and *Hirsch*, the claims being released are all predicated on

the very same generalized conduct – the same transfers of funds – and is not based on any

particularized injury caused to the Sagi Parties by the defendants.  While Arie and the Broser

Parties fully dispute the alleged avoidance claims and dispute that Orly or the Orly Trust has any

interest in the Disputed Settlement Proceeds, the mere receipt of money by a transferee of the

Disputed Settlement Proceeds is far from an independent act *by the transferee* that caused a

particularized injury to the plaintiffs distinct from the debtor/her estate.  The claims asserted by

the Sagi Parties seek to recover the very same transfers by the same transferor (the very solvent,

non-debtor Trump Group) to the same transferees, all based on the same fact that Orly signed the

Trump Settlement Agreement.  There is nothing "unique" about the Movants' claims here that

justifies them being "hand-picked" from other claims that are duplicative or derivative of the

claims that the trustee could bring.  *See In re Dreier LLP,* 2010 WL 3835179, at *4 (S.D.N.Y.

Sept. 10, 2010).  Indeed, a creditor does "not state independent claims merely by asserting new

legal claims or seeking different forms of relief[.]" *In re Bernard L. Madoff Inv. Sec. LLC*, 531

B.R. 345, 351 (S.D.N.Y. 2015).

53.     Sagi himself admits that the other fraudulent transfer/turnover claims are

derivative of his claims.  *See* Sagi Amended Motion to Dismiss, ECF No. 239 ¶ 61 ("The

involvement of every other party or alleged creditor is derivative of, and would be resolved as

part of, the adjudication by the District Court of that two-party dispute.").  So does the Orly

Trust.  *See* Orly Trust Objection to Texas Settlement Motion, ECF No. 114 ¶ 27 ("As a result of

the foregoing fraudulent scheme, shortly prior to the Petition Date, in June 2019, Recovery

Effort, Inc. ("REI"), a wholly owned subsidiary of the Trust to which the Trust has assigned its

rights in connection with the 2013 Settlement, brought suit in the Southern District of New York,

styled *Manhattan Safety Maine, Inc. & Recovery Effort, Inc. v. Michael Bowen, et al*., Civil

Action No. 1:19-cv-5642 (S.D.N.Y. 2019) (the "Trust Avoidance Action"), in order to recover

the 2013 Settlement proceeds that rightfully belonged to the Trust (and/or its assignee REI) . . .

."), ¶ 28 ("Concurrently and also prior to the Petition Date, Sagi also sought to pursue and

recover those same 2013 Settlement proceeds assets as a judgment creditor in that certain

proceeding styled *Dalia Genger v. Sagi Genger v. Orly Genger*, Civil Action No. 1:17-cv-8181

(S.D.N.Y. 2017) ("Sagi Avoidance Action")."), n1 ("While REI and Sagi have somewhat

different positions on ownership of the 2013 settlement proceeds, the two parties have agreed to

share in any recovery, rather than expend limited resources competing with one another for the

same funds.")  And the "Inter-Creditor Agreement" and its sharing provisions further evidences

the fact that each of the Sagi Parties' avoidance/turnover claims are derivative or duplicative of

one another.

54.    One of the Madoff cases is directly applicable here.  The Madoff trustee had filed

an adversary proceeding asserting claims under federal and New York state law for, among other

things, fraudulent transfers.  A class action lawsuit was also commenced in Florida pursuing

claims against the settling parties based on the same factual allegations as the trustee's

complaint.  The trustee filed a motion in bankruptcy court to enjoin those lawsuits, which the

court granted, also finding that the pursuit of the Florida action violated the automatic stay.  *Secs.

Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 429 B.R. 423, 432

(Bankr.S.D.N.Y.2010), *aff'd sub nom. In re Madoff*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd

sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81 (2d Cir. 2014).  The bankruptcy

court also issued a preliminary injunction pursuant to 11 U.S.C. § 105(a) finding that the Florida

actions threatened the BLMIS estate.  *Id.* at 434.

55.    Ultimately, after the District Court affirmed, the Second Circuit held that the

Florida actions were derivative of the Madoff trustee's claims against the Picower defendants,

because although they alleged different legal claims and sought different types of damages, the plaintiffs' complaints alleged "nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS, instead of 'particularized' conduct directed at BLMIS customers." *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d at 84.  As an example of "particularized" actions that were lacking, the court noted that the appellants did not allege that "the Picower defendants made any misrepresentations to appellants." *Id.* at 93.  In other words, the recipients of alleged fraudulent transfers had not themselves caused an independent, particularized injury to the plaintiffs who challenged the injunction.

