# EXHIBIT A

1               UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF NEW YORK
2    _____

3    In re

4    Orly Genger,                    Chapter 7
                                     CASE NO. 19-13895(JLG)
5    Debtor.

6    _____

7            ORAL DEPOSITION OF MICHAEL OLDNER

8                     June 25, 2020

9    _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23                 BUSHMAN COURT REPORTING
                   620 West Third, Suite 302
24                 Little Rock, Arkansas  72201
                        501.372.5115
25

                   BUSHMAN COURT REPORTING

```
 1                A P P E A R A N C E S

 2    ON BEHALF OF ORLY GENGER TRUST:

 3    ADAM POLLOCK, ESQ.
      Pollock Cohen LLP
 4    60 Broad Street
      24th Floor
 5    New York, New York  10004
      Adam@PollockCohen.com
 6

 7    ON BEHALF OF MICHAEL OLDNER:

 8    TIM CULLEN, ESQ.
      Cullen & Co., PLLC
 9    P.O. Box 3255
      Little Rock, Arkansas  72203
10    tim@cullenandcompany.com

11
      ON BEHALF OF KASOWITZ BENSON TORRES LLP:
12
      MICHAEL PAUL BOWEN, ESQ.
13    ANDREW R. KURLAND, ESQ.
      Kasowitz Benson Torres, LLP
14    1633 Broadway
      New York, New York  10019
15    MBowen@kasowitz.com
      AKurland@kasowitz.com
16

17    ON BEHALF OF ORLY GENGER:

18    YANN GERON, ESQ.
      Reitler Kailas & Rosenblatt LLC
19    885 Third Avenue
      20th Floor
20    New York, New York  10022
      ygeron@reitlerlaw.com
21

22    ON BEHALF OF THE CHAPTER 7 TRUSTEE:

23    ROCCO A. CAVALIERE, ESQ.
      Tarter Krinsky & Drogin LLP
24    1350 Broadway
      New York, New York  10018
25    rcavaliere@tarterkrinsky.com
```

 1                    (Appearances Continued)

 2   ON BEHALF OF MICHAEL OLDNER, TRUSTEE TO THE ORLY
     GENGER 1993 TRUST:
 3
     ELIZABETH M. ABOULAFIA, ESQ.
 4   Cullen and Dykman LLP
     100 Quentin Roosevelt Boulevard
 5   Garden City, New York  11530
     eaboulafia@cullenllp.com
 6

 7   ON BEHALF OF ADBG LLC:

 8   CHRIS GARTMAN, ESQ.
     Hughes Hubbard & Reed LLP
 9   One Battery Park Plaza
     16th Floor
10   New York, New York  10004
     chris.gartman@hugheshubbard.com
11

12   ON BEHALF OF CREDITOR:

13   ERIC D. HERSCHMANN, ESQ.
     Kasowitz Benson Torres, LLP
14   1633 Broadway
     New York, New York  10019
15   EHerschmann@kasowitz.com

16

17   ON BEHALF OF SAGI GENGER:

18   JOHN DELLAPORTAS, ESQ.
     Emmet, Marvin & Martin LLP
19   120 Broadway
     32nd Floor
20   New York, New York  10271
     jdellaportas@emmetmarvin.com
21

22   Also present:  Sagi Genger

23

24

25

1

I N D E X

2   EXAMINATION
        By Mr. Bowen. . . . . . . . . . . . . . .        9
3
    EXAMINATION
4       By Mr. Herschmann . . . . . . . . . . .        328

5   EXAMINATION
        By Mr. Geron. . . . . . . . . . . . . .        353
6
    EXAMINATION
7       By Mr. Dellaportas. . . . . . . . . . .        365

8

9

10

11

12                  E X H I B I T S

13   Exhibit No. 1 (Inter-Creditor Agreement) . . .    291
     Exhibit No. 2 (Settlement Agreement and Release)  390
14   Exhibit No. 3 (Claim Number 12). . . . . . . .    395

15

16

17

18

19

20

21

22

23

24

25

BUSHMAN COURT REPORTING

1                ANSWERS AND DEPOSITION OF MICHAEL OLDNER, a

2    witness produced at the request of the Creditors, was

3    taken by Zoom in the above-styled and numbered cause

4    on the 25th day of June, 2020, before Janess Ferguson

5    Smith, Certified Court Reporter and Notary Public in

6    and for Saline County, Arkansas, at the Law Offices

7    of Gary Green, 1001 LaHarpe Boulevard, Little Rock,

8    Arkansas, at 9:01 a.m.

9                    * * * * * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BUSHMAN COURT REPORTING

```
09:03:17  1              MR. POLLOCK:  So before we begin, Tim,
09:03:21  2         did you want to say something?
09:03:24  3              MR. CULLEN:  Sure.  I'm Tim Cullen.  I
09:03:26  4         represent Mr. Oldner in his personal
09:03:29  5         capacity.
09:03:29  6              To the extent that he is here
09:03:31  7         responsive to a subpoena in his individual
09:03:34  8         capacity, we are not waiving any of the
09:03:37  9         objections previously made to that in the
09:03:39 10         bankruptcy court or in the Motion to Quash
09:03:43 11         filed in Arkansas.
09:03:45 12              Mr. Oldner has no knowledge in his
09:03:48 13         individual capacity, so it's our position
09:03:51 14         that all questions should be limited to him
09:03:51 15         in his capacity as trustee.
09:03:53 16              We further understand that this
09:03:56 17         deposition by agreement and by order of the
09:03:58 18         bankruptcy court will be limited to topics
09:04:01 19         related to the Motion to Dismiss in the
09:04:04 20         bankruptcy filed by Sagi Genger, to which
09:04:09 21         Mr. Oldner nor the trust are parties.
09:04:12 22         They've not joined that motion.
09:04:15 23              MR. POLLOCK:  And Adam Pollock on
09:04:18 24         behalf of Mr. Oldner in his capacity as
09:04:21 25         trustee.  We represent the Orly Genger
```

09:04:24  1          Trust.

09:04:25  2              I join in what Mr. Cullen said.  We

09:04:27  3          are here in an effort to, in a good faith

09:04:32  4          effort here.

09:04:33  5              As I mentioned when I spoke with

09:04:35  6          everybody last week, we do -- we appear

09:04:39  7          without prejudice and without waiver of the

09:04:42  8          pending Motion to Quash.

09:04:44  9              I trust that consistent with the

09:04:47 10          judge's direction on the teleconference

09:04:50 11          that was on Tuesday we will be able to have

09:04:52 12          a successful deposition and hopefully avoid

09:04:57 13          further motion practice on that matter.

09:05:09 14              MR. BOWEN:  Well, let's go on the

09:05:10 15          record and swear in the witness, please.

09:05:11 16                  MICHAEL OLDNER,

09:05:11 17  the witness hereinbefore named, having first been

09:05:11 18  duly cautioned and sworn or affirmed to tell the

09:05:11 19  truth, the whole truth and nothing but the truth,

09:05:11 20  testified as follows:

09:05:23 21              MR. BOWEN:  As I stated off the

09:05:25 22          record, my name is Michael Bowen,

09:05:27 23          B-o-w-e-n.  I'm a lawyer from the law firm

09:05:29 24          Kasowitz Benson Torres, a creditor in this

09:05:33 25          bankruptcy, and I'll be asking you

09:05:35  1                questions to begin.

09:05:38  2                    Can, can we do a roll call of

09:05:40  3                everybody who is present at this meeting?

09:05:47  4                    MR. POLLOCK:  Good idea.

09:06:37  5                    MR. GENGER:  This is Sagi Genger.  I'm

09:05:51  6                here on behalf of myself.

09:06:44  7                    MR. GERON:  This is Yann Geron.  I

09:06:00  8                appear on behalf of Orly Genger.

09:06:51  9                    MS. ABOULAFIA:  Elizabeth Aboulafia,

09:06:51  10               with Cullen and Dykman.  I'm consult to

09:06:51  11               Michael Oldner in his capacity as trustee

09:06:51  12               of the Orly Genger Trust.

09:06:57  13                   MR. CAVALIERE:  Rocco Cavaliere,

09:06:57  14               Tarter Krinsky and Drogin, on behalf of

09:06:21  15               Debra Piazza, the Chapter 7 Trustee.

09:07:06  16                   MR. GARTMAN:  Chris Gartman from

09:06:27  17               Hughes Hubbard and Reed, on behalf of

09:06:29  18               creditor ADBG LLC.

09:07:15  19                   MR. KURLAND:  I'm Andrew Kurland.  I'm

09:06:36  20               with Kasowitz Benson Torres, as well as

09:06:38  21               Mike Bowen, and I'm here for creditor

09:06:42  22               Kasowitz Benson Torres.

09:06:47  23                   MR. BOWEN:  Okay.  I'm informed that

09:06:49  24               Eric Herschmann, who's also a creditor in

09:06:52  25               his own right, will be joining at some

```
09:06:52  1              point, so let's begin.

09:06:52  2                        EXAMINATION

09:06:52  3   BY MR. BOWEN:

09:06:58  4   Q.    Mr. Oldner, the Orly Genger Trust is not

09:07:05  5   joining in Sagi Genger's motion to dismiss this

09:07:08  6   bankruptcy?

09:07:14  7   A.    Is that a question?

09:07:17  8   Q.    Yes.

09:07:18  9   A.    No.

09:07:54 10   Q.    The answer is the Orly Genger Trust is not

09:07:24 11   joining in the Motion to Dismiss?

09:07:26 12   A.    The Orly Genger Trust is not joining in the

09:07:29 13   Motion to Dismiss.

09:08:08 14   Q.    Your, your volume is a little low.  I don't

09:07:34 15   know if anybody else is having a problem.

09:07:36 16   A.    That is because we have tried to keep it from

09:07:40 17   having feedback.  Can you hear me better now?

09:07:43 18   Q.    Yes.

09:07:44 19   A.    Okay.  Thank you.

09:08:21 20   Q.    The Orly Genger Trust did, however, join in a

09:07:50 21   prior motion by Sagi Genger to dismiss Orly Genger's

09:07:56 22   bankruptcy; correct?

09:07:57 23   A.    Yes.

09:08:34 24   Q.    Why is the Orly Genger Trust no longer joining

09:08:03 25   in the Motion to Dismiss?
```

```
09:08:07  1   A.     That is a technical legal matter that I have
09:08:11  2   left up to attorneys.
09:08:49  3   Q.     You claim to be the trustee of the Orly Genger
09:08:18  4   Trust; correct?
09:08:57  5   A.     I am.
09:08:21  6   Q.     You claim to be?
09:08:22  7   A.     I am.
09:08:25  8   Q.     Do you -- you're -- in your own mind you're
09:08:29  9   certain that you are the trustee of the Orly Genger
09:08:32 10   Trust?
09:08:34 11                  MR. POLLOCK:  Objection; asked and
09:08:35 12           answered.
09:08:36 13   Q.     You can answer.
09:08:39 14   A.     Yes.
09:09:17 15   Q.     On what basis?
09:08:45 16                  MR. POLLOCK:  Objection; the basis for
09:08:47 17           which he is the trustee has nothing to do
09:08:50 18           with the Motion to Dismiss that was filed
09:08:53 19           by Sagi Genger.
09:09:29 20   Q.     You can answer the question.
09:09:03 21   A.     I'm sorry.  After the back-and-forth, would you
09:09:06 22   please repeat the question?
09:09:35 23   Q.     What is your basis for your belief that you are
09:09:12 24   the trustee for the Orly Genger Trust?
09:09:16 25                  MR. POLLOCK:  And I'll note my
```

09:09:17  1              objection on the same grounds.

09:09:18  2    A.    I was appointed by the previous trustee.  I

09:09:22  3    accepted the appointment.

09:09:25  4    Q.    That's your only basis?

09:09:28  5              MR. POLLOCK:  Mr. Bowen, I remind you

09:09:29  6              that the judge was pretty clear about what

09:09:32  7              we're doing a deposition on today.

09:09:35  8              He's answered the question.  He

09:09:38  9              believes that he is lawfully appointed as

09:09:41 10              trustee.  Move on.

09:10:22 11    Q.    You can answer the question, please.  The

09:09:48 12    question was is that your only basis for your belief

09:09:51 13    that you are the trustee of the Orly Genger Trust?

09:09:56 14              MR. POLLOCK:  I will note the same

09:09:57 15              objection.

09:09:58 16    A.    Yes.

09:10:36 17    Q.    Who is the beneficiary of the Orly Genger 1993

09:10:06 18    Trust?

09:10:08 19    A.    The beneficiaries are Orly Genger and her

09:10:11 20    descendents.

09:10:12 21    Q.    Did you ever speak with Orly Genger?

09:10:21 22              MR. POLLOCK:  Mr. Bowen, I have given

09:10:23 23              you leeway.  I object to this entire line

09:10:25 24              of questioning.  If you want to explain how

09:10:26 25              this is relevant to the pending Motion to

09:10:27  1            Dismiss, you can make a proffer as to that.

09:10:31  2                But I -- Judge Garrity was very clear

09:10:34  3            that we are doing a deposition today on the

09:10:36  4            Motion to Dismiss, which has nothing to do

09:10:39  5            with the Orly Genger 1993 Trust.

09:10:42  6                It has nothing to do with whether

09:10:43  7            Mr. Oldner was appointed as trustee,

09:10:46  8            whether he has spoken to Ms. Genger.  You

09:10:50  9            are far afield, and I direct you to move

09:10:52 10            on.

09:10:56 11                MR. BOWEN:  Please answer the

09:10:56 12            question.

09:10:59 13                MR. POLLOCK:  Is this your last

09:11:01 14            question on this topic?

09:11:02 15  Q.    Please answer the question.  The question is

09:11:04 16  did you ever speak with Orly Genger?

09:11:07 17                MR. POLLOCK:  This is the last

09:11:09 18            question, and then he'll answer, and you'll

09:11:11 19            move on.

09:11:45 20  A.    No.

09:11:12 21  Q.    Did you ever make any attempts to speak with

09:11:15 22  Orly Genger?

09:11:20 23  A.    Through counsel.

09:11:52 24  Q.    I'm sorry?

09:11:26 25  A.    Yes.

09:11:28  1   Q.    You answered "yes"?

09:11:29  2   A.    Yes.

09:11:56  3   Q.    What attempts did you make to speak with Orly

09:11:35  4   Genger?

09:11:36  5              MR. POLLOCK:  Mr. Bowen, enough.  We

09:11:38  6         have an order of direction from Judge

09:11:40  7         Garrity about the content of this motion

09:11:42  8         to, of this deposition that relates to the

09:11:43  9         Motion to Dismiss.

09:11:45 10         If you have a proffer as to whether he

09:11:47 11         is, when he made attempts to speak to Orly

09:11:50 12         as possibly relevant to the pending Motion

09:11:52 13         to Dismiss, you can let me know, and we

09:11:55 14         will address that.

09:11:58 15   Q.    Please answer the question.

09:12:02 16              MR. POLLOCK:  No.

09:12:03 17              MR. BOWEN:  I'm sorry.  Who said "no"?

09:12:05 18              MR. POLLOCK:  I said that unless you

09:12:06 19         can make a proffer as to how this is

09:12:09 20         possibly relevant to the Motion to Dismiss,

09:12:10 21         we're going to move on in topics.

09:12:15 22              MR. BOWEN:  I'm asking the witness to

09:12:16 23         answer the question.

09:12:18 24              MR. POLLOCK:  Also, you're, you

09:12:19 25         represent a third party creditor, Kasowitz

                          BUSHMAN COURT REPORTING

09:12:20  1           Benson; correct?

09:12:25  2    BY MR. BOWEN:

09:12:25  3    Q.    Mr. Oldner, please answer my question.  What

09:12:27  4    efforts did you make to speak with Orly Genger?

09:12:31  5              MR. POLLOCK:  Mr. Bowen, I'm

09:12:32  6              respectfully asking you, consistent with

09:12:35  7              Judge Garrity's direction, to move on.

09:13:03  8              MR. BOWEN:  Please stop interfering

09:12:39  9              with my deposition and let the witness

09:12:41 10              answer the question.

09:12:42 11              You have interrupted every question I

09:12:44 12              have asked, and we're in the very

09:12:46 13              beginning.  Let your witness answer these

09:12:48 14              questions, and we can -- you'll see why

09:12:50 15              it's relevant.

09:12:51 16              MR. POLLOCK:  Mr. Bowen --

09:12:52 17              MR. BOWEN:  You're way out of line.

09:12:53 18              That's not how depositions are conducted in

09:12:54 19              this jurisdiction in a federal court.

09:12:56 20    BY MR. BOWEN:

09:12:57 21    Q.    Mr. Oldner, please answer my question.

09:12:59 22              MR. POLLOCK:  Mr. Bowen, your raising

09:13:01 23              your voice at me is completely out of line.

09:13:04 24              I'm asking politely to make a proffer as to

09:13:07 25              why this is related to the Motion to

BUSHMAN COURT REPORTING

```
09:13:08  1          Dismiss, which was Judge Garrity's clear
09:13:12  2          direction on the conference call that we
09:13:13  3          had on Tuesday afternoon at 4:00 p.m.
09:13:51  4              MR. BOWEN:  Your objection is on the
09:13:18  5          record.
09:13:19  6  BY MR. BOWEN:
09:13:20  7  Q.    I'm asking Mr. Oldner, what efforts did you
09:13:22  8  make to contact Orly Genger?
09:13:32  9  A.    May I answer the question now?
09:13:34 10              MR. POLLOCK:  Sure, over my objection.
09:13:37 11  A.    I made effort through my counsel.
09:13:41 12              MR. POLLOCK:  All right.  Mr. Bowen,
09:13:42 13          you got your answer.
09:13:44 14  Q.    Describe what efforts you made through your
09:13:47 15  counsel.
09:14:13 16  A.    I just told you.
09:13:48 17  Q.    Well, I don't understand your answer.  Please
09:13:50 18  describe what efforts you made through your counsel.
09:13:54 19              MR. POLLOCK:  Mr. Bowen --
09:13:55 20              MR. GENGER:  This is Sagi Genger.  To
09:13:55 21          the extent that the answer requires an
09:13:59 22          invasion of our joint privilege, I request
09:14:01 23          that the privilege be respected and that it
09:14:01 24          not be answered.
09:14:02 25              MR. BOWEN:  Mr. Genger, you're not
```

09:14:05  1                    licensed to practice in this jurisdiction.

09:14:09  2                    You're not allowed to interpose objections.

09:14:11  3                        You need to be quiet.  You have a

09:14:11  4                    lawyer.  Your lawyer can do it, so speak

09:14:13  5                    with your lawyer.

09:14:13  6                        MR. GENGER:  I don't --

09:14:13  7   BY MR. BOWEN:

09:14:13  8   Q.    Mr. Oldner, please answer the question.

09:14:13  9                        MR. GENGER:  I'm simply noting, I'm

09:14:13  10                   simply noting for the record --

09:14:13  11                       MR. BOWEN:  Mr. Sagi -- Mr. Genger,

09:14:13  12                   you are not allowed to speak in this

09:14:14  13                   proceeding.  You are not admitted in this

09:14:14  14                   court --

09:14:14  15                       MR. GENGER:  I'm not --

09:14:14  16                       MR. BOWEN:  -- or in any jurisdiction,

09:14:14  17                   as far as I know.  You must desist.  Talk

09:14:14  18                   to your lawyer.

09:14:32  19  BY MR. BOWEN:

09:14:34  20  Q.    Mr. Oldner, please answer the question.

09:14:37  21                       MR. POLLOCK:  Mr. Bowen, why don't --

09:14:37  22                   if you want to know about his counsel, what

09:14:40  23                   his counsel said or did, why don't you

09:14:43  24                   ask -- don't -- enough of this talk.

09:14:48  25                   Please restrict your questioning to the

09:14:50  1              pending Motion to Dismiss.

09:14:53  2  Q.    Mr. Oldner, please answer the question.

09:14:56  3                  MR. POLLOCK:  He answered the

09:14:56  4              question, like, six times.

09:14:59  5                  MR. BOWEN:  Your objection is noted.

09:15:01  6  BY MR. BOWEN:

09:15:01  7  Q.    Mr. Oldner, please answer the question.  What

09:15:03  8  efforts did you make through your lawyer to contact

09:15:07  9  Orly Genger?

09:15:08 10                  MR. POLLOCK:  Mr. Bowen, where are you

09:15:10 11              going with this line of questioning?

09:15:12 12  Q.    Please answer the question.

09:15:13 13                  MR. POLLOCK:  Mr. Bowen, we're going

09:15:14 14              to be here all day if you can't make a

09:15:17 15              proffer as to why this relates to the

09:15:18 16              Motion to Dismiss.

09:15:19 17                  I'm asking you to give us a one

09:15:21 18              sentence proffer how this relates to the

09:15:24 19              Motion to Dismiss, respectful of the eight

09:15:27 20              different lawyers on the line and their

09:15:29 21              time.

09:15:31 22                  MR. BOWEN:  Mr. Pollock, you're

09:15:32 23              disrupting this deposition.  I ask you to

09:15:34 24              stop.  You may interpose objections by

09:15:34 25              simply saying "Objection," and then you

09:15:39  1                must stop.

09:15:40  2    BY MR. BOWEN:

09:15:40  3    Q.    Mr. Oldner, please answer the question.

09:15:42  4                MR. POLLOCK:  Mr. Bowen, we got a

09:15:43  5          clear direction from Judge Garrity.  You

09:15:46  6          appear to be violating that clear

09:15:48  7          direction.  I am asking you if you are not

09:15:50  8          violating it to please let me know how.

09:15:53  9                MR. BOWEN:  Mr. Pollock, I'm not

09:15:54  10         discussing it with you.  I'm conducting a

09:15:56  11         deposition.  You can interpose an objection

09:15:58  12         by saying "objection," and that's it.

09:16:01  13   BY MR. BOWEN:

09:16:01  14   Q.    Mr. Oldner, please answer the question.

09:16:04  15               MR. POLLOCK:  Mr. Bowen, please move

09:16:05  16         on.

09:16:10  17   Q.    Mr. Oldner, please answer the question.

09:16:14  18               MR. POLLOCK:  It was asked and

09:16:15  19         answered several times.  Please move on.

09:16:21  20   Q.    I'm waiting for the answer to my question, and

09:16:23  21   the question was what efforts did you make through

09:16:26  22   counsel to contact Orly Genger?

09:16:38  23   A.    I spoke with counsel and asked counsel to --

09:16:42  24               MR. POLLOCK:  Hold on.  Please do not

09:16:43  25         testify at to what you spoke with --

                              BUSHMAN COURT REPORTING

```
09:16:46  1                 THE WITNESS:  Thank you.

09:16:46  2                 MR. POLLOCK:  -- with respect to

09:16:47  3         counsel.

09:17:24  4                 THE WITNESS:  I contacted counsel.

09:16:49  5    BY MR. BOWEN:

09:17:25  6    Q.    When?

09:16:54  7    A.    Multiple times.

09:17:27  8    Q.    What dates?

09:16:57  9    A.    I don't remember.

09:16:59 10    Q.    Generally?

09:17:00 11    A.    Within the last year.

09:17:03 12    Q.    When did you become trustee, to your

09:17:06 13    understanding?

09:17:08 14    A.    I accepted the appointment as trustee on

09:17:11 15    June the 14th last year.

09:17:38 16    Q.    When did you make efforts to contact Orly

09:17:17 17    Genger through counsel after that acceptance on

09:17:22 18    June 14th of last year?

09:17:24 19                 MR. WILLIAMS:  Objection; asked and

09:17:25 20         answered.  Mr. Bowen, we are not going to

09:17:28 21         go further down this line unless you can

09:17:30 22         make a proffer as to how this is relevant.

09:17:33 23         We will direct him not to answer

09:17:34 24         further questions on this line of

09:17:36 25         questioning, and if you have difficulty
```

09:17:38  1              with that, I invite you to call Judge

09:17:38  2              Garrity and explain to him two things.

09:17:40  3                  One is why this is relevant to the

09:17:43  4              Motion to Dismiss, and two is why you won't

09:17:47  5              tell anybody in this room why this is

09:17:49  6              possibly relevant to the Motion to Dismiss.

09:17:54  7                  MR. BOWEN:  Mr. Pollock, you are

09:17:54  8              obstructing this deposition.

09:17:56  9  BY MR. BOWEN:

09:17:56 10  Q.    Mr. Oldner, please answer the question.

09:17:58 11                  MR. POLLOCK:  I am letting you know

09:18:00 12              that I'm directing him not to answer any

09:18:00 13              further questions until and unless we

09:18:02 14              understand how this is possibly relevant to

09:18:05 15              the Motion to Dismiss.

09:18:07 16                  MR. BOWEN:  You're concluding this

09:18:09 17              deposition?

09:18:09 18                  MR. POLLOCK:  No.  I'm concluding this

09:18:11 19              line of questioning because you refuse to

09:18:14 20              let us know why this is relevant to this

09:18:16 21              Motion to Dismiss.

09:18:16 22  BY MR. BOWEN:

09:18:18 23  Q.    Mr. Oldner, please answer the question.

09:18:23 24                  MR. POLLOCK:  Mr. Bowen, can you hear

09:18:24 25              me?

                         BUSHMAN COURT REPORTING

```
09:18:25  1              MR. BOWEN:  I hear you, Mr. Pollock,
09:18:26  2         and I'm asking the witness.  You can make
09:18:29  3         an objection, and then you must desist.
09:18:30  4         You have repeatedly flaunted that rule.
09:18:34  5              Please stop obstructing this
09:18:36  6         deposition.  Please let the witness answer
09:18:38  7         the question.  We've just begun.
09:18:39  8  BY MR. BOWEN:
09:18:39  9  Q.    Mr. Oldner, please --
09:18:39 10  A.    Mr. Bowen, I answered the question.
09:18:42 11              MR. POLLOCK:  Mr. Bowen, I'm asking
09:18:44 12         you respectfully to let us know how your
09:18:46 13         line of questioning is consistent with
09:18:48 14         Judge Garrity's directions from the
09:18:50 15         conference on Tuesday at four p.m.
09:18:51 16              MR. BOWEN:  Your objection is noted.
09:18:52 17  BY MR. BOWEN:
09:18:53 18  Q.    Mr. Oldner, please answer the question.
09:18:55 19              MR. POLLOCK:  Mr. Bowen, please move
09:18:57 20         on.
09:18:59 21  Q.    You may answer the question, Mr. Oldner.  The
09:19:02 22  objection is noted.
09:19:03 23              MR. POLLOCK:  Does anybody else have
09:19:04 24         questions that are related to the Motion to
09:19:05 25         Dismiss, maybe Mr. Cavaliere, or Mr. Geron,
```

```
09:19:10  1              or Mr. Kurland?
09:19:11  2                 MR. BOWEN:  Mr. Pollock, I'm in the
09:19:13  3              middle of my examination.  You must desist.
09:19:14  4              You are obstructing this deposition.  I
09:19:17  5              don't understand what you think you're
09:19:18  6              doing, but you must stop.
09:19:20  7  BY MR. BOWEN:
09:19:20  8  Q.    Mr. Oldner, please, please --
09:19:23  9                 MR. POLLOCK:  Mr. Bowen --
09:19:23 10  Q.    -- please answer the question.
09:19:25 11                 MR. POLLOCK:  Mr. Bowen --
09:19:25 12  Q.    It's a simple question.  Let me start again.
09:19:28 13  I'll withdraw that question.  My question is when you
09:19:30 14  said June 14th of last year, you meant June 14th,
09:19:34 15  2019; correct?
09:20:09 16  A.    Yes, sir.
09:20:10 17  Q.    Okay.  In relation to June 14th, 2019, how soon
09:19:43 18  after that did you try and contact Orly Genger
09:19:47 19  through your lawyers?
09:19:49 20  A.    I can't remember that specifically.
09:20:24 21  Q.    I need you to speak up, please, sir.
09:19:53 22  A.    I'm sorry.  I cannot remember that
09:19:55 23  specifically.
09:19:57 24  Q.    But was it before you accepted the position as
09:20:00 25  trustee, in your mind?
```

09:20:02  1   A.      No.

09:20:42  2   Q.      It was after?

09:20:05  3   A.      Yes, sir.

09:20:07  4   Q.      And when you say you made the attempt through

09:20:10  5   your lawyers, what lawyers are you talking about?

09:20:14  6   A.      The lawyers that I hired.

09:20:53  7   Q.      And which lawyer was that?

09:20:20  8   A.      The last one was Adam Pollock.

09:20:24  9   Q.      Well, I'm asking which lawyer you tried to

09:20:27 10   contact Orly Genger through.

09:20:30 11   A.      Adam Pollock for sure.

09:20:33 12   Q.      When did Adam Pollock become your lawyer, or

09:20:37 13   the Trustee's lawyer?

09:20:41 14           I'll withdraw that question.  The question

09:20:43 15   is when did Adam Pollock become the lawyer for you in

09:20:47 16   your capacity as the trustee of the Orly Genger

09:20:50 17   Trust.

09:20:52 18           MR. POLLOCK:  Mr. Bowen, I recommend

09:20:52 19           that you refer to the public record, a, and

09:20:56 20           b, that you make a proffer as to why this

09:20:59 21           is possibly relevant to the Motion to

09:21:00 22           Dismiss, or we will stop this line of

09:21:03 23           questioning, and you can call Judge Garrity

09:21:06 24           and ask him whether, and let him know why

09:21:10 25           this is possibly relevant to the pending

```
09:21:11  1              Motion to Dismiss, and why you will not
09:21:14  2              inform any of the -- it looks from Zoom,
09:21:17  3              like 12 people on this line -- why you are
09:21:20  4              expending time on when he became the
09:21:24  5              trustee and when he reached out to Orly
09:21:30  6              Genger through counsel.
09:21:33  7                    MR. BOWEN:  Mr. Pollock, again, you
09:21:35  8              are obstructing my deposition.  Please, I'm
09:21:38  9              just asking the witness these questions.
09:21:40 10                    You need to stop.  You really -- the
09:21:43 11              record is going to reflect what you're
09:21:44 12              doing.  I don't know why you're doing it,
09:21:47 13              but I need to ask you to stop.
09:21:48 14  BY MR. BOWEN:
09:21:48 15  Q.    Mr. Oldner, please answer the question.
09:21:49 16                    MR. CAVALIERE:  If I could just
09:21:50 17              interject.  It's Rocco Cavaliere, on behalf
09:21:50 18              of the Chapter 7 trustee.
09:21:50 19                    I share in Mr. Bowen's concerns about
09:21:56 20              the interference in this deposition by Adam
09:21:56 21              Pollock, and I would appreciate limiting
09:22:00 22              those objections, if you could, or if
09:22:02 23              you're going to raise objections, raise
09:22:05 24              them for the record, and we can address
09:22:06 25              them with Judge Garrity at the appropriate
```

09:22:08  1            time.

09:22:09  2                 I disagree with the characterization

09:22:11  3            made by Mr. Pollock as to any direction

09:22:13  4            made at the, at the conference that I was

09:22:15  5            at on Monday, or was it Tuesday, whenever

09:22:19  6            it was, and there is no order directing Mr.

09:22:21  7            Oldner to, to speak about any one, you

09:22:25  8            know, pre-approved questions that

09:22:29  9            Mr. Pollock has in connection with this

09:22:32 10            deposition.

09:22:32 11                 And I think that all of these

09:22:34 12            questions are relevant to a determination

09:22:36 13            of, among other things, Mr. Oldner's

09:22:39 14            standing in this case; he filed a Proof of

09:22:39 15            Claim.

09:22:41 16                 And I don't, frankly, need to list all

09:22:45 17            of the reasons why at this time.  Your

09:22:46 18            objections are noted, Mr. Pollock, and we

09:22:48 19            would appreciate it if you desist and allow

09:22:51 20            Mr. Oldner to answer questions relating to

09:22:54 21            this, to the Motion to Dismiss and any

09:22:56 22            topic associated therewith.

09:22:59 23                 MR. POLLOCK:  I will respond to Mr.

09:22:59 24            Cavaliere, and then we'll move on.  Thank

09:23:03 25            you, Mr. Cavaliere --

                            BUSHMAN COURT REPORTING

09:23:06   1                    MR. BOWEN:  Mr. -- I'm sorry,

09:23:07   2            Mr. Pollock, I'm going to ask you to

09:23:10   3            desist.  You can respond off the record or

09:23:14   4            during a break.

09:23:15   5                    I want to continue this deposition.  I

09:23:17   6            am mindful of Mr. Oldner's time, and I'm

09:23:20   7            concerned that you're not acting like

09:23:21   8            you're mindful of Mr. Oldner's time.

09:23:25   9    BY MR. BOWEN:

09:23:25  10    Q.    Mr. Oldner, please answer my question.

09:23:27  11    A.    I can answer the question?  Obviously, a great

09:23:39  12    deal has gone back and forth since you asked.  I

09:23:43  13    apologize.  Will you please ask again?

09:23:45  14    Q.    The question, Mr. Oldner, is when did

09:23:48  15    Mr. Pollock become your lawyer in your capacity as

09:23:52  16    the trustee for the Orly Genger Trust.

09:23:56  17    A.    In August of 2020.

09:24:01  18    Q.    August of 2019?

09:24:02  19    A.    2019.  I am terribly sorry.

09:24:41  20    Q.    That's okay.

09:24:06  21    A.    Last year.

09:24:42  22    Q.    So other than trying to contact Orly Genger

09:24:14  23    through your lawyers, you have made no other efforts

09:24:18  24    to contact her; is that correct?

09:24:19  25    A.    Yes, that is correct.

09:24:20  1    Q.    And the only effort that you made through the

09:24:23  2    lawyers was through Mr. Pollock?

09:24:25  3    A.    That is correct.

09:25:00  4    Q.    And that had to be sometimes either in the

09:24:29  5    month of August 2019 or thereafter; is that correct?

09:24:35  6    A.    Or both.

09:24:37  7    Q.    Or both?

09:25:13  8    A.    Or both.

09:24:41  9    Q.    How many times did you try to contact Orly

09:24:43 10    Genger through Mr. Pollock?

09:24:46 11    A.    More than once.

09:24:47 12    Q.    How many?

09:24:50 13    A.    More than once.

09:24:51 14    Q.    You don't know -- other than saying "more than

09:24:53 15    once," you don't know how many?

09:24:55 16    A.    No, I don't.

09:24:57 17    Q.    What was your purpose in trying to contact Orly

09:24:59 18    Genger?

09:25:02 19    A.    That was based on a discussion with counsel.

09:25:09 20    Q.    Well, what was your understanding -- you don't

09:25:11 21    have to give me your conversation with counsel.  What

09:25:13 22    was your understanding of your purpose in

09:25:14 23    directing --

09:25:15 24                    MR. POLLOCK:  Mr. Bowen --

09:25:15 25    Q.    -- or trying to contact Orly Genger?

                          BUSHMAN COURT REPORTING

```
09:25:20  1              MR. POLLOCK:  Mr. Bowen, I continue to
09:25:21  2         note my objection to this entire line of
09:25:23  3         questioning.
09:25:24  4              It has nothing to do with Mr. Oldner's
09:25:26  5         standing.  It has nothing to do with the
09:25:27  6         Proof of Claim that was filed.  It has
09:25:29  7         nothing to do with the Motion to Dismiss.
09:25:30  8         This entire line of questioning is
09:25:33  9         completely out of line, and I object to it.
09:26:10 10              MR. BOWEN:  Once again, Mr. Pollock,
09:25:37 11         you're obstructing the deposition.  I ask
09:25:39 12         you to desist.  Just note your objection by
09:25:43 13         saying "objection," and that's it.  That's
09:25:45 14         all the rules permit.
09:25:45 15 BY MR. BOWEN:
09:25:46 16 Q.    Mr. Oldner, please answer the question.
09:25:49 17 A.    Once again, please restate the question.
09:25:55 18 Q.    The question is, leaving aside communications
09:25:58 19 with counsel -- I'm not asking for that -- but what
09:26:01 20 was your understanding of why you were trying to
09:26:05 21 contact Orly Genger?
09:26:09 22 A.    I had not until that time spoken to Orly
09:26:12 23 Genger.
09:26:15 24 Q.    Why did you want to speak to her?
09:26:21 25              MR. POLLOCK:  I object on the same
```

BUSHMAN COURT REPORTING

09:26:22  1              grounds.

09:27:11  2    Q.    You can answer, Mr. Oldner.

09:27:14  3    A.    She is the majority -- she is the "of age"

09:26:40  4    beneficiary of the trust.

09:27:17  5    Q.    And why did you want to speak to the "of age"

09:26:46  6    beneficiary of the trust?

09:26:47  7    A.    I felt like it would be the right thing to do.

09:27:30  8    Q.    Why?

09:26:54  9              MR. POLLOCK:  I object to this entire

09:26:56 10              line of questioning.

09:27:01 11    Q.    You can answer.

09:27:08 12    A.    I think that is my answer.  I felt like it

09:27:10 13    would be the right thing to do.

09:27:54 14    Q.    Why, to your feeling, was it the right thing to

09:27:15 15    do?

09:27:15 16              MR. POLLOCK:  Objection; asked and

09:27:16 17              answered.

09:28:00 18    Q.    You can answer.

09:27:24 19    A.    I believe I have answered.  I felt that it was

09:27:28 20    the right thing to do.

09:28:07 21    Q.    I understand your answer is that you felt it

09:27:32 22    was the right thing to do.  Why was it the right

09:27:35 23    thing to do?

09:27:37 24              MR. POLLOCK:  Objection; asked and

09:27:38 25              answered.

09:28:16  1   Q.    You can answer.

09:27:53  2   A.    I have answered that question.  It's the result

09:27:56  3   of me feeling it was the right thing to do.

09:28:25  4   Q.    My, my question is why did you have that

09:28:02  5   feeling?

09:28:03  6                MR. POLLOCK:  Objection.

09:28:04  7   Q.    What thought process did you go through to

09:28:08  8   conclude, This is the right thing to do?

09:28:11  9                MR. POLLOCK:  Objection; asked and

09:28:13 10            answered.

09:28:13 11   Q.    You can answer again.  Don't, don't worry about

09:28:15 12   the objections.  He's making objections for the

09:28:17 13   record.  It doesn't stop you from answering the

09:28:19 14   question.

09:28:20 15   A.    Thank you.  I do not remember my thought

09:28:25 16   process at the time.  I remember the conclusion of my

09:28:28 17   thought process, and that was that it was the right

09:28:30 18   thing to do.  I contacted my counsel accordingly.

09:29:03 19   Q.    What, to your understanding, what efforts were

09:28:42 20   made through your counsel to, to contact Orly?  How

09:28:45 21   was that done?

09:28:46 22                MR. POLLOCK:  Objection on the same

09:28:47 23            grounds.  This is very far afield from the

09:28:49 24            topic at hand.

09:28:50 25                MR. BOWEN:  Your speaking objections,

09:28:52  1              sir, are obstructionism.  I am asking you

09:28:54  2              for the tenth, or eleventh, or twelfth time

09:28:57  3              to please desist.

09:28:58  4                   MR. POLLOCK:  And I'm asking you --

09:28:58  5  BY MR. BOWEN:

09:28:58  6  Q.    Mr. Oldner, please answer the question.

09:29:27  7                   MR. POLLOCK:  And I'm asking you

09:29:01  8              respectfully, and I'm happy to go offline

09:29:02  9              and have a separate side discussion with

09:29:04 10              you, Mr. Bowen.

09:29:05 11                   I'm asking respectfully for a proffer

09:29:08 12              as to how this is relevant to the pending

09:29:10 13              motion.

09:29:12 14                   MR. BOWEN:  That statement is

09:29:13 15              obstructionist.  I'm asking you to desist.

09:29:14 16              Mr. Oldner, please answer the question.

09:29:17 17                   MR. POLLOCK:  So if it is helpful to

09:29:17 18              you, Mr. Bowen, why don't we go offline,

09:29:17 19              and we can have it off the record, that

09:29:21 20              discussion.

09:29:55 21                   MR. BOWEN:  It's not helpful to me.

09:29:25 22              It would be helpful to you if you desist in

09:29:28 23              obstructing this deposition.

09:29:29 24  BY MR. BOWEN:

09:29:29 25  Q.    Mr. Oldner, please answer the question.

09:29:32  1   A.   I hate to keep doing this, but would you please

09:29:34  2   ask the question again?

09:29:39  3   Q.   The question is to your understanding what

09:29:43  4   efforts were made by counsel or anybody else to

09:29:47  5   contact Orly Genger?

09:29:50  6              MR. POLLOCK:  Objection.

09:29:52  7   A.   Those efforts were between me and counsel.

09:30:26  8   Q.   Okay.  And I'm not trying to invade that

09:29:57  9   privilege, so I'm not asking you for communications

09:30:00 10   with your counsel, but what was your understanding of

09:30:03 11   what efforts were made?  Was it an email?  Was it a

09:30:07 12   letter?  Was it a phone call?  What happened?

09:30:12 13              MR. POLLOCK:  Objection.

09:30:13 14   A.   I do not know the method that my counsel used

09:30:17 15   to contact.

09:30:21 16   Q.   What was the response?

09:30:24 17              MR. POLLOCK:  Objection.

09:30:24 18   Q.   To your understanding?

09:30:26 19   A.   To my understanding, Orly Genger did not want

09:30:31 20   to talk to me.

09:30:33 21   Q.   And how -- what was -- let me ask it this way.

09:30:43 22   How many times was that effort made?

09:30:56 23              MR. POLLOCK:  Objection; asked and

09:30:57 24          answered.

09:31:03 25   A.   More than once.

BUSHMAN COURT REPORTING

```
09:31:04  1   Q.    Just more than once?

09:31:05  2   A.    More than once.

09:31:06  3   Q.    That's all you can say about it?

09:31:07  4   A.    That's enough.

09:31:08  5   Q.    Did you -- and you never yourself just pick up

09:31:12  6   the phone to try and call Orly Genger directly;

09:31:16  7   correct?

09:31:17  8                 MR. POLLOCK:  Objection.

09:31:17  9   A.    I did not.

09:31:18 10   Q.    Have you served as a trustee before for any

09:31:20 11   kind of spendthrift trust?

09:31:20 12                 MR. POLLOCK:  Objection.

09:31:20 13   A.    I have not.

09:31:20 14   Q.    I'm sorry.  I didn't hear you.

09:31:30 15   A.    I'm sorry.  Please let me know if you can't

09:31:32 16   hear me.  I have not.

09:32:23 17   Q.    Are you a lawyer?

09:31:37 18   A.    I am not.

09:32:25 19   Q.    What -- what's is your occupation?

09:31:42 20   A.    I was a securities broker.

09:32:30 21   Q.    Do you have any training in, in the law at all?

09:31:54 22   A.    I do not.

09:32:35 23   Q.    Do you have contacts in New York?

09:32:02 24   A.    Pardon me?

09:32:03 25   Q.    I'll change the question.  Did you ever live in
```

09:32:08  1   New York?

09:32:09  2   A.      I never did.

09:32:10  3   Q.      Do you have business contacts in New York, New

09:32:13  4   York state?

09:32:46  5   A.      I have had.

09:32:20  6   Q.      So this --

09:32:20  7   A.      Mr. Bowen, am I speaking --

09:32:23  8   Q.      I'm sorry.  I didn't hear you.

09:32:24  9   A.      I'm sorry.  That's what I was checking.  Am I

09:32:27 10   speaking loudly enough?

09:32:29 11   Q.      I can hear you.  It would help me if you could

09:32:32 12   speak a little louder.

09:32:34 13   A.      We're using a speakerphone that picks up

09:32:37 14   everybody to keep with the feedback.  Please remind

09:32:40 15   me when I'm not speaking loudly enough.  Sorry.

09:32:44 16   Q.      No, I appreciate that.

09:32:44 17   A.      Okay.  Thank you.

09:32:44 18   Q.      So just to make sure I understood your answer

09:32:44 19   to the last question, you in the past have had

09:32:54 20   business in New York, in the state of New York; is

09:32:57 21   that right?

09:33:36 22   A.      Yes, sir.

09:33:37 23   Q.      But you don't currently?

09:33:00 24   A.      I do not.

09:33:41 25   Q.      When was the last time you transacted any

09:33:05  1   business in, in New York?

09:33:07  2   A.    1997.  Possibly 1998, but I believe it was

09:33:12  3   1997.

09:33:52  4   Q.    And just to be clear about this, the only time

09:33:19  5   in your life that you served as a trustee for any

09:33:22  6   kind of trust is this one?

09:33:24  7   A.    Yes, sir.

09:33:33  8   Q.    What is your understanding of your duties and

09:33:36  9   obligations as the trustee of the Orly Genger Trust?

09:33:41 10              MR. POLLOCK:  I am going to object.

09:33:42 11              Mr. Bowen, we raised the issue -- Mr. Labov

09:33:45 12              raised the issue and we raised the issue

09:33:50 13              directly with Ms. Garrity, Mr. Garrity,

09:33:52 14              Judge Garrity -- excuse me -- as to the

09:33:55 15              attempts, apparent attempts to seek

09:33:58 16              discovery on underlying claims.

09:34:01 17              Judge Garrity was clear that we are

09:34:03 18              not doing discovery at this time on

09:34:05 19              underlying claims.

09:34:06 20              And you -- and, furthermore, it

09:34:09 21              appears from the proposed 9019 motion that

09:34:13 22              your, that claims are being proposed to be

09:34:16 23              sold against Mr. Oldner, purportedly

09:34:20 24              related to his fiduciary duties.

09:34:23 25              At this time it appears that you are

                        BUSHMAN COURT REPORTING

```
09:34:24  1              seeking discovery with respect to his

09:34:26  2              fiduciary duties.

09:34:28  3                   That is inappropriate, and that is

09:34:29  4              outside of the confines of what Judge

09:34:31  5              Garrity directed when we were on the phone

09:34:34  6              with him on Tuesday afternoon.

09:34:36  7                   Also present is his personal counsel

09:34:38  8              who, I presume, shares similar concerns.

09:34:41  9              We will direct him not to answer with

09:34:44 10              respect to any discovery relating to the

09:34:48 11              proposed claims that are subject to the

09:34:52 12              pending motion to be sold.

09:34:59 13                   MR. CULLEN:  I will join in the

09:34:59 14              objection.

09:35:01 15                   MR. BOWEN:  Mr. Pollock, sir, I have

09:35:01 16              lost count of how many times I'm going to

09:35:01 17              ask you to stop obstructing the deposition.

09:35:03 18 BY MR. BOWEN:

09:35:04 19 Q.    Mr. Oldner, please answer the question.

09:35:08 20                   THE WITNESS:  Mr. Cullen?

09:35:09 21                   MR. CULLEN:  This is Tim Cullen,

09:35:10 22              personal counsel for Mr. Oldner.  And as I

09:35:13 23              stated initially, this deposition is

09:35:16 24              limited to the Motion to Dismiss.

09:35:20 25                   It is not proper to try to take
```

BUSHMAN COURT REPORTING

09:35:22  1            discovery relating to Mr. Oldner's duties

09:35:26  2            or potential claims against him, and,

09:35:29  3            therefore, I join in Mr. Pollock's

09:35:32  4            objections.

09:35:33  5   BY MR. BOWEN:

09:36:07  6   Q.    Subject to those objections, Mr. Oldner, please

09:35:40  7   answer the question?

09:35:41  8   A.    I believe on advice of counsel I am not

09:35:44  9   answering that question.

09:36:15 10   Q.    You refuse to answer the question?

09:35:51 11   A.    On advice of counsel, I am not answering that

09:35:54 12   question.

09:36:21 13   Q.    What's the question you are not answering?

09:35:58 14            MR. POLLOCK:  Mr. Bowen, I

09:35:59 15            respectfully ask that you move on to the

09:36:03 16            topics at hand, or that you pass the seat,

09:36:06 17            as it were, to one of the other lawyers on

09:36:09 18            the line who seeks to ask questions

09:36:11 19            relating to the pending Motion to Dismiss.

09:36:41 20            MR. BOWEN:  Mr. Pollock, please stop

09:36:14 21            obstructing this deposition.

09:36:15 22   BY MR. BOWEN:

09:36:15 23   Q.    Mr. Oldner, please answer the question.  Many

09:36:17 24   times you have forgotten the question.  I want to

09:36:20 25   understand which question you are refusing to answer.

```
09:36:23  1   So please restate --

09:36:23  2   A.    Please ask --

09:36:23  3   Q.    -- the question you think --

09:36:25  4   A.    -- the question again.

09:36:25  5   Q.    -- you are refusing to answer.

09:36:26  6   A.    Please ask the question again.

09:36:57  7   Q.    Do, do you not remember the question?

09:36:32  8   A.    I do not remember the question.  Please ask the

09:36:34  9   question again.

09:37:03 10   Q.    The question is what is your understanding of

09:36:39 11   your duties and obligations as the trustee of the

09:36:43 12   Orly Genger Trust?

09:36:46 13               MR. POLLOCK:  Mr. Bowen --

09:36:47 14   A.    On advice of counsel, I refuse to answer that

09:36:49 15   question.

09:36:49 16               MR. POLLOCK:  Ms. Bowen, I would

09:36:50 17          respectfully ask that we go offline, and

09:36:52 18          you can explain to me, please, so that

09:36:54 19          we're not in the flow of the question, how

09:36:57 20          this relates to the Motion to Dismiss.

09:37:27 21               MR. BOWEN:  Mr. Pollock, I'm

09:37:01 22          conducting a deposition.  I have never

09:37:03 23          before encountered a lawyer who was as

09:37:05 24          obstructionist as you and who has

09:37:05 25          repeatedly tried to interfere with my line
```

09:37:09  1                    of questioning.  I ask you again, sir,

09:37:11  2                    please stop.

09:37:12  3    BY MR. BOWEN:

09:37:12  4    Q.    Mr. Oldner --

09:37:12  5                    MR. POLLOCK:  Mr. Bowen, I

09:37:13  6                    respectfully ask --

09:37:14  7    Q.    -- the question is as follows.  Do you know

09:37:17  8    Dalia Genger?

09:37:21  9                    MR. POLLOCK:  Mr. Bowen, I

09:37:22 10                    respectfully ask you not to raise your

09:37:24 11                    voice at the witness.

09:37:25 12                    MR. BOWEN:  I'm not raising my voice,

09:37:27 13                    sir.  I'm raising my voice in frustration

09:37:29 14                    to you, not to Mr. Oldner.  Mr. Oldner has

09:37:31 15                    been a perfect gentleman.

09:37:33 16                    I'm asking you again, Mr. Pollock,

09:37:35 17                    please stop interrupting my deposition and

09:37:37 18                    disrupting and obstructing justice.

09:37:39 19                    I don't -- I've never seen another

09:37:41 20                    lawyer do this before.  I'm just asking you

09:37:43 21                    please, just please stop.

09:37:45 22                    You can make whatever objection you

09:37:47 23                    want by saying "Objection."  If you want to

09:37:48 24                    discuss it with me, I will decide when I am

09:37:52 25                    at liberty to have a discussion with you.

                                  BUSHMAN COURT REPORTING

```
09:37:54  1              I'm not going to do it in the middle
09:37:56  2         of my examination, so please stop, sir.
09:37:57  3              MR. POLLOCK:  Mr. Bowen --
09:37:58  4  BY MR. BOWEN:
09:37:58  5  Q.    Mr. Oldner, I'm sorry for these continued
09:38:02  6  interruptions, but I can't control Mr. Pollock.  I'm
09:38:03  7  going to ask you again, do you know Dalia Genger?
09:38:06  8              MR. POLLOCK:  Mr. Bowen, I ask you
09:38:08  9         respectfully to stop raising your voice at
09:38:08 10         me.
09:38:08 11              As you know, I have sought in the past
09:38:11 12         to understand the nature of this
09:38:13 13         deposition, and you indicated that you
09:38:15 14         would not, quote, waste your time, end
09:38:17 15         quote, on that.
09:38:18 16              I'm sorry that you're unable to spend
09:38:21 17         that time, but if you would proceed with
09:38:22 18         the question, I would respectfully ask that
09:38:25 19         it be related to the pending Motion to
09:38:26 20         Dismiss.
09:39:00 21  Q.    Mr. Oldner, please answer the question.
09:38:39 22  A.    Okay.  I hate to do this.  Please restate the
09:38:42 23  question.  I'm not being a jerk.
09:38:46 24  Q.    No, no, I don't -- I understand entirely.
09:38:48 25  Please, don't worry about that.
```

09:38:49  1   A.      Thank you.

09:38:50  2   Q.      And anytime you need me to restate something,

09:38:52  3   don't hesitate to ask.

09:38:54  4   A.      Thank you.

09:38:54  5   Q.      You know what, I'm going to withdraw that

09:38:56  6   question and ask you just some general questions.

09:38:57  7   Have you ever been deposed before?

09:38:59  8   A.      Yes, sir.

09:39:00  9   Q.      So you have been a witness in legal

09:39:02  10  proceedings?

09:39:03  11  A.      Yes, sir.

09:39:04  12  Q.      And has that ever been in court giving live

09:39:07  13  testimony, or only in depositions?

09:39:10  14  A.      Both.

09:39:40  15  Q.      So you know the general rules of a deposition;

09:39:14  16  correct?

09:39:15  17  A.      Generally, but, again, I'm not a lawyer.

09:39:20  18  Q.      Well, for purposes of my examination, you

09:39:23  19  should never hesitate to ask me to restate a

09:39:27  20  question, or to even rephrase it, if that would help

09:39:30  21  you answer it.  So I hope you --

09:39:32  22  A.      Thank you.  I'm not trying to be contentious.

09:39:35  23  Q.      I, I recognize that, Mr. Oldner.  I don't think

09:39:38  24  that you are.

09:39:40  25  A.      Thank you.

09:39:40  1    Q.    But I want you to feel free to ask me at any

09:39:43  2    time to either restate the question or rephrase it,

09:39:46  3    even if that would help you.

09:39:48  4    A.    Thank you.

09:39:49  5    Q.    Do you understand that?

09:40:24  6    A.    Yes, sir.

09:39:50  7    Q.    Okay.  And if, if you do answer the question,

09:39:52  8    the presumption is that you understood the question,

09:39:55  9    and your answer is responsive to it.

09:39:55  10    A.    Yes, sir.

09:39:55  11    Q.    Do you understand that?

09:39:58  12    A.    Yes, sir.

09:40:36  13    Q.    Okay.  And if at any time you need to take a

09:40:03  14    break, again, don't hesitate to ask.

09:40:43  15    A.    Thank you.

09:40:07  16    Q.    Okay.  So your, your general background is in

09:40:17  17    the securities industry; is that right?

09:40:19  18    A.    Yes, sir.

09:40:20  19    Q.    And that was as a trader or a broker?

09:40:23  20    A.    I was a broker.  I owned a broker, I owned a

09:40:26  21    broker-dealer, financial planning for banks, yes,

09:40:30  22    sir.

09:40:33  23    Q.    And can you just give me a general idea of your

09:40:36  24    education background, just on a general level?

09:40:39  25    A.    Three years of college, multiple securities

BUSHMAN COURT REPORTING

09:40:42  1   degrees.

09:41:14  2   Q.    Okay.  So you didn't get a degree from college?

09:40:48  3   A.    I did not.

09:40:48  4   Q.    What college did you go to?

09:40:51  5   A.    Hendrix College was the last place I went to

09:40:54  6   college.

09:40:55  7   Q.    Where is that located?

09:40:56  8   A.    In Conway, Arkansas.

09:41:30  9   Q.    And your focus of study there was what?

09:41:03 10   A.    English literature.

09:41:04 11   Q.    I'm sorry.  I didn't hear you.

09:41:06 12   A.    English literature.

09:41:09 13   Q.    When was the last -- what year was the last

09:41:12 14   year you attended college?

09:41:13 15   A.    1975.

09:41:17 16   Q.    And after that you began working as a broker?

09:41:20 17   A.    No.  I actually managed a jewelry store before

09:41:24 18   that.

09:42:00 19   Q.    A grocery store?

09:41:27 20   A.    Jewelry.

09:41:29 21   Q.    Jewelry?

09:41:29 22   A.    A jewelry store.

09:41:31 23   Q.    Where was that?

09:41:32 24   A.    Little Rock, Arkansas.

09:41:35 25   Q.    Was that owned by you?

```
09:41:36  1   A.    No, sir.

09:42:09  2   Q.    How long did you manage that?

09:41:40  3   A.    Three years.

09:42:12  4   Q.    And can you give me the rest of your work

09:41:45  5   history following the jewelry store?

09:41:47  6   A.    I worked as the office product sales manager

09:41:51  7   for the 3M distributor in Little Rock, Arkansas.  And

09:41:56  8   after that I was in the securities business, the

09:42:00  9   institutional securities business with several

09:42:03 10   broker-dealers and banks in Little Rock, Arkansas.

09:42:42 11   Q.    Okay.  What time period altogether were you in

09:42:11 12   the securities industry?

09:42:12 13   A.    From 1982 through 1998.

09:43:01 14   Q.    And prior to 1975, did you have any work

09:42:21 15   history?

09:42:23 16   A.    Other than jobs to put me through school, no.

09:42:28 17   Q.    Did you go to high school in Arkansas as well?

09:42:30 18   A.    I did.

09:43:13 19   Q.    Have you pretty much lived in Arkansas your

09:42:34 20   entire professional life?

09:42:36 21   A.    Most of it.

09:43:21 22   Q.    Where else have you lived other than Arkansas?

09:42:43 23   A.    Austin, Texas.

09:43:26 24   Q.    Anywhere else?

09:42:50 25   A.    No.
```

09:43:32  1   Q.    Who asked you to take on the role of trustee

09:43:00  2   for the Orly Genger Trust?

09:43:02  3              MR. POLLOCK:   I object to the reasons

09:43:05  4         previously stated.

09:43:45  5   A.    Am I --

09:43:08  6   Q.    You can answer?

09:43:08  7   A.    -- to answer the question now?

09:43:13  8              MR. POLLOCK:   (Counsel nods head.)

09:43:15  9   A.    My original contact -- let me, let me think how

09:43:20 10   I should answer that, to give you an honest answer.

09:43:25 11   I was appointed by Dalia Genger.

09:43:32 12          The discussions held about it were with

09:43:36 13   Sagi Genger on her behalf, and originally the subject

09:43:42 14   was broached by Robin Rodriguez.

09:44:22 15   Q.    And the subject was first broached by Robin

09:43:51 16   Rodriguez in, around April of 2019; right?

09:44:31 17   A.    Yes, sir.

09:43:58 18   Q.    How do you know Robin Rodriguez?

09:44:01 19   A.    I used to be an employee of Robin Rodriguez

09:44:04 20   when he owned a broker-dealer in Little Rock,

09:44:06 21   Arkansas.

09:44:08 22   Q.    What was the name of that company?

09:44:10 23   A.    Anglo-American Investor Services Corporation.

09:44:17 24   Q.    What years were you an employee there?

09:44:19 25   A.    1989 and 1990, partially.  Part of '89, and

BUSHMAN COURT REPORTING

09:44:24  1   part of '90.

09:44:28  2   Q.    Why did you leave there?

09:44:31  3   A.    To purchase a broker-dealer of my own.

09:44:36  4   Q.    So before 1989, you did not know Mr. Rodriguez?

09:45:17  5   A.    I did not.

09:45:19  6   Q.    After you purchased your own broker-dealer, did

09:44:50  7   you maintain a business relationship with Mr.

09:44:52  8   Rodriguez?

09:45:26  9   A.    I did not.

09:44:55 10   Q.    He didn't have any ownership interest in your

09:44:59 11   broker-dealer?

09:45:00 12   A.    He did not.

09:45:00 13   Q.    Did he help you set it up?

09:45:41 14   A.    He did not.

09:45:48 15   Q.    Did you have contact with Mr. Rodriguez between

09:45:13 16   1990 and 2019?

09:45:52 17   A.    Yes.

09:45:15 18   Q.    What was the nature of that contact?

09:45:17 19   A.    We've been acquaintances for a very long time.

09:45:21 20   We stayed in touch.

09:45:23 21   Q.    Did you have any business dealings with him in

09:45:26 22   that period of time?

09:45:27 23   A.    No, sir.

09:46:16 24   Q.    I take it you first met Sagi Genger through

09:45:36 25   Robin Rodriguez?

09:46:20  1   A.      Yes, sir.

09:45:38  2   Q.      And that was in, sometime after April of 2019?

09:46:22  3   A.      Yes, sir.

09:46:23  4   Q.      So what did Mr. Rodriguez say to you when he

09:45:50  5   was describing, or you were talking about this topic

09:45:53  6   of the trustee for the Orly Genger Trust?

09:45:58  7                   MR. POLLOCK:   Objection, again, on the

09:46:00  8             same bases.

09:46:11  9   A.      Do I answer the question now?

09:46:12 10                   MR. POLLOCK:   Go ahead.

09:46:13 11   A.      Okay.   Sorry.   Will you repeat the question,

09:46:14 12   please?

09:46:15 13   Q.      Certainly.

09:46:16 14   A.      I'm sorry.

09:46:17 15   Q.      What was the topic -- let me put it this way.

09:46:20 16   I might be changing it a little bit.   What did Mr.

09:46:24 17   Rodriguez say to you when he first brought up this

09:46:27 18   topic of the trustee for the Orly Genger Trust?

09:46:31 19                   MR. POLLOCK:   Again, I object.   None

09:46:31 20             of this has anything to do with the Motion

09:46:33 21             to Dismiss.

09:46:47 22   A.      And I may answer the question now?   Robin first

09:46:47 23   outlined -- as a securities representative, I'm

09:46:49 24   familiar with derivative actions.

09:46:52 25             He first outlined the derivative case.

09:46:55  1   Then he asked me if I would consider serving as

09:46:59  2   trustee.  And then he said sent me --

09:47:06  3   Q.    What --

09:47:06  4   A.    Sorry.  And then he sent me the trust document.

09:47:08  5   That's the complete story.

09:47:21  6   Q.    What was the nature of the derivative claim or

09:47:22  7   action that he described to you?

09:47:25  8   A.    A party had brought a lawsuit on behalf of a

09:47:27  9   trust.  They won the lawsuit on behalf of the trust,

09:47:39 10   but the money did not go to the trust.

09:47:48 11   Q.    So after that conversation, Mr. Rodriguez sent

09:47:53 12   you a copy of the Orly Genger Trust, 1993 Trust

09:47:58 13   Agreement; right?

09:47:59 14   A.    Yes, sir.

09:48:34 15   Q.    And you read it?

09:48:01 16   A.    Yes, sir.

09:48:40 17   Q.    Did you discuss it with anybody?

09:48:07 18                 MR. POLLOCK:  Objection, for the same

09:48:09 19           reasons stated.

09:48:12 20   A.    May I answer the question now?

09:48:14 21   Q.    (Counsel nods head.)

09:48:16 22   A.    I discussed it with Robin.  I also discussed it

09:48:20 23   with Sagi.

09:48:58 24   Q.    Other than Mr. Rodriguez and Sagi Genger, did

09:48:27 25   you discuss it with anyone else?

```
09:48:30  1              MR. POLLOCK:  Mr. Bowen, if I may
09:48:32  2         respectfully caution the witness with
09:48:32  3         respect to preserving the privilege.
09:48:39  4  Q.   You can answer the question, but don't get into
09:48:42  5  communications with lawyers.
09:48:46  6  A.   Then if we're excluding communications with
09:48:49  7  lawyers, no one else.
09:49:23  8  Q.   Did you seek legal advice about the, the
09:48:54  9  trustee agreement?
09:48:56 10  A.   I did.
09:49:30 11  Q.   And I'm sorry, I said the "trustee agreement."
09:48:59 12  I should have said "Trust Agreement."
09:49:02 13  A.   And I'm sorry for making an interpretation.  I
09:49:05 14  apologize.  I sought legal advice concerning the
09:49:10 15  Trust Agreement.
09:49:11 16  Q.   Did you do that before you accepted appointment
09:49:14 17  as trustee?
09:49:15 18  A.   I did.
09:49:20 19  Q.   What other documents did you review, if any,
09:49:23 20  before accepting the position as trustee?
09:49:28 21              MR. POLLOCK:  Object on the same
09:49:29 22         basis, that you appear to be seeking
09:49:31 23         discovery as to diligence that he
09:49:34 24         performed, which is entirely unrelated to
09:49:37 25         the pending Motion to Dismiss and instead
```

09:49:40  1              appears related to the proposed claims to

09:49:42  2              be sold.

09:50:31  3    Q.    You can answer, sir.

09:50:31  4    A.    Would you be so kind as to repeat the question

09:49:52  5    for me?

09:50:36  6    Q.    The question is what other documents, if any,

09:49:55  7    did you review before accepting the appointment as

09:50:00  8    trustee?

09:50:02  9    A.    I read several court documents relating to the

09:50:07 10    fraudulent transferred case.

09:50:53 11    Q.    When you say "fraudulent transferred case," can

09:50:18 12    you identify it more than saying that?

09:50:22 13    A.    Yes.  It's the case that I have filed against

09:50:29 14    certain persons in New York in the Southern District

09:50:34 15    of New York through the corporation REI.  That would

09:50:41 16    give the best description.

09:50:43 17    Q.    Okay. Thank you.  Other than that document,

09:50:46 18    did you review anything else?

09:50:50 19    A.    Pardon me?

09:50:51 20              MR. POLLOCK:  Objection;

09:50:51 21              mischaracterizes the testimony.

09:50:57 22    Q.    Let me just try and clean it up.

09:50:59 23    A.    Please.

09:51:35 24    Q.    I understood you to say that you reviewed --

09:51:01 25    maybe you said plural -- you reviewed documents

09:51:07  1   related to this Recovery Effort action; is that

09:51:11  2   right?

09:51:44  3   A.    I reviewed documents relating to the suit that

09:51:15  4   would later be filed by Recovery Effort.  I reviewed

09:51:20  5   previous court opinions, previous rulings, which, of

09:51:26  6   course, I can't cite like you can, but they were

09:51:29  7   numerous.

09:51:30  8              And I have read them as carefully as I was

09:51:35  9   capable of, without being a lawyer, without

09:51:37 10   understanding the legal parts, on which I later

09:51:40 11   relied on counsel.

09:51:42 12   Q.    But that was after you accepted appointment or

09:51:45 13   before?

09:52:17 14   A.    No, sir.  That was relying on counsel.  Can we

09:51:51 15   start this question over --

09:51:53 16   Q.    Sure.

09:51:53 17   A.    -- so it gets answered correctly.  I apologize.

09:51:57 18   Q.    That's fine.  Let me try and ask a better

09:52:02 19   question.  When you said a moment ago that you did

09:52:05 20   eventually discuss these documents and these prior

09:52:10 21   court opinions with counsel, did that happen before

09:52:12 22   or after you accepted the position as trustee?

09:52:14 23   A.    That happened before.  It also happened after.

09:52:18 24   Q.    And the lawyer that you discussed it with, who

09:52:28 25   was that, before you accepted appointment?

```
09:52:31  1   A.    That is Tim Cullen, who is present.

09:52:41  2   Q.    So other than discussing it with counsel, and

09:52:44  3   discussing it with Mr. Rodriguez, and Ms. Sagi

09:52:46  4   Genger, you didn't discuss anything relating to the

09:52:51  5   Orly Genger Trust with anyone before you accepted the

09:52:53  6   appointment; is that right?

09:52:55  7              MR. POLLOCK:  Object on the same

09:52:56  8         basis.

09:52:57  9   A.    I may answer the question?  That is correct,

09:53:00 10   sir.  I did not discuss it with anyone other than

09:53:03 11   counsel, other than Robin Rodriguez, other than Sagi

09:53:06 12   Genger.

09:53:11 13              MR. CAVALIERE:  May I just interject a

09:53:12 14         question?  This is Rocco Cavaliere on

09:53:14 15         behalf of the trustee.  Is Ms. Cullen an

09:53:19 16         attorney licensed to practice law in New

09:53:23 17         York?

09:53:23 18              MR. POLLOCK:  I believe it's Mr.

09:53:23 19         Cullen.

09:53:25 20              MR. CAVALIERE:  I'm sorry.

09:53:25 21         Mr. Cullen.

09:53:27 22              MR. CULLEN:  No, I am not licensed to

09:53:28 23         practice law in New York.  I am licensed in

09:53:31 24         Arkansas, where the deponent resides, and

09:53:34 25         where there is a pending Motion to Quash in
```

09:53:38  1              the United States District Court in

09:53:41  2              Arkansas, where I am licensed.

09:53:44  3                  MR. CAVALIERE:  Thank you.  Is the

09:53:45  4              Trust Agreement that you reviewed,

09:53:46  5              Mr. Cullen, is that --

09:53:50  6                  MR. POLLOCK:  May I say --

09:53:51  7                  MR. CAVALIERE:  -- Trust Agreement

09:53:51  8              governed by -- is that Trust Agreement

09:53:52  9              governed by Arkansas?

09:53:56 10                  MR. POLLOCK:  Sorry.  Are you asking

09:53:57 11              Mr. Cullen the question?

09:53:58 12                  MR. CAVALIERE:  I'm asking, I'm asking

09:53:58 13              Mr., Mr. Oldner, as he's reviewed the Trust

09:54:01 14              Agreement.

09:54:03 15                  THE WITNESS:  Rocco --

09:54:03 16                  MR. CAVALIERE:  Mr. Oldner, to your

09:54:04 17              understanding -- one second, please.

09:54:05 18                  THE WITNESS:  Sure.

09:54:06 19                  MR. CAVALIERE:  To your understanding

09:54:06 20              is the Trust Agreement governed by Arkansas

09:54:08 21              law?

09:54:09 22                  MR. POLLOCK:  Objection; seeks a legal

09:54:10 23              conclusion.

09:54:13 24                  THE WITNESS:  Rocco, another thing, I

09:54:13 25              can't, I can't see you very well.  You are

09:54:16  1            on one corner of your pad.  Everybody else

09:54:20  2            is kind of in the middle.  There you are.

09:54:26  3            I can't hear you now.

09:54:33  4                 MR. POLLOCK:  Mr. Cavaliere, if you're

09:54:35  5            speaking, we can't hear you anymore.

09:54:38  6                 THE WITNESS:  But I can see you.

09:54:44  7                 MR. CAVALIERE:  Okay.  I apologize.

09:54:45  8                 THE WITNESS:  Thank you.

09:54:48  9                 MR. CAVALIERE:  I have no other

09:54:49 10            questions at this, at this present time.

09:54:51 11            Go ahead, Michael.

09:54:51 12  BY MR. BOWEN:

09:54:52 13  Q.    So, Mr. Oldner, did you make any attempts to

09:54:57 14  talk to Dalia Genger?

09:54:59 15  A.    I did not.

09:55:37 16  Q.    At any point in time?

09:55:02 17  A.    At no point.

09:55:41 18  Q.    Why is that?

09:55:41 19  A.    It's my understanding that Dalia Genger was not

09:55:10 20  in good health.

09:55:11 21  Q.    What was, what was -- well, how did you learn

09:55:13 22  that, from whom?

09:55:16 23                 MR. POLLOCK:  Objection.

09:55:18 24  A.    May I answer the question?  From Sagi.

09:55:52 25  Q.    So when was the first time you met Sagi Genger?

                      BUSHMAN COURT REPORTING

09:55:30  1              MR. POLLOCK:  Again, Mr. Bowen, if you
09:55:32  2         can please make a proffer as to what this
09:55:35  3         has to do with a pending Motion to Dismiss,
09:55:37  4         I think that would be helpful to all, and
09:55:39  5         I'm happy to do that offline.
09:55:40  6              I'm happy for him to answer the
09:55:41  7         question.  Then we can go off the record
09:55:43  8         and have that discussion.
09:55:44  9              It would be most productive to
09:55:47 10         everybody if you would respectfully even
09:55:49 11         give me one sentence or a short proffer as
09:55:53 12         to why this relates to the pending Motion
09:55:54 13         to Dismiss for which Mr. Oldner has agreed
09:55:58 14         to sit for a deposition today.
09:55:59 15              MR. BOWEN:  Mr. Pollock, again I ask
09:56:01 16         you to desist in obstructing this
09:56:03 17         deposition.
09:56:03 18  BY MR. BOWEN:
09:56:04 19  Q.    Mr. Oldner, please answer the question.
09:56:06 20  A.    Mr. Bowen, would you please restate the
09:56:09 21  question?
09:56:11 22  Q.    The question was when did you first meet Sagi
09:56:17 23  Genger?
09:56:17 24  A.    On -- in person on June 14th, 2019.
09:56:24 25  Q.    Where was that meeting?

                         BUSHMAN COURT REPORTING

09:56:26  1              MR. POLLOCK:  Objection on the same

09:56:27  2          grounds.

09:56:28  3  A.   May I answer the question?

09:56:32  4  Q.   (Counsel nods head.)

09:57:13  5  A.   The Community Bakery in Little Rock, Arkansas.

09:57:16  6  Q.   Now June 14th, 2019, is the day that you

09:56:43  7  accepted the appointment as trustee; correct?

09:56:46  8  A.   That is correct.

09:56:49  9  Q.   That was also the first time you met Mr. Sagi

09:56:52  10 Genger in person?

09:56:53  11 A.   Yes, sir.

09:56:54  12 Q.   Had you spoken with Sagi Genger prior to

09:56:56  13 then --

09:57:39  14 A.   Yes.

09:56:57  15 Q.   -- before then?

09:56:58  16 A.   Yes, sir.

09:57:43  17 Q.   How many times?

09:57:01  18 A.   I don't know, several.

09:57:12  19 Q.   Were those on calls with other people?

09:57:12  20 A.   No.

09:57:12  21 Q.   So those are just phone calls one-on-one?

09:57:15  22 A.   Yes, sir.

09:57:54  23 Q.   Did you have email communications with him

09:57:18  24 before June 14th?

09:57:22  25 A.   Yes, a few, and those were all produced.

BUSHMAN COURT REPORTING

09:58:11  1   Q.    What did you discuss with Sagi Genger before

09:57:32  2   you first met him in person?

09:57:35  3   A.    The history and nature of the case that was the

09:57:40  4   trust action, or would be the trust action, and the

09:57:45  5   performance that led to the trust not having any

09:57:50  6   money, as much as of the history as he could fill me

09:57:55  7   in on.

09:58:32  8   Q.    Were those long conversations?

09:58:00  9   A.    Some of them were long.

09:58:03 10   Q.    And no one else was on the --

09:58:03 11   A.    Define "long."  I -- thirty minutes is a long

09:58:12 12   conversation to me.

09:58:13 13   Q.    Were some of those conversations 30 minutes or

09:58:15 14   more?

09:58:16 15   A.    Yes, sir.

09:58:16 16   Q.    And no one else was on the call excerpt you and

09:58:19 17   Mr. Genger?

09:58:20 18   A.    No, sir.

09:58:48 19   Q.    Did you ever talk to John Dellaportas?

09:58:26 20               MR. POLLOCK:  Mr. Bowen, I object on

09:58:28 21          the same grounds and respectfully ask that

09:58:31 22          you make a proffer as to how this is

09:58:33 23          related to the Motion to Dismiss, or I ask

09:58:35 24          that you move on to topics that are

09:58:36 25          related, consistent with Judge Garrity's

```
09:58:36  1            direction.

09:58:38  2                  I have given you a lot of leeway over

09:58:40  3            the past hour.  We ask you respectfully to

09:58:43  4            move along.

09:58:45  5   BY MR. BOWEN:

09:58:45  6   Q.    You can answer the question, sir.

09:58:47  7   A.    May we have a break?

09:58:49  8                  MR. GENGER:  To the extent -- this is

09:58:50  9            Sagi Genger.  To the extent that it's a

09:58:50 10            communication with Mr. Dellaportas --

09:58:52 11                  MR. BOWEN:  Mr. Genger, you're not

09:58:54 12            permitted to talk.  I'm sorry.  I'm going

09:58:55 13            to talk over you.

09:58:55 14                  MR. GENGER:  Please don't interrupt

09:58:55 15            me.

09:58:55 16                  MR. BOWEN:  You're not permitted to

09:58:56 17            make an appearance.  You are not a lawyer,

09:58:59 18            sir.  You're not --

09:58:59 19                  MR. GENGER:  I'm not --

09:59:00 20                  MR. BOWEN:  -- admitted in this

09:59:00 21            proceeding in any way, shape, or form, and

09:59:04 22            you're not proceeding pro se.  You have

09:59:05 23            counsel, so you may not speak.  I'm sorry.

09:59:07 24            Contact your lawyer and have your lawyer

09:59:09 25            speak.  You may not, sir.
```

```
09:59:12  1              MR. POLLOCK:  Mr. Bowen, I would ask
09:59:14  2         you respectfully, for the benefit of our
09:59:16  3         court reporter, not to talk over any of
09:59:18  4         the --
09:59:19  5              MR. BOWEN:  I'm sorry.  I'm going to
09:59:19  6         talk over you now.  I'm going to talk over
09:59:21  7         Sagi Genger every time he speaks.  He is
09:59:24  8         not a lawyer.  He's not helping himself.
09:59:24  9         He must stop.
09:59:25 10              MR. POLLOCK:  I would respectfully --
09:59:26 11              MR. BOWEN:  Now you may say what you
09:59:28 12         want, Mr. Pollock.  Go ahead.
09:59:29 13              MR. POLLOCK:  I would respectfully ask
09:59:30 14         that you don't talk over me, as you
09:59:32 15         indicated, and that you don't talk over Mr.
09:59:33 16         Genger, regardless of your position as to
09:59:35 17         Mr. Genger, because our stenographer here
09:59:36 18         will have great difficulty making an
09:59:41 19         accurate record if you persist in speaking
09:59:43 20         over people here.  With that noted --
09:59:45 21 BY MR. BOWEN:
09:59:47 22 Q.    You may answer the question, Mr. Oldner.
09:59:50 23              MR. POLLOCK:  With that noted, I would
09:59:51 24         direct Mr. Oldner not to testify as to
09:59:56 25         common interest privileged materials or
```

```
10:00:00  1          conversations, and that would include his
10:00:03  2          conversations with Mr. Dellaportas, so you
10:00:03  3          may not answer the question.
10:00:05  4               MR. KURLAND:  That wasn't the
10:00:05  5          question.
10:00:05  6               MR. POLLOCK:  I apologize.  Who said
10:00:05  7          that?  What was the question?
10:00:05  8               MR. BOWEN:  I don't know who said it,
10:00:05  9          but they are correct, whoever said it.
10:00:05 10          That wasn't the question.
10:00:24 11               So, Mr. Oldner, let me try again.
10:00:26 12          And, Mr. Pollock, please don't obstruct
10:00:29 13          this line of questioning, or any
10:00:30 14          questioning during this deposition.
10:00:31 15               Your, your conduct is obstructionist
10:00:31 16          and is improper, and I ask you again to
10:00:34 17          stop.
10:00:34 18     BY MR. BOWEN:
10:00:35 19     Q.    Mr. Oldner, did you ever speak with Mr.
10:00:39 20     Dellaportas?  And you can answer the question with a
10:00:41 21     simple "yes" or "no."
10:01:25 22     A.    Yes.
10:00:44 23     Q.    And how many times?
10:00:52 24     A.    Twice, approximately.
10:00:53 25     Q.    Did you speak with him before you accepted the
```

10:00:55  1   position as trustee?

10:00:57  2   A.    I did not.

10:01:45  3   Q.    And the two times that you spoke with him after

10:01:02  4   becoming trustee, approximately when did those

10:01:06  5   conversations occur?

10:01:08  6   A.    I could be wrong.  It could be three times, but

10:01:10  7   I remember meeting him in Austin, Texas in August of

10:01:17  8   2019 and, again, in New York City in January of this

10:01:25  9   year.

10:02:32  10  Q.    Who else was present when you met with Mr.

10:01:32  11  Dellaportas?

10:01:34  12  A.    At, at which location?

10:01:41  13  Q.    You can start with the first one in Texas.

10:01:45  14  A.    Many lawyers and Sagi Genger.

10:01:51  15  Q.    And the second one?

10:01:54  16  A.    Many lawyers and Sagi Genger.

10:02:05  17  Q.    What did Sagi Genger tell you about Dalia

10:02:08  18  Genger?

10:02:14  19            MR. POLLOCK:  I object on the same

10:02:15  20         grounds.

10:02:17  21  A.    That Dalia was his mother, things that are in

10:02:25  22  court documents explaining that, and that his mother

10:02:32  23  was not in good health.

10:02:36  24  Q.    What did he say about that?

10:02:39  25            MR. POLLOCK:  Objection.  Are you

| | | |
|---|---|---|
| 10:02:40 | 1 | asking for details about her health |
| 10:02:43 | 2 | condition?  Did I hear you? |
| 10:02:49 | 3 | Q.   You can answer that question, sir. |
| 10:02:52 | 4 | A.   He gave me no details. |
| 10:02:53 | 5 | Q.   How did that topic come up? |
| 10:02:55 | 6 | A.   I don't remember. |
| 10:03:37 | 7 | Q.   Was it in the context of you asking to speak |
| 10:03:02 | 8 | with Dalia Genger? |
| 10:03:04 | 9 | A.   I don't remember. |
| 10:03:43 | 10 | Q.   Did you want to speak to her? |
| 10:03:18 | 11 | A.   Would I have liked to have spoken to the |
| 10:03:20 | 12 | previous trustee, of course.  Did I specifically |
| 10:03:25 | 13 | think I really needed to speak to Dalia Genger, no. |
| 10:03:52 | 14 | Q.   And why is that?  Why did you think you didn't |
| 10:03:31 | 15 | really need to speak with her? |
| 10:03:34 | 16 | MR. POLLOCK:  Objection.  If anything, |
| 10:03:34 | 17 | this appears to go to your, the issue of |
| 10:03:38 | 18 | diligence, which relates to the claims that |
| 10:03:40 | 19 | are proposed to be sold to the claims |
| 10:03:42 | 20 | pursuit entity. |
| 10:03:44 | 21 | I would ask respectfully that you make |
| 10:03:47 | 22 | a proffer as to how this is possibly |
| 10:03:49 | 23 | related to the Motion to Dismiss or that |
| 10:03:51 | 24 | you move along to a subject that is related |
| 10:03:53 | 25 | to the pending Motion to Dismiss. |

10:03:56   1   Q.   You can answer the question, sir.

10:03:57   2   A.   May I ask you to restate it, please, or repeat

10:04:00   3   it?

10:04:03   4   Q.   The question was why is it that you say that

10:04:18   5   you didn't see a need to speak with her in

10:04:21   6   particular?

10:04:23   7                MR. POLLOCK:  I object, and I direct

10:04:25   8                Mr. Oldner to stop answering questions that

10:04:28   9                relate to, appear to relate to a topic that

10:04:32  10                is not at hand, and respectfully ask that

10:04:36  11                you give me a proffer, or that we go

10:04:39  12                offline and have a discussion.

10:04:41  13                I have been very patient here.  We've

10:04:43  14                given you a lot of leeway, but it's time to

10:04:46  15                move on to the pending motion, which is

10:04:49  16                consistent with Judge Garrity's direction.

10:04:53  17                He said you could take the deposition

10:04:55  18                on the pending Motion to Dismiss.  What he

10:04:57  19                talked about with Dalia Genger in August of

10:04:59  20                2019 or didn't talk with Dalia Genger in

10:05:03  21                August 2019 has nothing to do with anything

10:05:06  22                that we are here for today.

10:05:09  23                MR. BOWEN:  Mr. Pollock, once again,

10:05:12  24                you're being obstructionist, and I ask you

10:05:15  25                to stop.  I have no obligation to explain

10:05:17  1            to you my line of thinking or my line of

10:05:21  2            questioning.

10:05:21  3                If you don't understand the relevance,

10:05:22  4            that's your problem.  You must stop being

10:05:25  5            obstructionist.

10:05:28  6                If you stop obstructing this

10:05:30  7            deposition, you will see the relevance of

10:05:32  8            all of these lines of questioning, but

10:05:34  9            because you keep interfering, that may be

10:05:38 10            impeding your ability to understand what is

10:05:41 11            happening.  So please stop.

10:05:43 12                MR. POLLOCK:  Mr. Bowen, you have an

10:05:45 13            obligation --

10:05:45 14  BY MR. BOWEN:

10:05:46 15  Q.    Mr. Oldner, please answer the question.

10:05:49 16                MR. POLLOCK:  Mr. Bowen, you have an

10:05:49 17            obligation to respect the guidance of Judge

10:05:49 18            Garrity, who was very clear when we met by

10:05:53 19            telephone on Tuesday, June 23rd at the four

10:05:56 20            o'clock discovery hearing.

10:05:58 21                I have yet to hear, and I think that

10:05:59 22            it would quite simplify this discussion if

10:06:02 23            you would make a brief proffer, either on

10:06:05 24            the record or off the record, as to how

10:06:08 25            this relates to the topic at hand.

BUSHMAN COURT REPORTING

```
10:06:09  1   BY MR. BOWEN:

10:06:12  2   Q.    Mr. Oldner, please answer the question.

10:06:14  3   A.    Mr. Bowen, it's my understanding that I have

10:06:19  4   just been instructed by counsel not to answer the

10:06:21  5   question.

10:07:27  6   Q.    Well, I have to ask you, sir, what's the

10:06:29  7   question you're not answering?

10:06:32  8   A.    The last one you asked.

10:07:38  9   Q.    Do you remember the question?

10:06:36 10   A.    No, sir, I do not.

10:06:39 11   Q.    Neither do I, Mr. Oldner --

10:06:40 12   A.    Okay.

10:07:47 13   Q.    -- so I'm going to ask the court reporter to

10:06:43 14   please read it back.

10:07:53 15   A.    Thank you.

10:07:53 16              COURT REPORTER:  Okay.  Give me a

10:07:53 17          minute to get back to it.

10:07:53 18       (Court reporter read back the question.)

10:07:16 19              MR. POLLOCK:  I have the same

10:07:16 20          objections, and I think that this question

10:07:21 21          and this line of questioning are in clear

10:07:24 22          violation of Judge Garrity's direction.

10:07:29 23              On top of that, the only one who

10:07:32 24          served a subpoena here was the debtor.  We

10:07:37 25          are here in an attempt at an accommodation
```

| | | |
|---|---|---|
| 10:07:39 | 1 | consistent with Judge Garrity's direction. |
| 10:07:44 | 2 | We have from -- the creditor, Kasowitz |
| 10:07:45 | 3 | Benson, emailed a rough draft unsigned PDF |
| 10:07:53 | 4 | form of subpoena. |
| 10:07:54 | 5 | Nonetheless, we are attempting to be |
| 10:07:56 | 6 | accommodating without prejudice and without |
| 10:07:59 | 7 | waiver of our pending Motion to Quash. |
| 10:08:02 | 8 | I respectfully suggest that if you |
| 10:08:04 | 9 | want to have a deposition on the pending |
| 10:08:06 | 10 | Motion to Dismiss that we have that, but it |
| 10:08:08 | 11 | appears that you are seeking discovery on |
| 10:08:10 | 12 | the claims that are to be sold. |
| 10:08:17 | 13 | It is clearly what Judge Garrity |
| 10:08:19 | 14 | directed not to do, and you're out of line. |
| 10:08:23 | 15 | And that is obstructionist and wasting |
| 10:08:26 | 16 | time.  I would respectfully ask that you |
| 10:08:29 | 17 | move along to the topic at hand. |
| 10:08:33 | 18 | Q.   Mr. Oldner, please answer that question. |
| 10:08:37 | 19 | A.   Am I -- |
| 10:08:38 | 20 | Q.   The question was, because I'm sure it's hard to |
| 10:08:41 | 21 | remember, with that long speaking objection, but the |
| 10:08:41 | 22 | question was Why is it that you didn't think that you |
| 10:08:45 | 23 | had a particular need to speak with Dalia Genger? |
| 10:08:49 | 24 | A.   Am I to answer the question or not? |
| 10:08:57 | 25 | MR. POLLOCK:  A, I think he did answer |

10:09:00  1              this, but, B, I think it's time to move on.

10:09:07  2   A.    Mr. Bowen, is it acceptable for us to take a

10:09:13  3   break?

10:09:14  4   Q.    Certainly, but I would prefer not to take a

10:09:16  5   break while a question is pending, so can you answer

10:09:18  6   that question, and then we'll take a break?

10:09:21  7   A.    Am I to answer the question or not?

10:09:26  8              MR. CULLEN:  No.

10:09:27  9   A.    On advice of counsel, I will not answer that

10:09:29 10   question.

10:25:07 11   Q.    Okay.  Well, let's take a break now.  So why

10:09:35 12   don't we say -- it's 11:11.  How's ten minutes, is

10:09:41 13   that okay, Mr. Oldner, or --

10:09:41 14   A.    Ten minutes is a break --

10:09:41 15   Q.    -- do you need more time?

10:09:42 16   A.    -- for me.

10:09:46 17   Q.    Okay.  So we'll come back at, say 11 -- let's

10:09:46 18   just say 11:25.

10:25:21 19   A.    Okay.

10:09:49 20   Q.    Thank you.

10:24:40 21   A.    Thank you.

10:24:40 22              (Fifteen-minute break.)

10:24:40 23   BY MR. BOWEN:

10:26:12 24   Q.    Mr. Oldner --

10:26:13 25   A.    Yes, sir.

10:26:14  1    Q.      -- going back to Dalia Genger --

10:26:55  2    A.      Yes, sir.

10:26:56  3    Q.      -- I take it that Mr. Sagi, Sagi -- excuse

10:26:23  4    me -- Sagi Genger told you that his mother Dalia

10:26:26  5    Genger was unwell?

10:26:31  6                    MR. POLLOCK:  Objection.

10:26:32  7    Q.      Is that right?

10:27:12  8                    MR. POLLOCK:  Objection to the grounds

10:26:34  9            previously stated.

10:26:37  10   A.      I, I don't know if he told me she was unwell.

10:26:42  11   The implication was she was not in good health.

10:26:46  12   Q.      And if I understood you correctly before the

10:26:49  13   break, your testimony was that that's pretty much all

10:26:54  14   he said.  He didn't provide any details about her

10:26:57  15   health; right?

10:26:59  16   A.      He provided no detail.

10:27:01  17                   MR. POLLOCK:  Objection.

10:27:02  18   A.      Sorry.

10:27:02  19                   MR. POLLOCK:  Objection.

10:27:02  20   A.      He provided no details.

10:27:11  21   Q.      And did you feel that you couldn't talk to

10:27:15  22   Dalia Genger because of a health-related issue?

10:27:21  23                   MR. POLLOCK:  Objection.

10:27:21  24   A.      Would you say the question again, please?

10:28:13  25   Q.      Did you feel that you either couldn't or should

10:27:29  1   not talk to Dalia Genger because of a health-related

10:27:33  2   issue that she had?

10:27:35  3   A.   No, sir, I did not.

10:28:24  4   Q.   So from the time that you accepted the

10:27:57  5   appointment up through today, what's your

10:27:59  6   understanding of the main goal that you have as

10:28:02  7   trustee for the trust?

10:28:05  8              MR. POLLOCK:  Mr. Bowen, I object on

10:28:07  9          the same grounds.  This is completely

10:28:09  10         unrelated to the pending Motion to Dismiss.

10:28:50  11  A.   Mr. Bowen --

10:28:16  12  Q.   You can answer.

10:28:17  13  A.   -- would you please restate, just say the same

10:28:20  14  question again.

10:29:00  15  Q.   During this whole period of time after you were

10:28:24  16  appointed trustee, what's your understanding of what

10:28:27  17  the main goal is for the trust?

10:28:30  18             MR. POLLOCK:  Objection.

10:28:31  19  A.   My goal is to recover monies that belong to the

10:28:35  20  trust for the beneficiaries of the trust.

10:28:44  21  Q.   And your understanding is that the

10:28:47  22  beneficiaries are Orly Genger and her descendants;

10:28:49  23  correct?

10:28:51  24  A.   Yes, correct.

10:28:54  25  Q.   And the asset that you, that the trust is

BUSHMAN COURT REPORTING

10:29:00  1    focused on recovering is the $32 million related to

10:29:03  2    the 2013 Settlement Agreement?

10:29:50  3    A.    The $32.3 million related to the settlement of

10:29:15  4    a derivative lawsuit that did not go to the trust,

10:29:20  5    that went to others.

10:29:26  6    Q.    But the trust's position is that that money

10:29:30  7    belongs to the trust for the benefit of the

10:29:34  8    beneficiaries; right?

10:29:35  9    A.    Yes, sir.

10:30:13 10    Q.    And you reached that conclusion before you

10:29:42 11    accepted the position as trustee?

10:29:45 12              MR. POLLOCK:  Objection for the

10:29:46 13           grounds previously stated.  His diligence

10:29:50 14           performed before he became trustee or after

10:29:52 15           he became trustee has nothing to do with

10:29:54 16           the pending Motion to Dismiss.

10:30:58 17    A.    Mr. Bowen, I will answer the question if you

10:30:04 18    will please ask it again.

10:30:05 19    Q.    Did, did you reach the conclusion that that

10:30:08 20    money was an asset of the trust before you took the

10:30:13 21    position as trustee?

10:30:15 22              MR. POLLOCK:  Objection.

10:30:16 23    A.    Yes, sir, I did.

10:30:38 24    Q.    Did you talk to any lawyers who represented

10:30:41 25    Dalia Genger when she was the trustee?

10:30:45  1    A.    At what point?

10:30:51  2    Q.    At any point.

10:30:57  3               MR. POLLOCK:  Objection for the

10:30:58  4          reasons stated.

10:31:02  5    A.    Repeat the question, and I will answer.

10:31:05  6    Q.    Did you discuss or did you talk with any

10:31:09  7    lawyers who represented Dalia Genger during the time

10:31:12  8    that she was the trustee?

10:31:14  9               MR. POLLOCK:  Objection.

10:31:16 10    A.    I might have talked -- no, I did not, that I --

10:31:25 11    to the best of my knowledge, I did not, not that I

10:31:27 12    represented her when she was trustee.

10:31:30 13    Q.    Did you --

10:31:30 14    A.    There are a lot of lawyers involved.

10:31:35 15    Q.    You don't have to tell me that.

10:31:36 16    A.    I know you know.

10:32:18 17    Q.    Did you discuss -- did you ever speak with any

10:31:44 18    lawyer who represents or represented Dalia Genger at

10:31:49 19    any point in time, in any capacity?

10:31:52 20    A.    I believe that I may have spoken to one or more

10:31:58 21    of Dalia's lawyers during the time I was in Austin,

10:32:04 22    but there were many lawyers present.

10:32:08 23               I believe that one represented her, but I

10:32:11 24    could be incorrect.  The answer would be I don't

10:32:15 25    know, but I kind of would think so.

10:32:20  1    Q.    Do you have an understanding of what Dalia

10:32:22  2    Genger -- let me try it again.  Do you have an

10:32:27  3    understanding of what Dalia Genger's position is with

10:32:31  4    respect to the same $32 million that you mentioned a

10:32:34  5    moment ago?

10:32:36  6                    MR. POLLOCK:  Objection, seeks

10:32:36  7              speculation.

10:32:42  8    A.    In general.

10:32:44  9    Q.    And what is that?

10:32:49 10                    MR. POLLOCK:  Same objection.

10:32:50 11    A.    It is, it is my understanding that Dalia seeks

10:32:56 12    some of the same monies that the trust seeks in order

10:33:01 13    to pay obligations owed to her to support her

10:33:05 14    lifestyle from the divorce decree.  Anything further.

10:33:10 15    Q.    Where did you get that -- I'm sorry.

10:33:10 16    A.    I'm sorry.

10:33:10 17    Q.    I spoke over you.  I apologize.

10:33:11 18    A.    My, my answer goes into your next question with

10:33:23 19    the rest of anything I say.

10:33:25 20    Q.    Well, I apologize for speaking over you.  It

10:33:28 21    wasn't my intent.

10:34:02 22    A.    I'm sorry.

10:33:30 23    Q.    So your understanding is that Dalia Genger has

10:33:34 24    a claim that some of the same $32 million that the

10:33:39 25    trust is claiming belongs to the trust really belongs

                      BUSHMAN COURT REPORTING

10:33:42  1   to her?

10:33:43  2                    MR. POLLOCK:  Michael, and I apologize

10:33:45  3              for this.  I'm having a little trouble

10:33:45  4              hearing you.  Are you seeking information

10:33:48  5              about her claims while she was trustee or

10:33:51  6              her present day claims?  I just can't hear

10:33:54  7              if you say "has" or "had," and it's hard

10:33:56  8              for me to hear with this remote connection.

10:34:00  9                    MR. BOWEN:  Well, however the witness

10:34:01 10              can answer.  Let's, let's start with the

10:34:03 11              present understanding, of her present

10:34:06 12              position.

10:34:07 13                    THE WITNESS:  It's my understanding --

10:34:08 14   BY MR. BOWEN:

10:34:09 15   Q.    Let me ask a question, sir.

10:34:11 16   A.    Yes, please.  Thank you.

10:34:13 17   Q.    Is it your understanding that her present

10:34:15 18   position is that some of that same $32 million that

10:34:20 19   the trust claims belongs to the trust really belongs

10:34:25 20   to her?

10:34:27 21   A.    It is my understanding that that is her claim.

10:34:32 22   Q.    And is it your understanding that she had that

10:34:34 23   same claim even during the period where she was the

10:34:38 24   trustee of the trust?

10:34:40 25                    MR. POLLOCK:  Objection.  Mr. Bowen,

                         BUSHMAN COURT REPORTING

10:34:40  1          you seem to be seeking testimony with

10:34:44  2          respect to your adversary proceeding, and

10:34:47  3          that is precisely what Judge, Judge Garrity

10:34:51  4          directed during the Tuesday, June 23rd

10:34:54  5          teleconference that we wouldn't be doing

10:34:56  6          during this current phase of discovery.

10:34:59  7               In fact, I think he said something to

10:35:00  8          the effect of, If we get to her adversary

10:35:02  9          proceeding, then we'll take discovery on

10:35:05 10          her adversary proceeding.

10:35:08 11               I would respectfully ask that you save

10:35:10 12          this line of questioning until we are

10:35:12 13          conducting discovery on her adversary

10:35:15 14          proceeding.

10:35:17 15               MR. HERSCHMANN:  It's Eric Herschmann.

10:35:17 16          I've joined the deposition.

10:35:17 17          H-e-r-s-c-h-m-a-n-n.

10:35:24 18               And just, Adam, I heard your last

10:35:25 19          comment.  I think Judge Davis mentioned a

10:35:25 20          constructive trust when he said that.  I'm

10:35:29 21          sorry, Judge Garrity.

10:35:29 22               MR. BOWEN:  Eric, there's, there's a

10:35:29 23          long history here.  We'll fill you in.

10:35:35 24               Mr. Pollock, I see that you are

10:35:38 25          continuing to be obstructionist.  I will

BUSHMAN COURT REPORTING

10:35:40 1                ask you for the umpteenth time to please

10:35:43 2                limit your objections to the word

10:35:45 3                "Objection," which is what the rules

10:35:47 4                require.

10:35:47 5                    If you desist in the obstruction of

10:35:52 6                this deposition, you will see the relevance

10:35:52 7                of my line of questioning.

10:35:54 8                    So, once again, and I have to say,

10:35:56 9                because this has been going on all morning

10:35:59 10               since the very first two or three questions

10:36:02 11               that I asked, that this deposition is not

10:36:05 12               going to be able to conclude today.

10:36:07 13                   It's going to take too, much more time

10:36:10 14               that it should take, and it's going to

10:36:13 15               impinge on Mr. Oldner's time.  So I ask you

10:36:15 16               to please desist.  I don't know how else to

10:36:17 17               say it.

10:36:18 18                   But the consequences of you continuing

10:36:22 19               to obstruct are going to reflect on you and

10:36:23 20               impinge on your client.  So I ask you, sir,

10:36:27 21               stop.

10:36:30 22   BY MR. BOWEN:

10:36:31 23   Q.   Mr. Oldner, please answer the question.

10:36:33 24   A.   I know this will come as no shock to you, but

10:36:36 25   after that exchange, could you please repeat the

```
10:36:39  1   question?
10:37:12  2   Q.    Certainly.  The question is did you have, or do
10:36:46  3   you have the understanding now that that was also
10:36:49  4   Dalia Genger's same position during the time that she
10:36:52  5   was the trustee?
10:36:55  6                 MR. POLLOCK:  Objection; seeks
10:36:57  7                 speculation, and objection for the reasons
10:36:59  8                 stated previously.  This is far out of
10:37:01  9                 line.
10:37:02 10   A.    And I would say that that, for me, is a
10:37:05 11   technical legal matter, and I will not be able to
10:37:08 12   answer that with anything other than I truly don't
10:37:11 13   know.
10:37:17 14                 If you can phrase it a different way, maybe
10:37:19 15   I can understand it, but I really don't understand
10:37:22 16   part of what you're asking.
10:38:03 17   Q.    Well, let me, let me ask it this way.  Did, did
10:37:30 18   you have an understanding at any time that Dalia
10:37:33 19   Genger's position as to who owns the $32 million
10:37:37 20   changed over time?
10:37:46 21                 MR. POLLOCK:  Objection for the
10:37:47 22                 reasons previously stated.
10:37:49 23   A.    I have no understanding on that one way or the
10:37:51 24   other.
10:37:52 25   Q.    Do you have any understanding about why Dalia
```

10:37:54  1   Genger was stepping down as the trustee?

10:37:58  2                 MR. POLLOCK:  Objection for the

10:37:59  3            reasons previously stated.

10:38:00  4   A.    Those, those are, again, speculation.  I have

10:38:04  5   guesses, but that would be all.

10:38:42  6   Q.    Because you never spoke to her directly; right?

10:38:12  7   A.    That probably -- it's as good of reason as any,

10:38:17  8   yes, sir.

10:38:18  9   Q.    Well, I just want to just double check.  I

10:38:20 10   mean, you never spoke to Dalia Genger at all about

10:38:22 11   anything; correct?

10:38:24 12   A.    No, sir.

10:38:25 13                 MR. POLLOCK:  Objection; asked and

10:38:26 14            answered.

10:38:26 15   Q.    You can answer again.

10:38:28 16   A.    No, sir, I did not.

10:38:32 17   Q.    So you didn't have any understanding about why

10:38:35 18   Dalia Genger was stepping down as trustee?

10:38:39 19                 MR. POLLOCK:  Objection,

10:38:39 20            mischaracterizes the testimony.

10:38:46 21   Q.    You can answer.

10:38:48 22   A.    I have no concrete reason.  There was no

10:38:52 23   concrete reason given to me Dalia Genger is stepping

10:38:56 24   down for X, Y, or Z.

10:38:59 25                 My assumption is because she was no longer

10:39:02  1   in health to do it.  I do not truly know her state of

10:39:06  2   mind at that time.

10:39:43  3   Q.    And you're basing that assumption on what Sagi

10:39:12  4   Genger said?

10:39:14  5   A.    I'm basing that assumption on the fact that she

10:39:18  6   appointed me as trustee, and I accepted, and she was

10:39:23  7   no longer trustee.  So for some reason she no longer

10:39:30  8   wanted to be trustee, or she no longer felt she could

10:39:34  9   be trustee.  I do not know.

10:40:07 10   Q.    And you never asked anyone why; is that right?

10:39:39 11   A.    No, sir, I did not.

10:39:43 12   Q.    What, what was your understanding about why you

10:39:45 13   were selected to become the new trustee?

10:39:49 14             MR. POLLOCK:  Objection, for the

10:39:50 15         reasons previously stated.

10:39:52 16   A.    Mr. Bowen, at this time, of course, I would

10:39:57 17   like to say, I would like to make a joke and say

10:40:01 18   because I am so lucky, but that would not answer your

10:40:04 19   question.

10:40:04 20             The reason I assumed that I was selected as

10:40:07 21   trustee is because I could be fair.  I could be

10:40:11 22   impartial, and I could do the job.

10:40:19 23   Q.    And your basis for saying that you were

10:40:22 24   selected because you could do the job is not based on

10:40:24 25   any prior experience that you have being a trustee

10:40:27  1    for anything; right?

10:40:30  2    A.    It would be on the basis of my experience in

10:40:33  3    the securities industry, my understanding of what

10:40:37  4    happens in a derivative action, my understanding of

10:40:40  5    what a fiduciary responsibility is.

10:41:13  6    Q.    So what is your understanding of what your

10:40:46  7    fiduciary responsibility is as a trustee, as the

10:40:50  8    trustee or the Orly Genger Trust?

10:40:53  9                MR. POLLOCK:  Objection.  Any -- the

10:40:55 10                entire line of questions about his

10:40:57 11                fiduciary duties appear to go directly to

10:41:00 12                your claims that are proposed to be sold to

10:41:04 13                the entity Claims Pursue, Inc., which are

10:41:07 14                purportedly with respect to Mr. Oldner's

10:41:10 15                alleged breach of his fiduciary duty.

10:41:12 16                You don't need to be taking deposition

10:41:14 17                today on his alleged duty, on alleged

10:41:15 18                breaches or his faithfulness to his

10:41:19 19                fiduciary duty.

10:41:21 20                And what's more is these are precisely

10:41:23 21                the topics that Mr. -- I apologize -- that

10:41:28 22                Judge Garrity said we wouldn't be doing,

10:41:30 23                that we would not be taking discovery on

10:41:33 24                the underlying claims that proposed to be

10:41:35 25                sold.

10:41:37  1              MR. BOWEN:  Please stop being

10:41:37  2          obstructionist and obstructing this

10:41:41  3          deposition, Mr. --

10:41:45  4              MR. POLLOCK:  Pollock.

10:41:46  5              MR. BOWEN:  -- Pollock.

10:41:46  6  BY MR. BOWEN:

10:41:46  7  Q.    Mr. Oldner, please answer the question.  What

10:41:49  8  is your understanding of your fiduciary duties as the

10:41:56  9  trustee for the Orly Genger Trust?

10:42:32 10  A.    Thank you for restating the question without

10:42:01 11  being asked.  My understanding is, is that it is the

10:42:06 12  highest responsibility that I can have is fiduciary

10:42:08 13  responsibility in the state of Arkansas, and that my

10:42:12 14  responsibility is to see to it that there is as much

10:42:16 15  value in the trust as can possibly be in the trust

10:42:19 16  for its beneficiaries, both current and future

10:42:22 17  generations.

10:42:27 18  Q.    Now you also said that you could be fair and

10:42:30 19  neutral; right?

10:42:34 20  A.    Did I say "neutral"?

10:42:36 21              MR. POLLOCK:  Objection.

10:42:38 22  A.    I can.  I'm, I'm fair and unbiased.

10:43:13 23  Q.    You're unbiased?

10:42:43 24  A.    I'm, I'm an outsider.  I believe certain things

10:42:47 25  are true, but I don't believe certain things are true

10:42:50   1   because I have been in the middle of this for years

10:42:53   2   and years.

10:43:24   3   Q.   Well, you have a personal relationship with

10:42:58   4   Robin Rodriguez?

10:43:00   5   A.   My personal relationship with Robin Rodriguez

10:43:03   6   does not affect my fiduciary responsibility

10:43:07   7   negatively.

10:43:09   8   Q.   I'm not asking you to say one way or the other

10:43:13   9   how it affects your responsibility as a fiduciary.

10:43:16  10   I'm just asking, you have a personal relationship

10:43:20  11   with Robin Rodriguez that goes back to 1990; correct?

10:43:23  12   A.   Yes, sir.

10:43:23  13              MR. POLLOCK:  Objection, Mr. Oldner,

10:43:24  14          if you could --

10:43:24  15   Q.   And you also have a relationship with Sagi

10:43:28  16   Genger, who you met through Robin Rodriguez; correct?

10:43:32  17              MR. POLLOCK:  Objection, for the

10:43:32  18          reasons stated.

10:43:35  19   Q.   Is that correct?

10:43:37  20   A.   I know Sagi Genger through Robin Rodriguez,

10:43:41  21   yes.

10:44:12  22   Q.   And you have never spoken with Orly Genger;

10:43:46  23   right?

10:44:23  24   A.   That's correct.

10:43:49  25   Q.   Or anybody who represents her position in this

```
10:43:52   1    bankruptcy; isn't that right?

10:43:54   2    A.    That's correct.

10:43:57   3    Q.    So I take it from your answer that you made an

10:44:00   4    effort to put yourself in Orly Genger's position as

10:44:03   5    the debtor and to understand her point of view on all

10:44:08   6    of this; is that correct?

10:44:11   7                  MR. POLLOCK:  Objection.  Objection to

10:44:12   8                  form, and for the reasons previously

10:44:15   9                  stated.

10:44:22  10    A.    To put myself in her position as debtor --

10:44:26  11    Q.    Yes.

10:44:26  12    A.    -- as in bankruptcy?

10:44:28  13    Q.    Yes.

10:44:30  14    A.    That did not fall within my purview as trustee.

10:45:22  15    Q.    Well, did you consider what her position is as

10:44:42  16    the beneficiary of the trust?

10:45:37  17    A.    Yes, I did.

10:44:47  18                  MR. POLLOCK:  Objection.

10:44:50  19    Q.    You did?

10:44:51  20    A.    Yes, I did.

10:44:52  21    Q.    And how do you characterize -- let me, let me

10:44:57  22    ask it this way.  Do you see Orly Genger's position

10:45:04  23    in this bankruptcy as consistent with the trust's

10:45:10  24    position?

10:45:15  25                  MR. POLLOCK:  Objection to that form.
```

                        BUSHMAN COURT REPORTING

10:45:16  1   A.    I don't -- no, I do not.

10:45:22  2   Q.    How is it not consistent?

10:45:25  3               MR. POLLOCK:  Objection; seeks a legal

10:45:27  4         conclusion.

10:45:35  5   Q.    You can answer.

10:45:37  6   A.    I believe that -- Adam's right.  I believe that

10:45:41  7   I would have to have greater legal knowledge than I

10:45:44  8   have.

10:45:46  9   Q.    Do, do you have an understanding of what Orly

10:45:49 10   Genger's legal position is with respect to the

10:45:52 11   $32.3 million that you referred to?

10:45:57 12               MR. POLLOCK:  Objection to form.

10:46:02 13   Q.    You can answer.

10:46:03 14   A.    That is also a technical question.

10:46:50 15   Q.    You don't have an answer to your own

10:46:11 16   understanding of what her position is?

10:46:16 17               MR. POLLOCK:  Objection to form.

10:46:18 18   A.    I don't know what you mean.  I'm not trying to

10:46:21 19   be evasive.

10:47:05 20   Q.    What's the trust's position with respect to

10:46:36 21   whether or not the $32.3 million that you refer to is

10:46:40 22   part of the debtor's estate or not?

10:47:15 23   A.    It is not part of the debtor's estate.

10:46:47 24   Q.    And what is Orly Genger's position on that same

10:46:50 25   question?

10:46:51  1              MR. POLLOCK:  Objection to form.

10:46:54  2  A.    Once again, that's a legal question.  I don't

10:46:56  3  know.

10:47:33  4  Q.    You've never discussed that with anyone?

10:47:02  5              MR. POLLOCK:  Mr. Bowen, if you're

10:47:03  6              seeking testimony about what he discussed

10:47:03  7              with counsel, I'll caution the witness not

10:47:06  8              to answer, but also, can I just clarify?

10:47:08  9              Are you asking him what Orly's

10:47:10 10              position, Orly Genger's position is as to

10:47:13 11              the bankruptcy?  Wasn't she deposed

10:47:16 12              yesterday?

10:47:26 13  Q.    Mr. Oldner, can you answer the question?

10:47:28 14  A.    Mr. Bowen, I don't understand the question.

10:47:31 15              MR. POLLOCK:  Yeah, me either.

10:47:32 16  Q.    I'm asking you to leave aside -- well, let me

10:47:34 17  do it in two steps.  The first question is just a

10:47:37 18  yes-or-no answer I'm looking for.

10:47:39 19        Do you have an understanding of what Orly

10:47:41 20  Genger's position is with respect to that $32 million

10:47:45 21  and whether or not it is or should be an asset of her

10:47:48 22  bankruptcy estate?

10:48:00 23  A.    I do not have an understanding of that.

10:48:03 24  Q.    And if I understood you correctly, what you

10:48:06 25  said before was that if you were to try and figure

10:48:10  1    that out, you would discuss it with your lawyers; is

10:48:13  2    that right?

10:48:40  3    A.    I would indeed.

10:48:43  4    Q.    But you haven't done anything to try and

10:48:18  5    understand her position on that issue; is that

10:48:21  6    correct?

10:48:22  7              MR. POLLOCK:  Again, I would just

10:48:23  8         caution the witness not to discuss what he

10:48:25  9         has communicated or conveyed with counsel.

10:48:29 10         Given that he just responded that if

10:48:31 11         he did something he would have done it with

10:48:34 12         counsel.  Now you're asking what he did.  I

10:48:36 13         think that the question is directly seeking

10:48:38 14         privileged communications.

10:48:42 15              MR. BOWEN:  Mr. Pollock, you're again

10:48:43 16         obstructing the deposition.  You're again

10:48:45 17         making speaking objections.

10:48:47 18         Obviously you're coaching your

10:48:47 19         witness.  You're again in violation of the

10:48:50 20         rules, and I again ask you to stop.

10:48:51 21         Listen, you're going to leave me in a

10:48:53 22         position where I have no choice but to

10:48:55 23         present this transcript to the judge in

10:48:57 24         our, as part of our application for, for

10:48:59 25         relief, and to address this kind of

BUSHMAN COURT REPORTING

10:49:01  1          recalcitrant conduct on your part.

10:49:02  2                And I don't want to do that, and I

10:49:05  3          think if you stop now, we can make it

10:49:08  4          through the rest of this deposition and,

10:49:10  5          and perhaps maybe even finish today.

10:49:12  6                That's my goal, Mr. Oldner.

10:49:14  7                So I ask you again to please stop.  If

10:49:17  8          you keep doing it you're going to really

10:49:17  9          leave me no choice.

10:49:19 10          MR. HERSCHMANN:  It's Eric Herschmann.

10:49:21 11          Can I make a suggestion to Mr. Pollock, so

10:49:22 12          he can stop this, at least from what I've

10:49:22 13          seen so far?

10:49:23 14                Why don't we give you a standing

10:49:26 15          objection.  Then you don't have to say

10:49:28 16          another word, other than instruct your

10:49:31 17          client not to answer on privilege grounds.

10:49:32 18          Will you accept a standing objection?

10:49:35 19          MR. POLLOCK:  Mr. Herschmann, I hear

10:49:36 20          you, and I, I will consider that.  In the

10:49:40 21          meantime, I am just respectfully asking

10:49:44 22          with respect to this question that it

10:49:46 23          appears, based on the answer to the

10:49:48 24          previous question that it would be directly

10:49:49 25          seeking privileged communication.

10:49:51  1              And I think it's entirely reasonable

10:49:52  2              to caution the witness, when a question

10:49:54  3              appears to be seeking privileged

10:49:56  4              communications, to caution the witness to

10:49:59  5              not reveal privileged communications.

10:50:02  6              That's all.

10:50:05  7                   MR. HERSCHMANN:  The question, the

10:50:06  8              question is -- if you're not going to

10:50:06  9              accept that as a standing objection, I'm

10:50:09 10              certain we will raise it with Judge

10:50:11 11              Garrity.

10:50:13 12              So I suggest you take our offer, so

10:50:13 13              it's preserved for the Court, and then we

10:50:17 14              don't have to have an issue with sanctions

10:50:19 15              or anything else.  This is my suggestion to

10:50:20 16              you, take it.

10:50:22 17                   MR. POLLOCK:  Mr. Herschmann, you have

10:50:24 18              preserved your objection.

10:50:25 19   BY MR. BOWEN:

10:50:26 20   Q.    Mr. Oldner, the question is, and I'd like you

10:50:28 21   to answer it now without any further objection from

10:50:28 22   Mr. Pollock, and you can, you can all assume that the

10:50:32 23   objection is, is reimposed here to this question, and

10:50:36 24   the question is as follows.

10:50:40 25              I take it from your last answer that you

10:50:43  1   have never discussed with anyone what Orly Genger's

10:50:49  2   position is in this bankruptcy with respect to that

10:50:51  3   $32 million; right?

10:50:55  4   A.    I did not.

10:51:30  5   Q.    Okay.  Now you, you mentioned -- I want to go

10:51:01  6   back to this about this topic that you were selected

10:51:05  7   to be the trustee.  Who, who made the decision that

10:51:09  8   the new trustee should be you, to your understanding?

10:51:14  9   A.    To my understanding, Dalia Genger.

10:51:18 10   Q.    Well, you never spoke to her; correct?

10:52:01 11   A.    I never spoke to her.

10:51:22 12   Q.    So what do you base that understanding on?

10:51:25 13   A.    The fact that she signed the document

10:51:29 14   appointing me trustee.

10:51:31 15   Q.    And who did you speak with about that document,

10:51:41 16   leaving the lawyers aside?

10:51:44 17   A.    Sagi Genger.

10:51:45 18   Q.    Did Sagi Genger tell you that Dalia Genger had

10:51:48 19   deemed you the best choice for the successor trustee?

10:51:52 20   A.    Yes.

10:51:53 21   Q.    What words did he say, as best you can recall?

10:51:57 22   A.    As best I can recall, he come -- that his

10:52:01 23   mother had appointed me trustee.  That's --

10:52:06 24   Q.    Did he --

10:52:06 25   A.    -- that's all I --

10:52:08  1    Q.    -- tell you that there were other -- I'm sorry.

10:52:11  2    What was the last thing you said?

10:52:13  3    A.    He mentioned, he mentioned one other person

10:52:16  4    and, and didn't say anything about anybody else, when

10:52:18  5    I asked him.

10:52:21  6    Q.    And who was the one other person?

10:52:23  7    A.    He didn't tell me.

10:52:30  8    Q.    So your understanding was that the choice was

10:52:32  9    between you and one other person to be the successor

10:52:34 10    trustee?

10:52:36 11    A.    I have no idea how many people were considered.

10:52:39 12    Q.    What process was followed to identify potential

10:52:44 13    candidates for this position, to your, to your

10:52:47 14    knowledge?

10:52:47 15    A.    I have no knowledge of that.

10:52:50 16    Q.    Were you interviewed by Sagi Genger?

10:52:54 17    A.    Yes.

10:53:41 18    Q.    What did he ask you?

10:53:06 19    A.    I actually don't remember.

10:53:47 20    Q.    Why do you say you were interviewed by him?

10:53:14 21    A.    Because of the process of talking about the

10:53:20 22    trust, about selecting a trustee.  I'm assuming that

10:53:27 23    process would constitute an interview.

10:53:29 24          Did we have a formal interview?  If we did,

10:53:32 25    it was the, when he flew down here and spent three

```
10:53:37  1   hours with me on June --

10:53:40  2   Q.   And that was in June --

10:53:41  3   A.   The 14th.

10:54:12  4   Q.   And what did you spend that time doing?

10:53:47  5   A.   Talking about the trust, the history of the

10:53:49  6   cases, going back to 2004.

10:53:55  7   Q.   Did he bring documents with him?

10:54:29  8   A.   He did not.

10:53:58  9   Q.   Did he have --

10:53:58 10   A.   Other than the documents --

10:53:59 11   Q.   -- a computer --

10:54:00 12   A.   -- other than the documents appointing me

10:54:02 13   trustee, and the document I had to sign agreeing that

10:54:07 14   I would be trustee, accepting it.

10:54:46 15   Q.   So he brought that document to you?

10:54:13 16   A.   He did.

10:54:48 17   Q.   And who else was present when you signed that

10:54:18 18   document?

10:54:52 19   A.   The notary at, at this office, as a matter of

10:54:28 20   fact, a notary, a notary at the law office where we

10:54:31 21   are now.

10:54:32 22   Q.   That's Mr. Cullen's law office?

10:54:35 23   A.   No.   This is Gary Green's law office.

10:55:08 24   Q.   Did he have any other documents with him, or

10:54:44 25   show you any other documents, either on a computer or
```

10:54:47   1   anything else?

10:54:48   2   A.    He showed me nothing on a computer, and at this

10:54:51   3   time I don't recall any other documents.

10:55:24   4   Q.    Did you sign the document accepting the

10:55:00   5   position as trustee at the beginning of that meeting

10:55:02   6   or at the end?

10:55:35   7   A.    At the end.

10:55:37   8   Q.    And you haven't made up your mind whether to

10:55:09   9   take the position until the end of the meeting?

10:55:13  10   A.    I had actually decided that if I were offered

10:55:16  11   the position, I would take the position before then.

10:55:58  12   Q.    But you weren't offered the position until that

10:55:23  13   three-hour meeting with Sagi Genger on June 14th,

10:55:26  14   2019?

10:55:29  15   A.    Officially, no.

10:56:10  16   Q.    Would it -- were, were you unofficially offered

10:55:35  17   it before that?

10:55:36  18   A.    Not that I know of.  But we held discussions

10:55:40  19   about if I were trustee, but there was no, You will

10:55:46  20   be the trustee from henceforth.

10:56:21  21   Q.    And when you say "we held discussions," you

10:55:52  22   mean you and Mr. Sagi, Sagi Genger?

10:55:57  23   A.    Sagi Genger and I, yes.

10:55:58  24   Q.    How did you answer that question, If you were

10:56:00  25   the trustee, what would you do?

10:56:34  1   A.      Pardon me?  I didn't understand.

10:56:10  2   Q.      In your last answer you said you had discussed

10:56:12  3   with Sagi, you weren't officially offered anything,

10:56:16  4   but you discussed if you were the trustee, et cetera.

10:56:19  5           So what did you say when you were

10:56:21  6   discussing hypothetically what you would do if you

10:56:25  7   were the trustee?

10:56:26  8   A.      That's what makes me think it's an interview.

10:56:31  9   I have no idea.  Everything would be a

10:56:34 10   generalization, and I could easily mischaracterize

10:56:38 11   it, general matters concerning the trust --

10:56:46 12   Q.      Well --

10:56:46 13   A.      -- and the --

10:56:46 14   Q.      I don't -- I'm not -- I'm sorry.  Say it again.

10:56:46 15   A.      And the lack of assets in the trust.

10:56:50 16   Q.      The lack --

10:56:50 17   A.      The trust has no money.

10:56:52 18   Q.      The lack of assets?

10:56:55 19   A.      The lack of assets, yes, sir.

10:56:56 20   Q.      All right.  We'll talk about that in a minute,

10:56:58 21   but --

10:56:59 22   A.      Those are the main, the general gist of the

10:57:03 23   conversation.

10:57:48 24   Q.      Before you accepted the position as trustee,

10:57:09 25   you had already discussed with Sagi Genger how to

10:57:14  1    prosecute what became the Recovery Effort litigation;

10:57:19  2    right?

10:57:20  3    A.    I had discussed with Sagi many different things

10:57:30  4    concerning the case, going all of the way back to the

10:57:35  5    divorce in 2004.

10:57:38  6          So I'm certain some of that -- to the best

10:57:43  7    of my recollection, I have no recollection of that

10:57:46  8    happening.  Based on what I know, I would assume some

10:57:49  9    of that did happen.

10:57:52  10          MR. POLLOCK:  Mr. Oldner, he's not

10:57:55  11          asking for you to assume or speculate.

10:57:58  12    A.    Okay.  Then I don't know.  I can't remember

10:58:00  13    that.

10:58:01  14    Q.    I want to make sure I understand your answer,

10:58:03  15    without Mr. Pollock interjecting his interpretation.

10:58:07  16    My sense from your answer, and please correct me if

10:58:11  17    I'm incorrect, but my sense is what you just said is

10:58:14  18    you must have discussed something along the lines of

10:58:17  19    what became the Recovery Effort action, but you don't

10:58:21  20    have a clear memory of that.  Is that right?

10:58:24  21    A.    We discussed so many cases that would lead up

10:58:26  22    to that, I do not have a clear memory.  Needless to

10:58:30  23    say, this easily becomes a, a very large, not that --

10:58:38  24    it becomes difficult to remember which part of it

10:58:42  25    leads to what.

BUSHMAN COURT REPORTING

10:58:43  1   Q.   When, when was recovery action created -- I'm

10:58:47  2   sorry -- Recovery Effort.  Recovery Effort, when was

10:58:50  3   that created?

10:58:52  4   A.   Recovery Effort was created in early June of

10:58:55  5   2019, June the 2nd or June the 4th.

10:58:59  6   Q.   Who created it?

10:59:01  7   A.   The previous trustee.

10:59:04  8   Q.   How do you know that?

10:59:35  9   A.   Who else would have the ability to create it?

10:59:13 10   Q.   Are you just assuming it?

10:59:16 11   A.   I am assuming it.

10:59:17 12   Q.   You are assuming it?

10:59:18 13   A.   Yes, sir, I'm assuming it.

10:59:20 14        MR. POLLOCK:  Mr. Oldner, he's not

10:59:21 15        asking for you to assume.  He's asking for

10:59:22 16        --

10:59:22 17        THE WITNESS:  All right.

10:59:23 18        MR. BOWEN:  I just asked him if he was

10:59:24 19        assuming that, and he said yes.

10:59:26 20        Mr. Pollock, please cease and desist from

10:59:29 21        interjecting and obstructing my line of

10:59:32 22        questioning.  It is completely improper.

10:59:34 23        I have said this a hundred times,

10:59:36 24        probably, or close to that.  So please

10:59:38 25        stop.

10:59:38  1   BY MR. BOWEN:

10:59:38  2   Q.    Mr. Oldner, you were just assuming that; is

10:59:41  3   that correct?

10:59:42  4   A.    That is correct.  I have no actual knowledge.

10:59:48  5   Q.    When did you first learn about Recovery Effort,

10:59:50  6   was it before you accepted the position as trustee or

10:59:55  7   afterward?

11:00:03  8   A.    I don't remember.  I have an email concerning

11:00:05  9   the formation.  I do not know if that was before or

11:00:10 10   right at that time.

11:00:42 11   Q.    Now if I remember what you said this morning,

11:00:18 12   and if I'm misstating it, please correct me.  I don't

11:00:22 13   mean to, to put words in your mouth.  I'm asking --

11:00:24 14   I'm trying to get us back to a topic we touched on

11:00:27 15   earlier.

11:00:28 16         But my understanding is that you learned

11:00:30 17   from Robin Rodriguez in one of the earliest

11:00:32 18   conversations you had about the trust that there was

11:00:35 19   a claim that the trust needed to bring, a lawsuit, in

11:00:38 20   order to recover $32.3 million that belonged to the

11:00:43 21   trust.  Is that right?

11:00:44 22   A.    Actually, I believe what I said is that I

11:00:50 23   learned about money that was taken through a

11:00:55 24   derivative action in another lawsuit that should have

11:01:01 25   been the trust's money.

BUSHMAN COURT REPORTING

11:01:03  1    Q.     And you got that understanding from Mr.

11:01:05  2    Rodriguez?

11:01:08  3    A.     Initially, yes.

11:01:09  4    Q.     And then you discussed that with Sagi Genger?

11:01:12  5    A.     I did.

11:01:50  6    Q.     And you never discussed it with anyone else,

11:01:16  7    other than lawyers?

11:01:17  8    A.     Other than lawyers.

11:01:56  9    Q.     And you never discussed it with Dalia Genger's

11:01:23 10    lawyers; right?

11:01:29 11    A.     Not to the best of my understanding.  I don't

11:01:32 12    know who all of Dalia's lawyers are, but no, to the

11:01:32 13    best of my understanding, I have not.

11:02:07 14    Q.     And you made an independent assessment of

11:01:40 15    whether the trust had a, indeed had a claim to the

11:01:45 16    $32 million that resulted from what you're calling

11:01:48 17    the derivative action; correct?

11:02:26 18    A.     Yes, sir.

11:01:51 19    Q.     And you have no legal training; right?

11:02:30 20    A.     I have no legal training.

11:01:56 21    Q.     But you did your best in reading the

11:01:58 22    decisions --

11:01:59 23    A.     I did.

11:02:00 24    Q.     -- to come to an, to come to that

11:02:00 25    understanding; is that right?

BUSHMAN COURT REPORTING

11:02:40  1   A.    I did.

11:02:41  2   Q.    And the decisions that you were, that you read

11:02:07  3   you were asked to read by Sagi Genger; correct?

11:02:13  4   A.    No.

11:02:13  5   Q.    How did you find the decisions?

11:02:15  6   A.    Through -- some of them at Sagi's

11:02:20  7   recommendation, some of them through counsel.

11:02:24  8   Q.    When you say "counsel," you mean Mr. Cullen?

11:02:26  9   A.    Pardon me, sir?

11:02:27 10   Q.    When you say "counsel," do you mean Mr. Cullen?

11:02:31 11   A.    I mean Mr. Cullen.

11:02:32 12   Q.    And who paid --

11:02:32 13   A.    And prior to, prior to me being trustee,

11:02:35 14   Mr. Cullen, yes.  Mr. Cullen --

11:02:39 15   Q.    Who paid, who paid Mr. Cullen's fees for that

11:02:41 16   legal advice?

11:02:42 17   A.    For that legal advice, that legal advice was

11:02:45 18   free on the front end, because I had used Mr. Cullen

11:02:48 19   for quite a while, and I was asking him about whether

11:02:51 20   or not I should take the --

11:02:54 21              MR. POLLOCK:  You know what, let me

11:02:56 22              pause you.  I don't think that you should

11:02:58 23              be testifying as to what you were asking

11:02:59 24              Mister, the legal advice that you were

11:03:01 25              seeking from Mr. Cullen.

BUSHMAN COURT REPORTING

```
11:03:04  1              MR. BOWEN:  Again, you're obstructing
11:03:06  2         this deposition, and you're interfering
11:03:09  3         with this line of questioning.
11:03:10  4              MR. POLLOCK:  I'm preserving --
11:03:11  5              MR. BOWEN:  If you're interposing an
11:03:11  6         objection, please state it briefly and
11:03:14  7         succinctly and not past the word
11:03:16  8         "Objection."
11:03:16  9              MR. POLLOCK:  I object on the grounds
11:03:17 10         of privilege, to the extent that this calls
11:03:20 11         for privileged communications with Mr.
11:03:21 12         Oldner, with Mr. Cullen, as to the advice
11:03:24 13         that Mr. Oldner was seeking from
11:03:25 14         Mr. Cullen.  And I'm sure that Mr. Cullen
11:03:30 15         joins in that direction.
11:03:33 16              MR. CULLEN:  I do.
11:03:34 17              MR. HERSCHMANN:  This is Eric
11:03:34 18         Herschmann.  This is talking about fees,
11:03:37 19         and I'm certain you know this, Mr. Pollock,
11:03:40 20         but the payment of legal fees is not
11:03:42 21         privileged.
11:03:44 22          So if you want to instruct him on that
11:03:46 23         basis in response to the question, you can
11:03:50 24         do it at your own peril.
11:03:51 25              MR. POLLOCK:  Mr. Herschmann, he was
```

| | | |
|---|---|---|
| 11:03:53 | 1 | beginning to testify as to the legal advice |
| 11:03:55 | 2 | that he sought from Mr. Cullen.  He had |
| 11:03:57 | 3 | answered the question about fees already. |
| 11:04:00 | 4 | MR. HERSCHMANN:  No, he said -- |
| 11:04:00 | 5 | BY MR. BOWEN: |
| 11:04:00 | 6 | Q.   Mr. Oldner, please answer the question. |
| 11:04:04 | 7 | MR. BOWEN:  We're not going to debate |
| 11:04:04 | 8 | this on the record.  I am going forward |
| 11:04:05 | 9 | with my questioning.  If you speak over me, |
| 11:04:08 | 10 | then, then this is only going to take that |
| 11:04:10 | 11 | much longer.  So, Mr. Pollock, please |
| 11:04:10 | 12 | desist. |
| 11:04:10 | 13 | MR. POLLOCK:  Please continue with |
| 11:04:10 | 14 | your questioning. |
| 11:04:10 | 15 | BY MR. BOWEN: |
| 11:04:14 | 16 | Q.   Mr. Oldner, I'm not asking you to get into |
| 11:04:17 | 17 | communications with your lawyer, Mr. Cullen, or |
| 11:04:20 | 18 | anyone else. |
| 11:04:22 | 19 | A.   Yes, sir. |
| 11:04:55 | 20 | Q.   Is Mr. Cullen retained by the trust? |
| 11:04:59 | 21 | A.   Mr. Cullen is now retained by REI. |
| 11:04:31 | 22 | Q.   And REI -- |
| 11:04:31 | 23 | A.   And by me. |
| 11:04:32 | 24 | Q.   -- not retained -- |
| 11:04:33 | 25 | A.   And by me. |

BUSHMAN COURT REPORTING

11:04:36  1  Q.    -- not retained by you in your capacity as

11:04:39  2  trustee?

11:04:40  3  A.    He is retained by me to advise me in my

11:04:45  4  capacity as trustee, but he is not retained by the

11:04:48  5  trust.

11:04:50  6  Q.    And who pays his fees in advising you in your

11:04:53  7  capacity as trustee?

11:04:55  8  A.    I do.

11:04:58  9  Q.    And where does that money come from, your own

11:05:01  10  personal money?

11:05:35  11  A.    No.  It comes from money I borrow to fund

11:05:04  12  Recovery Effort Inc.

11:05:40  13  Q.    And Mr. Cullen also is retained by Recovery

11:05:17  14  Effort Inc.?

11:05:19  15  A.    Yes.

11:05:19  16  Q.    And you caused that to occur; correct?

11:05:50  17  A.    I did.

11:05:22  18  Q.    And you did that in your capacity as the

11:05:24  19  principal for Recovery Effort Inc.?

11:05:56  20  A.    I did.

11:05:29  21  Q.    Recovery Effort Inc. is wholly owned by the

11:05:33  22  trust?

11:05:33  23  A.    It is wholly owned by the trust.

11:05:35  24  Q.    But you didn't create Recovery Effort Inc.;

11:05:38  25  right?

11:05:39  1    A.    I did not.

11:05:40  2    Q.    It was already in existence when you took the

11:05:43  3    position as trustee; correct?

11:05:44  4    A.    It was.

11:06:18  5    Q.    Now in your meeting with Sagi Genger, either

11:05:49  6    directly in person during that three-hour meeting on

11:05:52  7    June 14 or in any telephone conversations, or email

11:05:55  8    conversations, or any other mode of communication you

11:05:58  9    had with him, did you tell him that you were going to

11:06:01 10    prosecute the Recovery Effort action before you were

11:06:07 11    appointed as trustee?

11:06:11 12    A.    Not that I recall.

11:06:50 13    Q.    Did you have some understanding that that was a

11:06:17 14    requirement for the job?

11:06:21 15    A.    Did I have an understanding that that was the

11:06:26 16    requirement for getting the job?

11:06:30 17    Q.    The job as the successor trustee, yes.

11:06:33 18    A.    No.

11:07:11 19    Q.    Did you tell Sagi Genger before you were

11:06:40 20    appointed as successor trustee that you intended to

11:06:43 21    prosecute the Recovery Effort action on behalf of the

11:06:47 22    trust?

11:06:48 23    A.    Not that I recall.

11:06:50 24    Q.    Okay.  So what else was discussed with Mr.

11:06:52 25    Genger before you signed the, the transfer document?

11:07:00  1   A.   I mainly listened to as much information as he

11:07:04  2   could give me to stitch together the history of the

11:07:09  3   case.

11:07:39  4   Q.   Did he show you a draft complaint on behalf of

11:07:13  5   Manhattan Safety and Recovery Effort?

11:07:17  6   A.   He did not.

11:07:18  7   Q.   When was that Complaint filed after you were

11:07:20  8   appointed as trustee?

11:07:23  9   A.   6-17.

11:07:24 10   Q.   June 17th?

11:07:25 11   A.   Yes, sir.

11:07:54 12   Q.   You were appointed on June 14th?

11:07:29 13   A.   Yes, sir.

11:07:58 14   Q.   When did you first see that Complaint?

11:07:33 15            MR. POLLOCK:   Mr. Bowen, and I have an

11:07:35 16        objection on another ground now.  As you

11:07:37 17        know, you are a defendant, a nominal

11:07:39 18        defendant, but a defendant in that lawsuit,

11:07:42 19        and we specifically raised with Judge

11:07:44 20        Garrity the concern that you appear to be

11:07:47 21        seeking discovery as to the MSM action.

11:07:52 22            We raised that concern, and we got a

11:07:54 23        clear direction from Judge Garrity, and,

11:07:56 24        nonetheless, you are persistent in asking

11:07:59 25        questions that appear to be directly

BUSHMAN COURT REPORTING

11:08:01 1          related to the, not just appear to be, but

11:08:03 2          actually are related directly to the MSM

11:08:05 3          action.

11:08:06 4               And so that we can avoid going to

11:08:08 5          Judge Garrity on this to repeat what he has

11:08:12 6          already directed, I would respectfully ask

11:08:15 7          that you do not seek discovery on the MSM

11:08:17 8          action.  In fact, there is a pending motion

11:08:20 9          on exactly that, which is not at issue

11:08:24 10         here.

11:08:29 11              MR. BOWEN:  Please stop with the

11:08:30 12         speaking objections.

11:08:30 13    BY MR. BOWEN:

11:08:31 14    Q.    Mr. Oldner, please answer the question, and

11:08:33 15    I'll repeat it.

11:08:34 16    A.    Thank you.

11:08:35 17    Q.    The question is when did you see the Complaint

11:08:39 18    that was filed in the Recovery Effort action?

11:08:44 19    A.    To know the exact date, I would have to check

11:08:47 20    my email, but it was over that weekend, either the

11:08:49 21    14th, the 15th, or the 16th.

11:08:52 22    Q.    Who sent it to you?

11:08:54 23    A.    Watt Tale (phonetic) David Cohen.

11:09:51 24    Q.    Now when, when did Watt -- I forget the name of

11:09:51 25    that firm.  It's like Walden Macht or something?

BUSHMAN COURT REPORTING

```
11:09:51  1   A.      That's it, Walden Macht.  Sorry.  There are
11:09:11  2   enough law firms for me to get it confused.
11:09:14  3   Q.      When did you retain them?
11:09:16  4   A.      That weekend.
11:10:00  5   Q.      And how did you choose them?
11:09:21  6   A.      They had already been selected by Robin, and in
11:09:25  7   the part of the suit where we were joint with
11:09:33  8   Manhattan Safety Maine, I, I went to his lawyer for
11:09:37  9   that.
11:10:13 10   Q.      So you didn't select that lawyer?
11:10:14 11   A.      I did not select that attorney, that is
11:09:46 12   correct.
11:10:17 13   Q.      And you had never met them before this lawsuit
11:09:54 14   was filed?
11:09:55 15   A.      I had never met him before this lawsuit was
11:09:57 16   filed.
11:09:57 17   Q.      And by "this lawsuit," I mean the Recovery
11:09:59 18   Effort action; correct?
11:10:02 19   A.      The MSM-Recovery Effort combined action, yes.
11:10:07 20   Q.      Did you discuss with any lawyers at Walden
11:10:08 21   Macht that Complaint before it was filed?
11:10:13 22                   MR. POLLOCK:  And I would caution you
11:10:14 23            only to give a yes-no answer.  He is not
11:10:16 24            seeking the actual discussions.
11:10:18 25   Q.      That's correct.
```

11:10:20 1  A.     Define "discussion," please.

11:10:24 2  Q.     Emails, telephone.

11:10:26 3  A.     Yes.

11:11:03 4  Q.     What, what was the form of that communication?

11:10:33 5  A.     Email for sure.  I believe telephone, but I

11:10:37 6  cannot be sure, and those would have been the only

11:10:41 7  two possibilities.

11:11:20 8  Q.     Did you have -- don't, don't -- I don't want to

11:10:46 9  ask you what you've discussed with your lawyers, but

11:10:48 10  did you have questions?

11:10:53 11  A.     Did I have questions?

11:10:54 12  Q.     Yes.

11:10:55 13  A.     I read the filing.  The filing was consistent

11:10:57 14  with my understanding.

11:11:37 15  Q.     And your understanding is based on the

11:11:06 16  documents that you reviewed in the preceding two

11:11:09 17  months; correct?

11:11:10 18  A.     Yes, and discussions with counsel.

11:11:46 19  Q.     Who pays or who paid Walden Macht's fees?

11:11:21 20  A.     That is money -- half of it is paid by

11:11:24 21  Manhattan Safety Maine.  Half of it is paid by

11:11:27 22  Recovery Effort Inc.

11:11:57 23  Q.     And Recovery Effort Inc. has no assets;

11:11:34 24  correct?

11:11:35 25  A.     Recovery Effort Inc. has no assets.

11:11:38 1    Q.    And that -- but you borrowed money, or Recovery

11:11:40 2    Effort Inc. borrowed money; is that right?

11:11:43 3    A.    Recovery Effort Inc. borrows money, yes, sir.

11:11:46 4    Q.    When you went to the proceeding in Austin,

11:11:50 5    Texas, who hired the lawyers for the trust in that

11:11:54 6    proceeding?

11:12:34 7    A.    I did.

11:12:35 8    Q.    How did you pick those lawyers?

11:11:59 9    A.    I met with three, two that I remember

11:12:03 10   distinctly.  And Jay Ong, who I ended up hiring, was

11:12:12 11   lights-out bright.  He was very impressive, very

11:12:15 12   knowledgeable and could also explain to me exactly

11:12:18 13   what was happening in terms that were easy for a

11:12:23 14   layman to understand, so that I could execute my

11:12:26 15   responsibilities to the best of my ability.

11:12:35 16   Q.    And he was selected as somebody to represent

11:12:37 17   the trust by Sagi Genger?

11:12:39 18   A.    He was -- no, sir.  I just told you he was

11:12:42 19   selected by me.

11:12:43 20   Q.    Well, you, you were referred to him as a

11:12:45 21   potential candidate by Sagi Genger; is that right?

11:13:26 22   A.    I met Sagi and John Dellaportas in Austin,

11:12:56 23   Texas.  We met with several lawyers.

11:13:35 24   Q.    But they're the ones who lined up the meetings

11:13:05 25   for you to meet the people, correct, John Dellaportas

11:13:07  1   and Mr. Sagi Genger; right?

11:13:10  2   A.    It would be impossible for me to say whether

11:13:14  3   Sagi had lined them up or whether John Dellaportas

11:13:17  4   had lined them up, but there were multiple lawyers

11:13:20  5   for me to choose from.

11:13:22  6   Q.    But either Mr. Dellaportas or Mr. Sagi Genger

11:13:23  7   lined them up, one or the other; right?

11:13:27  8   A.    Yes, sir.  I did not, I did not pick them out.

11:13:31  9   Q.    And, and other than Mr. Ong, who you hired for

11:13:34 10   the trust in, in Austin, who else did you meet with,

11:13:38 11   what other lawyers?

11:14:06 12   A.    I, I do not remember the other lawyers.  I

11:13:42 13   remember one of them.  I can tell you he was a

11:13:46 14   graduate of the University of Texas in 1984, but I, I

11:13:50 15   don't remember his name.

11:13:51 16   Q.    Do you have any information related to them?

11:14:43 17   A.    At this time?

11:13:57 18   Q.    Well, yes, in your office, or wherever, like a

11:14:00 19   business card, or an email saying, "Thanks for the

11:14:02 20   meeting"?

11:14:03 21   A.    I don't remember an email.  I, I had phone

11:14:06 22   calls.  I, I could find the name, I would imagine,

11:14:12 23   and I believe I had a business card at one time.

11:15:02 24   Q.    Now -- so you personally had no role in

11:14:36 25   drafting the Recovery Effort Complaint; right?

11:14:42  1   A.     I did not.

11:15:10  2   Q.     And --

11:15:11  3   A.     As an, as an attorney, is that what you're

11:14:47  4   asking?

11:14:48  5   Q.     As anybody.  As a -- as the trustee, you had no

11:14:51  6   role in drafting it?

11:14:52  7   A.     Did, did I approve the draft as it was filed,

11:14:56  8   or --

11:14:57  9   Q.     No.  Did you have a role in drafting it?  Did

11:14:59 10   you say, "I want this language here," or, "I want

11:15:02 11   this topic addressed.  I want to say X.  I want to

11:15:05 12   say Y"?

11:15:06 13                 MR. POLLOCK:  Mr. Bowen, I'm concerned

11:15:07 14             that you're asking for his communications

11:15:09 15             that he had with counsel with respect to

11:15:11 16             the draft of the Complaint in the MSM

11:15:13 17             action.

11:15:14 18   Q.     I'm not asking for your communications with

11:15:16 19   lawyers.  I want to know if in your mind, in your

11:15:19 20   understanding, you had a role in drafting it.

11:15:57 21   A.     I had a role in accepting it, but the lawyers

11:15:26 22   drafted it.

11:16:02 23   Q.     All right.  So other than approving it, did you

11:15:30 24   have any other input into it?

11:15:32 25   A.     In that particular draft, no.

                        BUSHMAN COURT REPORTING

```
11:15:38  1    Q.    When was that draft, or how much before

11:15:43  2    June 17th had that document been drafted, to your

11:15:47  3    understanding?

11:16:19  4    A.    As I said, I saw it either on June 14th,

11:15:53  5    June 15th, or June 16th.

11:15:56  6    Q.    But --

11:15:56  7    A.    I am not sure.

11:15:58  8    Q.    -- do you know how much before then it was, it

11:16:00  9    was drafted?

11:16:01 10    A.    I have no idea.

11:16:02 11    Q.    Was that one of the documents --

11:16:02 12    A.    I have no knowledge.

11:16:03 13    Q.    Was that one of the documents that Sagi Genger

11:16:07 14    showed to you before you became the successor

11:16:09 15    trustee?

11:16:12 16    A.    As I've said, Sagi Genger showed me no

11:16:15 17    documents.

11:16:52 18    Q.    Well, he showed you the transfer, the successor

11:16:21 19    trustee agreement; right?

11:16:59 20    A.    He showed me -- the documents were not related

11:16:26 21    to my transfer.  I, I -- he gave me no court cases.

11:16:30 22    No, that was not one.

11:17:06 23    Q.    But you discussed what that action would be?

11:16:40 24    A.    We discussed what particular actions could be

11:16:43 25    taken.  Did we discuss exactly the case, as I saw it,
```

11:16:48 1   no, we did not.

11:17:27 2   Q.    Well, you discussed Recovery Effort; right?

11:17:31 3   A.    Yes, we did, that I would become the director

11:17:01 4   of Recovery Effort.

11:17:02 5   Q.    And you knew that before you signed on as

11:17:05 6   trustee; correct?

11:17:41 7   A.    I did.

11:17:42 8   Q.    And you say that you and Sagi discussed what

11:17:12 9   actions could be taken.  What did you discuss?

11:17:15 10   A.    I -- the conversation was three hours of

11:17:22 11   intense background into the Genger estate.  It would

11:17:26 12   be impossible for me to recall what was said then and

11:17:30 13   what was said later.

11:17:32 14   Q.    I understand why you say that, but I -- let me

11:17:34 15   rephrase the question, because I'm not asking if

11:17:34 16   you --

11:17:35 17   A.    Sure.

11:17:35 18   Q.    -- remember everything.  I just want you to

11:17:37 19   give us your best testimony about what Mr. Sagi

11:17:41 20   Genger said and what you said about what actions

11:17:44 21   could be taken by the trust before you signed the

11:17:47 22   document becoming the trustee.

11:17:49 23   A.    I, I do not recall.

11:18:30 24   Q.    But you do know that one of those possibilities

11:17:58 25   involved Recovery Effort?

11:18:00  1    A.     Yes.

11:18:48  2    Q.     And you knew before you became trustee that you

11:18:08  3    were also going to accept the chief managerial or

11:18:12  4    principal role in Recovery Effort; right?

11:18:14  5    A.     Yes, sir.

11:18:16  6    Q.     So what -- and you knew also that the trust had

11:18:20  7    no assets?

11:18:21  8    A.     Yes, sir.

11:18:24  9    Q.     You knew the trust was supposedly in debt?

11:18:27 10    A.     Yes.

11:18:28 11    Q.     What was the amount, the magnitude of the debt,

11:18:30 12    as far as you understood?

11:18:31 13    A.     At that time?

11:18:32 14    Q.     Yes.

11:18:32 15    A.     I'm honestly trying to recall, and I would have

11:18:47 16    to give you a guess.  If you want a guess, I will

11:18:49 17    give you a guess, but it would be a guess.

11:18:52 18    Q.     Okay.  You can guess.

11:18:53 19    A.     Approximately --

11:18:54 20    Q.     Understanding it's a guess.

11:18:55 21    A.     Approximately $20 million.  That's a guess.

11:19:41 22    Q.     Who were the creditors of the trust?

11:19:02 23    A.     The creditors of the trust were Manhattan

11:19:06 24    Safety Maine and Sagi Genger.

11:19:52 25    Q.     Manhattan Safety Maine is owned by Robin

11:19:14  1   Rodriguez; right?

11:19:16  2   A.    I -- yes.

11:19:20  3   Q.    Yes?

11:19:21  4   A.    Yes.

11:19:23  5   Q.    So before you took the position as trustee, you

11:19:26  6   knew that you were taking on responsibilities for a

11:19:30  7   trust that was $20 million in debt to, approximately,

11:19:35  8   roughly speaking, to Sagi Genger and to Robin

11:19:40  9   Rodriguez, or entities that they controlled and

11:19:44 10   owned; right?

11:19:45 11   A.    The -- may we have a break after I answer this

11:19:50 12   question, please?

11:19:52 13   Q.    Sure.

11:19:53 14               MR. POLLOCK:  You know what, I would

11:19:54 15          be happy to have a bio break as long as you

11:19:58 16          don't mind, Mr. Oldner.

11:19:59 17               THE WITNESS:  Pardon me?

11:19:59 18               MR. POLLOCK:  I'd be happy to have a

11:19:59 19          bio break, as long as you don't mind, or

11:20:01 20          Mr. Bowen, but answer the question.

11:20:03 21               MR. BOWEN:  What's a bio break?

11:20:05 22               MR. POLLOCK:  I have to go to the

11:20:07 23          men's room.  Thank you.

11:20:08 24               MR. BOWEN:  Oh, sorry.  I thought that

11:20:09 25          was some Zoom terminology that I'd never

11:20:13  1                  heard of before.

11:20:14  2                       THE WITNESS:  A bio break, a biology

11:20:16  3            break.

11:20:18  4                       MR. BOWEN:  Yeah.  It's, it's an

11:20:18  5            analogue problem, not a digital problem.

11:20:18  6                       MR. HERSCHMANN:  Can you read back the

11:20:18  7            question?

11:20:18  8                       MR. BOWEN:  Yeah, can we have the

11:20:18  9            question read back, please --

11:20:18 10                       THE WITNESS:  Thank you.

11:20:18 11                       MR. BOWEN:  -- and let Mr. Oldner

11:20:18 12            answer the question, and then we'll take a

11:20:18 13            break.

11:20:18 14                       THE WITNESS:  Thank you.

11:20:18 15                       COURT REPORTER:  Give me one second to

11:20:18 16            get back.

11:20:18 17                       THE WITNESS:  Take your time.  It

11:20:18 18            looks like we're going to be here all day

11:20:18 19            anyway.

11:20:18 20            (Court reporter read back the question.)

11:20:18 21                       THE WITNESS:  Yes.

11:21:06 22                       MR. BOWEN:  Okay.  Let's take a break.

11:21:07 23            We'll go off the record.

11:21:09 24                       (Sixteen-minute break.)

         25

                           BUSHMAN COURT REPORTING

11:39:05  1    BY MR. BOWEN:

11:39:05  2    Q.    Okay.  Go ahead, Mr. Oldner.

11:39:06  3    A.    Number one, I want to correct something from

11:39:07  4    earlier where I completely got something wrong, but I

11:39:08  5    also want to give you the reason and ask you to help

11:39:25  6    me remember this, along with anybody else.

11:39:29  7          I have a health condition that requires

11:39:30  8    that I move around about every hour.  Whenever I

11:39:33  9    don't -- really every 50 minutes would be better.  I

11:39:37 10    do this at home.  I've done this for years.

11:39:39 11          Whenever I don't, I become foggy.  I don't

11:39:42 12    think well, and I am making assumptions.  In one of

11:39:44 13    my assumptions I put two unrelated things together.

11:39:48 14    My apologies.

11:39:50 15          The trust does not owe $20 million.  The

11:39:53 16    trust has -- the trust has one note that it owes

11:39:54 17    money on; okay?

11:39:58 18          So I was -- whenever I told you I was

11:40:01 19    guessing, I was completely guessing.  I was

11:40:03 20    completely wrong, and I apologize for --

11:40:05 21    Q.    Who corrected --

11:40:05 22    A.    -- that ridiculous guessing.

11:40:08 23    Q.    Who told you --

11:40:09 24    A.    Pardon me?

11:40:10 25    Q.    Who corrected you or pointed out that you had

11:40:13  1   misspoken?

11:40:14  2   A.     I talked to my attorneys, and --

11:40:16  3   Q.     Was it Sagi Genger?

11:40:16  4   A.     Pardon me?

11:40:16  5   Q.     Was it Sagi Genger that, that contacted you to

11:40:21  6   say that you had misspoken?

11:40:24  7   A.     No.  I talked to Adam Pollock and Tim Cullen.

11:40:28  8   Q.     Did you have, did you have any communications

11:40:30  9   with Sagi Genger today, at any time today?

11:40:36 10   A.     Early this morning.

11:40:37 11   Q.     Before the deposition, or during the

11:40:38 12   deposition?

11:40:39 13   A.     Before the deposition.

11:41:10 14   Q.     And you haven't talked to him, or got an email,

11:40:43 15   or text from him during the deposition?

11:41:15 16   A.     Not will I, no, sir.

11:40:48 17   Q.     Nor, nor will you?

11:40:50 18   A.     Yes, I will not.

11:40:52 19   Q.     What do you mean --

11:40:52 20   A.     During the deposition I'm not checking --

11:40:54 21   Q.     -- by that?

11:40:54 22   A.     No, I won't -- no, I'm not doing anything in

11:40:57 23   this deposition.

11:40:57 24   Q.     All right.  You understand that would be

11:40:59 25   improper; right?

```
11:41:31  1   A.    Yes, sir, I do.

11:41:01  2   Q.    Okay.

11:41:01  3   A.    That's why I am pointing out that that's -- not

11:41:04  4   only is that not happening, it will not happen.

11:41:07  5              MR. POLLOCK:  Mr. Oldner --

11:41:08  6   Q.    Okay.  Did Sagi Genger discuss with you what

11:41:11  7   you should testify to, or what you should say in your

11:41:14  8   deposition, at any point in time?

11:41:16  9   A.    No.

11:41:53 10   Q.    No?

11:41:53 11   A.    No.

11:41:53 12   Q.    Did he, did he talk to you about the fact you

11:41:19 13   were being deposed today?

11:41:21 14   A.    Yes.

11:41:22 15   Q.    What did he say?

11:42:02 16   A.    When we talked this morning?

11:41:26 17   Q.    Yes.

11:41:26 18   A.    That, that barbecue sauce in, in Arkansas is

11:41:32 19   really good.

11:42:07 20   Q.    Is Sagi Genger in Arkansas?

11:42:12 21   A.    Pardon me?

11:42:12 22   Q.    Is Sagi Genger in Arkansas?

11:42:12 23   A.    No.

11:41:40 24   Q.    Where is he --

11:41:44 25   A.    Sagi Genger is someplace -- I don't know where
```

11:41:47  1   Sagi Genger is.

11:41:48  2   Q.    Okay.

11:41:49  3   A.    I really don't.

11:41:50  4   Q.    When you, when you were talking to him on the

11:41:52  5   phone, the only thing you talked about was that

11:41:55  6   barbecue sauce is really good in Arkansas?

11:41:59  7   A.    Yes, and that he didn't much care for

11:42:01  8   Defendants in this case, and that was pretty much it.

11:42:05  9   Q.    What did he say about the Defendants in the

11:42:06 10   case?

11:42:07 11   A.    That really needs to stay personal.  It, it --

11:42:10 12   Q.    No, it doesn't.

11:42:12 13   A.    It doesn't help.

11:42:13 14   Q.    You can say it.

11:42:14 15   A.    No, sir.  Please.  It's just rude.

11:42:16 16   Q.    I'm sorry.  Yeah, I -- the relationship with

11:42:18 17   Sagi Genger is very important in this case.  I need

11:42:21 18   you to tell me what he told you about the Defendants

11:42:24 19   in this case.

11:42:26 20   A.    I do not want to do this.  He said that Eric

11:42:28 21   Herschmann is an asshole, and I can quote him on

11:42:33 22   that.  Those were his exact words.

11:42:35 23   Q.    What did he say about me?

11:42:37 24   A.    Absolutely nothing about you.

11:43:22 25   Q.    What about any other Defendant in the case?

BUSHMAN COURT REPORTING

11:42:41  1    A.    Nothing about anybody else.

11:42:42  2    Q.    How about the other lawyers in the case?

11:42:45  3    A.    Nothing about any other lawyers.

11:42:46  4    Q.    What did Mr. Sagi Genger say to you about

11:42:51  5    Mr. Herschmann, other than saying, He's an asshole,

11:42:55  6    and you can quote me on that?

11:42:58  7    A.    That's it.

11:42:59  8    Q.    Well, what did he mean, to your understanding?

11:43:45  9    A.    It's, it's not funny.  I'm not laughing about

11:43:15 10    it.  It's just I, I, I think he has a very low

11:43:23 11    opinion of Mr. Herschmann.

11:43:25 12    Q.    What did he say to give you that impression?

11:43:29 13    A.    That Eric Herschmann is an asshole, and you can

11:43:33 14    quote me on that.  That kind of gives that

11:43:36 15    impression.  It's not what I want to talk about.

11:43:39 16    Q.    But in addition --

11:43:42 17    A.    Sorry.

11:43:42 18    Q.    In addition to that, did he say anything else?

11:43:44 19    A.    No.

11:44:18 20    Q.    Was he warning you that Eric Herschmann might

11:43:47 21    have questions for you?

11:43:49 22    A.    No.

11:44:22 23    Q.    Did he say, If Eric Herschmann asks you

11:43:52 24    questions, this is how you deal with those questions?

11:44:28 25    A.    No, he did not.

11:43:56  1   Q.    Did he give you examples of, of his reason for

11:44:01  2   saying that Eric Herschmann is an asshole?

11:44:05  3   A.    He did not.

11:44:06  4   Q.    Did you have any understanding about why he

11:44:08  5   said that?

11:44:09  6   A.    I do not.

11:44:52  7   Q.    Is this the first day he ever said anything to

11:44:18  8   you about Eric Herschmann, or did he talk to you

11:44:20  9   about Eric Herschmann in the past?

11:44:22 10   A.    He has talked to me about Eric Herschmann in

11:44:25 11   the past.

11:44:26 12   Q.    What did he say before?

11:44:27 13   A.    I don't remember.

11:45:12 14   Q.    Was it negative?

11:44:34 15   A.    Mostly.

11:44:42 16   Q.    I'm sorry?

11:44:43 17   A.    Mostly.

11:44:43 18   Q.    Mostly?

11:44:44 19   A.    Yes, sir.

11:44:44 20   Q.    What, what did he say that was not negative?

11:45:24 21   A.    That his defense of Donald Trump on the Senate

11:44:51 22   floor was excellent.

11:45:33 23   Q.    Anything else?

11:44:56 24   A.    Not that I can recall.

11:44:59 25   Q.    What did he say that was negative?

BUSHMAN COURT REPORTING

11:45:40  1   A.    Just general -- nothing I can recall

11:45:06  2   specifically.  I just have a negative overall --

11:45:11  3   Q.    What did he tell you about -- I'm sorry.  I was

11:45:12  4   speaking over you.

11:45:13  5   A.    I'm sorry.  It's a negative overall impression

11:45:17  6   that I get from him.

11:45:23  7   Q.    And you can't give us any other details about

11:45:27  8   what Sagi Genger was telling you to give you that

11:45:33  9   negative overall impression?

11:45:35 10   A.    No, sir.  I would be doing the same thing that

11:45:38 11   I did earlier when I made a guess, which was

11:45:41 12   completely off base, so no, I can't.

11:45:47 13              MR. HERSCHMANN:  It's Eric Herschmann,

11:45:48 14          just for the record.

11:45:51 15              THE WITNESS:  Hello, Mr. Herschmann.

11:45:53 16              MR. HERSCHMANN:  Nice to see you, Mr.

11:45:53 17          Oldner.

11:45:53 18              THE WITNESS:  Nice to meet you.

11:46:30 19              MR. HERSCHMANN:  It would be -- it is

11:45:57 20          not a guess when you live through something

11:45:58 21          and you're told something.

11:46:01 22              I ask that the witness answer the

11:46:03 23          question as to everything that he was told

11:46:05 24          by Sagi Genger regarding me.

         25

```
11:46:08  1  BY MR. BOWEN:

11:46:09  2  Q.   To the best of your recollection, sir, is there

11:46:12  3  any way you can remember it --

11:46:16  4            MR. POLLOCK:  I will --

11:46:16  5  Q.   -- as it's --

11:46:17  6            MR. POLLOCK:  -- restate my objection,

11:46:17  7        now that we've come back from the break,

11:46:20  8        that none of this has anything to do with

11:46:22  9        the pending Motion to Dismiss.  Go ahead.

11:47:00 10  Q.   Mr. Oldner --

11:46:31 11  A.   Yes.

11:46:31 12  Q.   -- the question to you, sir, subject to the

11:46:33 13  objection of Mr. Pollock --

11:47:09 14  A.   Yes.

11:46:36 15  Q.   -- is please state everything that Sagi Genger

11:46:38 16  told you about Eric Herschmann, to the best that,

11:46:42 17  that you can.

11:46:43 18  A.   The two things that stand out I've already told

11:46:47 19  you, one positive, one negative.  The rest of it I

11:46:50 20  cannot speak to with any certainty.  It would involve

11:46:57 21  guessing.

11:47:31 22  Q.   Okay.  Well, what would your guess be that

11:47:03 23  indicated a negative view of Mr. Herschmann --

11:47:07 24            MR. POLLOCK:  Objection.

11:47:08 25  Q.   -- understanding it's a guess.
```

11:47:10  1               MR. POLLOCK:  Objection; you're

11:47:11  2          literally asking the witness to guess.

11:47:15  3               MR. HERSCHMANN:  Mr. Pollock, I'm

11:47:16  4          going to give you the admonition, because

11:47:17  5          I'm more than happy to call Judge Garrity

11:47:17  6          on this, so I ask you to stop.

11:47:21  7               He said, "I'd have to guess," based on

11:47:21  8          his experiences in a conversation.  It's

11:47:24  9          not a guess when you lived through it.

11:47:25 10          It's your recollection.  But you have an

11:47:28 11          objection.  Let's get the answer to the

11:47:31 12          question.

11:47:31 13               MR. POLLOCK:  You are welcome to call

11:47:32 14          Judge Garrity and tell him that Mr. Bowen

11:47:33 15          is literally asking him to guess during the

11:47:37 16          deposition.

11:47:38 17               MR. HERSCHMANN:  Mr. Pollock, Mr.

11:47:39 18          Pollock, you're done with this.  You have a

11:47:41 19          standing objection.  Let's get the answer

11:47:43 20          to the question.

11:47:45 21  BY MR. BOWEN:

11:47:45 22  Q.    Mr. Oldner, I'll, I'll restate the question.

11:47:48 23  Do the best that you can and please tell us

11:47:50 24  everything that Sagi Genger said about Eric

11:47:53 25  Herschmann, even if it's a guess.  We understand that

11:47:56  1    what you're saying now is just a guess.  Go ahead.

11:47:58  2              MR. POLLOCK:  Objection; asked and

11:47:59  3              answered.

11:48:01  4    A.    Mr. Bowen, very, very respectfully on my part,

11:48:04  5    and, and I mean it, to guess means that I would get

11:48:08  6    it wrong.  And if I guess, I'm telling you things

11:48:11  7    that aren't true.

11:48:12  8              I've already made a big enough mistake in

11:48:16  9    guessing, because I was tired, the, the debt owed by

11:48:20 10    the trust, to a ridiculous number.

11:48:22 11              I do not want to say anything about

11:48:24 12    Mr. Herschmann that Sagi Genger said or that I

11:48:28 13    interpreted incorrectly.

11:48:30 14              I have told you the things that I do

11:48:32 15    remember.  One of them was complimentary.  One of

11:48:35 16    them one uncomplimentary.  And those are the things

11:48:39 17    that I know for sure, and I'm not, I'm not trying to

11:48:43 18    avoid the question.

11:48:46 19              MR. HERSCHMANN:  Move, move to strike

11:48:47 20              as nonresponsive.  Let's see if you can get

11:48:51 21              an answer to the question as to what he

11:48:52 22              recalls based on living through the

11:48:55 23              conversation.

11:48:56 24              MR. POLLOCK:  Objection; asked and

11:48:57 25              answered.

11:48:59 1            MR. HERSCHMANN:  Answer the question.

11:48:59 2            Tell us everything you recall that he said,

11:49:01 3            and if you're wrong, you're wrong, to the

11:49:03 4            best of your recollection, sir.

11:49:05 5            THE WITNESS:  Everything that I recall

11:49:06 6            specifically, I have no specific

11:49:09 7            recollections.

11:49:10 8            MR. HERSCHMANN:  How about generally,

11:49:11 9            sir?

11:49:11 10            THE WITNESS:  I don't know?

11:49:15 11  BY MR. BOWEN:

11:49:16 12  Q.    What did Sagi Genger say to you about his

11:49:19 13  sister, Orly Genger?

11:49:29 14  A.    I can't remember specifically.

11:49:33 15  Q.    Did he talk to you about Orly Genger?

11:49:36 16  A.    Yes, he did.

11:49:37 17  Q.    What did he say, specifically, or generally?

11:49:48 18  A.    One of the general things that I remember is

11:49:51 19  that -- and this is a summation on my part.  It is,

11:49:58 20  it's, it's a summary.  It's an approximation; okay?

11:50:02 21        These are certainly not his exact words,

11:50:04 22  but the general idea is that he would very much like

11:50:08 23  to settle this matter with his sister, with you, with

11:50:11 24  everybody involved and be done with it.

11:50:17 25  Q.    Other than that did he --

11:50:19  1   A.      Sorry?

11:50:20  2   Q.      What did you say?

11:50:21  3   A.      I said I'm sorry.  I was going to say that if,

11:50:24  4   if I had to pick one thing that I've heard more than

11:50:27  5   anything else, that would be it.

11:51:06  6   Q.      Did he say to you how he would settle it?

11:50:34  7   A.      No, he did not.

11:51:12  8   Q.      Did he propose different ideas that might

11:50:41  9   settle the dispute?

11:50:44 10   A.      You are at this point refreshing my memory.  He

11:50:47 11   said that he had offered settlements in the past.  He

11:50:51 12   proposed no ideas to me specifically, other than

11:50:57 13   proposals that were made to trustees in Austin and in

11:51:02 14   New York.

11:51:05 15                  MR. CAVALIERE:  I would just -- this

11:51:06 16             is Rocco Cavaliere, on behalf of --

11:51:09 17                  THE WITNESS:  Hi, Rocco.

11:51:09 18                  MR. CAVALIERE:  -- the trustee.  To

11:51:11 19             the extent that there are settlement

11:51:12 20             communications between Sagi Genger or

11:51:15 21             anyone else associated with Dalia Genger or

11:51:21 22             you, Mr. Oldner, you know, between, on, on

11:51:23 23             your end, the prior trustee or this, the

11:51:26 24             current trustee, I would appreciate you not

11:51:28 25             divulging that information on the court

11:51:31  1                record.  Thanks.

11:51:32  2                     THE WITNESS:  I'm sorry.  I apologize.

11:51:34  3                     MR. CAVALIERE:  No, no.  You did not,

11:51:35  4                you did not divulge anything --

11:51:37  5                     THE WITNESS:  Okay.

11:51:37  6                     MR. CAVALIERE:  -- just yet --

11:51:38  7                     THE WITNESS:  Okay.

11:51:38  8                     MR. CAVALIERE:  -- but I --

11:51:39  9                     THE WITNESS:  Okay.

11:51:39 10                     MR. CAVALIERE:  -- I just wanted to be

11:51:39 11                certain --

11:51:40 12                     THE WITNESS:  I'll --

11:51:40 13                     MR. CAVALIERE:  -- that you don't

11:51:41 14                divulge the details.  Thank you.

11:51:43 15                     THE WITNESS:  Rocco, that's just --

11:51:46 16                that is -- I would just say those are the

11:51:46 17                things -- other than that discussion,

11:51:47 18                that's the only settlement that I talked to

11:51:51 19                him about, that I recall.

11:51:55 20       BY MR. BOWEN:

11:51:55 21       Q.   So other than discussions with either the prior

11:51:58 22       bankruptcy trustee or the current bankruptcy trustee,

11:52:01 23       Mr. Sagi Genger never said anything to you about a

11:52:06 24       settlement idea or an offer with respect to disputes

11:52:09 25       that he has with his sister Orly Genger; is that

11:52:13  1   right?

11:52:53  2   A.    You, you cut out in the middle of that.  Could

11:52:19  3   you say it again, please?

11:52:20  4   Q.    Other than settlement talks that involve the

11:52:25  5   bankruptcy trustees, did Sagi Genger ever say to you

11:52:29  6   anything about how he would propose to settle with

11:52:34  7   Orly Genger?

11:52:37  8   A.    Not that I recall, no.

11:52:41  9   Q.    Did he say disparaging things about his sister?

11:52:45 10   A.    No, he never has.

11:53:24 11   Q.    Has he said disparaging things about his

11:52:53 12   father?

11:52:54 13   A.    Actually, no.

11:53:00 14   Q.    I didn't hear what you said.

11:53:01 15   A.    Actually, no.  I'm sorry.  I've gotten too

11:53:06 16   quiet.  Actually, no.

11:53:42 17   Q.    Now you said that you had to correct the amount

11:53:15 18   of indebtedness that the trust has.  How much is the

11:53:18 19   trust in debt?

11:53:20 20   A.    The trust --

11:53:20 21   Q.    And by that I mean the Orly Genger 1993 trust.

11:53:23 22   A.    Can we just say when we say "the trust," from

11:53:24 23   now on that's what we're talking about?

11:53:27 24   Q.    Yes.

11:53:27 25   A.    Okay.  The, the indebtedness is someplace

11:53:31  1   between eight and nine million dollars.  It is on the

11:53:34  2   original note for the trust.

11:53:39  3   Q.    And --

11:53:39  4   A.    That is the only indebtedness.

11:53:42  5   Q.    Who is the creditor?

11:53:44  6   A.    The creditor is Manhattan Safety Maine.

11:53:49  7   Q.    And that's owned by Robin Rodriguez?

11:53:53  8   A.    He is one of the owners.  I do not know if he

11:53:55  9   is the sole owner.

11:53:57 10   Q.    Well, who are the other owners?

11:53:59 11   A.    I don't know.

11:54:42 12   Q.    What interest does Sagi Genger have in

11:54:04 13   Manhattan Safety Maine?

11:54:07 14   A.    I'm sorry.  I did not understand.

11:54:10 15   Q.    What, what -- what interest does Sagi Genger

11:54:12 16   have in Manhattan Safety Maine?

11:54:16 17   A.    I, I do not know the answer to that question.

11:55:05 18   Q.    What debt does Recovery Effort Inc. have?

11:54:24 19   A.    To who?

11:54:26 20   Q.    To anyone.

11:54:27 21   A.    To anyone?  Debts for legal fees, debts for

11:54:36 22   some travel, debts for some supplies.

11:54:42 23   Q.    How much is that?

11:54:45 24   A.    Roughly, very roughly, $200,000 at this time.

11:54:51 25   Very roughly.

BUSHMAN COURT REPORTING

11:54:58  1   Q.    Who are the creditors to Recovery Effort Inc.?

11:55:01  2   A.    Who are we borrowing the money from?

11:55:07  3   Q.    Yes.

11:55:08  4   A.    Recovery Effort Inc. is borrowing the money

11:55:11  5   from Anglo-American, from one of the --

11:55:15  6   Q.    Who owns that?

11:55:15  7   A.    It's one of the, one of the companies owned by

11:55:17  8   Robin Rodriguez.

11:55:21  9   Q.    How much money has Recovery Effort borrowed

11:55:25 10   from, what did you call it, Anglo-American?

11:55:27 11   A.    Anglo-American.

11:55:28 12   Q.    Anglo-American, how much money has he borrowed?

11:55:31 13   How much money -- excuse me.  How much money has

11:55:36 14   Recovery Effort borrowed from Anglo-American?

11:55:40 15   A.    Every nickel we've borrowed.

11:55:42 16   Q.    Everything?

11:55:43 17   A.    Everything we've borrowed, yes, sir.

11:55:45 18   Q.    Which is about $200,000?

11:55:47 19   A.    Yes, sir.

11:56:19 20   Q.    How -- well, and you said that money was used

11:55:55 21   to pay lawyers?

11:55:57 22   A.    Primarily, overwhelmingly.

11:56:27 23   Q.    And to pay you?

11:56:01 24   A.    No.  I am not being paid.

11:56:03 25   Q.    You're not being paid for your services to

11:56:05  1    Recovery Effort Inc.?

11:56:07  2    A.    Not at this time.

11:56:09  3    Q.    What -- at what time will you be paid for your

11:56:12  4    services?

11:56:13  5    A.    I do not know.

11:56:47  6    Q.    What's the agreement that you have --

11:56:18  7    A.    I do not have --

11:56:20  8    Q.    -- for you being paid?

11:56:21  9    A.    I do not have one.

11:56:23 10    Q.    Well, why do you say you're going to get paid

11:56:25 11    in the future?

11:56:27 12                   MR. POLLOCK:  Objection;

11:56:28 13          mischaracterizes the testimony.

11:56:35 14    Q.    Why do you say you're going to get paid in the

11:56:38 15    future?

11:56:39 16                   MR. POLLOCK:  Same objection.

11:56:40 17    A.    I, I don't remember saying that.  Do you want

11:56:43 18    to read this back?

11:56:45 19    Q.    No, I don't want to read it back.

11:56:47 20    A.    Okay.

11:56:48 21    Q.    You can't answer that question?

11:56:49 22    A.    I don't believe I said that.

11:57:26 23    Q.    Well, let me ask you.  Are you going to get

11:56:55 24    paid in the future?

11:57:33 25    A.    I don't know.

BUSHMAN COURT REPORTING

11:56:57  1    Q.    Do you expect to be paid in the future?

11:57:05  2    A.    I hope to be paid in the future.

11:57:07  3    Q.    Why do you hope to be paid in the future?

11:57:15  4    A.    I, I don't understand the meaning of the

11:57:17  5    question.  I'm, I'm not trying to be obtuse.  Please

11:57:20  6    help me.

11:57:58  7    Q.    What's your basis for saying, for having any

11:57:24  8    hope that you would be paid in the future?

11:57:30  9    A.    Because I believe that the fraudulent transfer

11:57:33 10    action which we are seeking relief on, that our side

11:57:40 11    will prevail, and that I will be able to be paid as a

11:57:45 12    result of that.

11:57:46 13          Also, as you know, we have another lawsuit

11:57:50 14    against the attorneys that facilitated that transfer.

11:57:55 15    I believe that also has a good chance of recovery,

11:57:58 16    but it is very difficult for me to think that I

11:58:01 17    should be paid from a bankrupt trust, or from a

11:58:07 18    corporation that has recovered no money.

11:58:39 19    Q.    Is the trust bankrupt?

11:58:14 20    A.    The trust has no money.  The trust has debts.

11:58:17 21    That's not bankrupt, but the trust has money, has,

11:58:20 22    has no cash assets, is borrowing money, and has

11:58:25 23    debts.

11:58:27 24    Q.    Is the trust currently borrowing money?

11:58:31 25    A.    REI is borrowing money.  The trust is not

11:58:34  1   borrowing money.

11:59:16  2   Q.    Do you have an understanding that you are going

11:58:38  3   to be paid for your services as trustee?

11:58:41  4   A.    No.   The trust document says I cannot be paid

11:58:47  5   for my services as trustee.

11:58:50  6   Q.    When was Adam Pollock hired by the trust?

11:58:57  7   A.    In August of 2019.

11:59:37  8   Q.    Who hired him?

11:59:03  9   A.    I did.

11:59:39 10   Q.    Who made the introduction between you and

11:59:08 11   Mr. Pollock?

11:59:10 12   A.    I don't remember.

11:59:13 13   Q.    You said it was Sagi Genger and John

11:59:15 14   Dellaportas; no?

11:59:16 15   A.    It could -- I don't remember.

11:59:52 16   Q.    Well, it was -- I'm trying to refresh your

11:59:23 17   recollection.   Was it the case that it was Sagi

11:59:26 18   Genger or John Dellaportas that introduced you to

11:59:29 19   Mr. Pollock?

11:59:31 20   A.    I do not remember.   I did interview Mr. Pollock

11:59:34 21   myself.

11:59:35 22   Q.    Okay.

11:59:35 23   A.    I made that selection.

11:59:37 24   Q.    And who made the introduction?

11:59:38 25   A.    Well --

11:59:39  1                    MR. POLLOCK:  Objection; asked and

11:59:41  2           answered.

11:59:43  3  Q.    You can answer.

11:59:44  4  A.    You are asking me to speculate.  I don't

11:59:47  5  remember.

12:00:35  6  Q.    How many people did you interview before you

11:59:53  7  hired Mr. Pollock?

11:59:57  8  A.    I believe Mr. Pollock was the second person I

12:00:00  9  talked to.  He could have been the third, but I

12:00:07 10  believe that he was the second.

12:00:47 11  Q.    So how did you get referrals about who to hire?

12:00:23 12  A.    I have already made speculation once, and I was

12:00:27 13  wrong.  Please don't ask me to do it again.  I would

12:00:30 14  be guessing.

12:00:31 15  Q.    I have --

12:00:31 16  A.    I don't know.

12:00:35 17                    MR. KURLAND:  Move to strike as

12:00:36 18           nonresponsive.

12:00:37 19  BY MR. BOWEN:

12:00:38 20  Q.    Look I have more questions on this topic, and I

12:00:40 21  have questions on, on a lot of topics --

12:01:08 22  A.    Okay.

12:00:43 23  Q.    -- and all of this is related to the Motion to

12:00:44 24  Dismiss.  And --

12:00:45 25  A.    Okay.

```
12:00:45  1  Q.     -- you made a statement earlier that you have
12:00:49  2  some kind of medical condition that makes your
12:00:51  3  testimony unreliable.
12:00:54  4  A.     I did not.
12:00:55  5  Q.     Is that what you're saying?
12:00:56  6  A.     No, sir.  I said a medical condition that
12:00:58  7  requires that I get up and move about every 50
12:01:01  8  minutes to an hour.
12:01:02  9         It does not make my, my testimony
12:01:04 10  unreliable.  What it means is that if I don't move, I
12:01:08 11  get foggy.  I am likely to attempt to answer
12:01:12 12  questions by speculation, instead of realizing that
12:01:15 13  the true answer is "I don't know."
12:01:19 14  Q.     Well, other than the answer that you corrected
12:01:21 15  when we began after the break are you saying that the
12:01:24 16  rest of your testimony is completely reliable, or are
12:01:28 17  you saying there are other points where you got
12:01:32 18  foggy, and we can't rely on your testimony?
12:01:57 19  A.     I believe that the rest of my testimony is
12:01:38 20  reliable.
12:01:38 21  Q.     Okay.  And if you feel foggy, then it's your
12:01:41 22  duty --
12:01:42 23  A.     Yes.
12:01:42 24  Q.     -- as a witness under oath to say that you need
12:01:44 25  to stand up.  Do you understand that?
```

```
12:01:46  1   A.    I am, I am sorry.  That is why I let you know

12:01:49  2   last time, because I did not pay attention to the

12:01:52  3   clock.  It is why I asked for a break the first time.

12:01:54  4   Q.    Well, can I have an agreement with you that --

12:01:57  5   A.    I do understand.

12:01:58  6   Q.    -- if you feel foggy, and you need to stand up,

12:02:00  7   you are going to do that.  You're going to tell me

12:02:03  8   that --

12:02:03  9   A.    Yes, sir.

12:02:04 10   Q.    -- no matter what?

12:02:05 11   A.    Yes, sir.

12:02:05 12                   MR. POLLOCK:  Mr. Bowen --

12:02:05 13   Q.    Because you realize that we're all here to rely

12:02:08 14   on your testimony --

12:02:38 15   A.    Yes.

12:02:09 16   Q.    -- and we're looking to have truthful, honest,

12:02:12 17   reliable, believable testimony; right?

12:02:12 18   A.    I am trying to provide you with honest answers.

12:02:15 19   That is my goal.

12:02:16 20                   MR. POLLOCK:  Mr. Bowen, I think --

12:02:18 21   Q.    And your testimony today is that you have

12:02:20 22   provided truthful, reliable answers, all of the way

12:02:24 23   up until the, the last answer that you gave right

12:02:26 24   before the break; is that correct?

12:02:29 25                   MR. POLLOCK:  Mr. Bowen, it is
```

```
12:02:31  1              occasionally hard for anybody who feels

12:02:35  2              like an onset of a health condition or

12:02:37  3              foggy to determine exactly this question.

12:02:40  4                   My guess is that he is trying to the

12:02:42  5              best of his ability to do exactly what you

12:02:44  6              said.

12:02:45  7                   It is also possible for anybody who is

12:02:48  8              feeling a health condition to not be

12:02:50  9              completely self aware of that at that

12:02:52 10              moment.

12:02:54 11                   MR. BOWEN:  Mr. Pollock, you're again

12:02:55 12              obstructing my line of questioning, and I

12:02:57 13              ask you to, to desist.

12:02:58 14       BY MR. BOWEN:

12:02:58 15       Q.   Mr. Oldner, I'm asking you whether there's

12:03:00 16       anything else in your testimony that you feel is

12:03:03 17       unreliable, because if it is, we have to correct it

12:03:07 18       now.

12:03:07 19                   And I'm not casting any kind of aspersion

12:03:10 20       on you.  It happens.  You just tell me what else we

12:03:12 21       need to correct.

12:03:45 22                   MR. POLLOCK:  Mr. Bowen, I'm not sure

12:03:15 23              that that is how the FRCP works with

12:03:19 24              respect to corrections and an errata sheet.

12:03:23 25                   And I don't know that we need to take
```

BUSHMAN COURT REPORTING

```
12:03:24  1              testimony from Mr. Oldner as to how the
12:03:28  2              FRCP works and when corrections are
12:03:32  3              required.  He will do his best.
12:03:34  4                   MR. BOWEN:  Mr. Pollock, please
12:03:34  5              desist.  Please desist.  You're obstructing
12:03:35  6              this deposition.  Please stop.
12:03:37  7   BY MR. BOWEN:
12:03:37  8   Q.    Mr. Oldner --
12:03:39  9                   MR. POLLOCK:  Can we move on?
12:04:04 10   Q.    -- is there anything else you need to correct?
12:03:42 11   A.    Mr. Bowen, to, to the best of my knowledge, no.
12:04:12 12   Q.    And you -- I have an agreement with you now
12:03:50 13   that if you feel that you need to stop, or stand up,
12:03:53 14   or whatever, if you feel like you're no longer able
12:03:56 15   to provide reliable testimony, you will tell me,
12:03:59 16   right, to the best of your ability?
12:04:36 17   A.    To the best of my ability, yes, sir, I will.
12:04:02 18   If you happen to notice it's gone an hour, would you
12:04:04 19   mention that to me, please?
12:04:07 20   Q.    Okay.  But I need your lawyers to be
12:04:09 21   responsible for, for your timing issue, not mine.
12:04:12 22   Okay?
12:04:14 23   A.    Okay.
12:04:14 24   Q.    So going back to your lawyers, did your lawyers
12:04:17 25   ever tell you that -- well, let me ask it this way.
```

```
12:04:24  1   A.     Sure.

12:04:24  2   Q.     Did Sagi Genger or John Dellaportas ever tell

12:04:30  3   you that some of the lawyers that they contacted as

12:04:33  4   candidates to be hired as counsel for the trust had

12:04:38  5   already been retained by Eric Herschmann?

12:04:43  6   A.     Not that I recall.

12:05:21  7   Q.     Or than Eric Herschmann had already spoken to

12:04:49  8   them?  Did they tell you that?

12:04:52  9   A.     Not that I recall.

12:05:32 10   Q.     Does that refresh your recollection that John

12:04:59 11   Dellaportas and Sagi Genger arranged for you to talk

12:05:04 12   to Adam Pollock?

12:05:08 13   A.     No.  It --

12:05:10 14                  MR. POLLOCK:  Objection; asked and

12:05:11 15              answered.

12:05:13 16   A.     I, I don't know who I got that recommendation

12:05:15 17   from.  You could get a list of people, as well as I

12:05:20 18   could.

12:06:00 19   Q.     Well, who, who else could have made those

12:05:24 20   recommendations, if not John Dellaportas and Sagi

12:05:27 21   Genger?

12:05:29 22   A.     Robin Rodriguez.

12:05:31 23   Q.     Is he --

12:05:31 24   A.     But I don't remember.

12:05:32 25   Q.     -- the one?
```

```
12:05:34  1   A.     I don't remember.

12:05:35  2   Q.     Anyone else aside from Robin Rodriguez?

12:05:41  3   A.     I, I would assume that Jay Ong could have made

12:05:45  4   that recommendation.

12:05:46  5   Q.     Did he?

12:05:47  6   A.     Not -- I, I don't know.  I really don't.

12:05:54  7   Q.     Why was Walden Macht terminated as counsel to

12:05:59  8   the trust?

12:06:00  9                  MR. POLLOCK:  Objection; seeks

12:06:01 10             privileged communications, and --

12:06:06 11   Q.     Well, let me clarify.  I'm not asking you for

12:06:08 12   communications with any lawyers.  I'm asking for your

12:06:11 13   understanding of why they were terminated as counsel.

12:06:15 14                  MR. POLLOCK:  When they -- Mr. Bowen,

12:06:15 15             when a lawyer withdraws from a matter, as

12:06:19 16             you're aware, the, any submission --

12:06:26 17                  MR. BOWEN:  Mr. Pollock, this is a

12:06:28 18             speaking objection, and you're, once again,

12:06:29 19             obstructing my line of examination, and

12:06:29 20             you're making this interminable.

12:06:31 21                  MR. POLLOCK:  Mr. Bowen --

12:06:31 22                  MR. BOWEN:  And you have -- your

12:06:31 23             client just told you that he has a medical

12:06:35 24             condition, and he has -- let's show some

12:06:36 25             concern for your own client.
```

12:06:38  1            I am very sensitive to his, the

12:06:40  2            imposition on his time.  I am very much

12:06:44  3            aware of it.  And all of your

12:06:46  4            interpositions and, and speaking objections

12:06:47  5            not only are completely out of line and not

12:06:50  6            allowed under the rules, but it's having an

12:06:50  7            adverse effect on your client, who just

12:06:54  8            told all of us that this is wearing him

12:06:56  9            out --

12:06:56 10                MR. POLLOCK:  Mr. Bowen, I would --

12:06:57 11                MR. BOWEN:  -- to the point where he

12:06:58 12            just gave an answer that he said is

12:07:00 13            completely unreliable.

12:07:28 14                MR. POLLOCK:  Mr. Bowen, I would --

12:07:03 15                MR. BOWEN:  So, please, take that into

12:07:05 16            account.  Stop this kind of marathon.  This

12:07:08 17            should not be a marathon.  We should be

12:07:10 18            nearing the end of my examination, but

12:07:12 19            we're not because of you.

12:07:13 20            And I've said this to you repeatedly,

12:07:15 21            and you just won't stop.  And it's unfair

12:07:18 22            to your own client, so please stop.

12:07:20 23                MR. POLLOCK:  Mr. Bowen, I would --

12:07:21 24  BY MR. BOWEN:

12:07:21 25  Q.    Mr. Oldner, please answer the question.

                        BUSHMAN COURT REPORTING

12:07:23  1              MR. POLLOCK:  Mr. Bowen, I would

12:07:25  2         respectfully ask that you stop yelling at

12:07:28  3         me, that's, a.  And, b --

12:07:29  4              MR. BOWEN:  First of all, if you, if

12:07:29  5         you think that's yelling, you're not from

12:07:31  6         New York, and that ain't yelling, not where

12:07:34  7         I come from --

12:07:34  8              MR. POLLOCK:  Mr. Bowen --

12:07:35  9              MR. BOWEN:  -- so calm down.

12:07:37 10              MR. POLLOCK:  -- you are correct --

12:07:37 11    BY MR. BOWEN:

12:07:37 12    Q.    Mr. Oldner, please answer the question.

12:07:39 13              MR. POLLOCK:  Mr. Bowen, you are

12:07:39 14         correct that neither I nor the witness are

12:07:41 15         from New York.

12:07:42 16    Q.    Mr. Oldner --

12:07:42 17              MR. POLLOCK:  You are taking a

12:07:43 18         deposition --

12:07:44 19    Q.    -- please answer the question.

12:07:46 20              MR. BOWEN:  Mr. Pollock, I'm going to

12:07:48 21         speak over you.  I want you to stop.

12:07:49 22         Mr. Oldner, please answer the

12:07:50 23         question.  And I actually don't remember

12:07:50 24         it, so I'm going to ask the court reporter

12:07:52 25         to read it back.

                        BUSHMAN COURT REPORTING

12:07:53 1              MR. POLLOCK:  Mr. Bowen, respectfully

12:07:55 2              for the court reporter, I would ask that

12:07:57 3              you actually not speak over me, so that we

12:07:59 4              can get an accurate record.

12:08:01 5              I would remind you that you are taking

12:08:03 6              a deposition not in New York but in

12:08:05 7              Arkansas, and I would ask that you be

12:08:06 8              respectful to the decorum that at least

12:08:10 9              exists in Arkansas that doesn't involve

12:08:12 10             yelling at other attorneys.

12:08:14 11             C, I would ask that -- it is incumbent

12:08:18 12             on a lawyer to protect and preserve the

12:08:20 13             privilege, and I would ask that you be

12:08:23 14             respectful of that.  Thank you.

12:08:26 15             Now if you want to repeat the

12:08:28 16             question, or if you want the stenographer

12:08:29 17             to repeat the question, you can proceed.

12:08:33 18             MR. BOWEN:  I will repeat the

12:08:34 19             question.

12:08:34 20   BY MR. BOWEN:

12:08:34 21   Q.    Mr. Oldner, why was Walden Macht terminated?

12:08:44 22             MR. POLLOCK:  Again --

12:08:46 23   A.    I'm, I'm trying to think of the proper way to

12:08:48 24   answer that question, because Walden Macht is a fine

12:08:52 25   firm, but I felt that I needed representation that

12:08:59  1   was going to fit the needs of REI better than Walden

12:09:06  2   Macht was.

12:09:09  3   Q.    So you made the decision to terminate them?

12:09:11  4   A.    Yes.  Along with Robin Rodriguez, I made that

12:09:14  5   decision.  That is a fact.  I mean, I know that one

12:09:18  6   to be true.  I made that decision with Robin

12:09:20  7   Rodriguez.

12:09:22  8          And I was in charge of selecting the next

12:09:31  9   attorney, which Robin would then approve, because, as

12:09:35 10   you know, we have a joint suit.

12:10:14 11   Q.    So what did you discuss with Robin Rodriguez

12:09:41 12   about terminating Walden Macht?

12:09:46 13   A.    I, I believe that's -- I believe that should be

12:09:51 14   between me and Robin, since we are on the same side

12:09:56 15   of the lawsuit -- not meaning to be contentions -- of

12:10:00 16   which you are one of the Defendants.

12:10:04 17   Q.    Well --

12:10:04 18   A.    So if --

12:10:05 19   Q.    -- we're going to come back to that, maybe not

12:10:07 20   in this deposition.

12:10:08 21   A.    If it's still a good question, tell me, and I,

12:10:09 22   I will answer it.  Okay?

12:10:39 23   Q.    You, you think the fact that I'm a Defendant

12:10:15 24   is, is a basis for you not to answer my questions?

12:10:18 25   A.    No.  I'm just asking you if that's a proper

12:10:21  1    question.  If it is, I will answer.  I'm not -- as I

12:10:23  2    told you earlier, I'm really not trying to be evasive

12:10:26  3    in any way whatsoever.

12:10:28  4    Q.    Well, it is a proper question.

12:10:28  5    A.    Okay.

12:10:28  6    Q.    I'm not asking you an improper question.

12:10:29  7    A.    Thank you.

12:10:30  8    Q.    So what was your communication with Robin

12:10:31  9    Rodriguez about terminating Walden Macht?

12:10:35 10    A.    That we needed somebody that really --

12:10:38 11    actually, it was less about terminating Walden Macht.

12:10:42 12    It was finding, finding somebody who was a better fit

12:10:44 13    for what we needed to do.

12:11:22 14    Q.    And who decided you needed a better fit, you or

12:10:50 15    Robin?

12:10:51 16    A.    I was the first person that thought about it,

12:10:53 17    but -- that I remember, as I recall, but Robin and I

12:10:58 18    were on the same page, apparently, from immediately.

12:11:02 19    Q.    So what --

12:11:02 20    A.    You know, he may have brought it up to me.

12:11:05 21    Q.    What was it about Walden Macht --

12:11:07 22    A.    Pardon me?

12:11:07 23    Q.    What was it about Walden Macht that was not a

12:11:10 24    good fit?

12:11:11 25    A.    It, it -- there were multiple issues, which I

12:11:18  1   cannot recall right now.

12:11:22  2   Q.    Were they -- and you don't have to tell me what

12:11:26  3   they were, but this is a yes-or-no question.  Were

12:11:28  4   they legal issues where you didn't like the answer

12:11:31  5   you were getting from Walden Macht?

12:11:34  6   A.    No, they were not.

12:11:37  7   Q.    Did you -- again, just "yes" or "no" -- did you

12:11:40  8   have a problem with the quality of their work?

12:11:43  9            MR. POLLOCK:  Mr. Bowen, you appear to

12:11:45 10            be seeking discovery with respect to the

12:11:48 11            MSM action.

12:11:49 12            This couldn't possibly relate to the

12:11:51 13            pending Motion to Dismiss.  I would

12:11:53 14            respectfully ask you to move on.

12:11:55 15            And, b, you're getting right into work

12:11:58 16            product privilege, and -- you're talking

12:11:59 17            about the quality of their work.  That is

12:12:02 18            right into work product privilege and

12:12:04 19            privileged communication.

12:12:05 20            If you can possibly make a proffer as

12:12:08 21            to how this relates to the Motion to

12:12:10 22            Dismiss, I would respectfully ask that you

12:12:13 23            do so.

12:12:13 24            But it appears that contrary to Judge

12:12:13 25            Garrity's instructions, you are directly

```
12:12:16  1          seeking testimony that at best relates to
12:12:19  2          the MSM action in which you are a
12:12:21  3          Defendant, and in which various people on
12:12:24  4          this line have asked discovery in that case
12:12:27  5          to be stayed, including Mr. Cavaliere,
12:12:29  6          who's on the line, and Mr. --
12:12:29  7               MR. BOWEN:  Mr. Pollock --
12:12:29  8               MR. POLLOCK:  I don't know who John
12:12:29  9          is.  John, if you don't mind, can you
12:12:29 10          identify yourself?  He just came on.
12:12:38 11               MR. DELLAPORTAS:  Sorry.  This is John
12:12:38 12          Dellaportas.  I --
12:12:42 13               MR. POLLOCK:  Oh.
12:12:42 14               MR. DELLAPORTAS:  I'm apologize for
12:12:42 15          interrupting joining in progress, but I was
12:12:42 16          tied up this morning.
12:12:46 17               THE WITNESS:  John, you look
12:12:47 18          different.
12:12:48 19               MR. BOWEN:  Mr. Pollock was just
12:12:51 20          finishing yet another obstructionist
12:12:53 21          objection, and I asked him to stop.
12:12:58 22     BY MR. BOWEN:
12:12:58 23     Q.   Mr. Oldner, please answer the question, and
12:13:00 24     I'll repeat it.
12:13:01 25     A.   Thank you.
```

```
12:13:02  1    Q.    The question is -- and this is a yes-or-no

12:13:04  2    question, because I'm, I'm --

12:13:05  3    A.    Yes, sir.

12:13:05  4    Q.    -- mindful of the privilege.  Did -- was your

12:13:10  5    decision to terminate Walden Macht because you had a

12:13:14  6    concern about the quality of their work?

12:13:16  7    A.    It was not.

12:13:17  8               MR. POLLOCK:  Same objection.

12:13:19  9    Q.    All right.  And did -- was it part of your

12:13:23 10    decision in terminating Walden Macht because you

12:13:26 11    asked them to do something, and they didn't want to

12:13:28 12    do it?

12:13:30 13               MR. POLLOCK:  Objection.  That clearly

12:13:31 14          seeks --

12:13:34 15    Q.    You can answer that "yes" or "no."

12:13:35 16               MR. POLLOCK:  You cannot.  And I don't

12:13:35 17          even know the answer, but you cannot

12:13:37 18          testify to what you directed them or asked

12:13:40 19          them.  Those are all privileged

12:13:42 20          communications.

12:13:42 21    A.    Mr. Bowen --

12:13:43 22    Q.    This is a yes-or-no answer.  It is not --

12:13:44 23    A.    Mr. Bowen, I have been instructed --

12:13:46 24    Q.    -- impinging on privilege.

12:13:46 25    A.    Mr. Bowen, I have been instructed by counsel
```

12:13:49  1   not to answer that question.

12:13:52  2   Q.    So you're not going to answer that question?

12:13:53  3   A.    I've been instructed by counsel not to answer

12:13:57  4   that question.

12:14:39  5   Q.    How is Mr. Pollock being paid?

12:14:09  6   A.    REI pays him.

12:14:44  7   Q.    But he represents the trust?

12:14:15  8   A.    REI pays him on behalf of the trust.  He

12:14:18  9   represents the trust.  He represents REI, and REI

12:14:22 10   pays him for his representation of the trust as well.

12:15:00 11   Q.    Does the trust have an indebtedness to REI?

12:14:32 12   A.    No, the trust does not.

12:15:10 13   Q.    Then, then the question is, and I think you

12:14:39 14   answered it, but let me just ask this question to

12:14:42 15   clarify it.

12:14:43 16         Even though Mr. Pollock and his firm are

12:14:47 17   doing legal work on behalf of the trust, and they're

12:14:52 18   being paid for that work, the trust is not paying for

12:14:54 19   it?

12:14:54 20   A.    The trust is not paying for it.  Recovery

12:14:56 21   Effort Inc. is borrowing the money and paying for his

12:15:02 22   work, on behalf of the trust.

12:15:06 23   Q.    And you came to hire Mr. Pollock based on a

12:15:11 24   referral from either Sagi, John Dellaportas, or Robin

12:15:17 25   Rodriguez; is that correct?

12:15:19  1            MR. POLLOCK:  Objection;

12:15:19  2            mischaracterizes the testimony.

12:15:54  3  A.    I came to hire Adam Pollock based on a series

12:15:29  4  of lengthy conversations with Adam Pollock.

12:15:33  5  Q.    But, but you met or, or were referred to

12:15:36  6  Mr. Pollock by either Sagi Genger, John Dellaportas,

12:15:40  7  or Robin Rodriguez; is that correct?

12:15:43  8            MR. POLLOCK:  Objection; asked and

12:15:44  9            answered.  It mischaracterizes his prior

12:15:46 10            testimony.

12:15:46 11  A.    I don't remember.

12:16:15 12  Q.    But it was one of those three, but you don't

12:15:52 13  remember; is that correct?

12:15:53 14            MR. POLLOCK:  Objection;

12:15:53 15            mischaracterizes his prior testimony, and

12:15:56 16            asked and answered.

12:16:28 17  Q.    You can answer it.  It's one of those three,

12:16:01 18  but you don't remember which one?

12:16:03 19  A.    I believe I also said it could have been Jay

12:16:07 20  Ong.  I actually don't know.  It may be somebody else

12:16:11 21  who I have forgotten.  I do not want to make a

12:16:14 22  statement that I do not know to be true.  I don't

12:16:17 23  know.

12:16:18 24  Q.    And you're saying that Robin Rodriguez agreed

12:16:23 25  also to hire Mr. Pollock and his firm on behalf of

12:16:26  1    Manhattan Safety?

12:16:29  2    A.    He did.

12:16:29  3    Q.    Did you interview Mr. Pollock together?

12:16:32  4    A.    We did not.

12:16:35  5    Q.    Who interviewed him first?

12:16:38  6    A.    I'm not sure.  I believe I did.

12:16:48  7    Q.    Now you -- then you -- when you, when you

12:16:51  8    corrected your testimony, you originally said that it

12:16:59  9    was about $20 million in debt, and now you're saying

12:17:02 10    there's about $8 million in debt to the trust,

12:17:05 11    meaning the trust is in debt to the tune of about

12:17:09 12    $8 million --

12:17:11 13    A.    There's a note --

12:17:12 14    Q.    -- and that --

12:17:12 15    A.    It could be eight to nine million but, yes,

12:17:14 16    there's one note.

12:17:15 17    Q.    Okay.

12:17:15 18    A.    I do not know the amount of the note today.

12:17:18 19    Q.    And does that note carry interest?

12:17:22 20    A.    Only statutory interest.

12:17:57 21    Q.    What's that interest rate?

12:17:26 22    A.    The statutory interest rate in New York is

12:17:29 23    nine percent.

12:17:30 24    Q.    And other than that one note at an interest

12:17:34 25    rate of nine percent, there's no other debt on the

12:17:37  1   trust?

12:17:38  2   A.     The trust has no other debts.

12:17:45  3   Q.     But the trust wholly owns Recovery Effort, Inc;

12:17:49  4   right?

12:18:34  5   A.     That is correct.

12:18:35  6   Q.     And you're saying Recovery Effort Inc. is in

12:17:54  7   debt roughly $200,000?

12:17:57  8   A.     That is correct.

12:18:42  9   Q.     And Recovery Effort Inc. has been paying all of

12:18:02 10   the lawyers doing work either for Recovery Effort or

12:18:05 11   for the trust; right?

12:18:07 12   A.     That is correct.

12:19:00 13   Q.     Recovery Effort has no assets?

12:18:15 14   A.     None.

12:19:03 15   Q.     And it has one loan or multiple loans with

12:18:26 16   Anglo-American?

12:18:34 17   A.     I, I don't know what you mean by that question.

12:18:36 18            MR. POLLOCK:  Mr. Bowen, this entire

12:18:38 19         line of questioning is harassing and

12:18:41 20         burdensome of a witness who Mr. Geron

12:18:43 21         subpoenaed in Arkansas in his individual

12:18:52 22         capacity.

12:18:53 23            If how REI pays its bills is possibly

12:18:57 24         connected to the Motion to Dismiss, I

12:19:00 25         invite you to make a proffer.

BUSHMAN COURT REPORTING

12:19:02  1                    If not, please move on to the topic

12:19:04  2              that was directed by Judge Garrity for us

12:19:07  3              to have the deposition on in Judge

12:19:09  4              Garrity's, Tuesday, June 23rd, discovery

12:19:13  5              conference.

12:19:14  6    Q.    Mr. Oldner --

12:19:14  7                    MR. POLLOCK:  Otherwise, you are just

12:19:16  8              harassing --

12:19:18  9    Q.    -- that arrangement, the loan arrangement that

12:19:18 10    Recovery Effort Inc. has with Anglo-American, who

12:19:23 11    from Recovery Effort's side negotiated terms for that

12:19:27 12    loan agreement?

12:19:28 13    A.    I did.

12:19:59 14    Q.    And is that some kind of revolving line of

12:19:33 15    credit, where however much money you need, you can

12:19:36 16    get it, or is it a lump sum loan?

12:19:39 17    A.    It is on an as-needed basis.

12:19:43 18                    MR. POLLOCK:  Mr. Bowen --

12:19:45 19    Q.    What is the upper limit on that?

12:19:46 20    A.    Pardon me?

12:19:47 21    Q.    What's the upper limit?  What's the maximum you

12:19:50 22    can borrow?

12:19:51 23    A.    I am not certain.

12:20:28 24    Q.    Is there an upper limit?

12:20:32 25    A.    I'm sure there is.

12:20:33  1    Q.    But you don't know what it is, offhand?

12:20:01  2    A.    I do not.

12:20:39  3    Q.    What's the interest rate?

12:20:03  4    A.    Ten percent.

12:20:41  5    Q.    Ten percent?

12:20:46  6    A.    Ten percent.

12:20:10  7    Q.    Has Recovery Effort made any partial repayment?

12:20:17  8    A.    Pardon me?

12:20:18  9    Q.    Has Recovery Effort made any partial repayment

12:20:21 10    for any other type of money transferred to

12:20:24 11    Anglo-American?

12:20:25 12    A.    No, sir.

12:21:08 13    Q.    Now the assets of Recovery Effort are the

12:20:32 14    claims that were assigned by the trust?

12:20:35 15    A.    That is correct.

12:21:17 16    Q.    And those are the only assets it has, other

12:20:40 17    than borrowed money?

12:20:42 18    A.    Yes, sir.

12:21:24 19    Q.    And, to your understanding, the trust has only

12:20:53 20    one asset; correct?

12:20:57 21    A.    And that asset would be?

12:20:59 22    Q.    You tell me.

12:21:02 23    A.    You asked the question.  What asset are you

12:21:03 24    talking about?  I'm just trying to confirm.  I --

12:21:07 25    Q.    Well, the only asset that the trust has, to

BUSHMAN COURT REPORTING

12:21:10  1   your understanding, is the claim to the

12:21:11  2   $32.3 million?

12:21:15  3   A.    Plus the claim against the attorneys.  That --

12:21:18  4   those would be the two assets.

12:22:07  5   Q.    What are the values of those claims, roughly?

12:21:25  6   A.    41 and a half million dollars, approximately,

12:21:33  7   on the -- 41 and a half million dollars on the

12:21:43  8   derivative lawsuit, the one that is styled both by

12:21:51  9   Manhattan Safety Maine and Recovery Effort Inc.  And

12:21:55 10   it would be hard to say a value on the case against

12:21:59 11   the attorneys.

12:22:00 12   Q.    You don't have --

12:22:01 13              MR. POLLOCK:  Mr. Bowen --

12:22:02 14   Q.    -- a value in mind for that?

12:22:05 15              MR. POLLOCK:  Mr. Bowen, you appear to

12:22:06 16          be seeking discovery that is directly

12:22:10 17          related to the claim at issue in the MSM

12:22:14 18          action.

12:22:14 19              We are not doing discovery on that

12:22:16 20          case.  You're asking him to evaluate the

12:22:18 21          claims and, in that case.  We're not doing

12:22:20 22          that today.  That's just harassing the

12:22:21 23          witness.  Move on.

12:22:27 24              MR. BOWEN:  Please, please stop with

12:22:27 25          the obstructionist objections.

12:22:28  1   BY MR. BOWEN:

12:22:29  2   Q.    Mr. Oldner, do you have any ballpark figure of

12:22:32  3   how valuable that claim is?

12:22:34  4   A.    No, sir, I do not.

12:23:15  5   Q.    Were those claims pledged by Recovery Effort to

12:22:41  6   secure the loan that it's taking from Anglo-American?

12:22:49  7   A.    Only to the, only to the amount of the loan

12:22:53  8   plus interest, and, I don't -- actually, no.  I take

12:22:59  9   that back.  No, they were not.

12:23:32 10   Q.    So there's no pledge?

12:23:04 11   A.    There's no pledge.

12:23:06 12   Q.    Is there any security for the loan that

12:23:09 13   Recovery Effort has taken?

12:23:11 14   A.    None whatsoever.  This is complicated.  You

12:23:17 15   have to give me a minute to think about it; okay?

12:23:19 16   Sorry.

12:23:20 17   Q.    You take all of the time you want, Mr. Oldner.

12:23:23 18   A.    Thank you.

12:23:24 19   Q.    I have no --

12:23:25 20   A.    Yes, sir.

12:23:27 21   Q.    -- complaints with your, with your conduct at

12:23:27 22   all.

12:23:27 23   A.    Okay.  Mr. Bowen, they, they have no security.

12:23:28 24   They have no security interest.  They are loaning the

12:23:33 25   money at 10 percent.

12:23:36  1  Q.    You're aware of the Inter-Creditor Agreement,

12:23:38  2  of course?

12:23:40  3  A.    I am.

12:24:15  4  Q.    And you know that that money pledges money to

12:23:45  5  Robin Rodriguez and Sagi Genger; right?

12:23:51  6            MR. POLLOCK:  Again, I restate my

12:23:52  7            objection, that this has nothing to do with

12:23:54  8            the Motion to Dismiss, and appears to be

12:23:57  9            purely related to the pendency, the claims

12:24:00 10            that are pending in this action.

12:24:04 11            MR. HERSCHMANN:  Mr. Pollock, I don't

12:24:05 12            understand.  It's Eric Herschmann.  We have

12:24:08 13            given you a standing objection.  What more

12:24:10 14            on earth could you need, in continuously

12:24:11 15            doing this?

12:24:12 16            MR. POLLOCK:  I need --

12:24:13 17            MR. HERSCHMANN:  You have a standing

12:24:15 18            objection.  That's all you need to worry

12:24:17 19            about.

12:24:18 20            MR. POLLOCK:  I need the questioner to

12:24:20 21            stop harassing the witness.

12:24:52 22            MR. HERSCHMANN:  Then that's a

12:24:26 23            standing objection you have.  We're just

12:24:27 24            wasting time, and I don't have time for

12:24:29 25            this.

12:24:29  1              MR. POLLOCK:  I appreciate that you're
12:24:30  2         imposing time on the witness on topics that
12:24:30  3         are -- sorry, I apologize -- that you're
12:24:32  4         calling Mr. Bowen and imposing time on the
12:24:36  5         witness for topics that are far afield from
12:24:37  6         the Motion to Dismiss and the, far afield
12:24:41  7         from Judge Garrity's instruction, and I
12:24:44  8         would respectfully ask in the interest of
12:24:46  9         all of our times, including the witness,
12:24:47 10         that he move along.
12:24:50 11              MR. HERSCHMANN:  All right.  So every
12:24:53 12         time you make that speaking objection,
12:24:53 13         you're just wasting time.
12:24:57 14              I don't -- I've never seen anything
12:24:57 15         like it.  It's a standing objection.  As a
12:24:59 16         lawyer, it can never get any better.  Just
12:25:02 17         stop.
12:25:03 18    BY MR. BOWEN:
12:25:04 19    Q.    Mr. Oldner, let me restate the question
12:25:06 20    because --
12:25:07 21    A.    Thank you, Mr. Bowen.
12:25:49 22    Q.    -- you may have forgotten it.
12:25:12 23    A.    I have.
12:25:55 24    Q.    Okay.  The question was -- well, let me, let me
12:25:25 25    back up for a second.  You signed an Inter-Creditor

BUSHMAN COURT REPORTING

12:25:28  1    Agreement on behalf of the trust; right?

12:26:07  2    A.    I did.

12:26:08  3    Q.    And you signed it also on behalf of Recovery

12:25:36  4    Effort Inc.?

12:25:38  5    A.    I did.

12:25:39  6    Q.    Do you remember that agreement?

12:25:43  7    A.    Do I remember it broadly, or do I remember it

12:25:46  8    specifically?

12:25:47  9    Q.    Broadly.

12:25:48 10    A.    Yes.

12:26:22 11    Q.    You understand the purpose of that agreement?

12:25:54 12    A.    Yes.

12:26:26 13    Q.    And you signed that agreement on behalf of the

12:25:59 14    trust days after you were appointed the successor

12:26:02 15    trustee; correct?

12:26:05 16    A.    I did.

12:26:06 17    Q.    How many days, two days?

12:26:08 18    A.    I believe that was signed on the 16th.  You're

12:26:11 19    causing me to speculate, but I believe that was

12:26:13 20    signed on the 16th.

12:26:15 21    Q.    It was the weekend after you accepted

12:26:18 22    appointment as the successor trustee?

12:26:21 23    A.    That is correct.

12:26:22 24    Q.    The first time you saw that agreement was after

12:26:23 25    you had already been appointed; correct?

BUSHMAN COURT REPORTING

12:26:27  1    A.    That is correct.

12:26:27  2    Q.    But you had already discussed the idea behind

12:26:29  3    that agreement before you were appointed; isn't that

12:26:32  4    correct?

12:26:33  5    A.    No.

12:27:14  6    Q.    So that agreement was new to you when it was

12:26:40  7    first presented after you were appointed; is that

12:26:42  8    what you're saying?

12:27:24  9    A.    Yes.

12:27:24  10   Q.    And, and what did you do to -- well, you know

12:26:53  11   what, let me leave that for a moment, and I'll come

12:26:55  12   back to it.

12:27:31  13   A.    Sure.

12:27:32  14   Q.    Who, who is the creditor for the eight or

12:26:59  15   nine million dollars that the trust owes?

12:27:03  16   A.    Manhattan Safety Maine.

12:27:07  17   Q.    That's Robin Rodriguez again?

12:27:39  18   A.    Yes.

12:27:14  19   Q.    What were you thinking about when you said that

12:27:16  20   you thought the debt was around 20 million?

12:27:21  21   A.    As I've told you, that was a completely

12:27:23  22   inaccurate answer as a result of the fact that I

12:27:26  23   didn't get up and move around, which we will be doing

12:27:29  24   in about 11 minutes.

12:27:31  25         What was I thinking?  I can tell you I was

12:27:33 1    thinking incorrectly.  I added two different figures

12:27:36 2    that were totally unrelated, in my head, and made a

12:27:38 3    speculation.  I will refrain from doing that in the

12:27:41 4    future.

12:27:42 5                    MR. POLLOCK:  My --

12:27:43 6    Q.   What were those two different figures?

12:27:46 7                    MR. POLLOCK:  I don't want to

12:27:46 8          interrupt this question, but I think it now

12:27:49 9          has been 50 minutes.  Maybe if he can

12:27:52 10         answer this question, and we can take

12:27:54 11         another break.  I think we've been on since

12:27:55 12         11:40.

12:27:55 13   Q.   What were you are thinking of?  What were the

12:27:57 14   other two figures you were thinking about?

12:28:00 15   A.   I wasn't thinking two other figures.  I was

12:28:02 16   thinking two figures, the $8 million loan and the

12:28:05 17   $12 million in notes; okay?

12:28:07 18         The $12 million in notes are actually an

12:28:10 19   asset, or part of the $32 million, and I honestly,

12:28:14 20   Mr. Bowen, got that confused and thought those notes

12:28:18 21   were owed, in addition to the other note, by the Orly

12:28:21 22   Genger Trust.

12:28:23 23         And that is where I got the $20 million,

12:28:25 24   which is, is wrong, and it's stupid, and I apologize.

12:28:30 25   Q.   Can --

12:28:30  1   A.     And I hope that I have corrected that

12:28:32  2   completely.

12:29:01  3   Q.     If you want to continue this and just stand, or

12:28:38  4   even pace, we can do it that way, or do you need a

12:28:40  5   break?

12:28:42  6                 MR. POLLOCK:  No, we will take a

12:28:43  7             break.

12:28:43  8   A.     I need a break, and I need -- I need a break

12:28:45  9   every 50 minutes.

12:28:46 10   Q.     That's fine.  I'm not --

12:28:48 11                 MR. POLLOCK:  Ten minutes.

12:28:48 12   Q.     -- suggesting otherwise.  I'm just trying to

12:28:50 13   give you some options.  How much time do you want?

12:28:52 14   A.     You know something, I don't, I don't think

12:28:53 15   about standing, and I wouldn't have thought about it

12:28:55 16   until we got back to this.  I can stand.  I can pace.

12:29:00 17                 MR. POLLOCK:  Michael --

12:29:01 18   A.     I guess --

12:29:01 19                 MR. POLLOCK:  -- given what

12:29:03 20             happened --

12:29:04 21   Q.     We'll work through the video.

12:29:05 22   A.     Given the fact that I got -- okay.  Given the

12:29:05 23   fact that I got two things completely wrong,

12:29:07 24   completely backwards and decided that an asset of the

12:29:11 25   trust was a liability of the trust, because I'm

```
12:29:14  1  looking at a lot of people.  I'm answering a lot of

12:29:17  2  questions, let's take a break.  Why don't we take a

12:29:20  3  lunch break?  Can we eat?

12:29:21  4  Q.    Well, how much time do you need for that?

12:29:24  5              MR. POLLOCK:  25 minutes.

12:29:26  6  A.    Thirty minutes at the most.

12:29:28  7              MR. POLLOCK:  30 minutes.  Mr. Bowen,

12:29:29  8          you had asked 15 minutes ago that his

12:29:30  9          counsel be responsible for reminding you

12:29:32 10          after 50 minutes.

12:29:33 11              THE WITNESS:  We are now at 51

12:29:34 12          minutes.

12:29:36 13              MR. BOWEN:  I'm just asking how much

12:29:37 14          time you need.  That's all.

12:29:38 15              THE WITNESS:  Thirty minutes.

12:29:39 16              MR. BOWEN:  We're going to resume,

12:29:39 17          then, at two o'clock?

12:29:42 18              MR. POLLOCK:  Yes.

12:29:43 19              MR. BOWEN:  One o'clock your time?

12:29:45 20              THE WITNESS:  Yes.

12:29:45 21              MR. BOWEN:  Thank you, Mr. Oldner.

12:29:46 22          We'll see you then.

12:29:46 23              THE WITNESS:  Thank you, Mr. Bowen.

12:29:46 24          I'm not trying to be contentious.

         25
```

```
12:29:47  1                    MR. BOWEN:  No, don't worry about
12:29:51  2           that.  I understand.
12:29:52  3                    THE WITNESS:  Thank you.
12:30:20  4               (Lunch break.)
13:03:28  5   BY MR. BOWEN:
13:05:24  6   Q.    We're on the record.  Mr. Oldner, I want to go
13:05:26  7   back to the topic where we took a break, which is the
13:05:30  8   assets and liabilities of the trust, to your
13:05:32  9   understanding.
13:05:34 10           The $8.9 million of debt that the trust
13:05:39 11   has, with the nine percent interest, what's the total
13:05:45 12   amount of that debt, to your understanding, now?
13:05:49 13   A.    To my understanding, that includes the
13:05:51 14   nine percent interest.
13:06:32 15   Q.    And that interest has been accruing since when?
13:06:02 16   A.    I don't know.
13:06:05 17   Q.    But to your understanding, that's the only debt
13:06:08 18   that the trust has; is that right?
13:06:47 19   A.    Yes.
13:06:49 20   Q.    It doesn't owe money to lawyers or anybody
13:06:21 21   else; correct?
13:06:54 22   A.    It would, it would -- the trust would pay the
13:06:24 23   expenses of REI.  REI being the wholly owned
13:06:29 24   corporation owned by the trust, it would pay the
13:06:31 25   expenses of REI.
```

13:06:37  1   Q.    But I thought you said REI was paying its

13:06:40  2   expenses by borrowing money?

13:06:42  3   A.    It is.

13:07:18  4   Q.    But ultimately that debt is owed by the trust?

13:06:49  5   A.    Well, ultimately the money pays back, gets paid

13:06:52  6   back.  So if REI collects the money, REI then takes

13:06:56  7   the expense by paying off its expenses, and the

13:06:59  8   remaining money gets distributed accordingly to the

13:06:59  9   beneficiaries, or it gets put back in the trust for

13:07:04  10  future beneficiaries.  REI --

13:07:10  11  Q.    And if the trust gets money --

13:07:13  12  A.    Pardon me?

13:07:13  13  Q.    And if the trust gets money, it has to pay

13:07:13  14  REI's debt?

13:07:15  15  A.    No.  REI will have already paid its debts

13:07:20  16  before the trust gets money.

13:07:22  17  Q.    Because the trust owns all of the litigation

13:07:24  18  claim?  I mean -- I'm sorry -- REI owns all of the

13:07:25  19  litigation claim?

13:07:58  20  A.    REI owns all of the, owns the rights to that

13:07:30  21  litigation and has all of the litigation costs.

13:08:07  22  Q.    And you, to the extent that you expect to

13:07:37  23  receive any payment, you expect to receive it in your

13:07:40  24  capacity as the director of Recovery Effort Inc.;

13:07:42  25  right?

BUSHMAN COURT REPORTING

13:07:45  1   A.    That is correct.

13:08:24  2   Q.    And you testified earlier that the trust, the

13:07:52  3   only assets of the trust are claims relating to the

13:07:54  4   $32 million, which you call relating to a derivative

13:08:01  5   action, that's one?

13:08:02  6   A.    Yes, sir.

13:08:02  7   Q.    And the second assets are claims that the trust

13:08:04  8   has against a law firm; correct?

13:08:42  9   A.    Two law firms, but yes, sir.

13:08:10 10   Q.    Well, that's the Zeichner firm and the Wachtel

13:08:12 11   firm; correct?

13:08:47 12   A.    Yes, sir.

13:08:47 13   Q.    What efforts did you make to, to determine

13:08:22 14   whether there were other assets, other claims, legal

13:08:27 15   claims that the trust had?

13:08:28 16            MR. POLLOCK:  Mr. Bowen, you are both

13:08:31 17        seeking discovery as to, that may go to

13:08:36 18        communications with lawyers, a, and, b,

13:08:38 19        about something that is of no relevance

13:08:41 20        whatsoever to the pending Motion to

13:08:43 21        Dismiss.

13:08:44 22            I repeat my objection, and I caution

13:08:45 23        the witness not to testify with respect to

13:08:49 24        privileged matters.

13:08:52 25   Q.    Leaving aside communications with counsel, you

13:08:58  1   can, you can answer that question.  What did you

13:09:00  2   do -- well, I'll change the question.  I'll withdraw

13:09:01  3   that question.

13:09:01  4          The question is -- you can leave aside

13:09:02  5   questions, or communications with counsel -- what is

13:09:06  6   your understanding of what was done to determine

13:09:11  7   whether or not the trust has claims against other

13:09:17  8   parties?

13:09:18  9                 MR. POLLOCK:  Same objections.

13:09:25 10   A.    That's what I got from counsel.

13:10:15 11   Q.    To your understanding, did, did you or anyone

13:09:37 12   else on behalf of the trust make any inquiry into

13:09:44 13   whether or not the trust has claim against the prior

13:09:46 14   trustee?

13:09:48 15                 MR. POLLOCK:  Mr. Bowen, this line of

13:09:51 16            questioning is squarely, if anything,

13:10:00 17            related to the pending claims that are

13:10:02 18            pending to be sold.

13:10:04 19            If you have any reason that it

13:10:06 20            possibly relates to the pending Motion to

13:10:08 21            Dismiss, which was the subject of today's

13:10:12 22            deposition, I invite you to make a proffer

13:10:15 23            or move on.

13:10:16 24            Also, any analysis of legal claims

13:10:19 25            that Mr. Oldner made would inherently have

BUSHMAN COURT REPORTING

13:10:22 1          been made in conjunction with counsel.

13:10:24 2               And I find it beyond the pale that you

13:10:29 3          are asking him what analysis that he made

13:10:31 4          as far as legal claims, and what analysis

13:10:35 5          that he made separately from legal counsel,

13:10:38 6          it's inherently and inextricably wrapped up

13:10:43 7          when you are evaluating legal claim.  I

13:10:45 8          would ask you for all of those reasons to

13:10:48 9          please move on.

13:10:49 10              MR. BOWEN:  That's improper coaching

13:10:50 11         of the witness.  I ask you to stop.

13:10:50 12 BY MR. BOWEN:

13:10:51 13 Q.   Mr. Oldner, the question was what efforts did

13:10:54 14 you or anyone else make that you are aware of to

13:10:57 15 investigate whether there are claims that the trust

13:11:02 16 has, potential claims, against the prior trustee?

13:11:06 17              MR. POLLOCK:  Same objections.

13:11:12 18 Q.   You can answer.

13:11:12 19 A.   On advice of counsel, I will -- actually,

13:11:15 20 that's all privileged.  It's between me and counsel.

13:11:56 21 Q.   Well, nobody has instructed you not to answer,

13:11:23 22 so are you refusing to answer the question?

13:11:27 23 A.   No.  I'm telling you that all decisions on any

13:11:28 24 lawsuits that were potentially available to the trust

13:11:34 25 were made between me and counsel.

BUSHMAN COURT REPORTING

13:11:36  1   Q.    What counsel?

13:12:16  2   A.    My counsel.

13:11:38  3   Q.    Which one?

13:12:18  4   A.    All of my counsel.

13:12:20  5   Q.    So Mr. Pollock, Mr. -- I forget your, your

13:11:51  6   personal counsel.  Mr. Jenson, is that his name?

13:11:56  7   A.    Mr. Cullen.

13:11:57  8   Q.    Cullen.  So you're saying Mr. Pollock,

13:11:59  9   Mr. Cullen, Walden Macht, and Jay Ong, all of those

13:12:05 10   counsels were involved in evaluating whether there

13:12:08 11   were potential claims against Dalia Genger?

13:12:13 12                   MR. POLLOCK:  Objection;

13:12:13 13             mischaracterizes his testimony.

13:12:16 14   A.    No counsel presented me with any evidence that

13:12:19 15   there was any wrongdoing, any money taken from the

13:12:22 16   trust, any wrong on behalf of the trust, excerpt for

13:12:25 17   the $32 million that was wrongfully taken in the

13:12:29 18   derivative action.

13:12:30 19   Q.    Did you, yourself, look in to see how the prior

13:12:38 20   trustee conducted the trust?

13:12:38 21                   MR. POLLOCK:  Mr. Bowen, I repeat my

13:12:43 22             objection that any analysis of the previous

13:12:46 23             trustee's action and legal claim against

13:12:50 24             the previous trustee is inextricably

13:12:52 25             wrapped up with the privilege, and also of

13:12:54  1              no relevance to the Motion to Dismiss.  I

13:12:54  2              respectfully ask that you move on.

13:13:36  3    Q.    I'll repeat the question.  Did you, yourself,

13:13:01  4    personally undertake any review of the conduct by the

13:13:07  5    prior trustee with respect to the trust?

13:13:45  6    A.    Other than reading matters that are public

13:13:17  7    record, I did not.

13:13:18  8    Q.    You, you read all matters that are public

13:13:21  9    record pertaining to the trust?

13:13:22 10    A.    No.

13:13:23 11              MR. POLLOCK:  Objection;

13:13:23 12              mischaracterizes the testimony.

13:13:32 13    Q.    You can answer.  Did you read everything?

13:14:02 14    A.    No.

13:13:35 15    Q.    What did you read?

13:13:36 16    A.    I don't remember.

13:13:36 17    Q.    Did you see that the prior trustee did an

13:13:39 18    accounting of the assets and liabilities of the

13:13:41 19    trust?

13:14:11 20    A.    No.

13:14:12 21    Q.    You're not aware that the prior trustee did an

13:13:47 22    accounting of the assets and liabilities in the

13:13:49 23    trust?

13:14:20 24    A.    I am not aware of that.

13:13:50 25    Q.    Is this the first time anyone has ever

                         BUSHMAN COURT REPORTING

13:13:57  1    suggested to you that the prior trustee of the trust

13:13:59  2    did an accounting of the assets and liabilities?

13:14:03  3    A.    Please ask the question again.  I don't

13:14:05  4    understand what you're asking.

13:14:35  5    Q.    Is this the first time anyone ever suggested to

13:14:10  6    you that the prior trustee did an accounting of the

13:14:14  7    assets and liabilities of the trust?

13:14:16  8                    MR. POLLOCK:  Mr. Bowen, are you

13:14:19  9            asking him about matters that are on the

13:14:21  10           appellate docket?  Why are we doing this?

13:14:24  11                   MR. HERSCHMANN:  Mr. Pollock --

13:14:24  12                   MR. POLLOCK:  This has nothing to do

13:14:24  13           with --

13:14:26  14                   MR. HERSCHMANN:  Mr. Pollock, this is

13:14:26  15           Eric Herschmann.  I do not have time for

13:14:29  16           all of this.

13:14:29  17                   I don't know what you do with your

13:14:30  18           practice.  I just don't have time for this.

13:14:33  19           Can you please just stop it?

13:14:36  20                   You're just wasting everyone's time.

13:14:37  21           He's going to be back yet another day

13:14:40  22           because of it.

13:14:40  23                   MR. BOWEN:  Mr. Pollock --

13:14:40  24                   MR. DELLAPORTAS:  Mr. Herschmann, your

13:14:40  25           behavior is inappropriate.

                    BUSHMAN COURT REPORTING

13:14:40  1            MR. BOWEN:  -- you are really

13:14:42  2       blatantly coaching the witness, and it's

13:14:45  3       really, it's, it's really improper.  So

13:14:46  4       please stop.

13:14:48  5            MR. DELLAPORTAS:  I would ask

13:14:50  6       Mr. Herschmann to stop screaming in the

13:14:50  7       deposition.

13:14:50  8            MR. HERSCHMANN:  Mr. Dellaportas, a

13:14:50  9       judge can hear --

13:14:50 10            MR. BOWEN:  There's nobody screaming.

13:14:50 11            MR. DELLAPORTAS:  It's really

13:14:50 12       inappropriate.

13:15:08 13            MR. HERSCHMANN:  A judge can hear --

13:15:28 14            MR. BOWEN:  There's nobody screaming.

13:15:29 15            COURT REPORTER:  I can't understand

13:15:29 16       anyone.

13:15:29 17            MR. DELLAPORTAS:  We have a recording

13:15:29 18       which is recording the screaming, so

13:15:29 19       it's --

13:15:29 20            MR. HERSCHMANN:  Right.  So --

13:15:29 21            MR. DELLAPORTAS:  -- beta transcript.

13:15:29 22            MR. HERSCHMANN:  John, I'm happy to --

13:15:29 23            MR. DELLAPORTAS:  We all understand

13:15:29 24       that --

13:15:29 25            MR. BOWEN:  I'm asking --

                      BUSHMAN COURT REPORTING

13:15:29   1            MR. DELLAPORTAS:  -- Mr. Herschmann is

13:15:29   2        very busy --

13:15:29   3            MR. BOWEN:  I'm asking you to stop,

13:15:29   4        please.  You're interrupting my deposition.

13:15:29   5            MR. DELLAPORTAS:  -- more busy than

13:15:29   6        the rest of us, but that --

13:15:29   7            MR. BOWEN:  I'm --

13:15:29   8            MR. DELLAPORTAS:  -- to scream at

13:15:29   9        people.  It's really --

13:15:29  10            COURT REPORTER:  I can't understand

13:15:29  11        anyone.

13:15:29  12            MR. POLLOCK:  Hey, guys, one at a time

13:15:29  13        for the court reporter, please.

13:15:29  14            COURT REPORTER:  That whole time I

13:15:29  15        didn't understand anything because the

13:15:29  16        speaker was cutting out because y'all were

13:15:29  17        all on top of each other, so I didn't get

13:15:29  18        that whole conversation.

13:15:29  19            MR. BOWEN:  That's okay, Janess.

13:15:29  20        Don't worry about it.

13:15:29  21            MR. DELLAPORTAS:  This is John

13:15:30  22        Dellaportas.

13:15:32  23            MR. BOWEN:  Mr. Dellaportas, I'm

13:15:32  24        asking you to stop speaking.

13:15:35  25            MR. DELLAPORTAS:  Well, I'm saying no,

                        BUSHMAN COURT REPORTING

13:15:35  1            and I have the right to speak.

13:15:35  2                    MR. BOWEN:  So I'm asking you to stop.

13:15:37  3                    MR. DELLAPORTAS:  I'm asking you to

13:15:38  4            stop talking over me, so I can state my

13:15:42  5            objection, and then you can go on with your

13:15:44  6            questions.

13:15:45  7                 So this is John Dellaportas.  I'm

13:15:46  8            counsel to Sagi Genger in the bankruptcy.

13:15:46  9            Mr. Herschmann started screaming

13:15:49 10            uncontrollably at the witness.

13:15:50 11                    MR. BOWEN:  There was no screaming.

13:15:54 12            You have to stop that kind of stuff.

13:15:55 13                    MR. DELLAPORTAS:  We have --

13:15:55 14                    MR. BOWEN:  There's a video record,

13:15:55 15            Mr. Dellaportas.

13:15:56 16                    MR. DELLAPORTAS:  We do have --

13:15:57 17                    MR. BOWEN:  Please stop with the

13:15:58 18            blatant misrepresentation.

13:15:58 19                    MR. DELLAPORTAS:  Mr. Bowen, can you

13:15:58 20            not interrupt me?

13:15:59 21                    MR. BOWEN:  You have to stop.  This

13:16:01 22            is, this is embarrassing for you.

13:16:03 23                    MR. DELLAPORTAS:  Mr. Bowen --

13:16:04 24                    MR. BOWEN:  Please stop.

13:16:04 25                    MR. DELLAPORTAS:  -- can you not

                       BUSHMAN COURT REPORTING

13:16:04  1          interrupt me, so I can finish my objection?

13:16:06  2              MR. BOWEN:  No, not when you're saying

13:16:08  3          blatant falsehoods.  You need to stop.

13:16:09  4              MR. HERSCHMANN:  The objection is --

13:16:09  5          you want an objection?  There's a video.

13:16:11  6          The judge can watch it.

13:16:12  7              All I'm saying is -- and I'm sorry you

13:16:15  8          weren't here, John, earlier -- this has

13:16:17  9          been going on for several hours.  There's

13:16:19  10         nothing --

13:16:19  11             MR. BOWEN:  That's a good point.

13:16:21  12         Mr. Dellaportas, you're probably unaware of

13:16:23  13         the record that's been, that's made here,

13:16:26  14         and I'll give you some leeway, because

13:16:27  15         you're unaware of it.

13:16:29  16             MR. DELLAPORTAS:  When --

13:16:29  17             MR. BOWEN:  But I need to ask you, I

13:16:29  18         need to ask you, the same way that I asked

13:16:31  19         Mr. Pollock repeatedly today, throughout

13:16:34  20         the entire day, to limit his objection to

13:16:36  21         the word "Objection."  That's all you need.

13:16:39  22             MR. DELLAPORTAS:  Mr. Bowen --

13:16:39  23             MR. BOWEN:  You don't need to make a

13:16:40  24         speaking objection.

13:16:42  25             MR. DELLAPORTAS:  -- when you're ready

                        BUSHMAN COURT REPORTING

13:16:42  1          to --

13:16:42  2               MR. BOWEN:  I am going to give you the

13:16:43  3          same request and ask you to do the same.

13:16:46  4               MR. DELLAPORTAS:  Mr. Bowen, I'm ready

13:16:46  5          to stay here all day until you're done

13:16:46  6          talking, and then I'm going to state my

13:16:49  7          objection.

13:16:50  8               You have no right to interrupt my

13:16:52  9          objection.  So are you ready to let me

13:16:54  10          state my objection, or are you going to

13:16:56  11          scream over me, like your colleague?  Let

13:16:58  12          me know.

13:16:59  13               MR. BOWEN:  No, but I'm not going to

13:17:00  14          let you say your objection.  I want to --

13:17:00  15               MR. DELLAPORTAS:  You're not going to

13:17:00  16          let --

13:17:00  17               MR. BOWEN:  -- continue with my

13:17:00  18          questioning.

13:17:00  19               MR. DELLAPORTAS:  -- me state my

13:17:04  20          objection, is what you're saying?

13:17:05  21               MR. BOWEN:  Well, I'm sorry.  You're

13:17:05  22          not allowed to just do --

13:17:06  23               MR. DELLAPORTAS:  -- not going to let

13:17:06  24          me state my objection.

13:17:06  25               MR. BOWEN:  -- whatever you want to

13:17:07  1          do.  There are certain rules that apply,

13:17:07  2          and I'm asking you to abide by the rules.

13:17:10  3              MR. DELLAPORTAS:  And one of those

13:17:10  4          rules is I'm allowed to articulate my

13:17:11  5          objections.

13:17:13  6              MR. BOWEN:  No, you're not.  You're

13:17:14  7          not --

13:17:14  8              MR. DELLAPORTAS:  I'm not allowed to

13:17:14  9          articulate my objections?

13:17:14 10              MR. BOWEN:  You can state "Objection"

13:17:15 11          and --

13:17:16 12              MR. DELLAPORTAS:  You don't get to --

13:17:16 13              MR. BOWEN:  -- and a basis for it --

13:17:16 14              MR. DELLAPORTAS:  You don't get --

13:17:16 15              MR. BOWEN:  -- in a few words, but

13:17:16 16          that's it.

13:17:22 17              MR. DELLAPORTAS:  -- to scream over me

13:17:22 18          so the reporter doesn't get to capture it.

13:17:22 19          That's just never proper.

13:17:23 20              MR. BOWEN:  Well, I want to make sure

13:17:24 21          you understand the request that I'm making

13:17:25 22          and you understand the history, because you

13:17:26 23          weren't here for the entire day.

13:17:28 24              MR. DELLAPORTAS:  I'm not --

13:17:28 25              MR. BOWEN:  So I'm trying to give you

13:17:30  1          a sense of what's happening.

13:17:31  2                  MR. DELLAPORTAS:  If Mr. Herschmann is

13:17:32  3          frustrated, that's fine, but that's not an

13:17:36  4          excuse to start bellowing like a mad man.

13:17:36  5                  MR. BOWEN:  Well, first of all, you're

13:17:39  6          mischaracterizes the record, and I'm not

13:17:40  7          going to just let that happen with no

13:17:43  8          comment.  So I'm going to --

13:17:43  9                  MR. DELLAPORTAS:  There's a video.

13:17:43 10                  MR. BOWEN:  -- stop speaking now.  I'm

13:17:44 11          going to turn off my, my camera --

13:17:46 12                  MR. DELLAPORTAS:  Wonderful.

13:17:46 13                  MR. BOWEN:  -- and I'm going to wait

13:17:47 14          until you finish.  But whatever time you're

13:17:49 15          using is counting against the witness.

13:17:52 16          It's not counting against the time that we

13:17:54 17          were allotted to take this deposition.

13:17:55 18                  MR. DELLAPORTAS:  That's between --

13:17:55 19                  MR. BOWEN:  You may, you may proceed.

13:17:57 20                  MR. DELLAPORTAS:  -- you and Mr.

13:17:57 21          Pollock.

13:17:57 22                  MR. BOWEN:  You may proceed.

13:17:57 23                  MR. DELLAPORTAS:  I don't care.

13:17:57 24                  MR. BOWEN:  You may proceed.

13:17:58 25                  MR. HERSCHMANN:  Mr. Dellaportas,

13:17:58  1         you're really -- you're going to object to

13:18:00  2         my conversation with Mr. Pollock; right?

13:18:02  3             And Mr. Pollock is sitting there, and

13:18:05  4         it's all on the video.  We can go to the

13:18:07  5         judge.  Let's just keep going.

13:18:08  6             The witness has said he has an issue

13:18:10  7         that he wants to get up every 50 minutes or

13:18:13  8         so to take a break.  Let's just keep going.

13:18:15  9             We have a video.  Play the video to

13:18:17 10         the judge.  Do whatever you want.  Let's

13:18:19 11         just please keep going.  That's all.

13:18:20 12             MR. DELLAPORTAS:  Can I say --

13:18:20 13             MR. POLLOCK:  Hey, guys?

13:18:21 14             MR. DELLAPORTAS:  -- or are you guys

13:18:21 15         going to scream over me for the rest of the

13:18:21 16         afternoon?

13:18:24 17             MR. POLLOCK:  Hey guys, this is Adam

13:18:25 18         Pollock.  If I can ask --

13:18:30 19             MR. DELLAPORTAS:  It looks like I

13:18:30 20         finally get the privilege of speaking, so

13:18:30 21         this is John Dellaportas.  I'm the counsel

13:18:34 22         for Sagi Genger.

13:18:34 23             The witness is being very polite here,

13:18:37 24         is trying his best to answer the questions,

13:18:39 25         from what I can see.

13:18:41  1            There's no reason for Mr. Herschmann

13:18:43  2       to scream at the witness or his counsel,

13:18:45  3       particularly when he's not undertaking the

13:18:49  4       questions.

13:18:49  5            The interpretation here was because

13:18:51  6       Mr. Herschmann interrupted the questions,

13:18:53  7       never appropriate.

13:18:55  8            I got a big flavor of it yesterday

13:18:57  9       when his wife was testifying, and it was

13:18:57 10       frustrating then.  It's even more

13:18:57 11       frustrating now.

13:19:01 12            So I would ask that one person

13:19:03 13       question at a time.  That's Mr. Bowen.

13:19:03 14       When Mr. Bowen is done, I've got some

13:19:05 15       questions I'd like to ask Mr. Oldner.

13:19:10 16            MR. HERSCHMANN:  We'll go in order,

13:19:11 17       John, as we have discussed beforehand

13:19:14 18       amongst the attorneys, and I'll have some

13:19:15 19       questions when the times comes.  Let's deal

13:19:17 20       with that later.  Thank you.

13:19:17 21            Mike, please keep going.

13:19:19 22            MR. DELLAPORTAS:  Well, I'd like to go

13:19:20 23       next, so.

13:19:22 24            MR. HERSCHMANN:  Well, I appreciate

13:19:23 25       that, but you know what, John, we've

13:19:24  1              already arranged it, so you should have

13:19:24  2              mentioned that beforehand.

13:19:25  3                   MR. DELLAPORTAS:  Well, I'm sorry.  I

13:19:25  4              didn't --

13:19:25  5                   MR. BOWEN:

13:19:26  6     BY MR. BOWEN:

13:19:26  7     Q.    Mr. Oldner, we're going to --

13:19:29  8                   MR. DELLAPORTAS:  -- as to who goes

13:19:29  9              next.

13:19:29 10                   MR. BOWEN:

13:19:29 11     Q.    -- resume the question and answer.

13:19:29 12                   MR. DELLAPORTAS:  I would like to go

13:19:29 13              next.  I'm happy to flip a coin for you, if

13:19:31 14              you think that's appropriate.

13:19:32 15                   MR. BOWEN:  We're not having this

13:19:33 16              discussion in the middle of my examination.

13:19:35 17              You need to stop, Mr. Dellaportas.

13:19:36 18     BY MR. BOWEN:

13:19:38 19     Q.    Mr. Oldner --

13:19:38 20                   MR. DELLAPORTAS:  Well, stop

13:19:38 21              interrupting me.  For the future, when I

13:19:40 22              state an objection, you don't talk over me,

13:19:42 23              so the reporter can't hear my objection.

13:19:45 24              If we do that again, we're going to call

13:19:46 25              the judge.  Understand --

                              BUSHMAN COURT REPORTING

13:19:47  1              MR. BOWEN:  Mr. Dellaportas, I'm

13:19:47  2        asking you to stop.  You're interrupting,

13:19:49  3        and you're interfering with this

13:19:51  4        deposition.  Please stop.

13:19:51  5   BY MR. BOWEN:

13:19:51  6   Q.    Mr. Oldner --

13:19:54  7              MR. POLLOCK:  Hey, guys, if I may

13:19:56  8        state for the record two things.  One is,

13:19:58  9        Mr. Bowen, I would respectfully ask on

13:20:00 10        behalf of the stenographer so that we can

13:20:01 11        get a clear record that you stop speaking

13:20:04 12        over me, that you stop speaking over Mr.

13:20:06 13        Dellaportas, and that you stop speaking

13:20:08 14        over anybody else, because we will get a

13:20:11 15        clean record if you -- it's challenging

13:20:15 16        during Zoom -- if you would respect each

13:20:18 17        person to state their objection, and -- so

13:20:21 18        the stenographer can get it.  That's a.

13:20:24 19              B is, Mr. Herschmann, if you continue

13:20:27 20        to scream at me, and if you continue to

13:20:29 21        scream at my client, I will immediately end

13:20:31 22        this deposition.

13:20:32 23              That kind of conduct has no, no place

13:20:37 24        in any deposition, let alone in the

13:20:39 25        southern decorum of Arkansas and I will not

13:20:41  1                  hesitate to call the federal judge here and

13:20:44  2                  seek a Protective Order barring you from

13:20:47  3                  participating any further in, with your

13:20:51  4                  screaming interruptions or whatsoever.

13:20:55  5                      MR. HERSCHMANN:  All right.

13:20:55  6                  Mr. Pollock, if you're done, let's move

13:20:59  7                  forward.  Thank you.

13:20:59  8  BY MR. BOWEN:

13:21:00  9  Q.    Mr. Oldner --

13:21:00 10  A.    Yes, sir.

13:21:01 11  Q.    -- I was asking you whether --

13:21:04 12  A.    Let's get back into the flow of what we were

13:21:05 13  doing.

13:21:06 14  Q.    -- this is the first time anyone has ever

13:21:09 15  suggested to you that the prior trustee has done an

13:21:13 16  accounting of the debts, or the liabilities, and the

13:21:16 17  assets of the trust?

13:21:18 18                      MR. POLLOCK:  Same objection.

13:21:21 19  A.    Mr. Bowen, I do not understand your question,

13:21:30 20  so I don't know how to answer it.  Will you please

13:21:33 21  state it in a different format for me?

13:21:36 22  Q.    Do you understand what an accounting is?

13:21:39 23  A.    Yes, Mr. Dellaportas -- I mean, Mr. Bowen -- I

13:21:43 24  understand it very well.  I don't understand your

13:21:45 25  question as it relates to it.

13:22:19   1   Q.    Well, have you, have you ever been -- have you

13:21:51   2   ever seen a written accounting done by the prior

13:21:56   3   trustee of the assets and liabilities of the trust?

13:22:00   4   A.    That's a question I can answer.  The answer is

13:22:03   5   no, I have not.

13:22:37   6   Q.    Before today has anyone ever said to you that

13:22:09   7   there is a written accounting that was done by the

13:22:12   8   prior trustee?

13:22:14   9                  MR. POLLOCK:  You're asking for

13:22:15   10                 non-privileged communications?

13:22:17   11  Q.    All communications.

13:22:19   12  A.    I can't answer for privileged communications.

13:22:27   13  Q.    Well, you can answer if any -- I'm asking about

13:22:30   14  your awareness.  I'm not asking you about

13:22:33   15  communications.  Let me try it again.

13:22:35   16  A.    Okay.

13:22:35   17  Q.    The question is --

13:22:35   18  A.    Help me understand the question.

13:22:36   19  Q.    -- before today -- let me ask -- let me just

13:22:37   20  ask the question.  Have you ever been aware, whether

13:22:40   21  you've seen it or not, have you ever been aware of an

13:22:43   22  accounting, a written accounting done by the prior

13:22:46   23  trustee?

13:22:47   24  A.    I have not.

13:23:23   25  Q.    And before me saying it in this deposition has

13:22:52  1    anybody else ever suggested to you that a written

13:22:57  2    accounting had been done by the prior trustee?

13:23:00  3                    MR. POLLOCK:  I object --

13:23:02  4    A.    That's privileged.

13:23:03  5                    MR. POLLOCK:  -- on the grounds it

13:23:05  6         seeks privileged communication.

13:23:07  7    Q.    Leaving aside communications with lawyers has

13:23:10  8    anyone ever suggested that to you?

13:23:16  9    A.    I'm trying to understand the question.  Other

13:23:19 10    than having that discussion with my lawyer, who else

13:23:22 11    would have suggested that?

13:23:25 12    Q.    I'm asking you did Sagi suggest it?  Did Robin

13:23:30 13    Rodriguez suggest it?

13:23:32 14    A.    Did Sagi suggest it, no.  Did Robin suggest it,

13:23:36 15    no.

13:24:09 16    Q.    And did your lawyers -- this is a yes-or-no --

13:23:40 17    I'm only asking for a yes-or-no answer.  Did some

13:23:43 18    lawyer before today suggest to you that there is a

13:23:47 19    written accounting done by the prior trustee?

13:23:50 20                    MR. POLLOCK:  Objection.

13:23:51 21    Q.    Yes or no?

13:23:52 22                    MR. POLLOCK:  I direct the witness not

13:23:53 23         to answer the question, which squarely

13:23:56 24         calls for communications with counsel.

13:24:30 25    Q.    It's a yes-or-no question.  I'm not asking for

13:24:05  1   the substance of the communication.

13:24:09  2                    MR. POLLOCK:  The yes-or-no question

13:24:10  3              squarely calls for communication with

13:24:12  4              counsel, and I direct the witness not to

13:24:15  5              answer.

13:24:15  6                    And I also, respectfully, Mr. Bowen,

13:24:17  7              don't ask for privileged, for

13:24:19  8              communications with counsel and move on.

13:24:54  9   Q.    Mr. Oldner, are you following the instruction

13:24:25 10   not to answer?

13:24:27 11   A.    I am following my counsel's instruction not to

13:24:29 12   answer.

13:24:30 13   Q.    Do you think as the incoming trustee, had you

13:24:34 14   known that there was a written accounting, you would

13:24:37 15   have wanted to have seen it?

13:24:38 16   A.    That calls for a would've-could've-should've

13:24:44 17   speculation.  I have no idea how I would have acted.

13:24:49 18   Q.    You can't answer that question?

13:24:51 19   A.    I would like as much information as I can have,

13:24:54 20   but that may answer a different question.

13:25:28 21   Q.    So if -- can you think of a reason, sitting

13:25:01 22   here today, if you had known there was a written

13:25:04 23   accounting, why you would not have obtained a copy of

13:25:08 24   it?

13:25:08 25                    MR. POLLOCK:  Objection.

                              BUSHMAN COURT REPORTING

13:25:13  1    Q.    You can answer.

13:25:15  2    A.    No, I can think of no reason that if I had

13:25:19  3    known that there was a written accounting I would not

13:25:21  4    have obtained a copy of it.

13:25:25  5    Q.    Now that you know that one exists are you going

13:25:28  6    to obtain a copy of it?

13:25:59  7    A.    I do not know that one exists.  Are you telling

13:25:33  8    me one exists?

13:25:39  9    Q.    Well, I'm certainly suggesting to you that one

13:25:42 10    exists.  I'm not here to testify, but now that you

13:25:45 11    know that there's a possibility that a written

13:25:47 12    accounting exists, are you going to go look for it?

13:25:50 13                   MR. POLLOCK:  Mr. Bowen --

13:25:52 14    A.    That question is nonsensical.  I've told you

13:25:56 15    everything I know on that.

13:25:59 16    Q.    Are you concerned that there's a, an accounting

13:26:01 17    may exist, a written accounting by the prior trustee

13:26:04 18    that you never saw?

13:26:06 19                   MR. POLLOCK:  Mr. Bowen, again, you

13:26:06 20             are getting directly into communication

13:26:10 21             with counsel, a, and, b is this has nothing

13:26:13 22             to do with the Motion to Dismiss.

13:26:15 23             If anything, it only has something to

13:26:17 24             do with the claims that are proposed to be

13:26:21 25             sold to the entity related to

13:26:23  1                Mr. Herschmann, and if there is any

13:26:25  2                possible relevance, then please make a

13:26:29  3                proffer.

13:26:30  4                     And if not, then what we'll do is

13:26:32  5                we'll call the federal judge here in

13:26:35  6                Arkansas and tell her two things.

13:26:36  7                     One is that it appears to have no

13:26:40  8                possible relevance, and, b, you completely

13:26:43  9                refuse to tell us what potential relevance

13:26:45 10                it has to the Motion to Dismiss, and,

13:26:47 11                therefore, we're, we're taking up her time,

13:26:50 12                the federal judge in Arkansas, because you

13:26:52 13                won't make a simple proffer as to its

13:26:54 14                relevance.

13:26:56 15   BY MR. BOWEN:

13:27:23 16   Q.   Mr. Oldner, the question is now that you're

13:27:00 17   aware that a written accounting exists, or may exist,

13:27:04 18   are you going to make any effort to go look at it?

13:27:07 19                     MR. POLLOCK:  Mr. Bowen, move on.

13:27:09 20   Q.   You can answer the question, sir.

13:27:11 21   A.   Under advice of counsel, I am not answering

13:27:13 22   that question.

13:27:14 23   Q.   You refuse to answer --

13:27:14 24                     MR. POLLOCK:  Mr. Bowen --

13:27:14 25   Q.   You refuse to answer the question?

                         BUSHMAN COURT REPORTING

13:27:16  1   A.     On the advice of counsel, I'm not answering

13:27:19  2   that question.

13:27:19  3   Q.     What --

13:27:19  4               MR. POLLOCK:  Mr. Bowen, you're

13:27:20  5          harassing the witness.

13:27:22  6   Q.     What --

13:27:22  7               MR. BOWEN:  Mr. Pollock, I'm going to

13:27:24  8          ask you again to quit interrupting the

13:27:26  9          testimony and interfering with my line of

13:27:28 10          examination.

13:27:29 11   BY MR. BOWEN:

13:27:29 12   Q.     Mr. Oldner, what other efforts did you make to

13:27:36 13   understand how Dalia Genger conducted herself as the

13:27:40 14   trustee for the trust?

13:27:46 15   A.     I was appointed by Dalia Genger as trustee.  I

13:27:51 16   had my attorneys investigate what wrongs had been

13:27:56 17   done to the trust.  The attorneys came back to me

13:28:01 18   with --

13:28:01 19               MR. POLLOCK:  Hey, hey, pause.  Don't

13:28:03 20          testify about what your attorneys came back

13:28:05 21          and told you.

13:28:06 22   A.     Okay.  That's privileged.  I'm sorry.

13:28:08 23   Q.     So the trustees were paid by Recovery Effort

13:28:12 24   Inc. in conducting that investigation?  I'm sorry.

13:28:15 25   The lawyers were paid by Recovery Effort in

BUSHMAN COURT REPORTING

13:28:19  1   conducting that investigation?

13:28:20  2   A.   I'm, I'm -- that's back to privilege.

13:29:01  3   Q.   You're saying it's privileged who paid the

13:28:25  4   lawyers?

13:29:05  5   A.   All of the lawyers have been paid for by

13:28:29  6   Recovery Effort Inc.

13:29:11  7   Q.   Okay.  So did you give Dalia Genger -- as the

13:28:41  8   successor trustee did you give Dalia Genger a release

13:28:45  9   of all liability for her role as the prior trustee?

13:28:49 10   A.   I gave her a release, yes.

13:29:23 11   Q.   Is that release in writing?

13:29:28 12   A.   It is.

13:28:57 13   Q.   And where is that?

13:28:58 14   A.   I would assume it's in Dalia Genger's

13:29:04 15   possession.

13:29:05 16   Q.   Did you keep a copy of it?

13:29:07 17   A.   I did.

13:29:34 18   Q.   Did you produce it?

13:29:10 19   A.   I think my counsel has it.

13:29:38 20   Q.   But it wasn't produced; was it?

13:29:17 21               MR. POLLOCK:  Mr. Bowen, if you want

13:29:19 22         to know what's produced, check the document

13:29:21 23         production, or we can talk about it

13:29:23 24         separately.

13:29:24 25               MR. BOWEN:  I'm asking for this

13:29:26  1            witness's knowledge of what was produced.

13:29:29  2                 MR. POLLOCK:  You know, you're -- as

13:29:29  3            you know, the attorneys handle the document

13:29:31  4            production.

13:29:32  5                 If you want to know what's in the

13:29:34  6            document production, I invite you to call

13:29:37  7            me up, or just look at it yourself.

13:29:40  8  BY MR. BOWEN:

13:29:40  9  Q.    Mr. Oldner, do you know yourself that this

13:29:43 10  release was produced by you?

13:29:46 11  A.    I know that any document in my possession

13:29:49 12  relating to the Orly Genger Trust, to REI, or to any

13:29:54 13  action concerning that was delivered to Adam Pollock,

13:29:57 14  my attorney.  What Adam Pollock delivered to you, I

13:29:59 15  do not know.

13:30:00 16                 MR. POLLOCK:  And, Mr. Bowen, as you

13:30:02 17            know, I had an email exchange with Mr.

13:30:02 18            Kurland with respect to the topics of the

13:30:07 19            document production.

13:30:10 20                 I sent you a letter -- sorry.  I sent

13:30:12 21            Mr. Kurland a letter on that.  If you want

13:30:15 22            any subsequent document production, I

13:30:17 23            invite you to write me a letter or

13:30:19 24            otherwise contact me, and I'm happy to have

13:30:22 25            that discussion with you, presuming, you

13:30:25  1                know, as I've said to you before, that you

13:30:27  2                can make any kind of showing about the

13:30:29  3                relevance to the pending Motion to Dismiss.

13:30:33  4   Q.    Mr. Oldner, is it your testimony that you kept

13:30:36  5   a copy of the release?

13:30:38  6   A.    My testimony is that any copies I have in, of

13:30:41  7   any information that had to do with the trust up to

13:30:46  8   the time of, the last Requests for Production was

13:30:51  9   made have been turned over to Adam Pollock.  What he

13:30:55 10   delivered to you, I do not know.

13:30:57 11   Q.    Okay.  I'm sorry, sir.  I'm asking a different

13:30:59 12   question.  I think we were miscommunicating a little

13:31:02 13   bit.

13:31:02 14   A.    Okay.

13:31:03 15   Q.    Let me try and focus your attention.

13:31:05 16   A.    Okay.

13:31:06 17   Q.    The only question I'm asking about is the

13:31:08 18   release.  I'm not asking about any other documents.

13:31:11 19   And my --

13:31:12 20   A.    (Witness coughs.)

13:31:12 21   Q.    You okay?

13:31:12 22   A.    Oh yeah, I'm fine.  I have a cough drop.  Thank

13:31:16 23   you very much.

13:31:17 24   Q.    Okay.  And my only question is did you keep a

13:31:19 25   copy of that release yourself?

13:31:21  1   A.    I have kept a copy of every pertinent piece of

13:31:25  2   information.

13:31:25  3   Q.    Okay.  But --

13:31:27  4   A.    Your asking --

13:31:28  5   Q.    I don't mean to interrupt you, but I'm not

13:31:30  6   asking you about every piece of pertinent

13:31:32  7   information.  I really want you to focus on my

13:31:36  8   question.  It's really just about one piece of paper,

13:31:37  9   or one document.  The release, did you kind a copy of

13:31:41 10   that?

13:32:07 11   A.    To the best of my knowledge, I have a copy of

13:31:43 12   that.

13:32:11 13   Q.    And how long is it?  Is it one page, or is it

13:31:46 14   multiple pages?

13:31:47 15   A.    I have no idea.

13:31:48 16   Q.    What did it release?

13:31:50 17   A.    I have no idea.

13:31:52 18   Q.    Was it an --

13:31:52 19   A.    I knew when I signed it -- I read, I read it

13:31:54 20   when I signed it.

13:32:22 21   Q.    Well, I'm asking you for the best memory you

13:31:59 22   have.  Was it an unconditional general release?

13:32:02 23                    MR. POLLOCK:  Objection; calls for a

13:32:03 24           legal conclusion.

13:32:05 25   A.    Please tell me what an unconditional --

```
13:32:10  1                    MR. POLLOCK:  No, he doesn't need to
13:32:11  2            tell you.  He's not testifying.  He's
13:32:12  3            asking --
13:32:13  4   Q.    Well, Mr. Oldner, I --
13:32:13  5                    MR. POLLOCK:  -- you legal questions.
13:32:14  6   Q.    -- I, I don't, I don't mean this to be
13:32:17  7   difficult, and I'm not, I'm not trying to imply
13:32:19  8   anything by my question.  You've, as a business man
13:32:22  9   you've been involved with general releases in the
13:32:25 10   past; no?
13:32:27 11   A.    Very rarely.
13:33:20 12   Q.    Have, have you ever been involved in any
13:32:33 13   litigation, aside from litigation relating to the
13:32:36 14   Gengers?
13:32:38 15   A.    Oh yes.
13:32:38 16   Q.    How many times?
13:32:40 17   A.    Ten or more.
13:33:31 18   Q.    As a plaintiff?
13:32:48 19   A.    Sometimes a plaintiff, sometimes a defendant.
13:32:50 20   Q.    How many times as a plaintiff?
13:33:35 21   A.    Four or five, would be my guess, and that's
13:32:53 22   just a guess.
13:32:54 23   Q.    What kind of claims were they?
13:32:59 24   A.    Car wreck, hit and run, tort of outrage, a suit
13:33:13 25   against a, for an illegal sales tax.
```

BUSHMAN COURT REPORTING

13:34:05  1   Q.    And you worked with lawyers in those lawsuits?

13:33:26  2   A.    No.  I, I was the plaintiff in those lawsuits.

13:33:30  3   Q.    But did you have legal counsel, or were you

13:33:30  4   operating on your own behalf?

13:33:30  5   A.    No.  No, I had legal counsel.

13:33:36  6   Q.    Did you settle those claims?

13:34:35  7   A.    Two of them were settled.  One of them I

13:33:56  8   prevailed; that was the tort of outrage.  And on the

13:34:02  9   sales tax issue, the county prevailed.

13:34:10 10   Q.    And these were lawsuits in the courts of

13:34:12 11   Arkansas?

13:34:17 12   A.    Yes.

13:34:57 13   Q.    And they were brought in your own name?

13:35:02 14   A.    Yes.

13:35:02 15   Q.    How long ago are we talking were these, were

13:34:27 16   these lawsuits?

13:34:28 17   A.    Eighties and nineties.  One of them --

13:34:31 18   actually, the car wreck was from 2013 to 2017.

13:34:42 19   Q.    You've also been a defendant in lawsuits?

13:34:46 20   A.    Yes.

13:34:47 21   Q.    Personally?

13:34:47 22   A.    Yes.

13:34:48 23   Q.    What kind of claims were those?

13:34:50 24   A.    I was sued by an insurance company in my

13:34:55 25   capacity as a broker, or, actually, by a company

13:35:00   1   operating as if they were an insurance company but

13:35:03   2   without a license.

13:35:41   3   Q.    And the other lawsuits against you?

13:35:11   4   A.    That's, that's the only one that I can think of

13:35:16   5   offhand.

13:35:49   6   Q.    How long ago was that?

13:35:19   7   A.    1988.

13:35:22   8   Q.    That was in Arkansas?

13:35:23   9   A.    It was.

13:35:55  10   Q.    And did you have legal counsel?

13:35:27  11   A.    Yes.

13:35:28  12   Q.    Was that case settled?

13:35:30  13   A.    No.

13:36:00  14   Q.    So in conjunction with those settlements of, of

13:35:35  15   litigation, did you have an understanding of what a

13:35:38  16   general release is?

13:35:41  17   A.    Under no circumstance.

13:35:43  18   Q.    So you --

13:35:43  19   A.    I really don't know --

13:35:45  20   Q.    -- did not --

13:35:45  21   A.    -- what -- I really don't know what you're

13:35:45  22   talking about.  Please help me.

13:35:48  23   Q.    Okay.  So you don't have a, you don't have the

13:35:50  24   concept of a general release, or a general mutual

13:35:53  25   release?

```
13:35:55  1               MR. POLLOCK:  Mr. Bowen, to the extent
13:35:56  2           that you're asking the witness to define
13:35:58  3           legal terms, it's just harassing and
13:36:01  4           unnecessary.  Please move on.
13:36:04  5               MR. BOWEN:  I'm not asking him to
13:36:05  6           define it.  I'm asking Mr. Oldner, given
13:36:07  7           his experience in multiple litigations, if
13:36:08  8           he has an understanding of the concept of
13:36:12  9           what's generally known as either a general
13:36:16 10           release or a general mutual release.
13:36:18 11  BY MR. BOWEN:
13:36:18 12  Q.   It's a simple "yes" or "no," sir.
13:36:21 13  A.   No.
13:36:22 14  Q.   I'm having trouble hearing you.  Did you say
13:36:27 15  "no"?
13:36:27 16  A.   No.
13:36:28 17  Q.   Okay.  So you would need to see the release
13:36:35 18  that was given by you as the successor trustee to
13:36:39 19  Dalia Genger as the prior trustee to remember what it
13:36:43 20  means; is that right?
13:36:44 21  A.   I have a general idea what it means --
13:36:48 22  Q.   What was that?
13:36:48 23  A.   -- but to see what it --
13:36:52 24  Q.   What was the general idea?
13:36:53 25  A.   The general idea is that she's released from
```

13:36:58  1   what she did of, from her activities as trustee, for

13:37:07  2   her general activities as trustee.  That is a

13:37:10  3   requirement that is in the trust document.

13:37:51  4   Q.   And your testimony is that you're not able to

13:37:20  5   testify about any effort made to determine whether

13:37:25  6   the trust had claims against Dalia Genger because

13:37:30  7   that's privileged?  Is that right?

13:37:36  8              MR. POLLOCK:  I believe that question

13:37:38  9              was asked and answered already, and that is

13:37:40 10              that -- and you're right, that is exactly

13:37:42 11              how he answered it.  And I would ask you to

13:37:45 12              stop calling for privileged testimony.

13:37:47 13              MR. BOWEN:  I'm not calling for

13:37:48 14              privileged testimony.  I'm asking the

13:37:49 15              witness.  Maybe, maybe you misunderstood,

13:37:51 16              Mr. Pollock.

13:37:53 17              The question is, and I'm just trying

13:37:56 18              to clarify the witness's position, is that

13:37:58 19              he is refusing to answer the question about

13:38:00 20              any effort made to investigate whether or

13:38:02 21              not the trust has or had claims against

13:38:06 22              Dalia Genger as the, as the prior trustee

13:38:09 23              because it's privileged.  Is that your

13:38:12 24              position?

13:38:18 25              MR. POLLOCK:  Yes.  I am directing him

13:38:20  1                    not to answer that question.

13:38:21  2                    THE WITNESS:  Yes.  At the advice of

13:38:22  3             counsel, I'm not answering that.

13:38:24  4   BY MR. BOWEN:

13:38:25  5   Q.    Is there anything that you can tell us about

13:38:27  6   that topic that's outside of the privilege, to your

13:38:29  7   understanding?

13:38:30  8   A.    No.

13:44:41  9   Q.    So what I'm asking you is what did you

13:38:34 10   understand was done that's not based on privileged

13:38:39 11   communication from lawyers to investigate whether the

13:38:44 12   trust has or had a claim against Dalia Genger?

13:38:52 13   A.    Everything in that would be privileged.

13:45:13 14                    MR. HERSCHMANN:  Mike, it's Eric

13:38:58 15             Herschmann.  Can we take, like, a

13:39:00 16             three-minute break, please?

13:39:02 17                    THE WITNESS:  Of course.

13:39:05 18                    MR. BOWEN:  Yeah, we can take a break

13:39:07 19             right now.  I'm about to move topics.  So

13:39:07 20             let's do -- it's 2:40, 1:40 your time --

13:39:09 21             let's do 1:45, please.

13:39:12 22                    (Five-minute break.)

13:44:41 23   BY MR. BOWEN:

13:44:47 24   Q.    Okay.  So when you gave the release to Dalia

13:44:50 25   Genger, it was at the same day that you signed

```
13:44:55  1   accepting the position as the successor trustee;

13:44:58  2   correct?

13:45:51  3   A.    I did.

13:45:52  4   Q.    So any investigation you did about potential

13:45:04  5   claims against Dalia Genger you did before you became

13:45:12  6   the trustee?

13:45:14  7              MR. POLLOCK:  Same objection.

13:45:15  8   Q.    Is that correct?

13:46:03  9   A.    I have been through a lot of material.  I,

13:45:26 10   obviously, did not come up with claims against Dalia

13:45:32 11   Genger.  I came up with, with other claims, so.

13:45:43 12   Q.    But you did that before you accepted the

13:45:46 13   position as successor trustee; is that what you're

13:45:49 14   saying?

13:46:19 15   A.    I am saying I did not.

13:45:51 16   Q.    You did it after you became successor trustee?

13:45:55 17   A.    I'm saying no one has indicated to me at any

13:45:59 18   point that Dalia Genger has done anything that I need

13:46:03 19   to investigate.  If I were to find out that she had,

13:46:08 20   then I would take the resources and investigate that.

13:46:43 21   Q.    So you didn't conduct any investigation before

13:46:14 22   you signed the release releasing Dalia Genger --

13:46:17 23              MR. POLLOCK:  Objection.

13:46:17 24   Q.    -- is that true?

13:46:19 25              MR. POLLOCK:  Objection,
```

BUSHMAN COURT REPORTING

13:46:20  1              mischaracterizes the testimony.  Also, Mr.

13:46:22  2              Bowen, I believe you represent Kasowitz in

13:46:27  3              this proceeding.  Are you questioning him

13:46:30  4              as counsel for Kasowitz?

13:46:30  5   Q.    Mr. Oldner --

13:46:30  6                  MR. POLLOCK:  Is that right?

13:46:35  7   Q.    -- you can answer the question, please.

13:46:37  8                  MR. POLLOCK:  Let's go back to the

13:46:38  9              very beginning.  When you introduced

13:46:39 10              yourself, you didn't indicate who you were

13:46:41 11              representing.

13:46:43 12                  MR. BOWEN:  Okay.  You can have one.

13:46:43 13                  MR. POLLOCK:  Please indicate who you

13:46:44 14              represent.

13:46:45 15   BY MR. BOWEN:

13:47:20 16   Q.    Go head, Mr. Oldner.  You can answer the

13:46:52 17   question.

13:46:53 18   A.    Surprise, but would you ask the question again?

13:46:57 19   Q.    Oh, I'm sorry.  Yes.  You -- I'm trying to get

13:47:00 20   clarity on what your testimony is, and I think what

13:47:03 21   you're saying is you did not conduct any kind of

13:47:06 22   investigation of Dalia Genger before you signed the

13:47:10 23   release as the successor trustee releasing any claims

13:47:14 24   against her --

13:47:15 25                  MR. POLLOCK:  Objection --

13:47:15  1    Q.       -- is that correct?

13:47:16  2                    MR. DELLAPORTAS:  Object to form.

13:47:16  3                    MR. POLLOCK:  -- mischaracterizes the

13:47:18  4              testimony.  Also if, if you are, indeed,

13:47:21  5              representing Kasowitz here, I don't begin

13:47:25  6              to understand why Kasowitz as a creditor in

13:47:29  7              the Orly Genger bankruptcy is seeking

13:47:33  8              discovery on Mr. Oldner's -- Mr. Cavaliere,

13:47:36  9              I'm not sure what you're signaling to me.

13:47:41  10                   MR. CAVALIERE:  Mr. Pollock, I think

13:47:43  11             it's very -- it's, it's black letter law a

13:47:43  12             creditor has a right to ask questions of a

13:47:46  13             deponent in a bankruptcy case.  I think we

13:47:48  14             can move on.

13:47:49  15                   MR. DELLAPORTAS:  I don't think that

13:47:49  16             was his point.

13:47:51  17                   MR. POLLOCK:  That was not my point.

13:47:55  18             My point was that there is an entity of,

13:47:55  19             of, that is connected to Kasowitz in that

13:48:00  20             it is a -- I think you said, Mr. Cavaliere,

13:48:03  21             at the previous status conference that it's

13:48:07  22             directed by Mr. Herschmann or otherwise

13:48:08  23             tied to Mr. Herschmann -- I can't remember

13:48:12  24             your exact words -- but it appears that Mr.

13:48:14  25             Bowen is seeking discovery in support of

13:48:17  1              the entity Claims Pursue.

13:48:19  2                    And, on top of that, he won't -- he

13:48:20  3              has not even identified who he is

13:48:23  4              representing in this questioning, and it

13:48:25  5              appears that, in effect, he is representing

13:48:28  6              the interest of the Claims Pursue entity.

13:48:32  7                    And I've asked him to clarify who he

13:48:34  8              is representing in this proceeding during

13:48:37  9              the deposition, during which he is asking

13:48:38  10             the questions.

13:48:39  11  BY MR. BOWEN:

13:49:09  12  Q.    Go ahead, Mr. Oldner.  Let me, I think for the

13:48:45  13  third time I'll restate the question.  And, again,

13:48:48  14  I'm just asking you to clarify.  If I misstate it,

13:48:52  15  just correct it.

13:48:54  16                    MR. POLLOCK:  Mr. Bowen --

13:48:55  17  Q.    I understood you to say that you did not

13:48:57  18  conduct any investigation of Dalia Genger before you

13:49:01  19  signed a release as the successor trustee releasing

13:49:04  20  any claims the trust may or may not have against

13:49:07  21  Dalia Genger; is that correct?

13:49:09  22                    MR. POLLOCK:  Objection;

13:49:09  23             mischaracterizes his testimony.

13:49:11  24  Q.    You can answer it.  Am I right or wrong?

13:49:20  25  A.    I did not conduct any investigation into Dalia

                        BUSHMAN COURT REPORTING

13:49:24  1  Genger before I signed the release.

13:49:30  2  Q.    Now the 8.9 or 9 million dollar debt that the

13:49:34  3  trust has, you, you understand that's connected to

13:49:37  4  something called the D&K note; correct?

13:49:41  5  A.    Yes, sir.

13:49:48  6  Q.    And do you, do you know that Dalia -- well, let

13:49:49  7  me ask it this way.  At the time that you decided to

13:49:51  8  be the successor trustee were you aware of the fact

13:49:56  9  that Dalia Genger had purported to transfer that note

13:50:00 10  and, and incur debt on behalf of the trust that was

13:50:04 11  disallowed by the Court?

13:50:10 12                MR. DELLAPORTAS:  Object to form.  It

13:50:11 13            misstates the record.

13:50:13 14                MR. POLLOCK:  I join in that

13:50:14 15            objection.

13:50:17 16                MR. DELLAPORTAS:  It's just not true.

13:50:18 17  A.    Could you, could you point me to what you're

13:50:20 18  talking about?

13:50:52 19  Q.    Well, were you aware that there was any

13:50:23 20  transaction involving the D&K note that Dalia Genger

13:50:28 21  was involved in?

13:50:29 22  A.    Not at all.

13:50:31 23  Q.    You have no knowledge of that at all?

13:50:33 24  A.    I had no knowledge whenever I accepted the

13:50:36 25  position.

13:51:08  1   Q.    Okay.  And did, did you have any knowledge at

13:50:39  2   any time either before you accepted the position or

13:50:42  3   afterwards that the transactions had been disallowed

13:50:49  4   by the Court that purported to put debt on the trust?

13:50:55  5                   MR. DELLAPORTAS:  Objection; misstates

13:50:56  6              the record.  It's simply untrue.

13:51:00  7                   MR. POLLOCK:  And I join in that

13:51:02  8              objection.  And, also, I am concerned that

13:51:03  9              again what you are asking for is his legal

13:51:05 10              analysis of the legal record, which is

13:51:08 11              inherently privileged.  And, also --

13:51:11 12   Q.    You can answer.

13:51:12 13                   MR. POLLOCK:  -- this has nothing to

13:51:14 14              do with the Motion to Dismiss.

13:51:15 15   Q.    You can answer.  Subject to all of those

13:51:17 16   objections, just -- and I'll restate the question.

13:51:18 17   A.    Subject to those objections, are you speaking

13:51:21 18   of some particular decision?

13:51:25 19   Q.    Yes.

13:51:25 20   A.    Okay.

13:51:26 21   Q.    That there was a decision that disallowed a

13:51:29 22   debt, a liability that, that Dalia Genger had tried

13:51:33 23   to take on, onto the Orly Genger Trust.

13:51:37 24                   MR. POLLOCK:  Mr. Bowen --

13:51:38 25   Q.    Are you aware of any decision like that, where

13:51:39  1   that was disallowed?

13:51:39  2   A.    I wouldn't --

13:51:41  3                MR. POLLOCK:  Instead of

13:51:42  4           characterizing the decision, can you show

13:51:44  5           it to us, or otherwise -- I don't even know

13:51:47  6           why you are asking the witness to

13:51:49  7           characterize or testify to a court decision

13:51:51  8           without -- anything he knows about it is

13:51:57  9           his legal analysis with counsel.  Enough.

13:52:00 10           Move on.

13:52:00 11                MR. DELLAPORTAS:  This is John

13:52:00 12           Dellaportas --

13:52:03 13                MR. BOWEN:  That's blatant coaching,

13:52:03 14           which you've done repeatedly today, and I

13:52:05 15           would ask you again please to not do that.

13:52:07 16           It's against the rules.

13:52:12 17                MR. DELLAPORTAS:  Sorry.  This is John

13:52:12 18           Dellaportas.

13:52:12 19   BY MR. BOWEN:

13:52:12 20   Q.    Mr. Oldner --

13:52:12 21                MR. DELLAPORTAS:  Objection -- please

13:52:12 22           don't speak over my objections.

13:52:13 23                MR. BOWEN:  Mr. Dellaportas, I didn't

13:52:15 24           realize you were talking, because I was

13:52:16 25           responding to Mr. Pollock.

BUSHMAN COURT REPORTING

13:52:19  1              I don't know if my, my conduct is

13:52:21  2         heard by the reporter.  Can you cease and

13:52:24  3         desist for a moment?  I'll let you speak.

13:52:26  4              MR. DELLAPORTAS:  Okay.

13:52:26  5              MR. BOWEN:  Please stop.  Janess, did

13:52:26  6         you hear what I said or no?

13:52:41  7              COURT REPORTER:  In and out.  I could

13:52:41  8         hear Mr. Dellaportas breaking into your --

13:52:41  9         every time you paused, I could hear what he

13:52:41 10         was saying.

13:52:42 11              MR. BOWEN:  Okay.  Okay.  Mr.

13:52:42 12         Dellaportas, we've all been acknowledging

13:52:44 13         and respecting the limitations of this

13:52:46 14         medium and taking turns in speaking.

13:52:49 15              So you can't just immediately start

13:52:51 16         speaking whenever you feel like it.

13:52:53 17         Mr. Pollock had made some statements, and I

13:52:56 18         am responding to it.

13:52:57 19              If you want a chance now to state

13:52:58 20         whatever objection you have, you may do so.

13:52:58 21              MR. DELLAPORTAS:  Thank you.  Much

13:52:58 22         appreciated.  I would just ask that if we

13:53:04 23         are referring the witness to a decision, we

13:53:07 24         show that decision, because the last few

13:53:09 25         questions which purport to describe

                     BUSHMAN COURT REPORTING

13:53:13  1            decisions bear no relation to the actual

13:53:17  2            contents of those decisions, and really

13:53:19  3            it's counterproductive.

13:53:21  4                So, again, these decisions are public

13:53:23  5            record.  The witness, we can ask if he's

13:53:26  6            seen them, if he has views on them.

13:53:28  7                That's all, I guess, that seems

13:53:29  8            relevant, so it's fair game, but, but for

13:53:33  9            you to characterize decisions is just going

13:53:36 10            to have lots of speaking objections and

13:53:37 11            waste everybody's time, so please, please

13:53:37 12            don't do that.

13:53:37 13  BY MR. BOWEN:

13:53:39 14  Q.    Mr. Oldner, are you aware of any court

13:53:43 15  decisions involving the D&K note?

13:53:50 16  A.    Not that I can recall.  I recall things about

13:53:53 17  the D&K note.  That's all.

13:54:26 18  Q.    You do recall some things about the D&K note?

13:54:00 19  A.    I recall the D&K note for sure.

13:54:03 20  Q.    And what was your understanding about what the

13:54:05 21  D&K note -- and that's D, ampersand sign, K, D&K

13:54:09 22  note, what was your understanding about what that

13:54:13 23  was?

13:54:13 24  A.    My understanding is that was the note that

13:54:16 25  originally funded the trust, that purchased the

```
13:54:22  1   shares to fund the trust.  I can be wrong about that,

13:54:25  2   but that's my understanding.

13:55:02  3   Q.   And did you, did you learn about somebody by

13:54:31  4   the name of David Parnes in connection with that?

13:54:35  5   A.   Not in connection with that.

13:54:37  6   Q.   Do you know who David Parnes is?

13:54:38  7   A.   I do.

13:55:12  8   Q.   Have you meet him?

13:54:45  9   A.   I have.

13:55:14 10   Q.   Where, where did you meet him?

13:55:14 11   A.   Austin, Texas.

13:54:48 12   Q.   And was that in August of 2019?

13:55:20 13   A.   It was.

13:54:51 14   Q.   What did you discuss with Mr. Parnes?

13:54:54 15            MR. POLLOCK:  I would caution the

13:54:55 16         witness that communications with David

13:55:00 17         Parnes would be subject to the common

13:55:02 18         interest privilege, and direct him not to

13:55:04 19         give answers with respect to what he

13:55:06 20         discussed with Mr. Parnes.

13:55:09 21            MR. DELLAPORTAS:  Same -- this is Mr.

13:55:10 22         Dellaportas, same instruction.  I'm

13:55:12 23         instructing the witness not to answer any

13:55:15 24         questions about communications with

13:55:16 25         Mr. Parnes, period.
```

```
13:55:17  1   BY MR. BOWEN:

13:56:15  2   Q.    Who else was present when you had this, when

13:55:22  3   you met with Mr. Parnes?

13:55:27  4   A.    Mr. Parnes was in the room full of lawyers

13:55:35  5   being interviewed and operating concerning the

13:55:38  6   bankruptcy in Texas.

13:55:40  7   Q.    Who was there, what lawyers?

13:55:44  8   A.    Well, Mr. Dellaportas, Sabrina, whose last name

13:55:55  9   I don't know.  Sagi was there.  Jay Ong was there.

13:56:06 10   David Parnes was there, and it seems like there's one

13:56:10 11   other person that I may be missing.

13:56:15 12   Q.    Did you --

13:56:15 13   A.    But those people were there.

13:56:54 14   Q.    Okay.  And this was in person; right?

13:56:21 15   A.    Pardon me, sir?

13:56:22 16   Q.    This was in person in Austin?

13:56:26 17   A.    Yes, it was in person.

13:56:27 18   Q.    Had you talked to Mr. Parnes before that?

13:56:30 19   A.    That's the first day I met him.

13:56:32 20   Q.    Okay.  And then have you talked with him since

13:56:35 21   that day?

13:56:36 22   A.    Only one email exchange.

13:56:43 23   Q.    And is that email exchange subject to the

13:56:46 24   common interest privilege?

13:56:48 25              MR. POLLOCK:  Mr. Bowen, I would, on
```

13:56:54  1                 behalf of the witness, indicate that

13:56:56  2                 communications, privileged communications

13:56:58  3                 with Mr. Parnes are subject to the common

13:57:01  4                 interest privilege.

13:57:03  5    Q.    Well, I'm asking if the email exchange was a

13:57:06  6    privileged communication.

13:57:07  7    A.    I'm sure it was.

13:57:41  8    Q.    But he's not your lawyer; correct?

13:57:43  9    A.    He is not my lawyer.

13:57:15 10    Q.    And he doesn't represent the trust or Recovery

13:57:17 11    Effort; correct?

13:57:49 12    A.    He does not.

13:57:20 13    Q.    Do you know who he represents?

13:57:23 14    A.    I do not.  I want to say -- I would be

13:57:30 15    guessing.

13:57:31 16    Q.    If you don't --

13:57:31 17    A.    I would be guessing.  I don't know.

13:58:00 18    Q.    Well, if you don't know who he represents, then

13:57:37 19    what's the, how do you define the common, what topics

13:57:41 20    are in common, that would be within the common

13:57:43 21    interest?

13:57:44 22                 MR. POLLOCK:  Objection; seeks a legal

13:57:45 23                 conclusion.  We're not doing discovery on

13:57:48 24                 his understanding of a legal concept.

13:57:51 25                 Clearly, he already testified as to

13:57:53  1          who the parties were and who the lawyers

13:57:55  2          were in the room.

13:57:56  3               And we are asserting the common

13:57:58  4          interest privilege with respect to those

13:58:01  5          communications.

13:58:05  6               MR. DELLAPORTAS:  This is Mr.

13:58:05  7          Dellaportas.  Same objection --

13:58:12  8  Q.    So --

13:58:12  9               MR. DELLAPORTAS:  -- and same

13:58:12 10          instruction.

13:58:14 11  Q.    Mr. Oldner, are you following Mr. Dellaportas's

13:58:14 12  instruction not to answer these questions about Mr.

13:58:14 13  Parnes?

13:58:16 14               MR. POLLOCK:  No.  Presumably he'd be

13:58:18 15          following my instruction.

13:58:19 16               MR. BOWEN:  Well, Mr. Dellaportas

13:58:20 17          instructed him.

13:58:21 18  BY MR. BOWEN:

13:58:21 19  Q.    I'm asking you, Mr. Oldner, are you following

13:58:23 20  Mr. Dellaportas's instruction?

13:58:25 21  A.    Mr. Dellaportas is not my attorney.  I am not

13:58:27 22  following his instruction.  I am following Adam

13:58:30 23  Pollock's instruction, and I am not answering this

13:58:34 24  question on his instruction.

13:58:36 25  Q.    And, and you understand that the instruction by

BUSHMAN COURT REPORTING

13:58:38   1    Mr. Dellaportas and Mr. Pollock are the same?

13:58:41   2    A.    No.  I understand that instruction by Adam

13:58:44   3    Pollock is instruction from my attorney.  Instruction

13:58:47   4    from John Dellaportas is not instruction from my

13:58:51   5    attorney.

13:59:20   6    Q.    Did you discuss the D&K note with Mr. Parnes?

13:58:56   7                  MR. POLLOCK:  Objection.  I'm going to

13:58:58   8           direct the witness not to answer questions

13:58:59   9           about what he discussed with the legal

13:59:00   10          counsel.

13:59:03   11   Q.    You can just say "yes" or "no."

13:59:06   12                 MR. POLLOCK:  No, he can't say "yes"

13:59:07   13          or "no."  "Yes" or "no" would convey the

13:59:09   14          privileged communication, and I would ask

13:59:11   15          for the umpteenth time that you stop

13:59:14   16          directly asking him for legal

13:59:15   17          communications.  I find it completely

13:59:19   18          inappropriate.

13:59:24   19                 MR. DELLAPORTAS:  Same objection from

13:59:25   20          Dellaportas.

13:59:26   21   Q.    Are you following Mr. Dellaportas's and

13:59:28   22   Mr. Pollock's --

13:59:28   23   A.    I am following --

13:59:28   24   Q.    -- instructions?

14:00:15   25   A.    I am following Mr. Pollock's instruction not to

13:59:33  1    answer the question.

13:59:44  2    Q.    How did you learn about the D&K note?

14:00:26  3    A.    Through reading voluminous materials.

13:59:52  4    Q.    What's your understanding from that reading

13:59:56  5    about how the D&K note was used to fund the Orly

13:59:59  6    Genger Trust?

14:00:36  7    A.    My understanding, which is limited and not a

14:00:07  8    legal understanding, is that the money used from the

14:00:11  9    D&K note purchased the shares that went into each one

14:00:17 10    of the two trusts, the Sagi trust and the Orly trust,

14:00:21 11    and that that money, that note had to be paid back,

14:00:24 12    because if the note wasn't paid back, then the trust

14:00:28 13    would be considered a sham trust and would be

14:00:32 14    illegal, an illegal tax maneuver.

14:00:36 15           So from that I understand that -- once

14:00:39 16    again, it is simply my understanding.  This is not my

14:00:42 17    legal interpretation -- that the D&K note must be

14:00:46 18    repaid.

14:00:47 19           And from a decision I read that I cannot

14:00:50 20    tell you when it was, but I believe it was Justice

14:00:54 21    Jeff, he declared that the D&K note was owed 50

14:01:00 22    percent -- the balance of the D&K note had to be paid

14:01:04 23    off by each trust 50 percent -- 50 percent by the

14:01:07 24    Sagi trust, 50 percent by the Orly trust.  That is

14:01:11 25    99 percent of my understanding of the D&K note.

                        BUSHMAN COURT REPORTING

14:01:19  1   Q.   What was your understanding about what assets

14:01:21  2   the trust had to pay back the note?

14:01:25  3   A.   They were the shares that were purchased by

14:01:28  4   that note --

14:01:28  5   Q.   What shares --

14:01:28  6   A.   -- the value of the shares.

14:01:30  7   Q.   What shares?

14:01:31  8   A.   I believe those are the TPR shares.  I think

14:01:35  9   that's right.

14:01:36 10   Q.   So the TPR shares --

14:01:36 11   A.   TPR, which is -- the letters get confusing.

14:01:39 12   It's one of the two.

14:01:42 13   Q.   The TPR shares would generate a dividend

14:01:46 14   through the trust as the shareholder, and then the

14:01:49 15   trust would use that money to pay back the note?

14:01:52 16   A.   Originally I believe that Arie Genger made

14:01:56 17   payments on that note.

14:01:59 18   Q.   But what was your understanding of how the

14:02:01 19   trust would have the ability to pay off the note?

14:02:34 20   A.   Well, if the trust had the value of the shares,

14:02:08 21   the trust could either share, sell the shares --

14:02:11 22   there are multiple ways -- use the income from the

14:02:14 23   shares, or sell off a portion of the shares to pay

14:02:17 24   the note.

14:02:17 25   Q.   Was it your understanding that the trust was

14:02:19  1   using the income from the shares to repay the note?

14:02:24  2   A.   That they would use that solely, the income --

14:02:26  3   okay, income from one form or another, from either

14:02:29  4   sales or dividends?

14:02:33  5   Q.   Yes.

14:02:34  6   A.   That's what you mean?  Yes.  They would use the

14:02:37  7   income from that to pay off the notes.

14:02:39  8   Q.   Did you have the understanding that all of that

14:02:41  9   income was supposed to come from dividends?

14:02:44 10   A.   No, I did not.

14:03:26 11   Q.   If the trust just sold the shares and paid off

14:02:51 12   the note, what assets would the trust have left?

14:02:55 13   A.   Well, the trust would not have to sell all of

14:02:56 14   the shares to pay off the note.

14:02:59 15   Q.   That's your understanding?

14:03:01 16   A.   It is.

14:03:03 17   Q.   And how come the, the repayment of that D&K

14:03:07 18   note stopped, by the trust?

14:03:14 19               MR. DELLAPORTAS:  Objection; lack of

14:03:15 20           foundation.

14:04:05 21   A.   I don't know of any way.

14:04:06 22   Q.   Do you know if any repayment was ever made on

14:03:22 23   the D&K note?

14:04:10 24   A.   Yes.

14:04:10 25   Q.   How much was repaid?

14:04:16  1   A.    I do not know.

14:03:29  2   Q.    What, what's your basis for knowing that some

14:03:31  3   amount was repaid?

14:04:25  4   A.    I reconstructed a spreadsheet to determine the

14:03:52  5   value of the D&K note.

14:03:55  6   Q.    And where did you get the information for that

14:03:57  7   spreadsheet?

14:03:59  8                 MR. POLLOCK:  Mr. Oldner, I'll caution

14:04:01  9             you not to testify to matters undertaken in

14:04:06 10             anticipation of litigation or

14:04:08 11             communications that you had with your legal

14:04:10 12             counsel.

14:04:14 13   A.    Based on that, I, I cannot answer that

14:04:17 14   question.

14:04:57 15   Q.    You're refusing to answer that question?

14:04:24 16   A.    I cannot answer that question, based on the

14:04:26 17   fact that the information would be privileged.

14:05:06 18   Q.    So you're refusing based on privilege?

14:05:10 19   A.    I will not answer the question based on

14:04:35 20   privilege.

14:05:13 21   Q.    The person who holds the D&K note now is Robin

14:04:42 22   Rodriguez; right?

14:04:44 23   A.    I believe that that's the claim, that MSM holds

14:04:52 24   the rights to the D&K note.

14:04:55 25   Q.    Who does?

BUSHMAN COURT REPORTING

14:04:55  1    A.    I believe that that is the claim now, that

14:04:59  2    Manhattan Safety Maine holds the rights to the D&K

14:05:03  3    note, yes.

14:05:04  4    Q.    And Manhattan Safety Maine is Robin Rodriguez;

14:05:07  5    no?

14:05:09  6    A.    Yes.

14:05:09  7    Q.    Did you --

14:05:09  8             MR. POLLOCK:  Mr. Bowen, you are

14:05:12  9          squarely seeking discovery with respect to

14:05:12 10          the MSM action, and transparently so.

14:05:18 11             I would respectfully ask that you

14:05:18 12          either move along or make a proffer as to

14:05:21 13          how discovery with respect to the MSM

14:05:23 14          action possibly relates to the Motion to

14:05:27 15          Dismiss.

14:05:29 16    Q.    Have you and Robin Rodriguez done a

14:05:33 17    reconciliation to figure out from the trust, from the

14:05:36 18    trust's perspective how much money the trust owes on

14:05:39 19    the note?

14:05:40 20    A.    Robin, Robin Rodriguez and I have not.

14:06:31 21    Q.    Now you, on behalf of the trust, originally

14:05:58 22    joined in the Motion to Dismiss this bankruptcy;

14:05:59 23    correct?

14:06:01 24    A.    That is correct.

14:06:09 25    Q.    That was when the motion was made in Austin,

14:06:12  1    Texas bankruptcy court; correct?

14:06:49  2    A.    That is correct.

14:06:50  3    Q.    After the case was transferred to the Southern

14:06:22  4    District of New York, Sagi Genger made a, he filed

14:06:27  5    what he called an Amended Motion to Dismiss.  Are you

14:06:30  6    aware of that?

14:06:30  7    A.    I am.

14:06:32  8    Q.    Does the trust join in the Amended Motion to

14:06:36  9    Dismiss?

14:06:36 10    A.    The trust has not joined in that motion.

14:06:39 11    Q.    Why not?

14:06:40 12            MR. POLLOCK:  Mr. Bowen, again, I

14:06:42 13        caution the witness not to testify about

14:06:46 14        privileged communications, and I

14:06:48 15        respectfully ask you to stop trying to

14:06:51 16        elicit legal analysis from the witness.

14:06:57 17    Q.    Why not, Mr. Oldner?  To your understanding,

14:07:02 18    why did you not join in the Motion to Dismiss?  What

14:07:06 19    changed between Austin, Texas and the Southern

14:07:06 20    District of New York?

14:07:09 21    A.    Discussion with counsel, I chose not to.

14:07:13 22    Q.    Well, leaving your discussion with counsel

14:07:16 23    aside, to your understanding, why not?

14:07:46 24    A.    Leaving my discussion with counsel aside,

14:07:20 25    there's nothing else to say.

```
14:07:23  1   Q.   Well, I'm not asking for what they said or what
14:07:26  2   you said to them.  I'm just asking for you, because
14:07:29  3   you're -- well, let me, let me start this way.
14:07:31  4   A.   Okay.
14:07:32  5   Q.   You understand that you're responsible for the
14:07:34  6   trust; right?
14:07:35  7   A.   I do.
14:08:08  8   Q.   You understand that you have fiduciary duties
14:07:42  9   to the beneficiary of the trust; correct?
14:07:44 10              MR. POLLOCK:  Objection, it seeks a
14:07:45 11         legal conclusion.
14:08:18 12   Q.   You can answer, sir.
14:07:52 13   A.   I understand I have an obligation to the
14:07:55 14   beneficiaries of the trust, yes.
14:07:58 15   Q.   And you understand that's a fiduciary duty;
14:07:59 16   right?
14:08:29 17   A.   Yes.
14:08:02 18              MR. POLLOCK:  Objection; seeks a legal
14:08:04 19         conclusion.  And, also --
14:08:04 20   Q.   And you understand --
14:08:04 21              MR. POLLOCK:  -- Mr. Bowen, why are
14:08:06 22         you asking him --
14:08:07 23   Q.   You understand --
14:08:07 24              MR. POLLOCK:  -- for his legal
14:08:08 25         analysis --
```

BUSHMAN COURT REPORTING

14:08:09   1   Q.    You understand that --

14:08:09   2              MR. POLLOCK:  -- of his duties?

14:08:10   3   Q.   I don't know who's speaking, but, Mr. Oldner,

14:08:13   4   do you understand that part of the fiduciary duty

14:08:16   5   that you owe to the beneficiary of the trust is the

14:08:20   6   duty of undivided loyalty; right?

14:08:23   7              MR. POLLOCK:  Objection.  Mr. Bowen, I

14:08:25   8         asked, I am asking --

14:08:26   9              MR. BOWEN:  Who is speaking?  I can't

14:08:27  10         recognize your voice.

14:08:29  11              MR. POLLOCK:  This is Adam Pollock.  I

14:08:29  12         asked politely repeatedly for you to stop

14:08:33  13         asking him for his legal analysis, and I'd

14:08:35  14         also ask you for exactly what came up in

14:08:38  15         the conference with, with Garrity.

14:08:43  16         Garrity said we are not doing

14:08:44  17         discovery at this time on the pending

14:08:47  18         claims.  He said he does not see how an

14:08:50  19         analysis of those claims is relevant to the

14:08:53  20         Motion to Dismiss.

14:08:54  21         He said that those are not factors

14:08:56  22         that he would consider, and he

14:08:56  23         limited all --

14:08:57  24              MR. BOWEN:  Are you referring to

14:08:58  25         Judge, are you referring to Judge Garrity?

BUSHMAN COURT REPORTING

14:09:00  1                    MR. POLLOCK:  Yeah.  What did I say?

14:09:01  2                    MR. BOWEN:  You said "Garrity."  I

14:09:02  3           assumed you meant --

14:09:04  4                    MR. POLLOCK:  Right.  I apologize.

14:09:05  5                    MR. BOWEN:  -- Judge Garrity.

14:09:09  6                    MR. POLLOCK:  Judge Garrity.  And now

14:09:10  7           you are harassing the witness by asking him

14:09:14  8           to make a legal analysis of fiduciary

14:09:15  9           duties.

14:09:19 10                It is so far out of line, and if you

14:09:21 11           continue this harassment, we will have to

14:09:24 12           stop the deposition.

14:09:27 13                    MR. BOWEN:  Well, I'll ask you to stop

14:09:29 14           coaching the witness, because, again, it's

14:09:30 15           a blatant violation of the rules.

14:09:33 16  BY MR. BOWEN:

14:09:33 17  Q.    But, Mr. Oldner, I don't know if you answered

14:09:36 18  this question, because of the objection, but I'll ask

14:09:39 19  it again.

14:09:39 20                You understand in your capacity as the

14:09:43 21  trustee for the Orly Genger Trust that the fiduciary

14:09:46 22  duties that you owe to the beneficiary of the trust

14:09:50 23  include the duty of undivided, undivided loyalty.

14:09:55 24                    MR. POLLOCK:  Objection.

14:09:55 25  Q.    Do you understand that?

                          BUSHMAN COURT REPORTING

14:09:56 1              MR. POLLOCK:  Objection.  That

14:09:57 2         question is just harassing and unnecessary.

14:10:00 3         It -- whether you want him to agree with

14:10:03 4         your interpretation of the law, why are you

14:10:06 5         asking the, the witness this?

14:10:08 6              Why don't you ask the judge what the

14:10:10 7         correct interpretation of the law is, and

14:10:11 8         not the witness?  Move along, Mr. Bowen.

14:10:15 9    Q.    Go ahead, Mr. Oldner.  You can answer the

14:10:16 10   question, and I'll state it a third time.  Do you

14:10:20 11   understand that the duty of undivided loyalty is part

14:10:24 12   of your fiduciary duties to the beneficiary of the

14:10:26 13   trust?

14:10:26 14             MR. DELLAPORTAS:  This is John

14:10:26 15        Dellaportas.

14:10:27 16             MR. POLLOCK:  And I will object to the

14:10:27 17        form.

14:10:27 18             MR. DELLAPORTAS:  Sorry.  This is John

14:10:27 19        Dellaportas.  I object.  It just flatly

14:10:33 20        misstates New York law, and New York

14:10:35 21        lawyers should not misstate New York law.

14:10:38 22             MR. POLLOCK:  John, I'm having trouble

14:10:39 23        hearing you.

14:10:40 24   Q.    Go ahead, Mr. Oldner, you can, you can answer

14:10:41 25   the question.

                        BUSHMAN COURT REPORTING

14:10:41  1              MR. POLLOCK:  Mr. Bowen, just one

14:10:41  2         second for the stenographer.  John

14:10:44  3         Dellaportas, what did you say?

14:10:48  4              MR. DELLAPORTAS:  I object to the

14:10:49  5         question, that it flatly misstates New York

14:10:54  6         law, and New York lawyers should not

14:10:55  7         misstate New York law to non-lawyer fact

14:10:56  8         witnesses.  It's just improper.

14:11:02  9              MR. BOWEN:  Mr. Dellaportas, you have

14:11:02 10         to state your name before you start

14:11:04 11         speaking.  We've all been following that

14:11:05 12         convention except me, but --

14:11:06 13              COURT REPORTER:  I'm having --

14:11:06 14  BY MR. BOWEN:

14:11:06 15  Q.    So, Mr. Oldner, is that, is that your

14:11:10 16  understanding, that you have an undivided duty of

14:11:10 17  loyalty, or no?

14:11:11 18              MR. POLLOCK:  Hold on one second.  Mr.

14:11:15 19         Dellaportas, can you please speak up,

14:11:16 20         because the stenographer is having a lot of

14:11:16 21         trouble hearing you?

14:11:17 22              COURT REPORTER:  Thank you.  That's

14:11:17 23         what I was going to say.  You've got to

14:11:17 24         speak up, because I'm really having a hard

14:11:17 25         time.

BUSHMAN COURT REPORTING

```
14:11:30  1              MR. DELLAPORTAS:  Sure.  If you got my
14:11:30  2         last objection, I won't repeat it, and I'll
14:11:30  3         just speak up going forward.  If you didn't
14:11:30  4         get --
14:11:30  5              MR. POLLOCK:  I don't think that she
14:11:31  6         did.  I think you can speak up and repeat
14:11:32  7         it.
14:11:35  8              MR. DELLAPORTAS:  Okay.  Sorry.  This
14:11:36  9         is John Dellaportas.  I object to the last
14:11:39 10         question, in that it misstates New York
14:11:42 11         law, and New York lawyers should not
14:11:45 12         misstate New York law to non New York
14:11:47 13         lawyers.  It's improper.
14:11:50 14              I would ask Mr. Bowen not to make
14:11:52 15         recitations of New York law, particularly
14:11:52 16         incorrect ones, going forward to the
14:11:54 17         witness.  It's counterproductive.
14:11:55 18              MR. POLLOCK:  Mr. Bowen, this is
14:11:56 19         entirely counterproductive.  Can you please
14:12:00 20         move on?
14:12:00 21  BY MR. BOWEN:
14:12:26 22  Q.   Mr. Oldner, the question is do you understand
14:12:03 23  that you have an undivided duty of loyalty to the
14:12:06 24  beneficiary of the trust?
14:12:07 25              MR. POLLOCK:  Mr. --
```

14:12:08  1                    MR. DELLAPORTAS:  Same objection.

14:12:11  2                    MR. POLLOCK:  Same objection.

14:12:11  3             Mr. Oldner, you don't need to --

14:12:14  4                    MR. BOWEN:  I didn't, I didn't hear

14:12:14  5             the answer from the witness.

14:12:16  6  BY MR. BOWEN:

14:12:16  7  Q.    Can you repeat your answer?

14:12:17  8                    MR. POLLOCK:  I'm telling him that,

14:12:17  9             Mr. Oldner, you don't need to ask, answer

14:12:20 10             that question.  It's just harassing.  Mr.

14:12:22 11             Bowen can move on.

14:12:25 12  A.    On advice of counsel, I will not answer that

14:12:27 13  question.

14:12:27 14  Q.    You're refusing to answer that question?

14:12:30 15  A.    On advice of counsel, I will not answer that

14:12:32 16  question.

14:12:33 17  Q.    You're refusing to answer the question of what

14:12:35 18  your understanding is of your legal obligations to

14:12:37 19  the beneficiary of the trust, that you claim to be --

14:12:40 20                    MR. POLLOCK:  Now you're asking a

14:12:41 21             different question, Mr. Bowen.

14:12:43 22                    MR. BOWEN:  Excuse me.  You can't

14:12:44 23             speak over with an objection.  It's one

14:12:47 24             thing to, to interrupt and obstruct the

14:12:49 25             deposition at the end of a question.  It's

14:12:51  1              another to do it in the middle of a

14:12:53  2              question.

14:12:54  3    BY MR. BOWEN:

14:12:54  4    Q.    Mr. Oldner, leaving aside whatever

14:12:58  5    characterization your lawyer is trying to put on my

14:13:01  6    question, my question to you is you're refusing to

14:13:03  7    answer a question about what legal obligations you

14:13:07  8    have, to your understanding, in your position as the

14:13:10  9    trustee for the Orly Genger Trust; is that correct?

14:13:16 10              MR. DELLAPORTAS:  Objection; misstates

14:13:17 11              the prior question.  This is Dellaportas.

14:13:20 12              MR. POLLOCK:  I join in that

14:13:21 13              objection, that it misstates the prior

14:13:22 14              question, and I would ask you to stop --

14:13:25 15              MR. BOWEN:  I'm not trying to restate

14:13:26 16              a question.  I just said that.

14:13:28 17    BY MR. BOWEN:

14:13:28 18    Q.    Mr. Oldner, can you answer that question?

14:13:28 19              MR. DELLAPORTAS:  Yes, you are.  You

14:13:28 20              said, you said he's refusing to answer a

14:13:31 21              question which you did not ask, Mr. Bowen.

14:13:33 22              That's improper.  Please do not do that.

14:13:36 23              It just slows down the deposition.

14:13:37 24              MR. BOWEN:  Mr. Dellaportas, please

14:13:39 25              don't raise your voice.  You have to

                        BUSHMAN COURT REPORTING

14:13:41 1          identify who is speaking, and you are

14:13:41 2          yelling.

14:13:44 3               MR. DELLAPORTAS:  I was asked to raise

14:13:44 4          my voice --

14:13:45 5               MR. BOWEN:  You need to not yell.

14:13:45 6               MR. DELLAPORTAS:  -- by the reporter.

14:13:45 7          That's why I did.

14:13:45 8               MR. BOWEN:  Yelling is improper.

14:13:49 9               MR. DELLAPORTAS:  I didn't yell --

14:13:50 10              MR. BOWEN:  You can raise your voice,

14:13:53 11         the volume of your voice, without yelling.

14:13:53 12              MR. DELLAPORTAS:  -- I raised my voice

14:13:53 13         because the reporter asked me to raise my

14:13:53 14         voice.

14:13:53 15              MR. BOWEN:  I'm asking you not to

14:13:54 16         yell.

14:13:56 17              MR. DELLAPORTAS:  I wasn't --

14:13:56 18    BY MR. BOWEN:

14:13:56 19    Q.   Now let me try again, Mr. Oldner.  This is a

14:13:58 20    brand new question.

14:13:59 21    A.   Gentlemen, I'm going to the bathroom.

14:14:00 22    Q.   It doesn't have to do with any prior question.

14:14:01 23    A.   I'm going to the bathroom at this time.  Y'all

14:14:04 24    can argue this out.  I'm going to the bathroom.

14:14:05 25              MR. POLLOCK:  Mr. Bowen, I would ask

                    BUSHMAN COURT REPORTING

14:14:07  1          while he's going to the bathroom two
14:14:09  2          things.  One is that you stop speaking over
14:14:11  3          me.
14:14:11  4              MR. BOWEN:  Well, first of all, I'm
14:14:12  5          going to note for the court reporter that
14:14:14  6          the witness stood up and walked out of the
14:14:16  7          room.
14:14:18  8              THE WITNESS:  Yes.
14:14:19  9              MR. BOWEN:  He's no longer on the
14:14:20 10          camera.
14:14:20 11              MR. POLLOCK:  You're right.  He went
14:14:20 12          to the bathroom.  Mr. Bowen, I will ask
14:14:21 13          that you stop speaking over me when I'm
14:14:24 14          making an objection, and that you stop
14:14:25 15          raising your voice at me, and that you stop
14:14:27 16          badgering the witness, and you stop
14:14:29 17          harassing the witness.
14:14:33 18              THE WITNESS:  And I need a mask to go
14:14:34 19          to the restroom.  Excuse me.  I need my
14:14:35 20          mask.
14:14:37 21              MR. POLLOCK:  He needs a mask.
14:14:38 22              Mr. Bowen, I think that what you are
14:14:40 23          doing today is harassing and badgering, and
14:14:43 24          to this time, you haven't even identified
14:14:47 25          who you represent.

                          BUSHMAN COURT REPORTING

14:14:49  1              As long as he's in the bathroom and

14:14:51  2              we're still on the record, at least do me

14:14:53  3              the courtesy of explaining who you are

14:14:55  4              representing in this deposition.

14:15:02  5                  MR. BOWEN:  Mr. Pollock, we did a roll

14:15:04  6              call at the beginning of the deposition.  I

14:15:05  7              stated who I was and who I represent, so

14:15:08  8              I'm not going to play whatever game you're

14:15:10  9              trying to play.

14:15:11 10                  MR. POLLOCK:  So I --

14:15:11 11                  MR. BOWEN:  I have no interest in

14:15:12 12              having a colloquy with you, especially on

14:15:14 13              the record.  And, and so you need to stop.

14:15:18 14              I'm going to ask you for the umpteenth

14:15:20 15              time to please stop, and especially stop

14:15:21 16              coaching the witness.  It really reflects

14:15:25 17              very badly on you.

14:15:26 18                  And, unfortunately, it will probably

14:15:26 19              be brought to the attention of Judge

14:15:31 20              Garrity, so you need to stop.

14:15:34 21                  MR. POLLOCK:  Mr. Bowen, the witness

14:15:35 22              is in the bathroom.

14:15:36 23                  MR. BOWEN:  Since the witness is not

14:15:36 24              here, we're going off the record to give

14:15:38 25              the court reporter a break.

14:15:39  1          MR. POLLOCK:  Great.

14:15:40  2          MR. BOWEN:  As soon as the witness

14:15:40  3      returns, please let me know.  Thank you.

14:15:42  4          (Three-minute break.)

14:18:48  5          MR. POLLOCK:  All right.  Mr. Bowen,

14:18:48  6      are you still there?  Mr. Bowen, can we get

14:18:52  7      on to the topics of the Motion to Dismiss,

14:18:54  8      so that we can get to the matters at hand?

14:18:57  9          You have spent hours and hours on

14:19:00 10      matters that --

14:19:01 11          MR. BOWEN:  I don't know who's

14:19:02 12      speaking.  Who's speaking, please?

14:19:04 13          MR. POLLOCK:  It's Adam Pollock, and

14:19:06 14      I'm asking you, respectfully, to move on to

14:19:08 15      the Motion to Dismiss.  John Dellaportas

14:19:11 16      already indicated that he also has

14:19:13 17      questions today.

14:19:14 18          MR. BOWEN:  I, I -- look, you know,

14:19:15 19      this is exactly what I was talking to the

14:19:16 20      witness about was the Motion to Dismiss

14:19:19 21      when, when, when we had the break.

14:19:20 22  BY MR. BOWEN:

14:19:21 23  Q.    Mr. Oldner, we're back on the record.

14:19:23 24          MR. POLLOCK:  Mr. Bowen --

14:19:28 25          MR. CAVALIERE:  This is Rocco

14:19:28  1          Cavaliere.  I had also served a subpoena,

14:19:30  2          and Mr. Geron as well.

14:19:33  3              And I think after Mr. Bowen is done,

14:19:35  4          with all due respect, Mr. Dellaportas will

14:19:37  5          have an opportunity to ask questions, but

14:19:39  6          after Mr. Bowen is done, I think Mr. Geron

14:19:41  7          would go next.  I'd go after him, and then

14:19:45  8          Mr. Dellaportas, and anyone else that wants

14:19:46  9          to ask questions, if that's okay -- you

14:19:46 10          know, just to have a natural order of

14:19:50 11          things.

14:19:54 12              MR. BOWEN:  Let me, let me conclude my

14:19:55 13          portion of this, because I'm almost done,

14:19:57 14          and then, and then we can address that, but

14:19:59 15          I don't want to take time on that.

14:20:00 16              MR. DELLAPORTAS:  Okay.

14:20:01 17              THE WITNESS:  Can you hear me?

14:20:02 18              MR. BOWEN:  Yes, I hear you.

14:20:05 19              MR. POLLOCK:  If I can just clarify

14:20:07 20          the record, Mr. Cavaliere did not serve a

14:20:11 21          subpoena.  Mr. Cavaliere emailed a

14:20:11 22          subpoena.

14:20:11 23              MR. BOWEN:  We can do that later,

14:20:12 24          Mr. Pollock.  Please stop talking, so we

14:20:14 25          can conclude.

14:20:16  1            I'm going to -- I'm hoping to wrap

14:20:18  2            this up, at least my portion of the

14:20:21  3            questioning, you know, in a matter of a

14:20:22  4            short amount of time, so please cease and

14:20:25  5            desist.

14:20:25  6    BY MR. BOWEN:

14:20:26  7    Q.    Mr. Oldner, I was asking you about the, the

14:20:30  8    Motion to Dismiss, and we got on to the question of

14:20:37  9    what your understanding of your legal obligations are

14:20:39 10    as, as the trustee.

14:20:43 11            Let me just try and do this step by step.

14:20:46 12    I take it you do have an understanding of what your

14:20:49 13    legal obligations are as the trustee; correct?

14:20:52 14    A.    Yes, sir.

14:21:26 15    Q.    And your understanding is that the trust is

14:20:56 16    governed by New York law; right?

14:20:59 17    A.    Yes, sir.

14:21:33 18    Q.    And you have New York counsel that has been

14:21:03 19    advising you as the trustee; is that correct?

14:21:06 20    A.    Yes, sir.

14:21:08 21    Q.    So you have some -- however you want to

14:21:11 22    describe it, you understand you have some special

14:21:14 23    responsibility to the beneficiary of the trust?

14:21:17 24    A.    Did you say "beneficiary"?

14:21:19 25    Q.    Yes.

```
14:21:20  1   A.     It's beneficiaries, plural.

14:21:52  2   Q.     Okay.  Well, we -- you know that one

14:21:26  3   beneficiary is Orly Genger; correct?

14:21:29  4   A.     Yes.  One beneficiary is Orly Genger.  The

14:21:30  5   other beneficiary is her daughter.  The other

14:21:32  6   beneficiary is future generations.

14:22:05  7   Q.     Okay.

14:21:37  8   A.     I want to make sure we're on the same page.

14:22:10  9   Q.     Right.  Well, that, that's helpful that that's

14:21:42 10   part of your understanding as the trustee.

14:21:43 11   A.     Yes.

14:21:44 12   Q.     So you have to keep in mind not just the

14:21:46 13   interest of Orly Genger but the interests of her

14:21:49 14   descendents; right?

14:21:51 15   A.     Yes, sir.  Yes, sir.

14:22:27 16   Q.     And right now the trust has no assets, other

14:21:58 17   than the two legal claims you mentioned, and it has a

14:22:02 18   multimillion dollar debt; right?

14:22:04 19   A.     Yes, sir.

14:22:04 20   Q.     Okay.

14:22:05 21   A.     Yes, sir.  It has multimillion dollar claims

14:22:08 22   and a multimillion dollar debt.

14:22:45 23   Q.     Okay.  Now before, before I go on to the topic

14:22:15 24   of the Motion to Dismiss I just want to clarify on

14:22:18 25   the release, that was a document that Sagi Genger
```

14:22:24 1   brought to you in Arkansas on the day that you signed

14:22:27 2   the acceptance of the position; is that right?

14:22:32 3   A.   I believe that to be true.

14:23:13 4   Q.   So he had two documents; right?  He had the

14:22:39 5   document where you accepted the position, and he had

14:22:42 6   a separate document, which was the release of Dalia

14:22:45 7   Genger.  Is that right?

14:22:54 8   A.   I'm thinking.  Yes, he had those two documents

14:22:59 9   for sure.

14:23:29 10   Q.   Okay.  And your testimony, though, earlier was

14:23:03 11   you don't think he had any other documents with him,

14:23:05 12   and he didn't show you anything else; is that right?

14:23:08 13   A.   No, sir.  That was not my testimony.

14:23:12 14   Q.   Okay.  What, what else did he have with him,

14:23:13 15   and what else did he show you?

14:23:16 16   A.   The Inter-Creditor Agreement you brought up.

14:23:19 17   Q.   That, that was brought up on the very day that

14:23:20 18   you accepted the position?

14:24:05 19   A.   Yes.

14:24:06 20   Q.   Okay.  But you didn't sign that until sometime

14:23:28 21   over the weekend; is that right?

14:23:30 22   A.   Yes, sir.

14:24:11 23   Q.   Why -- what was the delay in signing that?

14:23:34 24   A.   Are you asking what I'm thinking, what I was

14:23:42 25   thinking when I did that?

14:23:45  1    Q.    Yes.  I'm asking why you didn't just sign it

14:23:48  2    when you signed everything else.

14:23:50  3    A.    Because I wanted to understand how that was

14:23:55  4    beneficial to the trust.

14:24:32  5    Q.    And how did you go about making a determination

14:24:06  6    that it was beneficial to the trust?

14:24:08  7                    MR. POLLOCK:  And, again, I would

14:24:10  8            caution the witness to the extent that he,

14:24:11  9            his analysis was with legal counsel that he

14:24:15 10            not testify to that analysis.

14:24:18 11    A.    Mr. Bowen, I'm, I'm going to have to decline to

14:24:21 12    answer that on the basis that my decision to sign

14:24:26 13    that was with the assistance of legal counsel.

14:25:15 14    Q.    So to answer that question would reveal

14:24:34 15    privileged attorney-client communication?

14:24:37 16    A.    Yes.

14:24:39 17    Q.    Now going back to the Motion to Dismiss,

14:24:46 18    leaving aside any communications with lawyers --

14:24:50 19    A.    Okay.

14:24:51 20    Q.    -- or privileged communications, did you have

14:24:53 21    an understanding about why the trust is no longer, no

14:24:57 22    longer seeking to dismiss the bankruptcy?

14:25:12 23                    MR. POLLOCK:  Objection; asked an

14:25:13 24            answered.

14:25:14 25    Q.    You can answer it.

14:25:14  1                    MR. POLLOCK:  Well, I don't know if he

14:25:16  2              can without revealing his privileged

14:25:18  3              communications.

14:25:23  4                    MR. BOWEN:  Well, Adam, Mr. Pollock,

14:25:24  5              that's, again, coaching, and I'm, I've

14:25:26  6              already prefaced my question with saying I

14:25:29  7              don't want him to reveal attorney-client

14:25:32  8              communications, but he can certainly reveal

14:25:35  9              his own understanding in the responsible

14:25:38 10              position that he has as the trustee.

14:25:40 11                    THE WITNESS:  Okay.

14:25:41 12  BY MR. BOWEN:

14:25:41 13  Q.    So the trustee, ultimately -- let me put it

14:25:44 14  this way, Mr. Oldner.  I'll change the question.  You

14:25:47 15  understand that the trustee is ultimately responsible

14:25:50 16  for positions that the trust is taking in litigation;

14:25:54 17  right?

14:26:27 18  A.    Yes, sir, I do.

14:25:58 19  Q.    And you take that responsibility seriously?

14:26:01 20  A.    Yes, sir.  I would not be suing people if I

14:26:04 21  didn't take it very seriously.

14:26:08 22  Q.    And you testified earlier that you saw this as

14:26:11 23  a position where you had a, you had an obligation, or

14:26:18 24  at least an understanding that you wanted to be fair

14:26:20 25  and impartial; right?

14:26:22  1   A.      Yes, sir.  That is true.

14:26:23  2   Q.      And, and you want your actions as the trustee

14:26:27  3   to be in the best interest or Orly Genger and her

14:26:30  4   descendents; right?

14:26:32  5   A.      Yes.

14:26:34  6   Q.      So --

14:26:34  7   A.      In accordance with, in accordance with how the

14:26:36  8   trust intended it to be, is how I interpret that, in

14:26:41  9   conjunction with my attorneys.

14:27:18 10   Q.      So having that in mind, what was your thinking,

14:26:47 11   your personal thinking -- I'm not asking what you

14:26:51 12   learned from the lawyers or, or anything else.  I'm

14:26:53 13   just asking what your view was about why the trust is

14:26:58 14   no longer seeking to dismiss the bankruptcy.

14:27:09 15   A.      Every bit -- everything that I had, every

14:27:12 16   understanding I had, dismissing of bankruptcy,

14:27:15 17   removing it to another location, those are all

14:27:18 18   communications that I've have with attorneys.

14:27:24 19   Q.      I understand, sir, and I'm not --

14:27:24 20   A.      All of the information -- I'm not trying to

14:27:28 21   avoid your question.  It's just everything that I, I

14:27:31 22   know about it involves issues that I have gone over

14:27:35 23   with attorneys.

14:27:36 24           They aren't things that I got up in the

14:27:39 25   middle of the night and worked out on a computer.  It

14:27:42  1   really is a discussion between -- and since it's been

14:27:47  2   in New York, it's been a lengthy discussion between

14:27:50  3   me and Mr. Pollock, far more lengthy than it was

14:27:55  4   between me and Mr. Ong, which was extensive.  I

14:27:58  5   don't --

14:27:59  6   Q.    But, but let's leave -- let's just leave that.

14:28:00  7   Mr. Oldner, I'm trying to be clear.  I'm not asking

14:28:02  8   you to tell me about your interaction with the

14:28:04  9   lawyers on this.

14:28:05 10          I'm not asking you to say what you asked

14:28:07 11   them, what they told you, what you learned from them.

14:28:11 12   Let's leave all of that aside.

14:28:13 13          You came to the conclusion that the trust

14:28:16 14   would no longer make a Motion to Dismiss the

14:28:21 15   bankruptcy.  My only question is why?

14:28:24 16   A.    My --

14:28:25 17              MR. POLLOCK:  Mr. Bowen, you have

14:28:27 18          asked this question a half dozen times now,

14:28:29 19          and he has answered a half dozen times that

14:28:31 20          all of his analysis and decision making is

14:28:33 21          inextricably linked to attorneys.

14:28:36 22              Now you have asked it six times.

14:28:37 23          You're harassing him, and you're badgering

14:28:39 24          him.  You have your answer.  Check the

14:28:42 25          transcript.  Move along.

14:28:44  1   Q.    Mr. Oldner, you can answer the question.

14:28:47  2              MR. POLLOCK:  He is not going to

14:28:48  3          answer.

14:28:49  4   Q.    Just leave aside, I'm not asking you to say

14:28:50  5   anything about what the lawyers said to you.

14:28:53  6              MR. POLLOCK:  He has answered the

14:28:55  7          question six times.

14:28:56  8   Q.    What is your understanding about what the

14:28:56  9   trust -- let me, let me try it differently.  I'll

14:28:57 10   withdraw that question.

14:28:57 11   A.    Okay.

14:28:57 12   Q.    My question is what is the trust's position

14:29:01 13   about whether or not the bankruptcy should be

14:29:04 14   dismissed?

14:29:05 15   A.    The trust did not take a position on whether or

14:29:14 16   not the bankruptcy should be dismissed in New York.

14:29:22 17   Q.    So your answer is the trust doesn't take a

14:29:24 18   position and is indifferent to whether the bankruptcy

14:29:30 19   is dismissed or not?

14:29:33 20              MR. DELLAPORTAS:  Object to form.

14:29:34 21   A.    No, sir, that's not what I said.

14:29:35 22   Q.    I'm trying to understand what you said.  You

14:29:37 23   said that the trust didn't take a position.

14:29:39 24   A.    That is correct.

14:30:08 25   Q.    But is that because the trust doesn't care

BUSHMAN COURT REPORTING

14:29:42  1   whether the bankruptcy is dismissed or not?

14:29:45  2   A.   I'm saying the trust didn't take a position.

14:29:48  3   Q.   And it doesn't take a position because the

14:29:50  4   trust doesn't care?

14:29:53  5              MR. POLLOCK:  Mr. Bowen, you have

14:29:54  6         completely mischaracterized the testimony.

14:29:56  7         You have got your answer.  Please move on.

14:29:59  8         You're also, again, although you claim

14:30:02  9         you're not, you are getting clearly into

14:30:05 10         legal analysis and legal strategy, which is

14:30:09 11         wholly inappropriate, and I ask you for the

14:30:11 12         umpteenth time to stop asking the witness

14:30:15 13         for his legal strategy and his legal

14:30:19 14         communications.  It's enough.  Move on.

14:31:04 15              MR. BOWEN:  Mr. Pollock, everything

14:30:24 16         that you just said makes no sense, and I'd

14:30:27 17         ask you to again desist from making these

14:30:30 18         speaking objections and trying to coach

14:30:32 19         your witness.

14:30:32 20   BY MR. BOWEN:

14:30:33 21   Q.   Mr. Oldner, as the trustee, you approved filing

14:30:37 22   a Motion to Dismiss or a joinder by the trust when

14:30:42 23   this case was in Texas; correct?

14:30:46 24   A.   Yes, sir.  That is correct.

14:30:49 25              MR. DELLAPORTAS:  Objection, John

                         BUSHMAN COURT REPORTING

14:30:54  1              Dellaportas.

14:30:56  2    Q.    What -- why, to your understanding -- and,

14:30:56  3    again, leave out anything with the lawyers.  Just

14:30:57  4    what was your thinking about why it was in the best

14:31:01  5    interest of Orly Genger and her descendents that her

14:31:08  6    bankruptcy be dismissed when you filed that joinder?

14:31:12  7              MR. POLLOCK:  Mr. Bowen, I object, but

14:31:15  8              also Mr. Dellaportas was trying to get an

14:31:19  9              objection onto the record when you spoke

14:31:19 10              over him.

14:31:19 11              Dellaportas, did you want to say

14:31:21 12              something?

14:31:23 13              MR. DELLAPORTAS:  Sorry, I think my

14:31:26 14              objection was a couple of questions ago.

14:31:27 15              It was just an objection to form.

14:31:31 16              MR. POLLOCK:  So, Mr. Bowen, you are

14:31:32 17              clearly seeking to invade his legal

14:31:35 18              communications and his legal strategy.

14:31:37 19              I ask you again and again to move

14:31:42 20              along.

14:31:42 21              You're also now asking about a Motion

14:31:44 22              to Dismiss or, in the alternative, to

14:31:46 23              transfer.  That was decided and is no

14:31:50 24              longer before this court.

14:31:51 25              We have a clear scheduling order

14:31:53  1                limiting discovery to the Motion to

14:31:54  2                Dismiss, which is Sagi's motion.

14:31:58  3                      You're out of bounds asking him about

14:32:01  4                his legal strategy with respect to a

14:32:04  5                disposed motion.  I ask you respectfully to

14:32:07  6                move along.

14:32:10  7   Q.   You can answer the question, Mr. Oldner.  The

14:32:13  8   question is what, to your understanding, as the

14:32:15  9   trustee was -- well, let me, let me start again.

14:32:22 10   A.   Before you ask your question, sir.

14:32:24 11   Q.   To your -- go ahead.

14:32:25 12   A.   Before you ask your question, may I go off the

14:32:28 13   record and have one word with my attorneys?

14:32:31 14   Q.   Sure.

14:32:32 15                      MR. POLLOCK:  No, you actually don't

14:32:33 16                get to do that while there is a question

14:32:36 17                pending.

14:32:36 18   A.   Sorry.

14:32:39 19   Q.   That's totally fine with me.  Do you want to

14:32:40 20   take a minute --

14:32:41 21   A.   No --

14:32:41 22   Q.   -- and talk to your attorneys?

14:32:41 23   A.   -- no, I want to play by the rules.  I'm sorry.

14:32:42 24   Go ahead.

14:32:42 25                      MR. POLLOCK:  Let him ask his

14:32:43  1              question, and then you can answer it, or

14:32:45  2              not, if you can't --

14:32:46  3    A.    I'm sorry.

14:32:46  4              MR. POLLOCK:  -- and then you can have

14:32:47  5         a break and talk to your counsel.

14:32:49  6    A.    I apologize.  Mr. Bowen, I'm sorry.

14:32:52  7    Q.    All right.  Well, you're not getting that from

14:32:54  8    me.  Your own lawyer is telling you he doesn't want

14:32:56  9    to talk to you, but it's fine with me if you want to

14:32:56 10    talk to him.

14:32:57 11              MR. POLLOCK:  I am happy to talk to

14:32:58 12         him after he attempts to answer your

14:33:00 13         question again.

14:33:02 14    Q.    The question is why did you conclude as the

14:33:06 15    trustee that moving to dismiss the bankruptcy was in

14:33:10 16    the best interest of Orly Genger and her descendents?

14:33:15 17              MR. POLLOCK:  I object, again, in that

14:33:16 18         this purely calls for legal --

14:33:19 19              MR. BOWEN:  You already objected.  You

14:33:20 20         keep saying the same thing all over again,

14:33:23 21         and you're never even going to let the

14:33:25 22         witness answer the question.  I mean, this

14:33:25 23         is getting absurd.

14:33:25 24              MR. POLLOCK:  You are correct --

14:33:25 25              MR. BOWEN:  You preserved your

                          BUSHMAN COURT REPORTING

14:33:25  1              objection.  Please let the witness answer.

14:33:29  2                    MR. POLLOCK:  You are correct that as

14:33:30  3              many times as you ask a question that calls

14:33:31  4              for a legal analysis, I am not going to let

14:33:33  5              him answer that.  Now let me --

14:33:35  6                    MR. BOWEN:  I am not asking for a

14:33:36  7              legal analysis.  I don't understand why you

14:33:39  8              think that.

14:33:39  9  BY MR. BOWEN:

14:33:39 10  Q.   Mr. Oldner, I'm not asking you for a legal

14:33:42 11  analysis.  I'm asking you for your view as the

14:33:44 12  trustee, who is acting in the best interest, or

14:33:48 13  trying to act in the best interest in all good faith

14:33:49 14  in the best interest of Orly Genger and her

14:33:53 15  descendents, why did you take the position, or why

14:33:56 16  did you conclude at the time that you joined a Motion

14:33:58 17  to Dismiss Orly Genger's bankruptcy that that was in

14:34:02 18  his best interest and the best interest of her

14:34:04 19  descendents?

14:34:05 20                    MR. POLLOCK:  Again --

14:34:05 21  Q.   What was your thinking about that, not legal

14:34:08 22  analysis?  Why did you think that was the right thing

14:34:11 23  for you to do as the trustee for Orly Genger and her

14:34:13 24  descendents?

14:34:16 25                    MR. POLLOCK:  Again, you are seeking

                        BUSHMAN COURT REPORTING

14:34:17   1            to elicit legal analysis under the guise of

14:34:21   2            seeking only his understanding about a

14:34:23   3            complicated legal issue.

14:34:24   4                 I'm not going to let him answer that

14:34:26   5            question.  If he wants to take a break

14:34:27   6            and --

14:34:28   7                 MR. BOWEN:  What's complicated about

14:34:28   8            the legal issue?  It's whether Orly Genger

14:34:30   9            should be allowed to seek bankruptcy

14:34:32  10            protection or not.

14:34:34  11                 MR. POLLOCK:  I think --

14:34:34  12       BY MR. BOWEN:

14:34:34  13       Q.   Mr. Oldner, why don't you talk to your lawyer

14:34:36  14       and see if we can get past the impasse.

14:34:38  15                 MR. POLLOCK:  Okay.  Okay.  That's

14:34:38  16            fine.

14:34:39  17                 MR. KURLAND:  What was the last

14:34:40  18            question?

14:34:41  19                 MR. POLLOCK:  That's fine.  Why don't

14:34:42  20            we do exactly what he suggested.

14:34:45  21                 MR. HERSCHMANN:  It's Eric Herschmann.

14:34:45  22            Adam, have you been instructing him not to

14:34:47  23            answer when you have made that it's an

14:34:49  24            issue, a legal issue intertwined?

14:34:52  25                 I have never heard you say you are

BUSHMAN COURT REPORTING

14:34:53  1          instructing him not to answer.  Is that

14:34:55  2          what you're doing, or that's what you've

14:34:57  3          been doing?

14:34:59  4              MR. POLLOCK:  Mr. Herschmann, I have

14:34:59  5          instructed him not to give an answer that

14:34:59  6          reveals legal analysis and legal

14:35:01  7          communications.

14:35:04  8              I believe that the question is purely

14:35:07  9          seeking to elicit legal analysis derived

14:35:10 10          from his legal communications with his

14:35:12 11          attorney.

14:35:12 12              I think it falls squarely within work

14:35:15 13          product, within work product privilege,

14:35:17 14          and, furthermore, work product privilege or

14:35:18 15          attorney-client privilege, if Mr. Bowen

14:35:21 16          wants to know the reasons that Mr. Oldner

14:35:24 17          believed that the motions that the

14:35:25 18          bankruptcy case should be dismissed, or in

14:35:28 19          the alternative transferred, I respectfully

14:35:31 20          refer Mr. Bowen to the document that was

14:35:35 21          filed in Texas that explicitly says the

14:35:40 22          reasons that the trust believes that the,

14:35:44 23          that the case should be dismissed, or in

14:35:46 24          the alternative transferred.  That said,

14:35:50 25          Mr. Oldner asked for a break.  Let's take a

14:35:54  1             break.

14:45:21  2                  MR. KURLAND:  That wasn't the question

14:35:56  3             either.

14:35:56  4                  MR. HERSCHMANN:  Mr. Pollock, this is

14:35:56  5             Eric Herschmann.  I just want to say one

14:35:56  6             thing.

14:35:56  7                  MR. POLLOCK:  Yeah.

14:35:56  8                  MR. HERSCHMANN:  Based on what you

14:35:59  9             just said, it can't be privileged, because

14:36:00 10             you said it's already been disclosed in a

14:36:03 11             document.  Why don't you consult with your

14:36:06 12             client and take a break?

14:36:07 13                  MR. POLLOCK:  I'm happy to take a

14:36:09 14             break.

14:36:10 15                  THE WITNESS:  It's time to take a

14:36:11 16             break anyway.

14:36:21 17                  MR. BOWEN:  Five minutes?

14:36:21 18                  THE WITNESS:  Ten.

14:36:22 19                  (Nine-minute break.)

14:45:13 20   BY MR. BOWEN:

14:45:15 21   Q.   Mr. Oldner, I'm just going to ask this one more

14:45:20 22   time, and if you're refusing to answer, just, just

14:45:22 23   say so.

14:45:25 24             How was the, the dismissal of Orly Genger's

14:45:30 25   bankruptcy in her best interest and in the best

BUSHMAN COURT REPORTING

14:45:35  1   interest of her decedents, descendents, when you

14:45:41  2   filed the joinder in the Motion to Dismiss in Austin,

14:45:44  3   Texas?

14:45:45  4                   MR. POLLOCK:  Objection to form and

14:45:46  5              mischaracterizes the testimony.

14:45:51  6   Q.    You can answer.

14:45:52  7   A.    I believe that you can find everything about

14:45:57  8   how I felt about that by reading the joinder itself.

14:46:00  9   Q.    But I'm asking for your understanding, not what

14:46:04 10   your lawyers wrote.  What is your understanding?

14:46:05 11   A.    I okayed that.  That is my understanding in

14:46:09 12   depth.

14:46:11 13   Q.    And your understanding is that the joinder, the

14:46:15 14   written brief explains why it's in the best interest

14:46:20 15   of Orly Genger?

14:46:21 16                   MR. POLLOCK:  Objection;

14:46:21 17              mischaracterizes the testimony.

14:46:24 18   Q.    You can answer.

14:46:26 19   A.    I believe that it is in the best interest of

14:46:28 20   Orly Genger's descendents that there's money in the

14:46:32 21   trust.  If there's no money --

14:46:33 22   Q.    That's not the question.  The question is why

14:46:37 23   was it in the best interest of Orly Genger and her

14:46:40 24   descendents that her bankruptcy be dismissed?

14:46:44 25                   MR. POLLOCK:  Objection; asked and

                        BUSHMAN COURT REPORTING

14:46:45  1              answered.

14:46:45  2    Q.    -- joined?

14:46:47  3                    MR. POLLOCK:   Objection; asked and

14:46:47  4              answered.

14:47:37  5    Q.    You can answer.

14:46:52  6    A.    If the bankruptcy dismisses the claims against

14:46:56  7    Orly Genger, or Orly Genger, discharges Orly Genger,

14:46:57  8    that's great.

14:46:59  9              If the bankruptcy dismisses the claims of

14:47:02 10    the trust, that's not, that doesn't help her

14:47:05 11    descendents.

14:47:54 12    Q.    So you think dismissing the bank, the

14:47:17 13    bankruptcy would have helped the trust preserve its

14:47:22 14    claims to the $32 million?

14:47:26 15                    MR. POLLOCK:   Objection;

14:47:26 16              mischaracterizes the testimony.

14:47:36 17    Q.    Is that correct?

14:48:07 18    A.    I think that the trust claims to the

14:47:38 19    $32 million should be able to be adjudicated outside

14:47:42 20    of bankruptcy.

14:47:43 21    Q.    And you think that's in the best interest of

14:47:47 22    Orly Genger and her descendents?

14:47:50 23    A.    I certainly do.

14:47:51 24    Q.    So in that case, why are you not joining in the

14:47:54 25    Motion to Dismiss now?

14:47:55  1   A.     That information is completely based on

14:47:58  2   discussion with current counsel.  That would be.

14:48:02  3   Q.     So --

14:48:02  4   A.     -- 100 percent privileged.

14:48:42  5   Q.     So nothing has changed, in your mind, except

14:48:09  6   that there's a legal, technical, or strategic reason

14:48:14  7   not to join the motion; is that correct?

14:48:18  8                  MR. POLLOCK:  Objection.  You're,

14:48:18  9          again, seeking -- and he just told you that

14:48:20 10          what you are seeking is analysis performed

14:48:24 11          in anticipation of litigation or in

14:48:26 12          conjunction with counsel.

14:48:28 13   Q.     Is that correct, what I said, Mr. Oldner, that

14:48:34 14   as far as you're concerned, nothing has changed.  It

14:48:37 15   would preferable to litigate the trust claims outside

14:48:39 16   of bankruptcy, but for some privileged reason, the

14:48:43 17   decision was made by you, because it's your

14:48:45 18   responsibility, not to join the Motion to Dismiss; is

14:48:48 19   that correct?

14:49:16 20   A.     I believe that everything that you just

14:48:51 21   mentioned is legal in matter.  It has nothing to do

14:48:55 22   with judgment outside of being legal in matter, and

14:48:58 23   so, consequently, everything that I decided on it was

14:49:02 24   based on a discussion between me and my lawyer.  So,

14:49:05 25   yes, I am not answering that question because every

14:49:07  1    answer I would give is privileged.

14:49:14  2    Q.    But you understand that the responsibility is

14:49:15  3    yours, not your lawyers'; correct?

14:49:55  4    A.    Yes, I do.

14:49:18  5    Q.    And you understand the lawyers work for you?

14:49:21  6    You understand that; right?

14:49:29  7    A.    Yes, I do.

14:49:29  8    Q.    So Mr. Sagi Genger claims in his current Motion

14:49:33  9    to Dismiss that the bankruptcy is a fraud, and it was

14:49:38 10    brought in bad faith by Orly Genger.  Do you agree

14:49:42 11    with that?

14:49:43 12    A.    Yes.

14:49:45 13                MR. POLLOCK:  Objection.

14:49:46 14                MR. DELLAPORTAS:  Objection; misstates

14:49:46 15          the record.  This is Dellaportas.

14:49:51 16    Q.    Do you agree with that, Mr. Oldner?

14:49:53 17                MR. POLLOCK:  Hold on.  Objection.

14:49:54 18          You're asking Mr. Oldner to characterize a

14:49:58 19          heavily redacted motion made by Sagi

14:50:04 20          Genger.  I think it's completely

14:50:06 21          inappropriate.

14:50:07 22    Q.    You can answer the question, Mr. Oldner.  Do

14:50:09 23    you agree with that claim that Sagi Genger has made?

14:50:14 24                MR. POLLOCK:  And, also, he's already

14:50:15 25          answered this question repeatedly about his

14:50:17  1            position, sorry, the trust's position with

14:50:20  2            respect to the motion.

14:50:22  3                You asked him again and again and

14:50:24  4            again.  It's enough.  You're harassing him

14:50:26  5            now.

14:50:27  6                MR. BOWEN:  You are really just

14:50:28  7            blatantly coaching the witness.  I would

14:50:31  8            ask you to stop.

14:50:32  9  BY MR. BOWEN:

14:50:32 10  Q.    Mr. Oldner, do you agree with that statement

14:50:33 11  that Sagi Genger has made in his Motion to Dismiss?

14:50:39 12                MR. DELLAPORTAS:  Objection, for the

14:50:40 13            record, misdescribed the motion.  I would

14:50:43 14            ask that the proper motion, the actual

14:50:45 15            motion be placed in front of the witness if

14:50:47 16            you want him to have comments on it.

14:50:47 17                Mr. Bowen's characterizations of the

14:50:49 18            motion are false and -- for any kind of

14:50:49 19            proper testimony.

14:50:53 20                MR. POLLOCK:  Two things, one is --

14:50:53 21  BY MR. BOWEN:

14:50:56 22  Q.    Go ahead, Mr. Oldner, please answer the

14:50:59 23  question.

14:51:00 24                MR. POLLOCK:  Mr. Dellaportas, if you

14:51:02 25            can please keep your voice up when you're

                          BUSHMAN COURT REPORTING

14:51:02  1            speaking.  It will be easier for the

14:51:02  2            stenographer.  That's A.

14:51:06  3                 B is I share similar concerns, to the

14:51:08  4            extent that I could hear them.  To the

14:51:11  5            extent you're asking him to take a position

14:51:13  6            on a pending motion, I would ask that you

14:51:15  7            put the motion in front of him and ask him

14:51:18  8            what his position in.

14:51:19  9                 In fact, you have asked him repeatedly

14:51:22 10            what his position is, and now you are

14:51:24 11            harassing him.

14:51:25 12                 I am asking you respectfully to move

14:51:27 13            on and stop harassing this witness in

14:51:29 14            Arkansas.

14:51:30 15  BY MR. BOWEN:

14:52:04 16  Q.    Mr. Oldner, do you agree with that

14:51:34 17  characterization of -- well, let me ask it this way.

14:51:37 18  Do you agree that the, the allegations in Sagi

14:51:47 19  Genger's Motion to Dismiss and his basis for

14:51:49 20  dismissing the bankruptcy; do you agree with them?

14:51:53 21                 MR. POLLOCK:  Mr. Bowen, I have the

14:51:53 22            same objections.  You're asking him to

14:51:54 23            analyze a heavily redacted document that's

14:51:57 24            not in front of him, and asking him if he

14:51:59 25            agrees with it.  That is totally improper.

BUSHMAN COURT REPORTING

14:52:02  1          Give him --

14:52:04  2  Q.    Mr. Oldner, do you agree with the basis for

14:52:07  3  dismissal that Sagi Genger made in his Motion to

14:52:11  4  Dismiss?

14:52:11  5  A.    Mr. Bowen, I have not seen that Motion to

14:52:15  6  Dismiss.

14:52:17  7  Q.    Do you agree that Orly Genger filed for

14:52:22  8  bankruptcy in bad faith solely to deprive Sagi Genger

14:52:27  9  of being able to enforce his multimillion dollar

14:52:30 10  judgment against her?

14:52:31 11          MR. POLLOCK:  Mr. Oldner -- Mr.

14:52:31 12          Bowen -- excuse me -- he is not a

14:52:35 13          percipient witness to anything you're

14:52:38 14          asking about.  What you're asking for is

14:52:39 15          mere speculation and is wholly improper.

14:52:48 16          MR. HERSCHMANN:  It's Eric Herschmann

14:52:48 17          again.

14:52:49 18          MR. DELLAPORTAS:  John Dellaportas, I

14:52:49 19          also object.  It misstates the record.  It

14:52:50 20          mischaracterizes the motion.  That's not

14:52:53 21          what the motion says.

14:52:56 22          MR. HERSCHMANN:  It's Eric Herschmann.

14:52:58 23          I'm going to again ask that we please stop

14:53:01 24          the speaking objections, so we don't have

14:53:01 25          to go to Judge Garrity and bother him

14:53:02  1          again.

14:53:05  2              There's -- we've offered a standing

14:53:05  3          objection to every single question, so

14:53:09  4          everything can be preserved.

14:53:10  5              I'm just asking again so when we go to

14:53:10  6          Judge Garrity, he knows that we have

14:53:10  7          offered it on multiple occasions.

14:53:13  8              MR. POLLOCK:  And I'm asking Mr.

14:53:15  9          Bowen --

14:53:15 10  BY MR. BOWEN:

14:53:16 11  Q.   Mr. Oldner, did you read the Motion to Dismiss

14:53:18 12  that was filed by Sagi Genger in the Southern

14:53:21 13  District of New York?

14:53:25 14              MR. DELLAPORTAS:  Objection; asked and

14:53:26 15          answered.

14:53:27 16  Q.   You can answer again.  I don't think I asked it

14:53:27 17  before.  Did you read it?

14:53:29 18  A.   No, I have not.

14:54:00 19  Q.   So do you have any understanding of what the

14:53:34 20  basis is that Sagi Genger has articulated for

14:53:39 21  dismissing the bankruptcy?

14:53:40 22              MR. POLLOCK:  Are you asking for his

14:53:42 23          legal analysis of Sagi Genger's --

14:53:43 24              MR. BOWEN:  No, Mr. Pollock, I'm not

14:53:45 25          asking for anybody's legal analysis, and

14:53:48 1           it's really becoming tiresome.  Please

14:53:49 2           stop.

14:53:49 3               I'm asking for Mr. Pollock {sic}, who

14:53:50 4           has a responsibility to make decisions for

14:53:52 5           the trust.  It's a serious responsibility,

14:53:55 6           which he has acknowledged.

14:53:57 7               MR. HERSCHMANN:  I think you meant --

14:53:58 8               MR. BOWEN:  Please let him answer the

14:53:59 9           question.  The question is a very simple

14:54:02 10          one.

14:54:03 11              MR. POLLOCK:  Mr. Bowen --

14:54:04 12  BY MR. BOWEN:

14:54:04 13  Q.   Mr. Oldner, I'm asking you now, do you have --

14:54:04 14          (All attorneys talking over one another)

14:54:27 15              MR. HERSCHMANN:  Can I make --

14:54:27 16              COURT REPORTER:  Let me speak first.

14:54:27 17          I cannot understand anyone when you speak

14:54:27 18          over each other, so your record is not

14:54:27 19          going to be complete.

14:54:27 20              MR. POLLOCK:  Mr. Bowen, this would go

14:54:29 21          a lot more smoothly if you would stop

14:54:29 22          yelling at me.

14:54:29 23              I have asked you repeatedly today to

14:54:32 24          stop raising your voice, and stop yelling

14:54:34 25          at me, and to stop yelling at the witness.

BUSHMAN COURT REPORTING

14:54:36 1          This is completely inappropriate.

14:54:39 2               MR. BOWEN:  Mr. Pollock, I have had it

14:54:40 3          with you.  I ask you to just stop talking,

14:54:42 4          please.

14:54:42 5               MR. POLLOCK:  And I would ask you --

14:54:44 6               MR. BOWEN:  Your behavior is very much

14:54:44 7          a problem.  It has been obstructionist, and

14:54:47 8          it's, and it's going to have to be

14:54:48 9          addressed with the Court, as much as I

14:54:50 10         don't want to waste my time.  But I ask you

14:54:52 11         to stop.

14:54:53 12 BY MR. BOWEN:

14:54:53 13 Q.   Mr. Oldner, it's a very simple question.  Do

14:54:56 14 you have any understanding of what the basis is that

14:55:00 15 Sagi Genger has alleged for dismissing the

14:55:03 16 bankruptcy?

14:55:05 17 A.   I have not read Sagi Genger's Motion to Dismiss

14:55:08 18 that was filed in New York --

14:55:11 19 Q.   And --

14:55:11 20 A.   -- so, therefore, I would --

14:55:13 21 Q.   And not --

14:55:13 22 A.   -- not have an understanding of it.

14:55:41 23 Q.   So you have no understanding of what he is

14:55:17 24 alleging in the Motion to Dismiss?

14:55:19 25 A.   I have not read the Motion to Dismiss.

14:55:50  1  Q.   Well, do you have any understanding of what

14:55:26  2  kind of claims he's making in the bankruptcy?

14:55:29  3              MR. POLLOCK:  Again, Mr. Bowen, you

14:55:30  4           appear to be --

14:55:32  5  Q.   Only on the Motion to Dismiss.  Do you have an

14:55:34  6  understanding of that?

14:56:02  7              MR. POLLOCK:  Again, Mr. Bowen, you

14:56:02  8           appear to be seeking to elicit privileged

14:56:02  9           communications with respect to Mr. Oldner's

14:55:41 10           understanding derived from his

14:55:44 11           communications between him or his counsel,

14:55:46 12           on advice of counsel, or in anticipation of

14:55:50 13           litigation.  You have asked him --

14:55:53 14       MR. BOWEN:  Mr. Pollock, with all due

14:55:55 15           respect, how do you know that?  How do you

14:55:57 16           know that Mr. Oldner has never discussed it

14:55:59 17           with Sagi?

14:56:01 18       MR. POLLOCK:  Why don't you start

14:56:02 19           by --

14:56:02 20       MR. BOWEN:  You keep trying to testify

14:56:03 21           for your own witness, and I really think

14:56:05 22           it's, it's beyond improper, and I don't

14:56:08 23           know why you're doing it, but I would ask

14:56:10 24           you again to stop.

14:56:38 25       MR. POLLOCK:  Mr. Bowen, you appear to

14:56:38  1              be --

14:56:38  2      BY MR. BOWEN:

14:56:13  3      Q.    Mr. Oldner, I'm not asking for any privileged

14:56:15  4      communications with lawyers.  I'm just asking do you

14:56:17  5      have an understanding from some other source other

14:56:19  6      than reading the Motion to Dismiss what, what the

14:56:23  7      bases are that Sagi Genger is alleging as the reason

14:56:26  8      to dismiss the bankruptcy?

14:56:29  9                  MR. POLLOCK:  That's great, Mr. Bowen.

14:56:30 10              Please lay a foundation.  You could ask

14:56:32 11              him, Have you talked about this motion with

14:56:34 12              Sagi?  Have you talked with so-and-so?

14:56:36 13              Ask him for areas where he may have

14:56:39 14              learned about the motion outside of

14:56:41 15              privileged communication, if that's what

14:56:43 16              you're seeking.

14:56:50 17      Q.    Can you answer the question the way I asked it?

14:56:53 18      A.    I hate to do this.  Would you please ask it

14:56:53 19      again?

14:56:53 20      Q.    Other than reading the motion, which you've

14:56:55 21      testified you didn't do, did you learn from some

14:56:58 22      other source what the basis is for the motion?

14:57:01 23      A.    I did not.

14:57:36 24      Q.    And you have never discussed it with Sagi

14:57:08 25      Genger; correct?

14:57:10  1   A.    Have Sagi Genger and I discussed the Motion to

14:57:12  2   Dismiss?  Yes, we have had conversations about it.

14:57:15  3   Have we discussed the contents of the Motion to

14:57:17  4   Dismiss, not that I recall.

14:57:20  5   Q.    Did you discuss --

14:57:20  6   A.    And I think I would remember that.

14:58:15  7   Q.    I'm sorry.  What did you say?

14:58:15  8   A.    And I think I would remember that.

14:58:15  9   Q.    Okay.  Did you discuss with Sagi Genger the

14:57:29 10   fact that the trust would not be joining the Motion

14:57:36 11   to Dismiss?

14:57:40 12   A.    Not to my recollection.  My only discussions of

14:57:46 13   the Motion to Dismiss, Mr. Bowen, were with

14:57:52 14   Mr. Pollock.

14:58:41 15   Q.    Did -- were you aware that Sagi Genger has made

14:58:03 16   a claim that Orly Genger is trying to conceal the

14:58:12 17   $32 million in order to frustrate his ability to

14:58:15 18   enforce his judgment against Orly Genger?

14:58:21 19                MR. DELLAPORTAS:  This is Dellaportas.

14:58:22 20          Objection; misstates the record, and the

14:58:25 21          motion, and the claim.  Please don't do

14:58:27 22          that.

14:58:27 23   Q.    Were you aware of that claim by Sagi Genger?

14:58:34 24   A.    As you stated it, no, I'm not.

14:59:10 25   Q.    Are you aware of a claim by Dalia Genger that

```
14:58:42  1   she's entitled to the 32, the same $32 million that

14:58:47  2   the trust is taking the position belongs to the

14:58:50  3   trust?

14:58:52  4              MR. DELLAPORTAS:  Same objection.

14:58:53  5         This is Dellaportas.  No such claim by

14:58:54  6         Dalia Genger.

14:58:56  7              MR. POLLOCK:  Yeah, I object on the

14:58:57  8         grounds that I believe it mischaracterizes

14:59:00  9         Dalia's Adversary Complaint.

14:59:03 10         And what's more is the judge

14:59:05 11         specifically said that we're not doing

14:59:06 12         discovery now on Dalia's Adversary

14:59:10 13         Complaint.  I would ask you to move on to

14:59:12 14         topics that Garrity permitted.

14:59:16 15              MR. HERSCHMANN:  This is Eric

14:59:17 16         Herschmann again.  I'm going to again say

14:59:20 17         if you guys would just state "Objection,"

14:59:22 18         they're all preserved.

14:59:22 19            (Zoom connection was lost.)

14:59:22 20              THE WITNESS:  I can't hear anybody.

14:59:22 21         Mr. Bowen, I can't hear you.

14:59:22 22            (Off the record to reconnect)

14:59:22 23   BY MR. BOWEN:

15:06:31 24   Q.   So, Mr. Oldner --

15:06:32 25   A.   Yes, sir.
```

BUSHMAN COURT REPORTING

15:06:33  1    Q.    -- let me try it this way.

15:06:34  2    A.    Can you hear me now?

15:06:36  3    Q.    Yes, sir.  Yes, sir.

15:06:36  4    A.    Okay.  Thank you.

15:06:39  5    Q.    You made a judgment in your position as trustee

15:06:43  6    that it was in the best interest of Orly Genger and

15:06:47  7    her descendents as the beneficiaries of the trust

15:06:51  8    that the bankruptcy, that Orly Genger's bankruptcy be

15:06:56  9    dismissed.  And you made that determination when the

15:07:00 10    bankruptcy was pending in Texas; is that correct?

15:07:36 11                MR. POLLOCK:  Objection; misstates the

15:07:04 12          prior testimony, and misstates the motion

15:07:07 13          that was filed in Texas.

15:07:09 14    Q.    Is that correct, sir?

15:07:11 15    A.    I filed a joinder to the Motion to Dismiss.

15:07:17 16    Q.    And you did that because you made the judgment

15:07:20 17    or the determination that that was in the best

15:07:23 18    interest of the beneficiaries of the trust; right?

15:07:59 19    A.    Beneficiaries, yes.  Beneficiaries of the

15:07:29 20    trust, yes.

15:08:03 21    Q.    And now that the bankruptcy is in New York, you

15:07:36 22    made the determination that it's no longer in the

15:07:39 23    best interest of the beneficiaries of the trust that

15:07:42 24    the bankruptcy be dismissed; is that correct?

15:07:46 25                MR. POLLOCK:  Objection; misstates the

                        BUSHMAN COURT REPORTING

15:07:48  1              record.

15:08:22  2    Q.    Is that correct?

15:07:54  3    A.    Will you ask that again, please?

15:07:57  4    Q.    Now that the case is in bankruptcy court in New

15:08:00  5    York, you have made the determination that it's no

15:08:03  6    longer in the best interest of Orly Genger and her

15:08:07  7    descendents as the beneficiaries of the trust that

15:08:11  8    the bankruptcy be dismissed?

15:08:14  9              MR. POLLOCK:  Objection; misstates the

15:08:15 10              record, and, again, purely calls for

15:08:19 11              privileged communications.

15:08:21 12              You've asked this repeatedly, and I've

15:08:24 13              asked you repeatedly to stop calling for

15:08:26 14              privileged communication.

15:08:28 15              At this point you're just harassing

15:08:29 16              the witness by asking the same questions

15:08:31 17              again and again.  I respectfully ask you,

15:08:33 18              Mr. Bowen, to move on.

15:08:37 19    Q.    Is that correct, Mr. Oldner, that you now made

15:08:40 20    the determination that it's no longer in the best

15:08:42 21    interest of the beneficiaries of the trust to seek

15:08:44 22    dismissal of the bankruptcy?

15:08:47 23              MR. POLLOCK:  Same objection.

15:08:48 24    A.    Your characterization is not correct, sir.

15:09:25 25    Q.    Well, how is it not correct?

                           BUSHMAN COURT REPORTING

15:08:57 1   A.     The trust at this time is not taking a position

15:09:01 2   one way or the other through the Motion to Dismiss in

15:09:07 3   New York.

15:09:08 4   Q.     Well, in your mind, you personally, as the

15:09:10 5   trustee, is it still your position that it's in the

15:09:13 6   best interest of Orly Genger and her descendents as

15:09:17 7   beneficiaries of the trust that the bankruptcy be

15:09:18 8   dismissed?

15:09:20 9             MR. POLLOCK:  Mr. Bowen, why do you

15:09:22 10            still keep asking and questioning and

15:09:25 11            questioning again and again?  You're just

15:09:27 12            harassing the witness.  He has given you

15:09:29 13            his answer.  Move along.

15:09:31 14   BY MR. BOWEN:

15:09:31 15   Q.     You can answer, Mr. Oldner.

15:09:33 16            MR. POLLOCK:  He already gave you his

15:09:34 17            answer.

15:09:34 18   Q.     You can answer the question.

15:09:36 19            MR. POLLOCK:  He did.

15:09:40 20   A.     My position --

15:09:42 21   Q.     Go ahead.

15:09:42 22   A.     -- right now is that the trust will take no

15:09:46 23   position right now in the Motion to Dismiss in New

15:09:49 24   York.

15:09:56 25   Q.     So you have made no conclusion as the trustee

15:09:59  1    or no determination of whether dismissal is in the

15:10:05  2    best interest of the trust beneficiaries; is that

15:10:08  3    right?

15:10:08  4              MR. POLLOCK:  Mr. Bowen, you are

15:10:10  5          seeking to elicit privileged communication,

15:10:12  6          but also you purport to represent, you

15:10:17  7          purport to represent a creditor here, and

15:10:20  8          yet you're asking him about what's in the

15:10:24  9          best interest of Orly Genger or her

15:10:27 10          descendents.

15:10:28 11              And I suspect that the reason for this

15:10:30 12          is that you are a law partner with Mr.

15:10:32 13          Herschmann, who -- and I'll try to

15:10:34 14          accurately remember what Mr. Cavaliere

15:10:37 15          said, but, effectively, Mr. Cavaliere

15:10:38 16          indicated that Mr. Herschmann controls or

15:10:42 17          directs the Claims Pursue entity that is

15:10:46 18          seeking to assert claims against

15:10:48 19          Mr. Oldner.

15:10:49 20              None of these questions could possibly

15:10:51 21          have anything to do with what's good for

15:10:55 22          Orly Genger, what's good for Orly Genger's

15:10:57 23          descendents.

15:10:58 24              It has nothing to do with Kasowitz's

15:11:00 25          position as a creditor in this bankruptcy,

15:11:03 1          or as a purported creditor in this

15:11:08 2          bankruptcy.

15:11:09 3              What you're doing is harassing the

15:11:10 4          witness, and I insist that you move on.

15:11:12 5          And, moreover, he has answered the question

15:11:14 6          like a dozen times, and yet you keep asking

15:11:17 7          it again and again.

15:11:17 8  BY MR. BOWEN:

15:11:22 9  Q.    Mr. Oldner --

15:11:23 10             MR. CAVALIERE:  If I could just

15:11:23 11         interject, Rocco Cavaliere, on behalf of

15:11:24 12         the Chapter 7 Trustee.

15:11:26 13             I disagree with the characterization

15:11:27 14         of Mr. Pollock, as it relates to what I

15:11:30 15         said on a court record on, on May 22nd,

15:11:33 16         which is a transcript as to what I

15:11:36 17         indicated as to who I negotiated with in

15:11:38 18         connection with the, the, the potential

15:11:41 19         sale of certain state causes of action that

15:11:44 20         is the subject of the trustee's motion.

15:11:46 21         Thank you.

15:11:47 22             MR. HERSCHMANN:  It's Eric Herschmann.

15:11:47 23         Mr. Pollock, I'm going to give you an

15:11:51 24         opportunity to correct the record.  Or if

15:11:51 25         you have a basis for what you just said,

15:11:54  1          outside of what Rocco said or Mr.

15:11:56  2          McMannes's (phonetic) deposition testimony,

15:11:58  3          you should correct it while you have the

15:12:00  4          chance.

15:12:02  5               It is absolutely wrong, but you do

15:12:05  6          these things, and Mr. Dellaportas already

15:12:07  7          got a Rule 11 Notice, and so did Mr. Sahar

15:12:07  8          (phonetic).  You do it at your own peril.

15:12:11  9               MR. DELLAPORTAS:  Mr. Herschmann, are

15:12:11 10          you representing that Mr. Cavaliere's --

15:12:11 11               MR. HERSCHMANN:  You need to --

15:12:11 12               MR. DELLAPORTAS:  -- statements to the

15:12:11 13          bankruptcy court were incorrect?

15:12:11 14               MR. HERSCHMANN:  -- stop it.

15:12:19 15               MR. DELLAPORTAS:  I'd like to know.

15:12:19 16          Mr. Herschmann, you heard what

15:12:21 17          Mr. Cavaliere told the bankruptcy court.

15:12:23 18          We were all there.  There's a transcript of

15:12:26 19          it.  Are you representing that it's

15:12:27 20          incorrect?

15:12:27 21               MR. HERSCHMANN:  Mr. Dellaportas,

15:12:27 22          you're going to have my deposition.

15:12:27 23               MR. DELLAPORTAS:  I --

15:12:27 24               MR. HERSCHMANN:  You're going to have

15:12:27 25          my deposition.

```
15:12:32  1              MR. DELLAPORTAS:  I got --
15:12:32  2              MR. HERSCHMANN:  We're going to talk
15:12:32  3         about all types of issues.  Don't worry --
15:12:34  4              MR. DELLAPORTAS:  I got you
15:12:35  5         instructing Mr. McMannes not to answer at
15:12:35  6         that deposition --
15:12:36  7              MR. HERSCHMANN:  Mr. Dellaportas --
15:12:36  8              COURT REPORTER:  I can't hear.
15:12:36  9              MR. DELLAPORTAS:  I'd like to know.
15:12:36 10              COURT REPORTER:  I can't hear.
15:12:36 11              MR. HERSCHMANN:  Mr. Dellaportas --
15:12:47 12              MR. DELLAPORTAS:  You started with the
15:12:48 13         Rule 11 sanctions, so I'd like to know are
15:12:48 14         you stating that what Mr. Cavaliere said to
15:12:49 15         Judge Garrity is incorrect?  I would
15:12:49 16         like --
15:12:50 17              MR. HERSCHMANN:  Always a pleasure
15:12:50 18         talking to you.  You're very professional.
15:12:50 19              MR. DELLAPORTAS:  What is it, is it
15:12:59 20         true or false?  Did Mr. Cavaliere correctly
15:13:00 21         or incorrectly articulate to Judge Garrity
15:13:04 22         at the last --
15:13:07 23              MR. BOWEN:  We're proceeding, we're
15:13:07 24         proceeding with the deposition.
15:13:09 25              MR. DELLAPORTAS:  Please do not
```

BUSHMAN COURT REPORTING

15:13:11  1            interrupt me, Mr. Bowen.

15:13:12  2                 MR. BOWEN:  We're proceeding with the

15:13:12  3            deposition.

15:13:12  4                 MR. DELLAPORTAS:  I did not interrupt

15:13:12  5            you.

15:13:12  6                 MR. BOWEN:  You can, you can have your

15:13:13  7            fight --

15:13:13  8                 MR. DELLAPORTAS:  I would like Mr.

15:13:13  9            Herschmann --

15:13:13 10                 MR. BOWEN:  -- later on somebody

15:13:13 11            else's time.

15:13:14 12                 MR. DELLAPORTAS:  Mr. Herschmann has

15:13:15 13            been throwing around ridiculous Rule 11

15:13:16 14            allegations, so I'd like him to say,

15:13:20 15            because I don't want to misrepresent

15:13:23 16            anything to the Court --

15:13:23 17                 MR. BOWEN:  Mr. Dellaportas, now you

15:13:25 18            are being obstructionist --

15:13:26 19                 MR. DELLAPORTAS:  -- that's not my

15:13:26 20            style.

15:13:26 21                 MR. BOWEN:  -- and you're preventing

15:13:26 22            this deposition from continuing.

15:13:26 23                 MR. DELLAPORTAS:  Perhaps Mr.

15:13:26 24            Cavaliere made a mistake.  It happens.  So

15:13:32 25            tell us, Mr. Herschmann, did Mr. Cavaliere

```
15:13:35  1              make a mistake in what he told Judge

15:13:37  2              Garrity?

15:13:39  3                   MR. BOWEN:  Mr. Dellaportas, please

15:13:40  4              desist --

15:13:41  5                   MR. DELLAPORTAS:  Please do not

15:13:41  6              interrupt me.

15:13:41  7                   MR. BOWEN:  You have to stop.  I'm

15:13:42  8              sorry.

15:13:42  9                   MR. DELLAPORTAS:  I did not interrupt

15:13:42 10              you.

15:13:42 11                   MR. BOWEN:  I'm continuing with the

15:13:42 12              examination.

15:13:42 13  BY MR. BOWEN:

15:13:42 14  Q.    Mr. Oldner --

15:13:42 15                   MR. DELLAPORTAS:  Your law partner

15:13:42 16              interrupted your own examination in order

15:13:50 17              to throw around Rule 11 sanctions, and now

15:13:52 18              he's, he's -- so he won't ask a simple

15:13:56 19              question over whether counsel to the

15:13:56 20              Chapter 7 trustee --

15:13:57 21                   MR. BOWEN:  Mr. Dellaportas, this is

15:13:57 22              inappropriate for a deposition.  Please

15:13:57 23              stop.

15:13:59 24                   MR. DELLAPORTAS:  Well, why didn't you

15:13:59 25              tell your partner --
```

15:13:59  1  BY MR. BOWEN:

15:13:59  2  Q.    Mr. Oldner --

15:13:59  3              MR. DELLAPORTAS:  -- Mr. Herschmann to

15:14:04  4         stop when he was threatening people with

15:14:05  5         Rule 11 sanctions for repeating what

15:14:07  6         counsel to the Chapter 7 Trustee told the

15:14:09  7         Court on the record?

15:14:14  8              MR. BOWEN:  Mr. Dellaportas, please

15:14:15  9         stop.  We are continuing with the

15:14:16 10         examination.

15:14:16 11  BY MR. BOWEN:

15:14:16 12  Q.    Mr. Oldner --

15:14:16 13              MR. POLLOCK:  Mr. Herschmann invited

15:14:19 14         me to correct the record.  The record

15:14:21 15         indicates that Mr. --

15:14:23 16              MR. BOWEN:  No, I'm sorry, Mr. -- I'm

15:14:26 17         sorry.  I'm drawing a blank on your name.

15:14:27 18              MR. POLLOCK:  Pollock.

15:14:28 19              MR. BOWEN:  Pollock.  Just stop.

15:14:29 20         We're moving on with the --

15:14:31 21              MR. DELLAPORTAS:  No, no, no.

15:14:31 22         Mr. Herschmann invited Mr. Pollock to

15:14:34 23         correct the record, so give him an

15:14:34 24         opportunity --

15:14:35 25              MR. BOWEN:  No, we're not doing that.

15:14:36  1            MR. DELLAPORTAS:  -- to correct the

15:14:36  2       record.

15:14:36  3            MR. BOWEN:  You want to correct the

15:14:37  4       record, you can do it when I cede my time

15:14:38  5       and I'm finished --

15:14:39  6            MR. DELLAPORTAS:  No, he can do it

15:14:39  7       now.  I would like Mr. Pollock to correct

15:14:43  8       the record, if he's going to correct it.  I

15:14:45  9       want to know what everyone's position is on

15:14:45 10       this.

15:14:47 11            MR. BOWEN:  Well, he can do it later.

15:14:48 12            MR. DELLAPORTAS:  Mr. Herschmann

15:14:48 13       invited him.

15:14:49 14            MR. BOWEN:  I'm going to continue my

15:14:49 15       examination.

15:14:49 16            MR. DELLAPORTAS:  I would like to hear

15:14:50 17       first what Mr. Pollock is going to say.

15:14:53 18            MR. BOWEN:  Mr. Dellaportas, you don't

15:14:54 19       get to decide the order of events.  I'm in

15:14:56 20       the middle of my examination.

15:14:56 21            MR. DELLAPORTAS:  You don't either.

15:14:57 22            MR. BOWEN:  Please stop.  Please stop.

15:14:59 23            MR. DELLAPORTAS:  You don't either.

15:14:59 24            MR. POLLOCK:  Mr. Bowen --

15:15:00 25            MR. BOWEN:  Yes, I'm conducting the

BUSHMAN COURT REPORTING

15:15:00  1          deposition.

15:15:03  2              MR. DELLAPORTAS:  But you allowed your

15:15:03  3          law partner, Mr. Herschmann, to

15:15:06  4          interrupt --

15:15:06  5              MR. BOWEN:  I don't know --

15:15:06  6              MR. DELLAPORTAS:  -- and pose --

15:15:14  7              COURT REPORTER:  I can't hear.

15:15:14  8              MR. DELLAPORTAS:  I was saying that --

15:15:14  9              MR. BOWEN:  You need to stop.

15:15:14 10              MR. DELLAPORTAS:  -- Mr. Bowen allowed

15:15:17 11          Mr. Herschmann --

15:15:18 12              MR. BOWEN:  You need to just control

15:15:18 13          yourself, please.

15:15:18 14              MR. DELLAPORTAS:  -- and pose a

15:15:18 15          question to Mr. Pollock, and now I would

15:15:23 16          like to hear Mr. Pollock's answer.

15:15:26 17              MR. BOWEN:  Okay.  Thank you.  We're

15:15:27 18          going to continue with the questioning.

15:15:29 19  BY MR. BOWEN:

15:15:29 20  Q.    Mr. Oldner, I don't know if you can hear me.  I

15:15:32 21  don't see you, but the question is --

15:15:35 22  A.    Mr. Bowen?

15:15:37 23  Q.    Yes.

15:15:39 24  A.    Is everybody finished arguing, so it's just you

15:15:42 25  and me now?

                        BUSHMAN COURT REPORTING

15:15:43  1   Q.     Yes.

15:15:43  2              MR. POLLOCK:  Before you go to Mr. --

15:15:45  3              MR. BOWEN:  No, no, we're not doing

15:15:47  4         anything else, Mr. Pollock.  I'm just going

15:15:48  5         to ask a question.

15:15:48  6              MR. POLLOCK:  Mr. Bowen --

15:15:50  7              MR. DELLAPORTAS:  Mr. Bowen --

15:15:50  8              MR. POLLOCK:  Mr. Bowen --

15:15:50  9              MR. DELLAPORTAS:  -- you can't talk

15:15:50 10         over other attorneys.  It's never proper,

15:15:55 11         please don't.

15:15:56 12              MR. BOWEN:  Well, there has to be

15:15:56 13         somebody in charge of the deposition.

15:15:57 14         Otherwise, it devolves to this kind of

15:16:00 15         free-for-all, which is not fair to anybody,

15:16:02 16         so let's just continue.

15:16:02 17              MR. POLLOCK:  Mr. Bowen --

15:16:03 18              MR. DELLAPORTAS:  That's not the way

15:16:03 19         depositions work.

15:16:03 20              MR. POLLOCK:  Mr. Bowen --

15:16:03 21              MR. DELLAPORTAS:  You speak over

15:16:03 22         everybody.

15:16:07 23  BY MR. BOWEN:

15:16:07 24   Q.    Mr. Oldner --

15:16:07 25              COURT REPORTER:  Okay.  I'm going to

                         BUSHMAN COURT REPORTING

15:16:07  1          control it.  We have to talk one at a time,
15:16:07  2          period.
15:16:14  3               MR. POLLOCK:  Okay.  So what I would
15:16:16  4          suggest, and I agree with what the
15:16:18  5          stenographer said, we should all talk one
15:16:23  6          at a time.
15:16:23  7               Mr. Herschmann leveled a very serious
15:16:25  8          accusation against me and suggested that I
15:16:26  9          check the record.
15:16:27 10               I am now checking the record, and I
15:16:29 11          see that on page 20 of the May 22nd
15:16:32 12          transcript Mr. Cavaliere indicated that he
15:16:35 13          held negotiations primarily with Mr.
15:16:38 14          Herschmann, comma, who is the
15:16:41 15          representative of the entity.
15:16:43 16               My understanding of the entity that
15:16:45 17          they are referring to, and that
15:16:46 18          Mr. Cavaliere was referring to is the
15:16:48 19          Claims Pursue, Inc. entity, and that Mr.
15:16:51 20          Herschmann is the representative of that
15:16:54 21          entity.  That is all.
15:16:56 22               MR. CAVALIERE:  I --
15:16:58 23               MR. HERSCHMANN:  -- of your statement,
15:16:58 24          I'm fine.  That's not what you said, but
15:17:01 25          let's move on.

15:17:02 1                    MR. CAVALIERE:  I think we should move

15:17:04 2          on.  The statements Mr. Pollock stated

15:17:07 3          during his deposition were not consistent.

15:17:10 4          The exact words he used were not the

15:17:12 5          words that were just read into the record

15:17:15 6          by Mr. Pollock that were stated on the

15:17:17 7          transcript on May 22nd.  I really think we

15:17:20 8          should just move on, and I'd like to do so

15:17:23 9          if it's okay with everyone.  Thank you.

15:17:26 10 BY MR. BOWEN:

15:17:27 11 Q.   Mr. Oldner, in your capacities as the trustee

15:17:29 12 you don't currently have a view of whether or not

15:17:35 13 dismissal of the bankruptcy is in the best interest

15:17:37 14 of the trust beneficiaries; is that correct?

15:17:42 15                    MR. POLLOCK:  Objection,

15:17:42 16          mischaracterizes the prior testimony.

15:17:47 17 Q.   Is that correct?

15:17:52 18 A.   The trust is taking no position at this time on

15:17:58 19 the Motion to Dismiss.

15:18:02 20 Q.   But do you have a view?  You don't have to tell

15:18:05 21 me what it is, but do you have a view of whether

15:18:08 22 dismissal is in the best interest of the

15:18:10 23 beneficiaries or not?

15:18:11 24                    MR. POLLOCK:  Mr. Bowen, if you're

15:18:13 25          asking for his testimony with respect to a

15:18:15  1           motion that he has already testified he

15:18:17  2           hasn't completely read, it's inappropriate,

15:18:19  3           and you've asked it again and again.

15:18:25  4   Q.    Mr. Oldner, in case you have the same confusion

15:18:28  5   as your lawyer, I'm not asking you to comment on the

15:18:30  6   Motion to Dismiss.

15:18:32  7           I'm asking you whether or not you have a

15:18:34  8   view.  You don't have to tell me what it is, but do

15:18:37  9   you have a view whether dismissal is in the best

15:18:41 10   interest of the beneficiaries or not, currently,

15:18:44 11   today?

15:18:46 12           MR. POLLOCK:  Same objection.

15:18:47 13   A.    Yes, I do.

15:18:50 14   Q.    And that view is different than the view you

15:18:51 15   had when you filed the joinder in the dismissal, or

15:18:55 16   the same?

15:18:59 17           MR. POLLOCK:  Same objections as

15:19:00 18           previously stated.  What you're asking for

15:19:04 19           is his legal analysis, and it's improper.

15:19:09 20           MR. BOWEN:  Mr. Pollock, can you just

15:19:10 21           stop and let your witness think for a

15:19:12 22           minute and give us an answer?  Please just

15:19:14 23           stop.

15:19:14 24           MR. POLLOCK:  I'm objecting again --

15:19:16 25           MR. BOWEN:  You already objected.

15:19:17 1                    Just stop.  Let him think.

15:19:19 2                         MR. POLLOCK:  Stop asking the same

15:19:20 3               question again and again.

15:19:23 4                         THE WITNESS:  There are many different

15:19:25 5               components of this, a number of which are

15:19:28 6               legal components, and the only way I know

15:19:34 7               how to honestly answer your question is

15:19:37 8               that, yes, I have opinions, but the trust

15:19:42 9               will take no position in the motion to

15:19:46 10              dismiss at this time.

15:19:48 11                   That's being said with full awareness

15:19:52 12              that I have not read the Motion to Dismiss,

15:19:54 13              and that I am not aware of its full

15:19:58 14              content, and I would be speculating as to

15:20:01 15              what it is in general.

15:20:04 16   BY MR. BOWEN:

15:20:06 17   Q.    Is it your view that Sagi Genger agrees with

15:20:10 18   the trust that the $32.3 million belongs to the

15:20:15 19   trust?

15:20:17 20                        MR. POLLOCK:  Objection to the form.

15:20:21 21                        MR. DELLAPORTAS:  Speculation.

15:20:25 22   A.    I believe that the $32.3 million belongs to the

15:20:29 23   trust since -- hence why I've filed a lawsuit.

15:20:37 24   That's it.

15:20:39 25   Q.    But my question is do you have an understanding

BUSHMAN COURT REPORTING

15:20:42  1   that Sagi Genger agrees with that view?

15:21:14  2   A.    Do I have an understanding Sagi -- do I have an

15:20:46  3   understanding with Sagi that he agrees with that?

15:20:50  4   Q.    Yes.

15:20:51  5   A.    No, I do not.

15:20:53  6              MR. DELLAPORTAS:  Objection; calls for

15:20:54  7              speculation.

15:20:54  8   Q.    Do you have an understanding that Sagi Genger

15:20:56  9   disagrees with that view?

15:20:59 10              MR. DELLAPORTAS:  Objection; calls for

15:21:01 11              speculation.

15:21:02 12              MR. POLLOCK:  I join in Dellaportas's

15:21:02 13              objection.  You're really seeking --

15:21:39 14              THE WITNESS:  I'm not --

15:21:09 15              MR. POLLOCK:  Hold on.  Don't talk

15:21:09 16              over me.

15:21:10 17              THE WITNESS:  Sorry.

15:21:11 18              MR. POLLOCK:  Are you really seeking

15:21:12 19              his testimony about what Sagi is thinking?

15:21:13 20              Are you deposing Sagi next week?

15:21:18 21              MR. BOWEN:  Mr. Pollock, if that's you

15:21:20 22              speaking, I ask you to stop.

15:21:22 23   BY MR. BOWEN:

15:21:22 24   Q.    Mr. Oldner, the question is simply do you have

15:21:25 25   an understanding?  I'm asking about your

15:21:28  1   understanding.  Although Mr. Pollock is confused

15:21:31  2   about that language, let me make it clear.

15:21:33  3        I'm asking your understanding.  To your

15:21:34  4   understanding does Sagi Genger disagree with the

15:21:39  5   trust's position that the $32.3 million belongs to

15:21:44  6   the trust?

15:21:45  7             MR. DELLAPORTAS:  Objection; calls for

15:21:46  8             speculation.

15:21:48  9             MR. POLLOCK:  I also join in that

15:21:50 10             objection.

15:21:52 11   A.    I don't know whether he agrees or disagrees.

15:21:56 12   Q.    So you don't know if he's an ally or an adverse

15:22:01 13   party to your position; is that correct?

15:22:03 14             MR. DELLAPORTAS:  Objection; misstates

15:22:04 15             the record.

15:22:06 16             MR. POLLOCK:  Objection to form, to

15:22:08 17             relevance, to misstates the record.  I have

15:22:10 18             a litany of objections.

15:22:14 19             MR. HERSCHMANN:  Guys, we have an

15:22:15 20             agreement that an objection for one is an

15:22:18 21             objection for everybody.  That's been

15:22:20 22             established already.

15:22:20 23             It's Eric Herschmann.  Can we please

15:22:20 24             just keep that rule?  So if Mr. Dellaportas

15:22:20 25             objects, it's all preserved.  Don't worry.

15:22:26 1            MR. DELLAPORTAS:  Mr. Herschmann,

15:22:27 2       that's a rule if the parties have the same

15:22:29 3       objection, but after I objected Mr. Pollock

15:22:32 4       objected on additional grounds beyond those

15:22:35 5       which I did.

15:22:36 6            MR. HERSCHMANN:  Right, but --

15:22:36 7            MR. DELLAPORTAS:  The ruling as I

15:22:36 8       understand it --

15:23:15 9            MR. BOWEN:  Let's finish.  Let's

15:23:15 10      finish.  Please, everybody stop.

15:22:42 11           MR. DELLAPORTAS:  -- one objection on

15:22:42 12      one ground, everybody has that, but if

15:22:43 13      somebody else has an additional ground,

15:22:44 14      then they are going to have to articulate

15:22:44 15      it, just to be --

15:22:45 16           MR. BOWEN:  Everybody stop.  Everybody

15:22:45 17      stop.

15:22:45 18           MR. DELLAPORTAS:  You cannot speak

15:22:45 19      over me.  It's really getting out of

15:22:45 20      control.

15:22:45 21           MR. BOWEN:  I need to finish --

15:22:45 22           MR. DELLAPORTAS:  I have the right --

15:22:45 23           MR. BOWEN:  -- this deposition.  It's

15:22:45 24      been a long day --

15:22:45 25           MR. DELLAPORTAS:  I have the right to

15:22:45  1              answer --

15:22:45  2                   MR. BOWEN:  Mr. Oldner has been a

15:22:45  3              gentleman throughout --

15:22:45  4                   MR. DELLAPORTAS:  -- it.

15:22:45  5                   MR. BOWEN:  Mr. Dellaportas, I'm

15:22:45  6              asking you to stop.  It's unfair to Mr.

15:23:00  7              Oldner.  Please stop.

15:23:02  8                   MR. DELLAPORTAS:  Stop talking over

15:23:02  9              me.

15:23:02 10  BY MR. BOWEN:

15:23:02 11  Q.   Mr. Oldner, the question was very simply

15:23:05 12  subject to these objections -- they don't have to be

15:23:07 13  restated -- is it the case that you don't -- as the

15:23:08 14  trustee, you don't know whether or not Sagi Genger is

15:23:15 15  an ally or an adverse party to the trust's position

15:23:18 16  as to the $32.3 million; correct?

15:23:21 17                   MR. POLLOCK:  Mr. Bowen --

15:23:24 18                   MR. DELLAPORTAS:  Objection.

15:23:24 19                   MR. POLLOCK:  And, Mr. Bowen, when you

15:23:25 20              see the stenographer waving her arms around

15:23:26 21              because you're talking over Mr.

15:23:28 22              Dellaportas, I respectfully ask that you

15:23:31 23              respect her and stop trying to speak over

15:23:33 24              Mr. Dellaportas, because it makes it very

15:23:36 25              hard for her to do her job today.

                         BUSHMAN COURT REPORTING

15:23:38   1              She has been valiantly trying, and

15:23:38   2              this is a difficult format for all of us,

15:23:38   3              to do a deposition by Zoom, and when she

15:23:38   4              does wave her arms like that, I ask that

15:23:47   5              you stop speaking over Mr. Dellaportas or

15:23:50   6              everybody else because it makes it very,

15:23:52   7              very challenging for her to get a good

15:23:54   8              record.

15:24:32   9    Q.    Mr. Oldner, please answer the question.

15:24:35  10    A.    Mr. Bowen --

15:24:02  11              MR. DELLAPORTAS:  Object to the form.

15:24:03  12              MR. POLLOCK:  I also object.

15:24:04  13    A.    Mr. Bowen, I know you've heard this a few

15:24:09  14    times, could you please repeat the question?

15:24:54  15    Q.    Certainly.  The question is you don't know

15:24:16  16    whether Sagi Genger is an ally or an adverse party to

15:24:20  17    the trust's position that the $32.3 million belongs

15:24:25  18    to the trust?

15:24:28  19              MR. DELLAPORTAS:  Object to form.  The

15:24:29  20              question is incapable of meaningful

15:24:31  21              response.

15:24:34  22              MR. POLLOCK:  I share in that

15:24:35  23              objection.  It's also completely far afield

15:24:38  24              from anything that we're at hand for today.

15:24:49  25    Q.    Go ahead, Mr. Oldner.

                          BUSHMAN COURT REPORTING

```
15:24:50  1   A.     Thank you.  It is -- the clearest way I can
15:24:56  2   state this is that my belief, my full belief is that
15:25:00  3   the trust is entitled to the full $32.3 million plus
15:25:07  4   interest, statutory interest, regardless of what
15:25:11  5   anybody else's claims are.
15:25:53  6   Q.     And is -- in your view is Sagi Genger assisting
15:25:16  7   the trust in getting the money paid to the trust?
15:25:22  8                     MR. DELLAPORTAS:  Object to form.
15:25:24  9                     MR. POLLOCK:  Objection.
15:25:28 10   A.     We, obviously -- our attorneys talk.  We talk.
15:25:35 11   But that does not mean that I agree with Sagi Genger,
15:25:39 12   or Sagi Genger agrees with me on anything or
15:25:44 13   everything.
15:25:45 14           It means that in some cases we share
15:25:50 15   information.  I do not believe that we have an
15:25:52 16   adversarial position.  I believe that the $32 million
15:25:56 17   is entirely the property of the trust.  So if that's
15:25:59 18   true, then I don't think Sagi and I have adversarial
15:26:01 19   positions.
15:26:41 20   Q.     Okay.
15:26:10 21   A.     If I understood that correctly.
15:26:12 22   Q.     So your view in that -- well, let me ask it
15:26:14 23   this way.  Do you have the view that Dalia Genger
15:26:16 24   also agrees that the $32.3 million belongs to the
15:26:24 25   trust?
```

15:26:27  1                    MR. DELLAPORTAS:  Objection; calls for

15:26:28  2          speculation.

15:26:29  3                    MR. POLLOCK:  Objection.

15:26:30  4  A.    As we discussed earlier, I have never talked to

15:26:32  5  Dalia Genger.

15:26:33  6  Q.    So you don't have a view about her position one

15:26:35  7  way or the other; is that correct?

15:26:38  8                    MR. POLLOCK:  Objection.

15:26:39  9  A.    On what she thinks of the $32 million, no, I

15:26:45 10  don't.  I -- at this point in time, I do not.

15:26:53 11  Q.    Are you aware of the federal litigation in

15:26:55 12  which both Sagi Genger and Dalia Genger claim that

15:27:00 13  the $32 million was monetized by Orly Genger?

15:27:03 14                    MR. POLLOCK:  Mr. Bowen, just two days

15:27:05 15          ago we had a conference with Judge Garrity

15:27:06 16          in which you insisted, tried to insist that

15:27:08 17          we do discovery on Dalia Genger's adversary

15:27:10 18          proceeding.  And Mr. Labov had a separate

15:27:14 19          view, and Judge Garrity gave clear

15:27:17 20          direction.

15:27:18 21                    I can't understand why you are

15:27:19 22          persisting in the face of Judge Garrity's

15:27:22 23          clear direction.  I'm happy to raise the

15:27:25 24          issue with them.

15:27:26 25                    I also don't know why you are

                              BUSHMAN COURT REPORTING

15:27:28  1            badgering this witness with what Dalia is

15:27:30  2            thinking or not thinking.  He has already

15:27:32  3            testified that he doesn't hasn't talked to

15:27:34  4            her.

15:27:34  5                 I respectfully ask that you respect

15:27:37  6            Judge Garrity's clear direction in this

15:27:39  7            matter.

15:27:41  8  Q.   You can answer --

15:27:41  9                 MR. POLLOCK:  I also --

15:27:43 10  Q.   You can answer.

15:27:43 11                 MR. POLLOCK:  Also, Mr. Labov isn't on

15:27:46 12            the line, but I presume that Mr. Labov

15:27:48 13            would have a similar objection to your

15:27:50 14            attempts to flout Judge Garrity's

15:27:53 15            direction.

15:27:58 16  Q.   You can answer the question, Mr. Oldner.

15:27:59 17                 MR. DELLAPORTAS:  This is Dellaportas.

15:27:59 18  Q.   Is that your understanding?

15:27:59 19                 MR. DELLAPORTAS:  I object to the

15:28:01 20            question because it misstates the record.

15:28:02 21            It misstates the positions taken in that

15:28:05 22            other forum, and it omits the actual

15:28:08 23            findings of the court in that other forum,

15:28:10 24            which were affirmed on appeal and are the

15:28:11 25            only things that are relevant.

                        BUSHMAN COURT REPORTING

15:28:14 1   Q.    Mr. Oldner, the question was simply are you

15:28:18 2   aware of the federal action in which Mr. Sagi Genger

15:28:22 3   and Dalia Genger have made the claim that Orly Genger

15:28:25 4   monetized the $32.3 million; are you aware of that?

15:28:30 5              MR. DELLAPORTAS:  Objection; misstates

15:28:31 6         the record.

15:28:32 7   Q.    Are you aware of that litigation?

15:28:36 8   A.    I am not familiar with the litigation.

15:28:39 9   Q.    Okay.  Are you aware of the fact that Sagi

15:28:43 10  Genger has made the claim that Dalia Genger under a

15:28:48 11  2004 agreement is going to request and demand, I

15:28:54 12  believe, $26 million to be paid half by Orly and half

15:29:02 13  by Sagi.  Are you aware of that?

15:29:05 14             MR. POLLOCK:  Mr. Bowen --

15:29:05 15             MR. DELLAPORTAS:  Objection; it

15:29:05 16        misstates the record.  No such --

15:29:09 17             MR. POLLOCK:  And, also, Mr. Bowen,

15:29:10 18        you purport to be --

15:29:13 19             MR. BOWEN:  I'm just asking Mr. Oldner

15:29:14 20        if he's aware of that.

15:29:16 21             MR. POLLOCK:  And I'm asking --

15:29:17 22             MR. DELLAPORTAS:  -- good faith basis

15:29:17 23        for making --

15:29:19 24             MR. BOWEN:  I think you're both

15:29:19 25        speaking at the same time.  You need to go

15:29:19  1              one at a time.

15:29:23  2                   MR. DELLAPORTAS:  This is Dellaportas,

15:29:24  3              the questioner lacks a good faith basis to

15:29:27  4              make the claim that he has, because he

15:29:28  5              knows it's not...

15:29:30  6                   MR. POLLOCK:  Mr. Dellaportas, if I

15:29:32  7              can ask you to keep your volume up.  We're

15:29:34  8              having a little bit of challenge hearing

15:29:37  9              you.

15:29:37 10  BY MR. BOWEN:

15:29:40 11  Q.   Mr. Oldner, are you aware of that, that claim

15:29:43 12  being made by Sagi Genger and Dalia Genger?

15:29:48 13                   MR. POLLOCK:  Mr. Bowen, you purport

15:29:50 14              to be representing Kasowitz, a creditor in

15:29:52 15              the bankruptcy.

15:29:54 16              I don't know why you are seeking

15:29:56 17              discovery as to what Dalia claims or Sagi

15:29:59 18              claims.

15:29:59 19              This is far afield, at best, from the

15:30:01 20              pending Motion to Dismiss and appears to be

15:30:04 21              squarely within the colloquy that you had

15:30:07 22              with Mr. Labov two days ago.

15:30:10 23              And now you're asking Mr. Oldner to

15:30:12 24              speculate about something that's in the

15:30:14 25              court record from -- I don't even know when

15:30:17  1              you're talking about.

15:30:18  2                   And I don't know why you're doing

15:30:20  3              this, and I'm asking you to make a proffer

15:30:22  4              as to why you are going down this path and

15:30:24  5              how this possibly, a, relates to the Motion

15:30:26  6              to Dismiss, and, b, relates to the

15:30:28  7              Kasowitz's role with respect to the Motion

15:30:31  8              to Dismiss.

15:30:32  9  BY MR. BOWEN:

15:30:34 10  Q.   Mr. Oldner, are you aware of that claim being

15:30:37 11  made by either Sagi or Dalia?

15:30:40 12                   MR. DELLAPORTAS:   Objection; misstates

15:30:41 13              the record.

15:30:43 14                   MR. POLLOCK:   Objection.

15:30:45 15  A.   If I had the claim in front of me, perhaps I

15:30:48 16  would be familiar with it.

15:30:51 17  Q.   Well, let's show you the Inter-Creditor

15:30:51 18  Agreement.  We'll mark this as Oldner 1, hyphen, 1

15:30:58 19  Exhibit Oldner 1 to the deposition.

15:31:02 20                   MR. POLLOCK:   Mr. Bowen, pursuant to

15:31:04 21              the email that I sent yesterday, when I

15:31:07 22              emailed you and your colleagues yesterday I

15:31:09 23              indicated that if you would email us the

15:31:11 24              exhibits in advance, we would be able to

15:31:14 25              print them out for Mr. Oldner, or that you

                         BUSHMAN COURT REPORTING

15:31:16  1        could FedEx them for first overnight

15:31:19  2        delivery to this law office, so that we

15:31:24  3        could have them.

15:31:26  4            I now see that Mr. Kurland is doing

15:31:30  5        the screen sharing thing.  I still don't

15:31:32  6        know how the stenographer can mark this

15:31:35  7        exhibit.

15:31:48  8            COURT REPORTER:  I was emailed a copy,

15:31:48  9        but I was already on my way here.  It was

15:31:48 10        like 7:58 this morning.  So I didn't -- I

15:31:48 11        couldn't print them.  I was already driving

15:31:48 12        here.

15:31:48 13            MR. DELLAPORTAS:  So this is Mr.

15:31:48 14        Dellaportas.  Yesterday, Mr. Pollock, you

15:31:50 15        weren't there, I don't think, but we

15:31:53 16        established a procedure whereby if there's

15:31:55 17        an exhibit which the reporter doesn't have,

15:31:55 18        the party asking the questions would email

15:32:01 19        it to all counsel.

15:32:02 20            So I would ask that that practice

15:32:04 21        continue to be followed.  I followed it.

15:32:06 22        It slowed down my deposition, but it was a

15:32:09 23        courtesy for all attorneys involved.

15:32:11 24            You have everyone's email addresses.

15:32:13 25        Let's forward the --

15:32:15  1            MR. KURLAND:  It's been done.  Let's

15:32:17  2        proceed.  You have it in your email box

15:32:18  3        already.

15:32:21  4            MR. DELLAPORTAS:  There it is.  Thank

15:32:21  5        you.  Please proceed.

15:32:21  6        (Exhibit No. 1 was marked.)

15:32:21  7  BY MR. BOWEN:

15:32:22  8  Q.    Mr. Oldner, this was produced by you.  The

15:32:25  9  first page has Bates number OGT 0001.

15:32:34 10  A.    Okay.

15:32:37 11            MR. POLLOCK:  Mr. Bowen --

15:32:38 12  Q.    Do you recognize this document?

15:32:40 13            MR. POLLOCK:  Hold on.  Mr. Bowen, to

15:32:41 14        be clear, you're showing him two-thirds of

15:32:44 15        one page of a nine-page document and asking

15:32:47 16        him if he recognizes it?  Is that what

15:32:50 17        you're doing?

15:32:51 18            MR. HERSCHMANN:  Mr. Pollock, we dealt

15:32:51 19        with this already.  It's Eric Herschmann.

15:32:55 20        Let us go through it.  You'll see how we

15:32:57 21        all agreed to do it, and it will be very

15:33:00 22        clear.  We have an agreement.  This should

15:33:02 23        not be difficult.

15:33:03 24            MR. POLLOCK:  I don't know that

15:33:04 25        Mr. Oldner, or Mr. Oldner's counsel, or me

15:33:08  1              have any idea what agreement it is that

15:33:10  2              you're referring to.

15:33:13  3                   MR. BOWEN:  Well, Mr. Pollock, if you

15:33:16  4              can, you know, just -- you can just print

15:33:20  5              it out, or you can share your screen with

15:33:23  6              the witness.  If that's impossible for you,

15:33:25  7              then we can just scroll through it.

15:33:25  8                   MR. HERSCHMANN:  The witness can see

15:33:25  9              it.

15:33:25 10  BY MR. HERSCHMANN:

15:33:25 11  Q.    But looking at the first page, Mr. Oldner, do

15:33:31 12  you recognize the document?

15:33:33 13  A.    I do.

15:34:01 14  Q.    And you recognize it as the Inter-Creditor

15:33:35 15  Agreement that we signed on behalf of the trust?

15:33:41 16  A.    Let's go all of the way through it.

15:33:46 17  Q.    All right.  Well, you see the date on the first

15:33:48 18  page is June 16th, 2019?

15:34:19 19  A.    I do.

15:33:50 20  Q.    You know that's a Sunday; correct?

15:34:25 21  A.    I do, as a matter of fact.

15:33:54 22  Q.    And you were given this agreement on the Friday

15:33:57 23  before hand, which is June the 14th; correct?

15:34:32 24  A.    That is correct.

15:34:33 25  Q.    All right.  Now if you scroll through to the

15:34:03  1   very end, the signature pages, you will see

15:34:05  2   signatures for yourself.  Do you recognize your

15:34:14  3   signature?

15:34:15  4   A.    That is my signature.

15:34:17  5   Q.    And you signed this document on behalf of the

15:34:19  6   Orly Genger 1993 Trust and on behalf of Recovery

15:34:26  7   Effort Inc.; correct?

15:34:56  8   A.    I did.

15:34:28  9   Q.    And then you sent your signature to Sagi

15:34:30 10   Genger; right?  Go to the next page.

15:35:03 11   A.    That is correct.

15:34:37 12                 MR. POLLOCK:  Sorry.  Can we see the

15:34:38 13           next page?

15:34:39 14                 MR. BOWEN:  It's on the screen.

15:34:39 15   BY MR. BOWEN:

15:34:39 16   Q.    So the next page has Sagi Genger's signature

15:34:42 17   underneath yours; do you see that?

15:34:45 18   A.    Yes.

15:34:45 19   Q.    Do you recognize Sagi Genger's signature?

15:34:48 20   A.    No.  But if you say it is, I believe you.

15:34:53 21   Q.    Well, after you sent your signature page to

15:34:56 22   Sagi Genger, he signed it on behalf of himself and on

15:35:00 23   behalf of TPR Investment Associates Inc, and then you

15:35:04 24   signed it again for Recover Effort; is that correct?

15:35:09 25   A.    I don't -- that's -- I have no idea.  I thought

15:35:12  1    I signed it on the 16th.  Okay.

15:35:14  2    Q.    Yeah.

15:35:14  3    A.    I can tell you that is --

15:35:16  4    Q.    If you scroll up a little bit, you'll see that

15:35:18  5    you sign on behalf of the trust.

15:35:18  6    A.    That is my signature, okay, for sure.

15:35:21  7    Q.    So did you forget to sign on behalf of Recovery

15:35:23  8    Effort?

15:35:58  9    A.    I have no --

15:35:26 10              MR. HERSCHMANN:  Mike, I think you

15:35:26 11          have to go up a page.

15:35:26 12    A.    That's entirely possible.

15:35:26 13              MR. BOWEN:  No, this is the page.

15:35:26 14              MR. HERSCHMANN:  Oh, Sorry.  I'm

15:35:26 15          sorry.

15:35:26 16    BY MR. BOWEN:

15:35:28 17    Q.    And, Mr. Oldner, did Sagi Genger call you and

15:35:37 18    say you needed to sign for Recovery Effort too?

15:35:40 19    A.    I do not remember.  I don't --

15:35:44 20    Q.    Did anybody call you and tell you you needed to

15:35:46 21    sign two times?

15:35:48 22    A.    Not that I remember, but I do remember sending

15:35:51 23    documents, but...

15:35:56 24    Q.    And you sent the document to Sagi; is that

15:35:59 25    correct?

BUSHMAN COURT REPORTING

15:35:59  1   A.     That's correct.

15:36:01  2   Q.     All right.  Now if we go back up to the first

15:36:05  3   page -- and, actually, you can go to page two, third

15:36:17  4   paragraph from the top, it reads, Whereas SG,

15:36:20  5   referring to Sagi Genger --

15:37:03  6   A.     Okay.

15:36:26  7   Q.     -- expects that, upon availability of funds,

15:36:30  8   DG, meaning Dalia Genger, will make demand of Sagi

15:36:35  9   Genger on her full remaining entitlement --

15:37:18 10   A.     Okay.

15:36:39 11   Q.     -- under Sagi Genger's promise to Dalia Genger,

15:36:43 12   which in turn will trigger Sagi Genger's entitlement

15:36:48 13   from Orly Genger under the Orly Genger Indemnity

15:36:53 14   Claim.

15:36:53 15          Do you see that?

15:36:54 16   A.     Yes, sir.

15:36:55 17   Q.     And above that paragraph on that same page it

15:37:03 18   reads, quote, Whereas, in the same civil action, by

15:37:08 19   Opinion and Order dated July 27th, 2018, the United

15:37:13 20   States District Court held that the total additional

15:37:17 21   potential liability of Orly Genger to Sagi Genger

15:37:22 22   under her 2004 indemnity to him is $9.25 million.

15:37:27 23          Do you see that?

15:37:28 24   A.     Yes, I do.

15:37:32 25   Q.     What was your understanding about the,

15:37:34  1   quote/unquote, availability of funds that is in that

15:37:39  2   first paragraph I read.

15:38:06  3   A.    I have no idea what you're talking about.

15:37:43  4                MR. POLLOCK:  Mr. Bowen, it appears

15:37:46  5           that you are squarely seeking discovery

15:37:48  6           with respect to the MSM action in which MSM

15:37:52  7           is a party.

15:37:53  8                The Inter-Creditor Agreement is not an

15:37:56  9           issue in the Motion to Dismiss whatsoever.

15:37:58 10           The Motion to Dismiss pertains to Orly's

15:38:01 11           alleged conduct.

15:38:03 12                Orly is not a signatory to this

15:38:05 13           document, has nothing to do with this

15:38:07 14           document.

15:38:07 15                What we are doing now is an analysis

15:38:11 16           of whether or not Orly Genger, sorry, Sagi

15:38:16 17           Genger's Motion to Dismiss should be

15:38:18 18           granted or not granted.

15:38:19 19                The Inter-Creditor Agreement has

15:38:23 20           nothing to do with that.  It appears to be

15:38:25 21           either an attempt for you to seek discovery

15:38:28 22           in connection with the entity for which

15:38:29 23           Mr. Mr. Herschmann is the, quote,

15:38:32 24           representative of, of for you to take

15:38:34 25           discovery in connection with the MSM

15:38:36  1                action.

15:38:37  2                I object to this entire line of

15:38:39  3                questioning, and I demand that you move

15:38:41  4                along or cede the chair to Mr.Dellaportas,

15:38:45  5                or Mr. Cavaliere, or whoever else it is who

15:38:48  6                wants to ask questions today.

15:38:50  7   Q.   Mr. Oldner, did you understand that the

15:38:52  8   reference to availability of funds was a reference to

15:38:55  9   the $32.3 million being paid either to Orly Genger or

15:39:03 10   to some party other than the trust?

15:39:09 11                MR. POLLOCK:  What paragraph are you

15:39:10 12                on, Mr. Bowen?

15:39:12 13                THE WITNESS:  He is on the third one,

15:39:13 14                third one down, Whereas SG expects that,

15:39:13 15                upon availability of funds.

15:39:17 16                Mr. Bowen, may, may I ask you a

15:39:19 17                question from something --

15:39:21 18                MR. POLLOCK:  You don't get to ask him

15:39:22 19                questions.

15:39:23 20                THE WITNESS:  I'm sorry.

15:39:23 21                MR. POLLOCK:  He's not testifying.

15:39:23 22   BY MR. BOWEN:

15:39:25 23   Q.   No, you can ask me.  What do you want to know?

15:39:27 24   A.   I'm sorry.  No, we're good.  Thank you.  What

15:39:30 25   is your, what is your question?  I found your

15:39:34  1   paragraph.

15:39:36  2   Q.    Did you understand the reference to

15:39:37  3   availability of funds, the reference to the

15:39:40  4   $32.3 million or any portion of that being paid

15:39:44  5   either to Orly Genger or to some party other than the

15:39:49  6   Orly Genger Trust?

15:39:54  7              MR. POLLOCK:  Objection.  You're

15:39:57  8              asking a lay witness to construe a

15:40:00  9              complicated legal contract that has nothing

15:40:02 10              to do with anything.  I think it's

15:40:03 11              inappropriate.  I think you should move on.

15:40:07 12   A.    But I can give you a -- go ahead.  I'm sorry.

15:40:11 13              MR. HERSCHMANN:  He signed the

15:40:12 14              document.  That's all.

15:40:14 15   Q.    Let's let the witness speak.  Go ahead, Mr.

15:40:15 16   Oldner.

15:40:17 17   A.    From a layman's point of view, I can tell you

15:40:22 18   what "availability of funds" means to me.

15:40:31 19   Q.    Okay.

15:40:34 20   A.    If there are any funds.

15:40:40 21   Q.    But did you understand that in this context, in

15:40:41 22   signing this agreement, which you did sign, that that

15:40:50 23   reference to that funds was a reference to the same

15:40:53 24   $32 million that you claim belongs to the trust?

15:40:56 25              MR. POLLOCK:  Objection.

BUSHMAN COURT REPORTING

15:41:01 1   A.    In the -- the way I read this, the way I

15:41:05 2   understood it at the time, the way I understand it

15:41:07 3   now is that there could be funds from other sources,

15:41:10 4   that the $32.3 million are not the, it's not the only

15:41:16 5   source of funds for either Sagi Genger or Orly

15:41:18 6   Genger.

15:41:21 7          So -- and for Dalia Genger, the source of

15:41:24 8   funds for -- as I understand it, the source of funds

15:41:26 9   for Dalia Genger is Sagi and Orly, and I do not

15:41:31 10  know -- I am -- I would be stunned to find out that

15:41:36 11  the $32.3 is all of the funds that they have between

15:41:41 12  them.  So I think that the $32.3 million belongs to

15:41:45 13  the trust.

15:41:51 14  Q.    Well, having taken that view, what was your

15:42:16 15  thinking in signing this agreement that made the

15:42:20 16  $32 million that you claim belongs to the trust be

15:42:25 17  payable to Sagi Genger or Robin Rodriguez?

15:42:31 18               MR. POLLOCK:  Objection;

15:42:31 19          Misstates the document.

15:42:35 20               MR. DELLAPORTAS:  Object to the form.

15:42:35 21          Objection; misstates the record.

15:42:38 22               MR. POLLOCK:  And objection misstates

15:42:39 23          the exhibit, or mischaracterizes the

15:42:41 24          exhibit.

15:42:47 25               MR. DELLAPORTAS:  Yeah.

15:42:47  1   BY MR. BOWEN:

15:42:48  2   Q.    You can answer the question.

15:42:49  3   A.    Okay.  Please, please show me where the

15:42:51  4   $32.3 million goes to Robin and Sagi.

15:43:30  5   Q.    Well, let me ask it this way first.  What is

15:43:01  6   your understanding of what the purpose of this

15:43:04  7   agreement is?

15:43:06  8   A.    My understanding of the purpose of this

15:43:07  9   agreement?

15:43:10 10   Q.    Yes, sir.

15:43:11 11   A.    Is to not add one more layer of litigation to

15:43:14 12   something that is already outrageously litigious

15:43:15 13   between me, and Sagi, and Robin Rodriguez, should

15:43:21 14   anybody collect any funds, to attempt to keep

15:43:24 15   expenses low, to attempt to keep the fees low, to

15:43:30 16   attempt to actually recover the money so that the

15:43:33 17   trust can retire its initial note, can retire any

15:43:37 18   other creditors, and can actually have a balance for

15:43:41 19   Orly Genger and Orly Genger's future generations.

15:43:47 20   Q.    So your view of this agreement was you making

15:43:50 21   peace with Sagi Genger and Robin Rodriguez?

15:43:56 22                  MR. POLLOCK:  Objection;

15:43:56 23              mischaracterizes --

15:58:57 24   A.    That's not what I said.

15:43:58 25                  MR. POLLOCK:  Mr. Oldner, let me talk

BUSHMAN COURT REPORTING

```
15:43:58  1              first.
15:43:59  2                   THE WITNESS:  I'm sorry.
15:43:59  3                   MR. POLLOCK:  Objection;
15:44:01  4              mischaracterizes --
15:44:03  5                   THE WITNESS:  I need a break.  What
15:44:04  6              time is it?  How long has it been since our
15:44:07  7              last one?
15:44:07  8                   MR. POLLOCK:  It's been a full hour.
15:44:08  9                   THE WITNESS:  I am done.  I have got
15:44:10 10              to have a break.  Everybody knows it.
15:44:13 11                   MR. BOWEN:  All right.  While there is
15:44:13 12              a question pending the witness is taking a
15:44:17 13              break.  We're off the record.
15:58:52 14                   (Fourteen-minute break)
15:58:52 15  BY MR. BOWEN:
15:58:53 16  Q.     Mr. Oldner.
15:58:54 17  A.     Can you hear me?
15:59:27 18  Q.     Yeah.  Yes.
15:59:27 19  A.     Thank you.
15:58:58 20  Q.     Your understanding of the Inter-Creditor
15:59:03 21  Agreement was that any recovery by the trust of any
15:59:07 22  portion of the $32 million would be divided up among
15:59:12 23  the parties to the Inter-Creditor Agreement,
15:59:15 24  according to the terms of the Inter-Creditor
15:59:17 25  Agreement; correct?
```

15:59:19  1    A.    Will you post the Inter-Creditor Agreement

15:59:22  2    again while we're talking about it?

15:59:25  3    Q.    Yes, yes.

15:59:25  4    A.    Thank you.  I think that puts me over on the

15:59:27  5    side bar to talk.

15:59:29  6    Q.    Yes.

15:59:29  7    A.    Okay.  There we are.

16:00:12  8    Q.    Okay.  So if you look at paragraph two on page

15:59:42  9    two, there's a Distribution of Litigation Recovery,

15:59:46 10    and it describes how the money goes first to Robin

15:59:49 11    Rodriguez's company, and to Sagi Genger.

15:59:56 12         And then -- and, secondly, it goes to those

16:00:00 13    two parties again, and, lastly, it goes to recovery.

16:00:03 14    Do you see that?

16:00:34 15    A.    I do.

16:00:36 16    Q.    Okay.  And you understood that; right?  You

16:00:08 17    understood that the $32 million, if the trust won and

16:00:10 18    got all of the $32 million into the trust, it would

16:00:14 19    have to divide up that money according to this

16:00:17 20    paragraph; correct?

16:00:18 21    A.    No, sir, not correct.

16:00:21 22    Q.    What's incorrect about that?

16:00:53 23    A.    Pretty much all of what you said.

16:00:55 24    Q.    Okay.  Well, then, if you're saying if the

16:00:28 25    trust wins on the claim, and the $32 million gets

16:00:31  1   paid into the trust, the trust gets to keep that

16:00:34  2   money?

16:00:35  3   A.    Well, those are two opposite ends, but, no, I'm

16:00:38  4   not saying that either.  The trust -- if REI wins,

16:00:43  5   the trust will then receive money -- REI will pay its

16:00:48  6   expenses.

16:00:48  7           The trust will then receive the money.

16:00:50  8   Money will be paid out of REI as follows.  Number

16:00:55  9   one, it will retire the trust legitimate debts at

16:00:59 10   that time.

16:01:02 11           And, obviously, we use the phrase "Proof of

16:01:06 12   Claim."  Obviously there has to be a Proof of Claim

16:01:10 13   on everything if the trust, if the trust wins, just

16:01:13 14   the same as it would be for anybody else.

16:01:17 15           The trust will not be handing money out on

16:01:19 16   the street corner.  This is our general agreement.

16:01:23 17   Our general agreement is that the D&K note will be

16:01:31 18   paid off.

16:01:32 19   Q.    Well, that would include the payment in

16:01:35 20   paragraph two to MSM; right?

16:01:39 21   A.    That would be the D&K note, yes.

16:01:43 22   Q.    Right.  And then Sagi Genger gets his payment?

16:01:48 23   A.    Depending on what that payment is, yes.

16:01:51 24   Q.    Well, it's defined in this agreement, and

16:01:53 25   you'll see that, if you look at the "where as"

16:01:56  1    clauses on the top of page two, that the Sagi Genger

16:02:03  2    claims that would get paid out of any money that the

16:02:06  3    trust recovers, are 3.2 million on the 2018 judgment,

16:02:11  4    plus 9.25 million, which is, roughly, 12 million.

16:02:19  5                    MR. POLLOCK:  Objection;

16:02:19  6              mischaracterizes the document.

16:02:23  7    Q.    Do you see that, Mr. Oldner, that that's

16:02:26  8    roughly 12 million?

16:02:28  9    A.    I -- are we talking about math?

16:02:33 10    Q.    Yes.

16:02:34 11    A.    Okay.  That looks like approximately somewhere

16:02:40 12    around $12.46 million.

16:02:45 13    Q.    Okay.  And then if you go to the first page, on

16:02:47 14    the second "whereas" clause, this talks about the

16:02:50 15    debt the Orly Genger Trust owes to TPR under the

16:02:56 16    note, the D&K note, of being no less than 8 million.

16:02:58 17    Do you see that?

16:03:03 18    A.    That would also be the note to MSM, the D&K

16:03:05 19    note, whatever.  You know what I'm talking about.

16:03:07 20    Q.    Well, the very next, the very next "whereas"

16:03:09 21    clause says that TPR is assigning that $8 million

16:03:13 22    debt to MSM.  Do you see that?

16:03:16 23    A.    Yes, okay.

16:03:16 24    Q.    So 8 million plus 12 million, approximately, is

16:03:19 25    $20 million?

16:03:21  1   A.    Let's say -- okay.  Let's just -- okay, 8 plus

16:03:27  2   12 is 20.  I will agree with that.

16:03:29  3   Q.    And that's the $20 million that you had in mind

16:03:32  4   when you said that there was $20 million of

16:03:33  5   liabilities for the Orly Genger Trust; correct?

16:03:39  6                   MR. POLLOCK:  Objection; plainly

16:03:41  7             misstates his prior testimony.

16:03:44  8   A.    No, that is not what I had in mind.

16:03:47  9   Q.    But that's the same number.  That just happens

16:03:49 10   to be the same number that you said when you were

16:03:52 11   testifying about what the liabilities are of the Orly

16:03:54 12   Genger Trust.  Is that just a coincidence?

16:03:57 13   A.    You said that just happens to be.  That just

16:03:59 14   happens to be.  I told you exactly how I arrived at

16:04:02 15   that number.

16:04:03 16   Q.    But you understand that this agreement requires

16:04:05 17   the trust to pay out $20 million to Sagi Genger and

16:04:12 18   to MS, MSM out of the $32 million that the trust is

16:04:18 19   claiming belongs to it.

16:04:20 20                   MR. POLLOCK:  Objection.

16:04:21 21   Q.    Is that your understanding of the agreement?

16:04:23 22                   MR. POLLOCK:  Objection.

16:04:24 23                   THE WITNESS:  Go ahead.  Sorry.

16:04:25 24                   MR. POLLOCK:  Objection.

         25

                              BUSHMAN COURT REPORTING

16:04:25  1   BY MR. BOWEN:

16:04:26  2   Q.    Is that your understanding of the agreement,

16:04:28  3   Mr. Oldner?

16:04:30  4                  MR. POLLOCK:  Objection.

16:04:33  5                  THE WITNESS:  Are you through

16:04:33  6           objecting?

16:04:35  7                  MR. POLLOCK:  Yes.

16:04:35  8                  THE WITNESS:  Okay.

16:04:35  9                  MR. BOWEN:

16:04:35 10   Q.    Is that your understanding?

16:04:37 11   A.    No.

16:04:37 12                  MR. POLLOCK:  Objection; asked and

16:04:38 13           answered.

16:05:17 14   Q.    I didn't hear the answer.  I'm sorry.  What was

16:04:40 15   the answer?

16:04:41 16   A.    No, that is not my understanding.

16:04:45 17   Q.    So your understanding is that the trust could

16:04:47 18   get $32.3 million awarded to it so that it's

16:04:53 19   adjudicated that that belongs, that money belongs

16:04:58 20   only to the trust, and it would not have to pay

16:05:01 21   $20 million to Sagi and Robin Rodriguez; is that

16:05:06 22   correct?

16:05:09 23                  MR. DELLAPORTAS:  Object to form.

16:05:10 24   A.    I also object.  If you're asking him to

16:05:13 25   interpret a legal contract, I think it's unnecessary

16:05:16  1   and wholly irrelevant to the pending Motion to

16:05:18  2   Dismiss.

16:05:19  3   Q.   Is that correct, Mr. Oldner?  Is that your

16:05:21  4   understanding, that you would not have to pay, the

16:05:23  5   trust would not have to pay any amount of the

16:05:23  6   $32.3 million under this Inter-Creditor Agreement; is

16:05:28  7   that correct?

16:05:30  8                MR. DELLAPORTAS:  Object.

16:05:30  9                MR. POLLOCK:  Mr. Bowen --

16:05:30  10               MR. DELLAPORTAS:  Object to form.

16:05:32  11               MR. POLLOCK:  -- I object to the

16:05:33  12          hypothetical.

16:05:33  13               MR. DELLAPORTAS:  The document speaks

16:05:33  14          for itself.

16:05:35  15               MR. BOWEN:  I'm asking for

16:05:35  16          Mr. Oldner's understanding of an agreement

16:05:37  17          that he signed on behalf of the trust that

16:05:40  18          binds the trust, or purports to bind the

16:05:40  19          trust.

16:05:40  20               MR. POLLOCK:  You are asking --

16:05:41  21               MR. DELLAPORTAS:  That's ambiguous.

16:05:44  22   BY MR. BOWEN:

16:05:44  23   Q.   Is that your understanding, Mr. Oldner?

16:05:46  24               MR. POLLOCK:  You're asking for --

16:05:47  25               MR. DELLAPORTAS:  Objection.

16:05:49  1                     MR. POLLOCK:  Objection.  You're

16:05:50  2             asking for --

16:05:51  3                     MR. BOWEN:  Can Mr. Oldner just be

16:05:51  4             allowed to answer the questions?  I'm

16:05:54  5             concluding my questioning shortly, at least

16:05:56  6             for today, if Mr. Oldner could be allowed

16:05:59  7             to answer the question, please.

16:06:00  8                     MR. POLLOCK:  And, Mr. Bowen, I would

16:06:02  9             ask for the benefit of our stenographer

16:06:04 10             that you allow me to state my objection

16:06:07 11             without talking over me.  I object --

16:06:08 12                     MR. BOWEN:  I didn't hear you speaking

16:06:09 13             at all, sir.  I'm just asking that you

16:06:11 14             state succinctly what your objection is and

16:06:11 15             let the witness speak.

16:06:12 16                     MR. POLLOCK:  I object to your -- I

16:06:15 17             object to your seeking his speculation

16:06:17 18             about a future event.

16:06:21 19                     MR. BOWEN:  Okay.  That's not what I'm

16:06:23 20             asking.

16:06:23 21   BY MR. BOWEN:

16:06:23 22   Q.    Mr. Oldner, I think you understand the

16:06:24 23   question.  You can answer it.

16:06:26 24   A.    I actually don't understand the question as the

16:06:29 25   best -- but if you would be so kind as to repeat it

16:06:32  1   one more time, I will answer that question.

16:07:20  2   Q.    How did you understand what this agreement

16:07:20  3   requires of the trust if the trust is awarded the

16:07:20  4   $32.3 that it claims belongs to it?

16:07:24  5                 MR. POLLOCK:  Objection; seeks

16:06:48  6           speculation.

16:06:51  7   A.    Number one, I see that at some point in the

16:06:54  8   future.  And at some point in the future, parameters

16:07:02  9   on everything not only likely will change, parameters

16:07:07 10   will have changed.

16:07:09 11                 So, consequently, I do not -- I look at

16:07:12 12   this note as a guideline and as an indication -- this

16:07:17 13   Inter-Creditor Agreement is an indication that we are

16:07:21 14   not going to fight with each other over the money.

16:07:24 15                 It is, it is my anticipation that the trust

16:07:27 16   will be able to satisfy, to pay its expenses, to

16:07:32 17   satisfy its legitimate creditors, and that the trust

16:07:36 18   will have money after that for its beneficiaries, not

16:07:40 19   only Orly Genger, but Orly Genger's descendents going

16:07:44 20   into the future.

16:07:46 21   Q.    So your understanding is this agreement doesn't

16:07:48 22   bind the trust to pay any particular amount to

16:07:52 23   anybody else; is that correct?

16:07:55 24                 MR. DELLAPORTAS:  Objection; misstates

16:07:56 25           the prior testimony.

16:07:58  1                    MR. POLLOCK:  Objection.

16:07:58  2   Q.    Is that correct?

16:08:01  3   A.    My understanding, my understanding is that this

16:08:03  4   agreement provides a general outline, but in the real

16:08:07  5   world things change.  I do understand --

16:08:10  6   Q.    So you expect to renegotiate the agreement?

16:08:14  7   A.    Mr. Bowen, I, I would be derelict in my

16:08:21  8   fiduciary responsibility if I don't try to

16:08:23  9   renegotiate some portions.

16:09:01 10   Q.    Do you understand that Sagi Genger is adverse

16:08:33 11   to Orly Genger, who is the beneficiary, or one of the

16:08:36 12   beneficiaries or the Orly Genger Trust?

16:08:39 13                    MR. DELLAPORTAS:  Objection; misstates

16:08:40 14          the record.

16:08:42 15                    MR. POLLOCK:  Objection.

16:08:43 16   A.    Can you tell me what "adverse" means in this

16:08:45 17   case?

16:08:49 18   Q.    That, that he's an opponent in the litigation

16:08:51 19   between the two of them.

16:08:54 20                    MR. DELLAPORTAS:  Same objection.

16:08:57 21   A.    I understand that Sagi Genger may be an

16:08:59 22   opponent in the litigation, but I also understand

16:09:02 23   that Sagi Genger would like to settle this litigation

16:09:07 24   and get this behind him.

16:09:11 25   Q.    And do you --

                              BUSHMAN COURT REPORTING

16:09:11  1   A.    That's what --

16:09:12  2   Q.    I'm sorry.  I didn't mean to interrupt you.  Go

16:09:15  3   ahead.

16:09:15  4   A.    I apologize.  That's from conversation with

16:09:19  5   Sagi Genger.

16:10:00  6   Q.    And you also understand that the trust is

16:09:25  7   adverse to Orly Genger; right?

16:09:31  8                  MR. POLLOCK:  Objection.

16:09:31  9   A.    I don't --

16:09:37 10   Q.    Are you aware -- I'll change the question,

16:09:38 11   Mr. Oldner.

16:09:39 12   A.    Please.

16:09:39 13   Q.    I see you're getting frustrated.  Are you

16:09:41 14   aware that --

16:09:41 15   A.    I am just trying to understand.

16:09:43 16   Q.    -- the trust has sued Orly Genger?

16:09:43 17   A.    I'm sorry.  I interrupted you.  Please tell me

16:09:46 18   again.

16:09:47 19   Q.    Are you aware that the trust has sued Orly

16:09:50 20   Genger?

16:09:52 21   A.    Yes, I am.  The trust --

16:09:55 22   Q.    So the trust --

16:09:56 23   A.    Whoa, whoa.  Pardon me?  In, in what capacity?

16:09:58 24   Where?

16:10:00 25   Q.    Well, the trust has sued its own beneficiary in

16:10:03 1   the Surrogate's Court in New York.

16:10:08 2   A.   Yes.  And that suit has been -- it is currently

16:10:10 3   stayed, but that suit has been replaced by the suit

16:10:15 4   in the Southern District of New York in which Orly

16:10:18 5   Genger is not sued.

16:10:20 6   Q.   Right.  Well, there's an issue about whether

16:10:23 7   that case will remain in the bankruptcy court or

16:10:26 8   whether it will be remanded to the Surrogate's Court.

16:10:30 9   A.   I --

16:10:30 10                  MR. POLLOCK:  Mr. Bowen --

16:10:30 11  Q.   What position does the trust have on that?

16:10:30 12                  MR. POLLOCK:  Yeah, Mr. Bowen, are you

16:10:32 13           asking for his position on the pending

16:10:36 14           remand motion?  Because don't -- the

16:10:39 15           pending remand motion is not the pending

16:10:41 16           Motion to Dismiss, and he's not going to

16:10:46 17           give discovery on a pending remand motion

16:10:49 18           with respect to the Surrogate's Court

16:10:50 19           action.

16:11:30 20  Q.   Mr. Oldner, I want to understand your

16:10:58 21  understanding of the adversarial relationship that

16:11:00 22  the trust has with its own beneficiary.

16:11:03 23           Is it your understanding that that

16:11:03 24  adversarial lawsuit with Orly Genger should be

16:11:08 25  remanded to the Surrogate's Court, or no?

16:11:11  1              MR. POLLOCK:  Mr. Oldner, I will

16:11:12  2         direct you not to answer that question.

16:11:14  3              Mr. Bowen, I will ask you to desist

16:11:19  4         from seeking discovery with respect to a

16:11:21  5         motion to which you are not a party, which

16:11:26  6         does not affect Kasowitz as a creditor, and

16:11:31  7         which is not currently before the court.

16:11:33  8              We have a status conference pending on

16:11:35  9         August 12th on that action, and if you wish

16:11:38 10         to seek discovery, I respectfully ask that

16:11:41 11         you appear at that status conference on

16:11:44 12         August 12th and explain to Judge Garrity

16:11:46 13         why you need discovery on the remand

16:11:49 14         motion.  We will not be doing that today.

16:11:50 15         Thank you.

16:11:54 16              MR. HERSCHMANN:  Mike, is there --

16:11:54 17              MR. BOWEN:  You instructed the witness

16:11:55 18         not to answer.

16:11:55 19    BY MR. BOWEN:

16:11:57 20    Q.    Mr. Oldner, are you following that instruction?

16:11:59 21    A.    I will take the advice of counsel and not

16:12:02 22    answer that question.

16:12:02 23              MR. HERSCHMANN:  Mike, this is Eric.

16:12:02 24         Can I ask for a two-minute break?  Do you

16:12:02 25         mind it --

16:12:03   1                      MR. BOWEN:  One second, one second.

16:12:03   2   BY MR. BOWEN:

16:12:03   3   Q.    Why, in your view, Mr. Oldner, is the trust

16:12:10   4   suing its own beneficiary?

16:12:19   5                      MR. POLLOCK:  Mr. Bowen, are you

16:12:20   6             asking about the Surrogate's Court action

16:12:22   7             that's been removed to federal court, or

16:12:24   8             are you asking about the Motion to Dismiss?

16:12:28   9                      MR. BOWEN:  I'm asking the trustee,

16:12:29  10             Mr. Oldner, who purports to be the trustee,

16:12:32  11             why, to his understanding, the trustee is

16:12:36  12             suing its own beneficiary in the

16:12:36  13             Surrogate's Court action.

16:12:38  14                      MR. POLLOCK:  Okay.  And, Mr. Bowen, I

16:12:40  15             am ending this line of questioning, and I

16:12:42  16             respectfully ask that you come to the

16:12:44  17             status conference on August 12th and advise

16:12:46  18             the Court as to why Judge Garrity, advise

16:12:50  19             Judge Garrity as to why Kasowitz Benson

16:12:52  20             needs discovery on the Surrogate's Court

16:12:56  21             action.

16:12:56  22                      I remind you --

16:12:56  23   BY MR. BOWEN:

16:12:57  24   Q.    Mr. Oldner, have you, have you discussed the

16:12:58  25   Surrogate's Court action with Sagi?

                        BUSHMAN COURT REPORTING

16:13:02 1            MR. POLLOCK:  Mr. Bowen, I am not

16:13:04 2        doing a deposition today on the Surrogate's

16:13:06 3        Court action that has been removed, nor

16:13:10 4        does Kasowitz Benson have a right to seek

16:13:14 5        discovery.

16:13:14 6            I will also remind you that we are,

16:13:16 7        have a seven-hour deposition today that's

16:13:18 8        supposed to be on the Motion to Dismiss.

16:13:21 9            Move on to the Motion to Dismiss, or

16:13:23 10       cede the chair to Mr. Dellaportas, or

16:13:24 11       Mr. Cavaliere --

16:13:27 12           MR. BOWEN:  Are you instructing the

16:13:28 13       witness not to answer the question?

16:13:29 14           MR. POLLOCK:  I sure am.

16:13:30 15  BY MR. BOWEN:

16:13:30 16  Q.   Mr. Oldner, are you following that instruction?

16:13:33 17  A.   I'm following instructions of counsel.

16:13:34 18  Q.   Did you --

16:13:35 19           MR. POLLOCK:  And I'm asking you to

16:13:36 20       come on August 12th.

16:13:37 21  Q.   Did you --

16:13:37 22           MR. POLLOCK:  -- and explain to Judge

16:13:38 23       Garrity --

16:13:42 24           MR. BOWEN:  I don't need invitations,

16:13:44 25       please.  This is a deposition.  There's no

BUSHMAN COURT REPORTING

16:13:44  1          invitations.

16:13:44  2   BY MR. BOWEN:

16:13:46  3   Q.    Mr. Oldner, in that -- under that

16:13:47  4   Inter-Creditor Agreement -- we can put it back up if

16:13:51  5   you want to see it.  It's Exhibit 1 to your

16:13:53  6   deposition.

16:13:54  7   A.    I do.

16:13:54  8   Q.    Does that agreement provide for payment of fees

16:13:55  9   to you, or does that fall under the renegotiation

16:13:59 10   that you intend to pursue?

16:14:02 11            MR. POLLOCK:  Objection.  Did you ask

16:14:04 12        if there's a payment from you, Mr. Bowen,

16:14:05 13        to Mr.  Oldner?

16:14:08 14        Can we get the question read back from

16:14:08 15        the stenographer?

16:14:11 16            MR. BOWEN:  I'll restate it.  Maybe

16:14:17 17        you didn't hear it correctly.

16:14:17 18   BY MR. BOWEN:

16:14:17 19   Q.    Mr. Oldner, the question is does the

16:14:21 20   Inter-Creditor Agreement provide for payments to you

16:14:26 21   in your capacity in operating Recovery Effort?

16:14:32 22            MR. DELLAPORTAS:  Objection; the

16:14:33 23        document speaks for itself.

16:14:38 24   A.    The Inter-Creditor Agreement is solely an

16:14:41 25   agreement between the parties -- Sagi, Robin

16:14:46  1    Rodriguez, the trust, REI -- not to fight with each

16:14:52  2    other over the money.  It has nothing whatsoever to

16:14:56  3    do with my payment.

16:15:29  4    Q.    And who, who did you expect was going to pay

16:15:01  5    your fee when the time came to pay?

16:15:05  6    A.    Recovery Effort Inc.

16:15:37  7    Q.    And where was Recovery Effort Inc. going to get

16:15:11  8    the money from the, whatever's left by, by virtue of

16:15:14  9    the Inter-Creditor Agreement?

16:15:17 10    A.    From whatever has been recovered.

16:15:20 11    Q.    And would you get the remainder of that money,

16:15:23 12    whatever's left to, that goes to Recovery; is that

16:15:28 13    the idea?

16:15:29 14                    MR. POLLOCK:  Objection.

16:15:30 15    A.    That's ludicrous.

16:15:33 16    Q.    Then what's your thinking on that?  What's the

16:15:34 17    fee amount you get?

16:15:35 18    A.    That's a ludicrous question.  I actually take

16:15:38 19    offense to that question.  It's the first thing

16:15:41 20    you've said that's offended me.

16:15:41 21            I'm going to get the -- so Robin is going

16:15:42 22    to get paid.  Sagi is going to get paid a bunch of

16:15:46 23    money.  The trust is going to be left with nothing?

16:15:49 24    No, that's not true at all.  Actually, I find that

16:15:52 25    very offensive, that characterization.

16:15:54  1    Q.    So what -- how are you going to fix your fee?

16:15:57  2    A.    There are, obviously, a number of metrics,

16:16:00  3    based on what I do, based on what it takes to recover

16:16:04  4    the money.

16:16:05  5            There are metrics that are available from

16:16:08  6    multiple different sources, and my fee would be paid,

16:16:11  7    and the guidelines would be established by those

16:16:15  8    metrics.

16:16:16  9    Q.    But --

16:16:16 10    A.    But we're, we're way off, we're way off on

16:16:17 11    hypotheticals right now, because the trust has

16:16:20 12    absolutely no money, and I am borrowing money through

16:16:23 13    a subsidiary of the trust, a wholly owned corporation

16:16:27 14    to pursue the action to get money back into the

16:16:29 15    trust.  Right now my concern is not my fee.

16:16:33 16    Q.    But you expect to get a fee?

16:16:37 17            MR. POLLOCK:  Objection; we covered

16:16:38 18            this extensively this morning.  Mr. --

16:16:40 19            MR. BOWEN:  I didn't -- this is my

16:16:41 20            last topic of, of inquiry for today.  I'm

16:16:44 21            just trying to ask the witness to give some

16:16:47 22            more insight into what his expectation is

16:16:50 23            of his fees.

16:16:51 24            MR. POLLOCK:  You already did this

16:16:52 25            this morning.  Let's move on.

16:16:53  1                    MR. BOWEN:  No, he didn't give us

16:16:53  2          metrics.

16:16:53  3   BY MR. BOWEN:

16:16:53  4   Q.   What are the metrics that you're talking about?

16:17:29  5   A.   Those -- the metrics that I use, the metrics

16:17:01  6   that will be used to determine that fee will be what

16:17:05  7   is fair and equitable based on what has been done to

16:17:09  8   recover the money.

16:17:11  9   Q.   Okay.  Are you referring to some industry

16:17:13 10   standard for metrics, or some kind of published

16:17:17 11   handbook about metrics for this kind of recompense?

16:17:20 12   A.   I don't think there's a published handbook on

16:17:23 13   the Genger saga.

16:17:25 14   Q.   So you just -- you're going to just leave that

16:17:27 15   for future negotiations between you and whom?

16:17:31 16   A.   I'm --

16:17:32 17                    MR. POLLOCK:  Objection;

16:17:32 18          mischaracterizes the testimony.

16:17:36 19   Q.   Who would be involved in setting your fee,

16:17:38 20   aside from you, of course?

16:17:41 21                    MR. POLLOCK:  Mr. Bowen, you covered

16:17:42 22          this this morning.  This has nothing to do

16:17:44 23          with the Motion to Dismiss.

16:17:46 24                    If any relevance whatsoever, it has to

16:17:48 25          do with the claims of the entity for which

16:17:51  1            Mr. Herschmann is a representative.

16:17:54  2                Mr. -- I'm sorry -- Judge Garrity was

16:17:54  3            absolutely clear that we're not doing

16:18:02  4            discovery on that right now.

16:18:03  5                I ask that you move on and give

16:18:06  6            Mr. Cavaliere a chance, and give Mr.

16:18:08  7            Dellaportas a chance before this seven-hour

16:18:12  8            deposition runs out, and I also don't know

16:18:16  9            if Mr. Geron has questions.

16:18:18 10  Q.    Mr. Oldner, who --

16:18:19 11                MR. HERSCHMANN:  This is Eric

16:18:19 12            Herschmann.  I have questions also.

16:18:21 13  Q.    -- is going to be involved in deciding your

16:18:23 14  fee, aside from you?

16:18:24 15                MR. POLLOCK:  I'm sorry.  Who's

16:18:24 16            speaking now?

16:18:24 17                MR. BOWEN:  It's Michael Bowen, and

16:18:24 18            I'm addressing the witness, Mr. Oldner.

16:18:24 19  BY MR. BOWEN:

16:18:24 20  Q.    Who aside from you, Mr. Oldner, will be

16:18:24 21  involved in determining your fee, when the time

16:18:26 22  comes?

16:18:39 23  A.    When the time comes, I will figure out how to

16:18:42 24  make that decision.  Right now is not the time to

16:18:45 25  make that decision.

16:18:49  1    Q.    And you don't know who else would be involved

16:18:52  2    in making that decision, aside from yourself?

16:18:53  3    A.    I do not.

16:18:54  4              MR. POLLOCK:  Objection; asked and

16:18:55  5          answered.

16:18:55  6              MR. BOWEN:  At this point in time, I'm

16:18:57  7          going to reserve my right to ask additional

16:19:00  8          questions after we address some issues with

16:19:02  9          the Court.

16:19:03 10              Mr. Oldner, I thank you for your

16:19:06 11          patience today.  It was remarkable.  And I

16:19:08 12          do have other questions, but we're going to

16:19:10 13          have to need -- we're going to need some

16:19:11 14          rulings from the Court before we can get to

16:19:14 15          those questions, including a determination

16:19:18 16          about the common interest privilege that

16:19:18 17          has been repeatedly asserted both by Mr.

16:19:22 18          Dellaportas and by Mr. Pollock, Pollock.

16:19:27 19              So you may have some time.  I think

16:19:31 20          the questioning should go to Mr. Geron or.

16:19:33 21              MR. HERSCHMANN:  It's Eric --

16:19:33 22              MR. BOWEN:  -- Rocco.

16:19:42 23              MR. HERSCHMANN:  It's Eric, if you

16:19:42 24          just let us know how late will Mr. Oldner

16:19:43 25          be staying?

                          BUSHMAN COURT REPORTING

16:19:46  1                MR. POLLOCK:  Absolutely.  We started

16:19:47  2           at nine a.m. Arkansas time.  It is now --

16:19:51  3           seven hours and twenty minutes have

16:19:54  4           elapsed.

16:19:55  5                We had a half an hour lunch break, so,

16:19:58  6           by my count, we're six hours and fifteen

16:20:02  7           minutes into to a seven-hour deposition.

16:20:04  8                If Mr. Geron, Mr. Cavaliere, and Mr.

16:20:07  9           Dellaportas have a few questions that

16:20:09 10           exceed those ten minutes that are still

16:20:13 11           available, if they could let us know now

16:20:16 12           approximately how much more time they need,

16:20:17 13           I'm happy to consider that.

16:20:20 14                MR. HERSCHMANN:  Well, it's Eric

16:20:20 15           Herschmann.  I have questions also, so I

16:20:20 16           don't know why --

16:20:24 17                MR. POLLOCK:  Okay.

16:20:24 18                MR. HERSCHMANN:  -- excluded.  I would

16:20:24 19           try to, I would try to be quick if you'll

16:20:28 20           let me go now.

16:20:30 21                I'm going to try to limit my topics.

16:20:33 22           I will give you a standing objection to

16:20:35 23           every single question.

16:20:37 24                If you'll let me do it quickly, I

16:20:38 25           think I can be done, at least to my side,

16:20:39 1        subject to going back to Judge Garrity, for

16:20:40 2        ten minutes.

16:20:40 3            MR. POLLOCK:  Mr. Herschmann --

16:20:44 4            MR. HERSCHMANN:  Is that okay?

16:20:44 5            MR. POLLOCK:  -- respectfully, Mr.

16:20:45 6        Cavaliere and Mr. Dellaportas have already

16:20:48 7        piped up that they want to get questions

16:20:50 8        in.

16:20:51 9            You have not served a Notice of

16:20:53 10       Deposition, a cross notice, a subpoena,

16:20:56 11       anything like that, so why don't we give

16:20:58 12       Mr. Cavaliere and Mr. Geron the floor.

16:21:00 13       Also, Mr. Dellaportas piped up.

16:21:01 14           If there's still room within the seven

16:21:08 15       hours at the conclusion, if you have a few

16:21:10 16       minutes of questions, we will respect that.

16:21:12 17           MR. HERSCHMANN:  Well, Mr. Pollock, I

16:21:14 18       don't need to give cross notice of a party,

16:21:15 19       but if -- I just want to be clear, because

16:21:17 20       I have to attend something with a

16:21:19 21       government official, so I'm not going to be

16:21:21 22       able to stay on.

16:21:23 23           If you want to give me the

16:21:24 24       professional courtesy, okay.  If you want

16:21:24 25       me to go back to Judge Garrity on it and go

16:21:28  1          through this, I can deal with that.  I'm

16:21:28  2          just trying to make it simple, and I won't

16:21:29  3          take long.

16:21:30  4               MR. POLLOCK:  You're asking for

16:21:31  5          professional courtesy from somebody who you

16:21:34  6          screamed at earlier?

16:21:37  7               MR. HERSCHMANN:  It's "yes" or "no."

16:21:37  8          Mr. Pollock, it's a "yes" or "no."  You

16:21:38  9          may -- just tell me "yes" or "no."  That's

16:21:40 10          all I care about right now.

16:22:10 11               MR. POLLOCK:  As far as I'm concerned,

16:21:42 12          Mr. Cavaliere and Mr. Dellaportas asked for

16:21:48 13          time first.  If you would like to stick

16:21:49 14          around and ask some questions later, you're

16:21:52 15          welcome.

16:21:52 16               MR. HERSCHMANN:  I asked for time

16:21:54 17          before Mr. Dellaportas ever got on the

16:21:54 18          call, so -- I don't want to -- I just

16:21:57 19          want -- I just want an answer.

16:21:58 20               Are you willing to give me the chance

16:21:59 21          to answer {sic} the questions now?  It's a

16:22:01 22          yes-or-no answer, please.

16:22:03 23               MR. POLLOCK:  I'm willing to give you

16:22:05 24          a chance to ask questions after the others

16:22:06 25          have had their opportunity.

                        BUSHMAN COURT REPORTING

```
16:22:07  1              MR. HERSCHMANN:  Okay.  So just so you
16:22:07  2         know that I have to get off and meet with
16:22:11  3         somebody, I will address with Judge Garrity
16:22:14  4         the fact that you wouldn't make the
16:22:15  5         professional courtesy -- since I'm going
16:22:16  6         and allowed to be asking questions, you're
16:22:18  7         just wasting time with the colloquy
16:22:18  8         already.  It's just a simple request.
16:22:22  9              MR. POLLOCK:  I --
16:22:22 10              MR. HERSCHMANN:  It doesn't make any
16:22:23 11         difference to you when I ask the questions.
16:22:25 12         Can I do it now before I'm obligated to
16:22:27 13         leave?
16:22:28 14              And I'll tell Judge Garrity what it
16:22:30 15         was about, but I'm asking you
16:22:30 16         professionally to agree.
16:22:32 17              MR. GERON:  Can I, can I interrupt for
16:22:32 18         a second?  This is Yann Geron.  I -- the
16:22:36 19         natural order of things -- Mr. Oldner, my
16:22:38 20         name is Yann Geron.  I am the attorney for
16:22:42 21         Orly Genger.
16:22:43 22              THE WITNESS:  Hello, Mr. Geron.
16:22:44 23              MR. GERON:  I am the next natural
16:22:45 24         witness, the next natural person to take
16:22:47 25         questions of you.
```

16:22:48  1                THE WITNESS:  Yes.

16:22:49  2                MR. GERON:  I would -- I will not -- I

16:22:51  3           have about, maybe, five or ten minutes

16:22:53  4           worth of questions, because Mr. Bowen

16:22:58  5           covered a great deal of ground with you

16:22:59  6           over the many hours.

16:23:00  7                I will ask that the parties agree to

16:23:01  8           allow me to go after Mr. Herschmann.  Mr.

16:23:04  9           Herschmann has, has agreed that he's going

16:23:08 10           to do about ten minutes, or as quickly as

16:23:11 11           he can.

16:23:11 12                I will go -- as I said, I am

16:23:13 13           previewing it for the parties, so if you

16:23:15 14           know what I'm talking about, I maybe have

16:23:19 15           10 or 15 questions.

16:23:20 16                I'm going to try my best not to cover

16:23:22 17           any of the areas that were previously

16:23:22 18           covered by Mr. Bowen, and there were a lot

16:23:25 19           of areas.

16:23:26 20                So for the sake of efficiency and to

16:23:28 21           make sure that we do our very best to

16:23:31 22           complete today's deposition today, I would

16:23:33 23           suggest that, that counsel at the

16:23:37 24           deposition agree to the following, to the,

16:23:39 25           to the schedule where Mr. Herschmann goes

16:23:42  1          next.  He'll do his very best to go as

16:23:45  2          quickly as possible.

16:23:46  3              I will go after that.  Mr. Cavaliere,

16:23:46  4          in the natural order of things, will also

16:23:50  5          do his quick questioning, and then we'll go

16:23:52  6          with, I think, the, the last requestor, who

16:23:57  7          was Mr. Dellaportas.

16:24:03  8              MR. POLLOCK:  Mr. Herschmann, do your

16:24:04  9          questions relate to the entity to which you

16:24:06 10          are the representative, or do your

16:24:08 11          questions relate to the pending Motion to

16:24:10 12          Dismiss?

16:24:12 13              MR. HERSCHMANN:  Dealing with the

16:24:12 14          Motion to Dismiss.  "Representative" means

16:24:12 15          legal representative.

16:24:12 16              I just -- if you'll let me do it,

16:24:14 17          we've already spent five minutes just on

16:24:19 18          asking for this courtesy.  Can I just

16:24:20 19          start, please?

16:24:21 20              MR. POLLOCK:  Mr. -- if I heard you

16:24:21 21          correctly, and I was having trouble hearing

16:24:21 22          you, these questions relate to the pending

16:24:29 23          Motion to Dismiss, or the entity for which

16:24:29 24          you are the representative?

16:24:32 25              MR. HERSCHMANN:  I am dealing with the

16:24:33  1        Motion to Dismiss now.  All right?  Okay.

16:24:36  2            If you'll let me start, maybe the --

16:24:38  3        it will be relatively quick if we can just

16:24:42  4        get started.  Okay?

16:24:46  5            MR. CAVALIERE:  I just want to

16:24:47  6        interject here briefly.  This is Rocco

16:24:48  7        Cavaliere again.  My battery on my iPad is

16:24:54  8        at one percent, so I may get, I may drop

16:24:56  9        off at some point.

16:24:58 10            I have it charged, but I don't think

16:25:00 11        my charge is fast enough to keep up with

16:25:03 12        the data from the video.  So I just wanted

16:25:08 13        to provide a little notice of that.

16:25:08 14            We could take a break once you see me

16:25:13 15        drop off, and I think I might need ten

16:25:15 16        minutes for it to charge, but I have no

16:25:18 17        problem with Mr. Herschmann going first.

16:25:21 18            MR. HERSCHMANN:  Okay.  Thank you.

16:25:21 19                    EXAMINATION

16:25:21 20  BY MR. HERSCHMANN:

16:25:21 21  Q.    So, Mr. Oldner, my name, my name is Eric

16:25:22 22  Herschmann.  Is it accurate, sir, we've never spoken

16:25:27 23  to each other before?

16:25:28 24  A.    Pardon me?

16:25:29 25  Q.    Is it accurate we've never spoke with each

16:25:32  1   other before?

16:25:33  2   A.    Not that I can recall.

16:26:19  3   Q.    We've never met each other; is that correct,

16:25:38  4   sir?

16:25:39  5   A.    I do not believe we have.

16:25:40  6   Q.    And you signed on to an original Motion to

16:25:57  7   Dismiss that was filed in Texas; correct?

16:26:01  8              COURT REPORTER:  Mr. Herschmann,

16:26:01  9          you're cutting out real bad.  I'm having a

16:26:01 10          hard time hearing you, and I think the

16:26:01 11          witness is too.

16:26:01 12   A.    You're, you're real fuzzy, Mr. Herschmann.

16:26:01 13   Q.    You joined in a Motion to Dismiss that was

16:26:01 14   filed in Texas; correct?

16:26:02 15              MR. POLLOCK:  Objection; asked and

16:26:03 16          answered this morning.  Mr. Herschmann, I

16:26:04 17          don't know if you were on the line this

16:26:05 18          morning.

16:26:05 19              MR. HERSCHMANN:  I was on, I was on.

16:26:07 20          It's a foundational question, so I'm

16:26:08 21          getting into the topic.  All right?

16:26:10 22   BY MR. HERSCHMANN:

16:26:13 23   Q.    Mr. Oldner?

16:26:48 24   A.    Yes.

16:26:49 25   Q.    You joined in a Motion to Dismiss that was

16:26:18  1   filed in Texas; correct?

16:26:19  2   A.    Yes.

16:26:21  3            MR. POLLOCK:  Objection; asked and

16:26:21  4         answered.

16:26:22  5   A.    Okay.  Something just happened.

16:26:25  6   Q.    Sir --

16:27:01  7   A.    Wait, wait.  Hold on a second.  I'm --

16:27:02  8            MR. POLLOCK:  Your screen went dead?

16:27:02  9   A.    My screen's dead.  Hold on.

16:26:36 10            MR. POLLOCK:  That's all right.  You

16:26:36 11         don't need --

16:26:36 12   A.    I got it, go.

16:26:36 13            MR. POLLOCK:  Okay.

16:26:36 14   Q.    Did you read the Motion to Dismiss before it

16:26:40 15   was filed?

16:26:42 16            MR. POLLOCK:  Objection.  Which --

16:26:44 17            MR. HERSCHMANN:  I'm only talking

16:26:45 18         about the Motion to Dismiss in Texas right

16:26:47 19         now.

16:26:47 20            MR. POLLOCK:  The one that --

16:26:48 21   Q.    Did you read --

16:26:49 22            MR. POLLOCK:  Mr. Herschmann, I had

16:26:50 23         asked if you're taking discovery on the

16:26:51 24         pending Motion to Dismiss.

16:26:53 25            MR. HERSCHMANN:  I am.  Mr. Pollock, I

16:26:55  1            need to set a foundation on the topic.  I'm

16:26:57  2            not...

16:26:57  3       BY MR. HERSCHMANN:

16:27:00  4       Q.   I just want to know if you read the motion

16:27:01  5       before it was filed; yes or no?

16:27:31  6       A.   Yes, I did.

16:27:03  7       Q.   As the trustee for the trust, did you do

16:27:06  8       anything to determine whether the allegations in that

16:27:10  9       Motion to Dismiss were accurate?

16:27:12 10            MR. POLLOCK:  Wait.  Mr. Herschmann,

16:27:13 11            are you asking about Sagi Genger's Motion

16:27:16 12            to Dismiss, or are you asking about the

16:27:18 13            joinder of the Orly Genger Trust?

16:27:21 14            MR. HERSCHMANN:  The -- when he joined

16:27:22 15            in the Motion to Dismiss in Texas, I want

16:27:25 16            to know if he took any steps to verify

16:27:27 17            whether the allegations were accurate.

16:27:30 18            MR. POLLOCK:  And I want --

16:27:30 19            MR. DELLAPORTAS:  I just -- sorry.

16:27:30 20            MR. POLLOCK:  -- to clarify whether

16:27:34 21            you're referring -- Mr. Dellaportas, let me

16:27:36 22            go.

16:27:37 23            MR. DELLAPORTAS:  Sure.

16:27:37 24            MR. POLLOCK:  I'd like to clarify

16:27:39 25            whether you're asking whether the

BUSHMAN COURT REPORTING

```
16:27:41  1              allegations in the Motion to Dismiss filed
16:27:44  2              by Sagi Genger were accurate or whether
16:27:47  3              you're asking whether the allegations in
16:27:49  4              the joinder that was filed by the Orly
16:27:51  5              Genger Trust --
16:27:53  6                   MR. HERSCHMANN:  I'm trying --
16:27:53  7                   MR. POLLOCK:  -- in support of the
16:27:54  8              Motion to Dismiss were accurate?
16:27:56  9                   MR. HERSCHMANN:  I'm trying to be
16:27:57 10              particular.  When I want to address the
16:27:58 11              joinder, I will address the joinder.  So
16:27:58 12              let me see if I can get it; okay?
16:27:58 13  BY MR. BOWEN:
16:27:59 14  Q.    Sir, you told us you read the Motion to Dismiss
16:28:06 15  that was filed in Texas.  Did you do anything to
16:28:09 16  determine whether or not the allegations, the factual
16:28:11 17  allegations in that motion were accurate?
16:28:15 18                   MR. POLLOCK:  Mr. Herschmann --
16:28:18 19                   MR. DELLAPORTAS:  I'm going to object
16:28:19 20              to the extent it's being referred to as a
16:28:19 21              Motion to Dismiss.
16:28:19 22                   It was a Motion to Dismiss or
16:28:21 23              Transfer, and the transfer aspect of it was
16:28:22 24              granted.
16:28:29 25                   MR. HERSCHMANN:  Okay.  That's, that's
```

16:28:29  1          fine.

16:28:29  2              MR. POLLOCK:  Mr. Herschmann, I'm

16:28:29  3          going to object on the grounds that you may

16:28:32  4          recall from this morning, which is that

16:28:34  5          Judge Garrity limited the, today's topic to

16:28:37  6          the Motion to Dismiss that is currently

16:28:39  7          subject to the --

16:28:42  8              MR. HERSCHMANN:  I --

16:28:42  9              MR. POLLOCK:  -- at issue, a.  And b

16:28:43 10          is, b is that what you are eliciting is

16:28:49 11          testimony with respect to his privileged

16:28:54 12          communications with counsel about his

16:28:57 13          analysis of somebody else's papers that

16:29:01 14          were filed -- I think what you're asking

16:29:05 15          about is Sagi Genger's allegation and Sagi

16:29:07 16          Genger's Motion to Dismiss that was filed

16:29:09 17          in Texas.

16:29:10 18              If you could please ask him about

16:29:11 19          something that has matter of hand, today

16:29:14 20          would be a lot more efficient.

16:29:16 21              MR. HERSCHMANN:  Mr. Pollock, let me

16:29:18 22          do this, because it's obviously not going

16:29:20 23          to be -- you're not going to allow me to

16:29:21 24          ask the questions.

16:29:22 25              I will give you a simple explanation.

16:29:24  1          All I'm asking now is did he do anything to

16:29:26  2          confirm the factual allegations.  Some of

16:29:29  3          those same factual allegations are in this

16:29:31  4          current Motion to dismiss.

16:29:33  5              I'm setting a foundation.  If you want

16:29:35  6          to do this, then it's obvious we won't

16:29:37  7          finish, and I won't get a chance to ask

16:29:39  8          questions, and I'll just take it up with

16:29:41  9          Judge Garrity.  I'm just trying to be

16:29:43  10         accommodating, if you'll let me do it.

16:29:45  11             MR. POLLOCK:  So --

16:29:46  12             MR. HERSCHMANN:  He understood the

16:29:46  13         question.  He said he read the Motion to

16:29:48  14         Dismiss.  Mr. Dellaportas objects to the

16:29:48  15         characterizing it that way.

16:29:51  16             I just want to -- if you want to let

16:29:52  17         me, okay.  If not, I'll call it a day, and

16:29:56  18         I'll just contact the judge.  We'll deal

16:29:57  19         with it.  It's fine.  I just want to give

16:29:57  20         you the choice.  I don't want to burden

16:30:02  21         Mr. Oldner.

16:30:02  22             MR. POLLOCK:  Mr. Herschmann, if you

16:30:03  23         can get to a place where you have better

16:30:06  24         cell phone reception for you, I think it

16:30:08  25         would be helpful, a, or a landline for

16:30:10  1                 respect for this deposition, and especially

16:30:11  2                 for the stenographer, is a.

16:30:12  3                 But, b, is if you could just be very

16:30:18  4                 clear when you're asking the question, both

16:30:20  5                 clear in signal of a cell phone, and also

16:30:22  6                 clear in your terminology, whose Motion to

16:30:25  7                 Dismiss you're referring to and whose

16:30:27  8                 allegations.

16:30:28  9                 I keep hearing "his motion," but if

16:30:30  10                 you can clarify who you're talking about, I

16:30:34  11                 think that would help everybody, including

16:30:36  12                 the witness.

16:30:38  13  BY MR. HERSCHMANN:

16:30:38  14  Q.    Okay.  Let me see if I can do that.

16:30:39  15  Mr. Oldner, do you recall that there was a Motion to

16:30:43  16  Dismiss the bankruptcy filed in Texas; yes or no?

16:31:15  17  A.    Yes, sir.

16:30:48  18  Q.    Did you read that Motion to Dismiss at some

16:30:50  19  point?

16:30:51  20                 MR. POLLOCK:  Objection.  Again, Mr.

16:30:52  21                 Herschmann, if you can be more clear.  Are

16:30:54  22                 you asking him if he read Sagi Genger's

16:30:56  23                 Motion to Dismiss or, in the alternative,

16:30:57  24                 the transfer, or are you asking him did he

16:31:01  25                 read the joinder of the Orly Genger Trust

BUSHMAN COURT REPORTING

16:31:04  1            and the reasons stated therein?

16:31:07  2                 MR. HERSCHMANN:  Mr. Pollock, I just

16:31:09  3            set the foundation.  The witness understood

16:31:10  4            it.  You're being obstructionist.

16:31:12  5                 If you want to do it this way, I'm

16:31:14  6            more than happy to say, Fine, you've now

16:31:17  7            made the record the way you want.  We'll go

16:31:19  8            to the Court.

16:31:20  9                 The witness didn't indicate one

16:31:21 10            concern about the question.  Please, just,

16:31:23 11            you have -- you have a standing objection

16:31:26 12            to every single question I ask, on all

16:31:28 13            bases.

16:31:29 14                 You don't have to worry about it.

16:31:30 15            It's preserved forever.  If you want the

16:31:33 16            witness to finish, it can't get any better.

16:31:36 17  BY MR. HERSCHMANN:

16:31:36 18  Q.    So, Mr. Oldner, after you read the Motion to

16:31:37 19  Dismiss that was filed in Texas, what steps did you

16:31:41 20  do, take, if any, to verify whether or not the

16:31:45 21  factual allegations were correct?

16:31:47 22                 MR. POLLOCK:  Mr. Herschmann, I am

16:31:49 23            directing, to the extent that you are

16:31:51 24            asking -- and I don't understand your

16:31:54 25            refusal to clarify which motion it is that

16:31:57  1            you're talking about -- to the extent that

16:31:59  2            you are asking him what steps did he take

16:32:03  3            to verify the allegations in the Sagi

16:32:06  4            Genger Motion to Dismiss, which were

16:32:09  5            heavily redacted, I would --

16:32:12  6                 MR. HERSCHMANN:  Mr. --

16:32:12  7                 MR. POLLOCK:  -- direct the witness

16:32:13  8            not to testify with respect to his

16:32:15  9            privileged communications with counsel at

16:32:17 10            the time.

16:32:20 11                 MR. HERSCHMANN:  Mr. Pollock, let me

16:32:21 12            do this, because I don't want to waste any

16:32:23 13            more time, and I'll make it -- I'll take it

16:32:25 14            a step back.

16:32:25 15  BY MR. HERSCHMANN:

16:32:26 16  Q.    Mr. Oldner, was Jay Ong your attorney in Texas?

16:32:57 17  A.    He was.

16:32:31 18  Q.    Do you know that Jay Ong got an unredacted copy

16:32:33 19  of the Motion to Dismiss in Texas; are you aware of

16:32:37 20  that fact?

16:33:04 21  A.    I am -- I do not know that at all.

16:33:07 22  Q.    Okay.  At some point did you Read the Motion to

16:32:44 23  Dismiss, and take any steps to verify the accuracy of

16:32:50 24  the allegations before you joined in it?

16:32:53 25                 MR. POLLOCK:  Objection; asked and

                        BUSHMAN COURT REPORTING

16:32:53 1          answered.  It would be helpful if you would

16:32:56 2          clarify which motion you are referring to,

16:32:58 3          a, and, b, to the extent that you're

16:33:00 4          calling, trying to elicit privileged

16:33:03 5          testimony, I will direct the witness not to

16:33:05 6          answer with respect to his privileged

16:33:07 7          communications.

16:33:09 8              MR. HERSCHMANN:  Mr. Pollock, let me

16:33:10 9          do this.

16:33:12 10             MR. POLLOCK:  Yes.

16:33:12 11             MR. HERSCHMANN:  I have given you

16:33:13 12         every opportunity not to interrupt it.  You

16:33:15 13         have given me no choice but to go to Judge

16:33:18 14         Garrity with it.

16:33:19 15             I will go to Judge Garrity and tell

16:33:21 16         him that almost on every single question,

16:33:23 17         okay, you gave a speaking objection.

16:33:23 18             So based on that conduct, right, if

16:33:28 19         you want to let me try to ask it, I'll

16:33:30 20         leave that topic now, based on your inter,

16:33:32 21         interjecting speaking objections

16:33:34 22         continuously, and let me move on, right,

16:33:36 23         and I'm going to reserve that time.

16:33:38 24     BY MR. HERSCHMANN:

16:33:38 25     Q.   Mr. Oldner, when you talk about the

16:33:42  1   beneficiaries of the Orly Genger Trust, tell me

16:33:45  2   everything you know about Orly Genger's daughter.

16:33:51  3   A.    About what?

16:33:54  4              MR. DELLAPORTAS:  You broke up at the

16:33:54  5          end there, Eric.

16:33:59  6   Q.    I'm sorry.  Sir --

16:33:59  7              MR. DELLAPORTAS:  It's --

16:33:59  8              MR. HERSCHMANN:  I'm sorry.  Let me

16:33:59  9          ask it again.

16:33:59 10   BY MR. HERSCHMANN:

16:33:59 11   Q.    Sir, you seem to be distinguishing between Orly

16:34:04 12   Genger as a beneficiary and her daughter as a

16:34:09 13   beneficiary of the trust.  Did I hear that correctly,

16:34:12 14   when you were testifying and responding to Mr.

16:34:14 15   Bowen's questions?

16:34:48 16   A.    It is my interpretation of the trust document,

16:34:20 17   with the assistance of attorneys, that the main

16:34:26 18   beneficiary of, the main beneficiaries of the trust

16:34:30 19   are future generations.

16:34:59 20   Q.    Sir, do you know what a primary beneficiary is,

16:34:36 21   and then a contingent beneficiary?

16:34:37 22              MR. POLLOCK:  Objection, to the extent

16:34:40 23          that that seeks legal characterizations.

16:34:42 24   Q.    I don't want any legal definition from you at

16:34:45 25   all, sir.  And I'm not asking for your legal opinion.

BUSHMAN COURT REPORTING

16:34:48  1    I never will.

16:34:49  2                    I want to understand as the trustee, you

16:34:50  3    understand the difference between a primary

16:34:52  4    beneficiary and a contingent beneficiary?

16:34:57  5                    MR. DELLAPORTAS:  Objection;

16:34:57  6                    relevance.

16:34:59  7                    MR. POLLOCK:  Yeah, Mr. Herschmann, I

16:35:01  8                    remind you that before we started this I

16:35:03  9                    asked if you were seeking discovery with

16:35:05 10                    respect --

16:35:06 11                    MR. HERSCHMANN:  I'm not --

16:35:06 12                    MR. POLLOCK:  -- to the Motion to

16:35:06 13                    Dismiss or with respect to the entity for

16:35:09 14                    which you, apparently, the representative.

16:35:12 15                    If you can proffer the relevance of

16:35:15 16                    this to the pending Motion to Dismiss, I

16:35:18 17                    would appreciate it, and I think it would

16:35:20 18                    help us all to move along swiftly.

16:35:23 19                    MR. HERSCHMANN:  Mr. Oldner, we're

16:35:23 20                    going to deal -- I'm sorry.  Mr. Oldner,

16:35:24 21                    I'm sorry about this.

16:35:25 22                    Your lawyer will continue to give

16:35:27 23                    speaking objections no matter what I say,

16:35:29 24                    and no matter the fact that I gave him a

16:35:31 25                    continuing objection.

                                    BUSHMAN COURT REPORTING

16:35:34 1               Is it your intention, Mr. Pollock, to

16:35:35 2               continue this every single time?  Because

16:35:37 3               I'm going to -- I'll try to move on, and

16:35:39 4               that will be another topic I have to

16:35:41 5               address with the Court.

16:35:42 6   BY MR. HERSCHMANN:

16:35:42 7   Q.   Mr. Oldner, you said that you take it very

16:35:45 8   seriously, were your exact words, when you bring

16:35:48 9   claims against anyone.  Do you remember that

16:35:50 10  testimony?

16:35:51 11              MR. DELLAPORTAS:  Mr. Herschmann, this

16:35:52 12              is Mr. Dellaportas.  This is very unfair.

16:35:52 13              You're timing out the rest of us.  You

16:35:54 14              don't -- you --

16:35:56 15              MR. HERSCHMANN:  So, John, I don't

16:35:56 16              want to argue --

16:35:57 17              MR. DELLAPORTAS:  You are --

16:35:57 18              MR. HERSCHMANN:  I don't want to

16:35:57 19              argue --

16:36:02 20              MR. DELLAPORTAS:  You are timing out

16:36:02 21              the rest --

16:36:02 22              MR. POLLOCK:  Stop.

16:36:02 23              COURT REPORTER:  I can't hear anyone.

16:36:02 24              MR. DELLAPORTAS:  We do have relevant

16:36:04 25              questions.  You don't have relevant

16:36:05  1              questions.  If you want to ask about your

16:36:08  2              daughter, and whether you think he's a good

16:36:08  3              thing, take it up in some other forum.

16:36:10  4                   MR. BOWEN:  Mr. Dellaportas, it is

16:36:11  5              unprofessional what you're doing.  It is --

16:36:11  6                   MR. DELLAPORTAS:  It is completely

16:36:11  7              inappropriate for you to be taking our time

16:36:11  8              when we have relevant questions, with your

16:36:11  9              irrelevant questions, which you have a

16:36:11 10              personal interest, apparently, that you

16:36:11 11              feel this man is not a good trustee for

16:36:11 12              your daughter.

16:36:12 13                   MR. HERSCHMANN:  Mr. Dellaportas,

16:36:12 14              please stop.

16:36:12 15  BY MR. HERSCHMANN:

16:36:12 16  Q.    Mr. Oldner, let me ask you a question.

16:36:13 17                   MR. DELLAPORTAS:  You have other

16:36:13 18              venues to address that.

16:36:13 19                   MR. HERSCHMANN:  Mr. Dellaportas,

16:36:13 20              please stop.

16:37:09 21                   MR. DELLAPORTAS:  Stop timing us out.

16:37:09 22                   MR. HERSCHMANN:  Your -- Mr.

16:37:09 23              Dellaportas, please stop.

16:37:09 24                   MR. DELLAPORTAS:  Do you have any

16:37:09 25              relevant questions?

                              BUSHMAN COURT REPORTING

16:37:09  1                    MR. HERSCHMANN:  Mr. Dellaportas, we

16:36:29  2              will address it with the Court.

16:36:39  3   BY MR. HERSCHMANN:

16:36:40  4   Q.   Mr. Oldner, can you please, if you can listen

16:36:42  5   for a moment, please.

16:36:43  6                    MR. POLLOCK:  Mr. Herschmann, I will

16:36:44  7              respectfully ask --

16:36:46  8                    MR. HERSCHMANN:  Mr. Pollock, are you

16:36:46  9              going to -- I've never literally in 35,

16:36:49 10              almost, years of practicing law, I don't

16:36:52 11              think I've ever seen anything like this.

16:36:54 12                    MR. DELLAPORTAS:  What about yesterday

16:36:54 13              when you instructed your wife --

16:36:54 14                    MR. HERSCHMANN:  Other than --

16:36:54 15                    MR. DELLAPORTAS:  Not to answer my

16:36:54 16              questions?

16:37:06 17                    MR. HERSCHMANN:  Mr. Dellaportas --

16:37:06 18                    COURT REPORTER:  I can't hear y'all.

16:37:06 19                    THE WITNESS:  Please, please.

16:37:06 20                    COURT REPORTER:  I can't hear either

16:37:06 21              one of you.

16:37:06 22                    MR. HERSCHMANN:  Mr. Oldner --

16:37:06 23                    MR. DELLAPORTAS:  In 35 years Mr.

16:37:07 24              Herschmann has never seen anything like it,

16:37:08 25              except yesterday when he disrupted my

                              BUSHMAN COURT REPORTING

16:37:09  1          deposition of his wife.

16:37:10  2                  MR. HERSCHMANN:  Oh, my God.

16:37:10  3                  MR. POLLOCK:  Mr. Herschmann, I will

16:37:12  4          ask you respectfully on behalf of the

16:37:13  5          stenographer to cease speaking over me and

16:37:17  6          to cease speaking over Mr. Dellaportas so

16:37:18  7          that we can get an accurate record to --

16:37:24  8                  MR. HERSCHMANN:  All right.

16:37:24  9                  MR. POLLOCK:  -- and move along.  I

16:37:25 10          don't understand why you're taking up time

16:37:29 11          asking questions about the infant

16:37:29 12          beneficiary of the trust.

16:37:36 13                  MR. HERSCHMANN:  Because your client

16:37:38 14          addressed it.  Your client distinguished it

16:37:41 15          beforehand.

16:37:41 16                  But I, I don't want to fight any

16:37:42 17          longer with you.  I just want to try to

16:37:44 18          move on.  That's another topic, and we'll

16:37:45 19          move on.

16:37:46 20                  MR. POLLOCK:  Great.

16:37:46 21   BY MR. HERSCHMANN:

16:37:46 22   Q.    Mr. Oldner, were you aware of the fact when you

16:37:50 23   met with Sagi Genger and he asked you to be trustee

16:37:53 24   that he was involved in lawsuits with the beneficiary

16:37:56 25   of the trust?

16:38:01  1    A.    I knew he had been involved in lawsuits.  I
16:38:05  2    knew he won a judgment against the beneficiary of the
16:38:08  3    trust.
16:38:09  4    Q.    Were you aware that there were certain findings
16:38:13  5    about Sagi Genger in relationship to a fraud case
16:38:17  6    when you met with him when he asked you to be
16:38:21  7    trustee?
16:38:21  8    A.    Pardon me?
16:38:23  9    Q.    Sure.  Did Sagi Genger --
16:38:23  10              MR. POLLOCK:  Mr. Herschmann, can you
16:38:25  11          get to a better cell phone location?
16:38:27  12   A.    I, I really can't --
16:38:27  13   Q.    No --
16:38:27  14   A.    -- I heard half of what you said.
16:38:29  15   Q.    I will try to speak more clearly.
16:38:29  16   A.    You're speaking very clearly.  You're cell
16:38:36  17   phone is cutting out.
16:38:36  18   Q.    I'm not on a cell phone.  Mr. Oldner, did Sagi
16:38:41  19   Genger tell you that he was in various lawsuits with
16:38:44  20   his sister, the beneficiary of the Orly Genger Trust,
16:38:48  21   when he asked you to become trustee?
16:38:52  22   A.    I believe that I was aware that they were, had
16:38:55  23   been off and on in lawsuits.  Obviously, to keep up
16:39:01  24   with the Genger saga is difficult.  I knew there were
16:39:04  25   multiple lawsuits between multiple parties at

16:39:08  1   multiple times.

16:39:09  2              MR. POLLOCK:  And you're -- I object

16:39:10  3         that your question mischaracterizes the

16:39:13  4         prior testimony.

16:39:16  5   Q.   Mr. Oldner, do you know that the lawsuits have

16:39:21  6   been going on, and some of them have continued for

16:39:23  7   years, and years, and years?  Are you aware of that

16:39:26  8   fact?

16:39:27  9   A.   Yes, sir.

16:39:27 10              MR. POLLOCK:  Objection to form.

16:39:28 11   Q.   Did you, did you seek -- did you talk to anyone

16:39:32 12   other than Sagi Genger when he brought you the

16:39:37 13   document asking you to become trustee?

16:39:40 14              MR. POLLOCK:  I object to the extent

16:39:41 15         that this question -- it was both asked and

16:39:43 16         answered this morning.  Now you're just

16:39:46 17         harassing the witness, a, and, b, is I

16:39:49 18         object to the extent that it seeks to

16:39:51 19         elicit privileged communications.

16:39:54 20              MR. HERSCHMANN:  I'm not asking -- I

16:39:55 21         don't know how much clearer I can make it

16:39:56 22         to you, Mr. Pollock.  I don't want any

16:39:59 23         conversations he had with any lawyers.

16:40:01 24   BY MR. HERSCHMANN:

16:40:02 25   Q.   So I want -- you told us earlier Mr. Sagi

16:40:07  1    Genger came to you with two pieces of paper.  One was

16:40:11  2    signed by Dalia Genger already, right, appointing,

16:40:14  3    asking to appoint you as trustee; correct?

16:40:16  4              MR. POLLOCK:  Objection; asked and

16:40:17  5         answered.

16:40:54  6    A.   Yes.

16:40:54  7    Q.   Okay.  And, sir, you don't know if that was

16:40:22  8    Dalia Genger's signature, because you never spoke

16:40:25  9    with her; right?

16:40:28 10    A.   That's a confusing non sequitur to me.  I

16:40:37 11    wouldn't recognize it as being her signature if I had

16:40:41 12    spoken to her.  I --

16:40:43 13    Q.   Do you --

16:40:43 14    A.   -- my assumption is that is Dalia's signature.

16:40:43 15    It has not been objected to by anybody saying that

16:40:45 16    it's not.  This is the first I've heard that

16:40:49 17    suggested.

16:41:20 18    Q.   Sir, was Dalia Genger in a medical facility, do

16:40:53 19    you know, when she supposedly signed this document?

16:41:29 20    A.   I have no idea.

16:41:31 21    Q.   Did anyone ever tell you that Dalia Genger has

16:41:02 22    certain mental issues that may inhibit her ability to

16:41:07 23    function under certain circumstances?

16:41:09 24              MR. DELLAPORTAS:  Object to form.

16:41:09 25    A.   No one has ever discussed Dalia Genger's mental

BUSHMAN COURT REPORTING

16:41:11  1    issues with me at all.

16:41:13  2    Q.    Okay.  So when the time -- at the time you

16:41:14  3    signed the document which you accepted to be trustee,

16:41:19  4    right, and you released Dalia Genger of any actions

16:41:24  5    that she took, tell us all of the actions that you

16:41:28  6    understood she took while she was trustee.

16:41:31  7                    MR. DELLAPORTAS:  Objection.  This is

16:41:31  8            what you --

16:41:31  9                    MR. POLLOCK:  Objection.

16:41:31 10                    MR. DELLAPORTAS:  -- Mr. Herschmann?

16:41:31 11            Some of us have relevant questions here.

16:41:39 12                    MR. POLLOCK:  Yes, Mr. Herschmann, her

16:41:39 13            actions --

16:41:39 14    Q.    You can answer the question, Mr. Oldner.

16:41:39 15                    MR. POLLOCK:  -- her actions as

16:41:41 16            trustee --

16:41:44 17                    MR. DELLAPORTAS:  You represent, you

16:41:44 18            represented you had relevant questions to

16:41:44 19            the motion.

16:41:48 20                    MR. HERSCHMANN:  Mr. Dellaportas, it's

16:41:48 21            directly relevant.  You're wasting our

16:41:48 22            time.

16:41:48 23    BY MR. HERSCHMANN:

16:41:48 24    Q.    Mr. Oldner, please answer the question.

16:41:54 25                    MR. DELLAPORTAS:  You want him to

16:41:54  1              recite ten years of what Dalia Genger did

16:41:56  2              as, as trustee?  That's relevant to the

16:41:58  3              Motion to Dismiss?  Explain how this is

16:42:01  4              relevant to the Motion to Dismiss.

16:42:02  5                   MR. HERSCHMANN:  Mr. Dellaportas,

16:42:04  6              you're wasting time.

16:42:06  7                   MR. DELLAPORTAS:  -- the rest of my

16:42:06  8              questions.

16:42:06  9  BY MR. HERSCHMANN:

16:42:10 10  Q.    Mr. Oldner, please answer the question.

16:42:10 11                   MR. DELLAPORTAS:  You're wasting time.

16:42:10 12              explain --

16:42:10 13  BY MR. HERSCHMANN:

16:42:10 14  Q.    Mr. Oldner, please answer the question.

16:42:10 15                   MR. DELLAPORTAS:  I'd like to ask my

16:42:10 16              questions.

16:42:10 17                   MR. HERSCHMANN:  John, you should have

16:42:12 18              come earlier in the day.

16:42:13 19  BY MR. HERSCHMANN:

16:42:13 20  Q.    Mr. Oldner, please answer the question.

16:42:13 21                   MR. DELLAPORTAS:  I'm sorry.  I --

16:42:14 22              would -- broken and allowed me to ask the

16:42:18 23              questions earlier in the day?  I kind of

16:42:19 24              doubt it.

         25

```
16:42:19  1  BY MR. HERSCHMANN:

16:42:20  2  Q.    Mr. Oldner, can you please answer the question?

16:42:22  3              MR. POLLOCK:  Mr. Herschmann, can you

16:42:24  4         please make a proffer --

16:42:25  5              MR. HERSCHMANN:  I --

16:42:25  6              MR. POLLOCK:  -- as to how a

16:42:27  7         recitation of ten years of Dalia Genger's

16:42:30  8         service as trustee --

16:42:32  9              MR. HERSCHMANN:  I --

16:42:32 10              MR. POLLOCK:  -- is

16:42:32 11         possibly relevant --

16:42:34 12              MR. HERSCHMANN:  I will --

16:42:34 13              MR. POLLOCK:  Please don't speak over

16:42:34 14         me, so we can make a good --

16:42:36 15              MR. HERSCHMANN:  Okay.

16:42:36 16              MR. POLLOCK:  -- a good transcript?

16:42:38 17              MR. HERSCHMANN:  Mr. Pollock, let me

16:42:39 18         see if I can do it differently, because,

16:42:39 19         obviously, we're going to the judge.

16:42:41 20  BY MR. HERSCHMANN:

16:42:42 21  Q.    Did you take any steps whatsoever to determine

16:42:46 22  whether it was appropriate to release Dalia Genger

16:42:48 23  from any liability while she was trustee; yes or no?

16:42:55 24              MR. POLLOCK:  Mr. Herschmann, that

16:42:56 25         question was already asked.  I, I will
```

16:42:59  1          object to any further questioning that, a,

16:43:02  2          that was already asked.  Now you're just

16:43:04  3          harassing and badgering the witness.

16:43:06  4              We did go to the judge, and the judge

16:43:08  5          set confines of this deposition, and we had

16:43:12  6          a clear direction.  The judge said, Take a

16:43:14  7          deposition only on the Motion to Dismiss.

16:43:18  8              Whether Dalia's, the actions that

16:43:21  9          Dalia took over the course of ten years and

16:43:24 10          any investigation that Mr. Oldner did is

16:43:28 11          only pertinent, if anything, to the claims

16:43:32 12          that were sought to be assigned to the

16:43:35 13          entity for which you are a representative.

16:43:38 14              And it is telling that you are now

16:43:40 15          seeking discovery in connection with those

16:43:43 16          potential claims.

16:43:44 17              This is precisely what Mr. -- excuse

16:43:48 18          me -- what Judge Garrity indicated was not

16:43:52 19          relevant to the Motion to Dismiss.

16:43:53 20              MR. HERSCHMANN:  Okay.

16:43:56 21              MR. POLLOCK:  We talked about exactly

16:43:57 22          this.

16:43:58 23              MR. HERSCHMANN:  Mr. Pollock --

16:43:58 24              MR. POLLOCK:  I don't know if you

16:43:59 25          were -- and I will direct you to move along

                        BUSHMAN COURT REPORTING

16:44:02  1          to the subject at hand, and I will direct

16:44:05  2          the witness not to answer any further

16:44:07  3          questions.

16:44:08  4               If, indeed, those claims are sold to

16:44:12  5          Claims Pursue, Claims Pursue, then

16:44:14  6          presumably a lawyer for Claims Pursue will

16:44:19  7          ask these very questions.

16:44:20  8               MR. HERSCHMANN:  Just, Mr. Oldner --

16:44:20  9               THE WITNESS:  May I ask a quick

16:44:21 10          question?  How much time is left in the

16:44:24 11          deposition?

16:44:24 12               MR. HERSCHMANN:  Okay.  So,

16:44:24 13          Mr. Pollock, let me do this.  I just want

16:44:27 14          to make it clear, and Mr. Dellaportas.

16:44:29 15               Both of you have taken every step

16:44:32 16          possible to interfere with the deposition.

16:44:34 17          I am now going to sign off, as I said.  I

16:44:37 18          will contact the Court.

16:44:40 19               Mr. Geron and, Rocco, I'm sorry for

16:44:43 20          the circumstance.  Do whatever you'd like.

16:44:45 21          Thank you.

16:44:48 22               MR. POLLOCK:  Can we take a short bio

16:44:50 23          break before we continue, five minutes?

16:44:56 24               MR. GERON:  A what?

16:44:57 25               THE WITNESS:  A bathroom break.

                          BUSHMAN COURT REPORTING

```
16:44:59  1                    MR. BOWEN:  That's fine.
16:45:01  2                    THE WITNESS:  How much time do we
16:45:01  3            have?
16:45:01  4                    MR. POLLOCK:  Well, we can count it
16:45:02  5            up, but let's take five minutes to go to
16:45:05  6            the bathroom, or at least three minutes to
16:45:07  7            go to the bathroom.  All right?
16:45:09  8                    THE WITNESS:  Okay.
16:45:09  9                    (Six-minute break.)
16:45:09 10                         EXAMINATION
16:51:49 11  BY MR. GERON:
16:51:49 12  Q.    Mr. Oldner, are we back on the record?
16:52:35 13  A.    We are.
16:52:37 14  Q.    Okay.  Mr. Oldner, again, my name is Yann
16:52:01 15  Geron.  I represent Orly Genger in this case.  I have
16:52:06 16  some notes here.
16:52:07 17            I am trying not to go over items that have
16:52:12 18  been covered by Mr. Bowen's extensive examination,
16:52:14 19  but just bear with me to the extent that it goes back
16:52:17 20  through some testimony or some topics that you
16:52:21 21  covered very early on in the deposition.
16:52:55 22  A.    Okay.
16:52:56 23  Q.    You testified earlier -- this is about the
16:52:29 24  document production.  This is about all of the
16:52:31 25  documents that you produced.
```

```
16:52:32  1              And I think with Mr. Bowen's testimony you
16:52:36  2    testified that, Mr. Bowen's questioning you testified
16:52:40  3    that the release of Dalia was produced by you to your
16:52:45  4    counsel, and what he did with that was counsel's
16:52:50  5    decision and was not up to you.
16:52:52  6              Do you recall that testimony in some
16:52:53  7    substance?
16:52:54  8    A.    If I had -- yes.  If I have a copy of that,
16:52:57  9    which I am assuming I have a copy.  There is always
16:53:03 10    the chance that I never got a copy of that, but if I
16:53:06 11    have a copy, I gave him a copy of that, and that
16:53:07 12    should have been produced to you at his discretion.
16:53:45 13    Q.    Okay.  So is it fair to understand from that
16:53:14 14    testimony, from that answer, that you produced
16:53:16 15    everything that you had that was responsive to our
16:53:20 16    subpoena?
16:53:21 17    A.    Yes, sir.
16:53:23 18              MR. POLLOCK:  Wait.  Can we just
16:53:25 19         clarify from his own?  There's a difference
16:53:28 20         between what he transmitted to me and --
16:53:31 21              MR. GERON:  No, Mr. Pollock, the
16:53:32 22         answer was given.  There's no need for
16:53:34 23         clarification.  The questioning is mine,
16:53:36 24         not yours.
         25
```

16:53:36   1   BY MR. GERON:

16:53:40   2   Q.    The next question, with whom did you discuss

16:53:44   3   your appearance at today's deposition?  I know you

16:53:47   4   testified earlier that you spoke with Mr. Sagi.

16:53:51   5            I assume you spoke with your attorneys.

16:53:54   6   Have you spoken with anyone else about your

16:53:57   7   deposition today?

16:53:58   8   A.    Does my wife count?

16:53:59   9   Q.    Well, I don't need to, I don't need to invade

16:54:01  10   that, that, that privacy.

16:54:04  11   A.    Okay.

16:54:05  12   Q.    Beyond your wife did you speak with anyone

16:54:07  13   else, any other third parties?

16:54:09  14   A.    I mean, Robin Rodriguez knew I was giving a

16:54:14  15   deposition, but we didn't talk about the deposition

16:54:16  16   itself.

16:54:48  17   Q.    And when you spoke with Sagi, I know you

16:54:20  18   covered this.  Just bear with me for a moment.

16:54:22  19   A.    Sure.

16:54:23  20   Q.    You said that when you discussed it with Sagi,

16:54:25  21   you spoke -- I think your answers to Mr. Bowen were

16:54:27  22   that you spoke about good barbecue sauce in Kansas

16:54:33  23   City.  And I'm very much looking forward to sampling

16:54:34  24   that at some point, but did you speak about the

16:54:34  25   deposition itself?

16:54:38  1    A.    I hate, I had to go afield on this, but we

16:54:40  2    wouldn't be in Kansas City.  We'd be in Arkansas.

16:54:43  3    Q.    Oh my --

16:54:43  4    A.    Kansas City has average barbecue sauce.  Okay.

16:54:47  5    Now that we've got that on the record, let's, let's

16:54:49  6    go back.

16:54:50  7    Q.    I'm sorry.  That's my --

16:54:50  8    A.    I talked to Sagi for 30 seconds this morning.

16:54:53  9    It was a very short conversation.

16:54:58 10    Q.    Okay.  But did you discuss the substance of

16:54:59 11    your testimony today?

16:55:01 12    A.    We did not.  Not at all.

16:55:02 13    Q.    During the many hours that you have sat today

16:55:05 14    for this deposition and during the breaks that you've

16:55:08 15    taken, other than discussing this matter with your

16:55:11 16    attorney, have you discussed it with any other, the

16:55:11 17    deposition or the substance of the deposition with

16:55:14 18    any other party?

16:55:45 19    A.    No, sir, no one at all.

16:55:47 20    Q.    Turning to the attorneys' bills that you

16:55:23 21    covered -- the area was covered pretty extensively

16:55:27 22    with Mr. Bowen, the attorneys' bills that are being

16:55:30 23    rendered to you.

16:55:31 24          Are the attorneys rendering bills to you?

16:55:33 25    We're talking about Mr. Pollock or any of the other

16:55:36  1    attorneys who have represented you in the Texas

16:55:38  2    segment of this case and now in the New York segment

16:55:43  3    of this case, are those attorneys' being sent to you

16:55:47  4    directly?

16:56:14  5    A.    Yes, they are.

16:55:49  6    Q.    And are you --

16:55:49  7    A.    They are sent to REI, care of me.

16:55:53  8    Q.    Okay.  Fair enough.  And is REI, or are you,

16:55:57  9    sending those bills to anyone else?

16:55:59 10    A.    I am not.  I evaluate the bill.  I request the

16:56:03 11    money.  The money is sent to me, and I pay the bill.

16:56:08 12    Q.    And, and when you request the money, this is,

16:56:09 13    you're talking about the loans that you're taking?

16:56:12 14    A.    That's correct.

16:56:14 15    Q.    Are you sending any documentation when you

16:56:16 16    send -- when you request the loans to fund the bills,

16:56:19 17    are you sending any documentation along with that?

16:56:24 18    A.    I prepare a spreadsheet that shows what the

16:56:28 19    fees have been, without any breakdown of the fees,

16:56:31 20    and that also shows a running balance of the checking

16:56:35 21    account for Recovery Effort Inc., and a running

16:56:40 22    balance of the loan with Anglo-American.

16:56:43 23    Q.    And were those documents produced to your

16:56:47 24    attorney in conjunction with a response to the

16:56:50 25    subpoenas that we served?

16:56:51  1   A.     Yann, I'm not sure.

16:57:36  2   Q.     All right.  I'm going to ask you to look at,

16:57:12  3   I'm going to ask you to look at those records, look

16:57:13  4   for those records --

16:57:15  5   A.     And I --

16:57:15  6   Q.     -- and produce them --

16:57:16  7               MR. POLLOCK:  Mr. Oldner, I'll ask you

16:57:18  8          not to speak over Mr. Geron.  It's very

16:57:20  9          hard for the stenographer.

16:57:22 10               And, Mr. Geron, if you want to meet

16:57:26 11          and confer on documents, I am -- you have

16:57:29 12          my cell phone number.  I'm always happy to

16:57:32 13          talk to you, and I always enjoy talking to

16:57:34 14          you.

16:57:35 15               MR. GERON:  Mr. Pollock, thank you.

16:57:37 16   BY MR. GERON:

16:57:37 17   Q.     I'm going to call for the production of those

16:57:39 18   documents, and I ask that your attorney produce those

16:57:39 19   documents to us.

16:57:44 20               MR. POLLOCK:  I will note with

16:57:45 21          objection your request, and we can, I'll be

16:57:49 22          happy to talk about it at a future time.

16:57:51 23   Q.     Okay.  Does the Orly Genger Trust have any bank

16:57:54 24   accounts?

16:58:28 25   A.     No.

16:58:33  1   Q.    Does it have any books and records?

16:58:00  2   A.    Recovery Effort Inc. has books and records.  I

16:58:09  3   do not have books and records for the Orly Genger

16:58:13  4   Trust, as the Orly Genger Trust has no assets at this

16:58:17  5   time, other than lawsuits.

16:58:51  6   Q.    Is the Orly Genger Trust filing any tax

16:58:22  7   returns, or has it filed any tax returns while you

16:58:25  8   have been the trustee?

16:58:26  9   A.    No, it has not.

16:59:10  10  Q.    I want to turn to REI for a moment.  Do you

16:58:36  11  know the date of its formation, when the, when REI

16:58:37  12  was formed?

16:58:40  13  A.    Either June the 2nd or June the 4th, early

16:58:44  14  June 2019.

16:58:48  15  Q.    Okay.  I'm going to represent to you that that

16:58:50  16  was on June 4th, 2019.

16:58:52  17  A.    All right.

16:58:52  18  Q.    Did you have any, any, any role in the

16:58:53  19  formation of REI?

16:59:04  20  A.    I, I did not.

16:59:05  21  Q.    REI was formed before you were appointed;

16:59:06  22  right?

16:59:07  23  A.    Yes.

16:59:08  24  Q.    What is REI's state of incorporation?

16:59:11  25  A.    Pardon me?

16:59:11  1   Q.    What is REI's state of incorporation?

16:59:14  2   A.    Arkansas.

16:59:21  3   Q.    Who chose that state of incorporation?  Who

16:59:24  4   made that decision?

16:59:25  5   A.    I do not know.

16:59:29  6   Q.    Did you make that decision?

16:59:30  7   A.    I did not.

16:59:32  8   Q.    Did Sagi make that decision?

16:59:34  9   A.    I don't know.

16:59:36 10             MR. POLLOCK:  Mr. Geron, I'm giving

16:59:37 11          you a lot of leeway here in trying to let

16:59:40 12          you complete your questioning.  Again, none

16:59:42 13          of these questions are --

16:59:47 14             MR. GERON:  Mr. Pollock, I hear you.

16:59:47 15          Mr. Pollock, let me move on.

16:59:47 16   BY MR. GERON:

16:59:48 17   Q.    Has Recovery Effort filed a claim against the

16:59:51 18   bankruptcy estate, sir?

16:59:52 19             MR. POLLOCK:  Mr. Geron, I would

16:59:52 20          respectfully --

16:59:52 21             MR. GERON:  Mr. Pollock --

16:59:52 22             MR. POLLOCK:  -- ask for the benefit

16:59:52 23          of our stenographer --

16:59:52 24             MR. GERON:  Mr. Pollock --

16:59:52 25             MR. POLLOCK:  -- that you not speak

16:59:52  1            over me.

16:59:52  2                 MR. GERON:  Mr. Pollock, please just

16:59:52  3            not your objection, and let's move on.  We

16:59:52  4            have very limited time.

17:00:01  5   BY MR. GERON:

17:00:01  6   Q.    Has Recovery Effort filed a claims against the

17:00:04  7   bankruptcy estate?

17:00:56  8   A.    No.

17:00:56  9   Q.    Only the trust has filed a claim against the

17:00:09 10   bankruptcy estate; right?

17:00:12 11   A.    Correct.

17:00:14 12   Q.    And am I right in understanding that the trust

17:00:17 13   assigned its claims to REI?

17:00:21 14   A.    Yes.

17:01:12 15   Q.    So, let me move on.

17:01:22 16   A.    It assigned certain claims.  Let me clarify

17:00:36 17   that.

17:00:37 18   Q.    Did it keep any -- did the trust keep any

17:00:39 19   claims?

17:00:39 20   A.    I believe that the trust kept claims against

17:00:42 21   Orly Genger.

17:00:51 22   Q.    So the trust's claims against Orly Genger were

17:00:53 23   not part of the Inter-Creditor Agreement?

17:00:55 24                 MR. POLLOCK:  Objection;

17:00:55 25            mischaracterizes the testimony.

                          BUSHMAN COURT REPORTING

17:00:58  1              MR. GERON:  I did not characterize any

17:00:58  2          testimony.  I'm asking a straight question.

17:01:01  3  BY MR. GERON:

17:01:02  4  Q.    Were the trust's claim against Orly Genger part

17:01:05  5  of the Inter-Creditor Agreement?

17:01:09  6  A.    I would have to go over the Inter-Creditor

17:01:11  7  Agreement again, and I am not trying to be --

17:01:22  8  Q.    You covered this at great length with Mr.

17:01:23  9  Bowen, and I just want to make sure that we have this

17:01:26 10  clear.

17:01:27 11              Is it your understanding that the trust can

17:01:27 12  collect on the Inter-Creditor, on the claims against

17:01:28 13  Orly Genger and not deal with them, or not deal with

17:01:33 14  collection through the Inter-Creditor Agreement?

17:01:37 15              MR. POLLOCK:  Objection to form.

17:02:32 16  A.    I don't know the answer to that question.

17:01:58 17  Q.    In the Inter-Creditor Agreement, the

17:02:01 18  Inter-Creditor Agreement provides that the, that

17:02:10 19  Sagi's collection costs will be paid as part of his

17:02:13 20  distribution.  Do you know that provision?

17:02:17 21              MR. POLLOCK:  Mr. Geron, can you let

17:02:18 22          us know what page or what paragraph you're

17:02:20 23          looking at?

17:02:21 24              MR. GERON:  Yeah, I'm just struggling

17:02:23 25          with putting that up on the screen again.

17:02:26  1              MR. POLLOCK:  Maybe Mr. Kurland can be

17:02:29  2         helpful.

17:02:32  3              MR. GERON:  The court reporter has our

17:02:33  4         exhibits.  I just -- and I know that I sent

17:02:35  5         them early on this morning, but that may

17:02:37  6         have been included in her comments earlier

17:02:39  7         today that she got it just as she was

17:02:39  8         transitioning, as she was transporting to

17:02:43  9         the deposition.

17:02:44 10  BY MR. GERON:

17:02:45 11  Q.    Let me move on.  The joinder to the Texas

17:02:51 12  Motion to Dismiss, I'm going to talk about it just

17:02:55 13  very briefly.  Who prepared that document?

17:03:00 14  A.    Jay Ong, my attorney.

17:03:05 15  Q.    Was Mr. Dellaportas involved in preparing that

17:03:09 16  document?

17:03:13 17  A.    I do not know.

17:03:14 18              MR. POLLOCK:  And I note the objection

17:03:15 19         to the extent that you're seeking common

17:03:18 20         interest privilege material.

17:03:23 21  Q.    I, I asked nothing of the sort.  I'm asking if

17:03:26 22  Mr. Dellaportas was involved in drafting of the

17:03:26 23  document, and I think I got the answer.

17:03:31 24  A.    Was he involved in the drafting of it, I have

17:03:33 25  no idea.

17:03:39  1    Q.    The only thing that you testified to just a

17:03:41  2    moment ago was that it was presented to you by your

17:03:44  3    attorney; is that correct?

17:04:21  4    A.    Jay Ong.  I got that from Jay Ong.  I got the

17:03:48  5    information from Jay Ong.  I believe that Jay Ong

17:03:52  6    received a summary -- no, that's it.

17:03:53  7                     MR. POLLOCK:  Don't --

17:03:53  8    A.    That's all.  I'm sorry.  That's privileged.

17:03:57  9    It's all from Jay Ong.

17:04:03 10    Q.    Who is Renae Oldner?

17:04:06 11    A.    Renae Oldner is my wife.

17:04:09 12    Q.    There were two emails produced by your attorney

17:04:12 13    that seem to have originated from Renae Oldner to

17:04:16 14    Sagi, to Sagi Genger.  Why would -- was Renae Oldner

17:04:20 15    communicating with Sagi?

17:04:24 16    A.    No.  I used that -- or was it the Renae Oldner,

17:04:26 17    Oldner r-r at SBC Global.net?

17:04:31 18    Q.    I believe so.  And is that, is that your email

17:04:33 19    or her email?

17:04:34 20    A.    That is my email.  I have changed it, but it's,

17:04:37 21    in half the places it shows up as hers.  That's been

17:04:41 22    my email for more than ten years.

17:04:44 23    Q.    Is, is Mrs. Oldner using that email for any

17:04:50 24    purposes?

17:04:50 25    A.    For no purposes at all.  She had two separate

BUSHMAN COURT REPORTING

17:04:58  1   email accounts.  She doesn't use that one.  That is

17:05:00  2   strictly mine.  Years ago it was our joint email

17:05:03  3   account.  Before that it was hers.

17:05:07  4              MR. GERON:  All right.  I'm going to

17:05:08  5         cede the rest of my time to Mr. Cavaliere.

17:05:13  6                   EXAMINATION

17:05:16  7   BY MR. CAVALIERE:

17:05:17  8   Q.    Okay.  Good afternoon, Mr. Oldner.

17:05:20  9   A.    How are you?

17:05:22 10   Q.    Good.  How are you?

17:05:23 11   A.    Tired, like you.

17:05:59 12              MR. CAVALIERE:  All right.  I don't

17:05:29 13         have many questions, and, and I just want

17:05:30 14         to state for the record that the, the

17:05:33 15         trustee will request that this deposition

17:05:37 16         remain open for a number of reasons.

17:05:39 17              There's, obviously, a number of

17:05:41 18         disputes here, a number of speaking

17:05:43 19         objections, and, in addition, we did not

17:05:47 20         get the balance of documents that we had

17:05:51 21         requested.

17:05:51 22              There's actually a dispute with

17:05:52 23         respect to the, the broadness, or, and

17:05:57 24         other, other types of objections that were

17:05:59 25         raised by Mr. Pollock that, hopefully, will

17:06:02  1            be resolved before the judge on June 30th.

17:06:05  2                 I'll be asking some limited questions,

17:06:07  3            but I anticipate once we also resolve the

17:06:11  4            issue on the common interest privilege,

17:06:13  5            that we will be meeting again at an

17:06:15  6            appropriate time.

17:06:15  7  BY MR. CAVALIERE:

17:06:15  8  Q.   So with that said, just a few questions,

17:06:20  9  Mr. Oldner.  If I could ask, you -- I think you've

17:06:29 10  testified and you've acknowledged as a matter of

17:06:32 11  public record that you, that Mr. Oldner, you, Mr.

17:06:34 12  Oldner, in your capacity as the trustee of the Orly

17:06:41 13  Genger trust has filed a Proof of Claim in the case

17:06:43 14  in the amount of approximately $41 million.  Is that

17:06:45 15  correct?

17:06:49 16                 MR. POLLOCK:  Objection, we're not

17:06:50 17            here on, on the claims evaluation.  We're

17:06:52 18            here consistent with Judge Garrity's

17:06:55 19            instruction to talk about the Motion to

17:06:57 20            Dismiss.

17:07:27 21                 MR. CAVALIERE:  Mr. Pollock, with all

17:07:02 22            due respect, I hear your objection, but

17:07:04 23            it's not, it's not appropriate.

17:07:07 24                 I've done a few Motions to Dismiss

17:07:09 25            bankruptcy cases before.  I'm very familiar

                        BUSHMAN COURT REPORTING

17:07:13  1              with what's appropriate and what's not

17:07:15  2              appropriate.

17:07:15  3                   And I, and I also want to state for

17:07:16  4              the record that I, that along the way you

17:07:19  5              have been stating, you characterized what

17:07:21  6              Judge Garrity ruled during a telephonic

17:07:23  7              conference on Tuesday.

17:07:26  8                   I don't believe he necessarily ruled

17:07:28  9              as to the, all of the topics that we've

17:07:30 10              discussed today.

17:07:32 11                   I understand your objection, and he'll

17:07:33 12              deal with -- and I'm sure he'll address the

17:07:37 13              objection at an appropriate time.  So if

17:07:40 14              you could just allow the, your client to

17:07:42 15              answer the question so we can move forward.

17:07:45 16  BY MR. CAVALIERE:

17:07:50 17  Q.    Do you want me to restate the question,

17:07:51 18  Mr. Oldner?

17:07:53 19  A.    I have completely forgotten the question by

17:07:56 20  now.

17:07:56 21  Q.    Okay.  Can you explain the basis for your

17:07:59 22  $41 million claim in the bankruptcy case?

17:08:04 23  A.    That's the claim that the attorneys for the

17:08:10 24  trust advised we file.

17:08:53 25  Q.    Okay.  You're -- okay.  Did you as, as trustee

17:08:22  1   of the Orly Genger Trust approve the filing of a $41

17:08:27  2   million claim in the bankruptcy case?

17:08:29  3   A.    I did.

17:09:04  4   Q.    And I'm asking you, what is your understanding

17:08:34  5   of the basis for your $41 million claim against Orly

17:08:38  6   Genger?

17:08:40  7   A.    The basis from that comes from discussion with

17:08:44  8   my attorney, which that discussion would be

17:08:46  9   privileged.

17:09:20 10   Q.    That's, that's not -- okay.  So you're, you are

17:08:53 11   testifying today that you are actually not aware

17:08:57 12   of -- you personally do not understand the basis for

17:09:00 13   your $41 million claim against Orly Genger, the

17:09:04 14   beneficiary of the Orly Genger Trust?

17:09:07 15              MR. POLLOCK:  Objection; misstates --

17:09:07 16              mischaracterizes and misstates the

17:09:09 17              testimony, a.

17:09:11 18              B, and you're completely flouting both

17:09:14 19              the scheduling order, which limited the,

17:09:17 20              limited the scope of discovery, and you're

17:09:21 21              flouting the clear direction that we got

17:09:23 22              from Judge Garrity that the strength of

17:09:27 23              claims, the claims process, the claims

17:09:30 24              reconciliation process is not at issue on

17:09:33 25              the Motion to Dismiss.

17:09:34  1              And he directed y'all -- see, I'm in

17:09:37  2              Arkansas -- he directed y'all to take

17:09:39  3              discovery limited to the Motion to Dismiss.

17:09:42  4              It's not on the understanding of the Proof

17:09:45  5              of Claim.

17:09:50  6                   MR. CAVALIERE:  I disagree --

17:09:50  7                   MR. POLLOCK:  And I would

17:09:50  8              respectfully ask --

17:09:52  9                   MR. CAVALIERE:  -- and I will just

17:09:52 10              move on and note for the record you've

17:09:53 11              directed, I guess you've directed your

17:09:56 12              client not to answer.

17:09:57 13                   MR. POLLOCK:  My client already

17:09:58 14              answered.  I'm asking you to respect his

17:10:00 15              time and move along to the topics at hand.

17:10:04 16              He already answered.

17:10:05 17  BY MR. CAVALIERE:

17:10:05 18  Q.    Mr. Oldner, you testified earlier that you

17:10:08 19  believe you could be fair and impartial as the

17:10:12 20  trustee of the Orly Genger Trust; is that correct?

17:10:14 21  A.    That is correct.

17:10:16 22  Q.    Do you believe you acted fairly and impartially

17:10:20 23  when you filed a $41 million claim against the

17:10:22 24  beneficiary of your trust in this bankruptcy case?

17:10:26 25  A.    Mr. Cavaliere, why do you insist upon saying

17:10:29  1   "beneficiary" when the trust has beneficiaries.

17:10:32  2   There's a difference between singular and plural.

17:10:33  3          I don't want to argue, but I am filing -- I

17:10:33  4   am trustee for the beneficiaries of the Orly Genger

17:10:40  5   Trust.  I will refer you to the trust document before

17:10:45  6   we go any further on this line.

17:10:53  7   Q.    Okay.  Do, do you believe you acted fairly and

17:10:54  8   impartially when you filed a $41 million claim

17:10:55  9   against the beneficiaries, well, against Orly Genger

17:11:03 10   in, in this bankruptcy estate?

17:11:05 11          MR. POLLOCK:  Objection to form.

17:11:07 12   A.    Will you please restate the question?

17:11:09 13   Q.    Do you believe you acted fairly and impartially

17:11:13 14   when you filed a $41 million claim against Orly

17:11:16 15   Genger in her bankruptcy case?

17:11:18 16   A.    When the Orly Genger Trust filed a claim

17:11:22 17   against Orly Genger in the bankruptcy, I feel like I

17:11:26 18   acted fairly and in the best interest of the trust

17:11:28 19   and the beneficiaries of the trust.

17:12:03 20   Q.    Do you believe you acted fairly and impartially

17:11:35 21   when you provided a general release in favor of Dalia

17:11:37 22   Genger, the former trustee?

17:11:42 23   A.    Mr. Cavaliere, I would respectfully ask that

17:11:45 24   you make a proffer as to how that relates to the

17:11:48 25   Motion to Dismiss, given the direction from Mr. -- I

17:11:55  1    keep making that mistake.  I apologize -- from Judge

17:11:58  2    Garrity who very clearly directed you that the

17:12:02  3    strength of the claims that were proposed to be sold

17:12:04  4    would not be the subject of the Motion to Dismiss,

17:12:06  5    and would not be evaluated, and would not be the

17:12:11  6    subject of discovery.  We precisely covered this

17:12:14  7    during the June 23rd conference with the Court.

17:12:19  8                  MR. CAVALIERE:  Mr. Pollock, I

17:12:20  9             disagree with your, your recitation.  I'd

17:12:22 10             ask that you allow the, your client to

17:12:24 11             answer the question, because I think it's a

17:12:27 12             fair question.

17:12:29 13                  MR. POLLOCK:  I would respectfully ask

17:12:31 14             that you make a proffer as to how that

17:12:33 15             relates to the Motion to Dismiss --

17:12:35 16                  MR. CAVALIERE:  I am not --

17:12:35 17                  MR. POLLOCK:  -- instead of seeking

17:12:37 18             discovery on the claims that you propose to

17:12:39 19             be sold to the entity for which

17:12:42 20             Mr. Herschmann is a representative in your

17:12:44 21             characterization.

17:12:48 22                  MR. CAVALIERE:  Mr. Pollock, we have,

17:12:50 23             we have a scheduling order, as you said,

17:12:51 24             that relates to the Motion to Dismiss, as

17:12:53 25             well as the trustee's motion; okay?

                              BUSHMAN COURT REPORTING

17:12:55  1                    MR. POLLOCK:  Yeah.

17:12:56  2                    MR. CAVALIERE:  That's on -- there's a

17:12:56  3              scheduling order, and there's broad

17:13:00  4              questions that can be asked as a result of

17:13:03  5              that.  We've had this debate numerous

17:13:03  6              times.

17:13:04  7                    I'm going to ask the question one more

17:13:07  8              time; okay?  Your, your objection is noted.

17:13:09  9              We will deal with this before Judge Garrity

17:13:12 10              at the appropriate time.

17:13:13 11                    MR. POLLOCK:  We did.

17:13:14 12                    MR. CAVALIERE:  I will ask it one more

17:13:14 13              time.

17:13:16 14                    MR. POLLOCK:  We did.  We talked

17:13:16 15              about the --

17:13:16 16  BY MR. CAVALIERE:

17:13:16 17  Q.    Do you believe, Mr. Oldner, that you acted

17:13:21 18  fairly and impartially when you provided a general

17:13:24 19  release in favor of Dalia Genger, the former trustee?

17:13:27 20  A.    Mr. Cavaliere, I would refer you to the trust

17:13:30 21  document that is, the statement of trust document

17:13:33 22  that each trustee provides a release to previous

17:13:37 23  trustees.

17:13:44 24                    MR. KURLAND:  Move to strike as

17:13:46 25              nonresponsive.

                         BUSHMAN COURT REPORTING

17:13:51 1              MR. POLLOCK:  I didn't hear who moved
17:13:53 2         to strike, but he answered the question.
17:13:55 3         If whoever doesn't like that answer, I
17:13:59 4         don't know what to say.
17:14:02 5              MR. KURLAND:  Just note for the
17:14:05 6         record, please, it was nonresponsive.
17:14:07 7         Thank you.
17:14:07 8              MR. CAVALIERE:  It's, obviously, not
17:14:07 9         responsive.  Okay.  We'll just move on.
17:14:07 10 BY MR. CAVALIERE:
17:14:09 11 Q.    If Judge Garrity allows, allows the Orly Genger
17:14:13 12 Trust to prosecute the $32 million claim and you're
17:14:18 13 successful, please explain how you intend on
17:14:22 14 distributing such monies?
17:14:26 15             MR. POLLOCK:  Objection; asked and
17:14:27 16        answered.  Mr. Geron squarely asked that
17:14:31 17        question not 15 minutes ago.
17:14:32 18 Q.    Okay.  Please answer the question, if you don't
17:14:34 19 mind.
17:15:05 20             MR. POLLOCK:  Are you asking him to
17:14:36 21        answer a question that was answered 15
17:14:38 22        minutes ago?
17:14:40 23 Q.    I'd, I'd like an answer to my question, please.
17:14:43 24             MR. POLLOCK:  You're just harassing
17:14:43 25        and badgering the witness --

                        BUSHMAN COURT REPORTING

17:14:45  1              MR. CAVALIERE:  I'm not --

17:14:45  2              MR. POLLOCK:  -- to keep asking him

17:14:46  3          the same thing over and over.

17:14:48  4              MR. CAVALIERE:  I'm not harassing

17:14:48  5          anyone.  I didn't ask the question.  Did I

17:14:48  6          ask the question?  This is my first time

17:14:52  7          asking this question.  I asked it --

17:14:53  8              THE WITNESS:  This question has been

17:14:54  9          asked many times.  Did you hear the other

17:14:56 10          answers?

17:14:59 11              MR. CAVALIERE:  Okay.  Okay.  It's

17:15:00 12          easy to answer it again, then.

17:15:02 13              MR. POLLOCK:  Mr. Cavaliere, order a

17:15:04 14          transcript.

17:15:47 15              THE WITNESS:  Why did you wait until

17:15:07 16          the end of the day to do this to me?

17:15:11 17              MR. POLLOCK:  Because they're

17:15:12 18          harassing you by asking the same questions.

17:15:15 19              MR. CAVALIERE:  I'm not harassing

17:15:16 20          anyone.

17:15:16 21  BY MR. CAVALIERE:

17:15:16 22  Q.    Okay.  So, so are you, are you not going to

17:15:18 23  answer the question as to what you intend, how you

17:15:18 24  intend to distribute the $32.3 million if you recover

17:15:22 25  it?

                    BUSHMAN COURT REPORTING

17:15:22  1   A.    I will recover -- I will do it exactly in the

17:15:25  2   manner that I stated earlier.

17:15:37  3   Q.    Okay.  Have you read the June 2013 Settlement

17:15:41  4   Agreement with the Trump Group?

17:15:45  5   A.    I have.

17:16:19  6   Q.    Are you familiar -- are you aware that there's

17:15:50  7   an indemnity provision in that agreement in favor,

17:15:53  8   potentially in favor of the Trump Group?

17:15:53  9              MR. POLLOCK:  Mr. Cavaliere, if you're

17:15:59 10              referring to a document or a particular

17:16:01 11              page of a document, can we get it up in

17:16:03 12              front of us and mark it, so we understand

17:16:06 13              what it is you're referring to?

17:16:08 14              MR. CAVALIERE:  Sure.  I can email it

17:16:12 15              to everybody.  Is it, is it -- and I

17:16:16 16              can't -- I don't think I can physically do

17:16:19 17              it, but can -- I'm not sure if anyone else

17:16:22 18              can.

17:16:22 19              MR. POLLOCK:  I think Mr. Kurland was

17:16:24 20              able to screen share earlier.

17:16:26 21              MR. KURLAND:  Yeah, I think this is a

17:16:27 22              waste of time, Mr. Pollock, but, but, but

17:16:29 23              maybe -- Rocco, maybe you can ask the

17:16:33 24              question, and while you do that, I'll, I'll

17:16:35 25              see if I can dig up the Trump Group

17:16:37  1          agreement.

17:16:37  2              MR. CAVALIERE:  I'll send it to you,

17:16:37  3          Andrew.

17:16:37  4              MR. POLLOCK:  Mr. Cavaliere is asking

17:16:39  5          the witness to characterize an

17:16:43  6          eight-year-old document, or, sorry, excuse

17:16:43  7          me, a seven-year-old document.

17:16:44  8              Let's look at what he is asking the

17:16:53  9          witness to characterize.  It's a 44-page

17:16:55 10          document, and it's complex legal jargon.

17:17:04 11              MR. KURLAND:  This is speaking

17:17:04 12          objection.

17:17:05 13              MR. CAVALIERE:  Yeah.

17:17:05 14              MR. KURLAND:  The witness testified he

17:17:07 15          knows about the document.  Rocco should

17:17:08 16          proceed with the question.

17:17:08 17              MR. POLLOCK:  Okay.  So why --

17:17:09 18              MR. KURLAND:  He knows about the

17:17:10 19          document.

17:17:11 20              MR. POLLOCK:  Mr. Kurland, your color

17:17:14 21          commentary is unnecessary.

17:17:17 22              MR. CAVALIERE:  Let's do this, while

17:17:19 23          Andrew pulls up the document, I'll, I'll

17:17:21 24          just retract the question, and I'll ask a

17:17:26 25          few other questions, because time is short,

17:17:28  1            and then we can go back to this area of

17:17:31  2            topic.

17:17:34  3                 MR. POLLOCK:  Good idea.

17:17:34  4   BY MR. CAVALIERE:

17:17:34  5   Q.    All right.  Mr. Oldner, you testified earlier,

17:17:37  6   and please correct me if I'm wrong, that a company

17:17:41  7   called Anglo-American is the party that makes payment

17:17:43  8   of the legal fees of REI; is that correct?

17:18:25  9   A.    That is correct.

17:18:26 10   Q.    Do you happen to know whether the Orly Genger

17:17:53 11   Trust guarantees the obligations of REI to pay back

17:18:03 12   the Anglo-American loan?

17:18:05 13                 MR. POLLOCK:  Objection for the

17:18:07 14            reasons previously stated.  Also, didn't we

17:18:09 15            cover this this morning?

17:18:12 16   A.    The, the Orly Genger Trust has no money unless

17:18:15 17   REI collects, and REI pays the fees before Orly

17:18:19 18   Genger Trust gets the money.

17:18:23 19   Q.    That, that wasn't my question.  Does the Orly

17:18:25 20   Genger Trust guarantee the obligations that REI has

17:18:31 21   against Anglo-American, to the extent REI does not

17:18:34 22   pay back the loan --

17:18:36 23   A.    No, it does not --

17:18:37 24   Q.    -- to Anglo- --

17:18:37 25   A.    No.

                    BUSHMAN COURT REPORTING

17:18:37 1   Q.   Okay.

17:18:38 2   A.   No, it does not.

17:18:40 3   Q.   Do you know whether another party is funding

17:18:46 4   Anglo-American in connection with the fees that

17:18:48 5   Anglo-American has paid to REI?

17:18:54 6                    MR. POLLOCK:  Objection;

17:18:54 7            mischaracterizes the testimony.

17:18:57 8   A.   What does you mean?

17:18:58 9   Q.   I didn't, I didn't mischaracterize any

17:19:00 10  testimony.  I'm not -- I'm asking --

17:19:37 11  A.   Ask the question.

17:19:02 12  Q.   I'm asking -- do you understand the question,

17:19:04 13  Mr. Oldner?

17:19:05 14  A.   Actually, could you rephrase it?  I don't know,

17:19:07 15  I don't know what you're asking.

17:19:11 16  Q.   Sure.  Anglo-American -- according to your

17:19:14 17  testimony, Anglo-American is the, is the entity that

17:19:17 18  has made the payment of legal fees of REI.

17:20:02 19  A.   Yes.

17:19:22 20  Q.   To your knowledge, where, who, who ultimately

17:19:28 21  funds Anglo-American's fees, the monies that

17:19:33 22  Anglo-American pays to REI for those fees?

17:19:37 23  A.   Anglo-American.

17:19:40 24  Q.   Is it -- do you believe -- do you have any

17:19:43 25  knowledge that Sagi Genger is loaning Anglo-American

17:19:48  1   any monies that are then loaned to REI?

17:19:52  2   A.   No.

17:20:22  3   Q.   Do you have any knowledge that Robin Rodriguez

17:19:57  4   personally lent money to Anglo-American that has been

17:20:01  5   paid to REI?

17:20:04  6   A.   Robin Rodriguez is one of the owners of

17:20:06  7   Anglo-American.

17:20:07  8   Q.   I understand that.

17:20:34  9   A.   So why --

17:20:11 10   Q.   So what's the answer?

17:20:12 11           MR. POLLOCK:  So, Mr. Cavaliere --

17:20:12 12   A.   I don't understand the question.  It's his

17:20:14 13   company.  Is he loaning himself money?  No.  It's his

17:20:17 14   money.

17:20:18 15           MR. POLLOCK:  And, Mr. Cavaliere, I

17:20:20 16       don't understand --

17:20:21 17   Q.   Well, that's doesn't happen?  Okay.  All right.

17:20:23 18           MR. POLLOCK:  Mr. Cavaliere, I don't

17:20:24 19       understand what this possibly has to do

17:20:26 20       with the Motion to Dismiss, but it sounds

17:20:27 21       like you're moving on.

17:20:29 22           MR. CAVALIERE:  Mr. Pollock, this

17:20:29 23       is not -- I'm not -- this is not, this is

17:20:29 24       not a school, okay, where I have to educate

17:20:33 25       you -- you're not a bankruptcy lawyer -- as

17:20:36 1          to what it has, what it has to do with the

17:20:37 2          Motion to Dismiss.  Okay?

17:20:39 3              MR. POLLOCK:  Yes.  But --

17:20:39 4              MR. CAVALIERE:  Okay?  In all

17:20:39 5          seriousness --

17:20:39 6              MR. POLLOCK:  -- but I --

17:20:39 7              MR. CAVALIERE:  -- this has been a big

17:20:41 8          waste of time in many respects because of

17:20:43 9          your speaking objections; okay?

17:20:46 10             MR. POLLOCK:  But --

17:20:46 11             MR. CAVALIERE:  I would like to just

17:20:47 12         move on.  I don't have many more questions.

17:20:50 13             MR. POLLOCK:  Mr. Cavaliere, I don't

17:20:52 14         appreciate your disrespectful, patronizing

17:20:53 15         tone, but I was on the call with Judge

17:20:54 16         Garrity on --

17:20:59 17             MR. CAVALIERE:  I --

17:20:59 18             MR. POLLOCK:  Don't interrupt me,

17:20:59 19         because, let me make a record for the

17:21:01 20         stenographer -- I was on the phone with

17:21:03 21         the, Judge Garrity on Tuesday afternoon

17:21:05 22         when he expressly limited the, the breadth

17:21:11 23         of the discovery to the Motion to Dismiss.

17:21:13 24         He was dead clear about it.

17:21:16 25             And you have chosen to repeatedly

BUSHMAN COURT REPORTING

17:21:19  1              flout his direction, as well as Kasowitz

17:21:21  2              has, Eric Herschmann has, and Yann Geron's

17:21:26  3              topics, while brief, were off topic also.

17:21:31  4                    In fact, it wasn't until 2:25 Arkansas

17:21:34  5              time, 3:25 your time, that finally Mr.

17:21:37  6              Bowen said, Okay, let's move on to the

17:21:39  7              Motion to Dismiss.

17:21:40  8                    It's inappropriate.  You have an

17:21:42  9              elderly -- excuse me.

17:21:44 10                    THE WITNESS:  That's fine.

17:21:45 11                    MR. POLLOCK:  You have a mid-sixties

17:21:47 12              witness --

17:22:18 13                    THE WITNESS:  Elderly.

17:21:48 14                    MR. POLLOCK:  -- who has been very

17:21:50 15              patient with y'all all day long, who has

17:21:53 16              health issues.  Stick to the topics at

17:21:55 17              hand, and we will be able to get done.

17:21:57 18                    MR. CAVALIERE:  I -- okay.  Adam, I

17:21:57 19              just -- honestly, I disagree with you about

17:22:00 20              everything you just said.

17:22:00 21                    So we'll just -- obviously, it's going

17:22:02 22              to be addressed with the judge at the

17:22:03 23              appropriate time.  So let me just move

17:22:04 24              forward.

17:22:05 25                    MR. POLLOCK:  Mr. Cavaliere --

17:22:08  1              MR. CAVALIERE:  I just want to ask my

17:22:08  2         questions, Adam.  If you want, I can just

17:22:10  3         stop.  If you prefer, I'll just stop, okay,

17:22:11  4         because we're going to keep this open

17:22:11  5         anyway.

17:22:14  6              Just tell me what you want me to do.

17:22:14  7         If every single question I'm going to ask

17:22:14  8         is going to be objected to, I don't have

17:22:14  9         the patience for it.

17:22:22 10              THE WITNESS:  Rocco, while I'm here --

17:22:23 11              MR. CAVALIERE:  Okay.

17:22:23 12              THE WITNESS:  -- please, please let's

17:22:24 13         continue.

17:22:25 14              MR. POLLOCK:  If you're already aware

17:22:26 15         that every question you're going to ask is

17:22:27 16         objectionable because it strays beyond the

17:22:30 17         bounds, please try to focus in your

17:22:33 18         questions on the topic at hand.

17:22:36 19    BY MR. CAVALIERE:

17:22:37 20    Q.    Mr. Oldner, did you, did you review the

17:22:39 21    trustee's motion seeking a loan and a sale of certain

17:22:42 22    causes of action?

17:22:44 23    A.    Would you excuse me for just one moment,

17:22:47 24    please?  Okay.  I'm sorry.  I apologize.  Would you

17:22:52 25    ask the question again?  I was inattentive.

                        BUSHMAN COURT REPORTING

17:22:56  1    Q.    Did you, did you review the trustee's motion

17:22:59  2    seeking a loan and a sale of certain causes of

17:23:03  3    action?

17:23:04  4    A.    Yes, I did.

17:23:05  5    Q.    I understand from your counsel that you do not

17:23:08  6    intend on filing in objection to the sale aspect of

17:23:10  7    the trustee's motion; is that correct?

17:23:47  8    A.    At this time I don't.

17:23:19  9    Q.    Do you -- okay.  At this time you don't.  Do

17:23:23 10    you anticipate --

17:23:23 11    A.    I --

17:23:23 12    Q.    -- there's a possibility you may change your

17:23:26 13    mind before the hearing?

17:23:27 14    A.    Rocco, at this moment, I don't anticipate

17:23:32 15    changing my mind.

17:23:35 16    Q.    Okay.  Do you anticipate --

17:23:36 17    A.    But I reserve, obviously, blah, blah, blah, you

17:23:38 18    know.

17:24:15 19    Q.    Okay.  Do you anticipate --

17:23:40 20    A.    I'm trying to be honest with you.

17:23:40 21    Q.    Do you anticipate filing objection to the loan

17:23:44 22    aspect of the trustee's motion?

17:23:47 23    A.    At this time I don't -- at this time I am going

17:23:53 24    to take that under advisement.  I have not, I have

17:23:57 25    not given that consideration.

17:24:03  1    Q.    Okay.

17:24:35  2    A.    I have plans --

17:24:05  3    Q.    Okay.  Did Mr. Pollock send you, in connection

17:24:10  4    with the discovery process here, a copy of the

17:24:13  5    trustee's discovery requests?

17:24:17  6                   MR. POLLOCK:  Mr. Cavaliere, to the

17:24:18  7              extent that you are seeking my

17:24:20  8              communication with my client, I object,

17:24:22  9              and -- and, frankly, you can probably

17:24:27 10              rephrase that question as, Have you

17:24:29 11              reviewed them, instead of specifically

17:24:30 12              seeking my communications with him.

17:24:35 13    Q.    It's fine.  Have you received a copy of the

17:24:40 14    trustee's subpoena for documents in connection with

17:24:44 15    the Motion to Dismiss and the trustee's motion?

17:24:47 16                   MR. POLLOCK:  Objection,

17:24:47 17              mischaracterizes the documents.  But,

17:24:49 18              again, if you want to ask him have you

17:24:51 19              reviewed the things, the pieces of paper, I

17:24:53 20              think it's a better way to ask him.

17:24:56 21    Q.    Mr. Oldner --

17:24:57 22    A.    Yes.

17:24:58 23    Q.    -- the trustee prepared a subpoena in

17:25:02 24    connection with the Motion to Dismiss requesting

17:25:05 25    documents from you.

17:25:07  1   A.     Yes.

17:25:07  2   Q.     Did you review that subpoena or request for

17:25:10  3   documents?

17:25:12  4               MR. POLLOCK:  Objection,

17:25:12  5          mischaracterizes the documents.

17:25:16  6   Q.     Mr. Oldner, can you answer, please?

17:25:17  7   A.     I have not received a subpoena from you.

17:25:27  8   Q.     So Mr., Mr. Pollock -- okay.  When you say you

17:25:33  9   didn't receive a subpoena from me, did you receive an

17:25:36 10   email from Mr. Pollock with a copy of my subpoena?

17:25:41 11               MR. POLLOCK:  Mr. Cavaliere, I think

17:25:43 12          this could be much easier if you would just

17:25:45 13          ask him have you reviewed the darn

17:25:47 14          documents?

17:25:48 15          That's very easy to ask, instead of

17:25:51 16          trying to ask did I email it to him or not,

17:25:53 17          seeking my privileged communications with

17:25:56 18          him.

17:25:57 19               MR. CAVALIERE:  I'm not seeking --

17:25:57 20               MR. POLLOCK:  Just ask him if he has

17:25:58 21          read it.

17:25:59 22               MR. CAVALIERE:  I didn't ask for

17:26:01 23          privileged communications.  I just want to

17:26:03 24          know if he is aware of the request for

17:26:05 25          documents that the trustee sent.

BUSHMAN COURT REPORTING

```
17:26:08  1              THE WITNESS:  Am I aware of the
17:26:09  2         request for documents, yes, sir.
17:26:10  3   BY MR. CAVALIERE:
17:26:11  4   Q.    Okay.  And what was the process that you
17:26:14  5   undertook to provide documents in response to the
17:26:17  6   trustee's request for information?
17:26:20  7   A.    I gathered all of the documents that I had.
17:26:24  8   There is a chance that I missed a spreadsheet, and
17:26:27  9   that would be unintentional and -- which I will
17:26:31 10   correct.  And I forwarded all of those to
17:26:39 11   Mr. Pollock.
17:26:40 12   Q.    When you forwarded those documents to
17:26:41 13   Mr. Pollock, did you copy anyone else on that
17:26:44 14   transmission?
17:26:45 15   A.    I did not.
17:27:20 16   Q.    Okay.  And what email addresses do you use in
17:26:50 17   connection with your communications in this case?
17:26:53 18   A.    Oldner r-r at SBC Global.net.  I also --
17:27:01 19   Q.    Any --
17:27:01 20   A.    When Yahoo doesn't work, which is occasionally,
17:27:04 21   but it's better, I also use Michael Oldner, my name,
17:27:10 22   at Gmail.com.
17:27:16 23   Q.    And in looking for documents, you looked at all
17:27:19 24   of your email addresses?
17:27:20 25   A.    Oh, yes, sir.  The only document I would have
```

17:27:23  1    missed, I believe, to the best of my knowledge, is if

17:27:26  2    I missed the spreadsheet that kept up with my loan.

17:27:33  3             All of my emails are contained between

17:27:35  4    those -- all of my communications with anybody is

17:27:38  5    contained between those two.

17:27:41  6             MR. POLLOCK:  And you will send that

17:27:42  7             to me after we are done today?

17:27:44  8             THE WITNESS:  I will go home and send

17:27:46  9             that to you immediately, yes.  That is an

17:27:48 10             accidental --

17:27:50 11             MR. CAVALIERE:  Okay.

17:27:51 12             THE WITNESS:  -- I did not mean to

17:27:52 13             leave that out.  I missed it.

17:27:55 14    BY MR. CAVALIERE:

17:27:56 15    Q.   Okay.  When you signed up for this role as

17:28:00 16    trustee, did you have an understanding as to how long

17:28:03 17    you would be the trustee?

17:28:04 18    A.   Yes.

17:28:13 19    Q.   Okay.  Can you tell us how long you anticipated

17:28:15 20    being the trustee?

17:28:17 21    A.   A couple of years.

17:28:47 22    Q.   Okay.

17:28:20 23    A.   It looks like it's going to be longer than

17:28:22 24    that.

17:28:23 25    Q.   I apologize.  I spoke over you.  Say that

BUSHMAN COURT REPORTING

17:28:26  1   again.  I couldn't hear you.

17:28:27  2   A.    It looks like it's going to be longer than

17:28:29  3   that.

17:29:03  4   Q.    Okay.  In your opinion, if you were to decide

17:28:34  5   to resign as trustee in the future, do you believe

17:28:38  6   you have the power to appoint a successor trustee?

17:28:42  7   A.    I do.

17:28:44  8   Q.    And assuming you're correct in your capacity as

17:28:48  9   a trustee or the Orly Genger Trust, would you accept

17:28:51 10   recommendations of future trustees from Robin

17:28:55 11   Rodriguez or from Sagi Genger?

17:28:58 12   A.    No, I would not, actually.

17:29:01 13   Q.    Okay.  If you were to resign as trustee, would

17:29:06 14   you select a trustee that is an independent person

17:29:10 15   and has absolutely no connection to the bankruptcy

17:29:13 16   case?

17:29:15 17   A.    Absolutely.  I believe that that is my best

17:29:19 18   service in the case, is to be able to be independent.

17:29:22 19   Q.    Thank --

17:29:22 20   A.    And I would want someone else -- if something

17:29:22 21   were to happen to me, or I were to resign, I would

17:29:27 22   want it to be somebody who is independent.

17:29:29 23   Q.    Thank you very much.  Did you sign a document

17:29:33 24   called a Common Interest Privilege Agreement?

17:29:41 25   A.    Rocco, I'm not -- I'm not saying I didn't, but

17:29:46  1   I'm not familiar with it right now.

17:29:49  2                MR. POLLOCK:  If you have a document,

17:29:50  3          Mr. Cavaliere, that you want to show the

17:29:52  4          witness.

17:29:53  5   A.    You know there are so many documents.

17:29:55  6                MR. POLLOCK:  You know what -- let me

17:29:56  7          finish.

17:29:57  8                THE WITNESS:  Can we take a break, so

17:29:58  9          I can walk around?  Can we take a break?

17:30:01 10                MR. CAVALIERE:  Of course we can take

17:30:02 11          a break.

17:30:03 12                THE WITNESS:  Give me a ten minute

17:30:04 13          walk-around; okay?

17:30:06 14                MR. CAVALIERE:  Sure.

17:30:06 15                THE WITNESS:  Just whenever I start

17:30:07 16          talking over people I'm doing the wrong

17:30:10 17          thing; okay?

17:30:11 18                MR. CAVALIERE:  Thank you.

17:30:12 19                   (Six-minute break.)

17:30:12 20                MR. CAVALIERE:  We're back on the

17:30:12 21          record.  I'll ask Mr. Kurland can, if you

17:30:12 22          got the document that I emailed you.

17:36:18 23                MR. KURLAND:  Yes.

17:36:18 24                MR. CAVALIERE:  If you can share that,

17:36:18 25          you know, put that on the screen.

```
17:36:18  1                    MR. KURLAND:  This is the Settlement
17:38:27  2             Agreement, Rocco, just so I have it right?
17:38:28  3                    MR. CAVALIERE:  Yes, the Trump Group
17:38:28  4             Settlement Agreement from 2013.
17:38:29  5             (Exhibit No. 2 was marked.)
17:38:29  6  BY MR. CAVALIERE:
17:38:32  7  Q.     Mr. Oldner, do you see that, do you see a copy
17:38:40  8  of the Trump Group, what I will call the -- well,
17:38:44  9  what is titled the Settlement Agreement and Release
17:38:47 10  document?
17:39:53 11  A.     Yes.
17:38:48 12  Q.     Okay.  Are you familiar with this document?
17:38:53 13  A.     Have I read it, yes.
17:38:55 14  Q.     Okay.  Can you turn to paragraph five of the
17:39:00 15  document.
17:39:16 16  A.     (Witness complies.)
17:39:16 17  Q.     Are you familiar with the indemnification
17:39:17 18  provision of this agreement?  And if you need more
17:39:24 19  time to read it, please just let me know.
17:39:26 20  A.     Keep going down a little bit.  Let me finish
17:39:27 21  it.  (Witness reviews document.)  Okay.
17:39:47 22  Q.     Okay.  What is your understanding of the, the
17:39:52 23  meaning of that provision?
17:39:55 24                    MR. POLLOCK:  Objection; seeks a legal
17:39:56 25             conclusion.
```

17:39:59  1    Q.    You can answer, Mr. Oldner.

17:40:03  2    A.    The explanation of that I would consult with

17:40:07  3    attorneys for.

17:40:10  4    Q.    Okay.  Is it, is it your understanding that the

17:40:14  5    group called the Trump Group has asserted that they

17:40:18  6    have an indemnification right under this Settlement

17:40:22  7    Agreement?

17:40:23  8             MR. POLLOCK:  Objection; seeks a legal

17:40:24  9          conclusion.

17:40:25 10    A.    I would have to get legal --

17:40:27 11             MR. POLLOCK:  I'm just asking him what

17:40:28 12          he knows.

17:40:29 13             THE WITNESS:  I would have to get a

17:40:30 14          legal opinion on that.

17:40:31 15    BY MR. CAVALIERE:

17:40:31 16    Q.    I'm asking if another party, the Trump Group,

17:40:34 17    has, has asserted, factually asserted that they

17:40:38 18    have -- I'm not asking you to weigh in on whether

17:40:41 19    their assertion is correct, or whether they'll

17:40:44 20    ultimately have a right to an indemnity, I'm asking

17:40:48 21    you factually if you know whether the Trump Group has

17:40:48 22    asserted that they have an indemnification right

17:40:54 23    under the Settlement Agreement.

17:41:40 24    A.    Do I know?  No, I do not.

17:41:04 25    Q.    Okay.  Are you aware that Dalia Genger has

17:41:09  1   brought a petition in the Surrogate's Court action to

17:41:13  2   enjoin the Trump Group from making payments in

17:41:17  3   connection with the Trump notes?

17:41:22  4              MR. POLLOCK:  Mr. Cavaliere, is, is

17:41:22  5         that one of the removed Surrogate's Court

17:41:26  6         actions for which there's a status

17:41:28  7         conference on August 12th?

17:41:37  8   BY MR. CAVALIERE:

17:41:37  9   Q.    Mr. Oldner, please answer the question.

17:41:37 10   A.    I don't know what document you're talking

17:41:38 11   about.  I don't know what case you're talking about.

17:41:41 12   Q.    Okay.  So in your capacity as the trustee of

17:41:43 13   the Orly Genger Trust, is it your testimony you're

17:41:47 14   not familiar with Dalia's petition that I just

17:41:50 15   referenced in the Surrogate's Court action?

17:41:53 16   A.    If you will put it in front of me and let me

17:41:56 17   look at it, I will tell you if I am familiar with it.

17:42:37 18              MR. CAVALIERE:  Okay.  I have to find

17:42:03 19         another -- I, I -- there was -- I think

17:42:07 20         there was a Proof of Claim that was

17:42:10 21         circulated by Yann Geron's firm that has

17:42:16 22         the petition attached to it?  Does the

17:42:19 23         reporting company have a copy of that?

17:42:21 24              MR. POLLOCK:  Mr. Cavaliere, when were

17:42:23 25         you talking about something that was

17:42:25  1          circulated?  I don't know what email you're
17:42:28  2          talking about.
17:42:30  3              MR. CAVALIERE:  All right.  Let me see
17:42:32  4          if I can find the Proof of Claim.  I think
17:42:34  5          that's just going to be easier.
17:43:02  6              MR. POLLOCK:  Mr. Cavaliere, is it
17:43:04  7          your contention that the scheduling order
17:43:05  8          permits discovery on the Proof of Claim?
17:43:10  9              MR. CAVALIERE:  I'm not seeking, I'm
17:43:13 10          not seeking an allowance or disallowance of
17:43:18 11          the Proof of Claim.
17:43:19 12              I'm asking questions that could have a
17:43:21 13          bearing on Judge Garrity's determination on
17:43:23 14          a Motion to Dismiss, and I think it's quite
17:43:26 15          relevant, as will be demonstrated to the
17:43:29 16          Court at the appropriate time when an
17:43:31 17          objection is filed to the Motion to
17:43:32 18          Dismiss.  Okay?  Please stop with the
17:43:35 19          question, the objections.
17:43:41 20              MR. POLLOCK:  I have respectfully
17:43:43 21          asked all day long for somebody to spend 30
17:43:46 22          seconds just telling me how any of these
17:43:48 23          topics are relevant to the Motion to
17:43:50 24          Dismiss, and the continued refusal to do so
17:43:54 25          indicates that what you're actually doing

17:43:57  1            is harassing the witness.

17:43:59  2                 I have asked respectfully and

17:44:02  3            repeatedly for a brief proffer.  I would

17:44:04  4            appreciate if you would make one.

17:44:09  5                 MR. CAVALIERE:  I disagree that we're

17:44:10  6            harassing the witness.

17:44:12  7                 Mr. Kurland --

17:44:16  8                 MR. KURLAND:  Yes.

17:44:16  9                 MR. CAVALIERE:  -- if you don't mind,

17:44:16 10            can you share, can you upload that Proof of

17:44:18 11            Claim when you get a chance?

17:44:22 12                 MR. KURLAND:  Yeah, is that -- that

17:44:22 13            was in one of the exhibits that, that Yann

17:44:24 14            circulated; is that right, Rocco?

17:44:28 15                 MR. CAVALIERE:  It is, but I also

17:44:30 16            emailed it to you separately.

17:44:31 17                 MR. KURLAND:  Okay.  I haven't gotten

17:44:31 18            that yet.  Okay.  This is the OG Trust

17:44:31 19            Proof of Claim, though; correct?

17:44:36 20                 MR. CAVALIERE:  Right.

17:44:36 21                 MR. KURLAND:  Okay.  Then, yes, I have

17:44:37 22            that here.  Here you go.

17:44:37 23                 MR. POLLOCK:  If there's an email that

17:44:40 24            Mr. Geron circulated, it would be helpful

17:44:43 25            if you guys would share that with me, so

17:44:46  1            that I can also be on the same page during

17:44:48  2            this deposition.

17:44:48  3            (Exhibit No. 3 was marked.)

17:44:48  4  BY MR. CAVALIERE:

17:44:49  5  Q.    Okay.

17:44:52  6  A.    And which page are you going to?

17:44:53  7  Q.    Well -- all right.  This is the only -- I don't

17:44:54  8  think we need -- there's not going to be any other

17:44:57  9  exhibits that I have, so let's just go through this.

17:44:58 10            MR. CAVALIERE:  If you could go down

17:45:00 11            to -- just go down a little further, until

17:45:04 12            you get to the petition, which is one of

17:45:05 13            the first.  Okay.  So you can stop there.

17:45:09 14  BY MR. CAVALIERE:

17:45:10 15  Q.    Are you, are you familiar -- this is the

17:45:11 16  document I was referring to earlier, Mr. Oldner.

17:45:19 17            MR. POLLOCK:  Mr. Kurland went very

17:45:22 18            fast.  This is a document that's attached

17:45:24 19            to the Proof of Claim?

17:45:26 20            MR. CAVALIERE:  That is correct.

17:45:28 21  BY MR. CAVALIERE:

17:45:30 22  Q.    So, Mr. Oldner, when you have a chance, and

17:45:34 23  when you're ready, Mr. Kurland can scroll down for

17:45:38 24  you.  Have you seen this --

17:45:38 25  A.    Yes, I have seen this document.

17:45:40  1                  MR. POLLOCK:  Let Mr. Cavaliere

17:45:42  2            finish.

17:45:43  3                  THE WITNESS:  I'm sorry.

17:45:45  4                  MR. POLLOCK:  Are you asking about a

17:45:46  5            308 page PDF?

17:45:49  6                  MR. CAVALIERE:  I'm asking about --

17:45:50  7            you asked me to present to you a copy of

17:45:52  8            the petition that I was talking about

17:45:55  9            relating to the Trump Group.

17:45:57 10            So I knew that -- I'm not asking about

17:45:59 11            a review of 300 pages.  I happened to know

17:46:03 12            it was attached to this group of claim, and

17:46:05 13            it's only, I think, like, 10 pages, 12

17:46:09 14            pages long.  So it's pages 7 to -- what is

17:46:19 15            it, 7 to 22.

17:46:25 16  BY MR. CAVALIERE:

17:46:58 17  Q.    So, Mr. Oldner, are you, are you familiar with

17:47:00 18  this document?

17:47:34 19  A.    I have seen this document.

17:47:04 20  Q.    Okay.  And, and what do you understand is being

17:47:09 21  sought as relief in this document?

17:47:13 22                  MR. POLLOCK:  Mr. Cavaliere, to the

17:47:14 23            extent that you're asking him to

17:47:16 24            characterize a 22-page legal document, I

17:47:19 25            object to the question.  You're just

17:47:21  1              badgering the witness at this point.

17:47:23  2                   MR. CAVALIERE:  I'm not badgering the

17:47:23  3              witness at all.  I'm asking him -- he's the

17:47:26  4              trustee of the Orly Genger Trust, and his

17:47:32  5              knowledge as to actions in which he is now

17:47:36  6              a party is important.

17:47:38  7                   So I'm asking him his understanding

17:47:40  8              of, of the relief requested in this

17:47:42  9              petition.

17:47:45 10  BY MR. CAVALIERE:

17:47:45 11  Q.    Can you please answer the question, Mr. Oldner?

17:47:47 12  If you don't know, then just say you don't know.

17:47:51 13                   MR. POLLOCK:  Mr. Cavaliere, his

17:47:53 14              knowledge of legal documents is

17:47:54 15              inextricably linked up with advice of

17:47:59 16              counsel.

17:47:59 17                   It directly elicits privileged

17:48:02 18              communications and, frankly, we're well

17:48:05 19              past seven hours, and now you're asking him

17:48:07 20              about a document that's two years old that

17:48:10 21              is 22 pages long, and you're asking him to

17:48:16 22              explain what's there and what it means?

17:48:18 23                   Furthermore, it appears that what

17:48:21 24              you're actually doing is seeking discovery

17:48:23 25              with respect to the removed actions.

17:48:25  1              Please move along.

17:48:28  2                   MR. CAVALIERE:  That's, that's not

17:48:29  3              what I'm doing, and I, and I assume you're

17:48:33  4              not going to allow Mr. Oldner to answer the

17:48:36  5              question, so.

17:48:37  6                   MR. POLLOCK:  I don't --

17:48:38  7                   MR. CAVALIERE:  I'll ask the following

17:48:39  8              question.

17:48:40  9                   MR. POLLOCK:  I don't know if

17:48:41 10              Mr. Oldner can characterize for us today a

17:48:44 11              22-page legal document, nor do I think that

17:48:47 12              is an appropriate question to be asking a

17:48:50 13              lay witness.

17:48:51 14  BY MR. CAVALIERE:

17:48:55 15  Q.    Mr. Oldner, in your capacity as a, as a trustee

17:48:59 16  of the Orly Genger Trust, to the extent that you can

17:49:04 17  limit the indemnification cost of the Trump Group, do

17:49:11 18  you believe that you have an obligation to do so?

17:49:16 19                   MR. POLLOCK:  Objection.

17:49:18 20  Q.    Please answer the question.

17:49:26 21  A.    May I rephrase the question to make sure I am

17:49:29 22  answering the right one?

17:49:31 23                   MR. POLLOCK:  Actually, Rocco could

17:49:33 24              rephrase it.

17:49:34 25  A.    Could you rephrase it, please?

                         BUSHMAN COURT REPORTING

17:49:38  1    Q.    Do you believe that you have an obligation to

17:49:42  2    attempt to limit the indemnification costs that are

17:49:49  3    being accrued potentially by the Trump Group in

17:49:53  4    contention with the Trump notes?

17:49:56  5                    MR. POLLOCK:  Objection.

17:49:59  6    Q.    You can answer.

17:50:01  7    A.    I would prefer to limit any lessening of the

17:50:06  8    value of those notes, and --

17:50:10  9    Q.    Thank you.

17:50:11 10    A.    You're welcome.

17:50:42 11    Q.    Okay.  I'm sorry I cut you off.  Did you have

17:50:15 12    anything else that you wanted to add?

17:50:17 13    A.    No.  I, I --

17:50:18 14    Q.    Okay.  If the opportunity presents, if the

17:50:21 15    opportunity presented itself in which, in which the

17:50:24 16    Orly Genger Trust would dismiss with prejudice its

17:50:30 17    petition against the Trump Group, such that the

17:50:33 18    monies that are due on the Trump notes would be paid

17:50:36 19    into an escrow account pending further court

17:50:39 20    determination, is that something that you would

17:50:42 21    consider in your capacity as trustee of the Orly

17:50:44 22    Genger Trust?

17:50:45 23                    MR. POLLOCK:  Mr. Cavaliere, I

17:50:46 24          continue to object to this line of

17:50:48 25          questioning.  It is not relevant to the

17:50:51  1           Motion to Dismiss, and --

17:50:52  2                MR. CAVALIERE:  It's most relevant.

17:50:52  3                MR. POLLOCK:  -- it's --

17:50:52  4                MR. CAVALIERE:  It's most relevant.

17:50:56  5           It's most relevant.  It's the trust's --

17:50:57  6           it's the Chapter 7 Trustee's assertion that

17:51:03  7           this is property of the bankruptcy estate,

17:51:03  8           and that property is being depleted because

17:51:07  9           of Dalia Genger's petition, which is now

17:51:11 10           Mr. Oldner's petition, and it's covers

17:51:12 11           property estate, which is governed under

17:51:17 12           Section 541 of the code; okay?

17:51:19 13                And there's numerous, numerous

17:51:20 14           references in the Motion to Dismiss about

17:51:23 15           the $32.3 million, and how that should

17:51:26 16           handle, and there's a number of other

17:51:28 17           reasons why it's relevant.

17:51:29 18                So I would appreciate if Mr. Oldner

17:51:31 19           can answer the question.  It's my last

17:51:34 20           question.

17:51:35 21                And then Mr. Dellaportas, if he's

17:51:36 22           still on, can ask, ask his questions, and

17:51:36 23           anyone else can ask questions, to the

17:51:42 24           extent time permits.

17:51:43 25                MR. POLLOCK:  Let me clarify.  You're

                          BUSHMAN COURT REPORTING

17:51:43 1          asking him if he would consider limiting --

17:51:46 2          I, I don't understand the question, and I'm

17:51:50 3          not sure that he understands your question.

17:53:42 4              MR. CAVALIERE:  Okay.  So why don't we

17:51:53 5          have -- I thought, I thought it was an

17:51:55 6          excellent question.  Why don't we have the

17:51:58 7          reporter read back the question, and then

17:52:00 8          we can determine whether Mr. Oldner

17:52:02 9          understands it.

17:52:03 10     (Court reporter read back the question.)

17:53:15 11             MR. POLLOCK:  Objection to form and

17:53:17 12         many other objections.

17:53:18 13  BY MR. CAVALIERE:

17:53:22 14  Q.    Do you understand the question, Mr. Oldner?

17:54:03 15  A.    Not actually.

17:54:06 16  Q.    Okay.  If the, if the Trump -- if you had an

17:53:31 17  opportunity to limit the indemnification costs by

17:53:40 18  exchanging releases with the Trump Group, or

17:53:45 19  withdrawing that petition, would you consider doing

17:53:49 20  so, as long as you're rights are preserved with the

17:53:53 21  monies to be paid into an escrow account of an

17:53:57 22  independent party?

17:54:00 23  A.    As long as my rights were preserved to the

17:54:03 24  $32.3 million?

17:54:06 25  Q.    That's correct.

17:54:07  1   A.    I would, I would definitely need to discuss

17:54:11  2   that with my attorneys, so it would be something that

17:54:14  3   I would talk over with my attorney.

17:54:19  4   Q.    Okay.

17:54:20  5               MR. CAVALIERE:  I don't have, I don't

17:54:22  6         have any other further questions at this

17:54:25  7         time.

17:54:25  8               As I said earlier, I reserve the right

17:54:28  9         to request that this, you know, ask

17:54:34 10         additional questions at a later date as we

17:54:36 11         receive additional documents that we have

17:54:40 12         been requesting.

17:54:43 13               MR. POLLOCK:  Thank you.  Mr.

17:54:45 14         Dellaportas, did you have -- Mr.

17:54:45 15         Dellaportas, are you still here, and did

17:54:47 16         you have additional questions for the

17:54:48 17         witness?  But please be considerate of the

17:54:52 18         extremely long day that he has already been

17:54:54 19         subjected to.

17:55:38 20               MR. GENGER:  I believe that John had

17:55:38 21         to log off for something else.  This is

17:55:07 22         Sagi Genger speaking.

17:55:08 23               MR. POLLOCK:  I'm sorry.  Can you

17:55:09 24         repeat what you said?

17:55:11 25               MR. GENGER:  I said this is Sagi

```
17:55:12  1            Genger speaking.  I believe my counsel, Mr.
17:55:16  2            Dellaportas, had to leave for something
17:55:18  3            else, and to the extent that his are the
17:55:19  4            only questions remaining, I think that
17:55:23  5            we'll waive our right to questions.
17:55:26  6                 MR. POLLOCK:  All right.  Then we're
17:55:26  7            done for the day.  Thank you, Mr. Oldner,
17:55:26  8            for your patience today.
17:55:26  9                 And extreme thank you to our
17:55:26 10            stenographer, who has been tremendously
17:55:26 11            patient over the course of this deposition,
17:55:26 12            and waved her arms around the best that she
17:55:26 13            could --
17:55:28 14                 MR. BOWEN:  You can stop speaking,
17:55:28 15            that would be appreciated by the reporter.
17:55:28 16            We're off the record everyone.
17:55:50 17        (The deposition was concluded at 5:55 p.m.)
         18
         19
         20
         21
         22
         23
         24
         25
```

```
17:55:52  1              WITNESS' SIGNATURE
17:55:52
17:55:52  2         I, MICHAEL OLDNER, hereby certify that I

17:55:52  3    have thoroughly read the transcript of my deposition

17:55:52  4    taken on the 25th day of June, 2020, and that said

17:55:52  5    transcript and corrections, if any, that appear on

17:55:52  6    the attached errata sheet, are a true and accurate

17:55:52  7    accounting of my testimony given on that day.

17:55:52  8    _____

17:55:52  9    WITNESS
17:55:52
17:55:52 10    _____

17:55:52 11    DATE

17:55:52 12

17:55:52 13    ********************************************************

17:55:52 14
17:55:52       STATE OF          )
17:55:52 15                      )ss.
17:55:52       COUNTY OF         )
17:55:52 16

17:55:52 17         SUBSCRIBED AND SWORN TO before me, a Notary

17:55:52 18    Public in and for the aforesaid county and state on

17:55:52 19    this, the ____ day of _____, 2020.

17:55:52 20

17:55:52 21                          _____

17:55:52 22                          Notary Public
17:55:52
17:55:52 23                          My Commission Expires:
17:55:52
17:55:52 24                          _____

         25
```

```
17:55:52  1                    ERRATA SHEET

17:55:52  2          If there are any corrections to your

17:55:52  3   deposition, indicate them on this sheet of paper,

17:55:52  4   giving the change, page number, line number, and

17:55:52  5   reason for the change.

17:55:52  6   The reasons for making changes are:

17:55:52  7             (1) To clarify the record;

17:55:52  8             (2) To conform to the facts; or

17:55:52  9             (3) To correct major transcription errors.

17:55:52 10   Page number ____Line Number____Reason for change_____

17:55:52 11   Change_____to_____

17:55:52 12   Page number ____Line Number____Reason for change_____

17:55:52 13   Change_____to_____

17:55:52 14   Page number ____Line Number____Reason for change_____

17:55:52 15   Change_____to_____

17:55:52 16   Page number ____Line Number____Reason for change_____

17:55:52 17   Change_____to_____

17:55:52 18   Page number ____Line Number____Reason for change_____

17:55:52 19   Change_____to_____

17:55:52 20   Page number ____Line Number____Reason for change_____

17:55:52 21   Change_____to_____

17:55:52 22   Page number ____Line Number____Reason for change_____

17:55:52 23   Change_____to_____

17:55:52 24                        _____

17:55:52 25                        SIGNATURE OF DEPONENT
```

BUSHMAN COURT REPORTING

```
17:55:52  1              COURT REPORTER'S CERTIFICATE

17:55:52  2   STATE OF ARKANSAS)
17:55:52                     )ss.
17:55:52  3   COUNTY OF SALINE )

17:55:52  4          I, JANESS FERGUSON SMITH, CCR, RPR, a

17:55:52  5   Notary Public in and for Saline County, Arkansas do

17:55:52  6   hereby certify that the facts stated by me in the

17:55:52  7   caption of the foregoing matter are true; and that

17:55:52  8   the foregoing matter was transcribed by me, to the

17:55:52  9   best of my ability and understanding, from my machine

17:55:52 10   shorthand notes taken at the time and place set out

17:55:52 11   in the caption hereto.

17:55:52 12          In accordance with Rule 30(e) of the Rules

17:55:52 13   of Civil Procedure, review of the transcript was

17:55:52 14   requested by the deponent or a party thereto.

17:55:52 15          I FURTHER CERTIFY that I am neither counsel

17:55:52 16   for, related to, nor employed by any of the parties

17:55:52 17   to the action in which this proceeding was taken;

17:55:52 18   and, further that I am not a relative or employee of

17:55:52 19   any attorney or counsel employed by the parties

17:55:52 20   hereto, not financially interested or otherwise, in

17:55:52 21   the outcome of this action.

17:55:52 22          GIVEN UNDER MY HAND AND SEAL OF OFFICE on,
17:55:52      this, the 25th day of June, 2020.
17:55:52 23
17:55:52      _____
17:55:52 24   JANESS FERGUSON SMITH, CCR, RPR
17:55:52      Notary Public for Saline County
17:55:52 25     and Court Reporter.
17:55:52      Certificate Number 453
```