# In the Matter of:
In re: Orly Genger

## Eric D. Herschmann

7/2/2020



3200 COBB GALLERIA PARKWAY

SUITE 265

ATLANTA, GA 30339

```
 1   IN THE UNITED STATES BANKRUPTCY COURT

 2   IN AND FOR THE SOUTHERN DISTRICT OF NEW YORK

 3   --------------------------------------X

 4   In re

 5

 6            ORLY GENGER              Case No.

 7                                     19-13895-jlg

 8

 9   --------------------------------------X

10

11         REMOTE DEPOSITION OF ERIC D. HERSCHMANN

12                 Thursday, July 2, 2020

13                      9:30 a.m.

14

15

16             REMOTE VIDEOTAPED DEPOSITION of

17   ERIC D. HERSCHMANN, taken by the adverse parties in

18   the above-entitled action, pursuant to Notice.

19

20

21

22   REPORTED BY:

23   Marie Foley, RMR, CRR

24   JOB NO.:  93088

25
```

Page 30

1   Q.  Sure. I'll try to speak up.
2       Who appointed Mr. McManus to be president
3 of Claims Pursuit, Inc.?
4       MR. BOWEN: Objection.
5   A.  I don't think anyone needed to appoint
6 him. I think he formed the entity or was counsel who
7 formed the entity. I don't believe there is an
8 appointment under that situation.
9   Q.  Okay.
10      Who's the shareholder of Claims Pursuit,
11 Inc.?
12   A.  The Lily Dor Herschmann 2020 Lifetime
13 Trust.
14   Q.  And who's the grantor of that trust?
15   A.  I am the grantor.
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21   Q.  And who is the trustee?
22      MR. BOWEN: I object to that question.
23   A.  I'm not identifying the trustee. That has
24 nothing to do with this whatsoever.
25   Q.  And what is the basis for your refusal to

Page 31

1 answer that question?
2   A.  Mr. Dellaportas, you have my answer.
3   Q.  Okay. We'll take it up with the court.
4   A.  Okay.
5      MR. DELLAPORTAS: I'd like to next mark as
6 Exhibit EH-1 a document entitled Eric Herschmann's
7 Responses to Sagi Genger's Supplemental Request For
8 Production. I'll e-mail that now.
9      (Pause.)
10     MR. DELLAPORTAS: So everyone should be
11 getting that in a second. And I'm going to stick it
12 on the screen.
13     (EH-1, Eric Herschmann's Responses to Sagi
14 Genger's Supplemental Request For Production, was
15 marked for identification, as of this date.)
16     (The above-referred to exhibit was
17 published.)
18     MR. DELLAPORTAS: So, I'll give it a
19 minute to arrive.
20     THE WITNESS: And what exhibit number is
21 this? Because I have a hard copy, if you tell me.
22     MR. DELLAPORTAS: This is going to be
23 EH-1.
24     THE WITNESS: Okay. Thank you.
25     MR. DELLAPORTAS: So, everyone should

Page 32

1 probably have this by now.
2 BY MR. DELLAPORTAS:
3   Q.  Mr. Herschmann, do you recognize this
4 document?
5   A.  I do.
6   Q.  And is this something that -- let's just
7 go to the last page here.
8     That's your, I guess it's a conformed
9 signature on the last page?
10   A.  Yes, it is.
11   Q.  Okay.
12     And you approved this before it went out?
13   A.  I reviewed it before it went out with my
14 partners.
15   Q.  Okay.
16     And you reviewed each of our -- our
17 supplemental document requests in responding to this
18 in preparing the document?
19     MR. BOWEN: Objection to the form.
20   A.  I did.
21     I should say I reviewed your -- I don't
22 know if I reviewed it in relationship to this, but I
23 reviewed your supplemental document -- supplemental,
24 I guess, Notice of Deposition.
25   Q.  Okay. Fair enough.

