# EXHIBIT 17

1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2        _____

3        In re

4        Orly Genger,                        Chapter 7
                                             CASE NO. 19-13895(JLG)
5        Debtor.

6        _____

7                    ORAL DEPOSITION OF MICHAEL OLDNER

8                              May 19, 2021

9                              VOLUME III

10       _____

11

12

13

14

15

16

17

18

19

20

21

22

23                      BUSHMAN COURT REPORTING
                        620 West Third, Suite 302
24                    Little Rock, Arkansas  72201
                            501.372.5115
25

```
 1              ANSWERS AND DEPOSITION OF MICHAEL OLDNER, a

 2  witness produced at the request of the Creditors, was

 3  taken by Zoom in the above-styled and numbered cause

 4  on the 19th day of May, 2021, before Janess Ferguson

 5  Smith, Certified Court Reporter and Notary Public in

 6  and for Saline County, Arkansas, at the Offices of

 7  Bushman Court Reporting, 620 West Third, Suite 302,

 8  Little Rock, Arkansas, at 12:59 p.m.

 9              * * * * * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              MR. BOWEN:  Good afternoon, Mr.
 2         Oldner.  It's good to see you again.  This
 3         is Mike Bowen.
 4              THE WITNESS:  Hello, Mr. Bowen.
 5              MR. HERSCHMANN:  Mike, can we do
 6         appearances -- Mike, let's do appearances.
 7              MR. BOWEN:  Eric, Eric, I will handle
 8         it.
 9              MR. HERSCHMANN:  Okay.
10              MR. BOWEN:  Thank you.  Thanks.
11              This is Mike Bowen.  I'm the counsel
12         or lawyer for the debtor, Orly Genger, in
13         this proceeding, and this is day number
14         three, a continuation of your deposition.
15              I'd like to have the witness placed
16         under oath again, and then we'll do
17         notices, or appearances for everybody.
18         Okay?
19              MICHAEL OLDNER,
20    the witness hereinbefore named, having first been
21    duly cautioned and sworn or affirmed to tell the
22    truth, the whole truth and nothing but the truth,
23    testified as follows:
24              MR. BOWEN:  All right.  So I put my
25         appearance on the record.  Eric, you want
```

1    Q.    Wasn't that at the same meeting, same day?

2    A.    I don't remember.

3    Q.    Who gave you the one-page releases?

4    A.    Sagi Genger.

5    Q.    So he gave you four pieces of paper; right?

6    A.    That I remember, yes.

7    Q.    So there was one release.  It was a one-page

8    document, and it was for Dalia Genger.  Do you

9    remember that?

10   A.    Yes, sir.

11   Q.    It was a one-page document that was a release

12   for both Sagi Genger and Elana Genger.  Do you recall

13   that?

14   A.    Yes, sir.

15   Q.    And then there was a one-page release for TPR;

16   correct?

17   A.    Yes, sir.

18   Q.    And then there was a fourth one-page release

19   for David Parnes; right?

20   A.    Yes, sir.

21   Q.    Were there any other written releases that you

22   signed that same day?

23   A.    Not that I remember.

24   Q.    But do you have a specific memory that there

25   were only four pieces of paper, or were there more

1   than four piece of paper that you signed that day?

2   A.    I don't remember.

3   Q.    To your knowledge who drafted the releases?

4   A.    I don't know.

5   Q.    You did not draft them; correct?

6   A.    I did not.

7   Q.    And no lawyer working for you drafted these

8   releases; correct?

9   A.    That is correct.

10  Q.    With whom did you discuss these releases before

11  you signed them?

12  A.    I don't remember.

13  Q.    Is it your testimony that you did discuss them

14  with someone; you just don't remember who?

15  A.    My testimony is I don't remember.

16  Q.    So you may or may not have discussed the

17  releases with anyone; is that your testimony?

18  A.    I don't --

19              MR. POLLOCK:  Objection --

20  A.    -- remember.

21              MR. POLLOCK:  Asked and answered.

22  Q.    What did you do with the releases after you

23  signed them?

24  A.    I don't remember.

25  Q.    Well, you signed them in front of a notary;

1            What did you get in exchange for the Orly

2    Genger Trust for giving Dalia Genger a release?

3    A.    For signing that release, I got Sagi's full

4    cooperation in pursuing in the minutiae and the

5    detail of the Orly Genger litigation saga in pursuing

6    the recovery of the $32.3 million that was

7    fraudulently transferred away from the trust.

