# EXHIBIT 62

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Orly Genger,<br><br>      Debtor. | Chapter 7<br><br>Case No. 19-13895-JLG |
| DALIA GENGER,<br><br>      Plaintiff,<br><br>-against-<br><br>ORLY GENGER, MICHAEL BOWEN, ARIE GENGER, ARNOLD BROSER, DAVID BROSER, ERIC HERSCHMANN, THE GENGER LITIGATION TRUST, ADBG LLC, TEDCO INC., and DEBORAH PIAZZA as chapter 7 trustee,<br><br>      Defendants. | Adv. P. No. 20-01010 |

**REPLY BRIEF BY BOWEN AND HERSCHMANN IN FURTHER
SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

Defendants Michael Bowen ("Bowen") and Eric Herschmann ("Herschmann," with Bowen, "KBT Movants") submit this reply memorandum in further support of the June 25, 2020 motion to dismiss this adversary action filed by defendants Orly Genger, Arie Genger, Arnold Broser, David Broser, The Genger Litigation Trust, ADBG LLC, and TEDCO, Inc., in which KBT Movants filed a joinder of even date.[1]

---

[1] Submitted herewith is the Declaration of Michael Paul Bowen, dated July 17, 2020 ("Bowen July 17 Decl."), with accompanying exhibits.

Pg 3 of 17

In her opposition, plaintiff Dalia Genger concedes she has no good faith cause of action against Bowen and Herschmann. She grandiosely pronounces that she has "no objection" to dismissing this action against them: "If they now wish to be excused from the case, Dalia has no objection, as long as it can be assured that the Notes will not be alienated." Dalia Opp. at 2. But this is not a matter of "wishing" to be "excused." It is Bowen's and Herschmann's legal right to have this egregiously frivolous legal action summarily dismissed with prejudice as a matter of law – a dismissal so plainly warranted that even plaintiff musters "no objection."

## ARGUMENT

In trying to defend her actions as against the other defendants, Dalia continues to malign Bowen and Herschmann despite her admission that she has "no objection" to dismissal as against them. For example, she mocks their contention that the false claims in this action gratuitously becloud their professional reputation and doubles down on her falsehoods: "the reality is worse than that which has been alleged, their protestations notwithstanding." *Id.* at 3. That disdain for the truth and the harm she (and her counsel) cause in so abusing legal process to make what would otherwise be legally actionable defamatory per se accusations warrants swift censure and sanctions. Because her opposition brief reasserts the very same false and defamatory claims that warrant dismissal (as even plaintiff concedes), we demonstrate below the egregious nature of her claims and her deliberate distortions. Additionally, Dalia's "appendix" to her opposition brief, which supposedly shows "line by line, the evidentiary basis for each and every allegation Dalia has asserted against Messrs. Herschmann and Bowen in the Amended Complaint" (Dalia Opp. at 2-3), is yet further proof that she has no evidentiary basis whatsoever and thus no good faith basis for any of her claims.

2

### A.  Plaintiff's Claim that Bowen Lied is Itself a Knowing Falsehood

In her opposition, Dalia – by her silence – concedes that her complaint falsely alleges that Bowen held the Notes "on behalf of Orly." As the Notes themselves state, the Notes are held on behalf of the AG Group, of which Orly is but one member. Dalia also abandons and does not even try to defend her false claim that the "Trump Notes were secretly and fraudulently transferred to Bowen"; there was nothing secret or fraudulent about the open and notorious amendment to the Notes to simply change the payee/escrow agent. Dalia has nothing to say to defend her false claims in the face of those two basic incontrovertible truths. Instead, she pushes her equally false claim that Bowen lied in sworn testimony that he gave as the corporate representative of his law firm Kasowitz Benson Torres LLP in post-judgment discovery taken by Dalia's son, Sagi Genger. Dalia (following Sagi) argues that Bowen either knowingly or unwittingly gave false testimony that the firm was "unaware of any agreement" among the members of the AG Group related to the Notes because he failed to cite the March 2017 Escrow Agreement – which is not an AG Group agreement, but an agreement establishing the priority of repayment owed to Herschmann by Orly Genger and her father Arie Genger pursuant to a secured, UCC-filed promissory note. To fabricate an utterly false and malignant claim to gratuitously impugn Bowen's professional integrity, Dalia (and her lawyers) lied to this Court in their opposition brief. That lie is revealed in Dalia's ellipses in quoting Bowen's testimony.

