UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

In re                                                    :
                                                         :          Chapter 7
Orly Genger,                                             :          Case No. 19-13895 (JLG)
                                                         :
                              Debtor.                    :
----------------------------------------------------------------X

## DEBTOR'S OBJECTION TO CREDITOR SAGI GENGER'S AMENDED AND UPDATED MOTION TO DISMISS

GLENN AGRE BERGMAN & FUENTES LLP

55 Hudson Yards, 20th Floor
New York, New York 10001

*Attorneys for Debtor Orly Genger*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 2

RELEVANT FACTS .............................................................................................................. 10
    A.   The Genger Family Allocation of TRI Shares ............................................. 10
    B.   The TRI-Related Actions and Genger Litigation Trust ................................ 13
    C.   The 2013 AG/Trump Settlement and Release of $10.3 Million Escrow ...... 15
    D.   The Federal Actions and the "Monetized" Ruling ....................................... 18
    E.   Sagi's Enforcement Actions ........................................................................ 20
    F.   Orly's Bankruptcy Filing and Lawsuits Against Sagi and Dalia ................. 22
    G.   The InterCreditor Agreement and OGT Debt-Funded Litigation ................ 25

ARGUMENT ......................................................................................................................... 30
   I.   NOTHING DEBTOR DID WARRANTS SECTION 707(a) DISMISSAL ................. 31
    A.   Sagi Has No Proof of Bad Faith or Any Egregious Wrongdoing ............... 33
    B.   Contrary to Sagi's View, the "Monetized" Ruling is Not Preclusive .......... 37
    C.   Sagi's False Oath Claim Is Both Untrue and Not Grounds for Dismissal ... 40

  II.   EQUITABLE CONSIDERATIONS DISALLOW DISMISSAL .................................. 43
    A.   Sagi Fails to Meet the 305 Standard for Dismissal ..................................... 43
    B.   Sagi's Unclean Hands Preclude Equitable Dismissal .................................. 47
    C.   The Lombardo Factors Weigh Against Dismissal ....................................... 48

CONCLUSION ...................................................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appreciation Fund, Ltd.,*
  200 B.R. 514 (Bankr. S.D.N.Y. 1996) ............................................................. 47, 50

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.,*
  792 F. Supp. 969 (S.D.N.Y. 1992) ....................................................................... 51

*Chase Manhattan Bank, N.A. v. Celotex Corp.,*
  56 F.3d 343 (2d Cir. 1995).................................................................................... 42

*Fernandez-Rodriguez v. Licon-Vitale,*
  470 F. Supp. 3d 323 (S.D.N.Y. 2020)................................................................... 41

*Genger v. Genger,*
  41 N.Y.S.3d 414 (N.Y. App. Div. 2016) .............................................................. 49

*Genger v. Genger,*
  76 F. Supp. 3d 488 (S.D.N.Y. 2015)................................................................. 21, 22

*Genger v. Genger,*
  123 A.D.3d 445 (1st Dep't 2014) ....................................................................... 8, 13

*Genger v. Genger,*
  144 A.D.3d....................................................................................................... 27

*Genger v. Genger,*
  771 Fed. App'x 99 (2d Cir. 2019)..................................................................... 23, 24

*Genger v. Genger,*
  2016 WL 551444 (Sup. Ct., N.Y. Cty. Feb. 10, 2016) ..................................... 26, 28

*Genger v. Genger,*
  2016 WL 1407903 (Sup. Ct., N.Y. Cnty. April 8, 2016).................................... 20, 26

*Genger v. Genger,*
  2019 WL 856565 (S.D.N.Y., Feb. 20, 2019)......................................................... 49

*Genger,*
  663 Fed. Appx.................................................................................................. 22, 42

*Glenclova Inv. Co. v. Trans-Resources, Inc.,*
  874 F. Supp. 2d 292, (S.D.N.Y. 2012)................................................................... 14

*Hausler v. JP Morgan Chase Bank, N.A.,*
  127 F. Supp. 3d 17 (S.D.N.Y. 2015)...................................................................... 42

*In re 167 West 133rd Street Housing Development Fund Corp.,*
  2018 WL 4637460 (Bankr. S.D.N.Y. Sept. 25, 2018)........................................... 35

*In re Aiello,*
  428 B.R. 296 (Bankr. E.D.N.Y. 2010)................................................................... 34

*In re Ajunwa,*
   2012 WL 3820638 (Bankr. S.D.N.Y. Sept. 4, 2012) ................................................................ 35

*In re Chovev,*
   559 B.R. 339 (Bankr. E.D.N.Y. 2016) ................................................................ 34, 35, 36, 45

*In re Dinova,*
   212 B.R. 437 (2d. Cir. BAP 1997) ................................................................................................ 50

*In re Fraleigh,*
   474 B.R. 96 (Bankr. S.D.N.Y. 2012) ................................................................................................ 46

*In re Grullon,*
   2014 WL 2109924 (Bankr. S.D.N.Y. May 20, 2014) ................................................ 34, 36, 38, 40

*In re Khan,*
   172 B.R. 613 (Bankr. D. Minn. 1994) ................................................................................................ 46

*In re Lobera,*
   454 B.R. 824 (Bankr. D.N.M. 2011) ................................................................................................ 35

*In re Lombardo,*
   370 B.R. 506 (Bankr.E.D.N.Y.2007) ................................................................................................ 35

*In re Lusane,*
   2012 WL 3018050 (Bankr. D.D.C. July 24, 2012) ................................................................ 45

*In re Murray,*
   543 B.R. 484 (Bankr. S.D.N.Y. 2016) ................................................................................................ 50

*In re Murray,*
   900 F.3d 53 (2d Cir. 2018) ................................................................................................ 50

*In re Nichols,*
   362 B.R. 88 (Bankr. S.D.N.Y. 2007) ................................................................................................ 46

*In re Parikh,*
   456 B.R. 4 (Bankr. E.D.N.Y. 2011) ................................................................................................ 45

*In re Pongvitayapanu,*
   487 B.R. 130 (Bankr. E.D.N.Y. 2013) ................................................................................................ 50

*In re Scandia Seafood (New York), Inc.,*
   2017 WL 2062894 (Bankr. S.D.N.Y. May 12, 2017) ................................................ 47, 48, 50

*In re Syndicom Corp.,*
   268 B.R. 26 (Bankr. S.D.N.Y. 2001) ................................................................................................ 35, 48

*In re Zick,*
   931 F.2d 1124 (6th Cir. 1991) ................................................................................................ 36

*Janvey v. Romero,*
   883 F.3d 406 (4th Cir. 2018) ................................................................................................ 36

*Jim Beam Brands Co. v. Beamish & Crawford Ltd.,*
   937 F.2d 729 (2d Cir. 1991) ................................................................................................ 41

*Primeau v. Granfield*,
  193 F. 911 (2d Cir. 1911) .................................................................. 51

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
  646 F.Supp.2d 510 (S.D.N.Y. 2009) ................................................... 51

*TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*,
  2014 WL 1979932 (S.D.N.Y. May 15, 2014) ............................... passim

*TR Investors, LLC v. Genger*,
  2010 WL 3279385 (Del. Ch. Aug. 9, 2010) ......................................... 14

*TR Investors, LLC v. Genger*,
  2013 WL 603164 (Del. Ch. Feb. 18, 2013) .......................................... 19

*United States v. Hussein*,
  178 F.3d 125 (2d Cir. 1999) ............................................................... 41

Other Authorities

  SEC Litig. Release No. 19675 ............................................................... 3

TO THE HONORABLE JAMES L. GARRITY JR.,
UNITED STATES BANKRUPTCY JUDGE:

Chapter 7 Debtor Orly Genger hereby objects to the motion to dismiss filed by creditor

Sagi Genger (ECF No. 239), and submits in support as follows:[1]

## **PRELIMINARY STATEMENT**

Sagi – Debtor's brother and only sibling – seeks to deny his sister bankruptcy relief,

accusing her of bad faith and fraud.  He claims that he and Dalia are entitled to $32.3 million in

settlement proceeds that Sagi claims Orly fraudulently conveyed to their father and her husband

as part of a massive, decade-long conspiracy to deprive Sagi and their mother – both of whom

have millions in assets and cash – of this additional money.  His proof?  He offers his own

lengthy and self-serving narration of snippets from a tangle of court decisions in numerous

Genger-related legal battles spanning multiple years going back to their parents' divorce in 2004

and multiple jurisdictions, from New York, to Delaware, to Texas.  The disproof, in contrast, is

simple.  It is also in large part uncontested.

Orly is broke.  She has no income, no cash, no business, no work, and no economic

prospects.  While she owns a one-half undivided interest in a Texas homestead protected

property which was gifted to her by her husband – her home where she lives with her husband

and young daughter – what she owes surpasses the value of that asset by millions.  It takes no

winding explanation to see the good faith basis for filing for bankruptcy.

Orly is an out of work artist, albeit of some renown.  She started her art career when she

was in her early twenties.  Her artistic vision gained adherents in the early aughts leading to

---

[1]  The Debtor and movant, brother and sister who share the same surname, are referred to herein by their respective first names, as are their parents Dalia and Arie.  Sagi's motion is cited herein as "Mot."  Accompanying this objection is the Declaration of Michael Paul Bowen, dated May 31, 2021, with exhibits, cited as "OG Ex."

2

commissions for public art installations.  She worked through an entity she and her father, Arie,

created, Everything Important LLC, fostered with seed-money and periodic cash investments

from Arie.

At that time, she thought and expected that she and Sagi would each receive an equal part

of a partial share in a multi-million-dollar family business, which partial share was intended by

their parents to go to trusts that they had established to benefit their two children equally upon

their divorce in 2004.  Orly's art business is the only work and employment she ever had.  She

never worked in any other business or in finance, like her older brother Sagi, who has an MBA

from Wharton Business School and who had worked as the CFO for Lumenis Ltd., a publicly

traded company until he was debarred by the SEC for financial fraud in 2006 (SEC Litig.

Release No. 19675, April 27, 2006).  Without any oversight from Orly – who as the kid sister

trusted her older brother implicitly as if he were a "little father" – Sagi thus operated both the

Canadian real estate venture set up by Arie for his children and the Genger family holding

company TPR Investment Associates, Inc. ("TPR"), which held the Genger family wealth,

including tens if not hundreds of millions of dollars' worth of shares of Trans-Resources, Inc.

(the "TRI shares").

Her struggling art company, and only source of income, was destroyed by Sagi.  The

nascent interest in her artwork vanished when Sagi served overbearing and overly burdensome

post-judgment subpoenas and seizure orders on anyone who showed interest in her art, including

her father, her accountant, her husband, her banks, her lawyers, New York art galleries, and a

sole proprietor jewelry maker and friend in San Francisco.  He seized her bank account, which

had a few thousand dollars, and asked in post-judgment discovery for her art supplies or any

artwork in production.  That severed her economic ties to the art world.  She has not sold art since.

Sagi cannot deny that Orly owes millions.  He certainly does not deny that Orly owes *him* $3 million-plus on his federal monetary judgment against her.  He also now claims that she owes him up to $12 million.  And Sagi joined forces with Dalia and is a proponent of her claim that Orly owes up to $32.3 million to *her* while simultaneously also promoting the claim by the Orly Genger 1993 Trust (the "Orly Trust" or "OGT") that Orly owes *it*, not Dalia and not Sagi, even more than that entire amount, over $41 million.  Together, Sagi and Dalia have deployed a full-on multi-prong litigation assault against Orly – using a needlessly complex array of actions to sue for and/or to otherwise demand the $32.3 million Sagi claims belongs to her in legal actions against her and her family members and their business contacts.  Orly also has other significant debt, as the third-party Proof of Claim filings show.  But even leaving that aside, just the amount of debt Sagi, Dalia and OGT claim – the entirety of which, while disputed by Orly, Sagi does not and cannot dispute – is debilitating to a debtor like Orly who has no cash, no income, and no prospects.

