# Exhibit F

<pre>
 1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2

 3   ------------------------------------X
                                        :
 4   SAGI GENGER,                       :  17-CV-8181 (VSB)(DCF)
                                        :
 5                         Plaintiff,   :
                                        :
 6              v.                      :
                                        :  500 Pearl Street
 7   ORLY GENGER,                       :  New York, New York
                                        :
 8                         Defendant.   :  January 8, 2019
     ------------------------------------X
 9

10              TRANSCRIPT OF CIVIL CAUSE FOR HEARING
              BEFORE THE HONORABLE DEBRA C. FREEMAN
11                 UNITED STATES MAGISTRATE JUDGE

12
     APPEARANCES:
13
     For the Plaintiff:      JOHN DELLAPORTAS, ESQ.
14                           Kelley Drye & Warren, LLP
                             101 Park Avenue
15                           New York, New York 10178

16
     For the Defendant:      MICHAEL BOWEN, ESQ.
17                           ERIC HERSCHMANN, ESQ.
                             ANDREW KURLAND, ESQ.
18                           Kasowitz, Benson, Torres LLP
                             1633 Broadway
19                           New York, New York 10019

20

21   Court Transcriber:      SHARI RIEMER, CET-805
                             TypeWrite Word Processing Service
22                           211 N. Milton Road
                             Saratoga Springs, New York 12866
23

24                           APPEARANCES CONTINUED ON NEXT PAGE.

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
</pre>

```
 1                         UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF NEW YORK
 2

 3     APPEARANCES CONTINUED:

 4     For Himself and
       Steven Spolansky:        LANCE HARRIS, ESQ.
 5                               Stein & Harris
                                 1211 Avenue of The Americas
 6                               Floor 40
                                 New York, New York 10036
 7
       For Raines & Fischer:    DANIEL LUST, ESQ.
 8                               Goldberg Segalla
                                 101 Park Avenue
 9                               New York, New York 10178

10     For David Broser:        MITCHELL GOLDBERG, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1          THE CLERK:  <u>Genger and Genger</u>.

2          Please state your name for the record.

3          MR. DELLAPORTAS:  Good morning, Your Honor.  John

4  Dellaportas for the judgment creditor Sagi Genger.

5          THE COURT:  Okay.

6          MR. BOWEN:  Good morning, Judge.  For the judgment

7  debtor Orly Genger, it's Michael Bowen, B-O-W-E-N, with the

8  Law Firm of Kasowitz, Benson, Torres.  And with me are my

9  partner Eric Herschmann.

10          THE COURT:  Who is whom?  Okay.

11          MR. BOWEN:  Immediately to my left; and my partner

12  Andrew Kurland.

13          THE COURT:  All right.  Who do I have --

14          MR. BOWEN:  There are a number of other parties

15  present, Judge, who are subject to the subpoenas.

16          THE COURT:  Yeah.  I'd like to have everybody's

17  appearances.

18          MR. BOWEN:  Okay.  So --

19          THE COURT:  Just go around introduce yourselves.

20  Tell me who you're for.

21          MR. HARRIS:  Lance Harris for, I guess *pro se*,

22  myself, regarding my IOLTA account that was subpoenaed.

23          THE COURT:  Did you sign an appearance sheet here?

24          MR. HARRIS:  I put in --

25          MR. BOWEN:  Yes.

4

1          THE COURT:  Oh, yes, I see it.  Okay.  I have your

2   card.

3          MR. HARRIS:  I also have my client, Steven Spolansky

4   [Ph.], in the gallery whose information was subpoenaed along

5   with my IOLTA information.

6          THE COURT:  Okay.

7          MR. HARRIS:  Thank you.

8          MR. GOLDBERG:  Good morning, Your Honor.  Mitchell

9   Goldberg from the [indiscernible] Law Group on behalf of David

10  Broser.  And with me today is Mr. Broser as well.

11         THE COURT:  All right.

12         MR. GOLDBERG:  Thank you.

13         MR. LUST:  Good morning, Your Honor.  Daniel Lust

14  from the Law Firm of Goldberg Segalla.  We're representing

15  Raines & Fischer who's been subpoenaed in this action.

16         THE COURT:  Wait, I'm sorry.  Tell me your name

17  again?

18         MR. LUST:  Daniel Lust, L-U-S-T.  Ron Herzog from my

19  office --

20         THE COURT:  Are you here on this sheet someplace?

21         MR. LUST:  I am.  I have my card attached.

22         THE COURT:  Oh, I see.  It's at the bottom.  Okay.

23  I'm sorry.  And you have someone with you?

24         MR. LUST:  No one with me, just on the e-filing

25  system, Ron Herzog was -- submitted a notice of appearance on

5

1  behalf of our firm.

2           THE COURT:  Okay.  And in the back, are you here as

3  well for somebody?

4           MR. SPOLANSKY:  Yes, actually Mr. Harris --

5           THE COURT:  No, all the way in the back, are you on

6  this case?

7           MR.  BOYLE:  I'm just observing, Your Honor.  I'm

8  with John Boyle with Skadden Arps.  We represent the nonparty

9  that was subpoenaed and already provided discovery in this

10 case, and we're just interested in how this could turn out.

11          THE COURT:  All right.  So, listen, you obviously

12 don't see a court reporter here.  We have electronic recording

13 in the courtroom.  I've got a whole courtroom full of male

14 voices.  If you speak on this record and you want a transcript

15 and somebody is trying to type it, they're not -- that person

16 isn't going to have the benefit of seeing you and putting name

17 to face.  So if you speak, please each time you speak, please

18 just say who you are so that if you get a record later, it'll

19 come out with the right person's name associated with the

20 right person's words.

21          If you're not familiar with the electronic recording

22 and how to go about getting a transcript, you can go to the

23 Court's website, and at the top, there's a menu bar.  You go

24 all the way over to the right, click on "Trial Support."  Go

25 from there to "Courtroom Technology," and "Courtroom

6

1   Technology" will take you to something called "Electronic

2   Court Recordings" or ECR and will tell you how to go about

3   ordering a transcript if you want one.

4           I may make rulings on the record, and I may not

5   follow them up with a written order.  So let's try to make

6   sure this transcript is clear.  If at any point you think that

7   I'm making a ruling and it lacks clarity, please ask me to

8   clarify, so hopefully we can end up with a clear transcript.

9   I might issue a written order afterwards, but if it all seems

10  clear enough, I may not bother doing so.

11          As you know, I have a stack of stuff.  I'm not

12  hugely pleased about the stack of stuff, and I must say this

13  is my at least second go-around, possibly third go-around with

14  the parties to this case.  And, you know, family feuds always

15  seem to be the worst.  And as family feuds go, this one seems

16  to be among the worst of the worst.

17          The level of argumentative submissions, just put it

18  that way, obviously, lawyers are often argumentative.  But the

19  level of hostilities in the cases that involves these parties

20  seem to be quite high, and I would like to try to dial it

21  back.  Here's the thing, there is a judgment.  The judgment

22  creditor is entitled to discovery to try to find the assets to

23  enforce the judgment.  If there are none to be found, there

24  are none to be found but judgment creditor is entitled to try.

25  There are rules that allow that.

7

1          And so I have to allow some leeway for that party to

2    try to locate assets and to follow whatever money there might

3    be to track it through time and try to figure it out because

4    there's a fairly significant judgment out there.  And even if

5    were not so significant, nonetheless, a judgment creditor has

6    certain rights.  That said, the discovery sought should bear

7    some relation to what we're looking for here, which are assets

8    to satisfy a judgment.  So there may be temporal issues, there

9    may be scope issues, and I'll look at those things.

10          What I want to try to do is work through what I've

11   got in some sort of logical order with due respect for

12   nonparties that are here.  If we can deal with some of the

13   nonparty issues first and let people go, if you're going to

14   want to stick around anyway to see how everything comes out,

15   then there's no particular need for me to do it in an order

16   that lets people get out of here sooner.  So I'll let you

17   guide me on that if you think there's something that's easy we

18   can do and get somebody out.

19          MR. BOWEN:  Judge, there is a person here, Mr.

20   Spolansky, Steven Spolansky, who has nothing to do with this

21   case, and he does have to leave right away.  And this has to

22   do with the IOLTA account of Mr. Harris who's an attorney, and

23   the other side subpoenaed the IOLTA account without any notice

24   to anybody.  And Mr. Spolansky's personal private information

25   was subpoenaed by the other side.  So that's the only reason

8

1  why they're here, and I would ask the Court to address that

2  issue first.

3          THE COURT:  I don't mind dealing with that first.

4  This issue about notice, bear in mind we're not under Rule 45

5  discovery while in litigation mode.  We're in post-litigation,

6  a post-judgment discovery where there are mechanisms

7  available, as I said, to try to locate assets to enforce a

8  judgment.  So just be careful about what rules you cite and

9  some of the usual thinking about how discovery is supposed to

10 progress with notice to the parties on everything may not

11 apply in this context.

12         But anyway, everybody knows about -- at least

13 everyone who's here now, everyone knows about what subpoenas

14 were served.  Let's see if we can deal with that one first.

15         MR. DELLAPORTAS:  I'm happy to address it, Your

16 Honor.  We did find that --

17         THE COURT:  Can I please remind you just --

18         MR. DELLAPORTAS:  Oh, sorry.

19         THE COURT:  -- introduce yourselves before you

20 speak.  And I don't know if --

21         MR. BOWEN:  It was Bowen who spoke a moment ago.

22         THE COURT:  Okay.

23         MR. DELLAPORTAS:  This is John Dellaportas;

24 apologies, Your Honor.

25         THE COURT:  Okay.

9

1          MR. DELLAPORTAS:  With respect to the Bank of

2    America account where we traced $850,000 of the funds, to the

3    extent there's a copy of one or more checks made out to Mr.

4    Spolansky, I don't remember.  We're happy to return or

5    disregard those checks or any other checks having nothing to

6    do with the <u>Genger</u> matter, although predominantly what we've

7    found were Genger-related checks, so.

8          THE COURT:  Well, hold on a second.  First of all,

9    we have some standing issues here.  So it's not necessarily

10   clear to me that Orly Genger would have standing to object to

11   every subpoena that's been served.  If it has to do with her

12   own personal information, like if it's her account and it's

13   her tax return, something like that, should would have

14   standing.  But I think in this -- on this particular one, if

15   Mr. Spolansky has an issue, I'd like to hear from his counsel

16   on that.  I'm not so sure she would have standing.

17         MR. HARRIS:  Lance Harris, my IOLTA account.  It was

18   $875,000 that went into my account which is unquestioned.

19   Every other transaction in that account is not -- should not

20   be subject to this discovery.  Mr. Spolansky, Mr. Spolansky's

21   brother, Mr. Spolansky's business, many other checks were

22   written out to my IOLTA account, as one would imagine with an

23   active transactional attorney, which I am.

24          And so I would ask that all of that information be

25   returned to me and destroyed, and the representation be made

10

1   that notice be --

2           THE COURT:  Returned to you and copies destroyed?

3           MR. HARRIS:  Yes.  Yes; thank you, Your Honor.

4           THE COURT:  Okay.

5           MR. HARRIS:  And I did not -- as a third party, I

6   did not receive any notice.  I would have sought a protective

7   order.  I had no notice that this information was being

8   transmitted, and I had to inform my clients, all of which were

9   compromised.

10          THE COURT:  Wait, who was subpoenaed; your bank?

11          MR. HARRIS:  My bank, Bank of America was

12  subpoenaed, my IOLTA account for which obviously business gets

13  conducted through my law firm from July --

14          THE COURT:  And the bank didn't notify you?

15          MR. HARRIS:  The bank to this date has not notified

16  me as to that subpoena.  And Mr. Dellaportas and I have known

17  each other for many years.  No courtesy was provided.  And not

18  only on the date that the money came into my account, which

19  was July of 2013, he subpoenaed not only July but all of the

20  remainder of that year.  And I would have readily provided to

21  him --

22          THE COURT:  All right.  What is this 875,000; what

23  does that represent?

24          MR. HARRIS:  I'm talking, John.

25          That $875,000 represents from the settlement

11

1   agreement money that came in through a series of other

2   accounts.

3          THE COURT:  And this was what year; what date?

4          MR. HARRIS:  July of 2013.

5          THE COURT: 2013?

6          MR. HARRIS:  Of 2013, Your Honor.

7          THE COURT:  Okay.  So I do understand that this 2013

8   settlement is of great interest, and trying to figure out what

9   happened to the money from that settlement is something that

10  the judgment creditor is very focused on.  So let me turn to

11  Mr. Dellaportas, why would you be looking for information

12  other than with respect to this $875,000?

13         MR. DELLAPORTAS:  We're not, Your Honor.  So we just

14  wanted to figure out when the 875 came in and how it was

15  disbursed because they've made the claim that Orly received no

16  benefit from this settlement.

17         THE COURT:  Okay.

18         MR. DELLAPORTAS:  So we --

19         THE COURT:  So how do you go about figuring out how

20  it was disbursed without intruding on completely irrelevant

21  aspects of this IOLTA account and potentially other clients?

22         MR. DELLAPORTAS:  Well, to the extent that they're

23  irrelevant, we have no objection to returning it.  But largely

24  what we found were upon this $875,000 coming in, a series of

25  checks made out to Orly's lawyers and other creditors for

12

1   about 550,000.

2         THE COURT:  What do you mean other creditors?

3         MR. DELLAPORTAS:  I'm sorry.  The court reporter she

4   paid, things of that nature, litigation expenses.  Basically

5   at least half a million dollars of the settlement funds was

6   used to pay Orly Genger's litigation expenses, whether

7   attorneys or other kinds of vendors.  So that's very relevant

8   to us.  It speaks to an entitlement.

9         THE COURT:  Is there anything with respect to Mr. --

10  let me get your name right here -- Spolansky, is there

11  anything about him or his business or work whatsoever that's

12  relevant here?

13        MR. DELLAPORTAS:  No.  No, Your Honor; not that I'm

14  away of.

15        THE COURT:  So can we identify -- can you work

16  together to identify everything that relates to Mr. Spolansky

17  and make sure all of that is returned and if there are copies,

18  they're destroyed?

19        MR. DELLAPORTAS:  Absolutely, Your Honor.

20        MR. HARRIS:  Yes, Your Honor.  There's also other

21  clients.  And if I just may for a moment, the day that the

22  wire came into my account, which Mr. Dellaportas is spaciously

23  ignoring, is two checks written to Orly Genger's attorneys

24  that equal $870,000.  Money came in and --

25        THE COURT:  Eight seventy-five, eight seventy?

13

1          MR. HARRIS:  Eight seventy.  I was holding 5,000 for

2    other expenses of Mr. Genger's that were later in that month.

3    But immediately, the two attorneys most responsible for that

4    settlement agreement, namely Paul Weiss and Mitchell

5    Silberberg, those checks on the same day as the money came in

6    were written for the specific purpose at the specific

7    direction of Mr. Genger for Mr. Genger's account.

8          Mr. Dellaportas is going months later and other

9    deposits later to deal with other issues and to forget the two

10   checks that are right in front of him.

11         THE COURT:  Okay.  Well, I'm already confused.

12         MR. HARRIS:  I'm sorry.

13         THE COURT:  No, no, because Mr. Dellaportas is, I

14   thought, saying there are any number of checks, and you seem

15   to be saying there would be two going out.

16         MR. HARRIS:  Two.

17         THE COURT:  Wire transfer in and two going out?

18         MR. HARRIS:  Yes, ma'am.

19         THE COURT:  So, Mr. Dellaportas, these other ones

20   that are going out besides two are traceable, you think, to

21   the same $870,000?

22         MR. DELLAPORTAS:  Your Honor, he provided no payment

23   instructions or other basis.  First, they don't add up.

24         THE COURT:  Wait, wait, wait.  Wait, wait.  Wait.

25         MR. DELLAPORTAS:  Yeah.

14

1          THE COURT:  Everything is very --

2          MR. DELLAPORTAS:  Yes.

3          THE COURT:  -- broad brush here.

4          MR. DELLAPORTAS:  Uh-huh.

5          THE COURT:  Okay.  I'm lacking specifics as to what

6   you're talking about.

7          MR. DELLAPORTAS:  Sure.

8          THE COURT:  Lots of stuff that you found, what are

9   you talking about?

10          MR. DELLAPORTAS:  Okay.  So, Your Honor, and this is

11   John Dellaportas.  What we've experienced, and this speaks not

12   only to Mr. Harris' submissions but to all of them, is that

13   the only facts we're able to find are through the bank

14   records.  Everything that's been told to us either in

15   arguments, letters, depositions has been inconsistent.

16          THE COURT:  Give me specifics.

17          MR. DELLAPORTAS:  Okay.  So what we found is that

18   the 32 million was settled in July.  Orly settled the $32

19   million --

20          THE COURT:  Give me specifics about the --

21          MR. DELLAPORTAS:  Sure.

22          THE COURT:  -- $870,000 and what you discovered in

23   the account --

24          MR. DELLAPORTAS:  Okay.

25          THE COURT:  -- as to where it went.

15

1          MR. DELLAPORTAS:  Okay.  So of that 32 million,

2  875,000 made its way into Mr. Harris' account.  The next day

3  $100,000 was wired out to the Law Firm of Zeichner Ellman.

4  Zeichner Ellman represents only Orly Genger and nobody else.

5  In the --

6          THE COURT:  Okay.  So that's 100,000 --

7          MR. DELLAPORTAS:  Yes.

8          THE COURT:  -- out next day.

9          MR. DELLAPORTAS:  And then --

10          UNIDENTIFIED SPEAKER:  Can you answer about the two

11  checks?

12          THE COURT:  Excuse me.

13          UNIDENTIFIED SPEAKER:  Oh, sorry.

14          THE COURT: I'm only going to be able to hear --

15          UNIDENTIFIED SPEAKER:  Sorry.

16          THE COURT:  -- one at a time.

17          UNIDENTIFIED SPEAKER:  Sorry, Your Honor.

18          THE COURT:  I'll hear from everybody.  I have the

19  entire morning carved out for this, much to my dismay.

20          MR. DELLAPORTAS:  Then we basically, I have here,

21  and this is submitted to Your Honor in the docket at Document

22  151-4.  We show approximately 20 more expenditures made out

23  for Orly's benefit.  One is July 3rd, one is July 2nd, another

24  is July 7th, another is July 23rd.

25          THE COURT:  I'm sorry.  I have Docket 151, which has

16

1   --

2          MR. DELLAPORTAS:  Yeah.

3          THE COURT:  -- Exhibits A, B, C, D.  We're talking

4   about D?

5          MR. DELLAPORTAS:  I think it's D because the

6   document --

7          THE COURT:  And it's copies of checks?

8          MR. DELLAPORTAS:  Yes.  So these are the checks we

9   found which are payments of debts owed by Orly Genger out of

10  the 850,000.  Now Mr. Harris says, well, the 850,000 was for

11  something else, not for this.  Well, the money came in and it

12  went out for this.  Now if Mr. Harris has evidence that some

13  other money was used to pay this, coincidentally, the day the

14  money -- the 850,000 came in, he can produce that and he can

15  say, hey, Orly Genger's half million dollars of debts, they

16  weren't paid from the 850,000 settlement proceeds.  They were

17  paid from some other 500,000.

18         We'd love to know that because that would show if

19  someone's paying their debts, she has an asset source that's

20  potentially, you know, can be drawn upon to collect the

21  judgment.  But he hasn't shown that.  It's just his say-so

22  that 850,000 comes in; 500,000 goes out to pay Orly's debtors

23  -- creditors, I apologize.  And they have no connection to one

24  another.

25         By timing, they would appear to have a connection to

17

1   one another if he has payment -- contemporaneous payment

2   instructions, records, and he can show where this 500,000

3   came, that would be great.  We'll accept it.  But I think for

4   now, it's a bit of a red herring in that he's talking about

5   other clients.  We're not seeking any records for other

6   clients.  These are the only checks that are of concern to us.

7   To the extent there were a handful of other checks paid out

8   that year, there weren't a lot, but there were a handful --

9           THE COURT:  Right.  Mr. Harris?

10          MR. DELLAPORTAS:  We're happy to return them.

11          THE COURT:  Mr. Harris, you've seen Docket 151 and

12   copies of these checks that are attached?

13          MR. HARRIS:  Yes, ma'am.

14          THE COURT:  Okay.  So these checks don't have to do

15   with payment of Orly Genger's debts?

16          MR. HARRIS:  No, Your Honor.  I want to be very

17   clear.  On the same day that the money came in, Mr.

18   Dellaportas is ignoring the two checks written from those

19   proceeds to pay Orly Genger's debts.  It is as simple as that.

20   Throughout the course of my representation and throughout the

21   course of my service --

22          THE COURT:  Those two checks are not in this

23   collection of checks.

24          MR. HARRIS:  He decided to ignore those.

25          MR. DELLAPORTAS:  It's Arie Genger, not Orly.

18

1          MR. HARRIS:  Arie Genger?

2          MR. DELLAPORTAS:  Right.

3          MR. HARRIS:  I'm sorry, Arie Genger.

4          MR. DELLAPORTAS:  Make sure that it's clear.

5          MR. HARRIS:  Oh, I said Ms. -- I'm sorry.  Yes,

6  don't yell at me.  Arie Genger.  Arie Genger's $875,000 came

7  in, and Arie Genger's debts were paid using that money on the

8  same day.  It is crystal clear from anyone who looks at it.

9  Mr. Dellaportas has removed those two checks because it does

10  not fit with his narrative and has included other checks that

11  had nothing to do with the 875.

12          THE COURT:  All right.  Do these checks have

13  anything to do with Orly Genger?

14          MR. HARRIS:  Yes, ma'am.  And money has come in

15  separate and distinct from the 875 --

16          THE COURT:  Okay.  So --

17          MR. HARRIS:  -- to pay those debts.

18          THE COURT:  So regardless of whether these other

19  checks are traceable to the 870 or 875,000 figure, why would

20  they not still be relevant in trying to understand what assets

21  Orly Genger has and what money -- yes?

22          MR. HARRIS:  I understand the question.  Money has

23  come in to pay those checks, and they are absolutely relevant.

24  They are not relevant to the 875 that was deposited into my

25  account.  That is my only point, Your Honor.

19

1        THE COURT:  Okay.  So maybe it is less important for

2   me to understand whether they are specifically linked to the

3   875 or 870 or whatever that number is.  We're going to call it

4   872-5.  But maybe it's not as important for me to figure out

5   if those checks are actually traceable to that infusion of

6   money.  Maybe the only question is do they have some relevance

7   to the assets of the -- assets or liabilities of the judgment

8   debtor.  If so, let Mr. Dellaportas file them wherever they go

9   and if not, then the material gets returned to you or

10  destroyed.

11       MR. HARRIS:  Okay.

12       THE COURT:  So how do we parse -- hold on, please.

13  How do we parse what there is that Mr. Dellaportas is still

14  holding that would really clearly have no relevance to what he

15  is looking for?

16       MR. DELLAPORTAS:  Your Honor, this is Dellaportas.

17  Other than the checks which I attached, I'm happy to return or

18  destroy any other checks that were obtained pursuant to the

19  subpoena.

