UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Orly Genger,<br><br>            Debtor. | Chapter 7<br><br>Case No. 19-13895-JLG |

**JOINDER IN OPPOSITION TO AMENDED MOTION TO DISMISS**

Creditors Kasowitz Benson Torres LLP ("KBT") and Eric Herschmann ("Herschmann")

submit this joinder in Chapter 7 Debtor Orly Genger's ("Orly") opposition to Sagi Genger's

("Sagi") Amended Motion to Dismiss ("MTD") (ECF No. 239), and state as follows:

**PRELIMINARY STATEMENT**

Sagi's amended motion to dismiss Orly's bankruptcy case should be denied for all of the

reasons set forth in Orly's opposition to his motion, in which KBT and Herschmann expressly

join, including because Orly's millions of dollars of debts greatly exceed her assets.  This

bankruptcy should continue so the Court can equitably and fairly administer the debt claims

against the estate, including those filed by KBT and Herschmann.  Without bankruptcy court

protection and administration of Orly's estate, it is likely that Herschmann and KBT would never

recover on their debt claims.[1]

At the outset of his motion to dismiss, Sagi attempts to make his conspiracy theory

somewhat coherent by lumping together Herschmann and KBT into allegations that he makes

against Arie and/or the Brosers.  For example, in only the third paragraph of his motion, he

---

[1] Exhibits referenced herein are attached to the Declaration of Andrew R. Kurland, filed herewith.  Portions of this brief and exhibits which are confidential pursuant to the Protective Order in this case are being publicly filed in redacted format, but will be directly provided to the Court and Sagi in un-redacted form.

KBT and Herschmann also join in the oppositions to the motions to dismiss filed by the other interested parties, including the Chapter 7 Trustee and ADBG LLC, and reserve the right to rely on exhibits attached to those oppositions as well as to Orly's opposition.

defines the "the Debtor Group" to include Herschmann, and then claims that the group has

worked collectively since at least 2013 to conceal assets of Orly that Sagi claims belong to him

or his mother, Dalia.  *See* MTD ¶ 3.  In reality, neither Herschmann nor KBT had any idea that

any of the Gengers, Brosers, or any other party involved in the instant proceeding even existed in

2013, let alone could be considered to be affiliated with them as they carried out Sagi's

purported years-long scheme to wrong him and Dalia.  Sagi has to manufacture these stories

because the true facts do not support his wild conspiratorial theory that everyone is out to harm

him.  His stories do not make sense because they are senseless and defy all common sense and

logic.

The real story of Herschmann and KBT's involvement in the Genger family Saga began

in January 2015.  Herschmann, who was semi-retired at that time, was asked by Orly (who he

had only met a few months earlier in Texas) to consider helping her in a case against her brother

because her lawyer, who had been handling the case for years, had unexpectedly been

hospitalized with a serious illness.  The fraud trial against Sagi was set to start on January 27,

2015.  Before agreeing to help, Herschmann read Orly's complaint and Sagi's answer, reviewed

some of Sagi's prior testimony, reviewed the SEC's case against Sagi related to Lumenis and

Sagi's past wrongdoing, and spoke with the former SEC attorney who handled that case.  After

conducting this due diligence and speaking with Orly about the case and assessing Orly's

financial condition – and recognizing the bench trial was only slated to last three days –

Herschmann and KBT agreed to handle the trial on a partial pro bono basis, as is reflected in the

January 23, 2015 retainer agreement between Orly and KBT.  That retainer letter makes clear,

*inter alia*:

This letter agreement covers only the trial; any further work on the case will be
subject to further discussion and agreement between us.  As you know, we have
had no involvement in this action until very recently and, thus, our ability to try
the claims is subject to the record established and developed prior to our retention.

For reasons you [Orly] and I [Herschmann] have discussed, including your
present financial means, we have agreed to handle the trial of this matter on
partial pro bono basis.  Accordingly, [KBT] will bill only for the hourly time
charges of its legal assistants and any out-of-pocket disbursements…
Disbursements (e.g., duplicating, postage, telefax, and other similar expenses)
also are billed separately.

Ex. A.

Those are the indisputable facts about how KBT and Herschmann got involved in

anything related to the Gengers.  There can be no doubt that KBT's retainer was

negotiated at arm's-length and in good faith.  Since this has unconditionally been

established, and since KBT performed legal services for Orly pursuant to the three

retainer agreements with her, the rest of Sagi's claims concerning KBT and Herschmann

must fail.

Unfortunately, the fraud trial lasted much longer than three days, and ending up lasting

almost thirty trial days spread over the course of several months, not including a multi-day court-

ordered deposition of Sagi's friend and lawyer for which the trial was temporarily adjourned.

Much of the greater-than-anticipated duration stemmed from the totally made-up defense that

Sagi and his counsel, Mr. Dellaportas, presented to the court, and Sagi's lack of credibility and

prevarications throughout his testimony.  For example, in what can now been seen as

foreshadowing considering the types allegations that Sagi has made against KBT and

Herschmann in this proceeding, very early on in the fraud trial, Sagi accused Herschmann and

KBT of misrepresenting that the firm was working on a partial pro bono basis (as memorialized

in its retainer agreement), and his counsel claimed, without any evidence, "we have reason to

believe that [Herschmann] is in business with Ari[e] Genger and that's his [and KBT's]

3

compensation" for its legal work for Orly. That allegation was as outrageous and as baseless as
Sagi's other, completely different allegations against KBT and Herschmann. At the time Sagi
made that claim, neither Herschmann nor anyone at KBT had any familiarity with Arie Genger
whatsoever, let alone any business dealings with him.

