Paul J. Labov, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Email:  plabov@pszjlaw.com

*Counsel to Dalia Genger*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

| | |
|---|---|
| **In re** : | |
| : | **Chapter 7** |
| **ORLY GENGER,** : | |
| : | **Case No.: 19-13895 (JLG)** |
| **Debtor.** : | |
| : | |

-------------------------------------------------------------X

**JOINDER OF DALIA GENGER TO THE**
**VARIOUS OBJECTIONS TO THE CHAPTER 7 TRUSTEE'S**
**MOTION FOR AN ORDER PURSUANT TO RULE 9019 OF THE**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) APPROVING**
**SETTLEMENT AGREEMENT AND (B) GRANTING RELATED RELIEF**

Dalia Genger ("Mrs. Genger"), by and through her undersigned counsel, hereby submits

this joinder to the: (1) *Objection and Cross Motion of Sagi Genger and TPR to the Chapter 7*

*Trustee's Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy*

*Procedure (A) Approving the Settlement Agreement, and (B) Granting Related Relief* (the "Sagi

Objection") [Docket No. 490], and (2) *Objection of the Orly Genger Trust, by its Trustee Michael*

*Oldner, to the Chapter 7 Trustee's Motion to Approve Settlement* (the "Orly Genger Trust

Objection" and with the Sagi Objection, the "Objections") [Dkt. No. 491] as more fully set forth

below.

DOCS_NY:43672.3 30398/001

## PRELIMINARY STATEMENT

1.      The Settlement Agreement[1] represents the final step in the Settling Parties' plan to defraud the Debtor's rightful and legitimate creditors of payment on their claims.  Mrs. Genger continues to be one of their victims, as she has been since the end of her marriage to Arie Genger.

2.      In fashioning a divorce decree and the attendant equitable distribution of property, Arie Genger first indicated that the couple's TRI shares (the same shares at issue in this bankruptcy proceeding) were largely worthless because they were encumbered by a $30 million claim on behalf of a creditor of TRI.  This assertion turned out to be false.  *See* Decision by E. Leo Milonas, Arbitrator at pp. 7-8 and 11 ("Although the value of TPR was listed on Schedule II(1) as 'Unknown,' that valuation was a direct result of the 'Unknown' personal contingent liability of $30M as a result of the Bogalusa litigation. That listing was there for a reason and it was clearly wrong, and skewed the numbers significantly.")  A copy of this decision is attached hereto as **Exhibit "A"**.  The Settlement Agreement is just the latest machination by the Settling Parties to ensure that Mrs. Genger never receives any of the proceeds of the TRI shares that were transferred to the Orly Genger Trust (the "OG Trust") as part of the consideration of Mrs. Genger's divorce.

3.      By way of the Settlement Agreement, the Debtor has found an ally in the chapter 7 trustee (the "Trustee"), who has used her office to sanction the pervasive fraud committed by members of the Settling Parties.  Should the Settlement Agreement be approved – and we pray that it is not – the Settling Parties will have wrestled away over $32 million in proceeds (not including the value of the Debtor's interest in an apartment she jointly owns with her husband), $12.35 million of which was found to be a direct result of Mrs. Genger's "conveyed marital interest

---

[1] Capitalized terms not defined herein shall have the same meaning ascribed to them in the Settlement Motion or as otherwise indicated.

of 794.4 shares," which came in exchange for the Debtor's promise to use the proceeds from the

monetization of those shares if requested by Mrs. Genger. *Genger v. Genger*, 2018 WL 3632521,

*7 n.5 (S.D.N.Y. July 27, 2018), *aff'd*, 771 Fed.Appx. 99 (2d Cir. June 28, 2019).

4.      Even prior to this ruling, once the District Court (and later the Second Circuit) had

made clear the scope of the Debtor's potential liability to her mother from the proceeds of the

monetization of the TRI shares, the Settling Parties embarked on a series of transactions designed

to ensure that the Debtor was judgment proof.  These actions have all been introduced to this Court

by way of the submissions and testimony in respect of Sagi Genger's Motion to Dismiss the

Chapter 7 Case (the "Motion to Dismiss"), including, *inter alia*, (i) inventing ten non-existent

promissory notes which the Debtor falsely testified to having executed in favor of her father

annually starting in 2007, (ii) back-dating promissory notes to the Debtor's husband and father so

they could "jump the line" ahead of legitimate creditors, and (iii) making false and otherwise

misleading oaths regarding the Debtor's obligations under various documents.

