Paul J. Labov, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Email:  plabov@pszjlaw.com

*Counsel to Dalia Genger*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**In re**                                         **:**

                                             **:**      **Chapter 7**

**ORLY GENGER,**                        **:**

                                             **:**      **Case No.: 19-13895 (JLG)**

                   **Debtor.**            **:**

                                             **:**
-------------------------------------------------------------X

**NOTICE OF FILING OF AMENDED EXHIBIT "A" TO JOINDER**
**OF DALIA GENGER TO THE VARIOUS OBJECTIONS TO THE**
**CHAPTER 7 TRUSTEE'S MOTION FOR AN ORDER PURSUANT TO**
**RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A)**
**APPROVING SETTLEMENT AGREEMENT AND (B) GRANTING RELATED RELIEF**

       **PLEASE TAKE NOTICE** that on July 16, 2021, Dalia Genger, by and through her

undersigned counsel, filed the *Joinder of Dalia Genger to the Various Objections to the Chapter*

*7 Trustee's Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy*

*Procedure (A) Approving the Settlement Agreement, and (B) Granting Related Relief* [Docket No.

494] (the "Joinder") with the United States Bankruptcy Court for the Southern District of New York.

**PLEASE TAKE FURTHER NOTICE** that the incorrect document was inadvertently inserted as Exhibit A.  The attached document should be inserted as amended exhibit "A" to the Joinder.

Dated: July 19, 2021                    PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Paul J. Labov*
Paul J. Labov, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone: (212) 561-7700
Facsimile:  (212) 561-7777
Email: plabov@pszjlaw.com

*Counsel to Dalia Genger*

# <u>EXHIBIT A</u>

DOCS_NY:43692.1 30398/001

AMERICAN ARBITRATION ASSOCIATION
Commercial Arbitration Tribunal
NEW YORK CITY
------------------------------------------------------X     Case No. 13 170 Y 00996 07
                                                      :
                                                      :
Dalia Genger                                          :     FINAL ARBITRATION AWARD
                        Claimant,                     :
                                                      :
            -against-                                 :
                                                      :
Arie Genger                                           :
                        Respondent.                   :
                                                      :
------------------------------------------------------X

I, the undersigned Arbitrator, having been designated in accordance with the terms of the

arbitration agreement entered into between the above-named parties dated October 26, 2004, and

having been duly sworn, and having duly heard the proofs and allegations of the Parties, do

hereby AWARD, as follows:

<u>Procedural Background</u>

This arbitration was commenced on May 31, 2007. The parties thereafter engaged in

extensive discovery, including the production of documents. Various pre-hearing applications

for relief were argued, considered and resolved. Hearings began on December 4, 2007 and

proceedings were closed on March 26, 2008. There were approximately 14 days of hearings and

the transcript of the hearings is in excess 2500 pages. The parties have made extensive pre and

post hearing submissions.

The parties to this arbitration Claimant Dalia Genger (Claimant, Dalia or Wife) and the

Respondent Arie Genger (Respondent, Arie or Husband) entered into a Stipulation of Settlement

(Stipulation) on October 26, 2004 to equitably distribute their marital property as of January 31,

2002, and as of the date of the agreement. The parties are seeking monetary awards, costs and

legal fees for claims against each other for various alleged breaches of the Stipulation. The

following are relevant provisions of the Stipulation.

<u>The Stipulation</u>

<u>Whereas Clause</u>

The Stipulation provides that "Whereas, except as otherwise provided or reflected herein,

it is the intention of the parties that upon completion of implementation of this Agreement, each

party will have received distributions equal to approximately 50% of the aggregate value of the

Husband and the Wife's net marital assets."

Article I(2) provides, "The 'Whereas' clauses at the beginning of this Agreement are an

integral part of this Agreement and shall be considered in any interpretation of the intention or

meaning of the parties or of any part of this agreement."

<u>Equitable Distribution</u>

Article VIII provides, "the parties acknowledge and agree that the resources of the parties

and the provisions of this Agreement, including the transactions contemplated hereby, are

intended, except as otherwise provided or reflected herein, to effect approximately 50-50

distribution of their net marital assets..."

