**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Deborah J. Piazza,*
*Successor Chapter 7 Trustee*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Rocco A. Cavaliere, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

                                          Chapter 7

ORLY GENGER,

                                          Case No.:  19-13895 (JLG)

                   Debtor.

-----------------------------------------------------------x

**REPLY OF CHAPTER 7 TRUSTEE TO VARIOUS OBJECTIONS TO
TRUSTEE'S MOTION FOR ORDER PURSUANT TO RULE 9019 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) APPROVING THE
<u>SETTLEMENT AGREEMENT AND (B) GRANTING RELATED RELIEF</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT...................................................................................................2

REPLY TO OBJECTIONS......................................................................................................4

   A.   The Sagi Parties Are Wrong that the Settlement Agreement Does Not Satisfy the Standards for Approval under Second Circuit Law.................................................................................5

   B.   The Release and Injunction Provisions Are Appropriate and Warranted ......................................16

     (i)   Similar Injunctions Have Been Approved in Chapter 7 or Similar Cases .................................22

     (ii)   The Court Has Jurisdiction to Approve the Settlement Agreement and Injunction...................25

     (iii)  The Discharge Actions Can Be Enjoined ...............................................................29

   C.   The Sagi Parties' Objections Relating to the Homestead are Meritless...........................................34

   D.   The Sale of the Estate Claims to the Estate Claims Assignee Is Reasonable and Appropriate and In the Best Interest of the Estate.............................................................................................41

   E.   Sagi's "Cross-Motion" Seeking Standing to Pursue the Disputed Settlement Proceeds Is Procedurally Deficient ...................................................................................................49

CONCLUSION....................................................................................................................52

TO:    THE HONORABLE JAMES L GARRITY
       UNITED STATES BANKRUPTCY JUDGE:

Deborah J. Piazza, not individually but solely in her capacity as the successor Chapter 7 trustee (the "Trustee") of the estate of Orly Genger (the "Debtor") in the above captioned case, by her attorneys, Tarter Krinsky & Drogin LLP, respectfully submits this reply (the "Reply") to the (i) *Objection and Cross Motion of Sagi Genger and TPR* (the "Sagi Objection") [Dkt. No. 490] *to the Chapter 7 Trustee's Motion For Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving the Settlement Agreement, and (B) Granting Related Relief* (the "Settlement Motion") [Dkt. No. 421], (ii) *Objection of the Orly Genger Trust by its Trustee Michael Oldner to the Motion* (the "Oldner Objection") [Dkt. No. 491], (iii) *Objection of the Sagi Genger 1993 Trust to the Motion* (the "Sagi Trust Objection") [Dkt. No. 493], and (iv) *Joinder of Dalia Genger to the Various Objections to the Motion* (the "Dalia Objection",[1] together with the Sagi Objection, the Oldner Objection and the Sagi Trust Objection, the "Objections", and such objectors, the "Sagi Parties"). The Sagi Objection also purports to include a "cross-motion" seeking standing to prosecute the very same claims that the Trustee has already informally pursued and proposes to settle pursuant to the Settlement Motion, which is impermissible under the Bankruptcy Rules, Local Rules of the Court, and for which Sagi did not seek permission from the Court in advance of filing. In support of the Reply[2] and in further support of her Motion, the Trustee respectfully represents as follows:

---

[1] Due to Dalia's refusal to comply with the Trustee's deposition notice in connection with the Settlement Motion, the Trustee has requested that the Dalia Objection be stricken or that a negative inference be drawn against her in accordance with Fed.R.Civ.P. 37(b)(2)(B), made applicable here by Bankruptcy Rule 7037. [Dkt. No. 503].

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Motion.

## PRELIMINARY STATEMENT

1.      The Settlement Motion and the Trustee's supporting declaration establish that the

Settlement Agreement, which would bring at least $2.55 million into the estate, plus potentially

far more in future litigation recoveries from the claims sought to be assigned thereunder, should

be approved because it is fair and reasonable, is in the best interests of the estate, complies with

applicable law, and far exceeds the required lowest point in the range of reasonableness.  It is not

even a close call.

2.      In response, the Sagi Parties – who only possess a single liquidated claim totaling

approximately $3.2 million (subject to potential equitable subordination and setoff claims) –

ignore or attempt to sidestep binding precedent and the various defenses raised by the Settling

Parties to, and potential challenges to, and costs and delays associated with the continued

prosecution of the claims being settled.  In addition to misstating and ignoring binding Second

Circuit precedent, the Sagi Parties argue that the Settlement Agreement must be an improper

exercise of business judgment because – regardless of the evidence, merits and defenses – they

would obviously win (and not just win some recovery, but rather, win 100%, plus interest, plus

attorneys' fees) because they regard their position as self-proving and not subject to normal

litigation risk.  Based on that bootstrapping, the Sagi Parties assume they are obviously right and

anyone who disagrees with them is obviously wrong and must simply not understand, must have

been lied to (as they alleged was the case with Ronald Satija (the "Prior Trustee") after he

reached a similar settlement in Texas with many of the Settling Parties, albeit for far less

consideration), or is "inept" or "negligent".  Applying this logic, a trustee would never be able to

settle a claim if an objecting creditor merely disagrees on the basis that it believed that it would

win a lawsuit against a third party. That is not how it works, and the Sagi Parties offer no support for such an absurd position.

3.      As the Court is aware, the dynamics in this case are, in many respects, unprecedented, for a chapter 7 case. The Trustee and her counsel have worked hard and diligently since the Trustee's appointment in December 2019 to analyze the various issues, claims and legal arguments set forth by the various parties over the last 20 months, and have during that time engaged in extensive, arm's length, and sometimes contentious negotiations (including with many of the Sagi Parties) that ultimately succeeded in substantially improving the settlement consideration for the benefit of the estate. Through the Settlement Agreement, the Trustee believes she has achieved an excellent result that will provide an estimated distribution of at least 30% to unsecured creditors holding allowed claims, with additional potential distributions to come from other recoveries. Against this backdrop, the Objections fail miserably in demonstrating that the settlement does not satisfy the standards for approval under well-established law.

4.      While each of the Objections lacks merit for the reasons described below, it bears noting at the outset that the Sagi Objection is particularly belligerent in its tone and content. After failing to demonstrate to the Trustee and this Court (after over a dozen depositions, thousands of produced documents and a multi-day trial) that the Debtor engaged in fraud and that others closely aligned to her conspired with her or otherwise backdated documents or inflated invoices, among other unproven theories, Sagi and his counsel (Dellaportas and Pitta) now predictably turn to name calling and personal attacks on the Trustee and her counsel, their next targets. But clearly there is nothing "inept" or "negligent" (as suggested by Sagi) about insuring a substantial seven figure settlement against well-heeled and sophisticated parties that

may have complete defenses in litigation, particularly one that more than doubles the settlement

consideration achieved by the Prior Trustee – who conducted his own investigation of the claims

being settled and came to similar conclusions about the potential merits and value of those

claims – prior to transfer of this case to resolve the same claims.

5.      As will be demonstrated, after dismissing Sagi's and his counsel's rhetoric and

their unsupported personal attacks on the Trustee and her counsel, the remaining arguments in

the Objections fail as a matter of law and should be dismissed.[3]

## <u>REPLY TO OBJECTIONS</u>

6.      The Objections include the following <u>main</u> arguments against approval of the

settlement:

(a) The Settlement Agreement, which includes consideration for a settlement of
    the Disputed Settlement Proceeds and the Homestead, does not satisfy the
    standards for approval under Second Circuit law;

(b) The Trustee may not sell whatever rights the estate may have in the Estate
    Claims, as the estate has no such rights; and

(c) The Settlement Agreement includes overreaching injunctions seeking to enjoin
    the Duplicative and Derivative Actions, including the discharge actions.

7.      Notably, the Objections do not raise any objections to the following settlement

terms set forth in the Settlement Agreement:

(a) The allowance of the KBT Claim at $1,450,000, reduced from the filed amount
    of the claim at $1,572,627;

---

[3] The Objections are also littered with numerous false statements of fact and law.  The Trustee generally denies all such allegations to the extent inconsistent with the Settlement Motion and this Reply, and reserves all rights, claims and defenses.  By not addressing some of the false statements, the Trustee is not conceding their accuracy. The absurdity of Sagi's objection (see par. 51) is demonstrated by his assertion that the Trustee made a false representation to this Court in the Settlement Motion because, in his estimation, it is "false" that Herschmann had "only recently met Orly" before agreeing to represent her on a partial pro bono basis in the fraud trial before Justice Jaffe in January 2015 because he met Orly the "preceding summer." Sagi's subjective view of "recently" justifies, in his assessment, accusing officers of this Court of perjury.  These types of baseless allegations permeate throughout many of Sagi's filings.  During her deposition, Sagi's counsel asked the Trustee about this statement multiple times, refusing to accept her answer.

(b) The waiver of Arie's lien and reclassification of his claim to an unsecured claim, subject to reconciliation at a later date;

(c) The waiver of any preference or priority in distributions from the Settlement proceeds by all of the Settling Parties (except Kasowitz);

(d) The support and cooperation being offered to the Trustee by the Settling Parties in paragraph 20 of the Settlement Agreement; and

(e) The tolling of the statute of limitations on pursuit of claims against the Settling Parties.

**A. The Sagi Parties Are Wrong that the Settlement Agreement Does Not Satisfy the Standards for Approval under Second Circuit Law**

8.      The Settlement Agreement indisputably satisfies the applicable standard governing approval of settlement motions, including the Iridium factors which courts consider. (*See* Settlement Motion ¶¶ 128-146.)  In support of the first Iridium factor ("balance between litigation's possibility of success and the settlement's future benefits"), the Objections[4] are based on the premise that Judge Forrest's decisions "lay out a clear road map to recovery" of the Disputed Settlement Proceeds.  (See Sagi Obj., ¶ 2.)  The Sagi Parties offer no support for their contention that the claims being settled are worth the 100% recovery that they claim, let alone anything at all.  They only cite to the Forrest ruling and related rulings in support of their arguments.  But this argument is overly simplistic, especially since the Second Circuit made clear that all that it was deciding is that Orly received a "peppercorn" and thus consideration existed under the contract.  The argument also ignores the many defenses raised by the Settling Parties (*see, e.g.,* Settlement Motion ¶ 139) and the fact that no court has ever determined whether Orly is actually entitled to any of the Disputed Settlement Proceeds, nor any of the other Settling Parties' numerous defenses to the claims.

---

[4] Oldner's Objection and the Dalia Objection do not really focus on an analysis of the Iridium factors. Their Objections focus on the scope of the proposed injunctions and the proposed sale of the Estate Claims against them.

9.      Orly was not involved in the negotiation of the 2013 Settlement Agreement and never personally owned any shares of TRI, and TRI was not her company.  Given these facts, there is a legitimate risk that a court could have concluded that Orly was not entitled to any of the Disputed Settlement Proceeds and was entitled only to the $10.3 million portion of the 2013 Settlement Agreement to the extent she prevailed on her claims to that amount (which she ultimately failed to do).  This too would have rendered the claims being settled here worthless.

10.     There were other signatories to the June 2013 Settlement Agreement which the Sagi Parties write out of the agreement without explanation – Arie (whose company was taken from him) and the Brosers (who funded the litigation that was settled).

11.     If successful, these defenses would have rendered the claims being settled worthless and thus greatly impact the litigation's chances of success.  In light of the many litigation risks associated with the claims being settled, the settlement consideration constituting at least $2.55 million plus potential future litigation recoveries provides a substantial benefit to the Debtor's estate and represents a reasonable outcome.

12.     Further, Sagi's persistent claim that no other party has rights to the Disputed Settlement Proceeds other than Orly, because she was the only one with "live claims" against the Trump Group in June 2013, (*see* Sagi Obj., n. 9.), defies logic and reality.  At the time of the settlement, Arie had aggressively prosecuted claims against the Trump Group for nearly five years at great expense to all parties – with Davis Polk and Paul Weiss, among others, in one corner, and Skadden, among others, in the other corner – relating not just to the TRI shares but also to what Arie believed to have been an improper ouster of him from the company he built from the ground up and ran for 25 years.  The June 2013 settlement was achieved shortly after Arie pursued a March 29, 2013 appeal against the Trump Group from four separate Delaware

Chancery Court rulings.[5]  Moreover, there remained a live dispute as to <u>all</u> of Arie's causes of action against the Trump Group in the 2010 Action at the time the 2013 Settlement Agreement was executed, including his causes of action against the Trump Group for:  (i) declaratory judgment to reform the Divorce Agreement; (ii) constructive trust; (iii) unjust enrichment; (iv) rescission; (v) breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and conspiracy to breach  fiduciary duty; (vi) aiding and abetting tortious interference with contract; and (vii) preliminary and permanent injunction, after Arie filed an appeal on January 28, 2013 of a decision dismissing his claims for reformation, constructive trust, conspiracy, rescission, aiding and abetting tortious interference with contract and the injunction counts (and thus denying the motion to dismiss as to the breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and unjust enrichment counts).[6]

13.    As the Court knows, this expensive litigation was funded by ADBG (the Brosers), which was required to be paid back from any litigation recoveries and which is still owed many millions of dollars despite receiving $16.3 million of the Disputed Settlement Proceeds.  The 2013 Settlement Agreement – which merely provides the settlement consideration to the "AG Group" and does not allocate a single dollar to Orly – provided for an initial cash payment that closely approximated the principal owed to ADBG as of the time of the settlement.[7]  The Broser Parties asserted numerous defenses and heavily disputed the merits of any claims against them.

