**EXHIBIT 92**

## Relevant Excerpts from Derivative or Duplicative Actions

## I. The Orly Trust Avoidance Action - *Dalia Genger, trustee of the Orly Genger 1993 Trust v. Orly Genger, et al.*, originally filed in Surrogate's Court, now Adv. Pro. No. 20-ap-01188 (Bankr. S.D.N.Y.); Settlement Motion (Dkt. No. 421) ¶¶ 71-75; 168

Amended Petition for Turnover of Trust Property and Other Relief (Cavaliere Decl. (Dkt. No. 423) Ex. 25):

¶ 3:  Respondent Orly Genger ("Orly") is the only non-contingent beneficiary of the Orly Trust (in addition to her daughter Lily). The remaining respondents ("Respondents") are interested parties who wrongfully aided and abetted Orly in the misappropriation of Orly Trust assets.

¶ 18:  In exchange, the Trump Group Entities agreed to pay $32.3 million to the so called "AG Group," consisting of Orly, her father Arie, and Respondents Arnold and David Broser (collectively, "the Brosers"). Upon information and belief, the Brosers are creditors of Orly personally, to whom Orly owes many millions of dollars. The payments were broken up into: (a) an immediate payment of $17.3 million and (b) two follow-up payments of $7.5 million. According to the federal court, which reviewed the document, "Orly monetized her beneficial interest in the Orly Trust['s] [TRI] shares for $32.3 million .... " (Ex. 8.)

¶ 23:  In a recent brief, Orly has alleged that, to date, she has not personally received any of the Settlement Proceeds. If true, this means $17.3 million of the Settlement Proceeds has been paid to other members of the "AG Group," i.e., the Brosers and Arie (the "Initial Payment"). Orly has not disclosed the intended recipients of the remaining $15 million.

¶ 24:  Consistent with her fiduciary duty to the Orly Trust and the express terms of the Trust Agreement Obligations, Orly was required to ensure that the Trump Group Entities Settlement proceeds were paid to the Orly Trust.  Orly failed to comply with these duties and Obligations.  Respondents Arie Genger, Arnold Broser, and David Broser were aware of, and aided and abetted, Orly's breaches of her fiduciary duty to the Orly Trust and the express terms of the Trust Agreement Obligations

¶ 30:  Orly owed a fiduciary duty to the Orly Trust.

¶ 31:  Consistent with her fiduciary duty to the Orly Trust, Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

¶ 32:  Orly did not so do. Instead, she entered into the Trump Group Entities Settlement Agreement, which provided for the Settlement Proceeds to be paid to parties other than the Orly Trust, and she authorized payment of the Settlement Proceeds to such other parties.

¶ 33:  Orly's actions constitute a breach of fiduciary duty.

¶ 34:  Respondents Arie Genger, Arnold Broser, and David Broser were aware of Orly's fiduciary duty to the Orly Trust.

¶ 35: Respondents Arie Genger, Arnold Broser, and David Broser knowingly induced and/or participated in Orly's breach of her fiduciary duty to the Orly Trust by, *inter alia*, taking the Settlement Proceeds which belong to the Orly Trust, by drafting and entering into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, by advising and inducing Orly to enter into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, and/or by directing and authorizing payment of the Settlement Proceeds to parties other than the Orly Trust.

¶ 36: In doing so, Respondents Arie Genger, Arnold Broser, and David Broser aided and abetted Orly's breach of fiduciary duty.

¶ 37: The Orly Trust has been injured by Orly's breach of fiduciary duty and the remaining Respondents' Arie Genger, Arnold Broser, and David Broser aiding and abetting of Orly's breach of her fiduciary duty to the Orly Trust in the amount of $32.3 million, plus statutory interest.

¶ 42: Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser were aware of the Trust Agreement Obligations.

¶ 44: Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser caused the Orly Trust's breach of the Trust Agreement Obligations by, *inter alia*, taking the Settlement Proceeds which belong to the Orly Trust, by drafting and entering into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, by advising and inducing Orly to enter into the Trump Group Entities Settlement Agreement which failed to direct payment of the Settlement Proceeds to the Orly Trust, and/or by directing and authorizing payment of the Settlement Proceeds to parties other than the Orly Trust.

¶ 45: In doing so, Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser tortiously interfered with the Trust Agreement Obligations.

¶ 46: Respondents' Orly Genger, Arie Genger, Arnold Broser, and David Broser interference with the Trust Agreement Obligations was both intentional and improper.

¶ 47: The Orly Trust has been injured by Respondents' Orly Genger, Arie Genger, Arnold Broser, and David Broser tortious interference with contract in the amount of $32.3 million, plus statutory interest.

¶ 51: Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

¶ 52: Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser knew that Orly was required to ensure that the Trump Group Entities Settlement proceeds were paid to the Orly Trust.

¶ 55: Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser received the Settlement Proceeds instead of the Orly Trust.

¶ 56: Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser received a benefit from the Settlement Proceeds which belongs to the Orly Trust.

¶ 57: Under principles of good conscience, Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser should not be allowed to retain the Settlement Proceeds which belong to the Orly Trust, but rather should be compelled to return all $32.3 million to the Orly Trust, plus statutory interest.

¶ 61: Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

¶ 62: Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser knew that Orly was required to ensure that the Settlement Proceeds were required to be paid to the Orly Trust.

¶ 63: Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser received the Settlement Proceeds instead of the Orly Trust.

¶ 64: Respondents Olry [sic] Genger, Arie Genger, Arnold Broser, and David Broser received a benefit from receiving the Settlement Proceeds which belong to the Orly Trust.

¶ 65: The benefit Respondents Olry [sic] Genger, Arie Genger, Arnold Broser, and David Broser received from payment of the Settlement Proceeds was at the expense of the Orly Trust.

¶ 66: Under principles of equity and good conscience, Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser must make restitution to the Orly Trust in the amount of $32.3 million, plus statutory interest.

¶ 70: Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

¶ 71: Respondents knew that Orly was required to ensure that the Settlement Proceeds were required to be paid to the Orly Trust.

¶ 72: Respondents Orly Genger, Arie Genger, Arnold Broser, and David Broser received the Settlement Proceeds instead of the Orly Trust.

¶ 73: Respondents have in their possession the Settlement Proceeds which should be delivered to the Orly Trust.

¶ 80: Orly was required to ensure that the Settlement Proceeds were paid to the Orly Trust.

¶ 81: Respondents knew that Orly was required to ensure that the Settlement Proceeds were required to be paid to the Orly Trust.

¶ 84:  Accordingly, the Trump Group Entities must be preliminarily and permanently enjoined from paying, expending, encumbering, spending, transferring or releasing the Remaining Payment to any of the other Respondents or to any party other than the Orly Trust, until further order of this Court.

¶ 86:  Orly has never provided an accounting of the Settlement Proceeds, which are an asset of the Orly Trust.

¶ 87:  As a matter of law and equity, Orly should provide an accounting of the Settlement Proceeds.

¶ 88: (titled "Interested Parties"):  The names and addresses of all persons, other than the Petitioner, interested in the obtaining a determination of the issues presented in this Petition, and all other persons interested in this proceeding who are required to be cited upon this application or concerning whom this Court is required to have information, are . . .

ORLY GENGER
210 Lavaca Street #1903
Austin, Texas 78701
Interest: Beneficiary and Respondent

¶ 90:  No previous application for this or similar relief has been made to this or any other court except Motion Seq. 42  (for payment into Court) in the Orly Trust Derivative Litigation, entitled Arie Genger, et al. v. Sagi Genger, et al., Index No. 651089/2010 in New York Supreme Court, New York County [**the Dalia Appeal**].

WHEREFORE, Petitioner requests the following relief:

a.  Against respondents Orly Genger, Arie Genger, Arnold Broser and David Broser, damages in the amount of $32.3 million, plus statutory interest;

b.  Against respondents Glencova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Trans-Resources, LLC, as successor to Trans-Resources, Inc., turnover of the Remaining Payment;

c.  Against respondents Glencova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Trans-Resources, LLC, as successor to Trans Resources, Inc preliminarily and permanently enjoining them from paying, expending, encumbering, spending, transferring or releasing the Remaining Payment to any of the other Respondents or to any party other than the Orly Trust, until further order of this Court;

d.  imposition of a constructive trust on the Settlement Proceeds;

e.  an order directing the delivery of the Settlement Proceeds to her as Trustee;

f. an accounting of the Settlement Proceeds . . . .

