UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

| | | |
|---|---|---|
| *In re:* | : | Chapter 7 |
| | : | |
| Orly Genger, | : | Case No. 19-13895 (JLG) |
| | : | |
| Debtor.[1] | : | |

--------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER DENYING JUDGMENT CREDITOR SAGI GENGER'S AMENDED AND UPDATED MOTION TO DISMISS

<u>**A P P E A R A N C E S**</u>**:**

EMMET, MARVIN & MARTIN, LLP
*Attorneys for Judgment Creditor Sagi Genger*
120 Broadway, 32nd Floor
New York, New York 10271
<u>By:</u>     Thomas A. Pitta
         John Dellaportas
         Beth Claire Khinchuk

EMMET, MARVIN & MARTIN LLP
*Attorneys for Creditor TPR Investment Associates, Inc.*
120 Broadway, 32nd Floor
New York, New York 10271
<u>By:</u>     Thomas A. Pitta
         John Dellaportas
         Beth Claire Khinchuk

GLENN AGRE BERGMAN & FUENTES LLP
*Attorneys for Debtor Orly Genger*
55 Hudson Yards, 20th Floor
New York, New York 10001
<u>By:</u>     Michael Paul Bowen

---

[1]    The last four digits of Orly Genger's social security number are 8893. The location of Orly Genger's services address for purposes of this Chapter 7 Case is: 210 Lavaca St., Unit 1903, Austin, TX, 78701.

1

HUGES HUBBARD & REED LLP
*Attorneys for ADBG LLC*
One Battery Park Plaza
New York, New York 10004
By:         Christopher K. Kiplok
            Christopher Gartman

KASOWITZ BENSON TORRES LLP
*Creditor*
1633 Broadway
New York, New York 10019
By:         Andrew R. Kurland

ERIC HERSCHMANN
*Pro se*
210 Lavaca Street, #1903
Austin, Texas 78701
By:         Eric D. Herschmann

TOGUT, SEGAL & SEGAL LLP
*Attorneys for Arie Genger*
One Penn Plaza, Suite 3335
New York, New York 10119
By:         Frank A. Oswald
            Jared C. Borriello

TARTER KRINSKY & DROGIN LLP
*Attorneys for Deborah J. Piazza, Chapter 7 Trustee*
1350 Broadway, 11th Floor
New York, New York 10018
By:         Deborah J. Piazza
            Rocco A. Cavaliere

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[2]

Orly Genger ("Orly")[3] is a chapter 7 debtor herein.[4]  In 2004, her parents, Dalia and Arie, divorced.  Under their 2004 Divorce Agreement, Dalia relinquished her marital claim to the economic benefit of 794.40 shares of TRI stock (the "Distributed TRI Shares"), and those shares were distributed equally between trusts settled for the benefit of Orly and her brother, Sagi. Pursuant to that certain "2004 Promise," and in connection with the transfer of the Distributed TRI Shares to the trusts, Sagi promised Dalia that, upon her requests, he would pay her, in the aggregate, up to an amount equal to the value of the Distributed TRI Shares.  Pursuant to that certain "2004 Indemnity," Orly agreed to indemnify Sagi in an amount equal to one half of his liabilities arising from his undertaking in the 2004 Promise.

In 2013, pursuant to that certain 2013 Settlement Agreement regarding the ownership of TRI's stock, among the Trump Group, on one hand, and Arie, Orly—individually and as a beneficiary under the Orly Trust—and others (defined below as the "AG Group"), on the other hand, the Trump Group agreed, without limitation, to pay $32.3 million to the AG Group in exchange for a declaration that the Trump Group owns all rights, title and interest (beneficially, of record, and otherwise) to all TRI shares.  The settlement proceeds include a cash payment of $17.3 million and the distribution of two $7.5 million Promissory Notes (the "Settlement Proceeds").

---

[2]    Capitalized terms have the meanings ascribed to them herein.

[3]    In this Memorandum Decision and Order, the Court refers to members of the Genger family by their given names.

[4]    References to "ECF No. __" are references to documents filed on the electronic docket in this Chapter 7 case, No. 19-13895.

Without limitation, under that agreement, Orly waived all of her claims to record and beneficial ownership of the TRI shares, both as a trust beneficiary and individually.

In 2014, Sagi honored Dalia's request under the 2004 Promise for the payment of $200,000, but Orly denied Sagi's demand for indemnification under the 2004 Indemnity. Sagi sued Orly for breach of contract in the United States District Court for the Southern District of New York. The district court granted Sagi's motion for summary judgment and awarded Sagi damages. *See Genger v. Genger*, 76 F. Supp. 3d 488 (S.D.N.Y. 2015) ("*Genger I*"). On appeal, the Second Circuit affirmed the judgment. *See Genger v. Genger*, 663 F. App'x 44 (2d Cir. 2016) (summary order) ("*Genger II*"). Orly satisfied that judgment. In 2017, Dalia requested the payment of $6 million under the 2004 Promise (the "2017 Demand). Sagi refused Dalia's demand, and Dalia sued him for breach of contract (the "District Court Action"). Sagi brought a third-party complaint against Orly to enforce the 2004 Indemnity with respect to the 2017 Demand. Sagi obtained a judgment against Orly for $3.2 million (the "2018 Judgment"). *See Genger v. Genger*, No. 17-cv-8181, 2018 WL 3632521, at *2 (S.D.N.Y. July 27, 2018) ("*Genger III*"). On June 28, 2019, the Second Circuit affirmed the 2018 Judgment. *See Genger v. Genger*, 771 F. App'x 99 (2d Cir. 2019) (summary order) ("*Genger IV*").

On June 11, 2019, on the heels of the entry of the 2018 Judgment, Sagi filed a turnover motion in the District Court Action. On July 12, 2019, Orly filed a voluntary petition under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas (the "Texas Bankruptcy Court") (the "Chapter 7 Case"). In her Petition, Orly values her assets at approximately $56,000, including her one-half undivided interest in her Residence, which she did not value. She lists liabilities of approximately $10 million. Fifteen parties filed proofs of claim against Orly that aggregate

4

approximately $90 million.  In *Genger I*, the district court found that under the 2013 Settlement Agreement, "Orly monetized her beneficial interest in the [TRI] shares for $32.3 million."  76 F. Supp. 3d at 501.  It is undisputed that Orly has not received any payment from the Settlement Proceeds, and she maintains that she is not entitled to any of those proceeds.  Sagi says that the district court has determined otherwise and that Orly has enjoyed a $32.3 million "windfall" from her rights to the Distributed TRI Shares.  He maintains that in the Petition, Orly has fraudulently concealed her right to the Settlement Proceeds.

The matter before the Court is Sagi's motion to dismiss the Chapter 7 Case (the "Motion").[5] Sagi contends that the case constitutes a sham attempt to avoid what is really a two-party dispute better adjudicated in the District Court Action, which he claims warrants dismissal as a matter of equity pursuant to section 305(a) of the Bankruptcy Code.  Alternatively, he asserts that Orly filed the case in bad faith, providing cause for dismissal under section 707(a) of the Bankruptcy Code. Creditor TPR Investment Associates, Inc. joined in support of the Motion.[6]  The Debtor filed an opposition to the Motion.[7]  Deborah Piazza, Esq., the chapter 7 trustee of Orly's estate (the "Trustee"), also filed an opposition to the Motion.[8]  Other creditors in the Chapter 7 Case joined

---

[5]    *See Judgment Creditor Sagi Genger's Amended and Updated Motion to Dismiss and Memorandum of Law in Support*, ECF No. 239.  The Motion is supported by the declaration of Sagi's counsel, John Dellaportas ("Mr. Dellaportas").  *Declaration of John Dellaportas*, ECF No. 239 ("Dellaportas Declaration").

[6]    *Joinder in Sagi Genger's Motion to Dismiss*, ECF No. 440.

[7]    *See Debtor's Objection to Creditor Sagi Genger's Amended and Updated Motion to Dismiss*, ECF No. 425 (the "Orly Objection" or "Orly Obj.").  The Orly Objection is supported by the declaration of Orly's counsel, Michael Bowen ("Mr. Bowen").  *Declaration of Michael Paul Bowen*, ECF No. 424 ("Bowen Declaration").

[8]    *See Chapter 7 Trustee's Objection to Sagi Genger's Amended Motion to Dismiss Bankruptcy Case*, ECF No. 433 (the "Trustee Objection" or "Trustee Obj.").

in Orly's Objection, including Arie,[9] ADBG, LLC,[10] and Eric Herschmann ("Herschmann"), Orly's husband, and Kasowitz Benson Torres LLP ("KBT").[11]  Sagi filed an omnibus reply in response to the Orly Objection and Trustee Objection (collectively, the "Objections").[12]

The Court held a trial on the Motion that spanned several days.[13]  A substantial amount of evidence was submitted at trial.[14]  Subsequently, the Court ordered post-trial briefing.[15]  Based on the evidence in the record, the Court concludes that Sagi has failed to demonstrate that the Chapter 7 Case was filed in bad faith, or that it is subject to dismissal under Section 305(a) of the Bankruptcy Code. As such, for the reasons set forth below, the Court denies the Motion.

---

[9]    *Arie Genger's Joinder to Debtor's Objection to Creditor Sagi Genger's Amended and Updated Motion to Dismiss*, ECF No. 432.

[10]    *Joinder of ADBG LLC in Support of Debtor's Objection to Creditor Sagi Genger's Amended and Updated Motion to Dismiss*, ECF No. 426.

[11]    *Joinder in Opposition to Amended Motion to Dismiss*, ECF No. 431 ("KBT Joinder").  The KBT Joinder is supported by the declaration of Andrew Kurland ("Mr. Kurland"), a lawyer at KBT.  *Declaration of Andrew R. Kurland*, ECF No. 434.

[12]    *See Omnibus Reply of Sagi Genger to the Objections to Judgment Creditor Sagi Genger's Amended and Updated Motion to Dismiss the Bankruptcy Case*, ECF No. 443 (the "Reply").

[13]    *See Transcript Regarding Hearing Held on 6/16/2021*, ECF No. 482 ("6/16 Tr."); *Transcript Regarding Hearing Held on 6/17/2021*, ECF No. 484 ("6/17 Tr."); *Transcript Regarding Hearing Held on 6/18/2021*, ECF No. 483 ("6/18 Tr."); *Transcript Regarding Hearing Held on 6/21/2021*, ECF No. 485 ("6/21 Tr."); *Transcript Regarding Hearing Held on 6/24/2021*, ECF No. 486 ("6/24 Tr.").

[14]    References to "Movant's Ex. __" are to exhibits submitted by Sagi at trial.  References to "Debtor's Ex. __" are to exhibits submitted by Orly in connection with the trial.

[15]    *Post-Trial Brief of Sagi Genger in Support of His Motion to Dismiss*, ECF No. 510 ("Sagi PT Br."); *Debtor's Post-Trial Submission in Support of Debtor's Objection to the Motion to Dismiss*, ECF No. 511 ("Orly PT Br."); *Post-Trial Submission of Arie Genger and Joinder in Support of the Debtor's and Other Objectors' Post-Hearing Submissions in Opposition to Sagi Genger's Motion to Dismiss*, ECF No. 512 ("Arie PT Br."); *Joinder of Chapter 7 Trustee to Debtor's Post-Trial Submission in Support of Debtor's Objection to Motion to Dismiss*, ECF No. 513 ("Trustee PT Br."); *Post-Trial Submission in Support of Objection to Motion to Dismiss*, ECF No. 514 ("KBT PT Br."); *Post-Trial Submission of ADBG LLC, TEDCO, INC., Arnold Broser and David Broser in Opposition to Sagi Genger's Amended Motion to Dismiss, and Joinder in Debtor's and Others Objectors' Post-Hearing Submissions*, ECF No. 515.

**Jurisdiction**

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334,

and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States

District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska,

C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**Facts**[16]

In 1985, the Genger family owned a holding company known as TPR Investment

Associates, Inc. ("TPR"). In 1985, Arie formed Trans-Resources Inc. ("TRI"), a Delaware

corporation and TPR's wholly owned subsidiary, which specializes in manufacturing fertilizer and

producing chemicals for agricultural use. *See Genger v. TR Invs., LLC*, 26 A.3d 180, 183–84 (Del.

2011) ("*TR Invs. I*").[17] In 1993, Arie owned 51% of TPR's stock, and he thereby controlled TRI.

The remainder of TPR's stock (49%) was held by D & K Limited Partnership ("D & K"), the

interests in which were divided between Dalia and separate trusts established for Sagi (the "Sagi

Trust") and Orly (the "Orly Trust"). *See Genger v. Genger*, No. 651089/2010, 2013 WL 221485,

at *2–3 (Sup. Ct. N.Y. Cnty. Jan. 3, 2013) (unpublished table decision).

---

[16] This Memorandum Decision and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure made applicable herein by Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

[17] There is a long history of litigation among the members of the Genger family, some of which is relevant to the matters at issue in the Motion. In addressing the merits of the Motion, the Court takes judicial notice of a handful of the many reported decisions regarding Genger family matters. *See Kasey v. Molybdenum Corp. of Am.*, 336 F.2d 560, 563 (9th Cir. 1964) (where parties had history of litigation in state court, court took "judicial notice of . . . officially reported decisions and refers to them for a better understanding of the complicated factual situation here existing"); *Wingate v. Gives*, No. 05-1872, 2016 WL 519634, at *1 (S.D.N.Y. Feb. 5, 2016) (court took judicial notice of facts in reported state court decisions).

Stockholders Agreement

By 2001, TRI had run into financial difficulty, and its $230 million in bonds were trading at a fraction of their face value. Jules Trump and his brother, Eddie Trump, and entities under their control, organized a group of investors (the "Trump Group") that purchased $220 million (face value) of TRI's bonds for $25 million. *TR Invs. I*, 26 A.3d at 184. Thereafter, the Trump Group entered into an agreement with TPR and TRI, pursuant to which it converted its bond holdings into a 47.15% equity stake in TRI, with TPR retaining 52.85% of the shares (the "Stockholders Agreement"). *Id.* Among other things, the agreement identified a limited universe of permitted transferees of the TRI shares and called for a transferring shareholder to give prior written notice to all shareholders of any proposed transfer. A share transfer in violation of the restrictions under the Stockholders Agreement was void, and non-transferring shareholders had the right to purchase any invalidly transferred shares (the "Purchase Rights"). *Id.*

The 2004 Stock Transfers

On October 26, 2004, Arie and Dalia resolved their contested divorce by entering into a so-ordered Stipulation of Settlement (the "2004 Divorce Agreement") that, among other things, distributed their marital assets, including their interests in TPR and TRI. Pursuant to the agreement and related documentation, Arie agreed to transfer his 51% interest in TPR to Dalia, with the proviso that TPR divest its 3,000 shares of TRI common stock on the following terms: (i) Sagi would become TPR's president and chief executive officer; (ii) TPR would transfer (a) 794.40 shares of TRI common stock representing 13.99% of TRI's common stock to Arie (the "Arie Shares") and (b) TPR would transfer 1,102.80 shares of TRI, representing approximately 19.43% of TRI's common stock, to each of the Sagi Trust (the "Sagi Trust Shares") and the Orly Trust (the "Orly Trust Shares") (collectively, the "2004 Stock Transfers"); and (iii) each of the trusts would execute agreements providing for, among other things, Arie's irrevocable right to vote the Sagi

8

Trust Shares and the Orly Trust Shares in TRI for the duration of his life. *Genger*, 2013 WL 221485, at *1. The distribution of 794.40 shares of TRI to Arie was a distribution of his 50% marital interest in TRI. Dalia held a 50% marital interest in TRI, but under the 2004 Divorce Agreement, she conveyed her marital rights to 794.40 TRI shares equally among the Orly Trust and Sagi Trust in consideration for a commitment by Sagi and Orly to financially support her. This arrangement was effectuated through the 2004 Divorce Agreement and a letter dated October 30, 2004, countersigned by Dalia and Sagi (the "2004 Promise"), and a letter dated November 10, 2004, countersigned by Sagi and Orly (the "2004 Indemnity"). *See Genger I*, 76 F. Supp. 3d at 492.

The Disputes over the Ownership of the TRI Shares

Arie failed to notify the Trump Group of the 2004 Stock Transfers and to obtain its consent to the transfers. In 2008, the Trump Group learned of the transfers, and in August 2008, the Trump Group invoked its Purchase Rights under the Stockholders Agreement to acquire the 3,000 TRI shares purportedly distributed to Arie and the Sagi Orly Trusts pursuant to the 2004 Stock Transfers. *See TR Invs. I*, 26 A.3d at 185–86. Arie rejected that demand, and, in response, in August 2008, the Trump Group filed a lawsuit in the United States District Court for the Southern District of New York against TPR and TRI, asserting that the 2004 Stock Transfers were invalid and seeking to enforce the Stockholders Agreement, including its Purchase Rights. *See Glenclova Inv. Co. v. Trans-Res., Inc.*, No. 08-cv-7140 (S.D.N.Y. filed Aug. 11, 2008) (the "*Glencova Federal Action*"). Eventually, Arie intervened in that action, and TPR interposed a third-party complaint against him, seeking a declaratory judgment that it was the true owner of the TRI shares. Arie responded to the claim and asserted counterclaims against TPR.

After the divorce, Dalia ceded control over TPR to Sagi. On August 22, 2008, the Sagi Trust, TPR (acting through Sagi, its president), and the Trump Group entered into an agreement

(the "2008 Agreement"), under which the Trump Group purchased the Sagi Trust Shares (i.e.,

1,102.80 TRI shares) for $26.7 million. *TR Invs. I*, 26 A.3d at 187. In part, the agreement provided

that if it was determined that the 2004 Stock Transfers were legally void (as transferred in violation

of the Stockholders Agreement), TPR, not the Sagi Trust, would be deemed and treated as

transferor of the Sagi Trust Shares to the Trump Group under the agreement. That day, the Trump

Group and TPR also entered into a "Side Letter Agreement," giving the Trump Group the option

to buy the Arie Shares (i.e., 794.40 TRI shares) and the Orly Trust Shares (i.e., 1,102.80 TRI

shares) at a discount to the agreed share price of the Sagi Trust Shares. *Id.* The Trump Group's

rights under the Side Letter Agreement would be triggered only if it was determined that the 2004

Stock Transfers were void. In that event, the legal and beneficial ownership of the TRI shares

would be deemed to have remained with TPR, and, accordingly, TPR would be the transferor of

the shares. *Id.* The Orly Trust and Arie were not parties to the Side Letter Agreement.

In August 2008, with the Sagi Trust Shares in hand (and with the *Glencova* Federal Action

pending), the Trump Group (as majority shareholder) purported to remove Arie from TRI's board

and to assert control over the board. *Id.* Arie refused to recognize the Trump Group's authority,

and the Trump Group filed suit against Arie in the Delaware Chancery Court (the "Chancery

Court"), seeking a determination pursuant to 8 Del. Code § 225 that it controlled TRI (the

"Chancery Court Action"). *See TR Invs. LLC v. Genger*, C.A. No. 3994 (Del. Ch. filed Aug. 26,

2008). In July 2010, after a trial, the Chancery Court ruled that (i) the transfers of the Sagi Trust

Shares out of TPR violated the Stockholders Agreement, (ii) the transfers were void and the shares

reverted to TPR, (iii) the Trump Group lawfully had the right to purchase the Sagi Trust Shares,

(iv) the Trump Group held record title to those shares, and (v) the Trump Group possessed a

majority voting interest and the resulting right to elect the majority of TRI's board (the "Merits Opinion"). *TR Invs., LLC v. Genger*, C.A. No. 3994, 2010 WL 2901704 (Del. Ch. July 23, 2010).

On July 27, 2010, days after the Chancery Court issued the Merits Opinion, Arie and Orly, in her individual capacity and on behalf of the Orly Trust, jointly brought suit in the New York State Supreme Court, New York County, against TPR, Sagi, and Dalia, seeking a declaration that Arie was entitled to reform his divorce settlement as if the 2004 Stock Transfers never happened. Arie and Orly later amended the complaint to add the Trump Group parties, the Sagi Trust, and Rochelle Fang, individually and as trustee of the Sagi Trust, as defendants. *See Genger v. Genger*, No. 651089/2010 (N.Y. Sup. Ct. N.Y. Cnty. filed July 26, 2010) (the "New York Action").

In August 2010, the Chancery Court issued the "Side Letter Opinion." *TR Invs., LLC v. Genger*, C.A. No. 3994, 2010 WL 3279385 (Del. Ch. Aug. 4, 2010). That ruling addressed the issue of the record and beneficial ownership of the Arie Shares and Orly Trust Shares that were the subject of the Side Letter Agreement. The court found that in 2004, TPR violated the Stockholders Agreement when it purported to transfer the TRI shares to Arie and the Orly Trust, and that as a consequence: (i) the transfers were void and the shares reverted to TPR; (ii) the Trump Group had the right to purchase the Arie Shares and Orly Trust Shares from TPR; and (iii) neither Arie nor the Orly Trust was a record or beneficial owner of any of the TRI shares. The court held that TPR was the record and beneficial owner of all TRI shares not then owned by the Trump Group. *Id.* at *2–3.

Arie appealed the Merits Opinion and the Side Letter Opinion. While those appeals were pending, the Trump Group exercised its option under the Side Letter Agreement to purchase the Arie Shares and Orly Trust Shares from TPR (controlled by Sagi) for approximately $7.4 million and $10.3 million (the "Orly Trust Shares Proceeds"), respectively. The sale proceeds were

11

deposited in separate escrow accounts. One escrow agreement was among TPR, the Orly Trust, Orly, as beneficiary of the Orly Trust, and the law firm of Pedowitz & Meister LP ("P&M"). The Trump Group deposited the Orly Trust Shares Proceeds in escrow with P&M (the "P&M Escrow"). The second was with TPR and Skadden, Arps, Slate, Meagher & Flom LLP (the "Skadden Escrow"). Essentially, the Trump Group deposited the $7.4 million purchase price for the Arie Shares in the Skadden Escrow.

In July 2011, the Delaware Supreme Court affirmed the Chancery Court's decisions, in part. It found that the 2004 Stock Transfers were invalid, that the Trump Group legally purchased the Sagi Trust Shares from TPR, and that the Trump Group held majority voting control of the corporation. *TR Invs. I*, 26 A.3d at 195–98. However, the court reversed the Side Letter Opinion, finding that while the Chancery Court had *in rem* jurisdiction to determine record ownership of the Arie Shares and Orly Trust Shares, it lacked personal jurisdiction over the Orly Trust and TPR, and, as such, it lacked the power to declare whether Arie or the Orly Trust held beneficial interests in the Arie Shares and Orly Trust Shares. *Id.* at 201–03.

On July 22, 2011, on the heels of the Delaware Supreme Court ruling, the Trump Group sued Arie and TPR in the Delaware Chancery Court, seeking a determination that it was both the record and beneficial owner of the Arie Shares. *See TR Invs., LLC, v. Genger*, C.A. No. 6697 (Del. Ch.). The Chancery Court granted the Trump Group summary judgment on its complaint. The court ruled that: (i) the Trump Group's acquisition of the Arie Shares "was proper and effective"; (ii) Arie was not a record or beneficial stockholder of TRI; and (iii) if the order was affirmed on appeal, or if Arie chose not to appeal, then TPR had the right to have released to it the funds held under the Skadden Escrow (i.e., $7.4 million). *TR Invs., LLC v. Genger*, C.A. No. 6697, 2013 WL 787117 (Del. Ch. Mar. 1, 2013). Arie did not appeal the summary judgment order.

12

On October 4, 2011, Dalia, in her capacity as trustee of the Orly Trust, filed a declaratory judgment action against the Trump Group and TPR in the Delaware Chancery Court, seeking an order that the Orly Trust was the beneficial owner of the Orly Trust Shares. *See Genger v. TR Invs., LLC*, C.A. No. 6906 (Del. Ch. filed Oct. 4, 2011) (the "Declaratory Judgment Action"). The Trump Group filed a counterclaim, seeking an order declaring that it beneficially owned the Orly Trust Shares.

Arie Finances the Litigation with a Loan from the Brosers
Purportedly Secured by an Assignment of the Litigation Proceeds

Arnold Broser and his son, David Broser, operated a family-owned investment business. 6/18 Tr. at 223:16–227:23 (D. Broser). As of 2008, Arie Genger and Arnold Broser had a longstanding business and social relationship. *Id.* at 228:2–8. They worked as executives at the same company for many years, and thereafter, they collaborated on various investments. 6/21 Tr. at 141:1–4 (Arie). Arie considered Arnold Broser to be a good friend. *Id.*

In 2008, Arnold introduced David to Arie in the context of potentially funding then-pending Genger litigation. 6/18 Tr. at 225:12–13; 228:7–8 (D. Broser). Arnold proposed to David that they consider funding the litigation. *Id.* at 225:16. The Brosers determined that they would fund up to $10 million in the Genger litigation. *Id.* at 225:20–25. As of September 19, 2008, the Brosers, through a family-controlled entity, ADBG LLC ("ADBG"), as Lender, entered into a credit agreement with Arie (the "Credit Agreement"),[18] as Borrower, pursuant to which the Brosers agreed to advance up to $10 million to Arie. David Broser, on behalf of ADBG, and Arie were the sole signatories to the agreement. Arie executed a $10 million term note (the "Term Note"). Orly was not a party to the Credit Agreement or the Term Note.

---

[18]    *See 10,000,000.00 Credit Agreement Between Arie Genger, as Borrower and ADBG LLC, as Lender, Dated as of September 19, 2008*, Movant's Ex. 134.

