**UNITED STATES BANKRUPTCY COURT**　　　　**NOT FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
Orly Genger,　　　　　　　　　　　　　　　:　　　Case No. 19-13895 (JLG)
　　　　　　　　　　　　　　　　　　　　　　:　　　Chapter 7
　　　　　　　　　　　　　　Debtor.　　　　:
-----------------------------------------------------------------x

## MEMORANDUM DECISION DENYING MOTION FOR AN ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) APPROVING SETTLEMENT AGREEMENT AND (B) GRANTING RELATED RELIEF

**APPEARANCES**:

TARTER KRINSKY & DROGIN LLP
*Attorneys for Deborah J. Piazza,*
*Chapter 7 Trustee*
1350 Broadway, 11th Floor
New York, New York 10018
By:　　Rocco A. Cavaliere
　　　　Deborah J. Piazza

EMMET, MARVIN & MARTIN, LLP
*Attorneys for Sagi Genger and*
*TPR Investment Associates, Inc.*
120 Broadway
New York, New York 10271
By:　　Thomas A. Pitta
　　　　John Dellaportas

POLLOCK COHEN LLP
*Attorneys for Michael Oldner as Trustee*
*on Behalf of the Orly Genger 1993 Trust,*
*Manhattan Safety Maine, Inc., and*
*Recovery Effort, Inc.*
111 Broadway, Suite 1804
New York, New York 10006
By:　　Adam Pollock

PACHULSKI STANG ZIEHL & JONES LLP
*Attorneys for Dalia Genger*
780 Third Avenue, 34th Floor
New York, New York 10017
By:     Paul J. Labov

HUGHES HUBBARD & REED LLP
*Attorneys for Arnold Broser, David Broser,*
*ADBG LLC, and Tedco, Inc.*
One Battery Park Plaza
New York, New York 10004
By:     Christopher Gartman

ERIC HERSCHMANN
*Appearing Pro Se*

LANCE HARRIS
*Appearing Pro Se*

GLENN AGRE BERGMAN & FUENTES LLP
*Appearing for himself and as counsel for Orly Genger*
Michael Paul Bowen
55 Hudson Yards, 20th Floor
New York, New York 10001
By:     Michael Paul Bowen

TOGUT, SEGAL & SEGAL LLP
*Attorneys for Arie Genger*
Michael Paul Bowen
One Penn Plaza, Suite 3335
New York, New York 10119
By:     Frank A. Oswald

KASOWITZ BENSON TORRES LLP
*On behalf of the firm and as counsel for Claims Pursuit, Inc.*
1633 Broadway
New York, New York 10019
By:     Andrew R. Kurland

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[1]

On July 12, 2019 (the "Petition Date"), Orly Genger ("Orly"[2] or the "Debtor") commenced her voluntary case under chapter 7 of the Bankruptcy Code (the "Chapter 7 Case") in the United States Bankruptcy Court for the Western District of Texas (the "Texas Bankruptcy Court"). Eric Herschmann ("Herschmann") is Orly's husband and Sagi Genger ("Sagi") is Orly's brother. Arie Genger ("Arie") and Dalia Genger ("Dalia") are Orly and Sagi's divorced parents. Sagi is a judgment creditor of Orly. On September 13, 2019, he filed a motion to dismiss the Chapter 7 Case or, alternatively, to transfer the case to this Court.[3] The Texas Bankruptcy Court directed the case be transferred to this Court.[4]

Deborah J. Piazza (the "Chapter 7 Trustee" or "Trustee") is the successor chapter 7 trustee, and the legal representative of Orly's estate (the "Bankruptcy Estate"). The matter before the Court is the Trustee's motion (the "Motion")[5] for an order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and to the extent applicable, sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York approving the Settlement Agreement[6]

---

[1] Capitalized terms shall have the meanings ascribed to them herein or, to the extent they are not defined herein, in the Motion or the Settlement Agreement (both defined below).

[2] The Court refers to the members of the Genger family by their first names.

[3] *See Judgment Creditor Sagi Genger's Motion to Dismiss Bankruptcy Case or, Alternatively, to Transfer Venue, and Memorandum of Law in Support of Motion*, ECF No. 32.

[4] *See Order Transferring Case*, ECF No. 168.

[5] *Chapter 7 Trustee's Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving Settlement Agreement and (B) Granting Related Relief*, ECF No. 421. Annexed as Exhibit B to the Motion is *the Declaration of Deborah J. Piazza In Support Of Motion For An Order Pursuant To Bankruptcy Rule 9019 (A) Approving Settlement Agreement And (B) Granting Related Relief*, ECF No. 421.

[6] The Settlement Agreement is annexed as Exhibit A to the Motion, ECF No. 421-1.

between the Trustee, solely in her capacity as the chapter 7 trustee, on the one hand, and Orly, Herschmann, Arie, Kasowitz Benson Torres LLP ("KBT"), individually and in its capacity as escrow agent, David Broser (individually and in his capacity as trustee of the Genger Litigation Trust) and Arnold Broser (together with David Broser, the "Brosers") and related entities ADBG LLC and Tedco, Inc. (collectively, the "Broser Parties"), Lance Harris, solely in his capacity as trustee of the Genger Litigation Trust, the Genger Litigation Trust, Michael P. Bowen ("Bowen"), and Claims Pursuit, Inc. (the "Estate Claims Assignee" and, together with Orly, Herschmann, Arie, KBT, the Broser Parties, Lance Harris and Bowen, the "Settling Parties") on the other hand.

The Sagi Genger 1993 Trust (the "Sagi Trust"), by its counsel, filed an objection to the Motion (the "Sagi Trust Objection").[7] Sagi and TPR Investment Associates ("TPR") (together, "Sagi/TPR") jointly filed an objection to the Motion, together with a cross motion (the "Sagi/TPR Objection").[8] The Orly Genger 1993 Trust (the "Orly Trust") by its trustee, Michael Oldner, filed an objection to the Motion (the "Orly Trust Objection").[9] Dalia (collectively with the Sagi Trust, Sagi, TPR, and the Orly Trust, the "Objecting Parties") filed a joinder to the Sagi/TPR Objection and Orly Trust Objection (the "Dalia Joinder").[10] The Objecting Parties contend that the Court must deny the Motion and not approve the Settlement Agreement. In essence, they argue that the

---

[7] *Objection of the Sagi Genger 1993 Trust to the Chapter 7 Trustee's Motion for Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving the Settlement Agreement, and (B) Granting Related Relief*, ECF No. 493.

[8] *Objection and Cross Motion of Sagi Genger and TPR to the Chapter 7 Trustee's Motion for Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving the Settlement Agreement, and (B) Granting Related Relief*, ECF No. 490. Sagi did not seek permission to file the cross-motion as required by this Court's rules, and the Court does not consider it.

[9] *Objection of the Orly Genger Trust, by its Trustee Michael Oldner, to the Chapter 7 Trustee's Motion to Approve Settlement*, ECF No. 491. Recovery Effort, Inc. ("REI") and Manhattan Safety Maine, Inc. ("MSM") filed joinders to the Orly Trust Objection. Respectively, ECF Nos. 508–09.

[10] *Joinder of Dalia Genger to the Various Objections to the Chapter 7 Trustee's Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving Settlement Agreement and (B) Granting Related Relief*, ECF No. 494.

settlement is not "fair and equitable" and is not in the best interests of the Bankruptcy Estate. They say that it runs afoul of the factors set forth in *Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 462 (2d Cir. 2007). The Trustee filed a reply to these objections (the "Reply").[11] The Settling Parties submitted a joinder in support of the Motion (the "Settling Parties Joinder").[12]

The Court conducted a hearing on the Motion. For the reasons stated herein, the Court denies the Motion.

## Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

### The Genger Lawsuits

In 1985, the Genger family owned a holding company known as TPR Investment Associates, Inc. (i.e., TPR). *Glenclova Inv. Co. v. Trans-Res., Inc.*, 874 F. Supp. 2d 292, 295 (S.D.N.Y. 2012); *Genger v. TR Invs., LLC*, 26 A.3d 180, 184 (Del. 2011).[13] Arie was TPR's

---

[11] *Reply of Chapter 7 Trustee to Various Objections to Trustee's Motion for Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving the Settlement Agreement and (B) Granting Related Relief*, ECF No. 506.

[12] *Joinder of Settling Parties in Support of Chapter 7 Trustee's Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving Settlement Agreement and (B) Granting Related Relief*, ECF No. 528.

[13] Matters as to which judicial notice may be taken include documents "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" pursuant to Rule 201(b)(2) of the Federal Rules of Evidence. *See D'Angelo-Fenton v. Town of Carmel Police Dep't*, 470 F. Supp. 2d 387, 393 n.5 (S.D.N.Y. 2007); *see also Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Adelphia Communications Corp. v. Bank of America, N.A.*, 365 B.R. 24, 34 (Bankr. S.D.N.Y. 2007) (taking judicial notice of documents incorporated in

majority shareholder (51%) and Dalia, Sagi, and Orly, collectively held the minority interest in TPR. *Glenclova*, 874 F. Supp. 2d at 295; *see Genger*, 26 A.3d at 184. The children's shares were held in the Sagi Trust and the Orly Trust, respectively. *Genger*, 26 A.3d at 184. In 1985, Arie formed Trans-Resources Inc. ("TRI"), a Delaware corporation that specializes in manufacturing fertilizer and producing chemicals for agricultural use, as TPR's wholly owned subsidiary. *Glenclova*, 874 F. Supp. 2d at 295; *Genger*, 26 A.3d at 183–84.

In 2001, a group of investors (the "Trump Group") purchased a minority stake in TRI under an agreement (the "Stockholders Agreement") that restricted future transfers of TRI stock and gave the Trump Group a right of first refusal. *Glenclova*, 874 F. Supp. 2d at 295–96; *Genger*, 26 A.3d at 184. A share transfer in violation of the restrictions under the Stockholders Agreement was void and non-transferring shareholders had the right to purchase any invalidly transferred shares (the "Purchase Rights"). *Glenclova*, 874 F. Supp. 2d at 296; *Genger*, 26 A.3d at 184.

In October 2004, Arie and Dalia divorced. *Glenclova*, 874 F. Supp. 2d at 296; *Genger*, 26 A.3d at 184. Pursuant to a divorce agreement, Arie transferred his interest in TPR to Dalia, and TPR transferred the family's interests in TRI to (i) Arie (the "Arie Shares"), (ii) the Orly Trust (the "Orly Trust Shares"), and (iii) the Sagi Trust (the "Sagi Trust Shares") (those transfers, collectively, the "2004 Stock Transfers"). *Genger*, 26 A.3d at 185.

Arie failed to notify the Trump Group of the 2004 Stock Transfers and to obtain the requisite consent to the stock transfers. *See Glenclova*, 874 F. Supp. 2d at 296; *Genger*, 26 A.3d at 185. In August 2008, the Trump Group invoked its Purchase Rights under the agreement, to

---

the complaint by reference); *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 309 (Bankr. S.D.N.Y. 1999). The Court does so in this section by noticing other decisions in litigation preceding the Motion. However, the Court does so only to recount those courts' findings as background to the Motion, rather than to adopt those findings itself.

acquire the TRI shares purportedly distributed to Arie, the Sagi Trust, and the Orly Trust pursuant to the 2004 Stock Transfers. *Glenclova*, 874 F. Supp. 2d at 296; *Genger*, 26 A.3d at 186. Arie rejected that demand. In response, the Trump Group filed a lawsuit in the United States District Court for the Southern District of New York to enforce the Stockholders Agreement, including its Purchase Rights.[14] The Trump Group sought a determination that it had title to the TRI shares held by Arie, the Orly Trust and the Sagi Trust.

The Sagi Trust, TPR, and the Trump Group entered a two-part settlement. In August 2008, the Sagi Trust, TPR, acting through Sagi, as its President, and the Trump Group entered into an agreement (the "Main Agreement") under which the Trump Group purchased the Sagi Trust Shares for $26.7 million. *Glenclova*, 874 F. Supp. 2d at 296; *Genger*, 26 A.3d at 186. The Trump Group and TPR also entered a "Side Letter Agreement" giving the Trump Group the option to buy whatever rights TPR held in the TRI shares purportedly held by Arie for approximately $7.4 million and the Orly Trust for approximately $10.3 million, or 60% less than the price paid for the Sagi Trust's stock. *Glenclova*, 874 F. Supp. 2d at 296; *Genger*, 26 A.3d at 187. This option would be triggered only if a court determined that the 2004 Stock Transfers were void, resulting in the legal or beneficial ownership of the TRI shares reverting to TPR. *Glenclova*, 874 F. Supp. 2d at 296; *Genger*, 26 A.3d at 187.

In August 2008, the Trump Group filed suit against Arie in the Delaware Chancery Court (the "Chancery Court") seeking a determination pursuant to Del. Code tit. 8, § 225 that it controlled TRI. *See Genger*, 26 A.3d at 187. In July 2010, after a trial in that action, the Chancery Court ruled that the Sagi Trust Shares had been transferred in violation of the Stockholders Agreement, that

---

[14] *Complaint*, *Glenclova Inv. Co. v. Trans-Resources, Inc.*, No. 1:08-cv-07140, ECF No. 1 (S.D.N.Y. filed Aug. 11, 2008).

the TRI shares reverted to TPR, and that pursuant to Main Agreement, the Trump Group had the right to purchase the Sagi Trust Shares from TPR (the "Merits Opinion"). *TR Invs., LLC v. Genger*, No. CIV.A. 3994-VCS, 2010 WL 2901704, at *19–22 (Del. Ch. July 23, 2010), *aff'd in part and rev'd in part*, 26 A.3d 180 (Del. 2011). In August 2010, the Chancery Court issued a "Side Letter Opinion." *TR Invs., LLC v. Genger*, No. CIV.A. 3994-VCS, 2010 WL 3279385, at *3 (Del. Ch. Aug. 9, 2010), *rev'd*, 26 A.3d 180 (Del. 2011). The court found that in 2004, TPR violated the 2004 Stockholders Agreement when it purported to transfer the Arie Shares and Orly Trust Shares to Arie and the Orly Trust, respectively, the transfers were void, the shares reverted to TPR, and that neither Arie nor the Orly Trust were record or beneficial owners of any of the TRI shares. *Id.* at *2–3. It held that TPR was the record and beneficial owner of all TRI shares not then owned by the Trump Group. *See id.* at *3.

Arie appealed the Merits Opinion and Side Letter Opinion. In July 2011, the Delaware Supreme Court affirmed the Merits Opinion. *Genger*, 26 A.3d at 198. It found that the 2004 Stock Transfers were invalid, and that the Trump Group legally purchased the Sagi Trust Shares from TPR. *Id.* at 198. It resolved that the Trump Group held title to the Sagi Trust Shares. The court reversed the Side Letter Opinion. *Id.* at 203. It found that while the Chancery Court had *in rem* jurisdiction over the shares, it lacked personal jurisdiction over the Orly Trust and TPR to determine record ownership of the Arie Shares and Orly Trust Shares and thus lacked the power to declare whether Arie or the Orly Trust held beneficial interests in the Arie Shares and Orly Trust Shares. *Id.* at 199–203.

Thereafter, the Trump Group sued Arie and TPR in the Chancery Court seeking a determination that it was the beneficial owner of the Arie Shares. *TR Invs., LLC v. Genger*, No. CIV.A. 6697-CS, 2013 WL 603164 (Del. Ch. Feb. 18, 2013). The court ruled that the Trump

Group had the right to purchase the Arie Shares from TPR in 2008 and that Arie was not a record or beneficial TRI shareholder. *TR Invs., LLC v. Genger*, No. 6697, 2013 WL 787117 (Del. Ch. Mar. 1, 2013). Arie did not appeal the final judgment order, thus resolving that the Trump Group held title to the Arie Shares.

