

# EMMET, MARVIN & MARTIN, LLP
## COUNSELLORS AT LAW

120 Broadway
New York, New York 10271
212-238-3000

**www.emmetmarvin.com**

John Dellaportas
*Partner*
Tel: 212-238-3092
Fax: 212-238-3100
jdellaportas@emmetmarvin.com

March 9, 2026

**Via ECF**

Honorable James J. Garrity, Jr.
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

> **RE:    *In re Orly Genger*, Case No.: 19-13895-jlg**

Dear Judge Garrity:

On behalf of creditor Sagi Genger, we respectfully submit this letter in response to last Thursday's letter from Michael Bowen, Esq., counsel to debtor Orly Genger (Dkt. 758), demanding an "immediate status conference."  As we show below, Mr. Bowen's most serious allegation—that "Sagi fabricated evidence"—is demonstrably false and contradicted by verifiable electronic metadata and 1,587 corroborating emails.  His remaining allegations recycle legal positions this Court has already considered and adopted, repackaged as scandalous revelations. And the documentary foundation for all of it rests upon informal investor updates of a third party whose central prediction, as history confirms, never materialized.

## Mr. Bowen's "Fabricated Evidence" Allegation

We first address the most serious of Mr. Bowen's allegations: that Sagi, and undersigned counsel personally, submitted "fabricated evidence" materials to fraudulently procure an attorney work product finding by this Court, by creating a nonexistent association between Jane Altshuler, the Israeli attorney who directly retained the Israeli private investigator, and David Parnes, Sagi's Israeli counsel.  Mr. Bowen is referring to Docket #s 631 and 634, attaching an email and business card from Ms. Altshuler reflecting their then-business association. Mr. Bowen labels these documents (and a nonexistent "website photograph") "forgeries."

Given the strictures of Fed. R. Civ. Proc. 11 and NYRPC 8.1, Mr. Bowen surely would not have made such grave allegations against a fellow Bar member to a court of law absent compelling evidence.  Yet the only evidence he cites is testimony given last December by Ms. Altshuler in an Israeli lawsuit that Eric Herschmann—Mr. Bowen's law partner and the husband of his client— filed against Ms. Altshuler for supposed "invasion of privacy."

Mr. Bowen presents Ms. Altshuler to this Court as a highly credible witness.

Honorable James J. Garrity, Jr.
March 9, 2026
Page 2

**Yet Mr. Bowen neglects to inform this Court that, during the same court proceeding, Ms. Altshuler also accused Mr. Herschmann of being a serial child rapist and having killed a giraffe, that she admitted to having PTSD as a result of, *inter alia*, her role in the Gaza War and having been stabbed, and that she engaged in conduct so disruptive that an exasperated Israeli judge had to admonish her throughout the proceeding.**[1]

## Ms. Altshuler's Performance In The Israeli Proceeding

Sagi is not a party to the Israeli proceeding, and thus we did not have access to the transcript prior to Thursday.  However, if Mr. Herschmann's trial testimony is to be believed, shortly before he took the stand, Ms. Altshuler approached him and made certain allegations about him, which he then recounted to her in his trial testimony.  (We reproduce these allegations solely so this Court can better understand the context of the testimony Mr. Bowen cites.)

> MS. ALTSHULER: How do you know me?
>
> THE WITNESS (Mr. Herschmann): This is the first time I have met you in person. Before the judge entered the courtroom, you made several shocking accusations against me. You accused me of knowing Jeffrey Epstein, whom I have never met in my life. You accused me of having sexual relations with twelve-year-old girls—that is absolutely false and absurd. You also accused me of liking to hunt animals and of having killed a giraffe. I have never hunted in my life. You made derogatory comments about President Trump, asking why he was not here because he is a white man and I am a white man.

Exh. A at 13.

To be clear, we have no reason to believe Ms. Altshuler's claims about Mr. Herschmann. But given the weight that Mr. Bowen attaches to her otherwise unsupported testimony, we expect in his next submission that Mr. Bowen will set forth when he plans to resign from the "Herschmann Bowen" law firm and report his law partner to criminal authorities.

