**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re Orly Genger*,<br><br>                      Debtor, | Chapter 7<br><br>Case No. 19-13895 (JLG) |

## ORLY GENGER'S MOTION FOR SANCTIONS
## AGAINST THE SAGI AND RODRIGUEZ PARTIES

HERSCHMANN BENSON BOWEN LLP

305 Broadway, 7th Floor
New York, New York 10007
Tel: (212) 226-4226

*Attorneys for Orly Genger*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT..................................................................................... 1

SUMMARY OF CERTAIN NEWLY PRODUCED DOCUMENTS RELEVANT TO THIS
MOTION.................................................................................................................... 7

FACTUAL BACKGROUND ........................................................................................ 9

A.    Genger Estate Planning and the Relevant Genger Family Businesses ............... 9

B.    Sagi's Foreclosure on Orly's Interests........................................................... 10

C.    The Orly and Trump Group Lawsuits...............................................................11

D.    Sagi and Rodriguez Monetized the Orly Trust Debt Sagi Fabricated ............. 12

E.    The 2013 Trump Group Settlement ................................................................. 13

F.    The "Nuclear Option" Devised by Sagi and Rodriguez and their Co-conspirators.......... 14

G.     Execution of the Nuclear Option: The Test Case (2014–2016)...................... 15

H.    Execution of the Nuclear Option: Escalating Demands (2017–2018)............. 17

I.     Execution of the Nuclear Option: The June 2019 Steps ................................. 19

J.    Orly's Bankruptcy.......................................................................................... 23

K.    The Discovery Violations ............................................................................... 23

L.     Parnes and Dellaportas Submit Fabricated Evidence to This Court ............... 26

ARGUMENT ............................................................................................................ 28

I.    The Sagi Parties Committed a Fraud on this Court by Forcing Orly to File for
      Bankruptcy for Improper Reasons ................................................................. 29

II.    The Sagi Parties Committed Fraud on This Court by Litigating the Bad-Faith
      Motion for Five Years Knowing It Was False.................................................. 32

III.   The Sagi Parties Improperly Withheld the Newly Disclosed Documents ......... 34

IV.   The Rodriguez Emails Are Not "Informal Investor Updates" — They Reflect
      Real-Time, First-Hand Knowledge Supplied by Sagi and His Counsel ............ 36

V.      Rodriguez, Manhattan Safety Maine, and Recovery Effort Are Independently
        Subject to Sanctions ........................................................................................... 38

VI.     Sagi's Fabricated Evidence Concerning the Herschmann Report ..................... 40

        A.      The Fabricated Business Card and Website............................................ 40

        B.      Altshuler's Testimony Is Corroborated and Unrebutted; Parnes's Testimony
                Refutes Itself ......................................................................................... 41

        C.      Dellaportas's Credibility Attack Does Not Address the Substance of
                Altshuler's Testimony............................................................................ 46

        D.      The Illegally Obtained Herschmann Records Constitute Independent
                Sanctionable Conduct ........................................................................... 48

        E.      The Herschmann Report: Irreconcilable Testimony............................. 49

        F.      Relief Sought ........................................................................................ 50

CONCLUSION.............................................................................................................. 51

## TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE(S)**

*Amerisource Corp. v. Rx USA Int'l Inc.*, 02–CV–2514 (JMA),
   2010 WL 2730748 (E.D.N.Y. July 6, 2010)........................................................ 38

*Anderson v. Credit One Bank, N.A. (In re Anderson)*,
   641 B.R. 1 (Bankr. S.D.N.Y. 2022)................................................................... 35

*CAT3, LLC v. Black Lineage, Inc.*,
   164 F. Supp. 3d 488 (S.D.N.Y. 2016) ............................................................... 34

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991)........................................................................................... 28

*Daval Steel Prods. v. M/V Fakredine*,
   951 F.2d 1357 (2d Cir. 1991) ........................................................................... 34

*In re Garcia*,
   260 B.R. 622 (Bankr. D. Conn. 2001) .............................................................. 29

*Genger v. Genger*,
   No. 100697/2008, 2016 WL 551444 (N.Y. Sup. Ct. Feb. 10, 2016)............................ 6, 46

*Genger v. Genger*,
   663 F. App'x 44 (2d Cir. 2016)......................................................................... 16

*Glassman v. Feldman (In re Feldman)*,
   597 B.R. 448 (Bankr. E.D.N.Y. 2019) .............................................................. 34

*In re Grabis, No. 13-10669-JLG*,
   2020 WL 7346467 (Bankr. S.D.N.Y. Dec. 11, 2020)........................................ 32

*Hadges v. Yonkers Racing Corp.*,
   48 F.3d 1320 (2d Cir. 1995) ............................................................................. 32

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
   322 U.S. 238 (1944)................................................................................. 2, 29, 30

*In re Khan*,
   488 B.R. 515 (Bankr. E.D.N.Y. 2013) .............................................................. 29

*In re Khan*,
   593 F. App'x 83 (2d Cir. 2015) ........................................................................ 29

*Madanes v. Madanes*,
        199 F.R.D. 135 (S.D.N.Y. 2001) ......................................................................... 35

*In re Manhattan Industries, Inc.*,
        224 B.R. 195 (M.D.F.L. 1997) ........................................................................... 31

*Manhattan Safety Maine, Inc., et al., v. Arie Genger, et al.*,
        No. 1:19-cv-5642-MKV-VF (S.D.N.Y.) ............................................................. 7

*In re Markus*,
        78 F.4th 554 (2d Cir. 2023) ............................................................................... 28

*New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*,
        432 F. App'x 25 (2d Cir. 2011) ......................................................................... 38

*Oliveri v. Thompson*,
        803 F.2d 1265 (2d Cir. 1986) ............................................................................. 28

*In re Orly Genger*,
        No. 25-cv-4099-CM; 2025 WL 1720145 (2025) ................................................ 26

*In re Parikh*,
        508 B.R. 572 (Bankr. E.D.N.Y. 2014) .............................................................. 38

*Pepper v. Litton*,
        308 U.S. 295 (1939) .................................................................................... 31, 32

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
        306 F.3d 99 (2d Cir. 2002) ................................................................................ 34

*In re Robinson*,
        506 F.2d 1184 (2d Cir. 1974) ............................................................................. 32

*Sagi Genger v. Sharon*,
        910 F. Supp. 2d 656 (S.D.N.Y. 2012) ..................................................... 6, 45, 46

*In re Sanchez*,
        941 F.3d 625 (2d Cir. 2019) ............................................................................... 28

*Torres v. Universal Music Grp. N.V.*,
        2025 WL 2710114 (S.D.N.Y. Sept. 23, 2025) ................................................... 28

*Torres v. Universal Music Grp. N.V.*,
        2026 WL 24823 (S.D.N.Y. Jan. 5, 2026) .......................................................... 28

iv

*TPR v. Fischer*,
    87 A.D.3d 876 (1st Dep't 2011) ........................................................................ 14

*Turoff v. McCaslin*,
    222 S.W.3d 664 (Tex. App.—Waco 2007) ......................................................... 30

*U.S. v. Sabbeth*,
    262 F.3d 207 (2d Cir. 2001) .............................................................................. 32

**STATUTES**

11 U.S.C. § 305 ..................................................................................................... 23

11 U.S.C. § 502 ........................................................................................... 6, 31, 51

11 U.S.C. § 510 ........................................................................................... 6, 31, 51

18 U.S.C. § 152 ................................................................................................. 7, 32

18 U.S.C. § 157 ........................................................................................... 7, 29, 32

28 U.S.C. § 1927 .................................................................................................. 29

N.Y. Judiciary Law § 487 .................................................................................. 7, 51

**RULES**

Fed. R. Bankr. P. 7037 .......................................................................................... 34

Fed. R. Bankr. P. 9014 .......................................................................................... 34

Fed. R. Civ. P. 37 ............................................................................................ 34, 38

Fed. R. Evid. 802 .................................................................................................... 9

22 NYCRR 1200 ................................................................................................... 42

Debtor Orly Genger respectfully submits this memorandum of law in support of her motion for sanctions and related relief against Sagi Genger, John Dellaportas, Dalia Genger, Michael Oldner, Recovery Effort Inc., Adam Pollock, TPR Investment Associates, Inc., D&K GP LLC and David Parnes  (collectively, the "Sagi Parties") and Robin Rodriguez, Manhattan Safety Company Ltd., and Manhattan Safety Maine, Inc. (collectively, the "Rodriguez Parties," and together with the Sagi Parties, the "Co-Conspirators").[1]

## PRELIMINARY STATEMENT

In an unparalleled saga of deceit, bad-faith legal maneuvering, breach of fiduciary duties, and extortion, the Co-Conspirators have committed a fraud on this Court—a fraud evidenced by, among other things, their own words in newly and belatedly produced documentary proof.  For the better part of a decade, Sagi Genger, his attorney John Dellaportas, and the other Co-Conspirators planned and carried out a scheme, which they called the "Nuclear Option." Pursuant to that scheme, they generated crushing debt obligations against Sagi's sister, Orly Genger, they knew she could not pay, forced her into bankruptcy, and used the bankruptcy proceeding and this Court for improper purposes—namely, to try to coerce Orly into abandoning her meritorious lawsuit against Sagi and to extort her spouse, Eric Herschmann, whom they called Orly's "billionaire husband/lawyer," into paying the Co-Conspirators tens of millions of dollars.

More than a decade ago, when their parents divorced, Sagi, a sophisticated businessman, decided to prey on Orly, his seven-year-younger sister and an artist with no business experience.

---

[1] Submitted herewith in support of the motion is the Declaration of Michael Paul Bowen, dated April 21, 2026, with Exhibits ("Bowen Decl."). Unless otherwise stated, all references herein to "Ex." are to the exhibits attached to the Bowen Decl., and all references to ECF No. are to docket filings in this case. Additionally, because Orly is obtaining the certified translation of the transcript of the Israeli court proceeding discussed herein – which, as the Court is aware, is not yet available – Orly will separately submit it once obtained and reserves the right to submit any needed supplement based on it.

He enlisted his Co-Conspirators—including high-powered lawyers and his business associates and friends, as well as Sagi and Orly's mother, Dalia—to do so, first hatching a scheme to hijack the trust their father had set up for her and assets to which she was entitled.  When it became clear that, as a result of the Co-Conspirators' own efforts, Orly was left with no "liquidity personally," and that therefore her bankruptcy would not produce any recovery for them, they decided to try to coerce Herschmann because, as co-conspirator Robin Rodriguez, Sagi's longtime "very close" friend and business associate, put it, Herschmann "would not want" his finances exposed in his wife's bankruptcy proceeding.  Exs. 1, 3.  As it turned out, the Co-Conspirators were unsuccessful in extorting Herschmann, but not before Dellaportas and other Co-Conspirators took illegal steps to obtain Herschmann's financial and other private information—highlighting his wealth in public court filings—and then to cover up their conduct, including through the submission to this Court of what appears to be out-and-out fabricated evidence.  Having forced Orly into bankruptcy for these plainly improper purposes, the Sagi Parties then spent the next five-plus years arguing to this Court—including in sworn submissions and at an evidentiary hearing—that it was *Orly* who had acted in bad faith (for example, they said this is a "textbook bad faith bankruptcy filing") (ECF No. 239 ¶ 43).  That argument— which the Sagi Parties knew was premised on a lie—was itself a continuing fraud on this Court.

This conduct—deliberately bringing about the bankruptcy to coerce and extort the debtor and her husband, then lying to this Court about it for five years—is precisely the kind of conduct that the Supreme Court held in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), constitutes fraud on the court—conduct, whether or not illegal on its face, that is carried out for the purpose of corrupting the judicial process and that courts retain the inherent equitable power to remedy.

The documents exposing this scheme were withheld from Orly, the Chapter 7 trustee, and this Court for six years, in violation of discovery obligations, and were produced for the first time in February 2026 in a related District Court proceeding.  The newly produced documents, including Rodriguez's emails from 2016, are a written record in which Sagi Genger and his Co-Conspirators planned and executed their "Nuclear Option."  They describe the scheme in detail: the test case, the escalating demands, the decision to proceed, the coordination with Dalia and Oldner, and the deliberate choice to force Orly into bankruptcy.  They confirm that the Co-Conspirators concocted their so-called Inter-Creditor Agreement in furtherance of and to conceal their conspiracy by pretending that they had legitimate differences, when in fact they were colluding together. The newly produced documents also confirm that the Co-Conspirators co-opted The Orly Trust, by, among other things, arranging for Oldner, hand-picked by Sagi and Rodriguez to be appointed trustee not to act as a legitimate trustee for the benefit of the Trust's beneficiaries, Orly and later her daughter, but rather to be part and parcel of the successful execution of the Nuclear Option, including by, among other things, forming Recovery Effort Inc., owned by the Trust he controlled to be able to siphon money away from the Trust to himself and his Co-Conspirators —conduct obviously anathema to his fiduciary duties to the beneficiaries. Oldner also knowingly withheld for years the newly produced documents.  Absent his wrongful conduct, the Co-Conspirators would have been unable to perpetrate their illegal bankruptcy scheme.