56.    Similarly, MSM and RE's avoidance claims are not claims for a particularized injury caused to them by the MSM Action defendants, who simply received money from the Trump Group pursuant to the 2013 Settlement Agreement.    MSM and RE seek to recover for a generalized alleged injury—one that, assuming any injury at all, arises from the fact that Orly was a party to the 2013 Settlement Agreement.  That fact forms the basis for Sagi's various claims against Orly, as well as Dalia's claim, the Orly Trust's claim, and the claim currently being pursued informally by the successor trustee, all of which seek to avoid the very same transfers of the very same property.  To the extent there is a harm caused by that fact, it is one that would affect all creditors of Orly's estate; it is not an independent harm caused by specific acts directed toward MSM or RE, and not by violating any duty owed directly to them.  *See In re Madoff*, 848 F. Supp. 2d 469, 480-84 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81 (2d Cir. 2014).

57.    Movants' attempt to address this issue in a footnote is insufficient and belies their position. *See* Motion at 13 n.6 (citing *Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 121 F. Supp. 3d 321, 333 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016).)  *Ritchie*

29

addresses standing—it does not even mention the automatic stay. Nonetheless, that case discusses three separate suits against non-debtors—all found to be estate causes of action. *Ritchie*, 121 F. Supp. 3d at 334-35. Indeed, by the reasoning of *Ritchie*, the MSM Action would also be an estate cause of action.

58.     There, as here, nearly identical cases had already been found to be subject to the stay. *Id.* at 335; *see also* Sec. I.B.3 *supra.* "In all three, the central theory of liability is that the defendants helped perpetuate" the scheme that defraud the plaintiffs. *Ritchie*, 121 F. Supp. 3d at 335. Furthermore, "there was no direct relationship or communication between the plaintiffs and defendants . . . the defendants had no duty to the plaintiffs . . . [and] no facts were alleged that that distinguishes the plaintiffs' injury from that of other creditors" the Debtor. *Id.* Here, as there, Arie and the Broser Parties have had no direct relationship or communication with the MSM Action plaintiffs and owe them no duties. The court's logic there applies here: Movants' "allegations are not specific to [Movants], but instead are allegations of generalized harm. Any creditor of [Orly] (after 20[13]) could make the same claim that [Movants] ha[ve] here—and some have" *Id.* at 336; *see also* Secs.I.B.1-5 *supra.* Movants' self-serving characterization of their claims as not being estate claims does not change this result. *See Ritchie*, 121 F. Supp. 3d at 336 ("although the names of the causes of action asserted . . . may vary somewhat, the allegations underpinning them overwhelmingly overlap."). Accordingly, the automatic stay applies here.

### B.     The MSM Action is Equivalent to Action against the Debtor

59.     Movants contend that the automatic stay does not apply to the MSM Action because "the Debtor has never been a party" to the MSM Action. *See* Motion at 14. They are wrong.

60.     Movants' choice to decline to name Orly in the MSM Action is meaningless. Section 362(a)(1) stays claims that are (1) "against the Debtor" and (2) claims that are "to recover a claim against the debtor". *See* 11 U.S.C. § 362(a)(1).  The MSM Action is effectively against the Debtor because the Debtor is a required party.

61.     Under FRCP 19, a nonparty is a required party if either: the court cannot provide complete relief among the existing parties in a lawsuit without the nonparty, or the claim exposes an existing party to a substantial risk of double, multiple, or inconsistent obligations because of the nonparty's claimed interest. FRCP 19(a)(1)(A).  The MSM Action alleges Orly caused the transfers and cannot be decided without determining whether she has an ownership interest in the proceeds. Ex. 30, the MSM Complaint, at 15.  Because there are multiple pending disputes concerning the Disputed Settlement Proceeds in this case and other actions, Arie and the Broser Parties face a risk of inconsistent adjudications if the MSM Action is allowed to proceed outside of this Court. Consequently, Orly is an indispensable party.  Accordingly, because any attempt to add Orly as a party to this action is stayed by section 362(a)(1) of the Bankruptcy Code, this action should also be stayed.