Page 33

1     So, I went through your -- the document
2 production I received from, looks like, Mr. Kurland
3 just short of 10 p.m. last night. It has about
4 430-some odd pages.
5     Is that the entirety of the requests that
6 you and the Kasowitz firm intend to make in response
7 to our bankruptcy subpoenas on those two parties?
8     MR. KURLAND: Objection to form.
9   A.  So, you know, Mr. Dellaportas, I know the
10 firm previously gave information. I don't know which
11 subpoenas you're talking about because obviously some
12 have not been served. Some are subject to protective
13 orders.
14     And as you know, you and I have spent a
15 considerable amount of time before Judge Garrity
16 addressing the allegations of criminal conduct
17 associated with Sagi in stealing my personal travel
18 and financial information. And I've made clear in
19 the submissions, and as you clearly know, I've
20 indicated that I will supplement my Motion For
21 Protective Order once Judge Garrity makes the rulings
22 on the investigator's report that you guys have
23 related to me and other issues that are pending
24 before him.
25     So, for now I will tell you that you have

Page 38

1    That's the answer to the question. I've
2 already answered it.
3    Q.  So, if you're withholding a document based
4 on the pendency of your motion before Judge Garrity,
5 is that withholding identified in your objections and
6 responses which you served late last night?
7    A.  I do not understand your question -- your
8 question at all.
9        MR. DELLAPORTAS:  Okay.  I'll ask the
10 reporter to read it back.
11    A.  I heard it.  I just didn't understand it.
12    Q.  What part didn't you understand?
13    A.  Almost all of it.
14        You want to rephrase it so I can
15 understand it?
16    Q.  Sure.
17        I'm trying to figure out if there are
18 documents you withheld on the basis of your pending
19 motion, and if so, what those documents are.
20    A.  You bounced out.  You said "I'm trying to
21 understand," and then I lost you.
22    Q.  Sure.
23        I'm trying to understand if you've
24 withheld documents as on the basis of your pending
25 motion, and if so, what documents are being withheld

Page 39

1 on that ground so I can determine whether or not
2 that's a matter I have to bring before the court.  So
3 if you could do me the courtesy of giving me an
4 answer to that, that would be great.
5    A.  I'm unable to do that, Mr. Dellaportas.
6        I suggest you review the request for
7 production, my responses to them and the objections,
8 the same as to the firm, the Motion For Protective
9 Order, the various letters submitted before Judge
10 Garrity, my indication that I will be supplementing
11 the Motion For Protective Order based on new
12 information as per the court rules.  And you have
13 that.  That's my answer.  It's all contained in
14 there.  There will be a supplemental Motion For
15 Protective Order.
16        I just think we're wasting time versus
17 trying to get to the substance of many of the
18 allegations that are in your Motion to Dismiss.  I'm
19 here ready, willing and able to answer those
20 questions, the deposition that you claimed I was
21 never offered to sit for and which I obviously did
22 and am now sitting.
23        So let's keep going, if you'd like.
24    Q.  Okay.
25        So, again, I did not ask you about your

Page 40

1 supplemental -- whether you intend to make a
2 supplemental Motion For Protective Order.  You can
3 make any motions you want.  I simply asked you to
4 answer my question.
5        Do you intend to supplement your document
6 production, or did we -- or what we got last night,
7 the 400 some-odd pages, is that all of it?  That's my
8 question.
9        MR. BOWEN:  Objection; asked and answered.
10    A.  Mr. Dellaportas, you have my answer.
11    Q.  You're refusing to answer whether or not
12 you intend to supplement your document --
13        MR. BOWEN:  Objection; asked and answered.
14    A.  No.  I've given you my answer, right.
15 I've given you my answer, Mr. Dellaportas.  You have
16 the objections.
17        If you want to address it with the court,
18 we can clearly address it with the court.  That's all
19 I have to say on this topic.
20    Q.  Okay.  Let's go through your requests
21 one-by-one.
22    A.  Okay.
23    Q.  If you could go to page 3 and you see it's
24 the request number 1:  All documents in which you
25 intend to show any witness in connection with this

Page 41

1 case.
2        And you respond:  This request is
3 overbroad, vague and ambiguous and improperly
4 impinges on attorney work product, close quotes.
5        Do you see that?
6    A.  I do.
7    Q.  Is there any document you intend to show a
8 witness in this case that you have not produced?
9        MR. BOWEN:  I object.  It's related to
10 attorney work product, and I'm instructing the
11 witness not to answer it.
12 BY MR. DELLAPORTAS:
13    Q.  Are you going to follow that instruction?
14    A.  I'm going to follow the instruction.
15        I mean, Mr. Dellaportas, is Sagi Genger
16 objecting to the settlement agreement, or is he not
17 objecting to the settlement agreement?
18    Q.  So, Mr. Herschmann, request number 2
19 reads:  All documents which you intend to use at the
20 July 21, 2020 hearing in this case, and at any
21 adjournment thereof, close quote.
22        And you respond:  This request is
23 overbroad, vague and ambiguous and improperly
24 impinges on attorney work product.
25        Do you see that?