8    Q.    Where is that document?

9    A.    What document?

10   Q.    Where is it documented that in exchange for

11   releasing Dalia Genger you got a promise from Sagi

12   Genger to assist the trust in all of the minutiae of

13   pursuing some other claim?

14   A.    Since that has been signed, Sagi has cooperated

15   through his attorney with my attorney to assist in

16   the recovery of that money in every way.  It has been

17   done.  It continues to be done.

18   Q.    Is there a document that reflects that in

19   exchange for giving the release to Dalia Genger the

20   Trust got in return a promise or an obligation from

21   Sagi Genger to assist the Trust?

22            MR. POLLOCK:  Objection.

23   Q.    You can answer.

24            MR. POLLOCK:  Object to form, for the

25            record.  You can answer, if you --

BUSHMAN COURT REPORTING

1  A.    No.

2  Q.    So that's -- that wasn't written down anywhere?

3  A.    No.

4  Q.    How did you come to have the understanding that

5  Sagi was promising to help the Trust if the Trust

6  gave the release to Dalia Genger?

7  A.    I don't remember.

8           MR. POLLOCK:  Objection to form also.

9  Q.    What conversations have you had with Sagi

10 Genger about releasing Dalia Genger?

11 A.    Would you free, would you rephrase that in a

12 way I can answer it, please.

13 Q.    Certainly.  What conversations have you had

14 with Sagi about releasing Dalia Genger?

15 A.    I don't remember any conversations.

16 Q.    You don't remember any conversations at all?

17 A.    No.

18 Q.    Well, did you have a conversation with him on

19 the day that you were both at Munsch Hardt offices in

20 Texas about the releases?

21 A.    Yes.

22 Q.    What was that conversation?

23 A.    I don't remember.

24 Q.    You don't remember anything about it?

25 A.    I do not.

1               MR. POLLOCK:  Objection to form.

2    A.    That is --

3    Q.    You can answer.

4               THE WITNESS:  May I answer the

5         question, Adam?

6               MR. POLLOCK:  Yes, if you can.

7               THE WITNESS:  Yes, that was my

8         understanding.

9    BY MR. BOWEN:

10   Q.    And that's the same commitment or promise that

11   you testified about a moment ago that was not

12   reflected in any writing; is that right?

13   A.    That is correct.

14   Q.    What relationship did Elana Genger have to the

15   Orly Genger Trust?

16   A.    I have no idea.

17   Q.    Do you have any idea how it is that the Orly

18   Genger Trust could have had any conceivable claim

19   against Elana Genger?

20   A.    I certainly do not.

21   Q.    And it wasn't your idea to include her in the

22   release; right?  It was Sagi Genger's idea to do

23   that?

24   A.    It was not my idea.

25   Q.    Do you know if it was Sagi's Genger's idea, if

1    you know?

2    A.    I do not.

3    Q.    Well, if it wasn't Sagi Genger's idea, whose

4    idea was it?

5    A.    It was not mine.  I have no idea who came up

6    with the idea.

7    Q.    And you never asked anyone why Elana Genger was

8    getting a release?

9    A.    No.

10   Q.    What relationship did Sagi Genger ever have

11   with the Orly Genger trust?

12   A.    What, what do you mean by "relationship"?

13   Q.    Well --

14   A.    I'm not trying to be evasive, just what do you

15   mean?

16   Q.    Let me ask you this way.  I'll withdraw that

17   question.

18   A.    Sure.

19   Q.    What did you do, if anything, to determine

20   whether or not there were claims that the Orly Genger

21   Trust potentially had against Sagi Genger?

22   A.    Back to my earlier answer, and it applies to

23   everybody, there's a copious amount of information,

24   cases that have been ruled upon, cases that have been

25   opened, closed.

1   Q.    By the time you got this in writing on

2   August 15, 2019, had you already done all of the due

3   diligence that you wanted to do in order to determine

4   whether or not the Trust had any claims against Sagi

5   Genger and/or Elana Genger?

6   A.    Yes.

7   Q.    So when did you first have the idea that you

8   should, or that you might release Sagi Genger and

9   Elana Genger?

10  A.    I don't remember.

11  Q.    Well, you're saying it was sometime before

12  August 15, 2019; right?

13  A.    It could not have been after August the 15th.

14  Q.    Right.  So the first time that you saw this

15  release in writing was on August 15, 2019; correct?

16  A.    To my best recollection.

17  Q.    And, and you signed it that same day; right?

18  A.    That's my handwriting.  That's the date.

19  Q.    And then you gave it to somebody else.  You

20  don't remember who right?