Contrary to what Dalia says in her opposition brief, the questioning was not about "any other sort of agreement directing the disposition of the Trump Note proceeds." Dalia Opp. at 16. At no point in the questioning was any question asked about "any other sort of agreement" as to how the AG Group members were dividing up the money. The question that was asked, however ineptly, was two-fold: Whether the AG Group had provided to KBT/Bowen as the

3

payee-escrow agent any directions as to how the proceeds of the Notes are to be distributed upon receipt; and, if not, whether KBT/Bowen is aware of any "agreement" among the group members as to how such directions will be communicated to KBT/Bowen as escrow-payee agent; and the answer was – and still is – "No." Nothing about that answer is even arguably false or incorrect.

To the extent this line of questioning was confused, it was due to the fact the questioner (Sagi's counsel, Mr. Dellaportas) continually exceeded the scope of the subpoena and asked poor questions. Most importantly, in her brief, Dalia melds together two answers separated by ellipses as if the two answers were in response to one question. She also provides a calculatedly incorrect page/line citation to misleadingly suggest both answers appear on page 27 of the deposition transcript. *See* Dalia Opp. at 16. In truth, her ellipses mendaciously conceal the fact that Bowen's answer following the ellipses was to an entirely different question asked <u>six</u> pages later.

The full excerpt is as follows (the underscoring indicates the portions that Dalia misleadingly cobbled together in her brief, and the bold italics indicate the objections and operative, albeit imprecise, question that was answered concerning directions to KBT/Bowen, not a question about "any sort of agreement directing disposition of proceeds" – words which nowhere appear in the transcript):

> Q. <u>Is it correct that the only way you will release the proceeds is if you are instructed by all four of those individuals to do so in the same manner</u>?
>
> A. No, that is not correct.
>
> Q. How is it incorrect?
>
> A. <u>There is no understanding that the firm is aware of that it's a majority vote or a consensus vote or anything like that. It's whatever -- whatever the agreement there is in and among the members of AG Group, the firm has no knowledge of that</u>.
>
> Q. Is the AG Group a corporation?

4

A. I have no idea.

Q. A trust?

A. I have no knowledge.

Q. LLC?

A. No knowledge.

Q. *When you say you say you are going to take instructions from the AG Group, how is that going to be communicated to you*?

A. I think *that's beyond the scope of this deposition and beyond the scope of your authority under Article 52. With that objection, and without waiving that objection,* I'm really not sure how to answer that question. How would that be communicated to me.

Q. Look, in a few days we are going to go before a judge, just to be frank. The judge is going to want to know about this $15 million. You are the escrow agent for the $15 million. *Clearly you know the circumstances under which you would release the $15 million, so why don't you just share this with me now* so that you don't unnecessarily annoy the federal judge?

A. Is that a question?

Q. It's a suggestion. I've asked several questions and you have been very disingenuous. Why don't you just try to answer them.

A. Look. I don't understand why you are making this into a hostile, ad hominem attack on me.

Q. I'm not making an ad hominem on you.

A. I'm speaking on behalf of the firm. I have --

Q. You are saying you have $15 million and you --

A. Excuse me. Let me finish.

Q. -- have no idea how it is going to. Do you understand how this is going to look when the judge sees this transcript? I'm trying to help because I don't want -- I don't need to make unnecessary motions. I'm just trying to collect some money here. I'm not trying to burden the court.

A. You interrupted my answer. You spoke over me so that the court reporter couldn't take down what I was saying.

5

*Q. Knock yourself out.*

A. I'm not going to engage in this kind of argumentative behavior. I thought that we were going to be here as two professionals talking in a professional way. You have immediately devolved into your normal mode of behavior, which is ad hominem attack and unreasonable speeches on the record. Everything you said I disagree with. *I have been very clear about the scope of which I'm prepared to answer and the scope within which we think your subpoena is authorized.* If you want to continue this, you must deal with me civilly. If you do that again, I'm going to leave and then you can explain to the federal judge and you can go look at the ethical rules, the professional rules which require you to be civil, why it was you weren't able to complete this deposition.

Q. I have been perfectly --

A. Do you want to continue?

Q. I have been perfectly civil with you. Your answers, frankly, are an embarrassment.

A. Don't characterize my answers. That's not being civil. Ask a question. If you have objections to my answers, you can proceed.