Sagi's response that Orly really has $32.3 million in settlement proceeds – part of a $50 million multi-party settlement – is a red herring.  As a matter of concrete fact, she does not have and never did have that money.  Nor did she transfer it to anyone.  As even Sagi acknowledges, $17.3 million of that amount was transferred from the Trump Group – the payor in the June 2013 settlement agreement between the AG Group and the Trump Group (the "2013 AG/Trump Settlement") as those "groups" are defined therein – to Arie's agent and longtime lawyer, William Wachtel, the designated "payee" for the AG Group in that settlement.  Arie, caused that payee to transfer the funds to a litigation trust known as the Genger Litigation Trust, which Arie

-4-

set up in 2012 to repay his lender/litigation funder ADBG, LLC ("ADBG"). That trust then transferred most of that sum in 2013 to ADBG, which had financed substantial legal fees for the past decade relating to the litigation that ultimately led to the 2013 AD/Trump Settlement and is still owed millions of dollars in unpaid legal fees. As is typical in a litigation funding arrangement, ADBG's loan agreement provides for it to be paid from the proceeds of the litigation it funded. The financial records show none of that money went to Orly. The balance of $15 million exists in the form of two $7.5 million contingent notes (the "AG Notes"). Neither note has been paid. The Trump Group asserts that neither is yet payable (due to frivolous litigation Sagi and Dalia have intentionally pursued to tie up that money), and the face amount of the notes is subject to set offs such that the amount to be paid is less than the face amount of $15 million.

Those notes are payable to the AG Group, not Orly, although Orly is one of four natural persons in that Group. As even Sagi must admit, the other parties in the AG Group, *i.e.*, Arie and Arnold and David Broser on behalf of themselves and their affiliated entities such as ADBG – lay claim to the entirety of the proceeds of the AG Notes. Therefore, the less than $15 million outstanding is at the very least both unrealized and very much contested. Even Sagi has to admit that these notes are not uncontestably an asset of Orly's, and even if they were, they are nonetheless swamped by his, Dalia's and OGT's claims, as well as the rightful claim of the Genger Litigation Trust/ADBG, which at a minimum exceed $32.3 million. And even were Sagi to prevail on his claim that Orly is legally entitled to the whole $32.3 million of the settlement cash (which she is not), the debt claims of the Sagi cohort alone wipe out that entire amount, leaving Orly nothing and still facing millions in debt claims by the law firms of her former counsel and by her father and her husband, who both loaned her millions to pay legal fees.

These facts, moreover, are unaltered by the 2015 federal court ruling that Orly "monetized" her interest in the Genger family TRI shares to the "tune of $32 million" – as is oft-cited by Sagi. That ruling did not include an adjudication of whether Orly in fact has possession of or legal entitlement to all or any part of that amount, an issue not yet litigated. It is agreed, even by Sagi, that the "monetized" ruling did not put any cash in Orly's pocket. Nor does it apply to Arie, the Genger Litigation Trust, and ADBG/Brosers, none of whom were parties in that federal proceeding and who claim that money belongs to them irrespective of that ruling.

Moreover, in his single-minded focus on the "monetized" ruling, Sagi admits *sub silentio* that Orly never received the separate $10.3 million paid to TPR by the Trump Group to buy the portion of the TRI shares that were allocated to benefit Orly (through the Orly Trust) and which sum is identified in that very same 2013 AG/Trump Settlement as the "Orly Trust Shares." That money, at the time held in escrow, was later ruled to belong to TPR and then was taken by Sagi even though he and Orly had at the time equal beneficial ownership in TPR. He nowhere denies, because he cannot, that, while he took possession of some $44 million related to the family TRI shares (inclusive of the $10.3 million from the Orly Trust Shares), representing 100% of the proceeds he received for selling 100% of the family TRI shares, Orly never received even a penny in actual cash attributable to those shares – despite their parent's express intent that Orly share equally in the family fortune with Sagi. Sagi, in contrast, benefited exclusively from the family businesses and from the sale of the family TRI shares. His wealth – including a five-story, twenty-foot wide multi-million-dollar Park Avenue mansion in Manhattan and a block long multi-million-dollar home compound on an exclusive island in Miami, Florida, complete with swimming pool and tennis court, and an asset protection plan that includes tens of millions in offshore accounts in the Cook Islands – dwarfs Orly's, which, aside from her partial interest in

her Austin home gifted to her by her husband upon their marriage, consists of little more than the clothes on her back.

That is the crux of the whole bankruptcy. Those simple and uncontested facts show (i) that, given just her uncontested debt to just Sagi alone, Orly has a good faith basis to seek bankruptcy protection since she has no way to pay even that amount, let alone the millions in claims she faces from other creditors; and (ii) that she is immobilized in a crossfire of multiple competing claims by multiple parties to the 2013 AG/Trump Settlement cash proceeds that now spans nearly a dozen separate actions filed by Sagi and his confederates.

Even Sagi recognizes that his claim to these funds is only one of many and that the other claims may prevail. That is why he entered the intercreditor agreement with OGT and related entities. That "truce" provides that, regardless of theory of recovery, he gets all of his claims paid and legal fees reimbursed from any recovery by the Sagi cohort of the $32.3 million before OGT gets anything left over, ensuring Orly gets nothing through her trust even were they proved right that the $32.3 million is hers or her trust's after all. That is also why he trained his sights on Orly's marriage and her share of the condo where she lives with her husband and 4-year-old daughter. He accuses Orly of living in luxury. He claims that her husband, Eric Herschmann, gave her a no-expense-spared expense account, an American Express "black card," no less, such that she has unlimited access to his personal wealth, making it, in Sagi's view, Orly's. To Sagi, any payment by Eric to her benefit – including buying household food – is an "asset" that Sagi wants to enforce his judgment against, threatening invasive litigation, not just to take away her home, but also to interpose himself in her marriage and in her husband's private life and personal wealth. It does not matter to him that Orly and Eric have a prenuptial agreement that provides each spouse is economically independent and segregates each spouse's pre-marital and post-

-7-

marital wealth to ensure that no creditor of one can enforce a judgment against the property of

the other. How can Sagi get around that? By (baselessly) alleging that Orly's and Eric's

prenuptial agreement itself was a sham intended only to defraud Sagi and his mother. That is as

deranged as it sounds.

Thus, this is not just a two-party litigation that belongs in the civil courts. This is a case

where no less than *eight* parties – Sagi, Dalia, OGT, Manhattan Safety Maine, Inc., Recovery

Effort, Inc., Arie, the Genger Litigation Trust and ADBG/Brosers – have competing claims to the

same settlement funds. This case involves, moreover, not just brother and sister, but multiple

third-party claims against Debtor's estate, including for money she owes her past lawyers, her

father, her husband, and others. Other creditors have also filed separate claims, including a

bonding company and Sagi and Dalia affiliated companies TPR and D&K GP LLC.

Collectively, these claims, which total in the millions separate and apart from Sagi's claim, are

all entangled in Sagi's counterclaims for fraud against anyone who ever tried to help Orly,

including his accusations of fraud against her father, her husband, the Genger family accountant,

and her prior and current lawyers and their law firms (including the Kasowitz firm, the

Sonnenschein firm, and the Zeichner firm). In prior proceedings, Sagi accused bystanders, like

the family accountant Bill Fischer of being in on the alleged massive-scale fraud, and even

insinuated judicial officers are in on Orly's alleged "scam," including trying (unsuccessfully) to

recuse a New York judge who found Sagi liable for material misrepresentations and falsifying

documents for bias because she supposedly failed to accommodate Sagi as mentally unwell and

deserving of allowances. *See Genger v. Genger*, 123 A.D.3d 445 (1st Dep't 2014) (noting Sagi's

claim of mental illness and denying request to reassign the case upon remand). And the one

viable but unliquidated asset that Orly does have is ignored altogether by Sagi: her pending

lawsuits against him for defrauding her out of her share of the family Canadian real estate

venture and for his breach of fiduciary duty in foreclosing on her share of TPR as well as her

lawsuit against her mother for fraud and breach of her fiduciary duty as trustee of the Orly Trust

when she had a clear conflict of interest even on her own account of her interests vis-à-vis that of

the Orly Trust.

      This proceeding thus involves multiple parties and multiple litigations at cross-purposes,

including potentially valuable legal claims by Debtor that she no longer can afford to pursue.

That is exactly the kind of scenario, as Judge Davis recognized, that justifies a bankruptcy court,

as a court of equity and a court expressly designed to consolidate the claims of multiple parties in

one court, seeing to it that justice is done despite concerted efforts of creditors to overwhelm a

vulnerable debtor who can no longer pay for lawyers and to use voluminous and repetitive filings

to inundate the courts.  Noting that Sagi and his cohort were engaging in "excessive advocacy"

by filing voluminous and repetitive filings by different counsel that had been written by the same

person ("I don't think I need a linguistic algorithm to tell me that") and that these filings were

"disgusting" in that they spent more time falsely "calling Orly a liar" than anything else, Judge

Davis observed:  "So, I mean, I'm just assuming everything that's in the motion to dismiss is

true, gosh, this sounds like it ought to be in bankruptcy somewhere."  OG Ex. 1 (at 6:25 to 7:4,

7:23 to 8:17).

      The Sagi cohort is using Orly to lay claim to the settlement money by claiming it belongs

to her only so they can take it away from her.  They do not believe or claim Orly gets a penny.

Their pursuit is so debilitating that, without bankruptcy protection, Orly is prevented from

getting back on her feet, from working, from any realistic hope of attaining even the minimal

economic independence needed for living day-to-day life as a free adult, never mind returning to

her calling as an artist whose work provides sustenance as well as personal fulfillment. Outside

of bankruptcy, Sagi is trying to take away, not just her home but even whatever material comfort

she gets from her marriage. Sagi and his confederates have no concern if she is left penniless

and homeless. They do not care if her art career or marriage is irretrievably destroyed. To them,

she is a pawn. Collateral damage in a fight over money that has nothing to do with her, that she

neither claims nor wants.

She was hounded into bankruptcy. Her last refuge is bankruptcy.

## **RELEVANT FACTS**

1.    Sagi's recitation of past Genger lawsuits is relevant in only one respect: it

confirms that Orly never received any money attributable to the TRI Shares, while Sagi himself

received all of that money, some $44 million. Although Orly sued to recover $10.3 million held

in escrow by TPR that were the direct sale proceeds of the TRI Shares that had been allocated by

the Genger family for her benefit, Sagi won that lawsuit and kept that money for himself in spite

of the fact that he and Orly had equal ownership in TPR at the time (through their respective

trusts), as demonstrated below.

### A.    **The Genger Family Allocation of TRI Shares**

2.    By all accounts, the $32.3 million in settlement cash is the bone of contention in

this case. That settlement – which is in actuality a $50 million settlement, as shown below – is

based on a multi-party dispute over the TRI Shares, involving intra-family claims among the

Gengers and legal claims by Jules and Eddie Trump and the ADBG/Brosers.

3.    The Trumps were business partners of Arie. In 1985, Arie founded TRI, a

fertilizer and agriculture chemical manufacturer. Originally TRI, which grew in value to become

worth hundreds of millions of dollars, was wholly owned by TPR, the Genger family holding

company.  Many years later, in 2001, the Trumps purchased a roughly 47% interest in TRI pursuant to a shareholder agreement with the remainder held by Arie though TPR.