20       THE COURT:  Okay.  And, Mr. Harris, with respect to

21  the ones that were attached, do you believe that any of those

22  should be -- that information should be returned or destroyed?

23  These are checks made out to ZEK, Ellen Graver or Graner.

24       UNIDENTIFIED SPEAKER:  Grauer [Ph.]

25       THE COURT:  Grauer, some other, Meyers, a law firm

20

1   it looks like.

2        MR. HARRIS:  Again, this was 2013, Your Honor.  I

3   don't recall what the payment to the Meyers Law Firm was.  I

4   know ZEK was Orly's Counsel, and I had received separate and

5   distinct other funds to make those payments.  So I have no

6   objection if Mr. Dellaportas holds that check.  Besides those

7   checks, he should also hold the two checks that equal the 870

8   that came into my account.

9        THE COURT:  All right.  Well, why don't we have the

10  two of you, meaning Mr. Dellaportas and Mr. Harris, commit to

11  going through the checks that are attached as Exhibit D to

12  Document 151, clarify whether there are any that you think are

13  not relevant and should not be in Mr. Dellaportas' hands.  If

14  you concede that they have relevance to Orly Genger and her

15  assets and liabilities, then we'll let it go and the rest will

16  be returned or destroyed.

17       MR. HARRIS:  Thank you, Your Honor.

18       THE COURT:  All right.

19       MR. DELLAPORTAS:  Thank you, Your Honor.

20       THE COURT:  Is that acceptable?

21       MR. DELLAPORTAS:  That is, Your Honor.

22       THE COURT:  All right.  Now I have Orly Genger's

23  counsel.  I have Mr. Bowen --

24       MR. BOWEN:  Yes.

25       THE COURT:  -- wanting to speak on this.

21

1          MR. BOWEN:  Well, since we're addressing checks that

2    were allegedly paid on Orly's behalf, we have standing to

3    address that.  And I also want to just bring something to the

4    Court's attention, which frankly has caused me concern simply

5    as an officer of the Court.

6          Number one, the scope of discovery here, which I

7    know Your Honor mentioned a moment ago, is that the creditor

8    can look for assets or monies that are due and owing to Ms.

9    Genger in order to look for assets to enforce the judgment

10   against the lien.  We don't dispute that.  We understand that

11   Mr. Dellaportas is focused on what he claims were payments out

12   of this -- what he says is an Orly settlement of $32 million

13   but in fact it was not Ms. Genger's settlement.  She did not

14   negotiate that.  She didn't settle it.

15         THE COURT:  I -- listen, on that particular point

16   and then I'll let you get back to what you were saying.  On

17   that particular point as to whose money it was, that

18   settlement, and what happened to it, the parties obviously,

19   you know, are telling me opposite things.  And I haven't

20   conducted a trial on the matter.  I don't know what's true and

21   what's not true.  And I'm in no position to buy into what

22   either side is telling me.

23         MR. BOWEN:  That's fine.

24         THE COURT:  Okay.  It's discovery.  People make

25   whatever arguments they make.  It leads wherever it leads, you

22

 1  know, in the search of assets.  But when you say that's simply

 2  not true, I cannot accept what you're saying anymore than I

 3  can accept what Mr. Dellaportas is saying on that.

 4          MR. BOWEN:  And all I'm doing, Your Honor, is

 5  correcting the record when Mr. Dellaportas says it was Orly

 6  settlement and it was a payment to Orly.

 7          THE COURT:  Well, I think you are well --

 8          MR. BOWEN:  And he said that repeatedly already this

 9  morning.

10          THE COURT:  I think you are well on the record with

11  all of these many submissions with your positions on what this

12  money was or wasn't --

13          MR. BOWEN:  Okay.

14          THE COURT:  -- and whose it was or wasn't.  And I'll

15  state that for this record that everyone has taken different

16  positions and those positions are reserved.

17          MR. BOWEN:  So going back to this subpoena of

18  information from a lawyer's IOLTA account, let me just step

19  outside of counsel for Orly Genger and just say as a lawyer,

20  as a member of the bar, it is improper for an adversary to

21  subpoena a lawyer's IOLTA account which involves privileged

22  communication and private communication between that lawyer

23  and his clients.  So for Mr. Dellaportas to say, well, it's

24  okay, we'll just destroy it or we'll just return it, that's

25  problematic.

23

1          THE COURT:  What's the -- you're saying that Orly

2     has a privilege in this information?

3          MR. BOWEN:  No, I'm not.  I'm saying Mr. Spolansky

4     has a privilege, and Mr. Spolansky has privacy --

5          THE COURT:  Okay.  Well, you're -- you --

6          MR. BOWEN:  -- interests and so do other people who

7     -- who are --

8          THE COURT:  Okay.  Well, hold on a minute.  To the

9     extent you are arguing that there is a privilege that runs to

10    your firm to your clients, I'll hear you on this.  So are you

11    arguing that there is a privilege that runs to your clients or

12    to your firm?

13         MR. BOWEN:  No.

14         THE COURT:  Okay.  So why am I hearing you on this

15    topic?

16         MR. BOWEN:  Because we're dealing with a situation

17    where a lawyer did something that is improper and unethical

18    for the lawyer to do, and it's part of a broader problem in

19    this case where in his zeal to find what he thinks are hidden

20    assets, Mr. Dellaportas is going outside what is an acceptable

21    use of judicial subpoenas either in federal court or in any

22    other court.  You can't -- to understand the checks --

23         THE COURT:  All right.  Well, wait, wait, wait.  I'm

24    going to take them issue by issue that I have in front of me

25    for discovery purposes to resolve discovery disputes; subpoena

24

1   by subpoena, whether it was overbroad, whether it was proper;

2   okay, issue by issue.  And I'll hear from anyone who has

3   standing to address any issue that's been raised.

4        If you just generally don't like Mr. Dellaportas'

5   practices, I don't think that that -- that you're in a

6   position to challenge any in particular unless you or your

7   client is  personally affected by it, you or your firm or your

8   client.

9        MR. BOWEN:  Well, in the sense that Mr. Harris was

10  also representing Orly Genger to a certain limited extent in

11  this time frame and that certain monies flowed through his

12  IOLTA account, it did affect her.  But my concern is broader

13  than that because the type of information that Mr. Dellaportas

14  is trying to get at, there's a way to do it that's appropriate

15  and there's a way to do it the way he used in this case by

16  subpoenaing an attorney's IOLTA account is inappropriate.

17       So I understand Your Honor --

18       THE COURT:  Are there any other --

19       MR. BOWEN:  -- saying you don't want to hear it

20  unless we have an injury.

21       THE COURT:  Are there any other attorneys' IOLTA

22  accounts that are at issue here, or is this the only one?

23       MR. BOWEN:  The only that we're aware of as far as

24  we know.  But, again, as Your Honor pointed out, he hasn't

25  been providing notice and he may or may not be required to.

25

1   Our position is he is required to in certain circumstances.

2         THE COURT:  Okay.  And what is your position as to

3   why notice was required for this particular -- notice to you,

4   why was it required?

5         MR. BOWEN:  Because he was getting into information

6   between our client and one of her prior attorneys, and there

7   are potential privilege issues.  So --

8         THE COURT:  Do you have authority for why this --

9   why you are entitled to notice of the subpoena?

10        MR. BOWEN:  Well, I can't cite a case at this

11  moment, no.

12        THE COURT:  Do you have codified authority in the

13  rules?

14        MR. BOWEN:  Well, it's basically a notion that you

15  can't subpoena privileged information without giving somebody

16  -- or potentially privileged information without giving the

17  holder of the privilege an opportunity to interpose an

18  objection.  Otherwise, you're running a rough shot over the

19  privilege.

20        THE COURT:  All right.  And what exactly is

21  privileged about checks?

22        MR. BOWEN:  Well, in this case, I don't think there

23  were anything -- there was anything privileged about these

24  particular checks which happened to be discovered by --

25        THE COURT:  Well, what would be privileged in an

26

1    IOLTA account?

2          MR. BOWEN:  Well, the fact that any monies went

3    through an IOLTA account and what the purpose of the monies

4    were used for could be privilege in certain circumstances.

5          THE COURT:  Well, why?  Attorney-client privilege?

6          MR. BOWEN:  Certainly.  It could even be --

7          THE COURT:  And attorney-client privilege is

8    communication by a client asking for legal advice or a

9    communication by a lawyer giving legal advice acting as a

10   lawyer and providing advice to a client.  Why would a check

11   constitute either a request for advice or the giving of legal

12   advice?

13         MR. BOWEN:  Well, it may be related to topics that

14   were being discussed between that lawyer and the client --

15         THE COURT:  It's not a communication --

16         MR. BOWEN:  --or it may just be a confidence.

17         THE COURT:  It's not a communication asking for or

18   giving legal advice.

19         MR. BOWEN:  No, but it may be related to it.  That's

20   my only point.

21         THE COURT:  A document related to a privileged

22   communication is not privileged.

23         MR. BOWEN:  In certain circumstances, it may be,

24   Judge.  But, listen, I don't want to belabor the point.  It's

25   certainly a confidence, and it certainly is private material

27

1   that doesn't belong --

2          THE COURT:  Okay.  All right.  Look, yes, it's true

3   that there are certainly information that can be pulled within

4   a communication as in I'm giving you a document together with

5   a request for advice regarding this document.  Yes, but it's

6   still communication-based.  The privilege is communication-

7   based, and it's advice-based.

8          All right.  Mr. Harris, you wanted to supplement

9   what you said before?

10         MR. HARRIS:  Yes.  I'm sorry.  There was a subpoena,

11  a new subpoena on my IOLTA account that I believe was stayed

12  until this hearing.  I think we resolved the subpoena in which

13  Mr. Dellaportas received information.  I'm asking this Court

14  that it quash the outstanding subpoena and that Mr.

15  Dellaportas be prohibited from further subpoenaing my IOLTA

16  account.

17         THE COURT:  What was this other subpoena?

18         MR. DELLAPORTAS:  It was what we found, Your Honor

19  -- this is Dellaportas -- was that all the money brought in,

20  the 858, 75, whatever it is, was not disbursed by the end of

21  2013.  And so we were looking to see if further payments were

22  made out of that money to Orly's creditors in 2014.  I would

23  note that all of this would be resolved if Mr. Harris, whose

24  firm was subpoenaed directly and who was the trustee of Orly's

25  litigation trust, had complied with the subpoena that we

28

1   served on his firm where we sought all of this information.

2         So from our standpoint, I don't think we can take

3   them in isolation.  Mr. Harris, although he says he's her

4   attorney and he may be, he's more significantly here, he's the

5   co-trustee of a trust account that Ms. Genger set up to hold

6   this $33 million as they came in.  Now this was a document

7   that came as much surprise to us because everybody, counsel,

8   witnesses, denied its existence until we found it.

9         But a part of what we seek from the subpoena of the

10  Stein and Harris firm is records relating to money that came

11  in and money that went out for Orly either as her attorney or

12  as the trustee.  And all that should be complied with.  And if

13  it is, then there's really no need for us to go to Bank of

14  America for it if you will provide it directly.  If he's

15  saying he's not going to provide it directly, then we have to

16  go to third-party financial institutions to get it.

17        THE COURT:  All right.  And what time frame are we

18  looking at here; the date of the settlement to the present?

19        MR. DELLAPORTAS:  Well, it depends on the things.

20  With regard to Orly's assets, we're looking for basically the

21  last six years, assets, income, what have you.  With respect

22  specifically to the 850 that we've traced through Mr. Harris,

23  that we originally sought through the end of 2013 and now

24  we're seeking for 2014.

25        MR. HARRIS:  Your Honor, this is in a word

29

1   outrageous.  Mr. Dellaportas, again, and he has not answered

2   Your Honor or myself, refuses to acknowledge that $870,000 of

3   checks left my IOLTA account contemporaneous with that

4   deposit.  He is ignoring that fact because he is running a

5   rough shot over my client's and my IOLTA account and

6   information.

7           THE COURT:  All right.  Mr. Dellaportas, did you see

8   when you subpoenaed the IOLTA account and you got information,

9   did you see transfers out, contemporaneous transfers out to

10  Mr. -- is it Arie Genger; is that correct?

11          MR. HARRIS:  No.  The two checks, Your Honor, were

12  500,000 to MS&K.

13          THE COURT:  I'm sorry, MS&K?

14          MR. HARRIS:  Mitchell Silberberg & Knupp, the law

15  firm.

16          THE COURT:  Okay.

17          MR. HARRIS:  MS&K is their initials.  And the

18  balance of 368,000 odd dollars to Paul Weiss.  Those were the

19  two checks written --

20          THE COURT:  Okay.

21          MR. HARRIS:  -- as soon as that money came in.

22          THE COURT:  Did you -- Mr. Dellaportas, did you see

23  those checks?

24          MR. DELLAPORTAS:  I saw a number of other payments,

25  including those two.  They did not add up to the 875,000.

30

1  That's an absolute falsehood.  And they did not go out, as Mr.

2  Harris said, the day the money came in.  That's not true

3  either.  If you have the checks, why don't you produce them.

4          MR. HARRIS:  I have them, Your Honor.  And --

5          MR. DELLAPORTAS:  What are the dates?

6          MR. HARRIS:  July 2nd.  These are the dates, the day

7  the money came in.  I don't want to waste the Court's time,

8  Mr. Dellaportas.

9          MR. DELLAPORTAS:  But more --

10         MR. HARRIS:  The two checks he's seen.

11         THE COURT:  Hold on.  Hold on.

12         MR. HARRIS:  But more importantly --

13         THE COURT:  Hold on.  Hold on.  Hold on.  Mr.

14 Dellaportas, let's for the sake of argument assume that what

15 Mr. Harris is saying is correct for the sake of argument.  It

16 may not be correct.  If he is -- if it is correct that over

17 $800,000 went out in a large chunk to MS&K and a large chunk

18 to Paul Weiss, that gives you another avenue to trace money to

19 see what happened with it next.  I assume you are

20 simultaneously doing that in case he is right and you're still

21 trying to figure out if that money ended up somehow in the

22 hands of Orly Genger, right?  Is that right?

23         MR. DELLAPORTAS:  It's right to the extent that when

24 we received your notice of the order, we stopped serving new

25 subpoenas.  We understood that Your Honor would be giving us

31

1  guidance as to the appropriate scope.  But it is definitely

2  our intention, unless Your Honor says we can't do it, to

3  continue --

4           THE COURT:  Okay.  So --

5           MR. DELLAPORTAS:  -- following this money to its

6  conclusion.

7           THE COURT:  So you have not to date pursued that

8  $500,000 to MS&K to see what happened to it when it got there

9  or the 368 to Paul Weiss to see what happened to that money

10 when it got there, but you hope to do so to see if it ended up

11 with Mr. Arie Genger or if he turned around and passed some of

12 it to Orly Genger or whatever, okay.

13          MR. DELLAPORTAS:  Yes, Your Honor.

14          THE COURT:  You are in the meantime following a

15 different thread, which Mr. Harris says is a false lead, but

16 you think might be a true lead of all of these other smaller

17 checks that went to people or entities that you know are

18 directly associated somehow with Orly Genger, her law firm,

19 expenses that she would have incurred in litigation, and so

20 on.

21          So it seems to me that both of these routes may be

22 legitimate routes to pursue wherever they end up going, and

23 one may end up being a dead end.  But counsel don't have to

24 trust and believe each other.  You know, nobody has to trust

25 and believe anybody in the discovery process.  You are testing

32

1   as long as you've got something to go on that's not wholly

2   invented and here you have checks, two sets of them.

3        It seems to me appropriate to follow those ends but

4   not other, you know, people like Mr. Spolansky or -- why do I

5   keep forgetting his name, Spolansky -- or others who have

6   nothing to do with anything, okay.  Because I cannot resolve

7   today, and perhaps ever from where I sit, whether in fact the

8   money from the settlement was in these two checks or was

9   somehow in some other collection of money, not without more

10  evidence, a hearing, sworn testimony, judging credibility of

11  witnesses.  I can't do all that today.

12       MR. HARRIS:  Okay, Your Honor.  In the meantime,

13  until such time as that happens, I'm just asking the Court to

14  please quash the subpoena for '14 because there has been no

15  proffer that that is leading to more evidence of this 875

16  disbursement or any other attacks on my IOLTA account.

17       THE COURT:  Well, I don't think I should do that,

18  but I do think that you should have the ability to before the

19  production is made, pursuant to that subpoena, to determine

20  what is in that collection.  You may be able to do that anyway

21  from your end, to know -- you know, to confer with Mr.

22  Dellaportas, to clarify what is and is not related in any way

23  to Orly Genger to see if you have any disputes about that to

24  make sure that this time Mr. Dellaportas doesn't end up with

25  checks that have absolutely nothing to do with the parties to

33

1   this case.

2          So it seems to me what you need to do is work

3   cooperatively and with -- is the bank represented here?

4          MR. HARRIS:  The bank is not represented here, Your

5   Honor.

6          THE COURT:  Okay.  So but confer with each other

7   about a protocol, a mechanism to try to head off the problem

8   of having things returned afterwards or destroyed.  Try to

9   figure out how not to have things produced in the first place

10  if you can come up with an agreed list to give to the bank and

11  say information on checks here or there.  Or if you are

12  willing to skip the bank for now and get the information

13  directly from Mr. Harris as to what checks there were, he

14  should have that information.  You seemed to say before you

15  wouldn't have needed to go to the bank had you gotten

16  information directly from Mr. Harris.  Maybe you can head it

17  off that way through some cooperative effort.

18         MR. HARRIS:  If Mr. Dellaportas is willing to

19  withdraw that subpoena, I'm willing to review my 2014 IOLTA

20  account for checks directly related to Orly Genger.

21         MR. DELLAPORTAS:  Your Honor, we're not willing to

22  withdraw the subpoena.  However, to get to the same point, we

23  are willing to have Bank of America make production to Mr.

24  Harris instead of to us.  We don't know if Mr. Harris' records

25  are complete, but the bank's surely are.  Mr. Harris, if he'll

34

1   represent on the record that he will weed out any non-Genger

2   family related checks and produce any Genger family related

3   checks to me, that's to me a perfect solution.

4          MR. HARRIS:  I'm willing to provide Orly Genger

5   related checks.  The purpose of Arie Genger related checks

6   seems to be beyond the scope of what is reasonably being asked

7   or discoverable here.  Again, I'm not a litigant, but to me

8   that would seem --

9          MR. DELLAPORTAS:  Your Honor?

10         THE COURT:  Well, we have this sort of lurking

11  question of, you know, did Arie or did Orly get money that was

12  intended for Orly.  And there are those saying it was intended

13  for Arie and, therefore, it goes to Arie and, therefore,

14  there's no issue.  And there are those who say -- or at least

15  one person here who says it looks like money that others are

16  saying was intended for Arie was really intended to Orly and

17  I'm entitled to track that through and see if it ended up with

18  Orly.

19         So maybe take it in steps.  Maybe discuss with Mr.

20  Dellaportas what there is.  See if you can narrow down what

21  dispute remains, if any.  And you can come back to me, if

22  necessary, with a narrower dispute after some good effort to

23  try to work this out.  The goal is to allow Mr. Dellaportas to

24  get discovery related to Orly's assets and liabilities during

25  the relevant time here and potentially Arie because of this

35

1  argument that money may have gone to Arie that may have been

2  Orly's assets.

3          MR. HARRIS:  Okay.  Thank you, Your Honor.  I

4  appreciate it.  And if Mr. Dellaportas will direct the

5  subpoena information to go to my office, I would certainly

6  work collaboratively in that vein.

7          I just want to make one last point, Your Honor.  The

8  totality of whatever the number is to your earlier point to

9  Mr. Bowen and Mr. Dellaportas, I am not here to opine on, but

10  I am here to say that the only one that both of these

11  gentlemen agree upon is that only $875,000 of that proceeds

12  touched my IOLTA account.  And only those 875 went out

13  contemporaneously from my IOLTA account.

14          THE COURT: Right.  It's just that I don't have any

15  proof in front of me or any basis for making fact -- findings

16  of fact that what you say that this 868,000, which doesn't

17  quite match the amount that we're talking about, that that is

18  the proceeds.  I mean money is fungible.  It's unclear to me

19  that that was earmarked and that's where it went.  I can't

20  tell that now.  It may be true.  I just am not in a position

21  to determine that.  And Mr. Dellaportas is entitled to follow

22  his leads, and if they turn out to be misleads, they turn out

23  to be misleads.  But I'm just not in a position to do that.

24  It's discovery.

25          MR. HARRIS:  Okay.  So is Mr. Dellaportas saying to

36

1  the Court that he will redirect that subpoena to be delivered?

2          THE COURT:  Mr. Dellaportas, can you please contact

3  the bank and give them the direction to produce the

4  information to Mr. Harris?

5          MR. DELLAPORTAS:  Yes, Your Honor.

6          THE COURT:  Okay.

7          MR. HARRIS:  Thank you, Your Honor.

8          THE COURT:  That's on this record.  And, also, Mr.

9  Dellaportas, in general, if you find yourself wanting to

10 subpoena an attorney's account, please notify that attorney

11 before you do so, all right?

12         MR. DELLAPORTAS:  I understand, Your Honor.

13         THE COURT:  Give that attorney an opportunity to

14 protect his or her client's interests.

15         MR. DELLAPORTAS:  Okay.

16         MR. HARRIS:  Thank you, Your Honor.

17         MR. BOWEN:  Your Honor, Mike Bowen.  I just have one

18 point of clarification, if I may?

19         THE COURT:  Uh-huh.

20         MR. BOWEN:  One of the issues here is the temporal

21 scope, which Your Honor referred to at the beginning of the

22 hearing.

23         THE COURT:  Right.

24         MR. BOWEN:  And we do have a relevance and burden

25 objection to going all the way back to 2013 to start the kind

37

1    of tracing that we all agree Mr. Dellaportas is entitled to

2    do.   But to go back and look whether or not a court reporter

3    was paid $2,000 in 2013 --

4          THE COURT:   Well, when did the underlying dispute

5    arise between the parties?

6          MR. BOWEN:   Between brother and sister, meaning --

7          THE COURT:   Right.

8          MR. BOWEN:   -- between Orly and Sagi --

9          THE COURT:   Right.

10          MR. BOWEN:   -- it was based on a promissory note

11    that Sagi alleged existed or an indemnification agreement

12    between Sagi and his sister Orly which related to a promise

13    that Sagi had made to his mother.   That document was dated way

14    back in 2004.   The first time Sagi tried to enforce that

15    document against -- or that set of documents against his

16    sister was 2014.   That was the first federal litigation that

17    started this.

18          It was after --

19          THE COURT:   And what -- were there discussions

20    between them and led up to that lawsuit or is it just straight

21    to court?

22          MR. BOWEN:   It was straight to court.   He made a

23    demand.   He paid under this promise a certain amount of money,

24    I believe it was $200,000, to his mother and then he turned

25    around and he --

38

1          THE COURT:  And when was that payment made to his

2   mother?