KBT and Herschmann learned that while Sagi had essentially failed at every business
venture in his life – one of which resulted in an investigation by the SEC, which obtained a
judgment against him that included a lifetime bar from committing securities fraud (*see SEC v.
Lumenis Ltd.*, et al., C.A. No. 06-cv-03225 (LAK) ECF No. 3, at 1-5 (final judgment
"permanently restrain[ing] and enjoin[ing]" Sagi from violating multiple provisions of the
Securities Act of 1933 and the Securities Exchange Act of 1934) – Sagi had excelled, and
continues to excel, in one arena: torturing his only sibling in years of litigation, finally driving
her into bankruptcy in 2019. It is indisputable that Sagi has taken all of the family wealth –
which was intended to be split between him and Orly equally – and kept it for himself. Now, in
a last-ditch effort to try to ensure that Orly does not get the protection that she deserves and is
statutorily entitled to through this bankruptcy, he accuses her, and essentially every professional
who has ever helped her, of fraud and bad faith. New York Supreme Court Justice Barbara Jaffe,
in finding Sagi liable in the now-infamous "three day" fraud trial, said it well:

> [Sagi'] great gifts were exploited when his parents inappropriately thrust their
> troubled son into the difficult position of resolving their divorce finances.
> Assigning [Sagi] such power apparently had the unintended consequence of
> convincing him that he, like Arie, could create and disperse interests and funds
> whenever and however he wished. His expressed resentment of [Orly] likely
> inspired the fraud, while his power and control of the entities enabled it.

Now, it must stop. There is no doubt that Orly is penniless. There is no doubt that she
filed for bankruptcy in good faith, and there is no doubt that she needs and is entitled to the

protections afforded by U.S. bankruptcy law. Sagi's motion to dismiss should be denied, and this bankruptcy should be allowed to proceed.

KBT and Herschmann are also compelled to submit this opposition to Sagi's motion to dismiss in order to address Sagi's multitude of claims of misconduct directed squarely at them. Without a shred of evidentiary support – because none exists outside of Sagi's own imagination – Sagi has accused KBT of engaging in false billing practices, financial wrongdoing and deceit. And throughout his motion, and in his filings generally, Sagi has fixated on Herschmann, baselessly accusing him of extensive wrongdoing, including fraudulently encumbering Orly's assets purportedly to harm Sagi and his mother, and assisting Orly in committing bankruptcy fraud. Not only does Sagi have no support for these claims, they are extremely prejudicial to both Herschmann and KBT. For this reason, the Court has already allowed the firm, Herschmann, and debtor's counsel Michael Bowen to file a Rule 9011 motion for sanctions against Sagi and his counsel. And, to take just one example, this Court has already found that Sagi's allegation that Orly and Herschmann hid a bank account in Israel and failed to cooperate with the chapter 7 trustee after it was identified by him is a complete falsehood. As set forth in the Rule 9011 motion, Sagi and his counsel should be sanctioned for their repeated false accusations for which they have no evidentiary support, and this bankruptcy case should be allowed to proceed.

**ARGUMENT**

**I. SAGI'S FALSE ACCUSATIONS ABOUT KBT**

Sagi has spent considerable effort fabricating stories about KBT's representation of Orly and, in particular, the terms on which the firm agreed to represent her and the firm's involvement (or, more accurately, lack thereof) with the 2013 Trump Group settlement agreement and Genger family litigation drama prior to 2015. As set forth herein, his contentions in his motion to dismiss concerning the firm are entirely false and provide no support for his argument that the bankruptcy case should be dismissed.

**A. Sagi's Claims Regarding Pro Bono Representation of Orly**

The bulk of the Court-authorized Rule 9011 sanctions motion pending against Sagi and his counsel concerns Sagi's extensive false allegations about the billing arrangement between KBT and Orly, including the baseless arguments Sagi makes in paragraph 34 of his motion to dismiss. *See* ECF No. 411. As previously articulated to the Court (*see, e.g.*, ECF Nos. 389, 397, 400), there is no legitimacy whatsoever to Sagi's various claims regarding KBT's billing arrangement with Orly.

In his motion to dismiss, Sagi claims that "the lion's share" of this firm's legal work for Orly was pro bono. MTD ¶ 34. He bases this on Herschmann's on-the-record statement during the fraud trial in 2015 that he was working on the matter pro bono, and that the retainer letter from this firm for the matter "reflect[s] that all of the attorneys that are on the trial for Kasowitz are working pro bono." Ex. B (March 2, 2015 Trial Tr.) at 957:26 to 958:3. These were and remain accurate statements, as set forth below. Further, in light of the irrefutable documentary evidence and testimony provided, Sagi has essentially admitted that his false contentions regarding the limited pro bono nature of KBT's representation of Orly in fact do not provide a

basis for dismissal of Orly's bankruptcy. *See* Ex. C (April 9, 2021 Hearing Tr.) at 22:21-23

("MR. DELLAPORTAS: Your Honor, if -- if the Court is asking about specifically whether or

not pro bono is the lion's share of -- of Kasowitz's – that's fairly tangential and I don't think

that's really going to play a significant role in our motion to dismiss, even in the reply.")