5.      Rather than discharging her fiduciary duty to protect the Estate's legitimate

creditors, the Trustee has instead facilitated this scheme.  To be sure, the Trustee does not say that

the causes of action asserted by Mrs. Genger or even the proceeds from the TRI shares belong to

the Estate – in fact, discovery reveals that the Trustee does not believe this to be true – instead, the

Trustee relies on a long history of litigation to seemingly throw her hands up and suggest that the

Settlement Agreement is the best anyone can hope for in what amounts to a complicated family

dispute.  Notwithstanding her abandonment of $15 million in remaining Trump Proceeds (the

"Trump Notes") for the Estate, the Trustee seeks to ensure that no other party could seek to collect

from the proceeds of the Trump Notes.  Discovery has revealed the inescapable conclusion the

Trustee has abdicated her responsibility in favor of the Settling Parties in exchange for just

$300,000 in non-refundable consideration.  For this reason alone, the Trustee's business judgment must not be sanctioned and the Settlement Agreement must not be approved.

6.      The Settlement Agreement itself calls for (i) a permanent injunction against direct claims and direct actions – the effect of which would be to grant the Settling Parties impermissible, non-consensual, third-party releases, (ii) an injunction to prevent the prosecution of non-dischargeability complaints – which the Trustee has no standing to enjoin, and (iii) the quitclaim sale of certain causes of action to the Debtor's insiders.  As more fully set forth below, these elements of the Settlement Agreement are entirely inappropriate and unlawful, and the terms of the settlement fall well below the lowest point of reasonableness, and for these additional reasons, the Settlement Agreement should not be approved.

## LEGAL ARGUMENTS

7.      The Objections collectively make several legal arguments, including: (i) the claims being enjoined are direct claims of the claimants, not derivative claims of the Estate, and therefore, the Court does not have the ability to enjoin such claims in this chapter 7 case.  *See Orly Genger Trust Objection Argument at Sections I and II.*   Moreover, the Settlement Agreement's injunction provisions would effectively result in non-consensual third-party releases unjustified under the facts and the law.  *See, Orly Genger Trust Objection Argument at Section III* and *Sagi Objection at ¶¶ 54-66* (generally), (ii) the non-dischargeability complaints cannot be enjoined as a result of an agreement by the Trustee**.**  *See, Sagi Objection at ¶¶ 61-66*, and (iii) the Settlement Agreement falls below the lowest point of reasonableness *See, Sagi Objection Argument at Section A.*  With respect to the claim sale portion of the Trustee's Motion – putting aside the legality of the Trustee's decision to do so - should this Court allow the Trustee to quitclaim the Estate's interest,

if any, in the enumerated causes of action, Mrs. Genger does not object to such sale so long as all her defenses are preserved and are not in any way curtailed by the Settlement Agreement.

8.      As more fully set forth below, Mrs. Genger adopts the legal arguments to the extent applicable and not inconsistent with her claim of a constructive trust in and/or an equitable lien on $17.3 million transferred to ADBG and the $15 million in Trump Proceeds.  In establishing the facts in tandem with the legal arguments made herein, Mrs. Genger relies on the statements made in her *Amended Complaint Seeking Declaratory Judgement* recognizing a constructive trust and/or equitable lien, found at Adv. Pro. No. 20-01010 (JLG) [Dkt. No. 8] (the "Constructive Trust Complaint") and in her *Opposition to Various Motions to Dismiss* [Dkt. No. 39] (the "Opposition").

## A.    The Trustee Impermissibly Seeks to Permanently Enjoin Claims

9.      Mrs. Genger adopts the legal arguments contained in the *Orly Genger Trust Objection Argument at Sections I and II*.  The Trustee has sought to permanently enjoin Mrs. Genger's direct claims against the Settling Parties in connection with the Constructive Trust Complaint and the Discharge Complaint.  Both complaints assert causes of action that Mrs. Genger holds directly, and which are brought against several of the Settling Parties on account of their actions to defraud her.  Notably, the Constructive Trust Complaint alleges that once the District Court (and eventually the Second Circuit) determined that the Debtor owed Mrs. Genger $12 million from the monetization of the TRI shares – the Settling Parties embarked on a series of transactions designed to ensure that Mrs. Genger would never realize any of those proceeds.  *See In re Howard's Appliance Corp*., 874 F.2d 88 (2nd Cir. 1989) ("Where the debtor's conduct gives rise to the imposition of a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to re-convey it to the rightful owner, the Estate will generally hold the

property subject to the same restrictions." (internal quotation marks omitted).   As such, the

proceeds are not part of the bankruptcy Estate. *See U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205

n.10 (1983) ("Congress plainly excluded property of others held by the debtor in trust at the time

of the filing of the petition").

10.     Here, the Debtor's dissipation of the Disputed Trump Settlement Proceeds through

Arie Genger's bogus promissory notes and Eric Herschmann's back-dated promissory note, along

with various machinations of ADBG documents purporting to encumber those proceeds and

obligate the Debtor to ADBG, were all directly intended to harm Mrs. Genger, not the Debtor.