<u>Distribution of Assets</u>

Article II provides, that the parties represent to each other that Schedule II(1) is a

complete list of marital property with their correct values.

Article II(2) provides for the immediate distribution of cash and other distributions. Arie

received, all life insurance policies, all of the marital investment in Conservation Securities

(estimated value of $2,128,000), cash from several accounts, including the BR Escrow, totaling

$1,345,000, and 79,045 shares of Lumenis Ltd. common stock.

2

Dalia received, cash totaling $1,345,000, the sole ownership of the Husband's 250 shares of common stock of TPR whose value was listed on Schedule II(1) as "Unknown", and Dalia retained 1.96% ownership of TPR through her general partnership interest in D&R, for a total of 52.96% of the outstanding common stock of TPR.  Certain marketable securities were also divided equally (Article II(2)(b)), as were all retirement accounts (Article II(2)(c).

Article II(2)(d) relates to the disposition of TRI stocks and moves the text of this section out of the Stipulation's sequence of distributions with the following direction "(1) Disposition of TRI Stock.  See Article II(9)(b) below."  (This was a typo and should be 9(a))

Article II(3) provides for the creation of a "Residual Cash" escrow account, "RC Escrow Account," for the safekeeping of accumulated cash during the implementation of the agreement.

Article II(4) requires that non-liquid assets which can not be divided in kind or sold by agreement of the parties are to be sold by Arie and Dalia's son Sagi Genger (Sagi).  Any unsold non-liquid asset remaining after the second anniversary, absent agreement on valuation and distribution by the parties, shall be sold to one party to the Stipulation by a coin toss process.

The Stipulation Article II(5) and (6) provides adjustments or for true ups after the 1st and 2nd Anniversaries of the agreement conducted by Sagi to correct imbalances in distributions received by either party, and to adjust the value of the assets of TPR as set forth in Schedule III(1) based on the net proceeds of the sales of such assets.  As noted above, Schedule III(1) specifically excludes investments in TRI.  The second anniversary true up provision provides for a summary of the sale of assets and distributions received by the parties and corrections as needed.

Article II(9)(a) gives Arie 50% of the marital interest in TRI (794.40 shares or 13.999468% of its common stock) and gives to the children's trusts (Sagi and Orly) 1,102.80

3

shares or 19.42766 of common stock and Arie receives irrevocable proxies from the trusts. The section states: "(e) Following the foregoing transfers of the TRI Stock, the Wife will have no ownership in TRI."

Article III of the Stipulation provides for the valuation and distribution of TPR assets following the execution of the Stipulation. This Article III, sets forth in bold caps the following:

"A FUNDAMENTAL PART OF THIS AGREEMENT IS THE HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP OF SHARES OF COMMON STOCK IN TPR, AND THE TRANSFER OF SUCH OWNERSHIP TO THE WIFE, THE PARTIES ARE UNABLE TO DETERMINE THE PRECISE VALUE OF TPR UPON THE EXECUTION OF THIS AGREEMENT AND ARE RELYING AT THE TIME OF EXECUTION OF THIS AGREEMENT ON TPR'S BOOK VALUE, AS SET FORTH ON SCHEDULE III (1)."

Schedule III(1) specifically excludes investments in TRI.

The TPR assets were divided into 3 categories: Category A (cash and marketable securities), Category B (partnership interest and designated investments) and Category C (art works and the like). The values of Category A assets as listed in Article III(1) was binding. The value of assets in Category B had to be accepted by Sagie as CEO of TPR, and if not, Arie had to be notified in writing, and they would be sold. Category C assets had to be sold or appraised. All unsold assets would be subject to a coin toss.

## TRI

### Arie

Arie asserts that although the Stipulation is not free from ambiguity, its text and structure, and the parties conduct support his position. Arie makes the following arguments.