---

[5] *See TR Investors, LLC v. Genger*, C.A. No. 6697-CS, Docket No. 275.
[6] *See Genger v. Genger*, 38 Misc. 3d 1213(A) (Sup. Ct. N.Y. County Jan. 3, 2013); *See also* 2010 Action, NYSCEF Nos. 292-294 (Notice of Appeal) and 295 (Preargument Statement of Arie Genger).
[7] The Trustee also considered Sagi's argument that there is a possibility that Orly's share of the Disputed Settlement Proceeds as, at minimum, $18.8 million in light of Sagi's reliance on Bill Fischer's admittedly incorrect workpapers. While the Trustee disagrees with Sagi's position, which amount other things, fail to account for the Genger Litigation Trust, even if 100% successful on it, the potential recovery to Orly's estate in this case would obviously be far less than $32.3 million.

14.     As to the second _Iridium_ factor, Sagi fails to address the Settlement Motion's points about the complexity of litigation to pursue the Disputed Settlement Proceeds, focusing instead on the Trustee's proposed sale of the Estate Claims (addressed below).   Rather than address the complexity of the litigation, Sagi instead states only that he "repeatedly offered to fund and manage the prosecution of the fraudulent transfer claims".   (_See_ Sagi Obj. ¶ 39.) Suffice it to say, the Sagi Parties' settlement proposals were inferior to the consideration provided by the Settlement Agreement and were designed to benefit the Sagi Parties.   Further, after witnessing Sagi's antics in this case, his unproven theories about anyone that disagrees with him, and the damage caused by Sagi to this estate, it should not be a surprise that the Trustee, who has an independent obligation to all creditors (not just those that Sagi says are creditors) rejected Sagi's overtures. Needless to say, Emmet Marvin's failure to prove any of their outlandish claims against the Debtor and others does not provide the Trustee, nor should it provide the Court, any comfort that Sagi and his counsel would actually be able to "manage" the prosecution of the Disputed Settlement Proceeds in an effective way.

15.     As to the third _Iridium_ factor ("paramount interest of creditors"), Sagi argues that "every active creditor of the estate that is not a party to the Settlement Agreement and/or a target of the fraudulent transfer claims strenuously objects to the proposed settlement." (_See_ Sagi Obj. ¶ 42.).   But Sagi does not get to decide who is and who is not a creditor, nor which creditor's views matter.   Under his logic, a trustee could, like here, negotiate a nearly global settlement with almost all creditors of an estate, but the few hold outs would be able to defeat the settlement – notwithstanding its other merits – simply because they objected to the settlement.   Of course, there is no basis in law for such an absurd result.   Moreover, Sagi's claim is factually inaccurate – there are other creditors who did not object to the Settlement Motion and who are not parties to

the Settlement Agreement.  The only parties that objected are the Sagi Parties, all of whom are closely aligned as the court is well aware, and who are all working together to try to place the Disputed Settlement Proceeds outside of the reach of this estate and, thus, other creditors..

16.    The cases cited by Sagi in support of his position, are clearly distinguishable. First, in *In re Remsen Partners, Ltd.*, 294 B.R. 557, 566 (Bankr. S.D.N.Y. 2003), a chapter 7 trustee filed a motion to settle a breach of contract claim, which was being handled by chapter 11 special counsel on a contingency basis prior to conversion.  The litigation had advanced to the stage where the parties were ready for trial.  The trustee proposed to settle the case without any distribution to be paid to unsecured creditors. Judge Drain found that there was a likelihood of success on merits on a breach of contract claim. *Id*. at 563.  He discounted the views of the trustee only because the evidence showed the professionals were the only ones being paid by the settlement, further finding that the settlement motion itself was not detailed enough in informing creditors of the strength of the breach of contract claim being settled by the trustee.  *Id*. at 567. In making that determination, Judge Drain cautioned that his decision was limited to the facts of this case but in other cases, where "the merits of the underlying dispute make it unreasonable for unsecured creditors to expect any recovery", their views are discounted considerably on the ground they should not be able to "gamble with the senior creditors' recovery in hopes of hitting a litigation jackpot". *Id*. at 566-567.  After disapproving the settlement, Judge Drain summarized the rarity of disapproval in his closing comments: "[b]ecause of the foregoing accumulation of factors, **this is the rare case** in which the Court cannot approve a proposed compromise, notwithstanding the fundamental role that settlements generally play in bankruptcy cases." *Id*. at 571 (emphasis added). Of course, unlike *Remsen*, the settlement in this case primarily will go to creditors, not professionals.

17.    Judge Drain's cautionary words when deciding *Remsen* were heeded by the District Court and ultimately the Seventh Circuit in *Lasalle Bank N.A. v. Doctors Hospital Hyde Park, Inc.*, 2005 WL 1766370, aff'd 474 F.3d 421 (7th Cir. 2006).  In the *Doctors Hospital* case, the bankruptcy court approved a settlement in which only $1.7 million of the approximately $6.1 million to be paid pursuant to the settlement would be available for unsecured creditors. *See Doctors Hospital*, 474 F.3d at 428. The settlement also released millions of dollars of claims against the estate, while also providing for possible future consideration through the active support of the defendant to object to a large claim in the case.  *Id*. at p. 424.  Thus, much like our case, the *Doctors Hospital* contained a global settlement of several different parts and forms of consideration.  In that case, the creditor argued that the possible recovery was from $34 million to $80 million but such creditor's views of the likelihood of success were discounted.  The Seventh Circuit noted that continued litigation was risky and would have been more costly, stating the "point of settlement is that everyone stops gambling and walks away from the table with some winnings (or at least fewer losses)". *Id*. at 431. The objecting creditor in *Doctors Hospital* cited to *Remsen* in support of its position, but the Seventh Circuit correctly noted that *Remsen* does not stand for the proposition that "courts should reject out of hand settlements that leave little for unsecured creditors." *Id*. While there are many similarities to our case, the settlement in our case is arguably much better in that the recovery to unsecured creditors is a much greater proportion of the settlement proceeds than in *Doctors' Hospital*, where the Court approved a settlement in which less than 30% of the settlement recovery would go to unsecured creditors, whereas in our case, more than 75% to 80% of the settlement recovery will go to holders of allowed claims.

18.     In *In re Pullum*, 598 B.R 489, 493 (Bankr. N.D. Fla. 2019), another case cited by
Sagi, creditors objected to a settlement in which the debtor proposed to settle with an alleged
secured creditor "whose judgment lien certificates were permanently void and of no effect" as set
forth under section 55.202(2) of a Florida statute, because the judgment lien certificates were not
timely filed. If disapproved, the opposing creditors also argued that the adversary proceeding
could be easily and quickly resolved by way of summary judgment. *Id*.  The Court in *Pullum*
reviewed the statute at issue and the parties' arguments in respect of the interpretation of the
statute, and ultimately made a statutory interpretation that suggested that the debtor would have a
reasonable chance of success in the adversary proceeding. *Id*. at 495.  Further, the Court stated
that "a finding that [Defendant] has an unsecured claim would allow a greater recovery for all
unsecured creditors and not a windfall for [Defendant] based on judgment lien certificates which
may be invalid. *Id*. at 496.

19.     Unlike *Pullum*, in which objecting creditors holding about 80% of the unsecured
debt objected to a settlement that would allow one creditor to maintain secured status in apparent
violation of a Florida statute, the Trustee notes that the settlement is approved by the majority of
creditors filing claims in this case.  Other than Sagi's judgment claim, which may be setoff
against by counterclaims, none of the other Sagi Parties has a claim against the Debtor.

20.     Finally, Sagi claims that this case "bears significant similarities to the situation in
*In re Interstate Cigar Co.*, 240 B.R. 816 (Bankr. E.D.N.Y. 1999).  Sagi is wrong. The *Interstate*
case is clearly distinguishable.  First, the objecting creditors in the *Interstate* case settled a claim
in the bankruptcy case with the creditors committee in which the objecting creditors (the
Hermans) waived an $8 million claim and instead accepted 50 percent of any recovery from a
certain adversary proceeding, net of attorneys' fees, such that the Hermans waived any right of

distribution from other monies in the bankruptcy estate and their ultimate payment "became tied directly to the outcome of the adversary proceeding". *Id*. at 820. The case involved a $200,000 settlement by the Committee for a claim that had a range of value from $4.4 million to $14.2 million, with $150,000 of such amount to be paid to the Committee's counsel, resulting in a recovery to the estate totaling only $50,000 (25% of the recovery). *Id* at 824. In addition to finding that the action had significant merits and warranted either a higher settlement amount or litigation on the issue in state court, the Court placed substantial weight on the fact that due to the earlier settlement between the Committee and the Hermans, the Committee owed "a certain degree of duty to the Hermans pursuant to their earlier claims settlement agreement." *Id*. at 825. The Court also found that the action had significant merit and warranted either a higher settlement amount or litigation on the issue in State Court. *Id*.

21.    The Trustee's Settlement Agreement in the case bears no resemblance whatsoever to the questionable settlements mentioned in the cases cited in the Sagi Objection, and in particular, the *Interstate Cigar* case. The Trustee has not entered into any agreement with the Sagi Parties with respect to their claims or recoveries in this case. Unsecured creditors are not netting only $50,000, with 75% of recoveries going towards attorneys' fees. TKD's legal fees through June 30, 2021 are estimated to be around $500,000, a small portion of the $2.55 million recovery. As explained more fully below, through the concessions achieved with the Settling Parties, and based on the Trustee's claims analysis, the remaining creditors that may ultimately have allowed claims in this case will receive distributions from this corpus alone of more than 30%. Thus, Sagi's argument that the Settlement Agreement will bring in "paltry returns", is simply false. (*See* Sagi Obj. ¶ 45.)

22.     Finally, Sagi's attempts to argue that the claims of the parties that are part of the settlement should not be counted as part of the "paramount interest of creditors" is unsupported by any law.  *See Goldstein v. Weeks Streets*, 2017 WL 567254 (N.D. Cal. Feb. 13, 2017) (finding that "Appellants consistently exclude [settling parties] as creditors and their claims at stake in their arguments which is not the proper standard to evaluate the paramount interest of creditors", distinguishing *Remsen* and stating that "unsecured debts in a settlement cannot be a litmus test for approval"); *see also In re Tower Automotive Inc.*, 241 F.R.D. 162 (S.D.N.Y. 2006) (approving a settlement with Retirees, and considering their claims as part of the paramount interest of creditors factor, nothing that the Retirees all agreed to substantial reductions that freed up significant cash essential to reorganization and for a dividend to other creditors); *see also In re Spokane Raceway Park, Inc.*, 329 Fed. Appx 86 (9th Cir. 2009) (noting that the court considered the interests of all the creditors.).

23.     As to the fourth factor (whether other parties support the settlement), Sagi discounts entirely, without any legal support, the support of the Settling Parties, most of whom are creditors who have claims against the Debtor, as well as the support of non-objecting creditors, which he ignores.  As noted herein, aside from the views of the estate representative, courts frequently consider the views of all creditors, even those involved in the proposed settlement.