## II.  The Dalia Appeal - *Arie Genger, et al. v. Sagi Genger, et al.*, No. 2019-4438 (N.Y. App. Div. 1st Dep't) (Motion Seq. 42); Settlement Motion (Dkt. No. 421) ¶ 169

Notice of Appeal (Cavaliere Decl. (Dkt. No. 423) Ex. 76):

p. 2 of Exhibit:

PLEASE TAKE NOTICE that defendant Dalia Genger ("Dalia") hereby appeals to the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, from (i) the decision and order of the Supreme Court, New York County (Jaffe, J.S.C.) (D.I. 1520), dated February 19, 2019, and entered by the Clerk of this Court on February 20, 2019 (the "Order"); (ii) the interim order dated and entered May 7, 2015 (D.I. 1279), holding in abeyance Dalia's motion to be substituted and for the Plaintiffs' Trump Group claim settlement funds to be paid into Court and ultimately to the Orly Trust pending the outcome of Orly Genger's petition in the Surrogate's Court to remove Dalia as trustee of the Orly Trust (Mot. Seq. No. 42), which interim order was made final by the Order, and (iii) any and all other prior non-final judgments and orders of the IAS Court and the Appellate Division in this action which necessarily affect the Order . . . .

Decision and Order Appealed From (p. 7 of Exhibit):

ORDERED, that the motion of defendant Dalia Genger to substitute herself as plaintiff and to direct that the Trump Group settlement fund be paid into court is denied in its entirety; it is further.

Interim Order Appealed From (p. 8 of Exhibit):

Defendant Dalia Genger's motion for an order substituting her, as trustee, as plaintiff for Orly Genger's Trump Group claims, and for an order pursuant to CPLR 2701 directing that the Trump Group settlement fund be paid into Court is held in abeyance pending the Surrogate's Court's resolution of Orly Genger' s petition to remove Dalia Genger as trustee of Orly Trust.  (*See Genger v Genger*, interim order dated Apr. 1, 2015, Index No. 113862/2010 [mot. seq. no. 2]).

Appeal Informational Statement (p. 10 of Exhibit):

Identifies the following cases as "related action[s] or proceeding[s]":

*Dalia Genger v. Arie Genger*, 113862/10 (Sup. Ct. Naw York County) (stayed)
*Sagi Genger v. Orly Genger*, 17-CV-8181 (S.D.N.Y.) (post-judgment)
*In the Matter of the Application of Orly Genger, for the removal of Dalia Genger as Trustee of the Orly Genger Trust* 0017/108 (Surr. Ct. New York) (pending)

Description of Appeal, Proceeding or Application and Statement of Issues (p. 10 of Exhibit):

Dalia Genger, as trustee, by her motion sought an order substituting herself as Plaintiff on Orly Genger's Trump Group claims, and for an order pursuant to CPLR 2701 directing that the Trump Group settlement fund be paid into Court and ultimately to the Orly Trust. On November 25, 2014, the IAS Court dismissed Plaintiffs' Trump Group claims pursuant to a settlement agreement, and the IAS Court severed the cross-claims, counterclaims and third-party claims. On May 7, 2015, the IAS Court held in abeyance Dalia's motion to be substituted and for the Plaintiffs' Trump Group claim settlement funds to be paid into Court and ultimately to the Orly Trust pending the outcome of Orly Genger's petition in the Surrogate's Court to remove Dalia as trustee of the Orly Trust. Such matter is still pending in the Surrogate's Court. On November 29, 2016, the Appellate Division, First Department, affirmed the dismissal of Plaintiffs' Trump Group claims pursuant to a settlement agreement by the IAS Court of the Complaint. On February 19, 2019 (entered on February 20, 2019), the AS Court denied Dalia's motion to be substituted and for the Plaintiffs' Trump Group claim settlement funds to be paid into Court and ultimately to the Orly Trust as moot on the grounds that the Appellate Division, First Department affirmed the dismissal of the action.

"Issues" section (p. 12 of Exhibit):

The IAS Court decision was erroneous because neither the IAS Court nor the Appellate Division, First Department ever decided that branch of Dalia's motion for the Plaintiffs' Trump Group claim settlement funds to be paid into Court and ultimately to the Orly Trust. These funds rightfully belong to the Orly Trust.

"Party Information" section (p. 12 of Exhibit) identifies Orly and the Trump Group, among others, as parties to the appeal.

## III.  Sagi Turnover Motion (*Sagi Genger v. Orly Genger*, No. 17-cv-8181 (Broderick, J.) (S.D.N.Y.); Settlement Motion (Dkt. No. 421) ¶¶ 70; 170

(Cavaliere Decl. (Dkt. No. 423) Ex. 24):

p.1:  Defendant/third-party plaintiff and judgment creditor Sagi Genger ("Sagi") respectfully submits this memorandum of law in support of his motion for an order: (a) pursuant to CPLR 5225(b) and 5227, and Fed. R. Civ. P. 69, compelling garnishees/transferees Michael Bowen, Arie Genger ("Arie") and Tedco, Inc. (together with its control persons and intermediaries) to turn over to the U.S. Marshal all promissory notes and funds in which third-party defendant and judgment debtor Orly Genger ("Orly") has an interest sufficient to satisfy Sagi's judgment; (b) pursuant to DCL 273, 273-a, 275, 276, 278, rescinding all fraudulent conveyances associated therewith;

pp.1-2:  . . . Orly settled the state court litigation claims in 2013 against parties known as the "Trump Group," whereby "Orly monetized her beneficial interest in the [family business] TRI shares for $32.3 million." *Genger I*, 76 F. Supp.3d at 501. "Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from

the Trump Group under the 2013 Settlement Agreement." *Id.* at 499. "The $32.3 million consists of $17.3 million in cash up front plus two additional $7.5 million [promissory notes] to be made over four years." *Id.* at 494 n.11. The two $7.5 million notes remain outstanding. Exh. N at 9:10-17.

p. 2: Instead of honoring this commitment, Orly, in collaboration with her father Arie Genger (who is divorced from Dalia) and her attorney/husband Eric Herschmann, set about on a scheme to frustrate that financial obligation and deny Dalia any support. When the first $17.3 million payment was made in 2013, Orly directed her then-attorney, William Wachtel, to immediately wire the entire sum to a trust established for the benefit of Arie's creditors (not hers). Because, however, the remaining $15 million had not yet come due, they had to be more creative. Together, they hatched a scheme to encumber those two promissory notes by having Orly pledge them as "security" to her husband and father for patently bogus "liabilities." They then fought tooth-and-nail to keep this scheme hidden as long as possible. Enough is now known, however, to bring this turnover and fraudulent conveyance proceeding to enforce the judgment.

p. 4: On June 16, 2013, Orly entered into a settlement agreement (the "2013 Settlement Agreement") with the Trump Group and others regarding her trust's claim to beneficial ownership of the TRI shares. The 2013 Settlement Agreement provided that the Trump Group would pay $32.3 million and, in exchange, Orly, Arie, and Arie's two litigation funders (Arnold and David Broser)—the four defined therein, collectively, as the "AG Group"—would provide the Trump Group with, *inter alia*, (a) a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and (b) Orly's waiver of all of her claims to the TRI shares, both as a trust beneficiary and individually. *Genger I*, 76 F. Supp.3d at 493-94. As Orly later told the U.S. Court of Appeals for the Second Circuit, the Agreement provides "that the Trump Group would pay $32 million to the AG Group in exchange for a release of any ownership interest in the TRI shares." Case 15-350, Doc. 93 p. 14.

p. 7: Orly, in cahoots with her husband and father, has spent recent years scheming to shield the $32.3 million she monetized under the 2013 Settlement Agreement, and her other assets, from collection, and thus frustrate the multi-million judgment she long knew would be coming. As noted above, the $32.3 million comes in two parts: (a) $17.3 million cash paid up front, and (b) two additional $7.5 million promissory notes to be paid later. Exh. A pp. 2-3. Under the 2013 Settlement Agreement, the Trump Group agreed to pay $32.3 million to an escrow agent (William Wachtel, Orly's counsel of record) without allocating that sum amongst the four counterparties to the Agreement, defined Orly, Arie, and the Brosers. *Id.* at 1.

p. 8: . . . it was Orly and only Orly who monetized her beneficial interest in her trust's shares for $32.3 million. Her co-parties to the 2013 Settlement Agreement, Arie and the Brosers, had no live claims to monetize.

p. 8: In sum, the Court correctly attributed all $32.3 million to Orly's monetization of the TRI shares.

pp. 8-9: Yet Orly did not set aside any of the $32.3 million to help financially support her mother, as she had promised to do in 2004, despite knowing that any TRI monetization came

with that encumbrance. In the intervening years, Orly had grown estranged from her mother, and was suing. Dalia (always unsuccessfully) in multiple forums. So instead of honoring her commitment, Orly diverted all $17.3 million to pay her father's creditors.

p. 9: The 2013 Settlement Agreement was executed on June 16, 2013. On July 1, 2013, the Trump Group made the first $17.3 million payment thereunder. Within two days, the money had traveled through five accounts. It started in the account of a Trump Group entity called "TI Capital Corp.," was then wired to the client IOLA account of Wachtel Missry LLP (the firm representing Orly in the underlying suit), was then wired to an account at Northern Trust Bank in the name of the "Genger Litigation Trust" (a trust co-created by Orly and Arie and naming another of Orly's lawyers, Lance Harris, and David Broser as co-trustees), was then wired to an account at Goldman Sachs in the name of "ADBG LLC" (the Broser entity designated as lender in the parties' Credit Agreement), and finally all but $1 million of it ended up in an account at Credit Suisse in the name of "Tedco" (another entity owned by the Broser family). Exh. Y.