The costs of Arie's litigation outpaced the $10 million committed under the Credit Agreement. By March 2012, ADBG's exposure under the agreement totaled approximately $18 million, consisting of approximately $15 million in principal and $3 million in accrued interest. In early 2012, Arnold Broser became uncomfortable with the level of ADBG's exposure under the Credit Agreement, and he reached out to Lance Harris, Arie's lawyer, in an effort to address his concerns. *See* 6/18 Tr. at 234:23–235:20 (D. Broser). In the wake of those discussions, Arie, as Borrower, and David Broser, on behalf of ADBG, as Lender, entered into an agreement titled "First Amendment to Credit Agreement," dated March 30, 2012 (the "March 30 Amendment").[19] Without limitation, the March 30 Amendment increased the borrowing limit under the Credit Agreement to approximately $18.8 million. The next day, Arie, as Borrower, and David Broser, on behalf of ADBG, as Lender, executed a "First Amendment to Credit Agreement" dated March 31, 2012 ( the "March 31 Amendment").[20] The amendment identified ADBG, as Lender, and Arie, as Borrower. It referred to Orly as a "Stockholder." Arie and David Broser, on behalf of ADBG, executed the amendment as Borrower and Lender, respectively. In executing the March 31 Amendment, Orly "Accepted and Agreed" to the amendment.

In June 2012, Arie and Orly established the Genger Litigation Trust. Pursuant to the Genger Litigation Trust Agreement,[21] they transferred and assigned to the trustees (the "GLT Trustees") "all net proceeds from the Lawsuits, the Additional Lawsuits, and any and all Future Lawsuits that Arie Genger and/or Orly Genger have or may have relating to the Company [i.e., TRI]." Genger Litigation Trust Agreement, Schedule A at 28. At that time, Orly had three actions

---

[19]  *First Amendment to Credit Agreement*, Movant's Ex. 67.

[20]  *First Amendment to Credit Agreement*, Movant's Ex. 113.

[21]  See *Genger Litigation Trust Agreement*, Bowen Declaration, Ex. 5.

pending against Sagi in New York state court. Under the agreement, David Broser and Lance Harris were appointed as the initial GLT Trustees. The trust corpus was held for the benefit of ADBG, as Lender under the Credit Agreement. The trust called for the proceeds from the litigation to be used first to repay the Broser loans to Arie. Genger Litigation Trust Agreement at 1–2. Arie and Orly assigned all of their litigation recoveries relating to, without limitation, TRI, Sagi, Dalia, and the Trump Group to David Broser and Lance Harris as GLT Trustees under the Genger Litigation Trust.[22]

There are three other documents that relate to Credit Agreement and Genger Litigation Trust Agreement. The first is the "June 11 Term Sheet."[23] That document is intended "to summarize the principal terms of the Credit Agreement and First Amendment thereto, dated September 19, 2008, and March 31, 2012, respectively and the Genger Litigation Trust Agreement, dated June 28, 2012, between the parties, including Arie Genger, Orly Genger, the [Orly Genger Trust], and ADBG, LLC." *Id.* at 1. It refers to ADBG, as Lender, and Arie, as Borrower, under the Credit Agreement. It defines Orly as a "Stockholder." The document is not signed and does

---

[22]    Schedule A reads as follows:

The Trustees shall collect all net proceeds from the Lawsuits, the Additional Lawsuits, and any and all Future Lawsuits that Arie Genger and/or Orly Genger have or may have relating to the Company including the settlement of any Lawsuits, Additional Lawsuits or Future Lawsuits including the receipt of monies by Arie Genger or Orly Genger from any of the named parties, including, directly or indirectly, through third parties, in the Lawsuits, Additional Lawsuits, and/or Future Lawsuits including but not limited to Dalia Genger, Sagi Genger, TPR Investment Associates, Inc., The Sagi Genger 1993 Trust, Rochelle Fang, Glenclova Investment Company, TR Investors, LLC, New 1R Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch and/or Trans-Resources, Inc. and all of their related entities, associates, employees, and attorney.

The Trustees shall collect all proceeds from the Lawsuits, the Additional Lawsuits, and any and all Future Lawsuits that Arie Genger and/or Orly Genger have or may have relating to the Company including the settlement of any Lawsuits, Additional Lawsuits or Future Lawsuits including the receipt of TRI shares by Arie Genger or Orly Genger.

Genger Litigation Trust Agreement, Schedule A at 28.

[23]    *Term Sheet, Credit Agreement and Genger Litigation Trust Agreement*, Movant's Ex. 113 at Bates No. 653.

not contain signature lines. The second document is the "Undated Amendment to Term Sheet."[24] The purpose of the amendment is to "amend[], update[], and summarize[] the terms of the Term Sheet June 11, 2012, the Credit Agreements dated September 18, 2008, and March 31, 2012, respectively, and the Genger Trust Agreement dated June 28, 2012, among Arie Genger and Orly Genger (borrowers) and ADBG (Lender)." Orly executed the agreement as a "Borrower." Finally, on or about July 17, 2012, Arie, as Borrower, and David Broser, on behalf of ADBG, as Lender, executed that certain Amendment to the Term Sheet, Credit Agreement and Genger Litigation Trust Agreement (the "July Amendment").[25] *Id.* at 1. Orly is identified as a "Borrower" in the July Amendment. Pursuant to that amendment, the Lender consented to the terms of a compensation and incentive agreement that Arie reached with his counsel, William Wachtel ("Mr. Wachtel").

Arie, Orly, the Brosers, and the
Trump Group Reach a Settlement

In June 2013, the Trump Group, Trans-Resources, LLC (as successor to TRI) ("Trans-Resources"), Arie, Orly (in her individual capacity and as beneficiary of the Orly Genger Trust), and David Broser and Arnold Broser, individually and on behalf of entities in his control (collectively, the "AG Group"), entered into a Settlement Agreement and Release (the "2013 Settlement Agreement"). Bowen Declaration, Ex. 6.

In support of the agreement, the parties stated that "since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations . . . concerning the ownership and control of Trans-Resources"; and that they "wish to resolve all issues, disputes and

---

[24] *Amendment to the Term Sheet, Credit Agreement, and Genger Litigation Trust Agreement [Undated]*, Movant's Ex. 160.

[25] The July Amendment is appended to the Genger Litigation Trust Agreement at Bates No. AGenger000239.

disagreements between them, including but not limited to the issue of ownership of all Trans-

Resources shares." 2013 Settlement Agreement at 2. In part, the agreement stated:

> **2. Initial Consideration from the Trump Group**. Upon dismissal with prejudice
> of the claims, counterclaims, cross-claims, third-party claims, issues and matters as
> provided in Paragraph 4 below, the Trump Group shall promptly:
>
>> (a) release all claims they may have to the (i) $7,428,994.00 plus
>> interest held by Skadden, Arps, Slate, Meagher & Flom LLP as
>> escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus
>> interest held by with Pedowitz & Meister as escrow agent (the
>> "P&M Escrow");
>>
>> (b) pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG
>> Group ("Wachtel") an amount in cash equal to $35,000,000.00
>> minus (i) the amount held in the Skadden Escrow, and (ii) the
>> amount held in the P&M Escrow.
>
> **3. Further Consideration from the Trump Group**. Trans-Resources on behalf
> of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third anniversary
> of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days
> following the third anniversary of the Effective Date The payments provided under
> this paragraph shall be (a) subject to the terms and conditions herein and (b)
> evidenced by two (2) promissory notes that are substantially in the form attached
> as Exhibit A hereto . . . .

*Id.* ¶¶ 2–3.

In return for that consideration, and without limitation, Orly, in her individual capacity,

and as beneficiary of the Orly Trust, agreed to take all actions necessary and desirable to

(i) discontinue all litigation against the Trump Group, (ii) cause the New York State Supreme

Court to "enter a definitive non-appealable order declaring that members of the Trump Group own

all right, title and interest (beneficially, of record and otherwise) to the shares of Trans-Resources

purportedly transferred by TPR in October 2004 to Arie Genger and to the Orly Trust," and (iii) if

called to testify in any pending litigation, to testify that she has waived all claims that she (in her

individual capacity and as beneficiary of the Orly Trust) had or may have to ownership (record,

beneficial or otherwise) of any shares of Trans-Resources and that she (in her individual capacity

17

and as beneficiary of the Orly Trust) is opposed to the Orly Trust seeking any remedy of any kind against any member of the Trump Group. *See* 2013 Settlement Agreement ¶ 4.

In furtherance of the settlement, the Trump Group transferred approximately $17.3 million (the "Settlement Cash") to Mr. Wachtel, and he transferred the bulk of those funds to the Brosers through an account controlled by the Genger Litigation Trust in payment of amounts due under the Credit Agreement. The Trump Group also delivered two $7.5 million promissory notes (the "Promissory Notes") to Mr. Wachtel, who held them as agent for the benefit of the AG Group until, at the behest of the members of the AG Group, he was replaced by Michael Bowen, then a partner at KBT. Both notes essentially suspend the obligation to pay so long as any legal action related to the Gengers is pending against the Trump Group (which is entitled to recoup litigation fees and costs incurred in any such legal action from the proceeds of the notes). To date, the notes have not been paid to anyone.

The Parties Settle the
Declaratory Judgment Action

On August 30, 2013, in the wake of the entry of the 2013 Settlement Agreement, the Trump Group, TPR, and Dalia, as trustee of the Orly Trust, resolved their dispute in the Declaratory Judgment Action over the beneficial ownership of the Orly Trust Shares pursuant to a stipulation dismissing the action (the "Dismissal Stipulation").[26] In short, they agreed (i) that the Trump Group owns, for all purposes, all rights, title, and interest (beneficially, of record, and otherwise) to the Orly Trust Shares (representing 1,102.80 shares of TRI stock); and (ii) as a consequence, the Trump Group owns for all purposes, all rights, title, and interest (beneficially, of record and otherwise) to all of the authorized and issued shares of TRI. Dismissal Stipulation ¶ 2. In the

---

[26] *Stipulation and Proposed Order of Dismissal*, Bowen Declaration, Ex. 42.

stipulation, the Trump Group also disclaimed any and all claims to the proceeds of the Orly Trust

Shares then on deposit in the P&M Escrow.  *Id.* ¶ 3.

The Court Directs Release of the Orly Trust
<u>Shares Proceeds from the P&M Escrow to TPR</u>

After the entry of the Dismissal Stipulation, TPR (controlled by Sagi) brought an action in

the United States District Court for the Southern District of New York against P&M, as escrow

agent under the P&M Escrow, and Dalia and Orly as trustee and beneficiary, respectively, of the

Orly Trust, seeking a judgment directing the release of the Orly Trust Shares Proceeds (i.e.,

$10.3 million) from the P&M Escrow to TPR.  *TPR Assocs., Inc. v. Pedowitz & Meister LLP*,

No. 13-cv-8243 (S.D.N.Y. filed Nov. 18, 2013).  The district court denied Orly's motion to dismiss

the action, granted summary judgment to TPR, and directed that the proceeds of the P&M Escrow

be released to TPR.  *TPR Assocs., Inc. v. Pedowitz & Meister LLP*, No. 13-cv-8243, 2014 WL

1979932, at *8 (S.D.N.Y. May 15, 2014).  As relevant, in part, in denying Orly's motion to dismiss,

the district court determined that that Orly had no interest in the proceeds from the sale of the Orly

Trust Shares because Orly's settlement reflected that she agreed the Trump Group had the

beneficial ownership of the shares, and because the Trump Group owned those shares, TPR was

entitled to the proceeds from the sale, which were held in escrow.  *Id.* at *7.  The district court

explicitly noted that its decision did not "announce any kind of equitable or normative conclusion

as to who among the Genger siblings ultimately deserves recompense," observing that TPR is only

the "next" beneficiary of the Orly Shares, "but not necessarily the last."  *Id.* at *6.  Importantly,

that opinion stated that "TPR is entitled to the [sale proceeds], with Orly's remaining claims for

money damages against TPR and Sagi to be resolved in New York Supreme Court."  *Id.* at *7.

<u>Sagi's 2014 Lawsuit Against Orly to Enforce the 2004 Indemnity</u>

In January 2014, Dalia demanded $200,000 from Sagi under the 2004 Promise (the "2014 Demand"), which Sagi paid.  In February 2014, Sagi demanded $100,000 from Orly under the 2004 Indemnity, which Orly refused to pay.  Sagi sued Orly for breach of contract in the United States District Court for the Southern District of New York.  In support of his complaint, Sagi alleged that he and Orly entered into a tri-party agreement with Dalia, under which Sagi and Orly received Dalia's marital share of the TRI shares in exchange for providing Dalia with financial support derived from the economic value obtained from those shares.  Sagi contended that Orly breached that agreement and sought damages equal to 50% of the $200,000 that he paid to Dalia, plus costs and fees incurred in enforcing the agreement.  *Genger I*, 76 F. Supp. 3d at 491.  In opposing the complaint and summary judgment motion, Orly denied that the agreement was valid and enforceable.  Her principal argument was that she never received the promised shares of TRI (i.e., the Orly Trust Shares that TPR sold to the Trumps for $10.3 million), and therefore the agreement failed for lack of consideration.  *Id.*

In granting summary judgment to Sagi (the "2015 Judgment"), the district court found that the 2004 Promise and the 2004 Indemnity constitute a single integrated agreement among Dalia, Sagi and Orly (the "2004 Integrated Agreement"), in which Sagi agreed to pay Dalia, upon demand, an amount up to the value of the TRI shares Dalia conveyed to the Orly Trust and Sagi Trust under the 2004 Divorce Agreement, and Orly agreed to indemnify Sagi for half of the payments he makes to Dalia.  *Id.* at 497.  In reaching that determination, the district court found that Orly could not contemporaneously sign the 2004 Promise because she was out of the country at the time Sagi and Dalia executed the 2004 Promise.  The court also found that before Sagi signed the 2004 Promise, Orly verbally agreed with Sagi to indemnify him for one-half of the payments he would have to make under the 2004 Promise.  *Id.* at 493.  The district court held that there was

"no triable issue as to whether the documents were 'designed to effectuate the same purpose' and to 'be read together.'"  *Id.* at 497 (quoting *This Is Me v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998)). The court reasoned, as follows:

> The 2004 Promise and the 2004 Indemnity are sufficiently unambiguous such that there is no triable issue as to whether they form an integrated agreement, even though they were executed on different dates and were not all between the same parties . . . .  Indeed, neither agreement makes any sense without the promises expressed in the other.  Without the 2004 Indemnity, Sagi could be obligated under the 2004 Promise to pay Dalia double the economic benefit he received from his shares of TRI, and Orly would effectively have received the shares as a gift. Further, the 2004 Indemnity explicitly attaches and cross-references the 2004 Promise . . . .

*Id.*

The court held that Orly breached her promise to Sagi when she rejected Sagi's demand for indemnification.  The court found that the 2004 Integrated Agreement provided each party with a benefit in exchange for a legal obligation and rejected Orly's claim that the 2004 Integrated Agreement was not supported by consideration because the Orly Trust never received the TRI shares.  In so ruling, the district court found that Sagi and Orly had monetized their beneficial interests in the TRI shares in the aggregate sum of $69.3 million.  The district court noted that Sagi-controlled TPR sold the Sagi Trust's shares to the Trump Group for $26.7 million and, after the shares reverted to TPR, sold the Orly Trust's TRI shares to the Trump Group for $10.3 million. *Id.* at 493–94.  The court reasoned that Orly had benefited from the Orly Trust's receipt of the beneficial interests in the TRI shares because her claim to beneficial ownership of the TRI shares individually and as trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement.  *Id.* at 499.[27]  The district court also rejected Orly's defenses

---

[27]    The court found:

> [T]he 2004 Promise states that Orly and Sagi are benefiting from receipt of *either* the TRI shares *or* 'beneficial interests in those shares,' by their respective trusts. . . .  Thus, the question becomes whether Orly has benefited from the Orly Trust's receipt of beneficial interests in the TRI shares.

to enforcement of the agreement.[28]  On appeal, the Second Circuit affirmed the judgment.  *See Genger II*, 663 F. App'x 44.  In doing so, and without limitation, the Second Circuit found that "the [2004] Promise and the [2004] Indemnity form an integrated agreement in which Orly has a contractual duty to reimburse Sagi for half of the amount he pays Dalia for living expenses."  *Id.* at 48.  It also rejected Orly's assertion that the agreement fails for lack of consideration, as follows:

> To the extent Orly attempts to make [the argument that the agreement is void for lack of consideration], she seeks to ground it by suggesting that the record does not reveal that she received any money from the settlement.  But surely any $32 million transaction for her shares would confer upon her more than a peppercorn, which is all we need to conclude (and all we do conclude) as to the extent of any benefit she received.   Consideration encompasses more than just receiving cash: it "exists where there is 'either a benefit to the promisor or a detriment to the promisee.'" *See Hollander v. Lipman*, 65 A.D.3d 1086, 1087 (2d Dep't 2009) (quoting *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458 (1982)).  Orly does not dispute that she was part of a group that settled a claim involving the shares she was to receive as part of the [2004] Divorce [Agreement].  Orly benefitted from the shares regardless of whether the settlement money went to Orly, as a gift to Arie, or to pay debts owed to her litigation partners.  Moreover, her argument oddly assumes that she derives no benefit from her brother's undertaking to support the mother of them.

*Id.* at 49–50.  By March 28, 2018, Orly had paid Sagi approximately $350,000 in satisfaction of the 2015 Judgment.[29]

Sagi's 2017 Lawsuit Against Orly to Enforce the 2004 Indemnity

---

There is no genuine dispute as to whether she has so benefited: Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement.  Further, no court has issued a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares.

*Genger I*, 76 F. Supp. 3d at 499.

[28]    Orly contended that (i) Sagi was judicially estopped from arguing that the Orly Trust received a beneficial interest in the TRI shares, (ii) even if the 2004 Integrated Agreement was valid, it should nevertheless be rescinded because there was a mutual mistake as to whether Sagi and Orly were being treated equally in their parents' divorce, and (iii) Orly has no contractual duty to indemnify Sagi without first receiving notice and an opportunity to defend, and Sagi failed to give Orly such notice. *See Genger I*, 76 F. Supp. 3d at 500–02.  The district court rejected those defenses, finding that there was no triable issue as to whether Orly had a viable defense to the 2004 Integrated Agreement. *Id.* at 503.

[29]    *Satisfactions of Judgment*, Bowen Declaration, Ex. 65

On October 21, 2017, Dalia demanded $6,000,000 from Sagi under the 2004 Promise. Sagi rejected the 2017 Demand, and Dalia sued him for breach of contract. *See Genger v. Genger*, No. 17-cv-8181 (S.D.N.Y. filed Oct. 24, 2017). In answering the complaint, Sagi conceded that the 2004 Promise was valid and enforceable, but he argued that it would be inequitable for him to make a payment to Dalia under the agreement because Orly had indicated that she would not honor her obligation under the 2004 Indemnity to indemnify him for 50% of the payment. Sagi also brought a third-party complaint against Orly to enforce the 2004 Indemnity.

Dalia moved for summary judgment against Sagi on her breach of contract claim, and Sagi moved for partial summary judgment against Orly in the third-party complaint. In granting Dalia summary judgment against Sagi, the district court found that, based on the rulings in *Genger I* and *Genger II*, "it has been conclusively established that: (1) the 2004 Integrated Agreement is valid and enforceable; (2) Sagi and Orly monetized their beneficial interests in the TRI shares for a total of $69.3 million, $24.7 million of which was attributable to Dalia's conveyed marital interest; and (3) pursuant to the 2004 Integrated Agreement, Dalia is entitled to demand payment up to a certain amount in her 'sole and absolute discretion.'" *Genger III*, 2018 WL 3632521 at *6 (footnotes omitted). The district court held that there was no triable issue as to whether all elements of a breach-of-contract claim under New York law were satisfied. *Id.* at *7. On August 17, 2018, the district court granted Sagi's motion for partial summary judgment against Orly. The court entered judgment against Orly in the amount of approximately $3.2 million plus 50% of Sagi's reasonable counsel and other professional fees, expenses, and costs in connection with the action. *Id.* at *7–

8.[30]   On June 28, 2019, the Second Circuit affirmed the 2018 Judgment.  *See Genger IV*, 771 F.

App'x 99.

<u>The Turnover Motion</u>

On June 11, 2019, after obtaining the 2018 Judgment, Sagi filed a post-judgment motion

to set aside what he claims are Orly's fraudulent conveyances related to the $32.3 million proceeds

of the 2013 Settlement.[31]   In the Turnover Motion, Sagi argued, inter alia, that Orly, Arie, and

Herschmann  "devised a plan to frustrate the [2018 Judgment] by encumbering the [Promissory

Notes] with bogus liabilities," including a $5.4 million note in favor of Arie and the $2 million

note to Herschmann.  *See* Turnover Motion at 9.  Sagi claimed that these and other liabilities

claimed by Orly are sham debts.  *See id*. at 10.  Before Orly's deadline to respond to the Turnover

Motion lapsed, Orly filed the Chapter 7 Case.

<u>Orly Files a Chapter 7 Petition in Bankruptcy in the Western District of Texas</u>

Orly was born and raised in Manhattan, New York City.  6/18 Tr. at 92:19–93:24 (Orly).

She earned an undergraduate degree from Brown University in 2001 and completed a

post-baccalaureate program at the Art Institute of Chicago in 2002.  *Id.* at 109:2-4.  Thereafter,

Orly began a master's program at the School of Visual Arts in New York, but she ended her

participation in that program as her art career picked up steam, and she took full advantage of

---

[30]   In so ruling, the district court reasoned, as follows:

> As previously noted, it has already been conclusively established that the 2004 Integrated
> Agreement is valid and enforceable, and therefore that Orly is required to indemnify Sagi for half
> of any payments made pursuant to the 2004 Promise.  Indeed, Sagi's third-party claims in this action
> are nearly identical to the claims he prevailed on in the 2014 Lawsuit, the only difference being the
> quantum of Dalia's demand (and the fact that Sagi has yet to pay).  The Court has reviewed all of
> Orly's arguments in opposition to summary judgment and finds them to be without merit . . . .

*Genger III*, 2018 WL 3632521 at *7.

[31]   *See* Judgment Creditor Sagi Genger's Memorandum of Law in Support of his Motion for Turnover of Promissory
Notes and Funds from Garnishees and Recission of Fraudulent Conveyance, *Genger v. Genger*, No. 17-cv-8181
(S.D.N.Y. June 11, 2019) (the "Turnover Motion").

opportunities to show and exhibit her artistic work instead. *Id.* at 90:6–25. At the beginning of her career, Arie helped Orly set up a limited liability company known as Everything Important LLC ("Everything Important"), through which she managed her art business. *Id.* at 91:16–25.[32]

Orly's artistic works included "very large-scale installations," some of which were large enough to occupy their own rooms, and which have been exhibited in major museums across the country. *Id.* On an even larger scale, Orly created public art installations in New York, Chicago, and Austin. *Id.* at 99:18–23. Orly also had her own shows in art galleries in the New York and various other cities. *Id.* Some of Orly's work is in the permanent collection of the Museum of Modern Art. *See id.* at 90:16–17. During the early stages of her art career, Orly lived in New York, primarily in a West Village apartment for which Arie paid. *Id.* at 107:11–19; 109:5–12; 112:7–10.

Orly met Herschmann in Texas, at one of her art shows, sometime in 2014. 6/21 Tr. at 12:11–14 (Orly). Orly moved to Austin, Texas in 2016. She and Herschmann were married in September 2016. Prior to their marriage, at Herschmann's insistence, they entered into a premarital agreement (the "Premarital Agreement").[33] On October 24, 2016, the District Court of Travis County, Texas, (No. D-I-GN-16-004247), upheld the agreement.

---

[32]   Prior to starting Everything Important, Orly had a company called "White Box," the purpose of which was essentially "the same idea" as the purpose that Everything Important would later serve. 6/18 Tr. at 91:22–25. The nature of Orly's work required large capital outlays, for which Everything Important provided a structure. Orly's large-scale installation pieces are made of reclaimed fisherman's rope with additional materials added, *id.* at 100:2–6, and the final products "could weigh literally tons." *Id.* at 100:16–20. Physically assembling and moving the structures required "all kinds of equipment," including heavy machinery, and a "team of people" to help. *Id.* Arie funded everything to enable Orly to make this work. *Id.* at 104:9–13; 6/21 Tr. 150:5–8 (Arie: "When my daughter decided to pursue the art world, I helped her form the entities from which she operated and I basically loaned money to those entities to enable her to do the work she was doing."). Over the years, Arie provided close to a million dollars in funds. 6/18 Tr. at 104:16 (Orly). Payment was rendered in exchange for Orly's installations, but "most of the payment went towards production," either to cover the cost of that installation's production or to be used to make more art pieces. *Id.* at 103:6–104:3. Orly was not paid a salary, but she "could use" extra money from her art company, at times requiring Arie's consent to do so. *Id.* at 103:6–104:8. However, Orly "didn't really take much." *Id.* at 104:8–12.

[33]   *See* Kurland Decl., Ex. I (Premarital Agreement filed under seal).

25

Orly was represented by counsel in connection with the negotiation and execution of the Premarital Agreement. 6/21 Tr. at 16:9–17:11 (Orly). She explained that she viewed herself and Herschmann "as equal, independent, economically independent grown-ups, individuals." *Id.* at 17:22–24. To Orly, it was "very clear" that under the agreement, she did not have a claim to Herschmann's property or wealth. *Id.* at 17:25–18:3. The Premarital Agreement includes an exhibit in which Orly could have listed the "Separate Property And Separate Liabilities Of Orly Genger." She intentionally left that exhibit blank. In support of the Motion, Sagi contends that Orly's failure to list her assets was part of her "preplanned and purposeful scheme" to frustrate Sagi's efforts to collect the 2018 Judgment by hiding her assets. Motion ¶ 37.