While the litigation was pending in the Chancery Court, Orly and Arie jointly commenced an action in New York state court (the "2010 Action").[15] In that action, Orly (derivatively, on behalf of the Orly Trust) and Arie brought claims related to the ownership of the TRI shares and the Trump Group's allegedly unfair purchase price paid to TPR for the Orly Trust's and Arie's shares under the Side Letter Agreement (i.e., the 60% discount compared to the price paid for the Sagi Trust's shares). *Genger v. Genger*, No. 651089/2010, 2013 WL 221485, *1 (N.Y. Sup. Ct. 2013). Orly purported to bring her claims derivatively and individually. *Id.* at *1. They also sought an injunction preventing Sagi or TPR from transferring the Orly Trust Shares or Arie Shares. *Id.* at *11.

The Trump Group moved to dismiss the 2010 Action. *Id.* at *1. On January 3, 2013, the state court granted in part and denied in part the Trump Group's motion to dismiss the derivative claims, permitting the breach of fiduciary duty and unjust enrichment claims to proceed, as pleaded by Arie and by Orly on behalf of the Orly Trust. *Id.* at *20–21. Arie appealed this decision.

In June 2013, Orly (in her individual capacity and in her capacity as beneficiary of the Orly Trust), Arie, the Brosers (in their individual capacities and on behalf of all entities managed, owned or controlled by the Brosers (collectively, the "AG Group")), on the one hand, and the Trump

---

[15] *Arie Genger and Orly Genger, in her individual capacity and on behalf of The Orly Genger 1993 Trust v. Sagi Genger, et al.*, NYSCEF No. 651089/2010 (N.Y. Sup. Ct.).

Group, on the other, entered an agreement to settle claims relating to the TRI shares that were being litigated against the Trump Group (the "2013 Settlement Agreement").[16]

The agreement provides that the Trump Group would pay $32.3 million (comprised of $17.3 million in cash and two promissory notes of $7.5 million each (the "Trump Notes")) (collectively, the "2013 Settlement Proceeds") to "resolve all issues, disputes and disagreements between [the parties]," including "the issue of ownership of all [TRI] shares." 2013 Settlement Agreement at 2–3. Without limitation, the parties also agreed to have the state court "enter a definitive non-appealable order declaring that members of the Trump Group own all right, title and interest (beneficially, of record and otherwise) to the shares of Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger . . . and to the Orly Genger 1993 Trust . . . ." *Id.* at 5. The 2013 Settlement Agreement also required the parties to "cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group . . . ." *Id.* at 16. The 2013 Settlement Agreement determined that the Trump Group was the beneficial owner of the TRI shares. *See TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP,* No. 13-CV-8243, 2014 WL 1979932, *2 (S.D.N.Y. May 15, 2014) ("Pursuant to th[e] settlement, Orly acknowledged that the Trump Group is the record and beneficial owner of the Orly Trust Shares.").

Pursuant to the 2013 Settlement Agreement, the Trump Group wired $17.3 million in cash to the IOLA account of the AG Group's designated payee William Wachtel. The remaining $15 million due under the 2013 Settlement Agreement has not been paid to anyone yet. These funds are in the form of two $7.5 million notes payable to Bowen, as escrow agent for the AG Group.

---

[16] The 2013 Settlement Agreement is annexed as Exhibit 1 to the *Declaration of Adam Pollock in Support of Objection to Motion to Approve Settlement*, ECF No. 492.

2013 Settlement Agreement, Recitals at 3–4.[17] Both notes suspend the obligation to pay so long as any legal action related to the Gengers is still pending against the Trump Group. *Id.*

The litigation in the Chancery Court, coupled with the 2013 Settlement Agreement, finally resolved the Trump Group's ownership of the TRI stock. However, there is a dispute among Orly and the Settlement Parties, all of whom are aligned with Orly, and the Objecting Parties, who are not, over who is entitled to the 2013 Settlement Proceeds.

### The Proofs of Claim and Discharge Objections

***Orly Trust***

The Orly Trust, through Michael Oldner as successor trustee to Dalia, filed a proof of claim in the Chapter 7 Case seeking the amount of $41,622,588, consisting of the entirety of the 2013 Settlement Proceeds plus interest (the "Orly Trust Claim"). Motion ¶ 78 (citing Orly Trust Claim).[18] The Orly Trust has filed an adversary proceeding seeking to deny the discharge of the Orly Trust Claim. *See Michael Oldner, as trustee of the Orly Genger 1993 Trust v. Orly Genger*, Adv. Pro. No. 19-ap-1447 (Bankr. S.D.N.Y.) (Garrity, J.) (the "Orly Trust Discharge Objection").

There is no dispute that Orly, as an individual, never directly owned shares of TRI. The Orly Trust states that pursuant to the 2013 Settlement Agreement, Orly "monetized her beneficial interest in the Orly Trust shares for $32.3 million." Orly Trust Objection at 19 (quoting *Genger v. Genger*, 76 F. Supp. 3d 488, 501 (S.D.N.Y. 2015)). It argues that the 2013 Settlement Proceeds belong to the Orly Trust, as the real party in interest and that it has "first call" on the 2013 Settlement Proceeds. *Id.* at 19–24.

---

[17] In the Settlement Agreement, the notes collectively are referred to as the "Escrowed Trump Group Settlement Proceeds." Settlement Agreement, Recitals at 4.

[18] The Orly Trust Claim appears on the Court's claims register in the Chapter 7 Case as Claim No. 12.

On June 13, 2019, the Orly Trust purported to sell and assign to Recovery Effort, Inc. (i.e., REI) all right, title, and interest of the Orly Trust to $32.3 million in litigation proceeds accruing under the 2013 Settlement Agreement (the "REI Assignment"). Motion ¶ 67.[19] REI is an Arkansas corporation that was formed in June 2019. *Id.* It is a wholly owned subsidiary of the Orly Trust. *Id.* Michael Oldner is identified as the President of REI. *Id.* The assignment did not include any claims against either Orly or any member of the Trump Group. *Id.* Manhattan Safety Maine, Inc. (i.e., MSM) is a Maine corporation that was formed in June 2019. *Id.* The Trustee asserts that TPR purported to transfer to MSM an alleged debt that MSM claims the Orly Trust owes it. *Id.*

As discussed below, the Orly Trust or REI are party to the following matters relating to the 2013 Settlement Proceeds: (i) *Manhattan Safety Maine, Inc. v. Bowen*, No. 19-5642 (S.D.N.Y.) ("MSM Action") and (ii) *Orly Genger 1993 Trust v. Genger*, No. 20-01188 (Bankr. S.D.N.Y.) ("Orly Trust Turnover Action"). The Orly Trust directly and through REI asserts that it is entitled to payment of the 2013 Settlement Proceeds.

### *Sagi and TPR*

Sagi is a judgment creditor of Orly. He has filed a claim in the Chapter 7 Case seeking approximately $12.9 million (the "Sagi Claim"). Motion ¶ 80 (citing Sagi Claim).[20] TPR has filed a claim for $420,487 (the "TPR Claim").[21] Sagi and TPR have jointly filed an adversary proceeding objecting to Orly's discharge in bankruptcy and objecting to the discharge of their

---

[19] The REI Assignment is annexed as Exhibit 22 to the Declaration of Rocco A. Cavaliere in Support of Chapter 7 Trustee's Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving Settlement Agreement and (B) Granting Related Relief, ECF No. 423 (the "Cavaliere Declaration").

[20] The Sagi Claim appears on the Court's claims register in the Chapter 7 Case as Claim No. 14.

[21] The TPR Claim appears on the Court's claims register in the Chapter 7 Case as Claim No. 11-2.

claims. *See Sagi Genger and TPR Investment Associates, Inc. v. Orly Genger*, Adv. Pro. No. 19-1444 (Bankr. S.D.N.Y.) ("Sagi/TPR's Discharge Objection").

Sagi, TPR, MSM or the Sagi Trust are party to the following matters relating to the 2013 Settlement Proceeds: (i) the MSM Action, (ii) *Genger v. Herschmann*, No. 21-01135 (Bankr. S.D.N.Y.) ("Sagi-Herschmann Action"), (iii) *Genger v. Genger*, No. 17-cv-08181 (S.D.N.Y.) (through *Judgment Creditor Sagi Genger's Memorandum of Law in Support of His Motion for Turnover of Promissory Notes and Funds from Garnishees and Rescission of Fraudulent Conveyance,* ECF Nos. 212–14 ("Sagi's Turnover Motion")), and (iv) *Genger v. Broser*, No. 19-cv-06100 (S.D.N.Y.) ("Sagi's Avoidance Action"). In those actions, Sagi and TPR take the position that the 2013 Settlement Proceeds belong to Orly.

### Dalia

Dalia contends that she is entitled to the 2013 Settlement Proceeds. She filed a proof of claim, seeking $12,542,488 plus interest. She alleges that the basis of her claim is a "constructive trust claim," that her claim is secured by a lien on "proceeds from 2013 litigation settlement," and the value of the property subject to her purported lien is "$32,257,001" (the "Dalia Claim"). Motion ¶ 80 (citing Dalia Claim).[22] Dalia has filed an adversary proceeding seeking to deny the discharge of the Dalia Claim, and to deny Orly's discharge in bankruptcy. *See Dalia Genger and D&K GP LLC v. Orly Genger*, Adv. Pro. No. 19-01445 (Bankr. S.D.N.Y.) (the "Dalia Discharge Objection").

Dalia is party to the following matters relating to the 2013 Settlement Proceeds: (i) *Genger v. Genger*, No. 20-01010-jlg, (Bankr. S.D.N.Y.) ("Dalia's Constructive Trust Action"), and (ii)

---

[22] The Dalia Claim appears on the Court's claims register in the Chapter 7 Case as Claim No. 9.

*Genger v. Genger*, No. 651089/2010 (through the *Memorandum of Law in Support of Trustee Dalia Genger's Motion to Substitute for Plaintiff Orly Genger on Her Derivative Claims Against the Trump Group and for an Order Directing Settlement Proceeds to Be Paid into Court*, NYSCEF No. 1108 (N.Y. Sup. Ct. filed Aug. 11, 2014)) ("Orly Trust's Substitution Motion").

**The Motion**

***The Settlement Agreement***

The Trustee asserts that the Court's approval of the Settlement Agreement will pave the way to the conclusion of the Chapter 7 Case. She maintains that this agreement would resolve the web of disputes surrounding the Genger family, their business interests, and the competing ownership interests in the 2013 Settlement Proceeds. The Settlement Agreement purports to address the claims, counterclaims, and ongoing litigation that have persisted for years among the Genger family members, their trusts, and related entities.

The Settlement Agreement encompasses a wide range of provisions, including monetary payments to the estate, the sale and assignment of certain purported estate claims by the Trustee, the transfer of property interests, broad mutual releases, a permanent injunction, and the dismissal of numerous pending actions and appeals. By securing Court approval for this agreement, the Trustee seeks to resolve the competing claims to the 2013 Settlement Proceeds, address the status of various proofs of claim, and pave the way for the conclusion of the Chapter 7 Case.

Settlement Payments

The Settling Parties agree to pay $2.5 million to the Bankruptcy Estate, in two payments consisting of (i) a $300,000 "Non-Refundable Settlement Payment" upon execution of the

agreement that becomes estate property regardless of whether the Effective Date[23] occurs, and (ii) $2,200,000 subject to the occurrence and within twenty-one days of the Effective Date. Settlement Agreement § 2. The agreement refers to these collectively as the "Settlement Payments." *Id.*

The Settlement Agreement says that the Settlement Payments are "made for the benefit of the Bankruptcy Estate in full satisfaction of any and all claims that the Bankruptcy Estate, or Orly in any capacity . . . may have relating to, in connection with or arising from Orly being a signatory to the [2013 Settlement Agreement], or otherwise . . . ." *Id.* This includes "any and all rights to proceeds which already have been paid and any and all rights to proceeds that have yet to be paid pursuant to the terms of the [2013 Settlement Agreement]." *Id.* The Settling Parties have made the Non-Refundable Settlement Payment.

Sale of Estate Claims

Under the Settlement Agreement, the Trustee would sell and assign certain claims to Claims Pursuit, Inc., as the Estate Claims Assignee. Specifically, she "sells and assigns to the Estate Claims Assignee all claims . . . that the Bankruptcy Estate may have against Dalia, present, former or successor trustees of the Orly Genger 1993 Trust, and affiliated or related entities other than Sagi . . . ." *Id.* § 3. These are collectively referred to, in the agreement, as the "Estate Claims." *Id.* The Estate Claims include, among others, but are not limited to those currently pending in the action captioned *In re Application of Orly Genger, as a person interested, for the removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust*, Adv. Pro. No. 21-01187 (Bankr. S.D.N.Y.) (the "Surrogate Court Action"), and *Orly Genger. v. Dalia Genger*, which was on appeal to the New

---

[23] The Effective Date is defined in the Settlement Agreement as "the date on which the United States Bankruptcy Court for the Southern District of New York . . . has issued a final, nonappealable order, in form and substance acceptable to the Settling Parties, granting the [Motion] which has not been reversed, stayed, modified or amended, and as to which order (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, or if appealed, the date on which such order has been upheld on appeal and is no longer appealable to any other court . . . ." Settlement Agreement, Preamble.

York State Appellate Division, First Department at Case No. 2020-01940 (the "State Court Action").[24]

In exchange for the assignment of the Estate Claims, the Estate Claims Assignee agrees to provide both upfront and contingent compensation to the Bankruptcy Estate. First, the Estate Claims Assignee agrees to pay $50,000—the "Initial Estate Claims Consideration." *Id.* § 4. The agreement notes that such amount "has previously been provided to the Trustee in escrow" and would be released upon Court approval of the sale. *Id.*

Additionally, the Estate Claims Assignee agrees to pay a percentage of any recoveries it obtains from pursuing these claims. The percentage differs based on the amount it recovers:

- "75% of the first $1.25 million of any remaining recoveries on Estate Claims";
- "60% of the portion of any remaining recoveries on Estate Claims totaling between $1,250,000.01 and $2.25 million";
- "50% of the portion of any remaining recoveries on Estate Claims totaling between $2,250,000.01 and $5 million"; or
- "25% of the portion of any remaining recoveries on Estate Claims that exceed $5 million . . . ."

*Id.* Regardless, the agreement caps the "maximum aggregate recovery to the Trustee" at $11 million. *Id.*

---

[24] The State Court Action appeal was decided on August 16, 2022. The Supreme Court of New York, Appellate Division, First Judicial Department affirmed the Supreme Court's Order entered October 4, 2019, which denied the Debtor's motion to reinstate her claim against Dalia. The Court is unable to locate any further appeal filed from that case. While the Settlement Agreement contains a clause tolling "[T]he running of any statutes of limitations applicable to the claims being settled pursuant to" the Settlement Agreement, it is unclear if such agreement would be effective to toll the appeal period. The Court shall nonetheless consider the case as appealable for the purposes of this decision.

Transfer of Condo Interest

Upon receipt of the Settlement Payments, "the Condo Interest shall be deemed transferred to Herschmann, free and clear of any liens, claims, interests or encumbrances." *Id.* § 7.[25] To facilitate the transfer, Orly agrees "to waive any and all homestead protections and exemptions that Orly may be entitled to, relating to the Condo Interest, including the Texas homestead exemption to the maximum amount allowed under the law." *Id.*

The Trustee also waives the Bankruptcy Estate's potential claims relating to the Condo Interest. She agrees specifically to "unconditionally and irrevocably release[], discharge[], and hold[] harmless Orly and Herschmann, from all claims to the Condo Interest . . . ." *Id.* Furthermore, the Trustee commits to "withdraw and dismiss with prejudice, any and all other objections filed by the predecessor trustee to the exemptions scheduled and asserted by Orly . . . ." *Id.*

Releases and Injunctions

The Settlement Agreement provides for broad mutual releases between the Trustee and Settling Parties. The Trustee, for Orly and the Bankruptcy Estate, releases the Settling Parties from "all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, remedies, offsets, rights, actions, proofs of claims, and causes of action" related to the 2013 Settlement Agreement, and other matters. *Id.* § 5.