Elsewhere in the same testimony, Ms. Altshuler repeatedly questioned if Mr. Herschmann had engaged in sexual relations with her, to the admonitions of the judge.

> MS. ALTSHULER: … Did we sleep together?
>
> …
>
> MR. NACHMANI: Your Honor, I have not objected until now despite the tone and the shouting, but there is no room for counsel to ask the witness whether he

---

[1] Mr. Bowen only attaches a snippet of the transcript from the Israeli case, but we have obtained the full 257-page transcript in Hebrew, and on Friday we procured a machine translation.  The original transcript is annexed hereto as Exhibit A, and the translated excerpts quoted herein have been vetted by Sagi, who is Hebrew-fluent. As Mr. Bowen wishes to "enlarge the record" to include it, he should be directed to provide the Court and parties with a complete, unedited certified translation thereof.

Honorable James J. Garrity, Jr.
March 9, 2026
Page 3

slept with her.

THE COURT: Ma'am, the question is improper and disrespectful. The record reflects everything. I will allow the question only if rephrased in a dignified manner, but I strongly suggest you move on to relevant matters.

MS. ALTSHULER: I asked him whether we had slept together.

THE COURT: I think,

MS. ALTSHULER: Act like a woman

THE COURT: I said no such thing. I said that you should behave in court in a dignified manner, not that you should act either like a woman or like a man.

MS. ALTSHULER: I am being perfectly respectful.

THE COURT: No.

MS. ALTSHULER: I did not ask "**Did he f\*\*\*ed me**" — I asked him whether we had slept together. [Bold language spoken in English.]

Exh. A at 22-24.

Mr. Herschmann's counsel, Mr. Nachmani, later threatened to "file a complaint with the Bar Association about the way she behaves towards me and towards my client in the courtroom" to which Ms. Altshuler responded: "All right, serve."  Exh. A at 49.

When scolded by the Court for her behavior, Ms. Altshuler twice alluded to her own mental health struggles:

THE COURT: … I am warning you that I am going to fine you.

THE WITNESS, MS. ALTSHULER: Fine me

THE COURT: Yes? So stop here.

THE WITNESS, MS. ALTSHULER: My father passed away

THE COURT: Madam

THE WITNESS, MS. ALTSHULER: I approved targets in Gaza,

THE COURT: Ma'am, stop.

THE WITNESS, MS. ALTSHULER: For two years.

THE COURT: Ma'am, stop.

THE WITNESS, MS. ALTSHULER: A man stabbed me with a screwdriver.

THE COURT: Madam

THE WITNESS, MS. ALTSHULER: If you think I am bothered by your fine.

THE COURT: Ma'am, I am asking you to stop.

THE WITNESS, MS. ALTSHULER: You are very wrong.

Honorable James J. Garrity, Jr.
March 9, 2026
Page 4

…

> THE COURT: I ask, change your language, your language of speech.

> THE WITNESS, MS. ALTSHULER: So I have PTSD, all right? I have PTSD, and this is my ability to speak. I approved targets in Gaza, my father passed away 3 months ago, I am an only daughter, there is already a very heavy financial burden on me. I now have to support my mother completely alone, Shevala, I have not talked to her in 7 years, now I have to start talking with her, and what else? Oh, yes, and I got stabbed. So I have PTSD. Let us get on with it

Exh. A at 104-05, 141-42.

Mr. Bowen's law partner, Mr. Herschmann, sat through every word of this testimony live, yet Mr. Bowen nonetheless decided to make Ms. Altshuler the evidentiary foundation for his grave allegations against undersigned counsel and Sagi.

**The Truth**

What we can say for certain is that the documentary record, as set forth below, establishes that Ms. Altshuler was indeed associated with Mr. Parnes' law firm for many years. Whatever the explanation for her strange and sometimes salacious testimony, Mr. Bowen had an obligation to present it to this Court in full, with appropriate candor about its source.

Notably, Mr. Bowen failed to provide the only parts of the transcript actually relevant to Your Honor's prior decisions holding the investigator's report to be attorney work product (Dkts. 348, 734), because they completely undermine his latest argument.