The newly produced documents also reveal the bad-faith arguments the Sagi Parties pressed against Orly and others in this Court for years—at the cost of millions of dollars in litigation expense, reputational and other damage and years of the Court's and parties' time and

3

resources. Those arguments were knowingly false, advanced by the very people who brought about the very bankruptcy they were falsely accusing Orly of misusing.

In his emails, while Orly's appeal from Sagi's test-case judgment against her pertaining to an alleged promise Orly made to their mother was pending, Rodriguez, referring to information and pleadings and other documents supplied or to be supplied to him by Sagi, explained the "nuclear option" plan:

> As soon as that [appeal] is disposed of the mother will make a decision about demanding a larger amount e.g., $20 million which would bankrupt the daughter if she doesn't stop the silly [Canada Fraud] litigation [against Sagi].

On October 1, 2016, two days after the Second Circuit affirmed the judgment, Rodriguez confirmed the reason they would proceed with the plan:

> [Orly] doesn't have liquidity personally and just has assets in her trust, she would either have to declare bankruptcy or get her billionaire husband/lawyer that she married last month pay the money … Bankruptcy is not a good option for [Orly] and her husband because that would open his finances up to discovery which we presume he would not want to do.

Ex. 1 at REIMSM_007025. These are not the words of a legitimate creditor pursuing a *bona fide* claim. They are the words of a co-conspirator describing an extortion scheme.

The documents produced in February 2026 doubtlessly are not all that exist. The full universe of communications among Sagi, Rodriguez, Dellaportas, Parnes, Oldner, investors like Hal Kraft, and their associates—across more than a decade of coordinated activity—must be substantially larger. What has now been produced, however, is more than sufficient for this motion: it is the blueprint for the Co-Conspirators' fraud on this Court, written by the architects themselves, describing in detail exactly what they did and why.

There is a second aspect to the fraud on this Court—an aspect which was part and parcel of the Co-Conspirators' scheme to extort Herschmann. In addition to engineering Orly's

bankruptcy and lying about it for years, Sagi, Sagi's Israeli counsel David Parnes, and Dellaportas—in trying to cover up and explain away as protected work product documents reflecting their efforts to steal Herschmann and Orly's confidential banking and travel records in Israel—submitted to this Court forged documents and false representations. For example, Jane Altshuler, an attorney admitted in New York and Israel, testified under oath that the business card Parnes and Dellaportas submitted to this Court with her name on it was fabricated, and that she had never seen it, let alone used it. Contrary the sworn testimony that Parnes and Dellaportas submitted to this Court, the Parnes & Co. website biography bearing Altshuler's name and a manipulated photograph of her was fabricated, and she never used or possessed a Parnes.co email address. Her testimony is independently corroborated by New York State Office of Court Administration records, which confirm that Altshuler's contact information, which she diligently updated, has never matched that which appears on the fabricated business card. Further, Parnes has now provided new sworn testimony that directly contradicts his and Dellaportas's prior representations to this Court regarding the provenance of the report they commissioned in the fall of 2019 concerning Herschmann's travel records and banking information (the "Herschmann Report")—and one of them, both longtime co-counsel to Sagi, is lying under oath.

This is not the first time courts have found that Sagi and Parnes fabricated evidence and provided false testimony in Genger-related proceedings—and Dellaportas was the presenting attorney on each prior occasion as well. In a federal lawsuit in which Judge Shira Scheindlin ruled against Sagi, she stated that she "observed the demeanor of the witnesses [including Parnes and Sagi]… [a]midst a maze of backdated, incomplete and contradictory documents, and even more dubious testimony" and that she was presented with "layer upon layer of deceit and dysfunction necessarily leading to the conclusion that, at best, only one of five—the accountant

5

[Bill Fischer, whom Dellaportas has accused of criminal conduct multiple times]—could possibly be deemed credible." *Sagi Genger v. Sharon*, 910 F. Supp. 2d 656, 657, 667 (S.D.N.Y. 2012). Similarly, the judge in Orly's lawsuit against Sagi for fraud—the "silly" litigation that the Co-Conspirators tried to coerce Orly to dismiss—found that Dellaportas put forward false documents and testimony generated by his client Sagi and co-counsel Parnes:

- "[Sagi's] frequent backdating or non-dating of documents for his or Parnes's benefit shows that he had no trouble creating false documents."

- "Given the long and close personal and business relationship between defendant [Sagi] and Parnes, [Sagi's] claim that he did not recognize Parnes's handwriting on the documents underlying the [fraudulent] transaction is incredible. . . .This prevarication, as well as [Sagi's] evasiveness and equivocation about the transaction, warrant doubt as to defendant's general credibility."

- "[Parnes's] unquestioning participation in much of [Sagi's] financial maneuvering reflects poorly on his credibility, thereby warranting the rejection of his testimony. . . ."

- "Given [Sagi and Parnes's] proclivity to execute undated and backdated documents," they cannot be believed.

*Genger v. Genger*, No. 100697/2008, 2016 WL 551444, at *5, 7, 8 (Sup. Ct., N.Y. Cnty. Feb. 10, 2016), *aff'd in relevant part and remanded for damages determination*, 144 A.D.3d 581 (1st Dep't 2016).

Accordingly, Orly respectfully requests the following relief: (1) disallowance under 11 U.S.C. § 502(b) or equitable subordination under 11 U.S.C. § 510(c) of the Sagi Parties' proofs of claim; (2) dismissal of the adversary proceedings in which the Sagi Parties object to Orly's discharge; (3) an award against the Co-Conspirators of all fees and expenses Orly was forced to incur in connection with this entire bankruptcy proceeding; (4) sanctions against Robin Rodriguez, Manhattan Safety Maine, Inc., and Recovery Effort Inc. for their failure to comply with the 2020 subpoenas by deliberately withholding responsive documents now known to exist and for Rodriguez's participation in the fraud on this Court; (5) an order, under the crime-fraud

6

exception, directing the Co-Conspirators to produce all documents they have withheld as privileged or work product; (6) an evidentiary hearing concerning the fabricated documents, false representations, and contradictory sworn testimony of Parnes and Dellaportas: (7) if appropriate, criminal referral of the Co-Conspirators and the Sagi Parties' attorneys pursuant to 18 U.S.C. §§ 152 and 157 and New York Judiciary Law § 487 and referral to the Disciplinary Committee of the New York Appellate Division; and (8) any other sanction or relief that this Court deems just and appropriate under these egregious circumstances.

Granting this relief will resolve all material issues remaining in this bankruptcy and will allow it to be brought to a final close—while vindicating the vital interest in protecting the integrity of judicial proceedings.

### SUMMARY OF CERTAIN NEWLY PRODUCED DOCUMENTS RELEVANT TO THIS MOTION

As the Court was made aware in letters submitted by the parties (at ECF Nos. 758, 760, 761, 762, 765, and 766, which are incorporated herein by reference), on February 22, 2026, Manhattan Safety Maine and Recovery Effort made a joint document production to defendants in *Manhattan Safety Maine, Inc., et al., v. Arie Genger, et al.*, No. 1:19-cv-5642-MKV-VF (S.D.N.Y.) ("MSM Action").  These documents were plainly responsive to discovery requests and subpoenas served in this bankruptcy proceeding and its associated adversary proceedings six years ago.  They were never produced.  Set forth below is a list of the key documents:

1. Offering Memorandum from Sagi Genger's friend and business associate Robin Rodriguez, dated March 31, 2012, offering potential investors the opportunity to invest in a $4 million promissory note purportedly issued by the Orly Trust ("Offering Memorandum," attached to Bowen Decl. as Ex. 2).

2. April 4, 2012 email from Rodriguez to Michael Oldner (attached to Bowen Decl. as Ex. 3), attaching and encouraging Oldner to invest in the opportunity described in the Offering Memorandum.

7

3. August through November 2013 email chain between Rodriguez and Hal Kraft (attached to Bowen Decl. as Ex. 4), who apparently invested in the opportunity pitched by Rodriguez in the Offering Memorandum, in which Rodriguez provided updates regarding ongoing litigation based on information that could only have originated from Sagi and/or Sagi's lawyer John Dellaportas.

4. February to June 2016 email chain between Rodriguez and Kraft (attached to Bowen Decl. as Ex. 5) in which Rodriguez provided detailed updates about his conversations with Sagi and ongoing Genger litigations, as well as introduced the so-called "Nuclear Option" to have Dalia Genger demand a $20 million payment in order to drive Orly into bankruptcy for improper reasons.

5. October 2, 2016 email chain between Rodriguez and Kraft (attached to Bowen Decl. as Ex. 1) in which Rodriguez confirms that Sagi will proceed with the "Nuclear Option" to bankrupt Orly in order to force her to drop her pending claims against Sagi or force Eric Herschmann to pay.

6. December 2018 through February 2019 email including, Sagi, Dellaportas, Rodriguez, and Kraft (attached to Bowen Decl. as Ex. 6), in which Dellaportas and Sagi forwarded Rodriguez and Kraft non-public discussions the parties to pending litigation were having with court chambers.  In the email, Rodriguez tells Kraft that New York State Supreme Court Justice Barbara Jaffe is "the lowest judge on the totem pole" and "there is good reason for her status.  In this case she has demonstrated that she is an idiot."

7. March 25, 2019 email chain between Rodriguez and Kraft (attached to Bowen Decl. as Ex. 7) in which Rodriguez articulates a plan in clear coordination with Sagi to proceed in federal court to demand collection on the promissory note in which Rodriguez and Kraft invested, arguing that there would no longer be any arguable offset on the amounts purportedly owed because the state court ruled that Orly did not prove damages in her litigation against Sagi.

8. Memorandum from Manhattan Safety that, based on its contents, was drafted some time around May or early June 2019 which contains from the perspective of Rodriguez and Sagi the history of the Genger litigations, and Sagi and Rodriguez's detailed, multistep strategy going forward to replace Dalia as Trustee of Orly Trust with Michael Oldner, assign claims and submit competing claims to 2013 Trump Group Settlement (defined below) in federal court and dismiss pending claims in Surrogate's Court, and enter into an inter-creditor agreement to divide up the proceeds among Sagi, Rodriguez, Oldner, and their entities, leaving nothing for the Orly Trust or Orly ("June 2019 Memo," attached to the Bowen Decl. as Ex. 8).

As shown below, these documents correspond to the sequence of events that unfolded, including before this Court.  No party could legitimately dispute their authenticity: they were produced by Manhattan Safety and Recovery Effort, entities Sagi had created and controlled in

close coordination with Rodriguez for years, and they expressly involve Sagi, Dellaportas, Rodriguez, and Oldner—the core members of the Sagi Parties' own purported "common interest" group. Each document is admissible in its entirety against the Co-Conspirators, whether as statements of party opponents under Rule 802(d)(2) of the Federal Rules of Evidence or as statements made in furtherance of the conspiracy against Orly. What they say is damning.

## FACTUAL BACKGROUND

The following background is drawn largely from the Co-Conspirators' own documents and sworn testimony, which together establish the scheme described in this motion.

### A. Genger Estate Planning and the Relevant Genger Family Businesses

Arie Genger and Dalia Genger are the parents of Orly and Sagi. In 1993, as part of a commonplace estate planning arrangement, Arie established the Orly Genger 1993 Trust ("Orly Trust") and the Sagi Genger 1993 Trust ("Sagi Trust"), for the benefit of Orly and Sagi, respectively. Each trust owned a 48% limited partnership interest in a family business, D&K LP ("D&K"), with the remaining 4% owned by Dalia. *See* June 2019 Memo (Ex. 8) at REIMSM_000840. D&K purchased 240 common shares—or 49%—of another Genger family entity, TPR Investment Associates, Inc. ("TPR"), the Genger family's primary holding company, which was controlled by Arie. *See id.* TPR's most valuable asset was its stake in Trans-Resources International, Inc. ("TRI"), a global fertilizer company founded and operated by Arie that at times was worth hundreds of millions of dollars.