62.     Second, "a third-party action to recover fraudulently transferred property is . . . a claim against the debtor and subject to the automatic stay pursuant to § 362(a)(1)" where, "[a]bsent a claim against the debtor, there is no independent basis for the action against the transferee".  *In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992).  In *In re Colonial Realty Co.*, the FDIC filed a state court complaint alleging that third-party defendants were liable where the debtor fraudulently transferred loan funds to the defendants. *Id*. at 128. The Court found that, even though the debtor was not named in the action, the FDIC was "clearly seeking to recover a claim against [debtor.]" *See id.* at 132. The Court reasoned that, without the debtor,

there would be no claim against the named defendants. Thus, the action sought to "recover a claim against the debtor" within the meaning of § 362(a)(1) and was stayed. *See id.*

63.     The same is true here. Each of the various Sagi Parties' avoidance claims is based on the same fact that Orly was a signatory to the 2013 Settlement Agreement.  Before Sagi and Dalia caused the MSM Action to be filed, Orly was a party in their respective actions seeking the Disputed Settlement Proceeds. *See* Secs.I.C.1-2.  In light of Orly's bankruptcy, those claims cannot proceed.  *Id*.

64.     Moreover, as discussed above, prior to assigning the Orly Trust's claims in this action to RE, Dalia had filed the Surrogate's Court petition against Orly, certain of the Defendants in the MSM Action, and others, seeking to avoid and recover the transfers of the Settlement Proceeds. *See* Sec.I.C.2.  That action also identified Orly as being a party with an interest in the adjudication of the claim.  *See id.*; *see also* Ex. 25 at ¶¶ 28-76.  The fact that Dalia dismissed the causes of action against certain of the defendants there and caused them to be refiled in the MSM Action does not change the nature of claims and the underlying facts, nor does it eliminate the need for Orly to be a party.

65.     Were it not for Dalia's improper claim-splitting and sham "assignments" to Movants, Orly would remain a party to the claims against Defendants that Movants now pursue. If that were the case, this action would indisputably be stayed.  A party cannot "use judicial processes outside the bankruptcy court to interfere with the administration of a bankruptcy court." *In re Gen. Growth Properties, Inc.*, 426 B.R. 71, 74 (Bankr. S.D.N.Y. 2010).  Movants are attempting to do just that here.  Accordingly, the MSM Action should indisputably be stayed.

C.      **The MSM Action is a Dispute over Potential Estate Property**

66.      The Movants' contention that Orly has no interest in the Disputed Settlement

Proceeds also misses the mark.  Motion at 14.  Because no Court has determined that the

Disputed Settlement Proceeds belong to the Orly Trust, the Movants' discussion of spendthrift

trust exceptions is irrelevant.  It is black letter law that a dispute as to whether property belongs

to a debtor's estate is a "core" Bankruptcy Court proceeding, subject to the bankruptcy courts'

exclusive jurisdiction. *See* Collier on Bankruptcy ¶ 3.02(3) (16th ed. 2019).

67.      It is well established that a determination as to "[w]hether property is property of

the estate is a question only a Bankruptcy Court can make with full authority." *See In re Deflora

Lake*, 571 B.R. 587, 593 (Bankr. S.D.N.Y. 2017) (noting that "[i]t is widely held that 'matters

requiring a declaration of whether certain property comes within § 541's definition of 'property

of the estate' are core proceedings'"); *see also In re Salander- O'Reilly Galleries, LLC*, 475 B.R.

9, 29 (S.D.N.Y. 2012); *In re Affirmative Ins. Holdings, Inc.*, 565 B.R. 566, 583 (Bankr. D. Del.

2017) (denying a motion to abstain in an action to determine whether funds were held in trust for

a non-debtor subsidiary because "[t]he power of bankruptcy courts to determine if a particular

asset constitutes property of the bankruptcy estate is clear").  Where a parallel proceeding

involves property that is potentially property of the estate, the action is stayed on the basis that

"the Bankruptcy Court, rather than another court, should be the forum to decide whether an asset

is property of the estate." *In re Neuman*, 71 B.R. 567, 573 (S.D.N.Y. 1987).  Further, where

causes of action brought against third parties seek the same funds that may be sought by the

estate, these actions "have the potential to substantially undermine [the bankruptcy court's]

jurisdiction, as further prosecution could ultimately result in another court's determining how

potential estate funds are distributed." *Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. at 437.