Page 42

1   A.  I do.
2   Q.  Is there any document that you intend to
3   use at the July 21, 2020 hearing in this case which
4   you have not produced?
5       MR. BOWEN:  Objection.  Same objection.
6   Same instruction.
7   BY MR. DELLAPORTAS:
8   Q.  Are you going to follow that instruction?
9   A.  I am.
10  Q.  Number 3 reads:  All communications and
11  other documents relating to the entity known as
12  Claims Pursuit, Inc. and/or relating to any trust
13  associated in any way therewith.
14      Do you see that?
15  A.  I do.
16  Q.  And you object to that?
17  A.  Why don't you read my response,
18  Mr. Dellaportas?  And obviously we produced documents
19  to you.  Why don't you read the full response which
20  may help you, especially because I've already told
21  you that I acted as counsel in relationship to Claims
22  Pursuit, Inc.
23      So, if you want to read it, it will tell
24  you the answer.  Plus you have our production.
25  Q.  Did you --

Page 43

1   A.  You just asked me about it.
2   Q.  Please if there's a question pending,
3   answer it.  If there's not a question pending, I do
4   not need your suggestions on what questions to ask.
5   That just elongates the deposition and is really not
6   helpful.
7       So, have you withheld any communications
8   regarding communications you had with the trustee?
9   A.  Are you asking whether or not settlement
10  discussions with the trustee have been produced?
11  Q.  I think my question was clear.
12      MR. BOWEN:  I object to form.
13  A.  If I -- I don't understand your -- I don't
14  understand the question, which is why I asked the
15  clarification.
16  Q.  To the extent --
17  A.  Are you going to tell me --
18  Q.  Sure.
19      To the extent that you as counsel for
20  Claims Pursuit, Inc., or actually in any regard, had
21  communications with the trustee, have those been
22  produced?
23      MR. BOWEN:  Objection to form.
24  A.  I don't know what's been produced in
25  relationship to all the communications with the

Page 44

1   trustee.  But I believe we are following the
2   trustee's request that settlement discussions amongst
3   the trustee and other parties are being considered as
4   privilege for now, and therefore I did not produce,
5   nor do I know if I have any of those documents, but I
6   did not -- I did not produce those documents.
7   Q.  What about --
8   A.  And if it turns out --
9   Q.  Sorry.
10  A.  I lost you, sorry.
11  Q.  Sorry.  I didn't mean to interrupt.  Go
12  on.
13  A.  No, I didn't have anything else.  I didn't
14  hear your question.
15  Q.  Okay.
16      What about documents relating to Claims
17  Pursuit --
18      MR. DELLAPORTAS:  I'm sorry.  Strike that.
19  Q.  What about communications relating to
20  Claims Pursuit, Inc. that you've had with the
21  Broser -- the Broser counsel or the counsel to the
22  Broser entities?
23  A.  I don't know what you're talking about.
24  Q.  Do you understand that in addition to the
25  trustee and Claims Pursuit, Inc., there's a third

Page 45

1   party to the settlement agreement called ADBG?
2   A.  Yes.
3   Q.  And do you understand that that's in some
4   way affiliated with the Broser family?
5   A.  Yes.
6   Q.  And I believe earlier today you testified
7   that counsel to the Brosers was part of the
8   discussions regarding the settlement agreement.
9   A.  That's correct.
10  Q.  So, your communications with the Brosers
11  or the Brosers' counsel regarding matters associated
12  with Claims Pursuit, Inc. or the settlement, were
13  those produced?
14      MR. GARTMAN:  Objection to form.  Gartman.
15  A.  I don't think there are any documents,
16  Mr. Dellaportas.  You're presuming within your
17  question that documents exist that would be between
18  Chris Gartman and myself.  I don't believe documents
19  exist, but if they did, I think they would be subject
20  to a common interest privilege vis-a-vis a settlement
21  agreement, but I don't recall.
22  Q.  And why do you believe that?
23      MR. BOWEN:  Objection to form.
24  A.  You're asking for my legal opinion as to a
25  joint interest privilege?