21  A.    I don't remember who.

22  Q.    So you certainly didn't do any due diligence to

23  determine whether there were any claims that the

24  Trust might have against Sagi Genger and Elana Genger

25  after you saw this release in writing; correct?

1   A.     Not to my recollection.

2   Q.     So to the extent that you did do due diligence

3   as to whether or not the Trust had any potential

4   claims against Sagi Genger and/or Elana Genger, you

5   did it sometime before August 15th, 2019, and after

6   you first had the idea of giving a release to them;

7   right?

8   A.     That would be a logical conclusion.

9   Q.     And you can't tell us under oath when you first

10  had the thought or somebody communicated to you the

11  thought that the Trust should release Sagi Genger and

12  Elana Genger; right?

13               MR. POLLOCK:  Objection; asked and

14          answered.

15  Q.     Is that right?

16  A.     Please ask the question again.

17  Q.     You don't remember when you first thought or

18  somebody communicated to you the thought to give a

19  release to Sagi Genger and/or Elana Genger; right?

20               MR. POLLOCK:  Objection.

21  A.     I do not.

22               MR. POLLOCK:  Asked and answered.

23  Q.     So that may have been back in June when you

24  first became the trustee, or sometime thereafter, but

25  before August of 2019; right?

1   A.    Can we go to the bathroom, is what he's asking.

2   Q.    We'll take a break.

3   A.    Yeah.

4           MR. POLLOCK:  Thank you.

5           MR. HERSCHMANN:  How long are we

6        breaking?  Are we taking -- how long are we

7        taking, guys?

8           MR. BOWEN:  Whenever they get back,

9        five minutes, whatever.

10          MR. HERSCHMANN:  Okay.  All right.

11             (Nine-minute break)

12  BY MR. BOWEN:

13  Q.    All right.  So can you just read to me, Mr.

14  Oldner, the Bates number at the bottom of the first

15  page you have there?

16  A.    I'm looking at OGT 00005908.

17  Q.    Okay.  Fine.

18  A.    Okay.

19  Q.    Yeah.  Now in that package of material there

20  were three sets of these four releases.  Do you

21  recall that you kept three copies of each release?

22  A.    I don't recall.

23  Q.    Okay.  All right.  Now when, the day that you

24  signed this in the Munsch Hardt offices on

25  August 15th, 2019, you never, you never asked anybody

1  to type this up, did you, any one of these release?

2  A.    No, sir.  No, sir.

3  Q.    You didn't ask for any changes to be made to

4  any of these releases; right?

5  A.    Excuse me one moment.

6          MR. POLLOCK:  Objection; outside of

7          Exhibit A.

8  A.    Thank you.  May I answer the question.

9  Q.    Yes.

10 A.    I don't -- please restate.

11 Q.    Did you ask anybody to make any changes after

12 you saw it in writing?

13 A.    Not that I remember.

14 Q.    Now if you flip past that first page that you

15 just read, go to the second page, you'll see that's a

16 release for Dalia Genger.

17 A.    Yes, sir.

18 Q.    Then go to the next one and you'll see a

19 release for TPR.

20 A.    TPR, yes sir.

21 Q.    This is also a release for TPR and D&K --

22 excuse me, D&K GP, LLC, for all of their officers,

23 directors, subsidiaries, et cetera.  Do you see that?

24 A.    Yes, I do.

25 Q.    And you understood what TPR was at the time you

1  signed this release?

2  A.    I did.

3  Q.    And you understood what D&K GP, LLC was; right?

4  A.    I believe that I did.

5  Q.    And you knew at this time that Sagi Genger was

6  in charge and operating TPR, and he was in charge and

7  operating D&K GP; correct?

8  A.    I believe that to be correct.

9  Q.    Now what was your understanding of what

10  potential claims the Orly Genger Trust may have had

11  or may have against either one of those corporate

12  entities?

13  A.    I don't remember.

14  Q.    Did you ever have any understanding of what

15  potential claims the Trust may have had?

16  A.    Yes.

17  Q.    And that was based on your general review of

18  the litigations that you have already testified

19  about?

20  A.    Yes, sir.

21  Q.    Was it based on anything else?

22  A.    That would be speculating, but I don't

23  remember.

24  Q.    What -- to your understanding at the time you

25  signed this release, what is TPR?