*Q. Please testify as to under -- what circumstances you will release the proceeds pursuant to the document where you are the escrow agent?*

A. I have already testified. This is asked and answered -- I'll interpose that objection -- at the direction of the AG Group.

Q. What does that mean?

A. I don't know how else to explain it to you.

Q. What does it mean?

A. What do you not understand about it?

*Q. Tell me what it means to be at the direction of the AG Group?*

*A. Well, first of all I object that this is outside the scope of your subpoena. If you had a basis to say that some of that money either belongs to Orly Genger or is payable to Orly Genger, you can make that showing and we can have that discussion.*

Q. Well, I think we have a document here --

A. We'll probably have to -- excuse me. I'm in the middle of my answer.

6

Q. Okay.

A. We'll probably have to litigate that, **but as of right now I see that outside of the scope of your authority under Article 52 and outside the scope of this subpoena.** However, **without waiving that objection**, I'm willing to give you some latitude which is what I said and **I'm willing to describe to you the firm's understanding of how this mechanism works.**

*Q. So please proceed.*

A. Well, I have already told you that the AG Group has to give direction about how the money is disbursed after it hits the escrow account held by the firm.

Q. Uh-huh.

*A. You asked me how is that direction going to be communicated.* My response is, on behalf of the firm, however the AG Group wants to communicate it. It can be in writing, it can be a phone call. It would have to be something that could be documented I would assume just to, you know, discharge our recordkeeping responsibilities to show the flow of the money and, you know, 1099s and whatnot.

And then you are asking me who can speak on behalf of the AG Group whether it has to be all four in consensus, whether it has to be a majority vote, whether somebody else can speak on behalf of the AG group and my answer is: We don't have any information about any agreements between the AG Group. We're not aware that there is any dispute among the members of the AG Group, that there is any agreement among the AG Group about who can direct the money and who can't direct the money maybe. If that -- maybe that will become an issue down the road but we are not aware of it.

*Q. Are you aware of anyone who is authorized to speak on behalf of the AG Group?*

A. Well, my understanding is that the members of the AG are reflected in Exhibit 3, these four individual people, and then the entities as you have pointed out. *I'm not aware of any issue about who the spokesperson for the group can be. If you are asking me can I identify who the spokesperson for the group is, the answer is no. We're not aware that a spokesperson has been designated. We're not aware that it's an issue.*

Q. Well, let me ask you: $15 million comes in, Arie Genger calls you up and says, I'm speaking on behalf of the AG Group, will you send him the money?

7

    A.  I can't really answer that question.  It's a hypothetical.  I'm not -- again, I think it's outside the scope of the subpoena so I'll object on that basis, but in the spirit of giving you some latitude so that you have some transparency into this arrangement at least as far as the firm is aware, the answer is maybe yes, maybe no.  I mean, if we don't hear from the other members of the group that there is some dissension, then the answer would be that we would follow that direction, hypothetically speaking.

    Q.  If I ask that question for Orly Genger, would you give the same answer?

    A.  If Orly Genger called up speaking on behalf of the AG Group? Yes, the same answer.

    Q.  What about Arnold Broser?

    A.  Same answer.

    Q.  David Broser?

    A.  Same answer.

    Q.  Has any money been received pursuant to this document?

    A.  No.

Bowen June 25, 2020 Decl., Ex. B at 27:6 to 34:20 (emphasis added).

    As is readily obvious, this line of question-and-answer has nothing to do with agreements among the AG Group as to who is entitled to what amount of proceeds from the Trump Notes or who has priority over others.  Nowhere in this line of questioning did the examiner ever ask about any other escrow agreements or agreements with parties outside of the AG Group as to priority of repayment of loans from the Trump Note proceeds, which is what the March 2017 escrow agreement is.  Certainly, the examiner never directly asked about such an agreement.  It is wholly disingenuous for Dalia to claim that this testimony is misleading in any way, much less knowingly or recklessly false.  That claim by Dalia is further belied by her own misdirection in using ellipses to mislead the Court in her opposition, which is demonstrated (Q.E.D.) by the transcript itself, both in its entirety and in the unabridged excerpt set forth above.