4.      The Orly Trust came about in 1993, when Orly was a teenager.  That year, Arie created two trusts, the Orly Trust and the Sagi Genger 1993 Trust (the "Sagi Trust") as part of his and Dalia's estate planning, with Orly and Sagi being the primary beneficiary of each, respectively.  Through a corporate structure involving TPR, a company called D&K LP, a note (the "D&K Note") and pledge agreements, each trust was allocated an equal share in TPR, which at the time had significant value.  In rough outline, the intent was that TPR would upstream to D&K its share of dividends from the TRI shares and other TPR holdings, and D&K would use the dividends to repay the D&K Note over time to TPR, leading to ownership by each trust, through D&K, of its respective equal share of TPR free of debt.  This is a commonplace installment sale that is typically used in many estate planning arrangements.

5.       In 2004, Arie and Dalia divorced.  Pursuant to the terms of their divorce Arie allocated 1,102.80 shares of TRI to the Orly Trust and the same number of TRI shares to the Sagi Trust.  It is undisputed that Arie and Dalia intended – and as most parents would – that each of their children benefit equally from the family wealth placed in trust for each of them.  OG Ex. 2 (Feb. 7, 2013 Dalia Tr. at 377:13-25); OG Ex. 35 (Arie Tr. 82:3-7).  *See also* OG Ex. 40 (Dalia 2/20/15 Affidavit at ¶ 6:  "Like any good parents, when my ex-husband Arie and I originally established the Orly Trust, our goal was to improve our daughter's, and also specifically our grandchildren's (hopefully her kids') lives. These funds should be used for what we intended - financing education, improving health, and generally helping Orly and our grandchildren build a better life.").

6.      As part of this same allocation of TRI shares, Arie allocated to himself 794.40 shares, and he held proxies for all of the shares allocated to his children's trusts, ensuring majority control of TRI by him.  Arie intended to continue running TRI, the company he founded, just as he had for years building the company.

7.      The terms of the divorce also provided that, after the transfer of the Gengers' TRI shares to the children's trusts and to Arie, "the Wife [Dalia] will have no ownership interest in TRI."  OG Ex. 3 (Divorce Agmt., Art. II, § 9(e)).  Dalia, however, cut a side deal with Sagi in 2004 – which is reflected in the 2004 Promise (defined and discussed below in connection with the "monetized" ruling) – by which she could later claim financial assistance from her children to the extent they realized value "attributable" to the same number of TRI Shares Arie was going to keep for himself (*i.e.,* 794.40 shares).  In a later arbitration in 2008, in which Dalia challenged Arie's valuations of certain assets during the original divorce action, the arbitrator (retired Justice Leo Milonas) awarded Dalia the value of one-half of the 794.40 shares allocated to Arie "in order to correct the marital distribution imbalance, namely $3.85 million."  OG Ex. 4 (at p. 11). Thus, in 2008, Dalia received one-half of what was considered to be the marital interest – the 794.40 TRI shares that Arie was allocated as part of the terms of the divorce.  In this bankruptcy, as this Court is aware, Dalia has since sought a constructive trust with respect to over $12 million of proceeds of the 2013 AG/Trump Settlement from Orly and multiple other parties, wrongly claiming that those proceeds somehow belong to her too.  *See Dalia Genger v. Orly Genger*, Adv. P. No. 20-01010-jlg.

8.      Around this time in 2008, Arie ceded control of TPR to Dalia, who ceded to Sagi. Sagi then had full control over TPR as well as control of a real estate venture in Canada owned by a company that Arie had created to benefit his son and daughter equally.  Orly was not

involved in managing either business and trusted her brother implicitly to safeguard her interests in the family businesses as carefully as he did his own.

**B.    The TRI-Related Actions and Genger Litigation Trust**

9.    After Sagi had control of the family businesses, he implemented changes to establish control over the TRI shares that had been allocated to his and Orly's trusts.  He did this by arranging to substitute new trustees for each trust.  While the Orly Trust originally had two independent trustees prior to the 2004 divorce, Sagi and Dalia insisted that they had the right to appoint a new trustee for the Orly Trust as a condition to Dalia signing the divorce agreement. That led to the resignation of the original trustees.  Sagi then caused his friends and relatives, including his best friend (David Parnes), his in-law, and his mother, Dalia, to serve as trustee of the Orly Trust.  Orly started an action in Surrogate's Court to remove Dalia as trustee shortly after her appointment.

10.    By 2008, the Trump Group, outside minority investors in TRI, challenged the assignments of the TRI shares from TPR to Arie and the two trusts, contending that the assignments were void under a 2001 shareholders agreement and that the challenged assignments activated certain option rights for the Trump Group to acquire the improperly transferred shares. *See generally Glenclova Inv. Co. v. Trans-Resources, Inc*., 874 F. Supp. 2d 292, (S.D.N.Y. 2012); *TR Investors, LLC v. Genger*, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010), *aff'd in part, rev'd in part*, *Genger v. TR Investors*, LLC, 26 A.3d 180 (Del. 2011).

11.    With full control of TPR, D&K and each trust, Sagi secretly negotiated with the Trumps to sell them the TRI Shares that Arie had purported to transfer from TPR to himself and to Sagi's and Orly's trusts.

-13-

12.     Sagi agreed to cause TPR to sell the TRI shares allocated to his trust to the Trumps for $26.7 million.  Later, without discussing the matter with Arie or Orly, he agreed to sell the shares allocated to the Orly Trust for $10.3 million and to sell the remaining TRI shares held by TPR (which had been allocated to Arie) for $7.4 million.  Sagi agreed with the Trumps to discount the shares associated with the Orly Trust and with Arie because, after Sagi had sold "his" allocated shares, the remaining Genger-held shares were no longer a controlling interest in TRI.  Thus, all told, Sagi caused TPR to sell all the Genger-held shares in TRI to the Trumps for a total of $44 million, which money was initially paid to TPR and was later transferred to Sagi or at his direction for his benefit.

13.     Much of the intra-family Genger litigation related to these sales of the TRI shares. The Trumps were also parties to these actions.  Arie, backed by ADBG/Brosers, sued to regain his shares and control of TRI and for various related claims Arie had against the Trumps.  Orly sued on various grounds to recoup from Sagi/TPR the $10.3 million in proceeds from the sale of the TRI shares associated with the Orly Trust and that were intended ultimately to benefit her, and for other damages including that Sagi had underpriced those shares.

14.     Sagi, without opposition from Dalia in her then-capacity as trustee for the Orly Trust, commenced litigation in which he successfully argued that these TRI shares did not belong to Orly or her trust, but rather to TPR (controlled by Sagi), and that TPR was therefore entitled to the proceeds of the sale of those shares to the Trump Group.  *See TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*, 2014 WL 1979932 (S.D.N.Y. May 15, 2014).  In connection with that action, the $10.3 million was held in escrow by the law firm Pedowitz & Meister LLP pending decision on whether it belonged to TPR, the Trumps, the Orly Trust, or Orly.

-14-

15.     To fund these actions, Arie turned to the Brosers, long time family friends who agreed to loan money to Arie to enable him to pay the legal fees needed to pursue his legal actions concerning TRI, the Trumps and Sagi.  Arie entered into loan agreements, borrowing money from ADBG/Brosers starting in 2008.

16.     At the same time, Arie loaned money to Orly to pay her lawyers in the actions she instituted both against Sagi and Dalia and to remove Dalia as trustee of the Orly Trust.

17.     In 2012, Arie established a litigation trust (the "Genger Litigation Trust") to ensure that any recoveries that either he or Orly obtained in their various actions would be held in trust to pay first the outstanding debt Arie owed the Brosers.  OG Ex. 5.  Pursuant to that trust agreement – executed more than seven years before this bankruptcy and a year before the 2013 settlement with the Trumps – Orly is obligated to pay into the trust any recoveries she obtains in her actions against Sagi for fraud and breach of fiduciary duties (discussed below) as well as any recoveries related to her claims against Dalia for breach of her fiduciary duties to Orly.  The trust agreement further provided that those funds are to be used first to repay the loans the Brosers extended to Arie.  *Id*.

18.     The various actions and competing claims concerning Sagi's sale of the TRI shares to the Trump Group and Arie's legal disputes with the Trumps as his former partners in TRI led to the 2013 AG/Trump Settlement.

**C.**     **The 2013 AG/Trump Settlement and Release of $10.3 Million Escrow**

19.     In June 2013, the Trumps reached a $50 million settlement with Arie, Orly and the Brosers.  OG Ex. 6.  At the time, Orly's claim pertaining to the $10.3 million in escrow was still pending against TPR/Sagi.  Orly was included in the settlement in that the Trumps agreed to withdraw any claim to that $10.3 million in escrow and to a mutual general release as between

the Trumps and her, both individually and as beneficiary of the Orly Trust, and with respect to

the TRI shares that Arie had intended to benefit her (called in the agreement the "Orly Trust

Shares"). The Trumps likewise agreed to withdraw any claim to the $7.4 million in escrow

associated with Arie's TRI shares. In addition to releasing any claim to that combined amount of

$17.7 million, the Trump Group also agreed to pay in cash $32.3 million -- for a total of $50

million.

20. The written 2013 AG/Trump Settlement expressly provided that Orly was a party

individually and as the Orly Trust beneficiary. A prior draft had included terms that suggested

the Orly Trust was also a party and was bound by the terms of the settlement, but the references

to the Orly Trust were struck through and excised before final execution to clarify that neither

Orly nor any other party purported to act on behalf of the Orly Trust in entering that settlement.

*E.g., id.* at p. 6. The dispute between the Trumps and the Orly Trust was resolved separately a

few months later, when Dalia, as the trustee, stipulated on August 30, 2013, to the dismissal with

prejudice of the Orly Trust's claims against the Trump Group pertaining to the Orly Trust

Shares. *Genger v. TR Investors, LLC*, No. 6906-CS (Del. Ch. Aug. 30, 2013).

21. The $32.3 million cash payment had two components. The first component was

an immediate payment of $17.3 million by the Trumps upon signing to the AG Group designated

payee, William Wachtel, a long-time friend and lawyer for Arie. That payment was in fact made

in 2013 after the agreement was signed. The financial records show that the full $17.3 million

was transferred from the Trumps to Wachtel, and, at Arie's direction, from Wachtel to an

account controlled by the Genger Litigation Trust, and then to ADBG/Brosers or lawyers for

Arie and Orly who had unpaid legal bills related to the Genger actions. The payment to ADBG

-16-

was in accordance with the loan agreements between the Brosers' ADBG and Arie and the terms

of the 2012 Genger Litigation Trust.  *See* OG Exs. 7 and 8.

22.    The second component consists of two $7.5 million notes that are not payable

until certain conditions are met and subject to set offs.  Both notes suspend the obligation to pay

so long as any legal action related to the Gengers is still pending against the Trumps and they

permit the Trumps to deduct from the amount payable their legal fees in defending any such

actions.  Sagi and Dalia, aware of these preconditions, have maintained nuisance suits against the

Trumps to this day in order to block payment on the notes.   OG Exs.  9 and 10.

23.    After the 2013 AG/Trump Settlement, Orly pressed her claim against TPR/Sagi to

recover the $10.3 million in escrow and for damages from the unlawful sale of the shares

allocated to her trust.  She lost.  In 2014, the court held in that action that the money belonged to

TPR.  *TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*, 2014 WL 1979932 at *8 (S.D.N.Y.

May 15, 2014).  The Orly Trust, controlled by Dalia as the trustee at that time, supported TPR's

position that the funds should go to TPR, and not to the Orly Trust, even though these were

proceeds from the sale of the 1,102.80 TRI shares allocated to the Orly Trust as part of the

divorce agreement.  OG Ex. 11 (*TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP, et al.*, No.

13-08243-JF (S.D.N.Y. April 29, 2014), Docket No. 45, April 29, 2014 Tr. at 26:7-9:  "we don't

object if this Court would direct that the escrow [i.e., the escrowed $10.3 million] be given to

TPR").

24.    Sagi and TPR similarly prevailed in convincing the courts that the proceeds from

the sale of Arie's TRI shares also belonged to TPR on the theory that Arie had no authority under

his shareholder agreements to transfer them away from TPR, making those transfers a legal

nullity.  *See TPR Inv. Assocs.*, *Inc. v. Pedowitz & Meister LLP*, 2014 WL 1979932 (S.D.N.Y.