3          MR. BOWEN:  In 2014.

4          THE COURT:  All right.  And so when you're talking

5   about a statute of limitations for fraudulent conveyance, it

6   has to be to avoid payment of a debt.  So if there is no

7   thinking about I'm going to have to try to avoid payment of

8   this prior to it ever coming up and being an issue, why would

9   you go back further?

10         MR. DELLAPORTAS:  So this is Dellaportas.  Just to

11  address this, this money is exactly the money that Orly

12  promised to pay to --

13         THE COURT:  I'm sorry; "this money?"

14         MR. DELLAPORTAS:  The 32 -- so Mr. Bowen referenced

15  that in 2004, the two kids, Sagi and Orly, promised to

16  financially support their mother if they ever monetized the

17  shares of a company called Trans Resources, TRI.  It was a

18  family business.  So basically they told their mom, hey, mom,

19  you're giving us these shares.  If we ever monetize these

20  shares through dividends, sale, whatever, we're going to

21  support you, mom.

22         And because of a long series of facts which we don't

23  need to get into, Sagi said he'd do the whole thing and then

24  Orly would indemnify him for half of what Sagi supported his

25  mother for.  That's why we have this convoluted third-party

1    proceeding.  So this is the money.  So Orly always knew

2    because she signed the document that if she ever got money for

3    her TRI shares, she was going to have to use that in some part

4    to financially support her mother.  That was known since 2004.

5            So now in 2013, she gets $32.3 million through this

6    settlement agreement.  And they go to incredible angst to hide

7    this.  We made various -- there's other litigations, as Your

8    Honor knows.  We made various discovery motions and sought for

9    over a year to get it before finally Judge Forrest ordered it

10   produced.  And, you know, I think Judge Forrest was a little

11   astonished by what was produced because it was inconsistent

12   with the prior representations that had been made that Orly

13   received no benefit from this.

14           So when they say that there's no connection, they're

15   inextricably intertwined, this money, this $32.3 million --

16           THE COURT:  Okay.  So --

17           MR. DELLAPORTAS:  -- is the monetization of the

18   family business.

19           THE COURT:  -- this was July 2013?

20           MR. BOWEN:  Correct.

21           MR. DELLAPORTAS:  Yes, ma'am.

22           THE COURT:  All right.  And you want to go back in

23   time earlier than July 2013?  No?

24           MR. DELLAPORTAS:  No, just to the settlement.

25           THE COURT:  July 2013 forward?

40

1          MR. DELLAPORTAS:  Yes.  And that's within the six-

2    year statute of limitations for any fraudulent conveyance --

3          THE COURT:  Okay.

4          MR. DELLAPORTAS:  -- that may have occurred.  And so

5    that's really all we're --

6          THE COURT:  Okay.  All right.

7          MR. DELLAPORTAS:  -- limiting it to.

8          THE COURT:  All right.

9          MR. BOWEN:  But if I may, Judge, Bowen.  Part of the

10   issue is it's not reasonably related to finding assets that

11   exist today or monies that are owed to Orly today.  And Mr.

12   Dellaportas keeps saying that Orly received $32 million.  It's

13   just flat out not the case.

14         THE COURT:  Okay.  All right.

15         MR. BOWEN:  I mean there's documentary evidence that

16   that's not the case.

17         THE COURT:  Okay.  Hold on a second.  I'm going to

18   allow discovery going back to July 2013, the date of the

19   payment of this settlement of the first payment on the

20   settlement if it wasn't fully paid.  Unclear to me whether it

21   was fully paid or partially paid.

22         MR. BOWEN:  It wasn't.

23         THE COURT:  It looked like from something I read

24   that it was partially paid.

25         MR. BOWEN:  Correct.

41

1          THE COURT:  But I'm going to allow the discovery

2    going back in time to that and trying to trace assets and

3    liabilities from that point forward.  I'm going to allow that.

4    I haven't really seen any submission from any producing party

5    or nonparty that claims undue burden and that demonstrates the

6    burden.  And if anyone wants to demonstrate burden, it is on

7    the burdened party -- it is the burden of the supposedly

8    burdened party to demonstrate that burden.

9          So I haven't really seen that any bank, any

10   accounting firm, any, you know, Ms. Genger herself, that

11   anybody is in fact unduly burdened.  I haven't heard anybody

12   say there are boxes and boxes in warehouses.  It's going to

13   take zillions of person hours to go through things.  You know,

14   it is an enormous enterprise.  I haven't heard anything about

15   burden.

16          I've heard about scope.  I've heard about relevance.

17   Most of the arguments seem to be about either relevance or

18   harassment.  With respect to relevance, I mean, again, it may

19   be barking up the wrong tree, but I cannot determine that so

20   I'm going to let Mr. Dellaportas bark.  He can follow this

21   2013 payment and if he goes off on, you know, false lines

22   where he thinks he's pursuing that money, you know, ultimately

23   -- mixing metaphors oddly -- it won't bear fruit, so.  But I'm

24   going to let him try that, okay?

25          MR. BOWEN:  This is Mike Bowen.  We don't have an

42

1    issue with Mr. Dellaportas tracing -- there was $17.5 million

2    that was paid out in July -- I think it was July 1, 2013.

3    There is objective documentary evidence that has already been

4    produced to Mr. Dellaportas, and we've prepared a chart and

5    summary of it.  We can hand it up.  And Mr. Dellaportas

6    already has all this information.  We gave him a summary.

7              That information we're not making -- on behalf of

8    Orly Genger, we're not objecting to that kind of barking.

9    What we are objecting to on the basis of harassment and on the

10   basis of relevance is to get into every check that Orly may

11   have paid or somebody may have paid on her behalf going all

12   the way back to 2013 where those sources of funds have nothing

13   to do with the 17.5 million.  It's just normal day-to-day

14   living that Orly Genger was doing over the last six years.

15             THE COURT:  Right.  Well, so far I haven't seen

16   anything where I can determine unequivocally that the

17   particular check has nothing to do with that money.  There are

18   different arguments about whether the checks that I have seen

19   so far do or don't relate to that money.  So arguments are

20   arguments; both sides can have them.  I don't know where the

21   relevance line lies for you, what in particular you're seeking

22   either not to produce on behalf of Orly or you're seeking to

23   quash on behalf on Orly as to some other subpoena on a

24   nonparty.

25             MR. BOWEN:  Well, we think that it has to do with

43

1   the scope of these subpoenas to the extent that they're even

2   going to third parties and that's why --

3           THE COURT:  Well, let's take them --

4           MR. BOWEN:   -- I raise it in this context.

5           THE COURT:  Let's take them one at a time.  I have

6   four docket entries that are actually open motions that have

7   to be decided.  They are 136, 138, 139, and 151.  Those are

8   the only ones where someone has actually said we need you to

9   rule on something, at least that's how you filed them, folks.

10          MR. DELLAPORTAS:  So, Your Honor, said you wanted to

11  try to get the third parties out first, so we think we have an

12  easy one.

13          THE COURT:  Let's take them one at a time.  Go

14  ahead.  You're on.

15          MR. DELLAPORTAS:  Okay.  So this is 130 through 133

16  docket entries.  And so it's pretty much standard boilerplate

17  black letter law that you get the judgment debtor's tax

18  returns.  So we asked them from Orly.  She didn't provide

19  them.  We subpoenaed them from the accounting firm we know her

20  to be an accountant.  The accountant -- the accounting firm

21  raised the burdensome objection.  It's fair.  They're a third

22  party.  We addressed that with them by offering -- agreeing to

23  reimburse them for their expenses or the set amount.

24          And so the only issue they had is that there's a

25  statute which says that an accountant can only release tax

44

1   returns upon a court order such as a so-ordered subpoena.  So

2   we made a joint application to so order the subpoena on the

3   Law Firm of Raines & Fischer.  Raines & Fischer did not

4   object.  Orly did object.  They didn't cite any case law that

5   says you don't get tax returns.  You did get returns.

6        They say -- they've insisted that they have a right

7   to unilaterally redact unrelevant information from the tax

8   returns.  Tax returns are not -- it's all financial

9   information.  We don't believe there should be any redactions

10  from a tax return.  And, number two, they made the same

11  argument that we shouldn't be allowed to go back six years.

12  And, again, the case law is very clear that you can go back

13  and try to set aside fraudulent conveyances.  You can look at

14  transfers with a judgment debtor to check their bonafides is

15  what the case law says.

16        So between us ad Raines & Fischer, we have an

17  agreed-upon motion where we move the Court to so order the

18  subpoena.  Raines & Fischer will produce the materials.

19        THE COURT:  Wait, I'm sorry.  Is Raines & Fischer

20  represented here?

21        MR. LUST:  Yes, Your Honor.

22        THE COURT:  That would be you, okay.

23        MR. LUST:  Yes.  And just to follow up Mr.

24  Dellaportas --

25        THE COURT:  And you are?

45

1          MR. LUST:  Dan Lust.

2          THE COURT:  Mr. Lust?

3          MR. LUST:  Of Goldberg Segalla.

4          THE COURT:  Okay, Mr, Lust.

5          MR. LUST:  So everything Mr. Dellaportas said is

6    correct.  There are some provisions of the Internal Revenue

7    Code that do state that, you know, absent the account holder

8    voluntarily providing those documents, the only way that the

9    accounting firm can provide them is under a court order.  And

10   beyond that, we have no objection to the Court so ordering

11   that.  We do understand that there are some objections from

12   Orly Genger, but beyond that, we don't have any objections.

13          THE COURT:  All right.  So the only thing that held

14   this one up was Orly Genger's objections.  And if you want to

15   speak to it, I'll hear you.  Otherwise, I'll so order the

16   subpoena.

17          MR. HERSCHMANN:  It's Eric Herschmann on behalf of

18   Orly Genger.  The issue that Mr. --

19          MR. DELLAPORTAS:  I would object, Your Honor.  He

20   has not entered an appearance in this case.  And previously

21   when I tried to send him stuff --

22          THE COURT:  This is post-litigation discovery to

23   enforce a judgment.  So I'll hear him.

24          MR. DELLAPORTAS:  Okay.

25          MR. HERSCHMANN:  Thank you, Your Honor.  The issue,

46

1   and I guess I'll consolidate it this way, what Mr. Dellaportas

2   has said is we're entitled to trace the $17.2 million that has

3   been paid, right.  Your Honor's now said that that's okay.

4   The issue then is $17.2 million was disclosed in claim of Arie

5   Genger's tax return for the 2013 year, all of it.  All of it's

6   on Arie Genger's tax return.

7           Mr. Dellaportas said I'm entitled to see whether she

8   got some of the $17.2 million.  Our response was, okay, we'll

9   give you the tax returns going back six years to show you that

10  none of the $17.2 million from the settlement came.  And in

11  reality, only $875,000 of the $17.2 million had anything to do

12  with going to Arie Genger.  The other amount of it, which

13  everybody knows, went to the Broser family who lent money to

14  Arie Genger.  It all went to their accounts, never touched

15  Orly Genger's accounts, never touched her tax returns, never

16  touched her bank accounts, nothing.

17          So we've said you've articulated for us before Judge

18  Broderick in the letter of October 10th why you want to go

19  back six years.  No problem, we will give you the tax returns

20  to show you.  Whatever else happened six years ago as far as

21  whatever income she earned, payments that have nothing to do

22  with the settlement, have nothing to do with a 2018 judgment.

23  That's what we're willing to do without any hesitation.

24          What Raines & Fischer was saying is as accountants,

25  we need a court order to provide it.  And what we've said is

47

1  you don't need the court order.  Just agree to sign a standard

2  confidentiality agreement, which he refused to do, and we'll

3  give you all the information.  And what you will see is that

4  none of it went --

5        THE COURT:  Okay.  When you say all the information,

6  you mean complete unredacted tax returns?

7        MR. HERSCHMANN:  No, no.  What Mr. Dellaportas

8  articulated before Judge Broderick in the submission --

9        THE COURT:  Which submission; what docket number?

10       MR. HERSCHMANN:  Our response is 134 where we

11  identify -- he says that in his view, six years of all these

12  returns --

13       THE COURT:  All right.  It says, "Orly agrees to

14  produce to Sagi all relevant portions of her tax returns that

15  were prepared from the date of the settlement agreement in

16  question."  I presume that means forward.

17       MR. HERSCHMANN:  Correct.

18       THE COURT:  Okay.  When you say all relevant

19  portions of her tax returns which is in bold, what portions do

20  you mean?  Do you mean a single line on each tax return?

21       MR. HERSCHMANN:  No, Your Honor.  If you look up in

22  the paragraph at the top of the paragraph, Mr. Dellaportas

23  specifically argued that he wanted the tax returns "that may

24  reflect the disposition of proceeds from the settlement

25  agreement with the entities known as the Trump Group which

48

1  related to her beneficial interest in the family business."

2        That's what he asked for.  We said no problem.

3  You're tracing $17.2 million.

4        THE COURT: Right.  And when you say you agree to

5  produce all relevant portions of the tax returns, what

6  portions do you mean?  Do you mean a single line item or if

7  it's not in there, do you mean an entirely redacted document?

8        MR. HERSCHMANN:  Well, I think, Your Honor, there's

9  portions of the tax returns that would show whether or not she

10  got a disposition or a payment.  So here's the problem that

11  everyone has.  She didn't get the money.  The tax returns --

12  and he has Arie Genger's tax returns.

13        THE COURT:  So if you produce Orly Genger's tax

14  returns and she didn't get the money and you would agree to

15  produce all relevant portions, what you're agreeing to produce

16  is a document that is completely redacted?

17        MR. HERSCHMANN:  No, Your Honor.  We would end up

18  producing information that may show a total income line, but

19  it would also show that she didn't receive anything because

20  you have to match up the two documents.  Arie Genger's tax

21  return reflects he got $17.2 million.  Obviously, Orly

22  Genger's tax returns prepared by the same accounting firm are

23  not going to show that she got $17.2 million.  And the reality

24  of what's transpired --

25        THE COURT:  Well, could a tax return show money that

49

1   comes in and also money that goes out?

2         MR. HERSCHMANN:  Sure.  And Arie Genger's return

3   would show that.  But Arie Genger's return doesn't show that

4   he gave part of the proceeds to Orly Genger, and Orly Genger's

5   tax return --

6         THE COURT:  As far as I could tell, his tax return

7   was not produced in its entirety.  It was only -- only one

8   line of it was produced; is that right?

9         MR. HERSCHMANN:  I think it was a schedule and it

10  has the 17.2 million to him.

11        THE COURT:  But does it show any monies out?

12        MR. HERSCHMANN:  I don't think there was any money

13  that went out as it relates to Orly Genger for sure not.  And

14  her tax returns, and what we're doing is we're proving a

15  negative.  What does he want to see?  He wants to see whether

16  Orly Genger's tax returns reflect that she got any of 17 --

17        THE COURT:  I think what he wants to see the tax

18  returns are tax returns that aren't redacted so he can see for

19  himself if there's anything there as opposed to trusting that

20  you have in fact shown him everything.

21        MR. HERSCHMANN:  Sure, Your Honor.  But that -- so

22  here's the issue so you can depose Orly and Orly says I didn't

23  get it.  That's one source.  The accounting firm says --

24        THE COURT:  And he clearly doesn't trust what Orly

25  is saying.

50

1          MR. HERSCHMANN:  No, there's no question, Your

2    Honor.  I agree, but then you --

3          THE COURT:  So he clearly wants documents.

4          MR. HERSCHMANN:  I understand that, but that's why

5    the documents from the Brosers and from the accounts show that

6    the money went to the Broser family.  There's no dispute about

7    that.

8          THE COURT:  But wait, wait, wait.

9          MR. HERSCHMANN:  Right?

10         THE COURT:  Wait a minute.

11         MR. HERSCHMANN:  Sure.

12         THE COURT:  There is some money, some fairly

13   significant chunk of money that everybody seems to agree went

14   to Arie Genger who I gather is the father, right?

15         MR. HERSCHMANN:  No.

16         THE COURT:  No?  Arie's not the father?

17         MR. HERSCHMANN:  No, I'm sorry.  Arie is the father.

18   I don't think we all agree where the chunk of money went.  I

19   think that --

20         THE COURT:  You don't all agree that some money went

21   to Arie Genger?

22         MR. HERSCHMANN:  No, I think to trace it exactly,

23   Your Honor, we have a chart that may make it really easy

24   because it actually shows the bank accounts and exactly what

25   transpired.

51

1        THE COURT:  I'm sorry.  This is something Mr.

2   Dellaportas has?

3        MR. HERSCHMANN:  He has all the backup documents for

4   sure.  Everyone has the backup documents and --

5        MR. DELLAPORTAS:  I have --

6        MR. HERSCHMANN:  And then I think it could be

7   addressed simply.  [Indiscernible] I'll be finished in a

8   moment if you'd give me a minute, okay?

9        And, Your Honor, I'm more than happy to hand it up

10  because I think they're all exhibits that have been provided.

11  The money went very simply, right, the $17.2 million --

12       THE COURT:  Can I reiterate for the umpteenth time

13  here, I cannot accept what you're telling me is true just as I

14  cannot accept what Mr. Dellaportas is telling is true.  If you

15  say this is where the money went, trust me, I can't do that.

16       MR. HERSCHMANN:  Your Honor, I agree with you.

17       THE COURT:  So, Mr. Dellaportas is entitled to look

18  at the same tax returns that you're looking at to confirm it

19  for himself and for his client and if it's not there, it's not

20  there.  And I don't mind it being under protective order and

21  presumably, he doesn't mind it being under protective order.

22  I think, if I can speak for him, what he's objecting to are

23  redactions or a refusal to produce altogether.

24       MR. HERSCHMANN:  So there's no -- we agree if he

25  would have signed --

52

1          THE COURT:  So produce the tax returns from 2013

2   forward for Orly Genger unredacted under protective order, and

3   I'll sign one.

4          MR. HERSCHMANN:  Okay.  So could I just ask then one

5   point because what you're saying is he doesn't believe that

6   she didn't get the money, which I understand, right?  The only

7   way you know whether she got the money on the tax returns

8   would be a disclosure.  It would have to be there.  And what

9   we're saying is we're going to give you that portion of the

10  tax returns.

11         THE COURT:  Right.  Give them the entire tax returns

12  for Orly Genger from July 2013 or the year 2013 forward

13  without redactions under a confidentiality order, negotiate

14  one, I'll sign it.

15         MR. HERSCHMANN:  Okay.

16         THE COURT:  You submitted a stipulated protective

17  order for a Mr. Broser [sic], I believe, which I'm happy to

18  sign.  I just have to put off everything until this

19  conference.  But the idea that you get to redact and say we

20  know what portions are relevant and he doesn't get to see the

21  other portions when this is the judgment debtor, let him have

22  the full tax returns and do it under a confidentiality order.

23         MR. HERSCHMANN:  Okay.  And the only thing that we

24  would ask is that if we get to these tax returns and you can

25  imagine the contentiousness that has existed amongst this

53

1   family --

2            THE COURT:  I don't have to imagine.  I've seen it.

3            MR. HERSCHMANN:  I completely agree.

4            THE COURT:  And by the way, it is a new year.

5            MR. HERSCHMANN:  I completely --

6            THE COURT:  January 1st just came.  I mean I don't

7   know why families have to behave like this.  Lawyers certainly

8   don't have to behave like this.  Any hostility within

9   families, you know, the lawyers have to rise above as they try

10  to work cooperatively as members of the bar, all right.  But

11  maybe it's time for everybody turning over a new leaf and

12  trying to sort this all out.  I think a settlement here is

13  more than I can manage, but --

14           MR. HERSCHMANN:  I could tell you that we have tried

15  on multiple occasions and, sadly, since someone who gets to

16  live it every day more than anyone else, I don't think it's

17  possible.  But I will say this, Your Honor, the only thing

18  that we'd ask in the confidentiality -- and we're going to

19  provide them with the tax returns under a confidentiality

20  order -- when he sees on the schedules because that's the only

21  place it's going to potentially exist that it's not there, we

22  want the limitation to be for this, not that he finds out

23  somewhere else because he didn't want to identify even the law

24  firm that would get documents.

25           THE COURT:  This is not a full sentence.

54

1          MR. HERSCHMANN:  Sure.

2          THE COURT:  The only thing you're asking is?

3          MR. HERSCHMANN:  Is that he uses it solely in this

4    proceeding for this purpose because if it turns out that it's

5    not on the schedule, he didn't want to identify when we said,

6    all right, we'll give the -- we'll sign the --

7          THE COURT:  What is the concern, that he uses what's

8    on the tax return how?

9          MR. HERSCHMANN:  To send to someone else in some

10   other way.  I mean this is what's been transpiring, and it's

11   been a circumstance --

12         THE COURT:  I'm sorry.  That's very vague.

13         MR. HERSCHMANN:  Sorry.

14         THE COURT:  What are you talking about?

15         MR. HERSCHMANN:  In that he's doing post-judgment

16   enforcement.  He's saying I need to see a tax return to

17   determine whether or not Orly got some portion of $17.2

18   million.  We're going to give him unredacted versions of that

19   tax return.

20         THE COURT:  And I presume also to see if there are

21   other sources of income, if there are other assets as to which

22   a judgment could be enforced.

23         MR. HERSCHMANN:  Sure.  No question.  That's why we

24   initially said 2017 and 2018, we understood wanting those tax

25   returns.  Be that as it may, that's fine.  What we don't want

55

1   to see happen is that the tax returns end up in some other

2   filing somewhere that he decides, okay, I want to go use this

3   for something.

4           THE COURT:  How many current litigations are there

5   between this brother and sister?

6           MR. HERSCHMANN:  Several.  Surrogates Court, fraud

7   finding against Sagi Genger before Judge Jaffe; breach of

8   fiduciary duty finding against Sagi Genger by Judge Jaffe.

9   Both have been up on appeal.  We're doing the damages phases

10  now.

11          THE COURT:  You guys are all nuts.

12          THE COURT:  Your Honor?

13          MR. HERSCHMANN:  This is a unique case, Your Honor,

14  in a variety of ways, but, you know, it has been playing

15  itself out for many, many years amongst the four family

16  members.  And, sadly, this is where it is, right.  I mean

17  unconditionally they'll see because in the submissions, we'll

18  see that on certain businesses which Mr. Dellaportas argued

19  were very, very successful, Orly never made a penny.  So at

20  the end, I think it'll all come clear what happened with the

21  money.  But at this stage, I don't see a way of having tried

22  this now for several years --

23          THE COURT:  Mr. Dellaportas?

24          MR. HERSCHMANN:  -- to resolve it.

25          THE COURT:  Mr. Dellaportas, are you willing to have

56

1   the Court enter a protective order that says that the Orly tax

2   returns would be produced to you in their entirety without

3   redaction for use for the purposes of enforcing this judgment

4   and not to be used for any other purpose?