      As explained to the Court previously (and as quoted above), the three engagement letters

KBT has with Orly (attached as Exhibit A), each from January 2015, expressly state that the firm

intended to charge Orly its customary and ordinary fees with the exception of the 2015 fraud trial

in which the firm agreed to waive the hourly charges of the attorneys working on the trial itself,

but to charge paralegal time, support staff time, and disbursements, and also to charge all

attorney time for certain trial-related out-of-court activities, including a deposition and post-trial

briefing. Ex. A at p. 1. The firm's invoices to Orly (Exhibit D) and the cancelled checks and

wire confirmations (Exhibits E and F) that show when the actual payments were received by the

firm from the beginning of its representation in 2015 through the end of 2016 – totaling more

than the $2.75 million including the $2 million Herschmann loaned Orly to pay a portion of what

she owed (*see* Section II.A, *infra*) confirm this, and also reflect the substantial work this firm has

done for Orly in connection with other state Supreme Court actions, Surrogate's Court actions,

and actions in federal court, all of which were billed, and all of which also involved Sagi. These

other actions are the true "lion's share" of legal work the firm has performed for Orly over the

years.

      Sagi also took this firm's deposition in connection with this bankruptcy. A portion of the

firm's testimony was provided by Mr. Herschmann, and the remainder by Mr. Bowen. Both firm

witnesses testified about the limited nature of the pro bono representation of Orly. *See, e.g.*, July

2, 2020 Dep. Tr. at 74:23 to 75:9 (attached hereto as Exhibit G) ("the only pro bono services that

were provided by the firm as it related to Orly Genger was, as I stated on the record and as is contained in the retainer agreement, was the pro bono trial time for the lawyers"); Aug. 18, 2020 Dep. Tr. at 55:16 to 56:8 (attached as Exhibit H ("anything that was post-trial, post-trial briefs, appeals, ancillary proceedings that may have been related to that trial, were no longer under that partial pro bono arrangement"). The testimony is entirely consistent with the documents the firm produced.

In his motion, Sagi also baselessly claims that Herschmann and Orly's premarital agreement provides support for the contention the majority or all of KBT's legal services for Orly were performed on a pro bono basis. *See* MTD ¶ 34.

***Redacted pursuant to Section 3(e) of the
Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).***



*Redacted pursuant to Section 3(e) of the*
*Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).*

*Redacted pursuant to Section 3(e) of the*
*Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).*

Ex. G (2020-07-02 Herschmann Dep. Tr.) at 199:5 to 204:13.

It therefore cannot be disputed that KBT provided substantial legal services to Orly,

totaling millions of dollars, on a pro bono basis.  But this *does not* mean that all or the majority –

or, in Sagi's words, the "lion's share" – of legal services were provided pro bono.  The

irrefutable documentary evidence and testimony described above, which has already been disclosed to the Court, confirms this. *See* ECF Nos. 389, 397, 400, 411.

As the Court will recall from earlier this year, no doubt realizing that their fabricated contention that the majority of the legal work KBT did for Orly was pro bono had been undermined by incontrovertible evidence, Sagi and his counsel recently changed their tune entirely from the argument contained in their motion to dismiss. First, they were forced to concede that their false allegations concerning the limited pro bono billing arrangement between KBT and Orly should be treated as "tangential" to their motion and no longer will "play a significant role in our motion to dismiss, even in the reply." Ex. C (April 9, 2021 Hearing Tr.) at 22:21-23. (Of course, the abandonment of their arguments concerning KBT's pro bono work leads to the logical conclusion that Herschmann's loan to Orly to pay those same bills is legitimate. *See* Section II.A, *infra*). Second, they made up an entirely new though equally frivolous and untrue story: they now claim that in 2015 KBT fraudulently converted what, according to Sagi, was supposed to have been pro bono work for Orly into work that was billed, in order to frustrate Sagi and Dalia's ability to collect from Orly. Ex. J (Feb. 25 Hearing Tr.) at 22:1-9, 32:8-13.[2]

KBT already dispelled this fabrication, too. The time entries the firm produced to Sagi and his counsel (redacted only for privilege), as directed by the Court, definitively prove that no time was shifted; rather, the time in question had at all times been billable work. *See* ECF No. 389 at 3-4; Ex. A. This is what the arrangement had always been, as reflected in the firm's engagement letters, billing records, and testimony.

---

[2] This is actually at least the third completely different (and unsupported) version of the story. As stated above, during the 2015 fraud trial against Sagi, Mr. Dellaportas accused Herschmann of being in business with Arie Genger, and that is how the firm was being compensated for its legal work. This was entirely untrue as well.

Further, Sagi's entire revised argument regarding the firm's purported billing arrangements is illogical. If the intent, as Sagi alleges, was to inflate Orly's obligations to the firm to somehow hurt he and Dalia, why would the firm agree to have done *any* work pro bono? Of course, in reality Sagi and his lawyer do not know and cannot know the understanding KBT had with its own client, and their self-serving re-interpretation of our engagement letters to which they are strangers can never be credited over the understanding and testimony of the parties' themselves. Moreover, Sagi has no standing to object to fees already paid by Orly to her own lawyers years ago (to pursue claims against and defend claims asserted by Sagi). These are basic truths that cannot be challenged. This firm did not modify its agreement with Orly, and Mr. Dellaportas and Sagi cannot do so to try to support their nonsensical theories that KBT was somehow involved in creating false liabilities to harm Sagi and Dalia. *See also* ECF Nos. 389, 397, 400.