Accordingly, Mrs. Genger's claims **against** the Settling Parties for a constructive trust and/or an

equitable lien are **direct** as to herself; they are **not asserted** on behalf of the Debtor - as would be

required to fit into the definition of a claim "derivative" of the Estate.

11.     Moreover, the Trustee does not even allege that either the proceeds of the TRI

shares or the cause of action for Constructive Trust/Equitable Lien belong to the Estate – and for

good reason.  In almost a 90-page Settlement Motion, the Trustee does not once take the position

that the proceeds from the TRI shares or the various causes of action asserted **against** the Settling

Parties are property of the Estate.  Instead, the Trustee simply states that the claims brought by

Mrs. Genger are "derivative" or "duplicative."  For the reasons stated above and also in the Orly

Genger Trust Objection, this is simply not true – and although the Trustee attempts to twist the

law by attempting to bring settlement proceeds into the Estate, in actuality, the Estate's creditors

have roundly rejected this Settlement and see it for what it is – a way to insulate the Settling Parties

from further litigation while allowing them to convert $32 million.

12.     The Trustee's own language belies the fact that she does not believe the various

claims by Mrs. Genger and the OG Trust to be Estate property, as she has taken only "informal"

steps to determine the ownership of the proceeds.  Far from seeking to intervene as the real party-in-interest in Mrs. Genger's Constructive Trust action (which the Trustee would have the right to do if the claim belonged to the estate), she simply filed a motion to dismiss labeling the complaint "frivolous."  Indeed, it has been already been adjudicated that the TRI shares were distributed to the OG Trust in 2004 in exchange for her daughter's express commitment to pay her mother the proceeds from those shares upon request.  Consequently, as the District Court explained, "rescission … would not serve the interests of equity …, as doing so would enable Orly to obtain her benefit from the agreement (the $32.3 million she received for the beneficial interest in the TRI shares) while escaping her obligations under it (<u>her commitment to financially support her mother</u>)." *Genger v. Genger,* 76 F.Supp.3d 488, 501 (S.D.N.Y. 2015), *aff'd,* 663 Fed.Appx. 44 (2d Cir. Sept. 29, 2016) (emphasis added).

13.    **<u>Notably, the Trustee never disputes that the TRI shares at issue were deposited into the OG Trust</u>**.  Given the foregoing ruling, such an argument would not be possible.  Further, to the extent Mrs. Genger is successful in recovering on the Constructive Trust Complaint, any recovery would not go to the Debtor but to Mrs. Genger on her constructive trust/equitable lien on the proceeds of the TRI shares.  Regardless of the outcome, the claims at issue do not belong to the Estate, are not duplicative of Estate claims, and are not derivative of any claim the Estate could bring.  Mrs. Genger's harm was particular to Mrs. Genger.  Moreover, the Debtor was not harmed and, instead, it is the Settling Parties that caused harm to Mrs. Genger.  Such action should not be sanctioned by providing the Settling Parties with an injunction (and resulting release, as more fully described below) – which would allow them to complete the conversion of the proceeds of the TRI shares to Mrs. Genger's detriment.

**B.  The Trustee Has Failed to Meet the Standards for Unilaterally
Extinguishing Mrs. Genger's Claims against the Debtor or for
Obtaining a Non-Consensual Third Party Release**

14.     Mrs. Genger adopts the legal arguments set forth in the Objections regarding non-consensual third-party releases.  Through the permanent injunction, the Trustee is providing the Settling Parties with a non-consensual, third party release of Mrs. Genger's direct claims against them – all without providing Mrs. Genger with any due process.  This is entirely inappropriate in the chapter 7 setting.  *See Sagi Objection at ¶¶ 54-60.*

15.     Granting these releases, while also allowing the Settling Parties to realize and retain the full benefit of the remaining $15 million in Trump Notes, unfettered by Mrs. Genger's rightful claims, will effectively eviscerate Mrs. Genger's ability to realize any recovery in relation to what the District Court held to be her express "her commitment to financially support her mother." Inexplicably, the Trustee is attempting to obtain these releases (through the injunction) using a lesser standard (lowest point in the range of reasonableness) than would be required in getting releases approved in the chapter 11 context[2].  Mrs. Genger is receiving no consideration for this release and has not consented.  In short, the Trustee is attempting to quash Mrs. Genger's due process rights by not allowing her to adjudicate her direct claims and leaving her without recourse to either the Trump Proceeds or the Settling Parties.

---

[2] As more fully set forth in the Orly Genger Trust Objection, *Metromedia* instructs that third-party releases are granted only in rare circumstances – and allows such releases only where a court finds that such releases are important to the plan of reorganization.  *In re Metromedia Fiber Network Inc.*, 417 F.3d 136, 143 (2d Cir. 2005). At a minimum, the injunction must "play[] an important part in the debtor's reorganization plan." *SEC v. Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992).  Here, there is no plan as this is a chapter 7 case and the Trustee has cited no authority approving a third-party release in chapter 7.