Arie claims the transfer of the TRI stock was the brainchild of their son, Sagi, and was instrumental in breaking the deadlock in negotiations between the parties. Arie's asserts that TRI had nominal value due to an $80 million bank defaulted debt, pension liabilities and the

4

Bogalusa litigation, and the disposition of the TRI marital interest was not a distribution but was a transfer "in kind", Arie retained his 50%, and Dalia's 50% was conveyed to the children's trusts. That this eliminated the need for the parties to do business together in the future, and eliminated the need for any valuation.

Arie further asserts, TRI was not included in Article II(1) the schedule of marital assets. TPR assets which were to be distributed to the parties were set forth on Schedule III(i), and that Schedule specifically excluded investments in TRI. Article II(2)(d) which refers to the conveyance of TRI stock to Arie, drops the text of the section down to Article II(9)(a) removing the TRI stock transfer section below the provisions which govern the distributions made by the parties which were subject to Sagi's true up powers. Article II(5) defines Sagi's power to correct valuations of TPR assets as set forth in Schedule III(1), and that Schedule specifically excludes TRI. Article II(6) provides for the adjustment of TPR values based on the net proceeds of the sales of TPR assets which refers back to Article II(5) and Schedule III(1) which excludes TRI. The coin toss provisions which follow do not relate to TRI. Article III, the valuation of TPR assets following execution of the agreement relies on TPR's book value set forth on Schedule III(1) which does not include TRI. This article relies on a coin toss for resolution of conflicts and not Sagi's true up authority.

Arie alleges, the sequencing of the above provisions carve out the conveyance and sale of TRI shares from the distribution of all other marital assets. The removal and dropping down of the Article, transferring the TRI shares (II(9)(a), below the Articles distributing martial property could not have been done randomly, but must have been done to effectuate the intent of the parties to transfer the TRI shares in kind and to distinguish that transfer from the distributions of marital property subject to future true ups and balancing.

5

The TRI stock transfer was accomplished by a Stock Purchase Agreement which sold the TRI shares to Arie and which was approved by Dalia and provides that the shares were "free and clear of all liens, claims, and encumbrances." In addition in Article II(9)(a), Dalia represents; "(e) Following the foregoing transfers of TRI Stock, the Wife will have no ownership interest in TRI."

The Stipulation grants no power to Sagi to value and correct any perceived imbalances relating to TRI, his authority being confirmed in Article II(5) and (6) to adjust imbalances in the distribution of identified assets. As stated above, the Stipulation places the provisions transferring TRI shares after the paragraphs appointing Sagi to true up the distributions. Furthermore, the shares of TRI were transferred by means of a sale to Arie and the Trusts, which would not require any valuation.

Arie asserts that the Stipulation was achieved after a long, bitter and acrimonious process and the parties hoped their settlement would fairly achieve finality to their disputes and not be a launching pad for more battles in the future.

The parties negotiated issues relating to the value of TRI without resolution until Sagi proposed the solution which divided the marital interest in TRI in half. The negotiating history, and the drafts of the Stipulation evidence that TRI was not a distribution to Arie subject to valuation. Drafts which required appraisals, or valuations or used "distribution" language, or require payment to Dalia were rejected by counsel and even by Sagi. Article II, 9(a) is the result of these negotiations and remove TRI from subsequent evaluation.

### Dalia

Dalia claims that the TRI stock transferred to Arie constitutes a distribution under the agreement which would be included in calculations of any inbalances under Articles II(5) and (6)

and/or Article XII and that she is entitled to one-half of the value of the TRI stock received by Arie which amounts to $8,238,258 and which amount should be trebled resulting, in a demand for $24,714,774 because of Arie's willful concealment.

Dalia's position is that the Stipulation is not ambiguous and that one need not venture beyond the words of the agreement to resolve this arbitration. Like Arie, Dalia agrees that the text and structure of the Stipulation, and its negotiating history support her position.

Although the Stipulation is not free from ambiguity, the Arbitrator agrees with Dalia on the merits and finds for Dalia on the TRI issue.