24.     In support of the fifth factor (competency and experience of counsel supporting the settlement) and the seventh factor (extent to which settlement is product of arms-length bargaining), Sagi and his counsel's main argument is that the Trustee and her counsel failed to "remotely grasp the facts and circumstances of this case and its history".  (Sagi Obj. ¶ 48.). His baseless position is essentially that because the Trustee does not agree with Sagi's positions, and

agreed to settle with the Settling Parties, she must therefore be incompetent.  (Sagi Obj. ¶ 91) ("The Trustee's inept and incompetent administration of this case is not mere speculation, as it is now on full display in the Settlement Agreement.")  In making this allegation, Sagi ignores the fact that the Trustee's Settlement Motion is 89 pages long, and includes 46 pages of detailed background history, with painstaking citations to the record, including 81 exhibits totaling nearly 2000 pages in length, along with highly sophisticated and detailed legal analysis of complex case law.  The test for approval of a settlement focuses on the merits of the settlement and the Trustee's business judgment in entering into it, not whether the Trustee or Sagi and his counsel - who have lived and breathed Genger family litigation for many years prior to this case – may have a better recollection of miscellaneous hearings and orders in various pre-petition litigations to which he was involved.[8]

25.     The Trustee is a highly experienced bankruptcy lawyer.  As explained in her declaration and at her deposition, she has been a trustee for over a dozen years, while also practicing in the area of bankruptcy law since 1998 (including at prestigious bankruptcy firms such as Weil Gotshal and Cadwalader), has served as a chapter 7 trustee in thousands of cases and has settled thousands of avoidance actions.  Trustee's counsel has been practicing in this Court and other bankruptcy courts across the country for approximately 21 years and similarly has substantial "big law" bankruptcy experience.  Furthermore, Sagi's claims that the Trustee is incompetent because she should know that his claim is a surefire winner are belied by the fact that the Prior Trustee and his counsel, who conducted their own investigation of the claims being settled here, came to a similar conclusion as the Trustee here, and agreed to settle the claims for

---

[8] Dellaportas spent about 90% of his time during the Trustee's recent deposition attempting to quiz her knowledge about the Genger litigation history rather than focus on the actual terms of the Settlement Agreement or the Trustee's rationale for entering into it.  In performing this "memory test", Dellaportas refused to show the Trustee any of the underlying documents he was asking her about despite multiple requests that he do so.

$1.2 million, less than half of the initial settlement consideration the Trustee achieved here. Thus, Sagi would have this Court believe that the independent judgment of two Chapter 7 trustees that are appointed by law are less competent to assess the reasonableness of settlements than Sagi, who has been deemed by Justice Jaffe at the fraud trial to not be credible and found liable for fraud, and who recently admitted that "I don't know anything about – now I know something, but I don't know that much about bankruptcy." See Sagi Transcript, p. 104:21 to 104:23.

26.    Likewise, there is no evidence whatsoever that the Settling Parties and the Trustee did not engage in arms' length negotiations. Sagi instead once again alleges that the Trustee and her counsel do not have an understanding of the facts and law such that the Court should presume that the negotiations were not at arms-length. Further, without actually knowing the amount of reasonable legal fees (i.e. roughly $500,000 as of June 30, 2021), the Sagi Parties appear to insinuate in the Objections that the settlement was reached in order to pay the Trustee's firm only. However, as noted, the legal fees of counsel are a small portion of the actual consideration to be achieved from this settlement. And Sagi only has himself to blame for the amount of the Trustee's fees, as, notwithstanding the Trustee's numerous pleas to withdraw the Motion to Dismiss, he bullishly pressed forward with the baseless Motion to Dismiss and countless other filings in this case, which were focused on pushing forward his own interests (in his own words at the trial – a "means" and an "instrumentality"), to the detriment of other creditors and without evidentiary support.[9]

---

[9] Ironically, notwithstanding that Sagi caused the Trustee to incur significant legal fees on a baseless Motion to Dismiss, when the Trustee's counsel reached out on July 1, 2021 to follow-up on a prior overture on June 1, 2021 to find a way for a global resolution, a belligerent email communication ensued in which Dellaportas suggested that the Trustee's firm should not be compensated for legal fees associated with participating in the discovery, briefing, and trial on Sagi's wasteful Motion to Dismiss. See Cavaliere Supplemental Declaration, **Exh. 82.**

27.     The record is clear that the negotiations were arms-length and in good faith. Indeed, if the Trustee and her counsel had no expertise, how is it possible that the Trustee and her counsel were able to extract more than double the settlement consideration achieved by the Prior Trustee, including $300,000 in non-refundable consideration in connection with the settlement regardless of court approval, which is borderline unprecedented.  The Orly Trust claims, without any support, that this nonrefundable consideration is somehow "collusive".  Yet the Orly Trust fails to disclose that the Trustee also engaged in good faith negotiations with the the Sagi Parties in which they agreed to make a non-refundable payment in connection with their separate settlement negotiations last year (a $50,000 non-refundable deposit at that particular time). See Cavaliere Supplemental Declaration, **Ex. 83**.[10]

### B.  <u>The Release and Injunction Provisions Are Appropriate and Warranted</u>

28.     The Settlement Motion contains a lengthy and detailed explanation as to why the release and injunction provisions of the Settlement Agreement – and specifically the injunction of the Derivative or Duplicative Actions – are appropriate and warranted here in accordance with *Madoff* and *Tronox*.  (*See* Settlement Motion ¶¶ 66-87, 147-206.)  Faced with three separate Second Circuit opinions over the last seven years (two in the *Madoff* case and one in *Tronox*), on top of even more lower court decisions, upholding the validity of the very same type of injunction of "derivative or duplicative claims" sought by the Settlement Motion, the Sagi Parties' objections either simply ignore or attempt to sidestep that controlling precedent by pointing to inapplicable case law relating to third party injunctions and releases in the chapter 11 plan context (namely *Metromedia*), claiming that the relief sought is unprecedented in a chapter 7 case and raising jurisdictional arguments.  They are wrong on all counts – the injunction and

---

[10] A sixth *Iridium* factor deals with the "nature and breadth of releases to be obtained by officers and directors".  The proposed injunction does not relate to "officers and directors" but to the extent relevant, the Trustee addresses the permissibility of the Injunction in Section B herein.

release of Derivative and Duplicative Actions sought by the Settlement Motion is wholly consistent with Second Circuit law and is warranted based on the facts and circumstances here.

29.    The Orly Trust is the only one of the Sagi Parties that even *mentions* the *Madoff* and *Tronox* opinions (in a footnote) in its objection to the Settlement Motion.  Yet the Orly Trust who assigned its claims against all of the Settling Parties other than Orly to Recovery Effort Inc.[11] (which has not objected to the Settlement Motion) and thus only has claims against the Debtor that are clearly within the Court's jurisdiction[12] - only mentions the ***derivative*** claims portion of those decisions, and completely ignores the fact that *Madoff* and *Tronox* enjoin claims that are derivative ***or duplicative*** of claims that could have been or were asserted by the trustee/debtor.  Here, the Derivative or Duplicative Actions are not only derivative but are also indisputably duplicative of claims that could have been asserted by the Trustee (and which were pursued informally by the Trustee prior to entry into the Settlement Agreement and by the Prior Trustee prior to entry into the Prior Settlement in Texas), and that *were* asserted by Sagi prepetition in the Sagi Turnover Motion and the Sagi Avoidance Action.

30.    The Sagi Parties' objections reflect a fundamental misunderstanding of the *Madoff* and *Tronox* line of cases pertaining to injunctions of "derivative or duplicative claims", which do not rely on third party release/injunction law, and do not need to do so, because they are not third party releases.  Rather, they are based on the premise that claims that are derivative or duplicative of claims that belong to a trustee, and thus the bankruptcy estate, can be enjoined pursuant to sections 105(a) and 362 of the Bankruptcy Code because they are effectively property of the estate or interfere with property of the estate and thus violate the automatic stay

---

[11] See Cavaliere Declaration, Ex. 22.

[12] The Orly Trust Objection purports to include a joinder by Manhattan Safety Maine, Inc. and Recovery Effort Inc. in a footnote (fn. 1) despite the fact that neither of those entities filed a separate objection or joinder to the Settlement Motion. Another party cannot legally join in a filing on behalf of someone else who does not file its own joinder or objection.

imposed by section 362 of the Bankruptcy Code.  Indeed, in *Tronox*, neither District Court nor the Second Circuit even mentioned the *Metromedia* case governing non-consensual non-debtor/third party releases in a chapter 11 plan relied upon by the Sagi Parties.  And in *Madoff*, the court found independent bases for issuing the injunction, and only analyzed *Metromedia* in the alternative as a completely separate reason why the injunction was warranted (because of the unusual circumstances there, as is the case here).

31.    Shockingly, the Sagi Parties press their arguments despite the fact that, in *Madoff*, the appellants advanced the very same arguments as the Sagi Parties here – namely, that the court lacked jurisdiction to issue the injunction because their actions asserted independent claims that were not property of the estate and that the trustee could not properly assert, that the injunction was an improper nondebtor release that failed to satisfy *Metromedia*.  The Second Circuit (as well as the lower courts and subsequent courts[13]) considered and rejected all of these arguments and upheld the validity of the injunction.  Specifically, in *Madoff*, the District Court (affirmed by the Second Circuit) held as follows:

> The Appellants' arguments in this regard track closely their arguments against the Automatic Stay Order.  They argue that, because the Florida Actions assert independent claims that are not the property of the estate and that the Trustee may not properly assert, the Bankruptcy Court lacked jurisdiction to permanently enjoin those claims.  These arguments have already been discussed,

---

[13] There have now been at least ***thirteen*** separate decisions rejecting the Madoff appellants' attempts to pursue their claims, many of which involved failed attempts – rejected by the courts, which have consistently enforced the injunction – to plead around the injunction by dressing up their fraudulent transfer claims as new types of tort and other claims they alleged to be direct claims that did not violate the injunction.  *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 429 B.R. 423 (Bankr. S.D.N.Y. 2010), *aff'd Fox v. Picard (In re Bernard L. Madoff)*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd Fox v. Picard (In re BLMIS)*, 740 F.3d 81 (2d Cir. 2014); *and Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 477 B.R. 351 (Bankr. S.D.N.Y. 2012), *aff'd In re Bernard L. Madoff Inv. Sec., LLC*, No. 12 CIV. 6109 RJS, 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013); *and Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 511 B.R. 375 (Bankr. S.D.N.Y. 2014), *aff'd In re Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 345 (S.D.N.Y. 2015); *and Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016), *aff'd In re Bernard L. Madoff Inv. Sec. LLC*, 565 B.R. 510 (S.D.N.Y. 2017), *aff'd*, 739 F. App'x 679 (2d Cir. 2018); *and Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 203 (Bankr. S.D.N.Y. 2017), *aff'd*, 598 B.R. 102 (S.D.N.Y. 2019), *aff'd* 818 Fed. Appx. 48 (2d Cir. 2020).

> and found unpersuasive, in the present case. The Appellants argue that the permanent injunction is an improper nondebtor release. *See Metromedia,* 416 F.3d at 141–43. However, to the extent that any party has genuinely independent claims against the Picower defendants, those claims are not enjoined by the permanent injunction. Only claims that are "duplicative or derivative" of claims that could have been or were asserted by the Trustee are enjoined. If, for example, the Appellants had asserted in the Florida Actions that the Picower defendants made specific misrepresentations to them in order to induce their investment with BLMIS, those claims might not be enjoined. *Cf. Johns–Manville,* 517 F.3d at 55. However, as discussed in detail already, the claims alleged in the Florida Actions are duplicative of claims owned by the estate, and are not independent. Because the estate owns these claims in the first instance, the estate is entitled to settle them. *Mrs. Weinberg's,* 278 B.R. at 365. Indeed, **\*490** similar language enjoining derivative, dependent claims was approved in the settlement of the *Dreier* litigation. *See Dreier,* 2010 WL 3835179, at \*5. Simply put, the only claims being released here are claims that are the Trustee's to bring, or that are duplicative or derivative of such claims. *Metromedia's* bar on nonconsensual releases of non-debtor claims does not apply here, because the claims being released belong to the BLMIS estate. Moreover, to the extent that the injunction does constitute a nonconsensual non-debtor release, this case presents the type of "truly unusual circumstances" that would justify such a release. *See Metromedia,* 416 F.3d at 143.

*Fox v. Picard (In re Bernard L. Madoff)*, 848 F. Supp. 2d 469, 489-490 (S.D.N.Y. 2012), *aff'd*

*Fox v. Picard (In re BLMIS)*, 740 F.3d 81 (2d Cir. 2014).

32.    And regarding *Metromedia*, the District Court also rejected the Sagi Parties'
contention that the type of injunction and release sought here is improper because the provisions
are being sought outside of a chapter 11 plan of reorganization. Specifically, the court held:

> Here, the ability of the Bankruptcy Court to issue narrowly tailored injunctions of derivative claims by individual BLMIS customers against third parties who have settled avoidance claims with the Trustee is critical to the success of the SIPA liquidation. The Trustee's ability to recover BLMIS property through settlements would be seriously undermined if those from whom the property was sought believed that they faced double liability. Indeed, the Trustee was required to seek this injunction as part of the settlement agreement. Moreover, by preventing duplicative or

derivative litigation, the injunction also ensures the integrity of the SIPA liquidation itself, by preventing those who are not SIPA payees under the Net Equity Decision from circumventing that decision and undermining the liquidation plan.

*Id.* at 490.