p. 9: There can be no dispute that the Brosers understood they were being paid from money that did not belong to their borrower (Arie), but rather to a third party (Orly) who owed them nothing. Exh. D at 36:9-10. As this Court twice found, Orly had generated that money by monetizing her own trust's interest in the TRI shares.

p. 9: The above transfers still left two $7.5 million promissory notes to be paid under the 2013 Settlement Agreement. Orly could not dissipate those funds, because they were not yet payable (to date, certain preconditions have not yet been met). So Orly, her father and her husband devised a plan to frustrate the upcoming judgment by encumbering the notes with bogus liabilities.

p. 12: If the Trump Group's $3 million indemnity claim is also treated as an offset (Exh. N at 66:9-15), that would leave nothing to pay Sagi's judgment. Indeed, that is exactly the intent of this scheme.

p. 13: Each of the foregoing transactions is a fraudulent conveyance under New York Debtor and Creditor Law. For purposes of the instant motion, however, Sagi seeks to set aside only: (a) the $17.3 million cash transfer to Arie, the Brosers and their entity, Tedco, Inc. (and, to the extent necessary, the intermediary entities through which the money passed); and (b) the encumbrances placed on the two $7.5 million promissory notes by Orly's husband and father. The promissory notes are currently held by Mr. Herschmann's law partner, Michael Bowen (Exh. H 35:5-25), so he, along with the above-named persons/entities, are being served with this motion.

p. 17: In this case, the Court has already conclusively determined, in its summary judgment rulings in Genger I and then again in this case, that the $32.3 million is property of the judgment debtor: "Orly has effectively monetized an interest in the very shares she claims not to have received to the tune of $32.3 million …. Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement. … Orly monetized her beneficial interest in the Orly Trust shares for $32.3 million." *Genger I*, 76 F. Supp.3d at 491, 501.

p. 20: Even if they could relitigate this Court's prior findings, it would not change the result, because this Court was correct—only Orly had live claims to settle. Thus, all $32.3 million in settlement value is attributable to her claims. As such, the transfer of $17.3 million in July 2013 from Orly to Tedco must be set aside. This is a textbook example of DCL 275—a "conveyance made … without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature." Thus, it is "fraudulent as to both present and future creditors." *Id.* Orly was well aware, when she made that transfer, that Dalia (through Sagi) had a claim on a portion of those proceeds.

pp. 20-21: The same holds true for the UCC liens placed on Orly's assets by Arie and Mr. Herschmann. Under DCL 270, a "conveyance" includes "the creation of any lien or incumbrance," which means it, too, must be for fair consideration.

p. 21: Even if Orly had kept the settlement proceeds for her own use, that might only mean that a portion of the promissory note was for fair consideration. But the grant of the security interest would still be a fraudulent interest, as it was almost entirely for past consideration.

p. 22: The note in favor of Mr. Herschmann reflects a similar recharacterization of past events. As noted above, Mr. Herschmann originally represented that those legal services were "pro bono," only to reclassify his invoices as "secured debt" once Sagi's claim emerged on the horizon. Transfers like these are exactly why intra-family transfers are suspect. Here, DCL 273 clearly has been violated, as Orly admits to being rendered insolvent, claiming she will have go bankrupt if the judgment in this case is affirmed on appeal. Doc. 123. Absent the promissory note, she would have been able to pay most of Sagi's judgment from the $15 million. Lastly, regardless of any alleged adequacy of consideration, all these transfers are fraudulent under DCL 276, in that they were all "incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors.

p. 23: This is about as close to direct evidence of actual intent to defraud as any fraudulent conveyance action ever has seen.

p. 24: The judgment debtor, Orly, at a time well after she had acknowledged to this Court the multi-million scope of her liability under the 2004 Indemnity, entered into a series of transactions with her husband and father to dissipate her most meaningful asset—her $15 million receivable under the 2013 Settlement Agreement while still maintaining the benefit thereof through her husband (who funds Orly's lavish lifestyle) and father (who pledged all of his assets back to Orly's husband).

p. 25: As noted above, actual intent is established here, both as to the transferor (Orly) and the transferees (Arie, Mr. Herschmann, and the Brosers and their entities).

**IV.  Sagi Avoidance Action -** *Sagi Genger v. David Broser, et al.*, **No. 19-cv-6100 (S.D.N.Y.) (Broderick, J.); Settlement Motion (Dkt. No. 421) ¶¶ 76; 171**

Complaint (Cavaliere Decl. (Dkt. No. 423) Ex. 27):

¶ 1:  Plaintiff is and will be owed up to $12.25 million, plus attorney's fees, by Orly Genger ("Orly") under a 2004 indemnity. Orly claims she cannot afford to honor this indemnity. Yet in 2013, Orly settled legal claims for an initial cash payment of $17.3 million (the "2013 Settlement Proceeds"), but the money ended up with Defendants through fraudulent conveyances and other wrongful means.  By this action, Plaintiff seeks to set aside those fraudulent conveyances, and collect his attorney's fees in doing so.

¶ 12:  It has been previously adjudicated in this Court that, pursuant to a written agreement dated November 10, 2004 (the "2004 Indemnity"), Orly currently owes Plaintiff over $3 million, and will ultimately owe Plaintiff up to $12.25 million.  Orly has maintained that she is unable to honor any portion of that indemnity, despite being a party to a 2013 litigation settlement agreement whereby she monetized certain shares in a family business for $32.3 million, $17.3 million of which was paid out on July 1, 2013.

¶ 13:  Other than the payors, the only parties that settlement agreement were Orly, her father Arie, and Arie's two litigation funders (Arnold and David Broser).  The only material consideration that payors received for the foregoing settlement payment was the release of claims by Orly.  As this Court found in a January 5, 2015 Opinion & Order in *Genger v. Genger*, C.A. No. 14-cv-5683, by entering into the 2013 Settlement, Orly monetized her beneficial interest in the Orly Trust shares for $32.3 million …."

¶ 16:  The Brosers thus had no interest in—and did not have any reason to believe they had any interest in—any recovery.  Rather, the entire 2013 Settlement Proceeds is properly attributable to Orly's claims, as indeed this Court has previously held.

¶ 17:  Despite the fact that the settlement concerned, and could only be providing consideration for, Orly's claims, on July 1, 2013, Orly's attorney, William Wachtel, who served as payment agent under the settlement agreement, transferred the 2013 Settlement Proceeds to the Litigation Trust (a trust co-created by Orly and Arie and naming David Broser as a co-trustee), who then wired it to ADBG (the Broser entity designated as lender), with all but $1 million ended up with Tedco (another entity owned by the Broser family).  Most of that remaining $1 million was transferred to Arie through his lawyer.

¶ 25:  Accordingly, the conveyances of the 2013 Settlement Proceeds to Defendants were fraudulent conveyances with respect to Plaintiff within the meaning of New York Debtor & Creditor Law § 273.

¶ 27:  Defendants caused the conveyances of the 2013 Settlement Proceeds to Tedco to occur with actual intent to hinder, delay, or defraud the present or future creditors of Orly, including but not limited to Plaintiff.

¶ 29:  Accordingly, the conveyances of 2013 Settlement Proceeds to Defendants were fraudulent conveyances with respect to Plaintiff within the meaning of New York Debtor & Creditor Law § 276.

WHEREFORE, Plaintiff demands that the Court enter judgment:

a. On the First and Second Causes of Action, pursuant to New York Debtor & Creditor Law § 278, (i) setting aside the relevant conveyances and/or, (ii) annulling the relevant obligations to the extent necessary to satisfy Plaintiff's claim, and/or (iii) disregarding the conveyances, and (iv) attaching or levying execution upon the property conveyed to the extent of Plaintiff's interest;

## V.  Manhattan Safety Avoidance Action - *Manhattan Safety Maine, Inc., et al. v. Michael Bowen, et al.*, No. 19-cv-5642 (S.D.N.Y.) (Vyskocil, J.); Settlement Motion (Dkt. No. 421) ¶¶ 71-75; 172-173

First Amended Complaint (Cavaliere Decl. (Dkt. No. 423) Ex. 30):

¶ 1:  This is an action to recover the proceeds of a settlement agreement made in June 2013 (the "2013 Settlement", and the "2013 Settlement Proceeds"), in a lawsuit expressly brought, in significant part, by Orly Genger in her derivative capacity "on behalf of" the Orly Trust (more formally called "Trust u/a 12/13/93 f/b/o Orly Genger").  The 2013 Settlement purported to resolve various disputes concerning the Orly Trust's beneficial ownership of certain shares in a business called Trans-Resources Inc. ("TRI").