Sagi provides no support for that contention and the record does not support it. At trial, in response to Sagi's question about why she left that schedule blank, she stated that she did so because "my husband understood what I had," and that "maybe the largest asset if at all was, you know, a possible claim that could go either way, a loss or a win, and I think he understood that as he was my lawyer." *Id.* at 18:4–15. Everything else "paled in comparison to what was on [Herschmann's] list and he had no interest basically" in Orly's assets. *Id.* at 18:17–20.

Moreover, the record is clear that Herschmann had no interest in Orly's assets and that he instigated the prenuptial agreement because he "wanted to protect [his] assets," and that he and Orly were "not getting married for any economic . . . windfall benefit." 6/21 Tr. at 241:16–24 (Herschmann). The prenuptial agreement was designed to protect his assets; he did not care about the extent of Orly's assets. *Id.* at 242:10–22. Herschmann specifically wanted the agreement made under Texas law, and confirmed six months later pursuant to that unique facet of Texas marital law, in part because "Texas rightfully or wrongfully doesn't allow alimony." *Id.* at 243:14–244:1. Herschmann was adamant that at the time that he entered into the agreement, he "was protecting

26

[himself] and [his] older children." The Court credits Herschmann's and Orly's testimony. The Court rejects Sagi's contention that Orly is using the Premarital Agreement to hide her assets from him.

After the birth of Orly and Herschmann's child in 2017, Orly "had taken a step back from work." 6/21 Tr. at 35:22–36:3 (Orly). By the summer of 2018, Orly was living in Israel with her daughter. *Id.* at 37:25–38:4. Two of Herschmann's children from a previous marriage were living in Israel, but they moved back to the United States by the summer of 2018. *Id.* at 38:5–7. In early 2019, Orly moved back to the United States. *Id.* at 38:25–39:5. She moved to Austin, Texas, to be with Herschmann. *Id.* at 39:11–15.

On July 12, 2019, Orly commenced the Chapter 7 Case in the Texas Bankruptcy Court.[34] Orly filed her schedules and statement of financial affairs (the "Schedules").[35] Those documents include a document entitled "Global Notes," which provides additional details concerning the Debtor's finances and caveats the disclosures in her Schedules. Global Notes at 3.[36]

In her Schedule A/B (Property), Orly shows assets valued at $56,627.77. *See* Schedules at 12 (PDF pagination). Her property includes claims in "Unknown" amounts against Sagi, Dalia, TPR, past and present trustees of the Orly Trust, and others. *Id.* at 13. In Schedule C (Exempt Property), Orly claims $25,829.00 in exempt property, excluding a one-half interest in a condominium in Austin, Texas (the "Residence") gifted to her as a wedding present from Herschmann, the value of which is marked "Unknown." Schedules at 14–15. In Schedule D (Secured Creditors), she identifies Arie and Herschmann as her secured creditors with claims

---

[34] *See Voluntary Petition for Individuals Filing for Bankruptcy*, ECF No. 1 (the "Petition").

[35] *Schedules and Statement of Financial Affairs*, ECF No. 20.

[36] *See Global Notes, Methodology and Specific Disclosures Regarding the Debtor Schedule of Assets and Liabilities and Statement of Financial Affairs*, ECF No. 20.

totaling approximately $5.4 million and $2.3 million, respectively. *Id.* at 16–17. In Schedule E/F

(Unsecured Creditors), she lists eight creditors holding non-priority unsecured claims, including

Sagi, TPR, Dalia, and the Orly Trust. *Id.* at 20.[37] In Schedule I (Income), Orly discloses that she

is unemployed and has no income, that Herschmann is an attorney employed by KBT, and that he

pays $8,366.57 in ongoing monthly expenses. *Id.* at 25–26. The Schedules show assets totaling

$55,627.77 and liabilities of $12,919,293.73. *Id.* at 30.

---

[37]    In summary, Orly's Schedules identify the following creditors:

| **Creditor** | **Amount** | **Status** |
| --- | --- | --- |
| Secured Claims | | |
| Arie | $5,451,389.27 | NA |
| Herschmann | $2,301,399.48 | NA |
| Nonpriority Unsecured Claims | | |
| D&K GP LLC | Unknown | Contingent, Unliquidated, Disputed |
| Dalia | Unknown | Contingent, Unliquidated, Disputed |
| KBT | $1,457,751.00 | NA |
| Markel Surety | $750.00 | NA |
| Orly Trust | Unknown | Contingent, Unliquidated, Disputed |
| Sagi | $3,219,693.00 | Disputed |
| TPR | Unknown | Contingent, Unliquidated, Disputed |
| Zeichner Ellman & Krause LLP | $488,310.98 | Disputed |

In the Schedules, Orly does not mention the 2013 Settlement Agreement or the $32.3 million of Settlement Proceeds.  However, in the Global Notes annexed to the Schedules, Orly states, without limitation, that:

> [t]hird parties have asserted, in various litigation, that Debtor may have claims that the Debtor does not believe exist.  To the extent known, such alleged claims have been listed and have been designated in such a manner to disclose, for notice purposes, the alleged claims but do not constitute an admission that such claim(s) exist.

Global Notes at 3; *see also id.* at 4 ("[g]iven the nature of the claims and the length and magnitude of pre-petition litigation, Debtor cannot be certain all such claims which third parties assert she may have the right to assert have been identified, and reserves the right to amend or supplement these schedules to the extent that they are subsequently identified").  Orly signed the Schedules after adding a notation that her signature is "[s]ubject to the Global Notes attached." *See* Schedules at 32, 43.

The bar date in this Chapter 7 Case was December 9, 2019.  The claims register reflects fourteen claims aggregating approximately $90 million.[38]

---

[38]    The Court briefly summarizes them, as follows:

Claimant: Arie Genger (Claim # 2).  The claim is filed as a secured claim in the sum of $5,451,389.27 on account of "Money Loaned," plus interest at a fixed rate of 2.75%.

Claimant: Zeichner Ellman & Krause LLP (Claim # 3).  The claim is filed as an unsecured claim in the sum of $488,310.98 on account of attorneys' fees.

Claimant : Eric Herschmann (Claim # 4).  The claim is filed as a secured claim in the sum of $2,301,051.91 as of July 12, 2019, on account of monies loaned by Herschmann to Orly.

Claimant: ADBG LLC (Claim #5).  The claim is filed as an unsecured claim in an "unknown" amount, on account of "the Trump Settlement Agreement, the Genger Litigation Trust Agreement, and the March 2017 Agreement.

Claimant: Genger Litigation Trust (Claim #6).  The claim is filed as an unsecured claim in an "unknown" amount, on account of "the Trump Settlement Agreement, the Genger Litigation Trust Agreement, and the March 2017 Agreement."

Claimant: Orly Genger (Claim #7).  This claim is filed as a secured claim in the sum of $12,542,488.00 on account of Dalia's constructive trust claim against Orly's rights to the remaining Settlement Proceeds.

On or about September 13, 2019, Sagi moved to dismiss the Chapter 7 Case for Orly's

alleged bad faith filing or, alternatively, to transfer the venue of the case to this Court.[39]  The

Debtor opposed the motion.[40]  The Texas Bankruptcy Court granted the motion to transfer but left

the alternative relief of dismissal of the Chapter 7 Case for consideration by this Court.[41]  The case

was transferred to this Court on December 10, 2019.[42]  On or about December 11, 2019, Deborah

J. Piazza was appointed successor chapter 7 trustee of Orly's estate.  On April 24, 2020, Sagi filed

the Motion.

---

Claimant: Orly Genger (Claim #8).  This claim is filed as a partially secured claim in the sum of $19,931.00 for damages for wrongful attachment under N.Y. C.P.L.R. § 6212(e).

Claimant: Dalia Genger (Claim #9).  This claim is filed as a secured claim in the sum of $12,542,488.00, arising out of Dalia's constructive trust claim.

Claimant: D&K GP LLC (Claim #10).  This claim is filed as a partially secured claim in the sum of $19,931.00 for damages for wrongful attachment under N.Y. C.P.L.R. § 6212(e).

Claimant: TPR Investment Associates, Inc. (Claim # 11).  This claim is filed as a partially secured claim in the sum of $570,487.00 for attorney's fees and expenses through September 30, 2019, in the amount of $331,092, plus prejudgment interest of $89,395, representing three years of simple interest on $331,092 at the CPLR rate of 9% per annum.

Claimant: Orly Genger Trust (Amended Claim # 12).  This claim is filed as an unsecured claim in the sum of $41,622,588.00.

Claimant: Kasowitz Benson Torres LLP (Claim # 13).  This claim is filed as an unsecured claim in the sum of $1,572,627.00.

Claimant: Sagi Genger (Claim # 14).  This claim is filed as a partially secured claim in the sum of $12,917,466.00.

Claimant: SureTec Insurance Company (Claim # 15).  This claim is filed as a partially secured claim in the sum of $13,451.70, on account of a bond which SureTec issued to the Orly on September 21, 2016.

[39]  *Judgment Creditor Sagi Genger's Motion to Dismiss Bankruptcy Case or, Alternatively, to Transfer Venue, and Memorandum of Law in Support*, ECF No. 32.

[40]  *Debtor Orly Genger's Response to Motion to Transfer Venue*, ECF No. 150.

[41]  *See Order Transferring Case*, ECF No. 168; *Amended Order Transferring Case*, ECF No. 179; *Transcript of Hearing Held on November 5, 2019*, ECF No. 173 at 10:11–14.

[42]  *See Receipt of Inter District Transfer*, ECF No. 192.

In *Genger III*, the district court determined that under the 2004 Integrated Agreement, Orly is obligated to support Dalia for up to $12.35 million of the $32.3 million. *See Genger III*, 2018 WL 3632521 at *6 n.5 ("Dalia's conveyed marital interest of 794.4 shares represents 36% of the total TRI shares that were monetized. Using that figure, the maximum amount payable to Dalia under the 2004 Integrated Agreement is approximately $24.7 million (or 36% of the total $69.3 million value) [to Sagi and Orly])."). In December 2019, Sagi arranged for Dalia to sue him in Florida state court under the 2004 Promise for $18.5 million (the "Florida State Court Litigation"). *See* Bowen Decl. Ex. 18. Sagi and Dalia promptly settled that litigation. In January 2020, pursuant to a Joint Motion for Entry of Judgment by Consent, the Florida court entered an Agreed Final Judgment awarding Dalia the sum of $18.5 million, inclusive of attorneys' fees and costs. *Id.*

On May 28, 2021, the Trustee filed a motion under Bankruptcy Rule 9019 (the "9019 Motion")[43] for approval of a settlement agreement dated as of May 26, 2021 (the "Proposed Settlement Agreement").[44] The parties to the agreement are the Trustee (solely in her capacity as trustee and not in her individual capacity), on the one hand, and Orly, Herschmann, Arie, KBT (individually and in its capacity as escrow agent), David Broser (individually and in his capacity as trustee of the Genger Litigation Trust), Arnold Broser, ADBG, Tedco, Inc. (together with David Broser, Arnold Broser, and ADBG, the "Broser Parties"), Lance Harris (solely in his capacity as trustee of the Genger Litigation Trust), the Genger Litigation Trust, Michael Bowen, and Claims Pursuit, Inc. (the "Estate Claims Assignee" and, together with Orly, Herschmann, Arie, KBT, the Broser Parties, Harris, and Bowen, the "Settling Parties"). In very broad strokes, and without limitation, under the Proposed Settlement Agreement:

---

[43]    *Chapter 7 Trustee's Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving Settlement Agreement and (B) Granting Related Relief*, ECF No. 421.

[44]    The Settlement Agreement is annexed as Exhibit A to the 9019 Motion.

The Trustee will be paid up to $2.5 million for the benefit of Orly's estate in full satisfaction of any and all claims that Orly's estate, or Orly in any capacity may have against the Settling Parties, in connection with or arising from Orly being a signatory to the 2013 Settlement Agreement.

The Trustee will sell and assign to the Estate Claims Assignee all claims, whether past, present or future, known or unknown, and asserted or unasserted, that the Orly estate may have against Dalia, present, former or successor trustees of the Orly Trust, and affiliated or related entities other than Sagi (collectively, the "Estate Claims") in consideration of a payment of $50,000, plus a percentage of recovery on Estate Claims.

The Trustee will provide broad releases from Orly's estate to the Settling Parties.

The Trustee will seek to permanently enjoin creditors of Orly's estate from asserting any claim against the Orly estate or any of the Settling Parties or any member of the Trump Group that is duplicative or derivative of any claim brought by the Trustee or which could have been brought by the Trustee against the Settling Parties or any member of the Trump Group.

The 9019 Motion is pending before the Court.

### **The Motion**

Sagi contends that Orly is "far from a typical Chapter 7 debtor" because "[w]hatever happens in this bankruptcy, she has enjoyed, and will continue to enjoy, the life of the 1%." Motion ¶ 10. He chalks up "the life of the 1%" to financial support that he says Orly receives from her husband, Herschmann. *See id.* Sagi describes this bankruptcy case as another chapter in the longstanding two-party, intra-family dispute between him and Orly, *id.* ¶ 7, and asserts that, pursuant to section 305(a)(1) of the Bankruptcy Code, the Court should abstain from hearing the case because the interests of Orly and her creditors would be better served by dismissing the case in favor of the Turnover Action, *id.* ¶¶ 60–61.

Sagi also seeks the extraordinary relief of dismissal of the Chapter 7 Case for bad faith under section 707(a) of the Bankruptcy Code. In support of that claim, Sagi maintains that Orly has spent the last several years trying to shield the Settlement Proceeds from him and, in turn, Dalia, by transferring the Settlement Cash to the Brosers and encumbering the Promissory Notes

in favor of Herschmann, Arie, and the Brosers. *Id.* ¶ 3. He also asserts that Orly dissipated all of

her remaining assets in the eighteen months leading up to the filing of this case. *Id.* ¶ 35.

In April 2017, Mr. Wachtel stepped down as escrow agent for the Promissory Notes in

favor of Michael Bowen, then Herschmann's law partner at KBT. Sagi contends that the change

in escrow agents is part and parcel of a scheme by Orly, Arie, Herschmann, and the Brosers to

encumber the Promissory Notes by having Orly pledge them as "security" to Herschmann and

Arie for "bogus, backdated 'liabilities.'" Motion ¶ 28. Specifically, he contends that the "key" to

Orly's plan was the creation of three documents in 2017–2018, which he maintains do not represent

bona fide debts and were backdated to "December 2016" to match the Debtor's timeline:

> (a) a $2 million promissory note dated December 30, 2016 in favor of her husband
> made jointly by Arie and Orly (the "Herschmann Note");
>
> (b) an intercreditor agreement among Arie and Herschmann dated December 31,
> 2016 (the "Subordination Agreement"); and
>
> (c) a $5.4 million promissory note dated December 31, 2016, in favor of her father
> (the "Arie Note").

*Id.*

Sagi asserts that, falsely claiming the Herschmann Note and Arie Note to be "secured

debts," Orly caused UCC financing statements to be filed in Texas, Florida, and New Jersey,

liening all of her assets, first in favor of Herschmann, and second in favor of Arie, who then filed

UCC financing statements liening all of his assets in favor of Herschmann. *Id.* ¶ 29; *see also*

Dellaportas Decl., Exs. E, F, G (financing statements). He says that the effect and plain intent of

the UCC liens, promissory notes, and related agreements is to "round trip" the money out of Orly's

estate and then back to Orly through her husband, who supports her lavish lifestyle. Motion ¶ 29.

Arie, Orly, Herschmann, ADBG, and KBT, as escrow agent, are signatories to a March 31,

2017, Escrow Agreement, which purports to allocate the proceeds of the Promissory Notes not yet

33

distributed under the 2013 Settlement Agreement.  Dellaportas Decl., Ex. R.  In part, and in substance, that agreement provides that after paying, first, up to $4.5 million to ADBG on account of the ADBG Obligation, and second, up to $2 million to Herschmann on account of the Herschmann Note, "any remaining Settlement Proceeds" shall be distributed "in accordance with joint written instructions of [Arie] and [Orly]."  *Id.* at 2.  To date, Orly has given no instructions as to how any "remaining Settlement Proceeds" will be distributed.  Sagi maintains that under that agreement, Orly has co-signing authority over at least $8.5 million dollars, yet she falsely contends that she is not entitled to even "one penny."  Motion ¶ 6.

Sagi also asserts that in 2016 and 2017, the Debtor completely liquidated her sizable portfolio of investment assets, transferring much of it to a trust for her own benefit.  Motion ¶ 36; Dellaportas Decl., Ex. AA at 35–39.  He maintains that in August 2018, after the district court entered the 2018 Judgment, Orly liquidated her U.S. investment and bank accounts and wired all the money to the IOLA account of her attorney.  *Id.*, Ex. FF.  He says that in September 2018, Orly recorded a transfer of her controlling interest in Everything Important to Arie for no cash, but instead only a nominal reduction on her debt to him.  *Id.*, Ex. GG.  He also complains that on September 28, 2018 (one week after Sagi domesticated his judgment in Texas), Orly and Herschmann recorded a "Deed of Trust" purporting to conditionally transfer her residual rights to her fifty percent (50%) interest in the couple's homestead (i.e., the Residence), to a trust for the benefit of Herschmann.  *Id.*, Ex. QQ.  Sagi maintains that none of this was mere coincidence.  He says that those actions were taken as part of a preplanned and purposeful scheme to place Orly's assets beyond the reach of Sagi.  Motion ¶ 37.

Finally, Sagi complains that in her Schedules, the Debtor lists "total property," outside of her interest in the Residence, of only $56,627.77.  *See* Schedules at 12.  In the Schedules, Orly

acknowledges that "[t]hird parties have asserted, in various litigation, that Debtor may have claims that the Debtor does not believe exist. To the extent known, such alleged claims have been listed and have been designated in such a manner to disclose, for notice purposes, the alleged claims but do not constitute an admission that such claim(s) exist." *Id.* at 3. Sagi maintains that it is remarkable that Orly fails to list, even as a "disputed" claim, her interest in the Settlement Proceeds, that the claims should have been scheduled, and that she deliberately omitted them. Motion ¶ 40.

Orly objects to the Motion. She contends that she is broke and has no income, no cash, no business, no work, and no economic prospects. Orly Objection at 2. She concedes that she holds a one-half undivided interest in the Residence (a Texas homestead protected property), where she lives with Herschmann and their daughter, but maintains that what she owes surpasses the value of that asset by millions of dollars. *Id.* at 2. Moreover, she says that Sagi's assertion that she has $32.3 million in Settlement Proceeds is a "red herring," and that it is a matter of "concrete fact" that she does not have, and never had, the Settlement Cash, and did not transfer it to anyone. *Id.* at 4–5. She also maintains that the Promissory Notes are not uncontestably her assets, as they are payable to the AG Group, and Arnold and David Broser, on behalf of themselves and their affiliated entities such as ADBG, and Arie lay claim to the entirety of the proceeds of the notes. *Id.* at 5. She also maintains that although in *Genger I*, the district court ruled that she "monetized" her interest in the Orly Trust Shares, the court did not adjudicate whether she was entitled to all or any portion of that amount, and, in any event, the ruling did not put cash in her pocket. *Id.* at 6. She says that Sagi is not entitled to relief under sections 707(a) or 305(a)(1) of the Bankruptcy Code because she did not act in bad faith in filing the Petition and because her interests and those of her creditors will not be better served by the dismissal of the Chapter 7 Case.

The Court considers those matters below.

## Discussion

### *Whether Dismissal of the Chapter 7 Case Under Section 305(a) Is Warranted*

Section 305(a) of the Bankruptcy Code provides that after notice and a hearing, the court may dismiss a case or suspend all proceedings in a case, if "the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a). "By its terms, section 305(a) applies to entire cases or all proceedings in a case, not particular proceedings in a case." *In re Newbury Operating LLC*, No. 20-12976, 2021 WL 1157977, at *10 (Bankr. S.D.N.Y. Mar. 25, 2021). Sagi maintains that the Court should abstain from this case under section 305(a) since it is an outgrowth of a family dispute between two factions—Orly, Arie, Herschmann, and the Broser entities on one side, and Dalia, Sagi, and the Orly Trust on the other—concerning Dalia's right to financial support. *See* Motion ¶¶ 61–63. For Sagi, the bilateral nature of the dispute is illustrated by the fact that Orly, Arie, Herschmann, KBT, and the Brosers filed a joint letter with the Court in response to the Court's request for position statements concerning how to proceed with the Chapter 7 Case, given the multitude of outstanding filings.[45] He argues that dismissal under section 305(a) is appropriate where "the debtor's financial condition is, in essence, a two party dispute between the debtor and [a] secured creditor[]." Motion ¶ 60 (alterations in original) (quoting *In re Loco Realty Corp.*, No. 09-11785, 2009 WL 2883050, at *2 (Bankr. S.D.N.Y. June 25, 2009) (quoting *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997))). He also contends that dismissal under section 305(a) is appropriate because the Chapter

---

[45]    *See Joint Position Letter by debtor Orly Genger and creditors Kasowitz Benson Torres, Eric Herschmann, the Genger Litigation Trust, ADBG LLC, and Arie Genger*, ECF No. 237.

7 Case is largely duplicative of the litigation in the now stayed Turnover Action in the District Court Action.

The Court disagrees. Dismissal of a properly filed bankruptcy case under section 305(a) is an extraordinary remedy appropriate only where the court finds that both the creditors and the debtor would be better served by dismissal. *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008) (citing *In re Eastman*, 188 B.R. 621, 624 (9th Cir. B.A.P. 1995)); *see In re Schur Mgmt. Co., Ltd.*, 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005) (dismissing the bankruptcy case pursuant to § 305(a)(1) as not in the interests of the debtor and creditors because the debtors, as defendants in a pending multimillion-dollar suit, prematurely filed for bankruptcy and were able to meet all of their non-contingent liabilities at the time of filing). The moving party must demonstrate more than a simple balancing of harms to the debtor and creditors; rather, it must show that the interests of both the debtor and its creditors will be served by dismissing the case. *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 255 (S.D.N.Y. 2004). "A court's determination whether to abstain and dismiss pursuant to section 305(a)(1) is a fact-intensive inquiry that entails consideration of the totality of the circumstances." *In re Wythe Berry Fee Owner LLC*, No. 22-11340, 2023 WL 1786407, at *6 (Bankr. S.D.N.Y. Feb. 6, 2023). Courts have considered the following factors in determining whether to dismiss or abstain under section 305(a):

> (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.
> !

*In re Monitor Single Lift I*, 381 B.R. at 464–65.  "[W]hile all factors are considered, not all are given equal weight in every case."  *Id.* at 65.

Sagi contends that Orly owes him more than $3.2 million on account of the 2018 Judgment against her, and claims that under the 2004 Indemnity, she owes him an additional $9.25 million based on the Agreed Final Judgment that he and Dalia obtained post-petition in the Florida State Court Litigation.  But this is not just a two-party litigation that belongs in the civil courts.  As set forth above, the case involves multiple third-party claims against Orly's estate, including for money she owes her past lawyers, Zeichner Ellman & Krause LLP ("ZEK"),[46] her father, her husband, and others.   Other creditors have filed separate claims, including Orly's bonding company and Sagi and Dalia affiliated companies TPR and D&K GP LLC.  Collectively, these claims total in the millions of dollars, separate and apart from Sagi's claim.

Moreover, there is a live dispute among Orly's creditors over whether Orly is entitled to the Settlement Proceeds at all.  Sagi is on both sides of that dispute.  Dalia has sought a constructive trust with respect to over $12 million of the Settlement Proceeds, claiming that those proceeds belong to her.  *See Dalia Genger v. Orly Genger*, AP No. 20-1010.  The Orly Trust likewise contends that it is entitled to the Settlement Proceeds and that Orly owes it more than $41 million. Even as Sagi asserts that the $32.3 million in Settlement Proceeds belong to Orly and that a portion of those proceeds should be paid to him in satisfaction of his claims, at the same time, he contends that those Settlement Proceeds rightfully belong to the Orly Genger Trust.  Sagi, through TPR, is

---

[46]    Sagi attempts to minimize the significance of the ZEK claim by arguing that the firm, unlike Sagi and Orly's other family creditors, were not "pressing the Debtor for payment prior to the Bankruptcy."  Reply ¶ 62.  Even if true, the Court finds that immaterial under section 305(a) of the Bankruptcy Code.  The zeal of a creditor's collection efforts has no impact on the validity of a claim.  Nor does it contribute to the argument that the Chapter 7 Case is a two-faction dispute.

party to that certain undated Inter-Creditor Agreement[47] with the Orly Genger Trust,  Recovery

Effort Inc. ("REI"), an entity wholly owned by the Orly Genger Trust, Manhattan Safety Company

Ltd, and Manhattan Safety Maine, Inc. ("Manhattan Safety").   In that agreement, and without

limitation, TPR acknowledges that the Orly Trust's "principal asset is its claim to the $32.3 million

in litigation proceeds, plus interest and attorney's fees and disbursements, accruing under [the

2013 Settlement Agreement] . . . by which Orly Genger  . . . settled claims she had brought

derivatively on behalf of [the Orly Genger Trust] seeking to recover its claimed beneficial

ownership interest in shares of [TRI]."[48]   Intercreditor Agreement at 1.   Accordingly, no fewer

than eight parties have competing claims to the Settlement Proceeds—Sagi, Dalia, the Orly Trust,

Manhattan Safety, REI, Arie, the Genger Litigation Trust and ADBG/Brosers.  This is plainly not

just a two-party litigation that belongs in the civil courts.