As discussed at length in the Analysis section below, in addition to these releases, the Settlement Agreement calls for the Court's entry of a permanent injunction. This injunction would bar "any creditor of the Bankruptcy Estate, anyone acting on their behalf or in concert or

---

[25] The "Condo Interest" is defined by the Settlement Agreement as "a one-half undivided interest in a condominium located at 210 Lavaca Street, Unit 1903, Austin, TX 78701, exclusive of any parking or storage units . . . ." Settlement Agreement, Recitals. The agreement explains that the interest belongs to Orly, who acquired it "by virtue of a gift by Herschmann in 2016." *Id.*

participation with them, or any person whose claim in any way arises from or relates to the [2013 Settlement Proceeds], the Condo Interest or the other claims settled by this Agreement" from asserting certain claims against the Bankruptcy Estate or the Settling Parties. *Id.* § 8. The injunction specifically bars claims that are "duplicative or derivative of any claim brought by the Trustee or which could have been brought by the Trustee against the Settling Party Releasees or any member of the Trump Group . . . ." *Id.*

Dismissal of Pending Actions

Another key component of the settlement is the dismissal of numerous pending actions, including appeals related to certain actions (collectively, the "Target Actions," as enumerated in the following footnote).[26] The agreement also covers "any similar actions against any of the Parties

---

[26] The Target Actions whose prosecution would be enjoined, as described by the Settlement Agreement, are the following:

1.  *Dalia Genger, trustee of the Orly Genger 1993 Trust v. Orly Genger, Arie Genger, Glencova Investment Company, TR Investors LLC, New TR Equity I, LLC, New TR Equity II, LLC, Trans-Resources, Inc., Arnold Broser, David Broser, John Does 1-20 and Jane Does 1-20*, originally in Surrogate's Court, now Bankr. S.D.N.Y., Adv. Pro. No. 20-ap-01188 (Garrity, J.) [i.e., the Orly Trust Turnover Action];

2.  the appeal filed by Dalia Genger in *Arie Genger et al. v. Sagi Genger et al.*, 1st Dept. Case No. 2019-4438 [i.e., the Dalia Appeal];

3.  the turnover motion filed by Sagi Genger in *Sagi Genger v. Orly Genger*, No. 17- cv-8181 (Broderick, J.) (S.D.N.Y. June 11, 2019) (Docket Nos. 212-214) [i.e., Sagi's Turnover Motion];

4.  *Sagi Genger v. David Broser, individually and as trustee of the Genger Litigation Trust, Arnold Broser, ADBG LLC, Tedco, Inc. Arie Genger, and John Does 1-10*, S.D.N.Y. Case No. 19-cv-6100 (Broderick, J.) [i.e., Sagi's Avoidance Action];

5.  *Manhattan Safety Maine, Inc. et al. v. Michael Bowen, Arie Genger, Arnold Broser, David Broser, Genger Litigation Trust, ABDG LLC, and TEDCO, Inc.*, S.D.N.Y. Case No. 19-cv-5642 (Vyskocil, J.) [i.e., the MSM Action];

6.  *Dalia Genger and D&K GP LLC v. Orly Genger, Michael Bowen, Arie Genger, Arnold Broser, David Broser, Eric Herschmann, the Genger Litigation Trust, ADBG LLC, Tedco Inc., and Deborah Piazza as chapter 7 Trustee*, Bankr. S.D.N.Y., Adv. Pro. No. 20-ap-1010 (Garrity, J.) [i.e., Dalia's Constructive Trust Action];

7.  *Sagi Genger and TPR Investment Associates, Inc. v. Orly Genger*, Bankr. S.D.N.Y., Adv. Pro. No. 20-ap-1444 (Garrity, J.) [i.e., Sagi/TPR's Discharge Objection];

hereto that are derivative or duplicative of the claims settled hereunder, or that could have been

pursued by the Trustee." *Id.*

Treatment of Proofs of Claim

The agreement addresses the treatment of various parties' proofs of claim in the Chapter 7

Case. Without limitation, the proof of claim filed by Arie[27] will be reclassified from a secured

claim to a general unsecured claim. *Id.* § 11. Arie agrees to waive "any priority or preference to

any distribution on account of the proceeds received by the Bankruptcy Estate as a result of the

receipt of the Settlement Payments . . . ." *Id.*

ADBG LLC and the Genger Litigation Trust agree that their respective proofs of claim

"shall be deemed satisfied" upon receipt of the 2013 Settlement Proceeds that are being held in

escrow. *Id.* § 12. Herschmann agrees to subordinate his proof of claim "solely to the extent of any

proceeds received by the Bankruptcy Estate as a result of the Settlement Payments," allowing these

funds to be "distributed pro rata to all creditors of the Bankruptcy Estate with allowed claims

---

8.  *Dalia Genger v. Orly Genger*, Bankr. S.D.N.Y., Adv. Pro. No. 20-ap-1445 (Garrity, J.) [i.e., Dalia's Discharge Objection];

9.  *Michael Oldner, as trustee of the Orly Genger 1993 Trust v. Orly Genger*, Bankr. S.D.N.Y., Adv. Pro. No. 20-ap-1447 (Garrity, J.) [i.e., the Orly Trust's Discharge Objection];

10. *Sagi Genger v. Eric Herschmann*, Bankr. S.D.N.Y., Adv. Pro. No. 21-ap-01135 (Garrity, J.) [i.e., the Sagi-Herschmann Action];

11. and any similar actions against any of the Parties hereto that are derivative or duplicative of the claims settled hereunder, or that could have been pursued by the Trustee, including but not limited to any and all claims relating to or arising from the Condo Interest, the [2013 Settlement Agreement], the [2013 Settlement Proceeds] and any Trump Group Settlement Claims (the actions identified in this clause (ix), together with the [Orly Trust Turnover Action], the Dalia Appeal, [Sagi's Turnover Motion], [Sagi's Avoidance Action], the [MSM Action], [Dalia's Constructive Trust Action], [Sagi/TPR's Discharge Objection], [Dalia's Discharge Objection], the [Orly Trust's Discharge Objection] and the [Sagi-Herschmann Action], are collectively . . . the [Target Actions]).

Settlement Agreement § 8.

[27] Arie's proof of claim appears on the Court's claims register in the Chapter 7 Case as Claim No. 2.

pursuant to 11 U.S.C. § 502 that have not been equitably subordinated." *Id.* § 13. KBT's claim "shall be allowed as a general unsecured claim in a reduced amount totaling $1,450,000." *Id.* § 14.

### Cooperation and Tolling Provisions

The Settling Parties agree to cooperate with the Trustee: the agreement requires them to provide "reasonable cooperation and support to the Trustee in connection with the (i) approval and consummation of this Agreement, and (ii) prosecution of claims, causes of action and claims objections against Sagi Genger . . . ." *Id.* § 20.

The agreement also includes a tolling provision for statutes of limitations. This provision "toll[s] and suspend[s]" any applicable statutes of limitations through the earlier of (a) thirty days after the Payment Due Date or receipt of the Settlement Payments, or (b) thirty days after a decision denying approval of the Agreement or overturning its approval on appeal. *Id.* § 21.

### Nonoccurrence Clause

The agreement provides that if the Effective Date fails to occur, the agreement becomes void. However, the Non-Refundable Settlement Payment would remain due, and the tolling provisions would remain in effect. *Id.* § 26.

## The Trustee's Position

The Trustee asks the Court to approve the proposed Settlement Agreement, arguing that it satisfies the seven *Iridium* factors and should be approved. Motion ¶¶ 133, 135 (citing *Iridium*, 478 F.3d at 462). The Trustee maintains that the Settlement Agreement represents a significant improvement over previous settlement attempts, resulting from extensive negotiations that began in early 2020 and led to better terms than those proposed in May 2020. *Id.* ¶ 136. She says that this improvement is evidenced by the substantial increase in cash consideration, with the current

agreement yielding $2.55 million for the estate, including a non-refundable $300,000 payment that immediately became property of the estate upon the Settlement Agreement's execution. *Id.* ¶ 138.

The Trustee argues that the Settlement Agreement resolves many complicated issues in the case, including claims related to the Debtor's homestead exemption and Condo Interest, and secures agreements from various parties to forgo their share of the cash consideration. *Id.* Additionally, the settlement provides for the sale of certain estate claims for $50,000 plus a percentage of potential future recoveries, allowing the estate to benefit from possible future litigation proceeds without incurring additional expenses. *Id.*

The Trustee says that her assessment of litigation risks justifies the Settlement Agreement because she concludes that there was a significant risk of losing an action to pursue the 2013 Settlement Proceeds from certain Settling Parties. *Id.* ¶ 140. Furthermore, she maintains that the resolution of the Homestead Dispute reflects a reasonable assessment of the claim's value to the Bankruptcy Estate and will avoid likely expensive litigation over novel legal issues. *Id.* ¶ 141.

The Trustee argues that the Settlement Agreement would significantly enhance distributions to unsecured creditors with allowed claims. *Id.* ¶ 146. She says that this is due to the agreement by most of the Settling Parties to not share in the recovery from the Settlement Payments, as well as the resolution of claims by various parties. *Id.* ¶¶ 145–46. She also says that the reclassification of the claims of certain Settling Parties and the waiver of others contribute to the overall benefit to the estate and its creditors. *See id.* ¶¶ 144–45.

### *The Permanent Injunction of Duplicative and Derivative Actions*

The Trustee argues that an injunction barring pursuit of the Target Actions is necessary given the unique circumstances of this case and the extensive Genger family litigations. Motion ¶ 147. The Settling Parties dispute whether the 2013 Settlement Proceeds belong to Orly, the Orly

Trust, or Dalia, and even whether there actually exist any potential claims that these proceeds belong to the Bankruptcy Estate. *Id.* ¶ 150. The Trustee contends that without the injunction, the Settling Parties risk piecemeal litigation, conflicting judgments, and potential liability for claims in other actions seeking to recover the same property based on the same transactions. *Id.* ¶ 151.

The Trustee maintains that the Court has "related to" jurisdiction to enjoin third-party disputes where the subject of the dispute is property of the estate or the dispute would affect the estate. *Id.* ¶¶ 152–53. She further argues that several parties, including Sagi, Dalia, TPR, D&K GP LLC, and the Orly Trust, have filed proofs of claim in this chapter 7 case, thereby consenting to the Court's jurisdiction. *Id.* ¶ 154.

The Trustee asserts that the Target Actions are all derivative or duplicative, predicated on the same generalized conduct and not based on any particularized injury caused by the various defendants. *Id.* ¶ 160. She argues that the Sagi Parties seek to recover for a generalized alleged injury arising from Orly being a party to the 2013 Settlement Agreement, which, if it causes harm, would affect all creditors of Orly's estate in the same way. *Id.* ¶ 164. The Trustee contends that because the Target Actions are predicated on the same transfers of funds, rather than on any particularized injury caused by the Settling Parties, they may be enjoined. *Id.* ¶ 166.

The Trustee argues that the permanent injunction is not a non-debtor release because it is limited only to the Target Actions. Motion ¶ 191. Moreover, the Trustee contends that even if considered a non-debtor release, the injunction is justified under the *Metromedia* exception, which allows such releases in "unusual circumstances" where the debtor's estate has received substantial consideration. *Id.* ¶¶ 191–92 (citing *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 141–43 (2d Cir. 2005)).

The Trustee argues that the circumstances of this case are unusual, citing the Sagi Parties'
attempts "to litigate around the automatic stay" and the extensive list of Target Actions. *Id.* ¶ 193.
She maintains that without the injunction, the Sagi Parties would continue their "neverending [sic]
quest to recover the [2013 Settlement Proceeds]," forcing the Settling Parties to expend millions
in legal fees defending themselves despite obtaining a release from Orly's estate. *Id.*

The Trustee stresses the substantial benefits the Settlement Agreement will bring to the
estate. She notes that the Settlement Payments and Initial Estate Claims Consideration will bring
$2.55 million into the estate for distribution to creditors, with potential for more if the Estate
Claims Assignee is successful in pursuing the acquired Estate Claims. *Id.* ¶ 194. The Trustee
highlights that $300,000 of the settlement consideration is non-refundable, providing immediate
value to the estate. *Id.* She asserts that this settlement would be the estate's largest recovery to
date, dramatically increasing the estate's property and the potential distributions to creditors. *Id.*

The Trustee also argues that the injunction is necessary to ensure the settlement's success.
She contends that without it, the Settling Parties would be "fearful of paying twice for the same
transfer." *Id.* ¶ 196 (quoting *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R.
423, 435 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. Fox v. Picard (In re Bernard L. Madoff)*, 848 F.
Supp. 2d 469 (S.D.N.Y. 2012), *aff'd sub nom. Marshall v. Picard (In re Bernard L. Madoff Inv.
Sec. LLC)*, 740 F.3d 81 (2d Cir. 2014)). The Trustee asserts that where a settlement is less likely
to occur without an injunction, a court may foster the conclusion of the settlement by providing
the finality sought by the parties through an injunction. *Id.*

### The Automatic Stay

The Trustee argues that the automatic stay applies to the Target Actions, regardless of
whether Orly is explicitly named as a party. *Id.* ¶ 198 (citing 11 U.S.C. § 362(a)(1)). She contends

that actions that do not name Orly, such as the MSM Action, the Sagi Avoidance Action, and the Sagi-Herschmann Action, are effectively against Orly because she is a required party. *Id.* The Trustee illustrates this point using the MSM Action, which alleges that Orly caused the transfers of the 2013 Settlement Proceeds, an issue that cannot be decided without determining her ownership interest in the proceeds. *Id.* ¶ 199. The Trustee also asserts that a third-party action to recover fraudulently transferred property is subject to section 362(a)(1) of the Bankruptcy Code as a claim against the debtor where, absent a claim against the debtor, "there is no independent basis for the action against the transferee." *Id.* ¶ 200 (quoting *In re Colonial Realty Co.*, 980 F.2d 125, 132 (2d Cir. 1992)). The Trustee does not explain what relationship the automatic stay has to the approval of the Settlement Agreement, so the Court does not consider the issue below.

### *Business Judgment*

The Trustee argues that the sale of the Estate Claims is a reasonable exercise of her business judgment and is in the best interests of the Bankruptcy Estate and its creditors, contending that under section 363(b) of the Bankruptcy Code, a sale of property is appropriate if there is "some articulated business judgment" for the transaction. *Id.* ¶¶ 207–08 (quoting *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19–20 (B.A.P. 9th Cir. 1988)).

The Trustee contends that a sound business justification exists because, without the sale, she would have no choice but to abandon the Estate Claims "for no value" or pursue litigation without funding. *Id.* ¶ 212. The Trustee argues that selling the claims "for a fixed settlement amount of $50,000 plus significant upside in the millions of dollars is a reasonable exercise of the Trustee's business judgment." *Id.* She maintains that the sale will produce a fair and reasonable price, noting that the purchase price was negotiated and analyzed for value, costs, and potential risks, and that Dalia, Sagi, and Michael Oldner have previously advised that the Estate Claims lack

merit. *Id.* ¶ 213. She also argues that the estate will benefit from both the fixed amount and potential future proceeds without incurring expenses. *Id.* ¶¶ 213–14.

Finally, the Trustee represents that the sale was the product of good faith negotiations, arguing that section 363(m) protection should apply, and proposes to serve notice of the motion on various parties, including all known creditors, the Trump Group, and relevant federal and state agencies. *Id.* ¶¶ 215–17, 219.

## **The Objections**

The Sagi/TPR Objection, the Orly Trust Objection, and the Dalia Joinder (together, the "Objections") raise similar arguments.

### *The Permanent Injunction*

The Sagi/TPR Objection argues that through the permanent injunction, the Settlement Agreement purports to enjoin claims that could not have been pursued by the Trustee, and the Orly Trust and Dalia contend that the enjoined claims are direct, not derivative, and thus beyond the Court's jurisdiction. Sagi/TPR Objection ¶ 57; Orly Trust Objection at 24; Dalia Joinder ¶ 7. The Orly Trust specifically argues that the claims to be enjoined are "by and for the benefit of the Orly Trust to recover assets particular to the Orly Trust," making them direct rather than derivative claims. Orly Trust Objection at 25.