Specifically, under direct questioning by the Israeli Court, and consistent with this Court's findings, Ms. Altshuler confirmed that she had in fact retained the investigator at Mr. Parnes' request and that she had no direct dealings with Sagi or even knew who he was:

> THE COURT: Did you know that Genger is the client? After all, Parnes turned to you. Genger turned to you directly.

> THE WITNESS, MS. ALTSHULER: No. He did not contact me directly. He told me it was for someone. His name is Sagi Genger.

Exh. A at 121-22. In this respect, Ms. Altshuler's testimony was confirmed by the Israeli private investigator himself, Sasson Mattityahu:

> THE COURT: Did you have contact with Genger?

> …

> THE WITNESS, MR. MATITYAHU: With Genger I had no contact.

Exh. A at 172.

The foregoing testimony once more debunks the basis for Mr. Herschmann's motion, which was that "the investigator has already admitted to me and my counsel, Yovel Nachmani and

Honorable James J. Garrity, Jr.
March 9, 2026
Page 5

Dror Arad Ayalon, that he prepared the reports for Sagi and dealt directly with him." Dkt. 257-1 at 7. A recording of that meeting later revealed that Mr. Herschmann had lied; the investigator told Mr. Herschmann the opposite, that he had never dealt with Sagi. Dkt. 558.

Despite the unreliability of Ms. Altshuler's testimony, an allegation of "forged" evidence is always serious, and therefore I asked Mr. Parnes to provide the actual electronic version of the email appended to his declaration at Docket #634, in which Ms. Altshuler appears to send an email to Mr. Parnes bearing the signature block of "Parnes & Co."

It should be noted that the aforementioned discussions with Mr. Parnes were delayed by several air raid sirens and the requirement that Mr. Parnes remove himself to a bomb shelter. Notwithstanding the challenging circumstances, Mr. Parnes was eventually able to locate and send me the original email, the metadata of which I then examined. By clicking "File" then "Info" then "Properties," the email reflects the metadata including the specific date on which the email was received – September 11, 2019 – which debunks Mr. Bowen's claim that the email is a later "forgery." A screen capture of the relevant metadata is annexed hereto as Exhibit B, and the electronic file is available for submission to the Court and any party who wishes to review it.

This email is no anomaly. Mr. Parnes also advised me that a search of his records reveals 1,587 emails to or from Ms. Altshuler regarding their shared client matters in which she used the email address Jane@parnes.co. Mr. Parnes indicated to me he is amenable to producing, for *in camera* inspection by the Court, sample emails if privilege can be preserved.

Most bizarre is Mr. Bowen's claim that, "to convince this Court to deny Herschmann's motion to compel disclosure of the investigator report," Sagi submitted a "website photograph [that] was also a forgery—a digital manipulation of her social media profile photo." We know of no instance in which Sagi submitted any photo of Ms. Altshuler. *See* Dkts. 631, 634.

In sum, Mr. Bowen's "forgery" allegations are false and invented. The metadata reflects an email received on September 11, 2019. The 1,587 corroborating emails speak for themselves. Ms. Altshuler's contrary testimony cannot withstand either.

### Mr. Bowen's Other False New Allegations

The remainder of Mr. Bowen's allegations relate to emails apparently produced by Robin Rodriguez in a related litigation, in which Mr. Rodriguez provides reports to investors as to the progress of Genger litigations. Sagi is copied on none of the communications, and has never seen them before, yet that does not stop Mr. Bowen from baselessly accusing Sagi of having hidden the emails from the Court. Mr. Bowen breathlessly reframes the emails as reflecting a "scheme" for Dalia to bankrupt Orly by making a "$20 million demand."