Arie arranged for D&K to finance its purchase of the TPR shares in part with a promissory note made by D&K to TPR in the principal amount of $8.95 million (the "D&K Note"). *Id*. The Sagi Trust and the Orly Trust each provided identical guarantees for 48% of the D&K Note, reflecting their proportionate ownership of D&K. *Id.* As security for the D&K Note, D&K pledged its 240 TPR shares. *Id*. This was a standard estate planning arrangement:

9

periodic distributions from TPR to its owners, including D&K, were expected to fund D&K's obligations on the Note. It was never contemplated that the Orly Trust, the Sagi Trust, or their beneficiaries would themselves have to pay off the D&K Note.

Over time, Arie and Dalia's relationship deteriorated and ended in divorce, memorialized in a 2004 settlement agreement drafted by David Parnes, Sagi's best friend and counsel (the "Divorce Agreement") Ex. 8 at REIMSM_000841. After the divorce, Sagi sided with Dalia and against Orly. Under the Divorce Agreement, Dalia obtained control of TPR from Arie and soon ceded it to Sagi, who also gained control of D&K. The Divorce Agreement also provided that the Orly Trust and the Sagi Trust would become direct owners of TRI shares—each receiving 1,102.8 shares—while Arie retained his TRI shares. *Id.* The remaining TRI shares were held by a group of entities and individuals referred to collectively as the Trump Group.

**B. Sagi's Foreclosure on Orly's Interests**

In addition to gaining control of TPR and D&K around the time of the divorce, by 2007 Sagi also effectively controlled both the Sagi Trust and the Orly Trust. Dalia, who followed Sagi's direction, became sole trustee of the Orly Trust.

In 2008, Sagi caused TPR to demand full payment of the outstanding balance of the D&K Note—in contravention of the estate planning arrangement—and then caused D&K to default on that demand but only as to Orly's interests. *See* Ex. 8 at REIMSM_000841. Based on that default, which resulted from Sagi's demand on an entity he also controlled, Sagi caused TPR to foreclose on the TPR shares D&K had pledged, and Sagi then acquired those shares himself through a purported credit bid of $2.2 million to himself. *Id.* This extinguished Orly's beneficial interest in TPR through the Orly Trust. Once Sagi got control, no money was ever distributed to the Orly Trust even though her trust and the Sagi Trust held equal interests in TPR.

10

**C. The Orly and Trump Group Lawsuits**

Orly initiated several lawsuits to protect her interests. In 2008, she filed an action in New York Surrogate's Court regarding Sagi's control over the Orly Trust through Dalia, seeking an accounting and the appointment of a replacement trustee. *See In re Orly Genger*, N.Y. Sur. Ct. File No. 2008/0017. She also sued Sagi in New York Supreme Court in *Orly Genger v. Sagi Genger*, Index No. 100697/2008, alleging that he fraudulently induced her to transfer to him her interest in a Genger-family real estate venture in Canada (the "Canada Fraud Action"). In 2009, she brought a broader action—*Orly Genger v. Dalia Genger et al.*, Index No. 109749/09 (the "2009 Action")—against, among others, Dalia, Sagi, TPR, and D&K concerning the TPR share foreclosure and related misconduct.

The Trump Group, meanwhile, had sued Arie and others in Delaware, contending that the TRI share transfer effected by the Divorce Agreement was invalid under the TRI shareholder agreement, and that therefore neither the Orly Trust nor the Sagi Trust had valid title to the TRI shares—which, if the Trump Group was right, would belong to TPR, then controlled by Sagi. *See* June 2019 Memo (Ex. 8) at REIMSM_000842.

In 2008, Sagi negotiated a deal to sell the Genger family TRI shares to the Trump Group. Regardless of the outcome of the Delaware litigation, Sagi controlled both TPR and the Sagi and Orly Trusts, giving him authority over the TRI shares under either theory of ownership. Sagi negotiated a $26.7 million purchase price for the 1,102.8 TRI shares assigned to the Sagi Trust under the Divorce Agreement—a sale that made the Trump Group the majority TRI shareholder. Sagi also negotiated the sale of the 1,102.8 TRI shares assigned to the Orly Trust, but for only $10.3 million (based on his unilateral decision that because his sale made her a minority shareholder, a discount of more than 60% should apply with respect to her shares). *See* Ex. 8 at REIMSM_000842. Orly objected to that sale, and while the dispute was pending, the Trump

11

Group escrowed the $10.3 million.  During this time, approximately $7 million in dividends had accumulated for the Orly Trust shares.  Ex. 8 at REIMSM_000843.  Sagi never distributed these dividends to the Orly Trust (but, if he had, they could have been used to pay off the D&K Note).

**D. Sagi and Rodriguez Monetized the Orly Trust Debt Sagi Fabricated**

By 2012, Sagi and his longtime friend and business associate Robin Rodriguez—who owned and controlled the offshore entity Manhattan Safety Company Ltd.—determined that they could raise money from investors based on debt obligations Sagi had caused the Orly Trust to incur.

Sagi claimed that, as a result of the D&K Note default, the Orly Trust owed TPR approximately $5.6 million on its guaranty (but according to Sagi, the Sagi Trust owned nothing on the exact same note).  *See* Ex. 8 at REIMSM_000841.  Without Orly's knowledge or consent, Sagi arranged for TPR, the Orly Trust, and D&K to "settle their differences" by having Oldner arrange for the Orly Trust to issue new promissory notes in place of the 1993 guaranty.  8 at REIMSM_000841-842.  *See* Ex. 9 (3/16/2012 Amended and Restated Settlement Agreement among TPR, Orly Trust, and D&K); Ex. 10 (Amended and Restated Promissory Note from Orly Trust to Manhattan Safety dated Oct. 3, 2011); Ex. 11 (May 15, 2012 $200,000 promissory note from Orly Trust to Manhattan Safety).  According to the June 2019 Memo, these modifications were "fairly trivial."  Ex. 8 at REIMSM_000841.  The June 2019 Memo also acknowledges that Orly "had not signed off on the 2011 settlement agreement"—because Sagi arranged for Dalia to approve it without Orly's knowledge. Ex. 8 at REIMSM_000841.

Rodriguez solicited investors beginning no later than early 2012, representing that the new Orly Trust notes were a highly profitable and safe investment because the funds the Trump Group had set aside pending resolution of the TRI ownership dispute would more than cover the purported obligations and because his "good friend" Sagi controlled the debtor's trust.  *See* Exs.

12

2, 3; Ex. 8 at REIMSM_000842-843.  Rodriguez's March 31, 2012 offering memorandum explained that Dalia, as trustee, had agreed to affirm the notes' validity and waived all defenses to them (which a trustee acting in accordance with her fiduciary duties never would have done). Ex. 2 at REIMSM_001350.  Sagi and Rodriguez created these obligations without Orly's knowledge or consent and then sold interests in them to outside investors including soliciting Michael Oldner and Hal Kraft.

When Orly learned of the foreclosure and purported replacement notes, she obtained a temporary restraining order in the 2009 Action enjoining Sagi and TPR from taking any action related to the purported settlement agreement.  The state court subsequently determined that the amended notes violated the TRO and declared them null and void.  *See* June 2019 Memo (Ex. 8) at REIMSM_000841.  Sagi and Rodriguez nonetheless took the position that the voiding of the new notes automatically revived the original 1993 D&K Note and Orly Trust guaranty.  *Id*. ("The logical result of the voiding of the settlement agreement was that the old D&K Note (and its guarantee by the Orly Trust) was still in effect.").  As described below, they have continued to assert this purportedly revived D&K Note in litigation against Orly through the present.

### E. The 2013 Trump Group Settlement

Separately, Arie had been pursuing litigation against the Trump Group since 2010 relating to the Trump Group's dealings with Sagi over the Genger family TRI shares.  Arnold and David Broser, through an entity called ADBG, financed that litigation.  On June 16, 2013, the Trump Group settled with Arie and the group referred to in the agreement using his initials as the "AG Group"—consisting of Arie, Orly, and the Brosers and their entities—for total consideration of $50 million (the "2013 Trump Group Settlement").  Ex. 8 at REIMSM_000843.

Under the settlement, the Trump Group paid $17.2 million up front to the AG Group.  All but $6,000 of that amount went to pay Arie's legal fees and to reimburse the Brosers for their

13

litigation funding. The Trump Group also released its claims to the $10.3 million it had set aside

for the Orly Trust TRI shares and the approximately $7 million attributable to Arie's TRI

shares—though those amounts subsequently went to Sagi, who controlled TPR, not to the AG

Group. Additionally, the Trump Group issued two promissory notes to the AG Group of $7.5

million each. Those notes remain unpaid because according to the Trump Group they are not

payable until Sagi ceases his pursuit of claims against them. *See* Ex. 8 at REIMSM_000843.

**F. The "Nuclear Option" Devised by Sagi and Rodriguez and their Co-conspirators**

According to the June 2019 Memo, the 2013 Trump Group Settlement was unexpected.

*See* Ex. 8 at REIMSM_000843 ("In a manoeuver [*sic*] that surprised all of us, the Trumps, Orly

and Arie agreed to settle their differences"). This was a "surprise" to them because, under Sagi

and Rodriguez's plan, any TRI-related proceeds were supposed to belong only to TPR, including

through the Orly Trust's guarantee of D&K's indebtedness to TPR—and therefore belonged, in

their view, to Sagi and his and Rodriguez's investors. As noted above, the 2013 settlement

produced substantial proceeds, but they went to the AG Group, not to the Orly Trust, and

therefore not to Sagi and the purported note holders. *See* Ex. 8 at REIMSM_000843-844.

To obtain those proceeds for themselves, Sagi and Rodriguez needed to accomplish two

things: (1) assert claims against the AG Group settlement proceeds through litigation, and (2) do

so through an entity they controlled. TPR and D&K could not claim these funds because an

earlier court order barred Dalia and entities in privity with her, including TPR and D&K, from

making any claims to TRI-related proceeds. *See TPR v. Fischer*, 87 A.D.3d 876 (1st Dep't 2011)

(holding that, pursuant to the doctrine of res judicata based on her divorce judgment, Dalia and

entities in privity with her are barred from relitigating the apportionment of TRI shares or related

proceeds). They could use the Orly Trust—which Sagi controlled through Dalia—to bring

competing claims to the settlement proceeds in federal court. But Orly was litigating against

14

Sagi in the Canada Fraud Action and the 2009 Action, and she would challenge any such scheme, complicating Sagi and Rodriguez's ability to proceed without opposition.

Their solution was the "Nuclear Option." The plan had two objectives: Force Orly into bankruptcy and use the bankruptcy to pressure Orly into dropping her lawsuits against Sagi and to extort her spouse Eric Herschmann—whom they described as her "billionaire husband/lawyer"—into paying them directly. As Rodriguez explained to investor Hal Kraft, they believed Herschmann "would not want" his finances exposed in his wife's bankruptcy proceeding.

The mechanism was a separate agreement Sagi and Orly had made with their mother Dalia—a one-page letter agreement under which Sagi had agreed to pay Dalia support on demand, in amounts tied to TRI share proceeds, and under which (according to Sagi) Orly had agreed to indemnify Sagi for half of whatever he agreed to pay—even if he never actually gave Dalia a penny. The Nuclear Option was to have Dalia make an escalating demand—ultimately tens of millions of dollars—that they knew and admitted in writing Orly could not possibly pay, thereby driving her into bankruptcy. As the Co-Conspirators admitted in writing, Sagi used a 2014 test case to confirm that this scheme would work before executing the plan in full.

**G. Execution of the Nuclear Option: The Test Case (2014–2016)**

Execution of the Nuclear Option began with a test case in 2014. Sagi, who claimed that he had recently moved away from his lifelong residence in New York, had Dalia demand $200,000 from Sagi pursuant to the letter agreement, enabling him to demand indemnification from Orly. When Orly—who had received none of the TRI share proceeds—declined to pay her $100,000 share, Sagi sued her in the Southern District of New York claiming that there was federal court jurisdiction since he now lived in Connecticut and Dalia in New York and the amount in controversy exceeded $75,000. *Sagi Genger v. Orly Genger*, Case No. 14-cv-05683-

15

KBF (S.D.N.Y.) (filed July 24, 2014).  Sagi won summary judgment on January 5, 2015, and a

judgment of $100,000 plus approximately $150,000 in legal fees, plus costs and interest, was

entered against Orly on March 17, 2015.  *Id.* at ECF No. 113.  Orly moved for reconsideration

under Rule 60 on November 12, 2015, which the judge denied on November 20, 2015.  *Id.* at

ECF No. 132.  Orly appealed these decisions to the Second Circuit.