68.     Here, there is a clear dispute about the ownership of the Disputed Settlement Proceeds. Sagi contends that the Disputed Settlement Proceeds belong to Orly, which would make them property of the estate. Movants contend that the Disputed Settlement Proceeds belong to the Orly Trust.  Arie and the Broser Parties dispute that the 2013 Settlement proceeds belong to Orly or the Orly Trust.  Both trustees have informally pursued claims relating to the Disputed Settlement Proceeds, implying that they believe the claims to be property of the estate.

69.     The fact that Orly never claimed ownership over the Disputed Settlement Proceeds is inconsequential for purposes of determining whether the MSM Action is subject to the automatic stay.  *See In re Dreier LLP*, 429 B.R. 112, 119 (Bankr. S.D.N.Y. 2010) (claims subject to stay in spite of allegation that the funds never became part of the debtor's estate because they were wrongfully diverted to a third party).  Accordingly, the MSM Action is subject to the automatic stay.

## III.   MOVANTS HAVE CONSENTED TO THIS COURTS' JURISDICTION

### A.     The Orly Trust Has Filed a Claim for the Disputed Settlement Proceeds

56.     Movants seek relief from the automatic stay in an attempt to recover, outside of this Court, 100% of the same amounts set forth in the Orly Trust's proof claim filed in this proceeding.  The act of filing a proof of claim constitutes a party's consent to the jurisdiction of the bankruptcy court to adjudicate matters pertaining to the claim itself and related matters. *See, e.g., In re Cruisephone, Inc.*, 278 B.R. 325, 330 (Bankr. E.D.N.Y. 2002); *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).  The Orly Trust is one of the Movants here.  *See* Motion at 1. The Orly Trust has filed proofs of claim in this case. *See* Sec.I.C.4(a). Accordingly, the Orly Trust has consented to have its claims determined by this Court.

57.    Even assuming TPR and the Orly Trust's highly questionable "assignments" to MSM and RE are valid, "[i]t is elementary ancient law that an assignee never stands in any better position than his assignor." *Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 126, 325 N.E.2d 137, 139 (1975) (citing 3 Williston, Contracts (3d ed.)).  "An assignee takes a cause of action subject to all the infirmities, equities and defenses that could have been asserted against the assignor at the time of the assignment." *Trans-Res., Inc. v. Nausch Hogan & Murray*, 298 A.D.2d 27, 30, 746 N.Y.S.2d 701, 704 (2002).  Moreover, as discussed above, the Inter-Creditor Agreement, timing of these actions, and the history of the inter-related actions, make clear that there is a thin veil between Movants and the real plaintiffs, Dalia and Sagi, both of whom have filed substantial proofs of claim in this case and both of whom are extremely active participants in this proceeding.[92] *See* Sec. I.B.

**B.    The Sagi Parties Have Objected to Dischargeability**

58.    Moreover, each of Sagi, Dalia, and entities they control, including the Orly Trust, has objected to the dischargeability of Orly's debts in this case based on the disputed $32.3 million.  *See* Sec.I.C.4.  Dischargeability determinations are "core" Bankruptcy Court proceedings, *see* 28 U.S.C. § 157(I), (J).  Each of their complaints therefore concedes that the Bankruptcy Court has jurisdiction with respect thereto.  Accordingly, the Bankruptcy Court must necessarily decide Orly's interests in the Settlement Proceeds as a "core" bankruptcy proceeding. The MSM Action should be stayed so that it may do so.

59.    The Court should not allow what the MSM Parties are attempting here: an end-run around the automatic stay by choosing not to name the debtor as a defendant in a duplicative "successor" case to one in which she remains a party, and conclusorily asserting that their claims

---

[92] As an example, as of June 22, 2020, of the 356 docket entries in this case to-date, 151 entries mention Sagi's name.

do not belong to the estate when, "everyone acknowledges, the issues raised in these claims were

litigated, or are presently being litigated, in [this] [C]ourt." *Glenclova,* 2013 WL 6003512, at *4.