Page 66

```
 1        MR. BOWEN:  Objection to the form of the
 2  question.
 3     A.    First of all, I don't know what you would
 4  know and not know.
 5        But you have, I believe, responsive
 6  documents to number 16 that are voluminous that go to
 7  the heart of your allegations against me.  I'm
 8  hopeful that we are going to get to those documents
 9  today so we can address whether or not the
10  allegations you have made have any merit.
11     Q.    So can you answer my question?
12        MR. BOWEN:  Objection; asked and answered.
13     A.    You have my answer, sir.
14     Q.    So, let's go to number 20.  Quote:  Any
15  and all invoices -- -- any and all invoices from
16  debtor's law firms for services rendered to the
17  debtor since 2007, and any correspondence regarding
18  those invoices, close quote.
19        Do you see that?
20     A.    I do.
21     Q.    And you raise a series of objections,
22  including, I'll read it:  Herschmann objects to this
23  request because it seeks irrelevant information and
24  to the extent it seeks privileged information.
25  Herschmann further objects to this request because it
```

Page 67

```
 1  seeks information already produced by KBT.
 2  Herschmann has no documents responsive to this
 3  request.
 4        Do you see that?
 5     A.    I do.
 6     Q.    So, you have no access to the bills
 7  prepared by the Kasowitz firm for the debtor?
 8        MR. BOWEN:  Objection to form.
 9     A.    Mr. Dellaportas, first you asked, and I
10  can't believe that this was actually tailored for us
11  because you asked for invoices since 2007, and you
12  know, 'cause it's been disclosed on multiple
13  occasions, that we didn't begin doing any -- I didn't
14  know, obviously, Orly Genger or anything about the
15  Genger family, I never heard of them, til 2014.  So,
16  I presume that that relates to someone else.
17        The firm has already produced to you
18  retainer letters, invoices, wire transfers.  I
19  produced to you in this response check payments
20  related to those bills and invoices, and you have the
21  invoices that are not privileged.
22        So, right, I don't have any other
23  documents other than what you've been provided to
24  that are non-privileged.
25     Q.    And when you add the qualifier
```

Page 68

```
 1  "non-privileged," I note that you did not produce
 2  full invoices, but rather just the cover pages of
 3  each invoice.
 4        Are you taking the position that the
 5  entirety of the invoice, other than the cover page,
 6  is protected by the attorney/client privilege?
 7        MR. BOWEN:  Objection to form.
 8     A.    Mr. Dellaportas, I think you have the
 9  redactions.  I believe invoices that describe legal
10  work that are done for a client, especially as that
11  legal work relates to your client who she's adverse
12  to, are privileged.
13        If you believe they're not privileged,
14  then that's some issue you could take up with the
15  court.  But I don't have those documents.
16     Q.    I'm sorry.  You're not able to access the
17  invoices that were provided to Ms. Genger in
18  connection with legal services for which, for the
19  most part, you operated as lead counsel?
20        MR. BOWEN:  Object to the form of the
21  question and it's argumentative.
22     A.    Mr. Dellaportas, I don't think you
23  understand what I said.
24        I don't have them.  I didn't prepare
25  invoices.  I didn't deal with that aspect of things,
```

Page 69

```
 1  right.
 2        So just so you understand it, the firm has
 3  that.  You've been provided the information.  If
 4  you're asking whether there are detailed invoices
 5  that describe the work done, the answer to that is
 6  obviously yes, like every other law firm in the
 7  world, right.  But that is my answer.  I don't have
 8  the documents.  I don't have access to it, or I
 9  wouldn't even know how to access the system to get
10  access to it.
11     Q.    Okay.
12        And are you here today with regard to the
13  billing matters as the corporate representative, Rule
14  30(b)(6) representative of Kasowitz or only in your
15  individual capacity?
16     A.    I don't know what you mean "billing
17  matters," Mr. Dellaportas.
18        MR. BOWEN:  No, Mr. Herschmann is not
19  designated as the representative of the firm on that
20  topic.
21        MR. DELLAPORTAS:  Okay.  So, we'll -- when
22  we depose the Kasowitz corporate representative on
23  billing matters, we'll -- we'll take it up with them.
24  BY MR. DELLAPORTAS:
25     Q.    But for now, your position is you're
```