1   A.      A company owned by Sagi.

2   Q.      What was the nature of that company?

3   A.      I don't recall.

4   Q.      What, what kind of business was it in?

5   A.      I don't recall.

6   Q.      And what did you understand about the entity

7   D&K GP?

8   A.      I don't remember.

9   Q.      Do you remember anything about D&K?

10  A.      Yes.

11  Q.      What?

12  A.      It had something to do with the note that

13  funded the Trust, I believe.

14  Q.      So you recall that the Orly Genger Trust was

15  indebted to D&K?

16                  MR. POLLOCK:  Objection outside of the

17                  scope of Exhibit A.

18  Q.      Is that correct, Mr. Oldner?

19                  THE WITNESS:  Adam, do I answer the

20                  question?

21                  MR. POLLOCK:  You can answer the

22                  question, and then I am confident that

23                  given that Mr. Bowen already asked

24                  extensive questions about the indebtedness,

25                  including on page 203 of the transcript,

1            that he will move on.

2                THE WITNESS:  Very well, well Mr. Bow

3            would you please ask the question again.

4    BY MR. BOWEN:

5    Q.    So you understood at the time that you were

6    signing this release that the Orly Genger Trust was

7    indebted to D&K?

8                MR. DELLAPORTAS:  Objection; leading.

9                MR. POLLOCK:  Objection to form.

10   A.    I don't remember.

11   Q.    Were you aware that D&K had signed its debt, or

12   the debt that it held for the Orly Genger Trust to

13   another entity, the Robin Rodriguez entity?

14               MR. POLLOCK:  Mr. Oldner, don't answer

15           the question.  I'll direct you not to

16           answer.

17               Mr. Bowen, you had a full day to ask

18           about the debt and the Robin Rodriguez.

19           We're not here for that.  That's outside

20           the scope of Exhibit A.  Move on, please.

21               MR. BOWEN:  I'm not, I'm not going to

22           debate this with you.

23               MR. POLLOCK:  That's fine.

24               MR. BOWEN:  We have a release --

25               MR. POLLOCK:  Very good.

BUSHMAN COURT REPORTING

1              off the air conditioning.  It's one of the

2              two.

3                      MR. CULLEN:  Be louder.

4                      THE WITNESS:  Pardon me?

5                      MR. CULLEN:  Be louder.

6                      MR. BOWEN:  I'll be louder.

7                      THE WITNESS:  Okay.  I'll yell.

8                      MR. BOWEN:  All right.

9    BY MR. BOWEN:

10   Q.    So the question is did you understand that D&K

11   had transferred, or was going to transfer, the debt

12   that it held against the Orly Genger Trust to

13   Manhattan Safety, a Robin Rodriguez entity at the

14   time that you executed the release of D&K?

15                      MR. POLLOCK:  Objection to form.

16   A.    Not that I recall.

17   Q.    And if you go to the next page in that packet,

18   towards the back you'll see a release given by the

19   Trust and your signature, David Parnes.  Do you see

20   that?

21   A.    I do.

22   Q.    What claims did the Trust have or may have had

23   back then to David Parnes?

24   A.    None that I was aware of.

25   Q.    What relationship did David Parnes have to the

1    Trust?

2    A.    I don't recall.

3    Q.    Are you aware he was the trustee for the Orly

4    Genger Trust at some point in time?

5    A.    I don't remember.

6    Q.    Did you ever have any discussions with

7    Mr. Parnes about the Orly Genger Trust?

8    A.    Not that I recall.

9    Q.    Well, did Mr. Parnes ask you for this release?

10    A.    I don't remember.

11    Q.    Was this also requested by Sagi?

12    A.    I don't remember.

13    Q.    Now if you look at this relies, you will see at

14    the top it reads, For and in consideration of ten

15    dollars and other good and valuable consideration the

16    receipt of which is hereby acknowledged.

17            Do you see that at the top?

18    A.    I do.

19    Q.    And, you know, that, that was on each of the

20    four releases we've been talking about today.  Do you

21    see that?

22    A.    I do.

23    Q.    Did you get $10 from somebody?

24    A.    I don't remember.

25    Q.    You don't remember anybody handing you $10 for

```
 1              question about whether you reached out to
 2              the bankruptcy trustee.
 3                   THE WITNESS:  Which bankruptcy trustee
 4              would that be, the one in Texas --
 5                   MR. POLLOCK:  I think --
 6                   THE WITNESS:  -- or the one in New
 7              York?
 8                   MR. BOWEN:  The one --
 9                   MR. POLLOCK:  I think he was asking if
10              you met with the one in Texas, or if you or
11              your --
12                   MR. BOWEN:  Whichever one.
13                   MR. POLLOCK:  Did you ask about the
14              lawyer also?
15   BY MR. BOWEN:
16   Q.    Whichever one.  It doesn't matter.
17   A.    Okay.
18   Q.    Did you reach out to any trustee for the
19   bankruptcy estate?
20   A.    Concerning the releases?
21   Q.    Correct.
22   A.    No.
23   Q.    Were you informed that there was an automatic
24   stay in place that prohibited anybody from taking any
25   action which may affect the legal rights of Orly
```

1  again.  I'll answer it.