8

Thus Dalia's gratuitous and false claim that Bowen was "evasive" (Dalia Opp. at 16) in answering Sagi's questions during this deposition is entirely false. She also exasperatingly claims: "Mr. Bowen twice claimed under oath the [March 2017] Agreement did not exist." Dalia Opp. at 17. That is demonstrably untrue. Bowen never was asked about the March 2017 Agreement or even whether an agreement of that kind existed such that he even *could have* claimed "under oath" that it "did not exist." That assertion by Dalia is an *intentional falsehood made by Dalia and her counsel*. Nothing in the transcript even remotely supports that outrageous claim. It is Dalia who is mendaciously distorting the written record by taking snippets of answers out of context and "evasively" hiding the true meaning of what was being asked and what the – perfectly straightforward and truthful – answers were.

### B. Dalia's Remaining Claims Are Equally Knowingly False

Dalia's claims impugning Herschmann are just as gratuitous yet even more nonsensical, bordering on incoherent. Just as Dalia simply dropped and did not defend demonstrably false claims against Bowen set out in her amended complaint, she again does the same with Herschmann: She simply ignores and no longer tries to defend her indefensible claim that Herschmann's $2 million loan to Orly and her father, memorialized in a written promissory agreement (backed up by other documentary evidence) and in the March 2017 escrow agreement is bogus. *See* Mot. (ECF No. 14) at ¶ 6; Bowen June 25 Decl. Ex. C. Her silence in her opposition brief is a concession that that claim in her complaint is knowingly and gratuitously false.

But, just as she doubled down on other false claims as to Bowen, Dalia plays the same game with respect to her malignant claims concerning Herschmann. In the appendix to her opposition brief – which Dalia asserts provides "line by line, the evidentiary basis for each and

9

every allegation" (Dalia Opp. at 2) – she claims that Herschmann and Bowen both "knew of Dalia's interest in the Notes" before the Notes were transferred to KBT/Bowen as escrow agent and before Herschmann loaned $2 million to Orly and Arie because Herschmann and Bowen filed a notice of appearance in a case after "Dalia's interest in TRI monetization was first adjudicated." *See* Dalia Opp., App. A1-A3. But there was never any adjudication that Dalia had any interest in any Notes and she has not made such a claim in any of the many prior Genger litigations (and she certainly cites to no such claim in the prior actions). Moreover, filing of a notice of appearance as counsel to handle a disputed matter could never, under any circumstances, suffice to show that the appearing attorney is somehow on notice of future claims by other parties or third parties. Under Dalia's absurd theory, every attorney in the country would be susceptible to claims of liability by an adverse party in the event that party asserted a competing claim that was later adjudicated to be meritorious or even not adjudicated at all. Additionally, if Dalia's logic were correct, any secured creditor of Orly, no matter the circumstances, committed fraud against Dalia because, on her logic, the mere existence of her (unsecured) potential claim for support under an executory contract with Sagi (indemnified by Orly) put that secured creditor on notice that Dalia has a superior "right" to the money. That of course also makes no sense.

Dalia alleges "[Herschmann] claims to have an interest in the Trump Notes [pursuant to a promissory note and a publicly filed UCC Financing Statement], which interest was created after [Herschmann] became aware of Dalia's interest therein." (AC, ¶ 7.) Dalia defines the "Trump Notes" as "the notes which were 'made payable to Bowen as Orly's agent' (AC ¶ 23), which were **created on or around Nov. 20, 2017** (Doc. 14-2)." (emphasis added). She likewise claims that Herschmann "knew of Dalia's interest in the Trump Notes prior to asserting his interest

10

therein." (AC, ¶ 7.)  *See* Dalia Opp., App. A1-A2.  But the timing of the actual events contradict her logic.  Herschmann's promissory note and UCC Financing Statements pre-date the creation of the Trump Notes.  The UCC Filings were made in May 2017 – ***six months before*** the "Trump Notes" were created.

Dalia also claims that Herschmann and Bowen (who were Orly's attorneys) somehow made knowing false representations to courts by stating Orly's legal position in appellate briefs by "arguing" that Orly has no right to or interest in the proceeds of the Trump Notes (or the previous $17.3 million payment related to the Trump/AG Group settlement agreement), even though that correctly represents Orly's litigation position since the advent of that settlement agreement.  *Id.*  The "evidentiary" support Dalia cites in her appendix for these allegations of wrongdoing collectively are:  Herschmann and Bowen's notices of appearance in Sagi's 2014 federal action against Orly; Herschmann's UCC-1 filing (discussed above); the Joint Status Report filed with this Court; and the March 2017 escrow agreement (where Dalia attempts to re-write the definition of Settlement Proceeds to illegitimately try to support her claims).  None of these documents support either of these wildly irresponsible and false claims by Dalia.