May 15, 2014); *TR Investors, LLC v. Genger*, 2013 WL 603164 (Del. Ch. Feb. 18, 2013). Thus

Sagi, through TPR, maintained control of and took the entirety of the $44 million in sale

proceeds related to all the TRI shares, despite his parents' intent that the family wealth

earmarked for the children be evenly divided between the two. Moreover, while Arie had

structured TPR, D&K and the two trusts so that each trust was supposed to have equal share in

TPR, Sagi executed a sham foreclosure on the D&K Note, with Dalia's knowledge and consent,

in order to strip the Orly Trust and ultimately Orly of its and her indirect ownership interest, that

originally had been equal to Sagi's, in TPR. *Genger v. Genger*, 2016 WL 1407903, at *15-16

(Sup. Ct., N.Y. Cnty. April 8, 2016), *aff'd*, 147 A.D.3d 443 (1st Dep't 2017).

25.    That enabled Sagi to keep the $44 million from the TRI share sales for himself.

The money was transferred out of TPR to offshore accounts controlled by Sagi originally in

Lichtenstein and later in the Cook Islands. Sagi admitted under cross examination that he

stashed the money offshore as an "asset protection" measure to keep the money away from Orly

in the event she prevailed on any of her legal claims against him. OG Ex. 12 (at 408:5-19,

455:15 to 456:17, 394:10 to 399:5). (As described below, Orly has legal claims against Sagi and

Dalia for this wrongful conduct, which claims are still pending, and she has other claims against

their accomplices; as to all of which she reserves all her rights, claims and defenses.)

D.    **The Federal Actions and the "Monetized" Ruling**

26.    After Sagi learned of the 2013 AG/Trump Settlement, he sued Orly in the 2014

federal action claiming she was in breach of his one-page "2004 Indemnification" letter between

him and Orly, which is based on his one-page "2004 Promise" letter between him and his

mother. Those two letters – devised by Sagi almost a decade before when Orly was only 24

years old –formed in Sagi and Dalia's view a binding contract that required Sagi to pay to his

mother to "support her lifestyle" any amounts up to the total amount either he or Orly received

"attributable" to 794.40 shares of TRI – a number equal to the number of shares Arie was going

to keep for himself out of the Genger-held TRI shares – and required Orly to indemnify Sagi for

up to 50% of any amounts he paid to Dalia under these letter agreements.  OG Exs. 13 and 14.

27.     Upon learning about the 2013 AG/Trump Settlement, Sagi arranged for Dalia to

demand $200,000 under the 2004 Promise.  When Orly refused to pay half of that amount to

Sagi under the 2004 Indemnity, he sued.  In that federal action he obtained a judgment against

Orly for over $350,000 (including awarded interest and attorney's fees).  *Genger v. Genger*, 76

F. Supp. 3d 488 (S.D.N.Y. 2015), *aff'd*, *Genger v. Genger*, 663 Fed. Appx. 44 (2d Cir. 2016).

That judgment was paid.  OG Ex. 65.

28.     Part of Orly's legal defense in this 2014 federal action was her claim that she

never received any money "attributable" to any TRI shares and therefore had no funds from

which to contribute to "support her mother's lifestyle."  That fact was framed in legal terms as

lack of consideration for the 2004 Indemnity, which legal argument was rejected by the Court.

The District Court held that Orly "effectively monetized" her claim to her portion of the TRI

shares by being a party to the 2013 AG/Trump Agreement and that sufficed as "consideration"

under New York contract law.  This is the context of the "monetized" quote that Sagi heavily

relies on in his motion.  The District Court loosely said in dicta that Orly had "effectively

monetized" her interest "to the tune of $32 million," a glib remark made just after quoting

Tolstoy in musing that the Gengers are a uniquely "unhappy" family intent on making each other

"as miserable as possible."  *Genger*, 76 F. Supp.3d at 491.  On appeal, however, the Second

Circuit issued a (less glib) written opinion affirming the holding below but also clarifying that

the question whether or not Orly actually received any money from the TRI shares had not been

adjudicated, holding instead that it did not matter because, as a signatory to the 2013 AG/Trump

Agreement, she received some benefit even if nothing much more than a "peppercorn": "But

surely any $32 million transaction for her shares would confer upon her more than a peppercorn,

*which is all we need to conclude (and all we do conclude)* as to the extent of any benefit she

received." *Genger*, 663 Fed. Appx. at 49 (emphasis added).

29.      After prevailing on appeal, Dalia and Sagi orchestrated a second demand by Dalia

for $6 million under the 2004 Promise and Indemnification and coordinated federal lawsuits

instituted in 2018, first by Dalia against Sagi, and then filed on the same day by Sagi against

Orly.  That led to a second federal judgment in Sagi's favor against Orly, this time for $3 million

(plus interest and attorney's fees).  In the second action, the Second Circuit again on appeal

clarified that the courts did not reach the issue of whether Orly "in fact [] received such

payments" "attributable to her portion of the TRI marital shares"; the Court held it did not need

to adjudicate that issue because the judgment entered in favor of Dalia against Sagi was

unchallenged and that judgment triggered the 2004 Indemnity regardless of whether or not Orly

actually received any TRI-attributable funds.  *Genger v. Genger*, 771 Fed. App'x 99, 101 (2d

Cir. 2019).

30.      This was the final blow to Orly.  Shortly after the Second Circuit affirmed the $3

million-plus judgment against her in its June 28, 2019 opinion, Orly filed for bankruptcy on July

12.

       **E.      Sagi's Enforcement Actions**

31.      Nor was the bankruptcy a surprise.  In the months leading up to the June 2019

appellate decision, Sagi had served dozens of judgment-enforcement subpoenas and restraining

notices on Orly's circle of family, friends, and past and current business associates.  Seizing her

bank account that had only a few thousand dollars, he both knew that she had no assets to pay his $3 million judgment and that his actions in seeking enforcement were leaving her no way out except bankruptcy.

32.     He served such subpoenas on, not only her husband, law firms and accountants, but also on New York art galleries that had ever shown interest in Orly's art.  He served Orly's friend, a jewelry maker and sole proprietor working out of her home in a San Francisco suburb, who created some jewelry in collaboration with Orly.  These subpoenas ended any chance of Orly making a living on her own, as an artist or otherwise.

33.     He also served invasive subpoenas on her husband Eric Herschmann, trying to interpose himself between Orly and her husband and to levy any economic sustenance she received from her marriage.  That invasive maneuver threatened to end any economic support Orly could manage from her marriage.

34.     He also tried to cut off Orly from her father and the Brosers.  He served them with enforcement subpoenas and what he called a "turnover" action, claiming that they had been party to what he claims was Orly's fraudulent conveyance of the $32.3 million in cash settlement proceeds.  *Sagi Genger v. Orly Genger*, No. 17-cv-8181 (VSB) (S.D.N.Y. June 11, 2019) (ECF Nos. 212-214).  In this way, Sagi sought both to end any conceivable source of funding to continue her legal actions against him and their mother (described below) and to enable him to levy against the $17.3 million previously received by Arie and ADBG and on the two remaining $7.5 million AG Notes.

35.     Contrary to Sagi's claim that Orly filed for bankruptcy only to avoid his "turnover" action filed in June 2019 (see Mot. ¶ 49, 54), in fact, some *six months before then* Orly had openly declared that, in the event the $3 million judgment is sustained on appeal, she

would have no choice but to file for bankruptcy: "Mr. Dellaportas [Sagi's counsel] well knows that if this judgment is upheld on appeal, that Orly will file for bankruptcy. That has been made clear. … Orly Genger has said it under oath. It has been – it becomes abundantly clear that's what will transpire." OG Ex. 15 (Jan. 8, 2019 Tr. at 67:9-14).

### F.    Orly's Bankruptcy Filing and Lawsuits Against Sagi and Dalia

36.    Orly filed this bankruptcy action – originally in Texas, where she lives – on July 12, 2019. On Sagi's prior motion to dismiss or to transfer venue, the bankruptcy court in Texas transferred the action here, but declined to dismiss, leaving that for this Court to decide.

37.    Orly was represented by bankruptcy counsel in Texas, who prepared her bankruptcy petition and accompanying schedules. While Sagi criticizes the preamble to her petition schedules as some sort of attempt to avoid filing under oath, the plain words of that document written by her counsel – albeit legalese – rebut that claim.

38.    The same goes for her description in her schedules related to the $32.3 million. Contrary to Sagi's claim that Orly failed to disclose this money as (what he claims is) an "asset" of her estate, she – and her legal counsel – in fact expressly identified the issue and the whole morass of competing claims pertaining to that money by expressly listing the particular legal actions in which this money is at issue and she expressly noted that other parties alleged this was a potential asset of her estate. OG Ex. 16 (Pet. Sch. E/F pp. 20-21). Far from concealing, Orly's schedules disclosed this money by accurately identifying the competing claims pertaining to it in various legal actions.

39.    The rest of her petition and schedules affirm that she has no appreciable money in financial accounts and owns no real property other than her half-interest in her home gifted by her husband upon their marriage.

40.     The only other assets Orly has are her litigation claims against Sagi and Dalia

(and their affiliates) to recover millions in damages based on their fraud and breaches of

fiduciary duties.

41.     Orly has two pending fraud/fiduciary duty actions against Sagi.  In a 2009 action

against Sagi, New York Supreme Court held that Sagi had breached his fiduciary duties to Orly

by engaging in a sham foreclosure action related to the D&K Note to strip her of her share of

TPR.  *Genger*, 2016 WL 1407903.  After a damages inquest, the court held TPR was worthless

at the time and that, accordingly, Orly was entitled to no damages.  That matter is pending

appeal.  In a 2008 action, the state court held that Sagi had fraudulently induced Orly to sell her

interest in the family Canadian real-estate venture, that he was generally not credible and that he

and his close friend and lawyer, David Parnes, had routinely falsified business records.  *Genger*

*v. Genger*, 2016 WL 551444 (Sup. Ct., N.Y. Cty. Feb. 10, 2016), *aff'd as modified*, *Genger v.*

*Genger*, 144 A.D.3d 581 (1st Dep't 2016).  Those findings were upheld on appeal, and the

matter was remanded to determine damages.  *Genger v. Genger*, 144 A.D.3d at 582-583.  While

a court-appointed accountant determined that Orly was injured by the fraud, he recommended

nominal damages, but the state court has yet to hold the continuation of the trial on damages.

42.     This fraud trial against Sagi is the only one of the many litigations involving him

that resulted in a plenary trial where he testified in open court and verdict.  Sagi's tactics at this

trial are revealing.  He first claimed to be ill to avoid or at least delay the trial.  He then launched

repeated *ad hominem* attacks on Herschmann, who after having only recently met Orly

substituted as her counsel because her then-lawyer was ill.  Sagi claimed without any good faith

basis that Herschmann had some prior business dealings with Orly's father, insinuating that his

motives were corrupt – even though Herschmann had at that time only recently met Orly, had no

prior dealings with the Gengers, and Sagi had no cause or grounds to impugn his integrity.

43.    Sagi lost at trial. The court held, after hearing his and Orly's diametrically

opposed testimony, that Orly was credible and Sagi was not, finding that Sagi had made material

misrepresentations that Orly reasonably relied on and that Sagi had falsified business records.

These findings were upheld on appeal by the Appellate Division, which remanded for further

proceedings on damages. In that action, among other findings that were unanimously upheld on

appeal, the trial court ruled:

- Sagi "had no trouble creating false documents" and that his testimony
  was so rife with "prevarication," "evasiveness," and "equivocation" as
  to "warrant doubt as to his general credibility";

- Sagi, in concert with his friend and attorney, David Parnes, created
  "false" and fictitious "legal" documents to defraud Orly;

- "Given the long and close personal and business relationship between
  defendant [Sagi] and Parnes, [Sagi]'s claim that he did not recognize
  Parnes's handwriting on the documents underlying the [fraudulent]
  transaction is incredible"; and,

- Sagi demonstrated a "proclivity to execute undated and backdated
  documents."