5           MR. HERSCHMANN:  Absolutely, Your Honor.

6           THE COURT:  Fine.  Then let's do that.

7           MR. DELLAPORTAS:  Okay.

8           THE COURT:  Submit a jointly proposed protective

9   order.  I'm sure you can do that.

10          MR. DELLAPORTAS:  Your Honor, and that's why I stood

11  up because the parties actually -- this is one of the issues

12  that unfortunately had to be put before Your Honor because the

13  parties entered into those negotiations.  We offered actually

14  a proposed order with much broader protections than Your Honor

15  just recited and --

16          THE COURT:  No, I was just responding to the one

17  that I heard Mr. Herschmann, right?

18          MR. HERSCHMANN:  Correct.

19          MR. DELLAPORTAS:  Yes.

20          THE COURT:  -- speak to?

21          MR. DELLAPORTAS:  And, unfortunately, they insisted

22  on some provisions in the confidentiality agreement that we've

23  never seen before and we don't think are proper.  So the

24  confidentiality stipulation that we'd proposed --

25          THE COURT:  All right.  Well, wait, wait a minute.

57

1   Hold on a minute.  Give me an example of a term that you've

2   never seen before that you think is improper.

3          MR. DELLAPORTAS:  Okay.  So one of them says that we

4   cannot even show -- if they mark something confidential, we

5   can't even show it to the Court, to you, Your Honor, unless we

6   get a prior court order.  So first I have to go to you to seek

7   an order for permission to show you the confidential

8   documents, Your Honor.  I mean we said it should be in camera,

9   you know, if it's --

10          THE COURT:  Look, there are plenty of sample

11  protective orders floating around that have been approved by

12  judges in this court.  A number -- I don't have a model

13  protective order, but a number of judges do.  And I'm prepared

14  to sign anything that is rational.  If it has some provision

15  in it that's outlandish like you can't show it to the Court,

16  I'll strike it.  But don't do something outlandish, Counsel.

17  And, you know, I'm sure you can negotiate a confidentiality

18  order.  That seems to me beyond --

19          MR. HERSCHMANN:  Your Honor, Eric Herschmann.

20          MR. DELLAPORTAS:  I'm still speaking.

21          MR. HERSCHMANN:  I agree.

22          MR. DELLAPORTAS:  I'm still speaking here.

23          MR. HERSCHMANN:  The judge just asked me a question

24          MR. DELLAPORTAS:  I'm sorry, I'm still speaking.

25          THE COURT:  Hold on.

58

1           MR. HERSCHMANN:  The judge asked --

2           MR. DELLAPORTAS:  I was just --

3           THE COURT:  Hold on.  No simultaneous talking.

4    Remember we don't have a court reporter here who's able to say

5    stop it, I can't get it.  So I'm going to have to play that

6    role, okay.  I'm sure someone's going to want to have a

7    transcript made.  If you speak simultaneously, you're going to

8    get jibberish.

9           MR. DELLAPORTAS:  So if I could finish my thought?

10           THE COURT:  No, you can't finish the thought.  I

11    interrupted you for a reason.

12           MR. DELLAPORTAS:  Okay.

13           THE COURT:  Okay?  I am sure that you are able to

14    negotiate a confidentiality order.  I am sure you're able to

15    do that.  If for some reason you are not able to negotiate top

16    to bottom an appropriate confidentiality order, what I expect

17    you to do is to submit to me a single document that has at any

18    given location the two dueling language proposals.

19           So if it's who can see it, if one side says and this

20    party, and the other says no, it'll be the two dueling

21    options.  I will either cross one out or I'll cross the other

22    out or I'll cross them both out and I'll write my own, but

23    it'll make it easy for me to edit.  Don't do anything

24    outlandish.  Do something pretty standard, and I will go for

25    it, okay.

59

1          And then you'll make the production of the complete

2   tax returns unredacted.  The one thing I've heard that I've

3   already said I would do is to say that they should be used for

4   purposes of the enforcement of this judgment and not for other

5   purposes, okay?

6          MR. HERSCHMANN:  Okay, thank you.

7          THE COURT:  Got that?

8          MR. DELLAPORTAS:  Yes.  And, Your Honor?

9          THE COURT:  Let's move on.

10          MR. DELLAPORTAS:  Okay.  And just to clarify, Your

11   Honor, our subpoena upon Raines & Fischer was somewhat broader

12   than that and sought some other materials as well.  I didn't

13   hear any objection to them, but we would like that to be so

14   ordered.

15          THE COURT:  All right.  Is there objection to

16   anything else that was covered by that subpoena?  What else

17   was covered by the subpoena besides tax returns?

18          MR. DELLAPORTAS:  Any -- we -- I'm sorry, Your

19   Honor.  Let me get out the subpoena.

20          UNIDENTIFIED SPEAKER:  It's 131.

21                   [Pause in proceedings.]

22          MR. DELLAPORTAS:  So it seeks six document

23   categories.  It seeks information about the settlement

24   agreement.  It seeks anything about other property or debts

25   held by Orly Genger.  It seeks -- it's about it, really.  And

60

1  documents concerning Orly Genger's accounting work, all

2  communications regarding the foregoing matters.  I mean it's

3  the same stuff we've been talking about all day.

4          MR. HERSCHMANN:  With all due respect to Mr.

5  Dellaportas -- Eric Herschmann -- it is not all related to the

6  same thing.  And let me start with this, if Orly has other

7  liabilities.  That's not applicable to a judgment creditor.

8  He's entitled to know what assets she has, right, and he's

9  entitled to know what debts are due and owing to her.  But if

10  she owes additional debts, that's not relevant to the judgment

11  creditor in collecting his judgment.  But he started off --

12          THE COURT:  Why would it not be relevant to discover

13  that actually certain money is not available because it's owed

14  somewhere else and that other party has priority?

15          MR. HERSCHMANN:  Because it presumes that there's an

16  asset, right.  So the question becomes this, I'm a judgment

17  creditor.  Do I get to go ahead and look at what other

18  liabilities you have.  The answer's normally not.  I get to

19  look at what assets you have.

20          THE COURT:  You have authority on this?

21          MR. HERSCHMANN:  I'm sorry.

22          THE COURT:  Authority?

23          MR. HERSCHMANN:  I don't have it in front of me

24  because I thought --

25          THE COURT:  So, generally what you're saying is in

61

1    post-judgment discovery, a judgment creditor is only entitled

2    to discovery as to assets, not to liabilities?

3             MR. HERSCHMANN:  It's normally assets and debts that

4    are due and owing.  And we could provide that to Your Honor,

5    but those are the two categories that you look towards, debts

6    that are due and owing and assets.  And what we started with

7    Raines & Fischer in the tax returns was $17.2 million.  And

8    now we've agreed we're going to do and produce all of the

9    $17.2 million or all the tax returns unredacted.

10            Now what he's saying is even though those should

11   show a lot of the things on the tax returns, he say I want to

12   see anything else associated with whatever liabilities

13   incurred.  And that's just, in our view, doesn't relate to the

14   two focus areas, which are assets and debts that are due and

15   owing.  And we're prepared to submit --

16            THE COURT:  I'm sorry.  You think the information

17   that the accounting firm has is severable so that there could

18   be certain information that is solely with respect to a

19   liability that can be carved out and not produced and other

20   information solely with respect to assets or amounts due to

21   Orly that can be --

22            MR. HERSCHMANN:  I'm sorry, Your Honor.

23            THE COURT:  I'm talking about the subpoena on Raines

24   & Fischer.

25            MR. HERSCHMANN:  And I apologize.  I misread the

62

1   subpoena.  He asked for debts owed to Orly, and I agree that

2   --

3            THE COURT:  Okay.

4            MR. HERSCHMANN:  -- that's appropriate.

5            THE COURT:  So do you have other objections to that

6   subpoena?

7            MR. HERSCHMANN:  Well, we object to debts owed to

8   Orly.

9            THE COURT:  Well, is that in the subpoena?

10           MR. HERSCHMANN:  Well, it says debts to, owed by, or

11  to Orly.  Debts owed --

12           THE COURT:  Wait, I'm sorry.  Does anybody have a

13  copy of the subpoena?  Is it part of the exhibits?

14           UNIDENTIFIED SPEAKER:  130-1.

15           THE COURT:  It's 130-1.  Hold on one second.  Let me

16  pull it out.

17                     [Pause in proceedings.]

18           THE COURT:  All right.  Exhibit A, all tax and

19  information returns filed by or on behalf of Orly Genger,

20  okay.  I'm not reading everything, but that's item 1

21  essentially.

22           Tax and information returns for any trust or entity

23  in which she manages or holds an interest, okay.  Documents

24  relating to the settlement agreement, okay.  Escrow accounts

25  or arrangements thereunder, okay.  Promissory notes issued

63

1    thereunder, okay.  Payments thereunder, okay.  Documents

2    relating to actual potential tax treatment of the Orly

3    settlement agreement or any resulting payments, okay.

4          All documents concerning any property held by or in

5    debts owed by or to -- so this is the crux -- debts owed by or

6    to Orly Genger at any point during the last six years.  Then

7    the next item is documents in terms of transfer of Orly

8    Genger's accounting work to another accountant.  And then

9    communications regarding the foregoing matters -- subjects, so

10   -- subject matters.

11          So you have one challenge, and that's the words "by

12   or to" in Item 4?

13          MR. HERSCHMANN:  Yeah.  And, obviously, all

14   communications regarding any of the foregoing subject matters

15   is going to be overly broad if you're talking about an

16   accountant's work for the last six years, you know, on this,

17   especially if he's getting the first --

18          THE COURT:  Well, wait a minute.  Wait a minute.  If

19   the items are relevant, then communications regarding the

20   items are going to be relevant.  The communications regarding

21   the five subject matters listed before, if I find the five

22   subject matters are relevant, I'm going to allow discovery

23   into communications about those five subject matters.  So what

24   I'm taking you to be complaining about is really a single

25   word, and that is the word "by," debts owed by Orly Genger.

64

1  Is that right?

2          MR. HERSCHMANN:  Yes, Your Honor.  If I could just

3  -- I just want to read the last portion.

4                    [Pause in proceedings.]

5          MR. HERSCHMANN:  Your Honor, that's where the focus

6  would be.

7          THE COURT:  All right.  So let me hear briefly from

8  Mr. Dellaportas about the word "by" in Item No. 4.  This would

9  be debts owed by Orly Genger at any point during the last six

10  years.

11          MR. DELLAPORTAS:  Yeah.  This turns out to be highly

12  relevant, Your Honor, and we have a reason for that.  As Your

13  Honor will recall, there was a predecessor action involving

14  this same debt, and it went all the way up to the Second

15  Circuit.  It was affirmed.  And then it came back down, and

16  there was judgment enforcement litigation.  Your Honor had to

17  issue an order about the surety and all that.

18          So when the matter came back down was in early 2017

19  and we started to serve judgment discovery.  At around that

20  time, Orly started filing UCCs, a dizzying array of UCCs in

21  three separate states: Texas, Florida, and New Jersey.  And

22  so, among other things, she filed a UCC statement in May 2017

23  in Texas where she pledged all her assets to Mr. Herschmann,

24  her husband/lawyer.

25          So what's going to happen, we presume, is if and

65

1   when we find an asset to collect on, Mr. Herschmann is going

2   to stand before us and say, Your Honor, I'm first in line.   I

3   have a pre-existing UCC.   So from that standpoint, we would

4   like to know as the judgment creditor if there's some other

5   creditor who claims to be in front of us, who they are, what's

6   the basis for it, and whether it's valid, and so that we can

7   explore that.   And the time to explore that's in discovery,

8   not when we have a U.S. marshal with a levy.   That's not the

9   right way to do it.   The right way to do it is during

10  discovery.

11          So we'd like to know generally what debts she has

12  but specifically Ms. Genger has pledged all her assets to her

13  husband, and she did so after the scope of the liability was

14  pretty well-known.   If there's some sort of documents

15  underlying that, we'd definitely be interested to learn that.

16  The loan agreement, it strikes us as unusual at a minimum and,

17  you know, there's a lot of conflicting hats people are wearing

18  here.

19          So that's what that's about.   And then on top of

20  that, then five days later, her father Arie also pledge his

21  assets to Mr. Herschmann.   Then the following year, Orly

22  pledged her assets in Texas and New Jersey to Arie in August

23  of next year.   So we have this circular set of liens whereby

24  any creditor who comes up to Orly is going to find that Arie

25  claims to be in front of us, that Mr. Herschmann claims to be

66

1   in front of us, and that Arie then whatever he gets, he

2   pledged to Mr. Herschmann.

3          So all of this ends up going -- it forms a perfect

4   circle whereby Orly's assets end up, as long as they're

5   married I assume, be used for the benefit of Orly.  So this is

6   something we definitely need to explore in discovery.  It may

7   be in the accountants.  We have other subpoenas that are

8   before Your Honor as well where we're seeking to vet this, but

9   that's why it's relevant.  Thank you, Your Honor.

10          MR. HERSCHMANN:  Can I respond, Your Honor?  Eric

11   Herschmann.  And this is exactly the point I'm talking about.

12   The issue of what's debt, whether Orly had a mortgage or

13   whether she was lent money subsequent to a 2014 judgment,

14   right, and it's UCC filed, which is what a secured creditor

15   does when they lend money, that's irrelevant.  It's totally

16   irrelevant to judgment enforcement.

17          What he's trying to say is if there's a -- if I go

18   exercise my judgment and if an asset has a lien on it, there's

19   a mortgage on a property, I'm entitled to understand the

20   mortgage and everything else to see whether or not I can get

21   ahead of the mortgage.  That's not what you do in judgment

22   enforcement.  You're checking on what the debtor has, right.

23   But if there's a lien that's been public filed, that's what's

24   happened.

25          The reality of what money got lent and who lent the

67

1    money and how it was done, that's not relevant to his judgment

2    enforcement.  What he's trying to say is it may be that I

3    think your loans or whatever are fraudulent.  He can suppose

4    that, but he'll have no basis for saying it.  And I think the

5    issue, and that's why, Your Honor, the focus should be on what

6    assets she has.

7            If she owes $100 million or $10 million and that

8    money is owed into a secured creditor and Sagi is an unsecured

9    creditor -- and as Mr. Dellaportas well knows that if this

10   judgment is upheld on appeal, that Orly will file for

11   bankruptcy.  That has been made clear.  There is no dispute

12   about that fact, right.  I don't think Sagi Genger disputes

13   it, Orly Genger has said it under oath.  It has been -- it

14   becomes abundantly clear that's what will transpire.

15           But he's here to pursue assets of Orly or debts that

16   are due and owing to Orly, not what she owes to other parties.

17           THE COURT:  First of all, I don't know what the

18   documents are.  I don't even know -- I'm going to direct this

19   to Mr. Lust -- I don't even know if they're severable.  I

20   don't even know if there are documents that would be produced

21   with respect to debts owed to where you could carve out

22   information about debts owed by without having to be, you

23   know, redacting a document.  There may be a net worth

24   statement or something that has, you know, more than one

25   column in it.

68

1          So I don't even know what we're talking about here.

2          MR. LUST:  That's a fair inquiry, Your Honor.  My

3    understanding is that once -- or if and when the subpoena is

4    so ordered, that we would hash it out, see what documents

5    actually are there and, you know, whatever's responsive to the

6    subpoena.  If there's an issue, I'm sure we can involve the

7    parties if there's, you know, some ambiguity.  But I think the

8    terms of the subpoena, at least what the scope of it it lies,

9    I don't think -- I think that's pretty clear.

10         So unless Your Honor wants to sever the debts to or

11   owed by, I mean as it stands now, I think it's all

12   encompassing where we wouldn't have an issue producing that.

13         THE COURT:  All right.  I'm going to give Orly's

14   counsel a very short period of time to provide me with case

15   law authority that post-judgment discovery regarding

16   liabilities of the judgment debtor are not appropriate for

17   discovery.  You find me case law from this circuit that says,

18   no, that ought to be out of bounds.  I'll consider limiting

19   this subpoena to take out those two words "by or" and just

20   leave the "to," the liabilities owed to Ms. Genger.  I'm a

21   little dubious, but that's -- and not a fully educated

22   reaction.

23         And I would also not be inclined to have documents

24   selectively redacted so that they don't make sense in their

25   entirety.  If they are stand-alone documents that only relate

69

1   to her debts -- in other words, not information that's

2   encompassed within a tax return or a net worth statement or a

3   profit and loss statement or something like that, I really

4   wouldn't want to see a document redacted so that it makes less

5   sense, all right.  But I'll give it a very short time to let

6   you see what you come up with.

7           MR. HERSCHMANN:  Eric Herschmann, and I completely

8   agree.  I think what we'd be talking about are documents that

9   are -- and like I'll put it under the doctrine of

10  completeness.  It's not a circumstance where I think Raines &

11  Fischer would say let's redact something out.  And I don't

12  even think they have the documents because I don't think it's

13  relevant on returns, but the documents that are totally

14  separate and apart, right, that have nothing to do with assets

15  or Orly's, right --

16          THE COURT:  Well, let's do this then.  Let's do

17  this.  I'll so order the subpoena.  So, Mr. Lust, when you

18  collect documents for production, take a look at the documents

19  with your client, see if there are any documents that as

20  stand-alone documents relate only to amounts that Orly owes to

21  someone, okay, as opposed to anyone owing her something, all

22  right.  If there are any -- I'm not asking you to redact any

23  documents that are produced, but if there are any stand-alone

24  documents like that, let counsel for both Sagi and Orly --

25  figure out one contact person between you, please, so that Mr.

70

1   Lust knows who to be in touch with on Orly's side.

2        But let counsel know that there's something that

3   you're holding back until that issue is resolved.  If there is

4   nothing, then that issue becomes moot, all right.  Nobody has

5   to do any research, nobody has to give me anything if there

6   really is nothing of that nature.

7        MR. LUST:  And, Your Honor, that's just in general

8   any documents related to No. 4, on Paragraph No. 4?

9        THE COURT:  That's right.  It's only on Paragraph 4

10  where it says, "Documents concerning any property held by or

11  debts owed by or to Orly," if there are any stand-alone

12  documents that relate to debts owed by Orly.

13       MR. LUST:  And, Your Honor, we can -- I can ask our

14  client to just run a search if there's any documents relating

15  to No. 4 whatsoever, you know, I think that might also

16  expedite the process as well, assuming that those --

17       THE COURT:  Well, I think it's going to be covered

18  by some of the others.

19       MR. LUST:  Understood.

20       THE COURT:  That's a fairly broad category.  So

21  we're really just talking about, you know, what does she owe

22  somebody as a stand-alone document.

23       MR. LUST:  Understood.

24       THE COURT:  Okay.  If there's anything like that,

25  tell counsel on both sides.  And before you produce that

71

1  remaining document or those remaining documents, I'll give

2  counsel for Orly an opportunity to give me some authority as

3  to whether it ought to be off limits for asset discovery, and

4  I'll let Mr. Dellaportas respond to that before I rule on it.

5  My hunch is I'm going to order it produced, but I'll give you

6  a chance if you think I'm way off here and the law is clear

7  that it's not appropriate, I'll let you show me that before I

8  order it produced and it's out of the bag.  All right?

9        MR. LUST:  Your Honor, just briefly, as counsel has

10  already agreed to voluntarily produce the tax returns, are we

11  saying that portion of the subpoena's rendered moot?

12        THE COURT:  No, produce it also.

13        MR. LUST:  Okay.  Understood, Your Honor.

14        THE COURT:  So he gets two copies.

15        MR. LUST:  Is there anything further --

16        THE COURT:  God forbid they don't match up and then

17  I'll never hear the end of it, but at least he gets to see.

18        MR. HERSCHMANN:  Just Eric Herschmann, it's also

19  going to be subject to the same confidentiality, right?

20        THE COURT:  That's perfectly fine.

21        MR. HERSCHMANN:  Okay.

22        THE COURT:  All right.  So before you produce it,

23  let's get a confidentiality agreement signed up.  And if --

24  I'm assuming that the accountant is good with whatever's

25  negotiated between the parties since it's your client?

72

1          MR. LUST:  We'd have to probably see this document

2     as it's produced, but I don't imagine there being an objection

3     to it.

4          THE COURT:  All right.  So make sure Mr. Lust is in

5     the loop on that.

6          MR. LUST:  Your Honor, is there anything further

7     required of Raines & Fischer?

8          THE COURT:  Wait, before you go.  I just asked my

9     law clerk who's sitting here to do some quick research on this

10    computer in front of him about this question of whether

11    liabilities are appropriate for discovery post-asset.  And

12    he's telling me that there are a lot of decisions out there

13    stating that a judgment creditor is entitled to wide discovery

14    of the judgment debtor's assets and liabilities.

15         So unless you find something really different from

16    that standard rule, my guess is I'm going to order discovery

17    with respect to both assets and liabilities, all right.  I'm

18    not sure what you're going to find, but since you seem so

19    confident, like I said, I'll give you a chance.  But I am

20    dubious, okay?

21         All right.  Is there anything else for Raines &

22    Fischer?

23         MR. DELLAPORTAS:  No, Your Honor.

24         THE COURT:  You are free to go --

25         MR. LUST:  Thank you, Your Honor.

73

1          THE COURT:    -- unless you really have a burning

2   desire to stay, in which case you're most welcome.

3          MR. LUST:  I'm good.  Thank you.

4          THE COURT:  All right.  So we will excuse Mr. Lust.

5   I'll also note for the record that Mr. Spolansky also left

6   when we finished talking about matters involving him.

7          All right.  I do have another subpoena, I believe,

8   involving Mr. Broser; is that right?

9          UNIDENTIFIED ATTORNEY:  Correct, Your Honor.

10          THE COURT:  I have a jointly proposed

11   confidentiality stip and order, which I'm assuming no one's

12   having any problems with.  Does anybody have any problems with

13   this on any side including any -- including Orly Genger's

14   counsel?  You don't have a problem with it?  No?

15          MR. DELLAPORTAS:  I believe it's specific to Mr.

16   Broser, so.

17          THE COURT:  Oh, all right.  Okay.  I'll review it.

18   I doubt I'm going to have a problem with it.  I was planning

19   to approve that.  If I do that, what issues remain with

20   respect to Mr. Broser?

21          MR. DELLAPORTAS:  So, Your Honor, they're very

22   narrow; just a couple of document issues, really.

23          THE COURT:  Okay.

24          MR. DELLAPORTAS:  So just by way of background

25   again, there's a settlement for $32 million.

74

1           THE COURT:  I got that far.

2           MR. DELLAPORTAS:  It provides that 17 million was

3  paid right away, and we've talked about chasing the money

4  down.  Then there's another 15 million that's going to be paid

5  at some indeterminate point in the future.  That's under the

6  settlement agreement.  The settlement agreement itself defines

7  -- only says that something called the AG Group is to get the

8  32 million, and it doesn't say amongst the four members of the

9  AG Group, one of which is Orly, who gets what.

10          So one of the main things we've sought through

11 discovery -- and a lot of it's even more relevant to the 15 to

12 come because that money hasn't even been paid yet, it's easier

13 to get money that hasn't been paid than money that's gone out

14 in the world.  One of the main questions we've had is how are

15 they going to allocate it.  And we asked that of Orly, we

16 asked that of everybody, and nobody gave us a straight answer

17 which was somewhat disconcerting.