In all events, KBT's billing arrangement with Orly lends no support whatsoever to Sagi's argument in his motion to dismiss that the firm somehow facilitated a bankruptcy fraud. The firm is still owed approximately $1.5 million for work performed between 2017 and the date Orly filed for bankruptcy. That is why the firm filed a proof of claim in this proceeding, under penalty of, *inter alia*, fines and imprisonment. *See* 18 U.S.C. §§ 152, 157, 3571. Sagi can point to no evidence that the firm filed its proof of claim or previously collected funds on account of the millions of dollars' worth of *non-pro bono* legal work it performed for Orly in order to frustrate the claims of Sagi and Dalia. That is because no such evidence exists or ever existed.[3]

---

[3] Of course, even if Sagi did have any evidence (again, he does not, since none exists or ever existed) or grounds to challenge KBT's proof of claim, dismissal of this proceeding still would not be a proper remedy; at most Sagi could file a claim objection.

**B. Sagi's Claims Regarding False Deposition Testimony**

Sagi claims that KBT provided false testimony at the 30(b)(6) deposition Sagi took in 2018 in the District Court action involving Dalia, Sagi, and Orly. MTD ¶ 30. He is wrong. Mr. Bowen never provided any testimony that was false. The crux of Sagi's argument is his contention that at the time of the deposition KBT had not produced an agreement known as the March 31, 2017 escrow agreement, which is related to Herschmann's $2 million promissory note (though which, as described in Section II.A, below, Sagi twists and misinterprets to further his own purposes). Sagi claims that the agreement "was only accidentally revealed," suggesting that the document was somehow deliberately withheld. MTD ¶ 31.

His contentions are false. The March 31, 2017 escrow agreement was never hidden from Sagi. It is expressly and specifically identified and referenced in the $2 million promissory note that has been in Sagi's possession for *years*. It simply had not been produced at the time of Mr. Bowen was deposed as the firm representative in the District Court case in 2018. When KBT realized the document had inadvertently not been produced, it promptly did so. Other parties also produced the document. Sagi also neglects to acknowledge that Mr. Bowen himself explained all of these details to Sagi and his lawyer in the more recent deposition of KBT that Sagi took in connection with this bankruptcy proceeding, where Mr. Bowen again served as a designated representative to testify on behalf of the firm. *See* Ex. H (Aug. 88, 2020 Bowen Dep Tr. at 33:10 to 37:11).

Accordingly, no testimony of the firm has been false, and Sagi cannot use his false contentions and maligning of the firm as a basis to argue that firm was part of any sort of scheme or bankruptcy fraud, or that the bankruptcy proceeding should be dismissed.

13

## II. SAGI'S FALSE ACCUSATIONS ABOUT HERSCHMANN

Sagi fixates on Herschmann as he tells his made-up story about a nonexistent bankruptcy

fraud in the motion to dismiss.  In general, the allegations against Herschmann Sagi has made to

this Court are head-spinningly bizarre.  For example, when this case was pending in Texas Orly,

KBT, Herschmann, the Brosers (and their related entities) and Arie reached a settlement with the

Texas chapter 7 trustee, Ron Satija in accordance with Rule 9019.  That settlement agreement

was reached after the trustee met with all parties (including Sagi though not including Dalia) and

conducted a thorough investigation in good faith.[4]  Subsequently, during Sagi's deposition of

Herschmann, apparently based on the fact that the prior settlement had been reached with the

Texas chapter 7 trustee, Sagi's counsel accused Herschmann of participating in an improper, ex

parte meeting with the trustee outside the presence of counsel at an art museum in order to "hash

out the terms of the 9019 settlement."  Both Mr. Herschmann and the predecessor trustee

testified that no such meeting ever occurred (it never did), and were perplexed by the absurdity

of the allegation.  Ex. G (July 2, 2020 Herschmann Dep. Tr. at 212:20 to 215:10; Ex. K (July 16,

2020 Satija Dep. Tr. at 13:14 to 14:7).  Nonetheless, this fallacy was repeated again to this Court

in a recent letter submission from Sagi in which he stated:

> In November 2019, Brian T. Cumings, Esq., who was Mr. Satija's counsel, told
> one of the Texas lawyers for the Creditor Group that:
>
> - Mr. Herschmann called Mr. Satija directly to solicit a meeting;
>
> - the two thereafter met, outside the presence of counsel, at an art gallery for a
>   few hours to discuss a possible deal; and
>
> - Mr. Satija returned from that meeting with a settlement agreement in
>   principal.

---

[4] As the Court is aware, these same parties have now reached a new settlement with the current chapter 7 trustee following the trustee's additional investigation that lasted approximately 18 months.  The Rule 9019 motion is pending at ECF No. 421.

ECF No. 399 at 1.

Brian Cumings, the Texas trustee's counsel, who was the supposed basis for this

allegation, summed it up best when asked about these allegations:

On Apr 5, 2021, at 5:23 PM, Andrew R. Kurland <AKurland@kasowitz.com> wrote:

Brian,
 The below is an excerpt from the start of the attached filing made today by Sagi Genger's counsel, John Dellaportas, in the Southern District of NY Bankruptcy Court.  Please let me know if you ever made the following statements that Dellaportas attributes to you.  And please let me know if they are accurate.  Thank you.

- Andrew

In November 2019, Brian T. Cumings, Esq., who was Mr. Satija's counsel, told one of the Texas lawyers for the Creditor Group that:
- Mr. Herschmann called Mr. Satija directly to solicit a meeting;
- the two thereafter met, outside the presence of counsel, at an art gallery for a few hours to discuss a possible deal; and
- Mr. Satija returned from that meeting with a settlement agreement in principal.

Andrew R. Kurland
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Tel. (212) 506-3306
Fax. (212) 835-5254
AKurland@kasowitz.com

**From:** Brian T. Cumings [mailto:BCumings@gdhm.com]
**Sent:** Monday, April 5, 2021 6:31 PM
**To:** Andrew R. Kurland <AKurland@kasowitz.com>
**Subject:** Re: Dellaportas' claim

Andrew,

Each of those claims is untrue, as is any assertion that I made them to anyone.