8

**C.    The Settlement Violates Mrs. Genger's Due Process Rights and
Contravenes Prior Rulings.**

16.    The Trustee's position in seeking to enjoin various claims is patently antithetical to fundamental due process and policy concerns.   Namely, the injunction proposed under the Settlement (the "Permanent Injunction") would, effectively, (i) dismiss the Constructive Trust and Discharge Actions, (ii) release or disallow Mrs. Genger's claims against the Debtor and the other Defendants, and (iii) grant a broad discharge to the Debtor (notwithstanding the various objections to the Debtor's discharge), all without any trial or other substantive adjudication of the merits of those claims.   Notwithstanding the broad sweep of the Settlement, Mrs. Genger is not a party to, or beneficiary of, the Trustee's Settlement, and thus her claims may not simply be wiped away because the Trustee is seeking to jam through an unfair and unreasonable settlement.

17.    Further, the Trustee seeks to effectively eliminate not only the Dalia Constructive Trust and Discharge Action, but also the various findings and orders (all adverse to the Debtor and/or establishing certain important facts) of the District Court and Second Circuit Court of Appeals in proceedings involving Dalia and the Debtor (the "Prior Rulings").   *See Plaintiff Dalia Genger's Memorandum of Law in Opposition to Motions to Dismiss Amended Complaint and in Support of Cross-Motion for Summary Judgment*, Docket No. 39 in Dalia Discharge Objection, Adv. Proc. No. 20-1010 (discussing Prior Rulings).   *See generally KeyBank N.A. v. Franklin Advisers, Inc*., 616 B.R. 14, 30 (Bankr. S.D. N.Y. 2020) (Judge M. Wiles) ("A 'collateral attack' is an attack on an order that is made in a proceeding (other than a direct appeal) that is different from the proceeding in which the order was entered and that seeks to undo or nullify the order itself.").   The Prior Rulings have preclusive/estoppel effect.   The Trustee cannot simply wipe away the Prior Rulings through a settlement to which Dalia is not even a party.

**D.     Mrs. Genger's Objection to Dischargeability Cannot be Enjoined.**

18.     Mrs. Genger adopts the legal arguments contained in paragraphs 61 to 66 in the

Sagi Objection.  The Trustee seeks to enjoin Mrs. Genger's Discharge Complaint; the Debtor's

discharge is a bedrock term of the Settlement Agreement.  For the reasons stated above and the

legal arguments set forth in the Sagi Objection, the Trustee has no standing to even bring, let alone

enjoin or cause the dismissal of, the Discharge Complaint.

19.     The allegations set forth in the Discharge Complaint establish by a preponderance

of the evidence that the Settling Parties acted to harm Mrs. Genger.  Thus, the Debtor should not

receive a discharge as pled in counts 1-4 of the Discharge Complaint.  Alternatively, and because

the Trustee is sanctioning the Settling Parties' illicit behavior, the debt due and owing to Mrs.

Genger should not be discharged as set forth in counts 5-8 of the Discharge Complaint.

20.     There is no dispute that the debt to Mrs. Genger arose in connection with her 2004

divorce agreement and as such, is in the nature of a domestic support obligation. *Genger,* 76

F.Supp.3d at 491 ("As part of the divorce, Dalia agreed to convey her marital rights to 794.40

shares of TRI to **trusts** benefiting Sagi and Orly …" in exchange for her continued support and

waiver of traditional alimony)(emphasis added).

21.     Further, the Settling Parties' attempt to enjoin this claim is entirely inconsistent

with the Debtor's attempt to have a Federal Court abstain from hearing any issues related to the

TRI shares on the basis of the "Domestic Relations Exception." According to the Debtor, the

Domestic Relations Exception"…bars a Federal Court from hearing cases which 'seek the granting

or modification of a divorce or alimony decree.'" (citations omitted).  *See* Memorandum of Law

in Support of Orly Genger's Motion to Dismiss, [Dkt. No. 11] at page 5.  11 Civ. 5602.

Importantly, in that case, the Debtor averred that with respect to the TRI shares, the Domestic

Relations Exception requires that the Federal Court abstain from hearing the case, writing that "**resolving competing claims to the [TRI Proceeds] will necessarily require resolution of claims seeking reformation of the Equitable Distribution Order entered in the Divorce Action.**" (emphasis added) Id.  Given that the Debtor has admitted that the TRI Proceeds are a direct result of Mrs. Genger's marital rights and part and parcel of Mrs. Genger's Equitable Distribution Order, she should not be allowed now to seek an injunction from a Federal Court – much less Federal Court protection for her conversion of the proceeds of the TRI shares.