The Whereas Clause which "shall be considered in any interpretation of the intention, or meaning of the parties or of any part of this Agreement," provides, that unless otherwise provided, it is the intention of the parties that upon the completion of the implementation of the agreement, "each party will have received distributions equal to approximately 50% of the aggregate value of the Husband and the Wife's net marital assets." Wherever ambiguities or close conflicts have to be resolved, the parties in their Stipulation have provided the Whereas Clause for guidance as to their intent.

The center of this arbitration involves the Bogalusa issues. This has consumed the litigation which preceded the arbitration, the negotiations leading to the Stipulation and the arbitration.

If as Arie asserts that the Bogalusa update is irrelevant for valuation, what was the need for the Bogalusa update at all and why is it so prominent? How would distributions differ if the Bogalusa update had not "inadvertently omitted information," information that may have made a $30 million difference in valuation? Although the value of TPR was listed on Schedule II(1) as "Unknown," that valuation was a direct result of the "Unknown" personal contingent liability of

7

$30M as a result of the Bogalusa litigation.  That listing was there for a reason and it was clearly wrong, and skewed the numbers significantly.

The Whereas Clause provides that the transactions contemplated by the agreement are intended to reflect a 50-50 distribution of the net marital assets.  The clause also provides for exceptions, "except as otherwise provided or reflected herein."  Although the Parties had made specific provisions in the agreement for such occurrences, the agreement contains no specific language which evidences that the TRI transfer was not a distribution.  Furthermore, if the parties had intended that TRI was not a distribution subject to valuation, they could and should have clearly written that in the Stipulation.  If TRI was transferred in kind and was not a distribution, why should Dalia be responsible for one-half of the Bogalusa litigation risk?  Article V(3)(b)(ii) which refers to the Bogalusa Litigation risk the Husband indemnifies the Wife from only 50% of that risk, making Dalia responsible for the other 50%, without, under Arie's interpretation, giving Dalia any value from the underlying asset.

Arie's represented in the litigation below, and confirmed at the hearing, that his personal contingent liability was based on the fact that the litigation was not resolved due to potential "opt-outs" and that additional attorney fees were to be paid.  This was significantly misleading, and Arie's exposure, if at all, was minimal.  In no measure could these factors have resulted in anything close to a $30M personal liability.  The argument that Dalia knew or should have known the realities of the Bogalusa liability, if true, does not bar the implementation of the provision of the agreement to correct imbalances in distributions.  There is no basis in law or in fact that she has waived her right for balancing of values.

Aricles II(5) and (6) of the Stipulation broadly provide for Sagi's true up powers, to adjust and equalize distributions up to the 2nd anniversary of the Agreements execution in order

8

to correct imbalances.   Article II(6) provides for the adjustment of "the value attributed to the assets of TPR as set forth on Schedule II(1) which includes TRI.   Article II(9)(a) calls for the "distribution" of TRI shares.   Article VIII(1) confirms that the Parties intend that the purpose of the provisions of the Agreement, "including the transactions contemplated . . ." are to effect a 50-50 distribution of their property.   There is no provision in the agreement which provides that TRI is not a distribution or that the value of TRI shares are not to be equalized upon distribution.

Arie contends that since TRI was an asset transferred in kind it is not subject to audit under Article XI and that in any event Article XII only authorizes audits to cover hidden assets and Bogalusa was not a hidden asset, that FTI does not qualify as a reputable accounting firm, and that the FTI report was not an audit contemplated by the Stipulation.

Article XII, which grants the Wife rights to several audits of the "Husband's Assets" is very broad in scope.   The Wife may audit the Husband's "assets and liabilities as of the date of the commencement of the parties' matrimonial action, i.e., January 31, 2002, as set forth in Schedule II(1) . . . and as of the date of the Agreement in order to test the correctness and completeness of the items included on such Schedules (including contingent liabilities) and the value assigned to each such item based on all information available at the time of the audit."

There is no conceivable reading of this language which would exclude TPR and TRI both listed on Schedule II(1), and the only relevant contingent liability, the Bogalusa contingent liability, from audit.

At an initial reading, an ambiguity appears to be created by the provisions which follow, all of which refer to audits finding assets or property owned by the Husband not previously disclosed or listed on Schedule II(1).