33.     The same is true here.  If the Derivative or Duplicative Actions are not enjoined, the Settling Parties could face double liability for the very same types of claims being settled here.  It would seriously undermine the integrity of this chapter 7 case, and would greatly impact the settlement consideration that the Settling Parties would be willing to provide, if the Sagi Parties were permitted to circumvent a substantial settlement of claims by simply continuing to pursue the very same types of claims that are being settled by the Trustee through the Derivative or Duplicative Actions, which merely assert alternate theories to recover the very same property based on the very same transactions.

34.     As stated in the Settlement Motion (Settlement Motion ¶¶ 191-197), this case presents the very definition of unusual circumstances, as the Sagi Parties have launched nearly a dozen separate actions that are derivative or duplicative of one another, all seeking to obtain the Disputed Settlement Proceeds under competing legal theories, but have at the same time agreed to share all of the recoveries pursuant to the Inter-Creditor Agreement, which gives Sagi (whose actual claims for turnover and fraudulent transfer actions are derivative claims as described herein) and Manhattan Safety, the assignee of his company TPR, first "dibs" to any recoveries (and does not provide for any distribution to Dalia or the Orly Trust, despite the Orly Trust's completely disingenuous statement in its objection that it merely seeks the money for the benefit of the Orly Trust and Orly, and any other beneficiaries).  Moreover, the settlement consideration - $2.55 million plus potential future recoveries on claims that Claims Pursuit is willing to pursue for the benefit of the estate – is substantial consideration in an individual chapter 7 case where

the claims being settled are subject to numerous defenses that would be prosecuted by extremely competent counsel.

35.     And while the Sagi Parties repeatedly quote Judge Forrest in support of their supposedly inevitable victory in this case, they conveniently fail to mention that it was none other than Judge Forrest who issued the injunction of derivative or duplicative claims in *Tronox*, ultimately upheld by the Second Circuit (*In re Tronox, Inc.*, 855 F.3d 84 (2d Cir. 2017), finding that "[t]he Injunction is also consistent with Second Circuit precedent. In a recent case that involved a multi-billion dollar settlement of fraudulent transfer claims, the Second Circuit upheld a permanent injunction that, like the one at issue here, was "limited to third-party claims based on derivative or duplicative liability or claims that could have been brought by the Trustee against the ... releasees." *In re Tronox, Inc.*, 2014 WL 5825308, *10 (S.D.N.Y. 2014) (Forrest, J.) (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 89, 95 (2d. Cir. 2014). The Sagi Parties also conveniently ignore the fact that it was none other than Judge Broderick - who succeeded Judge Forrest and was the presiding judge on (i) the Sagi Turnover Motion (which was since dismissed by Judge Broderick without prejudice to renewal following the bankruptcy proceedings) and (ii) the Sagi Avoidance Action (which has since been formally stayed by Judge Broderick)– who recently upheld the validity of the injunction of derivative or duplicative claims in *Madoff. See, e.g., Securities Investor Protection Corporation v. Bernard L. Madoff Securities, LLC*, 598 B.R. 102 (S.D.N.Y. 2019) (Broderick, J.) (affirming Judge Bernstein's lower court decision dismissing third party's action and enforcing permanent injunction of derivative or duplicative claims granted in prior settlement order originally issued by Judge Lifland (429 B.R. 423), and affirmed by Judge Koeltl (848 F.Supp.2d 469)), aff'd 818 Fed. Appx. 48 (2d Cir. 2020) (summary order). Having intentionally sought transfer of this chapter 7 case to this Court

with full knowledge of the law in this Circuit in order to allow their claims to be adjudicated by the federal courts of New York, and in particular by Judge Broderick, the Sagi Parties cannot now evade the law that governs injunctions of derivative or duplicative claims like the ones sought here by the Settlement Motion, and the very decisions of their preferred judges.

36.    The Sagi Parties fail to offer any explanation as to why binding Second Circuit precedent does not apply to them, nor does any exist.  Accordingly, the injunction sought by the Settlement Agreement – which tracks the "derivative or duplicative" language already approved in *Madoff* and *Tronox* – is entirely appropriate and should be approved.

(i)    <u>Similar Injunctions Have Been Approved in Chapter 7 or Similar Cases</u>

37.    The Sagi Parties also argue that the release and injunction of the Derivative or Duplicative Actions sought by the Settlement Motion is unprecedented in a chapter 7 case. Again, they are wrong – *Madoff* itself was a chapter 7 case that was substantively consolidated with a SIPA liquidation case.  *See SIPC v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-1789 (BRL) (Bankr. S.D.N.Y. June 10, 2009) (Docket No. 252) (Consent Order Substantively Consolidating the Estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment Securities LLC and Expressly Preserving All Rights, Claims and Powers of Both Estates) (providing for the substantive consolidation of Madoff's chapter 7 estate (Case No. 09-11893) into the broker-dealer SIPA liquidation proceeding (Case No. 08-01789) (¶¶ L, 3).).  That order provides that the SIPA trustee "shall have all duties and powers of a Chapter 7 trustee for the Madoff estate other than those set forth in paragraph 4 hereof" (*id.* ¶ 6), and that "the SIPA Trustee is authorized to pursue claims on behalf of the consolidated estate as the representative of and fiduciary for the BLMIS SIPA Proceeding and as subrogee and assignee of creditors' claims for, among other things, the avoidance and recovery of transferred property" (*id.* ¶ 7).

38.    Similarly, in Lehman Brothers Inc.'s SIPA liquidation proceedings, and prior to the three *Madoff* and *Tronox* Second Circuit opinions, Judge Peck approved a settlement and issued an injunction barring the pursuit of duplicative claims against the settling party. *See In re Lehman Brothers Inc.*, No. 08-01420 (JMP) (Bankr. S.D.N.Y. April 16, 2013) (Docket No. 6021). As is the case here, that order (i) provides for the transfer of assets by a trustee pursuant to a settlement agreement free and clear of all liens, claims and encumbrances (*id.* ¶ 10), (ii) prohibits and enjoins "[a]ll Persons . . . from taking any action to adversely affect or interfere with the ability of the Parties to transfer property and Claims pursuant to and subject to the terms of the Settlement Agreement" (*id.* ¶ 13), and (iii) permanently enjoins the pursuit of "any suit or proceeding, arising out of the facts and transactions relating, directly or indirectly, to" duplicative claims against the settling party (*id.* ¶ 14[14]).

39.    It is well established that SIPA liquidation proceedings are treated like chapter 7 cases, and are in fact, administered in accordance with subchapters I and II of chapter 7 of the Bankruptcy Code (in addition to chapter 1, 3, and 5 of the Bankruptcy Code). *See* 15 U.S.C. § 78fff(b) ("To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11."); *see also* 1 Collier on Bankruptcy P 12.02 (2021) ("The provisions of the Bankruptcy Code apply in a SIPA liquidation to the extent consistent with SIPA, and in that regard SIPA liquidations are similar to chapter 7 liquidations

---

[14] Paragraph 14 of the order provides as follows: "All Duplicative Claimants, and any persons claiming for, through or under any Duplicative Claimants, and all other Noticed Parties, are permanently enjoined from (i) commencing, conducting, or continuing any suit or proceeding, arising out of the facts and transactions relating, directly or indirectly, to the Duplicative Claims or claims for accounts with LBIE, against LBIE in any U.S. state or federal court and/or in any foreign court or foreign proceedings (other than in the UK Proceeding), (ii) levying against or attaching the property LBIE is receiving pursuant to the Settlement Agreement in any U.S. state or federal court and/or in any foreign court or foreign proceedings (other than in the UK Proceeding), or (iii) creating, perfecting or enforcing any purported encumbrance against the property LBIE is receiving pursuant to the Settlement Agreement."

with the addition of SIPA's customer property provisions."); *In re Lloyd Sec.*, 75 F.3d 853, 859 (3d Cir. 1996) ("We … conclude that SIPA incorporates § 503 of the Bankruptcy Code and requires that a SIPA proceeding be treated like a chapter 7 bankruptcy case."). Accordingly, a SIPA trustee is vested with the authority to avoid transfers pursuant to chapter 5 of the Bankruptcy Code just like a chapter 7 trustee. *See SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 448 (Bankr. S.D.N.Y. 2015) ("To the extent consistent with SIPA, the liquidation is conducted in accordance with chapters 1, 3 and 5 and subchapters I and II of chapter 7 of the Bankruptcy Code, SIPA § 78fff(b), and the trustee is vested with the same powers and title with respect to the property of the debtor, including the right to avoid preferences, as any ordinary bankruptcy trustee.").

40.    And similar injunctions were issued by Judge Glenn and Judge Bernstein in, respectively, the Dewey & LeBoeuf (a liquidating chapter 11 case) and Dreier (a joint settlement between the chapter 7 (for Marc Dreier individually) and chapter 11 (for the Dreier LLP law firm) trustees) bankruptcy cases. *See In re Dewey & LeBoeuf LLP, No. 12-12321* (MG) (Docket No. 1472) (Bankr. S.D.N.Y. May 30, 2013) (settlement order provided, in relevant part, that "all Persons (as defined in the Plan) and entities are enjoined and barred from commencing or continuing any and all past, present or future Claims (as defined in the Plan) or Causes of Action (as defined in the Plan) and from asserting any and all allegations of liability or damages, of whatever kind, nature or description, direct or indirect, in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability or otherwise, whether or not based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty or otherwise (including attorneys' fees, costs or disbursements) . . . [against the settling party] . . . where the Claim constitutes or arises from a Released Claim, including any ***Claim that is duplicative of any***

***Claim of the Debtor, is derivative of any Claim of the Debtor, or could have been brought by
or on behalf of the Debtor or its estate*** including Claims based on alter ego or veil piercing or
similar doctrine or otherwise based on the contention that the Partners of the Debtor or its
Predecessor Entities or Related Entities are liable for the debts of the Debtor . . . ." (¶ 8
(emphasis added)); *In re Dreier LLP*, No. 08-15051 (SMB) (Docket No. 610) (June 9, 2010).

41.    Thus, the fact that this case is a chapter 7 case does not prohibit entry of the
injunction and releases sought by the Settlement Motion.

**(ii)    The Court Has Jurisdiction to Approve the Settlement Agreement and
Injunction**

42.    Dalia and the Orly Trust's arguments that the Court lacks jurisdiction to enter the
injunction sought by the Settlement Motion are equally meritless.  As the Second Circuit made
clear in *Madoff*, "Insofar as such claims are truly duplicative or derivative, they undoubtedly
have an effect on the bankruptcy estate and, thus, are subject to the Bankruptcy Court's
jurisdiction."  *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d at 89.  The Second Circuit
reaffirmed this position in *Tronox*, where it held "In making that pronouncement in *Madoff*, we
held that the bankruptcy court did not exceed its jurisdiction in issuing the injunction. 740 F.3d at
89.  The Injunction here does the same: it goes to the limit of the bankruptcy court's jurisdiction
to bar derivative or duplicative claims, but no further."  *In re Tronox, Inc.*, 855 F.3d 84, 111 (2d
Cir. 2017).

43.    The Settlement Motion explains at great length why the Court has jurisdiction and
the authority to approve the injunction and releases sought by the Settlement Motion, and why
the Derivative or Duplicative Actions are not independent, direct claims, but rather are claims
that are truly derivative or duplicative of estate claims and can be enjoined.  (*See* Settlement
Motion ¶¶ 152-190, 198-206.)

44.    And as noted in the Settlement Motion (Settlement Motion ¶ 179), Sagi and the

Orly Trust have already admitted that the other fraudulent transfer/turnover claims are derivative

or duplicative of each other.  *See* Sagi Amended Motion to Dismiss, Docket No. 239 ¶ 61 ("The

involvement of every other party or alleged creditor is derivative of, and would be resolved as

part of, the adjudication by the District Court of that two-party dispute."); *see also* Orly Trust

Objection to Texas Settlement Motion, Docket No. 114 ¶ 27 ("As a result of the foregoing

fraudulent scheme, shortly prior to the Petition Date, in June 2019, Recovery Effort, Inc.

("REI"), a wholly owned subsidiary of the Trust to which the Trust has assigned its rights in

connection with the 2013 Settlement, brought suit in the Southern District of New York, styled

*Manhattan Safety Maine, Inc. & Recovery Effort, Inc. v. Michael Bowen, et al*., Civil Action No.