¶ 2:  The 2013 Settlement included a payment of $32.3 million, comprised of $17.3 million in cash and two promissory notes of $7.5 million each. These funds were wrongfully obtained by the instant Defendants through fraudulent conveyances and other wrongful means, depriving the Orly Trust of its rightful property.

¶ 7:  Thus, at the time of the 2013 Settlement, the only TRI shares whose ownership was the subject of a live dispute were the "Orly Trust Shares"—i.e., shares in TRI that, if Orly's derivative claims brought on behalf of the Orly Trust in her capacity as trust beneficiary succeeded, would be deemed property of the Orly Trust.  Arie had no interest in any TRI shares, nor did Arie's litigation funders, the Brosers, and Arie's main interest in entering the 2013 Settlement was to avoid being held in contempt by the Delaware Chancery Court.

¶ 9:  Upon information and belief, of the $17.3 million cash payment, approximately $16.3 million went to Tedco, Inc. ("Tedco"), an entity controlled by the Brosers, and all or virtually all of the remainder went to Arie; the two promissory notes, meanwhile, are being held by Defendant Michael Bowen ("Bowen"), as successor to William Wachtel, who was the original payment agent designated in the 2013 Settlement.

¶ 10:  This action is brought to restore the 2013 Settlement Proceeds to their rightful owner, the Orly Trust.

¶ 14:  Recovery has received from its 100% owner, the Orly Trust, an assignment of all right, title, and interest the Orly Trust has in the 2013 Settlement with respect to the claims that form the subject of this action.

¶ 38:  The 2013 Settlement Agreement provided, in relevant part, that the Trump Group would pay $32.3 million (comprised of $17.3 million in cash and two promissory notes of $7.5 million each).

¶ 39:  Despite these broader recitations, the only material consideration that the Trump Group in fact received for the foregoing settlement payment was the release of the derivative claims by Orly, in her capacity as trust beneficiary, with respect to the Orly Trust Shares.  As Judge Forrest of this Court found in her January 5, 2015 Opinion & Order in *Genger v. Genger*, C.A. No. 14-cv-5683, by entering into the 2013 Settlement, "Orly monetized her beneficial interest in the Orly Trust shares for $32.3 million …."

¶ 40:  Although Orly also purported to waive any individual claim to ownership of TRI shares in the 2013 Settlement, that waiver was, at most, a mere formality, because Orly never had any individual interest in any TRI shares. To the contrary, in the 2010 Action, Orly, suing in part in her derivative capacity as trust beneficiary on behalf of the Orly Trust, expressly alleged that the shares at issue were "Orly Trust Shares."

¶ 44:  Thus, the entire $32.3 million in Settlement Proceeds is properly attributable to the Trump Group's extinguishment of the Orly Trust's claims to beneficial ownership of the Orly Trust Shares.

¶ 48:  The 2013 Settlement "payment" had two components: (a) an upfront payment of $17.3 million, and (b) two promissory notes, each in the amount of $7.5 million, to be paid upon the happening of various events, many of which have not yet occurred. Accordingly, to date, no payment has been made for any amount under either promissory note.

¶ 49:  Upon information and belief, approximately $16.3 million of the $17.3 million cash payment ended up with Defendant Tedco, a fact only recently discovered. Specifically, on July 1, 2013, the Trump Group made the first $17.3 million payment thereunder. It wired the payment to the client IOLA account of Wachtel Missry LLP (the firm representing Orly in the underlying suit), which then wired it to the Defendant Genger Litigation Trust (a trust co-created by Orly and Arie and naming David Broser as a co-trustee), which then wired it to ADBG (the Broser entity designated as lender in the parties' Credit Agreement), and finally all but $1 million of it ended up with Tedco (another entity owned by the Broser family).

¶ 52:  Upon information and belief, the two promissory notes are currently held by Defendant Michael Bowen, as agent under the 2013 Settlement (in place of William Wachtel, the agent named in the Agreement). Defendant Bowen also continues to purport to act as attorney with respect to derivative claims on behalf of the Orly Trust in a related New York state court proceeding entitled *Orly Genger v. Dalia Genger et al.*, Index No. 109749/2009.

¶ 58:  The Orly Trust contends that the two promissory notes held by Defendant Bowen

represent property of the Orly Trust because they were issued in respect of $15 million of the $32.3 million total that the Trump Group agreed to pay as consideration for acquiring all right, title, and interest in the Orly Trust Shares, and only a representative of the Orly Trust has the right and power to obtain such right, title, and interest.

¶ 59:  To the extent any other party has sought to encumber the notes with liens based upon supposed liabilities of any person or entity other than the Orly Trust, such encumbrances cannot affect or undermine the Orly Trust's right to obtain the note free and clear of any such encumbrances, because Orly has no claim in her personal capacity to the notes.

¶ 60:  An actual controversy exists between the parties concerning ownership of the promissory notes, the Orly Trust Trustee having made demand on the Defendants to acknowledge the Orly Trust's right to the notes, and the Defendants having declined to do so.

¶ 61:  This Court should declare that Recovery, as assignee of the Orly Trust's claims concerning the 2013 Settlement Proceeds, is entitled to the notes, free and clear of any encumbrances other than any valid indemnity claim by the Trump Group.

¶ 67:  Upon information and belief, Defendant Tedco received approximately $17.3 million in 2013 Settlement Proceeds, which it distributed in whole or part to the Brosers, and Arie received approximately $1 million in Settlement Proceeds, all of which should have gone to the Orly Trust in respect of the Orly Trust Shares.

¶ 71:  As such, Defendants Tedco, Arnold Broser, David Broser, and Arie liable for restitution to Recovery, in its capacity as assignee of the Orly Trust's claims concerning the 2013 Settlement Proceeds, of money had and received.

¶ 85:  The Orly Trust either was insolvent, or was caused to be insolvent, when Orly, who was the Orly Trust's representative in the 2010 Action as a plaintiff asserting derivative claims on its behalf, entered the 2013 Settlement causing the entire $32.3 million in 2013 Settlement Proceeds to be placed outside the Orly Trust.

¶ 88:  Accordingly, the conveyances of the 2013 Settlement Proceeds to Defendants were fraudulent conveyances with respect to Manhattan, in its capacity as assignee of the Note from TPR, within the meaning of New York Debtor & Creditor Law § 273.

¶ 94:  Upon information and belief, Orly caused the conveyances of 2013 Settlement Proceeds to Defendants Arie Genger, Tedco, and Bowen to occur, and such Defendants received such conveyances, with actual intent to hinder, delay, or defraud the present or future creditors of the Orly Trust, including but not limited to TPR.

WHEREFORE, Plaintiffs demand that the Court enter judgment:

a. on the First Cause of Action, declaring that the two promissory notes held by Bowen are property of Recovery as assignee of the Orly Trust, free and clear of any encumbrances;

b. on the Second Cause of Action, imposing a constructive trust on the two promissory notes held by Bowen in favor of Recovery as assignee of the Orly Trust, free and clear of any encumbrances;

c. on the Third and Fourth Causes of Action, awarding damages to Recovery, (i) against Tedco, Arnold Broser, and David Broser in such amounts as are determined at trial, but not less than $17.3 million, and (ii) against Arie in such amounts as are determined at trial, but not less than $1 million on the Third Cause of Action and $17.3 million on the Fourth Cause of Action;

d. on the Fifth Cause of Action, awarding damages to Recovery against Tedco in such amounts as are determined at trial, but not less than $17.3 million;

e. on the Sixth and Seventh Causes of Action, pursuant to New York Debtor & Creditor Law § 278, (i) setting aside the relevant conveyances and/or, (ii) annulling the relevant obligations to the extent necessary to satisfy Manhattan's claim, and/or (iii) disregarding the conveyances, and (iv) attaching or levying execution upon the property conveyed to the extent of Manhattan's interest;

Related Case Statement (Dkt. No. 7):

Full Caption of Later Filed Case:

MANHATTAN SAFETY MAINE, INC. and
RECOVERY EFFORT, INC.,
Plaintiff

vs.

MICHAEL BOWEN, ARIE GENGER, ARNOLD
BROSER, DAVID BROSER, individually and as
trustee of the GENGER LITIGATION TRUST,
ABDG LLC, TEDCO, INC., and JOHN DOES 1-10
Defendant

Case Number 19-cv-5642

Full Caption of Earlier Filed Case:
(including in bankruptcy appeals the relevant adversary proceeding)

Genger,
Plaintiff

vs.

Genger
Defendant

Explain in detail the reasons for your position that the newly filed case is related to the earlier filed case.

The newly filed case involves the same subject matter and many of the same parties as the earlier filed case before Judge Broderick (17-cv-8181)[the case in which the Sagi Turnover Motion was filed].