Moreover, Sagi has not established that dismissal of the case is in the interests of Orly, and

the rest of Orly's creditors.  He says that dismissal under section 305(a) would allow him to litigate

the Turnover Motion in the district court but does not demonstrate how this would benefit Orly or

anyone else.  *See, e.g.*, *In re RCM Glob. Long Term Cap. Appreciation Fund, Ltd*., 200 B.R. 514,

524 (Bankr. S.D.N.Y. 1996) (refusing to grant section 305(a) motion because the movant "has not

shown how any party in interest other than [itself] would be benefitted by a dismissal.").

The case law Sagi relies on is inapposite.  Citing *In re Loco Realty Corp*., he states that the

Chapter 7 Case should be dismissed because Orly's "financial condition is, in essence, a two-party

dispute between the debtor and [a] secured creditor." But that case concerns a chapter 11

---

[47]    *See Inter-Creditor Agreement*, Bowen Declaration Ex. 25.

[48]    Sagi also recognizes that Orly "has not satisfied any portion of the 2018 Judgment, and claims to have no significant assets other than her interest, *if any*, in the Settlement Agreement Proceeds and her home in Austin, Texas."  Inter-Creditor Agreement at 1.

bankruptcy, where the court emphasized that the "critical test" for dismissal is whether the debtor had a reasonable chance to reorganize—something immaterial to this Chapter 7 Case. *In re Loco Realty Corp.*, No. 09-11785, 2009 WL 2883050, at *3 (Bankr. S.D.N.Y. June 25, 2009). Sagi also cites *In re Selectron Mgmt. Corp.* for support. That case concerned an involuntary bankruptcy petition opposed by the debtor, which objected to bearing the costs of proceeding in bankruptcy in addition to litigation fees in a related proceeding. *See* No. 10-75320, 2010 WL 3811863, at *5 (Bankr. E.D.N.Y. Sept. 27, 2010). It is not persuasive authority because Orly voluntarily commenced the Chapter 7 Case, and there is no evidence that dismissal would benefit her. The "prototypical fact pattern under section 305(a)" occurs where creditors commence an involuntary proceeding. 7 Collier on Bankruptcy, at ¶ 305.02[2][a] (16th ed. 2011). That fact pattern is absent here. For that additional reason, the Court finds that dismissal under section 305(a) is not appropriate.

Moreover, Sagi has failed to make any showing that the relevant factors support his request for abstention. *See In re Monitor Single Lift I*, 381 B.R. at 464–65. A review of those factors demonstrates that they do not favor abstention. First, as to the economy and efficiency of administration, under the unique circumstances of the Genger family litigation (which spans across a variety of state and federal jurisdictions), the ability for all litigants to participate in this case makes the continuation of these proceedings, at least for now, a more efficient use of judicial resources than abstention. Accordingly, application of the first factor weighs against abstention. While there are multiple other fora available, the excessive litigation surrounding these cases has imposed a serious burden on the various jurisdictions involved. For that reason, the second factor is neutral. Third, federal proceedings are necessary to reach a just and equitable solution, because Sagi seeks to enforce a federal judgment against the debtor; thus, application of factor three also

weighs against abstention.  Fourth, Sagi has not demonstrated that there is an alternative means of achieving an equitable distribution of assets.  Accordingly, application of factor four weighs against abstention.  Fifth, given the personal vitriol among the various creditors, and the Gengers' history of litigating until the bitter end, it is doubtful that any out-of-court arrangement will be reached, and so application of factor five also weighs against abstention.  Sixth, there is no non-federal insolvency, and so application of factor six weighs against abstention.  Seventh, Orly has sought bankruptcy jurisdiction to obtain a discharge of, inter alia, the crushing debts incurred through more than a decade of litigation across various jurisdictions.  Accordingly, application of this factor also weighs against abstention.

Based on the foregoing, the Court denies Sagi's request for relief under section 305(a) of the Bankruptcy Code.

**Whether Dismissal of the Chapter 7 Case is Warranted Under Section 707(a)**

A bankruptcy court's decision to dismiss a chapter 7 case for cause under section 707(a) of the Bankruptcy Code must be guided by equitable considerations and is committed to the court's sound discretion.  *See Wilk Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53, 58–59 (2d Cir. 2018) (citing *Schwartz v. Geltzer (In re Smith)*, 507 F.3d 64, 73 (2d Cir. 2007); *Krueger v. Torres (In re Krueger)*, 812 F.3d 365, 369–75 (5th Cir. 2016); 6 Collier on Bankruptcy § 707.03[1] (16th ed. 2018)).  In resolving motions under section 707(a), courts "engage in case-by-case analysis in order to determine what constitutes 'cause' sufficient to warrant dismissal."  *In re Murray*, 900 F.3d at 58 (quoting *Dinova v. Harris (In re Dinova)*, 212 B.R. 437, 442 (2d Cir. B.A.P. 1997)).  In each case, the court must determine "whether cause exists by looking at 'whether dismissal would be in the best interest of all parties in interest.'"  *In re Smith*, 507 F.3d at 72 (quoting *In re Dinova*, 212 B.R. at 442).  The party seeking dismissal bears the burden of proving "cause" under

41

section 707(a) by a preponderance of the evidence. *In re Ajunwa*, No. 11-11363, 2012 WL 3820638, at *6 (Bankr. S.D.N.Y. Sept. 4, 2012); *see also In re Murray*, 900 F.3d at 59 (noting that an appellate court will "disturb a dismissal for cause [under section 707] only if the bankruptcy court has abused its discretion." (citing *In re Smith*, 507 F.3d at 73)).

Section 707(a) provides that a court may dismiss a chapter 7 case for "cause" and identifies the following three grounds for relief: unreasonable delay by the debtor, nonpayment of any fees, and failure to comply with the duties imposed on a debtor by section 521. 11 U.S.C. § 707(a)(1)–(3). In support of the Motion, Sagi does not rely on an alleged violation of any of these subsections. Instead, as described above, and without limitation, Sagi seeks to dismiss the Chapter 7 Case on the ground that Orly filed it in bad faith to avoid her obligations to indemnify him for his support of Dalia under the 2004 Promise. *See, e.g.*, Motion ¶ 43.

The specified grounds under section 707(a) are illustrative, not exclusive. *In re Smith*, 507 F.3d at 72 (citing *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1191 (9th Cir. 2000); *Dionne v. Simmons (In re Simmons)*, 200 F.3d 738, 743 (11th Cir. 2000)); *see also In re Dinova*, 212 B.R. at 442 ("Dismissal for cause under section 707(a) is not limited to the three examples enumerated within the section."). As a threshold matter, Orly maintains that Sagi cannot meet his burden of proof under section 707(a) because "bad faith" is not "cause" for dismissal under that section of the Bankruptcy Code. *See* Orly Obj. ¶¶ 59–63.

In 2005, Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109–8, 119 Stat. 23 which, among other things, amended section 707(b) to add a "bad faith" standard in section 707(b)[49] but did not amend section 707(a)

---

[49]    In part, section 707(b) states, as follows:

> (b)(1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case

to add that standard.  The courts are not uniform on whether "bad faith" constitutes cause for dismissal under section 707(a).  Prior to the enactment of the BAPCPA legislation, the Sixth Circuit held that "lack of good faith is a basis for dismissal under § 707(a)."  *Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1127 (6th Cir. 1991).  In the wake of the enactment of that legislation, the Third, Fifth, and Eleventh Circuits have held that "bad faith" is a ground for dismissing a case under section 707(a).  *See Perlin v. Hitachi Cap. Am. Corp.*, 497 F.3d 364, 369 (3d Cir. 2007) ("[A] debtor's lack of good faith in filing a bankruptcy petition is a proper cause for dismissal under section 707(a)."); *In re Krueger*, 812 F.3d at 370 ("This circuit joins those courts that have held a debtor's bad faith in the bankruptcy process can serve as the basis of dismissal 'for cause,' even if the bad faith conduct is arguably encompassed by other provisions of the Code."); *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, 719 F.3d 1253, 1260–62 (11th Cir. 2013) (holding that bad faith constitutes cause for dismissal under section 707(a)).  In contrast, the Eighth and Ninth Circuits hold that "cause," not "bad faith,"

---

filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.  In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).

. . . .

(3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider—

    (A) whether the debtor filed the petition in bad faith; or

    (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b).

provides grounds for relief under section 707(a). *Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 970 (9th Cir. 2007) (following *In re Padilla*, 222 F.3d 1184, 1193 (9th Cir. 2000), which held that "cause" rather than "bad faith" was the proper standard under section 707(a)); *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 832 (8th Cir. 1994) ("If the bankruptcy court elects instead to act under the inherent judicial power to punish a bad faith litigant, that action should not be taken under § 707(a).").

The Second Circuit has not explicitly addressed the issue,[50] although courts within the Circuit, both pre- and post-BAPCPA, recognized that "cause" to dismiss under section 707(a) includes "bad faith" case filings. *See, e.g.*, *Miller v. Cloud (In re Miller)*, 263 B.R. 183, 185 (N.D.N.Y. 2001) (noting that "[c]ourts have uniformly interpreted the 'for cause' standard in 11 U.S.C. § 707(a) to provide for a bankruptcy petition's dismissal when it is not filed in good faith"); *Duttle v. Werner (In re Werner)*, 91-cv-6868, 1992 WL 162637, at *3 (S.D.N.Y. June 23, 1992) (citing *In re Zick*, 931 F.2d 1124); *In re Lombardo*, 370 B.R. 506, 511 (Bankr. E.D.N.Y. 2007) (noting that courts in this Circuit have followed the Sixth Circuit standard, i.e., *In re Zick*, "in dismissing cases where there is an absence of good faith"); *In re O'Brien*, 328 B.R. 669, 674 (Bankr. W.D.N.Y. 2005) ("I find that a bad faith filing is cause to dismiss a Chapter 7 case under Section 707(a)."); *Blumenberg v. Yihye (In re Blumenberg)*, 263 B.R. 704, 713–14 (Bankr.

---

[50]    In *Austin v. U.S. Treasury Dep't of Internal Revenue Serv.*, No. 06-cv-4828, 2010 WL 11606823 (E.D.N.Y. Mar. 31, 2010), the district court stated as follows:

> The Second Circuit has implied that bad faith constitutes a ground for dismissal under § 707(a), affirming a district court's affirmance of a bankruptcy court's refusal to dismiss for bad faith based purely on the facts. *Owens v. Owens*, 155 Fed. App'x 42 (2d Cir. 2005). Of relevance on this appeal, the district court had applied the "bad faith" standard endorsed by the Sixth Circuit, and the Second Circuit favorably cited to that same Sixth Circuit case as "recognizing [a] stringent standard for finding bad faith under § 707(a)." *Id.* at 45. However "stringent" the test for bad faith, if satisfied, § 707(a) authorizes dismissal.

*Id.* at *2, n.3.

E.D.N.Y. 2001) ("noting that there is New York authority at both the district and bankruptcy court levels that adheres to the [Sixth Circuit] line of reasoning" for bad faith dismissal under section 707(a)).  Where courts find that bad faith is a ground for dismissal of a bankruptcy case under section 707(a), they uniformly apply "an exacting standard."  *In re Chovev*, 559 B.R. 339, 345 (Bankr. E.D.N.Y. 2016).  These courts have arrived at a "general consensus that the standard for finding bad faith under § 707(a) is stringent, and 'is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt *based on conduct akin to fraud, misconduct, or gross negligence*.'"  *In re Ajunwa*, 2012 WL 3820638, at *6 (quoting *In re Zick*, 931 F.2d at 1129).  In considering whether bad faith provides cause for dismissal, courts in this Circuit have noted that such dismissal is a "response to fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor."  *In re Aiello*, 428 B.R. at 302 (quoting *Marrama v. Citizens Bank*, 549 U.S. 365, 374–75 (2007)).  As a general rule, "[i]n determining whether a debtor has pursued actions in a case that would warrant conversion or dismissal for lack of good faith, a court must review the totality of the circumstances."  *In re Pellechia*, 617 B.R. 750, 758 (Bankr. D. Conn. 2020).  In applying the "totality of the circumstances" standard in assessing whether a debtor's action or inaction rises to the level of conduct warranting dismissal of its case under section 707(a), courts in the Second Circuit have applied the following factors set forth in *In re Lombardo*:

(1) The debtor's manipulations having the effect of frustrating one particular creditor;

(2) The absence of an attempt to pay creditors;

(3) The debtor's failure to make significant lifestyle changes;

(4) The debtor has sufficient resources to pay substantial portion of debts;

(5) The debtor inflates expenses to disguise financial well-being;

(6) The debtor is overutilizing protections of the Bankruptcy Code to the conscious detriment of creditors;

(7) The debtor reduced his creditors to a single creditor in the months prior to the filing of the petition;

(8) The debtor filed in response to a judgment, pending litigation or collection action; and there is an intent to avoid a large single debt;

(9) The unfairness of the use of Chapter 7;

(10) The debtor transferred assets;

(11) The debtor is paying debts to insiders;

(12) The debtor failed to make candid and full disclosure;

(13) The debts are modest in relation to assets and income; and

(14) There are multiple bankruptcy filings or other procedural "gymnastics."

370 B.R. at 511–12; *see, e.g.*, *In re Ajunwa*, 2012 WL 3820638, at *6 (noting that the multi-factor approach in *Lombardo* is "the most commonly and recently utilized § 707(a) test"); *Nath v. Select Portfolio Servicing, Inc. (In re Nath)*, No. 16-cv-2023, 2017 WL 1194735, at *4 (S.D.N.Y. Mar. 31, 2017) (noting that "[c]ourts should look to the totality of the circumstances" when determining whether there is a lack of good faith in the debtor's bankruptcy filing and referring to *Lombardo*'s fourteen factors); *Morillo v. Wells Fargo Bank, N.A.*, No. 19-cv-08183, 2020 WL 2539068, at *3 (S.D.N.Y. May 19, 2020) (same). "While the presence of one of these factors alone will not be sufficient to support a dismissal for cause, a finding of a combination of factors may suffice." *Lombardo*, 370 B.R. at 512 (citing *In re Eddy*, 288 B.R. 500, 505 (Bank. E.D. Tenn. 2002); *In re Spagnolia*, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995)).

In support of the Motion, Sagi relies on *In re Syndicom Corp.*, 268 B.R. 26 (Bankr. S.D.N.Y. 2001), and *In re Krueger*, 812 F.3d 365. He also asserts that application of the *Lombardo*

factors supports his assertion that Orly filed the Chapter 7 Case in bad faith and that the Court should apply those factors and dismiss it as such. Motion ¶¶ 47–49. Orly contends that *Syndicom* and *Krueger* are inapposite, that the *Lombardo* factors have never been adopted by courts in this district, and that the Court should not adopt them in this case. Orly Obj. ¶ 62. She asserts that, in assessing whether to dismiss a case as filed in bad faith, the proper inquiry is not which *Lombardo* factors apply in a given case, but whether the allegedly bad faith conduct of the debtor is egregious, arose post-petition, and is not addressed in other provisions of the Bankruptcy Code. *See id.* As support, she cites *In re Grullon*, No. 13-11716, 2014 WL 2109924 (Bankr. S.D.N.Y. May 20, 2014).

In *Grullon*, the bankruptcy court denied a motion to dismiss a case for bad faith under section 707(a), finding that, because the misconduct alleged to evidence bad faith was addressed specifically by other Bankruptcy Code provisions, it "cannot properly constitute grounds for dismissal under a vague general equitable concept such as 'bad faith.'" *Id.* at *2. The court also found that "[i]f a debtor's conduct is to be considered 'cause' for dismissal under § 707(a)," then "it should be the type of conduct described in that section—all of which relates to post-petition conduct of a debtor after the filing. . . . [I]t should be conduct not dealt with elsewhere in the statute." *Id.* at *4. Finally, the court found that, in the case law, "there is general consensus that the standard for finding bad faith under § 707(a) is stringent, and 'is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt *based on conduct akin to fraud, misconduct, or gross negligence*.'" *Id.* (quoting *In re Ajunwa*, 2012 WL 3820638, at *6). Other courts within the Second Circuit have adopted the same reasoning. *See In re Chovev*, 559 B.R. at 347 (adopting *In re Grullon*'s "legal framework" and

denying motion to dismiss under section 707(a), holding that "[t]he allegations do not amount to

the type of misconduct that meets the stringent standard for finding bad faith under § 707(a), and

are addressed, for the most part, by specific provisions of the Bankruptcy Code.").

  *Grullon* did not expressly reject the *Lombardo* factors.  Rather, it reasoned that they were

not applicable to that case because other sections of the Bankruptcy Code better addressed the

debtor's conduct at issue.  *In re Grullon*, 2014 WL 2109924, at *2 ("most of the Debtor's acts

claimed to evidence bad faith are addressed specifically under other provisions of the Bankruptcy

Code and cannot properly constitute grounds for dismissal under a vague general equitable concept

such as 'bad faith.'"); *see also In re Ajunwa*, 2012 WL 3820638, at *6 (declining to decide whether

bad faith constitutes cause under section 707(a) and holding that "even assuming that there is

continuing judicial discretion to dismiss for lack of good faith under § 707(a), the Debtors did not

act in bad faith").

  The Court does not need to weigh in on the applicability of the *Lombardo* factors as a

standard for assessing whether a case is filed in bad faith under section 707(a).  As set forth below,

Sagi has not met his burden of demonstrating grounds under the *Lombardo* factors, or otherwise,

for dismissing the Chapter 7 Case as filed in bad faith under section 707(a) of the Bankruptcy

Code.

  Before turning to the analysis of the *Lombardo* factors*, Syndicom* and *Krueger*,  the Court

considers the contention of Sagi that is central to the Motion: that the Settlement Proceeds

constitute Orly's property and that she cannot, in good faith, argue to the contrary. In resolving the

Motion, the Court will not determine the extent of Orly's interest, if any, in the Settlement

Proceeds.  It will consider Sagi's arguments in the context of its analysis of whether Orly filed this

case in good faith, including whether she has made adequate disclosure in her Petition and Schedules.

The district court's holdings in *Genger I* and *Genger III*, as affirmed by the Second Circuit in *Genger II* and *Genger IV*, respectively, are binding on Orly, but they are not dispositive of the ownership issue. As relevant, in *Genger I,* the district court held that "Orly monetized her beneficial interest in the [TRI] shares for $32.3 million." 76 F. Supp. 3d at 501. In *Genger III*, the court reaffirmed that determination as it found that:

> Based on the prior rulings of this Court in *Genger I* (and the Second Circuit's subsequent affirmance in *Genger II*), it has been conclusively established that … Sagi and Orly monetized their beneficial interests in the TRI shares for a total of $69.3 million [$32.3 million to Orly and $37 million to Sagi], a substantial portion of which was attributable to Dalia's conveyed marital interest.

*Genger III,* 2018 WL 3632521, *2. In determining that Orly monetized her beneficial interests in the TRI shares for $32.3 million, the district court did not adjudicate what portion of the Settlement Proceeds, if any, belong to Orly, as opposed to the other members of the AG Group. In affirming the district court's ruling in *Genger I,* the Second Circuit determined only that Orly received a benefit from being a signatory of the 2013 Settlement Agreement, as part of the AG Group that settled claims related to the TRI shares. The Circuit reasoned that Orly received some benefit even if nothing much more than a "peppercorn": "But surely any $32 million transaction for her shares would confer upon her more than a peppercorn, which is all we need to conclude (and all we do conclude) as to the extent of any benefit she received." *Genger II*, 663 Fed. Appx. at 49. In affirming *Genger III,* the Second Circuit did not reach the issue of whether Orly "in fact [] received such payments" "attributable to her portion of the TRI marital shares." The Court held it did not need to adjudicate that issue because Orly did not challenge the judgment entered in favor of Dalia

against Sagi, and that judgment triggered the 2004 Indemnity regardless of whether or not Orly actually received any TRI-attributable funds. *Genger IV,* 771 Fed. App'x at 101.

At trial, Orly testified that she has always viewed the Settlement Proceeds as Arie's money, even though her parents had (unsuccessfully) tried to gift her part of it.  6/17 Tr. at 63:17–64:3 (Orly).  Fundamentally, Orly understood that Arie "had borrowed a huge sum of money from the Brosers," and the "first thing that needed to happen was that the Brosers needed to get paid back." *Id*. at 62:20–22.  Orly wanted to see Arie's debts get repaid, and "if there was money left over and [Orly] was fortunate enough that he would want to share," Orly would only then share in a recovery.  *Id.* at 64:4–5.  Orly simply wanted "to make sure that [Arie] could . . . get something to show for his work, for his life's work."  *Id.* at 64:10–16.  She also pointed out that Arie had lent her "millions of dollars" and, from her perspective,  not only was any potential recovery Arie's money, but she "actually owed [Arie] money on top of it and still do[es] so." *Id.* at 65:5–13.  Orly testified that she had a damages claim against Sagi with respect to the $10.3 million that was "supposed to be for my shares that my brother had sold."  *Id.*  Orly had envisioned that, "if the Brosers had been paid back in full," and she received a subsequent recovery for the $10.3 million value of her shares, that recovery would go to [her]."  *Id.*  On the other hand, if Orly recovered for the value of her shares before the Brosers were repaid, that recovery would have gone directly to repayment of the Brosers.  *Id.*

Sagi contends that the Court should give attach no weight to that testimony for a number of reasons.  First, he says that Orly could not have expected her share of the Settlement Proceeds to be the $10.3 million in the P&M Escrow because those funds represented the proceeds of the Orly Trust's TRI shares, and in the settlement agreement, Orly, individually and as a beneficiary under the Orly Trust, waived any right to those shares and acknowledged that the Trump Group

had record and beneficial ownership of those shares. In the Settlement Agreement, the Trump Group agreed to release any claims to the $10.3 million in escrowed funds. Orly contends, and the Court agrees that the waiver had value to Orly, because she intended to litigate with TPR either to get the $10.3 million back or sue TPR for monetary damages.

Next, Sagi says that in signing the 2013 Settlement Agreement, Orly in fact intended and understood that most of the $32.3 million Settlement Proceeds belonged to her. As support for that contention, Sagi says that from the onset of the TRI litigations, Orly has acknowledged a financial interest in their outcome. He points to Orly's testimony in 2009 in the Delaware trial between her father and the Trump Group as follows: "Q. You stand to benefit if your father prevails in this litigation? O. Genger: I hope. Yeah, I think." *TR Investors, LLC v. Genger*, 2010 WL 2901704, *7 n.38 (Del. Ch. July 23, 2010). The Court attaches no weight to that testimony. Orly did not say that she was entitled to any portion of the proceeds. Rather, she testified that given the state of her finances, she could only hope to benefit from her father monetarily because, if he recovered, he could "also continue to help me pursue, you know, my passion and my career and help me . . . I mean, he's my dad." 6/18 Tr. 83:22 to 84:1 (Orly).

Sagi also contends that multiple documents executed by Orly and third parties demonstrate Orly's knowledge of her right to the Settlement Proceeds. First, he asserts that in October 2014, Arie, through his tax accountant, William Fischer, reported the $17.3 million settlement payment under the 2013 Settlement Agreement to the IRS as an installment sale of the TRI shares, and calculated the associated basis on the "expectation" that Arie would ultimately receive only 41.872% of the total settlement proceeds. Not the 100% he claims. Movant's Exs. 117, 119. Sagi maintains that in two successive depositions, Mr. Fischer testified that, prior to his filing Arie's 2013 return, Arie had reviewed and approved this specific tax calculation, which had saved Arie

considerable taxes. 6/18 Tr. at 210–13. At trial, Mr. Fischer testified without contradiction that his understanding reflected in his workpapers was not based on anything he learned from Orly.  He testified that he never discussed the settlement with her. *Id.* at 190:1–195:11 (Fischer: "The reason I remember so definitively is that this had to do with Arie Genger's tax return. . . . I would not be discussing it with Orly").   Indeed, Mr. Fischer testified his workpapers were not based on communications with any of the parties to the 2013 settlement but in fact were based on a mistake. *Id.* at 194:2–19 ("Do you recall whether you discussed with [Arie] that your understanding was fifty million dollars was being paid out and a portion of that was going to the Orly Genger 1993 Trust? A. I certainly didn't have that discussion . . . I then came to understand I was in error."); 6/17 Tr. 224:24–227:5 (Harris: "I just went through the financial terms of the agreement [with Fischer] and that the only incoming money then was the seventeen which would need to be picked up . . . reported on [Arie's] tax return . . . the best potential . . . was fifty million dollars. Q. Did you convey that to Mr. Fischer? A. I'm sure I did.").   The Court finds no merit to Sagi's assertion that the Fischer work papers demonstrate that Orly intended and understood in signing the 2013 Settlement Agreement  that at least most of the $32.3 million in settlement cash belonged to her.

In April 2017, the AG Group determined that it would change the payee on the Promissory Notes from Mr. Wachtel, to Michael Bowen of KBT.   At that point, Mr. Wachtel was the AG Group's former counsel having been replaced by KBT.  Sagi notes that, in part, the letter states that "refusing to change the payee to [KBT] will delay payment by the Trump Group under the Settlement Agreement, and cause damage to me." *See* Movant's Ex. 15.  It is undisputed that Orly and each member of the AG Group sent virtually identical letters to Mr. Wachtel, and that the letters were drafted by counsel.  Arie testified that Mr. Wachtel had been asked to resign his position as "payee" under the notes, but had failed to do so.  6/21 Tr.  at 153:5–7 (Arie).  He further

stated he was concerned that Mr. Wachtel's delay in resigning his post could cause the Trumps to delay in paying on the notes, and thereby delay Arie from repaying the Brosers. *Id.* at 153:8-10. For her part, Orly testified that it was not her decision for Mr. Wachtel to step aside or to send him the letter, and no one discussed the letter with her. *Id.* at 31:23–32: 4 (Orly). She also testified that the rest of the AG Group wanted to remove Mr. Wachtel as payee but that she was not sure what it was that Mr. Wachtel was not doing. *Id.* at 31:13–22. Sagi says that the letter is evidence that Orly believed that she had an interest in the Settlement Proceeds because if Orly was never going to receive any of the litigation proceeds or a reduction of her indebtedness to her father, then a delay in payments could not possibly "cause damage" to her. The Court disagrees. The foregoing makes clear that Arie, not Orly, was concerned about the potential damage from a delay in payments, and that Orly merely signed the letter as a member of the AG Group, and at the behest of the AG Group's counsel.