The Orly Trust argues that the harm suffered by the Orly Trust by reason of the 2013 Settlement Agreement is unique and distinct, making its claims neither derivative nor duplicative. *Id.* at 32 n.26. Furthermore, the Orly Trust argues that several ongoing actions, including the MSM Action, the Orly Trust Turnover Action, and the Dalia Appeal, concern the Orly Trust exclusively and any recovery must benefit the Orly Trust, not the estate. *Id.* at 27–30. The Orly Trust maintains that because these actions seek to recover assets particular to the Orly

Trust, they are direct claims that the Court cannot enjoin. *Id.* The Orly Trust also says that the Trustee has not asserted that the Bankruptcy Estate would have claims against these third parties for the return of the 2013 Settlement proceeds. *Id.* at 5.

The Objections also argue that the scope of the proposed injunction and releases are overbroad. The Objections contend that these releases constitute non-consensual third-party releases, which they argue are not allowed. Sagi/TPR Objection ¶ 58; Dalia Joinder ¶ 14; Orly Trust Objection at 37 n. 29. The Objections also object to the Settlement Agreement's purported release of objections to the Debtor's discharge. Orly Trust Objection at 25 n.17; Sagi/TPR Objection ¶ 61; Dalia Joinder ¶ 18. Sagi/TPR explain that Local Rule 4007-2 requires an affidavit stating that no consideration was promised or given for the withdrawal or failure to prosecute a complaint objecting to discharge. Sagi/TPR Objection ¶ 63. They note that no such affidavit has been filed here, assertedly because the Trustee's failure to prosecute the discharge objection is explicitly in exchange for the consideration provided under the Settlement Agreement. *Id.* ¶ 64. Sagi/TPR further argue that even where courts have permitted settling objections to discharge, they have followed Bankruptcy Rule 7041, which requires court approval with terms and conditions the Court deems proper. *Id.* ¶ 65 (quoting Fed. R. Bankr. P. 7041).

### *Estate Claims Sale*

The Objections argue that the sale of the Estate Claims exceeds the Trustee's authority because those claims do not belong to the Estate and are not derivative or duplicative of claims that do. *Id.* ¶ 48.

Sagi/TPR maintain that the Estate Claims have largely been decided against the Debtor and would not result in any recovery by the estate even if valid because they do not belong to the

estate. *Id.* They further argue that Heschmann's willingness to pay does not justify selling assets that do not belong to her. *Id.* ¶ 72 (citing *In re Kiersz*, 311 B.R. 145, 148 (Bankr. W.D.N.Y. 2004)).

The Orly Trust echoes this point, asserting that any funds collected on these claims would belong to the Orly Trust—the real party in interest of a derivative claim—and not to Orly or the Bankruptcy Estate. Orly Trust Objection at 6. Consequently, they argue that the Trustee lacks standing to sell these claims as they do not affect the Bankruptcy Estate. *Id.*

The Orly Trust further objects to the sale of the Estate Claims, asserting that Orly's claims in various actions, including the State Court Action, the Surrogate's Court Action, and claims against the Orly Trust trustees, all inure to the Orly Trust. Orly Trust Objection at 39–50. It argues that these claims are derivative in nature, brought on behalf of the Orly Trust, and therefore any recovery belongs to it and not the Bankruptcy Estate. *Id.* at 45, 47–48. The Orly Trust maintains that the claims are not property of the Bankruptcy Estate and cannot be sold by the Trustee. *Id.* at 41, 49.

### Rule 9019

The Sagi/TPR Objection purports to address each of the seven factors relevant to the evaluation of whether a settlement is fair and equitable, Sagi/TPR Objection ¶¶ 21–22 (citing *Iridium*, 478 F.3d at 462), while the Orly Trust Objection addresses only the third and fourth factors, Orly Trust Objection at 51–52. Sagi/TPR contend that the Settlement Agreement represents a failure by the Trustee to competently perform her job, Sagi/TPR Objection ¶ 24, and argue that it purports to sell claims that do not belong to the estate, allows "fraudulent transferees" to keep over $30 million in alleged estate assets, and grants releases and injunctions protecting these transferees, *id.* ¶¶ 25–26.

The Sagi/TPR Objection argues that the Settlement Agreement would increase the risk of complex and protracted litigation, *id.* ¶ 37, while conceding it would end certain litigation among the Genger family, *id.* ¶ 38. The objection contends that the sale of claims would cause more litigation against Sagi and revive various stale or previously decided litigations. *Id.*

Both the Sagi/TPR and the Orly Trust emphasize that virtually every active creditor not party to the Settlement Agreement objects to it, *id.* ¶ 42; Orly Trust Objection at 52.[28] Sagi/TPR further attacks the analysis of the Trustee and her counsel, Sagi/TPR Objection ¶¶ 48–49, arguing that their so-said failure to conduct sufficient due diligence and willingness to take unsupported positions militate against approval, *id.* ¶ 53. Finally, they contend the Settlement Agreement was not reached at arm's length. *Id.* ¶¶ 67–68.

**<u>The Reply</u>**

***The Settlement Agreement's Propriety***

The Reply argues that the Sagi/TPR overestimates the value of the settled claims, ignoring the fact that no court has determined Orly's entitlement to the 2013 Settlement Proceeds. Reply ¶ 8. The Trustee acknowledges that a court could potentially find Orly entitled to none of the 2013 Settlement Proceeds, rendering the claims worthless. *Id.* ¶ 9. She explains that the 2013 Settlement Agreement provided consideration only to the AG Group without explicitly allocating anything to Orly, and allowed for an initial cash payment approximating the principal owed to ADBG LLC at the time of settlement. *Id.* ¶ 13.

Regarding creditors' support—or lack of support—for the Settlement Agreement, the Trustee asserts that that courts frequently consider the views of all creditors, even those party to

---

[28] Only the Settling Parties filed a document in support of the Motion. *See Joinder of Settling Parties in Support of Chapter 7 Trustee's Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (A) Approving Settlement Agreement and (B) Granting Related Relief*, ECF No. 528.

the settlements at issue. *Id.* ¶¶ 15, 23. She also argues that Sagi/TPR's objection to the proposed sale of pending claims is based on a misunderstanding of the claims being sold and of the Settlement Agreement itself. *Id.* ¶ 73. The Trustee contends that those claims are ongoing and belong to Orly, not the Orly Trust, because Orly is a beneficiary of the trust. *Id.* ¶ 80.

***The Release and Injunction Provisions are Appropriate and Warranted***

The Trustee argues that the proposed injunction is similar to others upheld by the Second Circuit. Motion ¶ 31 (citing *Fox*, 848 F. Supp. 2d 469, 489–90 (S.D.N.Y. 2012), *aff'd*, *Madoff*, 740 F.3d 81 (2d Cir. 2014)). She emphasizes the necessity of these injunctions, asserting that without them, the Settling Parties could face double liability for the claims being settled. *Id.* ¶ 33.

The Trustee asserts that all claims and proceedings that would be enjoined by the permanent injunction are derivative or duplicative. *Id.* ¶ 45. The Trustee argues that the Settlement Agreement can enjoin various discharge objections because they are derivative or duplicative of the Sagi Parties' turnover and fraudulent transfer claims, as well as the Trustee's claims related to the 2013 Settlement Proceeds. *Id.* ¶ 53.

<u>Analysis</u>

The Settlement Agreement would resolve a web of litigation surrounding the Genger family disputes, particularly those relating to the 2013 Settlement Proceeds. Through the settlement, the Settling Parties seek to conclusively secure their rights to those proceeds.

There are two issues with the Motion. First, though the Court refrains from deciding the issue, the Settlement Agreement likely does not satisfy *Iridium*. The deal that the Trustee has stuck with the Settling Parties appears to give too much to the Settling Parties and gets back too little for the creditors as a whole. However, even if the benefits from the Settlement Agreement that the Bankruptcy Estate would receive were so great as to justify its approval, the Court still could not

approve it. The reason is that the Settlement Agreement depends on the Court's issuing a permanent injunction that would prevent certain non-settling parties from prosecuting claims against the Settling Parties; the Trustee has not demonstrated that many of these would-be enjoined claims belong to the Bankruptcy Estate. Because the Court cannot enter such an order, the Court denies the Motion.

## The Nature of the Settlement Agreement

The settlement is a global resolution of claims with clear winners and losers. It aims to give the Settling Parties control over estate assets and litigation rights while limiting the Objecting Parties' ability to pursue their claims. The practical effect of the settlement would be to allow the Settling Parties to retain about 92% of the 2013 Settlement Proceeds and leave Herschmann with the Condo Interest, while permanently enjoining the Objecting Parties' claims to those assets and barring their objections to Orly's discharge.

The Settlement Agreement provides that "all amounts due and owing in connection with the Escrowed Trump Group Settlement Proceeds shall be paid to the Genger Litigation Trust, and each of the Parties agrees to promptly transfer any [2013 Settlement Proceeds] he, she or it receives to the Genger Litigation Trust." Settlement Agreement § 9. Given that David Broser and Lance Harris are the trustees of the Genger Litigation Trust, this provision ensures that these settlement proceeds would remain under the control of parties aligned with Orly.

Simultaneously, the agreement seeks to prevent other estate creditors, like Sagi and Orly Trust, from contesting the ownership of the 2013 Settlement Proceeds. The Settlement Agreement would achieve this by the Court's entry of a broad permanent injunction:

> Subject to Paragraph 6 above, the Final 9019 Order shall include an order by the Bankruptcy Court . . . permanently enjoining any creditor of the Bankruptcy Estate, anyone acting on their behalf or in concert or participation with them,

> or any person whose claim in any way arises from or relates to the [2013
> Settlement Proceeds], the Condo Interest or the other claims settled by this
> Agreement, from asserting any claim against the Bankruptcy Estate or any of
> the Settling Party Releasees or any member of the Trump Group that is
> duplicative or derivative of any claim brought by the Trustee or which could
> have been brought by the Trustee against the Settling Party Releasees or any
> member of the Trump Group.

*Id.* § 8. This would tie the hands of the Objecting Parties by preventing them from challenging the ownership of the 2013 Settlement Proceeds, thus ensuring that none of them will be able to challenge that control. This would effectively allow the Settling Parties parties to maintain control over the 2013 Settlement Proceeds without ever risking a court finding that the Orly Trust or any Sagi-aligned party is the rightful owner of those proceeds.

Finally, the Settlement Agreement would assign the Estate Claims to Claims Pursuit, Inc. These include "all claims, whether past, present or future, known or unknown, and asserted or unasserted, that the Bankruptcy Estate may have against Dalia, present, former or successor trustees of the Orly Genger 1993 Trust, and affiliated or related entities other than Sagi." *Id.* § 3. This assignment effectively gives Orly's side a license to pursue the Orly Trust-related claims.

In exchange, the Settling Parties have agreed to make payments and other concessions to the Bankruptcy Estate. *Id.* § 2. These include a total payment of around $2.5 million, specific modifications to creditor claims (including reclassification, subordination, and in one case, reduction),[29] and asset transfers. *Id.* §§ 2, 7, 11, 13–14.

---

[29] Specifically, Arie agrees to reclassify his claim from a secured claim in the amount of $5,451,389.27 to a general unsecured claim. Settlement Agreement § 11. Herschmann agrees to subordinate his proof of claim, but only to the extent of any proceeds received by the Bankruptcy Estate because of the Settlement Payments. Settlement Agreement § 13. KBT's claim would be allowed as a general unsecured claim in a reduced amount totaling $1,450,000 (from $1,572,627). Settlement Agreement, Recitals & § 14. Separately, ADBG LLC and the Genger Litigation Trust agree that their proofs of claim in the bankruptcy case would be considered satisfied, but only if the Genger Litigation Trust received the 2013 Settlement Proceeds in escrow. Settlement Agreement § 12.

Of the benefits that the Settling Parties would receive if the Court granted the Motion, the importance of the injunctions and releases cannot be overstated. According to the Settlement Agreement's recitals, the 2013 Settlement Agreement is worth $50 million, of which $17.3 million has been paid and $15 million remains in escrow. *Id.*, Recitals.[30] As explained in more detail below, various parties, including Sagi, Dalia, and their affiliated entities, have over the years asserted claims to these proceeds.

To prevent those various parties from challenging who owns the 2013 Settlement Proceeds, the Settling Parties require the Court to issue a permanent injunction as part of an order effecting the settlement. *Id.* § 8. This injunction would prevent creditors from asserting claims against the Settling Parties that are "duplicative or derivative" of claims brought by the Trustee. *Id.* Additionally, the agreement anticipates the dismissal of at least ten actions against combinations of the Settling Parties. *Id.*

The agreement says that its terms are "mutually dependent, interrelated and non-severable." *Id.* § 31. The upshot is that since the Settlement Agreement's provisions are interdependent, without the injunctions, the settlement would unravel because the Settling Parties' contributions to the estate depend on the injunction. The Court cannot grant the injunctions, and

---

[30] The settling parties break out the $50 million as follows:

- Approximately $17.3 million, which has been paid to date by the Trump Group to the AG Group. Settlement Agreement, Recitals.

- $15 million (subject to certain setoffs, as described in the 2013 Settlement Agreement) in notes payable to Bowen, as escrow agent for the AG Group, has yet to be paid by the Trump Group to the AG Group. Settlement Agreement, Recitals.

- $17.7 million—the amount of Sagi's sale of the Orly Trust's and Arie's TRI shares to the Trump Group at discounted values of $10.3 million and $7.4 million, respectively, without Orly or Arie's consent—that was ultimately paid to TPR Investment Associates, Inc. Settlement Agreement, Recitals.

for that reason, it must deny the Motion. The Court will nonetheless address the parties' other objections before explaining why it cannot grant the injunctions.

## Section 363 Sales

### *Estate Claims*

The Orly Trust argues that the proposed sale of "Estate Claims" by the Trustee should not be approved because these claims are not part of the Debtor's bankruptcy estate and therefore not the Trustee's to sell. The Trust asserts that the Estate Claims are claims on behalf of the Orly Trust against Dalia Genger and present, former, or successor trustees of the Orly Trust. Orly Trust Objection at 39. As such, these claims do not belong to the Debtor personally, but to the Orly Trust itself. *Id.* If these claims are indeed trust property rather than personal property of the Debtor, they would not be part of the bankruptcy estate and thus not within the Trustee's authority to sell. *Id.* at 40.

The Bankruptcy Code empowers the trustee to sell property of the estate under 11 U.S.C. § 363(b). After notice and a hearing, the trustee may "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

A trustee may only sell what belongs to the bankruptcy estate. Such property includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.* § 541(a)(1). However, the Bankruptcy Code nowhere defines what those interests are. The extent of a debtor's interests in property depends instead on state law. *Butner v. United States*, 440 U.S. 48, 55 (1979) (state law creates and defines property interests "unless some federal interest requires a different result"); *see also In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1101 (2d Cir. 1990) ("Although federal bankruptcy law determines the outer boundary of what may constitute property of the estate, state law determines the 'nature of a debtor's interest' in a given item. Therefore,

whereas federal law instructs us that [an asset] may constitute property of [the debtor's] estate,
state law determines whether [the debtor's] interest in the [asset] is sufficient to confer on the estate
a property right." (quoting *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir. 1989))).

In *In re Atlantic Gulf Communities Corp.*, the Bankruptcy Court for the District of
Delaware held that speculative litigation claims are property of the estate and may be sold by a
bankruptcy trustee under section 363 of the Bankruptcy Code. 326 B.R. 294, 299 (Bankr. D. Del.
2005). The speculative claim at issue concerned the ownership rights to accreted land along a river
in Florida. *Id.* at 296. It was unclear when the accretion happened and whether it was included in
the original conveyance of the lots. *Id.* at 298 & n.3.

The dispute arose when the bankruptcy trustee sought to sell the accreted land adjacent to
certain lots, claiming that it belonged to the bankruptcy estate. *Id.* at 297. The plaintiffs, who had
purchased one of the lots, objected to the sale, claiming that they owned the accreted land as part
of their lot. *Id.*

The court recognized that the ownership of the accreted land was a matter of genuine
dispute. *Id.* at 298. It noted that the timing of the accretion was material because "if it arose before
the conveyance by the Debtor's predecessor, then the conveyance which is in metes and bounds
did not include it." *Id.*

Despite this uncertainty, the court held that the trustee could sell the estate's interest in the
disputed property. *Id.* at 300. The court reasoned that under state law, there was "no discernable
difference between the assignment of a litigation right and the execution of a quitclaim
deed." *Id.* The court thus treated the sale of the estate's interest in the disputed property through a
quitclaim deed as being the same as selling a speculative litigation claim. *Id.*

34

The court's decision was based on the broad definition of property of the estate under section 541(a) of the Bankruptcy Code, which includes "all legal and equitable interests of the debtor." *Id.* at 299 (citing 11 U.S.C. § 541(a)(1)). This encompassed speculative litigation claims. *Id.* (citing *Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A v. Alvarez (In re Alvarez)*, 224 F.3d 1273, 1279–80 (11th Cir. 2000)).