The underlying documents, on their face, do not say what Mr. Bowen claims they say, but rather are consistent with the position that Sagi advanced in this case, *and this Court adopted*, which is that he has cooperated with*, inter alia*, Mr. Rodriguez's entities (Recovery Effort and Manhattan Safety) toward their shared collection goals. As the Court found in its February 24, 2021 ruling granting those parties a common interest privilege:

Honorable James J. Garrity, Jr.
March 9, 2026
Page 6

Sagi explains that rather than expending the resources litigating the question of title to the trust shares prior to the petition date, Sagi, TPR, the Orly Genger Trust, Recovery [Effort, Inc.], Manhattan Safety Maine, Inc. and Manhattan Safety Co., Ltd. executed an intercreditor agreement dated June 16, 2019. The parties to the intercreditor agreement state that through the agreement, they wished to resolve any potential matters among themselves without needless legal fees and other expenditures. … Sagi says that through the agreement, the creditor group parties share a common legal interest in the respective claims to recover the allegedly fraudulent transfers because under the agreement, Sagi, Dalia and the Orly Trust have pooled their disparate and conflicting claims to recover the 32.3 million dollars in fraudulently transferred assets from Orly or the Orly Trust.

…

In sum and substance, the creditor group parties [defined to include Sagi and the Rodriguez entities] assert that they share a common legal interest in the successful prosecution of each other's claims against Orly and the debtor transferee parties, notwithstanding conflicts among those parties because by application of the settlement agreement and intercreditor agreement, the successful prosecution of any of those claims will redound for the benefit of each of them.

Dkt. 373 at 33-35.

The very premise of the Court's common interest finding forecloses Mr. Bowen's "contradictory positions" argument. A common interest privilege cannot exist among parties pursuing genuinely independent litigation strategies—it requires, by definition, coordinated legal positioning toward a shared goal. This Court expressly found in its February 24, 2021 ruling that Sagi and the Rodriguez entities shared a common legal interest notwithstanding "conflicts among those parties." Mr. Bowen cannot now ask this Court to treat as fraudulent the same cooperation it previously found sufficient to establish a common legal interest.

Moreover, Mr. Rodriguez's emails do not match the spin Mr. Bowen seeks to put on them. As noted above, these are not communications by Sagi—he is copied on none of them. They are informal updates written by Mr. Rodriguez to outside investors, offering his lay understanding of complex litigation matters, in the manner of a business pitch. They are, in short, one businessman's imprecise retelling of events he understood only partially. History confirms their unreliability. Among other things, Dalia never made a $20 million demand upon Orly prior to her bankruptcy. Nor does Mr. Rodriguez predict Orly would be "forced" to file; he in fact predicts the opposite: that Orly would rationally choose settlement over bankruptcy.

Mr. Bowen's "bad faith" argument was in any event raised and rejected by a unanimous Second Circuit Court of Appeals, which expressly held that Orly's contractual commitments to her mother are not subject to any such purity test. *See Genger v. Genger*, 771 Fed. Appx. 99, 101 (2d Cir. 2019) ("Orly cannot explain how Dalia and Sagi's alleged bad faith bears on her unambiguous obligation to Sagi under the 2004 Indemnity.").

Honorable James J. Garrity, Jr.
March 9, 2026
Page 7

As further set forth in that decision, Dalia indirectly requested $3 million from Orly (and an equal amount from Sagi)—not the $20 million Mr. Bowen now claims — after it was revealed that Orly had monetized her interest in Dalia's TRI shares for $32.3 million. Mr. Bowen cannot explain why it is *bad* faith for Dalia to want $3 million, yet *good* faith for Orly to want to retain all of the $32.3 million she procured through her mother's beneficence.

Lastly, Mr. Bowen attaches significance to a 2012 email (Exh. 4 to his letter) in which Mr. Rodriguez solicited Michael Oldner to invest in a note related to the Genger litigation. Mr. Oldner did not do so. How a declined investment solicitation from seven years before his appointment as trustee reflects on any motion before this Court remains a mystery.

## Conclusion

There comes a time when even good arguments, let alone terrible ones, must be put to bed. When those arguments have been factually debunked by undisputed electronic evidence, as well as legally rejected by appellate courts, that time is now.

We thank the Court for its consideration.

Respectfully submitted,

John Dellaportas

cc:    All Counsel of Record [via ECF]