In a February 13, 2016, email, Rodriguez updated investor Hal Kraft on the status of the

test case and confirmed the plan to proceed.  He wrote:

> The nuclear option stems from an agreement the children [Sagi and Orly] made
> with the mother [Dalia] in consideration of her setting up their trusts that they are
> personally obligated to give her money for her support.  To test the validity of that
> requirement [Dalia] made a demand for $200,000 which Sagi paid but his sister
> refused to pay her $100,000 share of it.  The Court concluded that it was just a
> simple contract dispute and the contract was completely clear so he awarded the
> mother a $100,000 judgment against the sister plus $150,000 in legal fees it took
> her to collect it.  His sister appealed it and the Appeals Court just ruled that the
> mother is entitled to the money.  While the sister made a motion for
> reconsideration it won't change anything.  As soon as that is disposed of the
> mother will make a decision about demanding a larger amount e.g., $20 million
> which would bankrupt the daughter if she doesn't stop the silly litigation.  The
> money has concluded that it is the only way to stop the litigation in a reasonable
> time frame.

Ex. 5 at REIMSM_007030.

On October 1, 2016, two days after the Second Circuit affirmed the judgment against

Orly and the denial of her motion for reconsideration, *Genger v. Genger*, 663 F. App'x 44 (2d

Cir. 2016), Rodriguez sent Kraft another update confirming that they would proceed with the

Nuclear Option.  He wrote that the Second Circuit decision:

> sets a precedent for [Dalia] to demand another $10 million from each [Sagi and
> Orly] and since [Orly] doesn't have liquidity personally and just has assets in her
> trust, she would either have to declare bankruptcy or get her billionaire
> husband/lawyer that she married last month pay the money.

Ex. 1 at REIMSM_007025.[2]  Rodriguez also wrote that "[b]ankruptcy is not a good option for [Orly] and her husband because that would open his finances up to discovery which we presume he would not want to do."  *Id.*

**H. Execution of the Nuclear Option: Escalating Demands (2017–2018)**

Following the Second Circuit's ruling, Sagi and Rodriguez proceeded to execute the plan. In May 2017, Sagi arranged for a Florida court to enter a consent judgment of $14,136,000 in favor of TPR and against D&K on the D&K Note—the one that Sagi and Rodriguez had decided "sprung back to life" after the state court voided their amended notes.  Ex. 12 (FL consent judgment); *see* Ex. 8 at REIMSM_000841.  Sagi, who was on both sides of that transaction, then caused TPR to assign that judgment to Manhattan Safety, giving Rodriguez's entity a nominal claim against D&K, still controlled by Sagi.  Ex. 13; *see* Ex. 8 at REIMSM_000841.  Rodriguez then purported to create a new $400,000 obligation on the Orly Trust purportedly to "improve its ability" to assert claims related to the TRI shares.  Ex. 30.  According to Sagi, the Orly Trust's 48% guaranty of the D&K Note had also revived, enabling Rodriguez to levy as well against the Orly Trust, also controlled by Sagi through his mother, Dalia.  *See* Ex. 8 at REIMSM_000841. In selling this to investors, Rodriguez emphasized that it was a sure thing because Sagi—his "very close friend"—was involved with the entities that were obligated to pay the assigned judgment (Ex. 2 at REIMSM_001349; Ex. 3 at REIMSM_000488) and they would collect because Sagi was in control of the entities.

On or about October 21, 2017, exactly as Rodriguez had described in advance to investor Kraft, Sagi caused Dalia to demand $6,000,000 from him—thirty times the amount of the test case demand.  There was no basis for this demand.  *See* Ex. 5 at REIMSM_007029 (Kraft email

---

[2] Orly and her husband were married in September 2016.

asking, "does the mother have to justify that the $20mm is actually support? i.e. seems like a lot of support … in excess of the spirit of the agreement")[3].  Three days later, rather than paying, Sagi had Dalia sue him in federal court and then proceeded to file a third-party complaint against Orly, seeking half of Dalia's demand.  *See Genger v. Genger* (S.D.N.Y. Case No. 17-cv-8181, filed Oct. 24, 2017).  When Kraft asked Rodriguez whether Dalia had to "justify" that the demand was actually for support, Rodriguez replied: "No justification is required at all."  Ex. 5 at REIMSM_007029.  The district court granted summary judgment to Sagi on July 27, 2018.  A judgment of $3,219,698, plus costs and fees, was entered against Orly on August 17, 2018.  *Genger v. Genger*, 17-cv-8181 at ECF No. 112.

Though fully aware that Orly lacked the means to satisfy the judgment, *see* Ex. 1 at REIMSM_007025 (Rodriguez email), Sagi proceeded with extensive post-judgment discovery directed at both Herschmann's assets and the AG Group's notes from the 2013 Trump Group Settlement.  *See generally id.* at ECF Nos. 141 through 222; Ex. 8 at REIMSM_000844.  Tellingly, and as described in the newly produced documents, even after receiving the pre-nuptial agreement that confirmed that Herschmann and Orly shared no joint assets other than their homestead protected property in Texas, and after stealing Herschmann's private banking information in September 2019, Sagi subpoenaed almost all personal financial information from Herschmann from 2015 onwards.  *See* ECF No. 257-6) (*e.g.* "Any and all bank statements;" "Any and all assets")

---

[3] The Co-Conspirators' initial demand might have been based on Kraft's concern that an immediate $20 million dollar demand would not have been in the "spirit" of the agreement or on their belief that it would be easier to initially extort Herschmann to pay a $3 million demand rather than a $10 million demand. In any event, shortly after Orly filed for bankruptcy, the Co-Conspirators increased their demand to more than $20 million dollars (which is Sagi's revised claim in this bankruptcy). Claim 14-1.

18

**I. Execution of the Nuclear Option: The June 2019 Steps**

With the judgment entered and Orly's bankruptcy anticipated, Sagi and Rodriguez

executed the next phase of the plan, as set out in the June 2019 Memo.  According to the Memo,

their "plans run as follows":

1. Replace the Trustee of the Orly Trust. We understand that Dalia is prepared to resign and appoint Michael Oldner, who is prepared to serve. (Orly expected to object after the fact). A pending motion in Surrogates Court to remove Orly becomes Moot, we hope.

2. The Trust will assign its rights to a corporation owned by the Trust, which will litigate the Trust's claim.

3. Sagi will meanwhile continue his litigation, and will attempt to foreclose on the Notes.

4. The Trust will be arguing that the Notes belong to the Trust, and that the $17.2 million has been misappropriated, and should return to the Trust.

5. Sagi will argue that the Notes belong to Orly, so he is entitled to foreclose, and further that the promissory notes are a sham, and should not come in front of his judgement [*sic*].

6. If the Orly Trust gets the money it will pay off MSL [a co-conspirator] – Orly expected to object!

7. The division of the proceeds will be subject to an inter-creditor agreement, which is being negotiated.

Ex. 8 at REIMSM_000844.  Each of the foregoing steps was then executed in June 2019, as

described below, with the exception of step 6, as the Orly Trust has not received the money it has

claimed.

*June 11, 2019 – Sagi's Turnover Action.*  On June 11, 2019, in his post-judgment

enforcement efforts in the District Court, Sagi filed a "turnover" motion seeking the proceeds of

the 2013 Trump Group Settlement, and in particular the two $7.5 million notes.  *Genger v.*

*Genger*, No. 17-cv-8181 at ECF No. 212-213; *see also* ECF No. 239 (Sagi MTD) ¶ 49.  In

19

connection with this first step and in later filings, Sagi (and Dellaportas) gratuitously cited examples of Herschmann's personal wealth, including the total amount of his American Express points (reflecting the amount of money he had personally spent using his American Express card), his "exotic car collection," "string of multimillion dollar homes," as well as successful and lucrative business transactions.  ECF No. 239-30 at 1; *see also* ECF No. 113 at ¶ 13 and ECF No. 239 at ¶ 10.  They even challenged the validity of his prenuptial agreement with Orly, interposing themselves into their marriage without any legitimate basis for doing so, and claimed that they needed copy of his tax returns supposedly to ensure themselves that he did not commit tax evasion  *See* SDNY Case No. 19-mc-210-VSB-VF, ECF No. 3, at 3.  All of this was intended to signal to Herschmann and Orly their coercion tactic of "opening up" Herschmann's finances in any bankruptcy filed by Orly.

*June 13, 2019 – Assignment of Claims to Recovery Effort Inc.*  Recovery Effort Inc. was formed on June 4, 2019.  Oldner emailed Sagi the corporate formation documents on June 10, 2019, four days before he became the purported Trustee of the Orly Trust.  Exs. 14, 15.  On June 13, 2019, Dalia—still acting as trustee though she had signed a resignation document the prior day—executed a purported assignment of $32.3 million from the 2013 Trump Group Settlement proceeds from the Orly Trust to Recovery Effort Inc.  Exs. 16, 17, 18.

*June 14, 2019 – Installation of Oldner as Trustee.*  Rodriguez contacted Oldner in April 2019 to discuss the possibility of replacing Dalia as trustee.  Ex. 19 at 45:11-17.  Oldner became purported Trustee on or about June 14, 2019.  Ex. 15.

The newly produced documents confirm that, as part of their scheme, the Co-Conspirators used Oldner to co-opt the Orly Trust, by, among other things, arranging for Oldner, hand-picked by Sagi and Rodriguez to be appointed trustee—but not to act as a legitimate trustee

20

for the benefit of the Trust's beneficiaries, Orly and her daughter.  Rather, utterly ignoring Orly's interests and rights, which he was obligated to protect, Oldner willingly joined the conspiracy and was part and parcel of the execution of the Nuclear Option—among other things, he immediately and with no legitimate basis formed Recovery Effort Inc., owned by the Orly Trust he controlled, to be able to siphon money away from the Trust to himself and his Co-Conspirators—conduct obviously anathema to his fiduciary duties to the beneficiaries. He likewise signed, on behalf of the Orly Trust, the so-called Inter-Creditor Agreement without any basis, inasmuch as he knew that, as discussed further below, there was no legitimate disagreement among the parties to that agreement, including Sagi and Rodriguez, who jointly solicited him to join and advance their criminal conspiracy by becoming the trustee to execute on their plans. He then inexplicably agreed to an amendment to the agreement that would ignore any rulings as to dischargeability by this Court and make sure Sagi got money no matter what.  Ex. 31.  Oldner also knowingly withheld for years the newly produced documents and without his wrongful conduct, the Co-Conspirators would have been unable to perpetrate their illegal bankruptcy scheme.

 *June 16, 2019 – The Inter-Creditor Agreement.*  The "Inter-Creditor Agreement," dated June 16, 2019, was entered into by Sagi, TPR, the Orly Trust and Recovery Effort Inc. (by Oldner), Manhattan Safety Maine (by Rodriguez), and Sagi's lawyer John Dellaportas as escrow agent.  Ex. 20.  Under the agreement, any proceeds from the litigation efforts of Sagi, Oldner, or Rodriguez would be divided among the three of them.  Not one penny was to be distributed to the Orly Trust or its beneficiaries.  *Id.* at 2.  The original draft reflected that the third component of the "waterfall" was supposed to provide proceeds to the Orly Trust, but Sagi said that was an

21

error and Dellaportas would make sure to change the agreement to ensure that the money went only to Recovery Effort, Inc., which Dellaportas promptly did.  Ex. 31.

The newly disclosed documents thus confirm that the Inter-Creditor Agreement is a ruse. These documents are conclusive proof that, from the outset, the Co-Conspirators were colluding together and shared an identical interest in procuring money for themselves collectively, and therefore did not have competing claims to the 2013 Trump Group Settlement proceeds that were compromised through an arms-length intercreditor agreement.  Rather, they concocted the Inter-Creditor Agreement to create a false appearance of arms-length competing interests where in fact there are none so that each of the Co-Conspirators each working in unison could bring ostensibly conflicting claims before this Court and the District Court in the MSM Action, discussed below, while asserting a baseless common interest privilege.

*June 17, 2019 – District Court Action.*  On June 17, 2019, Recovery Effort Inc. (controlled by Oldner) and Manhattan Safety Maine (controlled by Rodriguez) represented by the same counsel, Adam Pollock, who also purported to represent the Orly Trust[4] commenced the MSM Action in the District Court against, among others, Arie, the Brosers, and Michael Bowen as nominal defendant holder of the AG Group notes.  S.D.N.Y. Case No. 19-5642.  The June 2019 Memo reflects that the parties anticipated and planned for Orly would file for bankruptcy and therefore did not name her as a defendant.  The June 2019 Memo also reflects concern about the six-year statute of limitations running from the June 2013 settlement; Rodriguez and Oldner filed on June 17, 2019—the Monday after Sunday, June 13, the day the six-year period would have expired.  Ex. 8 at REIMSM_000844.