## IV.    MOVANTS' REQUEST TO PROCEED WITH DISCOVERY IS BASELESS

60.    Movants' request to proceed with discovery even if the MSM Action is stayed is

entirely baseless.  A case is either subject to the automatic stay or it is not.  There is no exception

to the automatic stay to allow discovery to proceed in otherwise stayed cases.  Indeed, allowing

discovery to proceed in a stayed action would defeat the entire purpose of the automatic stay.

This Court can only decide whether or not the MSM Action is subject to the automatic stay or

should be enjoined, not whether discovery should be allowed to proceed in an action before

another Court.

61.    In support of their argument, Movants cite a line of cases that have nothing to do

with the relief they request here.  Rather, Movants' cases deal with non-controversial instances

where a third party seeks discovery from a non-party debtor in an unstayed action, such as if the

debtor were a third party witness.  Movants' attempt to support their plea for discovery using

cases in the director and officer context therefore fails.  *Le Metier Beauty Inv. Partners LLC v.

Metier Tribeca, LLC*, 2014 WL 4783008 (S.D.N.Y. Sept. 25, 2014), like others Movants cite in

support of their plea for discovery, stands for the unremarkable proposition that, where there are

direct, non-estate claims against a debtor's directors and officers that do not otherwise implicate

the automatic stay, a plaintiff is not precluded from seeking third-party discovery against the

debtor.  *Id.*, at *5.  Here, the MSM Action is *not* such a direct, non-estate claim; it's a

generalized and duplicative claim that is subject to the automatic stay.  *See* Secs. II.A, IV *supra*.

62.    Movants' additional attempt to support their plea for discovery by asserting that

"none of the parties to the Actions are deeply involved in the Debtor's bankruptcy" is

remarkably inaccurate.  *See* Motion at 22.  Arie and ADBG have asserted substantial,

multimillion dollar claims in this chapter 7 case.  RE and MSM have apparently chosen to hide

behind the $42 million claim filed by RE's assignor, the Orly Trust, and the various filings in

this case by MSM's assignor, TPR, but as stated above they stand in the shoes of their assignors,

as well as the real parties in interest, Dalia and Sagi.

63.     Furthermore, this is most certainly *not* a situation "where there [i]s a single non-

debtor litigation that would not have any substantive effect" on the bankruptcy case. Motion at

22 (quoting *CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 34 (S.D.N.Y. 1990)).

Rather, the MSM Action is one of a host of duplicative actions filed by the Sagi Parties, the

outcome of which have a substantial effect on Orly's estate.

64.     Moreover, contrary to Movants' assertions, the burden on the estate rationale

applies just as forcefully in chapter 11 cases as in this chapter 7 case—where a debtor's potential

creditors have initiated a flurry of litigation that burdens the debtor's financial rehabilitation.

Section 362(a)'s "legislative history reveals that the section was intended 'to permit the debtor to

organize his or her affairs without creditor harassment and to allow orderly resolution of all

claims.'" *CAE Indus. Ltd.*, 116 B.R. at 32.  Movants attempt to proceed with discovery in

another court on an issue already before this Court would disrupt the orderly resolution of claims

here, especially given the Sagi Parties' litigation history. *See* Secs. I-II.

65.     Finally, it should be noted that MSM and RE's request to proceed with discovery

is consistent with their past scorched earth tactics to advance discovery at every turn even prior

to the filing of a motion to dismiss in the MSM Action while at the same time asserting sweeping

objections to Arie and the Broser Parties' discovery requests to them. *See generally* Ex. 44,

MSM's Responses and Objections; Ex. 45, RE's Responses and Objections.  Given their clear-

cut manufacturing of diversity jurisdiction, as well as numerous other fatally flawed pleading

deficiencies, there is little doubt that the MSM Action would be dismissed.  It should also be

noted that despite their never-ending discovery push, Judge Freeman temporarily stayed the

MSM Action while she considered letter briefing on whether the action should be stayed in light

of this bankruptcy filing.  Based on agreements between the MSM Action plaintiffs and the

trustee, as well as certain temporary stays of all litigation directed by this Court, that letter

briefing has not been decided.