Page 274

1  your comments to me are inappropriate, but go ahead.
2       MR. DELLAPORTAS:  Okay.  Well, who knows.
3  It may happen some day.
4  BY MR. DELLAPORTAS:
5       Q.   So, for now, isn't it true that your wife
6  pledged her assets to you and she also pledged her
7  assets to her husband and her husband pledged his
8  assets back to you?  Is that what happened?
9       A.   No.  No.
10      Q.   Okay.
11           What part of that's wrong?
12      A.   Every part of it.
13           MR. DELLAPORTAS:  Okay.  Good.  That's all
14 we got.
15           THE WITNESS:  Okay.  Thank you.
16           MR. KURLAND:  I think Rocco has a couple
17 of questions.
18           THE WITNESS:  Rocco, I'm sorry.  I
19 apologize.  Go ahead.
20           I know we have to let Marie leave in a few
21 minutes.
22 EXAMINATION BY
23 MR. CAVALIERE:
24      Q.   Okay.  Mr. Herschmann, do you recall
25 engaging in discussions with me in connection with

Page 275

1  the agreement that's part of the trustee's motion?
2       A.   Yes.
3       Q.   Were you authorized by Mr. McManus to
4  speak with me to negotiate on behalf of the claims
5  purchaser?
6       A.   I was.
7       Q.   Do you believe the negotiations with me in
8  my capacity as counsel for the trustee were at arm's
9  length and in good faith?
10      A.   Absolutely.
11      Q.   Do you feel that you took advantage of me
12 in the negotiations?
13      A.   Absolutely not.
14      Q.   If you had your preference between the
15 settlement that we reached as part of the trustee's
16 motion or the prior trustee's settlement, which
17 settlement would you prefer?
18      A.   Probably the prior one.  You were much
19 more difficult to negotiate with on many, many
20 details.  But, you know, obviously the settlement is
21 something that I believe is appropriate and should be
22 approved by the court.
23      Q.   If -- if -- this is my last question.
24           If the settlement agreement is approved
25 and the claims purchaser becomes the -- becomes the

Page 276

1  owner of the claims, do you have confidence that the
2  purchaser will exercise appropriate diligence to
3  maximize the value of these claims?
4       A.   Absolutely.
5            MR. CAVALIERE:  Okay.  I have no further
6  questions.
7            MR. DELLAPORTAS:  I just have one more,
8  Mr. Herschmann.
9  FURTHER EXAMINATION BY
10 MR. DELLAPORTAS:
11      Q.   Does the trustee or the trustee's counsel
12 know who the trustee of the Lily Herschmann Trust is?
13           MR. KURLAND:  Objection.
14      A.   I don't -- I don't understand your
15 question, and it has nothing to do with -- it was
16 asked a moment ago.  So I don't know what you mean.
17      Q.   Well, did you or someone associated with
18 you share the identity of the trustee of the Lily
19 Herschmann Trust with either Mr. Cavaliere or Ms.
20 Piazza?
21      A.   You're talking -- you keep saying in two
22 different trusts, and I'm not understanding what
23 you're talking about.
24           Can you, because I can't see you, John,
25 but can you try to ask that again?

Page 277

1       Q.   Yeah, yeah, sure.
2            So, we looked a little bit earlier in the
3  day at a trust agreement for a document called the
4  Lily Dor Herschmann 2020 Lifetime Trust.
5            Do you recall that?
6       A.   I do.
7       Q.   Okay.  And it's a trust agreement made
8  between Eric D. Herschmann as settler and big black
9  redaction mark as trustee.
10           Do you recall that?
11           MR. KURLAND:  Objection.
12      A.   I recall that the trust -- okay.  I recall
13 that there was a redaction of the trustee, yes.
14           What is your question?
15      Q.   So, does the -- does the Chapter 7
16 trustee, Ms. Piazza, or her counsel, Mr. Cavaliere,
17 know the identity of the trustee of the Lily Dor
18 Herschmann 2020 Lifetime Trust?
19      A.   I will say this to you.  I represented to
20 them, and as I've represented to you, that the
21 trustee is not Orly Genger, Arie Genger, Dalia
22 Genger, you, Sagi Genger, anyone associated with the
23 Genger family at all.  But I don't believe they know
24 exactly who the trustee is.
25      Q.   And why did you not feel the need to share