2  Q.    Even though you knew there was a bankruptcy

3  going on, and you saw the general releases that you

4  were signing, each one of the four, you did nothing

5  to contact the bankruptcy trustee; correct?

6            MR. POLLOCK:  Objection; asked and

7            answered.  Outside of the scope of Exhibit

8            A.

9  A.    That mischaracterizes, but I did not contact

10  the trust, the bankruptcy trustee.

11  Q.    How does it mischaracterize?

12  A.    It makes it sound like I am trying to do

13  something that is not above board.

14  Q.    But you --

15  A.    The implication is -- pardon me?

16  Q.    I'm sorry.  Go ahead.

17  A.    No, please.

18  Q.    You said it made it sound like it's something

19  not above board, the implication is --

20  A.    Yes.

21  Q.    -- what?

22  A.    The, the implication is, is that I have done

23  something surreptitiously.  I did not.

24  Q.    Right.  I don't mean to suggest that you were

25  intentionally doing something wrong, but it just

BUSHMAN COURT REPORTING

1    Q.    Yes.  It's literally the front page.

2    A.    Okay.

3    Q.    Do you se --

4    A.    You don't have to put it up there.  I've got

5    it.

6    Q.    Okay.  There's an email -- there's a gray bar

7    on top.  It looks like an email from you to Sagi

8    Genger dated June 10, and you are attaching these

9    bylaws and all of these form documents that were

10   filled out for Recovery Effort.  Do you see that?

11   A.    Yes, sir.

12   Q.    Underneath it it's forwarding an email from

13   Sanga Aguayo, A-g-u-a-y-o, and that's from her to you

14   with a subject line that says, "Completed filing for

15   Recovery Effort Inc.," and the date is June 6th,

16   2019.

17          And that text reads, quote, Dear Michael,

18   thank you for choosing CorpNet.com as your legal

19   document filing service.

20          This is a courtesy email to let you know

21   that your business entity for Recovery Effort Inc.

22   has been successfully created and filed as of 6,

23   slash, 04, slash, 2019 in the State of Arkansas,

24   closed quote.

25          Does this refresh your recollection, Mr.

BUSHMAN COURT REPORTING

1    Oldner, that you did create Recovery Effort Inc. on

2    June 4, 2019?

3    A.    Mr. Bowen, I told you earlier I did not create

4    Recovery Effort Inc.  Do you remember, do you

5    remember that?

6    Q.    Yes, sir, I do.  And I'm asking you --

7    A.    Okay.

8    Q.    -- does this --

9    A.    I did not --

10   Q.    -- refresh your recollection?

11   A.    I did not create Recovery -- no, it does not.

12   I did not create Recovery Effort Inc.

13   Q.    Did you receive this email?

14   A.    It looks like I sent this email.

15   Q.    Well, the email below is from Sonja Aguayo to

16   you.

17   A.    Yes.

18   Q.    Did you receive that email from her?

19   A.    I did.

20   Q.    And why was she sending you an email, to your

21   knowledge, reporting that your business entity,

22   Recovery Effort Inc., has been successfully created

23   and filed as of June 4, 2019?

24           MR. DELLAPORTAS:  Objection; calls for

25              speculation?

1              MR. POLLOCK:  Same objection.

2    A.    I have, I have no clue.

3    Q.    So your testimony is you had nothing to do with

4    creating Recovery Effort Inc. or hiring CorpNet.com

5    to file documents to recreate Recovery Effort Inc.;

6    is that right?

7              MR. POLLOCK:  Objection; asked and

8              answered, outside the scope of Exhibit A.

9              MR. DELLAPORTAS:  Objection; leading.

10   Q.    Is that right, Mr. Oldner?

11   A.    Please ask the question again.

12             MR. POLLOCK:  I'm sorry --

13   Q.    Your testimony is that you don't have any --

14   you don't -- let me put it this way.  You don't have

15   any explanation for why this email was sent to you on

16   June 6th, 2019, stating that, quote, Your business

17   entity for Recovery Effort Inc. has been successfully

18   created, closed quote, June 4 with the state of

19   Arkansas; right?

20             MR. POLLOCK:  Objection; asked and

21             answered.  Outside the scope of Exhibit A.