The absurdity of Dalia's claims is readily apparent in her claim that Herschmann and Bowen "knew" that Dalia has a superior right to the proceeds of a settlement to which Dalia was not even a party.  She claims that Bowen and Herschmann had to "know" that all the money belonged to Dalia merely because they appeared as counsel for Orly in the federal lawsuit in which Sagi sought to enforce the 2004 letter indemnification agreement against Orly.  But since at least 2012, Dalia herself has represented – and sworn under oath – in numerous court actions that this same money did <u>not</u> belong to her, but rather belonged to the OG Trust and that she, as trustee, intended to recover that money to ensure that only the OG Trust received those proceeds.

11

That version of Dalia's story has been set forth every year since at least 2012, when, for example, Dalia testified that the OG Trust was the rightful owner of the TRI shares that Sagi had sold to the Trump Group.

> Q. So as we sit here today you believe as trustee of the Orly Genger trust that Orly owns the [TRI] shares, the trust owns –
>
> A. The trust, yeah.

Bowen July 17 Decl., Ex. D at 30:24 to 31:3. In 2013, Dalia echoed this in a different deposition: "My daughter, Orly, will get her shares of TRI shares, okay, that's my goal, and also my goal is that no monies from Orly Genger Trust will, um, will leave the trust. Q. Okay. A. And that's my goal."). *Id.* Ex. E (April 19, 2013 Dep. Tr.) at 511:3-8.

Then, in 2014, after the Trump Group entered into the settlement with the AG Group that resulted in the payment of settlement proceeds on account of the TRI shares, Dalia filed a motion for the proceeds to be paid into court, because she contended they belonged to the OG Trust. *Id.* Ex. F. In 2015, in a sworn affidavit submitted in support of her motion, Dalia attested under oath as follows:

> [T]he money belongs to the Orly Trust and no one else. . . . As one court has recently found, Orly, by virtue of the Trump Group Settlement, 'monetized her beneficial interest in the Orly Trust shares …' Thus, the settlement proceeds must be safeguarded for the Orly Trust. … Like any good parents, when my ex-husband Arie and I originally established the Orly Trust, our goals were to improve our daughter's, and also specifically our grandchildren's (hopefully her kids') lives. *These funds should be used for what we intended – financing education, improving health, and generally helping Orly and our grandchildren build a better life.*

*See Id.*, Ex. G, ¶¶ 3-6 (emphasis added). Then, in 2016, Dalia made the same argument to the New York Surrogate's Court in a turnover action filed against numerous parties, including Arie Genger, the Brosers and even the Trumps. *See* Bowen July 17 Decl., Ex. H. She repeated this theory in another Surrogate's Court action she filed against Orly individually in 2017. *Id.* Ex. I.

12

And she repeated it again in 2018 when she amended her turnover petition at the Surrogate's Court. *Id.* Ex. J.

Dalia also expressed this same legal position while testifying in open court during a damages inquest in a prior lawsuit in which Orly obtained summary judgment against Sagi for his breach of fiduciary duties to her. *See generally Orly Genger v. Dalia Genger*, No. 109749/2009, 2016 WL 1407903 (N.Y. Sup. Ct. April 8, 2016), *aff'd* 147 A.D.3d 443 (1st Dep't 2017). In that proceeding Dalia testified:

> THE COURT: Let's repeat the question. There was a sale of shares?
> THE WITNESS: Right.
> THE COURT: Money was received?
> THE WITNESS: Right. Money was received.
> THE COURT: Did any part of that money go -- wait. Wait until you hear my question. Should any part of that money have gone to the trust that you are the trustee of, the trust for your daughter.
> THE WITNESS: If the money was supposed to go for, I mean, was for the sale of Orly's share, it should have gone to Orly's trust.
> THE COURT: Okay.
> THE WITNESS: Okay.
> THE COURT: That's the answer.

Bowen July 17 Decl., Ex. K (H'rg. Tr. at 116:14 to 117:10).

John Dellaportas, on behalf of Sagi and in support of Dalia, likewise swore under oath that the settlement proceeds from the Trump Settlement Agreement belong to the OG Trust and no one else. *See, e.g., id.* Ex. L (Feb. 13, 2015 Dellaportas Affirmation) at ¶ 1 ("Sagi Genger and the Sagi Trust support and join in Trustee Dalia Genger's Motion . . . for an Order Directing Settlement Proceeds To Be Paid Into Court."); *id.* ¶ 55 ("It is the Sagi Trust's position that all or almost all of the settlement proceeds belong to the Orly Trust.")