*Genger, supra,* 2016 WL 551444.

44.    Orly also has pending claims against her mother. She sued Dalia in Surrogate's

Court over ten years ago to remove her as trustee and for damages related to her breach of

fiduciary duty and conflicts of interest. The last decision in that matter was in 2017, in which the

Surrogate's Court denied Dalia's motion to dismiss. Despite its age, that action is only just past

the pleading stage and is nowhere near resolved. It was removed to this Court for further

proceedings and OGT and Dalia both moved to remand. Orly also sued Dalia in Supreme Court

for fraud, which was *sua sponte* improperly dismissed by that court during the pendency of this
chapter 7 bankruptcy.  The appeal of that wrongful dismissal is pending.

### G.   The InterCreditor Agreement and OGT Debt-Funded Litigation

45.     As noted above, Sagi has acknowledged that other parties lay claim to the $32.3
million that he claims belongs to Orly.  That is exhibited in the intercreditor agreement signed by
him, OGT, Recovery Effort, Inc. ("REI") and Manhattan Safety Maine, Inc. ("Manhattan
Safety").  The intercreditor agreement expressly notes that OGT, REI, and Manhattan Safety
*agree with Orly* that she is not entitled to and has no interest in the $32.3 million; rather, they
claim that money belongs to OGT, which is obligated to use those funds to repay alleged debt
held by Manhattan Safety and REI.

46.     REI was created in early June 2019 as a wholly owned subsidiary of OGT.  The
purpose of REI is to borrow money, pledging OGT unrealized legal claims to the $32.3 million,
to fund OGT's litigation efforts to recover the $32.3 million.  It has thus taken on significant debt
to its lender.  Manhattan Safety was created around the same time and it purchased debt from
TPR that TPR claimed was owed to it by OGT related to the D&K Note.  The person behind
Manhattan Safety is the same person who is lending money to REI.  That is Robin Rodriguez,
Sagi's long-time friend and business partner.  Sagi has been investing with Rodriguez since
2008, and, in or about 2016, began working for his company, Cordell Funding, assisting in
various financing projects, for which he earned a salary of $600,000 per year.  OG Ex. 12 (Tr.
369:25 to 372:10; and 496:11 to 497:12).

47.     Rodriguez is also the one who enlisted an old Arkansas colleague of his, Michael
Oldner, to set up REI and then to assume at Sagi's behest the role of (purported) successor
trustee of OGT.  Oldner never even met or communicated with Dalia, the "resigning" trustee

who supposedly signed the designation appointing Oldner as successor trustee; he was

interviewed only by Sagi at a bakery in Arkansas, at which time Sagi presented him with all the

paperwork for OGT and the intercreditor agreement.  Oldner discussed and/or negotiated these

matters only with Sagi and somewhat with Rodriguez.  Oldner professes bewilderment as to how

REI was set up using his Arkansas home address and has no explanation why a corporate filing

service sent him an email two days after REI was created under Arkansas law congratulating him

on the successful creation of "your company" or even why he then forwarded to Sagi days later

that same email with REI by-laws and other documentation designating OGT as the sole REI

owner– all of which happened before he was the (supposedly) appointed trustee.  OG Ex. 17

(May 19, 2021 Oldner Tr. 617:6 to 622:24, 628:24 to 632:13, 765:13-15, and 766:14 to 767:3);

OG Ex. 33 (June 6 Oldner email to Sagi, with attachments); Ex. 36 (Dalia Genger RFA Resp.

No. 4).

48.     Sagi is the common connection behind REI, Manhattan Safety, and OGT.

49.     He is also behind every step Dalia has taken in this matter.  The intercreditor

agreement notes that Dalia intends to demand the full amount of the money she claims to be

entitled to under the 2004 Promise, which Sagi and Dalia calculate to be approximately $24

million.  In fact, Sagi arranged in December 2019 for Dalia to commence an action against him

in Florida – even though he lives in Connecticut and Dalia in New York – for $18.5 million,

which in a coordinated January 2020 "agreed" judgment he agreed to pay to Dalia, intending

thereby to bind Orly for half that amount.  OG Ex. 18 (FL complaint and agreed judgment).  This

was done during the period Dalia claims she was incapacitated (OG Ex. 37) and well after Orly

had filed for bankruptcy in an obvious attempt to evade detection by Orly and to end-run the

automatic stay.  By their lights, Orly thus now owes Sagi – even though he has paid practically

nothing to Dalia – a total of over $12 million (plus interest and attorney's fees) under the 2004 Indemnity, which represents half of the $24,500,000 Dalia supposedly now needs to support her lifestyle despite being mentally incapacitated.  OG Ex. 14.

50.    Although Dalia interposed her own separate claim to a substantial part of this same $32.3 million, claiming that it is held in a "constructive trust" for her – which competes with the claim by OGT, REI, and Manhattan Safety that this same money belongs to OGT, which competes with Sagi's claim that it belongs to Orly – she has been unavailable in this action.  Despite Orly's and other parties' discovery demands, Dalia has not testified, and her counsel produced practically nothing in discovery.  She has not even met or communicated with the current or predecessor Chapter 7 Trustee.  The doctor's letters submitted on her behalf to excuse her from testifying demonstrate that she did not have the legal capacity to make any of the decisions attributed to her since at least June 2019 – which invalidates the appointment of Oldner, the Florida consent judgment for $24 million and her constructive trust claim for the $32.3 million that lies at the heart of this case.  And it confirms that Dalia's "demands" are a sham:  Sagi is orchestrating Dalia's litigation position, and he is the one who is driving these claims about the $32.3 million because he is the one who stands to gain, along with Oldner and Rodriguez.  OG Ex. 37 (under seal doctor letters concerning Dalia); OG Ex. 38

51.    This is further demonstrated by Sagi's "rider" to the intercreditor agreement. That addendum, which Sagi procured after Orly filed for bankruptcy, provides that even if his claim against Orly is discharged in bankruptcy, he still is entitled to recover the entire amount of his claims set forth in the intercreditor agreement.  OG Ex. 39.

52.    Sagi's "fingerprints" on this whole web of claims is fully revealed by the purported general "releases" that Sagi arranged for Oldner (as purported OGT trustee) to sign on

August 15, 2019, after Orly filed for bankruptcy the previous month.  Those releases purport to

release and discharge, not just Dalia, but also Sagi and his wife, David Parnes (Sagi's friend,

personal lawyer and a prior OGT trustee), TPR and D&K GP from any and all claims that not

only OGT may have had against them, but also any such claims the trust beneficiaries may have

had.  OG Exs. 19-22.  That is, they purport to release *Debtor's* claims (as the OGT beneficiary)

against Sagi, Dalia, Sagi's wife, Parnes, TPR and D&K – in blatant violation of the automatic

bankruptcy stay and despite the fact that Orly has pending claims against Dalia in both

Surrogate's Court (removed to this Court) and on appeal in New York Supreme Court.  Sagi in

fact admitted in his deposition the releases were intended to end Orly's claims against him and

their mother.  OG Ex. 23 (Sagi Tr. 206:21 to 207:12:  "I said I'd like to close this thing out …

there was trial but there was zero damages … there was still theoretically a possibility of

appeal").

      53.     In addition to violating the automatic stay, these releases betray the rot at the core

of the Sagi cohort.  Sagi testified that Oldner prepared the releases.  OG Ex. 23 (Sagi Tr. 203:6-

8, 205:7-18).  But Oldner said he got the releases from Sagi.  OG Ex. 24 (Oldner Vol. 1 Tr.

233:23 to 234:9); OG Ex. 17 (Oldner Vol.3 Tr. 556:3-6, 557:3-9, 589:23 to 590:2).  Oldner

testified he gave the general releases to all these people and entities, without any earnest due

diligence or even understanding who some of these people or entities are, solely because Sagi in

exchange "obligated" himself to cooperate "fully" with OGT in its efforts to recover the $32.3

million *for OGT*.  OG Ex. 24 (Oldner Vol.1 Tr. 202:17 to 203:1; Ex. 17 (Oldner Vol.3 Tr. 574:14

to 575:6; 577:1 to 578:1, 612:18-22, 615:2-10, 591:24 to 593:10, 596:10 to 597:8, 559:1 to

560:1.)  Sagi admitted in his deposition that he asked for the releases and that, if Oldner wanted

to "work together," he had to give the releases:  "That I asked for it and he ultimately agreed to

it." OG Ex. 23 (Sagi Tr. 206:11 to 207:12). But the intercreditor agreement was signed by Oldner (for OGT) in June *before* the releases were signed in August; and that agreement starkly shows that Sagi and Dalia are intent only on making sure *they* get the $32.3 million for themselves, *not* OGT. Oldner's testimony is therefore either knowingly false or he is a complete dupe. Either way he is a shill for Sagi.

54.     The terms of the intercreditor agreement ensure that, if any party to that agreement recovers any portion of that money under any theory, it is to be used first to pay off all of *Sagi's* claims, including all of his expenses and legal fees, and then all of the debt owed to Manhattan Safety, with any balance remaining to be used to repay all of REI's debts incurred in these legal proceedings, including paying Mr. Oldner for his services. See OG Ex. 25 and Ex. 24 (Oldner Tr. 302:24 to 303:23, 316:19 to 317:10). It leaves nothing for OGT.

55.     Under questioning, Mr. Oldner – obviously discomfited by the all-too-apparent collusion and violation of fiduciary duties to OGT's beneficiary – blurted out that he viewed this entire arrangement and the executed Intercreditor Agreement as somehow nonbinding and subject to later negotiation. He insisted that, despite the very wording of the agreement and all the evidence to the contrary, he intended to see to it that OGT's interests are kept entirely separate and apart from Sagi's. OG Ex. 24 (Oldner Tr. 309:2 to 310:9). Really. That is simply not believable on this record.

56.     But that is precisely what this bankruptcy is for: to stop these self-professed "creditors" from ganging up on Orly so that she can get on with being a productive member of society. One who is again – after more than a decade – free to contribute economically, socially, artistically, and as a full independent adult free to live her life. That is why she filed this case, in good faith, and it is exactly the purpose of the Bankruptcy Code.

## ARGUMENT

57.    This bankruptcy, filed in July 2019, has been pending now for almost two years. During that time Sagi and other creditors long-ago filed multiple adversary proceedings and have sought other benefits under the Code.  He nonetheless presses for dismissal on two grounds:  (1) his claim that Orly acted in bad faith in filing her petition sufficient to warrant punitive dismissal under 11 U.S.C. § 707(a); and (2) his claim that her bankruptcy is a sham attempt to avoid what is really a two-party dispute better adjudicated in pending federal actions, which he claims warrants dismissal as a matter of equity pursuant to 11 U.S.C. § 305(a).  Under both statutory provisions, Sagi, as movant, bears an onerous burden of proof.  *In re Aiello*, 428 B.R. 296, 299 (Bankr. E.D.N.Y. 2010) (movant has burden); *In re Chovev*, 559 B.R. 339, 345 (Bankr. E.D.N.Y. 2016) (section 707(a) is an "exacting standard'); *In re Grullon*, 2014 WL 2109924, at *4 (Bankr. S.D.N.Y. May 20, 2014) (standard is "stringent").  Dismissal is the extreme exception to the general rule favoring a debtor's right to file a bankruptcy case and obtain a discharge in order to have a chance at a fresh start.  To prevail, Sagi thus must show under exacting standards that Orly deserves to be denied her federal right to file for bankruptcy.