18          But then we subpoenaed one of the banks which had

19 some -- that received the money, there was attached an excerpt

20 of a document called the "Genger Litigation Trust Agreement."

21 And the Genger Litigation Trust Agreement, it's signed by Orly

22 and Arie as grantor.

23          THE COURT:  This is an exhibit to something in front

24 of me?

25          MR. DELLAPORTAS:  This is 148-1.

75

1           THE COURT:  148?

2           MR. DELLAPORTAS:  Yeah, so probably Exhibit A to tab

3    to 148.

4           THE COURT:  Okay.

5           MR. DELLAPORTAS:  Okay.  And, again, and Orly in her

6    sworn interrogatory answer said she doesn't know of any

7    agreement about what's to happen to the money.  But here's her

8    signature on the document, and it creates a trust.  It

9    appointed David Broser and Lance Harris -- both their

10   attorneys are here today -- as trustees.

11          And it says that, "Arie and Orly hereby -- this is

12   in the preamble -- transfer and assign to the trustee the

13   property listed on Schedule A."  And then when you go to

14   Schedule A, you find it's basically the settlement proceeds

15   from a series of Genger-related lawsuits that Orly had

16   brought, one of which is the one that eventually settled for

17   $32.3 million.

18          So this is the governing document, and we know it's

19   the governing document because when we saw the payment records

20   for the first 17 that went out, it went into an account in the

21   name of the Genger Litigation Trust.  So the problem with

22   this, this would be very relevant to us because it defines not

23   only who gets the first 17 but also who gets the next 15.  And

24   that's obviously of interest to us because we deposed Mr.

25   Broser, and he says he's paid and he's not owed anything

76

1   further.

2              So we'd like to know what's going to become

3   according to this agreement to the next 15.  The problem is

4   that information appears to be on Page 2.  We have Page 1 and

5   then Page 26.  We don't have Pages 2 through 25.  It's obvious

6   that Arie Genger, Orly Genger, David Broser and Lance Harris

7   all have a copy of this agreement.  They're all parties to

8   this agreement.  We've asked all four of them in one way or

9   the other through subpoenas or requests, what have you, to

10  please produce the missing pages from this agreement so we can

11  see what arrangements the parties themselves made as to the

12  disposition of the future proceeds.  And nobody has given it

13  to us.

14             Obviously, there's nothing burdensome about showing

15  us the Genger Litigation Trust Agreement.  It could not be

16  more relevant.  It relates to potentially to $15 million to be

17  paid in the future.  Our judgment's only $3 million, so that

18  would be fantastic.

19             So, first, from I believe we were speaking to Mr.

20  Broser, we asked Mr. Broser to produce just that document,

21  just the missing pages from that document, and he declined to

22  do so.  The next thing we asked is Mr. Broser, in addition to

23  being the trust --

24             THE COURT:  Wait, this was waiting for the

25  protective order or just in general?

77

1          MR. DELLAPORTAS:  In general.  Now it was unclear

2   because his joint half of the letter to Your Honor doesn't

3   identify any specific objection to producing this particular

4   document.  However, when we asked him directly are you going

5   to produce it, he said he was going to present it absent a

6   court order.  So that's number 1.

7          The other two documents we need from Mr. Broser, and

8   this goes again to the liability issue, so Mr. Broser is in

9   addition to the trustee of this litigation trust, he is the

10  president or managing member of the lender that loaned money

11  to Arie and maybe Orly, I don't know, to fund these

12  litigations.  He was the litigation funder.  And so he has

13  argued, and people have argued on the other side, that he has

14  a claim to some portion of the settlement proceeds to repay

15  his loan.

16         So we'd like to know there's 15 million yet to be

17  paid, you know, are you still owed money, are you going to

18  claim that you're owed some of that $15 million.  If so, how

19  much?  And so we've asked can you show us your loan agreement,

20  and he said yes once Your Honor so orders the confidentiality

21  agreement, so I think we're good there.  But then I said -- we

22  also asked we'd like to see the ledger, how much have you

23  dalled and how much has been paid back.  And for some reason,

24  he's not willing to produce the ledger, which seems to me a

25  commercial document and something that Mr. Broser should

78

1  produce.

2          So really with Mr. Broser, we just have two

3  documents that we need from him, the Genger Litigation Trust

4  Agreement and the ledger showing what he claims are monies

5  loaned out, you know, against the future proceeds and what

6  monies have been collected back in in repayment of the debt

7  along with the loan agreement which he's agreed to produce

8  upon the so-order.  Thank you, Your Honor.

9          MR. GOLDBERG:  May I, Your Honor?

10          THE COURT:  Sure.  You are Mr. Broser?

11          MR. GOLDBERG:  No, Mr. Broser is --

12          THE COURT:  You're Mr. Broser in the back, okay.

13  You are?

14          MR. GOLDBERG:  Mitchell Goldberg.

15          THE COURT:  Mr. Goldberg, okay.  Got it.

16          MR. GOLDBERG:  A little context here.  The credit

17  agreement, which we have agreed to provide subject to the

18  Court so ordering the confidentiality stipulation was put in

19  place in September of 2008.  And Mr. Dellaportas is correct.

20  My client through an entity known as ADBG, LLC, lent money to

21  Arie Genger individually -- that's what the credit agreement

22  will establish -- to help finance the underlying litigation in

23  which Arie Genger, my understanding was the principal

24  benefactor of those litigations.  That ultimately resulted in

25  the settlement of $32 million of which 17,257,000 has been

79

1   funded to date.

2          Thee trust agreement, Your Honor will notice, was

3   dated, in the first page was dated as of June 28th, 2012.

4   I'll note that it's prior to the period that Your Honor

5   directed today is the subject of discovery because I think

6   Your Honor indicated 2013.

7          THE COURT:  Well, if -- but if money coming in in

8   2013 is distributed in accordance with a 2012 agreement, then

9   it's going to be relevant.

10          MR. GOLDBERG:  Your Honor, the essence of the

11   litigation trust agreement that was put in place in 2012 was

12   to protect the lender so that the first monies that were paid

13   under the settlement agreement would go to pay the liability

14   of Arie Genger under the credit agreement.  That was the

15   essence.  So the first page that was produced, if you look at

16   Article II, under A, it talks about mandatory payments and

17   that's basically belt and suspenders to insure that the first

18   monies that came in through the settlement were paid to Mr.

19   Broser's lending entity.

20          THE COURT:  What do you mean the first monies; how

21   much?

22          MR. GOLDBERG:  In other words, the monies that came

23   in.  So the 32 million was the settlement; $17,257,000 has

24   been paid to date.  And Your Honor has heard that tracking the

25   funds, the funds first went into the -- Bill Wachtell [Ph.]

80

1    who was the attorney for the AG Group, who then transferred

2    the monies into a litigation, the Genger Litigation Trust

3    account.  $17,257,000 was placed in the trust account.  And

4    from there, $17,200,000 went to pay off the loan that was as

5    between Mr. Broser and Arie Genger individually.

6              That's where the lion's share of the first tranche

7    of the settlement went.  It went to -- I know Your Honor's not

8    making fact finding  summations.  This part of it is all --

9    based on the efforts of Mr. Dellaportas have all been

10   established with documentary evidence that the flow of money

11   went into the trust and then went to pay down the loan between

12   Arie Genger and Mr. Broser's entity which he created to lend

13   money to Arie Genger.

14             So all that the litigation trust agreement does, and

15   it's essentially belt and suspenders, is to ensure that the

16   lender got paid the first monies from the tranche of money

17   that has been paid to date.  Where Mr. Dellaportas was

18   incorrect is that Mr. Broser did not -- did not testify at his

19   deposition that there's no further monies owed to him.  In

20   fact, to the contrary.

21             The 875 that was part of the $17,200,000 that went

22   into the lender's account, that was another -- that was an

23   advance, another advance on their loan agreement to pay off

24   Arie Genger's debts.  So that and other monies have been

25   advanced under the credit agreement since the first tranche of

81

1   the settlement proceeds came in.

2        I don't have -- but there to be sure and I'm certain

3   that the deposition transcript -- certain it is consistent

4   with that.  There are other monies that are due the lender to

5   date and that if and when the next tranche of the settlement

6   payment is made, some of that money -- some of that money we'd

7   use to pay down the payoff of the continuing credit facility

8   that was put in place in 2008, well before there was ever a

9   thought of any litigation that resulted in the judgment.

10        The same thing with the trust agreement, nothing to

11  do whatsoever with this 2014 litigation.  Put in place in

12  2012, my presumption was at that point Mr. Broser realized the

13  monies were significant and wanted to ensure that there was a

14  mechanism in place to ensure that he got paid first --

15        THE COURT:  Can I ask you to get to what I think is

16  the point here, which is what you are agreeing to produce,

17  what you are refusing to produce, and why you are refusing to

18  produce what you're refusing to produce.

19        MR. GOLDBERG:  So the credit agreement, I thought,

20  would put the issue -- because all I needed -- all I -- I

21  didn't know that it was necessarily relevant.

22        THE COURT:  All right.  Wait.

23        MR. GOLDBERG:  But I thought it would put to rest

24  given the date and the agreement itself, that there was a

25  legitimate arms-length loan that was made by Mr. Broser --

82

1          THE COURT:  But hold on.

2          MR. GOLDBERG:  -- to

3          THE COURT:  There are two kinds of documents that I

4   understand are sticking points here that Mr. Dellaportas wants

5   to have produced and that your client does not wish to

6   produce.  Can we just turn to those particular documents and

7   tell me why you don't want to produce them in sort of succinct

8   terms?

9          MR. GOLDBERG:  The trust agreement -- so it's the

10  trust agreement --

11         THE COURT:  Trust agreement and a ledger.

12         MR. GOLDBERG:  And he has the first page of the

13  trust agreement through a subpoena that --

14         THE COURT:  Right.  The rest of the trust agreement,

15  why will you not produce the rest of the trust agreement?

16         MR. GOLDBERG:  It has no relevance to --

17         THE COURT:  How do we know this?

18         MR. GOLDBERG:  Because he has the loan agreement

19  that establishes a just debt that is due by Arie Genger --

20         THE COURT:  But the trust --

21         MR. GOLDBERG:  -- to my client.

22         THE COURT:  So the trust -- the purpose of the trust

23  agreement does not -- is not, at least in part, to determine

24  how monies get paid out?

25         MR. GOLDBERG:  It is belt and suspenders to ensure

83

1  that the monies from any settlement that's scheduled on A of

2  the trust agreement gets used in the first instance --

3          THE COURT:  It's got 25 pages' worth of saying it

4  goes in the first instance to the lender?

5          MR. GOLDBERG:  Your Honor, I'm telling you that the

6  intent of this document is to ensure that the lender gets

7  paid.  The rest is boilerplate.

8          THE COURT:  Okay.  It's --

9          MR. GOLDBERG:  It has no relevance whatsoever.

10         THE COURT:  So 25 pages of no relevance and --

11         MR. GOLDBERG:  If Your Honor -- if you --

12         THE COURT:  -- of boilerplate?

13         MR. GOLDBERG:  If Your Honor would like to look at

14 the trust agreement in camera and satisfy Your Honor that --

15         THE COURT:  Okay.  If it's 25 pages of boilerplate,

16 what's the harm in producing it?

17         MR. GOLDBERG:  Because it's not relevant.  It's just

18 not relevant to -- it is something that was done for my

19 client's protection to ensure that it got paid the first

20 monies from the settlement.  He has or will have the credit

21 agreement to establish that it is a just debt that is due

22 between my client and Arie Genger.

23         THE COURT:  You don't even -- you haven't even

24 produced all of the portion that you produced apparently.

25         MR. GOLDBERG:  No, what --

84

1            THE COURT:  Article 2 has an A; where's the B?

2            MR. GOLDBERG:  No, Your Honor.  The way that the --

3            THE COURT:  Article 1 seems to be missing.

4            MR. GOLDBERG:  Your Honor, we haven't produced this.

5   The way that Mr. Dellaportas received this document is he

6   served a subpoena on the bank when we -- where the account for

7   the trust was established.  And when my client went to open

8   that account, the bank needed to see the first page --

9   presumably needed to see the first page of the agreement and

10  the signature pages.  And so that's what he has.

11           THE COURT:  All right.  So basically all he's got is

12  the first page and a signature page and doesn't have any meat

13  of it whatsoever.  And you're saying it's just none of it has

14  any bearing on anything?

15           MR. GOLDBERG:  What I'm representing to Your Honor

16  is that it was put in place, and Your Honor can plainly see

17  from the first page that the purpose of it was to protect my

18  client to ensure that he was -- the first monies that were

19  paid as part of any settlement to Arie Genger would be used to

20  pay off Mr. Genger's liability to my client under the credit

21  agreement which we're prepared to produce.

22           THE COURT:  All right.  Let's stick with this one

23  document which is the Genger -- Genger or Ginger?

24           MR. GOLDBERG:  Genger.

25           UNIDENTIFIED SPEAKER:  Genger.

85

1              THE COURT:  Genger.  Genger, okay.  The Genger

2   Litigation Trust Agreement where Orly Genger is apparently

3   transferring and assigning property to the trust, okay, so

4   she's taking some of her money and she is transferring or

5   agreeing to transfer and assign that money to the trustees,

6   right?

7              MR. GOLDBERG:  As a co-grantor with Arie Genger.

8              THE COURT:  "Arie Genger and Orly Genger hereby

9   transfer and assign to the trustees property listed on

10  Schedule A to hold in trust for the benefit of the lender."

11  Okay.  And the property -- you have Exhibit A, right?

12             MR. GOLDBERG:  Exhibit A is part of what --

13             THE COURT:  Schedule A.

14             MR. GOLDBERG:  -- what the bank required when we

15  opened up the account.

16             THE COURT:  Which includes all proceeds from the

17  lawsuits including additional lawsuits and future lawsuits.

18  So if -- just for me to understand what you're saying, if

19  money comes in from later lawsuits that is more than the

20  amount than the lender needs, then how's it get distributed

21  back?  Is all of it -- it's all for the benefit of the lender?

22             MR. GOLDBERG:  No, no, no.  I didn't meant to

23  suggest that, Your Honor.  No, it was --

24             THE COURT:  So if all net proceeds from the

25  lawsuits, the additional lawsuits, and any and all future

86

1   lawsuits gets transferred to the trustees, then what happens

2   to it per this agreement after the lender is made whole?

3           MR. GOLDBERG:  It remains in the trust.

4           THE COURT:  Forever?

5           MR. GOLDBERG:  No, I can't speak to -- I don't want

6   to interpret the document.  The essence -- the point of this

7   document that was put in place at the request of my client is

8   -- and I don't want to suggest otherwise, was to ensure that

9   the first monies that came in --

10          THE COURT:  Right.  But this is a trust agreement

11  where all this money is supposed to go into this trust.  So if

12  the purpose is to make sure that the first money goes to the

13  lender, then what does this trust agreement say in the

14  remaining 25 pages, if at all, about the rest of the money and

15  who gets it?  Your client is wanting to speak.

16          MR. BROSER:  I speak as a trustee and the person who

17  put the document together.  David Broser, okay.  In 2008 Arie

18  Genger's business was taken from him in an action in Delaware.

19  His son sold shares to an adversary.  My family's known Mr.

20  Genger for many years.

21          THE COURT:  Which Mr. Genger?

22          MR. BROSER:  Arie Genger.

23          THE COURT:  Arie Genger?

24          MR. BROSER:  Arie Genger.  I was introduced to Arie

25  Genger.  From a personal standpoint, I thought it was a

87

1    horrific action that took place.  I lent Arie Genger money.

2    Litigation took many, many years.  Sagi Genger subsequently

3    started to sue in many different courts.  I continued to fund

4    strictly Arie Genger.  All my agreements were with Arie

5    Genger.

6          Fast forward to 2012, no settlement yet with the

7    Trump Group, no settlement with Sagi.  There was a large

8    ledger out there.  And there was a concern like, hey, who's

9    going to get paid first here.  Even though my loan was only

10   with Arie, I wanted to make sure because Orly at that time was

11   potentially entitled to shares from the Trump Group, get

12   payment from the Trump Group.

13         So we came up with this comprehensive trust

14   agreement that no matter where the money came from would go

15   into the trust in 2012.  Fast forward, we negotiate for a year

16   with the Trump Group.  A settlement is reached in 2013.  In

17   that settlement, 16 or 17, $17 million gets paid, $17.2

18   million get paid.  I had that money come in.  I pay Mr. Lance

19   Harris 875 to pay Arie Genger's lawyers.  That's what the

20   money was designed to do, pay Arie Genger's lawyers.  The

21   balance of 16.4 million I take in because my ledger at that

22   point is about 17 million, 18 million dollars.

23         Fast forward again, there's money hanging out.

24   There $10 million and $7 million in a state court, which

25   Orly's shares, that's Orly's shares' money and that's why Orly

88

1   was originally part of this agreement was maybe Orly's going

2   to get some money from her shares.  Her brother and Mr.

3   Dellaportas somehow manages to take that $7 million of his

4   sister's money and $10 million of his dad's money.

5           Everything else, I mean and Mr. Dellaportas, with

6   all due respect, is phishing around, and that's my frustration

7   as a guy who's the third party here.  I do have a nice

8   relationship with Arie Genger.  I know his daughter.  I'm

9   sitting here as a guy first in line knowing all the facts of

10  this, and he continues to twist what is going on.  That's my

11  frustration, so I apologize for that on the record.

12          But the point is the 17 million Arie Genger paid

13  taxes in 2012.  Everybody knew it was his money, and now all

14  of a sudden, Mr. Dellaportas and Sagi are like, no, it may be

15  Orly's money.  There's not one basis of fact that he could

16  state that for.  The only -- this was Arie Genger's company.

17  He settled with the Trump Group.

18          The only reason why Orly was mentioned in the

19  settlement agreement was because of the money hanging out in

20  escrow, the $10 million that subsequently the son takes.

21  Subsequently even in state court, I'll go one other thing, his

22  mother who is a trustee of her trust is the one who is asking

23  for the money.  The whole -- this whole thing is from a third

24  party-standpoint is a complete mess.  But Mr. Dellaportas is

25  doing a very good job of mixing some of these facts up.

89

1           THE COURT:  Mr. Dellaportas's client in this action

2    in this court has a judgment.

3           MR. BROSER:  Right.

4           THE COURT:  Okay.  Whether it was the right result

5    or not, he has the judgment, okay.  He's looking for assets to

6    enforce the judgment.  So if you want to paint Sagi Genger as,

7    you know, disreputable in some way or counsel is twisting

8    things around in some way, he's got a judgment so he's to some

9    extent in the driver's seat in this particular go-around of

10   discovery because he's the one who's entitled to the post-

11   judgment discovery because the judgment was not paid, okay.

12   There's a judgment that's outstanding; it was not paid.  He's

13   entitled to look, right.

14          There is a trust agreement.  Orly Genger who is the

15   judgment debtor has her name on this thing.  She says on the

16   few pages you can see that she's pledging to put monies that

17   she receives into this trust.  The amount going into the

18   trust, it sounds like, the amount that's already been put in

19   was almost enough to make you as the lender holder.  Some more

20   may be still to be paid, but there's an awful lot more

21   supposedly that was -- that could be coming into the trust.

22          Is some of that her money?  What's supposed to

23   happen to it?  Does this trust agreement speak to that?  You

24   know, might it be money that ultimately does come in and it

25   goes somewhere and it might provide money that could enforce

90

1  -- help enforce this judgment?  Unclear.  Unclear to me how

2  you can have 25 pages, the entirety of an agreement except for

3  the front page and the signature page and the schedule all be

4  "boilerplate" and have no real meaning or consequence to the

5  people who are signing the agreement.  I don't know what it

6  says.

7          I mean, yeah, I could look at it in camera, but I'm

8  not sure I want to get involved trying to understand myself

9  what all of these documents are and making my own

10  determinations as to, you know, whether it really is

11  meaningless or not when her name is on it, when it's talking

12  about assets currently and potentially in the future, and when

13  it looks like her money might be going into a trust that maybe

14  has some provision as to what would happen thereafter.

15          MR. BROSER:  But I guess what I'm saying as a person

16  who's a trustee is that payments from the $17.2 million

17  payments has already left the building in a certain regard.  I

18  got paid back first.  Arie Genger got paid back.  What Mr.

19  Dellaportas is doing, he's frozen even a bank account of mine

20  for $50,000 that the money came in in 2012 without telling me.

21          Again, it was almost like what happened to Mr.

22  Harris here.  He went to the bank.  Banks are not doing a very

23  good job notifying people.  I was never notified at all of him

24  subpoenaing my bank account.  I subpoenaed his bank account,

25  then freezes the asset as he's going to claw [Ph.] something

91

1  back six years ago.

2          So stuff like that which continues to draw on.  If

3  he's looking for the future payments of $15 million, bring me

4  in as a trustee, sue the trust, do whatever you need to do,

5  but make a claim for it.  Don't just flow --

6          THE COURT:  But the issue that I have in front of me

7  right now is quite narrow.  It's whether he gets to see 25

8  missing pages of this trust agreement.  That's it.  That's the

9  current issue.  Does he get to see the middle of the trust

10  agreement as opposed to just the front end and the back end?

11  If it is what you say it is, then it is what you say it is and

12  he'll see it when he sees it.  And if it's not, if there's

13  something in there that talks about how monies would get paid

14  out again and whether Orly's entitled to something, he'll see

15  that.

16          But just to say all he's entitled to is the front

17  page and the last page which he got from the bank and

18  otherwise it's irrelevant when it has her name on it, it's

19  talking about her transferring assets into a trust, I mean on

20  the standard of broad discovery to try to find assets, I don't

21  see why he shouldn't get to see this.

22          MR. BROSER:  This is a layperson.  I agree on the 15

23  million.  When it came to previous payment, he knows

24  everything.  He can sit in that chair and say I --

25          THE COURT:  Time out.

92

1          MR. BROSER:  Yeah.

2          THE COURT:  Understand I've got an hour before I'm

3    going to have to break for a lunch meeting, okay.  I said I'd

4    have you my whole morning, but it's noon.  I have a lunch

5    meeting at one.

6          So in the one hour, I need to focus on what is

7    actually in front of me, which is does Mr. Dellaportas on

8    behalf of his client get to see certain documents or does he

9    not.  That's what's in front of me.  And if he does get to see

10   certain documents, should we have a protective order in place

11   or not, right.  Either he gets or he doesn't get or he gets in

12   part.  Either it's with a protective order or it's not.  These

13   are the issues, okay.