Regards,

Brian Cumings

Sent from my iPhone

Exhibit L (highlighting added).

As set forth herein, just as the foregoing claim is a falsehood, each of Sagi's other claims in the motion to dismiss involving Herschmann are demonstrably false, and do not provide any justification for the dismissal of this proceeding.

**A.  Sagi's Claims Regarding Herschmann's $2 Million Loan**

A focus of Sagi in his motion to dismiss is Herschmann's $2 million loan to Orly (and her father, Arie Genger).  *See* MTD ¶¶ 28-33.  Herschmann made the loan in 2016, more than two and one-half years before Orly filed for bankruptcy and long before Dalia ever made her demand for $6,000,000 that precipitated this bankruptcy.  In his motion, Sagi falsely claims that Herschmann's $2 million loan to Orly (and her father) was part of a scheme to commit bankruptcy fraud because, according to Sagi, the promissory note pursuant to which Orly promises to repay Herschmann is "backdated," Orly "never directly received a single dollar in exchange for the promissory note[]," and the funds Herschmann loaned were used to pay KBT for legal services that were never intended to be paid at all because, according to Sagi, all or the majority of KBT's services were to be provided pro bono.  All of these are falsehoods.

Starting with contention regarding the nature of KBT's pro bono legal work, Sagi (even though he has long had, among other things, the relevant retainer agreements and billing records) completely mischaracterizes the billing arrangement the firm had with its own client and the scope of the pro bono aspects of its representation.  As explained in Section I.A, above, the $2 million that Herschmann loaned to Orly and Arie at the end of 2016 went towards Orly's then-outstanding balance owed to the firm for its work until that point.  That is an indisputable fact.  Of course, if the entire design of KBT's representation of Orly, as Sagi alleges, was to take money from Orly only to "round-trip" it back (in a bankruptcy filing that Orly would be forced to file years later), there would be no reason for the firm to have done pro bono work for Orly in

the first place.  This allegation, like Sagi's other claims, defies logic.  Of course, if someone

lends money and then gets repaid, they have had their money returned to them; that is not

nefarious.  But, using Sagi's logic, all loans that are repaid constitute "round-tripping" and are

improper.

Further, Sagi's entire "round-tripping" argument is nonsensical on its face.  According to

Sagi, Herschmann made the $2 million loan from his own separate assets to fabricate a debt to

Orly so that Herschmann could become a creditor in a bankruptcy she would be forced to file

years later, in which Herschmann would try to get his money paid back and used to support Orly.

Sagi's convoluted theory does not make sense, financial or otherwise.  Based on this argument,

Herschmann should have just kept his $2 million dollars in the first place and just use it to

support Orly whenever and however he wanted to.  Why would he go through all the legal

expense and aggravation that has transpired?  This is another subject of the pending Rule 9011

motion for sanctions the Court authorized Herschmann and the firm to file against Sagi and his

counsel.  ECF No. 411.

Sagi's other contentions regarding the loan are false too.

***Redacted pursuant to Section 3(e) of the
Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).***

*Redacted pursuant to Section 3(e) of the*
*Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).*

Sagi coyly claims in his motion to dismiss that "the existence of the 2017 Agreement was only accidentally revealed, when Sagi discovered a passing reference to it in *another document produced in discovery*."  (emphasis added) MTD ¶ 31.  Of course, Sagi knew exactly which "document produced in discovery" contained the reference (*i.e.* the promissory note), because he explicitly refers to and defines the Herschmann promissory note two paragraphs earlier in his motion to dismiss.  The necessity for this sleight-of-hand argument is clear: if the note was fraudulent as Sagi alleges, why would there need to be any escrow agreement at all?  (There wouldn't.)

That should be enough, but Sagi has even more proof that the note is not "backdated" – he has all of the emails, drafts, and testimony which provide the specifics of when and why Herschmann's loan was made and the various iterations of the documents that memorialize it. Ex. N.  He even has the native files and metadata showing all of the foregoing.[5]  Sagi knows that the $2 million from Herschmann was loaned at the end of the year (specifically the afternoon of Thursday, December 29, 2016, the day before the last business day of the year).  He also knows why the loan wasn't formally documented in writing until later.  Arie's counsel, who was away at the time the loan was made, returned from vacation a few weeks later, and sent his first draft

---

[5] While not in his motion to dismiss brief, in other submissions to the Court Sagi has attempted to make much of the email KBT produced in which Arie Genger states he executed the promissory note on or about December 26, 2016. Obviously Arie and his counsel Lance Harris erred in saying as much, concerning the promissory note was not even finalized until May 2017.  Sagi misleads the Court when he references this email, since he fails to mention that 30 minutes after Lance Harris and Arie Genger sent the erroneous message, they realized their mistake and corrected the record, confirming that the promissory note was not actually signed in December 2016.  *See* Ex. O.

of the promissory note to the KBT attorney representing Herschmann on January 24, 2017.[6]  *See*
Ex. N.

Additionally, as reflected in the emails that were produced to Sagi long ago, the delay
between the date of the loan and the final execution of the documentation memorializing it is
understandable and has been explained in full already.  There were *months* of contentious
negotiations and re-negotiations after the money was transferred, between Herschmann and his
counsel, on the one hand, and Lance Harris, the attorney representing borrowers Orly and Arie
Genger, on the other.  *See* Ex. N.  Through these renegotiations, Arie obtained better terms for
himself, to the detriment of Herschmann.  This is one of the primary reasons that Herschmann no
longer speaks with Arie.  *See* Ex. G (July 2, 2020 Herschmann Dep. Tr.) at 141:22 to 142:1.  If
anything, these negotiations through counsel prove beyond any possible doubt that the loan is
real and legitimate, as if it were not each side would not have had their own separate attorneys
negotiating and documenting the loan in furtherance of their own interests.