**E.      Mrs. Genger Must Be Allowed to Maintain Her Defenses and Counterclaims in Connection with Any Sale of Estate Claims**

22.      As noted above, Mrs. Genger relies on the legal arguments made, and facts set forth in the Objections as they pertain to the Trustee's ability to sell "Estate" claims.  Nevertheless, should the Court allow the Trustee to sell such claims – or more particularly –whatever interest the Estate has in those claims, it would be patently unfair that anything contained in the Settlement Agreement could be used to (i) impair, curtail, or otherwise diminish Mrs. Genger's ability to defend herself in any of those actions, or (ii) prevent Mrs. Genger from filing any counterclaim or take any other action relative to any particular litigation.

## CONCLUSION

For the reasons stated herein and in the Objections, Mrs. Genger respectfully requests that the Court enter an Order (a) denying the Settlement Motion, and (b) granting such other and further relief as is just and proper.

Dated: July 16, 2021              PACHULSKI STANG ZIEHL & JONES LLP

                                          _/s/ Paul J. Labov_____
                                          Paul J. Labov, Esq.
                                          PACHULSKI STANG ZIEHL & JONES LLP
                                          780 Third Avenue, 34th Floor

New York, New York 10017
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Email: plabov@pszjlaw.com

*Counsel to Dalia Genger*

# EXHIBIT A

William B. Wachtel
Elliot Silverman
WACHTEL & MASYR, LLP
1 Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017
Telephone:  (212) 909-9500
wachtel@wmllp.com
esilverman@wmllp.com

Attorneys for Defendant
Orly Genger

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PEDOWITZ & MEISTER LLP,<br><br>                              Plaintiff,<br><br>                    v.<br><br>TPR INVESTMENT ASSOCIATES, INC.,<br>GLENCLOVA INVESTMENT CO., TR<br>INVESTORS, LLC, NEW TR EQUITY I, LLC,<br>NEW TR EQUITY II, LLC, DALIA GENGER, AS<br>TRUSTEE OF THE ORLY GENGER 1993 TRUST,<br>AND ORLY GENGER,<br><br>                              Defendants | 11 Civ. 5602 (JFK) |

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANT**
**ORLY GENGER'S MOTION TO**
**DISMISS OR STAY THIS ACTION**

## PRELIMINARY STATEMENT

This statutory interpleader action seeks to bring before this Court an intra-family dispute which is already pending before Justice Feinman of the Supreme Court, New York County, in an action (the "State Case") which has been pending for nearly 15 months. All of the parties to this case (except for the plaintiff stakeholder) are already parties to the State Case; all of the potential claims to the interpleaded fund are already being litigated in the State Case. Litigating those claims in this Court will be duplicative and wasteful.

Moreover, to resolve those claims, the state court will have to construe the terms of a final judgment of divorce, including an equitable distribution order, and will have to resolve claims seeking to reform that equitable distribution order. Accordingly, this Court lacks subject-matter jurisdiction over this action under the Domestic Relations Exception to this Court's diversity jurisdiction. (Point I, *infra*).

Alternatively, even if this Court had subject-matter jurisdiction of this action, it should abstain from exercising that jurisdiction, because all of the parties and claims involved in this action are already before Justice Feinman in the State Case. (Point II, *infra*).

## STATEMENT OF FACTS

The following statement of facts is drawn largely from the pleadings in the case of *Arie Genger et al. v. Sagi Genger, et al.*, Index no. 651089/2010, pending in the Supreme Court, New York County, before Justice Paul G. Feinman (the "State Case"), and from certain related cases. The cited pleadings are annexed as exhibits to the Declaration of Elliot Silverman, submitted herewith.

### The Shares of TRI and TPR

Co-defendant Arie Genger ("Arie") is plaintiff in the State Case and the father of moving defendant Orly Genger ("Orly") (also a plaintiff in the State Case) and the ex-husband of co-defendant Dalia Genger ("Dalia") (a defendant in the State Case). (Silverman Dec., Ex. 1, ¶¶1, 2, 6). Arie is the founder of Trans-Resources, Inc. ("TRI")

1

a closely held Delaware Corporation which is one of the world's leading manufacturers of agricultural fertilizers. (*Id.* ¶¶9, 18, 21)

Arie founded TRI in 1985. Until 2001, TRI was wholly-owned by TPR Investment Associates, Inc. ("TPR"), another Delaware corporation which is a defendant both in this action and in the State Case. (Silverman Dec., Ex. 1, ¶¶4, 22). Until 2004, TPR was majority-owned by Arie, and the remaining stock of TPR was controlled indirectly by Dalia and by trusts for Arie's two children, Orly and Sagi. (*Id.* ¶¶23-26).