9

This is clarified however by the language of the opening and defining paragraph which authorizes an audit to test the correctness and completeness of contingent liabilities. Bogalusa is the only contingent liability. Furthermore, since the article specifically allows audits to test the correctness of contingent liabilities, the finding of assets may occur by the addition and enhancement of value by correcting and reducing erroneous contingent liabilities. Finally, any doubt as to the meaning and interpretation of this article must be resolved by the Whereas Clause guidepost requiring the equal distribution of marital assets.

Arie claims that the audit was not authorized and that FTI is not a reputable accounting firm and that a proper audit was not conducted. The evidence establishes that Arie waived his rights to make the above arguments. In any event FTI need not have certified its findings in accordance with GAAP, as Article XII does not require such a report but a test of the correctness and completeness of the Article II(1) values.

Although the evidence presented together with the provisions of Article XII require a correction of values due to the erroneous Bogalusa update representations and the erroneous representation of contingent liability, the punative operation of XII 2(b) should not be operative.

Arie concedes that the Bogalusa update "inadvertently did not include references to the Second Amendment to the CAS which provided that TRI did not have to pay an additional $17 million into the escrow account and that TRI would receive a portion of the settlement escrow back." Arie contends that Dalia was capably represented throughout the intensely litigated matrimonial and that there was full discovery, and that Dalia's counsel knew or should have known the accurate Bogalusa status. The extent of Arie's deception or Dalia's knowledge was contested at the arbitration. Dalia asserts her position was to "trust but verify", i.e.,

representations made in the Stipulation were accepted but subject to Sagi's true up authority and audits to correctly balance distributions and to make corrections.

The Arbitrator finds the imbalances on Schedule II(1) should be corrected in Dalia's favor, and that the treble damage award is not warranted. Arie has established by the preponderance of evidence that this was not an instance of willful concealment of hidden assets, as Bogalusa was disclosed, but rather a misrepresentation of the Bogalusa status which altered the contingent liability amount. The purpose of the treble damage provision was to discouragae Arie, who was in full control of the marital assets from hiding assets not known to Dalia, so as to deprive her of her fair share of these assets. At most, this was a misrepresentation of value, but not a concealment of assets as Dalia knew of the Bogalusa litigation. This was a situation for, "trust but verify," but not for treble damages.

The various submissions on the valuation of TRI/TPR have been considered and the arguments relating to them have been evaluated. The most credible, reliable and the fairest assessment was prepared by Sagi (with the assistance of Jay Fishman, the "jointly appointed and court approved appraiser"), and appear in his 11/25/06 and 1/6/07 Memoranda.

The Arbitrator grants Dalia's alternative award request in her counsel's March 24, 2008 demand, and finds that the equity value of TRI at the date of the Stipulation was in the $53-67 million range, and adopting a value below the mid-point range and calculates Arie's ownership interest at $7.4 – 9.4 million. The arbitrator awards Dalia one-half of the latter sum in order to correct the marital distribution imbalance, namely, $3.85 million. To that sum, interest is to add at the New York statutory rate of 9%, to commence March 7, 2007.

11

### AG Properties

This claim by Dalia involves real estate investments in Canada. Dalia's assertions date back to the matrimonial litigation where she argued that the participation of Gilad Sharon ("Gilad") was a sham. This issue also was considered by Sagi in his true up capacity and he made no ruling, deferring the issue to arbitration if Dalia so desired.

At the arbitration, Dalia asserted that Arie fraudulently misrepresented the true nature of the transaction as a result of backdated transactions, and that there was inadequate consideration, all of which erased her $3 million marital interest.

Arie asserts that the Canadian investment opportunities were brought to him by Gilad and were made for the benefit of the Genger children and TPR which made a loan at market rate. Arie confirms the backdating but alleges that he discovered that his attorney had erred, and because of complications involving Israeli law and taxes, the paperwork was delayed.