1:19-cv-5642 (S.D.N.Y. 2019) (the "Trust Avoidance Action"), in order to recover the 2013

Settlement proceeds that rightfully belonged to the Trust (and/or its assignee REI) . . . ."), ¶ 28

("Concurrently and also prior to the Petition Date, Sagi also sought to pursue and recover those

same 2013 Settlement proceeds assets as a judgment creditor in that certain proceeding styled

*Dalia Genger v. Sagi Genger v. Orly Genger*, Civil Action No. 1:17-cv-8181 (S.D.N.Y. 2017)

("Sagi Avoidance Action"). .") ("While REI and Sagi have somewhat different positions on

ownership of the 2013 settlement proceeds, the two parties have agreed to share in any recovery,

rather than expend limited resources competing with one another for the same funds.").

45.    In fact, in moving to transfer this chapter 7 case to this Court from its original

filing place of Texas (where the Debtor actually resides), Sagi stated that "the central issue in

this bankruptcy will be the Debtor's fraudulent conveyance of her $32.3 million in settlement

proceeds to third parties, including her father and his creditors. Those transfers took place in

New York, and will be subject to New York Debtor-Creditor Law governing such transfers,

which is yet another factor favoring transfer to the Southern District of New York." *See* Sagi

Motion to Dismiss or to Transfer Venue, Docket No. 32 ¶ 53.  In doing so, Sagi argued:

> "Lastly, there is the issue of related cases; there are eight of them.
> No less than four TRI-related cases are pending in the U.S. District
> Court for the Southern District of New York, all of which center
> on the same issue that is central to this bankruptcy—the fate of the
> $32.3 million in Orly's settlement proceeds: (a) *Sagi Genger v.
> Orly Genger*, Civ. Action No. 17-cv-08181; (b) *Recovery Effort v.
> Zeichner et ano*, Civ. Action No. 19-5641; (c) *Manhattan Safety &
> Recovery Effort v. Michael Bowen et al.*, Civ. Action No. 19-5642;
> and (d) *Sagi Genger v. Arnold Broser et al.*, Civ. Action No. 19-
> cv-06100. Another four TRI-related cases are pending in the state
> courts of the same New York county: (a) *In re Application of Orly
> Genger*, File No. 2009-0017 (Surr. Ct.); (b) *In re Matter of Dalia
> Genger*, File No. 2008-0017E (Surr. Ct.); (c) *Dalia Genger v. Arie
> Genger*, Case No. 113862/2010 (Sup. Ct.); and (d) *Arie Genger et
> ano v. Sagi Genger et al.*, Case No. 651089/2010 (Sup. Ct.)."

*Id.* ¶ 54.  Thus, Sagi has already admitted that the Sagi Parties' various Derivative or Duplicative

Actions are in fact, related and derivative or duplicative of one another, as they all seek to avoid

and recover the Disputed Settlement Proceeds based on an allegation that they belong to the

Debtor, who in turn, misappropriated them.  The Orly Trust and Dalia joined in that motion filed

by Sagi and thus are similarly bound by Sagi's position.  (*See* Docket Nos. 108 & 124.)

46.     The Sagi Parties also ignore the simple fact that none of the Derivative or

Duplicative Actions would exist if Orly was not a party to the 2013 Settlement Agreement, that

Orly is an indispensable party to each of those cases, regardless of whether or not she is presently

named as a party, and that as a result, the Derivative or Duplicative Actions are subject to the

automatic stay imposed by section 362(a)(1) of the Bankruptcy Code.  (*See* Settlement Motion ¶¶

198-206.)  None of the objecting parties were parties to the 2013 Settlement Agreement, and the

2013 Settlement Agreement does not provide that any of them are to receive a single dollar of

the Disputed Settlement Proceeds.

47.    Sagi does not and cannot dispute that the Sagi Turnover Motion and the Sagi

Avoidance Action are plain vanilla derivative claims that belong to the Trustee.  Through them,

he is seeking to avoid and recover transfers that he contends belong to Orly, and thus, to her

chapter 7 estate.

48.    The Orly Trust Avoidance Action is an action that is only currently pending

*against Orly* (and the Trump Group).  None of the other Settling Parties are party to that action

any longer.  And the Orly Trust filed the single largest claim in this chapter 7 case, totaling $41

million.   The Orly Trust's proof of claim attaches the Orly Trust Avoidance Action, and its

addendum provides, in relevant part, as follows:

> As set forth more fully in Exhibits A and B, the Orly Genger 1993
> Trust, through Michael Oldner as successor Trustee to Dalia
> Genger, seeks base damages in the amount of $32.3 million, plus
> statutory interest. The $32.3 million consists of: (a) two interest-
> free promissory notes in the amount of $15 million, which are not
> yet payable, and (b) a $17,257,001 cash payment that was
> misappropriated from the creditor on July 1, 2013. Applying the
> CPLR statutory rate of 9% which governs the claim to the latter
> amount, the total prejudgment interest sought by the creditor, as of
> the July 12, 2019 petition date, is $9,365,587. When that interest
> amount is included, the total claim amount is $41,622,588.

(*See* Settlement Motion Ex. 29 (Claim No. 12).)

49.    Similarly, Dalia filed a proof of claim in this case, which seeks $12.5 million plus

interest, alleging that the basis of her claim was a "Constructive Trust claim described in Exhibit

A" and that her claim was secured by a lien on "Proceeds from 2013 litigation settlement" and

identifying the value of the property subject to her purported lien as "$32,257,001"105 (the

Disputed Settlement Proceeds).  (*See* Settlement Motion Ex. 70 (Claim No. 9).) Dalia's proof of

claim attaches a filing in this case in which she asserts a constructive trust over the Disputed

Settlement Proceeds, the 2004 Indemnity, the 2004 Promise, Dalia's $6 million judgment against

Sagi, and Judge Forrest's decision in the *Sagi v. Orly* matter relating thereto.  (*Id.*)  Dalia then

filed the Constructive Trust Action before this Court, seeking relief from this Court with respect

to the Disputed Settlement Proceeds.  (*See* Settlement Motion Ex. 71.)

50.     In taking all of these actions, the Orly Trust and Dalia indisputably submitted

themselves to the jurisdiction of the Bankruptcy Court with respect to their claims and, thus,

issues relating to the disposition of the Disputed Settlement Proceeds.  (*See* Settlement Motion ¶

154.)

51.     Against this backdrop, the Sagi Parties' arguments as to a lack of jurisdiction here

defy credulity and should be rejected.

**(iii)     <u>The Discharge Actions Can Be Enjoined</u>**

52.     The Sagi Parties argue that the Sagi Discharge Objection, the Dalia Discharge

Objection and the Orly Trust Discharge Objection (collectively, the "<u>Discharge Objections</u>")

cannot be enjoined.  However, the Discharge Objections can be enjoined just like any other

claims because they are derivative or duplicative of actions that the Trustee could have asserted.

The inclusion of the Discharge Objections in the release and injunction provisions of the

Settlement Agreement was an integral part of the Settlement Agreement and was a term on

which the Settling Parties conditioned their willingness to enter into the Settlement Agreement.

53.     The Discharge Objections all seek to deny the Debtor a discharge pursuant to

section 727 or to prevent dischargeability of the Sagi Parties' "debts" pursuant to section 523

based on allegations that the Debtor fraudulently transferred and/or frustrated the Sagi Parties'

efforts to obtain the Disputed Settlement Proceeds.  The section 727 claims are estate claims that

the Sagi Parties are currently prosecuting in a representative capacity on behalf of all creditors.

And the section 523 claims are derivative or duplicative of the section 727 claims, as they are all

based on alleged misconduct pertaining to the alleged fraudulent transfer, misappropriation and/or concealment of the Disputed Settlement Proceeds that, if true, would only cause a generalized harm to all creditors of the estate, not a particularized injury to any of the Sagi Parties.    They are therefore derivative or duplicative of the Sagi Parties' various turnover/fraudulent transfer claims, as well as the Trustee's claims relating to the Disputed Settlement Proceeds, and can be enjoined pursuant to *Madoff* and *Tronox* just like any other claims.

54.    Contrary to the Sagi Parties' contentions, Local Bankruptcy Rule 4007-2(a) does not apply to the Settlement Agreement.  Local Bankruptcy Rule 4007-2(a) provides "***In the event of the withdrawal*** of a complaint objecting to discharge ***or failure to prosecute an adversary proceeding objecting to discharge***, no discharge shall be granted unless the debtor shall make and file an affidavit and the debtor's attorney shall make and file a certification that no consideration has been promised or given, directly or indirectly, for the withdrawal or failure to prosecute."  (Emphasis added.)  Here, the Settlement Agreement does not provide for the withdrawal of a complaint objecting to discharge, and does not relate to a failure to prosecute a discharge objection.[15]  Rather, it provides for an injunction that enjoins the Discharge Objections because they are derivative or duplicative of estate causes of action being settled by the Settlement Agreement, consistent with *Madoff* and *Tronox*, which do not in any way limit the scope of what types of causes of action can be enjoined as long as they are derivative or

---

[15] Accordingly, this case is distinguishable from *In re Meffert*, cited by the Orly Trust.  In *Meffert*, the debtor was paying the party asserting a discharge objection to withdraw the discharge objection.  The withdrawal portion of the deal triggered Local Bankruptcy Rule 4007-2(a), which Judge Bernstein determined prevented approval of the settlement.  Nevertheless, Judge Bernstein determined that the plaintiff had failed to plead the discharge objection with the particularity required by Rule 9(b) and ordered the plaintiff to show cause within 20 days as to why the discharge objection should not be dismissed for failure to state a claim, and for failure to satisfy the pleading requirements of Rule 9(b).  *In re Meffert*, 232 B.R. 71, 75 (Bankr. S.D.N.Y. 1998).

duplicative claims.  The Sagi Parties have no basis for trying to limit the scope of that controlling

precedent.

55.    Even putting aside *Madoff and Tronox*, Judge Hardin's opinion in *In re Hass*, 273

B.R. 45 (Bankr. S.D.N.Y. 2002), which long predates those decisions, is particularly instructive

with respect to settlement of discharge actions and Local Bankruptcy Rule 4007-2(a).   In

relevant part, it provides:

> Where a Section 727(a) action lapses or is withdrawn, Local
> Bankruptcy Rule 4007–2(a) acts as a check against the discharge
> of a debtor who has secretly paid off the plaintiff, to the detriment
> of all other creditors, who would benefit by denial of the debtor's
> discharge.  Local Bankruptcy Rule 4007–2(a) cannot be invoked,
> however, in at least two circumstances: (1) where there has been a
> bona fide settlement, by the trustee or a creditor, of a Section
> 727(a) claim in exchange for consideration to be paid to the
> debtor's estate; and (2) where the creditor files a complaint
> asserting causes of action under Sections 523(a) and 727(a) and,
> upon obtaining a settlement of his 523(a) claim, seeks to withdraw
> or dismiss the 727(a) claims pursuant to Bankruptcy Rule 7041.
> The interests of the debtor's estate and all creditors are protected
> by Bankruptcy Rules 9019 and 7041.   The need for Local
> Bankruptcy Rule 4007–2(a) is obviated in circumstance (1),
> because settlement of the Section 727(a) action will benefit the
> estate. The terms of the settlement will be disclosed to all
> interested parties, and the court will be called upon to determine
> whether the settlement is in the best interests of the estate, i.e.,
> whether the debtor's payment of post-petition money or property to
> the estate is preferable to further litigation to deny the debtor's
> discharge . . . .

*Id.* at 57.  There, Judge Hardin approved the settlement of a discharge action and found that

Local Bankruptcy Rule 4007-2(a) was not applicable, noting that "[c]onsensual resolution of

litigation has been favored in the law from time immemorial, whether by the parties themselves,

or through mediation or other techniques of dispute resolution. Settlements in discharge and

dischargeability litigation are no less favored."  *Id.* at 50.  Notably, he held that "a per se

prohibition on compromise of Section 727(a) actions is entirely inconsistent with Bankruptcy

Rule 7041, *Chalasani*, the time-honored judicial policy which favors consensual dispute resolution, and the right which a plaintiff always has to decline to continue prosecuting a claim." *Id.* at 54. Here, the Trustee provided sufficient notice to parties in interest in accordance with this Court's scheduling orders, and parties in interest had almost 50 days or approximately 3.5 times the usual 14 day objection deadline period provided by Bankruptcy Rule 2002 to object to the Settlement Motion.

56.     Moreover, the very existence of Bankruptcy Rule 7041 and Local Bankruptcy Rule 4007-2(b) makes clear that discharge objections can be settled. Bankruptcy Rule 7041 provides, in relevant part that "a complaint objecting to the debtor's discharge shall not be dismissed at the plaintiff's instance without notice to the trustee, the United States trustee, and such other persons as the court may direct, and only on order of the court containing terms and conditions which the court deems proper." Thus, "courts may fashion case-appropriate remedies. Bankruptcy Rule 7041 grants bankruptcy courts sufficient authority and flexibility to place conditions on dismissal adequate to prevent tainted compromises." *In re Hass*, 273 B.R. 45, 52 (Bankr. S.D.N.Y. 2002) (internal citations omitted). Local Bankruptcy Rule 4007-2(b) provides that "[i]n all instances not governed by section 524(d) of the Bankruptcy Code, no adversary proceeding to determine the dischargeability of a debt shall be settled except pursuant to an order of the Court after due inquiry into the circumstances of any settlement, including the terms of any agreement entered into between the debtor and creditor relating to the payment of the debt, in whole or in part." Obviously, it would improperly render these two rules meaningless if a discharge objection could not be settled.