## VI. <u>Dalia Constructive Trust Action - *Dalia Genger v. Orly Genger, et al.*, Adv. Pro. No. 20-ap-1010 (Bankr. S.D.N.Y.); Settlement Motion (Dkt. No. 421) ¶¶ 79-82; 174</u>

<u>Amended Complaint (Cavaliere Decl. (Dkt. No. 423) Ex. 71):</u>

¶ 1:  By this action, Dalia seeks, *inter alia*, a declaratory judgment recognizing a constructive trust and/or an equitable lien imposed for her benefit on all property the Debtor, Orly Genger ("Orly"), has realized from her beneficial ownership of Dalia's marital claim to the economic benefit of 794.40 shares of Trans-Resources, Inc. (the "Rights"), including the Trump Notes (hereinafter defined), up to $12.25 million plus interest. The proceeds from such Rights have been diverted from Dalia and misappropriated by Orly to insiders, including the Trump Notes which have been transferred to Michael Bowen ("Bowen") for no legal consideration, with the actual and/or constructive intent to hinder, delay and defraud Dalia's entitlement to such proceeds.

¶ 5:  A substantial portion of the proceeds from the Rights, approximately $17.3 million, were diverted by Orly to Arie's creditors and/or business partners. Arie knew of Dalia's interest in the monetized proceeds of the Rights, including the Trump Notes, prior to falsely asserting his interest therein because he materially participated in the events that gave rise to Dalia's constructive trust and/or equitable lien.

¶ 6:  David Broser ("Broser") is a natural person who upon information and belief resides in the State of New York, who improperly received $17.3 million of Orly's monetization of the Rights for no consideration and for no value to Orly.  Broser and the entities related to him asserting an interest in the Trump Notes on his behalf knew of Dalia's interest in the monetized proceeds of the Rights, including the Trump Notes, prior to asserting their interest therein because they and/or their officers and agents materially participated in the events that gave rise to Dalia's rights.

¶ 7:  Eric claims to have an interest in the Trump Notes, which interest was created after Eric became aware of Dalia's interest therein. Eric knew of Dalia's interest in the Trump Notes prior to asserting his interest therein because he materially participated in the events that led to their creation.  Eric asserted to Courts on various occasions that Orly has never had an interest in the Trump Notes or the $17.3 million realized from Orly's monetization of the Rights, most recently in a letter to Judge Garrity. That assertion was made despite contrary written recitations in the March 2017 escrow agreement that he executed.

¶ 8:  At one time, an account titled to the Litigation Trust improperly received $17.3 million from Orly's monetization of the Rights for no consideration or value to Orly.

¶ 9:  ADBG is a lender to Arie which, at one time, improperly received $17.3 million from Orly's monetization of the Rights for no consideration or value to Orly.  Further, ADBG improperly claims to be entitled to in excess of $4 million of the Trump Notes.  ADBG has falsely asserted that Orly never had an interest in the Trump Notes or the $17.3 million realized from Orly's monetization of the Rights, most recently in a letter to Judge Garrity.

¶ 10:  Bowen, Arie, Broser, Eric, the Litigation Trust (including Broser as Trustee thereof) and ADBG are collectively referred to herein as the "Transferees."

¶ 20:  Since the 2004 Agreements, Orly has devised devious and fraudulent schemes to deprive Dalia of her bargain with the intent to hinder, delay and defraud Dalia, including by fraudulently transferring and encumbering Orly's $32.3 million of the proceeds from the monetization of the very Rights that were to be set aside for Dalia's retirement in order to nullify Dalia's ability to reclaim those Rights.

¶ 22:  Specifically, the court found that Orly had monetized her interest in the Rights by virtue of a settlement with the Trump Group (the "2013 Settlement Agreement").

¶ 23:  The $32.3 million payment pursuant to the 2013 Settlement Agreement consisted of $17.3 million in cash up front and $15 million in two un-matured promissory notes of $7.5 million each (the "Trump Notes"), made payable to Bowen as Orly's agent which are in Bowen's possession and remain outstanding.

¶ 25:  Arie's liens are at the very least a constructive fraud as against Orly and/or Dalia and therefore void.

¶ 26:  Eric's liens are at the very least a constructive fraud as against Orly and/or Dalia and therefore void.

¶ 27:  Further, any transfer by Orly to the Litigation Trust would be a fraudulent conveyance, as Orly received no consideration or value for it.  The aforementioned liens are at the very least a constructive fraud as against Orly and/or Dalia and therefore void.

¶ 39 (section titled The Fraudulent Transfers):  In order to frustrate Dalia's rights, in 2013 Orly secretly and fraudulently transferred approximately $17.3 million of the $32.3 million obtained in the 2013 Settlement Agreement to creditors and/or business partners of Arie, namely, Broser and his affiliated entities, including the Litigation Trust and ADBG, in purported satisfaction of false liabilities and for no consideration or value to Orly.

¶ 40 (section titled The Fraudulent Transfers):  In addition, the Trump Notes were secretly and fraudulently transferred to Bowen, and the future proceeds thereof fraudulently encumbered, in purported satisfaction of false liabilities and for no consideration to Orly.

¶ 41 (section titled The Fraudulent Transfers):  In 2019, the U.S. District Court for the Southern District of New York (Broderick, J.) was about to consider a motion to set aside the above conveyances as fraudulent when Orly filed this bankruptcy case (originally in Texas) to halt that proceeding in an attempt to delay and/or totally prevent Dalia from recovering the financial support which she has demanded from the monetized proceeds of the Rights pursuant to the 2004 Agreements.

¶ 46:  In 2014 and thereafter, Orly breached her duty to Dalia and abused the trust and confidence placed by Dalia in her by repudiating her promise and refusing to pay Dalia from the proceeds of her monetization of the Rights and/or reimburse and indemnify Sagi for his payments to Dalia made pursuant to Dalia's request.

¶ 47:  Instead, Orly diverted and misappropriated the proceeds of her monetization of the Rights, including the Trump Notes, by transferring and encumbering them for no legal consideration or value to Orly and with the actual and/or constructive intent to hinder, delay and defraud Dalia.

¶ 48:  The retention of the proceeds of the monetization of the Rights, including the Trump Notes and any liens thereon, by Orly, her estate and/or any of the Transferees would unjustly enrich Orly and the Transferees.

¶ 49:  Orly, her estate and the Transferees may not in good conscience retain the benefits of Orly's monetization of the Rights.

¶ 51:  For the foregoing reasons, Dalia seeks a declaratory judgment that the proceeds of the monetization of the Shares, including the Trump Notes, up to $12.25 million plus interest, is held by Orly and the Transferees in constructive trust and/or an equitable lien for Dalia's benefit whose interest at all relevant times is and was superior to the interests of Orly, the Transferees and Debtors' other creditors.

¶ 54:  For the foregoing reasons, Dalia is entitled to the specific enforcement of the remedy of a constructive trust in her favor and for her benefit upon the proceeds of Orly's monetization of the Shares, including the Trump Notes, up to $12.25 million plus interest, and Bowen should deliver the Trump Notes, in whole or in part, to Dalia.

¶ 57:  For the foregoing reasons, Dalia is entitled to the specific enforcement of an equitable lien in her favor and for her benefit upon the proceeds of Orly's monetization of the Shares, including the Trump Notes, up to $12.25 million plus interest, and Bowen should deliver the Trump Notes, in whole or in part, to Dalia.

¶ 59:  For the foregoing reasons, Dalia is entitled to a temporary, preliminary and/or permanent injunction enjoining and restraining defendants from selling, transferring, assigning, encumbering, hypothecating, or otherwise alienating the Trump Notes and mandating that defendants take all actions necessary for Dalia to receive the proceeds of Orly's monetization of the Rights, including the Trump Notes.

**VII. Sagi Discharge Objection - *Sagi Genger and TPR Investment Associates, Inc. v. Orly Genger*, Adv. Pro. No. 19-ap-1444 (Bankr. S.D.N.Y.); Settlement Motion (Dkt. No. 421) ¶¶ 84; 175**

(Cavaliere Decl. (Dkt. No. 423) Ex. 73):

¶ 2:  As a direct creditor, Sagi objects to the discharge and dischargeability of this Debtor (herein "Debtor" or "Orly") for actual fraud in the fraudulent transfer of all funds she monetized for $32 million paid by this Debtor to insiders with the actual intent to hinder, delay and defraud Sagi, a creditor. As significant, the fraudulently transferred funds were encumbered with a constructive trust under New York law, and recognized in the Fifth Circuit that "……the imposition of a constructive trust is a potent remedy, as it gives the successful claimant priority over the debtor's unsecured creditors; …We look to state law to determine whether a party has adequately demonstrated that property is held in constructive trust for another."

¶ 11:  Remarkably, this same suggestion is also referenced by the Debtor as to the obligations to honestly complete Schedule A/B, first, when the debtor claims "Debtor has identified claims that third parties, in various litigation, may have suggested that she owns (and which Debtor does not agree exist)" which apparently the Debtor is not intending to disclose (at least voluntarily). Without the detailed history above, the Court would have no idea to what this disclaimer refers. However, with this Debtors history disclosed, this reference is to the $32 million in fraudulent transfer [sic] the Debtor made.