The 2013 Settlement Agreement did not address how the AG Group would distribute the $15 million in proceeds from the Promissory Notes. Rather, that agreement states only that the notes would be held by the Mr. Wachtel, the AG Group's then-counsel of record. The disposition of the Promissory Notes is addressed in the March 31, 2017, Escrow Agreement among Arie, Orly, ADBG, Herschmann and KBT, as escrow agreement (the "2017 Escrow Agreement"). *See* Mov. Ex. 18. In the Recitals to the agreement, the signatories state, without limitation, that they "wish to set forth their agreement with respect to payments to [Arie] and [Orly] pursuant to the [2013] Settlement Agreement." Pursuant to section 2(a) of the agreement, Arie, Orly and ADBG agree that they "shall cause all Settlement Proceeds to be paid directly to an escrow account maintained by Escrow Agent," and that "upon receipt, Escrow Agent shall distribute Settlement Proceeds in the following order of priority:

(1) *first*, to ADBG in payment of the ADBG Obligation, up to the maximum amount of $4,520,530.40;

(2) *second*, to [Herschmann] in payment of the [Herschmann] Note, up to the maximum amount of $2,000,000.00, plus all accrued interest and any fees or costs payable to [Herschmann] under the [Herschmann] Note; and

(3) *third*, in accordance with joint written instructions of [Arie] and [Orly] in respect of any remaining Settlement Proceeds after payment of the foregoing amounts.

2017 Escrow Agreement ¶ 2(a). It is undisputed that Arie and Orly have not provided instructions, written or otherwise, with respect to the Settlement Proceeds. Sagi contends that means that Orly has co-signing authority over at least $8.5 million but that she claims that she is not entitle to any part of those funds.

However, the 2017 Escrow Agreement does not allocate any portion of the Settlement Proceeds to Orly or otherwise vest her with rights to the proceeds. Moreover, Orly testified that she and Arie understood this "joint instruction" provision was intended to allow for Orly to have some say in the event money she recovered from her actions against Sagi and/or Dalia was used to repay the Brosers and Herschmann in addition to or before the balance of the AG/Trump Notes was paid to Arie. 6/17 Tr. 78:1–91:10 (Orly: "My understanding was in concept all the money was my father's and the main goal was to pay back the Brosers . . . after that point if money had come in from any of my litigations . . . it would have been my money. But that would've been any money that was associated with my litigations or the 10.3"); 6/21 Tr. 95:19–97:6. The 2017 Escrow Agreement does not lend itself to Sagi's assertion that some portion of the Settlement Proceeds belongs to Orly.

Finally, Sagi contends that the Genger Litigation Trust Agreement vests Orly with rights to the Settlement Proceeds. Orly is not a party to the Credit Agreement and has not executed the Note. At trial, Arie, Orly and David Broser testified that Orly has not borrowed funds from the

Brosers.  However, Orly signed the undated "Amendment to The Term Sheet, Credit Agreement And Genger Litigation Trust Agreement" (Movant's Ex. 160) under a signature "BORROWERS" and the preamble to the agreement names "Arie Genger and Orly Genger (borrowers)."  Sagi says that makes Orly a borrower under the Credit Agreement with rights to the Settlement Proceeds. He also contends that Orly's failure to disclose her interest in the proceeds supports his contention that Orly has filed the case in bad faith because it plainly vests Orly with an interest in the Settlement Proceeds.  The Court disagrees.  David Broser manages ADBG's relationship with Arie.  He testified that Orly did not borrow money from the Brosers and that the amendment that she executed was created by his elderly father while David was preoccupied dealing with his newborn son's "personal matter."  6/18 Tr. 271:10 to 272:8, 234:21 to 236:11; 6/21 Tr. 135:2-16 (Arie: "David was not available at the time. David had [] a family issue"); 6/17 Tr. 218:10-21 (Harris: "the senior Broser, Arnold" asked Orly to sign).  Under these circumstances, Orly's execution of the undated amendment does not support Sagi's assertion that  Orly intended and understood that most of the Settlement Proceeds belong to her.  Sagi also notes that  as a shareholder under the Genger Litigation Trust Agreement, Orly has a right to the Settlement Proceeds.  But Sagi has not demonstrated those rights afford Orly "at least most of" the Settlement Proceeds.

The Court finds no merit to Sagi's contention that the foregoing documents demonstrate that Orly intended and understood that at least most of the Settlement Proceeds under the 2013 Settlement Agreement belonged to her.  Moreover, and as explained below, the Court finds no merit to Sagi's assertion that Orly has failed to provide full disclosure in this Chapter 7 Case.

It is settled that a debtor must fully disclose all information relevant to the administration of a bankruptcy case.  *In re Riccardo*, 248 B.R. 717, 723–24 (Bankr. S.D.N.Y. 2000); *see also*

*Jensen v. Brooks (In re Brooks)*, 278 B.R. 563, 566 (Bankr. M.D. Fla. 2002) ("It is not for the

debtor to decide what is and is not relevant."). That information must be disclosed in the Schedules

and Statement of Financial Affairs that accompany the debtor's bankruptcy petition. *See In re*

*Brooks*, 278 B.R. at 566. "[A] debtor's bankruptcy petition and the accompanying schedules and

statement of financial affairs constitute statements under oath." *Zemon v. Papadopoulos (In re*

*Papadopoulos)*, No. 12-01907, 2015 WL 1216541, at *8 (Bankr. S.D.N.Y. Mar. 13, 2015)

(quoting *Moreo v. Rossi (In re Moreo)*, 437 B.R. 40, 59 (E.D.N.Y. 2010)). "[T]he integrity of the

bankruptcy system depends on full and honest disclosure by debtors of all of their assets." *Isnady*

*v. Vill. of Walden*, No. 18-cv-02662, 2019 WL 3252753, at *6 (S.D.N.Y. July 19, 2019), *aff'd*, 799

F. App'x 91 (2d Cir. 2020) (summary order).

Sagi asserts that Orly's failure to make complete, candid disclosure in her bankruptcy

schedules violates section 727(a)(4) of the Bankruptcy Code and provides grounds for dismissing

the case as filed in bad faith. *See* Motion ¶ 53. He says that her "nondisclosure and outright

evasion" in her Schedules starts with her "Introduction," which he characterizes as "a remarkable

attempt to modify the 'penalty of perjury' obligation upon execution by [Orly] of her schedules."

*Id.* ¶ 56. He also complains that while Orly states in her Global Notes that, "[i]n the event that the

Schedules and Statement differ from the foregoing Global Notes, the Global Notes shall control,"

the Global Notes are not signed under penalty of perjury—or any penalty, for that matter. *Id.* ¶ 57

(quoting Global Notes at 3).

Moreover, Sagi asserts that there is little, if any, meaningful financial information provided

in the Schedules or the Statement of Financial Affairs. Motion ¶ 55. Central to Sagi's argument

that Orly acted in bad faith in filing the Chapter 7 Case is his contention that she failed to disclose

in her Schedules that she had "monetized" the TRI Shares deposited in the Orly Trust for $32.3

million.  He says that "most egregiously, [Orly] makes no mention of the $32.3 million, not even as a 'disputed' claim, notwithstanding the fact that there was an open turnover proceeding at the time Orly filed for bankruptcy."  *Id.* ¶ 54.  He also maintains that the Schedules are deficient because Orly includes no information as to the value of various trusts, and because she listed Arie and Herschmann as secured creditors without listing them as subject to avoidance claims.  *Id.* ¶ 55.  Finally, he asserts that "although [Orly] lives off her rich husband's cash," in her Schedules I and J—which request information on Orly's non-filing spouse's financial assets and income—Orly states that "[s]uch information is not available to the Debtor, and is, accordingly not listed."  *Id.* ¶ 58.  Sagi says that those Schedules do not "request" any information—they "require" full, honest, and truthful disclosures.  *Id.*  He complains that answers to those questions are not optional, or at the pleasure of a debtor, and that the Orly simply refuses to disclose the information.  *Id.*

The Court finds no merit to those contentions.  First, Orly prepared her Petition and Schedules with the advice of legal counsel, a bankruptcy practitioner who was in charge of presenting the information about Orly's assets and liabilities and who inserted the disclaimers Sagi challenges.  Bowen Declaration, Ex. 16; 6/21 Tr. 45:23–46:25, 50:1–53:12, 58:23–59:12 (Orly). Her credible and unrebutted testimony was that she provided full information to her counsel about all of her assets and liabilities, including the competing claims concerning the Settlement Proceeds and related ongoing legal actions.  6/21 Tr. 53:15–24, 55:25–59:12, 99:8–22 (Orly); 6/18 Tr. 221:21 to 222:2 (Fischer) (stating that he provided information for and reviewed Orly's bankruptcy filing).  Counsel's inclusion of the Global Notes with the Petition is not a ground for dismissing the Chapter 7 Case.  The Court finds that in executing the statement of oath in the preprinted form,

as altered by Orly's counsel to read: "subject to the Global Notes attached," Orly has not submitted

a false oath under section 727(a)(4) of the Bankruptcy Code.[51]

The Court also finds that Orly adequately disclosed her assets in the Schedules. Orly is

plainly bound by the district court's ruling. Still, the evidence is clear that Orly does not possess

any of the Settlement Proceeds because the Settlement Cash was paid to the Brosers, and the

Promissory Notes are still held in trust pursuant to the Escrow Agreement. Moreover, Orly does

not have an unchallenged right to the Settlement Proceeds, or any portion thereof. It is undisputed

that the following parties lay claim to at least a portion of the Settlement Proceeds: (i) Sagi;

(ii) Arie; (iii) the Orly Genger Trust; (iv) Dalia; (v) Manhattan Safety; (vi) the Brosers; (vii) REI;

and (viii) the Genger Litigation Trust. The Court finds that Orly's Petition and Schedules fairly

disclose the competing claims to the Settlement Proceeds and her good faith position that the funds

are not her assets.

> The first pages of Orly's petition expressly state, "Third parties have asserted, in
> various litigation, that Debtor may have claims that the Debtor does not believe
> exist." Petition at 3.
>
> On the next page she states that: "Debtor has identified claims that third parties, in
> various litigation, may have suggested that she owns (and which Debtor does not
> agree exist)." *Id.* at 4.

---

[51] Moreover, and in any event, under the facts of this case, to the extent Orly's counsel erred in including the Global Notes with the Petition, such an error would not be a ground for dismissing the Chapter 7 Case. *See, e.g.*, *In re Nichols*, 362 B.R. 88, 96 (Bankr. S.D.N.Y. 2007) (noting that "dismissal of a bankruptcy case will often cause debtors to be irreparably harmed, and this result is unjust when it arises from attorney error that has not resulted in harm to any other party in interest"); *In re Fraleigh*, 474 B.R. 96, 105, 110 (Bankr. S.D.N.Y. 2012) (finding "mistakes in the schedules will not doom a debtor's discharge" where the debtor "reasonably relied on her attorney to make the appropriate use of [the debtors' financial] information in the legal work she had hired him to perform"); *see also In re Khan*, 172 B.R. 613, 627 (Bankr. D. Minn. 1994) (denying motion to dismiss when debtors' "schedules' shortfall . . . as to [debtor's] income and expenses . . . is attributed only to one thing: counsel's failure to give a competent, hardheaded review of the content to his client"). Orly clearly did not write the legalese of the "Global Notes" preface or on her own put a condition on the statement of oath. That was her lawyer. She cannot be blamed for taking legal counsel in matters as complex as her financial and litigation affairs are.

Moreover, Orly's Schedules list the particular legal actions in which this money is at issue and note that other parties allege this money is a potential asset of her estate. *Id.* at 19–21. The Schedules also identify as assets of Orly's estate three separate cases where third-party claims are asserted by Sagi, Manhattan Safety and REI, two turnover petitions filed by Dalia in Surrogate's Court, and the District Court Action that reiterated the "monetized" ruling and in which Sagi filed his "turnover" claim—all of which assert either his claim that Orly has a legal right to the $32.3 million or that the Orly Trust does. *Id.* at 13, 57, 61, 63.[52] Further, as to her response to Schedules I and J, Orly and Herschmann's Premarital Agreement confirms that Orly is economically independent of her husband. She has no right or access to any of his personal assets or wealth. 6/21 Tr. 16:4–19:24, 21:14–22:6 (Orly); 6/21 Tr. 241:12–244:8 (Herschmann). In that light, the Court finds that Orly's response to Schedules I and J is adequate. So is her listing of her secured creditors. Finally, Sagi has not demonstrated how Orly's failure to provide additional information with respect to her trusts is material to the issue of whether Orly made candid and full disclosure of her assets in the Schedules

The Court turns to its review of the *Lombardo* factors.

### (1) Whether the Debtor's Manipulations Frustrate One Particular Creditor

Application of this *Lombardo* factor supports a finding of bad faith where a debtor files a chapter 7 case solely to frustrate a creditor's collection efforts, and that creditor demonstrates that the debtor has done so with the "intention to avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence." *In re Zick*, 931 F.2d at 1129. Standing alone, "the fact that a debtor files a Chapter 7 petition solely to . . . frustrate that creditor's collection efforts . . . is

---

[52]    Sagi testified that Orly's Petition discloses his claim about the $32.3 million and the two $7.5 million Promissory Notes. OG Ex. 23 (Sagi Tr. 293:18 to 294:24: "Q: That also relates to the two seven and a half million-dollar promissory notes, right sir? A: Yes."). And, as noted above, Sagi at trial agreed it is a good faith position to assert—as Orly does in her petition schedules—that none of the $32.3 million belongs to Orly.

not enough to warrant a dismissal under § 707(a)." *In re Gutierrez*, 528 B.R. 1, 15 (Bankr. D. Vt. 2014); *see also In re Aiello*, 428 B.R. at 303; *In re Glunk*, 342 B.R. 717, 736 (Bankr. E.D. Pa. 2006); *In re Grullon*, 2014 WL 2109924, at *4.

Sagi maintains that application of this *Lombardo* factor supports his Motion because Orly filed the Chapter 7 Case to interfere with his prosecution of the Turnover Action and to frustrate his efforts to recover what he argues are assets that she fraudulently conveyed to Arie and Herschmann. Reply ¶ 60. He asserts that Orly has consistently taken steps to frustrate his efforts to collect his judgment, including**:** (i) refusing to comply with discovery obligations by concealing documents demonstrating her rights to the Settlement Proceeds; (ii) fabricating and backdating notes; and (iii) misrepresenting her domicile before multiple courts during litigation with Sagi. As to the latter, Sagi focuses on the Texas Bankruptcy Court's comments that Orly and Herschmann "as owners of multiple residences, have used this fact to their legal advantage by claiming to reside in whichever location most suits their legal needs at the time . . . . in an attempt to frustrate the post-judgment discovery being attempted by Sagi Genger." *Genger v. Genger*, No. 19-MC-0366-LY, 2019 WL 12420871, at *3 (W.D. Tex. Apr. 15, 2019).

Orly argues that Sagi's contentions are unsubstantiated. The Court agrees. First, the Texas Bankruptcy Court did not find that Orly did not reside in the Western District of Texas. That court's decision to transfer the venue of the case is not evidence of fraud or misdeeds on Orly's part in filing the case in Texas. Moreover, she was represented by counsel in determining to file the Petition in Texas. Second, as discussed below, Sagi has not demonstrated that Herschmann backdated the Herschmann Note or that Arie and Orly fabricated the Arie Note.

Finally, the Court finds no merit to Sagi's contention that Orly and others concealed the March 2017 Escrow Agreement. Sagi asserts that the existence of the March 2017 Escrow

Agreement was only accidentally revealed, when Sagi discovered a passing reference to it in another document produced in discovery. Motion ¶ 31. He says that this "subterfuge" was necessary because the Herschmann Note and Arie Note do not reflect actual debts. *Id.* ¶ 32. This ties into Sagi's argument that the Herschmann Note reflects advances made by Herschmann to KBT in an attempt to manufacture debts for Orly and thereby somehow frustrate Sagi's ability to obtain payment on his judgment. *Id.* ¶¶ 32–34.

Orly disputes the assertion that the March 2017 Escrow Agreement was only accidentally revealed in the course of discovery. So do KBT and Herschmann. They correctly observe that the agreement is referenced in the Herschmann Note. KBT PT Br. ¶ 4. Orly points out that Sagi admits the agreement is referenced in the Herschmann Note. Orly Obj. ¶ 72. "That is not concealment." *Id.* Moreover, KBT and Herschmann note that Sagi failed to elicit testimony at trial from Herschmann to support the accusation. KBT PT Br. ¶ 4 (citing 6/21 Tr. at 199:3–17; 204:15–205:12 (Herschmann)). More broadly, whatever discovery dispute the parties had, Sagi's contortion of those "minor discovery glitches" into an accusation that unspecified lawyers intentionally withheld a document is not evidence suggestive of a coverup. Orly PT Br. at 7.

In his post-trial brief, Sagi says that the Orly-aligned parties "went to great lengths to conceal the Escrow Agreement, *repeatedly denying under oath that any such agreement existed.*" Sagi PT Br. ¶ 22 (emphasis added). In support of this accusation, Sagi first cites to Orly's 2019 deposition, in which Sagi's counsel, Mr. Dellaportas, asked Orly whether she had "any agreements or understandings with any other party that, in the event you are to recover money from any of those litigations, what will become of that money?" Dellaportas Declaration, Ex. Q at 77:14–17. Orly said that she is "not good with memory stuff," and asked to see any type of document Mr. Dellaportas could provide related to the question. *Id.* at 77:19–25. Mr. Dellaportas responded

that he had only one relevant document, which related to a "Canada case"—i.e., it pertained to other Genger litigation.  Mr. Dellaportas pressed the issue, asking whether Orly was "aware, sitting here today, of any agreements or understandings you've entered into that if you're to prevail on any of these litigations, how the money will be allocated or disbursed?"  *Id.* at 78:11–14.  Orly responded that she did not know.  *Id.* at 17–23.  She did not deny that any such agreement existed.  *Id.*  The representation that Orly perjured herself in those proceedings is plainly inaccurate.

The next citation Sagi provides to support his perjury accusation is to David Broser's trial testimony.  Sagi PT Br. ¶ 22 (citing 6/18 Tr. at 268–69).  In that exchange, Mr. Dellaportas referred to the March 31, 2017, agreement and asked Broser why, at Broser's 2018 deposition, had Broser told Mr. Dellaportas that there were no "agreements of the sort."  6/18 Tr. at 267–69.  Broser responded that he signed "a lot of documents" and "barely paid any attention to" the agreement, so it was not at the "forefront of [his] mind" when Mr. Dellaportas posed the question.  *Id.* at 269:4–7 (D. Broser).  Broser confirmed that he had signed the agreement a year and a half prior to the deposition.  *Id.* at 269:8–10.

The transcript of David Broser's deposition reflects that the discrepancy in Broser's testimony is more nuanced.[53]  Sagi's post-trial brief does not point to the pages of the deposition where Broser allegedly perjured himself, and at trial Mr. Dellaportas did not show David Broser the relevant section of the deposition.  6/18 Tr. at 268:24–25 ("And at that time when I—I'm not going to put the thing up because we're running short on time.").  The court looks first to pages 12 through 14 of the deposition.  Mr. Dellaportas asked Broser whether he was aware of certain terms of the settlement agreement with the Trump Group.  Broser Depo. at 12:2–15.  Mr. Dellaportas

---

[53]    Dellaportas Declaration, Ex. HH ("Broser Depo.").

then asks, "Is there an agreement as to where that money is to go as among the members of the AG Group?" *Id.* at 12:16–18  Broser's counsel asks for clarification: "Pursuant to the settlement agreement?" *Id.* at 12:19–20.  Mr. Dellaportas declines to clarify, and he instead asks "Can you answer my question?" *Id.* at 12:21.  Broser asks for the question to be repeated, and the record is read back. *Id.* at 12:22–24.  For the second time, Broser's counsel asks for Mr. Dellaportas to clarify whether he is "referring to the money under the settlement agreement." *Id.* at 13:2–3.  For the second time, Mr. Dellaportas refuses to provide any clarification, instead saying: "I think my question is clear. Can you answer it?" *Id.* at 13:4–5.  Broser then asks, "Where all the money goes under the settlement agreement?  I believe the settlement agreement has more than 32 million dollars in it." *Id.* at 13:7–9.  For a third time, Mr. Dellaportas declines to provide any clarification as to what he is asking. *Id.* at 13:10–13.  At Broser's request, the question is read back. *Id.* at 13:18–23.  Broser then finally gives the monosyllabic answer "Yes." *Id.* at 13:24.  Mr. Dellaportas then asks "What is that agreement?" and Broser responds "All the money goes to Ari Genger." *Id.* at 14:2–4.  Mr. Dellaportas asks whether "that agreement" was reduced to writing, and Broser says that it was not. *Id.* at 14:5–7.  The line of questioning then returns to the circumstances surrounding the negotiation of the settlement with the Trumps, which predates the March 2017 Escrow Agreement. *Id.* at 14–16.  Here, the transcript reflects that there was confusion as to whether Mr. Dellaportas's question was limited only to the settlement agreement with the Trump Group.  David Broser's answer is consistent with his understanding that the Settlement Proceeds were all to go to Arie.  If Mr. Dellaportas wanted to ask an open-ended question about any settlement agreement in general, he had the opportunity to make that clarification three times. *Id.* at 12–14.  He declined to do so, and his confusing question received a confused answer.  That is not perjury.

The third citation Sagi provides is to a "6.24.18 Trial Tr. at 88–89." Sagi PT Br. ¶ 22.[54]
The Court assumes that Sagi intends to refer to pages 88 through 89 of the transcript for the portion
of the trial held in this Court on June 24, 2021. 6/24 Tr. at 88–89. Those pages correspond with
Mr. Bowen's cross-examination of Sagi. *Id.* On page 87, Mr. Bowen asked Sagi, "You also
accused me of perjury?" *Id.* at 87:18. Then, the pages Sagi cited to, pages 88 through 89, contain
essentially Sagi's own testimony that he believed Mr. Bowen had perjured himself. *Id.* at 88:10–
89:7. There, Sagi said to Bowen, "It's my understanding that in your deposition, you said that the
inaccurate or false testimony that you gave was a result of you not being made aware of the various
documents which you were supposed to produce, and the possibility that you were sent there in
ignorance to give false testimony is—is entirely possible, and I—I don't know what the truth of it
is." *Id.* at 88:10–18. This is not evidence of perjury. Moreover, Sagi raises the possibility that
Mr. Bowen was deliberately sent to the deposition "in ignorance" of the alleged wrongdoing,
which directly contradicts his claim in the post-trial brief that Bowen committed perjury. *Id.*

Sagi also points to a submission made prior to transfer of venue in this case,[55] in which
Orly took the took the legal position that she did not retain signing authority over promissory notes.
Sagi PT Br. ¶ 22. Sagi disputes that position. *Id.* However, the representation in that filing is
consistent with the position that Orly has taken throughout this case—she says she has no claim to
the Promissory Notes. That is not evidence of perjury, bad faith, or any other sort of malintent—
it is just a dispute as to the nature of Orly's legal rights. Similarly, Sagi points to another filing
Orly submitted before transfer of venue, in which she objected to Sagi's then-pending motion to

---

[54]    Mr. Dellaportas does not appear to have attached that document to either the Dellaportas Declaration or the
Dellaportas Letter. No trial was held in this Court on June 24, 2018. Review of the dockets in the district court, No.
17-cv-8181, and a recently active New York state trial-court case, No. 109749/2009, do not appear to reflect any trial
held on that date.

[55]    *Debtor Orly Genger's Amended Response to Motion to Transfer Venue*, ECF No. 153 at 6.

submit a number of documents under seal in connection with his motion to dismiss or transfer venue, since some of those documents were subject to a protective order issued by the District Court for the Southern District of New York.[56]  Orly took the view that all the documents subject to the Seal Order, not just the March 2017 Escrow Agreement, were irrelevant and inadmissible. *Id.* ¶ 3.  She therefore reserved her rights to object to their admission on evidentiary grounds.  *Id.* ¶¶ 3–4.  Sagi neglects to mention that, notwithstanding that reservation, Orly "does not assert that any privilege applies" to any of the documents Sagi sought to admit.  *Id.* ¶ 4.  In sum, this was an evidentiary battle fought years ago—Orly sought only to bar Sagi from introducing a host of documents on evidentiary grounds.  This is not an instance of "prevaricat[ion]" by Orly, it is just a legal position she took earlier in this case.  Sagi PT Br. ¶ 22.  To the extent that Sagi relies on either of these legal positions as evidence that Orly or anyone else attempted to withhold discovery, they do not offer any support.