Here, the Estate Claims fall into three categories: a state court claim against Dalia Genger for alleged fraud, claims in Surrogate's Court to remove Dalia as trustee and for an accounting, and potential claims against past, present, and future trustees of the Orly Trust. The Orly Trust contends that all of these claims are derivative in nature, meaning any recovery would benefit the Orly Trust itself, not the Bankruptcy Estate. For that reason, the Orly Trust contends that those claims are not the Bankruptcy Estate's to sell.

This argument is nonresponsive to the issue of what claims Orly could have asserted on behalf of the Orly Trust prior to bankruptcy. Those are the interests that became part of the estate under section 541 of the Bankruptcy Code. Orly has maintained actions for the Orly Trust derivatively in the past, including in the 2010 Action. What principle of New York law would render Orly, and thus the Trustee, unable to do so now is a question left unaddressed by the Orly Trust. At the very least, what right Orly may have had to bring such a claim is a speculative one. As *Atlantic Gulf* explained, even speculative claims are property of the bankruptcy estate. The relevant question is not who would ultimately benefit from these claims, but whether Orly had the right to bring these claims at the time of the bankruptcy filing.

The Orly Trust also argues that the Bankruptcy Code excludes beneficial interests in spendthrift trusts from the bankruptcy estate. While this is generally correct, the issue is not whether Orly's beneficial interest in the Orly Trust belongs to the Bankruptcy Estate. Rather, the

issue is whether Orly had a right to sue on the Orly Trust's behalf. The Court has no need to decide that issue. In *Atlantic Gulf*, the court allowed the trustee to sell disputed property interests through a quitclaim deed, effectively permitting the sale of speculative interests without definitively resolving the underlying ownership disputes. Likewise, the fact that there is no clear answer whether Orly had a right to assert the claims does not prevent the Trustee from selling whatever right she had to assert them. The ultimate resolution of what interest, if any, Claims Pursuit, Inc. may have acquired can be resolved in future litigation.

The next issue is whether the Court should credit the Trustee's business judgment. When considering whether to approve a sale under section 363 of the Bankruptcy Code, courts apply the business judgment rule. This rule requires that sales be based on the trustee's sound business judgment. *In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012). Courts generally apply a "strong presumption" that the trustee's decision was made in good faith and in the best interests of the estate. *Id.* Courts also often consider the factors outlined in *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). Though some of the factors outlined in that case are relevant only to sales in cases under chapter 11 of the Bankruptcy Code, some that are relevant here include the relative value of the asset to the estate compared to its other assets, how in line the sale proceeds are with appraisals, "whether the asset is increasing or decreasing in value," and whether selling the asset is preferable to using it. *Id.*

The Trustee's business judgment is sound. The Trustee asks to sell the Estate Claims for $50,000 upfront, plus a percentage of future recoveries. Despite the admittedly low initial payment, it is one that makes sense for the Bankruptcy Estate in proper context.

The Estate Claims in question include actions against Dalia and others; they include allegations of breach of fiduciary duty, fraud, and other unasserted claims. The terms of the sale

provide immediate benefit to the Bankruptcy Estate while retaining some potential for upside. The $50,000 upfront payment represents a guaranteed recovery for the estate that allows it to avoid the cost and uncertainty of litigation, which, together with the contingent payments, the Trustee has decided outweigh the risks of litigation. This arrangement allows the estate to benefit if any claims for monetary damages prove successful.

The sale mitigates risk for the Bankruptcy Estate by transferring the burden of pursuing the claims to the Estate Claims Assignee, an entity with knowledge of the pre-petition litigation.[31] Second, the negotiated price, which the Trustee believes to be fair and reasonable, was reached after her analysis of the claims' value, costs, and inherent risks. Although the Court would have preferred that she be able to quantify those risks, the uncertain nature of any recovery from them somewhat excuses this failure. Third, the sale cannot be viewed in isolation—it comes in the context of what is essentially a "package deal" that would bring a total of $2.55 million into the Bankruptcy Estate.

When considering whether to approve such a sale under section 363 of the Bankruptcy Code, courts apply the business judgment rule, which presumes that the trustee acted in good faith and in the best interests of the estate. *MF Glob.*, 467 B.R. at 730. Here, the Trustee's decision meets this standard. By securing an immediate benefit for the estate, avoiding the costs and

---

[31] Special considerations become relevant when dealing with insider transactions. The Bankruptcy Code defines who is an "insider" in 11 U.S.C. § 101(31), which includes relatives of the debtor. A court may also consider somebody a non-statutory insider; to do so, it typically considers the closeness of the would-be insider's relationship with the debtor and whether the transaction is conducted at arm's length. *Hirsch v. Va. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002). This determination is a case-by-case one. *Id.* When a proposed sale would benefit an insider, courts often apply heightened scrutiny to ensure fairness. *In re Flour City Bagels, LLC*, 557 B.R. 53, 78 (Bankr. W.D.N.Y. 2016). However, the situation here bears important distinctions from the usual case where insider status is implicated. The Trustee is an independent and neutral third party whose duties run to the creditors of the Bankruptcy Estate. Whatever Claims Pursuit, Inc.'s interests in the transaction or relation to Orly, no party has raised a credible argument that the Trustee has not dealt with either the Settling Parties or Claims Pursuit, Inc. at arm's length. Therefore, this concern is attenuated.

37

uncertainties of protracted litigation, and retaining the potential for significant future recoveries, the Trustee has made a calculated decision that balances the issues with pursuing uncertain litigation with a guaranteed recovery.

**Condo Interest**

As part of the Settlement Agreement, the Trustee proposes to sell the Condo Interest to Herschmann. The Trustee's position is essentially that the sale provides immediate and substantial value to the Bankruptcy Estate, avoids the practical and legal challenges of a forced sale, efficiently addressing disputes over to what extent Orly is entitled to a homestead exemption in a single transaction. The Court agrees; the sale is a sound exercise of the Trustee's business judgment.

Sagi/TPR challenge the sale. They focus on the valuation of the Condo Interest, arguing that the property is worth between $3–4 million, with Orly's 50% interest valued at least $1.5 million. Sagi/TPR Objection ¶ 31. To support this claim, Sagi/TPR point to a Zillow estimate that the property is worth $4.1 million. *Id.* ¶ 4.

As the court in *In re Darosa* observed:

> Zillow is a participatory site almost like Wikipedia. Whereas Wikipedia allows anyone to input or change specific entries, Zillow allows homeowners to do so. A homeowner with no technical skill beyond the ability to surf the web can log in to Zillow and add or subtract data that will change the value of his property. This of course makes Zillow inherently unreliable.

442 B.R. 173, 177 (Bankr. D. Mass. 2010). The Court disagrees somewhat. The fact that the Zestimate depends on the facts that homeowners may input does not mean that Zillow is "inherently unreliable." At least in this instance, the Trustee has not explained how those inputs are wrong for the property here. Nonetheless, that Court does not think the Zillow estimate is a reason to second-guess the Trustee's business judgment. The Trustee received an estimate from a licensed real estate broker with experience in the building where the unit is located. Reply ¶ 62

The Trustee relied on the broker's management of sales for the condominium project since its inception. *Id.* ("She manages the sales team for the entire condominium project and closed all of the 159 condos which sold there from 2011 through 2014."). Additionally, the Trustee considered the property's tax assessed value of about $2.4 million. *Id.* ¶ 63. The Trustee's approach also accounted for property-specific factors—it is at least unclear whether Sagi/TPR's Zillow estimate accounted for these. These include water damage to the unit, Orly's lack of ownership in associated parking spaces and storage, and the impact of local factors like nearby homeless encampments on property values. *Id.* ¶ 66.

The Trustee has exercised reasonable business judgment in her valuation of the Condo Interest. The Court will not substitute its own judgment or that of Sagi/TPR for the Trustee's analysis. The Trustee's valuation methodology provides a more reliable basis for the proposed sale of the Condo Interest than the Zillow estimate.

Sagi/TPR also argue that the settlement gives Herschmann Orly's share of the Condo Interest for "little to no consideration." Sagi/TPR Objection ¶ 4. This argument fails to consider the whole context of the settlement. The $2.55 million cash payment to the Bankruptcy Estate is part of a comprehensive agreement—the Court agrees that it matters little who is paying what amount towards which part. *See* Reply ¶ 64 ("Further, the Trustee's objective is to receive the $2.55 million from the Settling Parties, irrespective of the party that makes the payment to the Trustee, and it is of no concern of the Trustee which of the Settling Parties actually pays the full $2.55 million or if Herschmann is contributing to one of the Settling Parties on some portion of the Settlement Payment.").

Though Sagi/TPR has offered to guarantee $1.6 million for the Condo Interest, the Trustee correctly notes that this offer was for the entire property, not merely Orly's share. *Id.* ¶ 61

("Notwithstanding all of these significant figures, as Sagi himself indicated in the Sagi Objection, the most he was willing to offer to the Trustee was $1.6 million, but what Sagi does not say is that $1.6 million was the amount he proposed to pay for the entire Homestead, <u>including Herschmann's interest</u> in the Homestead."). Moreover, Sagi's offer included additional components beyond just the purchase of the Condo Interest. Sagi's proposal would have given him the right to pursue the 2013 Settlement Proceeds. *Id.* It also included a release of counterclaims that may exist against Sagi. *Id.*

In contrast, the current Settlement Agreement provides immediate cash to the Bankruptcy Estate while preserving potential future value through the sale of certain litigation claims to Claims Pursuit, Inc. This arrangement would allow, if successful, the Bankruptcy Estate to benefit from recovery on these claims without bearing the costs and risks of the litigation. For these reasons, Sagi's offer and the scheme contemplated by the Settlement Agreement are not directly comparable, and the Court cannot say that the Trustee's proposed sale, at least when weighed against Sagi/TPR's alternative, was not based on a sound business reason.

Sagi/TPR also argue that the sale should not be approved because the homestead exemption would protect up to only a relatively small amount of Orly's from the Condo Interest. Sagi/TPR contend that the federal exemption of $25,150 (now $27,900) would apply, or at most, any exemption would be limited to $170,350 (now $189,050) under section 522(p) of the Bankruptcy Code. *See* Sagi/TPR Objection ¶¶ 31–33. The Trustee, however, maintains that Orly may be entitled to Texas homestead protections, despite not completely conceding the issue.

Section 522(p) of the Bankruptcy Code imposes a cap on the homestead exemption for property acquired within 1,215 days before filing for bankruptcy. That section provides, as relevant:

> Except as provided in paragraph (2) of this subsection and sections 544 and
> 548, as a result of electing under subsection (b)(3)(A) to exempt property under
> State or local law, a debtor may not exempt any amount of interest that was
> acquired by the debtor during the 1215-day period preceding the date of the
> filing of the petition that exceeds in the aggregate $125,000 in value in—real or
> personal property that the debtor or a dependent of the debtor uses as a residence
> [or] real or personal property that the debtor or dependent of the debtor claims
> as a homestead.

11 U.S.C. § 522(p)(1)(A), (D)

Sagi/TPR's argument hinges on their claim that Orly was not a resident of Texas when she filed for bankruptcy or for the requisite period beforehand. They point to statements made in a letter from an attorney, Daniel Benson, dated May 2, 2019, which ostensibly suggests Orly was living in Tel Aviv. Sagi/TPR Objection ¶ 32. They also reference deposition testimony from Arie, where Sagi/TPR claim Arie testified that Orly was living in Tel Aviv. *Id.*

The Trustee dismisses these arguments for several reasons. First, she argues that the letter from Daniel Benson and the deposition testimony from Arie are "not evidence, much less admissible evidence, about Debtor's legal residence and the timing of her change in domicile for purposes of Texas law." Reply ¶ 68. The Trustee notes that "This Court already ruled such one-sided depositions are inadmissible hearsay." *Id.* The Trustee argues that even if they are admissible, they "furnish[] no ground to nullify the statutory protections to which the Debtor is entitled pursuant to applicable Texas homestead laws." *Id.*

The Court agrees, that, as the Trustee puts it, "Homestead litigation, . . . is at best problematic and uncertain." Motion ¶ 141. By settling the matter rather than litigating it, the Trustee avoids the risk and expense of protracted litigation over Orly's residency status and eligibility for the exemption. The Court need not, and will not, decide merits of the homestead exemption dispute or the admissibility of the contested evidence. It suffices to say that the Trustee

has raised reasonable concerns regarding the complexity and uncertainty surrounding these issues. The Trustee's decision to settle rather than engage in protracted litigation over Orly's residency and exemption eligibility reflects the Trustee's sound business judgment. Here, the Trustee has reasonably opted for a settlement that sidesteps these issues while securing immediate value for the Bankruptcy Estate. This Court will not substitute its judgment for that of the Trustee.

The Trustee's proposed sale of the Condo Interest represents a reasonable resolution given the Trustee's assessment of its value. The $2.55 million cash payment to the Bankruptcy Estate, combined with potential proceeds from future litigation, provides sufficient consideration for the Condo Interest.

## **Rule 9019**

The Settlement Agreement, as explained below, depends on the Court's enjoining the Target Actions. Because the Court cannot do so, the Court has no need to proceed to considering whether the proposed settlement agreement falls below the "lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *In re Adelphia Communications Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)). Nonetheless, assuming that the Court could have entered the injunction that would have given effect to the Settlement Agreement, it is doubtful that the Settlement Agreement would have fallen within that range.

Sagi/TPR argue that the settlement agreement is unreasonable. They contend that the settlement provides only $2.5 million to the Bankruptcy Estate in exchange for potential claims worth up to $34 million (plus interest and attorney's fees). Sagi/TPR Objection ¶ 25. They note that the settlement effectively values the $32.3 million fraudulent conveyance claim at only $900,000, which they argue is far below its potential worth. *Id.* ¶ 35. They also point out that Sagi

offered to guarantee the estate $1.6 million for the Condo Interest alone—or nearly two-thirds of the total settlement amount. *Id.*

The Trustee argues that there were significant risks to pursuing the claims against certain Settling Parties. Motion ¶ 140. The Trustee cites the complexity of legal and factual issues related to the 2013 Settlement Proceeds and the likelihood of a "vigorous[]" defense by the Broser Parties. *Id.* Regarding the Condo Interest, the Trustee, as discussed above, outlines various legal and practical challenges, including valuation arguments, tax issues, and complications arising from Texas homestead protection laws. *Id.* ¶ 141. The Trustee contends that these factors warranted a substantial discount of the total value of the assets in question. *Id.*

In her Reply, the Trustee further argues that the Sagi Parties ignore potential defenses and the fact that no court has ruled on Orly's entitlement to the 2013 Settlement Proceeds. Reply ¶¶ 8–9. The Trustee also points out that Arie and the Brosers were signatories to the 2013 Settlement Agreement and had ongoing claims and interests, which complicates the valuation of Orly's potential share. *Id.* ¶¶ 10–13. Furthermore, the Trustee notes that ADBG LLC (or the Brosers) funded the litigation leading up to the 2013 Settlement Agreement and was owed repayment from any recoveries. *Id.* ¶ 13.

The valuation of the claims and assets is the key point of contention. Sagi/TPR argue that the Debtor's 50% interest in the condominium is estimated to be worth at least $1.5 million. Sagi/TPR Objection ¶ 31. They also focus on the large disparity between the $2.5 million that the Settlement Agreement would yield against the $32.3 million value of the 2013 Settlement Agreement. *Id.* ¶¶ 27, 30.