---

[4] It is, to say the least, unclear how Pollock could ethically represent the Orly Trust while simultaneously representing a party (MSM) adverse to it.

**J. Orly's Bankruptcy**

Unable to satisfy the judgment, unwilling to drop her lawsuits against Sagi and Dalia, and facing aggressive post-judgment enforcement directed at her husband, Orly, as the Co-Conspirators planned, filed for bankruptcy on July 12, 2019.

After the case was transferred to this Court, Sagi filed an amended motion to dismiss on April 24, 2020, asserting that Orly had filed in bad faith and in collusion with Herschmann, Arie, and the Brosers.  ECF No. 239.  Sagi argued:

> The Debtor's false statements and machinations are head-spinning. The Debtor's demonstrated lack of candor and good faith in her sworn, voluntary petition is also an affront to the dignity of this Court and the Bankruptcy Code. Her bankruptcy filing lacks good faith and has no proper purpose.  Its only goal is to keep her assets in the hands of her father (who, in turn, has pledged all his assets back to her husband) and her husband, who supports the Debtor in a lavish lifestyle, while leaving her one true creditor—Sagi (and by extension, her estranged mother, Dalia)—holding the bag.  This is a textbook bad-faith bankruptcy filing.  Accordingly, Sagi respectfully submits that the most—perhaps only—appropriate remedy for such misconduct is dismissal of the Debtor's bankruptcy case under 11 U.S.C. §§ 305(a) and/or 707.

ECF No. 239 ¶ 43.  Sagi also claimed that Orly filed to conceal and shield the $32.3 million in AG Group settlement proceeds.  *See* ECF No. 239 ¶¶ 47–49; ECF No. 443 at 59.

**K. The Discovery Violations**

During discovery on the motion to dismiss and motion for relief from the automatic stay, Orly, the Chapter 7 trustee, and the Kasowitz law firm (a creditor in the bankruptcy) served subpoenas and discovery requests on Oldner, the Orly Trust, Manhattan Safety Maine, and Recovery Effort, calling for documents that were not produced until February 2026 in the District Court action.

For example, in her June 3, 2020 subpoena to the Orly Trust, Orly sought, among other things (Ex. 23):

- Documents and communications relating to Manhattan Safety Company Ltd. (Request Nos. 6-9, 14-16);

- Documents and communications relating to Recovery Effort Inc. (Request Nos. 10-13);

- Documents and communications related to D&K LP and D&K GP, the D&K Note, and purported settlements (Request Nos. 20-25);

- All communications between you and Robin Rodriguez and Michael Oldner (Request Nos. 35-37);

- Documents and communications related to any agreement with Manhattan Safety Maine, Manhattan Safety Co. Ltd., or Recovery Effort (Request No. 41).

On June 3, 2020, Orly served a subpoena on Oldner individually calling for, among other things (Ex. 24):

- All documents and communications relating to or concerning Manhattan Safety Company Ltd. (Request No. 10-11);

- All documents and communications relating to or concerning D&K, the D&K Note, and the purported settlements related to the D&K Note  (Request Nos. 16-21);

- All communications with Robin Rodriguez (Request No. 31);

- All documents and communications relating to or concerning any agreement between any member of the Sagi Group and Manhattan Safety Maine, Inc., Manhattan Safety Company Ltd. and/or Recovery Effort, Inc. (Request No. 36).

On June 19, 2020, the Chapter 7 trustee served document requests on Manhattan Safety

Maine and Recovery Effort Inc. calling for, among other things (Exs. 25, 26):

- All Documents Concerning the inter-creditor agreement (Request No. 4);

- All Documents between Manhattan Safety and the Sagi Entities concerning the MSM Action (Request No. 7);

- All Documents Concerning TPR's alleged assignment of the D&K Note to MSM (Request No. 28);

24

- All Documents Concerning any alleged payment by MSM to TPR in connection with the assignment (Request No. 29).

On June 3, 2020, the Kasowitz firm served a similar subpoena on Oldner and the Orly Trust calling for, among other things (Exs. 27, 28):

- All documents and communications relating to or concerning Manhattan Safety Company Ltd. (Request Nos. 14–15);

- All documents and communications relating to or concerning the D&K Note, and foreclosure, and purported settlements (Request No. 20-23);

- All documents concerning the assets and liabilities of the Orly Trust (Request No. 29);

- All communications and documents relating to or concerning Robin Rodriguez (Request No. 38);

- All documents and agreements where Manhattan Safety Maine, Manhattan Safety Company Ltd., Recovery Effort, Inc., Robin Rodriguez, and/or Michael Oldner is a party, including the Inter-Creditor Agreement (Request Nos. 47–48);

- All documents relating to any debts owed by Orly Genger or the Orly Trust (Request Nos. 57).

Every document produced in the District Court action in February 2026 was responsive to these requests served six years ago.  While Adam Pollock, who was still simultaneously counsel for Orly's Trust, MSM and Recovery Effort, served on behalf of Oldner blanket objections to these requests as improper and supposedly "irrelevant" to Sagi's motion to dismiss the bankruptcy, those objections were obviously interposed in bad faith since the concealed documents are clearly relevant—they are proof of Sagi's and his cohort's bad faith in seeking dismissal of the bankruptcy.

After many months of discovery and depositions, the Court conducted an evidentiary hearing at which it heard testimony from, among other witnesses, Sagi, Orly, Herschmann, and

25

David Broser.  The Court denied Sagi's motion to dismiss in its entirety, finding that Orly had not filed for bankruptcy in bad faith.  ECF No. 615.  Sagi moved for reconsideration (ECF No. 630), which was denied.  Sagi then sought leave to take an interlocutory appeal.  The District Court denied that motion on June 20, 2025.  *In re Orly Genger*, No. 25-cv-4099-CM, 2025 WL 1720145 (S.D.N.Y. June 20, 2025).

The only reasonable inference from the six-year gap between the subpoenas and the production of these documents is that the Co-Conspirators and their counsel withheld them deliberately, knowing they would have negated the false bad-faith narrative the Sagi Parties were simultaneously pressing before this Court.

This Court's June 20, 2025 order also permitted the stayed Manhattan Safety/Recovery Effort District Court action to proceed.  ECF No. 755.  Discovery began in that action, and on February 22, 2026, the plaintiffs there produced for the first time the documents that are the subject of this motion.

**L. Parnes and Dellaportas Submit Fabricated Evidence to This Court**

The Co-Conspirators, it is clear, advanced their fraud-on-the-court Nuclear Option through fabricated evidence as well.  In the course of this bankruptcy proceeding, Parnes—Sagi's Israeli counsel—and Dellaportas submitted to this Court, among other things, a business card,, and purported email metadata purportedly establishing that Jane Altshuler, an attorney admitted in New York and Israel, was affiliated with Parnes & Co and used the business card and a Parnes.co email address.  Parnes swore that Altshuler used the business card in meetings with clients.  Ex. 21 at 217:4-16.  Dellaportas represented to this Court that he received the Herschmann Report—a report concerning Eric Herschmann that played a material role in proceedings before this Court—directly from Parnes, who in his words had the "only copy" in

26

April 2020 and was wholly unaware of its existence beforehand.  ECF No. 720 at 18, 40-41, 56, 92.

Altshuler testified under oath on December 8, 2025 that all of this is false.  She swore she never worked at Parnes & Co; never saw the business card until her testimony; never used or possessed a Parnes.co email address; and has used only one professional email address throughout her career.  She further testified that the Parnes & Co website biography bearing her name was fabricated and that her photograph on it was digitally manipulated—the color of her dress was altered from her own social media profile black to blue.  Her testimony is corroborated by New York State Office of Court Administration, records, which confirm that her registration has always reflected only her Gmail address and Israeli cellular number, neither of which appears on the business card.  Although the business card claims that Altshuler has a New York telephone number, the records show no such affiliation and those numbers are only associated with Parnes.

Parnes's own sworn testimony in Israel further undermines the submissions made to this Court.  He admitted that he set up, pays for and controls the Parnes.co domain, but he could not swear that Altshuler ever had a Parnes.co mailbox.  Yet he and Dellaportas offered to submit to this Court *ex parte*, among other things, purported metadata for 1,587 emails from that address as evidence of her affiliation.  Altshuler has sworn and later confirmed in writing that this metadata is fake and could easily be fabricated by Parnes.  Ex. 128 at 6-26.

As to the Herschmann Report, Parnes, on December 8, 2025 testified at trial in Israel that he never had the Herschmann Report and has no knowledge of how it reached the United States to be submitted *ex parte* by Dellaportas to this Court—testimony directly contradicting Dellaportas's prior representations to this Court and the metadata provided.  Parnes testified that he "assumes" the private investigator Matityahu sent the report directly to Sagi, but that directly

27

refutes the basis for much of this Court's decisions related to the Herschmann Report (ECF Nos. 348 and 720).  Ex. 21 at 231:15-16, 121:19 to 123:17, 165:14-19, 171:11-27, 172:14-17.  Parnes has also conceded that any work product privilege assertion over the report is "not mine" to assert. Dellaportas or Parnes has been lying to this Court, the Israeli Court or both courts, but, in any event, they are and have been co-counsel, representing Sagi in almost all of his numerous legal matters for more than the last 15 years and both have been instrumental in effectuating the "nuclear option."  This conduct does not occur in a vacuum: as described in Argument V, two separate courts have previously found that Sagi and Parnes fabricated evidence and provided false testimony in Genger-related litigations, and that Dellaportas was the presenting attorney on each occasion.  The legal consequences are addressed in Argument V below.

## ARGUMENT

Courts possess both statutory and inherent authority to sanction parties and counsel for fraud on the court.  The Court has inherent "power to conduct an independent investigation in order to determine whether it has been the victim of fraud."  *Torres v. Universal Music Grp. N.V.*, 2025 WL 2710114, at *5 (S.D.N.Y. Sept. 23, 2025) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).  *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986) ("[T]he only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is that awards under § 1927 are made only against attorneys, while an award made under the court's inherent power may be made against an attorney, a party, or both.").  Such inherent authority is vested in bankruptcy courts.  *In re Markus*, 78 F.4th 554, 563 (2d Cir. 2023); *In re Sanchez*, 941 F.3d 625, 628 (2d Cir. 2019).  Available remedies include monetary sanctions, dismissal of pleadings, disallowance or subordination of claims, fee-shifting against counsel, and adverse inferences.  *See Torres v. Universal Music Grp. N.V.*, 2026 WL 24823, at *1 (S.D.N.Y. Jan. 5, 2026) (dismissing complaint as fraud on the court after hearing on

28

fabricated evidence); 28 U.S.C. § 1927; *In re Khan*, 488 B.R. 515, 535 (Bankr. E.D.N.Y. 2013),

*aff'd sub nom. In re Khan*, 593 F. App'x 83 (2d Cir. 2015) (invoking inherent authority and

§ 1927 to impose sanctions for meritless claims filed for improper purpose); *In re Garcia*, 260

B.R. 622, 625 (Bankr. D. Conn. 2001) (overruling objection to discharge and ordering counsel to

show cause why they should not be sanctioned where objection was meritless and filed for

improper purposes).

Additionally, both federal and New York criminal laws are implicated.  Under Section

157 of Title 18, any person who participates in a "scheme to defraud" using filings in a

bankruptcy are guilty of bankruptcy fraud, a felony.  18 U.S.C. § 157.  And pursuant to Section

487 of the New York Judiciary Law, an attorney who is "guilty of any deceit or collusion, or

consents to any deceit or collusion, with intent to deceive the court or any party" is "guilty of a

misdemeanor" and the injured party is entitled to treble damages.  N.Y. Jud. Law § 487.

I. **The Sagi Parties Committed a Fraud on this Court by Forcing Orly to File for Bankruptcy for Improper Reasons**

According to well-settled Supreme Court precedent, if done for an improper purpose,

even something that otherwise would be entirely legal can amount to fraud on the court.  *See*

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944).  In *Hazel-Atlas*, the

plaintiff's lawyers had secretly ghost-written a trade journal article and submitted it as

purportedly independent expert evidence to support their patent infringement claim.  322 U.S. at

239–40.  Ghost-writing an article is not, in itself, illegal.  But the Supreme Court held that the

conduct nonetheless constituted fraud on the court—because it was done for the purpose of

deceiving the tribunal, and the judgment rested on that deception.  The Court vacated the

judgment notwithstanding the finality principles that would otherwise apply, holding that courts

retain inherent equitable power to remedy such conduct regardless of the passage of time.  322

U.S. at 246.