## V.    THE COURT SHOULD ENJOIN THE MSM ACTION

66.    As Movants recognize, the statutory power of the Bankruptcy Court to stay

actions involving the debtor or its property is not limited to section 362(a)(1) and (a)(3).  Section

105 empowers the bankruptcy court to enjoin parties against parties other than the bankrupt from

commencing or continuing litigation. *See, e.g.*, *In re Tronox*, 855 F.3d 84 (2d Cir. 2017).  In the

exercise of its authority under § 105, the Bankruptcy Court may use its injunctive authority to

"protect the integrity of a bankrupt's estate and the Bankruptcy Court's custody thereof and to

preserve to that Court the ability to exercise the authority delegated to it by Congress." *In re*

*Johns-Manville Corp.*, 40 B.R. 219, 226 (S.D.N.Y. 1984); *see also In re Quigley Co., Inc.*, 676

F.3d 45, 53 (2d Cir. 2012) ("while we have treated whether a suit seeks to impose derivative

liability as a helpful way to assess whether it has the potential to affect the bankruptcy res, the

touchstone for bankruptcy jurisdiction remains whether its outcome might have any 'conceivable

effect' on the bankruptcy estate.").

67.    If there is any doubt the automatic stay applies (and there is none) in the interests

of judicial economy and fairness, the Court should exercise its authority to enjoin the MSM

Action to avoid the risk of inconsistent outcomes and deter any further attempts to game the

processes of the Court.  The MSM Action is the Sagi Parties' latest attempt to create yet another

"'headache-inducing jurisdictional conflict' through the filing of numerous actions in various fora." *Glenclova,* 2013 WL 6003512, at *1 (quoting *Glenclova*, 874 F.Supp.2d at 300). "The stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another." *Fidelity Mortg. Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir.1976), *cert. denied*, 429 U.S. 1093.  Given the sprawling history of the Genger family litigations, the Sagi Parties' course of conduct, the nature of the interrelated actions and their potential to create preclusive and inconsistent obligations, it is especially appropriate here to enjoin the MSM Action.

68.    Each of the *Tronox* and *Madoff* Second Circuit decisions above make clear that it is appropriate to enjoin under section 105(a) the pursuit of claims that are derivative or duplicative of estate claims.  This Court's decision in *CIL* is also on point.  As the Court will recall, the issue in *CIL* was whether plaintiff's claims were direct, independent claims that could be pursued or whether the claims were derivative of an estate fraudulent transfer claim.  Relying on the *Madoff* Second Circuit decision discussed herein and related *Madoff* decisions, this Court held that the plaintiff "has not pled independent, direct claims against the Defendants because he has not alleged injuries particularized to the Employee Investors that can be traced to the Defendants' actions."  *In re CIL Ltd.*, 2018 WL 1989436, at *7 (Bankr. S.D.N.Y. Apr. 25, 2018) (citing *Hirsch*, 72 F.3d at 1093).  In doing so, the Court focused on the transfer at issue and found that because the transfer caused the same general harm to the plaintiff as the debtor, it was not particularized as to the plaintiff.  Notably, the Court found that plaintiff's fraud claims "merely repackage the estate's fraudulent transfer claims relating to the CEVA Equity Transfer. Upon the commencement of CIL's chapter 7 case, those claims vested in the Trustee."  *Id.* at *12

(collecting cases).  The Court ultimately found that the pursuit of these claims that were derivative of estate fraudulent transfer claims violated the automatic stay, and enjoined the plaintiffs from continuing to prosecute the action under section 105(a).  *Id.*  For the reasons stated above, the same principle supports enjoining the MSM Action here.

## VI.     <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny the Motion and enter an order staying and enjoining the MSM Action.  Any other result "could spark a return to the jurisdictional Serbonian bog . . . The interests of the parties, affected non-parties, courts and public do not compel such an outcome." *Glenclova*, 2013 WL 6003512, at *4 (denying Sagi and TPR's motion to lift a stay of duplicative litigation they pursued in past litigation).

DATED:  New York, New York
        June 23, 2020

*/s/ Frank A. Oswald*            */s/ Christopher Gartman*
Frank A. Oswald                 Christopher Gartman
Togut, Segal & Segal LLP        Hughes Hubbard & Reed LLP
One Penn Plaza, Suite 3335      One Battery Park Plaza
New York, NY 10119              New York, NY 10004
(212) 201-5590                  (212) 837-6000
Fax : (212) 967-4258            Fax : (212) 422-4726
Email: frankoswald@teamtogut.com   Email: chris.gartman@hugheshubbard.com
*Attorneys for Arie Genger*      *Attorneys for Arnold Broser, David Broser,*
                                *ADBG LLC, and TEDCO, Inc.*