Page 278
1  ==the identity of these with the trustee or her==
2  ==counsel?==
3  ==    A.   What is the relevance of the identities of==
4  ==the trustee as far as Claims Pursuit, Inc. entering==
5  ==into a settlement agreement to pursue the claims when==
6  ==the principal of Claims Pursuit, Inc. is obviously==
7  ==going to pursue those claims?==
8  ==    Q.   Well, Mr. Cavaliere asked you about your==
9  ==level of confidence in Claims Pursuit, Inc.'s either==
10 ==willingness or ability to pursue the claims for which==
11 ==the bankruptcy estate has some contingent back-end==
12 ==interest.  So it would be interesting to know who==
13 ==actually controls the hundred percent owner of Claims==
14 ==Pursuit, Inc. because that person, among other==
15 ==things, could fire the CEO of Claims Pursuit, Inc.,==
16 ==Mr. McManus, and put somebody else in.==
17     ==    So maybe you want to rethink --==
18 ==    A.   Mr. Dellaportas, I guess anything in the==
19 ==world is possible.  Mr. Dellaportas, anything in the==
20 ==world is possible.==
21         I think if you look at the retainer
22  agreement between Claims Pursuit, Inc. and the law
23  firm, you shouldn't be concerned.
24         I think you should be very happy, since
25  you say it has no value, and not that you say you're

Page 279
1  going to object to it, but you sure seem concerned
2  about it, if it has no value, don't worry.  Then the
3  estate will just get $50,000.  And if it has a lot of
4  value, then the estate will get a lot of money and
5  your client will get paid that.
6         You should be happy as could be.  I can't
7  even understand how you could object to this since
8  you say it has no value.  Be happy.  The estate got
9  $50,000.  If all goes well, the estate will get $11
10 million and your client can get paid and everyone
11 else will get paid.
12     Q.   Do you have a lien on the $50,000?
13         MR. KURLAND:  Objection.
14     A.   I didn't understand the question.
15     Q.   Do you take the position that you have,
16 pursuant to the various UCCs and whatnot that you
17 filed, a lien on the $50,000 that Claims Pursuit,
18 Inc. has paid or will pay to purchase these shares?
19         MR. KURLAND:  Objection to the form of the
20 question.
21     A.   Mr. Dellaportas, I didn't even understand
22 your question.
23     Q.   Which part don't you understand?
24     A.   All of it.  I don't understand.
25         You keep asking me these -- you ask a

Page 280
1  question that's incomprehensible and then you ask me
2  which part of the question I don't understand.  I
3  tell you I don't understand the question.  I don't
4  understand the question.
5      Q.   You understand what a lien is, L-I-E-N?
6      A.   I have heard of that term,
7  Mr. Dellaportas.
8          Are you asking me if I understand that
9  what the term "lien" is?  Yes.  If you want to give
10 me a definition of lien.
11         I don't understand what you're asking me.
12 I'm really not trying to be difficult.  It is now 8
13 o'clock at night.  We spent hours and hours talking
14 to me about, you know, going through document
15 requests.
16         I know Marie has to leave now.
17         Is that your last question?
18     Q.   It will be if you answer it.
19     A.   I don't understand your question.  How
20 many times could I tell you the same thing?
21     Q.   Your security interest that you claim
22 pursuant to the UCC that you filed against your wife,
23 do you believe it applies to the $50,000 that is
24 giving to the estate?
25     A.   Mr. Dellaportas, I don't have a belief

Page 281
1  that that is what applied.  I haven't thought about
2  it.  I don't expect to try to get $50,000 back from
3  the estate.  I don't think it's a practical question.
4  I don't even know why you're asking it.
5          If that's going to be your basis to object
6  to the settlement agreement, argue with the Judge
7  Garrity.  Maybe he will find it interesting.
8      Q.   So, are you saying here today that you're
9  going to waive your lien against that $50,000?
10         MR. KURLAND:  Objection.
11     A.   Mr. Dellaportas, I'm not saying to you
12 anything else on this.
13         Mr. Dellaportas, this is the most
14 ridiculous line of questioning I've seen.  It is 8
15 o'clock at night, and this has been predominantly a
16 waste of my time because you didn't want to ask the
17 questions that would prove your allegations are
18 inaccurate.  It's been a waste of a large part of the
19 day.
20         MR. DELLAPORTAS:  Well, the highest
21 ranking levels of the United States Government will
22 have to try to survive this incredibly --
23         THE WITNESS:  Well, yeah.
24 Mr. Dellaportas, I appreciate your great insight.  I
25 want to tell you thank you that Sagi texted me after