22   Q.    Answer the question, Mr. Oldner.  Do you have

23   any explanation for this email?

24   A.    I do not know why -- I do not know how this

25   happened.  I can tell you that.  Anything else is

1   speculation and guesswork.

2   Q.   But you never -- let me ask this.  You never

3   hired CorpNet to file paperwork to create the

4   business entity Recovery Effort Inc.; is that right?

5              MR. POLLOCK:  Mr. Bowen, you asked all

6              of these questions on page 359 of the

7              transcript.

8              MR. BOWEN:  That's not true.  I didn't

9              have these documents, and this is pointing

10             out something that Mr. Oldner testified

11             about last time without having the benefit

12             of this document.  And I'm asking --

13             MR. POLLOCK:  He's giving you --

14             MR. BOWEN:  -- him to reconcile.

15             MR. POLLOCK:  -- the same testimony.

16             MR. BOWEN:  I'm asking him to

17             reconcile his testimony that he had nothing

18             to do with creating Recovery Effort Inc.

19             with this document, which looks like he

20             did.

21   BY MR. BOWEN:

22   Q.   Mr. Oldner, do you have any explanation for

23   that?

24   A.   Yes.  I've told you, I did not create Recovery

25   Effort Inc., period.  Anything else, you speculate

1   on.  I don't know.

2   Q.   So you just have no explanation -- you can't

3   explain this email at all --

4                MR. POLLOCK:  Objection --

5   Q.   -- is that correct?

6                MR. POLLOCK:  -- harassing; asked and

7                answered.

8                MR. BOWEN:  I just want to clarify Mr.

9                Oldner's testimony.

10  Q.   Mr. Oldner, you have no explanation for this

11  email; is that correct?

12               MR. POLLOCK:  You asked him that,

13               like, ten times now, Michael, both a year

14               ago, and again today.

15               MR. BOWEN:  But you keep interrupting,

16               Mr. Pollock.  If I get a clean answer, I

17               can move on.

18               MR. POLLOCK:  He --

19  BY MR. BOWEN:

20  Q.   Mr. Oldner, you have no explanation for this

21  email, but you don't deny that you received it; is

22  that correct?

23               MR. POLLOCK:  Objection; asked and

24               answered, compound, outside the scope of

25               Exhibit A.

1   Q.    Is that correct, Mr. Oldner?

2   A.    Is what correct?

3   Q.    That you have no explanation for this email

4   that's on this first page from Sonja Aguayo, but you

5   don't deny that you received it --

6           MR. POLLOCK:  Objection.

7   Q.    -- on or about June 6th, 2019; correct?

8           MR. POLLOCK:  Objection; compound,

9       asked and answered, outside of the scope of

10      Exhibit A.

11  Q.    Is that correct?

12  A.    May I answer?

13  Q.    Yes.

14          THE WITNESS:  Adam?

15          MR. POLLOCK:  Sure.

16          THE WITNESS:  Okay.

17          MR. POLLOCK:  You've answered, like,

18      ten times already.

19          THE WITNESS:  This will be my last

20      time.  I did not send this email.  I did

21      not set this process in motion.

22          I did not discuss this.  I did not

23      create the company.  Nor did I participate

24      in its creation.  I received this email.

25

1              MR. POLLOCK:  No.

2              MR. BOWEN:  -- that I'm asking to ask

3         on this document.

4              MR. POLLOCK:  No.

5              MR. BOWEN:  Can we just do it that

6         way, so Mr. Oldner doesn't have to have the

7         question repeated --

8              MR. POLLOCK:  You don't --

9              MR. BOWEN:  -- three times.

10             MR. POLLOCK:  You don't need to keep

11        asking the same questions again, and

12        again --

13             MR. BOWEN:  I'm not asking --

14             MR. POLLOCK:  -- and again.

15             MR. BOWEN:  -- the same question.  I'm

16        breaking it down --

17             MR. POLLOCK:  Great.

18             MR. BOWEN:  -- like he asked me to do.

19             MR. POLLOCK:  Please do.

20             MR. BOWEN:  I'm taking it step by

21        step.