13

Needless to say, in light of these past sworn statements from at least 2012 by Dalia and Sagi's counsel on Sagi's behalf that Dalia is <u>not</u> entitled to these proceeds but that the OG Trust is entitled to all of these funds, Dalia can hardly be taken seriously when she says, now, in 2020 – as she is further in thrall with Sagi's machinations – that Bowen and Herschmann nevertheless had to "know" all along that Dalia would abandon her positions and that it was in fact Dalia herself who had the right to these funds or some substantial portion all along. Dalia and her lawyers obviously have no good faith basis for such a claim so easily and irrefutably revealed as illogical and necessarily false.

In a letter filed by her attorney today (ECF No. 23), Dalia futilely tries to reconcile her past and current position by suggesting that her prior sworn statements were made on behalf of the OG Trust, while she now speaks for herself personally. She recently purportedly resigned as trustee of the OG Trust, transferring that duty to a successor trustee hand-selected by Sagi, the decade-long adversary to Orly, the beneficiary of the trust. During the pendency of this bankruptcy, and after Sagi obtained for Dalia a (purported) full release of all potential claims against her from the new trustee of the OG Trust (*id.* Ex. M), Dalia is now claiming that the proceeds are hers, a claim she believes she can make because she is not making it as trustee of the OG Trust.[2] This attempt to reconcile her self-contradictory positions fails, of course, because in her prior statements, including her 2015 sworn affidavit, she was speaking from first-hand personal knowledge as the mother of Orly, not as the trustee. *See, e.g.*, Bowen July 17 Decl. Ex. G ¶ 6 ("when my ex-husband Arie and I originally established the Orly Trust, our goals were to improve our daughter's, and also specifically our grandchildren's (hopefully her kids') lives"),

---

[2] The OG Trust also purportedly released all claims against Sagi and his wife (and his trust). Bowen July 17 Decl. Ex M. The dubious releases even purport to include beneficiaries of the OG Trust (*i.e.*, Orly) as "Releasors."

14

discussed *supra*. That attempt to reconcile also underscores that this is a "new" position made for the first time during the course of this bankruptcy, not one that Herschmann and Bowen "knew" years ago.[3]

All of her claims against Bowen and Herschmann are rife through and through with this level of mendacity and falsehood. For that reason alone, her action should be summarily dismissed.

### C. Dalia's "Cross-Motion" for Summary Judgment is Frivolous

KBT Movants join in the replies filed by the other moving parties, which demonstrate that Dalia's claims are legally barred in all events. Moreover, her so-called "cross motion" for summary judgment is both procedurally defective and substantively devoid of merit, as demonstrated in the replies filed by the other movants. That she arrogates to herself the "right" to file an adversary action chock full of demonstrated falsehoods and hypocritical self-contradictions and then claim entitlement to summary judgment in her favor before issue is even joined, before the Court rules on our motion to dismiss, and before any discovery is to heap absurdity on absurdity.

### CONCLUSION

For the foregoing reasons, and the reasons set forth in the KBT Movant's June 25, 2020 joinder and the briefs of the other movants, the KBT Movants submit that this adversary proceeding should be dismissed in its entirety with prejudice, Dalia and her counsel should be

---

[3] The letter Dalia's counsel filed today also makes the claims that Herschmann and Bowen were party to the case in which Dalia filed a declaration in 2015 in which she claimed the proceeds belonged to the OG Trust, captioned *Arie Genger et al. v. Sagi Genger*, Index No. 651089/10. ("[T]he defendants in this case, who were also parties in that case, vigorously opposed Dalia's request…") ECF No. 23 at 1. This is false. Neither Herschmann nor Bowen were party to that case, nor had they even appeared as counsel in the case until the fall of 2016.

15

sanctioned for asserting these baseless claims, and KBT Movants should be awarded their attorneys' fees and costs and other further and appropriate relief.

Dated: July 17, 2020

                                               KASOWITZ BENSON TORRES LLP

                                               By: /s/ Michael Paul Bowen
                                                   Eric D. Herschmann
                                                   Michael Paul Bowen

                                             1633 Broadway
                                             New York, NY  10019
                                             (212) 506-1700
                                             EHerschmann@kasowitz.com
                                             MBowen@kasowitz.com

                                             *Attorneys for Movants*