58.    He does not come close.  Not only that, he has no good faith basis himself for seeking dismissal – a point highlighted by the fact that other creditors who previously sought dismissal dropped their joinder in this motion, leaving Sagi as a lone movant.  E.g., OG Ex. 24 (Oldner Tr. 263:19 to 264:24).  He seeks dismissal only for his own personal benefit.  It is this rush to the courthouse to obtain priority in judgment enforcement that bankruptcy is intended to redress; dismissal here, sought by a single creditor, would undermine that core purpose of the Code.

## I.   **NOTHING DEBTOR DID WARRANTS SECTION 707(a) DISMISSAL**

59.    Section 707(a) of the Bankruptcy Code provides limited grounds for dismissal.
By its plain terms it allows for dismissal "only for cause" upon notice and after a hearing, and
the "cause" is defined, by nonexclusive example, as intentional noncompliance in connection
with filing or other post-petition wrongdoing like "unreasonable delay by the debtor that is
prejudicial to creditors" or "nonpayment of any [bankruptcy] fees."  11 U.S.C. § 707(a)(1) and
(2).

60.    This Section nowhere specifies that "bad faith," either pre- or post-petition, may
be considered "cause" for these purposes.  *See In re Chovev*, 559 B.R. 339, 344 (Bankr.
E.D.N.Y. 2016) (noting no express reference to bad faith in this section, in contrast to Section
707(b)).  While some courts have concluded otherwise, the prevailing view is that "bad faith" is
not "cause" for purposes of Section 707(a) because Congress omitted it from that subsection
while including "bad faith" as cause in Section 707(b), which applies to filers with consumer
debts.  *See id.*  "If Congress intended 'bad faith' to be a reason for dismissal of any Chapter 7
case, it would have added that term to section 707(a) which applies to all chapter 7 cases.  It did
not."  *In re Lobera*, 454 B.R. 824, 838 (Bankr. D.N.M. 2011).

61.    Sagi cites nothing to the contrary (and certainly no controlling decision).  The
"bad faith" cases he does cite—*In re 167 West 133rd Street Housing Development Fund Corp.*,
2018 WL 4637460 (Bankr. S.D.N.Y. Sept. 25, 2018) and *In re Syndicom Corp.*, 268 B.R. 26, 51-
52 (Bankr. S.D.N.Y. 2001)—are Chapter 11 cases and so do not implicate Section 707(a)'s
"exacting standard."  *In re Chovev*, 559 B.R. at 345.

62.    Sagi misleadingly proposes (Mot. ¶ 47) that a 15-factor test, promulgated in *In re
Lombardo,* 370 B.R. 506 (Bankr.E.D.N.Y.2007) is the "most commonly and recently utilized

§ 707(a) test." He's wrong. It has never been adopted or applied by the Second Circuit. Only

one court in this District has referred to it, and not favorably. *See In re Ajunwa*, 2012 WL

3820638, at *1 (Bankr. S.D.N.Y. Sept. 4, 2012) (noting but not applying the *Lombardo* factors

and finding no bad faith in filing for bankruptcy). Two years later, the same Judge (Judge

Gropper) expressly rejected the *Lombardo* factors as unfaithful to the parameters of Section

707(a). *In re Grullon*, 2014 WL 2109924, at *4 (Bankr. S.D.N.Y. May 20, 2014). "It is not

enough simply to list factors and assert that they add up to 'bad faith.'" *Id*. Rather, the proper

inquiry is not application of the *Lombardo* factors but whether the allegedly bad faith conduct

fits within the four corners of section 707(a):

> If a debtor's conduct is to be considered "cause" for dismissal under § 707(a),
> it should be the type of conduct described in that section—all of which relates
> to ***post-petition conduct of a debtor after the filing*** . . .. it should be conduct
> not dealt with elsewhere in the statute . . .. there is general consensus that the
> standard for finding bad faith under § 707(a) is stringent, and 'is generally
> utilized only in those egregious cases that entail concealed or misrepresented
> assets and/or sources of income, and excessive and continued expenditures,
> lavish lifestyle, and intention to avoid a large single debt ***based on conduct
> akin to fraud, misconduct, or gross negligence***.

*Id*. (emphasis in original). *See also In re Chovev*, 559 B.R. at 347-48 (citing *Grullon*). *See*

*generally* 2 Bankr. Law Manual § 10:17 (5th ed. & June 2020 Update).

63.    As *Grullon* makes clear, while the examples cited in Section 707(a) are not

exclusive, the wrongful conduct must be extreme and it must be the same type of conduct cited

in that section, *i.e.*, conduct that pertains to the bankruptcy filing itself or post-petition conduct.

*Grullon*, 2014 WL 2109924, at *4. *See generally Janvey v. Romero*, 883 F.3d 406, 412 (4th Cir.

2018) (bar for finding of bad faith is "a high one"), *citing In re Zick*, 931 F.2d 1124, 1129 (6th

Cir. 1991); 6 COLLIER ON BANKRUPTCY, § 707.03 (Alan N. Resnick & Henry J. Sommer eds.

16th ed. 2015) (court has discretion in considering other misconduct under Section 707(a) but must consider "extenuating circumstances").

### A.    <u>Sagi Has No Proof of Bad Faith or Any Egregious Wrongdoing</u>

64.    Sagi has no proof of any intentional abuse by Orly in filing her petition or in her conduct of this bankruptcy and certainly nothing that even comes close to bad faith or fraud on this Court or similar extreme misconduct that warrants the extreme remedy of dismissal.  His claim (Mot. ¶ 40) that Orly intentionally failed to disclose and fraudulently concealed in her petition *his position* that she is legally entitled to the $32.3 million in settlement cash is disproved by the petition itself.

65.    The very first pages of Orly's petition expressly state, "Third parties have asserted, in various litigation, that Debtor may have claims that the Debtor does not believe exist."  OG Ex. 16, at 3.  She states it again on the next page:  "Debtor has identified claims that third parties, in various litigation, may have suggested that she owns (and which Debtor does not agree exist)."  *Id.* at 4.  The attached schedules also identify as *assets* of the Estate three separate cases where third-party claims are asserted by Sagi, Manhattan Safety and REI, two turnover petitions filed by Dalia in Surrogate's Court, and the very District Court case that reiterated the "monetized" ruling and in which Sagi filed his "turnover" claim – all of which assert either *his* claim that Orly has a legal right to the $32.3 million or that OGT does.  *Id.* at 13, 57, 61, 63.  If Sagi's objection is that the figure "$32 million" nowhere appears in her petition, that by no stretch amounts to concealment.  Even Sagi, under questioning, had to admit that Orly's petition does in fact disclose his claim about the $32.3 million and the two $7.5 million notes.  OG Ex. 23 (Sagi Tr. 293:18 to 294:24:  "Q:  That also relates to the two seven and a half million-dollar promissory notes, right sir?  A:  Yes.").

-33-

66.     It is by no means concealment to do what Orly did here, which is citing to the many variations of the claims made by others about the $32.3 million rather than trying to restate in summary form those multiple competing and contradictory claims herself in her own petition. Her choice to disclose this information in this way as opposed to the way Sagi prefers is just a matter of stylistic preference.  That obviously is not egregious wrongdoing under the "stringent" 707(a) standard.  *Grullon*, 2014 WL 2109924, at *4.   Nor is it proof of an intention to "avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence" when she in fact *did list* the overwhelming claims made by Sagi and his cohort against her based on their different theories as to the $32.3 million. OG Ex. 16 (Pet. Sch. E/F, pp. 20-21).  In fact, Sagi himself acknowledged in the intercreditor agreement the legitimacy of the claim made by OGT that the $32.3 million is *not* part of Orly's estate, which is *consistent with Orly's position* in her petition.

67.     Sagi's motion also suggests that Orly really has money even apart from the question of the $32.3 million.  He suggests (as he has in multiple litigations) that Orly lives a "lavish" lifestyle based on his insinuation that what's her husband's is hers.  See Mot. ¶¶ 29, 43. But that ignores their pre-marital agreement, which is already adjudicated as binding and enforceable and which unequivocally separates and bars Orly from her husband's wealth.  OG Ex. 26.  The AmEx statements showing Orly's use of her husband's credit to buy household goods and personal items, if anything, prove only that she has no money left or remaining credit of her own to buy necessities.  See, e.g., OG Ex. 27 (Aug. 17, 2020 Orly Tr. 91:20 to 93:16).

68.     Sagi's complaint about the "Deed of Trust" filed by Orly and her husband related to their home in Austin – which he alleges was done in reaction to him domesticating his $3 million federal judgment in Texas – is also no indicator of any bad faith or egregious wrong.

The deed conditionally transfers Orly's residual rights to her fifty percent (50%) interest in the couple's property to a trust for the benefit of her husband.  OG Ex. 28; OG Ex. 61.  The plain terms of that deed make the transfer conditional upon a finding that Orly cannot maintain her homestead claim to this interest under Texas law.  It does not affect any valid prior lien.  Her husband, who is owed $2 million in principal, had the absolute right to require Orly, as a debtor on his secured note, to agree to the Deed of Trust.  See OG Ex. 9 (EH Note).  Such open and above-board self-help by a secured creditor is not untoward.

69.     Nor is Orly in on some grand conspiracy with her father and husband to "round trip" her own money through a fabricated $2 million debt to her husband, as Sagi claims (¶ 29).  The evidence is unrefuted that she owed more than $2 million to her lawyers at the end of 2016 and that her husband, Eric Herschmann, loaned $2 million to her and Arie so they could pay her lawyers on the express understanding, later memorialized in a secured note, that it is a loan to both Arie and Orly as co-borrowers.  OG Exs. 9 and 30.  All the evidence confirms the loan proceeds were transferred, at their direction as borrowers, from a Herschmann account to her lawyers, who applied that money to her outstanding balance on law firm legal invoices.  OG Ex. 31 (KBT acct. statement).  Sagi has no witness or documentary proof otherwise.

70.     So, instead, he claims – with no proof and no even conceivable good faith basis – that the Kasowitz law firm invoices are a sham.  Mot. ¶ 34.  For Sagi to prove this, he has to prove that Orly, her father, her husband (Eric Herschmann, an eminent member of the bar) and a prominent national law firm all conspired to falsify business records and commit fraud just to "round trip" $2 million that belongs – not to Orly – but to Herschmann.  What would be the point of that?  None.  It makes no sense.  The only proof is Sagi's allegation itself which is proof enough of the absurdity and falsity of his claims.

71.     His remaining arguments about Orly transferring money to trusts or to her lawyers

in the three- or four-years pre-dating her filing are much ado about peanuts.  As a threshold

matter, that is not post-petition conduct that can satisfy Section 707(a)'s exacting standard.  In

any case, that money is at best a few hundred thousand dollars and is dwarfed by her legal bills

in 2015 and 2016 alone and any one of the multi-million dollars in debt held by any one of her

creditors.  Moreover, shortly after this period she arranged to pay *Sagi himself* over $350,000 on

his first judgment against her.  OG Ex. 65.  This hardly fits the bill of egregious conduct.  Her

conduct in making those payments on outstanding legal bills and transferring some assets to

trusts had nothing to do with her bankruptcy, which was not even contemplated until the $3

million judgment obtained by Sagi in 2017 and cannot constitute bankruptcy fraud.  After all,

each of those trusts are listed in her petition and laid bare by this proceeding.