14         It's not, you know -- okay?

15         MR. GOLDBERG:  Judge, to short-circuit this, my

16   point to Your Honor was this was a document that was put in

17   place at the behest of my client who saw a -- who has a

18   revolving facility and the monies that were being advanced

19   became significant and he thought it would be prudent to

20   insure that he was the first money paid.  And he explained --

21   or Mr. Broser did explain why Orly was a party to that --

22         THE COURT:  But if the document says that, then it

23   says that.  And Mr. Dellaportas won't be able to do anything

24   further with it, and that will be that.  But it has Orly's

25   name, signature, and talk of her assets in the document, so it

93

1 | seems to me he should be able to see it.  And if you need a
2 | protective order, again, I'm happy to do it.
3 |         MR. GOLDBERG:  Your Honor, we would --
4 |         THE COURT:  Then go and negotiate it.  Same deal.
5 |         MR. GOLDBERG:  Your Honor, if you're --
6 |         MR. DELLAPORTAS:  We --
7 |         MR. GOLDBERG:  If Your Honor's inclined --
8 |         THE COURT:  By the way, if you can negotiate one to
9 | put in place in the case that everybody can buy into, so much
10 | the better.  If you need separate ones, fine.  I think you
11 | have one.
12 |         MR. GOLDBERG:  I think it would be --
13 |         THE COURT:  I think you have one already here.
14 |         MR. GOLDBERG:  We have one in place --
15 |         THE COURT:  Fine.
16 |         MR. GOLDBERG:  -- and I'd rather use that as the --
17 |         THE COURT:  Fine.  That's fine.
18 |         MR. GOLDBERG:  -- format than get bogged down --
19 |         THE COURT:  That's fine.
20 |         MR. GOLDBERG:  -- with that.
21 |         THE COURT:  I'll do that.
22 |         MR. GOLDBERG:  So that's the loan agreement.  And
23 | then I think --
24 |         THE COURT:  The trust agreement.
25 |         MR. GOLDBERG:  I'm sorry, the trust agreement.  The

94

1   loan agreement dealt with --

2          THE COURT:  And the ledgers has to do with money

3   coming in and money going out of the trust.

4          MR. GOLDBERG:  The ledgers is -- I'm assuming it's

5   what he's looking for is notations of advances made and

6   payments received.

7          THE COURT:  By the trust from the trust, right?

8          MR. DELLAPORTAS:  Yeah.  Yes, Your Honor.

9          MR. GOLDBERG:  No, no.  Not from the trust.  No, no,

10  no, no.  What he's looking for are advances made by the lender

11  under the credit agreement, nothing to do with the trust, and

12  repayments by Arie Genger under the loan, nothing -- none of

13  this has to do with -- it basically has to do with the

14  accounting as it relates to the credit agreement in place

15  between Mr. Broser as lender to an entity to Arie Genger

16  individually.  That's what he's looking for.

17         He's looking for -- has nothing to do with Orly

18  Genger because Your Honor will see or counsel will see that

19  the credit agreement that was put in place in 2008 --

20         THE COURT:  Right.  But if money from this --

21         MR. GOLDBERG:  -- is with Arie Genger.

22         THE COURT:  Okay.  Hang on a second.  If money from

23  the settlement that we have spoken about earlier came in and

24  there's a notation on a ledger and then some of it was paid

25  out and there's a notation on the ledger, why would that not

95

1   be relevant as he's trying to trace that money?

2            MR. GOLDBERG:  The money -- he knows already from

3   his efforts to discovery that the $17,257,000 went into the

4   trust account, the Genger Litigation Trust Account;

5   $17,200,000 went to the lender to repay the loan.  He has that

6   already.  What else does he need?  He has that through the

7   bank records.

8            THE COURT:  Is it the same information that would be

9   on this ledger?

10           MR. GOLDBERG:  The ledger, it's -- all he needs to

11  know is the -- in furtherance of the credit agreement --

12           THE COURT:  All right.  Are you saying that it's

13  cumulative to what he already has?  It's not that it's

14  irrelevant, it's just cumulative?

15           MR. GOLDBERG:  No.  What he's looking for is all of

16  the advances made by the lender to Arie Genger under the

17  credit agreement and repayments.  Now the repayment part he

18  does already have because he got that through the bank

19  records.  He wants to see that --

20           THE COURT:  You're talking about money from Mr.

21  Broser to Mr. Genger and from -- Arie Genger and Mr. Arie

22  Genger to Mr. Broser?

23           MR. GOLDBERG:  Well, no, it only works one way.  And

24  we spoke about Mr. Broser, it's actually a lending entity

25  created by David Broser and his father to Arie Genger.

96

1          THE COURT:  Okay, his entity?

2          MR. GOLDBERG:  Yeah.

3          THE COURT:  It only goes one way?

4          MR. GOLDBERG:  It only goes one way.  It's a loan

5     that was made by Mr. Broser's entity to Arie Genger

6     individually.

7          THE COURT:  Okay.  So the money that comes in would

8     not come in from Arie Genger.  It would come in from some

9     other source and then would be used to go to Mr. Arie Genger?

10          MR. GOLDBERG:  In this particular instance, the

11     credit facility whereby Mr. Arie Genger is a borrower was

12     repaid out of the trust account in accordance with the trust

13     agreement.

14          THE COURT:  And that would be reflected on this

15     ledger, if there is one?

16          MR. GOLDBERG:  What would be reflected would be a

17     payment on July 1st or 2nd, July 2nd or July 3rd.

18          THE COURT:  So this would be, you say, cumulative

19     evidence, not irrelevant but cumulative?

20          MR. GOLDBERG:  The payment itself would be

21     cumulative because he already has the record from the trust

22     account to the Goldman Sachs account where the lender has its

23     account.  That he has, no dispute.  What he's looking for

24     beyond that are the advances made by the lender to Arie

25     Genger.

97

1          MR. DELLAPORTAS:  So, Your Honor, I'm looking for

2     any advances made under the credit agreement, whoever it is,

3     the dollar the amounts, and any interest on it that would

4     obviously be relevant, and any payments to reduce that.  Now

5     they say the 17 million was a payment to reduce it.  I don't

6     know if there are any other payments.  I don't know how they

7     organized their financial affairs because they haven't given

8     us any documents.  I've had to scrap together what little I

9     know from bank records.

10          But fundamentally, it's what Your Honor said, which

11     is there's 15 million coming in.  They don't claim that

12     they're entitled to all of that, and so we'd like to know,

13     well, how much of it do you claim you are entitled to and

14     what's your substantiation for it.

15          MR. GOLDBERG:  That's a different issue, though,

16     Your Honor.  What he's talking about now is prospectively,

17     prospectively, and that money is a moving target because

18     advances under the credit facility could be made on a rolling

19     basis and interest accrues presumably on that.

20          THE COURT:  All right.  So Mr. Broser sets up an

21     entity that lends money to Arie Genger.

22          MR. GOLDBERG:  To finance the litigation.

23          THE COURT:  Lends money to Arie Genger, expects to

24     be paid back by Arie Genger at some point.  When settlement

25     money comes in, that money is -- some of it is for Arie

98

1   Genger, and some of that, therefore, is supposed to pay back

2   Mr. Broser's entity that lends him money.

3          So we have money that came in from whatever source,

4   which was used to help --

5          MR. GOLDBERG:  To pay down.

6          THE COURT:  -- pay Mr. Genger, and then Mr. Genger

7   when he got money, however it got channeled, is supposed to be

8   paying back some money, right.  All of this, a lot of this

9   relates to this same settlement, at least a portion of this

10  relates to the same settlement we've been talking about.

11  Prior to that settlement money coming in, there may have been

12  advances that came in from other sources somehow, right, or

13  maybe just Mr. Broser.

14         MR. GOLDBERG:  I'm not clear as to whether or not --

15  I believe advances from the lender to Arie Genger were made

16  from time to time.  That's why they were left with a debt of

17  over approximately 17 million as of July 2013.  I'm not clear

18  -- I just don't know whether or not the payment that was

19  received by Mr. Broser's entity on July 1st was the first

20  payment made under the credit agreement by Mr. Genger or if

21  there were prior ones as well.  I don't know.

22         MR. BROSER:  It was the only payment.

23         MR. GOLDBERG:  It was the only payment.  Remember,

24  Your Honor the loan agreement with the credit facility took

25  place in 2008, and the first payment made by Arie Genger on

99

1  behalf of Arie Genger was made in July of 2013.  So advances

2  were made for that five-year period.

3       THE COURT:  So you're looking for ledger entries

4  going back in time prior to this even June 28, 2012 trust

5  agreement?

6       MR. DELLAPORTAS:  Well, I'd like -- yes, because I'd

7  like to know what is their claim against the remaining $15

8  million.

9       MR. GOLDBERG:  That's a different issue.  That is a

10 different issue.  What he wants to know is of the 15 million

11 -- again, we're not here on a fact-finding mission.  But I'm

12 representing to the Court, Mr. Broser just represented that

13 there were monies advanced, including the $875,000 that was

14 wired from the lender's account to Lance Harris on July 2nd --

15 that was another advance under the loan agreement -- and other

16 advances that were made since the settlement.

17       And so there is now a liability by Arie Genger under

18 the credit agreement that exists, a legitimate loan that's due

19 by Mr. Genger and he expects -- my client, that is -- expects

20 to get paid from the next tranche of the settlement that gets

21 paid when it gets paid if it gets paid.

22       MR. DELLAPORTAS:  So, Your Honor, I just want the

23 ledger.  I mean I don't think it's burdensome.  I don't think

24 it's private in any way.  It is simply a financial ledger

25 showing the monies they loaned, the interest that's accrued,

1   and the monies they've gotten back so I have a sense of what

2   their claim is on the remaining 15.  I don't think it's -- I

3   think it's relevant to my judgment collection efforts because

4   there's 15 that's still out there to be paid.

5           So I'm not sure what his -- what the basis of his

6   objection is other than --

7           MR. GOLDBERG:  The basis to the objection is

8   relevance in that the credit agreement will definitively

9   establish in a matter of days that there is a loan agreement

10  in place between an entity created by David Broser and his

11  father and Arie Genger, neither of whom are parties to the

12  2014 litigation.  And that the credit agreement was put in

13  place six years before the litigation and eight years before

14  the judgment.

15          MR. DELLAPORTAS:  So, Your Honor, the credit

16  agreement will show us maybe an original loan outlay, but it

17  sounds like there are ongoing outlays.  He said they're

18  ongoing outlays beyond the 2008 credit agreement.  It won't

19  tell us that.  It won't tell us what repayments have been

20  made.  It won't tell us what interest has accrued.  And so the

21  ledger's really the only way for us to know what they're

22  claiming they're owed other than to simply take counsel's word

23  for it, which again I'd rather not do given then history.

24          THE COURT:  All right.  So you have this credit

25  agreement which you are willing to produce under the

101

1   protective order.  The details of what's actually owed under

2   the credit agreement in actuality and practice based on the

3   monies that have come in and gone out would be shown by the

4   ledger.  So it seems to me the two go hand in hand to show the

5   state of affairs.

6           The agreement might define the legal rights of the

7   parties.  The ledger might show what has happened and,

8   therefore, might show the amount still due and to the extent

9   there's any Orly money that's going to go into the trust,

10  what's going to happen to it or what's supposed to happen to

11  it per this agreement and who counsel or his client might

12  stand in line behind.

13          I'm not -- I mean I understand that, you know, as we

14  move farther from Orly Central, you know, things get a little

15  bit more tenuous, but it's so -- I mean I hate to use the

16  word, it's so incestuous.  It's so tangled that it's -- you

17  know, it seems to me to be rather -- I mean I know you think

18  it's all really straightforward.

19          MR. GOLDBERG:  I just --

20          THE COURT:  But I think it's not.  I think it's very

21  convoluted.

22          MR. GOLDBERG:  I would just object to the word

23  "incestuous."

24          THE COURT:  Yeah, I'm sorry.  Bad choice.  But I

25  mean the fact of the matter is --

1          MR. GOLDBERG:  I just would say that this was an

2    arms-length -- an arms-length --

3          THE COURT:  No, but let's face it.  Let's face it.

4    I have --

5          MR. GOLDBERG:  And it ultimately helped facility the

6    settlement of this litigation.

7          THE COURT:  But I have family members everywhere

8    positioned everywhere vis-a-vis one another in different

9    postures.  I have father and daughter signing an agreement.  I

10   have father entering into an agreement with somebody else.  I

11   have money that's supposed to be in part for one going to

12   another.  I have allegations about UCCs going wife to husband

13   and husband to someone else and back to husband.  I have --

14   it's very, very confusing from where I sit, and it is -- there

15   are a lot of lines to be drawn as you chart this out.

16   Judgment creditor is entitled to pretty broad discovery to try

17   to sort things out.  This is one that needs sort of sorting

18   out.

19          And even based on what you're saying, it sounds to

20   me like you can either produce an agreement that defines

21   certain individual's rights or you can produce the agreement

22   plus this ledger which he says he's always looking for there

23   to show how it actually was carried out and what the actual

24   amounts of money were.  And it's hard to say to a judgment

25   creditor you don't get something that shows actual amounts of

103

1   money as you're trying to dot all the -- you know, make all

2   the dotted lines, all the straight lines, put it all together

3   and understand what's left, where it goes, who it's owed to,

4   and what the line is.

5          MR. GOLDBERG:  Your Honor, if I was --

6          THE COURT:  There's a lineup.

7          MR. GOLDBERG:  Your Honor if I was Chase Manhattan

8   Bank and I made a loan to Arie and in my mind it's no

9   different whether or not it's an institution or a private

10   bank, would counsel be able to subpoena Chase and get the

11   whole history of advances made under a facility that has

12   nothing to do with the parties in the litigation?  For what

13   purpose?

14          THE COURT:  Well, except that --

15          MR. GOLDBERG:  Chase would object in the same way

16   that David Broser would object.  We have a legitimate debt.

17   Here's a loan agreement.  Now you want to test and see whether

18   or not we have a legitimate loan.  Well, a loan agreement --

19          THE COURT:  Well, except for the fact -- except for

20   the fact that it seems tied up with this trust agreement.

21   Because the money that was used to pay back the loan in whole

22   or in part was the money coming from this trust which involved

23   Orly's money.  So --

24          MR. GOLDBERG:  Your Honor is correct.  It's belt and

25   suspenders because the loan had to get paid first and --

104

1        THE COURT:  Okay.  It may be belt and suspenders and

2   it may be, as I said, duplicative or cumulative, but I think

3   I'm going to allow it.  So, again if your protective order's

4   good enough and would cover it, we're fine.  If not, let me

5   know.  But I'm --

6        MR. GOLDBERG:  Just to be clear --

7        THE COURT:  It doesn't sound like what's being asked

8   for is so outlandish here.

9        MR. GOLDBERG:  I'm not 100 percent sure, I mean

10  there was likely an accounting that was made as of July 1st to

11  show the balance.  I don't know what records -- I'll probe the

12  client separately to determine what --

13       THE COURT:  You came in here today without even

14  knowing if there was a ledger?

15       MR. GOLDBERG:  No.  I know that there were at least

16  a statement that was generated as an around -- in my mind, I

17  view credit as --

18       THE COURT:  Let's look at it this way.  Mr.

19  Dellaportas is looking for movement of money.  He's looking

20  for money that goes from here to there to here to back to

21  around.  He's looking to track the actual flow of dollars.

22       MR. GOLDBERG:  Only as it relates to the --

23       THE COURT:  So that's what a ledger would do.

24       MR. GOLDBERG:  Only as it relates to the settlement.

25  This is what he's looking for here are advances made by the

105

1  lender to a borrower unrelated to this litigation.

2          THE COURT:  But that affects, if I understand it --

3          MR. GOLDBERG:  Correct.

4          THE COURT:  -- what kind of claim there is to the

5  settlement money.

6          MR. GOLDBERG:  Yes.  But all I'm saying to you is

7  that when we talk about ledgers, if there was an advance made

8  of half a million dollars in 2009, he's looking for some

9  notation that the lender has that an advance was made on that

10 day.  And if there was another advance of a half million

11 dollars made six months later in 2010, he wants a record of

12 that.  And if there was yet another, because it could be --

13         THE COURT:  Right.  But you see now if the amount of

14 money that was loaned out was $300,000 and if the amount that

15 came in was $800,000, then he would be entitled to know that

16 in fact there's nobody standing in line for the balance, for

17 the difference.  If the amount that was lent out and that was

18 owed was more than the amount coming in, he'd understand that

19 he might be in line behind that if this is an agreement that

20 has priority.

21         So I think he's entitled to understand what this is

22 since there is a claim on this same money that he's trying to

23 make a claim against.

24         MR. GOLDBERG:  That my client has a priority to.

25         THE COURT:  Right.  So let him find that out and

106

1   understand that, okay?

2         MR. GOLDBERG:  So --

3         THE COURT:  So I'm going to move on to the next

4   issue that I have in front of me so I can get through this

5   within the next 40 minutes.

6         MR. GOLDBERG:  Okay.  The next issue that Mr. --

7         THE COURT:  I thought those were all of the issues.

8         MR. GOLDBERG:  There is -- Mr. Broser touched on one

9   other, and I think, Your Honor, because you're not making

10  fact-finding determinations, I just want to give you a heads

11  up because I'm assuming if I move by order to show cause,

12  it'll be before Your Honor.

13        But what's happened here is, well, the flow of money

14  was $17,257,000 that went into the trust account.  Seventeen-

15  two was advanced to pay off or pay down the loan.  $57,000

16  remained in the trust account for six years, and that was to

17  pay just to keep a balance in the account and for no other

18  purpose.  That $57,000 remained in that account.

19        Mr. Dellaportas served a second subpoena, this time

20  with a restraining notice on Northern Trust.  That's the bank

21  that holds the fund from the trust account, and Northern Trust

22  now has frozen those funds, the $57,000.  That's funds that,

23  again, as a lender, he has first priority to.  Now, in our

24  wildest dreams, we never thought we had to take that money and

25  pay down the loan.  We wanted to keep -- or Mr. Broser wanted

107

1    to keep a balance in that account.

2            Now what's happened is that money is now frozen and

3    the bank is telling me that the only way -- I've tried to tell

4    the bank that they shouldn't have restrained the funds.  I now

5    have to make a motion to get the $57,000.  And if need be,

6    that money will then pay down the loan that Mr. Broser has

7    with Arie Genger.

8            THE COURT:  All right.  I'm looking ahead and I'm

9    looking at what has come before as possibly an indicator of

10   what's coming ahead of me.  I don't want flurries like this of

11   letters on the docket which are repetitive, lengthy, finger-

12   pointing, you know, repeating the same arguments that have

13   been made I have not seen before.  I don't want orders to show

14   cause.  I don't want, you know, a letter, a response, a reply,

15   a surreply, a sur-surreply, a sur-sur-surreply.  I mean I'm

16   not going to have that going forward.  I don't have the

17   bandwidth to deal with that.

18           MR. GOLDBERG:  There is a solution.  Since we are

19   giving the ledger to Mr. Dellaportas and as part of that

20   ledger, it will establish that as of today, there is a debt

21   due and owing by Arie Genger.

22           THE COURT:  So here's what I should do.

23           MR. GOLDBERG:  And if that's the case, that money --

24           THE COURT:  Here's what you do.

25           MR. GOLDBERG:  -- should be released.

108

1          THE COURT:  Here's what you do.  Produce the

2    documents that Mr. Dellaportas is asking for, the full trust

3    agreement and the ledger and the credit agreement.  Mr.

4    Dellaportas, look at them together with Mr. Goldberg?

5          MR. GOLDBERG:  Yeah.

6          THE COURT:  -- Mr. Goldberg, good faith, okay,

7    confer about it, determine whether you think you have a right

8    to keep that money frozen or you don't.  If you don't, release

9    it.  If you think you do, instead of writing me letters, the

10   two of you and anyone else who wants to participate contact my

11   chambers, get on my calendar for a phone conference.  I will

12   talk through that one issue, and I will rule either that that

13   freeze is going to be lifted or not for whatever principled

14   reason you're able to give me.

15         MR. GOLDBERG:  The principle reason, Your Honor, so

16   that we're clear is I'm going to establish with a statement

17   that there is a just debt due by Arie Genger to the lender.

18   And that should be given the trust agreement, that should be

19   the end of the story.

20         THE COURT:  Okay.  If it has priority, if it comes

21   first in line, and it's not Orly Genger's money, and we can

22   determine that, then there's not going to be basis for this

23   freeze and, you know, I'll either order it lifted or you'll

24   inform the bank that it should be lifted.  But see if you can

25   come to agreement on it.

1          If you can't let's shortcut all of this letter

2     writing.  You can -- right, I mean you can get on my calendar

3     and maybe just before the conference, you can submit a joint,

4     you know, something joint that says our position is this,

5     their position is that.  I'll read the two positions, I'll

6     have the call.

7          MR. GOLDBERG:  And the only -- all right, because

8     Your Honor will need to see the trust agreement to establish

9     the priority and the loan statement, the current loan

10    statement to establish a day.

11         THE COURT:  Well, maybe you don't need me.

12         MR. GOLDBERG:  No, no.  I don't want -- you're

13    correct.

14         THE COURT:  Okay.  I'm going to tell everybody to

15    the extent you do not need me, please do not need me.

16         MR. GOLDBERG:  Okay.

17         THE COURT:  Okay?  On anything and everything.  I

18    expect you to come to me when you really cannot work things

19    out and you really ought to be capable of working out more

20    than you have so far, okay.

21         MR. GOLDBERG:  Thank you, Your Honor.

22         THE COURT:  Okay.

23         MR. GOLDBERG:  Thank you.

24         THE COURT:  And I never, ever want to hear from

25    anybody that this one won't return my calls and this one's

110

1   refusing to confer with me, and any nonsense like that.

2          All right.  We have about half an hour.

3          MR. DELLAPORTAS:  Okay.  There's still,

4   unfortunately, a good bit yet.  Would you like me to just

5   summarize everything that's left and then Your Honor can --

6          THE COURT:  Let's make a list.

7          MR. DELLAPORTAS:  Okay.  We have subpoenas out to

8   two businesses which Orly, Ms. Genger co-owns.

9          THE COURT:  Oh, this is the jewelry and stuff?

10          MR. DELLAPORTAS:  Yes.  One's an art business; one's

11   a jewelry business.  We sought only tax returns, financial

12   statements, and one other category, I forget.  But we've

13   gotten -- oh, ownership records.  We've gotten almost nothing.

14   We got one redacted page of one ownership record.

15          THE COURT:  All right.  Before you go on with the

16   list, who's here on behalf of these businesses?

17          MR. DELLAPORTAS:  Mr. Harris, I believe, is the

18   counsel for one and the registered agent of --

19          MR. BOWEN:  This is Mike Bowen.  My understanding is

20   Mr. Harris is the registered agent for both of these entities,

21   but he hasn't been retained as legal counsel for them.

22          THE COURT:  Have you been?

23          MR. BOWEN:  No.  I can --

24          THE COURT:  Do they have counsel?

25          MR. BOWEN:  Well, I can represent Orly Genger with

111

1   respect to her interest in those two entities and I can --

2          THE COURT:  But if the entities have been

3   subpoenaed, the entities have not appeared through counsel.