It matters not that the loan proceeds did not ever reach Orly's bank account, but rather
went directly to KBT to pay down Orly's then-outstanding balance due.  *See* MTD ¶ 32.
Herschmann did not agree to lend the money until the very end of the year.  The money had to
go to the law firm that day to satisfy her obligations.  No one (other than Sagi) claims that the
money was not sent as a loan.  Sagi also cites to no authority, because none exists, that the
money had to be re-routed through the borrower's accounts to make it a valid loan (and if Sagi
were right, even mortgages would not exist, considering the money a purchaser borrows to buy a

---

[6]  It is of no moment that the loan was not fully documented until months after the funds were actually transferred.
UCC Section 3-408, which governs the note, confirms that "no consideration is necessary for an instrument or
obligation thereon given in payment of or as security for an antecedent obligation of any kind."

home goes not to the purchaser, but to the seller of the home).  All parties involved in the note

(*i.e.*, Herschmann, Orly, and Arie) always agreed and intended that Herschmann would transfer

the loaned funds directly to KBT to go towards Orly's then-outstanding balance owed to the

firm.  And that is exactly what happened, and that is exactly how KBT accounted for it when the

wire arrived.  Exs. F and P.

Sagi also references certain agreements executed in connection with Orly's promissory

note to Herschmann, including the March 2017 escrow agreement and the so-called

"subordination agreement."  MTD ¶¶ 28, 31.  In the subordination agreement, Arie and Orly

agree that Orly's debt to Arie (defined as the "Subordinated Creditor") is subordinate to the $2

million loan from Herschmann (defined as the "Senior Creditor") to Orly and Arie (defined as

the "Senior Obligations").  Ex. Q.  That agreement, which was done at the advice of

Herschmann's counsel at KBT, was drafted to clarify that Orly's obligations to Arie were

subordinate to the obligations to Herschmann as set forth in the $2 million promissory note.  In

fact, on its face the subordination agreement has nothing to do with Sagi or any of his claims.  It

was an agreement between Orly, Arie and Herschmann.  Sagi's claim that the agreement affects

his rights is again devoid of any factual basis.  The subordination agreement also does not cause

the validity or enforceability of the promissory note to Herschmann to be called into question.  If

anything, it provides even more proof (as if more was needed) that the loan is real.

The March 2017 escrow agreement similarly does not affect the validity of the

promissory note to Herschmann.  That agreement makes clear that

*Redacted pursuant to Section 3(e) of the*
*Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).*

***Redacted pursuant to Section 3(e) of the
Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).***

Finally, Herschmann provided extensive testimony under oath at his deposition concerning all of the circumstances surrounding the $2 million loan and the negotiation and execution of the documentation that memorializes it.  All of his testimony, which is supported by the documents referenced herein, is unrebutted, and irrefutable.  *See* Ex. G (July 2, 2021 Herschmann Dep. Tr. at 94:7 to 142:10).

Sagi – recognizing that his argument about the $2 million dollar loan being bogus was falling apart – also attempts in his motion to fall back on yet another theory to try to support his argument: the $2 million loan is simply a "wealthy spouse paying his less-wealthy spouse's bills."  MTD at 14 n.4.  Yet again, this is just typical Sagi say-so.  It is not supported by anyone or anything.  The only witness who could support this latest made-up theory is Herschmann and he unequivocally has rejected it because it is and always was untrue.

**B.  Sagi's Claims Regarding Orly and Herschmann's Premarital Agreement**

Herschmann and Orly married in 2016.  Prior to their marriage, they entered into a premarital agreement, which they negotiated at arm's-length, each represented by separate counsel.  The agreement was upheld as valid by the District Court of Travis County, Texas, on October 24, 2016 (No. D-I-GN-16-004247) (almost three years before Orly filed for bankruptcy).  As Herschmann has made clear to the Court (*see, e.g.*, ECF No. 257), the premarital agreement between him and Orly unconditionally establishes that Orly's and

Herschmann's assets and liabilities are separate, and that Herschmann's assets are not available to satisfy any obligation or judgment against Orly.

Faced with the indisputable fact of the legitimacy of the premarital agreement and its legal effects, Sagi argues, based on nothing but his wishful thinking, that the premarital agreement actually supports his theories set forth in his motion to dismiss that Orly is hiding the $32.3 million (MTD ¶ 37), that the pre-marital agreement is "rooted in fraud" against Sagi and Dalia, and, at least until he changed his story (*see* Section I.A, *supra*), that KBT did its work for Orly on a pro bono basis.  MTD ¶ 34.  As the Court will see for itself when reviewing it, the premarital agreement provides no support for these contentions.  Exhibit I.[7]  In fact, paragraph 34(b) of the agreement explicitly refutes it.

Sagi's false allegation that the premarital supports his belief that Orly and Herschmann conspired to hide the $32.3 million is again belied by the record and simple common sense.  *See* MTD ¶ 37.  Herschmann is the party to the marriage who demanded the premarital agreement to be drafted in the first instance, and Herschmann was the plaintiff in the Texas court proceeding which resulted in the premarital agreement to be deemed fully valid and enforceable back in 2016, after Herschmann and Orly married.