In 2001, a group of investors known as the Trump Group bought a minority stake in TRI, through co-defendants Glencova Investment Co. ("Glencova") and TR Investors, LLC ("TR Investors"). (Silverman Dec., Ex. 1, ¶¶9-17, 27). Glencova, TR Investors and their shareholders (the Trump Group) are all defendants in the State Case. (*Id.*)

### The Stockholders Agreement

Even after the Trump Group invested in TRI, Arie continued to control TRI through his majority ownership of TPR, which in turn was the majority owner of TRI. (Silverman Dec., Ex. A, ¶28). Arie and the Trump Group entered into a Stockholders Agreement dated March 30, 2001, which provided that TPR's majority interest in TRI could not be transferred during Arie's lifetime except to certain permitted transferees. (*Id.* ¶¶29-31). The Stockholders Agreement was designed to insure that Arie would control TRI during his lifetime. (*Id.*)

### The Divorce Action and the
### Equitable Distribution Order

In 2002, Arie and Dalia became embroiled in a contentious divorce action in Supreme Court, New York County (the "Divorce Action"). (Silverman Dec., Ex. 1, ¶32). In 2004, the Divorce Action was settled by a court-ordered Stipulation of Settlement, which equitably distributed marital property between Arie and Dalia (the "Equitable Distribution Order"). (*Id.* ¶33). Pursuant to the Equitable Distribution Order, Arie transferred his 51% interest in TPR to Dalia, and TPR transferred its stock ownership in

TRI to Arie and to trusts for the benefit of Arie's and Dalia's children, Orly and Sagi. (*Id.* ¶¶34-37).

The Equitable Distribution Order contains an express reformation clause, permitting the court to reform the Equitable Distribution Order if any part of it were ever voided by any court of competent jurisdiction. (Silverman Dec., Ex. 1, ¶38). The transfer of shares of TRI and TPR directed by the Equitable Distribution Order was carried out in 2004 (*id.* ¶48), and the transfers were reflected in the books and records of TRI (*id.* ¶62).

### The Delaware Litigation

In 2008, the Trump Group contended that the transfers of TRI shares pursuant to the Equitable Distribution Order violated the TRI Shareholders Agreement, and that this violation gave the Trump Group the right to buy all of those shares of TRI. (Silverman Dec., Ex. 1, ¶¶103, 105). Glencova filed an action in this Court, *Glencova Inv. Co. v. Trans-Resources, Inc.,* 08 Civ. 7140 (JFK) seeking to void the transfers of TRI shares made pursuant to the Equitable Distribution Order. (Silverman Dec., Ex. 1, ¶106; *id.,* Ex. 2). That lawsuit did not name Arie, Dalia, Sagi or Orly (or the trusts for the benefit of Orly and Sagi) as parties. (*Id.,* Ex. 2). Arie later intervened in that action, but Orly and her trust are not (and never have been) parties to it.

Shortly thereafter, the Trump Group purported to purchase the shares of TRI, including the shares which had been transferred to Orly's trust under the Equitable Distribution Order (the "Orly Shares"), from TPR (then controlled by Sagi) (Silverman Dec., Ex. 1, ¶¶114-31), and they also commenced an *in rem* action in the Delaware Court of Chancery seeking a determination that they controlled TRI. (*Id.,* Ex. 1, ¶143; *id.,* Ex. 3). Eventually, that court ruled that the transfers of TRI shares made pursuant to the Equitable Distribution Order were void and that the Trump Group had the right to purchase all of those shares. (*Id.,* Ex. 1, ¶¶146, 156-58).

### The State Case

While the Delaware litigation was pending, Arie and Orly commenced an action in Supreme Court, New York County (the "State Case"), against TPR, the Trump Group, Dalia, Sagi and others, seeking, *inter alia,* to enjoin the sale of the Orly Shares to the Trump Group. *Arie Genger, et al. v. Sagi Genger, et. al.,* Index No. 651089/2010 (Supreme Court, New York County). (Silverman Dec., Ex. 4).

On February 17, 2011, the Supreme Court, New York County (Feinman, J.) entered a preliminary injunction in the State Case, freezing the proceeds of the purported sale by TPR to the Trump Group of the TRI shares in which Arie claimed a beneficial interest. (Silverman Dec., Ex. 5).

### The Escrow Agreement

Meanwhile, Orly and the Trump Group entered into an escrow agreement providing for the law firm of Pedowitz & Meister, counsel for Dalia, to hold in escrow the proceeds of the purported sale by TPR to the Trump Group of the Orly Shares, pending Arie's appeal to the Supreme Court of Delaware from the decision of the Delaware Court of Chancery. (Silverman Dec., Ex 6).

### The Delaware Supreme Court Decision

On July 18, 2011, the Delaware Supreme Court affirmed in part and reversed in part the decision of the Delaware Chancery Court. (Silverman Dec., Ex. 7). Specifically, the Delaware Supreme Court held that the Delaware Court of Chancery had no jurisdiction to adjudicate the beneficial ownership of the TRI shares purportedly sold by TPR to the Trump Group, including the Orly Shares. (*Id.,* pp. 34-44).