Arie testified that from the outset of this transaction Gilad was a key person. The idea for the deal was Gilad's, who found the opportunity. The equity interest was to be split evenly with Gilad and that it was structured so that Gilad was to establish an ownership entity for his 50% interest. For the other 50% interest, Arie established a limited partnership "AG Real Estate Partners, L.P.," 10% of which was owned by the General Partner, AG Real Estate G.P., Inc., and 90% by Orly & Sagi, as limited partners. Arie owned the General Partner and it loaned $11,700 each to Orly and Sagi.

Arie sold his general partnership interest to Orly and Sagi who agreed to pay Arie between $200,000 to $300,000

Arie testified that in addition to the investment being Gilad's find, Gilad supervised the investment and was responsible for management of the property. His 50% interest was based on origination and sweat equity.

Arie asserts that in the matrimonial proceeding, the Canadian venture was fully explored in discovery and depositions that this claim was settled and released in the Stipulation which was incorporated in the Divorce Judgment.

It is undisputed that Dalia made issue of the Canadian venture prior to the execution of the Stipulation. The Stipulation provides for the release of all claims unless covered by the agreement, or unless they were concealed by fraud or misrepresentation.

Dalia's claim at the arbitration was that she discovered that critical documents creating Gilad's interests in the Canadian venture were prepared after the separation date, and then back-dated. That Arie sold his 5% interest in the venture for $300,000 in 2004 to his children, and that this results in a $6 million value for the entire venture, and accordingly, Arie should pay her $3 million for her marital interest.

The issue at the hearing was whether the backdating was fraudulent, a sham to conceal Arie's assets and to deprive Dalia of her marital interest, or whether the testimony of Arie and attorney David Parnes (Parnes) was credible, and that the transaction, although backdated in documentation, was legitimate.

The Arbitrator finds for Arie on this issue, as the testimony of Arie and Parnes was credible. The Canadian investment from its inception was intended to involve Gilad. Whether because he was the finder, or for his sweat equity, or for Arie's business or personal reasons, or for all of these reasons, Gilad from the inception was an equal partner. Arie wanted his children to benefit from this investment, Parnes testified that the Canadian venture was always intended

to be owned 50% by Gilad and 50% by the Genger family, that the September 20, 2001 deal structure diagram, created before the divorce evidenced that intent.

Parnes also testified that he prepared and forwarded the AG Properties transaction documents on February 4, 2002 which would have memorialized Gilad's interests in the venture. Thereafter a delay occurred and the documents were not signed in February, 2002 because of Gilad's indecision regarding the ownership entity and associated tax issues.

Dalia points to the testimony Arie gave in his March 14, 2003 deposition in the matrimonial action where she claims he committed perjury when he testified he was a 50% owner along with Gilad.

Arie testified he learned thereafter that the paper work was not completed and he became very upset with his attorney and demanded that the documents be completed immediately. New documents were re-drafted, and executed, and all were dated as of the original date of the earlier instruments, February 6, 2002. As a result the documents were executed. Parnes testified that this was not done as part of a scheme to defraud anyone.

Although clouded by the backdating of the Canadian venture documentation, the record established that Arie's intent was to create an co-venture investment for Gilad and his children. That at most his interest was no more than 5%, and that was sold to the children. The children's interest in the Genger investment was reflected in the 2001 tax returns for AG Properties. Dalia never had any real or equitable marital interest in the Canadian venture. The arbitrator therefore dismisses the Dalia's AG Properties claim.

14

### D&K Note

Arie claims he should be awarded one half of the value of the D&K Note, or $2,420,694 plus interest from the date of the Stipulation. Arie claims this is part of the value Dalia received upon the distribution of TPR shares.

The arbitrator finds for Dalia on this issue. The D&K note was a part of the estate planning scheme to transfer wealth to the children. The parties never intended for this note to be collected and to do so would re-transfer wealth back to the parents and defeat their estate plan.

The note was also excluded from valuation under the Stipulation as evidenced in a writing by Arie's attorney Edward Klimmerman which did not include it as an asset to be valued, and the D&K note was not included by the open issue list provided by Klimmerman in response to Sagi's November instructions.

Finally, although the sale of the note for $12,000 to David Parnes in 2006 is questionable, the note was out of Dalia's control, and it could be transferred for nominal consideration to a third party. The arbitrator therefore dismisses Arie's D&K note claim.