57.     Under the facts and circumstances here, the inclusion of the Discharge Objections in the injunction and release provisions in the Settlement Agreement is warranted and is a case

appropriate remedy. The Discharge Objections are nothing more than dressed up fraudulent transfer claims that the Sagi Parties have concocted to spread more chips around the table in order in furtherance of their coordinated pursuit of their fraudulent transfer/turnover claims against the Settling Parties for Sagi's benefit. As a result, the Discharge Objections ought to be enjoined as derivative or duplicative of those very claims that the Settling Parties are providing substantial consideration to settle.

58.    The numerous *Madoff* decisions have repeatedly held that alternatively labeled claims that are really just disguised fraudulent transfer claims are subject to the injunction there regardless of the new labels the appellants attempt to attach to the claims. As Judge Broderick aptly stated, "In sum, despite Appellants' attempts to 'thread the eye of the needle outlined by the prior decisions in this line of cases,'" the legal claims that Appellants assert are, once again, merely fraudulent transfer claims – 'the paradigmatic example of a claim that is general to all creditors in bankruptcy.' For that reason, the Bankruptcy Court correct concluded that the *Fox III* Complaint violates the permanent injunction and that the action should be dismissed." *See, e.g., Securities Investor Protection Corporation v. Bernard L. Madoff Securities, LLC*, 598 B.R. 102, 117 (S.D.N.Y. 2019) (Broderick, J.) (internal citations omitted). The same is true here, and an injunction of the Discharge Objections is warranted because they are simply disguised fraudulent transfer claims that are general to all creditors.[16]

59.    In addition to the foregoing, the allegations in the Discharge Objections mirror the allegations in Sagi's Amended Motion to Dismiss. Given the Discharge Objections' severe

---

[16] Oldner's Objection cites to numerous emails between counsel to the Trustee and counsel to the Brosers/ADBG as evidence that Trustee's counsel agrees with the Mr. Oldner's recitation of the law on releases and injunctions. However, those emails from Trustee's counsel are not evidence of any such thing. The emails merely reflect settlement communications in which the Trustee's counsel is posturing and debating the law on releases and injunctions – as the putative plaintiff and thus the opposing party – with counsel to the Brosers/ADBG in an effort to maximize settlement value to the estate. It should come as no surprise that the Trustee's counsel pressed competing legal positions in settlement communications in order to maximize value.

pleading deficiencies, coupled with the fact that the Sagi Parties, all of whom had an opportunity

to present evidence, failed to provide any evidence sufficient to warrant dismissal of this case or

denial of discharge or dischargeability during the Court's seven-day trial on Sagi's Amended

Motion to Dismiss the chapter 7 case, the Court could also dismiss the Discharge Objections *sua*

*sponte* or on *res judicata* or law of the case grounds.

### C. <u>The Sagi Parties' Objections Relating to the Homestead are Meritless</u>

60.    As noted above, although Sagi does not attempt to distinguish the potential

defenses raised by the Settling Parties to the Disputed Settlement Proceeds, he does spend some

time attacking the inclusion of the Homestead in the Settlement Agreement.  Sagi makes the

following "arguments" in the Sagi Objection regarding the Homestead (as defined in the

Motion).

(a) The Settlement Agreement also gives Herschmann the Debtor's half share of the Homestead in exchange for little or no consideration, in which the Debtor's interest is in excess of $1.5 million, noting that Zillow recently estimated the value at $4.1 million.  <u>See</u> Sagi Objection, ¶ 4 and 31.

(b) Herschmann is not making any payment on account of the Homestead under the Settlement Agreement. <u>Id</u>.

(c) The $2.5 million payment under the Settlement Agreement is barely more than the value of the Debtor's interest in the Homestead. Id. at ¶ 30.

(d) The Trustee did not get an appraisal or other valuation of the Homestead, instead relying "solely" on information provided by the Debtor's "obviously conflicted" husband and a broker the referred to the Trustee. Id. at ¶ 31, fn. 10.

(e) The value of the Debtor's interest in Homestead is limited by section 522(p) of the Bankruptcy Code to a value of $170,350 because the Debtor acquired the interest within 1,215 days of the Petition Date. However, citing statements in a letter dated May 2, 2019 from Daniel Benson, Esq., the Debtor's domicile was not in Texas on the Petition Date, and thus, section 522(b)(3) does not permit her to exempt property under Texas's liberal homestead exemption, and at most the federal exemption of $25,150 applies. Id. ¶¶ 31, 32, and 33.

(f) The Debtor executed a conditional deed of trust to her husband pursuant to which she granted a lien on Homestead to her husband within the one year

period and 1.5 years after Herschmann made the payment to KBT, which is deemed a gift under the pre-nuptial agreement. ¶ 34.

(g) Sagi made proposals to the Trustee to guarantee recovery on Homestead, irrespective of litigation risks on Homestead and other defenses Debtor and Herschmann could assert, including one offer that guaranteed $1.6 million to estate. ¶ 35.

61.     Sagi's arguments with respect to the value of the Homestead is a constantly moving target.  In some instances, Sagi claims the Homestead is worth $3 million (with Orly's portion being $1.5 million); and more recently, Mr. Dellaportas located a Zillow "valuation" that attributes a value of $4.1 million to the Homestead. Notwithstanding all of these significant figures, as Sagi himself indicated in the Sagi Objection, the most he was willing to offer to the Trustee was $1.6 million, but what Sagi does not say is that $1.6 million was the amount he proposed to pay for the entire Homestead, including Herschmann's interest in the Homestead.  In addition, the $1.6 million figure offered to the Trustee for the entire Homestead, also included a number of other forms of consideration.[17]  Namely, if accepted by the Trustee, Sagi would also have gotten the right to pursue the Disputed Settlement Proceeds through his law firm, Emmet Marvin, as well as a full release of all counterclaims that may exist against Sagi.  A copy of the December 16, 2019 memoranda to the Trustee is annexed as **Exhibit 83** to the Supplemental Declaration of Rocco A. Cavaliere.  In other words, much like the Settlement Agreement, to which the Trustee seeks approval, which includes numerous forms of consideration, Sagi's proposal contemplated a global deal, not an isolated offer to purchase the entire Homestead for $1.6 million.

---

[17] The Sagi Objection does not take a position on Orly's lack of interest in parking spaces and storage units which have their own independent value and are transferable among residents in the building.  For instance, parking spots alone at the W Hotel Residences can fetch over $100,000 per spot.  Thus, if the Trustee had accepted $1.6 million as a "stalking horse bid" from Sagi, Herschmann could have matched this price under section 363(i) which permits a non-debtor spouse to match an offer on co-owned real property.  Then, the Trustee would have had to determine how much of the $1.6 million would remain in the estate and how much would be paid to Herschmann, and after considering capital gains taxes, the Debtor's lack of interest in the parking spaces and storage units, the estate would have recovered significantly less value than what is proposed in the global Settlement Agreement before the Court.

62.     It is true that the Trustee did not get an appraisal for the Homestead.  However, an appraisal is not a pre-requisite to a sale if the Trustee has other means available to her to identify the actual value.  In this case, the Trustee's assessment of the value of the Homestead took into account the views of Katy McCallum, a licensed Real Estate Broker that the Trustee understands has sold more units in the W Hotel than any other broker, and likely has the most knowledge of the Homestead's value.  Sagi objects to the Trustee's reliance on Ms. McCallum ostensibly because Mr. Herschmann recommended that the Trustee communicate with her regarding the value of the Condo Interest.  However, Ms. McCallum is not some random broker in Austin.  She did not represent Mr. Herschmann when he originally bought the Condo unit and there is no other ground to suggest her views is anything other than a sound objective assessment given current market conditions and her knowledge of comparable sales in the building.  Since 2005, she has worked for Stratus Properties, the developer of the entire W Residences project, which was built in 2010.  She manages the sales team for the entire condominium project and closed all of the 159 condos which sold there from 2011 through 2014.  She has also resold or leased more than 50 of the units since that time.  She is by far the most experienced and knowledgeable broker dealing with the W building; even her real estate office is located at the W building.[18] That fact is not altered simply because Mr. Herschmann recommended her.

63.     Further, aside from the Trustee's own investigation, including Ms. McCallum's views of the value, the Trustee also considered the fact that the Homestead had a tax assessable value of about $2.4 million, which the Trustee understands reflects an approximate fair market valuation of the entire Homestead, including parking and storage.  After establishing that the

---

[18] Ms. McCallum's contact information, information on Stratus Properties, and information regarding the residential assets Ms. McCallum manages, are available at the following links.  https://www.stratusproperties.com/contact/; http://block21residences.com/contact; https://www.stratusproperties.com/property/block21/; https://www.stratusproperties.com/property/barton/; http://bartoncreekliving.com/contact/

likely value of the entire Homestead was, roughly $2.4 million. However, this value is not an even 50/50 split between Herschmann and Orly and Orly's portion must be discounted by her lack of ownership of valuable parking spots and storage units, which are owned exclusively by Herschmann. Once brokerage fees, taxes (including capital gains) and any other related closing costs,, as well as the Debtor's homestead exemption (which is being waived) is considered, the Trustee believed that the potential net equity was roughly $400,000, which would further be depleted b – perhaps entirely - by legal fees in connection with a contested sale.

64.    Sagi also claims that Herschmann is not making any payment to the Trustee for the Homestead but this argument ignores the fact that the Settlement Agreement is a global settlement in which the Trustee will receive $2.55 million with potential upside on future recoveries from the Estate Claims. Further, the Trustee's objective is to receive the $2.55 million from the Settling Parties, irrespective of the party that makes the payment to the Trustee, and it is of no concern of the Trustee which of the Settling Parties actually pays the full $2.55 million or if Herschmann is contributing to one of the Settling Parties on some portion of the Settlement Payment.

65.    While the Trustee relies on empirical data in support of value, Sagi's exclusive reliance of value is based on zillow.com – which has been found to be inherently unreliable by other courts – to try to support his position as to the value of the Condo interest is telling. Courts have uniformly held in a variety of contexts that Zillow is an inherently unreliable source that cannot be relied upon. *See, e.g.*, Decision and Order, *In re Miroslav J. Bartonik*, Case No.: 13-75485-AST, Doc. No. 14, dated April 10, 2015 ("Courts presented with this type of value evidence have rejected it, noting that Zillow.com is inherently unreliable, because it is a participatory site almost like Wikipedia. Whereas Wikipedia allows anyone to input or change

specific entries, Zillow allows homeowners to do so.") (quoting and citing *In re DaRosa*, 442 B.R. 173, 177 (Bankr. D. Mass. 2010); *Debilio v. Golden (In re Debilio)*, 2014 Bankr. LEXIS 3886, at *19 (B.A.P. 9th Cir. Sept. 11, 2014); *In re Cocreham*, 2013 Bankr. LEXIS 3537, at *8-9 (Bankr. E.D. Cal. Aug. 23, 2013); *In re Slovak*, 489 B.R. 824, 826 (D. Minn. 2013). Indeed, the webpage itself cautions that its "zestimates" are "not an appraisal and can't be used in place of an appraisal." *Patel v. Zillow, Inc.*, No. 17-C-4008, 2018 U.S. Dist. LEXIS 76245, at *11 (N.D. Ill. May 7, 2018) (Zillow estimates "are nonactionable opinions of value" and "are merely an estimate of the market value of a property — as supported by Zillow.com's statements that Zestimates may not be accurate.").

66.     But apart from an inaccurate overall value, Sagi's estimate also fails to take into account other factors which affect the value of the Debtor's interest, including that the unit has had water damage which would have to be reported to any market purchaser, that the Debtor has no interest or ownership in the valuable parking spaces and storage associated with the condo unit or the furnishings in the unit, or that the other half interest of the unit is owned by Mr. Herschmann, which is protected by Texas law as his homestead.  Further, as Ms. McCallum has made clear, the value of the Condo has been negatively impacted by COVID, as Austin high-rise apartment living with shared common spaces is less attractive than it may have once been, and currently homeless encampments have been set up right out front of the building, causing building lockdowns and negatively affecting property values.  The only comparable sale in the building for a similar Condo unit took over 300 days to sell and sold for a 13% discount off the 2019-2020 list price due to unstable market conditions.  That discount occurred even though, unlike the unit where the Debtor resides, that unit had walk-in closets and came with two premium parking spaces and two premium storage units, according to information provided by

Ms. McCallum.  In fact, Ms. McCallum is not aware of any units that have *ever* sold without parking.  The Trustee has taken all of these factors and others into account in determining the reasonableness of the settlement, including significant expenses of capital gains taxes (including considering the Debtor's cost-basis is zero), listing fees, moving expenses, and litigation expenses that would be incurred with any other sale of the unit.  To that end, Sagi's purported $1.6 million "stalking horse" to give him the right to pursue the Disputed Settlement Proceeds and the entirety of the Homestead (including what the Debtor does not own) is not a viable offer.