¶ 13:  Critically missing is any indication or even hint that there is $15 million in promissory notes from the Trump/Orly monetization of the TRI stock still being held, now by Mr. Bowen, a partner in Kasowitz and a partner of Herschmann, that the Debtor and her Father have signature authority over.

¶ 14:  It is, however, the Schedule of Creditors that illustrates the depth of deception of this Debtor's purported need for Chapter 7 bankruptcy protection. After admittedly turning over almost $17 million to her Father, Arie, in cash, she now schedules her father as a secured creditor for $5,451,389.27. What could this Debtor possibly have received in fair equivalent value for this payments or this indebtedness totaling $22,451,389.27? The answer is, of course, nothing. She simply gave all of her monetized stock cash to her father as part of the fraudulent transfer scheme, planning all along to try and wait out the 6-year New York statute of limitations on fraudulent transfers, then file bankruptcy and walk away from her multi-million debts due her brother and mother. But for the Southern District Federal Courts' work and the Turnover Motion, the plan may have worked.

¶ 19:  In point of fact, the Debtor has no creditors that are not directly or indirectly tied to the underlying litigation pending in New York Courts to avoid a series of fraudulent conveyances made by the Debtor to frustrate Sagi's and Dalia's claims.

¶ 22:  In point of fact, the Debtor has no creditors that are not directly or indirectly tied to the underlying litigation pending in New York Courts to avoid a series of fraudulent conveyances made by the Debtor to frustrate Sagi's and Dalia's claims.

¶ 25:  As set forth herein the Debtor has not filed or explained the assets she currently owns, including but not limited to $15 million of notes held by her husband's law firm and subject to her authority and control with her Father.

¶ 28:  In the course of the prior case to avoid the fraudulent transfer the Debtor has filed false pleadings and made false oath respect to the concealed Escrow Agreement, her schedules, statements of affairs and the assets under her control as of the Petition date.

¶ 31:  The misrepresentations include but are not limited to the Debtor's promise she would pay Sagi one-half (½) of the support obligations for her Mother's support and that she would agree that the shares of the TRI state would be under the control of her Trust.  She then fraudulently transferred the assets away from the Trust to her insider group of creditors, including her Father and her husband.

¶ 34:  As set forth herein the Debtor engaged in a fraudulent scheme to move assets away from her creditors and then the Debtor and her counsel and business partners lied under oath and in pleadings in the Southern District of New York, the Second Circuit and the New York Supreme Court about the existence of the Escrow Agreement that governs her rights to the $15 million of Notes held by her husband's law firm for her and her Father's benefit.

## VIII.  Dalia Discharge Objection - *Dalia Genger and D&K GP LLC v. Orly Genger*, Adv. Pro. No. 19-ap-1445 (Bankr. S.D.N.Y.); Settlement Motion (Dkt. No. 421) ¶¶ 84; 176

(Cavaliere Decl. (Dkt. No. 423) Ex. 74):

¶ 1: As a direct creditor Dalia objects to the discharge and dischargeability of this Debtor (herein "Debtor" or "Orly") for actual fraud in the fraudulent transfer of all funds she monetized for $32 million paid by this Debtor to insiders with the actual intent to hinder, delay and defraud Dalia, a creditor.   As significant, the fraudulently transferred funds were encumbered with a constructive trust . . . .

¶ 10:  This same Judge Forrest now has pending in his Court the Turnover Motion, including the Turnover Memorandum involving the same transactions made the basis of this Complaint.  Dalia incorporates herein the entire Turnover Memorandum and the Turnover Motion, including all of its exhibits, attachments, transcripts and arguments and authorities, as incorporated herein by reference for all purposes.

¶ 14:  However after suffering judgments for damages confirming Arie's misrepresentations of more than $4 million, and after another judgment for almost $4 million in sanctions and damages for Arie's manipulation and destruction of evidence before the Delaware Chancery Court, the Debtor and Arie  designed and implemented a conspiracy involving himself, his daughter Orly, the Debtor and the Debtor's insiders including her husband and his law firm, to fraudulently and intentionally direct the Dalia-encumbered funds: (i) received by Orly only as part of the Divorce Settlement Agreement;  and (ii) held by Orly pursuant to the Integrated Agreement's obligation for Dalia's future source of support; and (iii) stolen through a fraudulent transfer scheme and

given to her father, her father's creditors, the Debtor's husband and his law firm. The exclusive source of Orly's wealth was the Dalia marital property share of the TRI Stock contributed pursuant to these two marital agreements (the Divorce Settlement Agreement and contemporaneous Integrated Agreement) found by the Second Circuit Court of Appeals to have been monetized at the end of 2013 by Orly for more than $32 million in late 2013. This fraudulent conspiracy and resulting fraudulent transfers literally gave not only $17 million cash to her father, but also was designed to give the remaining $15 million in promissory note debt due Orly, not to Dalia for her support as the Divorce Settlement Agreement and the Integrated Agreement mandated, but:

(i)      to Dalia's ex-husband Arie and his purported creditors; and

(ii)      to the Debtor's rich husband and his law firm,

all designed to avoid all the Claw Back Rights and obligations due Debtor's mother encumbering her marital property TPI Stock.

¶ 15:  Ultimately, final judgments arising from breach of the Integrated Agreement by Orly, currently totaling about $3.5 million, coupled with the Turnover Motion and proceeding pending in the SDNY to recover the fraudulent transfers, gave rise to the filing of this Chapter 7 that literally challenges every aspect of honest and full disclosure of the truth mandated by bankruptcy policy.

¶ 16:  It was thus, no coincidence, that this Chapter 7 bankruptcy case was filed on the eve of the deadline of the Debtor and her insider father, husband and his law firm (all targets of the pending SDNY Turnover Motion) to respond to the Turnover Motion and Turnover Memorandum and its damning list of evidence and law, establishing the $32 million in fraudulent transfers (much of which evidence is now subject to these Insiders' Motions for Protection to prevent disclosure to Dalia because they unilaterally marked "confidential" and have threatened suit if even the Chapter 7 Trustee, not to mention Dalia, are given access to such information).

¶ 17:  Thus, with the motion to compel the return of the fraudulently transferred funds' pending before the same federal Judge Forrest that had found prior defaults and prior misconduct, this Debtor sought to move the controversy to Austin Texas in hopes of a different outcome.

¶ 18:  Remarkably, Orly filed this Chapter 7 case hoping to reverse the judicial findings, conclusions and judgments of the SDNY Courts, Delaware Chancery and Supreme Court, and grant releases to the Debtor and her Insiders for a potential payment of slightly more than 3% of the fraudulently transferred funds, the balance of $31+ million to remain with those creating the fraudulent transfer and leaving Dalia and her judicially-recognized rights with literally no assets of this estate.

¶ 27:  What is stunning about this bankruptcy case and the Trustee's decisions thus far, is that the Debtor was a multi-millionaires [sic] (given access to and in fact monetized $32 million in TRI

stock received from her mother's marital property) only to transfer the entire $32 million to her father (purportedly to fund his creditors) and to her husband and his law firm (purportedly claiming millions in legal fees and if true, all spent in these repeated failed efforts in Arie's and Orly's litigation (all lost by Arie and/or Orly) . . . .

¶ 40:  Later, Orly settled her claims for $32 million [SDNY Forrest Op#1, pg. 6 (*Genger l*, 76 F. Supp. 3d 494)] and signed a stipulation in her derivative capacity precluding Dalia's claims as trustee, Dalia stipulated to dismissal of the Delaware action at Orly's written request [*See, Genger v. TR lnv'rs, LLC*, No. 6906-CS, 2013 Del. Ch. LEXIS 355 (Ch. Aug. 30, 2013)] That stipulation triggered the Trump's rights to purchase record ownership of Orly's TRI shares from TPR for $10.3 million under the 2008 Side Letter Agreement. Thus, Orly and Sagi collectively monetized their interest for $69 million - $32.3 million to Orly and $36.7 million to Sagi ($26.7 million plus $10.3 million).

n.21:  The agreement provides that Orly, Arie, and their litigation funders[21] will receive $32.3 million in exchange for a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and  otherwise)" to the TRI shares,  and that Orly waives all of her claims to the TRI shares, both as a trust beneficiary and individually.  The 2013 Trump Settlement Agreement does not waive any of the Orly Trust's claims. However, in the agreement the Orly Trust to do the same.  [See footnotes omitted]. [SDNY Forrest Op#1, pg. 6 (*Genger l*, 76 F. Supp. 3d 494) (emphasis added)].

¶ 47:  Orly benefitted from the shares - but claims to have received none of the money she caused to be monetized because she gifted it to Arie.  This blatant and obvious fraud must result in the denial of this Debtor's discharge.