Sagi does not specify which lawyers he is accusing of intentionally withholding the March 2017 Agreement.  As both Orly and Herschmann point out, the Herschmann Note was disclosed to Sagi, and it specifically references the March 2017 Agreement.  That document is the foundation for Herschmann's claim, and all parties had every reason to suspect that it would be subject to scrutiny in this litigation.  It would be absurd for the debtor (and more so for Herschmann) to intentionally try to hide the March 2017 Agreement while, at the same time, disclosing a document that both formed the basis of a $2 million claim and also expressly referenced the March 2017 Agreement.  *See* Motion ¶ 31.  Accordingly, the Court affords this unfounded argument no weight.

The Court finds that application of this factor does not support Sagi's claim for relief.

---

[56]    *Notice Regarding Supplemental Information Filed Under Seal*, ECF No. 66.

### *(2) Whether the Debtor Has Failed to Attempt to Pay Creditors*

The second *Lombardo* factor "focuses on the import of a debtor's failure to try to pay [its] creditors prior to seeking bankruptcy relief." *In re Gutierrez*, 528 B.R. at 18–19. Courts find a bankruptcy petition subject to dismissal as a bad-faith filing when a debtor has the capacity to repay some debts yet fails to do so. *See, e.g.*, *Austin v. U.S. Treasury Dep't of Internal Revenue Serv.*, No. 06-cv-4828, 2010 WL 11606823, at *3 (E.D.N.Y. Mar. 31, 2010) (upholding dismissal because the appellant "does not seriously challenge Judge Milton's findings that 95% of his debt was owed to the IRS, that he never attempted to pay the IRS, or that he had the capacity to repay some debts"). Sagi contends that application of this factor supports the Motion because Orly "has refused to pay any portion of [his] $3 million judgment in the three years since it was issued," and "[i]nstead she has spent all her resources attempting to find ways to avoid paying the judgment, culminating in this bankruptcy filing." Sagi PT Br. ¶ 44. The Court disagrees.

It is undisputed that in 2018, Orly arranged to pay Sagi over $350,000 in satisfaction of the 2015 Judgment. *See* Orly PT Br. ¶ 37. Moreover, as discussed below, the evidence shows and the Court finds that there are serious questions regarding Orly's ability to pay all or even a portion of the 2018 Judgment or any of her other debts. Accordingly, application of this factor does not support the dismissal of the case. *See In re Gutierrez*, 528 B.R. at 19 (holding that dismissal was inappropriate because "there are no undisputed material facts showing the Debtor has sufficient means to make any payments to creditors").

### *(3) Whether the Debtor Failed to Make Significant Lifestyle Changes*

"[T]he bankruptcy laws are grounded on the fresh start concept. There is no right, however, to a head start." *McLaughlin v. Jones (In re Jones)*, 114 B.R. 917, 926 (Bankr. N.D. Ohio 1990) (citing *Lines v. Fredrick*, 400 U.S. 18, 21 (1970)). Accordingly, an individual chapter 7 debtor

must do some financial "belt-tightening" in the wake of the commencement of a case. A debtor's failure to make lifestyle changes supports dismissal under section 707(a) of the Bankruptcy Code if it "rises to the level of egregiousness." *In re Mazzella*, No. 09-78449-478, 2010 WL 5058395, at *8 (Bankr. E.D.N.Y. Dec. 6, 2010).

Sagi asserts that Orly "continues to live the lifestyle of a very rich woman," pointing primarily to comments by the Texas Bankruptcy Court that Orly is a "highly mobile individual [who] can clearly be where she needs to be." Motion ¶ 48. He also contends that "she carried an AmEx Centurion Card issued under her husband's account and used it liberally," and notes that Orly retained sophisticated, expensive law firms in this bankruptcy case and the litigations that preceded it. Sagi PT Br. ¶ 45. For those reasons, he asserts that Orly runs afoul of this *Lombardo* factor. The Court disagrees.

First, in the context of this case, Orly is entitled to select the counsel of her choice. Moreover, the evidence demonstrates that she is dependent on her husband for living expenses for herself and her daughter—none of which the Court finds to be egregious luxury expenses. Sagi contends that, "[u]ntil it was discovered through a third-party subpoena," Orly "carried an AmEx Centurion Card issued under her husband's account and used it liberally." Sagi PT Br. ¶ 45.[57] He also asserts that, in October 2018, in her response to interrogatories, Orly "concealed" charges she had made on American Express accounts. Sagi PT Br. ¶ 26 (citing Movant's Exhibit 41 (the "Interrogatories")). The interrogatory in question, number 16, reads as follows:

> Identify all bank (checking or savings) accounts, brokerage accounts, credit card accounts, or other financial accounts held by, in the name of, or for the benefit of, Defendant, either individually or jointly, or any account over which Defendant has

---

[57] While Sagi points to Orly's American Express bills as evidence of her lavish lifestyle, the evidence does not reflect lavish luxury expenses—instead, it shows that she used the credit card to purchase basic household necessities. *See*, *e.g*., 6/21 Tr. at 41:18–42:4 (Orly) (testifying that the card was used to purchase "basically home needs, baby needs, groceries, not . . . major purchases").

a direct or indirect interest in or control over, for any period during the last six
years.

Interrogatories at 15.  Orly objected to the interrogatory on the grounds that it was overbroad and
unduly burdensome.  Regardless, Orly identified four accounts to which she had access, one of
which had been attached by Sagi in 2017.  *Id.*  Sagi included a corresponding request for
production, which asked essentially for all documents related to interrogatory number 16.  *Id.*  Orly
also objected to this, but in any event she agreed to conduct a search for non-privileged documents
from 2017 to the present.  *Id.* at 15–16.

At trial, Sagi's counsel questioned Orly about her usage of certain American Express
charges that had accrued in or around October 2018.  First, counsel asked whether Orly was staying
in Tel Aviv in October 2018, which Orly could not recall.  6/18 Tr. at 39:10–12 (Orly).  Some of
those charges were for Gett, an Israeli ride-sharing app, and Orly pointed out that both she and
Herschmann's adult children used the Gett account associated with the American Express account,
so it was unclear whether the relevant charges were accrued by her or by Herschmann's adult
children.  *Id.* at 39:13–22.  Another charge was at a bookstore, which Orly did not remember.  *Id.*
at 39:23–40:2.  There was a charge made at an Israeli food store, which Orly did not specifically
recall, but conceded "it's very possible that it was my charge."  *Id.* at 40:3–6.  There was another
charge made at a restaurant, which Orly had been to previously, but she did not recall whether the
charge was hers.  *Id.* at 40:7–12.  When asked why she did not include the American Express card
in her interrogatory response, Orly stated that she answered on her counsel's advice, that this was
not her personal card, and that her limited use of that card was just her "husband allowing [her] to
get around."  *Id.* at 41:8–13.

Both Orly and Herschmann have testified as to the nature of Orly's use of the American
Express card.  Orly testified later in the hearing that she occasionally used Herschmann's American

Express account, with his permission, for limited purposes until Herschmann "took it away" when she defaulted under the Herschmann Note in 2018. 6/21 Tr. at 40:8–42:20. Before Herschmann confiscated the credit card, Orly was permitted to use it for their shared child, home expenses, living purposes, or doctors' appointments. *Id.* at 41:24–42:4. Orly mainly used it to get groceries. *Id.* at 42:3.

Currently, Orly does not have the use of the American Express card, and she testified that she does not have any kind of credit card. *Id.* at 44:15–21. When she responded to the interrogatories, Orly had no credit card. *Id.* at 45:1–5. She did not know that the American Express account had been used to accrue ride-sharing charges at the time the interrogatory was made. *Id.* at 45:12–14.[58]

Herschmann's testimony about the American Express card is consistent with Orly's. Herschmann explained that he had absolute control over the Black Card. He could "see a charge every time it's swiped," and he could "block whatever charges" he wanted. 6/21 Tr. at 269:22–270:5 (Herschmann). He would receive a notification on his cellphone each time the card was used, and while he had not yet blocked a charge, these notifications had previously prompted him to call and ask "where are you and what are you getting." *Id.* at 270:3–4. He attested that Orly had "Zero" control over the account. *Id.* at 6–7. Herschmann thought of Orly's former access to the card as a personal convenience for himself because Orly had become pregnant and he was "traveling a lot." *Id.* at 270:8–13. The charges were for "baby expenses," doctors, and

---

[58] Orly did not learn until the course of these proceedings that Herschmann had also used the American Express account affiliated with Orly's name to set up an account with Gett when Orly, her newborn, and two of Herschmann's adult children were living in Israel. *Id.* at 45:6–18. Orly used the Gett account, and the adult Herschmann children also incurred charges on the account, which Herschmann presumably paid. *Id.* at 43:1–17. Orly used the Gett app on her Israeli cellphone, a hand-me-down she was allowed to use that had previously belonged to Herschmann's eldest son. *Id.* at 44:8–12.

69

"house-related expenses." *Id.* at 270:16–19. Herschmann corroborated Orly's testimony that he confiscated the credit card shortly after he sent the notice of default to Orly. *Id.* at 269:15–19.

The AmEx Statements are consistent with the corroborative testimony from Herschmann and Orly that Herschmann stopped permitting her to use the card for incidental expenses shortly after Orly defaulted under the Herschmann Note. Overall (with the exception of a few large purchases at clothing stores), the AmEx Statements overwhelmingly reflect that Orly used the card primarily for medical expenses, going to the grocery store, and ordering takeout. They also contain a large number of Gett charges, which is consistent with the testimony that Herschmann's adult children were charging their Gett rides to Herschmann's American Express account under Orly's name. The AmEx Statements certainly do not reflect that Orly was living a lavish lifestyle in Tel Aviv at Herschmann's expense. Rather, they are evidence that Orly lived fairly frugally, that she rarely dined out, that she used Herschmann's account to help care for their infant daughter, and that Orly used the account to pay medical professionals either for her own treatment or for that of their child.

Nor is there any merit to Sagi's contention that Orly intentionally concealed her limited former access to Herschmann's credit card account. The record is clear that she lost access to the credit card around the time that she responded to the interrogatories, and in any event, it was never her account. Moreover, her response was given on the advice of counsel.

The Premarital Agreement provides that Orly has no assets in common with her husband and no right to access to his personal wealth. Orly testified credibly that she has no income or job prospects and no ability to reboot her art career. *See, e.g.*, 6/21 Tr. at 59:25–60:9 (Orly). Herschmann's testimony confirms her dependence on him.[59] The Court finds that Orly's lifestyle

---

[59] For example, at trial, Herschmann testified, as follows:

does not support Sagi's assertion that she filed the Chapter 7 case in bad faith.  *See In re Mazzella*,

2010 WL 5058395, at *8 (holding that a debtor's lifestyle does not suggest a bad-faith filing unless

it "rises to the level of egregiousness.").

### *(4) Whether the Debtor Has Sufficient Resources to Pay a Substantial Portion of Her Debts*

In applying this factor, the Court notes that a debtor's ability to repay a debt "cannot serve

as the principal basis to dismiss a chapter 7 case for cause under § 707(a)."  *In re Chovev*, 559 B.R.

---

Q. In your daily experience with your wife, did she have access to any funds?

A. The only funds she could have access to is what I hand her.

Q. What you did?

A. What I hand her.

Q. Does she spend money on herself?

A. De minimis.

Q. Does she take trips by [herself]?

A. The only trip I think she is taken by herself was to go to a funeral for a day in California.

Q. Does she have any pleasure craft like cars and [boats]?

A. She doesn't have a car.  Candidly, she doesn't even have a bicycle.

Q. Does she go to galas and social events that cost, you know, monetary donations or the price of admission?

A. She—she hasn't gone to anything in years and only thing she went to work things in which I supported a charity.

Q. To your understanding, when your wife wants to spend money on something, how does she get access to the money?

A. Through Amazon for, you know, basic staples.  She can go down to the restaurant in the building and buy food and have a meal with our daughter, my adult children, or herself.  Grocery shopping we predominantly do together.  And for gas, for the car, I would normally give her money for gas.

Q. Well, if she wanted to buy an item for a special occasion, like a gift your daughter or one of your other children, how would she go about getting money for that?

A. She couldn't.  She'd just have to ask me.

6/21 Tr. at 275:1–276:8 (Herschmann); *see also id.* at 269:15–270:7 (Herschman) (noting that he can "block" any charges Orly attempts on his American Express card, Orly had "zero [control]" over the card," and that he "ke[pt] more control . . . over it" starting in 2018, before Orly commenced the Chapter 7 Case).

at 348.  The record is clear that Orly has no income, no job prospects, and is wholly dependent on

Herschmann for basic living expenses for herself and her daughter.  *See, e.g.*, 6/21 Tr. at 275:5–

276:8 (Herschmann); *see also* Schedules at 25–26.  Nevertheless, Sagi contends that Orly has

"more than necessary" to pay the 2018 Judgment because: (i) she has signatory authority over at

least $8.5 million of the Settlement Proceeds; and (ii) Herschmann's wealth should be considered

in assessing her ability to pay her debts.  *See* Sagi PT Br. ¶¶ 46–47.  The Court disagrees with both

arguments and finds that Sagi has not demonstrated that Orly has sufficient resources to pay a

substantial portion of her debts.

Sagi relies solely on *In re Kulakowski*, No. 10-bk-07286, 2011 WL 3878386 (Bankr. M.D.

Fla. Sept. 2, 2011), *aff'd*, 735 F.3d 1296 (11th Cir. 2013), as support for the proposition that the

Court may not disregard Herschmann's wealth in assessing Orly's ability to repay her debts.  Sagi

PT Br. ¶ 47.  In *Kulakowski*, the bankruptcy court granted the United States Trustee's motion to

dismiss an individual's chapter 7 case under sections 707(b)(1) and (b)(3) of the Bankruptcy Code.

2011 WL 3878386, at *1.  Under section 707(b)(1), a bankruptcy court "may dismiss a case filed

by an individual debtor under [chapter 7] whose debts are primarily consumer debts . . . if it finds

that the granting of relief would be an abuse."   11 U.S.C. § 707(b)(1).   In making this

determination, the bankruptcy court considers whether "the totality of the circumstances . . . of the

debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(B).  That section does not

define "totality of the circumstances."  In granting the motion, the bankruptcy court included the

non-filing spouse's income and separate expenses in calculating "current monthly income" under

section 707(b)(2).  2011 WL 3878386, at *1.  In addition, in evaluating whether the debtor had the

ability to repay her debts and whether the totality of the circumstances demonstrated abuse, the

court pooled the debtor and her husband's income and expenses because under the facts of the case, the debtor and her non-filing spouse acted as an economic unit. *Id.*

The bankruptcy court based that decision on the facts that during their twenty-one years of marriage, the debtor and non-filing spouse filed joint tax returns and shared a joint checking account into which the non-filing spouse routinely deposited all of his pay checks; and that the debtor did not own any non-exempt property, that she and her non-filing spouse were joint obligors on two debts secured by a jointly owned homestead and vehicle, and that the debtor owed a significant amount of credit card debt incurred for household purchases and purchases specifically for the non-filing spouse. *Id.* at *6. The *Kulakowski* court distinguished those unique facts from a case where a court decided a non-filing spouse's income and assets were separate, and consequently declined to dismiss the case under section 707(b)(3) where the "evidence demonstrated that the non-debtor spouse paid the debtor only a small salary, and refused to pay any of her living expenses in excess of that salary." *Id.* at *7 (citing *In re Boatwright*, 414 B.R. 526 (Bankr. W.D. Mo. 2009)).

Sagi misplaces his reliance on *Kulakowski,* as he does not account for the fact that section 707(a) does not contain a monthly income calculation for determining whether a debtor abused the provisions of chapter 7. Moreover, and in any event, Herschmann and Orly plainly do not operate as an economic unit. For example, they do not share a credit card or a joint checking account, and pursuant to their Premarital Agreement, their assets and liabilities remain separate. The Court will not include Herschmann's assets in assessing Orly's ability to repay her creditors.

For the reasons set forth above, the Court is persuaded that Orly cannot satisfy the 2018 Judgment, let alone the eight-figure liabilities disclosed on her Schedules. Again, the funds Sagi

73

claims she could use to do so, the proceeds of the 2013 Settlement, are not undisputedly hers.[60]

As noted, the proceeds from the 2013 Settlement have been hotly disputed with various creditors

claiming that the funds belong to them and not Orly.  Indeed, the evidence demonstrates that even

Sagi recognizes that the funds may belong not to Orly, but rather to the Orly Genger Trust, which

was the holder of the TRI shares on which the 2013 Settlement is based.  *See, e.g.*, 6/24 Tr. at

146:4–12 (Sagi).[61]  Given the competing claims to the $32.3 million—a fact that is reasonably

disclosed in the Schedules and admitted by Sagi—the Court finds that Orly had a good-faith belief

that the proceeds of the 2013 Settlement were not hers and, thus, not available to satisfy the 2018

Judgment, let alone her other debts.

For the reasons set forth above, the Court finds that Orly's inability to repay her debts

weighs against granting the Motion.

### (5) Whether the Debtor Inflated Expenses to Disguise Financial Well-Being

Sagi contends that Orly has created false debts that have allowed her to shield her assets

from him and the 2018 Judgment, which he maintains is the only debt for which she faces

collection pressure.  *See* Sagi PT Br. ¶ 50 ("The Debtor has never had a significant creditor other

than Sagi.").  He contends that she did so by backdating three agreements that allegedly created

---

[60]    The value of Orly's one-half interest in her Austin, Texas condo—her only hard asset of significant value – is insufficient to satisfy the 2018 Judgment, let alone her other liabilities.

[61]    Indeed, Sagi explicitly recognized that Orly's position reflected a good-faith argument:

Q. You just said that it was a good faith position to both claim that the money, the $32.3 million dollars, belongs to the [1993 Orly Genger] trust.

A. Right.

Q. And, at the same time, claim that it belongs to your sister individually?

A. That's correct.

Q. So it's just a good faith certainty about where the money belongs, correct?

A. I think that's fair. Yes.

*Id*. at 121:23–122:7 (Sagi).

fabricated debts that allowed her to fraudulently transfer the Settlement Proceeds.  *See, e.g.*, Sagi PT Br. ¶¶ 1, 32, 48.  His argument primarily focuses on: (i) the $2 million Herschmann Note; (ii) a subordination agreement dated December 31, 2016, among Herschmann, Orly and Arie; and (iii) the $5.4 million Consolidated Note in favor of Arie (the "Arie Note").  *Id.* ¶ 32.  He contends that these "false" debts have inflated Orly's liabilities in a manner that makes her financial situation appear worse than it truly is and, thus, demonstrates that she has no legitimate need to maintain the Chapter 7 Case.  The Court considers those matters below.

The Herschmann Note

Sagi contends that the Herschmann Note is a "bogus," backdated note that reflects "advances" made by Herschmann to KBT in Orly's name. He says that Orly never directly received a single dollar in exchange for the note and has never made a single dollar of "repayment" under the note. Motion ¶¶ 28, 32. In making these assertions, Sagi rejects Orly's contention that the note is on account of Herschmann's $2 million payment in satisfaction of Orly's then-outstanding bill at KBT.  He says that cannot be so, because the lion's share of the work KBT did for Orly was in the state court Fraud Trial in which Herschmann told the court that he had "a retainer letter that would reflect that all of the attorneys that are on the trial for [KBT] are working pro bono." Motion ¶ 34 (quoting Dellaportas Declaration, Ex. BB at 957–58).  He maintains that the Premarital Agreement recites the same arrangement.  *Id.* The Court finds no merit to those contentions.  For the reasons set forth below, the Court finds that the Herschmann Note reflects a bona fide debt due and owing to Herschmann by Orly.

In January 2015, at Orly's request, Herschmann, then a semi-retired partner at KBT, agreed to represent her in a fraud case against Sagi because her lawyer, who had been handling the case for years, had unexpectedly been hospitalized with a serious illness.  6/21 Tr. at 13:9–15 (Orly).

The case was scheduled to go to trial on January 27, 2015, and the state court judge had allotted three trial days. *Id.* at 239:9–240:19 (Herschmann). After conducting due diligence and speaking with Orly about the case and assessing Orly's financial condition—and recognizing the bench trial was slated to last only three days—Herschmann and KBT agreed to handle the trial on a partial pro bono basis. *Id.* at 240:14–241:7. On or about January 23, 2015, Orly executed Engagement Letters[62] to retain KBT to represent her:

> (i) As trial counsel in *Genger v. Genger*, No. 100697/08 (Sup. Ct. N.Y. Cnty.). The trial was scheduled for three days beginning on January 27, 2015 (the "Fraud Trial"). Engagement Letters at 1-2.

> (ii) As counsel in connection with any appellate work in *Genger v. Genger*, No. 100697/08 (Sup. Ct. N.Y. Cnty.). Engagement Letters at 3-4.

> (iii) As counsel in connection with the appeal of *Genger v. Genger*, No. 14 Civ. 5688 (KBF) (S.D.N.Y.). Engagement Letters at 5-6.

The Engagement Letters called for KBT to bill Orly its customary and ordinary fees, except that in the Fraud Trial Engagement Letter, KBT agreed to waive the hourly charges of the attorneys participating at the Fraud Trial itself.[63] The Fraud Trial did not conclude in three days; rather, it lasted almost thirty trial days spread over the course of several months, *see* 6/21 Tr. at 241:8–11,

---

[62]    *Declaration of Andrew R. Kurland*, ECF No. 434 (the "Kurland Declaration), Ex. A (each an "Engagement Letter" and collectively the "Engagement Letters").

[63]    In part, the Engagement Letter for the Fraud Trial states:

> This letter agreement covers only the trial; any further work on the case will be subject to further discussion and agreement between us. As you know, we have had no involvement in this action until very recently and, thus, our ability to try the claims is subject to the record established and developed prior to our retention.

> For reasons you [Orly] and I [Herschmann] have discussed, including your present financial means, we have agreed to handle the trial of this matter on partial pro bono basis. Accordingly, [KBT] will bill only for the hourly time charges of its legal assistants and any out-of-pocket disbursements . . . . Disbursements (e.g., duplicating, postage, telefax, and other similar expenses) also are billed separately.

Engagement Letters at 1.

not including a multi-day court ordered deposition of Sagi's lawyer for which the trial was temporarily adjourned.

During the period of 2015–2016, KBT billed Orly approximately $2.9 million for services rendered.  *See* Kurland Declaration, Ex. D (the "KBT Invoices").  Checks and wire confirmations from KBT's records show that, during the period of 2015-2016, KBT received payments totaling more than $2.75 million (including the proceeds of the Herschmann Note ), and it credited those payments to Orly's account.  Kurland Declaration, Ex. E (the "IOLA Checks"); Ex. F (the "Wire Transfer Confirmations"); Ex. P (the "Consolidated Billings and Payments").  In its timely filed proof of claim, KBT asserts that it is owed approximately $1.5 million for work performed between 2017 and the Petition Date.[64]

On top of the amounts for which KBT actually billed Orly, the KBT Invoices reflect additional amounts for attorneys' time spent in service of the Fraud Trial, aggregating $638,446.50, which KBT then credited to Orly's account as pro bono work, consistent with the Engagement Letter, as follows:

> For the period from January 2015 through March 2015, KBT credited Orly $550,039.00 in pro bono attorney time for work on the Fraud Trial.  KBT Invoices at 10.

> For the month of April 2015, KBT credited Orly $45,659.00 in pro bono attorney time for work on Fraud Trial. *Id.* at 8.

> For the month of May 2015, KBT credited Orly $25,642.50 in pro bono attorney time for work on the Fraud Trial. *Id.* at 12.

---

[64]   Herschmann, the lead partner in charge of the representation, provided extensive, detailed, and wholly credible and unrebutted testimony about, among other things, the firm's representation of Orly, including in the Fraud Trial, the firm's billing records, and the payments received on account of the work that the firm performed.  6/21 Tr. at 239:4–241:11; 248:18–250:24; 251:21–253:15.  Herschmann also testified that KBT performed work on other New York matters, including state appellate work, litigation in the Southern District of New York, and appellate matters at the Second Circuit.  *Id.* at 201:24–202:4.

For the period from September 2015 through July 2016, KBT credited Orly $17,106.00 in pro bono attorney time for work on the Fraud Trial. *Id.* at 9.[65]

Arie underwrote Orly's litigation expenses pursuant to a series of loans to Orly of the funds that he borrowed from the Brosers. 6/21 Tr. at 22:7–23:17 (Orly). In December 2016, KBT held a large receivable against Orly. Prior to December 2016, Orly's legal bills to KBT were "paid without any questions," and Arie did not discuss "any possible inability to pay the [KBT] bills" until the end of 2016—notably, after Herschmann's September 2016 marriage to Orly, the reaffirmance of the Premarital Agreement, and the decision of a Texas court to uphold that agreement. 6/21 Tr. at 208:15–209:22 (Herschmann). Herschmann had already performed thousands of hours of Genger-related legal work on a pro bono basis,[66] and he was familiar with the family's history of incurring "litigation costs that were unbelievable" in the service of "petty fights." *Id.* at 245:20–21. Indeed, part of his rationale for insisting on the Premarital Agreement and having it upheld by the Texas state courts was to ensure that he "was not going to be a source of funding for this family to fight." *Id.* at 245:22–246:2.

Herschmann's uncontroverted and credible testimony proves that he was a reluctant lender who wanted to steer clear of Arie and Orly's financial matters but believes that he was misled by Arie regarding the payment of the KBT invoices and that, ultimately, he felt pressure from KBT to finance the payment of the bills. *Id.* at 245:14–246:12. By the end of December 2016, Herschmann was feeling "a lot of pressure from [KBT]" to clear the receivable, *id.* at 246:9–10, and he believes that he was "put in a position where [he] didn't have a choice" as to whether to

---

[65]    There are two additional categories of invoices: "Genger State Miscellaneous" and "Genger Federal Court Appeal." Orly was not credited pro bono attorney time for either of those matters. The discount applied only to the Fraud Trial. KBT did not collect or attempt to collect the $638,446.50 in pro bono charges from Arie or Orly. KBT does not seek to recover those amounts in this bankruptcy.