Sagi/TPR stress that Sagi will pursue the litigation at his own expense and risk for the Bankruptcy Estate. Sagi/TPR Objection ¶ 43. The Trustee challenges this assertion, stating that

Sagi's settlement proposals were self-serving and inferior to those that culminated in the Settlement Agreement. Reply ¶ 14.

The main issue with the Settlement Agreement is whether the Trustee has adequately considered if the settlement would maximize value for the Bankruptcy Estate by balancing litigation prospects, the benefits of the Settlement Agreement, and the interests of the objecting creditors. As the Court sees it, the real issue lies in the Trustee's settlement of potential fraudulent transfer claims. The Trustee cites the "significant risk" of losing actions against Settling Parties, but aside from reproducing the Settling Parties' arguments for their positions, does not offer much explanation what merit she thinks they may have. Motion ¶¶ 139–40. While the Settling Parties' arguments illustrate the complexity of the litigation that might surround the 2013 Settlement Proceeds, complexity in litigation is only one factor that the Court would be called to consider in assessing the Settlement Agreement, and is certainly not sufficient to justify a settlement of those claims.

The Trustee also argues that Arie's and the Brosers' interests in the 2013 Settlement Agreement and the repayment owed to ADBG LLC for litigation funding are relevant in quantifying the potential value of the claims. Reply ¶¶ 9–13. The Trustee is correct that what proportion is due from the 2013 Settlement Agreement to Arie and the Brosers, if any, may have the potential to directly reduce the net recovery to creditors as a whole from a potential fraudulent transfer action. However, to the extent the Trustee argues that some portion of the 2013 Settlement Proceeds that rightly belong to Orly could be due to offset amounts that were advanced or loaned to fund Orly's and Arie's litigation, this argument is somewhat undercut by the assumption that it would result in a dollar-for-dollar reduction or setoff against property of the Bankruptcy Estate, without explaining why it would not simply result in an unsecured claim paid *pro rata* like other.

Courts must also consider the interests of the creditors in approving a settlement agreement. There are few creditors in this case, and there are fewer than a handful who the Settlement Agreement would not directly affect. The first group are those creditors who are among the Settling Parties, and the others are those whose claims could be enjoined within the Target Actions.

This is not a case where all creditors rise and fall together. Some creditors—the Settling Parties—would benefit considerably from the Settlement Agreement's release of claims against them. In theory, part of the consideration for the Settlement Agreement is those creditors' agreement that their claims would be reduced, satisfied, or subordinated. Settlement Agreement §§ 11–12, 14. In reality, the non-settling parties would be paid their claims in the Chapter 7 Case in cents-on-the-dollar, if at all, while the Settling Parties would keep the assets that the non-settling parties contend do not belong to them.

If the Court could grant the permanent injunction that the Settlement Agreement is premised on, the non-settling parties would have no right to continue the fight for the 2013 Settlement Proceeds themselves, which cannot be considered a harm to them. But that is not the relevant question. What matters is whether the interests of the creditors as a whole are served by the Trustee's forfeiting her right to pursue those assets for the benefit of the Bankruptcy Estate's creditors in exchange for a payment of about 8% of what those claims appear to be worth on their face. As noted above, the Trustee has offered little explanation of how she came to this figure, and only some explanation of why she believes such claims would likely not succeed.

Courts must also consider creditor support for the settlement. Even "where large claim holders oppose a settlement," the settlement may be approved so long as it benefits the estate generally. *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 494 n.56 (Bankr. S.D.N.Y. 2024). "However, the overriding consideration is the [s]ettlement's benefits to the creditor body, and not

whether the Settlement benefits defendants in a dispute among the Debtor's former insiders." *In re Soup Kitchen Int'l Inc.*, 506 B.R. 29, 44 (Bankr. E.D.N.Y. 2014) But here, there is no "creditor body," or at least not a general one. Instead, there are two camps, with support and opposition practically split down the middle. Thus, the Court views the Settling Parties' endorsement—defendants in fraudulent transfer actions—with a critical eye. Their support clearly stems from their interest in avoiding potential liability for fraudulent transfers and keeping a recovery out-of-reach from the non-settling defendant, not out of common cause with other creditors of the Bankruptcy Estate. However, the non-settling parties undoubtedly also have their own interests. Yet, some of their objections to the Settlement Agreement are based on a concern about the effect of the Settlement Agreement on the Bankruptcy Estate. For example, Sagi/TPR opposes the Settlement Agreement, among other reasons, because he seeks to return the 2013 Settlement Proceeds to the Bankruptcy Estate. If Sagi/TPR's theory of the case is correct, those assets belong to all of Orly's creditors.

Ultimately, the Court has no need to exhaustively analyze or conclude whether the Settlement Agreement satisfies *Iridium*. However, it remains unconvinced that the creditors generally would be served, in this circumstance, by a settlement agreement requiring the Trustee to forego pursuing potentially valuable Bankruptcy Estate claims in exchange for about 8% of the apparent value of those claims. An 8% return on a claim that has a proportionally low chance of succeeding might be justifiable in isolation, but the situation here is different; the Settlement Agreement effectively picks sides between two groups of creditors, providing a disproportionate benefit to one group at the probable expense of the other. The Settling Parties and non-settling parties are both comprised of unsecured creditors, but only one group would be left with no recovery other than their claims and whatever money remains in the Bankruptcy Estate to pay

them. It is true that creditors have no absolute right to benefit equally from every settlement, but the stark disparity in this case is troubling. Nonetheless, the Court must resolve the Motion on other grounds.

## The Permanent Injunction

Separate from the issue of a settlement's satisfaction of the *Iridium* factors is whether a proposed order that would effect the Settlement Agreement is proper. Whether an order issued in connection with a settlement agreement is proper is a question that must be evaluated on its own. *See Fox*, 848 F. Supp. 2d at 487 ("[T]he issuance of a permanent injunction in connection with the settlement is reviewed for abuse of discretion, but the underlying determination of legal questions is reviewed de novo.").

### *Release and Injunction of Prosecution of Derivative Claims*

The Trustee contends that the claims that the proposed order would release and enjoin are so-called "derivative or duplicative" claims and thus belong to the estate.[32] The Trustee argues that because they belong to the estate, she may compromise them, and the Court may enjoin their prosecution.

---

[32] The Trustee argues the release and injunction issues together. The Court agrees that the issues are related; the estate's claims are what they are, and just as the Court cannot enjoin the prosecution of claims that do not belong to the estate except to the extent otherwise provided by the Bankruptcy Code, neither can the Trustee release a third party's claims that she is without authority to release. However, the Trustee says that she can release and enjoin such claims because "[i]n *Metromedia*, the Second Circuit held that nonconsensual nondebtor releases and injunctions are proper in 'unusual circumstances' where, among other things, the debtor's estate has received substantial consideration." Motion ¶ 192 (quoting *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005)). This argument fails for two reasons. First, in light of *Harrington v. Purdue Pharma L.P.*, this argument fails because "the code *does* authorize courts to [permanently] enjoin claims against third parties without their consent . . . in only one context, [asbestos-related bankruptcies]," 144 S. Ct. 2071, 2085 (2024), and that context is not relevant here. Second, even if it did, "11 U.S.C. §§ 105(a), 1123(b)(6), jointly provide[d] the statutory basis for the bankruptcy court's authority to approve a plan that includes nonconsensual releases of third-party claims against non-debtors." *Purdue Pharma, L.P. v. City of Grande Prairie (In re Purdue Pharma L.P.)*, 69 F.4th 45, 57 (2d Cir. 2023). Thus, even prior to the Supreme Court's ruling, nonconsensual nondebtor releases were permitted in some circumstances as necessary for a plan of reorganization, but the statutory basis for this authority could not have extended to a settlement agreement in a case under chapter 7 of the Bankruptcy Code.

At their core, derivative or duplicative claims are claims against a non-debtor that derive from its harm to the debtor and could be brought by any creditor. The Second Circuit has defined derivative claims in the bankruptcy context as those that "arise[] from harm done to the estate" and "seek[] relief against third parties that pushed the debtor into bankruptcy." *Madoff*, 740 F.3d at 89 (alteration in original) (quoting *Picard v. JPMorgan Chase & Co.*, 721 F.3d 54, 70 (2d Cir. 2013)). Derivative claims are property of the bankruptcy estate. *Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.)*, 855 F.3d 84, 99 (2d Cir. 2017). The reason is that derivative and duplicative claims are based on injuries to the debtor that affected all creditors collectively, rather than particularized injuries to specific creditors. *Madoff*, 740 F.3d at 89.

The Second Circuit applied the doctrine in *Madoff*, which decision arose out of the liquidation proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS") following the Madoff Ponzi scheme. Two of Madoff's defrauded investors (Marshall and Fox) filed separate lawsuits in Florida against Jeffry Picower and related defendants. *Id.* at 85–86.

Irving Picard, the trustee for the BLMIS estate, had sued the Picower defendants for fraudulent transfers in this Court, alleging they had improperly withdrawn billions from BLMIS. *Id.* at 85. He later settled the fraudulent transfer action with the Picower defendants for $5 billion. *Id.* at 86. As part of the settlement, this Court issued an injunction barring any claims "derivative" of Picard's claims against the Picower defendants. *Id.* at 86–87.

Meanwhile, Marshall and Fox had filed separate lawsuits in Florida against the Picower defendants, alleging conspiracy, conversion, and other state law claims. *Id.* at 85–86. They argued that those claims were independent of Picard's fraudulent transfer claims and sought damages not recoverable in Picard's action, including lost returns on investments and taxes paid on fictitious gains. *Id.* at 93.

This Court determined that the Florida actions were barred by its injunction as derivative of Picard's claims. *Id.* at 87. The District Court affirmed, and Marshall and Fox appealed to the Second Circuit. *Id.* The key issue before the Second Circuit was whether the Florida actions were based on truly independent claims or claims that were derivative of Picard's fraudulent transfer claims. *Id.* at 88–89.

The Second Circuit affirmed the Court's injunction barring claims against the Picower defendants that were derivative of Picard's fraudulent transfer claims, and found that Marshall and Fox's claims were derivative. *Id.* at 93. The court found that the allegations in the Florida complaints essentially mirrored those in Picard's fraudulent transfer action, alleging "nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS." *Id.* Although the appellants argued that they alleged particularized injuries, the court determined they had not alleged any misrepresentations or actions by the Picower defendants that were directly aimed at BLMIS customers. *Id.*

The appellants also contended that their claims could not be derivative because they sought damages that were not recoverable in the Trustee's avoidance action. *Id.* The Second Circuit rejected this argument, explaining that their alleged damages were "mere secondary harms flowing from the Picower defendants' fraudulent withdrawals and the resulting depletion of BLMIS funds." *Id.* at 96.

The Second Circuit further explained the doctrine in *Tronox*. That case arose from toxic tort claims brought by over 4,300 individuals (the "Avoca Plaintiffs") who alleged injuries from the operation of a wood-treatment plant in Avoca, Pennsylvania between 1956 and 1996. *In re Tronox Inc.*, 855 F.3d at 88. The Avoca Plaintiffs first filed their claims in Pennsylvania state court against several entities, including Kerr-McGee Corporation ("New Kerr-McGee"). *Id.* However,

that action was stayed when two of the defendants, the owners and operators of the Avoca Plant (the "Tronox Debtors"), filed chapter 11 petitions for relief in this Court. *Id.* After the Court approved a settlement and, as part of it, issued an injunction barring certain claims, the Avoca Plaintiffs attempted to revive their toxic-tort claims in Pennsylvania state court, naming New Kerr-McGee as a defendant. *Id.* In response, New Kerr-McGee sought enforcement of the injunction in the District Court for the Southern District of New York (the "District Court"), arguing that the Avoca Plaintiffs' claims were barred because they arose from liabilities derived from the Tronox debtors and were generalized claims common to all creditors. *Id.* at 88–89.

The District Court agreed with New Kerr-McGee, concluding that the claims were barred by the injunction; it ordered the Avoca Plaintiffs to dismiss their state-court complaints with prejudice. *Id.* at 93. On appeal, the Second Circuit affirmed the District Court's interpretation of the injunction and its classification of the Avoca Plaintiffs' claims as derivative. *Id.* at 105–06. The court's analysis hinged on the nature of the claims asserted by the Avoca Plaintiffs. A derivative claim is one that arises from harm done to the debtor, rather than directly to the creditor, and which could be brought by any creditor of the estate. *Id.*

The Second Circuit found these claims to be derivative for a few reasons. First, the Avoca Plaintiffs did not allege direct claims against New Kerr-McGee for its own wrongdoing, but instead relied on indirect alter-ego and veil-piercing theories to hold New Kerr-McGee responsible for the conduct of the Tronox Debtors. *Id.* at 105. Second, the court noted that establishing these claims would benefit all creditors of the Tronox debtors generally, not just the Avoca Plaintiffs. *Id.* at 107. Finally, the claims arose from liabilities derived from or through the Tronox Debtors, rather than from direct actions of New Kerr-McGee. *Id.* at 110. Thus, the court concluded that the Avoca

50

Plaintiffs' claims were generalized, derivative claims and were property of the bankruptcy estate. *Id.* at 104.

**The Target Actions**[33]

With these principles in mind, the Court must consider whether the Target Actions are derivative. Some are, and some are not. The Court analyzes them in turn:

<u>The MSM Action</u>

MSM and REI are suing Bowen, Arie, the Brosers, the Genger Litigation Trust, ABDG LLC, Tedco, Inc., and "John Does 1–10" to recover the $32.3 million of the 2013 Settlement Proceeds. MSM Complaint ¶¶ 1–2, 11–22.[34]

The plaintiffs are seeking declaratory judgment that the Trump Notes allegedly held by Bowen belong to REI as the Orly Trust's assignee, imposition of a constructive trust on those notes, and monetary damages against various defendants for the wrongful transfer and retention of the settlement funds. *Id.* ¶¶ 57–81.

The complaint alleges that the $32.3 million settlement resolved claims concerning shares of TRI in which the Orly Trust claimed an ownership interest. MSM Complaint ¶¶ 26–37. Despite this, the settlement proceeds were allegedly transferred to entities controlled by Arie and the Brosers rather than to the Orly Trust. *Id.* ¶¶ 46–52.

---

[33] The Court takes judicial notice of each of the actions described in this section. *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) ("A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991))); Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

[34] *First Amended Complaint, Manhattan Safety Maine, Inc. v. Bowen*, No. 19-5642, ECF No. 48 (S.D.N.Y. filed Nov. 8, 2019) (the "MSM Complaint").

Specifically, the complaint alleges that of the $17.3 million cash payment, approximately $16.3 million went to Tedco, Inc., an entity controlled by the Brosers, and most of the remainder went to Arie. *Id.* ¶¶ 9, 49–51.

The plaintiffs contend that these transfers were fraudulent conveyances made with the intent to hinder, delay, or defraud creditors of the Orly Trust, including TPR Investment Associates, Inc., which had assigned its rights to MSM. *Id.* ¶¶ 82–96. They seek to recover the settlement proceeds for the Orly Trust. *Id.* ¶ 10.

The Trustee has failed to show that the claims brought by MSM and REI against Bowen, Arie, the Brosers, and others to recover the 2013 Settlement Proceeds are derivative. The nature of the alleged harm is specific to the Orly Trust, not to the Bankruptcy Estate or her creditors in general. The complaint in the action contends that the 2013 Settlement Agreement resolved claims concerning TRI shares in which the Orly Trust had an ownership interest, and that the proceeds were wrongfully diverted to entities controlled by Arie and the Brosers instead of being paid to the Orly Trust. On its face, this a particularized harm to the Orly Trust, rather than a general harm to a debtor's estate or a broader group of creditors.