Here, as in *Hazel-Atlas*, the conduct at issue is not illegal on its face.  It is not, standing

alone, illegal or fraudulent for a legitimate creditor to compel a debtor to file for bankruptcy or to

start an involuntary bankruptcy proceeding against a debtor.  It is also not illegal or fraudulent

for a group of creditors to enter into an intercreditor agreement.  But that is precisely the point of

*Hazel-Atlas*: conduct that is otherwise legal becomes a fraud on the court where, as here, it is

carried out for the purpose of corrupting the judicial process.  Thus, it would not have been

improper for Sagi to compel Orly's bankruptcy filing as a result of good faith attempts to collect

on his multi-million-dollar judgment against her.  But it is unlawful to orchestrate a bankruptcy

filing to extort her to drop her state cases and her husband to pay money he is not obligated to

pay.  It is also unlawful to conspire to knowingly manufacture conflicting claims, where none

actually exist, and then enter into a purported agreement to "resolve any potential matters

amongst themselves without needless legal fees and other expenditures."  Ex. 20 at 2.  *See, e.g.*,

*Turoff v. McCaslin*, 222 S.W.3d 664, 665 (Tex. App.—Waco 2007) (affirming summary judgment

decision voiding an agreement among bankruptcy creditors which presented the "sham of

adversity" akin to an improper Mary Carter agreement).

This is clearly what happened here, as proven by the recently produced documents.  It

was unlawful for the Sagi Parties to drive Orly into bankruptcy here because they did so for

plainly improper reasons—even assuming they are legitimate creditors (and at least with respect

to Robin Rodriguez, Manhattan Safety, and the Orly Trust, there is serious doubt as to that).  The

newly produced documents confirm that the Co-Conspirators acted in concert to drive Orly to

file for bankruptcy for at least three improper reasons.  First, they did so in an attempt to compel

her into withdrawing her pending "silly litigations" against Sagi in both the Canada Fraud Action and the 2009 Action. Ex. 1 at REIMSM_007025, Ex. 5 at REIMSM_007030. *Cf. In re Manhattan Industries, Inc.*, 224 B.R. 195 (M.D.F.L. 1997) (dismissing *involuntary* bankruptcy proceeding brought by creditor-franchisor against debtor-franchisee in retaliation for a lawsuit that franchisee was pursuing against franchisor in state court).

Second, they did so in attempt to coerce Eric Herschmann—who, according to the Sagi Parties, is Orly's "billionaire husband"—into paying off the Co-Conspirators because they believed that he would not want his own personal information scrutinized as part of his wife's bankruptcy case. Ex. 1 at REIMSM_007025.

Third, they did so to try to steal for themselves the balance of the Trump Settlement Agreement to which they were not entitled. *See* Ex. 8.

A primary focus of Sagi and the parties who joined his bad-faith motion to dismiss was that Orly filed for bankruptcy to try to shield the proceeds of the 2013 Trump Group Settlement, of which Orly received none. *See, e.g.*, ECF No. 239 (Sagi MTD) ¶ 49 ("There can be no doubt that the Debtor's primary, if not sole, purpose, in filing this Bankruptcy Case was and is to protect the fraudulent transferees of the $32.3 million from the turnover motion brought in the District Court.")

Because the Sagi Parties drove Orly into bankruptcy for plainly improper purposes—to silence her litigation, extort her husband and to steal the balance of the Trump Settlement—their objections to Orly's discharge in Adversary Proceeding Nos. 19-ap-1444, 19-ap-1445, and 19-ap-1447 should be dismissed with prejudice, their proofs of claim should be disallowed under 11 U.S.C. § 502(b) or equitably subordinated under 11 U.S.C. § 510(c), and Orly should be granted a full discharge of her debts. As the Supreme Court held in *Pepper v. Litton*, 308 U.S. 295

31

(1939), a bankruptcy court sitting in equity has inherent power to disallow or subordinate the claims of a party who used control over the debtor to manufacture those very claims—and the court must "sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." 308 U.S. at 308. That principle applies with full force here. The Sagi Parties cannot be allowed to collect as creditors in the bankruptcy they deliberately and improperly engineered.

## II.    The Sagi Parties Committed Fraud on This Court by Litigating the Bad-Faith Motion for Five Years Knowing It Was False

"Fraud upon the court [is that] which seriously affects the integrity of the normal process of adjudication. The concept of fraud on the court embraces only that species of fraud which does, or attempts to, defile the court itself." *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1325 (2d Cir. 1995). "A fraud on the court encompasses conduct that prevents the court from fulfilling its duty of impartially deciding cases." *In re Grabis*, No. 13-10669-JLG, 2020 WL 7346467, at *7 (Bankr. S.D.N.Y. Dec. 11, 2020). "The essence of fraud on the court is when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process." *Id.*

Moreover, pursuant to 18 U.S.C. § 152(2), a person who knowingly makes a false oath or account in or in relation to any bankruptcy case under title 11 is subject to fine and imprisonment for up to five years. 18 U.S.C. § 152; *U.S. v. Sabbeth*, 262 F.3d 207, 217 (2d Cir. 2001) (with respect to the meaning of 'fraudulently' for purposes of section 152, "it was sufficient for the District Court to define 'fraudulently' as 'made with the intent to deceive.'"); *In re Robinson*, 506 F.2d 1184 (2d Cir. 1974) (Section 152 "only requires … a 'false oath.'… [M]ost authorities agree that the false oath statute is essentially equivalent to a perjury statute. Thus only the basic requirements of perjury need be proven."). And, according to 18 U.S.C. § 157, any person who

32

participates in a "scheme to defraud" using filings in a bankruptcy are guilty of bankruptcy fraud, a felony.

Filing a motion to dismiss is not illegal.  Engaging in discovery is not illegal.  Seeking reconsideration of an adverse ruling is not illegal.  But, again as *Hazel-Atlas* makes clear, otherwise lawful litigation conduct becomes a fraud on the court when it is knowingly premised on a false narrative advanced for the purpose of corrupting the adjudicative process.  That is exactly what happened here.  For five years, Sagi and the parties who joined his amended motion to dismiss maintained before this Court—through extensive discovery, a lengthy evidentiary hearing, a motion for reconsideration, and an attempted interlocutory appeal—that Orly filed for bankruptcy in bad faith and that her case should be dismissed without discharge. They pressed this position, expensively and relentlessly, while falsely accusing other parties and their counsel of multiple felonies.  They knew it was all false.  *See, e.g.*, ECF No. 239 (Sagi Amended Motion to Dismiss) ¶¶ 43, 47-50, 55; ECF No. 443 (Sagi Reply) ¶¶ 54, 58-61.

The newly disclosed documents establish beyond any doubt that the Co-Conspirators deliberately drove Orly into bankruptcy—planning the scheme for years under the name "Nuclear Option," engineering Dalia's demand for tens of millions of dollars they knew Orly could not pay, and timing each step to corner Orly and her husband. Sagi was not compelled to participate in this bankruptcy.  He designed it.  *See* Exs. 1, 5 (emails explaining Nuclear Option). It is therefore impossible for the Sagi Parties to have contended, as they did on their motion to dismiss, that Orly sought bankruptcy protection in bad faith and for improper purposes.  That they maintained that false position throughout the pendency of the motion to dismiss—in sworn filings, through discovery, and at the dismissal motion trial before this Court—constitutes a continuing fraud upon this Court.

33

The Sagi Parties' five-year campaign on the motion to dismiss was, in its entirety, a fraud on this Court: a knowingly false narrative pressed in sworn filings, through discovery, at evidentiary hearing, and in appellate proceedings, by the very parties who had constructed the bankruptcy they were attacking. Orly, the Chapter 7 trustee, and all parties who were required to litigate against that fabricated narrative are entitled to recover every dollar in attorneys' fees and costs incurred in connection with this entire bankruptcy proceeding.  The Sagi Parties' counsel, who prosecuted these proceedings, should be held jointly and severally liable.

### III.    The Sagi Parties Improperly Withheld the Newly Disclosed Documents

Courts regularly sanction parties for failing to comply with discovery obligations.  *See Glassman v. Feldman (In re Feldman)*, 597 B.R. 448, 463 (Bankr. E.D.N.Y. 2019) (dismissing bankruptcy case and awarding attorneys' fees for failure to comply with discovery obligations and discovery order).  *See also, e.g., Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002) (sanctions appropriate where party fails to produce relevant evidence through culpable conduct) (*superseded by statute on other grounds as stated in CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 495 (S.D.N.Y. 2016)); *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991) (defendant prohibited from challenging alter ego finding as a sanction for defendant's failure to comply with discovery obligations).

"Compliance with discovery orders is necessary to the integrity of our judicial process and parties who flout such orders do so at their peril.  In general, noncompliance with discovery may be sanctioned under Federal Rule of Civil Procedure 37 [applicable here through Rule 9014(c) and Rule 7037 of the Federal Rules of Bankruptcy Procedure].  Additionally, a bankruptcy court may impose sanctions pursuant to its inherent equitable powers, which are available to address bad-faith conduct and failure to comply with a court order."  *Feldman*, 597

34

B.R. at 463; *Anderson v. Credit One Bank, N.A. (In re Anderson)*, 641 B.R. 1, 15, 22, 24, 27

(Bankr. S.D.N.Y. 2022) (imposing default judgment as sanction for rampant discovery abuse).

Every one of the documents that Manhattan Safety and Recovery Effort produced in the

District Court action on February 22, 2026 should have been produced in this bankruptcy

proceeding *six years ago* by Sagi, the Orly Trust, and Oldner in connection with discovery

requests and subpoenas served on them and their associated entities in connection with Sagi's

amended motion to dismiss.

Additionally, because the newly disclosed documents and communications demonstrate

that the Co-Conspirators have been engaged in a fraud on this Court since the inception of this

case, the crime-fraud exception to privilege applies, and the Co-Conspirators should be ordered

to produce all communications amongst themselves and their counsel that have been withheld as

privileged to date. *See Madanes v. Madanes*, 199 F.R.D. 135, 148-49 (S.D.N.Y. 2001) ("the

attorney-client privilege does not protect communications in furtherance of an intentional tort

that undermines the adversary system itself."). As this Court has observed: "No protections are

afforded to any privileged communications or work product made in furtherance of a crime or

fraud." ECF No. at 720 n.72.

Because they were not produced, the Court should impose sanctions including: (a) an

award of all fees and costs incurred by all parties in connection with this entire bankruptcy

proceeding, which would have been avoided or dramatically shortened had the documents been

timely produced; and (b) an order directing that the Co-Conspirators produce all documents

withheld as privileged under the crime-fraud exception and an adverse inference that the

withheld documents would have confirmed the Sagi Parties' improper purposes; and (c) such

other relief as the Court deems just and proper, including evidentiary sanctions in connection with any further proceedings.

### IV.   The Rodriguez Emails Are Not "Informal Investor Updates" — They Reflect Real-Time, First-Hand Knowledge Supplied by Sagi and His Counsel

Dellaportas characterizes the Rodriguez emails as "informal updates written by Mr. Rodriguez to outside investors, offering his lay understanding of complex litigation matters, in the manner of a business pitch."  ECF No. 759 at 6.  This characterization is false, and the emails themselves refute it.

Rodriguez was not a distant third party offering imprecise lay impressions of litigation he observed from afar.  He was Sagi's longtime friend and business partner—a man who described the Orly Trust's trustee as "the mother of a very close friend of mine."  Ex. 3 at REIMSM_000488.  He received real-time, first-hand litigation intelligence directly from Sagi and Sagi's counsel, before actions were taken and before public filings.  The emails confirm this at every turn.

Rodriguez knew the precise amount of the first demand ($200,000), how much Sagi spent collecting it ($150,000 in legal fees), and the exact procedural posture of the resulting lawsuit— down to the pendency of Orly's Rule 60 motion and Circuit Court rulings.  Ex. 5 at REIMSM_007030.  He knew this because Sagi told him directly: "I finally connected with Sagi by phone," Rodriguez wrote to Kraft; Sagi was "going to go over pleadings in detail" with Rodriguez to prepare the investor update.  *Id*.  Rodriguez explicitly promised Kraft he would "get out a more detailed update on Tuesday or Wednesday" after meeting with Sagi in person in Mexico.  *Id.*  These are not the words of someone summarizing public filings.  They are the words of someone receiving direct operational briefings from the party directing the litigation.