22             MR. POLLOCK:  Great.  Please do.

23   BY MR. BOWEN:

24   Q.   So the next question, Mr. Oldner, is although

25   this email says, Thank you for choosing CorpNet as

```
 1   your legal document filing service, closed quote, you

 2   never hired CorpNet.com with respect to Recovery

 3   Effort Inc.; correct?

 4               MR. POLLOCK:  Objection; outside of

 5          the scope of Exhibit A, and asked and

 6          answered.  Now --

 7   Q.   Is that --

 8               MR. POLLOCK:  -- Michael Oldner.

 9   Q.   -- correct?

10               THE WITNESS:  Now I may answer the

11          question?

12               MR. POLLOCK:  Yes.

13               THE WITNESS:  I did not create this

14          business.

15   BY MR. BOWEN:

16   Q.   I'm asking whether you ever hired CorpNet.com

17   in connection with Recovery Effort Inc.  That's all

18   I'm asking?

19   A.   I did --

20               MR. POLLOCK:  Object --

21   A.   -- not.

22               MR. POLLOCK:  Michael Oldner, you've

23          gotta let me --

24               THE WITNESS:  Ugggg.

25               MR. POLLOCK:  Objection; asked and
```

1              answered.  Objection to form, outside of
2              the scope of Exhibit A.
3                   Now Michael Oldner, answer his
4              question, please.
5                   THE WITNESS:  I did not hire CorpNet.
6     BY MR. BOWEN:
7     Q.    And although this email from Sonja Aguayo says,
8     This is a courtesy email to let you know that your
9     business entity, Recovery Effort Inc., has been
10    successfully created and filed, closed quote, you
11    never created Recovery Effort, and it's not your
12    business entity as of June 6th, 2019; correct?
13                 MR. POLLOCK:  Objection to form; asked
14             and answered, compound, outside the scope
15             of Exhibit A.
16                 MR. DELLAPORTAS:  Calls for
17             speculation as well.
18    Q.    Is that correct?
19    A.    Please break that down in to individual
20    questions for me.
21    Q.    Well, your testimony is that Sonja Aguayo is
22    mistaken, or wrong, when she says that Recovery
23    Effort is, quote/unquote, your business entity.
24    Correct?
25                 MR. POLLOCK:  Objection to form;

1            misstates the testimony.

2    A.    My testimony is, is that I did not, I did not

3    hire CorpNet to create this company.  I did not pay

4    them to create this company.  I was not involved --

5    Q.    Do you know who --

6    A.    -- in the creation.  Go ahead.  I was not

7    involved with the creation of the company.

8    Q.    Well, do you know who did hire them and pay

9    them?

10   A.    I do not.

11   Q.    Do you have any explanation for why this email

12   was sent to you on June 6th, 2019?

13   A.    Everything I would have would be a guess.

14   Q.    Okay.  Did you respond to this email by saying

15   to Ms. Aguayo, I don't know what you're talking

16   about.  Why are you sending me this email?

17            MR. POLLOCK:  Objection to form,

18            outside of the scope of Exhibit A.

19   A.    Not that I recall.

20   Q.    Then if you look at the top of this page, you,

21   then, forward this four days later to Sagi Genger

22   with all of these attachments for Recovery Effort;

23   right?

24   A.    That is correct.

25   Q.    And we're not going to take the time for this,

1    but if you'll look at those attachments, those

2    attachments indicate that the director and the sole

3    owner of Recovery Effort Inc. is the Orly Genger 1993

4    Trust.  Did you know that on June 10th when you sent

5    this to Sagi Genger?

6    A.    I don't remember.

7    Q.    Why did you send it to Sagi Genger forwarding

8    Sonja Aguayo's email June 6th, along with all of

9    these attachments about Recovery Effort.

10   A.    I would have to speculate.

11   Q.    So you have no testimony you can give us about

12   that; correct?

13   A.    Not that I recall.

14   Q.    Okay.  So let me ask just a few, few more

15   questions, and then I'm done.

16          The last time that you testified, you did

17   not remember that you gave general releases to David

18   Parnes and to TPR and D&K; right?

19          MR. POLLOCK:  Objection to form;

20          mischaracterizes the testimony, outside of

21          the scope of Exhibit A.

22   Q.    Is that true, Mr. Oldner, you had just

23   forgotten about those releases?

24          MR. POLLOCK:  Objection to form;

25          mischaracterizes the testimony.