72.     Sagi's claim (¶¶ 30-32) that Orly and her lawyers (including her current counsel

in this bankruptcy) concealed agreements among the AG Group members with "false" testimony,

even false testimony by counsel, has already been debunked.  Dalia made the same claims in her

"constructive trust" adversary proceeding, which was partially dismissed by this Court and is

pending decision on the balance of the motions to dismiss.  *See Dalia Genger v. Orly Genger*,

Adv. P. No. 20-01010-jlg (Dkt No. 12-14, 25-36).  Merely reading the testimony in question,

rather than the elided and distorted version Sagi offers, refutes his unsupported (and

unsupportable) accusations of perjury.  OG Ex. 62.  At the March 19, 2021 hearing, this Court

already rejected the very same argument, based on the same ellipses, that Sagi offers here,

dismissing Dalia's action as against Orly's current counsel.  OG Ex. 63 (Tr. 113:17-22).  Sagi's

claim that the March 2017 agreement, which clarifies priority of debts Arie owes to Herschmann

and to ADBG, was only "accidentally revealed" (Mot. ¶ 31) is belied by the fact that he himself

admits that a produced promissory note on its face refers to the March 2017 agreement.  OG Ex 9 (at § 6(f)).  That is not concealment.

73.     Such allegations by Sagi "against the Debtor simply do not amount to conduct that is so egregious that this Debtor should be shackled with her prepetition debts for possibly the rest of her life."  *Grullon*, 2014 WL 2109924, at *4.

## B.     Contrary to Sagi's View, the "Monetized" Ruling is Not Preclusive

74.     Part of Sagi's argument that Orly was concealing something that she in fact did not conceal is his (misguided) argument that the "monetized" ruling means she in fact has $32.3 million and should have said so in her bankruptcy, presumably citing the "monetized" ruling. See Mot. ¶ 40.  But that ruling is not preclusive, no matter how many times Sagi intones the contrary.  It does not and cannot change the "facts on the ground," the reality that she neither has this money nor, in her good faith view, a legal right to it.

75.     The doctrine of collateral estoppel, or issue preclusion, "prevents the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding." *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991).  The doctrine applies only when: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was *actually litigated and actually decided*, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was *necessary* to support a valid and final judgment on the merits."  *Fernandez-Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 364 (S.D.N.Y. 2020), quoting *United States v. Hussein*, 178 F.3d 125, 129 (2d Cir. 1999) (emphasis added).

76.     Because this issue was never "actually litigated" or "actually decided" and was not "necessary" to support the final judgments in the federal decisions either issuing or reviewing

the "monetized" ruling, these two cases (and related appellate decisions) have no preclusive effect with respect to the fact question now squarely at issue – that is, the question whether and if so to what extent Orly is legally entitled to the $32.3 million in light of the claims to that same money by other members of the AG Group who are also signatories to the 2013 AG/Trump Settlement but who were not parties in the earlier proceedings. As noted above, each time Orly made the factual claim in the prior federal proceedings that she neither received any portion of the $32.3 million and has no legal claim to that money, the court avoided deciding that issue by deciding instead (as all that needed to be decided and all that was decided) that she received at least "more than a peppercorn" or in the second case that the issue was precluded altogether on procedural grounds. *See Genger v. Genger*, 663 F. App'x 44, 49 (2d Cir. 2016), discussed *supra*. Nothing in the holdings of these prior federal decisions turns on having *actually* or *necessarily* decided that Orly is entitled to or has already received the full $32.3 million.

77.    Because these other members of the AG Group, namely Arie and the Brosers, were not parties in the prior federal cases, those rulings, even as expansively interpreted by Sagi, have no preclusive effect on them: "[A] person who was not a party to a suit generally has not had a full and fair opportunity to litigate the claims and issues settled in that suit." *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 42–43 (S.D.N.Y. 2015) ("As a general rule, a judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.").

78.    These parties are not so closely aligned with Orly as to be in privity with her for purposes of adjudging them bound by the previous decisions. For purposes of res judicata, "requisite privity" does not exist unless there is a "substantial identity of the incentives of the earlier party with those of the party against whom *res judicata* is asserted" such that the party to

the previous action necessarily advocated the same position with the same efficacy that the

nonparties would have done had they been before the court. *Chase Manhattan Bank, N.A. v.*

*Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995). That is not the case here. Obviously, the

rational economic incentive of Orly with respect to these funds is not the same as that of the rest

of the AG Group. Orly's interest extends only to the point of demonstrating that the funds do not

belong to her; Arie and the Brosers have a separate economic interest in demonstrating that the

funds in fact belong to Arie: She does not care from a rational economic point of view if the

funds are ever paid; Arie does. To the extent that Sagi argues privity based on some common

conspiratorial objective, that, at best for him, would require fact finding and rulings on his

underlying "conspiracy" claim that these parties (and their eminent legal counsel) are all

involved in some multi-year "collusion" and coverup to hide what they all knew and agreed was

solely Orly's money despite the fact that they too are members of the AG Group and signatories

to the 2013 AG/Trump Settlement. As outlined above that "conspiracy theory" is flat false and

Sagi has no evidence, and certainly not the required clear and convincing evidence, to prove such

an extraordinary claim. All the parties with direct personal knowledge about that agreement and

the allocation of the settlement proceeds – i.e., *admissible* evidence, as opposed to Sagi's

sweeping denouncements – concur that the $32.3 million belongs to Arie and secondarily to the

Brosers.

79.    In any case, Sagi misstates the "monetized" ruling and distorts the logic

underlying both that decision and the 2013 AG/Trump Settlement. In Sagi's view, Orly is

entitled to the $32.3 million in cash settlement proceeds because there is, in his view, no other

explanation for why she is a party to that agreement. That, as noted, overlooks the $10.3 million

in escrow (expressly related to the Orly Trust shares), as to which the Trumps agreed to

withdraw any claim.  It also misleadingly ignores Arie and the Brosers altogether.  They, too, are signatories and members, indeed Arie is the principal member, of the AG Group, which bears Arie's initials.  Sagi's theory cannot explain why Arie or the Brosers would have agreed to all the settlement cash going only to Orly.

80.    In fact, as Orly, Arie and ADBG/Brosers have and will attest, the cash settlement payment was paltry compensation for what Arie was giving up in exchange – namely, full control of, and significant ownership interest in, *his own* highly-profitable company that he founded and nurtured for 25 years to such great success.  In Orly's mind, she had no claim on the fruits of the Genger TRI shares except as a recipient of Arie's largesse, of whatever amount he elected to gift to her; and that gift was up to him.  He was the one who built TRI; not Orly.  Orly was a young child for most of the time Arie ran TRI.  And Arie is the one who negotiated with the Trumps, not Orly; he created the AG Group and structured the terms as to her and as to him, not Orly; he involved Wachtel and retained him as the lawyer for the AG Group, not Orly.  Orly never for a moment viewed her signature to this agreement – which to her was principally between her father and his former business partners involving an intricate years-long business relationship of which she knew very little – as somehow a means by which she (or Sagi), as Arie's offspring, could wrest away from him any and all economic vestige of his life's work.

81.    To her, Arie is entitled to that $32.3 million in cash – as the least that could be managed for him from the wreckage of Sagi's dealings with the Trumps and the Trump-favored rulings in the courts.  That was her express intent (and Arie's and the Brosers') all along.

**C.    Sagi's False Oath Claim Is Both Untrue and Not Grounds for Dismissal**

82.    Sagi also attacks the "Global Notes" addendum that Orly's prior bankruptcy counsel (in Texas) added to her petition schedules, which is chock full of legalese and

-40-

reservation of rights.  He protests that the petition schedules are written as if information is only

"requested" instead of required by law.  Mot. ¶ 56-58.  He also specifically takes issue that the

statement of oath in the preprinted form, under which Orly's signature appears, was altered by

Orly's lawyer to read:  "subject to the Global Notes attached."  See OG Ex. 16 (at 43).

According to Sagi, this amounts to a faux oath that violates the law.  But no matter what, this is

hardly the kind of thing that amounts to "conspiracy" to commit massive and egregious fraud or

otherwise to qualify for dismissal under the Code.

83.      It is also not a false oath.  A false oath in the context of signing a petition is one

where the debtor signs under oath a knowingly false petition, i.e., a filing containing false

information or omitting material information.  Many courts have held that that specific type of

alleged wrongdoing does not even warrant dismissal because it is addressed specifically by a

different section of the Code concerning dischargeability.  *See In re Chovev*, 559 B.R. 339, 348-

349 (Bankr. E.D.N.Y. 2016) (since "Section 727(a)(4)(A) specifically addresses instances in

which a debtor is alleged to have made a false oath," such conduct does not constitute "cause" to

dismiss a chapter 7 case under Section 707(a)); *In re Lusane*, 2012 WL 3018050, at *2 (Bankr.

D.D.C. July 24, 2012) ("If there are inaccuracies on the schedule or statements, and they were

made fraudulently, that may be grounds for denial of the discharge under 11 U.S.C. § 727, but

that would not establish that the debtor filed his chapter 7 petition in bad faith."); *In re Parikh*,

456 B.R. 4, 10 (Bankr. E.D.N.Y. 2011), *vacated on other grounds*, 2013 WL 1305499 (E.D.N.Y.

March 28, 2013) (potential wrongdoing addressed in section 727(a) is not grounds "to dismiss

the case for a bad faith filing").

84.      The kind of "global" disclaimers about which Sagi complains are commonplace

in bankruptcy filings and practically a writing 'tic' throughout the entire bar.  Nothing is

concealed.  Nothing is false.  And swearing under oath is never less binding because of an

"asterisk" or add-on any more than it would be by crossed fingers behind the back.  To say

otherwise, as Sagi suggests, is childish if not plain foolish.  Here, moreover, given the Byzantine

complexity foisted upon Orly's financial affairs – most, if not all of it, a result of Sagi's

management of the TPR and D&K family concerns and his financial shenanigans, including

sham auctions and convoluted and falsified business transactions even with the Orly Trust – it is

a mark of utmost good faith to caution the Court in her petition that some of her assets and

liabilities are unknown and subject to adjustment as the litigation smoke clears.  At this stage,

Orly's schedules make appropriate and adequate disclosures about her economic affairs, and

Sagi has not and cannot prove otherwise.

85.    Furthermore, this was all done on advice of counsel.  Errors in a filing done by

counsel are not worthy of dismissal.  *See e.g.*, *In re Nichols*, 362 B.R. 88, 96 (Bankr. S.D.N.Y.

2007) ("dismissal of a bankruptcy case will often cause debtors to be irreparably harmed, and

this result is unjust when it arises from attorney error that has not resulted in harm to any other

party in interest"); *In re Fraleigh*, 474 B.R. 96, 110 (Bankr. S.D.N.Y. 2012) (collecting cases and

finding "mistakes in the schedules will not doom a debtor's discharge" where debtor "reasonably

relied on her attorney to make the appropriate use of [debtors' financial] information in the legal

work she had hired him to perform"); *see also In re Khan*, 172 B.R. 613, 627 (Bankr. D. Minn.

1994) (denying motion to dismiss when debtors' "schedules' shortfall . . . as to [debtor's] income

and expenses . . . is attributed only to one thing: counsel's failure to give a competent,

hardheaded review of the content to his client").  Orly clearly did not write the legalese of the

"Global Notes" preface or on her own put a condition on the statement of oath.  That was her

lawyer.  She cannot be blamed for taking legal counsel in matters as complex as her financial and

-42-

litigation affairs unfortunately are.  If anything, that shows Orly's desire to follow the law, not flout it.

## II. **EQUITABLE CONSIDERATIONS DISALLOW DISMISSAL**

86.    Sagi argues that this Court, being a court of equity, should use its considerable discretion to dismiss Orly from bankruptcy anyway, regardless of his failure to meet the strictures of Section 707(a).  He does this both by arguing, incorrectly, that some general notion of equity can inform the Court's 707(a) analysis (despite case law to the contrary) and by invoking Section 305(a).  Mot. ¶ 60.  But Section 305(a) does not permit dismissal here either.