4   No counsel has shown up on the scene for them?

5          MR. BOWEN:  They responded to the subpoenas through

6   their agent-in-fact, which was Lance Harris who's here today.

7          THE COURT:  All right.  Let me go back to my list-

8   making.  What will be the other issues?

9          MR. DELLAPORTAS:  The other issues are the issues

10  directly with Ms. Genger.  And there are a bunch of them.  We

11  laid them out in our letter, but I think the most important

12  ones -- some of them overlap, obviously.  But I think the most

13  important ones are the liens that she filed; again, her

14  business records, to the extent she has them and her

15  businesses don't have them; and her premarital agreement which

16  we think is highly relevant in light of some of the liens and

17  other things that have been filed.

18         THE COURT:  So is that the list now?

19         MR. DELLAPORTAS:  I can -- if Your Honor bears with

20  me for one second, I'll see if I've forgotten anything.  Oh,

21  and any records she has about the acquisition of her home.

22         THE COURT:  I'm sorry.  Regarding the acquisition

23  of?

24         MR. DELLAPORTAS:  She represented earlier in this

25  case that she was acquiring a home.

112

1          THE COURT:  Acquisition of her home?

2          MR. DELLAPORTAS:  Home, yes.

3          THE COURT:  Okay.

4          MR. DELLAPORTAS:  Yes, Your Honor.  And I believe

5   that's --

6          THE COURT:  All right.  Let's deal with the

7   subpoenas to the two businesses.  If we end up after all

8   morning and we still have some issues with respect to

9   documents requested directly from Orly Genger, I'll set up a

10  telephone conference and I'll follow up with those by phone

11  conference if need be with the parties.  So --

12         MR. HERSCHMANN:  Your Honor?

13         THE COURT:  Yes?

14         MR. HERSCHMANN:  This is Eric Herschmann.  If I

15  could just address one thing because two of the points that

16  Mr. Dellaportas raises only impact me, and that would be my

17  prenuptial agreement.  And to be clear, I didn't know Orly

18  Genger or Sagi Genger or anybody in 2013 when all this stuff

19  was going on.  I am prepared, and I've made representations --

20         THE COURT:  I'm sorry; you were married when?

21         MR. HERSCHMANN:  2016.

22         THE COURT:  Okay.

23         MR. HERSCHMANN:  All right.  So I want to be clear

24  about two issues that --

25         THE COURT:  You're still married?

113

1          MR. HERSCHMANN:  I'm still married.

2          THE COURT:  Okay.

3          MR. HERSCHMANN:  So I said, Your Honor, I'm more

4   acutely aware of the conflict in this family than most people

5   and what can question sanity in stepping into this mess.  But

6   I want to address two things.  The prenuptial agreement, Mr.

7   Dellaportas has asked for this document, tried to get it in

8   New York state court, he wasn't able to get it.  He has a keen

9   interest in it.

10         It is something that I have represented to the Court

11  identifies no assets of Orly Genger.  He argues that it's a

12  Texas community property state.  The prenuptial agreement

13  specifically addresses that there is no community property

14  established.

15         THE COURT:  Submit it for in camera review.

16         MR. HERSCHMANN:  That's exactly what I want to do,

17  Your Honor.  Thank you.  And I have it here.  If I can do

18  that?

19         THE COURT:  Hand it up.

20              [Pause in proceedings.]

21         MR. HERSCHMANN:  Your Honor, if I could address one

22  other point or just let me hand it up.

23         THE COURT:  Hand it up.

24         MR. HERSCHMANN:  Just hand it up.  Hand it up.

25         MR. DELLAPORTAS:  And so Your Honor understands what

114

1   we believe might be relevant from that, we obviously haven't

2   seen it, one would be a listing of any assets Ms. Genger might

3   have, second would be a listing of any entitlement to either

4   income or assets from the -- since Texas is a community

5   property state -- from the community property going forward in

6   the marriage.

7         We obviously are not interested in anything that

8   might be in there that's non-financial.

9         THE COURT:  Hold on.  I've opened the sealed

10  envelope that's been handed up to me.  There are tabs and

11  highlights.

12        MR. HERSCHMANN:  And I think, Your Honor, that was

13  my copy of it.  Those addressed specifically the community

14  property or lack of community property, lack of liability.  I

15  can give you a non-highlighted version, but that directly

16  pinpoints Your Honor to exactly what's there and it also

17  addresses the fact that Orly Genger lists no assets whatsoever

18  on this prenuptial agreement.  The only assets listed are

19  mine.

20        And I can provide Your Honor -- I thought that would

21  be simpler.  If Your Honor wants one that's not flagged with

22  all the specific provisions --

23        THE COURT:  It doesn't look like it's annotated.  It

24  just looks like there are certain things --

25        MR. HERSCHMANN:  Correct.

1          THE COURT:  -- highlighted.  I'm capable of reading

2   both highlighted lines and unhighlighted lines and paying

3   attention to tabs or ignoring tabs as I see fit.  So I will

4   look at it.  It's lengthy.  I'm not going to look at it as I

5   sit here.

6          MR. HERSCHMANN:  Sure.

7          THE COURT:  It appears to be 39 pages plus a couple

8   of reaffirmations.  All right.

9          MR. HERSCHMANN:  And if I could address one other

10  point that Mr. Dellaportas raised --

11         THE COURT:  Okay.

12         MR. HERSCHMANN:  -- which is a home in Tel-Aviv that

13  I purchased solely with my assets.  Orly Genger has no

14  ownership interest in it whatsoever.  And she doesn't have any

15  documents to produce on it.

16         THE COURT:  You have produced the documents to show

17  that?

18         MR. HERSCHMANN:  Well, he has the documents.  And

19  the house is owned --

20         THE COURT:  I'm sorry, the purchase -- the --

21         MR. HERSCHMANN:  Well, no, I didn't produce my

22  personal documents because I think my finances are irrelevant

23  to this.

24         THE COURT:  No, the documents that show that the

25  home that she lives in is not something she has any ownership

116

1   interest in.  He has the documents?

2          MR. HERSCHMANN:  He has that it's purchased by a

3   limited, and he has a representation --

4          THE COURT:  He has the documents or he has just say-

5   so?

6          MR. HERSCHMANN:  Well, I don't know what he's

7   subpoenaed and what he's gotten out of Israel, but he's gotten

8   documents out of Israel that reflect no ownership interest by

9   Orly.  That's for sure.  And it was a Tel-Aviv home in a

10  foreign country, and all the money paid for it came from me.

11  She has no ownership interest whatsoever.  She never has and

12  never will.

13         THE COURT:  Mr. Dellaportas, you have documents that

14  show the ownership of this home?

15         MR. DELLAPORTAS:  The only thing I have is the deed

16  record which shows that it's being held in the name of some

17  sort of nominee entity called Rocatch [Ph.] something or

18  other.  I don't know how it was purchased, who's the

19  beneficial owner of that nominee other than their

20  representations.  They certainly haven't produced anything,

21  and I haven't gotten it from any other source.  I do know

22  who's listed on the deed because that's a public record.

23  That's all I know.

24         One more thing, Your Honor.  It was attested to in a

25  submission that they made pre-judgment back when they had

117

1   other purposes that Orly has attested that "she purchased the

2   home in Tel-Aviv with her husband and that she lives there

3   with her infant daughter."

4          So at least it was -- I believe I have a good faith

5   inquiry because they've represented to the Court back when

6   they were trying to prove that Orly was an Israeli resident

7   and blah-blah-blah that she purchased the home with her

8   husband.  So now all of a sudden she not only didn't purchase

9   it, she doesn't have any documents about it and her husband

10  can't give it.

11         THE COURT:  Can you please produce -- Mr.

12  Herschmann, can you please produce documents sufficient to

13  show who owns the home?

14         MR. HERSCHMANN:  Your Honor, I can do this, Your

15  Honor.

16         THE COURT:  Not a nominee, but you know who actually

17  bought it.

18         MR. HERSCHMANN:  If Your Honor will allow me to do

19  this in camera, I will show you the wire transfers from my

20  accounts paying for the entire house, right, and it's only

21  maintained.  When I --

22         THE COURT:  Wait a minute.  Look, I do recall this

23  -- Mr. Dellaportas pointing this out that there was a prior

24  statement to the Court made by Orly Genger that she with you,

25  I guess, purchased this house.  There is, therefore, either a

118

1  misrepresentation previously made or a careless phrasing

2  earlier made, but certainly a good faith basis for Mr.

3  Dellaportas to explore it.

4          Can you provide documents, not every last document,

5  but documents sufficient to show the ownership of the

6  property?

7          MR. HERSCHMANN:  I can, Your Honor.  If I can do

8  that for Mr. Dellaportas' attorney's eyes only under a

9  confidentiality agreement, I will show him that the property

10  is owned by me.

11          THE COURT:  Okay.  Why does that need to be

12  confidential?  What is the concern?

13          MR. HERSCHMANN:  Because Mr. Dellaportas' client,

14  Sagi Genger, is an Orthodox Jewish person.  I am as well.  He

15  tends to speak with people in various places where I've lived

16  and discussed various issues associated with me, and I prefer

17  that things that I do and how I establish them and what I may

18  I do from estate planning purposes are not public to

19  disclosure.

20          And I think if their allegation is that Orly

21  purchased the house, they'll see that never happened.  If

22  their allegation is that Orly has an ownership in the house,

23  they will see that that never happened.  I just want to be

24  able to produce a document sufficient to show I own it, it's

25  mine, that's all there is to it.  And it's definitely not

119

1   subject to any judgment or attachment.

2           THE COURT:  Can you produce documents to show --

3   when was this purchased?  It had to have been 2016 or later,

4   right?

5           MR. HERSCHMANN:  Correct.

6           THE COURT:  Unless you purchased it before marriage,

7   in which case it would be harder for her to have had a role.

8   So can you --

9           MR. HERSCHMANN:  I may have actually -- I don't

10  remember, but it's --

11          THE COURT:  You purchased it before your marriage --

12  were married?

13          MR. HERSCHMANN:  It may have been shortly before my

14  marriage.  I don't remember the exact date, but --

15          THE COURT:  All right.  Can you produce documents

16  sufficient to show original ownership and current ownership so

17  that it's clear that nothing was transferred in the interim?

18          MR. HERSCHMANN:  Sure.  It's only been owned by me

19  since day one.

20          THE COURT:  So current --

21          MR. HERSCHMANN:  Since the day I bought it until

22  today, it's owned by an entity and I'm the sole beneficiary of

23  the entity.

24          THE COURT:  Oh, it was purchased in the name of an

25  entity?

120

1            MR. HERSCHMANN:  Yeah, and --

2            THE COURT:  So then you need to have documents

3    sufficient to show --

4            MR. HERSCHMANN:  Correct, exactly.

5            THE COURT:  -- who owns this entity and who has --

6            MR. HERSCHMANN:  Sure.

7            THE COURT:  -- any interest in it.

8            MR. HERSCHMANN:  There's no question.  Israel has a

9    complicated circumstance in foreigners purchasing property and

10   all that, but I'm prepared to show documents sufficient to

11   show that I have been and am the only owner of this property.

12           THE COURT:  All right.  Let's try that and see if

13   that puts that issue to bed.

14           MR. DELLAPORTAS:  And if I --

15           MR. HERSCHMANN:  Mr. Dellaportas can agree when he

16   sees that it is attorney's eyes only, and if he has any issue

17   with that information, then we could deal with it.

18           THE COURT:  Can we make that attorney's eyes only?

19           MR. DELLAPORTAS:  Yes, subject to the right to bring

20   it to Your Honor if I think it's improper designation.

21           THE COURT:  Fine.  Attorney's eyes only, reserve

22   rights to come back to the Court to ask to have that broadened

23   if need be.

24           MR. DELLAPORTAS:  And to be clear, Your Honor, the

25   reason I make that proviso was because since Orly now

121

1    maintains that she lives in Israel, we may at some stage have

2    to make a judgment enforcement proceeding there, you know, to

3    the extent we can't collect here.

4            THE COURT:  Right to reserve, attorney's eyes only

5    on that one.  If you need something formal in writing, put in

6    a letter something for me to so order.

7            MR. HERSCHMANN:  Thank you, Your Honor.

8            THE COURT:  I don't know if we need a full fancy

9    additional agreement for that one.

10           All right.  Let's move to the subpoenas for the two

11   businesses, and then we'll go back at the end to any

12   additional documents from Orly Genger.  We have tax returns,

13   financial statements, ownership records for these businesses.

14   The businesses, I gather, have no retained counsel to speak

15   for them today?

16           MR. HARRIS:  No, Your Honor.  I, in the initial

17   subpoena as the registered agent, received that from Mr.

18   Dellaportas and then responded in letter form with whatever

19   document I had on behalf of the entities but they have not

20   retained me to appear in this matter or to otherwise represent

21   them.

22           THE COURT:  Well, because they're corporations or

23   corporate entities, they can't speak without counsel.

24           MR. HARRIS:  No, understood.

25           THE COURT:  So they're not represented here by

122

1    counsel.  And so I don't have any objection from the entities

2    that I can rule on.

3            MR. HARRIS:  I had some -- right, Mr. Herschmann

4    just reminded me, in the limited capacity of representing them

5    vis-a-vis their subpoenas, had had some written objections to

6    the requests that were sent to Mr. Dellaportas.

7            THE COURT:  Well, you're either speaking for them as

8    counsel today in front of me or you're not.

9            MR. HARRIS:  I guess I have to speak for them as

10    counsel today, Your Honor.

11            THE COURT:  You do?  You're authorized to do that?

12            MR. HARRIS:  I have spoken to the principal of one

13    of the entities and on the other entity, I have spoken to Orly

14    Genger.  I have not spoken to the other 50 percent owner as to

15    representing her here today, Your Honor.

16            THE COURT:  Well, if there's a 50 percent owner who

17    hasn't given authority for you to speak on behalf of the

18    entity, I'm not sure you can.

19    (Counsel confer)

20            UNIDENTIFIED ATTORNEY:  Can we have a moment, Your

21    Honor?

22            MR. HARRIS:  Let me just clear this up.

23            THE COURT:  You may have a moment.  Just be aware

24    that in court, you know, a corporate entity can only speak

25    through counsel and it has to be authorized.

123

1          MR. HARRIS:  Clear, Your Honor.

2          THE COURT:  Okay.

3          MR. HARRIS:  I just want to clear it up.

4          MR. DELLAPORTAS:  While they have a moment, may I

5    address just one issue I --

6          THE COURT:  No, because they'll be distracted.

7          MR. DELLAPORTAS:  Okay.

8          THE COURT:  Unless it's an issue that doesn't

9    concern them.

10         MR. HARRIS:  Yes, Your Honor.  I have authority to

11   speak on behalf of both entities.

12         THE COURT:  How did you suddenly get permission from

13   the 50 percent owner that's not here?

14         MR. HARRIS:  Mr. Herschmann reminded me of a

15   telephone call where the 50 percent owner asked me to respond

16   to the subpoenas.  She's a California resident.

17         THE COURT:  Okay.  What are the names of these two

18   entities?

19         MR. HARRIS:  OGJM, LLC, and Everything Important,

20   LLC.

21         THE COURT:  All right.  So Ms. Genger had had an

22   interest in these businesses, correct; both of them?

23         MR. HARRIS:  Has an interest in both of them.

24         THE COURT:  Currently has an interest in both?

25         MR. HARRIS:  Yes, Your Honor.

124

1          THE COURT:  Okay.  So she currently has an interest

2     in both.  So why would there be an objection to producing

3     ownership records of both to show her interest?  Start there.

4          MR. HARRIS:  I would think Everything Important, I

5     provided the exhibit evidencing her ownership interest from

6     the LLC agreement of Everything Important to Mr. Dellaportas

7     which would identify her ownership interest in such entity.

8          THE COURT:  Wait, wait.  All right.  Let me start

9     this way.  Mr. Dellaportas, you said you got hardly anything

10    from these entities.  What's missing that you're looking for

11    from each of the two entities and are they the same or

12    different for the two entities?

13         MR. DELLAPORTAS:  Slightly different.  I'll first

14    start with what's the same.  No tax returns from either

15    entity; no financial statements, balance sheets, or income

16    statements from either entity.  And with regard to the

17    ownership records, that's where there's a difference.  I was

18    given one redacted document where the consideration was

19    redacted by which Orly transferred a majority of her interest

20    in OGJM to an entity owned by her father, Arie Genger.  And

21    this was put on public record sometime after the judgment was

22    entered.

23         So I have that ownership record.  For Everything

24    Important, I don't believe I have any ownership records.

25         MR. HARRIS:  Wait, for Everything Important you have

125

1   no ownership records?

2           MR. DELLAPORTAS:  I don't believe so.  You can

3   remind me if you've produced something.

4           MR. HARRIS:  You were just talking about the fact

5   that Orly transferred a majority of her interest.

6           MR. DELLAPORTAS:  No, no.  That's OGJM.

7           UNIDENTIFIED ATTORNEY:  No.

8           MR. DELLAPORTAS:  Yes.  Oh, I'm sorry.  I flipped

9   them.

10          MR. HARRIS:  I'm confused, Your Honor.

11          MR. DELLAPORTAS:  I apologize, Your Honor.  For --

12          THE COURT:  You got them backwards?

13          MR. DELLAPORTAS:  I got them backwards, yes.  For

14  OGJM, we have no ownership records.  For Everything Important,

15  there was a filing, I think in Florida, after the judgment was

16  entered by which Orly transferred a majority interest in

17  Everything Important.

18          THE COURT:  She transferred her entire interest or a

19  portion of her interest?

20          MR. HARRIS:  She did not.  She did not.

21          MR. DELLAPORTAS:  Like 51 percent of something like

22  that --

23          MR. HARRIS:  No.  That's not true, Your Honor.

24          MR. DELLAPORTAS:  -- to her -- a majority interest

25  to an entity owned by her father called AGA, LLC.

126

1          MR. HARRIS:  That's just simply not true, Your

2     Honor.  It's akin to a check conversation earlier.  She and

3     her father from the day it was incorporated owned Everything

4     Important.  There was several percentage ownership, as I

5     understand.

6          THE COURT:  She had her father owned it in its

7     entirety with no other owner?

8          MR. HARRIS:  Yes, Your Honor.

9          THE COURT:  Okay.

10          MR. HARRIS:  And at some point, and I don't have the

11     date in front of me and I apologize, a few percentage points,

12     two, three, four percent was transferred from Orly to Arie

13     Genger of Everything Important.

14          THE COURT:  All right.  Let's start with Everything

15     Important.

16          MR. HARRIS:  Yes, Your Honor.

17          THE COURT:  She still has an ownership interest?

18          MR. HARRIS:  Yes, Your Honor.

19          THE COURT:  Okay.  Why have no tax returns or

20     financial statements been produced for Everything Important?

21          MR. HARRIS:  I believe I had inquired of Mr.

22     Dellaportas to enter into a confidentiality agreement in

23     connection with the providing of those financial statements.

24          THE COURT:  And tax returns?

25          MR. HARRIS:  And tax returns; yes, Your Honor.  And

127

1   I have not to this day heard back from Mr. Dellaportas.

2           THE COURT:  Sounds like you don't need me on this

3   one.

4           UNIDENTIFIED ATTORNEY:  Right.

5           THE COURT:  Sounds like you can negotiate it with a

6   confidentiality order again.  I mean you ought to be able to

7   come up with one model and keep using it if need be, but it

8   sounds like there's willingness to produce subject to the

9   confidentiality order.

10          MR. DELLAPORTAS:  Okay.

11          THE COURT:  So go do.

12          MR. DELLAPORTAS:  Thank you, Your Honor.

13          THE COURT:  All right.  Moving to OGJM.

14          MR. HARRIS:  That is an entity, as I understand it,

15  that has little to no assets, income, or the like.  Orly and I

16  think has been identified to Mr. Dellaportas as a 50 percent

17  owner.

18          THE COURT:  Is that not true?

19          MR. HARRIS:  That is true.

20          THE COURT:  Okay.

21          MR. HARRIS:  But --

22          THE COURT:  So she's got a 50 percent ownership in

23  an entity, and you're saying the entity doesn't really have

24  much.  Why is Mr. Dellaportas not entitled to see with his own

25  eyes how much this entity has where she's got a 50 percent

128

1  ownership?

2          MR. HARRIS:  I --

3          MR. BOWEN:  Can I just jump in here?  It's Mike

4  Bowen again on behalf of Orly.  But in the letter that was

5  submitted on behalf of OGJM, we specifically or it was --

6          THE COURT:  Docket what?

7          MR. BOWEN:  -- specifically stated --

8          THE COURT:  Docket number what?

9          MR. BOWEN:  Docket No. 139, starting on Page 3 at

10  the bottom.  Again, it specifically refers to tax returns,

11  which are available and have been offered to Sagi's lawyer.

12          THE COURT:  I'm sorry; 139 --

13          MR. BOWEN:  Yes.

14          THE COURT:  -- is a letter from Mr. Dellaportas?

15          MR. BOWEN:  The second half of the letter is the

16  response from Everything Important and OGJM --

17          THE COURT:  Oh.

18          MR. BOWEN:  -- that was written by Mr. Harris.

19          THE COURT:  All right.

20          MR. BOWEN:  The bottom paragraph on Page 3 refers to

21  the tax returns that are available as soon as a

22  confidentiality order is entered into which is the same as

23  Everything Important.  The tax returns show the ownership

24  interest and show that the company is losing money.  It made

25  $167 last -- in 2015.  And by 2017 --

129

1          THE COURT:  Wait, wait, wait.  Wait a minute.  Wait

2    a minute.  First of all, I don't know who provided these

3    statements in this letter but it says "OGJM has not retained

4    counsel for this matter" at the very bottom of Page 3.

5          MR. HARRIS:  Yeah, since that time, I had spoken

6    with the other 50 percent owner, Your Honor.  That's what I

7    was clearing up with Mr. Herschmann earlier.  I apologize.

8          THE COURT:  Okay.  And so tax returns were located,

9    were turned over to Mr. Dellaportas.  Mr. Dellaportas?

10         MR. BOWEN:  They were offered as soon as the

11   confidentiality order was entered into.

12         MR. HARRIS:  Which I have not heard back on.  And as

13   to financial statements, just to be clear, given the lack of

14   revenues and staffing, I don't -- my understanding is there's

15   no financial statements to provide other than the tax returns.

16         THE COURT:  They have no financial documents?  It's

17   a company that just isn't doing well so they have no records?

18         MR. HARRIS:  It's a company run out of a woman -- a

19   mother's home in California that does not have any records of

20   a financial nature other than the tax returns.  That's

21   correct, Your Honor.  You can see it lost or made $160.

22         THE COURT:  So there's nothing to support the tax

23   returns?  There are no invoices or checks or anything that

24   could be provided if there were an IRS audit?  There's

25   nothing; just the tax return itself?

130

1          MR. HARRIS:  I believe it would be burdensome.  I'm

2    sure I can ask for invoices.