***Redacted pursuant to Section 3(e) of the
Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).***

---

[7] A copy of the confidential agreement (as produced to Sagi and his counsel only) is attached as Exhibit I so that the Court can review it.

In any event, Orly's assets were irrelevant to Herschmann.  The premarital agreement was to protect Mr. Herschmann's assets in case of a divorce.  Sagi know this fact since he has made numerous filings discussing Herschmann's wealth.

*Redacted pursuant to Section 3(e) of the*
*Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).*

*Redacted pursuant to Section 3(e) of the
Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).*

***Redacted pursuant to Section 3(e) of the***
***Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).***

Ex. G (2020-07-02 Herschmann Dep. Tr.) at 204:14 to 207:9.

***Redacted pursuant to Section 3(e) of the***
***Confidentiality and Protective Order entered by the Court on June 10, 2020 (Dkt. 259).***

The premarital agreement accordingly provides no basis

whatsoever for dismissal of this bankruptcy.

### C. Sagi's Claims Regarding Home Ownership

Right at the top of his motion to dismiss Sagi argues, without citation, that Herschmann

and Orly "own a collection of multi-million-dollar homes around the world (Tel Aviv, Austin,

Miami Beach, Englewood, and Woodstock)."  MTD ¶ 10.  The reason why Sagi cites no source

for this assertion is because none exists, as it is not true.  The only real property Orly owns is her

one-half interest in a condominium apartment in Austin, TX which Herschmann gifted to her in

2016 after their marriage pursuant to the very premarital agreement that Sagi challenges.  Orly

disclosed her interest in this condominium in the Schedules submitted to the Court in connection

with her bankruptcy petition.  Of course, if the design of the premarital agreement was to defraud

Sagi and Dalia, why would Herschmann transfer any property to Orly in the first place?  She

owns no other real property, directly or indirectly.  Sagi knows this, and also knows, based on

documents that were produced to him long ago on an attorneys'-eyes only basis and testimony

provided by Herschmann, that Sagi's assertions about Herschmann's ownership of property are

also not accurate.  But even if they were, any and all of Herschmann's assets and property are

irrelevant to this bankruptcy proceeding.  It is undisputable – and already been upheld by a court

of competent jurisdiction – that Herschmann's assets are entirely separate from Orly's, and have

nothing to do with this bankruptcy proceeding.

Sagi also references the "Deed of Trust" that was filed in Texas on or about September

28, 2018.  MTD ¶ 36.  Sagi claims this document "purport[s] to conditionally transfer [Orly's]

residual rights to her fifty percent (50%) interest in the couple's [Texas condominium] to a trust

for the benefit of Mr. Herschmann."  *Id.*  Sagi is wrong.  First, contrary to what Sagi says, the

Deed of Trust does not "transfer" anything to Herschmann.  As the publicly recorded document

makes clear on its face, it is merely a ***contingent*** perfection of the lien that was originally created

pursuant to the promissory note from Orly to Herschmann in connection with the $2 million

loan.  Exhibit U.  Therefore, the Deed of Trust *has not caused the transfer of anything*; Orly's

interest in the Texas property continues to be hers to this day.  The Deed of Trust is subject to

various conditions that have not occurred yet and likely will never occur: namely, a final judicial

determination that homestead protection had been waived by both Orly and her husband.  *See id.*

Not only has this not happened, but no proceeding seeking to challenge the homestead protection

has even been commenced.[8]

Moreover, the perfection of the contingent lien pursuant to the Deed of Trust does not

affect valid previously recorded liens.  *See id.* ("This lien shall remain superior to liens later

created even if the time of payment of all or part of the note is extended or part of the property is

released.") (emphasis added). The Deed of Trust was filed in late September 2018, *after* Sagi

filed his purported abstract of judgment from the S.D.N.Y. action in Texas in (a failed) attempt

to create his own lien on the property.  Therefore, the Deed of Trust does not affect any of Sagi's

---

[8] Further, the Texas Constitution and the Texas Property Code prohibit the waiver of the homestead protection without the joinder of the spouse, which has not and will not occur here.  Tex. Const. Art. XVI Section 50(B) and Tex. Prop. Code Section 41.004.

claimed rights, and is not an indication of any bad faith on the part of Herschmann or Orly, let alone a reason that supports dismissal of the bankruptcy. Ironically, after Sagi was provided a copy of the $2 million promissory note that documents the loan Herschmann made and that authorized the Deed of Trust filing, Sagi used almost identical language in an agreement with Dalia that would have allowed her to demand a similar type of filing from Sagi. Clearly, Sagi and Dalia did not believe there was any issue when they included essentially verbatim protections as were contained in the note from Orly and Arie to Herschmann.

### D.  Sagi's Claims Regarding Herschmann's American Express Account

Sagi claims in paragraphs 10 and 29 of his motion to dismiss that Orly shares an American Express Centurion "Black Card" with Herschmann, and that Herschmann (and Orly) falsely denied this under oath. In support of this Sagi relies on certain of Herschmann's private account statements, which he surreptitiously subpoenaed (for which he was admonished by Magistrate Judge Freeman), and then misinterpreted. As stated above, Herschmann and Orly have no joint financial accounts, including credit cards, and never have had any such accounts. According to their premarital agreement, all of their assets and liabilities are, and are to remain, separate. Moreover, Sagi's fabrication about the joint American Express account was refuted by American Express itself, which confirmed that joint accounts of that type do not even exist. Ex. V ("there are no joint Centurion accounts.").

Contrary to what Sagi argues in his motion, both Orly and Herschmann testified accurately when they said that no such joint account existed. While for a period of time Orly did have use of an American Express card on Mr. Herschmann's account (the same way a parent can authorize a child to have a credit card on the parent's account), she no longer had the card at the time Mr. Dellaportas deposed her or the time when she answered Sagi's written interrogatories.