As a result of the Delaware Supreme Court's ruling, Pedowitz & Meister commenced this interpleader action in this Court, seeking to have Orly and the Trump Group litigate their entitlement to the escrowed proceeds.

Arie and Orly have a filed Third Amended Complaint in the State Case (Silverman Dec., Ex. 1), seeking, *inter alia,* reformation of the Equitable Distribution Order. (*Id.,* ¶¶174-189). That Third Amended Complaint also seeks to recover for Orly

6720-72000\1061665.1

the funds which were interpleaded in this case.  (*Id.* ¶¶223-224, 232-241).  All of the parties to this case (except for plaintiff Pedowitz & Meister) are parties to the State Case. (*Id.*).

## ARGUMENT

**I.    THIS COURT HAS NO SUBJECT-MATTER JURISDICTION OVER THIS ACTION UNDER THE DOMESTIC RELATIONS EXCEPTION**

As the foregoing statement of facts makes clear, the claims which plaintiff seeks to bring before this Court necessarily involve the construction of the Equitable Distribution Order and claims seeking reformation of that order.  Under the Domestic Relations Exception to this Court's diversity jurisdiction, this Court lacks subject-matter jurisdiction over this suit.

Long ago, the United States Supreme Court recognized that "the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States, and not to the laws of the United States." *Elk Grove Unified School District v. Newdow,* 542 U.S. 1, 12 (2004) (quoting *In re Burrus,* 136 U.S. 586, 593-94 (1890)). *Accord, McKnight v. Middleton,* 699 F. Supp.2d 507, 516 (E.D.N.Y. 2010).  Therefore, the Supreme Court has "recognized a 'domestic relations exception' that divests the federal courts of power to issue divorce, alimony and child custody decrees." *Elk Grove,* 524 U.S. at 12 (quoting *Ankenbrandt v. Richards,* 504 U.S. 689, 703 (1992)).

The Domestic Relations Exception also bars a federal court from hearing cases which "seek the granting or modification of a divorce or alimony decree." *Ankenbrandt,* 504 U.S. at 701-702; *McKnight,* 699 F. Supp.2d at 517.  That is precisely this case: resolving the competing claims to the interpleaded funds will necessarily require resolution of claims seeking reformation of the Equitable Distribution Order entered in the Divorce Action.

Alternatively, even if this Court were to find that it had jurisdiction of the subject-matter of this action, it should abstain from exercising that jurisdiction.  The Supreme

Court has held that it is "appropriate for the federal courts to decline to hear a case involving 'elements of the domestic relationship,' even when divorce, alimony, or child custody is not strictly at issue." *Elk Grove,* 542 U.S. at 13 (quoting *Ankenbrandt,* 504 U.S. at 705). "A federal court presented with matrimonial issues or issues 'on the verge' of being matrimonial in nature should abstain from exercising jurisdiction so long as there is no obstacle to their full and fair determination in state courts." *American Airlines v. Block,* 905 F.2d 12, 14 (2d Cir. 1990) (citations omitted).

"[E]ven if subject matter jurisdiction lies over a particular matrimonial action, federal courts may properly abstain from adjudicating such actions in view of the greater interest and expertise of state courts in the field." *American Airlines,* 905 F.2d at 14. This rule is "based upon a policy consideration that the states have traditionally adjudicated matrimonial and child custody disputes and therefore have developed competence and expertise in adjudicating such matters, which federal courts lack." *McKnight v Middleton,* 699 F. Supp.2d 507, 517 (E.D.N.Y. 2010) (citation omitted).

"[I]n general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts." *Elk Grove,* 542 U.S. at 13. Such deference is especially appropriate here, where this case will not only require the Court to adjudicate claims seeking a modification of the Equitable Distribution Order entered in the Divorce Action, but where the parties have already been litigating those claims for more than a year in the previously-filed State Case. (*See also* Point II, *infra*).

For these reasons, the Court should dismiss this action for lack of subject-matter jurisdiction.

## II.    THIS COURT SHOULD ABSTAIN FROM HEARING THIS CASE IN FAVOR OF THE PENDING NEW YORK STATE LITIGATION

Even if this Court has subject-matter jurisdiction over this case (*but see* Point I, *supra*), it should decline to exercise that jurisdiction. The dispute which plaintiff asks this Court to decide is already the subject of a case which has been pending for nearly 15 months before Justice Feinman of the Supreme Court, New York County. All of the

6720-72000\1061665.1

parties named in the federal complaint as potential claimants to the interpleaded fund are already parties to the State Case; all of their potential claims are already being litigated in that case. Litigating this case before this Court will merely burden the Court and the parties with an additional, and completely unnecessary, lawsuit.