### Valor Life Annuities

Dalia seeks $5,700,000 a trebled award for the value of Valor Life annuity policies not listed in the marital balance sheet. Arie asserts the Valor Life annuity policies were exchanges for life insurance policies distributed to him pursuant to the Stipulation.

The Arbitrator finds for Arie on this issue. The evidence established that Arie exchanged the three whole life policies for the Valor Life annuity policies. This policy exchange occurred a year and a half after the Agreement. The life insurance policies received by Arie under the Stipulation became Valor Life Annuities. The arbitrator therefore dismisses Dalia's Valor Life claim.

500223116v1

## Life Insurance Policies

The parties agree that the value of life insurance policies increased from the commencement date of the divorce through the Stipulation date, and Dalia should receive one half of that increase.

Although Dalia demands $426,739, as the true up relying on Sagi's November 25, 2006 memorandum and her brief. Arie submitted a schedule (AE Ex. 66) which identifies expenses deducted from the cash surrender value of the policies. This schedule was accepted in evidence and Dalia has not adequately refuted its calculations. The arbitrator awards Dalia $60,480. To that sum interest is to be added the New York statutory rate of 9% to commence May 1st, 2007.

## 2001 Tax Refund

Dalia seeks a trebled award for the 2001 tax refund or $80,368.50. The arbitrator finds that Arie properly accounted for the 2001 tax refund as confirmed in Sagi's November 2006 Memorandum. The arbitrator awards Dalia $26,880 for her one-half interest in the refund, without interest.

## Furniture

Arie claims one half of the alleged value of the marital household furniture and seeks a $283,000 award. Dalia asserts the furniture was destroyed in storage and Arie was given the benefit of any tax loss  There was insufficient evidence on this issue, and any claims or counterclaims are dismissed.

## AG Property Notes From Sagi to Orly

The Arbitrator has no jurisdiction to render an award on this matter, and declines to issue an award.

16

### Two Notes from Sagi to Arie

The Arbitrator has no jurisdiction on this matter and declines to issue an award.

### OBB Resort, Sage Development, and TJS Partners

The parties have agreed, and the Arbitrator directs the parties to coin toss pursuant to the Stipulation.

### Conservation Securities General Partnership

The parties agree, and the Arbitrator awards Dalia $199,540, without interest.

### Hightech, Arco and Channel Holdings

The parties have agreed, and the Arbitrator directs the parties to equally divide the value of these three investments and divide equally the distribution of $430,925 from Hightech Holdings.

### The Escrow Account

The parties have agreed and the Arbitrator directs that the balance in the Escrow Account be divided equally by the parties.

### Cost of Audit

Article XII. 1.(d) provides that if the audit finds assets not previously disclosed in excess of $250,000 the Husband shall pay the cost of the Audit. The Audit in this matter was triggered by the Bogalusa concealment discussed above. Dalia is awarded costs for the audit of $207,727.00, without interest.

### Other Costs

Article XIII. 3.(e) provides that: "The party against whom the arbitrator found shall bear the total costs, arbitrator's fees and other expenses of the arbitration between the parties, including the legal fees borne by the other party in bringing or defending the action."

500223116v1

In these proceedings the Arbitrator has made material findings for and against each party and there is no clear prevailing party, therefore under this provision no party can be awarded payment for the above charges.

The administrative fees of the American Arbitration Association totaling $26,509.81 shall be borne as incurred by the parties.

The compensation and expenses of the Arbitrator, E. Leo Milonas totaling $131,908.74 shall be borne equally by the parties.

The parties shall unless otherwise expressly directed herein, bear their costs, legal fees, and other expenses as incurred.

This award is in full settlement of all claims and counterclaims submitted to this arbitration, unless otherwise specifically provided.  All claims not expressly granted are hereby denied.

5/6/08
_____
Date

_____
E. Leo Milonas

I. E. Leo Milonas, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

5/6/08
_____
Date

_____
E. Leo Milonas

18

500223116v1