67.    Moreover, nowhere in the Sagi Objection does Sagi address the other non-economic reasons described in the Motion outlining why a sale of the Debtor's Homestead under section 363(h) is potentially problematic, over the objection of Herschmann.  See Motion, ¶¶ 142 and 143.  For instance, had the Trustee pursued the Sagi offer, as noted earlier, Herschmann could have matched the offer pursuant to section 363(i) with cash or a credit bid of his secured debt.  But, if he did not match it, acceptance of Sagi's offer would have required the Trustee to sell the entire apartment and all its appurtenant interests which the Debtor does not own, and evict the Debtor and Mr. Herschmann along with his infant daughter and one of his adult children, against their will.  This forcible eviction would result in significant expenses that would be borne by the Debtor's estate in connection with litigating with Mr. Herschmann over his homestead protections and ownership interests.  After telling this Court repeatedly that the Disputed Settlement Proceeds, if recovered, would pay all creditors in full, Sagi's callous and unrealistic plan to sell a Homestead that would bring in a relative pittance (after consideration of all of the costs and deductions described herein) tells this Court all it needs to know about Sagi and his intentions.

68.     In addition, contrary to what Sagi argues, the Debtor is also entitled to protections afforded by the Texas homestead laws.  Sagi blatantly misconstrues and selectively quotes (as he often does) the letter from Daniel Benson regarding visits with Mr. Herschmann's and the debtor in Israel, where she lived before moving to Austin. That letter is not evidence, much less admissible evidence, about Debtor's legal residence and the timing of her change in domicile for purposes of Texas law.  He also refers to inadmissible (not to mention inaccurate) deposition testimony Sagi elicited from Arie Genger in another action where only Sagi was present and Debtor had no opportunity to cross-examine. This Court already ruled such one-sided depositions are inadmissible hearsay. But even that testimony furnishes no ground to nullify the statutory protections to which the Debtor is entitled pursuant to applicable Texas homestead laws.

69.     Finally, Sagi repeats his tireless, baseless, and now fully disproven contention that Mr. Herschmann's $2 million loan and the Deed of Trust were part of some fraudulent scheme. (Sagi Opp. ¶ 34.)  He cannot deny much less disprove that the loan proceeds were transferred to pay Orly's legal bills and that the loan in fact occurred at the end of December 2016.   He misconstrues Debtor's marital agreement to argue that a "reimbursement" clause invalidates that loan.  But that fails because his reading does not (and logically cannot) control in place of the understanding and intent of the parties to the marital agreement.   Their construction of that clause is informed and supported by more than a century of Texas family law on "reimbursement" obligations upon divorce in contending that his own interpretation of the Debtor's premarital agreement with Mr. Herschmann supersedes that of the parties to the private agreement.  (*See also* ECF No. 451 at 7-13.)  Of course, and as made clear at the recent trial on

his motion to dismiss, Sagi's self-serving and unsupportable interpretation is belied by both the law and the evidence.  All of Sagi's arguments should be rejected.

70.    In sum, the $2.55 million in cash that is being provided to the estate in connection with the settlement – plus the potential proceeds from the successful prosecution of litigation being sold to Claims Pursuit – provides more than enough consideration in exchange for the sale of the Debtor's one-half interest in the Condo.

### D. The Sale of the Estate Claims to the Estate Claims Assignee Is Reasonable and Appropriate and In the Best Interest of the Estate

71.    As noted in the Motion, the Trustee proposes to sell whatever rights the estate may have in the Estate Claims.  This position should not be controversial as many, if not all, of the Sagi Parties have previously advised the Trustee and this Court that they have no objection to the proposed sale as long as Dalia's and Mr. Oldner's defenses are preserved in response to any pursuit of claims by the Estate Claims Assignee.  In fact, even their own Objections reiterate the point.  See Sagi Objection, ¶¶ 72, 73 ("as a general matter, Sagi has no objection to the claims by the Trustee…Sagi advised the Trustee that the claims had to be sold subject to whatever defenses, counterclaims, setoffs, etc. exist vis-à-vis the Debtor and the Trustee");[19] see also Dalia Objection, ¶ 7 ("should this Court allow the Trustee to quitclaim the Estate's interest, if any, in the enumerated causes of action, Mrs. Genger does not object to such sale so long as all her defenses are preserved and are not in any way curtailed by the Settlement Agreement.  The Trustee respectfully submits that to the extent that the proposed order is not clear on these reservation of rights, the order can be revised accordingly.

---

[19] It is ironic that Sagi, who has a $3.2 million judgment and stands to gain a distribution in the case if he is right that the estate's counterclaims against him have no value, would not want the Trustee to collect as much as possible from the Estate Claims, which can then be used to pay him, and in turn, used to pay his mother on her judgment against him.

72.     Notwithstanding previously making clear all they wanted was for their defenses to be preserved, the Objections go to great lengths to prove that the Estate Claims do not belong to the Trustee or that any recovery obtained against Dalia and Mr. Oldner would actually need to be paid to the Orly Trust.   As noted, the Court need not make this determination at this time as the Trustee is willing to make clear all defenses are preserved in connection with the Estate Claims. However, to the extent that the Court believes it appropriate to weigh in on the ultimate recipient of any recovery from the Estate Claims, the Trustee respectfully submits that there are ample reasons why the recovery belongs to the estate instead of the Orly Trust, a so-called spendthrift trust, which has been controlled by trustees that have been adverse to Orly for over 15 years.

73.     The Sagi Parties' protestations to the proposed sale of pending claims are based on a fundamental misunderstanding of the claims that are being sold, and of the Settlement Agreement itself.  Sagi argues that the claims being sold either have already been decided against the Debtor, or that they do not belong to the Debtor.  He is wrong on both fronts. As a threshold matter, the Objections assume that the only claims being sold are ones that have already been asserted.  That is inaccurate, as the claims sale also includes unasserted claims that could have nothing to do with the Orly Trust.

74.     Prior to having to file for bankruptcy, Orly has been pursuing the claims against Dalia Genger in question since 2009, in both the New York State Supreme Court and Surrogate's Court, including removing the Surrogate Court action to this Court pursuant to Rule 9027.[20] Contrary to what Sagi says (see Sagi Opp. ¶¶ 79-81), both actions seek damages from Dalia. The Surrogate's Court claims are focused on Dalia's breaches of her fiduciary duties as trustee of the Orly Trust, for which Dalia served as trustee until Sagi had her appoint Michael Oldner to replace her.  Sagi tries to make it seem as though the Surrogate Court action is concluded,

---

[20]    The claims were removed to this Court pursuant to Rule 9027.

arguing that Dalia prepared an accounting years ago. But the purported accounting is facially inadequate and has never been accepted by the court. In any event, that action is pending. The breach of fiduciary duty claim has not yet been tried; Dalia's and Sagi's attempts to get it dismissed were finally denied by the Surrogate's Court in 2017 and no further adjudication has yet occurred. Nor is this action somehow moot because Sagi arranged for Dalia to appoint (purportedly) a successor trustee. The claim for damages against Dalia is unaffected by that dubious appointment, even if upheld. More importantly, the appointment itself is subject to annulment in the event the Court concludes that Dalia acted in breach of her fiduciary duties.

75.     Having failed to show that these actions are effectively over, Sagi argues in the alternative that Orly's claims against Dalia belong to the Orly Trust because any damages she seeks to recover would in his view be payable only to the Orly Genger Trust and not to Orly directly. That is a misconception of Orly's pending claims against Dalia. The case Sagi cites involved a Chapter 7 trustee who tried to attach the assets of a spendthrift trust. *In re Treadway*, 117 B.R. 76 (Bankr. D. Vt. 1990), cited by Sagi at Sagi Opp. ¶ 81.[21]  It provides no support for Sagi's argument that the claims Orly has been pursuing individually against Dalia for well more than a decade in order to benefit the Orly Trust. The opposite is true – the relief Orly has been seeking is for her own benefit. Contrary to what Sagi argues, the trustee of the Orly Trust owes fiduciary duties to the beneficiaries of the trust, not to the trust itself, which the trustee controls. *See, e.g.*, *Mercury Bay Boating Club Inc. v. San Diego Yacht Club*, 76 N.Y.2d 256, 270, 557 N.E.2d 87, 95 (N.Y. 1990) ("We have described a fiduciary's duty as requiring 'not honesty alone, but the punctilio of an honor the most sensitive.'  This strict standard is the usual and

---

[21] *Treadway* is distinguishable to the extent that it dealt with post-petition claims of a debtor that were not being administered by the Trustee, and there was a prior determination in that case that there was, in fact, a spendthrift trust. This court has never found that the Orly Trust is a spendthrift trust or continues to remain one in light of the conduct of the previous trustees and current trustee of such trust.

appropriate measure of a trustee's fiduciary obligations because the trustee must administer the trust *for the benefit of the beneficiaries* and cannot compete with the beneficiaries for the benefits of the trust corpus.") (emphasis added) (quoting and citing *Meinhard v. Salmon*, 249 N.Y. 458, 464 (N.Y. 1928), 2A Scott, Trusts § 170, at 311 [Fratcher 4th ed.]; Restatement (Second) of Trusts § 170); *see also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc*., 837 F. Supp. 2d 162, 191 (S.D.N.Y. 2011) (the trustee "owes a fiduciary duty to act with undivided loyalty and administer the trust *solely in the interests of the beneficiaries*.") (emphasis added) (citing *See In re Heller*, 6 N.Y.3d 649, 655 (N.Y. 2006)).

76.     Likewise, Mr Oldner's reliance on *In Re Kiersz*, 311 B.R. 145 (Bankr. W.D.N.Y. 2004) is similarly misplaced.  The Court in *Kiersz* found that a life insurance policy was an exempt asset, further opining that a proposed sale of a debtor's equitable claims to a homestead or the proposed sale of a lawsuit that is really post-petition property of a debtor cannot be sold. *Id*. at p. 151.  In this case, the claims against Dalia arise from years of misconduct as reflected in the pending state court actions. And *In re Hecht*, 54 B.R. 379, 383 (Bankr. S.D.N.Y. 1985), cited by Mr. Oldner for the uncontroversial proposition that "a spendthrift trust prevents the beneficiary from transferring his right to future payments of income or capital; the creditors of the beneficiary are also prevented from attacking the beneficiary's interest to satisfy their claims" is of no moment or persuasive value here, especially in light of the fact that nowhere in *Hecht* does the Court bless a conflicted trustee of a spendthrift trust from protecting himself from liability for his actions.

77.     This is all the more appropriate in this case, where the Orly Trust has been thoroughly corrupted by Dalia and Sagi, who claims his trust, the Sagi Trust, has standing (on a theory of contingent remainder) to benefit from the Orly Trust. Sagi argued, before Orly had a

child, that she was disqualified as a trust beneficiary and the assets of the trust belong to his trust

(and his offspring and heirs).    Among other things, this is evidenced by the fact that Sagi

believes that funds that go to the Orly Trust may actually be for his benefit, as he claims that his

own trust is a contingent remainder beneficiary of the Orly Trust.  (*See* Sagi Trust Obj. ¶¶ 2-4.)

Sagi previously coldheartedly argued this before the Debtor had her daughter.  (*See, e.g.*, ECF

No. 424-34 at ¶ 46 ("If … Orly ultimately has no children (she is 36 and currently childless),

then … the principal of the Orly Trust passes in trust to… beneficiaries of the Sagi Trust.  This

makes the Sagi Trust a contingent remainder beneficiary."))  Shockingly, he still maintains this

argument today, even though the Debtor now has a young child.  As Sagi would have it, though,

he should be treated as a contingent beneficiary of the trust in perpetuity in case both Orly and

her child pass away, and therefore should have a say.

78.    Sagi and his cohorts' roundabout and illogical theory would allow them to pillage

the Orly Trust, saddle it with millions of dollars of bogus liabilities (as described in, for example,

the so-called Inter-Creditor Agreement which Sagi and his cohorts created), and, when Orly

establishes their wrongdoing, ensure any damages collected are put back in the Orly Trust so

they can continue to do as they please, since they control the trust.    Notwithstanding a prior

desire to "alienate" the spendthrift trust with a proposal to the trustee of a 50% split of any

recoveries from the Disputed Settlement Proceeds, after a question from Sagi's counsel, Mr.