¶ 50 (under section titled "The Trump Settlement Distributions were an Actual Fraud 'Fraudulent Transfer'"):  At the time of this Trump settlement, and although Dalia remained the Trustee of the Orly Trust, Dalia was neither consulted nor did she participate in this 2013 Trump Settlement Agreement, and the parties refused to even give her, as Trustee, a copy.  [*See, infra*].  Dalia's participation was problematic to the Orly transaction, inasmuch as Dalia was both a Trustee with an economic beneficial interest (through the Claw Back Rights provided in the Integrated Agreement).  Then, on August 30, 2013, the Orly Trust, TPR, and the Trump Group all agreed that "the Trump Group owns, for all purposes, all  right,  title  and interest (beneficially, of record and otherwise) to all authorized and issued shares of [TRI] . and so ordered by the Delaware Chancery Court" [SDNY Forrest Op#1, pg. 7 (*Genger l*, 76 F. Supp. 3d 494)].

¶ 55:  The Debtor's schedules ignore, and certainly do not disclose that (as four (4) opinions of the NY Federal trial and appellate Courts found) in 2013 "*Orly monetized her beneficial interest in the [family business] TRI shares for $32.3 million*." [*See, e.g. Genger I*, 76 F. Supp.3d at 501].

¶ 56:  "The $32.3 million consists of $17.3 million in cash up front, plus two additional $7.5 million [promissory notes] to be made over four years." *Id.* at 494 n.11.  All cash has been paid out.   Thus, instead of honoring Orly's written commitment to her mother, Orly, in concert and conspiracy with her father Arie Genger and her attorney/husband Eric Herschmann, set

about on a scheme to frustrate that financial obligation and deny Dalia all support. When the first $17.3 million payment was made in 2013, Orly directed one of her then-attorneys, William Wachtel, to immediately wire the entire sum to a trust established for the benefit of Arie's (not Orly's) creditors.

¶ 57: Orly could not dissipate those funds, because they were not yet payable (to date, certain preconditions have not yet been met and they have not yet been paid). Because the remaining $15 million had not yet come due, the AG Group had to be more creative to avoid Dalia's or Sagi's access to the remaining $15 million. So, Orly, her father and her husband devised a plan to frustrate the upcoming judgments for the Claw back demands by encumbering these two notes with bogus liabilities. [See, redaction in SDNY Turnover Memorandum, referencing Exh. X at 79:12-80:7 (emphasis added)]. The conspiracy hatched a scheme to encumber the $15 million evidenced by the two Trump Group promissory notes by having Orly pledge them as "security" to her husband and father for patently bogus "liabilities."

¶ 74: Critically missing is any indication or even hint that there is $15 million in promissory notes from the Trump/Orly monetization of the TRI stock still being held, now by Mr. Bowen, a partner in Kasowitz and a partner of Herschmann.

¶ 75: It is, however, the Schedule of Creditors that illustrates the depth of deception of this Debtor's purported need for Chapter 7 bankruptcy protection. After admittedly turning over almost $17 million to her father Arie in cash, she now schedules her father as a secured creditor for $5,451,389.27. What could this Debtor possibly have received in fair equivalent value for these payments or this indebtedness totaling $22,451,389.27? The answer is, of course, nothing. She simply gave all of her monetized stock cash to her father as part of the fraudulent transfer scheme, planning all along to try and wait out the 6-year New York statute of limitations on fraudulent transfers, then file bankruptcy and walk away from her multi-million debts due her brother and mother. But for the Southern District Federal Courts work and the Turnover Motion, the plan may have worked.

¶ 81: In point of fact, the Debtor has no creditors that are not directly or indirectly tied to the underlying litigation pending in New York Courts to avoid a series of fraudulent conveyances made by the Debtor to frustrate Sagi's and Dalia's claims.

¶ 87: The Debtor has neither reference nor produced documents, nor disclosed in her Schedules or Statements of Affairs, the details of the transactions by which the Debtor cannot account for the use of more than $32 million.

¶ 88: The foregoing facts illustrate that this Debtor has intentionally withheld, failed to disclose, and has hidden millions of dollars in financial transactions without documents to establish the actual and ultimate use of those funds, the names of the transferees of those funds, and the necessary detail. Accordingly, the Debtor's discharge should be denied.

¶ 97: Most importantly, this Debtor has hidden almost every critical document to the transaction dealing with the Monetization of the $32 million, hidden the use of those funds, and

hidden information relevant to the discovery of these facts and accordingly, the Debtor's discharge should be denied.

¶ 101: This Debtor has hidden almost every critical document to the transaction dealing with the Monetization of the $32 million, hidden the use of those funds, and hidden information relevant to the discovery of these facts and accordingly, the Debtor's discharge should be denied.

¶ 104: This Debtor, with the full knowledge of her Trust's obligation and of the constructive trust on its assets to support the Debtor's mother (the actual source of the wealth of his Debtor) by actual fraud monetized the Trust's TPI [sic] stock, took the funds for her own use without the consent or participation of the Trustee Dalia, and fraudulently transferred these funds to and for the benefit of her insider father (funds that her father had previously defrauded Dalia into signing the marital agreements (the Divorce Settlement and the Integrated Agreement) and transferring to Orly's trust. But for this fraud Dalia could have support and compliance with these Agreements; but for this fraud Dalia has no assets of the Trust or of Orly to look to.

¶ 105: This actual fraud was fraud by commission (including the Monetizing of the funds and the fraudulent transfer) and by omission (including the hiding of the Trump Settlement Agreement and its terms, and the conduct of Trust affairs by the Debtor to the exclusion of the actual Trustee), and accordingly, the Debtor's discharge should be denied.

¶ 108: This Debtor, with the full knowledge of her Trust's obligation and of the constructive trust on its assets to support the Debtor's mother (the actual source of the wealth of this Debtor) by actual fraud monetized the Trust's TPI [sic] stock, took the funds for her own use without the consent or participation of the Trustee Dalia, and fraudulently transferred these funds to and for the benefit of her insider father (funds that her father had previously defrauded Dalia into signing the marital agreements (the Divorce Settlement and the Integrated Agreement) and transferring to Orly's trust. But for this fraud Dalia could have support and compliance with these Agreements; but for this fraud Dalia has no assets of the Trust or of Orly to look to.

¶ 109: This actual fraud was fraud by commission (including the Monetizing of the funds and the fraudulent transfer) and by omission (including the hiding of the Trump Settlement Agreement and its terms, and the conduct of Trust affairs by the Debtor to the exclusion of the actual Trustee), and accordingly, the Debtor's discharge should be denied.

¶ 112: Dalia had a property right and legal and equitable interest in the TPI [sic] Stock specifically encumbered with the obligations to of future support. This Debtor, with the full knowledge of her Trust's obligation and of the constructive trust on its assets to support the Debtor's mother (the actual source of the wealth of his Debtor) by actual fraud monetized the Trust's TPI stock, took the funds for her own use without the consent or participation of the Trustee Dalia, and fraudulently transferred these funds to and for the benefit of her insider father (funds that her father had previously defrauded Dalia into signing the marital agreements (the Divorce Settlement and the Integrated Agreement) and transferring to Orly's trust. But for this fraud Dalia could have support and compliance with these Agreements; but for this fraud Dalia has no assets of the Trust or of Orly to look to.

¶ 116: All of the wealth of the Orly Trust, which wealth was taken by the Debtor Individually . . . .

## IX. Orly Trust Discharge Objection - *Michael Oldner, as trustee of the Orly Genger 1993 Trust v. Orly Genger*, Adv. Pro. No. 19-ap-1447 (Bankr. S.D.N.Y.); Settlement Motion (Dkt. No. 421) ¶¶ 84; 177

(Cavaliere Decl. (Dkt. No. 423) Ex. 75):

¶ 7: By this Complaint, the Trustee seeks to except from the Debtor's discharge the Trust's claims to the proceeds of that certain, pre-petition Settlement Agreement dated as of June 14, 2013, and agreed to by the Debtor in her derivative capacity on behalf of the Trust. The Trustee makes these claims in order to preserve the Trust's corresponding claims to the extent necessary and appropriate to recover the proceeds of the foregoing settlement, primarily against third parties, and so that such proceeds can be protected beyond the reach of the Debtor's estate and its creditors in order to ensure the Trust's ability to provide for the maintenance of its beneficiaries.

¶ 14: Subsequently, as of June 14, 2013, Arie and the Debtor entered into a Settlement Agreement with the Trump Group (the "2013 Settlement").

¶ 15: Under the 2013 Settlement, in exchange for free and clear title to the Trust Shares, the Trump Group provided $32.3 million in settlement proceeds, comprised of a cash payment of $17.3 million, and two promissory notes of $7.5 million each. Because the Debtor's claims against the Trump Group were expressly cast as derivative claims, and she asserted no interests in the Trust Shares other than in her capacity as the beneficiary of the Trust, the Trump Group expressly required under the settlement that Arie and the Debtor would take all actions necessary to obtain a judicial declaration "that [the] members of the Trump Group own all right, title and interest … to the shares of [TRI] purportedly transferred by TPR in October 2004 to Arie Genger… and to the Orly Genger 1993 Trust (the 'Orly Trust Shares')." 2013 Settlement, at § 4.