[66]    Herschmann's unrebutted testimony at trial was that he worked "thousands" of hours on KBT's Orly-related matters, but did not bill any of his time. 6/21 Tr. 244:9-12; 245:2-6.

make the loan to Arie and Orly, *id.* at 251:7–17.  Despite Herschmann's displeasure with Arie's expectation that he would pay Orly's KBT bill, he "finally agreed on December 29th, to wire the money in the afternoon[,] knowing that December 30th is Friday and that [KBT] had further distributions coming."  *Id.* at 247:1–3; 251:3–4.

Pursuant to his agreement with Orly and Arie, Herschmann wired the loan proceeds directly to KBT as a credit against Orly's then-outstanding balance to the firm.  That is how KBT accounted for the transfer when the wire arrived.  *Id.* at 250:3–251:4.  Before Herschmann transferred the funds, Arie and Orly verbally agreed to at least three of Herschmann's specific preconditions.  First, Herschmann would be "first in line" on any UCC filed.  *Id.* at 247:20–21.  Second, the loan would be due by a drop-dead date.  *Id.* at 247:21–24.  Third, Herschmann charged interest at "the minimum required by the U.S. Treasury for loans" at that time, which approximated 2.75 %.  *Id.* at 247:25–248:5.

Herschmann made the $2 million loan to Arie and Orly on the afternoon of Thursday, December 29, 2016, the day before the last business day of the year.  *Id.* at 247:1–3.  The parties did not formally document the loan when Herschmann funded the loan and transferred the loan proceeds to KBT.  The compressed year-end deadline and additional circumstances precluded Herschmann from waiting until the loan was memorialized in a written document before transferring the money to KBT.  First, Arie and Orly's attorney, Lance Harris, was unavailable.  *Id.* at 248:10.  Further, Herschmann initially thought that, if he were to "start drafting loan agreements," he would "give an indication that [he was] willing to lend the money," and he very much did not want to give such an impression.  *Id.* at 248:10–13.

Contrary to Sagi's assertion, the $2 million payment to KBT on behalf of Orly did not relate to pro bono attorney services in the Fraud Trial.  That attorney time equated only to

$638,446.50, which KBT did not recover.  The Premarital Agreement simply acknowledges the existence of these services and the fact that Orly was not obliged to pay them.  The record demonstrates that the $2.9 million in KBT fees  incurred in 2015 and 2016 stemmed from time spent  on the Fraud Trial by non-attorneys, and by attorneys out of court, and time spent by attorneys and support staff on state-court matters other than the Fraud Trial, and federal court matters.  Orly paid more than $750,000 of the balance owed, and the loan from Herschmann covered another $2 million.  It is clear that Orly benefitted from the Herschmann loan because the proceeds of the loan were used to satisfy $2 million of Orly's very real obligation to KBT.  Sagi's assertion that the loan evidenced by the Herschmann Note was an advance to KBT is belied by the documentary evidence and Herschmann's unrefuted and credible testimony.

On January 24, 2017, Arie's counsel sent his first draft of the promissory note to Herschmann's counsel.  *See* Kurland Declaration, Ex. N (the "Loan Correspondence").  Thereafter, there were months of contentious negotiations and re-negotiations between Herschmann and his counsel, on the one hand, and Lance Harris, the attorney representing borrowers Orly and Arie Genger, on the other.  *See id.*  Arie's conduct precipitating the 2016 loan is one of the primary reasons that Herschmann and Arie are estranged; Herschmann no longer speaks to Arie.  S*ee* Kurland Declaration, Ex. G (July 2, 2020, Herschmann Dep. Tr.) at 141:22–142:2.

Arie executed the Herschmann Note on April 21, 2017, Loan Correspondence at 308, and Herschmann and Orly executed the Herschmann Note by May 9, 2017, *id.* at 328.  They dated the note December 30, 2016, to reflect the time at which Herschmann funded the loan and to indicate that interest and other terms apply as of that date.  6/21 Tr. 245:10-253:15 (Herschmann); 6/17 Tr. 200:14- 201:24 (Harris).  Contrary to Sagi's contentions that the note was backdated to frustrate his efforts at recovery of the note, Herschmann has provided uncontroverted documentation of the

negotiation of the terms of the written agreement, which all parties agree was dated December 30, 2016, to reflect the time at which Herschmann actually made the loan. Herschmann's testimony reflects that the $2 million was always intended to be a loan, it was made at the last minute only out of necessity. Herschmann also testified that in May 2017, after the note was executed, he filed UCC financing statements in Florida and Texas. 6/21 Tr. at 213:23–217:17 (Herschmann).

After he funded the loan, Herschmann insisted that Orly and Arie enter into an agreement (the "Subordination Agreement") [67] to clarify that Orly's obligations to Arie are subordinate to the obligations to Herschmann as set forth in the Herschmann Note. 6/21 Tr. at 180:4–15; 225:25–228:11 Pursuant to the agreement, Arie (defined as the "Subordinated Creditor") agreed that Orly's $5.4 million debt to Arie is subordinate to the $2 million loan from Herschmann (defined as the "Senior Creditor") to Orly and Arie (defined as the "Senior Obligations"). As such, by its terms, the agreement has no bearing on Sagi's claim. While the parties executed the agreement in 2017, like the Herschmann Note, it is dated as of December 30, 2016.

The Court finds that the Herschmann Note is bona fide debt chargeable against Orly.

### The $5.4 Million Note

The Arie Note is dated December 31, 2016; the parties to the note are Arie, as Lender, and Orly, as Borrower. The note purports to replace and consolidate ten notes aggregating approximately $5.4 million. Each such predicate note purportedly is on account of payments made by Arie to Orly's lawyers in a given year, during the period of 2007–2016. *See* Dellaportas Declaration, Ex. Z.

---

[67]    Kurland Declaration, Ex. Q.

Sagi contends that the Arie Note does not reflect a bona fide debt.[68]  He denies that the predicate notes exist at all, because (i) to date, no one has produced copies of any of the notes, or even a contemporaneous document referencing any of them, *see* Dellaportas Declaration, Ex. Y at 11:13–17:9 (Harris deposition), and (ii) the records from William Fischer, Arie's accountant, reveal that the amounts ascribed to each of the ten notes for 2007-2016 were first calculated in July 2017.  Dellaportas Declaration, Ex SS.  Sagi also contends that, in any event, Orly did not execute the Arie Note until sometime in mid-2018, and the UCC liens based on the Arie Note were not filed until August 2018, both of which were after the district court awarded summary judgment to Sagi.  The Court considers those matters below.

Lance Harris is an attorney in New York City who Arie retained in 2008 to oversee the various Genger family litigations on behalf of both himself and Orly.  6/21 Tr. 124:24-125:5 (Arie).  Without limitation, Harris was tasked to manage the payments for Arie's and Orly's respective lawyers, communicate with those lawyers, and keep track of "a lot of document requirements." 6/17 Tr. at 132:2–133:13 (Harris).  Mr. Harris explained that in the ordinary course, he would receive bills from Orly's or Arie's lawyers, and he would then ask Arie for the funds necessary to pay the bills.  *Id.* at 134:21–135:7.  After Mr. Harris made a request, money would be wired to an account that Harris controlled, and Harris would use those funds to pay the lawyers.  *Id.* at 135:5–7.  Mr. Harris noted that "sometimes money came from Orly," but the "vast majority" of payments "came from Arie's account."  *Id.* at 136:3–8.  Arie would make payments through AGA, an entity

---

[68]    Sagi maintains that while Arie may have paid Orly's lawyers directly for certain lawsuits brought in her name using some of the funds he borrowed from the Brosers, it is incredible that when one of those suits led to the $32.3 million settlement, and $17.3 million was used to fully repay Arie's alleged debt to the Brosers, Arie continued to treat Orly's corresponding debt to him as still unpaid.  Motion ¶ 32.  Arie disputes that contention.  He testified that Orly was not given credit for any portion of the $17.3 million paid to the Brosers under the 2013 Settlement because all of those funds were allocated to his indebtedness to the Brosers.  He maintains that the funds allocated to Orly under the settlement consisted solely of the $10.3 million in escrow or damage claims associated with those funds. 6/21 Tr. at 127:24–128:8 (Arie).

Arie controlled. *Id.* at 136:9–12. Mr. Harris testified that he "always kept . . . Orly ledgers going back much earlier than 2015" that were designed to record the amounts advanced by Arie to Orly. *Id.* at 141:11–17.

William Fisher is Arie's accountant. He explained that while Mr. Harris was tasked with vetting attorney invoices and transmitting funds to Arie's and Orly's attorneys, his job was to transmit the funds for those transfers to Mr. Harris (via check of wire transfer). 6/18 Tr. at 154:16–24 (Fischer). Mr. Fischer testified that while he did not have any specific written communications with Arie that explicitly referred to these payments as loans to Orly, he had had "[m]any telephone conversations" with Arie in which Arie was clear that the advances to Orly for legal fees "were always treated and to be treated as loans to Orly." *Id.* at 163:3–15. Mr. Fischer explained that prior to 2015, he maintained a loan ledger with respect to these advances, *id.* at 163:24–164:1, in which the loans to Orly were "categorized as an asset, meaning there is an expectation they will be repaid in the future." *Id.* at 164:2–5. Still, he acknowledged that prior to 2019, he had never seen either the Arie Note, *id.* at 152:1–23, or any of the ten predicate notes, *id.* at 153:5–16, and had not received any communication from Arie or Harris that indicated the existence of promissory notes executed between 2007 and 2016. *Id.* at 153:22–154:3.

Mr. Harris was responsible for documenting the predicate loans at the end of each year. He testified that that the notes were drafted by an associate, whom Harris employed during that timeframe, 6/17 Tr. at 176:13–177:1 (Harris), and that each note was dated at approximately the end of the year to which it applied, *id.* at 187:14–18. He also testified that Orly went to his office and signed each of those ten notes "roughly contemporaneously" with the time each note was issued, *id.* at 174:7–175:24, and that she signed the last of the predicate notes in 2016, before she moved to Israel. *Id.* at 175:15–19. Mr. Harris testified that Orly signed only one copy of each

note, *id*. at 177:2–6, and that it is his practice not to make or distribute copies of the original

document. *Id*. at 216:21–217:2. He explained that by retaining only an original promissory note,

he could "destroy it when it gets paid or destroy it when . . . something takes its place." *Id*. at

216:21–217:2. He compared this practice to the treatment of wills. *Id*.

Orly testified that she executed a paper copy of each of the ten predicate notes. 6/17 Tr.

at 121:4–123:23 (Orly). She did not recall exactly when she signed each document, nor whether

she signed each note on an annual basis, but she knew that "it was over a period of time." *Id*. at

123:17–23. She could not recall for certain where she was when she signed the notes, *id*. at

123:24–124:3, but asserted that it was likely that she signed them at Harris's office. *Id*. at 124:4–

8. She testified that she did not retain a copy of the signed notes, does not have electronic copies

of the notes, and that she likely left each executed note with Mr. Harris, or one of his associates.

*Id*. at 127:5–18; 128:19–21. She does not recall the dates of the predicate notes, the applicable

interest rates, or any of the other repayment terms whatsoever. *Id*. at 125:9–20. She testified that

she had never made a payment on account of the Arie Note, but that she received a $4,500 credit

against the note in exchange for Orly's transfer to Arie of her remaining stake in Everything

Important (her art business). *Id*. at 118:2–119:11. Arie testified that he has never seen and never

possessed copies of the ten notes reflected in the Arie Note, 6/21 Tr., 125:6-9 (Arie), but that he

has no doubt that those notes existed, *id*. at 153:24-154:9.

Sometime in 2015 or 2016, Arie asked Mr. Harris to calculate and consolidate the total

amount Arie lent Orly into one note. 6/21 Tr. 128:12-25 (Arie).[69] In 2015, Arie asked Fischer to

---

[69]    Arie testified that his decision to consolidate the predicate loans in the Arie Note was
precipitated by two events. 6/21 Tr. at 128:18–129:8. First, Herschmann had required Arie to
execute the Herschmann Note after which Herschmann filed UCC statements, and it raised in Arie
the question of whether he "should do the same thing." *Id*. at 128:20–22. He says that Harris
suggested to him that he should "go ahead and do that," and file a corresponding UCC statement.

work with Harris to calculate the amounts of legal fees that Arie had advanced on Orly's behalf. 6/18 Tr. at 154:4–14 (Fischer). Fischer testified that Harris's office provided him with a chart that summarized the legal fees related to Orly Genger for the year 2008 through some part of 2015. *Id.* at 158:6–10. Fischer says that using information from Harris, he created a chart that reflects amounts due from Orly Genger in connection with legal fees and expenses paid on her behalf by Arie for the period beginning 2007 up to and including July 20, 2017. *Id.* at 158:14–122. In preparing the 2017 chart, Fischer reviewed Harris's methodology, noting that Harris had neglected to include Harris's firm's expenses on the schedule, and that there were amounts that Orly had paid from her own funds. *Id.* at 159:5–11. In short, Fisher worked with Harris to update and perfect the chart. *Id.* at 159:12–14.

Mr. Harris was responsible for drafting the Arie Note. He testified that the figures in the Arie Note are based on the face value of the predicate notes, and the amounts that correlated with those face values may have been updated and adjusted in light of information provided to Harris by Fischer. 6/17 Tr. at 137:15–138:3, 179:8–180:5 (Harris). When Harris created the Arie Note, he reviewed both the ten predicate notes and the spreadsheet containing the updated information regarding the predicate notes. *Id.* at 179:8–180:5.

Mr. Harris confirmed that he represented both Arie and Orly in connection with the Arie Note, and no other lawyer was involved. *Id.* at 164:18–23. He identified a final draft of the Arie Note dated April 5, 2018, which he testified was signed either on April 5 or sometime thereafter.

---

*Id.* at 128:23–24. Second, he considered the fact that "there was a lot of litigation going at the time with Orly in a case that Sagi filed against her also in the federal court." *Id.* at 128:25–129:2. As a result of those two factors, Arie came to the "realization that we better do it properly." *Id.* at 129:2–4. Accordingly, on Harris's advice, Arie instructed Harris to "organize the note" and file the UCC statement. *Id.* at 128:24–25.

*Id.* at 165:23–166:19.[70]  Mr. Harris says that after Orly executed the Arie Note, he destroyed the

ten notes on which the Arie Note is predicated.  *Id.* at 176:5, 182:15–183:5.  Mr. Harris testified

that in addition to having Orly sign only one original version of each of the ten predicate notes, he

did not make any copies of those executed predicate notes whatsoever, and he did not provide

copies of the notes to Orly, Arie, or Fischer.  *Id.* at 183:6–184:5.  In short, there were never any

copies of the original predicate notes.  *Id.* at 184:1–5.  Harris's associate drafted the predicate notes

on an "old" computer in her office at Harris's firm.  *Id.* at 184:6–25.  The law firm did not use a

"cloud base," nor did it use a server, and the predicate notes were stored on the computer's local

hard drive.  *Id.* at 184:17–25.  Harris no longer possesses the computer—because it was old, he

"gave it to the IT people" at an unspecified point after his associate left the firm in 2015 or 2016,

retaining only certain documents that were relevant.  *Id.* at 184:23–185:15.  Harris reviewed his

associate's drafts of the promissory notes only via paper copies, and so there were no email records

of the notes, which is consistent with Harris's current business practices.  *Id.* at 186:6–14.

The Court finds that the $5.4M Consolidated Note reflects bona fide loans from Arie to

Orly based on the testimony of witnesses with personal knowledge.  The evidence reflects that the

ten loans underlying the $5.4M Consolidated Note were made when Arie, through Harris, paid

Orly's legal bills.  *See, e.g.*, 6/17 Tr. at 133:23–139:10, 164:11–183:19, 216:17–217:25, 228:11–

231:13 (Harris testimony).  Further, the Court finds that the backdating of the $5.4M Consolidated

Note does not provide evidence of fraud or misconduct necessary under section 707(a) of the

---

[70]    Harris also identified a Texas UCC filing and a New Jersey UCC filing that his office had filed on behalf of Arie,
both dated August 3, 2018.  *Id.* at 166:20–167:17.  The purpose of these filings was to perfect Arie's security interest
in Orly's property under the Arie Note.  *Id.* at 168:6–12.  Harris instructed that the UCC filings should be filed in
Texas and New Jersey because he was "unclear" about which state was Orly's residence.  *Id.* at 168:13–21.  The
four-month delay between the approximate April 5 date the Arie Note was signed and the August 3 UCC filings was
caused by Harris's unfamiliarity with Texas procedure and his attempts to determine Orly's residency, which was
complicated by the time she spent overseas.  *Id.* at 169:7–13.

Bankruptcy Code. *See In re Grullon*, 2014 WL 2109924, at *4. Sagi provides no authority for the proposition that consolidating underlying loans into a consolidated note after the fact—*i.e.*, backdating the note—evidences fraud or misconduct.[71]

### (6) Whether the Debtor is Overutilizing Protections of the Bankruptcy Code

Sagi maintains that "[t]his entire case is an overutilization of the Bankruptcy Code," because "[i]t is an attempt by [Orly] to shield third parties from Sagi's claims (an attempt the Trustee has unfortunately sought to reward through her fatally flawed settlement agreement with the Debtor Group)." Sagi PT Br. ¶ 49. As support, he relies on a text message (Debtor's Ex. 80) that he says demonstrates that Orly and Herschmann opposed an arrangement that would have provided Orly a discharge but allowed a court to adjudicate the rights to the Settlement Proceeds. Sagi PT Br. ¶ 49. The text was sent by Sagi to Herschmann. In it, Sagi states in substance that under his "deal," which is contingent upon the Turnover Action proceeding in the District Court Action, Orly would get a discharge in bankruptcy. Debtor's Ex. 80. Sagi says that Orly's rejection of the "deal" demonstrates that she does not need relief under Chapter 7 and is overutilizing protections of the Bankruptcy Code. The Court disagrees. First the Court attaches no weight to the text message. Moreover, the evidence establishes that Orly has no income, minimal assets, and multimillion dollar debts that she is incapable of satisfying. Sagi has not demonstrated otherwise. The Court finds that Orly has not overutilized the protections of the Bankruptcy Code. Accordingly, application of this factor weighs against granting the Motion.

---

[71]  *Gray v. Fill* (*In re Fill*), 82 B.R. 200, 209 (Bankr. S.D.N.Y. 1987), cited by Sagi, is not to the contrary. Sagi claims *In re Fill* showcases that backdating notes "is not good faith" when it enables the debtor to "rid himself of assets before [his creditor] could reach them." *Id*. But the Court *In re Fill* assessed the test for fraudulent transfers under New York Debtor and Creditor Law 272, not what constitutes cause for a bad faith dismissal under section 707(a) of the Bankruptcy Code.

**(7) *Whether the Debtor Reduced Her Creditors to a Single Creditor in the Months Prior to Filing the Petition***

In applying this *Lombardo* factor, courts find evidence of bad faith where the debtor "manipulate[s] his financial situation to reduce his creditors to a single creditor in the months prior to filing his petition." *Deglin v. Keobapha (In re Keobapha)*, 279 B.R. 49, 53 (Bankr. D. Conn. 2002). This factor "contemplate[s] manipulation or preferential treatment of other creditors to the detriment of one." *In re Edwards*, No. 16-06436-5, 2017 WL 3616582, at *4 (Bankr. E.D.N.C. Aug. 22, 2017).

Sagi contends that application this factor weighs in favor of dismissing the Chapter 7 Case because Orly never had a significant creditor other than Sagi. Sagi PT Br. ¶ 50. He says that Arie's claim is "a fabrication created after Sagi prevailed on summary judgment," and that Herschmann's claim is invalid because Herschmann disclaimed any right to seek reimbursement for any of the Debtor's expenses he paid during the course of their marriage unless agreed to in advance in writing." *Id.* Moreover, he speculates that there is no risk that either KBT or ZEK will seek to collect their fees from Orly. *Id.* ¶ 51.

This factor is not applicable because Sagi does not argue that Orly manipulated her finances to reduce her creditors to the detriment of Sagi. To the contrary, he says that Orly has improperly inflated the claims of her creditors. Moreover, Sagi has not demonstrated that Herschmann has disclaimed a right to seek payment of the Herschmann Note, or that KBT and ZEK will not seek to collect their fees from Orly. Finally, Sagi is not Orly's only significant creditor, and Orly has not manipulated her financial situation to reduce her claims to a single creditor. Dalia, the Orly Trust, and TPR have filed claims against Orly aggregating in excess of $52 million. Application of this *Lombardo* factor does not support the Motion. *See In re Mazzella*, 2010 WL 5058395, at *6 ("The Debtor has other general unsecured creditors with respect to credit card debts and a

88

priority claim by the State of New York for unpaid workers compensation taxes. [The movant,] CDF[, the Debtor's largest creditor,] has not shown that the Debtor manipulated his financial situation to reduce his creditors to a single creditor . . . .").

*(8) Whether the Debtor Filed the Chapter 7 Case in Response to a Judgment, Pending Litigation, or Collection Action, and Whether There Was an Intent to Avoid a Large Single Debt*

Sagi contends that Orly commenced this Chapter 7 Case to shelter the Settlement Proceeds and to avoid paying the 2018 Judgment. *See, e.g.*, Motion ¶ 1 ("The purpose of this Bankruptcy Case is . . . to frustrate the efforts of . . . Sagi . . . to collect on a judgment representing Orly's half of a financial commitment they made to support their mother Dalia."); *id.* ¶ 48 ("Orly has admitted to filing this [Chapter 7 Case] in response to the judgment of a single creditor, Sagi."). Sagi contends that, of all the *Lombardo* factors, the factor that asks whether "the debtor filed in response to a judgment, pending litigation or collection action," is, in this case, "perhaps the most spot on." Motion ¶ 49. He emphasizes that "[t]here can be no doubt that the Debtor's primary, if not sole, purpose, in filing this Bankruptcy Case was and is to protect the fraudulent transferees of the $32.3 million from the turnover motion brought in the District Court." *Id.*

It is well settled that "filing for bankruptcy to counter the collection efforts of one creditor without further indicia of bad faith is insufficient for dismissal under § 707(a)." *In re Ajunwa,* 2012 WL 3820638, at *7; *see also In re Mazzella*, 2010 WL 5058395, at *6 ("[T]he fact that the Debtor filed for bankruptcy in response to pending litigation without more additional evidence of misconduct is not enough to dismiss this case for cause under 11 U.S.C. § 707(a)."); *In re Keobapha*, 279, B.R. at 50 (where the debtor caused two deaths in a car accident and was a defendant in a resultant lawsuit, paid out the limit on his car insurance, and then filed for bankruptcy after his resources were exhausted, the filing was not in bad faith because despite the filing as a result of the lawsuit, there were no other bad-faith indicia).

In the rare case where a court finds bad faith in reliance on the debtor's apparent response to a judgment, litigation, or collection efforts, that reliance is accompanied by other factors. For example, in *In re Rosado*, the bankruptcy court found that dismissal was warranted where a total of four of the *Lombardo* factors were present. *See In re Rosado*, No. 07-05871, 2010 WL 5019023, at *12 (Bankr. D.P.R. Dec. 1, 2010), *vacated on other grounds*, No. PR 10-080, 2011 WL 4572021 (B.A.P. 1st Cir. Aug. 10, 2011) (per curiam). In that case, the debtor was the owner of a defunct art gallery—much of the debtor's legal problems arose from the fact that he had repeatedly sold artworks on behalf of clients while keeping the proceeds himself, at least in part to fund the operation of the struggling art gallery. The court found that the debtor misrepresented the nature of the vast majority of his debts on his bankruptcy petition, characterizing them as personal debts when they were actually accrued in the operation of his art gallery business. *Id.* Next, the *Rosado* debtor filed the bankruptcy in response to a judgment, pending litigation, or a collection action. *Id.* He had been sued in four state-court actions by the creditors, one of which resulted in a judgment against him, while the other three were still pending (all those cases stemmed from his failure to pay clients for their artwork after he had sold it). The *Rosado* court also found that the debtor was engaging in an unfair use of chapter 7, and his filing was designed to frustrate the client creditors who had provided him with artworks on consignment. *Id.* It was through the application of those several factors that the *Rosado* court determined the case should be dismissed. *Id.*; *see In re Marino*, 388 B.R. 679, 683–84 (Bankr. E.D.N.C. 2008) (relying on *Lombardo* to grant dismissal under section 707(a) where: (i) the debtor's bankruptcy was timed to preclude an arbitration of the creditor's claims; (ii) the debtor's primary purpose in filing for bankruptcy was to avoid an obligation to her creditor law firm and where the creditor law firm had helped the debtor to acquire $250,000 in exempt assets; and (iii) the debtor had rejected a "more than fair" offer to settle her

obligation to the law firm); *see also In re Bryant*, 474 B.R. 770 (Bankr. N.D. Fla. 2012) (applying the Eleventh Circuit's equivalent of the *Lombardo* factors to grant dismissal, determining that the debtor filed the case in response to a judgment and for the sole purpose of avoiding the appurtenant obligation, and opining that seven additional factors also supported dismissal); *accord In re Piazza*, 451 B.R. 608, 616 (Bankr. S.D. Fla. 2011) (granting a section 707(a) dismissal where the debtor filed the case in response to a judgment, pending litigation, or collection action, and (i) the debtor intended to avoid a large single debt; (ii) the debtor was paying insiders' debts; and (iii) the debtor failed to make candid and full disclosure).