The Orly Trust, a spendthrift trust, is separate from Orly's estate if it restricts the transfer of Orly's interest in the trust. 11 U.S.C. § 541(c)(2); *In re Quackenbush*, 339 B.R. 845, 849 (Bankr. S.D.N.Y. 2006) ("The function of Section 541(c)(2) seems to be to acknowledge that an enforceable restriction on the transfer of a Debtor's interest would effectively prevent the transfer of such interest . . . so that the Debtor's interest would not constitute estate property."). The Trustee has failed to demonstrate that Orly individually had any pre-bankruptcy entitlement to the 2013 Settlement Proceeds. If Orly had a right to these proceeds, the result would be different: in such a scenario, the diversion of the proceeds to third parties would constitute a generalized harm to all

of Orly's creditors, like in *Tronox*, rendering the claims derivative. In *Tronox*, the Avoca Plaintiffs' claims were based on harm to Old Kerr-McGee (the debtor), not to them directly. The fraudulent transfer claims in *Tronox* arose from the depletion of assets that belonged to the Tronox estate, meaning that all creditors were indirectly harmed because the debtor had fewer assets to pay its liabilities.

The underlying harm here is based on a failure to pay the Orly Trust directly, rather than a diminution of assets available to pay Orly's creditors. If the Orly Trust's theory to recovery is sound, then it is not Orly, and thus not her creditors generally, who would recover, but only the Orly Trust. This makes the harm specific and direct to the Orly Trust, and not to the Bankruptcy Estate.

The Orly Trust Turnover Action

Dalia, as then-trustee of the Orly Trust, filed an amended turnover petition against Orly, Arie, and several other respondents. The petition seeks to recover $32.3 million in 2013 Settlement Proceeds that Dalia claims rightfully belong to the Orly Trust. Amended Turnover Petition ¶ 21.[35]

The dispute centers around the 2013 Settlement Agreement. Dalia alleges that Orly breached her fiduciary duty to the Orly Trust by causing the 2013 Settlement Proceeds to be paid to others. *Id.* ¶¶ 31–33. According to the petition, instead of ensuring the 2013 Settlement Proceeds were paid to the Orly Trust, Orly, Arie, and the Brosers received the money. *Id.* ¶ 55.

Dalia asks to compel the turnover of the 2013 Settlement Proceeds to the Orly Trust. *Id.* ¶ 76. Additionally, Dalia seeks an injunction to prevent further dispositions and an accounting of the

---

[35] *Amended Petition for Turnover of Trust Property and Other Relief, Orly Genger 1993 Trust v. Genger*, No. 20-01188 (i.e., the Orly Trust Turnover Action), ECF No. 1-4 (Bankr. S.D.N.Y. filed June 20, 2020) (the "Amended Turnover Petition").

2013 Settlement Proceeds. *Id.* ¶¶ 83–84, 87. She alleges that the respondents' actions have caused $32.3 million in damages to the Orly Trust. *Id.* ¶ 37.

For the same reasons as above, the Court cannot find that the claims brought by Dalia in her amended turnover petition are derivative. In *Madoff*, the court distinguished between claims seeking to recover for generalized injuries to all creditors (which are derivative) and claims for "particularized" injuries directly traceable to a third party's conduct (which are independent). Here, Dalia's claims on behalf of the Orly Trust, like those in the MSM Action, are more akin to the second category. The alleged harm—the diversion of $32.3 million in 2013 Settlement Proceeds—is specific to the Orly Trust and directly traceable to the alleged actions of Orly, Arie, and the Brosers. Unlike in *Madoff*, where the plaintiffs' claims basically mirrored the trustee's fraudulent transfer claims and stemmed from the same alleged wrongful withdrawals that harmed all BLMIS customers, Dalia's claims are based on a specific alleged right of the Orly Trust to the 2013 Settlement Proceeds.

In *Tronox*, too, the court found the Avoca Plaintiffs' claims were derivative because they were based on theories that, if successful, would increase the pool of assets available to all creditors of the Tronox debtors. In contrast, Dalia's claims, if successful, would benefit only one entity: the Orly Trust. Nor is the nature of these claims to hold third parties responsible for Orly's debts through alter-ego or successor liability theories, as was the case in *Tronox*. Instead, they assert a direct right of the Orly Trust to specific assets.

Both *Madoff* and *Tronox* emphasize that the crux of determining whether a claim is direct or derivative lies in the nature of the injury and who suffered it. Here, the alleged injury—the wrongful diversion of the 2013 Settlement Proceeds—was allegedly suffered directly by the Orly Trust, not by Orly's creditors generally. The Trustee's failure to demonstrate Orly's individual

entitlement to these proceeds underscores the direct nature of the claims. There is no basis to treat Dalia's claims as derivative actions that the Trustee has the exclusive right to pursue.

Sagi-Herschmann Action

Sagi alleges that he holds a $3.2 million judgment against Orly and is seeking to recover damages from Herschmann for his alleged role in frustrating Sagi's ability to collect on that judgment. Sagi-Herschmann Action Complaint ¶¶ 1, 8, 15.[36] At issue are $15 million of the 2013 Settlement Proceeds from the 2013 Settlement Agreement (which Sagi refers to as "the Receivable") and Orly's 50% interest in a $2 million condominium in Austin, Texas. *Id.* ¶¶ 1, 6. Sagi alleges that Orly and Herschmann engaged in a series of fraudulent transfers to place these assets out of Sagi's reach. *Id.* ¶¶ 3–6.

The first alleged fraudulent transfer occurred on May 10, 2017, when Herschmann filed a UCC-1 Financing Statement claiming a lien against all of Orly's personal and real property, including litigation claims and settlement proceeds. *Id.* ¶ 3. This was purportedly based on a backdated "Secured Promissory Note" from December 30, 2016. *Id.* ¶ 3. The second alleged fraudulent transfer took place in Summer 2018, involving a "Subordination Agreement" between Orly and Arie. *Id.* ¶ 4. This agreement purportedly subordinated Arie's debt to that of Herschmann, whose purpose was to fraudulently make Arie's note appear to have been executed earlier. *Id.* ¶ 4.

The third alleged fraudulent transfer occurred on September 28, 2018, approximately one month after the judgment was entered. Orly, at Herschmann's behest, filed a "Deed of Trust" in Travis County, Texas, conditionally conveying her interest in the condominium to a trust for Herschmann's benefit. *Id.* ¶ 6. These transfers, Sagi claims, were designed to frustrate Sagi's

---

[36] *Complaint*, *Genger v. Herschmann*, No. 21-01135 (i.e., the Sagi-Herschmann Action), ECF No. 1 (Bankr. S.D.N.Y. filed May 10, 2021) ("Sagi-Herschmann Action Complaint").

ability to collect on the judgment by placing Herschmann ahead of Sagi with respect to the so-called Receivable and by encumbering Orly's interest in the condominium. *Id.* ¶¶ 5–6.

Sagi further alleges that Orly and Herschmann concealed information about these transfers through false testimony, pleadings, and other wrongdoing, forcing Sagi to incur substantial legal fees and expenses to uncover the truth. *Id.* ¶ 7. The complaint asserts four claims against Herschmann: conspiracy to violate fraudulent transfer laws in New Jersey, Texas, and New York, and tortious interference with enforcement of judgment. *Id.* ¶¶ 58–82.

Here, Sagi is acting as a judgment creditor of Orly, seeking to recover on a $3.2 million judgment. The assets he is pursuing—$15 million of the 2013 Settlement Proceeds and Orly's interest in a $2 million condominium—are alleged to belong to Orly. The alleged fraudulent transfers that Sagi describes, namely the UCC-1 Financing Statement, the Subordination Agreement, and the Deed of Trust, are actions that purportedly placed Orly's assets out of reach of her creditors. Thus, the alleged harm is not specific to Sagi, but would affect all of Orly's creditors by reducing the pool of assets available to satisfy her debts.

In *Madoff*, the court found that although the Florida plaintiffs had pleaded conspiracy language, their underlying allegations basically mirrored the trustee's claims about fraudulent withdrawals. Similarly, while Sagi alleges conspiracy and tortious interference, the core of his complaint revolves around fraudulent transfers that allegedly diminished Orly's estate. As in *Madoff*, that is a harm that would affect all of Orly's creditors. Moreover, although Sagi has a judgment against Orly, his claims against Herschmann are not for direct harm caused by Herschmann, but rather for Herschmann's alleged role in hiding Orly's assets.

Moreover, as in both *Madoff* and *Tronox*, the facts necessary to establish Herschmann's liability would be generally available to any creditor, not specific to Sagi. If successful, these claims would increase the pool of assets available to all of Orly's creditors, not just Sagi.

For these reasons, unlike the claims related to the Orly Trust, which allege specific harm to the trust based its alleged right to be paid to the exclusion of other creditors, Sagi's claims against Herschmann are derivative; they arise from alleged harm to Orly's estate (the diminution of assets available to pay creditors) rather than a particularized harm to Sagi. As such, they are property of the Bankruptcy Estate, and the Trustee has the exclusive right to pursue them for the benefit of all creditors.

<u>Sagi's Turnover Motion</u>

Sagi is moving for an order compelling Michael Bowen, Arie, and Tedco, Inc. to turn over promissory notes and funds in which Orly has an interest, sufficient to satisfy Sagi's judgment. Sagi's Turnover Motion at 1.[37] Sagi is also seeking to rescind fraudulent conveyances associated with these assets. *Id.*

The sought relief is based on the 2013 Settlement Agreement, from which Sagi claims Orly received $32.3 million. *Id.* at 2. This sum consists of $17.3 million in cash paid upfront and two additional promissory notes of $7.5 million each (i.e., the Trump Notes), to be paid over four years. *Id.* Sagi alleges that Orly engaged in fraudulent transfers to avoid paying her debts. *Id.*

When the initial $17.3 million payment was made in 2013, Orly allegedly directed her then-attorney William Wachtel to immediately wire the entire sum to a trust established for Arie's creditors, and not for her benefit. *Id.* Furthermore, Sagi claims that Orly, in collaboration with Arie

---

[37] *Judgment Creditor Sagi Genger's Memorandum of Law in Support of His Motion for Turnover of Promissory Notes and Funds from Garnishees and Rescission of Fraudulent Conveyance*, *Genger v. Genger*, No. 1:17-cv-08181, ECF No. 214 (S.D.N.Y. filed June 11, 2019) (i.e., Sagi's Turnover Motion).

and Herschmann, attempted to encumber the two $7.5 million promissory notes by pledging them as "security" to Herschmann and Arie for allegedly bogus "liabilities." *Id.*

Specifically, Sagi contends that Orly created a secured promissory note dated December 31, 2016, in favor of Arie, and another dated December 30, 2016, in favor of Herschmann. *Id.* at 10. Sagi says that these actions were taken with the intent to hinder, delay, or defraud creditors, including himself. *Id.* at 22. He argues that Orly knew she had financial obligations to Dalia (through Sagi) when she made these transfers. *Id.* at 20.

Sagi is seeking to have these transfers set aside as fraudulent conveyances under New York Debtor and Creditor Law sections 273, 273-a, 275, and 276. *Id.* at 14–17. He aims to compel the turnover of the funds and promissory notes to satisfy his $3.2 million judgment against Orly. *Id.* at 6.

Sagi's claims here again arise from his position as a judgment creditor of Orly. The assets at the center of Sagi's claims—including $17.3 million from the 2013 Settlement Proceeds, the Trump Notes, Orly's interest in an art business, and rights to the apartment—are all alleged to have belonged to Orly before being fraudulently transferred to elude Orly's creditors.

The nature of the alleged fraudulent transfers is instructive: Sagi contends that Orly, with the assistance of Herschmann, Arie, and the Brosers, engaged in a series of transactions designed to shield her assets from creditors. These actions, if proven, would harm all of Orly's creditors by reducing the pool of assets available to satisfy her debts. This generalized harm to all creditors stands in contrast to the particularized harm alleged by the Orly Trust, which claims it was the rightful and exclusive recipient of the 2013 Settlement Proceeds.

Given that Sagi's claims arise from alleged harm to Orly's estate more broadly, rather than from a harm specific to him, they are derivative claims. As such, these claims are property of the

Bankruptcy Estate, and the Trustee has the exclusive right to pursue them. Moreover, the relief sought by Sagi—voiding the transfers and obtaining turnover of the funds and notes—would benefit all of Orly's creditors, not just Sagi.

<u>Sagi's Avoidance Action</u>

In Sagi's Avoidance Action, Sagi is suing the Brosers, ADBG LLC, Tedco, Inc., Arie, and "John Does 1–10." Sagi's Avoidance Action Complaint ¶¶ 1.[38] The action seeks to set aside alleged fraudulent conveyances of the 2013 Settlement Proceeds and collect attorney's fees. The complaint alleges that Orly owes Sagi up to $12.25 million plus attorney's fees under a 2004 indemnity agreement. *Id.* ¶¶ 1, 12. Sagi alleges that despite this obligation—and despite the disbursement of the 2013 Settlement Proceeds, Orly claims she cannot afford to honor the indemnity. *Id.* ¶¶ 12–13.

Sagi alleges that although the 2013 Settlement Agreement was based solely on Orly's claims, the 2013 Settlement Proceeds were fraudulently transferred to the defendants rather than to Orly. *Id.* ¶¶ 16–17, 25, 29. Specifically, on July 1, 2013, William Wachtel allegedly transferred the 2013 Settlement Proceeds to a trust co-created by Orly and Arie, which then wired the funds to ADBG LLC. *Id.* ¶ 17. All but $1 million allegedly rested with Tedco, Inc., another entity owned by the Broser family. *Id.*

The complaint asserts that these transfers were fraudulent conveyances under New York law. *Id.* ¶¶ 19–29. Sagi alleges that Orly was insolvent or rendered insolvent by redirecting the 2013 Settlement Proceeds, that she did not receive fair consideration, and that the transfers were made with intent to hinder, delay, or defraud creditors. *Id.* ¶¶ 22–24, 27.

---

[38] *Complaint*, *Genger v. Broser*, No. 1:19-cv-06100 (i.e., Sagi's Avoidance Action), ECF No. 1 (S.D.N.Y. filed June 28, 2019) ("Sagi's Avoidance Action Complaint").

Sagi's Avoidance Action presents another instance of claims that are derivative rather than direct. Here, Sagi is seeking to set aside alleged fraudulent conveyances of the 2013 Settlement Proceeds and collect attorney's fees from the Brosers, ADBG LLC, Tedco, Inc., Arie, and other unnamed defendants. The crux of Sagi's complaint is that Orly owes him a substantial sum under the 2004 indemnity agreement, but the 2013 Settlement Proceeds, which Sagi alleges were rightfully Orly's, were fraudulently transferred to other entities, leaving Orly unable to honor her indemnity obligation.

These claims bear the hallmarks of derivative actions. The alleged harm affects all of Orly's creditors, not just Sagi. The fraudulent conveyance allegations, including claims that Orly was insolvent or rendered insolvent, did not receive fair consideration, and that the transfers were made with intent to hinder, delay, or defraud creditors, are classic elements of claims general to all of a debtor's creditors. The relief sought, namely setting aside the alleged fraudulent conveyances, would increase the pool of assets available to all of Orly's creditors.

This scenario parallels Sagi's action against Herschmann and Sagi's Turnover Motion. In both cases, Sagi is acting as a creditor of Orly, seeking to recover assets he claims were wrongfully transferred away from Orly's estate. In contrast, the key difference between these actions and the claims related to the Orly Trust is the nature of the alleged harm and the basis of the claim. While the Orly Trust claims allege a specific harm to the trust based on its alleged exclusive right to the 2013 Settlement Proceeds, Sagi's claims are based on *Orly's* alleged right to these proceeds and the subsequent transfer away from her creditors generally in such a way that resulted in a second-order harm to him.

Because these claims are derivative in nature, they are property of the Bankruptcy Estate.

Dalia's Constructive Trust Action

Dalia has sought a declaratory judgment that up to $12.25 million plus interest from the proceeds of the 2013 Settlement Agreement is held in constructive trust for Dalia's benefit. Dalia's Constructive Trust Complaint ¶¶ 1, 51.[39] The action stemmed from the 2004 divorce agreement where Dalia transferred her marital rights in 794.40 TRI shares to Orly and Sagi in exchange for their promise to support Dalia financially. *Id.* ¶¶ 15–19.

Dalia alleges that she is entitled to up to $12.25 million of the 2013 Settlement Proceeds based on the 2004 agreements. *Id.* ¶¶ 36–38. She alleges that Orly fraudulently transferred approximately $17.3 million of the 2013 Settlement Proceeds to the Brosers, among others, to frustrate Dalia's rights. *Id.* ¶¶ 39–40.