The specificity of Rodriguez's knowledge extends far beyond what any outside observer could know.  He knew about the Surrogate's Court proceeding and the question of who would be appointed trustee.  He knew that the first $100,000 demand was a deliberate test—"to test the validity of that requirement," not because the money was actually needed.  Ex. 5 at REIMSM_007030.  He knew, two days after the Second Circuit affirmed the test-case judgment, that Orly had married Eric Herschmann the prior month—information he could only have received from Sagi.  Ex. 1 at REIMSM_007025.  And he received non-public communications from court chambers forwarded to him by Dellaportas himself.  Ex. 6 at REIMSM_007017.  Dellaportas's purported defense that Sagi is not copied on the newly produced documents is utterly irrelevant—he is referenced throughout them, including as, among other things, Rodriguez's source for virtually all the information necessary to the scheme and is the key beneficiary of the wrongful conduct. Further, since only a small amount of documents have been produced to date, there are no doubt more documents with Sagi copied and involved.

Dellaportas's principal purported defense is that what he calls Rodriguez's "central prediction"—a $20 million demand—"never materialized."  ECF No. 759 at 6.  This disingenuous assertion is false.  The $20 million demand—which was in fact "up to" $20 million (Ex. 8 at REIMSM_000842)—was the originally contemplated mechanism; it was never made as a single demand because Sagi and Rodriguez determined they did not need it.  The $6 million demand—thirty times the test case amount—was sufficient to force the bankruptcy.  Dalia then made a further demand for, collectively, even more than $20 million after Orly filed, exactly as the plan contemplated, to increase Sagi's claim in these proceedings.  The fact that the scheme was executed in two stages rather than one does not mean the central prediction never materialized.  It means it succeeded.

**V.    Rodriguez, Manhattan Safety Maine, and Recovery Effort Are Independently Subject to Sanctions**

Although Rodriguez, Manhattan Safety Maine, and Recovery Effort are not named as putative creditors in this bankruptcy, they are not beyond the reach of this Court's sanctioning authority.  Their exposure rests on two independent grounds.

First, Recovery Effort—an entity wholly by the Orly Trust, a creditor here, that Oldner set up even before he became trustee—and Manhattan Safety Maine and were served with subpoenas in this proceeding in June 2020 by the Chapter 7 trustee, calling for, among other things, all documents concerning the inter-creditor agreement, TPR's assignment of the D&K Note, and all communications between those entities and the Sagi Parties concerning the MSM action.  Those requests directly called for the very documents that Manhattan Safety Maine and Recovery Effort produced for the first time in the District Court action in February 2026.  Their failure to produce those documents in response to the 2020 subpoenas was a clear violation of their discovery obligations, sanctionable under Rule 37 of the Federal Rules of Civil Procedure and under this Court's inherent authority.  There is no excuse for the six-year gap between the subpoenas and the production.

Second, these parties and Rodriguez personally are subject to sanctions under this Court's inherent authority as a non-party participant in the fraud on this Court.  Non-parties may be sanctioned pursuant to the inherent power of this court where, as here, the non-parties act in bad faith, have a substantial interest in the litigation, and play a substantial role in the litigation. *In re Parikh*, 508 B.R. 572, 601 (Bankr. E.D.N.Y. 2014); *citing Amerisource Corp. v. Rx USA Int'l Inc.,* 02–CV–2514 (JMA), 2010 WL 2730748 at *5–6 (E.D.N.Y. July 6, 2010) (sanctioning non-party majority shareholder of entity involved in litigation), *aff'd sub nom New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 F. App'x 25 (2d Cir. 2011) ("Sanctions for

38

fraud are warranted if it is established by clear and convincing evidence that Defendant has

sentiently set in motion some unconscionable scheme calculated to interfere with the judicial

system's ability impartially to adjudicate the action.'").

The non-parties here are not peripheral participants. In close coordination with Sagi,

Rodriguez authored the documents that prove the scheme. He directed Manhattan Safety Maine

and, with Oldner, Recovery Effort—the entities that withheld those documents from this Court

for six years. He signed the Inter-Creditor Agreement that is central to the fraud. He

communicated in real time with Sagi and Dellaportas about proceedings before this Court,

relaying non-public information from chambers to his investors. And his entities were active

litigants in the District Court proceedings that were directly stayed by and related to this

bankruptcy. A non-party who helps orchestrate a fraud on the court cannot escape the court's

inherent power to remedy it.

The foregoing is not the full extent of the Sagi Parties' fraud on this Court. The newly

produced documents—such as the Nuclear Option emails, the June 2019 Memo— and the Inter-

Creditor Agreement establish that the Co-Conspirators manufactured the bankruptcy and then

lied about it for five years. In addition, sworn testimony and corroborating evidence now

establish that Sagi Genger, David Parnes, and John Dellaportas also submitted forged documents

and false representations directly to this Court in the course of these proceedings as part of their

nuclear option. Fabricating a business card, manipulating a photograph for a fake affiliation with

a website, and submitting false or misleading metadata to this Court are not merely improper—

they are precisely the kind of corrupt conduct that *Hazel-Atlas* condemns, and they demand

sanctions commensurate with the gravity of what was done. A limited evidentiary hearing is

warranted to resolve these issues fully, after which the Court should impose the most severe

39

sanctions available and refer the matter to the Department of Justice for investigation and potential criminal prosecution.

### VI. Sagi's Fabricated Evidence Concerning the Herschmann Report

#### A. The Fabricated Business Card and Website

Parnes and Dellaportas submitted to this Court a business card to support their contention that Altshuler was affiliated with Parnes & Co and used a Parnes.co email address during 2015 to 2021 and only stopped her affiliation with Parnes & Co when she was sued in Israel. ECF No. 720 at 37; ECF No. 575-1. Parnes also swore that Altshuler "used the business card" in meetings with clients. Ex. 21 at 217:4-18.

Altshuler testified under oath on December 8, 2025 that every aspect of this is false. She swore that: she never worked at Parnes & Co; she had never seen the business card before her testimony; she was never affiliated with the addresses or telephone numbers listed on it; she never used or saw the Parnes.co email address attributed to her on the card; and she has used only one email address throughout her entire career – janealthsuleradv@gmail.com. *Id.* at 15:6-17, 123:21-29, 126:1-29, 127:16-31, 128:6-8, 138:17-23. She further testified that she only works from her home, and she listed each of her home addresses. *Id.* at 239:25-28, 123:21-32.

This testimony is independently corroborated. On April 14, 2026, the New York State Office of Court Administration confirmed upon counsel's inquiry that Altshuler's registration has always reflected only her Gmail address and her Israeli cellular number—neither of which appears on the business card. She has never had a New York telephone number. She updated her address each time she moved, as she testified. Ex. 22. The telephone numbers on the business card are affiliated only with David Parnes. If Altshuler had been using the card, as Parnes swore, she plainly would have known of its existence and—consistent with her established practice— would have updated her OCA registration to reflect the contact information on it. She never did.

40

Altshuler also testified that the Parnes & Co website containing her biography was fabricated, and that her social media photograph had been digitally manipulated—specifically, that the color of her dress was changed from black to blue, and that she does not own a blue dress. She testified that she had never seen the website before her court appearance in December 2025—notwithstanding and casting serious doubt on Parnes's contention that she had been affiliated with Parnes & Co for more than six years. Ex. 21 at 134:30-136:20. The fabrication of both a business card and a manipulated website biography as evidence of Altshuler's affiliation with Parnes & Co is not an isolated mistake or a disputed fact. It is part of the broader pattern of deception that these proceedings have revealed—the same pattern of manufacturing evidence and misrepresenting facts to this Court that the Nuclear Option documents expose. If no business card exists that Altshuler ever used or saw, and if Parnes fabricated a card for Dellaportas to submit to this Court to mislead it and the parties, such conduct is criminal. Consistent with Altshuler's testimony, the Parnes & Co Israeli registry does not reflect her affiliation at all. Ex. 29.

### B. Altshuler's Testimony Is Corroborated and Unrebutted; Parnes's Testimony Refutes Itself

Altshuler's testimony does not stand alone. Following her December 8, 2025 appearance, Altshuler again confirmed in writing that the information submitted to this Court was forged. *See* ECF No. 767. As shown in section A above, the OCA records confirm the accuracy of her testimony about her contact information—information she has consistently and diligently maintained. If discovery of her computers and email records confirms, as she swears, that she never used a Parnes.co email address, the conclusion will be inescapable: Sagi and his counsel submitted fabricated evidence to this Court, and did so deliberately.

41

Sagi's response to all of this is telling.  He does not challenge the substance of Altshuler's testimony.  He does not produce a single document—no retainer agreement, no engagement letter, no correspondence, no letterhead, office space records with her name on it, no time records, no financial transaction—reflecting the professional relationship with Altshuler that Parnes swore existed for more than five years.  He does not explain why, if Altshuler worked as "a lawyer with me" in the same office for five-plus years, she would have no OCA registration reflecting that affiliation, no record of any kind consistent with that relationship.  Instead, Sagi simply asserts, on his own say-so, that she is not credible.  That is not a rebuttal.  It is an accusation without support, directed at a witness whose account has already been corroborated by independent government records.  Moreover, as officers of this Court, counsel for Orly have an independent ethical obligation to bring credible evidence of fraud on the court to the Court's attention.  *See* 22 NYCRR 1200 at Rule 3.3(b) ("a lawyer who represents a client before a tribunal and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal."); *see also id.* at Rule 1.2(d) ("a lawyer shall not … assist a client[] in conduct that the lawyer knows is illegal or fraudulent.")

Parnes's own sworn testimony, far from rebutting Altshuler, makes matters considerably worse.  Its systematic self-contradiction puts into serious doubt every representation made to this Court about Altshuler's supposed affiliation with Parnes & Co. Parnes swore that Altshuler "used the business card" in meetings with clients. Ex. 21 at 217:4-16.  But Parnes had previously sworn that Altshuler does not even know the identity of his clients.  ECF No. 582-2 at 2.  These two statements cannot both be true.  If Altshuler was meeting clients using a Parnes & Co business card, she necessarily knew who those clients were.  If she did not know his clients,

42

she was not meeting with them and handing them his firm's card. Parnes has offered no explanation for this irreconcilable inconsistency—because none exists.

On Parnes's own account, he and Altshuler worked together as colleagues—"she is a lawyer with me"—in the same office for more than five years. Ex. 21 at 217:4-21. If that is true, Altshuler's categorical denial under oath of any professional relationship with Parnes & Co is simply inexplicable. She did not say she barely remembered the relationship, or that it ended badly, or that she disputes some of the details. She swore she never worked there, never saw the business card, never used the email address, never saw the website and never shared an office with him or was at all affiliated with the address listed on *her own* business card—that the entire relationship Parnes describes does not exist. Parnes does not and apparently cannot explain why she would say this. The far simpler explanation, consistent with Altshuler's testimony, her OCA records, and the complete absence of any corroborating documentation, is that the relationship he describes did not exist and was simply fabricated to mislead this Court.

Parnes's testimony about the Parnes.co email address is equally self-defeating. When asked whether Altshuler had a Parnes.co mailbox, Parnes—who controls the domain—admitted under oath: "I don't know about [Altshuler' Parnes.co] mailbox." Ex. 21 at 218:30-32. That admission alone is disqualifying.

Parnes then proceeded to explain how the email routing system he controls works, and in doing so described exactly how the metadata submitted to this Court could have been generated without Altshuler ever possessing or using a Parnes.co address. His testimony on this point can only be described as gobbledygook—rambling, internally contradictory, and ultimately refuting the very position he was attempting to support. He testified:

> In Gmail there's a possibility that you have a sort of alias like that as if it is, sort
> of enters one box and another box. So for example in my Gmail I can have

43

> something with something else, and it's not a [email] box of its own…. I have an
> [email] address from the university where I studied. There is no such address.
> There is no such box. There is an address and it reaches my Gmail, it's the
> Gmail. But when I send from my Gmail there will appear the address of, of the
> university.

*Id.* at 221:6-9, 221:19-23.

When asked specifically about the address purportedly belonging to Altshuler, he

testified: "Jane's address, but it could be and this is what it seems to me, that it's the Altshuler

Gmail. Like how I receive … to the Gmail … with another address." Ex. 21 at 223:27-30. He

confirmed: He confirmed: "I have one [Parnes.co] box"—his own—and "the [Parnes.co] domain

is mine." *Id.* at 222:5-8, 218:30-32. He further acknowledged that when he sends email, "it goes

out with the university address. The general public does not know that it's not from my Gmail."

*Id.* at 223:1-7.