BUSHMAN COURT REPORTING

```
 1                    MR. HERSCHMANN:  Mr. Pollock, Mr.
 2               Bowen addressed this earlier today.  I'm
 3               not wasting time.  This will take two
 4               minutes it you will stop being an
 5               obstructionist.
 6                    MR. POLLOCK:  I'm not being an
 7               obstructionist.  I'm asking you a direct
 8               question --
 9    BY MR. HERSCHMANN:
10    Q.    Mr. Oldner --
11                    MR. POLLOCK:  -- and you won't answer.
12    BY MR. HERSCHMANN:
13    Q.    Mr. Oldner, do you see the 801 Pleasant Valley
14    Drive, Number 16, Little Rock, Arkansas 72227 on
15    Bates 5639.  Do you see that, sir?
16    A.    Mr. Herschmann --
17                    MR. POLLOCK:  Objection, outside the
18               scope of Exhibit B.
19    Q.    You can answer the question, Mr. Oldner.
20    A.    Will you remove that?
21    Q.    Do you see that?
22    A.    I want that down.
23    Q.    Mr. Oldner, do you see that?
24    A.    Would you remove the document?
25    Q.    Mr. Oldner, do you see that address?
```

BUSHMAN COURT REPORTING

1   A.      Would you remove the document?  I have it in my

2   hand.

3   Q.      Okay, yeah, so we can remove the document.

4   A.      Thank you.

5   Q.      Are you familiar with that address?

6               MR. POLLOCK:  Objection.

7   Q.      Whose address is that, sir?

8               MR. POLLOCK:  Objection.

9   A.      Are you going to remove the document?

10              MR. HERSCHMANN:  Yes.  John, can you

11          still remove the document?

12              THE WITNESS:  Thank you.

13  BY MR. HERSCHMANN:

14  Q.      Sorry, Mr. Oldner.  Whose address is this?

15  A.      That is mine.

16  Q.      Do you have any explanation how your personal

17  home address ended up on that document --

18              MR. POLLOCK:  Objection.

19  Q.      -- for an entity in which you say you had no

20  involvement in creating.

21              MR. HERSCHMANN:  Adam, I didn't finish

22          the question.

23              MR. POLLOCK:  Objection; outside the

24          scope of Exhibit B.

25

1   BY MR. HERSCHMANN:

2   Q.      You can, you can answer the question, sir.

3   A.      My address is public information.

4   Q.      Okay.  So why don't you turn to paragraph 50 on

5   page 18 of Exhibit 4.

6   A.      Okay.

7   Q.      Of Exhibit 4, your joinder.

8   A.      Okay.  Thank you.  You have to tell me which

9   one it is.  I don't have the numbers on the exhibits.

10  Q.      It's the joinder.

11  A.      Yes, sir.  Page 18?

12  Q.      Yes, sir.

13  A.      Okay.  Thank you.

14  Q.      You say, on the first sentences of paragraph

15  50, There can be no doubt this case was NOT -- "NOT"

16  in capital letters, N-O-T -- filed in order to

17  address any genuine financial distress.

18          Do you see that, sir?

19  A.      Yes, sir.

20  Q.      What's your basis for your claim that there

21  could be no doubt that the case was not filed in

22  order to address any genuine financial distress?

23  A.      I don't remember.

24  Q.      Sir, at the time of October of 2019, do you

25  have any idea what money Orly Genger had in any bank

BUSHMAN COURT REPORTING

1              COURT REPORTER'S CERTIFICATE

2    STATE OF ARKANSAS)
                      )ss.
3    COUNTY OF SALINE )

4              I, JANESS FERGUSON SMITH, CCR, RPR, a

5    Notary Public in and for Saline County, Arkansas do

6    hereby certify that the facts stated by me in the

7    caption of the foregoing matter are true; and that

8    the foregoing matter was transcribed by me, to the

9    best of my ability and understanding, from my machine

10   shorthand notes taken at the time and place set out

11   in the caption hereto.

12             In accordance with Rule 30(e) of the Rules

13   of Civil Procedure, review of the transcript was

14   requested by the deponent or a party thereto.

15             I FURTHER CERTIFY that I am neither counsel

16   for, related to, nor employed by any of the parties

17   to the action in which this proceeding was taken;

18   and, further that I am not a relative or employee of

19   any attorney or counsel employed by the parties

20   hereto, not financially interested or otherwise, in

21   the outcome of this action.

22             GIVEN UNDER MY HAND AND SEAL OF OFFICE on,
     this, the 19th day of May, 2021.
23

24   _____
     JANESS FERGUSON SMITH, CCR, RPR
     Notary Public for Saline County
25     and Court Reporter.
     Certificate Number 453
           BUSHMAN COURT REPORTING