### A.    **Sagi Fails to Meet the 305 Standard for Dismissal**

87.    Section 305(a) allows dismissal at any time if "the interests of creditors and the debtor would be better served by such dismissal or suspension."  11 U.S.C. § 305(a)(1).  As with Section 707(a), dismissal under 305(a) is a "form of *extraordinary* relief."  *In re RCM Glob. Long Term Cap. Appreciation Fund, Ltd.*, 200 B.R. 514, 524 (Bankr. S.D.N.Y. 1996) (emphasis added); *In re Scandia Seafood (New York), Inc.*, 2017 WL 2062894, at *5 (Bankr. S.D.N.Y. May 12, 2017) ("Courts in this District have held that abstention [under § 305(a)] is not to be granted lightly, and instead is a form of extraordinary relief").  No proven facts – leaving aside unproven fanciful "conspiracy theories" expounded without evidence throughout Sagi's motion – supports the "extraordinary" relief of stripping Orly of her federal right to bankruptcy.

88.    By Sagi's reckoning, Section 305(a) permits dismissal or suspension in favor of his pending federal lawsuits over the $32.3 million because all this fuss is nothing more than a two-party dispute between him and his sister over his one-page 2004 Indemnity letter, written so long ago.   But this does not warrant 305(a) dismissal.

89.     The law is clear that a bankruptcy precipitated by a single creditor's claim or judgment does not standing alone warrant the exceptional relief of 305(a) dismissal. *See, e.g.*, *In re Efron* (B.A.P. 1st Cir. 2015) (reviewing whether bankruptcy court below determined there was the "absence of a true bankruptcy purpose" in debtor's single creditor case dismissed under section 305(a)). *See also* 6 COLLIER ON BANKRUPTCY ¶ 707.03[2], p. 707–18 (16th ed. 2013) ("the fact that there is only one significant creditor, so that the bankruptcy case is essentially a two-party dispute, is not, by itself, cause for dismissal").

90.     More importantly, this is *not* a two-party dispute – just ask all the other people who are active parties in this proceeding.  This is definitively shown by Sagi's own intercreditor agreement, which alone demonstrates that other parties, like OGT, Manhattan Safety and REI have competing claims to the $32.3 million.  OG Ex. 25.  In fact, OGT claims to have damages claims against Orly personally even apart from the 32.3 million.  *Id.*; OG Ex. 29 (OGT POC and Amended Turnover Petition).  Dalia, too, claims that this money is hers, not Orly's.  And, of course, Arie, the Genger Litigation Trust and the ADBG/Brosers claim the money is theirs (and Orly agrees the money is rightfully her father's, as the last and poor vestige of the vast wealth he created with Trans-Resources).  In reality, as shown in the claims register, there are over a dozen claims filed in this case separate and apart from Sagi's claim and the total of all 15 claims is $89,912,209.86.  *In re Orly Genger,* Case No. 19-13895 (JLG) (Claims Register).  This is self-evidently not a two-party dispute.

91.     Sagi's argument that this bankruptcy is a sham attempt to end run his "turnover" petition in the District Court, which he presents as a *fait accompli*, fares no better.  It is well settled that the filing of a bankruptcy petition on the eve of a major legal setback, like a foreclosure or an eviction, does not by itself establish a bad faith filing or cause for dismissal.

*See, e.g., In re Syndicom Corp.*, 268 B.R. 26, 47-49 (Bankr. S.D.N.Y. 2001). Here, moreover,

Sagi's turnover did not precipitate the July filing of the bankruptcy. Sagi's claim that his

turnover was a "sure thing" – as if it were already adjudicated in his favor – is disingenuous. He

repeatedly sought court orders as long ago as 2013 and again in 2015 to require that all these

settlement proceeds be deposited in court pending final adjudication and those applications have

always been denied. *See* OG Ex. 34 at ¶ 45 and fn. 3. His turnover motion had not even been

fully briefed yet, never mind fully submitted or on the verge of a ruling. The respondents' time

to oppose the motion had not even elapsed prior to the petition date. OG Ex. 64. Nor was this a

case of seeking turnover of a distinct piece of property that clearly belonged to Orly. Rather, the

case would have required a threshold determination as to whether the $32.3 million, or any part

of it, even belonged to Orly in the first place. Sagi's own conduct also makes clear that the case

was not on the verge of a ruling. Rather, apparently recognizing the procedural deficiencies of

attempting to pursue a fraudulent transfer claim without due process by dressing it up as a

turnover motion, Sagi hurriedly followed up this procedurally flimsy gambit by actually

commencing a separate fraudulent transfer action. *See Sagi v. Broser et. al*., No. 19-06100-VSB

(S.D.N.Y. June 28, 2019). And contrary to that action being anywhere close to an adjudication,

Sagi never even served that complaint before Orly filed her petition.

92.    Dalia, too, had been trying for years to intervene in Orly's court actions,

supposedly on behalf of the trust, seeking to have the court impound the $32.3 million in

settlement proceeds. She also was unsuccessful every time. *See Genger v. Genger*, 41 N.Y.S.3d

414 (N.Y. App. Div. 2016); *Genger v. Genger*, 2019 WL 856565, at *1 (S.D.N.Y., Feb. 20,

2019) ("the motion of defendant Dalia Genger to substitute herself as plaintiff and to direct that

the Trump Group settlement fund be paid into court is denied in its entirety"). What did trigger

Orly's filing was Sagi's and his allies' scorched earth litigation tactics and the Second Circuit's

decision in June affirming Sagi's $3 million judgment. And Sagi knows that. His lawyers were

told in open court for months beforehand that Orly would file for bankruptcy if Sagi's judgment

were upheld by the Second Circuit. OG Ex. 15 (Jan. 8, 2019 Tr. 67:9-14).

93.    To warrant 305(a) dismissal Sagi would have to show, not just that such dismissal

would benefit him, but also that it would be better for all the creditors, the judicial system as a

whole *and for debtor*. *See, e.g., RCM Global*, 200 B.R. at 524 (denying 305(a) motion because

movant had "not shown how any party in interest other than [itself] would be benefitted by a

dismissal"). *See generally In re Murray*, 900 F.3d 53, 63 (2d Cir. 2018) (balancing of

"competing interests at stake" of both debtor and creditors as well as overall bankruptcy system

is required before dismissal under section 707(a)); *In re Dinova*, 212 B.R. 437, 442 (2d. Cir.

BAP 1997) (same); *In re Scandia Seafood (New York), Inc.*, 2017 WL 2062894, at *5 (Bankr.

S.D.N.Y. May 12, 2017) (identifying factors to be considered on 305(a) application, including

judicial economy implications and availability of relief to debtor in other forums, including state

debt relief programs and alternative judicial and nonjudicial means to resolve the dispute).

94.    Sagi does not even try to show how dismissal would benefit Orly. He cannot. It

would be devasting to her. She has been financially torn to shreds and drained by the unrelenting

claims and litigations from Sagi, her mother, Manhattan Safety, REI, and even her own trust,

OGT -- created by her parents as a conduit for her share of family wealth and from which

reigned instead only misery and financial ruin for her. Where else can she go? Back to the

piecemeal litigation that drove her here in the first place and that holds not even the remote

possibility of breaking free from the Sagi gang and this crushing debt? That alone suffices to

block 305(a) or any other "equitable" dismissal. *See, e.g., In re Murray*, 543 B.R. 484, 494-95

(Bankr. S.D.N.Y. 2016), *aff'd*, 565 B.R. 527 (S.D.N.Y. 2017), *aff'd*, 900 F.3d 53 (2d Cir. 2018)

(Code is intended to prevent a debtor from suffering insuperable wholesale loss, with all assets

going just to the "swiftest or the most aggressive" creditor); *In re Pongvitayapanu*, 487 B.R. 130,

139 (Bankr. E.D.N.Y. 2013) (attempts by imperious creditors to hamstring a debtor's fresh start

are not to be countenanced).

### B.    Sagi's Unclean Hands Preclude Equitable Dismissal

95.    In addition, given the record as recounted herein, Sagi's own unclean hands

prevent his invocation of equity as a basis for dismissal.

96.    "It is a fundamental principle of equity jurisprudence that a court of equity will

exercise its extraordinary powers only for the enforcement of the requirements of conscience,

and in enforcing them it demands conscientiousness in the parties.  He that cometh into equity

must have clean hands.  He that hath committed iniquity shall not have equity."  *Primeau v.

Granfield*, 193 F. 911, 912 (2d Cir. 1911).  *See, e.g., Stokely-Van Camp, Inc. v. Coca-Cola Co.*,

646 F.Supp.2d 510, 532 (S.D.N.Y. 2009) (denying movant relief based on its own inequitable

conduct perpetrated against other party); *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*,

792 F. Supp. 969, 969-70 (S.D.N.Y. 1992) (denying movant equity based on movant's

misconduct in the litigation).

97.    Sagi's iniquity as demonstrated herein, disqualifies his appeal to equity.  His

conduct in wronging his "little" sister and besieging her marriage, her family, her basic economic

(not to mention emotional) well-being is beyond the pale of minimal "conscientiousness."

Legalities aside, his destructive hostility and antipathy toward his own kin and only sibling is so

alien to the ordinary and reasonable conduct of human affairs as to shock most people.  Even the

judiciary is astonished.  Multiple judges in multiple published decisions could not refrain from

marveling at and chastising Sagi's never-ending litigations as epic – indeed, Tolstoian – in irrational and destructive infliction of misery.

C.    **The Lombardo Factors Weigh Against Dismissal**

98.    Thus, upon evaluating Sagi's dismissal arguments based on what the actual proof shows, even all the *Lombardo* factors on which he so heavily relies require denial of his motion: (1) Orly has engaged in no "machinations" to frustrate Sagi or any other creditor; (2) she has attempted to repay her debts and in fact paid Sagi's first judgment against her; (3) she made significant "lifestyle" changes since her art career was destroyed and she has no independent economic life of her own now as a result of her crushing debts; (4) she has no resources of her own at all, much less enough to repay "substantial portions of debts"; (5) she has not "inflated" any expenses; (6) she has not "overutilized" the Code or engaged in "excessive advocacy" (Sagi has); (7) she has not reduced her creditors to a single creditor; (8) her filing was in response to Sagi's $3 million judgment but she openly declared for months before filing that she had no alternative if his judgement was upheld on appeal; (9) her intent is to obtain a full discharge, not to avoid any one single debt; (10) she did not transfer assets other than in attempts to raise funds to pay her debts, including legal fees; (11) she has not repaid any debt to "insiders" in preference to other creditors (she in fact previously paid Sagi's first judgment, while her father and husband have not been repaid); (12) she made fulsome and candid disclosures in her petition and schedules including citing to pending litigation where Sagi and his cohort explain in their own words their various contradictory theories concerning the $32.3 million; (13) the debts are anything but "modest" relative to her limited assets and nonexistent income; (14) there have not been multiple filings or "gymnastics"; and (15) there is no "unfairness" in her invocation of chapter 7.  See Mot. ¶ 47 (citing and quoting *Ajunwa*'s summary of the Lombardo factors).

-48-

\*        \*        \*

99.      Orly stands no chance for a "fresh start" without bankruptcy.  Zero evidence exists to find otherwise.  Bankruptcy exists for this very purpose.  It should not be denied to Orly when she rightfully is entitled to it and so clearly needs it.

## **CONCLUSION**

For the foregoing reasons, the creditor Sagi Genger's motion to dismiss should be denied in its entirety.  Orly further requests that she be awarded reimbursement of her costs and expenses (including professionals' fees) in connection with her defense of Sagi's motion to dismiss.

Dated: New York, New York
        June 1, 2021

GLENN AGRE BERGMAN & FUENTES LLP

By:    /s Michael Paul Bowen
        Michael Paul Bowen

        55 Hudson Yards, 20th Floor
        New York, New York 10001
        T: 212-358-5600
        mbowen@glennagre.com

        *Attorneys for the Debtor Orly Genger*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that a true and correct copy of this Objection has been served upon each

attorney of record by ECF and filed with the Court on this 1st day of June 2021.


_/s Michael Paul Bowen_