3          THE COURT:  All right.  We'll start with the tax

4    returns and depending upon what you're seeing in there, you

5    can come back to the well if need be to ask for a greater

6    production.

7          So work out a confidentiality agreement; produce the

8    tax returns for both; produce, if you haven't already,

9    documents about ownership interests from the beginning of

10   these entities to the present so that we see if there was any

11   transfer made of any ownership interest and how much; and

12   produce financial statements to the extent you have them.  If

13   there's a problem with that, confer, come back to me if need

14   be.

15         MR. HARRIS:  Okay.  Thank you, Your Honor.

16         THE COURT:  Okay?  Mr. Dellaportas, you're okay with

17   that?

18         MR. DELLAPORTAS:  Yes, Your Honor, subject to our

19   right when we see the tax returns to --

20         THE COURT:  Subject to seeing the tax returns seeing

21   if there's more there to talk about.

22         MR. DELLAPORTAS:  Yes, Your Honor.

23         THE COURT:  All right.  So I have information from

24   Orly Genger regarding liens and business records.  That's what

25   --

1          MR. HERSCHMANN:  Your Honor, can I address one other

2    thing that is just something that's been raised?  It's Eric

3    Herschmann.  Orly Genger has gone by Orly Genger, and you'll

4    see it in the prenup that she maintains the name Orly Genger.

5    She's never changed her name in any way, right.  Mr.

6    Dellaportas has gone about now and issued restraining notices

7    all over the place including to financial institutions putting

8    down Orly Herschmann even though we never --

9          THE COURT:  If there is no such person, there's

10   nothing to restrain.

11         MR. HERSCHMANN:  Sure, Your Honor.  But in some of

12   these institutions, I may have relationships.  And I had an

13   independent career besides running a -- besides being a

14   lawyer.  I was running a publicly traded company.  I've been

15   involved in various businesses and outside of the legal

16   profession.  I've asked Mr. Dellaportas to stop serving

17   anything that has my last name in it since she's not known

18   that way, and it can only be harmful.

19         And he has come up with an explanation as to why

20   because some school, at some middle school in Englewood, New

21   Jersey, where my brother was being honored, someone in the

22   administration wrote Eric and Orly Herschmann, so he says

23   that's the basis.  And there was a prior filing in which

24   someone corrected it to make it Orly Genger.  That's the only

25   time it's ever come, and she's never used it.  She's never

132

1  referred to it that way.  And it's -- there's no reason to say

2  it, especially in restraining notices to businesses and

3  financial entities if that person doesn't exist and I have a

4  relationship with.

5         THE COURT:  Mr. Dellaportas, do you have any other

6  basis?  I don't recall from your writings.

7         MR. DELLAPORTAS:  Yes, Your Honor.  So, well, first

8  of all, we've never used the name Eric Herschmann in any of

9  our subpoenas or anything.  This is solely about Orly

10 Herschmann.  I guess Mr. Herschmann believes he owns the last

11 name Herschmann.  There's lots of Herschmanns out there, but

12 specifically with respect to Orly, she's married to Eric

13 Herschmann.  Under New York law, one doesn't need to file

14 anything formal to change name.  You can change name through

15 usage.  That's all that's needed under New York law.

16        We found just with a Google search -- God know how

17 much else is out there -- seven separate instances in which

18 she's used the name Orly Herschmann, including in filings with

19 the Federal Elections Commission, which is, you know, things

20 people take pretty seriously.

21        So all of our subpoenas simply said we have a third-

22 party judgment debtor Orly Genger AKA Orly Herschmann.  If we

23 don't have that, then she can walk into any bank at any time

24 and open up an account under Orly Herschmann and we're not

25 going to find it.

133

1          MR. HERSCHMANN:  Your Honor, if I could address

2    that?  That's actually a legal impossibility.  Orly Genger

3    cannot walk into any bank and open an account for Orly

4    Herschmann.  And Mr. Dellaportas must know that, right.  It's

5    an impossibility.  Orly Herschmann doesn't exist.  And the one

6    time where he says Orly Genger used it, number one, she

7    didn't.

8          THE COURT:  Wait, wait, wait.  He just said he found

9    several instances.

10          MR. HERSCHMANN:  You know, he cites to one thing

11    where he says it was an FEC filing on a donation.  In fact,

12    the person who did the filing gave an affidavit and it's

13    Document 47 on the docket that specifically says --

14          THE COURT:  47?

15          MR. HERSCHMANN:  47.  And it's prior to the judgment

16    during the litigation, where he says he filled out the form

17    incorrectly and then corrected it.  Because he didn't even

18    know Orly Genger's last name.  All he knew was that I got

19    married.

20          THE COURT:  Okay.  What is the harm to you

21    personally if a restraining notice is served for accounts of

22    Orly Genger AKA Orly Herschmann?  What happens to you if that

23    gets served on a bank?

24          MR. HERSCHMANN:  It is solely reputational and to

25    the extent that --

134

1          THE COURT:  But how does that affect your

2   reputation?

3          MR. HERSCHMANN:  Because the banks that I know of

4   have affiliated Orly Herschmann -- the claims of orly

5   Herschmann with Orly Genger the same way they were served a

6   restraining notice on a --

7          THE COURT:  I'm sorry.  Has it affected any of your

8   accounts, personal accounts?

9          MR. HERSCHMANN:  Honestly, I have no idea what

10  they've subpoenaed.  I have no idea if my personal accounts

11  have been subpoenaed.  Maybe we should ask Mr. Dellaportas has

12  he issued --

13         THE COURT:  Wait a minute.  If there is a

14  restraining notice served for an account of Orly Genger and it

15  says AKA Orly Herschmann, how does that harm your reputation

16  with the bank?

17         MR. HERSCHMANN:  Because it --

18         THE COURT:  Or with anybody else.

19         MR. HERSCHMANN:  Because there appear that --

20  because the only reason to put the last name Herschmann is to

21  be associated with me.  And I have substantial --

22         THE COURT:  But, okay, so the bank says there's a

23  restraining order for your wife's assets who is in fact

24  associated with you.  She is your wife.

25         MR. HERSCHMANN:  Correct.  With no joint accounts.

135

1          THE COURT:  Right.  Okay.  So she is in fact your

2    wife.  So if the bank officer knows you well through -- is

3    going to know it's your wife anyway.  And if it says AKA Orly

4    Herschmann and they say, oh, wait, I wonder if that's a

5    relative of Mr. Herschmann who's a customer here and it turns

6    out it is, what has happened to you that is any different from

7    if they haven't made that connection?

8          MR. HERSCHMANN:  Because there's two issues.  One is

9    there's no judgment or no claim ever brought against AKA Orly

10   Herschmann.  He never did it in the case.  Had he raised in

11   the beginning, I think it would have been addressed in the

12   underlying case.  Two is we have no joint accounts, but if a

13   bank gets a restraining notice and he's serving it in Texas

14   and other places where I live and which I have accounts, then

15   it's detrimental to me.  There's no reason to do it, Your

16   Honor, other than to prejudice.

17         THE COURT:  What if she were to decide to use your

18   name starting next week?

19         MR. HERSCHMANN:  Your Honor, if that happens, I will

20   make a representation to the Court that it's happened.  As an

21   officer of the Court, I will come forth and make that

22   representation.  It hasn't happened.  I don't expect it to

23   happen.

24         THE COURT:  How would you even necessarily know?

25         MR. HERSCHMANN:  Well, she can turn around and use

136

1   Mr. Dellaportas' last name; I don't know.  You know --

2           THE COURT:  Well, no.  I mean she's not married to

3   Mr. Dellaportas.

4           MR. HERSCHMANN:  Your Honor, I agree, Your Honor.

5   But is it possible?  Sure, anything's possible.  But right

6   now, the restraining notices and there's no articulable reason

7   to say Orly Herschmann to financial institution other than to

8   taint me.  There's nothing to do with my last name.  She never

9   took it.  None of the accounts, thing that she's ever had, we

10  don't file joint tax returns, nothing.  And there's no reason

11  to do it.

12          THE COURT:  Okay, look.

13          MR. HERSCHMANN:  And he can't articulate a reason.

14          THE COURT:  Look, look.  Wait.  Mr. Dellaportas,

15  what were all the instances you found online when you looked?

16          MR. DELLAPORTAS:  We found seven instances.  They're

17  attached to our Filing 129.

18          THE COURT:  129?  I don't --

19          MR. DELLAPORTAS:  Document 129.

20          THE COURT:  129, Exhibit what?  Is it at the back?

21          MR. DELLAPORTAS:  It would be Exhibit -- the first

22  exhibit.  Maybe Exhibit A.  And I don't have a label on it,

23  but it's the first exhibit.

24          THE COURT:  All right.

25          MR. DELLAPORTAS:  So the first one is --

137

1        THE COURT:  So we have event shares at a --

2        MR. DELLAPORTAS:  Yeah.

3        THE COURT:  -- U.S. Senate campaign even.

4        MR. DELLAPORTAS:  If you go to Page 2, it says the

5 --

6        THE COURT:  Eric and Orly Herschmann.

7        MR. DELLAPORTAS:  -- the event shares are Eric and

8 Orly Herschmann.

9        THE COURT:  And we have --

10        MR. DELLAPORTAS:  Something from NORPAC [Ph.] which

11 is a political PAC, again, says Eric and Orly Herschmann.

12        THE COURT:  On the birth of their daughter.

13 Congratulations, by the way.

14        MR. DELLAPORTAS:  Then we found a few pages there.

15 Another Orly Herschmann.  It looks like some sort of school.

16 Then there's an art exhibition "made possible thanks to the

17 generosity of Eric and Orly Herschmann."  And then, lastly,

18 there are three FEC, Federal Election Commission filings on

19 Orly Herschmann.  Now they're prepared a affidavit with

20 respect to one of them from some guy saying it was

21 inadvertent.  They haven't with respect to the other two.  I

22 don't know that they're all filed by the same person, but they

23 say Orly Herschmann.

24        It's enough to cause for us to have a concern that

25 there will be assets out there held under the name of Orly

1   Herschmann which is in fact her husband's last name.  And we

2   want to make sure we get them.  I don't think they've shown

3   any reputational damage other than any damage which associates

4   from the truthful fact that Mr. Herschmann is married to a

5   judgment debtor.  But --

6           THE COURT:  Mr. Herschmann, I mean I've been married

7   a lot longer than you and Ms. Genger have been married.  I

8   don't use my husband's last name.  I don't think anyone would

9   ever find anything online indicating me with my husband's last

10  name.  This is seven instances just from what happens to be

11  online and there's an awful lot of stuff that doesn't happen

12  to be there.

13          I think it's a good faith basis for throwing it in

14  as potential AKA.  And I don't really see the reputational

15  harm to you by doing that if it's associated with someone

16  named Orly who does in fact happen to be your wife.  Now, if

17  he finds no account with that name, there's no account with

18  that name.  By any chance there is, he finds it.

19          MR. HERSCHMANN:  Sure, Your Honor.  But we're

20  talking about -- I don't know where all these restraining

21  notices and subpoenas have been served because he hasn't

22  identified it, right.  That's one of the issues.  But to sit

23  there and say -- and as an officer of the Court, I can make

24  the representation, and I think I would know, right, that

25  there are no accounts on earth that say Orly Herschmann.

139

1   There are no businesses.

2          The fact that a middle school in Englewood, New

3   Jersey where my brother gets honored would put it down and

4   NORPAC who did the --

5          THE COURT:  Can I just say something?  The amount of

6   lack of trust in these lawsuits between brother and sister and

7   other family members is extraordinary.  There's nothing you

8   could say or do that I think is going to make Mr. Dellaportas

9   and his client trust that what you say is truthful even if it

10  is.  And I don't have any reason to doubt it, but there is a

11  lack of trust.

12         And when there's a lack of trust and someone says,

13  look, Judge, I have an explanation, a good faith explanation.

14  We did a search and we did find this name popping up and we

15  don't want to have to trust someone's word that we're not

16  missing anything if we leave the name out, if there's nothing

17  there, there's nothing there.  And the only thing you're

18  really saying to the contrary is it's going to hurt me

19  personally and I'm not really seeing how.

20         MR. HERSCHMANN:  Because, Your Honor, like you said,

21  I was married for a long time the first time.  So, yes, my

22  first wife took our last name, right.  Everyone knew it,

23  right.  I have zero liabilities, none, right.  Restraining

24  notices that go to entities or institutions that see my last

25  name, right --

140

1          THE COURT:  It hurts you if there's an account that

2     says Eric and Orly Herschmann.

3          MR. HERSCHMANN:  Sure.  It would also hurt me if it

4     was saying --

5          THE COURT:  But if it says Eric Herschmann, your

6     account's not going to be restrained.

7          MR. HERSCHMANN:  I completely agree, Your Honor, but

8     they --

9          THE COURT:  I'm going to move on.

10         MR. HERSCHMANN:  Okay.

11         THE COURT:  I'm sorry.  I mean, look, I think, Mr.

12    Dellaportas, that there are points where people on the other

13    side of the aisle may be speaking truth and you may be in your

14    effort to leave no stone unturned going a little bit more

15    broadly than you need to.

16         But he has shown me a good faith basis for it.  I

17    don't really see the harm in any concrete way.  If you have an

18    example of something that's actually harmed, you come back to

19    the Court.  But I'm not really seeing it.  So --

20         MR. HERSCHMANN:  Well, Your Honor, I guess I should

21    ask the question then because the banks obviously have not

22    been too responsive when subpoenas being issued, have any

23    subpoenas been issued for my accounts?  I think I'm entitled

24    to know that.

25         THE COURT:  Have any subpoenas been issued for Mr.

141

1   Herschmann's own accounts?

2          MR. DELLAPORTAS:  No, but that raises the next issue

3   I wanted to bring up for the Court.

4          THE COURT:  Wait.  I've got to run because it's --

5   at least on that clock it's three minutes to one.  I may be

6   running slightly fast.  So I may have another five minutes

7   here, but I do have a meeting I need to go to in the court.

8   So we're going to have to wrap up and to the extent anything

9   is left out, I have my calendar with me.  And I think we're

10  only down to the parties and hopefully, you'll be able to

11  schedule a telephone conference without too much difficulty.

12         MR. BOWEN:  This is Mike Bowen.  I'd prefer, Judge,

13  given your rulings today that we take a breather on the

14  dispute specifically about --

15         THE COURT:  By all means.

16         MR. BOWEN:  -- about Orly.  And we can see between

17  the documents that are being produced by the companies that

18  she's a co-owner of and the other rulings today, we should be

19  able to work it out.

20         THE COURT:  Here, I don't mind you taking a little

21  breather to confer in good faith to try to work things out on

22  what's remaining, to work out confidentiality orders and get

23  those in place, to get additional things produced.

24         Mr. Dellaportas, if you are subpoenaing records and

25  if there is a party that might have a confidentiality

1    interest, I want that -- or a non-party -- I want that non-

2    party to be able to have an opportunity to voice an objection.

3    So if you serve it on, you know, some third party's account,

4    it doesn't necessarily mean under the law you have to notify

5    Orly Genger's counsel.  But that party whose account it is

6    should have an opportunity to come and say, wait.

7              So please give some thought to that, all right, so

8    that we don't have people jumping up and down and saying this

9    has not been fair.  And understand that if you're very

10   confident and you think there's a reason you need to do it

11   without notice to anybody that I -- you know, I may require

12   you to destroy or return something thereafter.  So make sure

13   things are kept, you know, close to you and not widely spread

14   before there can be an opportunity for any ruling.

15             Listen, I'm just going to say a few last words here

16   and we're going to pick a date a little bit farther down the

17   road to reconvene by phone with the parties if necessary.  If

18   you've worked things out, by all means we can cancel it.  This

19   really -- this litigation, and I use the word "litigation"

20   broadly to cover collection of litigations, has been marred by

21   a lot of name-calling, finger-pointing, you know, accusations

22   of lying, accusations of bad faith, you know, just so much

23   unpleasantness that it's not necessary from counsel.

24             I realize one of the attorneys happens to be married

25   to a party, but the rest of you, you know, you're really not

143

1   interested family members.  You are counsel.  You're members

2   of the bar.  You're officers of the court.  You can work

3   together civilly and cordially and you can present a dispute

4   that's a bonafide honest dispute without all of the

5   accusations.

6       If you think someone is not being candid or

7   truthful, you can say, you know, our understanding is that the

8   facts are different without calling people all kinds of, you

9   know -- accusing them of being less unethical.  So, you know,

10  I just am going to ask you, please, to try to make my life a

11  little bit easier by keeping the amount of paper down.  If

12  there really is a dispute, try to make a joint submission, try

13  to be succinct.  I'll schedule a conference to try to deal

14  with it and keep you going.

15      Try not to have the history we've had in this case

16  with the way in which papers come in with motion, motion,

17  motion, motion.  Just, you know, try to keep it a little bit

18  more toned down and to the point.

19      And let me get you down on the calendar for a

20  follow-up if necessary.  Let's give you a little time to get

21  protective orders ironed out and get some things produced.

22  What do you think would be the right length of time, maybe

23  three weeks or something like that?

24      MR. DELLAPORTAS:  The shorter the better, Your

25  Honor, from our standpoint.  So I think we'll know.

144

1          THE COURT:  Well, I mean I want to give you a chance

2   to get things to see -- and talk and see if you really need my

3   further attention or not.  Don't assume you do.  You might

4   not.

5          Today is the 8th.  I'm looking maybe the week of

6   January 21.

7          MR. DELLAPORTAS:  I'm available all week, Your

8   Honor.

9          MR. BOWEN:  I'm actually out of the country that

10  week.

11         THE COURT:  When are you leaving and when are you

12  back?

13         MR. BOWEN:  I leave on the 16th of January and

14  return the morning of the 25th, which is a Friday but I'm in

15  court before Judge Sullivan that day.

16         THE COURT:  All right.  So then what I'm going to do

17  is I'm going to entrust you to work seriously on issues

18  between now and the time you leave --

19         MR. BOWEN:  Certainly.

20         THE COURT:  -- and have somebody delegated in your

21  absence to be continuing to work on issues while you're gone

22  if need be.  If you really find yourself at some new boiling

23  point where you need me, get in touch with me by Monday, the

24  14th, and get on my calendar for the morning of the 15th so I

25  can get you before you go.  But short of some crisis, let's

145

1  put you on as a whole date for January 29 or 30 in the morning

2  for a call?  That's a Tuesday or Wednesday.

3           MR. HERSCHMANN:  The 29th works.

4           MR. DELLAPORTAS:  For us as well.

5           THE COURT:  Okay.  29th at 10:00 a.m. for a

6  telephone call.  If you're okay, please let us know and we'll

7  cancel it, okay.  If there are still discovery issues or if

8  there are new ones, let me know.  If there are more non-

9  parties who are served with more subpoenas, make sure you

10  inform them, Mr. Dellaportas, of that date.  Make sure they

11  understand they can be part of that conference if need be.

12  And if there is a dispute, hold it until then so I can rule on

13  it before they start producing things before a dispute can be

14  resolved.

15           Do you want me to hold something on the 15th as well

16  just in case?

17           MR. DELLAPORTAS:  That would be good, yeah.

18           THE COURT:  Just in case.  Hopefully to be

19  cancelled.  I have a busier schedule that day.

20           MR. BOWEN:  I'm just trying to see what I have on

21  for the --

22           MR. HERSCHMANN:  It's Eric Herschmann.  I'm not sure

23  the 15th will give enough time if we're going to try to get

24  documents from the woman in California.

25           THE COURT:  Yeah.  I'm only concerned about Mr.

146

1   Bowen's being away.  So if there's an issue that he wants to

2   address before he's away, unless you're reachable by phone

3   where you are.

4          MR. BOWEN:  I'm going to be -- well, it's on the

5   other side of the planet.  I mean it's a little hard to do

6   those kind of phone calls, but --

7          MR. HERSCHMANN:  I guess if we need something before

8   the 15th, Your Honor, I think we can be in contact with you.

9   I don't think we need to schedule a call.

10          THE COURT:  All right.  I'm not going to put it on

11   the calendar.  Monday the 14th -- my Mondays are usually -- I

12   won't say always -- usually my most open days because I have a

13   deputy who's nice to me who tries not to have me come back

14   from the weekend and immediately plunge into all kinds of

15   things.  So the 15th is already getting kind of crowded.  So

16   just be aware if you need me before you go, we're only talking

17   about a week from now or less than a week from now.  Hopefully

18   you don't have any pressing needs within a week.

19          MR. DELLAPORTAS:  The only thing we would envision,

20   Your Honor, is if we're not able to agree on a confidentiality

21   order, it's probably like one or two clauses and it's holding

22   up the production.

23          THE COURT:  Well, then you're going to submit it

24   with the dueling clauses.

25          MR. DELLAPORTAS:  Yeah, okay.

147

1          THE COURT: Right?  I already said that.

2          MR. BOWEN:  Right.

3          MR. DELLAPORTAS:  Okay.  Yes.

4          THE COURT:  So you're probably not going to need me

5    the 14th or 15th.  I put you down the 29th.  That's the most

6    likely time to talk to you again.  If you don't need me then,

7    God bless.

8          MR. BOWEN:  Did you want a time, Judge?  10:00 a.m?

9          THE COURT:  10:00 a.m.

10         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

11         THE COURT:  All right.  I'm going to reserve ten to

12   eleven but not more than that, okay?  All right.

13         Listen folks, you can do it.  You can start a new

14   year with a resolution.  I'm not planning to issue a written

15   order.  I will review the one document in camera and I will

16   issue some ruling on that probably.  But I'm probably not

17   going to issue a ruling memorializing what was said today

18   unless somebody comes back to me and tells me you need

19   something.

20         MR. HERSCHMANN:  Your Honor, just on the one

21   document?  It's Eric Herschmann.

22         THE COURT:  Yeah.

23         MR. HERSCHMANN:  After you review it, how do I

24   arrange to get it picked up?

25         THE COURT:  Oh, we'll be in -- my clerk or somebody

148

1  will get in touch with you.

2              MR. HERSCHMANN:  Okay.

3              THE COURT:  Okay.  I do have the confidentiality

4  stip Docket 137 with respect to Mr. Broser.  I'll review that.

5  I think it's okay.  I want to give it one last look.  And I do

6  have the subpoena that you wanted me to so order for Raines &

7  Fischer, which I plan to do in lines with what I said.  All

8  right.  I'm pulling those out separate to make sure I do my

9  part on those.

10             Was there anything else I was supposed to sign or --

11             MR. HERSCHMANN:  No, Your Honor.

12             THE COURT:  Okay.  All right.  We're adjourned.

13             MR. HERSCHMANN:  Thank you.

14             MR. DELLAPORTAS:  Thank you, Your Honor.

15             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

16             THE COURT:  You're welcome.

17                         *  *  *  *  *

18

19

20

21

22

23

24

25

149

1     I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                           Shari Riemer, CET-805

7  Dated:   January 22, 2019