Therefore, no testimony was false.  Further, Sagi knows – including from the primary source of

Herschmann's American Express records themselves which Sagi subpoenaed – that Orly's

expenses on the card were essentially comprised of medical bills and household expenses like

groceries and items for their newborn child.

Herschmann also testified about this extensively at the deposition Sagi took of him in this

case, refuting all of Sagi's arguments concerning the nonexistent joint account.  Here are relevant

portions of the testimony:

> Q.   So, looking back to your -- the Centurion statement, and I think you said
> that it's not a jointly-owned account.  Is that correct?
>
> A.   That's not what I said.
>
> Q.   Maybe you could correct what you did say.
>
> A.   I said to you Centurion -- let me clarify it. You seem to point out
> continuously that Centurion says if you spend more than $250,000, you can
> get a Centurion card.  It doesn't work that way.  Centurion membership at
> American Express is only by invitation, all right.  It doesn't -- it's not a
> question of how much you spend.  You have to be invited to do it.  And
> they don't have joint ownership.  There is no such a thing as a joint
> Centurion account.  It does not exist. Does that answer your question?
>
> Q.   Sure.  So, would it be more accurate to characterize Ms. Genger as an
> additional cardholder on your account?
>
> A.   I don't know how it's more accurate to characterize her.  You've made
> allegations that I committed perjury by saying, and I don't remember the
> exact term I used, but you claimed it was a joint Centurion account, and
> you've made it multiple occasions.  There is no such a thing.  The card
> Orly has, and I don't know if you have children or not, Mr. Dellaportas, is
> the same type of card you can give to anyone over 13 years old.  They can
> charge on it.  You can block the charges.  I can see every single potential
> charge.  They have no access to information.  They don't see statements.
> They don't see anything.  They can't increase credit.  And it is not the
> traditional, what I would call, sharing of an account or joint account that I
> had with my first wife where we both had access to and available.  This
> was a very different arrangement.
>
> Q.   During this time period, did Ms. Genger have a physical card that said
> "Centurion" and had her name on it?
>
> MR. BOWEN:  Object to the form.
>
> A.   During -- during which time period?

Q.   The time period for which we've seen invoices reflecting charges by her on the same statement as charges by you.

MR. BOWEN:  Object to the form.

A.   No.  If you're talking about the ones that I've now produced today, I think the answer would be -- let me see if I can do this.  The answer may very well be -- looking at the Bates 398, my belief would be she probably had one in the beginning of October of 2018, and then I don't -- those other charges I don't believe she would have had a card.  Let me go to the next one, the one that is Bates 375 and 376, I think the answer to that would be she would not have had a card.  The answer to -- on Bates 408 and 409, she would not have had a card.  And on Bates 411 she would not have had a card.

So, on the four that you received today, I don't believe she would have had a physical card.

Q.   And at a certain point in time, did Orly stop having a Centurion card?

A.   Yes.

Q.   When was that?

A.   I don't remember when I took the card.  I just don't remember the time period.

I would say that in the last set of production, it is clear to me that I don't believe she had a physical card after, my guess would be, October of '18, somewhere in that period.

Ex. G (July 2, 2021 Herschmann Dep. Tr.) at 144:14 to 150:12.

Accordingly, Herschmann's American Express account, which is not and never was "jointly held" with Orly, provides no support for dismissal of the bankruptcy, and Sagi cannot argue otherwise.  In fact, Sagi has actually apologized for even making this argument in the first place.  At his deposition in this proceeding, Sagi admitted under oath that his claim concerning the nonexistent "joint" American Express account was "technically inaccurate" and that Herschmann's prior sworn statements denying the existence of any joint card were "technically accurate."  Sagi also "apologize[d]" for making the allegations about the supposed joint account, conceding that Herschmann stated correctly that he and Orly do not have "joint ownership of the

Centurion card[.]"  Ex. W Sagi Dep Tr. at 264:5-19; 263:14-15; 68:13-14; 68:25 to 69:3.  This is just another indication why the motion to dismiss should be denied.

## CONCLUSION

Notice of this joinder and opposition to motion to dismiss has been provided by electronic means through the Court's ECF system to:  (i) Sagi Genger; (ii) Orly Genger; (iii) the Chapter 7 Trustee; (iv) any such other party entitled to notice pursuant to Local Bankruptcy Rule for the United States Bankruptcy Court for the Southern District of New York 9013-1(b).  In light of the relief requested, KBT and Herschmann respectfully submit that no further notice is necessary.  Additionally, no prior request for the relief sought herein has been made by KBT or Herschmann to this or any other court.

Therefore, for the foregoing reasons and those stated in the oppositions to the amended motion to dismiss filed today by all other interested parties, including Orly, the Broser parties, and the Chapter 7 trustee, KBT and Herschmann respectfully submit that Sagi's amended motion to dismiss should be denied in its entirety, they should be awarded their attorneys' fees in having to address Sagi's frivolous motion, and the case should be allowed to proceed.

Dated:  June 1, 2021

KASOWITZ BENSON TORRES LLP

By:/s/ Andrew R. Kurland
Andrew R. Kurland
1633 Broadway
New York, NY 10019
(212) 506-1700
AKurland@kasowitz.com

ERIC HERSCHMANN, individually

By:  /s/ Eric D. Herschmann
Eric D. Herschmann
210 Lavaca Street, #1903
Austin TX  78701
EDHNoice@gmail.com