It is of course true that the mere pendency of parallel litigation in state court does not ordinarily oust a federal court of jurisdiction. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 284 (1995) (citation omitted). But it is equally true that a federal district court "is under no compulsion to exercise that jurisdiction," *id.,* where abstaining from exercising jurisdiction will result in "avoiding duplicative litigation" and will promote "the efficient administration of judicial resources." *NYLife Distributors, Inc. v. Adherence Group,* 72 F.3d 371, 376 (3d Cir. 1996) (citing *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 818 (1976)).

In a typical lawsuit, a federal court should abstain from exercising its jurisdiction only in "exceptional circumstances." *Wilton,* 515 U.S. at 284 (citing *Colorado River,* 424 U.S. at 818-820). But in certain types of cases, federal district courts have far broader discretion, and may abstain even in the absence of "extraordinary circumstances." *Wilton,* 515 U.S. at 286.

In *Wilton,* the Supreme Court held that a district court has broad discretion to abstain from hearing a declaratory judgment action, even in the absence of any extraordinary circumstances, because of the "nonobligatory nature of the [declaratory judgment] remedy." 515 U.S. at 288. The Declaratory Judgment Act gives federal courts "substantial discretion" to grant or withhold declaratory relief. *Id.* at 286. Abstention is therefore permissible in a declaratory judgment action whenever "another suit involving the same parties and presenting opportunities for ventilation of the same state law issues is pending in state court." *Id.* at 283.

The Second Circuit has held that an interpleader action, like a declaratory judgment action, is subject to discretionary abstention under *Wilton,* and not to the "extraordinary circumstances" test of *Colorado River.* "Interpleader is an equitable

6720-72000\1061665.1

proceeding," *Truck-a-Tune, Inc. v. Re,* 23 F.3d 60, 63 (2d Cir. 1994), "and a federal court may abstain from deciding an interpleader action if another action could adequately redress the threat that the stakeholder might be held doubly liable." *American Airlines v. Block,* 905 F.2d 12, 14 (2d Cir. 1990). *Accord, National Union Fire Ins. Co. v. Karp,* 108 F.3d 17, 21 (2d Cir. 1997) ("the availability of interpleader jurisdiction does not require its exercise, and the district court acts within its discretion to decline adjudicating issues raised in an interpleader action that can be fairly adjudicated in state court") (citations and internal quotes omitted).

Accordingly, the Second Circuit has held, a district court may abstain from hearing an interpleader case under the liberal *Wilton* standard, and need not find "extraordinary circumstances" as would be required under *Colorado River. National Union,* 108 F.3d at 22; *Truck-a-Tune,* 23 F.3d at 63; *American Airlines,* 905 F.2d at 14. Other Circuits are in accord. *Eg., NYLife Distributors,* 72 F.3d at 372; *id.* at 379 ("district courts . . . possess broad equitable discretion to decline jurisdiction over a statutory interpleader suit when in their view there is a pending state proceeding that obviates the need for federal action").

Therefore, this Court should abstain from hearing this case if "the claims of all parties in interest can satisfactorily be adjudicated in the pending state court proceeding." *National Union,* 108 F.3d at 22 (citations omitted). That standard is easily met here; all of the defendants in this case are parties to the State Case, and the pleadings in that State Case raise all potential claims to the interpleaded fund. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 283 (1995). "[T]here is an identity of parties, and the issues and relief sought are the same." *National Union,* 108 F.3d at 22. "The New York courts can fairly adjudicate . . . this controversy." *Truck-a-Tune,* 23 F.3d at 63.

This Court should accordingly abstain from hearing this case.[1]

## CONCLUSION

For the Foregoing reasons, this Court should dismiss this action or stay it pending

the determination of the State Case.

Dated:  New York, New York
        October 14, 2011

Respectfully submitted,

**WACHTEL & MASYR, LLP**

By:     /s/ Elliot Silverman
        William B. Wachtel
        Elliot Silverman
        *Attorneys For Defendant*
        *Orly Genger*
        1 Dag Hammarskjold Plaza
        885 Second Avenue
        New York, New York 10017
        Telephone:  (212) 909-9500
        Wachtel@wmllp.com
        esilverman@wmllp.com

---

[1] An interpleader action is ordinarily adjudicated in two steps:  in the first, the court relieves the stakeholder of liability, and in the second the claimants to the interpleaded fund litigate their entitlement to it.  If this Court dismisses this suit, plaintiff is not without a remedy, because it could interplead the funds in Supreme Court, New York County.  *American Airlines*, 905 F.2d at 15 (citing N.Y.C.P.L.R. § 1006).  Alternatively, this Court could discharge plaintiff from liability and thus stay the remainder of the case pending the outcome of the State Case.

6720-72000\1061665.1