Oldner testified that he would not "alienate" the Orly Trust by sharing any recoveries with the

Trustee.  However, on the other hand, Michael Oldner, the current purported trustee of the Orly

Trust, admitted that he already pledged any recovery the Orly Trust ever might receive in

litigation to purported creditors of the Orly Trust – such as Sagi.  In follow-up questioning by

Trustee's counsel at his May 19, 2021 deposition, Mr. Oldner testified:

> Q. You just testified that to the extent there is any recovery for the
> [Orly Trust], you wouldn't share it with the Chapter Seven Trustee
> estate, is that correct?
> A. That is correct.
> Q. But notwithstanding that, you would share that with creditors,
> such as Sagi Genger, in accordance with the Inter-Creditor
> Agreement; is that correct?
> A. Once again, my original idea in signing the Inter-Creditor
> Agreement is to at least stop the insane litigation on this side of the
> matter, so, whereas – the short, the short answer is "yes."

[Oldner Transcript] at 803:16 to 804:4.

79.     Thus, any payment of damages to the Orly Trust for harm done to Orly as beneficiary would only prolong litigation, not resolve it.  That alone provides grounds for the courts adjudicating Debtor's claims against Dalia to direct awarded damages to Orly personally and not to the Orly Trust even were the trust to prevail that it, too, was damaged by Dalia's breaches of fiduciary duty.

80.     All of this demonstrates that Orly has claims for damages against Dalia for breach of fiduciary duty, irrespective of damages to the Orly Trust, that may be assigned as proposed in the proffered settlement at issue on this motion.  *See, e.g.*, N.Y. S.C.P.A. §§ 2206, 2214, 2215, 2216.  *See also, e.g.*, *Town of Evans v. Catalino*, 88 A.D.2d 780, 781 (4th Dep't 1982) ("It is fundamental that a fiduciary must make whole the beneficiary of the trust for any damage resulting from a breach of the fiduciary's duty.  The appropriate measure of damages requires putting the beneficiary in the same condition in which he would have been if the wrong had not been committed and the trustee had done his duty) (citing *Matter of Rothko*, 43 N.Y.2d 305, 322, 401 N.Y.S.2d 449; Bogert, Trusts and Trustees [2d ed rev], § 701); Uniform Trust Code § 1002, Damages for Breach of Trust ("(a) A trustee who commits a breach of trust is liable to the beneficiaries affected for . . . the amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred"); Restatement

(Third) of Trusts § 100 Liability of Trustee) at (a)(2) ("*Form of recovery from trustee.* If suit for breach of trust is successfully brought against the trustee, recovery may take the form of a money judgment or (if feasible) specific restitution…   The form of the recovery should, to the extent practicable, reflect the preferences and best interests of the beneficiaries."). *See generally* N.Y. S.C.P.A. §§ 2206, 2214, 2215, 2216.

81.     Furthermore, as a matter of equity (and common sense) a Court may fashion remedies to take into account the corruption of the trust and need not return funds to a depleted trust corpus where that trust has been depleted and corrupted by a corrupt trustee.  In fact, in the Genger action against Sagi for breach of his fiduciary duties to Orly resulting in a sham foreclosure on TPR shares held only indirectly for the benefit of Orly through the Orly Trust and D&K, the New York court did just that.  The court awarded damages to Orly personally rather than awarding replevin of the TPR shares to the corporate/trust holding entities.   Genger v Genger, 2017 NY Slip Op 00923 (1st Dep't, February 7, 2017) ("The motion court's grant of summary judgment to plaintiff [Orly] on the replevin cause of action was appropriate, notwithstanding that the court directed that the value of the shares would be awarded rather than ordering the return of the shares").

82.     In addition to the breach of fiduciary duty claims, Orly has also been pursuing a claim against Dalia in New York State Supreme Court for fraud related to her extensive material misrepresentations she made to Orly that aided and Sagi in carrying out a fraudulent scheme. Orly has an appeal against Dalia pending before the First Department relating to the trial court's improper *sua sponte* dismissal of the fraud claim, which the Trustee perfected in December 2020, with continued briefing expected in November 2021.  The Trustee expects the fraud claim

against Dalia will be revived once the Appellate Division rules, and when it is, Orly's claim for damages against Dalia as a result of her fraud will be live once again.

83.    Through litigation on the merits of both this claim against Dalia and the claims against her in the Surrogate's Court (which are now removed to this Court), the Trustee recognizes that there could be a substantial recovery.  That is why the settlement the Trustee negotiated enables the Debtor's estate to recover up to $11 million on account of these claims, over and above the $2.55 million cash paid into the estate by the Settling Parties.  It is also advantageous that the claims assignee, Claims Pursuit, retained counsel that agreed to handle the litigations on a contingency fee basis, with counsel's fees being paid only to the extent it successfully recovers through the litigations.  Oldner, the current purported trustee of the Orly Trust, testified at his recent deposition that the Orly Trust would never share assets or litigation recoveries with the debtor's bankruptcy estate.  [Oldner Tr.] at 803:16-20.  The settlement the Trustee reached with the Settling Parties is far more beneficial than the proposals advanced by Sagi for this reason alone.

84.    Of course, even Sagi recognizes that there are viable claims related to actions taken by the Orly Trust which have been detrimental to its beneficiary, Orly.  This is demonstrated by the fact that Sagi sought, had drafted, and obtained broad purported releases of claims from the Orly Trust for the benefit of himself and his wife, his friend David Parnes, Dalia, and his company TPR.  If there were no potential claims, the releases, which are unquestionably improper, would have been irrelevant to Sagi.

85.    In conclusion, as stated at the outset, and as reflected in the Motion, there are numerous reasons why the sale of the Estate Claims is in the best interest of the estate, including the ability to avoid the incurrence of legal fees associated with their pursuit.  But most

importantly, as it relates to Dalia and Mr. Oldner's rights, they will be preserved and they are free to argue any defenses they wish to maintain before any court such that this Court is not required to opine, at this time, where the recoverable damages from the Estate Claims may ultimately be paid. However, to the extent that the Court wishes to engage in that determination now, as set forth above, it is abundantly clear that the pending claims against Dalia as well as unasserted claims against Dalia and Mr. Oldner are "property of the estate" that may be sold by the Trustee to the Estate Claims Assignee.[22]

### E. Sagi's "Cross-Motion" Seeking Standing to Pursue the Disputed Settlement Proceeds Is Procedurally Deficient

86.     The Court held numerous conferences to discuss a hearing and briefing schedule on the Settlement Motion. In accordance with the Second Amended Scheduling Order dated July 12, 2021 [ECF No. 488], the Court determined that objections to the Settlement Motion would be due on July 16, 2021, while the Trustee's Reply would be due on July 26, 2021 (thereafter extended to July 27, 2021 on consent of the parties). Thus, as requested and required by the Court, all briefing on the Settlement Motion would be closed on July 27, 2021.

87.     Notwithstanding the foregoing, at the end of the Sagi Objection, Sagi purports to include a "cross-motion" seeking standing to pursue the Disputed Settlement Proceeds. At no point in time during the various conferences did Sagi's counsel ever request permission to file a cross-motion for standing to pursue the estate's rights to the Disputed Settlement Proceeds. If they had done so, the Trustee and other Settling Parties would have objected to such request. The cross-motion smacks of bad faith and is an obvious attempt to have the last word on

---

[22] Sagi also claims that the Court should not grant a waiver of the 14 day stay under Bankruptcy Rule 6004(h). However, such waivers are standard in this Court and other courts and have been approved in the context of motions that settle claims and authorize sales. *See In re Lehman Brothers, Inc.* (Order dated April 16, 2013, ¶ 25. See Case No. 09-01420, Dkt. No. 6021.

briefing, in essence hoping that this Court would allow a "sur-reply", even though the Court made clear that briefing was concluded on July 27, 2021.

88.    As the Court is aware, Your Honor's Chambers rules state "Pursuant to Local Rule 5070-1, a moving party or applicant must contact Chambers to obtain a hearing date prior to filing and serving a motion, **cross-motion**, application of any other request for relief requiring a hearing. All scheduling requests should be directed to Willie Rodriguez, Courtroom Deputy". (emphasis added).  To our knowledge, Sagi's counsel did not request permission from Chambers and decided for themselves that they would file a "cross-motion" in violation of the rules. Moreover, the Court has already disposed of a similar tactic involving the Sagi Parties, having denied a "cross-motion" that Dalia filed in connection with parties' motions to dismiss her constructive trust action for failure to comply with the rule.

89.    Sagi's purported "cross-motion" is thus procedurally defective and should be denied outright.  And any "sur-reply" or "reply in support of the cross-motion" filed by Sagi should be stricken and the Court should consider sanctions.

90.    And in any event, the "cross-motion" could never be granted because it fails to satisfy applicable case law with respect to the granting of standing to a creditor.  For example, Sagi fails to make the required showings (with evidentiary support) that his claims are colorable, that the Trustee has improperly failed to pursue the claims being settled, or that the granting of standing to him would be in the best interests of the estate and not merely to advance his own claim, all of which are grounds for denying the motion.  *See, e.g., In re Sabine Oil & Gas Corp.*, 562 B.R. 211 (S.D.N.Y. 2016) affirming bankruptcy court's denial of standing to a creditor following a 15-day trial on the grounds that, among other things, the creditors failed to show that the claims were colorable; *In re George Washington Bridge Bus Station Development Venture*

*LLC*, No. 20-cv-01324 (AJN) (S.D.N.Y. Feb. 16, 2021) (Docket No. 28) (affirming bankruptcy court's denial of standing to a creditor on the grounds that, among other things, the creditor failed to show that the claims were colorable and merely sought to have its interests preferred over those of other creditors and that the creditor's pursuit of the claims thus would not be in the best interests of the estate and holding that "the bankruptcy court may consider not only whether pursuit of a claim by *some* creditor would benefit the estate, but also whether pursuit of a claim by *this* creditor would benefit the estate.").  Instead, he simply claims without basis that he will win, that the Trustee is incompetent, and that he should therefore be granted standing.  However, Sagi cannot show why he should be able granted standing to proceed with claims that the Trustee has already informally pursued and now settled.  *See In re Sabine Oil & Gas Corp.*, 562 B.R. 211, 227 (S.D.N.Y. 2016) ("More importantly, [the appellants] have not shown why they should proceed with claims that the Debtors have already decided to pursue.  The Appellants are not entitled to <u>STN</u> standing to pursue claims that the Debtors are already pursuing.")  And Sagi is a conflicted creditor that would not be able to show that he was not simply pursuing standing to advance his own interests, as he has already repeatedly admitted that that is his goal in this case.  Thus, as in *George Washington Bridge Bus Station*, he cannot establish that his pursuit of the claims sought to be settled would be in the best interests of the estate and that he would properly represent the interests of all creditors rather than his own personal interests and those of the other Sagi Parties with whom he is aligned.

91.     Finally, the "cross-motion" is premature.  If this Court finds that the settlement is approved, then the "cross-motion" would become moot.  If, on the other hand, the Court denies the settlement, the Trustee has already obtained the benefit of a tolling agreement that is included in the Settlement Agreement and could still seek to pursue the claims being settled.

92.     Accordingly, a motion for standing (and the costs associated with briefing same) is not only procedurally improper and without any evidentiary support but is also simply premature at this time.  For these reasons, the "cross-motion" should be denied.

## CONCLUSION

93.     Based on the Trustee's lengthy investigation, the Trustee's business judgment, the Prior Trustee's separate investigation and business judgment, the facts and circumstances of this case, and the weighing of various considerations, the Trustee respectfully submits that she and her counsel have presented to this Court a Settlement Agreement that is fair and reasonable, in the best interests of the estate, and well above the lowest point in the range of reasonableness.

94.     For all of the reasons set forth in the Settlement Motion, the Trustee's supporting declaration, and this Reply, the Objections fail to satisfy their burden and the Settlement Motion should be approved.

**WHEREFORE,** the Trustee respectfully requests entry of an order approving the Settlement Motion and granting such other and further relief as the Court may deem just and appropriate.

Dated: New York, New York
     July 27, 2021

                       **TARTER KRINSKY & DROGIN LLP**
                       *Attorneys for Deborah J. Piazza*
                       *Successor Chapter 7 Trustee*

              By:    /s/Rocco A. Cavaliere
                    Rocco A. Cavaliere
                    1350 Broadway, 11th Floor
                    New York, New York 10018
                    (212) 216-8000