¶ 16: By the time of the 2013 Settlement, Arie had suffered a prior adverse judgment, affirmed on appeal, dismissing and denying any claims that he asserted to any equity interests in TRI.

¶ 17: The 2013 Settlement provided for two types of settlement proceeds. First, the Trump Group made an initial cash payment upon dismissal of the claims listed in the agreement. Second, the Trump Group provided for an additional $15 million payment—memorialized in two $7.5 million promissory notes—that would not be paid until all potentially related claims have been dismissed and the corresponding statutes of limitations expired. See 2013 Settlement, Exh. A (Form of Subordinated Note), § 3.

¶ 18: The proceeds of the 2013 Settlement constitute property of the Trust. The Debtor, acting derivatively on behalf of the Trust, directed the cash proceeds of the 2013 Settlement to be paid to her lawyer and then to a separate trust (the Orly Genger Litigation Trust) having no relationship to the Trust or any claim to its property.

¶ 19. The Debtor also subsequently transferred interests in and to the 2013 Settlement proceeds in order to collateralize debts that are not valid Trust obligations.

¶ 20.  By virtue of the Debtor's foregoing actions, the Trust was left insolvent and unable to generally pay its debts as they became due.

¶ 23. The Debtor intentionally misused her fiduciary capacity and position of authority to deprive the Trust of its rightful interests in the proceeds of the Trust Shares and 2013 Settlement, for the benefit of the Debtor's insiders and their affiliates.

¶ 24.  Such conduct constitutes the Debtor's defalcation of the Trust's property, which the Debtor, as a person entrusted with such property and funds as a fiduciary of the Trust, misappropriated.

¶ 25.  Accordingly, the Debtor's corresponding debts to the Plaintiff for her defalcation of the proceeds of the Trust Shares and 2013 Settlement should be excepted from discharge in her Bankruptcy Case pursuant to section 523(a)(4) of the Bankruptcy Code.

## X.  Herschmann Action - *Sagi Genger v. Eric Herschmann*, Adv. Pro. No. 21-ap-01135 (Bankr. S.D.N.Y.); Settlement Motion (Dkt. No. 421) ¶¶ 83; 178

Complaint (Cavaliere Decl. (Dkt. No. 423) Ex. 72):

¶ 1:  By Judgment entered on August 17, 2018 (the "Judgment"), Sagi is a creditor of the Chapter 7 debtor, Orly Genger ("Orly" or the "Debtor"). Starting in 2016, after the scope of the Debtor's potential liability was crystalized by rulings of the U.S. District Court and U.S. Court of Appeals, the Debtor entered into multiple fraudulent conveyances designed to frustrate Sagi's ability to collect his Judgment from her two main assets: (a) a $15 million notes receivable deriving from a June 2013 litigation settlement (the "Receivable"), and (b) a 50% interest in a multi-million dollar condominium in Austin, Texas (the "Condominium").

¶ 2:  To accomplish these fraudulent conveyances, the Debtor conspired with her husband-counsel, defendant Eric Herschmann ("Herschmann"), a Big Law partner knowledgeable in devices that can be exploited to frustrate lawful creditors. Together, the Debtor and Herschmann conspired in at least three fraudulent conveyances, each with the intent and outcome of benefitting Herschmann—who supports the Debtor's lifestyle—while (at least facially) impoverishing the Debtor, thereby ensuring that Sagi could not collect against her.

¶ 5:  The intention and effect of these fraudulent conveyances was to unlawfully place Herschmann ahead of Sagi with respect to the aforementioned Receivable.

¶ 7:  The three foregoing fraudulent conveyances have, collectively, frustrated Sagi's ability to collect his Judgment against the Debtor's true assets.

¶ 14:  The Second Circuit unanimously affirmed Judge Forrest's rulings in September 2016. Even before it had so ruled, the Debtor and Herschmann had already begun to scheme to

frustrate Sagi's ability to collect from the Debtor on her one-half of their support obligation to their mother, with whom the Debtor had previously become estranged.

¶ 15: Sagi thus began post-judgment discovery. From the start, he focused his discovery on the Debtor's 2013 litigation settlement agreement, pursuant to which (Judge Forrest found) the Debtor had "monetized" her interest in a family business for $32.3 million. At the time, Sagi had a copy of the Agreement itself, but no other documents as to the fate of the $32.3 million.

¶ 19: The Debtor's answer here again was false and misleading in several respects, all of which Herschmann knew at the time. First, the Debtor knew that the first $17.3 million in settlement proceeds had gone to pay Arie's debt to entities affiliated with Arnold and David Broser (the "Brosers"), as she had testified to that fact in an earlier litigation with Herschmann present. Second, according to documents subsequently produced, the Debtor is a signatory to four writings by which she purports to commit to use settlement proceeds to pay the Brosers (and, in one case, Herschmann). Third, by this time, the Debtor had already purportedly collateralized $2 million of future settlement proceeds as security for her "debt" to Herschmann.

¶ 34: The Escrow Agreement debunks the position Herschmann was then pursuing on behalf of the Debtor; namely, that that she had "nothing to do with" the $32.3 million.

¶ 40: In other words, the Debtor has always had claim to a significant portion of the Receivable, even absent Judge Forrest's finding that the entire Receivable is the product of her monetization of her (or her trust's) claim to a beneficial interest in the TRI shares. Herschmann knew all along that his wife/client the Debtor, her father Arie (also a firm client at times), and the Brosers had so agreed, yet he told this Court and other courts differently.

¶ 59: As set forth above, the Debtor transferred assets with the actual intent to hinder, delay, or defraud her creditor, Sagi, in violation of the New Jersey Uniform Fraudulent Transfer Act ("NJUFTA"), N.J.S.A. 25:2–20 to 2–34, and other comparable laws.

¶ 60: As set forth above, Herschmann acted in concert with the Debtor in a scheme to commit multiple fraudulent transfers in violation of the NJUFTA, via a series of overt agreements with the Debtor and others, with the purpose of inflicting injury upon Sagi by frustrating his ability collect the Judgment.

¶ 62: Herschmann well understood the general objectives of the foregoing scheme, accepted them, and agreed, both explicitly and implicitly, to do his part to further that scheme, by assisting the Debtor in executing and concealing her fraudulent transfers.

¶ 63: Sagi has suffered injury as result of Herschmann's misconduct, in the amounts of, *inter alia*, the unpaid Judgment and his associated Collection Costs.

¶ 65: As set forth above, the Debtor transferred assets with the actual intent to hinder, delay, or defraud her creditor, Sagi, in violation of the Texas Uniform Fraudulent Transfer Act ("TXUFTA"), Sections 24.001-24.0012, and other comparable laws.

¶ 66:  As set forth above, Herschmann acted in concert with the Debtor in a scheme to commit multiple fraudulent transfers to himself (and to a third party through which he held an interest) in violation of the TXUFTA, via a series of overt agreements with the Debtor and others, with the purpose of inflicting injury upon Sagi by frustrating his ability collect the Judgment.

¶ 67:  Herschmann well understood the general objectives of the foregoing scheme, accepted them, and agreed, both explicitly and implicitly, to do his part to further that scheme, by assisting the Debtor in executing and concealing her fraudulent transfers.

¶ 70:  Sagi has suffered injury as result of Herschmann's misconduct, in the amounts of, inter alia, the unpaid Judgment and his associated Collection Costs.

¶ 72:  As set forth above, the Debtor transferred assets with the actual intent to hinder, delay, or defraud her creditor, Sagi, in violation of the New York Debtor & Creditor Law ("NYDCL"), Article 10 (§§ 270-281), and other comparable laws.

¶ 73:  As set forth above, Herschmann acted in concert with the Debtor in a scheme to commit multiple fraudulent transfers to himself (and to a third party through which he held an interest) in violation of the NYDCL, via a series of overt agreements with the Debtor and others, with the purpose of inflicting injury upon Sagi by frustrating his ability to collect the Judgment.

¶ 74:  Herschmann well understood the general objectives of the foregoing scheme, accepted them, and agreed, both explicitly and implicitly, to do his part to further that scheme, by assisting the Debtor in executing and concealing her fraudulent transfers.

¶ 75:  Most of these fraudulent transfers were undertaken by the Debtor and Herschmann through the Kasowitz law firm, which is based in New York. In addition, the ultimate goal of the scheme was to deny financial support to Dalia Genger, a New York domiciliary.

¶ 77:  Sagi has suffered injury as result of Herschmann's misconduct, in the amounts of, *inter alia*, the unpaid Judgment.

¶ 79:  Sagi is the holder of a valid Judgment against the Debtor, entered by a New York federal court, which Judgment remains unpaid.

¶ 81:  Herschmann intentionally and improperly interfered with Sagi's ability to collect the Judgment, through the wrongful conduct set forth above.