Orly's bankruptcy case is nothing like those cases. Her debts did not arise from some distasteful scheme or fiscal irresponsibility like the art-gallery scam at the root of *Rosado*. Instead, her debts were largely accrued through her obligations to fund years' worth of litigation. The 2018 Judgment is by no means the only claim against Orly's estate. While that judgment certainly did precipitate Orly's petition, as she concedes, it is not her sole motivation for the filing—on its face, that judgment simply represents an enormous debt outstanding, which Orly credibly represents that she cannot pay. In the same vein, unlike the *Rosado* debtor, Orly has made a candid and full disclosure of her financial circumstances—her Petition stakes out her position as to what assets and liabilities she has, and the Global Notes elaborate on the potential that other parties will attribute legal claims to her that she does not believe she has. Moreover, separate from the concession that this filing was a response to Sagi's judgment, there is not a shred of evidence to show that Orly intends to frustrate only her debt to Sagi, since this filing will also impact the rights of other creditors, e.g., Herschmann, Arie, and Dalia, along with the many non-familial creditors. Perhaps most significantly, there is no evidence that Orly is using chapter 7 in an unfair manner.

*(9) Whether the Debtor Has Unfairly Utilized Chapter 7*

Sagi contends that Orly has unfairly utilized chapter 7 because she "is seeking to exclude from her bankruptcy the assets that were specifically meant to be available to satisfy her obligations to her largest creditor." Sagi PT Br. ¶ 62. He says that the district court held that Orly "monetized her beneficial interest for $32.3 million, a substantial portion . . . attributable to Dalia's conveyed marital interest" from Dalia and Arie's 2004 divorce decree. *Id.* ¶ 63 (quoting *Genger III*, 2018 WL 3632521, at *2). Sagi asserts that now, because Orly and her mother are estranged, Orly is seeking to misuse the bankruptcy process to transfer the proceeds of Dalia's conveyed marital interest to Arie, her non-estranged father, and to herself, thereby undoing the 2004 divorce settlement. *Id.* He adds that "[a]s icing on the cake," Orly, via the proposed Rule 9019 settlement, would then subject her 75-year-old mother to a new round of lawsuits, despite having lost every case against her over the course of a decade. *Id.* As support, Sagi cites to *In re Lombardo*, 370 B.R. 506, and *In re Marino*, 388 B.R. 679, for the proposition that a debtor acts in bad faith where it seeks to exclude from its bankruptcy assets that were specifically meant to be available to satisfy its obligations to its largest creditor. Sagi overstates the import of the holdings in those cases.

In *Lombardo*, the bankruptcy court granted a motion to dismiss the individual debtor's chapter 7 case as filed in bad faith in violation of section 707(a). The movant was the debtor's divorce attorney, whose efforts were directly responsible for the debtor's receipt of an award of equitable distribution in the sum of $30,400 from her ex-husband's 401(k) plan. 370 B.R. at 507. Those funds were exempt assets under section 522 of the Bankruptcy Code and section 282 of the New York Debtor and Creditor Law. Nonetheless, to persuade the movant to continue to provide legal services in the divorce action—even as the debtor was not paying her legal bills—the debtor

agreed to give the movant a security interest in the funds.  Based on that promise, the movant

continued to provide legal services for the debtor and ultimately obtained the equitable distribution

award for the debtor's benefit.  However, before the movant could perfect her interest in those

funds, the debtor filed for bankruptcy in order to prevent the movant from doing so.  *Id*. at 510.

The movant failed to object to the debtor's discharge.  *Id.* at 507.  The court noted that unless it

granted the motion to dismiss, "the Debtor would receive a discharge of the claims listed in her

Schedules without any distribution to all her creditors."  *Id.*  The debtor did not file a written

response to the motion to dismiss and failed to submit a written pre-trial statement.  *Id.* at 508.  In

granting the motion, the court found that the debtor "was not . . . [an] 'honest but unfortunate

debtor' that the Bankruptcy Code was intended to assist in obtaining a fresh start."  *Id.* at 513.  The

court reached that decision in large part based on its determination that: the debtor's debts other

than to the movant totaled $8,400, and the debtor had sufficient income to pay them; the debtor

did not file her chapter 7 case in response to a sudden adverse change in her financial situation;

the divorce award provided the debtor with the means to satisfy the movant's greatly reduced fee,

and that the debtor intentionally misled the movant into providing legal services to her, since when

she promised to pay the movant out of the proceeds of the divorce action, she had no intention of

doing so.  *Id*.  The court found that "[t]he Debtor's conduct in misleading [the movant] into

performing legal services without the intention to satisfy her liability when the Debtor will have

the means to do so was lacking in good faith."  *Id.* at 514.

In *Marino*, the debtor's divorce attorneys sought to dismiss her chapter 7 case on the

grounds that she filed the case in bad faith, since she had the ability to pay her creditors and filed

the case primarily to frustrate the movants' efforts to collect their legal fees that the debtor agreed

would be paid from the equitable distribution award that the debtor received as a result of the

movant's services after they successfully represented her in her divorce action.  388 B.R. at 682.

In granting the motion, the court relied, in part, on *Lombardo*.  *Id*. at 683.  It found that the debtor

did not file the case in response to a sudden financial disaster, rather, she timed the filing of the

chapter 7 case to preclude the arbitration of the movant's claim, and for the primary purpose of

avoiding her obligation to the movant.  *Id*.

   Those cases are plainly distinguishable.  Unlike the debtors in *Lombardo* and *Marino*, Orly

has substantial debts and no income or assets to satisfy even a portion of that indebtedness.

Moreover, Sagi has not demonstrated, or even alleged, that Orly misled him or Dalia into entering

into any aspect of the 2004 Divorce Agreement.[72]  They do not support Sagi's claim for relief

---

[72]    Sagi points to *In re Huckfeldt* as authority for his assertion that Orly is using these bankruptcy proceedings in an
unfair manner.  Sagi PT Br. ¶ 64 (citing *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829 (8th Cir. 1994)).  In *In
re Huckfeldt*, the debtor was a recently divorced surgical resident who, together with his ex-wife, had accumulated
over $250,000 in debts during their marriage.  *Id*. at 830.  The divorce decree ordered that Huckfeldt would pay
$166,000 that he owed in student loans, as well as half of a $47,000 debt to his ex-wife's parents, which the divorced
couple had jointly incurred, and other enumerated debts.  *Id*.  Less than three months after that decree, and six only
months before finishing his surgical residency, the debtor filed his chapter 7 petition; shortly after filing, he accepted
a one- or two-year university fellowship that paid substantially less than he could have made as a surgeon during the
bankruptcy proceeding.  *Id*.  Huckfeldt identified over $500,000 in liabilities.  *Id*.  After the debtor filed his bankruptcy
petition, his creditors began to pursue his ex-wife, and she and her creditor parents moved to dismiss Huckfeldt's
petition under 11 U.S.C. § 707(a), arguing that (i) he commenced the proceeding in defiance of the divorce decree for
the purpose of shifting responsibility for his debts to his ex-wife; and (ii) he deliberately reduced his annual income
to avoid paying his debts.  *Id*.  The ex-wife filed bankruptcy a year after Huckfeldt had.  *Id*.  The bankruptcy court
dismissed Huckfeldt's case under § 707(a) for bad faith, and the district court affirmed.  *Id*.

   The Eighth Circuit affirmed, but in doing so it warned courts that "bad faith" actions justify dismissal under
§ 707(a) only in limited circumstances.  *Id*. at 832.  The court acknowledged that "some conduct constituting cause to
dismiss a Chapter 7 petition may readily be characterized as bad faith," but it is better to conduct a § 707(a) analysis
in applying the statutory "for cause" standard because, "[i]f the bankruptcy court elects . . . to act under the inherent
judicial power to punish a bad faith litigant, that action should not be taken under § 707(a)."  *Id*.  The Eighth Circuit
determined that Huckfeldt's conduct was sufficiently egregious to warrant dismissal for cause under § 707(a).  It
specifically relied on the bankruptcy court's finding that "Huckfeldt filed the petition for the purpose of frustrating
the divorce court decree and forcing his ex-wife into bankruptcy, at a time when his financial prospects made him
anything but an 'honest but unfortunate debtor' needing Chapter 7 relief."  *Id*. (quoting *Grogan v. Garner*, 498 U.S.
279, 286 (1991)).

   *In re Huckfeldt* is not factually analogous.  There, the debtor did not just seek a discharge of his debts—he sought
to burden his ex-wife with the obligations imposed on him by a divorce decree just a few months prior.  Sagi has not
demonstrated, and the record does not reflect, that Orly has any ulterior motive in filing this case.  Unlike *In re
Huckfeldt*, granting Orly a discharge will not effectively transfer her debts to Sagi (or any other party).  Moreover, it
should be noted that *In re Huckfeldt* directly contradicts Sagi's argument that "bad faith" alone is a ground for
dismissal under 11 U.S.C. § 707(a).  *See* Motion ¶ 44 ("Courts in this Circuit have dismissed Chapter 7 cases pursuant
to § 707(a) where there is an absence of good faith.").  While *In re Huckfeldt* is not binding on this Court, it makes a

herein.  The Court finds that Sagi has not met his burden of demonstrating that Orly has utilized

chapter 7 unfairly.  Application of this factor weighs against granting the Motion.

### (10) Whether the Debtor Has Transferred Assets

"Most instances of dismissal for bad faith filing under § 707(a) involve concealment,

misrepresentation, or unexplained transfers to place assets beyond the reach of creditors." *In re*

*Marks,* 174 B.R. 37, 41 (Bankr. E.D. Pa. 1994).  Sagi says those factors are present here, and

asserts that the following transfers by Orly evidence her bad faith in commencing this case: (i) in

2013, Orly transferred the Settlement Proceeds to members of the AG Group; (ii) in 2016 and

2017, she liquidated her portfolio of assets to a trust for her own benefit; (iii) in January 2017, she

transferred the controlling interest in Everything Important to Arie for a $4,500 credit against her

debt to him; (iv) in 2018 Orly liquidated her U.S. investment and bank accounts and wired the

proceeds to her counsel's IOLA account; and (v) on or about September 17, 2018, she transferred

a contingent interest in the Residence to a trust for Herschmann's benefit.  *See* Motion ¶¶ 35–36;

Sagi PT Br. ¶ 54; *see also* Movant Ex. 194; Deed of Trust.[73]  The Court disagrees.

First, the record is clear that Orly did not transfer the Settlement Proceeds to the members

of the AG Group.  Next, the Court attaches no significance to Orly's liquidation of her asset

portfolio and investment and bank accounts.  There is no evidence that Orly undertook those

actions to frustrate Sagi's efforts to collect his judgment or to place them beyond the reach of her

creditors.  To the contrary, Orly's unchallenged testimony is that she utilized the proceeds of those

---

distinction between bankruptcy courts' inherent ability to dismiss a bad-faith filing and a § 707(a) dismissal for cause
(although conduct warranting the latter may be described as "bad faith").  *In re Huckfeldt*, 39 F.3d at 832.  Even then,
only "extreme misconduct" amounts to colloquially bad-faith cause warranting dismissal.  *Id.*  No such misconduct
exists here.  Accordingly, to the extent Sagi relies on *In re Huckfeldt*, such reliance is misplaced.

[73]    The Deed of Trust is annexed as Exhibit U to the Kurland Declaration.

assets to pay her legal bills. *See* 6/21 Tr. at 62:18–63:4 (Orly). Arie's unrebutted testimony is that as of September 2016, he held a 48% or 49% interest in Everything Important, and Orly held the majority interest of 51% or 52%. When Orly decided to move to Israel, she asked Arie to acquire a controlling interest in Everything Important so that she would not be burdened with the legal responsibility for that entity. 6/21 Tr. 138:19-139:8 (Arie). Accordingly, at her request, he purchased three units of Everything Important from Orly for a $4500 credit against the $5 million she owed to Arie. *Id.*; *see also* Movant Ex. 194 (Bill of Sale). Sagi produced no evidence that the transfer was not arm's length and for value.

Herschmann had a contractual right to require the filing of the Deed of Trust. Bowen Declaration, Ex. 9; 6/21 Tr. at 34:4–17 (Orly) ("he had the right to ask me for . . . a lien on the apartment"); 6/21 Tr. at 265:16–269:14 (Herschmann) ("I showed her the part of the promissory note that mandated it"). Pursuant to the Deed of Trust, Orly, as Grantor, conveyed her interest in the Residence to the Trustee, in trust for the benefit of Herschmann, as Beneficiary, "[t]o and only to the extent that homestead protection has been waived by [Orly] and [Herschmann] and to "secure payment of the [Herschmann Note]." Deed of Trust at 2. Sagi claims this document "purport[s] to conditionally transfer [Orly's] residual rights to her fifty percent (50%) interest in the couple's [Residence] to a trust for the benefit of Mr. Herschmann." Motion ¶ 36. The Court disagrees. The document is clear that it is merely a contingent perfection of the lien that was originally created pursuant to the Herschmann Note. The Deed of Trust has not caused the transfer of anything; Orly's interest in the Residence continues to be hers to this day. Moreover, the Deed of Trust is subject to conditions that have not yet occurred and may never occur, namely, a final judicial determination that Orly and Herschmann have waived the Texas state homestead protection for the Residence. Deed of Trust at 2. This has not occurred, and no proceeding seeking

96

to challenge the homestead protection has even been commenced.[74]  The Deed of Trust was filed

in late September 2018, after Sagi filed his purported abstract of the 2018 Judgment in Texas.  The

perfection of the contingent lien pursuant to the Deed of Trust does not affect valid previously

recorded liens.  *See* Deed of Trust at 3 ("This lien shall remain superior to liens later created even

if the time of payment of all or part of the note is extended or part of the property is released.").

Application of this *Lombardo* factor does not support the Motion.

### (11) Whether the Debtor Is Paying Debts to Insiders

Sagi does not assert that Orly is satisfying the debts of insiders.  Rather, he contends that

the "*raison d'etre*" of the case is to shield the prepetition payment of debts to insiders because, if

this case proceeds and the Court grants the 9019 Motion, Sagi will get nothing, and the full value

of the shares monetized by Orly will be used to pay the debts of the Brosers, Arie, and Herschmann.

That might be relevant in considering the merits of the 9019 Motion, but it is of no moment in

assessing the merits of the instant Motion.  Sagi does not satisfy this *Lombardo* factor because, in

support of the Motion, Sagi does not assert, let alone demonstrate, that Orly has been paying debts

to insiders.

### (12) Whether the Debtor Failed to Make Candid and Full Disclosure

As discussed in detail above, Sagi has not demonstrated that Orly has failed to make a

candid and full disclosure.  The Court has found that Orly's Schedules and attached Global Notes

adequately disclose her assets.  As mentioned, Sagi's arguments with respect to the general

disclosure requirement are unavailing.  *See In re Riccardo*, 248 B.R. at 723–24; *In re Brooks*, 278

B.R. at 566.

---

[74]    Further, the Texas Constitution and the Texas Property Code prohibit the waiver of the homestead protection without the joinder of the spouse, which has not occurred here.  Tex. Const. art. XVI, § 50(B) and Tex. Prop. Code § 41.004.

*(13) Whether the Debts are Modest in Relation to Assets and Income*

Courts find that the magnitude of a debtor's liabilities in relation to its income and assets may suggest a bad faith filing when those assets and income are sufficient to "pay down a substantial portion of . . . [the] claims over time." *In re Lombardo*, 370 B.R. at 514.  In contrast, this factor weighs against dismissal when the debtor's assets do not "represent a substantial dividend to unsecured creditors." *In re Gutierrez*, 528 B.R. at 21–22 (denying motion to dismiss, in part, because "the ratio of the Debtor's total unsecured debts to his annual disposable income is 82 to 1. . . . With that income, over a 3 to 5 year period, *i.e.* in the context of a Chapter 13 plan, the Debtor could pay $16,776 to $27,960, or a 3.7%–6.1% dividend to general unsecured creditors. This does not represent a substantial dividend to unsecured creditors").

The Court rejects Sagi's arguments for the same reasons set forth above concerning the Debtor's lack of resources to pay her debts.  The evidence demonstrates that it is far from certain that Orly has a meaningful interest, if any, in the Promissory Notes and that her undisputed debts far exceed the value of her assets.

Application of this factor does not support the relief Sagi seeks in the Motion.

*(14) Whether the Debtor Has Filed Multiple Proceedings or Engaged in Procedural Gymnastics*

Sagi says that application of this *Lombardo* factor supports his claim for relief because Orly "failed to make candid and full disclosure of her assets, in particular her right to some or all of the $32.3 million;" and put him though "the 'gymnastics' of a spurious Texas venue."  Motion ¶ 48; *see also* Sagi PT Br. ¶ 61.  Orly disputes those contentions and asserts that she commenced the Chapter 7 Case in Texas because she resides in Texas (Orly PT Br. ¶ 16) and that her Schedules,

as relevant here, fairly reflect competing claims to the $32.3 million in proceeds from the 2013

Settlement (Orly PT Br. ¶ 25).

In transferring the venue of this case, the Texas Bankruptcy Court found, inter alia, that

judicial economy would be served by adjudicating the Chapter 7 Case in New York, where

litigation that precipitated the Chapter 7 Case was pending.[75]    Sagi fails to allege, let alone

demonstrate, that the original Texas venue has prejudiced him.    Further, the Court finds Orly's

testimony that she intended to reside in Texas beginning in early 2019—i.e., before commencing

the Chapter 7 Case—to be credible.    *See, e.g.*, 6/21 Tr. at 39:10–15 ("Q.  Why move to [Austin,

Texas]?  A.  Because that's where the residency in the United States was.  And that's where—I

mean, that's where my residency—that's where my residency became and Eric had been a resident

of Austin, Texas for I don't know how many years, way before he even met me.").    The Court is

persuaded that Orly commenced the Chapter 7 Case in Texas because she intended Texas to be

her state of residency, not because she sought to frustrate Sagi or any other creditor.    The Court

finds no merit in Sagi's alternative argument because the Court has found that Sagi has not

demonstrated that Orly failed to file candid Schedules.

For these reasons, application of this factor does not support dismissing the Chapter 7 Case

under section 707(a) of the Bankruptcy Code.

*                         *                         *                         *

Based on the foregoing, the Court finds that none of the *Lombardo* factors support Sagi's

Motion.  Sagi has failed to meet his burden of demonstrating, by a preponderance of the evidence,

that Orly filed the Chapter 7 Case in bad faith.

---

[75]    *Transcript regarding Hearing Held 11/5/19*, ECF No. 173 ("11/5/19 Tr.") at 5:6–9 (The court: "It's far more efficient for the parties to the bankruptcy and to the related litigation to litigate in one District Court rather than two . . . .").

Whether the So-Called "*Syndicom* Factors" Warrant Dismissal of the Chapter 7 Case

Sagi also relies on a decision of this Court that, he says, sets forth four additional factors that relate to a determination of bad faith. Motion ¶ 50 (citing *In re Syndicom Corp.*, 268 B.R. 26, 51–52 (Bankr. S.D.N.Y. 2001)). He asserts that "[e]ach of the *Syndicom* factors is present here." *Id.* Without citation, he says that Orly's bankruptcy case "was filed as a tactic to stay the federal court suit wherein, after years of litigation, the U.S. District Court was situated to set aside the Debtor's fraudulent conveyances, and she and her cohorts faced impending motions for sanctions and contempt." *Id.* Orly asserts that, because *Syndicom* is a chapter 11 case, it does not "implicate Section 707(a)'s 'exacting standard.'" Orly Objection ¶ 61 (quoting *In re Chovev*, 559 B.R. at 345).

Sagi says that *Syndicom* identified four general factors that reflect a debtor's bad faith. Motion ¶ 50. The Court does not read the case the same way. First, as Orly rightly points out, *Syndicom* applied an eight-factor bad-faith standard in the chapter 11 context, distinct from the applicable chapter 7 standard here. *See In re Syndicom Corp.*, 268 B.R. at 50 (citing *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311). Moreover, the *Syndicom Corp.* court found that the applicable *C-TC 9th Ave. P'ship* factors did not neatly align with the facts in *Syndicom Corp.*, but "the totality of the circumstances indicated that the filing was in bad faith." *In re Meena, Inc.*, No. 18-74693, 2018 WL 5880916, at *31 (Bankr. E.D.N.Y. Nov. 6, 2018) (citing *In re Syndicom Corp.*, 268 B.R. at 51). As relevant, *Syndicom* held that, in applying the bad-faith test for chapter 11 cases set forth in *C-TC 9th Ave. P'ship*, courts can consider that the eight-factor list in *C-TC 9th Ave. P'ship* is not exhaustive. *See in re Syndicom*, 268 B.R. at 51–52. To that end, the court identified four "factual findings" that were "material elements of the totality of the circumstances" analysis. *Id.* at 51. These findings were: (a) the case was filed as a tactical step in connection with other

100

litigation; (b) there has been no showing of financial pressure on the debtor; (c) unsecured creditors would not benefit in any material way from the debtor's filing; and (d) the case was filed with the purpose and effect of securing benefits for non-debtors. *Id.* at 51–52. Contrary to Sagi's representation, those factual findings do not represent generalized principles applicable in the analysis of a § 707(a) dismissal motion. In any event, Sagi has not met his burden of demonstrating how application of those facts (or factors) supports the dismissal of this case.

Sagi's Reliance on *In re Krueger*

Sagi also relies on the Fifth Circuit's decision in *In re Krueger*, 812 F.3d 365 (5th Cir. 2016), on which he says the Second Circuit relied in *In re Murray*. *Id.* ¶ 51; *see In re Murray*, 900 F.3d at 58–59. Sagi says that the *Krueger* court decided that dismissal under § 707(a) is appropriate because of the debtor's duplicitous behavior in that case. Motion ¶ 51. Sagi argues that his sister's behavior in this case "has been far more duplicitous than that in *Krueger*, and accordingly this case should be dismissed for all the same reasons." *Id.* ¶ 52.

*Krueger* involved a willfully dishonest debtor. In *Krueger*, the Fifth Circuit relied on the bankruptcy court's findings that the debtor petitioned for bankruptcy not to seek a fresh start as an honest but unfortunate debtor, but to hamper the state court litigation" against him. *In re Krueger*, 812 F.3d at 374. Krueger had explicitly testified "that among his primary reasons for filing bankruptcy were to 1) avoid the pending criminal contempt proceeding 2) avoid state court summary judgment proceedings [and] 3) otherwise delay the state court litigation because he no longer liked Austin, Texas as a venue and was convinced Austin's judges were biased against him," even though Krueger had chosen where to file suit. *Id.* Krueger "willingly failed to list his officer and director position" and de facto controlling interest in a company on his statement of financial affairs. *Id.* at 374–75. Krueger additionally "violated the automatic stay when he voted

his shares in the [company] shareholder meeting in which he (and his handpicked fellow nominees) were elected to [the company's] board of directors," immediately after which the board voted to dismiss all of the company's claims against Krueger.  *Id.* at 375.  Some of those claims had arisen from Krueger's seizure of money from the company's bank accounts.  *Id.*  Krueger also used a false address in his bankruptcy petition, which was consistent with his conduct in state-court litigation, where he "listed fake addresses to avoid being served with injunctions and other legal process."  *Id.*  Krueger even "admitted to the bankruptcy court that he didn't live at the listed address at the time of his filing, doesn't know if it exists (it doesn't), and actually lived somewhere else."  *Id.*  Krueger also "repeatedly perjured himself in the bankruptcy court proceedings on a wide range of topics," for example, testifying that he had not read a state-court injunction until it was physically served on him, which was "contradicted by other witness testimony and physical evidence that Krueger immediately read the injunction after it was issued."  *Id.*  Moreover, Krueger threatened a witness during the bankruptcy court's hearing on the § 707(a) motion.  *Id.*  "The bankruptcy court found that Krueger approached another witness during the break in that witness's testimony and said 'You're next, buddy.  I'm going to sue the s_ out of you.'"  *Id.*

The bankruptcy court ultimately found that Krueger filed his chapter 7 petition "because of a criminal contempt proceeding pending against him, because his state court litigation had taken a turn for the worse, and to provide him the cover to retake control of [a company]."  *Id.*  Once that case commenced, Krueger "engaged in conduct designed to manipulate the proceedings to his own ends, including false filings, false testimony, and witness intimidation," which was "exactly the sort of conduct contemplated by most courts as giving cause for dismissal under § 707(a)."  *Id.*  The bankruptcy court also "weighed the costs of dismissal to creditors and was able to mitigate them through appropriate orders."  *Id.*  Applying an abuse-of-discretion standard, and "[i]n light

102

of the [bankruptcy] court's balancing inquiry and findings," the Fifth Circuit affirmed the § 707(a) dismissal.

The Court finds no merit to Sagi's assertion that Orly's conduct was "far more duplicitous" than Krueger's. Motion ¶ 52. Orly has always maintained that her bankruptcy filing is a result of the decade-long barrage of lawsuits instigated by Sagi, whereas Krueger was attempting to stay a criminal contempt case and other state litigation. *See Krueger*, 812 F.3d at 374. Orly did not purposefully omit assets from her filings, and her Global Notes explicitly state that there was disagreement about whether Orly had a stake in certain legal claims. Sagi's disagreement with Orly's legal position, as referenced in the Global Notes, does not establish any sort of willful concealment of an asset by Orly. Any perceived defect in Orly's disclosures is incomparable with Krueger's complete omission of his stake in the company over which he later staged a takeover. *Krueger* provides no support to Sagi.

## Conclusion

Based on the foregoing, the Court denies the Motion.

**IT IS SO ORDERED.**


Dated: New York, New York
        June 30, 2023


                                    /s/ *James L. Garrity, Jr.*
                                    Hon. James L. Garrity, Jr.
                                    U.S. Bankruptcy Judge