The Court dismissed Dalia's amended complaint, and on September 1, 2024, denied Dalia's subsequent motion for reconsideration of that dismissal. Reconsideration Decision at 1–2.[40] The Court rejected Dalia's arguments that it had overlooked evidence or misinterpreted precedent regarding several issues. Dalia has filed a notice of appeal of that decision.

Unlike the claims related to the Sagi's judgment creditor action, Dalia's claim here is based on rights that are allegedly personal to her. This agreement, where Dalia allegedly transferred her marital rights in TRI shares to Orly and Sagi in exchange for financial support, forms the basis of her claim to a portion of the 2013 Settlement Proceeds.

In *Madoff*, the court focused on whether the plaintiffs had alleged any "particularized" injuries directly caused by the defendants, separate from the general harm to all customers.

---

[39] *Amended Complaint*, *Genger v. Genger*, No. 20-01010 (i.e., Dalia's Constructive Trust Action), ECF No. 8 (Bankr. S.D.N.Y. filed June 7, 2020) ("Dalia's Constructive Trust Complaint").

[40] *Memorandum Decision and Order Denying Motion for Reconsideration*, *Genger v. Genger*, No. 20-01010, ECF No. 58 (Bankr. S.D.N.Y. filed Sept. 1, 2024) ("Reconsideration Decision").

Similarly, in *Tronox*, the court examined whether the Avoca Plaintiffs' claims were based on specific harm to them or general harm to all creditors. In both cases, the courts found the claims to be derivative because they basically mirrored the trustees' claims and sought to recover for generalized injuries to all creditors.

Dalia's claim, however, is fundamentally different. Unlike the plaintiffs in *Madoff* and *Tronox*, Dalia is asserting a claim based on her personal rights. This agreement, where Dalia allegedly transferred her marital rights in TRI shares in exchange for financial support, forms the basis of her claim to a portion of the 2013 Settlement Proceeds. This is a particularized injury specific to Dalia, not a generalized harm affecting all of Orly's creditors.

Dalia is not seeking to recover assets for the benefit of all creditors, nor is she alleging harm to the Bankruptcy Estate that affected her as a consequence. The alleged fraudulent transfer of $17.3 million to the Brosers and others, in Dalia's telling, was an attempt to frustrate her personal rights. This distinguishes her claim from those in *Tronox*, where the plaintiffs' claims were found to be derivative because they were based on alleged harm to the *Tronox* debtors which then secondarily harmed all creditors.

Dalia's claim is a direct one and Dalia has a right to continue to prosecute it, including by litigating the pending appeal.

<u>The Dalia Appeal</u>

Dalia, as then-trustee of the Orly Trust, seeks to be substituted as the plaintiff in place of Orly in the 2010 Action for claims brought on behalf of the Orly Trust against the Trump Group. Orly Trust's Substitution Motion at 1.[41]

---

[41] *Memorandum of Law in Support of Trustee Dalia Genger's Motion to Substitute for Plaintiff Orly Genger on Her Derivative Claims Against the Trump Group and for an Order Directing Settlement Proceeds to be Paid into*

The lawsuit originally involved claims by Orly, both individually and derivatively on behalf of the Orly Trust, against various defendants including the Trump Group. *Id.* Orly reached a settlement agreement with the Trump Group (i.e., the 2013 Settlement Agreement) to resolve these claims. *Id.*

Dalia's focus is the 2013 Settlement Agreement's provision for Orly's dismissal of all then-pending claims between the Trump Group, TRI, Orly and Arie. *Id.* As part of the settlement, Orly also agreed to cause the Orly Trust to release its claims against the Trump Group. *Id.* at 2.

Dalia claims that Orly has since taken the position that her settlement only resolved her individual claims, not the Orly Trust's claims against the Trump Group, *id.* at 3, which has created uncertainty about whether the Orly Trust's claims were actually settled and who is entitled to the 2013 Settlement Proceeds, *id.* at 4.

To protect the Orly Trust's interests, Dalia, as then-trustee, sought to be substituted as plaintiff for the trust's claims and to have the settlement funds paid into court until ownership could be determined. *Id.* at 10. Dalia argues that this substitution is necessary because Orly no longer represents the Orly Trust's interests regarding the Trump Group claims, and Orly has suggested the trustee should "pick up the cudgel" on those claims. *Id.* at 5.

The core issue in the Dalia Appeal is whether the Orly Trust's claims against the Trump Group were settled as part of the 2013 Settlement Agreement, and consequently, whether the 2013 Settlement Proceeds belong to Orly individually or to the Orly Trust. This question is similar to that presented by the MSM Action: who has the legal right to the 2013 Settlement Proceeds?

---

*Court, Genger v. Genger*, No. 651089/2010, NYSCEF Doc. No. 1108 (N.Y. Sup. Ct. filed Aug. 11, 2014) (i.e. the Orly Trust's Substitution Motion).

If the Trust's claims were indeed settled without proper authorization or compensation, or if the 2013 Settlement Proceeds rightfully belong to the Orly Trust but were diverted elsewhere, this would represent a particularized harm to the Orly Trust, not a general harm to Orly's creditors or the Bankruptcy Estate. Moreover, Dalia's motion for substitution is explicitly aimed at protecting the Orly Trust's interests. She argues that Orly does not represent the Orly Trust's interests regarding the Trump Group claims.

Thus, as noted earlier, the Trustee has not demonstrated that Orly individually had any pre-bankruptcy entitlement to the 2013 Settlement Proceeds or the claims against the Trump Group. The New York Supreme Court's inability to determine ownership of the 2013 Settlement Proceeds underscores this fact. Therefore, absent a showing by the Trustee that these claims or proceeds are rightfully part of the Bankruptcy Estate, the Court cannot conclude Dalia's claim to prosecute the 2010 Action on the Orly Trust's behalf is derivative.

### The Nondischargeability Objections

The Trustee also seeks to settle the three objections to Orly's discharge. These objections, filed by Sagi, Dalia, and the Orly Trust, respectively, are similar in the following respects: All three objections center around allegations of fraudulent conduct by Orly involving the proceeds from the 2013 Settlement Agreement. The objections commonly allege that Orly engaged in fraudulent transfers of these assets, specifically highlighting her transfers of about $17 million to her father and transfers of the Trump Notes. The objections accuse Orly of concealing assets, making false statements in her bankruptcy filings, and engaging in fraudulent transfers to hinder creditors. The objections seek to either deny Orly's discharge entirely or have specific debts declared non-dischargeable under various provisions of the Bankruptcy Code. Before proceeding to its analysis, the Court briefly summarizes each objection below.

Sagi/TPR's Discharge Objection

In Sagi/TPR's Discharge Objection, Sagi and TPR Investment Associates, Inc. object to Orly's discharge in bankruptcy and seek to have certain debts declared non-dischargeable. The plaintiffs are seeking to deny Orly's discharge entirely under 11 U.S.C. § 727 and alternatively to have specific debts declared non-dischargeable under 11 U.S.C. § 523(a). Sagi/TPR's Discharge Objection ¶ 5.[42]

Sagi alleges that Orly engaged in a fraudulent scheme to transfer assets away from creditors, including $32 million, ostensibly from the 2013 Settlement Agreement. *See id.* ¶¶ 2, 13. Specifically, Sagi claims Orly transferred almost $17 million to her father, while still listing him as a secured creditor for over $5.4 million. *Id.* ¶ 14.

The objection also alleges that Orly improperly listed her husband as a secured creditor for over $2.3 million in legal fees, and his law firm as an unsecured creditor for around $1.45 million. *Id.* ¶¶ 15–16.

They also alleged that Orly failed to disclose $15 million in promissory notes (i.e. the Trump Notes) from the 2013 Settlement Proceeds, which are allegedly being held by Bowen, but remain under the control of Orly and Arie. *Id.* ¶ 13.

The objection seeks denial of discharge, including for concealing assets, failing to explain loss of assets, making false oaths, and fraud. *Id.* ¶¶ 20–34.

---

[42] *Sagi Genger's and TPR Investment Associates, Inc.'s Objection to the Discharge and Dischargeability of Orly Genger*, *Genger v. Genger*, No. 19-01444, ECF No. 1 (Bankr. S.D.N.Y. filed Oct. 15, 2019) (i.e., Sagi/TPR's Discharge Objection).

<u>Dalia's Discharge Objection</u>

Dalia's Discharge Objection seeks to deny Orly's discharge because of her allegedly fraudulent conduct involving the proceeds of the 2013 Settlement Agreement. Dalia's Discharge Objection ¶¶ 1, 14–15, 27.[43] According to the complaint, Orly concealed and fraudulently transferred $32.3 million of the 2013 Settlement Proceeds, which were subject to an agreement to provide financial support to Dalia. *Id.* ¶¶ 1, 14–15, 25, 40. Specifically, Orly allegedly transferred $17.3 million in cash to her father and $15 million in promissory notes to Bowen. *Id.* ¶¶ 14, 74–75.

The complaint contends that Orly failed to keep adequate records explaining the loss of these assets and did not satisfactorily account for how her wealth diminished from $32 million to less than $60,000. *Id.* ¶¶ 87–88, 91–92. Additionally, Dalia alleges that Orly made false oaths in her bankruptcy filings by omitting assets and transactions. *Id.* ¶¶ 95–97.

Dalia alleges that the fraudulent transfers were made to hinder, delay, and defraud Dalia as a creditor. *Id.* ¶ 1. The complaint seeks denial of discharge under several provisions of the Bankruptcy Code, including 11 U.S.C. § 727(a)(3)–(5) and denial of dischargeability of specific debts under 11 U.S.C. § 523(a)(2), (a)(4)–(6), and (a)(15). *Id.* ¶¶ 86, 90, 94, 99, 103, 107, 111, 115.

<u>Orly Trust's Discharge Objection</u>

Michael Oldner, as trustee of the Orly Trust, is seeking to have the Trust's claims against Orly excepted from discharge in her bankruptcy case under 11 U.S.C. § 523(a)(4). Orly Trust's

---

[43] *Dalia Genger and D&K GP LLC's Complaint to Determine the Discharge and/or Dischargeability of Orly Genger*, *Genger v. Genger*, No. 19-01445, ECF No. 1 (Bankr. S.D.N.Y. filed Oct. 15, 2019) (i.e., Dalia's Discharge Objection).

Discharge Objection ¶¶ 3, 7.[44] The complaint alleges that Orly, acting in a fiduciary capacity on behalf of the Orly Trust, misappropriated the 2013 Settlement Proceeds. *Id.* ¶¶ 18–19. The Orly Trust alleges that Orly directed the cash portion of the 2013 Settlement Proceeds to be paid to her lawyer and then to a separate trust, the Orly Genger Litigation Trust, which had no relationship to the original Orly Trust or any claim to its property. *Id.* ¶ 18.

Furthermore, the complaint asserts that Orly engaged in fraudulent transfers by subsequently transferring interests in the 2013 Settlement Proceeds to collateralize debts that were not valid obligations of the Orly Trust. *Id.* ¶ 19. These actions allegedly left the Orly Trust insolvent and unable to pay its debts as they became due. *Id.* ¶ 20.[45]

The complaint states that in seeking, negotiating, and agreeing to the 2013 Settlement Agreement, Orly was expressly acting in a derivative capacity on behalf of the Trust and had been authorized to assert the Orly Trust's claims. *Id.* ¶ 21. The Orly Trust alleges that as a result of a prior ruling by the New York Supreme Court, Orly had been entrusted with administering the Trust's property, effectively making her a "de facto trustee." *Id.* ¶¶ 21–22.

Based on these allegations, the Orly Trust contends that Orly's corresponding debts to the Trust for her alleged defalcation of the 2013 Settlement Proceeds should be excepted from discharge in her bankruptcy case under section 523(a)(4) of the Bankruptcy Code. *Id.* ¶ 25. The complaint thus seeks a judgment declaring that the Trust's claims against Orly are not dischargeable. *Id.*

---

[44] *Original Complaint to Determine Non-Dischargeability of Specific Debts*, *Oldner v. Genger*, No. 19-01447, ECF No. 1 (Bankr. S.D.N.Y. filed Oct. 29, 2019) (i.e., Orly Trust's Discharge Objection).

[45] There are two paragraphs numbered "20." This citation refers to the first paragraph numbered "20."

***Settlement of Discharge Objections***

The issue is whether the Trustee has the authority to settle claims under sections 523 and 727 of the Bankruptcy Code, even though those claims were not brought by the Trustee. The framework for settling such claims is primarily governed by Bankruptcy Rules 7041 and Local Bankruptcy Rule 4007-2(b). Bankruptcy Rule 7041 states in relevant part: "a complaint objecting to the debtor's discharge shall not be dismissed at the plaintiff's instance without notice to the trustee, the United States trustee, and such other persons as the court may direct, and only on order of the court containing terms and conditions which the court deems proper."

Local Bankruptcy Rule 4007-2(b) addresses the settlement of dischargeability proceedings:

> In all instances not governed by section 524(d) of the Bankruptcy Code, no adversary proceeding to determine the dischargeability of a debt shall be settled except pursuant to an order of the Court after due inquiry into the circumstances of any settlement, including the terms of any agreement entered into between the debtor and creditor relating to the payment of the debt, in whole or in part.

L.B.R. 4007-2(b)

Neither of these rules, alone, cloak the Trustee with authority to settle another party's dischargeability proceedings. Thus, for her position, the Trustee relies on *Madoff* and *Tronox* for the proposition that derivative or duplicative claims, including fraudulent transfer claims "disguised" as discharge objections, can be enjoined or settled if they are general to all creditors. The Trustee has not provided any case law that directly applies the principles from *Madoff* and *Tronox* to the settlement of dischargeability actions.

The Bankruptcy Code delineates the rights of creditors in sections 523 and 727. Section 523(c)(1) explains that the determination of dischargeability for certain debts is a matter between the individual creditor who claims their debts are nondischargeable and the debtor, making

nondischargeability contingent "on request of the creditor to whom such debt is owed." 11 U.S.C. § 523(c)(1). Similarly, section 727(c)(1) of the Bankruptcy Code grants creditors an independent right to object to discharge, separate from that of the trustee. 11 U.S.C. § 727(c)(1). These claims granted by statute to individual creditors are independent of the trustee's powers, rendering the Trustee's reliance on the *Madoff* and *Tronox* decisions misplaced. These cases address derivative claims, which do not belong to creditors because, as the court in *Tronox* made clear, they are "property of the estate." *Tronox*, 855 F.3d at 99. If nondischargeability proceedings were derivative, and thus property of the estate, any creditor seeking to exercise its rights under sections 523 or 727 of the Bankruptcy Code would necessarily be litigating a claim that did not belong to it.[46]

Finally, while Bankruptcy Rule 7041 does allow for the dismissal of complaints objecting to discharge under court supervision, it does not authorize the Trustee to settle such claims brought by other parties. The rule merely ensures court oversight of dismissals, but does not grant the Trustee settlement authority.

The Trustee cannot settle the discharge objections.

---

[46] Fraudulent transfer actions, like those that *Madoff* and *Tronox* speak to, are often indeed general to creditors in bankruptcy. The same could be said, in a broad-brush fashion, for section 727 actions. However, the thrust of those decisions is not simply that the action to be enjoined is "general" to all creditors in the sense that it would benefit all creditors, but that the injury derives from one that is general to all creditors—or is derivative of a harm to the debtor.

Moreover, the Trustee's allusion to *In re Hass*, 273 B.R. 45 (Bankr. S.D.N.Y. 2002) is one that is out of context. Judge Hardin's opinion merely states that there is no per se prohibition against settling section 727 claims. It does not hold that trustees have the power to settle such claims brought by other parties.

## **Conclusion**

For the reasons explained above, the Court has no basis to enter a permanent injunction that would enjoin the non-derivative claims of third parties, and the Trustee cannot settle claims that do not belong to the Bankruptcy Estate. On that basis, the Court denies the Motion.

IT IS SO ORDERED.

Dated: New York, New York
       October 5, 2024

                                            /s/ *James L. Garrity, Jr.*
                                            Honorable James L. Garrity, Jr.
                                            United States Bankruptcy Judge