In a single extended answer, Parnes has explained: (1) he controls the domain; (2) he

controls a Gmail account from which email can be sent displaying any address he chooses; (3) an

alias address requires no independent mailbox—it routes to an existing Gmail account; (4)

recipients of email sent through this system cannot tell that the address is not a genuine

independent account; and (5) he cannot confirm that Altshuler ever had her own Parnes.co

mailbox for a domain that the admits he controls. This describes how 1,587 emails could be

attributed to a Parnes.co address associated with Altshuler without Altshuler ever having seen or

used that address. Altshuler has sworn that the metadata is based on false and misleading

information. Parnes has explained, in his own words, the way it could have been generated.

Finally, Parnes's account of Altshuler's role in obtaining the Herschmann Report is

equally irreconcilable with what Dellaportas represented to this Court. Altshuler has sworn that

her entire involvement in obtaining the report was not as co-counsel at all, but as a personal favor

to a friend—Parnes—who was overseas at the time. *Id.* at 113:4-6, 115:12-16, 116:3-4, 119:17-

25, 123:21-29.  Parnes has also admitted that any work product privilege assertion over the report is "not mine" to assert. *Id.* at 227:22-29.  Parnes's testimony is not ambiguity or honest confusion.  It is a failure to support—and in many respects a contradiction of—every representation Parnes and Dellaportas made to this Court about Altshuler, the business card, the email address, the metadata, and the Herschmann Report.  Parnes and Dellaportas convinced this Court not to order production of the Herschmann Report because it was Parnes's firm's work product and Altshuler was affiliated with his firm. Althsuler has eviscerated that claim.  So now, Parnes swears that the Herschmann Report does not exist and he never had it.  Based on his past willingness to commit perjury before two courts, as described below, this is not surprising.  In the recent trial, Parnes, Altshuler and Matityahu did not dispute the testimony, which was therefore deemed admitted, of the Head of the Ministry of the Interior, Population and Immigration Authority and the Head of the Israeli Cyber and Information and Security Division that obtaining the banking and travel records of Herschmann was illegal absent a court order. *See* ECF No. 557-2 at 12.   This position was confirmed by the Israeli Court in the proceeding related to Orly.  *See id.* at 19.  This is not the first time Dellaportas has presented fabricated or false evidence to a court on Sagi's behalf. On two separate occasions, federal and state court judges have found that Sagi and Parnes—Sagi's longtime counsel and Dellaportas's longtime co-counsel—fabricated evidence and provided knowingly false testimony in Genger-related litigations.  On each occasion, Dellaportas was the attorney who presented the fabricated and backdated evidence to the court.

In *Sagi Genger v. Sharon*, 910 F. Supp. 2d 656 (S.D.N.Y. 2012), Judge Scheindlin, after hearing testimony from Sagi and Parnes, ruled against Sagi amid what she described as "a maze of backdated, incomplete and contradictory documents, and even more dubious testimony."  *Id*.

45

at 657.  She found that "at best, only one of five witnesses—the accountant—could possibly be deemed credible," expressly excluding both Sagi and Parnes from that category.  *Id*. at 667.

In *Genger v. Genger*, No. 100697/2008, 2016 WL 551444 (N.Y. Sup. Ct. Feb. 10, 2016), *aff'd in relevant part*, 144 A.D.3d 581 (1st Dep't 2016), Justice Jaffe found in the Canada Fraud Action trial that Dellaportas put forward false documents and testimony on Sagi's behalf. The court found that Sagi "had the greater motivation to effect the transaction, and his frequent backdating or non-dating of documents for his or Parnes's benefit shows that he had no trouble creating false documents."  *Id*. at *5.  The court further found that Sagi's claim that he did not recognize Parnes's handwriting on the documents underlying the fraudulent transaction was "incredible," and that "[t]his prevarication, as well as defendant's evasiveness and equivocation about the transaction, warrant doubt as to defendant's general credibility."  *Id*. at *7.  As for Parnes, the court held that his "unquestioning participation in much of defendant's financial maneuvering reflects poorly on his credibility, thereby warranting the rejection of his testimony."  *Id*. at *8.  The court further noted that "[g]iven [Sagi and Parnes'] proclivity to execute undated and backdated documents," their testimony could not be credited.  *Id*.

Those findings by two independent judges—one federal, one state—establish that the conduct described in this section is not an aberration.  It is a pattern.  Dellaportas brought that pattern into this Court.

### C. Dellaportas's Credibility Attack Does Not Address the Substance of Altshuler's Testimony

Dellaportas devotes the opening pages of his letter to this Court to describing Altshuler's behavior during the Israeli proceedings—her PTSD, her father's death, her service in Gaza, and her exchanges with the Israeli judge.  ECF No. 759 at 2-4.  This is a credibility attack, not a substantive rebuttal.

Not one word of Dellaportas's letter addresses the OCA records.  Not one word explains why the telephone numbers on the business card belong only to David Parnes.  Not one word explains why, if Altshuler used the business card for years and met clients with it, she never once updated her OCA registration to reflect any contact information consistent with it.  Not one word engages with Parnes's own admission that he does not know whether Altshuler ever had a Parnes.co mailbox, or with his testimony describing the alias routing mechanism that explains how the metadata could have been generated without Altshuler's knowledge or participation.

Dellaportas describes the 1,587 emails and the metadata as "verifiable electronic evidence" that "debunks" Altshuler's testimony.  ECF No. 759 at 1.  But Parnes himself—the person who controls the domain—has explained under oath the technical mechanism by which email attributed to a Parnes.co address could be routed through an existing Gmail account, with no independent mailbox required.  The metadata that Dellaportas calls "verifiable" was generated by a system whose own operator cannot confirm, under oath, that Altshuler ever possessed an account on it—as Parnes himself admitted.

Altshuler's testimony is, moreover, corroborated by sources entirely independent of her credibility.  The OCA records confirm her account.  Her post-testimony written confirmation independently affirms it.  And her offer to submit her computers for forensic examination—to demonstrate that she never used a Parnes.co email address—remains outstanding.  Dellaportas does not mention that offer.  If the electronic evidence is as dispositive as he claims, the answer is simple: accept Altshuler's offer, let a forensic expert examine the computers for Parnes and Altshuler, and let the results speak.  The Co-Conspirators' failure to pursue that resolution, and their choice instead to attack her mental health and personal circumstances, speaks for itself.

47

**D.  The Illegally Obtained Herschmann Records Constitute Independent Sanctionable Conduct**

The fabricated business card and manipulated website are not the only improperly obtained materials submitted to this Court.  The Herschmann Report itself—the document at the center of the irreconcilable testimony between Parnes and Dellaportas—was generated using Eric Herschmann's private financial and travel records that also were illegally obtained from the Israeli government's database.

This Court has already addressed this.  At ECF No. 720 at 91-92, this Court noted the uncontested testimony of the Head of the Israeli Government Cyber and Information Security Division, Population and Immigration Authority, that only authorized employees with required responsibilities can access the Israeli government database to obtain the dates a person entered and exited Israel and their banking information.  Neither a lawyer nor a private investigator—licensed or otherwise—can gain access to that information without a court order.  There is no legal means by which the information about Herschmann contained in the Herschmann Report could have been obtained.  It was stolen.

Dellaportas has previously argued that there was no proof that the Herschmann Report similar to the Orly Report contained stolen information, Now, that Parnes, Altshuler, and their investigator accept that the information could not be obtained legally, that issue has been fully resolved.  The investigator obtained Herschmann's private government-controlled records without authorization, incorporated them into the Herschmann Report, and that report was then transmitted to Dellaportas and submitted in proceedings before this Court.

The submission to this Court of evidence obtained through the illegal acquisition of private records from a government database is independently sanctionable conduct, separate and apart from the fabricated business card and manipulated photograph.  It warrants referral to the

48

Department of Justice regardless of the outcome of the evidentiary hearing on the other fabrication issues.  This conduct should be included within the scope of the evidentiary hearing and any DOJ referral.

### E.  The Herschmann Report: Irreconcilable Testimony

The sworn testimony regarding the Herschmann Report presents an equally serious problem.  Dellaportas represented to this Court that he received the Herschmann Report directly from Parnes.  ECF No. 720 at 18, 40-41, 56, 92.  Parnes has now sworn, at pages 229-230 of his cross-examination transcript, that he never received the Herschmann Report and has no knowledge of how it reached the United States. Ex. 21 at 229:19-20, 230:8-11; 245:3-19.  Parnes has also testified that he "assumes" that Sasi —the private investigator—sent the report directly to Sagi.  .  *Id.* at 231:15-16.  But Sasi has testified that he was never in contact with Sagi, and Altshuler has testified to the same. *Id.* at 121:19 to 123:17, 165:14-19, 171:11-27, 172:14-17.

Parnes and Dellaportas cannot both be telling the truth. Either Dellaportas's representation to this Court—that he received the Herschmann Report directly from Parnes—is false, or Parnes's sworn testimony that he never had the report is false. Both men are attorneys who represent Sagi. And their directly contradictory accounts both go to matters on which this Court has previously relied. ECF No. 720 at 18, 40-41, 56, 91-92.  Either way, one officer of the court has lied—either to this Court in submissions, or under oath in Israel. The irreconcilable Herschmann Report testimony is further evidence that a pattern of deception jas pervaded these proceedings and that a hearing is required.

After this Court issued its decision relying on Parnes' representation that the Herschmann Report was Parnes' work product, Parnes swore under oath in the proceeding in Israel that any work product privilege assertion over the Herschmann Report is "not mine"—i.*e.*, he is not

49

asserting it.  Ex. 21 at 227:22-29.  That concession removes any remaining basis for withholding documents or information relating to the report's provenance and transmission.

### F.  Relief Sought

Based on the foregoing, Orly respectfully requests that the Court order a limited evidentiary hearing at which Parnes, Dellaportas, Altshuler, and Sasi are required to testify, and at which the following must be addressed: (a) the provenance and authenticity of the business card submitted to this Court; (b) the provenance and authenticity of the Parnes & Co website and the manipulated photograph of Altshuler; (c) the provenance and integrity of the metadata purportedly showing 1,587 emails from the Parnes.co address; and (d) the chain of custody of the Herschmann Report and the accuracy of Dellaportas's representations to this Court regarding how it was obtained.  The Court should further order Parnes to produce immediately: the original business card submitted to this Court; proof of purchase of business cards for Altshuler; any written correspondence in which Altshuler agreed to be affiliated with Parnes & Co. or to use a Parnes.co email address; and any evidence of financial transactions between Parnes and Altshuler reflecting a professional relationship.  Upon completion of the hearing, the Court should impose sanctions commensurate with its findings and refer the matter to the Department of Justice and, as appropriate, to the disciplinary authorities of the New York Appellate Division. Taken together, the Nuclear Option conduct and the Altshuler evidence present a unified picture: a coordinated, multi-year effort by the Co-Conspirators to corrupt this Court's proceedings at every level—from engineering the bankruptcy itself, to lying about why it was filed, to fabricating the evidence submitted within it.

**CONCLUSION**

For the foregoing reasons, the Court should (1) award Orly all costs and fees incurred in connection with this entire bankruptcy proceeding; (2) disallow under 11 U.S.C. § 502(b) or equitably subordinate under 11 U.S.C. § 510(c) the proofs of claim filed by the Sagi Parties; (3) dismiss with prejudice the objections to discharge in Adversary Proceeding Nos. 19-ap-1444, 19-ap-1445, and 19-ap-1447; (4) issue a criminal referral pursuant to N.Y. Judiciary Law § 487 and 18 U.S.C. §§ 152 and 157 concerning the misconduct of the Co-Conspirators and their attorneys, and refer the matter to the Disciplinary Committee of the New York Appellate Division; (5) sanction Robin Rodriguez, Manhattan Safety Maine, Inc., and Recovery Effort Inc. for their failure to comply with the 2020 subpoenas served in this proceeding and for Rodriguez's participation in the fraud on this Court, including by awarding fees and costs and imposing such further relief as the Court deems appropriate; (6) order under the crime-fraud exception the Co-Conspirators to produce documents withheld as privileged or work product; (7) order a limited evidentiary hearing concerning the fabricated business card, manipulated photograph, false email metadata, and contradictory sworn testimony of Parnes and Dellaportas regarding the Herschmann Report, as described in Argument V; and (8) award Orly such other and further relief as the Court deems just and proper.

Dated: New York, New York
     April 21, 2026

Respectfully submitted,

HERSCHMANN BENSON BOWEN LLP


By: */s/ Michael Paul Bowen*
Michael Paul Bowen
305 Broadway, 7th Floor
New York, New York 10007
(212) 226-4226

52